IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CINDY L. BALAS a/k/a CINDY L. | : | |
| ADKINS, Executrix of the Estate | : | |
| of CORPORAL JOHN J. BALAS, | : | |
| | : | |
| Plaintiff, | : | C.A.No. |
| | : | |
| v. | : | |
| | : | |
| STANLEY W. TAYLOR, JR., | : | |
| individually and in his official | : | |
| capacity as the Commissioner of | : | Jury Trial Demanded |
| Correction; ALAN MACHTINGER, | : | |
| individually and in his official | : | |
| capacity as the Director of Human | : | |
| Resources of the Department of | : | |
| Correction; MICHAEL DELOY, | : | |
| individually and in his official | : | |
| capacity as Deputy Warden of Sussex | : | |
| Correctional Institution; CAPTAIN | : | |
| DAVID WILKINSON, individually; | : | |
| LIEUTENANT TRUMAN MEARS, | : | |
| individually; and DEPARTMENT OF | : | |
| CORRECTION OF THE STATE OF | : | |
| DELAWARE, | : | |
| | : | |
| Defendants. | : | |

**COMPLAINT**

1.  This is a civil survival action for compensatory and
punitive damages and for injunctive relief brought by the Estate
of a deceased Correctional Officer whose death was proximately
caused by a Department wide policy of retaliation against
Correctional Officers who refused to engage in anti-Union
activity or become strike breakers, in violation of the
decedent's rights to free speech, association, assembly and

petition under the First and Fourteenth Amendments of the U.S. Constitution.  As a citizen the decedent engaged in protected conduct under the First Amendment, by speaking out on matters of public concern, actively associating with his Union and refusing to become a strike breaker in a job action by over 1,187 Union members who also were petitioning government for the redress of grievances and engaging in collective bargaining.  The defendants then retaliated against him in such a severe fashion that as a direct and proximate result the decedent committed suicide on February 19, 2005 as a result of their continued retaliation.

## I.  JURISDICTION

2.  The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) and (4), 28 U.S.C. §§ 2201 and 2202, and the First and Fourteenth Amendments to the U.S. Constitution.  The cause of action arises under 42 U.S.C. § 1983. The claim arose in this judicial district.

## II.  THE PARTIES

3.  Plaintiff is the widow of Corporal John J. Balas, a citizen of the United States and a resident of Sussex County, Delaware.  She is the executrix of the Estate of John J. Balas, appointed under his Last Will and Testament dated June 15, 1994, and brings this survival action on behalf of the Estate.

4.  Corporal John J. Balas was a long term 11 year employee of the Department of Correction who at the time of his death on

February 19, 2005 held the rank of Corporal at the Sussex
Correctional Institution.  Cpl. Balas had a distinguished career
and was a capable and courageous employee. He also was an active
member of the Correctional Officers Association of Delaware
("COAD"), the collective bargaining agent for approximately 1,187
employees of the Department of Correction ("Department").

5.   Prior to being hired by the Department of Correction, he
served in the United States Navy from 1986 to 1989 and
subsequently he was a member of the Naval Reserves until 1999.
He also served for three years in the Army National Guard of
Delaware.

6.   Stanley W. Taylor, Jr., at all times relevant hereto,
was the Commissioner of Correction of the State of Delaware. He
is sued in his individual and official capacity.  Defendant
Taylor ratified, sanctioned, authorized, approved or participated
in the actions challenged in this case.  He was aware of the
decedent's protected conduct described below and it antagonized
him.

7.   Alan Machtinger, at all times relevant hereto, was the
Director of Human Resources and Development of the Department. He
is sued in his individual and official capacity.  Defendant
Machtinger ratified, sanctioned, authorized, approved or
participated in the actions challenged in this case.  He was
aware of the decedent's protected conduct described below and it

-3-

antagonized him.

8.  Michael Deloy, at all times relevant hereto, was the Deputy Warden of the Sussex Correctional Institution.  He is sued in his individual and official capacity.  Defendant Deloy ratified, sanctioned, authorized, approved or participated in the actions challenged in this case.  He was aware of the decedent's protected conduct described below and it antagonized him.

9.  Captain David Wilkinson, at all times relevant hereto, was the superior officer in the chain of command over the decedent.  He is sued in his individual capacity.  Defendant Wilkinson ratified, sanctioned, authorized, approved or participated in the actions challenged in this case.  He was aware of the decedent's protected conduct described below and it antagonized him.

10.  Lieutenant Truman Mears, at all times relevant hereto, was the superior officer for the decedent. He is sued in his individual capacity.  Defendant Mears participated in the actions challenged in this case.  He was aware of the decedent's protected conduct described below and it antagonized him.

11.  Defendant Department of Correction of the State of Delaware (the "Department") is an agency of the State of Delaware, which is only joined in this action for purposes of collecting attorneys' fees and costs.

