# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CINDY L. ADKINS,<br>Executrix of the Estate<br>of JOHN J. BALAS, | ) | |
| | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C. A. No. 06-592-JJF |
| | ) | |
| STANLEY W. TAYLOR, JR., | ) | |
| ALAN MACHTINGER, | ) | |
| MICHAEL DELOY, | ) | |
| DAVID WILKINSON, | ) | |
| TRUMAN MEARS, and the | ) | |
| DEPARTMENT OF CORRECTION | ) | |
| of the STATE OF DELAWARE, | ) | |
| | ) | |
| Defendants. | ) | |

## OPENING BRIEF IN SUPPORT OF
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

DEPARTMENT OF JUSTICE
STATE OF DELAWARE

*/s/ Ralph K. Durstein, III*
Ralph K. Durstein, III, ID #912
Stacey Xarhoulakos, ID #4667
Deputy Attorneys General
Carvel State Office Building
820 North French Street
Wilmington, DE 19801
(302) 577-8400
Attorneys for Defendants

DATED:  JANUARY 31, 2008

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................. iii

NATURE AND STAGE OF THE PROCEEDINGS ....................................................... 1

SUMMARY OF THE ARGUMENT ................................................................................ 2

STATEMENT OF FACTS ................................................................................................. 3

ARGUMENT .................................................................................................................... 13

      Standard of Review ................................................................................................ 13

I.     All Claims Arising From Conduct Occurring Before September 25, 2004 Are Time-barred Under The Limitation Period Governing Survival Actions Under Delaware Law 14

II.    Plaintiff's Claims In This Survival Action Are Limited To Those Arising During The Lifetime Of The Decedent, And Recovery Of Damages Sustained After His Death Are Barred By The Failure Of The Plaintiff To File A Wrongful Death Action .................... 16

III.   Defendants are Entitled to Summary Judgment On All Counts Because The Plaintiff Can Not Establish That Any Of The Defendants Retaliated Against Decedent In Violation Of His First Amendment Rights ................................................................................... 18

      A.    Decedent's alleged protected conduct was pursuant to his official duties and not protected by the First Amendment ....................................................................... 19

      B.    Plaintiff can not establish a prima facie case of First Amendment retaliation because decedent did not suffer any adverse action ............................................. 20

            1.    The "Meets Expectations" evaluation was not an adverse action ............. 22

            2.    The allegation that Lt. Mears was constantly watching and monitoring the conduct of decedent is completely unsupported by any evidence ............. 23

            3.    The change to officers' time cards was not a retaliatory action and was not exclusive to decedent ................................................................................ 24

            4.    The decision not to give the decedent a new supervisor was not an adverse action ...................................................................................................... 25

            5.    There is no evidence that Defendants Wilkinson or Deloy ignored retaliation against the decedent ............................................................... 26

6.    The alleged adverse actions are either unsubstantiated or insufficient to establish a First Amendment claim of retaliation .....................................27

C.    Decedent's alleged protected conduct was not a substantial or motivating factor in any alleged adverse action by defendants...............................................28

1.    Absence of Temporal Proximity.............................................................29

2.    Absence of any evidence in the record to support causation ....................29

3.    The plaintiff's attempt to causally connect decedent's union activity with an alleged failure of the defendants to prevent his suicide is not constitutionally permissible .....................................................................32

D.    Defendants would have taken the same actions even in the absence of the protected activity....................................................................................34

IV.    Plaintiff Cannot Support His Claims Against Defendants Deloy, Wilkinson, Machtinger, or Taylor Because They Had No Personal Involvement In The Allegations In the Complaint.........................................................................................................35

V.    Plaintiff Has Failed to Establish An Actionable Claim Under The Petition Clause..........36

VI.    Defendants Are Entitled To Summary Judgment In Their Official Capacities And Qualified Immunity In Their Individual Capacities.........................................................37

A.    Defendants are immune in their official capacities................................................37

B.    Defendants are immune from liability in their individual capacities pursuant to the doctrine of qualified immunity ............................................................................38

CONCLUSION........................................................................................................39

# TABLE OF AUTHORITIES

**Case Name**                                                                                                       **Page**

*Anderson v. Creighton,* 483 U.S. 635 (1987) ...........................................................................38

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986) ...............................................................13

*Baldassare v. New Jersey,* 250 F.3d 188 (3d Cir. 2001) .............................................................18

*Bart v. Telford,* 677 F.2d 622 (7th Cir. 1982)...........................................................................21

*Battle v. Bd. of Regents,* 468 F.3d 755 (Ga. 2006) .....................................................................19

*Blackburn v. United Parcel Serv., Inc.,* 179 F.3d 81 (3d Cir. 1999) .....................................13, 31

*Bouriez v. Carnegie Mellon Univ.,* 2005 WL 2106582 (W.D. Pa Aug. 26, 2005)......................13

*Bradshaw v. Township of Middletown,* 296 F.Supp.2d 526 (D.N.J. 2003) ..................................36

*Brennan v. Norton,* 350 F.3d 399 (3d Cir. 2003)...................................................................18, 21

*Carr v. Town of Dewey Beach,*  730 F.Supp. 591 (D.Del. 1990)  ...............................................14

*Celotex Corp. v. Carter,* 477 U.S. 317 (1986)......................................................................13, 30

*Collins v. Village of Woodridge,*  96 F.Supp.2d 744 (N.D.Ill. 2000) ..........................................17

*Cooper v. Cape May Cty. Bd. of Soc. Svcs.,* 175 F.Supp.2d 732 (D.N.J. 2001)..........................36

*Coulson v. Shirks Motor Express Corp.,*  107 A.2d 922 (Del. 1954) ...........................................16

*Cuffy v. Getty Refining & Marketing Co.,* 648 F.Supp 802 (D.Del. 1986)...................................14

*Deary v. Three Unnamed Police Officers,* 746 F.2d 185 (3d Cir.1984).......................................14

*DeShaney v. Winnebago Cty. Dept. of Soc. Svc.* 489 U.S. 189 (1989).........................................33

*Estate of Smith v. Marasco,* 318 F.3d 497 (3d Cir. 2003) ...........................................................29

*Estate of Smith v. Town of West Hartford,* 186 F. Supp. 2d 146 (D. Conn. 2002)..................17, 33

*Farrell v. Planters Lifesavers Co.,* 206 F.3d 271 (3d Cir. 2007)..................................................29

*Foraker v. Chaffinch,* 501 F.3d 231 (3d Cir. 2007)........................................................19, 20, 36

*Garcetti v. Ceballos,* --- U.S. --- ,126 S.Ct. 1951 (2006) ..................................................18, 19, 20

*Glass v. Snellbaker,* 2007 WL 1723472 (D.N.J. June 14, 2007) ....................................................19

*Green v. Philadelphia Housing Authority,* 105 F.3d 882 (3d Cir. 1997) ......................................18

*Hafer v. Melo,* 502 U.S. 21 (1991) ................................................................................................37

*Harlow v. Fitzgerald,* 457 U.S. 800 (1982) ..................................................................................38

*Haynes v. City of Circleville,* 474 F.3d 357 (6th Cir. 2007) ..........................................................20

*Hill v. City of Scranton,* 411 F.3d 118 (3d Cir. 2005) ..................................................................18

*Hoffman v. Dougher,* 2008 WL 148877 at *10 (M.D. Pa. Jan. 14, 2008) .................19, 21, 28, 29

*Jewett v. International Telephone and Telegraph Corp.,* 653 F.2d 89 (3d Cir. 1981) .................14

*Killen v. N.W. Human Servs., Inc.,* 2007 WL 2684541 (E.D. Pa. Sept. 7, 2007) ........................29

*Lauren W. ex rel. Jean W. v. Deflaminis,* 480 F.3d 259 (3d Cir. 2007) .......................................28

*Loden v. Getty Oil Co.,* 359 A. 2d 161 (Del. 1976) ......................................................................16

*Magee v. Rose,* 405 A.2d 143 (Del. Super. 1979) ........................................................................16

*McDonald v. Smith,* 472 U.S. 479 (1985)......................................................................................36

*McKee v. Hart,* 436 F.3d 165 (3d Cir. 2006)..........................................................................21, 38

*Meenan v. Harrison,* 2006 WL 1000032 (M.D.Pa Apr. 13, 2006)................................................28

*Mills v. City of Evansville, Ind.,* 452 F.3d 646 (7th Cir. 2006)....................................................20

*Mount Healthy Cty. Sch. Dist. Bd. Of Educ. v. Doyle,* 429 U.S. 274 ( 1977 )..............................18

*National Railroad Passenger Corp. v. Morgan,* 536 U.S. 101 (2002).........................................15

*O'Connor v. City of Newark,* 440 F.3d 125 (3d Cir. 2006) ..........................................................15

*O'Connor v. Kelly,* 2004 WL 1012853 (E.D. Pa. May 5, 2004) ...................................................31

*Pennsylvania v. Porter,* 659 F.2d 306 (3d Cir. 1981)...................................................................35

*Philbin v. Trans Union Corp.,* 101 F.3d 957 (3d Cir. 1996) ..................................................13, 31

*Polk County v. Dodson,* 454 U.S. 312 (1981)................................................................35

*Proctor v. ARMDS,* 2006 WL 3392932 (D.N.J. Nov. 21, 2006) .................................13

*Reynolds v. Willis,* 209 A.2d 760 (Del. 1965) ...........................................................16

*Rode v. Dellarciprete,* 845 F.2d 1195 (3d Cir. 1988) ................................................35

*Sample v. Diecks,* 885 F.2d 1099 (3d Cir. 1989) .......................................................35

*SanFilippo v. Bongiovanni,* 30 F.3d 424 (3d Cir. 1994).............................................36

*Saucier v. Katz,* 533 U.S. 194 (2001) .........................................................................38

*Schallk v. Gallemore,* 906 F.2d 491 (10th Cir. 1990)...............................................36

*Scott v. University of Delaware,* 601 F.2d 76 (3d Cir. 1979) .......................................16

*Seminole Tribe of Florida v. Florida,* 517 U.S. 44 (1996) ..........................................37