-4-

### III.  FACTS GIVING RISE TO THE ACTION

### A.  The Context of Protected Speech and Other Activity

12.  After several years of ineffective Union representation, on June 1, 2002, COAD was certified as the exclusive bargaining representative for all correctional officers up to and including Sergeants and also for other positions which require basic correctional officer training plus a primary skill.

13.  The decedent became an active member of COAD in June of 2002.

14.  Throughout 2003 and 2004, COAD began an aggressive campaign of informing the media, elected officials and the general public about various matters of public concern.  COAD also engaged in continuing contract negotiations directly with defendant Machtinger who has never missed a contract negotiating session.

15.  On behalf of the decedent and other Union members, in 2003 and 2004 COAD engaged in protected conduct in the following areas.

16.  First, in the media and before the General Assembly, COAD advocated solutions for the chronic problem of understaffing found throughout the correctional system of Delaware.

17.  For example, understaffing created security concerns among officers who as a result were being forced to work overtime.  This forced overtime, aka "freezing," resulted in many

officers working 16 hour shifts because the Department was unable to find voluntary replacements. Officers were often forced to work these unexpected overtime shifts instead of being home with their families, making divorces a common occurrence among correctional officers. As a result, morale among the officers sank and officers were quitting faster than new ones could be trained.

18. Second, in the media and before the General Assembly, COAD also advocated wage increases to help recruit and retain trained correctional officers.

19. For example, when COAD's lobbying began, the starting salary was under $27,000 - less than both what Maryland and New Jersey paid. Delaware correctional officers also often remained at their starting salary grade until retirement, to their great economic detriment.

20. Third, in the media and before the General Assembly COAD also exposed security lapses caused by understaffing which led to hazardous conditions within the central and largest prison in the State.

21. For example, in 2004, the danger to the public became real as four separate incidents involving security lapses put the public at risk. One inmate slit his own throat during a trial, another managed to get out of shackles with a paper clip and remained at large for three weeks, one walked away from a work release facility, and one inmate cut another inmate.

Additionally, incidents of attacks on officers within the facilities were increasing.

22.  Then on July 12, 2004, a female counselor was taken hostage for hours at the Sussex Correctional Institution which housed 2,400 inmates. She was raped, and almost murdered before a Corrections Emergency Response Team ("CERT") officer was able to reach them from the ceiling and shoot the inmate.  The next day, the news media ran stories quoting COAD officials criticizing the Administration for not heeding their warnings about security.

23.  As a consequence of COAD's efforts in trying to make the public aware of the difficulties correctional officers were facing, the media began to run headlines and stories disclosing the problems within the correctional system.

24.  Despite these efforts, the officer members of COAD grew increasingly upset as they saw no relief in sight, in spite of the barrage of publicity.  They were continuously faced with an Administration which did nothing to help the problems with understaffing and freezing, low wages and security lapses.

25.  As tempers mounted, officers at the Sussex Correctional Institution spontaneously demanded an acceptable response to their complaints.  Despite being promised an increase in hazardous duty pay and small raises by the General Assembly, correctional officers in the Court and Transportation Unit

organized a job action and refused to work the voluntary overtime that was critical to their assignment.

26.  As a result of this job action, on July 26, 2004 defendant Taylor was embarrassed to learn that many of his court and transportation officers were not delivering prisoners for trial.  Judges and prosecutors grew increasingly concerned as prisoners were missing deadlines for arraignments and trials were postponed.

27.  Defendant Taylor tried to end the job action by meeting with Union leaders to discuss implementing salary adjustments already authorized by the Legislature, but which had been delayed.  Instead, Union leaders decided to endorse the spontaneous correctional officers' job action.

28.  The effect of all this Union action and the public media outcry regarding all these issues antagonized defendant Taylor, his administration, and all the other defendants.

29.  Additionally, the Governor became more concerned about her chances for re-election in November 2004 and she issued statements trying to defuse the situation.  But her remarks were seen by the Union and the public as inflammatory.

30.  As the job action grew more successful, the Governor filed a lawsuit in Chancery Court and sought a Temporary Restraining Order ("TRO") naming COAD leaders as defendants.  The TRO was denied the next day.

31.   On August 6, 2004, the same day as the TRO hearing, defendant Taylor activated the CERT Team members to work as court and transportation officers to fill the void of correctional officers who refused to work voluntary overtime.  Because he had ordered this remedy to the job action by his employees, he was kept fully informed by his subordinates of the decedent's refusal, and that of other CERT Team members, to be strike breakers, contrary to his orders.  Their opposition to his orders antagonized him.

32.   Cpl. John J. Balas was a CERT Team member who was ordered by defendant Taylor to help break this job action by his co-workers and Union members.