*Shankle v. Bell,* 2006 WL 2794559 (W.D. Pa. Sept. 27, 2006)..................................31

*Shellenberger v. Summit Bancorp., Inc.,* 318 F.3d 183 (3d Cir. 2003) ........................29

*Smith v. Central Dauphin Sch. Dist.,* 511 F.Supp.2d 460 (M.D. Pa. 2007) ...........21, 34

*Sporn v. Ocean Colony Condo Ass'n,* 173 F.Supp.2d 244 (D.N.J. 2001) ....................31

*Suppan v. Dadonna,* 203 F.3d 228 (3d Cir. 2000)....................................21, 30, 38, 39

*Will v. Michigan Dept. of State Police,* 491 U.S. 58 (1989)........................................38

*Williams v. West Chester,* 891 F.2d 458 (3d Cir. 1989) .........................................13, 31

*Wilson v. Garcia,* 471 U.S. 261 (1985)........................................................................14

## Statutes

10 *Del.C.* §3704 ..........................................................................................................16

10 *Del.C.* §3724 ..........................................................................................................16

10 *Del.C.* §3724(d) ......................................................................................................16

10 *Del.C.* §8107 ..........................................................................................................16

10 *Del.C.* §8119 ................................................................................................................14

42 U.S.C.§1983 ......................................................................................... *passim*

Other Authorities

First Amendment of the United States Constitution ................................................. *passim*

Fourteenth Amendment of the United States Constitution .......................................17, 33

F.R.C.P. 56(c) ...........................................................................................................13

F.R.C.P. 56(e) .....................................................................................................13, 31

## <u>NATURE AND STAGE OF THE PROCEEDINGS</u>

This is a survival action, filed on behalf of the Estate of a Department of Correction ("DOC") employee who committed suicide on February 19, 2005. The lawsuit was filed on September 25, 2006. The plaintiff claims damages under 42 U.S.C. §1983 for alleged "retaliation" against the decedent, John Balas, on the part of his supervisor and other DOC administrators, for his actions in August of 2004 in refusing an assignment and resigning from a voluntary departmental emergency response unit.

The defendants responded by denying the alleged instances of "retaliation", correcting numerous errors in the Complaint, and by disputing the Court's jurisdiction to hear any claims arising from the decedent's suicide. The defendants stated affirmative defenses based on the applicable statute of limitations, qualified immunity from liability, sovereign immunity, the limited claims and damages recoverable in a survival action under Delaware law, and the failure of the plaintiff to state any viable claim arising from the suicide of the decedent.

The parties have completed discovery in the case. This is the motion on behalf of the defendants for summary judgment.

1

## SUMMARY OF THE ARGUMENT

1.      Defendants are entitled to Summary Judgment on any claims arising before September 25, 2004 because they are barred by the applicable statute of limitations.

2.      Partial Summary Judgment in favor of the defendants should be granted for any damage claims arising from the suicide of the decedent.  Federal law imposes no duty on the State to protect an individual from himself.  Further, under Delaware law, in a survival action, the plaintiff's damages are limited to those recoverable during decedent's lifetime.  Thus the plaintiff can not claim damages based on the suicide of the decedent.

3.      The plaintiff does not have an actionable First Amendment retaliation claim because the decedent did not engage in protected conduct and did not suffer an adverse action. Even if he had, there is no evidence in the record to causally connect the alleged retaliatory conduct of the defendants to the alleged protected conduct, and such conduct would have occurred regardless of the protected activity.  Thus Summary Judgment in favor of the defendants should be awarded on Counts I, II, and III of the Complaint.

4.      A plaintiff filing a lawsuit pursuant to 42 *U.S.C.* § 1983 is required to show that the defendants had personal involvement in the alleged wrongs.  Plaintiff has not established personal involvement by defendants Taylor, Machtinger, Deloy, or Wilkinson sufficient to maintain an action against them and Summary Judgment should be granted in their favor.

5.      Summary Judgment in favor of the defendants should be awarded on the Petition Clause count of the plaintiff's Complaint because the decedent did not petition the government

6.      Defendants are immune from liability in their official and individual capacities. Thus Summary Judgment in favor of the defendants is appropriate.

## STATEMENT OF FACTS[1]

**A.    Resignation of CERT Members**

John Balas was a member of the Correctional Emergency Response Team ("CERT") team at the Sussex Correctional Institution (SCI).  The CERT team is a tactical voluntary unit called upon to handle everything from shakedowns to escapes.[2]  Participation in CERT can be reflected in a favorable way on an evaluation, but leaving CERT would not be a negative, unless discipline was involved.[3]    Balas' record while on CERT was "shaky".  He was twice removed for failure to respond to activations, in 2001 and 2003.[4]  Lt. Truman Mears, also a CERT member, was not involved in either incident, both of which were handled by CERT headquarters.

Several SCI CERT members were activated on August 5, 2004.  CERT members, including Balas, met at the home of Lee Mears to discuss the activation.[5] They had been tasked to transport inmates to and from court, to replace other DOC officers who had refused to work overtime.  The activation was unpopular.  No one wanted to break the "job action" of the Court & Transportation Unit.  Following much discussion, the CERT members agreed to report the following day.  After leaving the meeting, Lt. Mears, as team leader, called CERT command, either Warden Hall or Maj. Radcliffe.  He reassured them that the team would respond, even though no one wanted to do the mission.[6] Lee Mears received a phone call from Maj. Radcliffe, who was irate and accused him of being an instigator.[7]

---

[1]  The plaintiff lacks personal knowledge of the facts alleged in her Complaint.  She admitted under oath that her only source of information was her husband.  A15-16 (Adkins at 29-30).  She admitted to having no facts to support allegations against defendants Taylor, Machtinger, Deloy, and Wilkinson.  A61-62 (Adkins at 139-140).

[2]  A153-154 (T. Mears at 61-62).

[3]  A156 (T. Mears at 74-76).

[4]  A153-155 (T. Mears at 61-67).

[5]  A125-126; A89-94 (L. Mears at 18-19; Foskey at 20-25).

[6]  A163-167 (T. Mears at 109-118, 119, 123).

[7]  A120-121 (L. Mears at 11-12).

The next day, August 6, 2004, the CERT officers who were activated, reported for duty at SCI. They were criticized by fellow officers as "strike-breakers".[8] Scott Bradley, one of the team members, contacted Maj. Hall to complain about the assignment. After the CERT shift was over, ten CERT members collectively went to Warden Kearney's office and resigned from CERT.[9]

After the resignations, Balas refused to speak to Lt. Mears, his supervisor, with whom he had gone duck-hunting in the past.[10] Curiously, he never complained to Foskey, his brother-in-law, co-worker, and another CERT team member who resigned, about Lt. Mears.[11] Lee Mears felt that he got a "cold shoulder" from the administration after resigning. He is not aware of any CERT officers who resigned, other than Balas, who experienced that; nor were any, including Balas, denied a raise, transfer, or promotion.[12] Foskey was never treated any differently.[13] After co-workers learned of the resignations, their attitude was completely different. They appreciated what the CERT members had done, and were sorry they had to do it.[14]

**B.    Balas' Affair**

Balas approached Jennifer (Cox) Weldon, who worked at SCI for a medical contractor, in late August of 2004. They met and began an affair in September.[15] During that time, Balas did not appear to be stressed out about his job. He seemed unhappy about a performance evaluation, but did not say his supervisor was out to get him.[16] The affair ended in December of 2004, due

---

[8]  A126-128; A95-96 (L. Mears at 19-20, 22; Foskey at 26-27).
[9]  A167-169; A96-101 (T. Mears at 124-130; Foskey at 27-32).
[10]  A152 (T. Mears at 54).
[11]  A102 (Foskey at 33).
[12]  A117-120, A129 (L. Mears at 8-11, 23).
[13]  A103 (Foskey at 34).
[14]  A129-130 (L. Mears at 23-24).
[15]  A202 (Weldon at 6).
[16]  A204-207 (Weldon at 8-11).

to Balas' personal problems.[17]   However, Balas and Jennifer kept in contact by telephone after

that.  These conversations were of a personal nature, and not about work.  She became concerned

that Balas had told her he would hurt himself because she had tried to break things off.  A few

days before John's death, she went to Deputy Warden Deloy and told him what Balas had said.[18]

Balas told Lee Mears while hunting in November of 2004 that he had a "girlfriend",

Jennifer, who worked a the jail.  Balas later told Lee that he loved Jennifer and that things went

back and forth until late January of 2005, when she broke off the relationship because Balas

would not leave his wife.[19]  After that, Balas continued to have contact with Jennifer.  He had a

cell phone he used only to speak with her.[20]  Lee recalled that Balas had called her the night

before he was taken to St. Jones for psychiatric intervention.  After the phone call, he was upset

and possibly suicidal.  He told Lee that he (Balas) "would not be around in the morning".[21]

The night (Friday) before Balas' suicide, he left several voice messages with Jennifer,

who was trying to remove herself from the relationship.  She spoke to him after he wrecked his

truck and his speech was very slurred.  She asked him if he had been drinking.  She spoke to him

again the next morning, but the conversation ended when he was interrupted and hung up.[22]

### C.    Balas' Evaluation from Lt. Mears

Balas worked in the receiving or property room at SCI, processing inmates newly

committed to the institution, handling inmates to be transferred or released.[23]   His job

performance was very good for a number of years.  Beginning early in 2004, there was a change

and his performance dropped, not drastically, but there was a change, and the problems were

---

[17]  A203 (Weldon at 7).
[18]  A207-210 (Weldon at 11-14).
[19]  A133-136 (L. Mears at 33-36).
[20]  A49-51 (Adkins at 118-120).
[21]  A136-138 (L. Mears at 36-38).
[22]  A211 (Weldon at 16).
[23]  A152-153 (T. Mears at 55-58).

documented.[24]  Balas had received a rating of "Exceeds Expectations" from Lt. Mears on August 5, 2002, for the time period starting on January 1, 2001.  Lt. Mears had commended Balas for perfect attendance, and, in May of 2004, Balas and others who participated in a quarterly inspection were commended.[25]