**B.   THE FORM AND CONTENT OF SPEECH AND PROTECTED ACTIVITY**

33.   In the midst of the job action in August of 2004, decedent and many other correctional officers who served on the elite CERT Team were asked to abandon their normal job duties, in effect cross the picket line, and work voluntary overtime as court and transportation officers.  They were asked to become strike breakers.

34.   However, when the ten CERT Team members reported for duty to serve as court and transportation officers, they were ridiculed by their fellow co-workers who blurted profanities at them and turned their backs to them because they were crossing the picket lines.

35.   The decedent, as well as the other nine CERT team members, then decided at the end of their shift to make a statement in support: of the job action; of COAD their Union; of the many issues, like forced overtime and freezing, low wages and security lapses, which Union members were advancing through proper channels both within the prison system, in the media, with the general public, and with legislators.

36.   At the end of their shift as court and transportation officers, decedent and the nine other CERT members tendered their resignation directly to the Warden and handed in their equipment. By this action they engaged in symbolic speech in opposition to defendant Taylor's orders to break the job action by his employees.

37.   The decedent and the other CERT Team members also actually spoke out and refused to be strike breakers and in effect cross the picket line.  Each of them spoke out and conveyed the message that they supported the job action, opposed forced overtime and freezing, low wages and security lapses. This message was communicated up the chain of command to each individual defendant and they were antagonized by it.

38.   As stated, defendant Taylor was fully informed by his subordinates, including defendant Machtinger, of the decedent's resignation from the CERT Team, his symbolic and actual speech, and all of this antagonized him.

39.  On August 7, 2004, the Delaware State News also ran an article discussing the problems surrounding the overtime issues in the Department of Correction and specifically mentioned that ten CERT Team members handed in their equipment and resigned their positions on the team after being forced to cross the picket line and work voluntary overtime as court and transportation officers.  All the defendants read this news story.

### C.  THE DECEDENT ACTED AS A PRIVATE CITIZEN

40.  All of the decedent's speech and other protected activity was taken in his capacity as a private citizen commenting on matters of public concern.

41.  Nothing he said or did was pursuant to his ordinary and regular job duties.

42.  Decedent served as a Corporal in the Property/Receiving Room.  His essential job duties included processing prisoners and transfers, logging each prisoner's personal belongings upon arrival to the prison, issuing prison attire and collecting the prisoners' paperwork.

43.  In addition, decedent also served as a CERT Team member.  CERT is an elite group of chosen correctional officers who serve on the CERT unit in addition to their normal duties as correctional officers.  CERT officers compete for promotion to the CERT team by passing rigorous physical and mental tests.  The

CERT unit ensures public safety, as well as, the safety of department staff and offenders. CERT develops and implements security programs for institutions based on the individual needs as well as trains and develops selected groups of staff to perform advanced, high-risk, or community operations. CERT acts as technical advisors to Wardens and provides tactical responses during emergency situations. CERT also assists with escapee and erroneous release operations.

44.  In August, the ten CERT members were asked to fill in for the court and transportation officers who usually would be forced to work overtime to accommodate the prisoners' court schedules.  These court and transportation officers were responsible for the transportation of DOC offenders to their court appearances and for the transfer of offenders from one facility to another.

45.  None of the three aforementioned jobs required decedent to speak out in support of union activity.

46.  When decedent spoke up in support of his Union's activity, decedent was speaking as a union member and private citizen and <u>not</u> as a correctional officer, CERT member or temporary court and transportation officer.

47.  All of the decedent's protected speech and activity was taken in his capacity as a private citizen reflecting matters of public concern.  He knew the dangerous conditions under which

correctional officers worked threatened their own safety, the
safety of inmates and the public.  Upon realizing that the Union
members' job action could improve those conditions, he elected to
side with his fellow union members.

### D.  THE POLICY, PRACTICE AND CUSTOM OF RETALIATION

48.  Defendants Taylor, Machtinger and Deloy have an
official policy, practice or custom of harassing and retaliating
against any COAD Union member who speaks out on or acts to
advance issues of concern to the Union membership, such as
opposition to understaffing, forced overtime, low pay, security
lapses, or other issues facing the workforce.

49.  They have communicated this policy to their managers
throughout the Department.

50.  Defendant Machtinger is in a position to implement this
policy through the Human Resources Division which controls, among
other things, the terms, conditions and privileges of employment,
promotions, assignments, transfers, shifts and days off.

51.  Machtinger is viewed as the enforcer for Commissioner
Taylor and managers throughout the Department are aware of his
and Taylor's anti-union animus.  In the past, officers have been
warned to avoid union activity if they want to advance in the
Department.  See Del. Correction Officers Ass'n. v. State of DE,
Dept. of Correction, et al., 2003 WL 23021927 (Del.Ch. Dec. 18,
2003).