In early 2004, Balas and Foskey helped Lt. Mears with QRT (Quick Response Team) training.  During the training, Balas would constantly come in late, want to leave early, or need the night off.  This created a burden for Lt. Mears and Foskey to train some three hundred officers.  Maj. Townsend and Deputy Warden Deloy determined that Balas would not be involved in the training in the future.[26]

On September 26, 2004, decedent received his annual performance evaluation from Lt. Mears, his supervisor.  The evaluation included a rating of "Meets Expectations" and reads: "In light of the rest of Corporal Balas' performance I do not feel that perfect attendance alone, although commendable, is enough to justify exceeds."[27]  In an attachment, Lt. Mears listed the reasons for the rating of "Meets Expectations": the problems with QRT training, the lack of CERT membership, and complaints from Sgt. Cassase, the officer in charge of the property area, concerning Balas' poor work performance, poor attitude, and unwillingness to get along with staff.[28]  The evaluation, including the rating, had no effect on Balas' compensation or his job assignment.[29]

The plaintiff characterizes this rating as "mediocre", but has presented no facts to support that theory.  According to the affidavit of Warden Deloy, attached hereto, such a rating does not

---

[24]  A153 (T. Mears at 59-61).
[25]  A157-160 (T. Mears at 80-87, 95-96).
[26]  A161-162 (T. Mears at 99-105).
[27]  A229; A171 (Wilkinson at 93; T. Mears at 146-148).
[28]  A186; A175-176 (T. Mears Exhibit #11 at 3; T. Mears at 167-170).
[29]  A132 (L. Mears at 30).

reflect poorly on the employee. A negative rating would be "Needs Improvement" or "Unsatisfactory". A majority of the evaluations done by supervisors at SCI contain the "Meets Expectations" rating. A rating of 'Meets Expectations' does not adversely impact an employee's assignments, shifts, salary, requests for time off, transfers, opportunity for advancement, or any other benefit.

The plaintiff alleges[30], without support, that the decedent had, prior to his resignation from CERT, "consistently received" ratings of "Exceeds Expectations". In fact, Balas had received prior ratings of "Meets Expectations" in 1996 and in 1998. It is noteworthy that those ratings were given by supervisors other than Lt. Mears. The plaintiff has made no showing that such acceptable ratings adversely affected the decedent in any way.[31] She admits that her husband at no time lost salary, vacation time, promotion, or other economic loss.[32]

Balas refused to even look at the evaluation, and would not sign to acknowledge that he had received it. "It's not an exceeds, I don't want it".[33] Lt. Mears told Balas that he could have a copy of the evaluation, after he sat down and discussed it.[34] Lt. Mears eventually turned in the evaluation, with an attachment explaining Balas' refusal to meet and discuss (or sign) it.[35]

Maj. Wilkinson recalled that, after he had signed off on the evaluation, Balas spoke to him about his disappointment or dissatisfaction that he did not receive a rating above "meets expectations".[36] Balas thought that Lt. Mears was going to 'screw him' on the evaluation because he quit CERT. He asked Wilkinson to be present for discussion of the evaluation with

---

[30] A261 (Complaint ¶¶60, 62).
[31] The plaintiff admitted at her deposition that she was unaware of the prior ratings of "Meets Expectations". A17-21 (Adkins at 32-35).
[32] A63-64 (Adkins at 143-144).
[33] A172-173 (T. Mears at 151-154).
[34] A178 (T. Mears at 182).
[35] A174, A179 (T. Mears at 158-159, 187).
[36] A217-218, A220, A245 (Wilkinson at 53-54, 62, 115).

Lt. Mears and Wilkinson agreed to be there.[37]  Before Wilkinson spoke to Lt. Mears to set up the meeting[38], Balas called Wilkinson at home, upset that Lt. Mears had forwarded the evaluation up the chain of command, and Wilkinson promised to "take care of it".[39]  At his request, the Warden retrieved the evaluation a day or two later, and Wilkinson attempted to set up the meeting with Lt. Mears and Balas.[40]  Balas committed suicide several days later.[41]

**D.    Time Cards/Vacation Days**

The DOC allows employees to take planned vacation days or to request emergency vacation days.  The only difference between the two is that a regular vacation day is pre-scheduled and an emergency vacation day is a last minute request of the employee.  Emergency vacation days are not frowned upon and they do not adversely impact an employee or their employment status.[42]  Lt. Mears routinely recorded emergency vacation days for all employees he supervised.[43]

At the end of the year, supervisors total each employee's time cards, they are audited, and then copies are given to the officers.  Early in 2005, Balas requested his 2004 time card, and Lt. Mears immediately gave it to him.[44]

After Balas spoke to Wilkinson about his issues with the notations on the time cards, Wilkinson ordered Lt. Mears to change them, in order to "shut John up".[45]  Lt. Mears had explained that time cards for all the employees were marked in the same way, based on the rosters, indicating "emergency vacation".

---

[37]  A219, A221 (Wilkinson at 57, 65).
[38]  A226-227 (Wilkinson at 77-78).
[39]  A222-223 (Wilkinson at 67-68).
[40]  Lt. Mears had "no problem" with that.  A227-228, A246 (Wilkinson at 78-79, 116).
[41]  A222-225 (Wilkinson at 67-69, 75).
[42]  A2, A180-181 (Affidavit of Warden Mike Deloy, attached hereto, at ¶4; T. Mears at 192-194).
[43]  A181 (T. Mears at 195).
[44]  A179 (T. Mears at 186).
[45]  A235-236; A181 (Wilkinson at 103-104; T. Mears at 195-196).

E.      **"Excessive Monitoring"**

Balas never complained to Wilkinson about so-called "excessive monitoring".[46]   He never mentioned it to Jeff Foskey.[47]

F.      **Request for Transfer**

Balas never asked Wilkinson for a transfer.[48]   He never asked Lt. Mears for a change in supervisor or a transfer to a different assignment within the institution.[49]   Deputy Warden Deloy felt that Balas wanted him to remove Lt. Mears as his supervisor.   This was based on the "Meets Expectations" rating that Balas received in his evaluation.   There were no complaints from Balas to Deloy of "harassment".[50]

G.      **Grievance**

Lee Mears recalled that Balas talked about filing a grievance over sick leave or his attendance record, but he never saw any such document.[51]   Balas mentioned to Jeff Foskey that he was filing a grievance over his time cards, but Foskey never heard anything more about it. Balas did not mention filing a grievance over his performance evaluation.[52]   Jennifer Weldon recalled Balas mentioning a grievance over dissatisfaction with his performance evaluation, but he never mentioned how it was ultimately resolved.[53]   Maj. Wilkinson was not familiar with the grievance form supposedly filed by Balas.[54]   Lt. Mears was not aware of any grievance filed by Balas as a result of his evaluation.[55]   The plaintiff claims that in the fall of 2004 Balas mentioned

---

[46]   A239-240 (Wilkinson at 107-108).
[47]   A107 (Foskey at 40).
[48]   A238 (Wilkinson at 106).
[49]   A182 (T. Mears at 198-199).
[50]   A74-76 (Deloy at 53-55)
[51]   A122-124 (L. Mears at 13-15).
[52]   A105-106 (Foskey at 38-39).
[53]   A87-88 (Foskey at 10-11).
[54]   A230-234 (Wilkinson at 98-102).
[55]   A173-174 (T. Mears at 157-158).

filing a grievance about "retaliation" for resigning from CERT. She found the grievance forms among her husband's papers after his death.[56]

Officer Michael R. Ackenbrack, the COAD union shop steward, could not recall talking to Balas about his grievance directed at the performance evaluation.[57] He testified that he would have given Balas a form to complete. He could not remember signing the form, although he recognized his signature.[58] He kept the first page, after Balas completed the top area with basic information, and gave Balas the second page to complete. It was up to Balas to complete the second page and submit it. Ackenbrack did not follow up with Balas, and Balas never gave him any documents back to file. Ackenbrack did not tell anyone else about the grievance, due to confidentiality. He has no idea whether Balas actually filed the grievance.[59]

## H.    Suicide

Balas had a history of alcohol problems. He tried to stop drinking in May of 2004 at his wife's insistence, but resumed in July of 2004.[60] On January 29, 2005, Lee Mears found Balas drunk, with a gun in his lap, and very depressed after calling Jennifer from a pay phone. After staying up with John all night, Lee, Jeff Foskey, and Cindy took Balas to Dover for a psychiatric evaluation.[61] John wanted to handle his problems through outside care, and did not pursue the DOC employee assistance program.[62] He was seen by a counselor and released. When they returned, Foskey and Lee Mears removed all of Balas' guns from the house.[63] Later that day,

---

[56]  A24-28 (Adkins at 55-59).
[57]   A4 (Ackenbrack at 15)
[58]  A5 (Ackenbrack at 22).
[59]  A6-12 (Ackenbrack at 24-30).
[60]  A29-36 (Adkins at 89-96).
[61]  A108-113; A36 (Foskey at 41-46; Adkins at 96-104).
[62]  A42 (Adkins at 102).
[63]  A113; A45 (Foskey at 46; Adkins at 109).

Balas and Lee Mears discussed the affair, whether his wife was aware of it, and the need to end it.  Balas called SCI and arranged to take time off from work.[64]

The DOC Employee Assistance Program (EAP) offered confidential assistance, including counseling, on a twenty-four hour basis.  It was not reported up the chain of command.[65]  The request for help would be initiated by the employee.  Supervisors could also refer employees, or get advice on how to handle troubled employees.[66]  In the event a supervisor became aware of employee behavior issues that suggested an inability to function, or presented a danger in the workplace, the employee could be referred for a fitness for duty examination.[67]  At one point, the plaintiff obtained the number for the program, but did not call because she thought that the decedent would not want to do that.[68]

Lt. Mears noted changes in Balas' behavior in the year before his death, "not major deficiencies, but uncharacteristic of him".[69]  Shortly before Balas' death, Lee Mears told Lt. Mears that Balas was having problems at home, and that Lee was working with him on that.[70]  When Wilkinson dealt with Balas' complaints about his evaluation and the time cards, he seemed "upset", but not "worried" or "stressed".  He acted "normal", and Wilkinson saw no change in attitude.[71]

Two days before Balas' suicide, Jennifer spoke to Deputy Warden Deloy about Balas.  She said that she had been romantically involved with Balas, had just broken up with him, and was afraid he might hurt himself.  Deloy then told Warden Kearney and they determined that

---

[64]  A138-143; A47 (L. Mears at 38-43; Adkins at 114).
[65]  A69-70 (Deloy at 28, 31).
[66]  A151 (T. Mears at 25).
[67]  A71 (Deloy at 34).
[68]  A46 (Adkins at 111).
[69]  A175 (T. Mears at 167).
[70]  A183 (T. Mears at 202).
[71]  A241-243 (Wilkinson at 109-111).