52.   Defendants Wilkinson and Mears were aware of the policy, practice or custom of harassing and retaliating against COAD members and took steps to implement it with reference to the speech and other protected activity of the decedent.

53.   Defendants Wilkinson and Mears then retaliated against and harassed the decedent.

54.   Defendants Deloy, Machtinger and Taylor were aware of that retaliation and harassment and sanctioned, authorized, approved or participated in the retaliation and harassment.

### E.   ADVERSE ACTION AGAINST THE DECEDENT

55.   After the decedent resigned from the CERT Team, he feared immediate retaliation by Mears, who still served as his direct supervisor.  Decedent asked Capt. Wilkinson and Deputy Warden Deloy for a transfer to a different supervisor.  But they refused, despite the fact that they each knew of the symbolic and actual speech of the decedent in opposition to defendant Taylor's orders and that this would cause defendant Mears to be antagonistic to the decedent.

56.   At all times, defendant Mears was aware of the reasons the ten CERT team members resigned.  He had even participated in a CERT team meeting to discuss their possible resignation.

57.   In fact, Mears was one of the CERT Team members.

58.  Mears was the only active CERT member (not on vacation or on active duty) who refused to stand by his fellow CERT team members and resign in August of 2004.

59.  The month after the decedent resigned from the CERT team, the retaliation by Mears began.  It included, but was not limited to, the following.

60.  First, on September 26, 2004, Mears approached decedent with his 2004 annual performance evaluation and asked him to review and sign it.  The decedent learned that for the first time in his career he had received a mediocre performance evaluation, rating him only at "Meets Expectations."

61.  Prior to his resigning from the CERT team, the decedent had consistently received rankings of "Exceeds Expectations."

62.  In previous evaluations Mears had recognized the decedent's perfect attendance records and also had mentioned his CERT membership, as areas where his performance was distinguished or exceeded expectations and ranked him as "Exceeds Expectations."

63.  However, in the September 26, 2004 evaluation, Mears refused to recognize decedent's commendations for his perfect attendance record for four consecutive years and his CERT membership for the majority of the year.

64.  Mears also refused to mention or consider decedent's commendation for his instrumental part in the recertification of

the Quick Response Team ("QRT") training during February and March of 2004.

65.  The decedent believed that Mears was evaluating him with personal bias as opposed to professional objectivity.  He then stated that he would sign the evaluation at a later date.

66.  When the decedent requested a copy of the evaluation, Mears refused and upon further questioning stated that decedent's commendations were not enough to warrant a ranking of "Exceeds Expectations" and they did not need to be on the evaluation as they had been previously.

67.  Since the decedent had dreams of one day rising to the rank of a prison Warden, he reasonably feared that this mediocre performance evaluation and his supervisor's hostility would hinder his rising up the ranks.

68.  Further, under the State Merit Law, 29 <u>Del.C</u>. §5927, performance records are considered in determining salary increases, promotions, transfers, and other employment actions. So this bad evaluation would have a direct negative effect on the decedent's salary progression and other terms and conditions of employment.

69.  On October 4, 2004, the decedent then filed an Official Grievance with COAD through his shop steward disputing the performance evaluation and asked that the rating to be increased from "Meets Expectations" to "Exceeds Expectations."

70.   Later on January 9, 2005, Mears again began pressuring the decedent to sign the mediocre performance evaluation.  But the decedent stated he would not sign it until Capt. Wilkinson and a union representative were present to review the evaluation. This disgusted and frustrated Mears who was trying to bully him into signing the performance evaluation.

71.   That same day decedent called and advised Capt. Wilkinson of Mears' actions and reiterated his request that he and a union representative be present to review the evaluation.

72.   By February 7, 2005, the decedent still had not received a copy of his evaluation.

73.   He later learned from the Warden's secretary that his evaluation had been submitted without his knowledge and "Refused to Sign" had been written in place of his signature.

74.   Upon learning this, the decedent immediately called Capt. Wilkinson and Mike Deloy to inform them of this fact.

75.   Prior to his death on February 19, 2005, the decedent never received his 2004 evaluation and he was never given the opportunity to meet with Capt. Wilkinson and a union representative to review his mediocre performance evaluation which he expected to have a crushing effect on his career.

76.   Second, the decedent also was watched and monitored constantly by defendant Mears who was seeking a performance misstep to use as a basis for discipline against him.  For

-17-

example, he was once shown a note pad where someone was keeping chronological notes of his performance and whereabouts.

77.  Third, as part of his home record keeping, the decedent periodically made copies of his time cards.  In September of 2004 he noticed that Mears was tampering with and altering his timecard to show that he had taken "emergency vacation days," which are frowned upon.  But on each of those days the decedent had legitimately taken holidays or vacation days, contrary to Mear's false claim.