Balas had been given vacation and was off work until the following week.  They decided that they would handle the matter when Balas returned to work.[72]

The afternoon before his suicide, Balas had a rollover accident in his truck, with his son Jonathon along.  He was injured and received medical treatment.  Balas had been taking medication since February 15, but was told at the emergency room to quit taking it until he saw his family doctor.[73]  The truck looked demolished, but was drivable.[74]  Cindy told Jeff Foskey and Lee Mears about it.[75]  After arriving home and speaking with his wife, Balas called John Mitchell of the Delaware State Police and reported the accident.[76]

On the morning of February 19, 2005, Cindy learned from Tina Foskey that her husband had been involved in an affair with Jennifer Weldon.  Up until that moment, Cindy had been unaware of the relationship.[77]  Cindy went out back and immediately confronted her husband, and he admitted that he had been cheating on her.  He wanted to know who told her, and she told him Tina, and he said "I have got one job to finish".  He went to the barn, obtained a hidden gun, and shot himself.[78]

After John Balas' passing, Cindy made entries in a calendar for the week before his death.  The entry for February 19 reads as follows:  "Found out John cheated from Tina.  Confronted him.  He killed himself."[79]

---

[72]  A77-85 (Deloy at 60-63, 65-68, 70).
[73]  A53 (Adkins at 124).
[74]  A48 (Adkins at 116).
[75]  A144-145 (L. Mears at 44-45).
[76]  A49, A51-52 (Adkins at 118, 120-121).
[77]  A147-149; 54-56 (L. Mears at 47-49; Adkins at 130-132).
[78]  A57-60 (Adkins at 133-136).
[79]  A66; A57 (Adkins Exhibit 6 at 2; Adkins at 133).

## ARGUMENT

**Standard of Review**

Federal Rule 56(c) permits a Court to grant summary judgment, "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The United States Supreme Court holds that a court must enter summary judgment, "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celetox Corp. v. Carter*, 477 U.S. 317, 322-23 (1986).  The summary judgment standard requires that "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (emphasis in original).

"Argument supported by hearsay, not admissible at trial, cannot be considered on a motion for summary judgment."  *Philbin v. Trans Union Corp.*, 101 F.3d 957, 961 (3d Cir. 1996).  At the summary judgment stage, hearsay evidence should not be considered unless the party offering the evidence can establish either that it can be reduced to a form that is admissible at trial or that it is not inadmissible hearsay under the Federal Rules of Evidence.  *Celotex*, 477 U.S. at 327; *Williams v. West Chester*, 891 F.2d 458, 466 n. 12 (3d Cir. 1989); *Blackburn v. United Parcel Serv. Inc.*, 179 F.3d 81, 95 (3d Cir. 1999); Fed. R. Civ. P. 56(e).  The "mere possibility that a hearsay statement will be admissible at trial, does not permit its consideration at the summary judgment stage."  *Bouriez v. Carnegie Mellon Univ.*, 2005 WL 2106582, *9 (W.D. Pa. Aug. 26, 2005); *Proctor v. ARMDS*, 2006 WL 3392932, *4 (D.N.J. Nov. 21, 2006).

I.    **All Claims Arising from Conduct Occurring Before September 25, 2004 Are Time-barred Under The Limitation Period Governing Survival Actions Under Delaware Law.**

This lawsuit, filed on **September 25, 2006**, includes many claims concerning conduct alleged to have occurred before **September 25, 2004**.[80]  In particular, the plaintiff relies on alleged acts of "harassment" and "retaliation" on the part of the defendants that she says occurred on or about **August 7, 2004,** the date of which the decedent and others resigned from the CERT team.[81]  These claims, and any alleged acts of the defendants, prior to **September 25, 2004**, are time-barred.  Under Delaware law, the limitation period for the filing of actions under 42 U.S.C. §1983 is two years.  10 *Del.C.* §8119; *Carr v. Town of Dewey Beach,* 730 F.Supp. 591, 602-603 (D.Del. 1990)( citing *Wilson v. Garcia,* 471 U.S. 261, 277-280 (1985)).

Federal law determines the date of accrual of a §1983 cause of action.  *Deary v. Three Unnamed Police Officers,* 746 F.2d 185, 197 (3d Cir. 1984).  A §1983 claim accrues at the point the injured person knew or had reason to know of the injury giving rise to the lawsuit.  *Cuffy v. Getty Refining & Marketing Co.,* 648 F.Supp. 802, 808 (D.Del 1986) (untimely claims barred where employee failed to show continuing violation of civil rights).  Where the plaintiff can show only "the occurrence of isolated or sporadic acts", she cannot assert claims for acts occurring outside the limitation period.  *Jewett v. International Telephone and Telegraph Corp.,* 653 F.2d 89, 91 (3d Cir. 1981)(judgment reversed, based on untimely filing of EEOC complaint and lack of evidence of continuing violation).  In order to determine whether a series of events constitute discrete actions or a continuing course of conduct, the Court must first identify precisely the practice complained of, and separate it from its inevitable, but neutral, consequences.  *Carr v. Town of Dewey Beach, supra.*

---

[80]  A251-258 (Complaint at ¶¶12-32, 33-47).
[81]  A259-261 (Complaint at ¶¶ 48-59).

This Circuit has recognized the bright-line distinction set forth in *National Railroad Passenger Corp. v Morgan,* 536 U.S. 101, 113 (2002) between discrete acts, which are individually actionable, and those acts which may be aggregated. *O'Connor v. City of Newark*, 440 F.3d 125, 127 (3d Cir. 2006):

> "*Morgan* held simply that causes of action that can be brought individually expire with the applicable limitations period….The Court did nothing more than to restate, in the employment discrimination context, the common-sense proposition that an applicable statute of limitations begins to run at the time the claim accrues, and that time-barred claims cannot be resurrected by being aggregated and labeled continuing violations." *Id.* at 128-129.

In this case the plaintiff complains of several such discrete acts, including a transfer request, a satisfactory evaluation that was disappointing to the decedent, and a dispute over vacation requests and time cards. Those events occurring after September 25, 2004 are not barred by the limitation statute. However, under the *Morgan* test as set forth in *O'Connor, supra,* those acts complained of that occurred before that date, including specifically those relating to the CERT resignation, are barred. *O'Connor* was a First Amendment retaliation case, and the decision of the trial court, barring untimely claims and granting summary judgment, was affirmed.

Thus, the plaintiff's claim that the decedent feared "immediate retaliation"[82] on August 7 following his resignation is barred. Likewise, the further claim, that Balas asked Captain Wilkinson and Deputy Warden Deloy for a transfer that they refused, is time-barred. The defendants are entitled to partial summary judgment as to any and all claims of "retaliation" or "harassment" based on acts before September 25, 2004.

---

[82]  A260 (Complaint ¶55).

II.  **Plaintiff's Claims In This Survival Action are Limited To Those Arising During The Lifetime of The Decedent, and Recovery Of Damages Sustained After His Death Are Barred By The Failure Of The Plaintiff To File A Wrongful Death Action.**

The plaintiff, as Executrix, has filed a survival action on behalf of the Estate of her deceased husband.[83]  The action is thus governed by 10 *Del.C.* §3704.  No action for wrongful death has been filed pursuant to §3724, and any such action is now barred by the two-year statute of limitations.  10 *Del.C.* §8107.  The plaintiff (and other potential beneficiaries of a wrongful death action) have thus effectively waived the right to recover damages for (1) the deprivation of the expectation of pecuniary benefits that would have resulted from the continued life of the decedent; (2) loss of contributions for support; (3) loss of household services; (4) funeral expenses; and (5) mental anguish resulting from the suicide death of John Balas.  §3724(d).

The Delaware Survival Act does not create a new cause of action, but merely allows the personal representative of the decedent to pursue a cause of action that had accrued prior to his death.  *Coulson v. Shirks Motor Express Corp.,* 107 A.2d 922 (Del. 1954).  The measure of damages recoverable in a survival action by a decedent's personal representative is the same as what would have been recoverable had the injured party survived.  *Loden v. Getty Oil Co.,* 359 A.2d 161, 163 (Del. 1976).  Punitive damages[84] may only be recovered for actual pain and suffering prior to death.  *Reynolds v. Willis,* 209 A.2d 760 (Del. 1965); *Magee v. Rose,* 405 A.2d 143 (Del. Super. 1979).  The claims asserted here by the plaintiff for "emotional distress, humiliation, embarrassment, and injury to reputation", would be limited in time to the period from **September 25, 2004** (per Argument I above) to the death of John Balas on **February 19, 2005**.  *See Scott v. University of Delaware,* 601 F.2d 76, 81 (3d Cir. 1979).

---

[83]  A248 (Complaint ¶¶1, 3).
[84]  A276 (Complaint, prayer for relief ¶D, at 30).

Having failed to file a wrongful death action, the plaintiff is barred from recovering for funeral expenses, or for "compensatory damages, including lost wages, back pay, pension or other benefits, for future of front pay, loss of earning capacity"[85], as a result of Balas' death. The record is clear that decedent, prior to his suicide, did not suffer termination, reassignment, reduction in pay, denial of raises or promotion opportunities, or any other pecuniary loss whatsoever, regardless of the "retaliation" alleged in the plaintiff's complaint. He remained an employee in good standing of the Department of Correction, with his full salary and all benefits intact. Thus there is no evidence that, at the time of his death, the decedent had sustained any such loss.[86] The defendants are entitled to partial summary judgment as to all such claims.