78.  The decedent immediately brought this to the attention of Capt. Wilkinson.  Eventually Mears was forced to change the decedent's timecard back to its original state.  But Mears was never disciplined, reprimanded or told to stop his retaliatory behavior.

79.  Fourth, in January of 2005 the decedent did not receive a copy of his updated timecard from Mears.  This violated work rules which require each record keeper to give the employee a copy of his timecard at the end of the year.  This delay caused the decedent to fear that Mears was up to something else to prejudice his career path.  Finally, after specifically demanding a copy, Mears reluctantly turned over a copy of the timecard.

80.  Fifth, the decedent constantly demanded a transfer from under Mears, to whom he had to report, so that the retaliation against him would be alleviated.  It was hoped that this would

-18-

help his deteriorating mental and emotional condition.  But defendants Wilkinson and Deloy never took any action to transfer the decedent.  In fact, his requests were denied.

81.  Sixth, the decedent informed defendant Wilkinson, and often defendant Deloy, of the retaliatory actions taken against him by Mears.  But they never took steps to stop Mears from retaliating against the decedent. Instead they ratified, sanctioned, and approved of his misconduct, despite their personal awareness of it.

82.  As a direct and proximate result of the harassment he was experiencing from Mears, the decedent began to experience excruciating headaches.  He underwent medical tests and he was prescribed medication.

83.  The decedent then concluded that the harassment would continue and that the career advancement which he hoped for would never happen.

84.  In February of 2005, operating under extreme work-related stress, the decedent warned his close friends that he intended to kill himself.

85.  Immediately the decedent's friends and family attempted to get him professional help by taking him to a mental health facility, where his suicidal ideation was recorded.

86.  In an attempt to get the decedent as much medical assistance as possible, one of his friends reported his suicidal

ideation to defendant Deloy, three weeks before he committed suicide.  As his manager who had driven the decedent to this state, Deloy refused to bring any State of Delaware or Human Relations Personnel resources to the assistance of the decedent. No preventative or therapeutic action was taken by Deloy or any manager of the decedent to prevent his suicide despite the forewarning that a suicide was imminent.  This inaction violated all standards of professional personnel management and State of Delaware training and procedures.

87.  The decedent also continued to be stressed due to his unbearable working conditions and he submitted Leave Request Forms for vacation to relieve his stress.  He was not granted vacation leave.

88.  During this time, the decedent's family and friends continuously attempted to get him help.  Finally, on February 15, 2005 the decedent agreed to see his family doctor who prescribed Colanzepam for his work-related anxiety.

89.  Then, at the insistence of his wife, on February 18, 2005, the decedent called and scheduled an appointment with a psychiatrist, but the only available appointment was for June 8, 2005, four months later.

90.  As a direct and proximate result of the actions of the defendants, on February 19, 2005, Corporal John J. Balas committed suicide in his backyard while his wife and children were in their home.  He administered a self-inflicted gunshot

wound to his head, leaving as his survivors his dear wife, Cindy
L. Balas, his beloved son, Jonathan Balas, presently age 11, and
his beloved daughter, Lauren Balas, presently age 9.  His widow
has subsequently remarried and is now known as Cindy L. Adkins.

### F.    DAMAGES

91.  As a direct and proximate result of the actions of the
defendants as detailed herein, the continued harassment and
stress was too much for the decedent to bear.

92.  Correctional officers experiencing job-related stress
have an average life expectancy about 20 years less than the
general population.

93.  As a direct and proximate result of the actions of the
defendants, the decedent's Estate has suffered damages which
include burial costs, pain and suffering of the decedent prior to
his death, loss of earnings and pension benefits over his
expected lifetime had he not killed himself, loss of consortium
with his wife, and other pecuniary losses, emotional pain,
suffering, disappointment, anger, inconvenience, mental anguish,
loss of enjoyment of life, mental and physical pain, anguish,
humiliation, embarrassment, injury to reputation, and other non-
pecuniary losses and injury.

## G.  EVIDENCE OF CAUSATION

94.  There is a causal link between First Amendment protected activity and adverse action, as set forth above.  This is demonstrated by the following:

(a) Defendants were personally aware of decedent's protected activity.

(b) They had a motive to retaliate against decedent who was a member of the newly certified Union which on all fronts was pressing management and the Department for better treatment of its members, while also exposing mismanagement within the Department.

(c)  The temporal proximity is unduly suggestive.  The retaliation began the month after Cpl. Balas resigned from the CERT team.

(d)  There is circumstantial evidence of a pattern of antagonism towards plaintiff.  For example, defendant Deloy ignored a direct warning that his employee was suicidal, in violation of all professional management training and standards.  Cpl. Balas also was denied a requested transfer, requested vacation, received a mediocre performance evaluation, was refused a meeting to review this evaluation, endured having his timecard altered, and had his every move watched and monitored.

(e)  Lies and manufactured false reasons have been offered by the defendants to explain the suicide of the decedent.