In the absence of a wrongful death action, the plaintiff cannot attribute the decedent's suicide to his alleged problems at work, or to the supposed "retaliation" of the defendants. Such claims, arising only upon death, cannot be pursued in a survival action, and cannot be added as elements of damages, since they did not arise during decedent's lifetime. Apart from the tragic suicide of John Balas, the record reflects an unextraordinary employment dispute. *Compare Collins v. Village of Woodridge,* 96 F.Supp.2d 744, 755 (N.D. Ill. 2000) (dismissing claim of alleged retaliation of behalf of police officer who committed suicide). As here, the decedent in *Collins* sought "to remove what she perceived to be a hindrance to her advancement at the Department, not to promote a broader social issue". *Id.* The Due Process Clause imposes no duty on the State to protect an individual employee from himself. *Estate of Smith v. Town of West Hartford*, 186 F.Supp.2d 146, 151 (D.Conn. 2002)(court dismissed First Amendment

---

[85]  A276 (Complaint, prayer for relief, ¶C, at 30).
[86]  The plaintiff has submitted the report and projections of an economist as to such losses. However, these projections are entitled to no weight, as the economist only projected losses *attributable to the suicide,* and thus recoverable only in a wrongful death action, under Delaware law.

retaliation claims based on union activities brought by widow of police officer who committed suicide).

### III. Defendants Are Entitled To Summary Judgment On All Counts Because The Plaintiff Can Not Establish That Any Of The Defendants Retaliated Against Decedent In Violation Of His First Amendment Rights.

The First Amendment protects a public employee's right, under certain circumstances, to speak as a citizen on matters of public concern. *Brennan v. Norton*, 350 F.3d 399, 412 (3d Cir. 2003)(citing *Baldassare v. New Jersey*, 250 F.3d 188, 194 (3d Cir. 2001). This protection does not extend to public employees when the speech is made pursuant to their official duties. *Garcetti v. Ceballos*, --- U.S. ---, 126 S.Ct. 1951, 1957 (2006).

A "well-established" three-step approach is used by the courts when analyzing a First Amendment retaliation claim. *Hill v. City of Scranton*, 411 F.3d 118, 125 (3d Cir. 2005); *Mount Healthy Cty. Sch. Dist. Bd. Of Educ. v. Doyle*, 429 U.S. 274, 287 (1977). The plaintiff must establish: 1) that the activity in question is protected by the First Amendment; 2) the "protected activity was a substantial factor in the alleged retaliatory action"; and 3) the defendants can rebut a prima facie case of retaliation by "demonstrating that the same adverse action would have taken place in the absence of the protected conduct." *Hill*, 411 F.3d at 125 (citations omitted); *See also Green v. Philadelphia Housing Authority*, 105 F.3d 882, 885 (3d Cir. 1997).

The plaintiff can not establish even a *prima facie* case of retaliation because he did not engage in protected conduct. Even if he had, the decedent did not suffer any adverse action and there is no evidence to support that any of the alleged adverse actions were in retaliation for protected activity. Further, the actions of the defendants alleged to be in retaliation for protected conduct protected would have occurred regardless of the alleged protected conduct.

A.    **Decedent's alleged protected conduct was pursuant to his official duties and not protected by the First Amendment.**

The plaintiff alleges that decedent's resignation from CERT is a protected activity because it was symbolic speech done in support of a work action.[87]  The plaintiff further alleges that the decedent spoke out in support of the union,[88] but all of the allegations of speaking out relate to the resignation from CERT.  After *Garcetti*, "before analyzing whether an employee's speech is of public concern, a court must determine whether the employee was speaking 'as a citizen' or, by contrast, pursuant to his duties as a public employee."  *Foraker v. Chaffinch*, 501 F.3d 231, 243 (3d Cir. 2007).  Only after it is found that the employee was speaking as a citizen, is an inquiry made into the content of the speech.  Thus, the reasons why decedent resigned from CERT are not relevant until it is determined that he did so as a citizen, rather than a public employee, and he did not.

CERT officers accept additional responsibilities requiring them to respond to special situations when activated.[89]  Once a correctional officer joins CERT, they accept responsibilities above and beyond their duties as a correctional officer and the decision whether or not to continue with those additional responsibilities is included in the scope of conduct of the CERT members.   *See Battle v. Bd. Regents*, 468 F.3d 755, 761 (Ga. 2006)(if speech is not a part of the everyday functions of an employee's job, but concerns an unusual aspect of the job, it may still be considered pursuant to official duties).  Just as the decision to participate in CERT is pursuant

---

[87] A274 (Complaint at ¶132).

[88] Plaintiff spends significant time in the Complaint discussing the actions of the union and also asserts that the decedent spoke out through these actions because he was a member of the union.  It is noteworthy that other than being a member of the union, there is no allegation or evidence that decedent was actively involved in any negotiations in the summer of 2004, or actively engaged in any union activity beyond his being a member.  *Compare Hoffman v. Dougher*, 2008 WL 148877 (M.D.Pa Jan. 14, 2008)(plaintiff participated in union negotiations); *Glass v. Snellbaker*, 2007 WL 1723472 (D.N.J. June 14, 2007) (plaintiff criticized defendant and convinced the union to hold an open meeting to air their grievances instead of a confidence vote).

[89] A153 (T. Mears Dep. at 61-62).

to employment duties, so is the decision not to participate.  As the Court stated in *Garcetti,* "[r]estricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen."  *Garcetti* at 1960.  Further, the prospect of protection does not invest employees with a right to perform – or not perform – their job duties however they see fit.  *Id.* at 1960.

The context of the alleged protected speech provides further support that *Garcetti* precludes the plaintiff's claims.  The Third Circuit noted in *Foraker*, that several circuits have considered as persuasive the fact that an employee spoke privately.  *Foraker*, 501 F.3d at 241(citing *Haynes v. City of Circleville*, 474 F.3d 357 (6th Cir. 2007)(employee's communication solely to his supervisor indicated that he was speaking as a public employee); *Mills v. City of Evansville, Ind.*, 452 F.3d 646, 648 (7th Cir. 2006)(the fact that the employee was on duty, in uniform, and spoke with superiors all indicated she spoke in capacity as public employee).  The CERT members all resigned at the prison, in a conference room and in a private meeting with the Warden.[90]  These facts all lend further support that decedent was speaking, not as a citizen, but as a correctional officer.

The decedent did not engage in protected conduct as a citizen, but rather acted within the scope of his duties as a correctional officer, and specifically a CERT team officer.  His conduct or speech is not protected under the First Amendment and summary judgment should be awarded in favor of the defendants.

**B.    Plaintiff can not establish a prima facie case of First Amendment retaliation because decedent did not suffer any adverse action.**

None of the conduct alleged by the plaintiff to be adverse, either individually or collectively, is sufficient to be actionable under the First Amendment.  "To qualify as retaliatory,

---

[90] A96-101 (Foskey at 27-32).

an employer's conduct must adversely affect an employee's First Amendment rights." *Hoffman*, 2008 WL at *10 (citing *Brennan*, 350 F.3d at 419. The adverse action need not be great to be actionable, but it must be more than *de minimis*. *Smith v. Central Dauphin Sch. Dist.*, 511 F.Supp.2d 460, 474 (M.D. Pa. 2007)(citing *Brennan*, 305 F.3d at 419). The alleged retaliatory conduct must be sufficient to deter a person of ordinary firmness from exercising his First Amendment rights. *Suppan v. Dadonna*, 203 F.3d 228, 235 (3d Cir. 2000).

Adverse decisions on hiring, rehiring, promoting, transferring, and recalling an employee have all been found to be sufficient to deter an employee from exercising his First Amendment rights. *Smith*, 511 F.Supp.2d at 474. The Third Circuit in *Suppan* stated that "an entire campaign of harassment" may be sufficient to constitute adverse employment action, but "it gave little guidance as to what the threshold of actionability is in retaliatory harassment cases." *McKee v. Hart*, 436 F.3d 165, 172 (3d Cir. 2006). The Third Circuit in *McKee* clarified that "it would trivialize the First Amendment to hold that harassment for exercising the right of free speech was always actionable no matter how unlikely to deter a person of ordinary firmness from that exercise." *Id*. at 170 (citing *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982).

The plaintiff asserts the following adverse actions in support of his first amendment claim:

1) He received an evaluation of "Meets Expectations" on September 26, 2004 and the evaluation was submitted without his signature.

2) He was "watched and monitored constantly by defendant Mears who was seeking a performance misstep to use as a basis for discipline against him."

3) His timecards were altered to include a notation for "emergency vacation days."

4) He did not receive a copy of his updated timecard in January of 2005.

5) He was denied a transfer.

6) He informed Defendants Wilkinson and Deloy of the retaliatory actions by Mears and they never took steps to stop the retaliation.[91]

The record establishes that several of these allegations are completely unfounded and not supported by evidence, while others are not adverse actions at all. What remains are trivial allegations that are insufficient to be actionable alone and insufficient to rise to the level of retaliatory harassment.

### 1.     The "Meets Expectations" evaluation was not an adverse action.

Decedent received an evaluation of "Meets Expectations" from his supervisor, Lt. Mears, on September 26, 2004. The plaintiff asserts that prior to resigning from CERT, decedent had "consistently received rankings of 'Exceeds Expectations'."[92] Cindy Adkins testified that her husband had never received a rating of "Meets Expectations" and she and John viewed this as a negative evaluation.[93] The plaintiff concludes that this unprecedented evaluation must be in retaliation for decedent's resignation from CERT.[94] The record establishes that the plaintiff is wrong. This was not an unprecedented rating for decedent nor was it a negative or adverse evaluation. The DOC's evaluations provide for five possible ratings from "Distinguished" at the highest end of the scale to an "Unsatisfactory" at the lowest end. A "Meets Expectations" falls squarely in the middle and, despite the plaintiff's and decedent's belief otherwise, it is a good evaluation.[95] This rating has no effect on a correctional officer's assignments, shifts, salary, requests for time off, transfers, opportunity for advancement, or any other benefit.[96]

---

[91] A260 (Complaint at section E).
[92] A261 (Complaint at ¶61).
[93] A17, A20, A21 (Adkins at 32, 35, 36)
[94] A24 (Adkins at 55).
[95] A1-2, A177 (Deloy Affidavit, T. Mears at 175).
[96] A1-2 (Deloy Affidavit)

While the plaintiff maintains that decedent had never before received this ranking, the record establishes that he had received an evaluation of "Meets Expectation" twice in the past.[97] Both in years that he also had perfect attendance.[98]  Decedent was also promoted to Corporal since receiving a 'Meets Expectations'.[99]

A 'Meets Expectations' evaluation is not sufficient to deter a person of ordinary firmness from exercising their constitutional rights because it is not a negative or bad evaluation, as evidenced by decedent's own employment history.  There is no genuine issue of material fact that decedent suffered an adverse action simply because he was unhappy with his evaluation.