(f)  State law was violated when his timecard records were violated.  Altering a public document generated by a State employee is against the laws of Delaware.

(g) The evidence as a whole shows that at a time of intense public dispute with COAD, defendants saw to it that decedent was punished for his pro Union activity so that a message was sent to the membership that this also would happen to their careers if they pushed management too hard.

95.   First Amendment protected activity was a substantial or motivating factor in the adverse action against the decedent.

96.   The natural probative force of the evidence demonstrates causation.

97.   A reasonable person of ordinary firmness would be deterred from exercising their First Amendment rights when defendants humiliated him by refusing to recognize his exceptional achievements and stellar attendance in his performance evaluation, altered his time cards to reflect poorly on his attendance, and further attacked his professionalism, loyalty, leadership, and character by monitoring and tracking his every move.

98.   The totality of retaliatory adverse action taken by defendants against decedent is sufficient to deter any person of ordinary firmness from exercising their First Amendment rights to free speech, association, assembly and petition.

99.   Any reasonable person of ordinary firmness would be deterred from exercising their First Amendment rights to free speech, association, assembly and petition knowing that subsequent harassment would be so severe that it would lead to his suicide.

100.   The defendants cannot prove by a preponderance of the evidence that absent a constitutional violation they would have

-23-

any other reason to treat the decedent unfairly and take adverse action against him.

## IV.  ALLEGATIONS REGARDING THE DEFENDANTS' CONDUCT

101.  The individual defendant's actions violated clearly established federal constitutional rights of which any official would have known, including two decades of Third Circuit case law prohibiting retaliation against public employees for protected speech.

102.  At all times material hereto the individual defendants participated in, authorized, and sanctioned the federal constitutional deprivations described above.

103.  At all times material hereto the individual defendants and their agents were acting under color of law.  The federal constitutional deprivations described herein are fairly attributable to the State.

104.  The actions of the defendants and their agents or employees were deliberately, intentionally, willfully, purposefully, and knowingly done in violation of federal constitutional rights and because of the exercise of those rights.

105.  The defendants either knew or showed a negligent or reckless disregard for the matter of whether their conduct violated federal constitutional rights.

106.  Their actions were outrageous and taken with evil

motive, in bad faith, out of personal animus and without any reasonable grounds to support them.

107.  Their actions were wanton and malicious or taken with reckless indifference to federal constitutional rights.

108.  The exercise of rights under the U.S. Constitution made a difference in all actions adverse to the decedent.

109.  The exercise of these rights was a motivating, substantial or determinative factor in all actions adverse to Plaintiff.

110.  The defendants did not reasonably believe that the actions they took were necessary to accomplish any legitimate governmental purpose.

111.  The defendants' actions were motivated by bias, bad faith, and improper motive.

112.  The defendants' actions constitute an abuse of governmental power.

113.  The defendants' actions do not further any narrowly drawn important, substantial or compelling governmental interest.

114.  The defendants' actions are not so reasonable as to further any governmental interest asserted and do not closely fit the goal of serving those governmental interests.

### COUNT I (First Amendment - Public Employee Free Speech Retaliation)

115.  Plaintiff repeats and realleges paragraphs 1-114 set out above.

116.  The decedent in his private capacity as a citizen spoke out on issues of public concern under the First Amendment, for example, understaffing, forced overtime, low wages and security lapses.  It was not part of his routine job duties to engage in such speech.

117.  By its content, form and context, at all times the decedent spoke out about matters of public concern.

118.  All of the decedent's speech was non-disruptive of any interest of his employer and it was on matters of concern to the public at large.  His speech related to matters of political, social and other concern to the community.

119.  The individual defendants were aware of the decedent's protected speech and it antagonized them.

120.  There is a causal link between First Amendment protected activity on matters of public concern and adverse action.

121.  The defendants took action adverse to the decedent as a direct and proximate result of and in retaliation for his First Amendment protected speech on matters of public concern.  There is a temporal and causal relationship between the decedent's aforementioned protected speech and conduct, and adverse employment action.  First Amendment protected activity was a substantial or motivating factor in the adverse employment action.  The defendants cannot prove by a preponderance of the

evidence that absent a constitutional violation they would have other grounds to act against the decedent.

122.   The decedent's constitutional right to freedom of speech was denied under the First Amendment of the U.S. Constitution and 42 U.S.C. § 1983.

### COUNT II (First Amendment - Public Employee Petition Clause Retaliation)

123.   Plaintiff repeats and realleges paragraphs 1-122 set forth above.

124.   The decedent participated in historically recognized petitions of government for a redress of grievances which were not a sham.

125.   For example, through his Union he petitioned the General Assembly for salary increases as a resolution for the chronic understaffing and forced overtime problems within the Department.