2.    **The allegation that Lt. Mears was constantly watching and monitoring the conduct of decedent is completely unsupported by any evidence.**

The plaintiff next asserts that decedent was constantly watched and monitored by defendant Mears looking for him to misstep and that decedent was "shown a note pad where someone was keeping chronological notes of his performance and whereabouts."[100]  This allegation is completely unsupported by any evidence.  There have been no such notes produced or any evidence that the alleged notes, if they exist, were written by Lt. Mears.  Lt. Mears was decedent's supervisor.  His responsibilities included monitoring officers who were under his command.[101]  There is no evidence that Lt. Mears was monitoring decedent more than or differently than the other officers under his command, and Lt. Mears did not keep any handwritten notes on decedent.[102]  To find that this allegation is a sufficient adverse action would lead to the absurd conclusion that any supervisor who monitors their staff may be risking

---

[97]  A283-287 (Meets Expectations evaluations).
[98]  A280-281 (perfect attendance letters).
[99]  A22-23 (Adkins at 38-39).
[100]  A263 (Complaint at ¶76).
[101]  A278-279 (employment description).
[102]  A182 (T. Mears at 200-1).

constitutional liability. There is no genuine issue of material fact that Lt. Mears excessively monitored decedent.

> **3.    The change to officers' time cards was not a retaliatory action and was not exclusive to decedent.**

The plaintiff alleges that decedent's time cards were altered to include emergency vacation days and this was retaliatory conduct.[103] There is no evidence to support or even suggest that this was a retaliatory action by Lt. Mears for decedent's protected conduct.

In the fall of 2004, Lt. Mears made handwritten notations on his personal time card records, including decedent's. He made the notations to mark days when employees took an emergency vacation day as opposed to a regular vacation day.[104] Despite the plaintiff's assertion that the use of emergency vacation days are "frowned upon",[105] they are not.[106] There is no difference between a regular vacation day and an emergency vacation day, except that one is pre-planned and one is last minute.[107]

Regardless, Lt. Mears was not singling out decedent to retaliate against him. Lt. Mears made this notation on all of his officers' cards, not just decedent's.[108] His reasons for making the notations were completely unrelated to decedent. Lt. Mears was approached by officers who alleged that they were having more difficulty than other officers getting emergency vacation days because of their race. Lt. Mears went back to track emergency vacation days on all of his officers' cards so he could see if this was the case and, if so, remedy the situation.[109] After decedent complained about the marks on his cards, Lt. Mears was instructed to change them

---

[103]  A264 (Complaint at ¶77)
[104]  A180-181 (T. Mears at 190-197).
[105]  A264 (Complaint at ¶77)
[106]  A115, A197, A213, A236-237, A1-2 (Hastings at 21, Mumford at 36, West at 19-20, Wilkinson at 104-105, Deloy Affidavit).
[107]  A180, A1-2 (T. Mears at 191, 192, Deloy Affidavit).
[108]  A180, A236 (T. Mears at 192, Wilkinson at 104).
[109]  A180 (T. Mears at 191-92).

back, and he did on decedent's card only.[110]  Further, these timecards were kept by Lt. Mears for his personal records, while the official timecard for employment purposes was kept in the timekeeper's office.[111]  The allegation that this was somehow done to retaliate against decedent is completely unsupported by the evidence.

The plaintiff also asserts that the fact that decedent did not receive a copy of his updated time card from Lt. Mears was in retaliation for protected conduct.[112]  There is no evidence that Lt. Mears gave other officers their time cards and not decedent.  Lt. Mears testified that he had not given any time cards out when decedent asked for his.  When he printed them out for distribution, decedent was the first to receive his card.  In fact, Lt. Mears handed it to him right off the copier.[113]  This is a trivial allegation that is not at all suggestive of retaliatory conduct.

The allegations related to the time card are an attempt by the plaintiff to bolster an ordinary employment dispute between a supervisor and an employee to the level of a constitutional claim with trivial unsupported allegations.  There is no genuine issue of material fact on the allegations related to the timecard and summary judgment should be awarded to the defendants.

> **4.    The decision not to give the decedent a new supervisor was not an adverse action.**

The plaintiff asserts that decedent "constantly demanded a transfer from under Mears" and that "Defendants Wilkinson and Deloy never took any action to transfer the decedent" and "his requests were denied."[114]  This claim is completely unsupported by the record.

---

[110]  A181 (T. Mears at 195-196).
[111]  A180 (T. Mears at 192).
[112]  A264 (Complaint at ¶79).
[113]  A179 (T. Mears at 186).
[114]  A264-265 (Complaint at ¶80).

While it is admitted that Wilkinson and Deloy never transferred the decedent, there is no evidence that the decedent ever requested that he be transferred. The decedent requested that he be assigned a different supervisor, and this request was made only to Deloy, and not Wilkinson.[115]

The decedent told Deloy that he wanted a new supervisor because he was unhappy with his employment evaluation.[116] As stated by Deloy in the attached affidavit, he routinely receives this type of request from employees. It would be poor precedent for a warden or deputy warden to immediately grant such a request when tempers are high. Thus, Deloy told decedent that he would not grant the request at that time but would reconsider it in a few months if he was still unhappy. This was not an adverse action to retaliate against decedent. Rather, this was the standard practice of Deloy because, in his experience, the passage of time allows tempers to settle and typically resolves the issue. As indicated by Deloy, he did not entirely rule out the request, but told decedent that he wanted to come back to the issue in several months if necessary, and John appeared satisfied with that response.[117]

There is no genuine issue of material fact on the transfer issue and summary judgment in favor of the defendants should be granted.

     **5.**    **There is no evidence that Defendants Wilkinson or Deloy ignored retaliation against the decedent.**

Finally, the plaintiff asserts that Defendants Wilkinson and Deloy were informed of the retaliation and "never took steps to stop Mears from retaliating against the decedent."[118] This allegation fails. Deloy testified that he did not recall a conversation with decedent about Lt. Mears harassing him or retaliation against him and there is no other evidence to support this

---

[115]  A238, A74-75 (Wilkinson at. 106, Deloy at 53-54).
[116]  A73-74 (Deloy at 52, 53).
[117]  A 1-2 (Deloy Affidavit)
[118]  A265 (Complaint at ¶81).

allegation.[119]  Wilkinson testified that decedent complained to him about Lt. Mears with respect to his evaluation and he immediately took action and suggested they all sit down together to review the evaluation.[120]  The first time he saw Lt. Mears after that, he discussed with him that they would all sit down together for the meeting.[121]  Further, when decedent complained to him about the time cards, he instructed Lt. Mears to change them back.[122]

Further, as discussed above, there is no evidence to support that any of the alleged actions by Lt. Mears were in retaliation for protected conduct.  Deloy and Wilkinson could not have ignored retaliatory conduct where none existed in the first instance.

There is no evidence that Deloy was ever aware that decedent believed Lt. Mears was retaliating against him or harassing him and the claim against Deloy must fail.  The record also establishes that Wilkinson affirmatively acted in response to decedent's complaints about Lt. Mears.  There is no evidence to support the allegation that he ignored decedent's complaints.

There is no genuine issue of material fact as to the allegations that Deloy or Wilkinson ignored retaliation against decedent.

### 6.    The alleged adverse actions are either unsubstantiated or insufficient to establish a First Amendment claim of retaliation.

Not every action at work that an employee is unhappy with or subjectively believes is an adverse action can be piled together to create an actionable First Amendment claim.  After parsing through the plaintiff's allegations and the lack of evidence to support the allegations, what remains is *de minimis* and insufficient to constitute retaliatory adverse actions, individually or collectively, for purposes of First Amendment liability.

---

[119]  A75 (Deloy at 54).
[120]  A219, A221 (Wilkinson at 57, 65).
[121]  A224 (Wilkinson at 69)
[122]  A236-237 (Wilkinson at 104-105)

Decedent did not suffer any adverse action sufficient to be actionable under the First Amendment.  Thus, the plaintiff can not establish a *prima facie* case of retaliation and summary judgment in favor of the defendants should be granted.

### C.    Decedent's alleged protected conduct was not a substantial or motivating factor in any alleged adverse action by the defendants.

The record does not support a finding that any of the alleged retaliatory actions were a result of decedent's resignation from CERT or any other alleged protected activity.  "To establish the causation element of a retaliation claim, a plaintiff must prove that the exercise of his First Amendment rights "played some substantial role" in motivating the retaliatory act." *Hoffman*, 2008 WL at * 11 (citing *Meenan v. Harrison*, 2006 WL 1000032, at *4 (M.D.Pa. April 13, 2006).  Although a plaintiff need not prove that the retaliation was motivated solely or primarily by the protected activity, the causation requirement is to be strictly interpreted by the courts.  *Id.*  As the Third Circuit stated:

> "A court must be diligent in enforcing these causation requirements because other wise a public actor cognizant of the possibly that litigation might be filed against him, particularly in his individual capacity, could be chilled from taking action that he deemed appropriate and, in fact, was appropriate. Consequently, a putative plaintiff by engaging in protected activity might be able to insulate himself from action adverse to him that a public actor should take."  *Id.*
> (citing *Lauren W. ex rel. Jean W. v. Deflaminis*, 480 F.3d 259, 267 (3d Cir. 2007).