126.   Through his Union he also informed legislators of the fact that the correctional system is broken and in need of repair.  Security lapses occur frequently and endanger the lives of many persons due to understaffing and forced overtime.

127.   Through his Union he also petitioned the Governor about many of the same matters.

128.   The defendants took action against the decedent as a direct and proximate result of and in retaliation for the exercise of his First Amendment right to petition the government

for redress of grievances.  There is a temporal and causal
relationship between the decedent's aforementioned protected
petitioning and adverse employment action.  First Amendment
protected activity was a substantial or motivating factor in the
adverse employment action.  The defendants cannot prove by a
preponderance of the evidence that absent a constitutional
violation they would have had reasons to adversely treat the
decedent.

129.  The decedent's constitutional right to petition the
government for redress of grievances was denied under the First
Amendment of the U.S. Constitution and 42 U.S.C. § 1983.

**COUNT III (First Amendment - Assembly, Petition, Association
and Expression - Retaliation for Union Activities)**

130.  Plaintiff repeats and realleges paragraphs 1-129 set
out above.

131.  The decedent has maintained an active affiliation with
COAD from its being certified as the collective bargaining agent
through the present.  He was a member of COAD and each of the
defendants were personally aware of his membership.

132.  The decedent in effect refused to cross a Union picket
line.  He engaged in symbolic speech in support of a work action
by members of his Union.  He also publically spoke out and
refused to be a strike breaker.

133.  The Defendants were aware of the decedent's protected Union activities and they were antagonized by the protected activity.

134.  There is a causal link between First Amendment protected Union membership and other activities and adverse action.

135.  First Amendment protected assembly, petition, association and expression were a substantial or motivating factor in the adverse action against the decedent.  The natural probative force of the evidence demonstrates causation.

136.  The defendants cannot prove by a preponderance of the evidence that absent a constitutional violation they would have reasons to take adverse action against the decedent.

137.  The totality of retaliatory adverse action taken by the defendants against decedent is sufficient to deter any person of ordinary firmness from exercising their First Amendment rights to assembly, petition, association and expression.

138.  The defendants took action adverse to the decedent as a direct and proximate result of and in retaliation for his First Amendment protected assembly, petition, association and expression.  There is a temporal and causal relationship between his aforementioned protected activity and adverse employment action.  First Amendment protected activity was a substantial or motivating factor in the adverse employment action.  The

defendants cannot prove by a preponderance of the evidence that absent a constitutional violation they would have grounds to take action adverse to the decedent.

139.  The decedent's constitutional rights to assembly, petition, association and expression have been denied under the First Amendment of the U.S. Constitution and 42 U.S.C. § 1983.

**Wherefore**, Plaintiff prays that the Court:

A.    Enter judgment against the defendants.

B.    Enter a declaratory judgment declaring the acts of the defendants to be a violation of the decedent's constitutional rights.

C.    Enter a judgment against the individual defendants, jointly and severally,  for funeral expenses and other compensatory damages, including lost wages, back pay, pension and other benefits, for future or front pay, loss of earning capacity, emotional distress, humiliation, embarrassment, and injury to reputation.

D.    Enter separate judgments against the individual defendants for punitive damages.

E.    Issue a mandatory injunction ending the continuing illegal actions of defendant Taylor, Machtinger and Deloy and baring them from considering protected speech, assembly, association, or petition, whenever considering the terms, conditions and privileges of employment of any correctional officer who is a member of COAD; and also ordering him to send a directive to all administrators in the Department advising that protected speech, association, assembly and petition by COAD members is not to be considered as a negative factor in terms, conditions or privileges of employment in the Department.

F.    Issue a reparative injunction directing that the individual defendants place a signed document in

the decedent's personnel file apologizing for
violating decedent's constitutional rights.

G.    Award Plaintiff attorney's fees, costs and pre and
      post judgment interest for this action.

H.    Require such other and further relief as the Court
      deems just and proper under the circumstances.

**THE NEUBERGER FIRM, P.A.**


/s/ Thomas S. Neuberger
**THOMAS S. NEUBERGER, ESQ. (#243)**
**STEPHEN J. NEUBERGER, ESQ. (#4440)**
Two East Seventh Street, Suite 302
Wilmington, Delaware 19801
(302) 655-0582
TSN@NeubergerLaw.com
SJN@NeubergerLaw.com

Attorneys for Plaintiff

Dated: September 25, 2006

Cindy Adkins\PLEADING\COMPLAINT - FINAL.wpd

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I. (a) PLAINTIFFS**

CINDY L. BALAS a/k/a CINDY L.ADKINS, Executrix of of the Estate of CORPORAL JOHN J. BALAS

**DEFENDANTS**

STANLEY W. TAYLOR, JR.; ALAN MACHTINGER; MICHAEL DELOY; CAPT. DAVID WILKINSON; LT. TRUMAN MEARS; AND DEPARTMENT OF CORRECTION of the STATE OF DELAWARE