A correctional supervisor should not be discouraged from rating an officer under his command as a "Meets Expectations" for fear of First Amendment liability.  As previously discussed, this is not an evaluation that adversely impacts assignments, shifts, salary, requests for time, transfers, or any other aspect of employment with the DOC and it is not a negative evaluation.  Decedent may have desired more than a "Meets Expectations" rating, but decedent's subjective belief that he deserved a better evaluation is not sufficient to establish constitutional liability.

### 1.     Absence of Temporal Proximity.

The plaintiff suggests that the temporal proximity in this case is "unduly suggestive."[123] In fact, under current precedent, there is an absence of temporal proximity in this case which suggests that the alleged adverse action had no causal connection to the alleged protected conduct.

The temporal proximity of an alleged retaliatory act to the protected conduct in a First Amendment case is "probative, but not dispositive of the causation element of a retaliation claim." *Hoffman*, 2008 WL, at *12 (citing *Estate of Smith v Marasco*, 318 F.3d 497, 512 (3d Cir. 2003). When the Courts hold that temporal proximity is sufficient to establish causation, the difference in time is measured in days, rather than in weeks or months." *Id.* (citing *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280 (3d Cir. 2007)(two days can establish causation on its own); *Shellenberger v. Summit Bancorp., Inc.*, 318 F.3d 183, 189 (3d Cir. 2003)(ten days insufficient to establish temporal proximity unless accompanied by other evidence of wrongdoing); *Killen v. N.W. Human Servs., Inc.,* 2007 WL 2684541, at *8 (E.D. Pa. Sept. 7, 2007)(seventeen days is insufficient to establish causation).

The first alleged retaliatory act in this case, the evaluation of September 26, 2004 occurred approximately seven weeks after the alleged protected activity or resignation on August 6, 2004. Third Circuit precedent establishes that this length of time is insufficient standing alone to establish causation. Thus the Court must examine the record "as a whole" for additional evidence that would give rise to causation as a whole. *Hoffman*, 2008 WL, at *12.

### 2.     Absence of any evidence in the record to support causation.

Examining the record as a whole, does not support a finding of causation.

---

[123]   A253 (Complaint at ¶22).

In *Suppan*, the Court found that the record as a whole could lead a fact finder to conclude that the defendants' actions were in retaliation for protected conduct. *Suppan*, 203 F.3d at 237. The plaintiff, in *Suppan*, alleged that the defendants retaliated against them for their union activity for over a period of time of more than a year. *Id.* at 230-32. The conduct included repeated chastisements and threats from their superiors. The Court found that even though the retaliatory decisions may not have adversely effected the plaintiff's terms of employment, an entire "campaign of harassment" may meet the threshold of actionability for § 1983. *Id.* at 235. The Court cited, as most important, several admissions that the protected conduct caused them to lower the score and several statements made that reflected hostility to the plaintiff for his union activity. *Id.* at 237.

The record here establishes otherwise. There are no statements by the defendants, records of the defendants, admissions, or other admissible evidence to suggest that any of the alleged adverse actions were at all connected to decedent's alleged protected conduct. The DOC administration, and specifically the defendants, did not harbor any animosity against decedent or the other CERT team members for the resignation.[124]

The only evidence in the record to support a causation argument comes from decedent's subjective belief that he was being retaliated against. The plaintiff has produced documents in discovery that are alleged to be written by decedent during his lifetime, but the statements in these documents would not be admissible to prove causation at trial and thus can not be considered for purposes of summary judgment. As outlined in the standard of review, argument supported by inadmissible hearsay cannot be considered on a motion for summary judgment. *See Celotex*, 477 U.S. at 327(evidence produced at summary judgment stage must be admissible

---

[124]  A101, A199-200, A244, A195-196 (Foskey at 32, Shockley at 19-20, Wilkinson at 114, Mumford at 31-32)

at trial); *Williams*, 891 F.2d at 466 n. 12 (what is produced at summary judgment stage must set forth evidence that would be admissible at trial); *Philbin,* 101 F.3d at 961(argument supported by inadmissible hearsay can not be considered on summary judgment; *Blackburn*, 179 F.3d at 95 (court had to determine at the summary judgment stage if the evidence relied upon would be admissible at trial); Fed. R. Civ. P. 56(e).  Further, any statements that decedent may have made to his wife or anyone else during his life would not be admissible to prove causation at trial, and thus also can not be considered.  Regardless, constitutional liability does not lie in an employee's subjective beliefs absent any other evidence to support the claim.  *See Shankle v. Bell*, 2006 WL 2794559 (W.D. Pa. Sept. 27, 2006)(citing *Sporn v. Ocean Colony Condo. Ass'n.*, 173 F.Supp.2d 244, 251 (D.N.J. 2001)(testimony of subjective belief rejected for the purposes of showing retaliatory motive)).

The court in *O'Connor v. Kelly* examined the causation prong of the First Amendment analysis in a case with a similar absence of evidence.  In *O'Connor*, a police officer claimed he was denied a promotion in retaliation for his union activity.  The Court held that "the facts that compelled the *Suppan* court to find that the substantial or motivating factor analysis had been satisfied are notably absent from the case at hand."  *O'Connor*, 2004 WL 1012853, at *3 (E.D. Pa. May 5, 2004).  The Court noted that there was no evidence that the defendants admitted that union activity played any role in their promotional decision, which was alleged to be the adverse conduct.  The plaintiff also could not point to any comments made by the defendant expressing contempt for the union or the plaintiff's role.

What the record in this case does establish is that decedent was suffering a difficult time period in his life.  He was depressed, drinking excessively, having marital problems, and

engaged in an extra-marital affair.[125]  Some of these problems already existed at the time of the resignation.[126]  He had been drinking heavily in the spring of 2004 and had even driven while intoxicated with his children in the vehicle.[127]  He was arguing with his wife during the same time period.[128]  Decedent also initiated an affair by anonymously sending flowers to a woman that he worked with in August of 2004, which was at least one month before any alleged retaliatory conduct.[129]

It is apparent from the record that the CERT resignation occurred at an unfortunate time for decedent.  He appears to have taken the resignation significantly harder than any of the other officers who resigned with him.  First Amendment law, however, is designed to protect a "person of ordinary fitness" and the defendants can not be held liable absent any evidence that their conduct was related to decedent's alleged protected activity.

The record as a whole does not establish that any of the alleged adverse actions by the defendants were causally connected to decedent's resignation from CERT, or other alleged protected activity.  Summary judgment in favor of defendants should be granted on all counts.

3.     **Plaintiff's attempt to causally connect decedent's union activity with an alleged failure of the defendants to prevent his suicide is not constitutionally permissible.**

To the extent that the plaintiff is alleging that decedent's suicide is causally connected to his union activity and that the defendants failed to prevent his suicide in retaliation for his union activity, this allegation is wholly unsupported by the record and completely subverts existing constitutional law.

---

[125]  A30-34, A55-57, A202-203 (Adkins at 90-94, 131-33, Weldon at 6-7)
[126]  A14 (Adkins at 28)
[127]  A30-31 (Adkins at 90-1)
[128]  A33-34 (Adkins at 93-94)
[129]  A202 (Weldon at 6)

In *DeShaney v. Winnebago Cty. Dept. of Soc. Svc.*, 489 U.S. 189 (1989), the plaintiff attempted to recover from the State based on its alleged failure to intervene and protect a child from repeated abuses by the child's father. The plaintiff alleged that defendants had been presented with evidence of the abuse but had not removed the child from the father's custody. The United States Supreme Court refused to impose such a duty on the defendants. It held that absent a "special relationship", such as custody, "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *DeShaney,* 489 U.S. at 196-97. This analysis in *DeShaney* is equally applicable in the First Amendment context.

The District Court of Connecticut addressed the issue in the case of *Estate of Smith v. Town of West Hartford*. In that matter, a police officer's widow was attempting to recover against the State after her husband committed suicide. She alleged that the defendants had failed to prevent her husband's suicide and thus had violated his due process rights and his First Amendment rights in retaliation for his union activities. *Estate of Smith*, *supra.* With respect to the First Amendment allegation, the Court relying on *DeShaney*, stated the following:

> The adverse action the plaintiffs challenge is the defendant's failure to prevent Smith from the private violence he inflicted upon himself. The Supreme Court has definitively held that where, as here, the individual was not in custody, there is no constitutional obligation under the Due Process Clause for the state to act to protect an individual against private violence. To accept the plaintiffs' theory for their retaliation claim would be tantamount to holding that the First Amendment creates a constitutional obligation for the State to act in circumstances where the Supreme Court has definitively concluded that the Due Process Clause imposes no such duty. Such a holding would appear to permit an inappropriate end-run around *DeShaney* and its progeny.

*Id.* at 157 fn. 7

Similarly, here the defendants had no constitutional obligation to protect decedent from the violence that he inflicted upon himself. Even if the Court finds that they did, the defendants

are entitled to qualified immunity on such a claim because this right was not clearly established at the time of decedent's death.

      **D.**      **Defendants would have taken the same actions even in the absence of the protected activity.**

The third prong of the First Amendment retaliation analysis applies only if the plaintiff can demonstrate the first two prongs. *Smith*, 511 F.Supp.2d at 480. As stated above, no genuine issue of material fact exists as to the first two prongs. However, even assuming *arguendo* that a genuine issue does exist, the defendants would have taken the same actions absent the protected activity.

As the record establishes, the actions of the defendants alleged to be in retaliation for protected conduct would have occurred regardless of the alleged protected activity. For example, Lt. Mears testified that Balas' work performance had changed beginning in February of 2004, or approximately six months prior to the CERT resignation.[130] This time period coincides with the time when Cindy Adkins testified that her husband was drinking more and had driven drunk with the kids in the car, and when they fought about the drinking and money.[131] Given these personal problems, it is not at all a surprise that decedent's work performance was affected.

Clearly, Lt. Mears would have made the same alterations to the time cards absent the protected conduct considering that his reasons for making the changes, i.e. the complaint of several officers, would have occurred regardless of decedent's alleged protected activity. Defendant Deloy also would have made the same decision with respect to the request for a new supervisor considering this was his typical practice and, from his experience, was the best approach in dealing with such requests.