(b) County of Residence of First **Sussex County**
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First _____
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

(c) Attorney's (Firm Name, Address, and Telephone Number)
Thomas S. Neuberger, Esq.
The Neuberger Firm, P.A., 2 East 7th Street,
Suite 302, Wilmington, DE 19801
302-655-0582

Attorneys (If Known)

**II. BASIS OF JURISDICTION** (Place an "X" in One Box Only)

☐ 1 U.S. Government Plaintiff

☐ 2 U.S. Government Defendant

X 3 Federal Question (U.S. Government Not a Party)

☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place an "X" in One Box for Plaint and One Box for Defendant)
(For Diversity Cases Only)

| | PLF | DEF | | PLF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury— | ☐ 620 Other Food & Drug | | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | ☐ 423 Withdrawal | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury— | of Property 21 USC | 28 USC 157 | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | **PROPERTY RIGHTS** | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 820 Copyrights | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 830 Patent | ☐ 810 Selective Service |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | ☐ 840 Trademark | ☐ 850 Securities/Commodities/ |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | Exchange |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | | **SOCIAL SECURITY** | ☐ 875 Customer Challenge |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | **LABOR** | ☐ 861 HIA (1395ff) | 12 USC 3410 |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | ☐ 710 Fair Labor Standards | ☐ 862 Black Lung (923) | ☐ 891 Agricultural Acts |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 892 Economic Stabilization Ac |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury | Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| | | | | ☐ 865 RSI (405(g)) | ☐ 894 Energy Allocation Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 740 Railway Labor Act | ☐ 870 Taxes (U.S. Plaintiff | ☐ 900 Appeal of Fee |
| ☐ 220 Foreclosure | X 442 Employment | Sentence | | or Defendant) | Determination Under |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | ☐ 790 Other Labor Litigation | | Equal Access to Justice |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party | ☐ 950 Constitutionality of |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | ☐ 791 Empl. Ret. Inc. | 26 USC 7609 | State Statutes |
| ☐ 290 All Other Real Property | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | Security Act | | ☐ 890 Other Statutory Actions |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |

**V. ORIGIN** (PLACE AN "X" IN ONE BOX ONLY)

X 1 Original Proceeding

☐ 2 Removed from State Court

☐ 3 Remanded from Appellate Court

☐ 4 Reinstated or Reopened

☐ 5 Transferred from another district (specify)

☐ 6 Multidistrict Litigation

☐ 7 Appeal to District Judge from Magistrate Judgment

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

This is a civil survival action for compensatory and punitive damages and for injunctive relief for violations of decedent's right to free speech, association, assembly and petition under the First and Fourteenth Amendment of the U.S. Constitution.

**VII. REQUESTED IN COMPLAINT:**
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: X Yes ☐ No

**VIII. RELATED CASE(S) IF ANY**
(See instructions):
JUDGE NONE
DOCKET NUMBER

DATE 8/--/06

SIGNATURE OF ATTORNEY OF RECORD
Thomas S. Neuberger

FOR OFFICE USE ONLY

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

JS 44 Reverse  (Rev. 3/99)

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS-44

### Authority For Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

I.       (a) Plaintiffs-Defendants. Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

         (b.) County of Residence. For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

         (c) Attorneys. Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

 II.      Jurisdiction. The basis of jurisdiction is set forth under Rule 8(a), F.R.C.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States, are included here.

United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; federal question actions take precedence over diversity cases.)

III.      Residence (citizenship) of Principal Parties. This section of the JS-44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

IV.      Nature of Suit. Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section IV below, is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

V.       Origin. Place an "X" in one of the seven boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.

Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.

Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a) Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment. (7) Check this box for an appeal from a magistrate judge's decision.

VI.      Cause of Action. Report the civil statute directly related to the cause of action and give a brief description of the cause.

VII.     Requested in Complaint. Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand. In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

VIII.    Related Cases. This section of the JS-44 is used to reference related pending cases if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

Date and Attorney Signature. Date and sign the civil cover sheet.

AO FORM 85 RECEIPT (REV. 9/04)

United States District Court for the District of Delaware

Civil Action No. 0 6 - 5 9 2

# ACKNOWLEDGMENT
# OF  RECEIPT  FOR AO FORM  85

## *NOTICE OF AVAILABILITY OF A*
## *UNITED STATES MAGISTRATE JUDGE*
## *TO EXERCISE JURISDICTION*

I HEREBY ACKNOWLEDGE RECEIPT OF _____7_____ COPIES OF AO FORM 85.

SEP 2 5 2006

_____
(Date forms issued)

_____
(Signature of Party or their Representative)

_____
(Printed name of Party or their Representative)

Note: Completed receipt will be filed in the Civil Action