---

[130] A153 (T. Mears at 60).
[131] A30-34 (Adkins at 90-94).

The defendants' actions would have occurred of any alleged protected activity by decedent and summary judgment should be granted in favor of the defendants on all counts.

## IV.    Plaintiff Cannot Support His Claims Against Defendants Deloy, Wilkinson, Machtinger, or Taylor Because They Had No Personal Involvement In The Allegations In the Complaint.

To support a claim for a civil rights violation a plaintiff must show that the defendant had *personal involvement* in the alleged wrongs. *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988) (emphasis added). A plaintiff must prove that the accused official "played an affirmative role in the deprivation of the plaintiffs' rights, i.e., there must be a causal link between the actions of the responsible officials named and the challenged misconduct." *Pennsylvania v. Porter*, 659 F.2d 306, 336 (3d Cir. 1981). It is also well established that § 1983 will not support a claim based on the theory of *respondeat superior* or vicarious liability. *Polk County v. Dodson*, 454 U.S. 312, 325 (1981). "Supervisory liability may attach if the supervisor implemented deficient policies and was deliberately indifferent to the resulting risk or the supervisor's actions and inactions were "the moving force" behind the harm suffered by the plaintiff. *Sample v. Diecks*, 885 F.2d 1099, 1117-118 (3d Cir.1989).

As previously discussed, there is no evidence to establish a causal link between any of decedent's alleged protected activity and any conduct by Defendant Deloy. As to Defendant Wilkinson, rather than affirmatively act to deprive decedent of his rights, he acted to attempt to remedy decedent's complaints. There is also no evidence that Defendants Taylor or Machtinger participated, condoned, or even knew of any of the conduct alleged to be retaliatory or that they implemented a deficient policy which was the "moving force" behind the alleged harm suffered by the decedent.

While the plaintiff makes the broad assertion that the defendants "have an official policy, practice, or custom of harassing . . .union members who speak out."[132] There is absolutely no evidence to support this claim or any actionable claim against Defendants Deloy, Wilkinson, Machtinger, or Taylor as they were not affirmatively involved in any alleged deprivation of decedent's rights. Absent any such evidence, no genuine issue of material fact exists to present to a jury and summary judgment should be granted in favor of Defendants Deloy, Wilkinson, Machtinger, and Taylor.

**V.    Plaintiff Has Failed to Establish an Actionable Claim Under the Petition Clause.**

The decedent did not petition the government for redress, either formally or informally, and thus the plaintiff's petition clause claim must fail. "A public employee who has petitioned the government through a formal mechanism such as the filing of a lawsuit or grievance is protected under the Petition Clause from retaliation for that activity". *Foraker*, 501 F.3d at 236 (citing *San Filippo v. Bongiovanni*, 30 F.3d 424 (3d Cir. 1994). Lawsuits, grievances, workers compensation claims are all examples of formal mechanisms. *Id.* Less formal mechanisms "may occasion a lesser degree of constitutional protection." *Id.* (citing *McDonald v. Smith*, 472 U.S. 479, 482 (1985); *Schallk v. Gallemore*, 906 F.2d 491 (10th Cir. 1990)). Informal conduct is not protected by the Petition Clause. *See Bradshaw v. Township of Middletown*, 296 F.Supp.2d 526, 545-46 (D.N.J. 2003)(informal conduct, including letters, phone calls, memoranda, or meetings is not protected by Petition Clause); *Cooper v. Cape May Cty. Bd. of Soc. Svcs.*, 175 F.Supp.2d 732, 746 (D.N.J. 2001)(informal verbal or written complaints did not implicate the Petition Clause).

---

[132]  A259 (Complaint at p. 13).

The plaintiff asserts that decedent petitioned the government for change through his union.[133]  Other than the fact the decedent was a member of the union, there is no evidence that he used any formal or informal mechanisms to petition the government and was then retaliated against for use of that mechanism.  There is no allegation that this alleged petition was a lawsuit, a grievance, or even a letter.

The decedent did not petition the government.  There is no genuine issue of material fact sufficient to present to a jury and summary judgment in favor of the defendants should be granted on the plaintiff's Petition Clause count.

## VI.    Defendants Are Entitled To Summary Judgment In Their Official Capacities And Qualified Immunity In Their Individual Capacities.

### A.    Defendants are immune in their official capacities.

Defendants are immune from liability under the Eleventh Amendment.  The plaintiff names defendants Taylor, Machtinger, and Deloy in their official capacities, as well as the DOC. The Eleventh Amendment stands "for the constitutional principle that State sovereign immunity limit[s] the federal courts jurisdiction under Article III."  *Seminole Tribe of Florida v. Florida*, 517 U.S. 44 (1996).  The United States Congress can waive the state's sovereign immunity, and therefore, its Eleventh Amendment immunity through the Fourteenth Amendment, however, only a clear indication of Congress's intent to waive the state's immunity will produce this result. *Id.*  No such clear intent can be found in 42 *U.S.C.* §1983.  In fact, Congress's intent appears to be to the contrary as the statute facially allows suits only to be brought against persons.  42 *U.S.C.* §1983.

A suit against state officials in their official capacities is treated as a suit against the State. *Hafer v. Melo*, 502 U.S. 21 (1991).  Under federal law, the defendants in their official capacities

---

[133]   A273-274 (Complaint at Count II)

are not "persons" for the purposes of §1983.  *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71 (1989).  Consequently, this Court lacks jurisdiction over the DOC, a state agency, and the defendants named in their official capacities.  Therefore summary judgment is appropriate as to the DOC and the defendants named in their official capacities.

### B.    Defendants are immune from liability in their individual capacities pursuant to the doctrine of qualified immunity.

The plaintiff names all of the defendants in their individual capacities.  The plaintiff cannot maintain an action against the defendants in their individual capacities pursuant to the doctrine of qualified immunity.  Government officials performing discretionary functions are immune from liability for damages, provided that their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  A right is clearly established when, "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

The Court is required to first determine whether a constitutional right would have been violated on the facts alleged. *Saucier v. Katz*, 533 US. 194, 200 (2001).  If the Court finds that the answer is yes, it must then determine whether the right was clearly established. *Id.* at 201.

The law of retaliatory harassment was not clearly established during the times relevant to the allegations in the Complaint.  *Suppan* was decided in 2000, but this was only an acknowledgment that such a claim may exist under the First Amendment. *McKee*, 436 F.3d at 172.  The court "gave little guidance as to what the threshold of actionability is in such cases. *Id.* At the time of the allegations of the Complaint, the "bounds of a retaliatory harassment cause of action" were simply not defined with "sufficient specificity" to put the defendants on notice as required by the law of qualified immunity. *Id.* at 174.  The Court in *McKee* noted that the

38

conduct in *Suppan* was over the course of a year and included "admonishments of employees because of their union activities."

Unlike the alleged conduct in this case, which after parsing through the unsupported allegations, leaves no individually actionable adverse action.  Further, the alleged adverse actions are not actionable collectively based on the evidence in the record.  Even if they were those action were not clearly defined by precedent to be actionable under a "campaign of retaliatory harassment" theory.

Given that the defendants are immune from liability in their official and individual capacities, the plaintiff cannot maintain this action and the Motion for Summary Judgment should be granted.

## **CONCLUSION**

The plaintiff is barred by the statute of limitations from recovering from any claims concerning conduct occurring before September 25, 2006.  The defendants are entitled to partial summary judgment as a matter of law for the plaintiff's claims for funeral expenses and other damages arising from the suicide death of John Balas.  The claims for lost wages, back pay, "front" pay, and future loss of earnings and support fail for lack of any evidence that Balas sustained any such losses during his lifetime.

The plaintiff can not establish an actionable First Amendment retaliation claim.  The decedent did not engage in conduct protected under *Garcetti* and did not petition the government.  There is no evidence to support the assertion that the decedent suffered any adverse action or that the supposed adverse actions were in retaliation for decedent's alleged protected activity.  Further, the plaintiff does not have a viable claim arising from the suicide.

The plaintiff has not established the personal involvement of defendants Taylor, Machtinger, Deloy, or Wilkinson. The record supports, not a constitutional retaliation case, but a dispute between decedent and his supervisor, Lt. Mears, over a performance evaluation and, apart from the suicide of Balas, this in an unextraordinary employment dispute case.

The defendants did not retaliate against the decedent and summary judgment in their favor should be awarded on all counts.

/s/ Ralph K. Durstein, III
Ralph K. Durstein, III (ID# 912)
Stacey Xarhoulakos (ID#4667)
Deputy Attorneys General
Department of Justice
State of Delaware
820 N. French Street, 6th Floor
Wilmington, DE 19801
(302)577-8400

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

CINDY L. ADKINS,                    )
Executrix of the Estate             )
of JOHN J. BALAS,                   )
                                    )
         Plaintiff,                 )
                                    )
    v.                              )        C. A. No. 06-592-JJF
                                    )
STANLEY W. TAYLOR, JR.,             )
ALAN MACHTINGER,                    )
MICHAEL DELOY,                      )
DAVID WILKINSON,                    )
TRUMAN MEARS, and the               )
DEPARTMENT OF CORRECTION            )
of the STATE OF DELAWARE,           )
                                    )
         Defendants.                )

## CERTIFICATE OF SERVICE

The undersigned certifies that on January 31, 2008, he caused the Opening Brief in

Support of Defendants' Motion for Summary Judgment to be sent via CM/ECF to the following:

Thomas S. Neuberger, Esq.
Stephen J. Neuberger, Esq.
Cheryl Hertzog, Esq.
Two East Seventh Street, Suite 302
Wilmington, DE 19801

**DEPARTMENT OF JUSTICE**
**STATE OF DELAWARE**

*/s/ Ralph K. Durstein, III*
Ralph K. Durstein, III, ID #912
Stacey Xarhoulakos, ID #4667
Deputy Attorneys General
Carvel State Office Building
820 North French Street
Wilmington, DE 19801
(302) 577-8400
Attorneys for Defendants