**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF DELAWARE**

**CINDY L. ADKINS, Executrix of the Estate of JOHN J. BALAS,**

**Plaintiff,**

**v.**

**STANLEY W. TAYLOR, JR., ALAN MACHTINGER, MICHAEL DELOY, DAVID WILKINSON, TRUMAN MEARS, and the DEPARTMENT OF CORRECTION of the STATE OF DELAWARE,**

**Defendants.**

**C. A. No. 06-592-JJF**

**APPENDIX TO OPENING BRIEF IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**DEPARTMENT OF JUSTICE**
**STATE OF DELAWARE**

*/s/ Ralph K. Durstein, III*
Ralph K. Durstein, III, ID #912
Stacey Xarhoulakos, ID #4667
Deputy Attorneys General
Carvel State Office Building
820 North French Street
Wilmington, DE 19801
(302) 577-8400
Attorneys for Defendants

DATED: JANUARY 31, 2008

# TABLE OF CONTENTS

Page

Affidavit of Mike Deloy ........ A000001

Portions of Deposition of Michael Ackenbrack ........ A000003

Portions of Deposition of Cindy (Balas) Adkins ........ A000013

Portions of Deposition of Michael Deloy ........ A000068

Portions of Deposition of Jeffrey Foskey ........ A000086

Portions of Deposition of Harry Hastings ........ A000114

Portions of Deposition of Arthur Lee Mears ........ A000116

Portions of Deposition of Truman Mears ........ A000150

Portions of Deposition of Jon Mumford ........ A000194

Portions of Deposition of William Shockley ........ A000198

Portions of Deposition of Jennifer (Cox) Weldon ........ A000201

Portions of Deposition of David West ........ A000212

Portions of Deposition of David Wilkinson ........ A000214

Complaint filed September 25, 2006 ........ A000247

Correctional Lieutenant Job Description ........ A000278

Letters to John Balas regarding perfect attendance ........ A000280

Letter to John Balas regarding promotion to Correctional Corporal ........ A000282

Employee Evaluations for John Balas for the years 1996 and 1999 ........ A000283

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| **CINDY L. ADKINS,**<br>**Executrix of the Estate**<br>**of JOHN J. BALAS,** | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **C. A. No. 06-592-JJF** |
| **STANLEY W. TAYLOR, JR.,**<br>**ALAN MACHTINGER,**<br>**MICHAEL DELOY,**<br>**DAVID WILKINSON,**<br>**TRUMAN MEARS, and the**<br>**DEPARTMENT OF CORRECTION**<br>**of the STATE OF DELAWARE,** | ) | |
| **Defendants.** | ) | |

**CERTIFICATE OF SERVICE**

The undersigned certifies that on January 31, 2008, he caused the Appendix to Opening Brief in Support of Defendants' Motion for Summary Judgment to be sent via CM/ECF to the following:

Thomas S. Neuberger, Esq.
Stephen J. Neuberger, Esq.
Cheryl Hertzog, Esq.
Two East Seventh Street, Suite 302
Wilmington, DE 19801

**DEPARTMENT OF JUSTICE**
**STATE OF DELAWARE**

*/s/ Ralph K. Durstein, III*
Ralph K. Durstein, III, ID #912
Stacey Xarhoulakos, ID #4667
Deputy Attorneys General
Carvel State Office Building
820 North French Street
Wilmington, DE 19801
(302) 577-8400
Attorneys for Defendants

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

CINDY L. ADKINS, Executrix of the Estate of JOHN J. BALAS,

Plaintiff,

v.

STANLEY W. TAYLOR, JR., ALAN MACHTINGER, MICHAEL DELOY, DAVID WILKINSON, TRUMAN MEARS, and the DEPARTMENT OF CORRECTION of the STATE OF DELAWARE,

Defendants.

C. A. No. 06-592-JJF

AFFIDAVIT OF MIKE DELOY

I, Mike Deloy, having been duly sworn by law, do hereby depose and state as follows:

1. I am employed by the State of Delaware Department of Correction ("DOC") as Warden at the Sussex Correctional Institution ("SCI"). I have been employed by the DOC since November of 1980 and as Warden since May 13, 2007. At all times relevant to the allegations in the Complaint, I held the position of Deputy Warden.

2. At all times relevant to the allegations in the Complaint, the DOC used an evaluation system which ranks employees at one of five possible ratings: Distinguished, Exceeds Expectations, Meets Expectations, Needs Improvement and Unsatisfactory.

3. A rating of 'meets expectation' is not a negative or bad evaluation. The most common rating used by supervisors at SCI is a rating of 'meets expectations' and thus the majority of the evaluations result in this rating. A rating of 'meets expectations' does not adversely impact an

employee's assignments, shifts, salary, requests for time off, transfers, opportunity for advancement, or any other benefit.

4. The DOC allows employees to take planned vacation days or to request emergency vacation days. The only difference between the two is that a regular vacation day is pre-scheduled and an emergency vacation day is a last minute request of the employee. Emergency vacation days are not frowned upon and they do not adversely impact an employee or their employment status.

5. Employees often come to me and request a new supervisor. It is not my practice to automatically grant such requests because whatever situation may have spurred the request, normally resolves itself within a few months. Instead, I typically inform the employee that I will not grant the request at that time, but if the problem persists after a few months they can return to me to discuss it and I will reconsider the request. In my experience, the situation usually resolves itself after some time has passed and cooler heads prevail. I can not recall an instance where I ever had to assign a new supervisor to an employee.

6. I used this same approach with Cpl. Balas. He came to me sometime near the end of 2004 and asked for a new supervisor because he was unhappy with the evaluation he received from his current supervisor, Lt. Mears. I informed Cpl. Balas that I would not approve a new supervisor at that time, but would reconsider it in several months after the situation with the evaluation had resolved or passed and if John was still unhappy. John responded that that he felt okay with that.

[signature]
Mike Deloy

**SWORN AND SUBSCRIBED** before me this 29th day of January, 2008.

[signature]
Notary

JESSICA I. FORAND
NOTARY PUBLIC - STATE OF DELAWARE
MY COMMISSION EXPIRES:
MARCH 10, 2008

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

CINDY L. BALAS a/k/a CINDY L. ADKINS, Executrix of the Estate of CORPORAL JOHN J. BALAS,

Plaintiff,

v.

STANLEY W. TAYLOR, JR., individually and in his official capacity as the Comissioner of Correction; ALAN MACHTINGER, individually and in his official capacity as the Director of Human Resources of the Department of Correction; MICHAEL DELOY, individually and in his official capacity as Deputy Warden of Sussex Correctional Institution; CAPTAIN DAVID WILKINSON, individually; LIEUTENANT TRUMAN MEARS, individually; and DEPARTMENT OF CORRECTION OF THE STATE OF DELAWARE,

Defendants.

Civil Action No. 06-592-JJF

Deposition of MICHAEL R. ACKENBRACK taken pursuant to notice at the law offices of The Neuberger Firm, P.A., Two East Seventh Street - Suite 302, Wilmington, Delaware, beginning at 10:03 a.m. on Tuesday, January 8, 2008 before Christina M. Vitale, Certified Shorthand Reporter and Notary Public.

Continued. . . . . . . . . . .

WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
(302) 655-0477

www.wilfet.com

W&F
WILCOX & FETZER LTD.
Registered Professional Reporters

COPY

Q. Did he speak to you about what his grievance was about?

A. At the time he must have, yes.

Q. And do you remember how he went about doing it?

A. No.

Q. I want to let you take a look at this document and read through the first and second page to see if it refreshes your memory at all.

A. (Witness complies.)

Q. Do you remember speaking to John at all about what this grievance was about?

A. Just after reading it, yes.

Q. But it doesn't refresh your memory as to what you talked about?

A. No.

Q. You don't remember if he contacted you in-person or by phone?

A. No.

Q. But you worked at the same institution?

A. Correct.

Q. Excuse me, you worked at the same institution in October of 2004?

A. Correct.

Q. Is it possible he came and talked to you in-

A. No.

Q. After you spoke with John -- and it could have been either by phone or in person, correct, could have been?

A. Sure.

Q. -- did you hand him a grievance form?

A. I might have. He might have just requested it. If he requested it, I gave it to him.

Q. Isn't that your signature on the grievance?

A. Yes. I don't remember.

Q. Do you remember signing that form?

A. I don't remember signing it, no.

Q. But you don't contest that that's your signature?

A. No, I'm not contesting that it's my signature. It is my signature.

Q. Would you have reviewed the grievance before signing it?

A. I guess I would have, yes.

Q. And as part of being a shop steward would you think that that was your job to review the grievance --

A. Sure.

Q. -- before signing it?

his interest?

MS. XARHOULAKOS: Object to form.

BY MS. HERTZOG:

Q. You can answer.

A. I guess if he felt he was being disciplined, yes. May I give you some clarity to one of these forms?

Q. Sure.

A. John would have been handed that probably for him to fill out.

Q. "That" meaning the second page of the grievance?

A. That's correct, second page of the grievance. First page would have stayed with me. He would have filled out the top form, the top area where it says the date filed and the name of grievant because the name of grievant that is not my handwriting. He would have filled out the institution area, SCI, the classification of grievant, which is CPL, short for corporal, he would have filled that all out. The remaining areas, the file number, the page, the list of violations or nature of grievance, the EPPA or employee performance evaluation -- whatever it breaks down to -- for the year 2004 is my handwriting. The

adjustment required is my handwriting and I probably would have had him just sign it the day I gave it to him and I might have just signed it as waiting to receive the second page back. That might have been, you know, how it went down.

Q. Are you saying that might have been or that's how you remember?

A. Well, that's how I remember pretty much how what happens.

Q. And did you ever follow-up with John to get the second page?

A. No.

Q. You knew he wanted to file a grievance, but did you ever call him and ask him where he was at?

A. No, no.

Q. Do you remember why you wouldn't have done that?

A. Why I wouldn't have done what?

Q. You are saying that you might have kept that first page in your possession.

A. Sure.

Q. If he had the second page, would you have followed up with him to ask if he was going to complete it?

A. That was up to him.
Q. What did you ever do with the first page?
A. I have no idea.
Q. Did you keep files?
A. I did probably then in a binder, yeah. Whatever happened to it I couldn't tell you.
Q. When you were no longer a shop steward, did you turn those files back into COAD? Did you turn them -- who did you turn those into?
A. I don't believe I had any files to turn back into COAD other than the shop steward binder that we were given.
Q. What was that binder?
A. It just had the copies of our -- at that time or currently -- our interim agreement and I don't remember anything else that was in there.
Q. So you don't know what would have happened to the original?
A. I have no idea.
Q. Would you have taken the first two pages of that?
A. If there were three pages, I don't remember, I don't remember how many pages there were to the grievance form.

Q. But you are saying you might have kept the original of this page?

A. No.

Q. Then maybe I don't understand what you were saying before is that you would have kept the top page and waited for the second page to come back to you?

A. I don't know. Like I said, I don't remember if there was the other two pages to this. I have no idea what happened to them.

Q. I'm just expanding a little bit when you asked to clarify and you said that you probably would have kept this top page?

A. Right, yeah, if there was two or three pages to it, I might have kept a copy of it, yes.

Q. But you don't know what happened to those copies?

A. I have no idea.

Q. And you never gave copies of that to anybody at the Department of Correction?

A. No.

Q. You never gave copies of that to anybody at COAD?

A. No.

Q. I'm going to place another document in front of

you that has been marked Mears Exhibit 12. I don't think I'll mark this as an exhibit to this since it was marked previously.

MS. XARHOULAKOS: That's fine.

BY MS. HERTZOG:

Q. Does this appear to be another copy of the grievance we have been discussing?

A. Yes, it does.

Q. And at the bottom you see where it says Deposition Exhibit Mears 12?

A. That's correct.

Q. At the top do you see -- I'm sorry, let me back up a minute. Do you see the same file number, 0404A?

A. That's correct.

Q. And it's the same file number, correct?

A. That's correct.

Q. And the same date, 10/4/04?

A. That's correct.

Q. At the very top do you see where there is a fax number and I'll represent that I think when it got scanned by the court reporter for Mears Exhibit 12 it got cut off, but I'll represent that it's 854-6985, do you see that?

A. Yes.

Q. Do you know what fax number that is?

A. I have no clue.

Q. Do you know why this would have had a fax number on it?

A. I have no clue.

Q. I think you are saying that you filled in -- back to Ackenbrack Exhibit 1 I think you said you filled in where it says list of violations and then adjustment required?

A. That's correct.

Q. You didn't sign a blank grievance form, correct?

A. No.

Q. You wouldn't have signed a blank grievance form?

A. No.

Q. I think you stated that you did not follow-up with John after you signed this grievance form?

A. Not that I remember.

Q. And John never gave any documents back to you to file?

A. Not that I remember, no.

Q. Did you ever tell anybody that John was going to file a grievance?

A. Not that I remember, no.

Q. So, you didn't alert his lieutenant at that time that John Balas was going to file a grievance?

A. No, because any type of -- basically that was confidentiality.

Q. So, you wouldn't have gone to them and told them?

A. No, I would not breach confidentiality, no.

Q. Did you tell anybody else, other shop stewards, anything?

A. I don't remember who was a shop steward with me then. I have no clue.

Q. It has been a long time?

A. Yes, it has.

Q. And you represented that you don't remember if there were white and pink copies to the grievance so you don't remember whatever happened to them?

A. No.

Q. To the best of your recollection you never actually filed this grievance?

A. That's correct.

Q. Do you know if John filed the grievance?

A. I have no idea.

Q. So, he could have gone and filed the grievance

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

CINDY L. BALAS a/k/a CINDY L. ADKINS, Execiutrix of the Estate of CORPORAL JOHN J. BALAS, :

Plaintiff, :

vs. : Civil Action No. 06-592-JJF

STANLEY W. TAYLOR, JR., individually and in his official capacit as the Commissioner of Correction, et al., :

Defendants. :

\- - -

Deposition of CINDY L. ADKINS, taken pursuant to notice in the offices of Delaware Department of Justice, Sixth Floor, Carvel State Office Building, 820 North French Street, Wilmington, Delaware, on Thursday, December 20, 2007, at 9:41 a.m., before Lorraine B. Marino, Registered Diplomate Reporter and Notary Public.

\- - -

WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
(302) 655-0477
www.wilfet.com

WILCOX & FETZER LTD.
Registered Professional Reporters

ORIGINAL

at all. I don't know why he didn't stay home -- discussing, you know, the understaffing and the problems that the jail was going through.

Q. Did you feel that work was causing him any stress in 2003?

A. Yes. When he was teaching QRT with Truman and Mears and my brother, it frustrated him that Truman was coming in late, leaving early, not showing up at all, writing in incorrect times on his time card. And John and Jeff were doing all the work, and Truman was getting credit for being there and he wasn't.

Q. Who is this? Jeff who?

A. Jeff Foskey, my brother.

Q. Foskey. How about in 2002?

A. No. He -- when Drummond, Rudy Drummond was his supervisor, I remember one day telling him -- he would always go to work early. And I remember telling him -- he always seemed real jolly. And I am, like, you know, "You make me sick because I wish I loved my job as much as you do." He really enjoyed Rudy as his supervisor.

Q. I want to talk a little bit about the complaint in the case. Did you read the complaint?

A. Yes.

Q. A lot of the complaint seems to deal with issues and circumstances that you would not have been directly involved in. Does that sound accurate?

A. Yes.

Q. So I would like to know where the information that is contained in the complaint came from.

A. From interviewing union officials and from their sworn affidavits.

Q. Do you mean your attorneys interviewing?

A. Yes.

Q. Do you have any personal knowledge of the allegations in the complaint?

A. Such as?

Q. Any of them.

A. That was discussed with the union. I don't know exactly what you are trying to say.

Q. Well, the complaint walks through various time periods but specifically goes through 2004 forward. Does that sound accurate?

A. Yes.

Q. Did you have any direct involvement in any of the allegations contained in the complaint from

2004 forward?

A. You mean like John being harassed for speaking out against the job action?

Q. Any of the allegations, but that would be one, yes.

A. Yes.

Q. What was your involvement?

A. Just, you know, that John would come home and tell me that, you know, Truman had a personal vendetta against him, and that for speaking out against, you know -- resigning from CERT and speaking out for the job action, he felt like he was being retaliated against.

Q. So is any of the information that you know or that you gave for drafting the complaint, does that come through John?

A. He had discussed it with me, yes.

Q. Other than information you got from John, did you personally get information from anywhere else?

A. No.

Q. How do you know if the information that you got from John is complete and/or accurate?

A. I don't know that. Just from the -- I found when I was cleaning out his closet the bag that he had

resigned from CERT.

Q. What time period do you think he started keeping handwritten notes?

A. I would say September of '04.

Q. Did you know at the time that he was writing the notes?

A. I saw some of them when he was writing them.

Q. Do you know how many times John received an evaluation with the rating of meets expectations while he was employed at the Department of Correction?

A. I don't believe ever until the last one.

Q. What basis do you form that belief on?

A. From the ones I found, he always got meets, because he always strived to do a hundred-plus effort, because that meant -- an exceeds expectations was very important to John, and he felt like if he put out good work, that he deserved an A-plus evaluation. And a meets expectations to him was a failing grade.

Q. So I just want to go back, because I think you might have misspoke before. You said he always got meets. Did you mean he always got exceeds?

A. I mean he always got exceeds, yes.

Q. When John got evaluated at work, did he speak with you about it?

A. Yes. We always did. I get evaluated every year. And we always discussed our evaluation when we got it.

Q. Do you recall him ever telling you before that he had gotten a meets expectations?

A. No, never. I remember one particular day he went to work with a fever of 102, and I said, "You've really got no business going to work." And he said, "No, I want my perfect attendance."

Q. Have you reviewed the documents that we provided to your counsel in this case?

A. Yes.

Q. Are you now aware that John had in the past received meets expectations before the one that he received from Lieutenant Mears?

A. No.

Q. Did you see that in the documents?

A. No, I didn't see that.

Q. I have a copy I can show you, or do you have reason to disbelieve me? Would you like to me to show you a copy or --

A. Sure, because I don't remember seeing that when I was reviewing the documents. And what year was that?

MS. XARHOULAKOS: I believe these have previously been admitted, so we will mark them as Exhibits 1 and 2. We will do the earlier one as 1 and the second one as 2.

(Adkins Deposition Exhibit Nos. 1 and 2 were marked for identification.)

MR. NEUBERGER: Stacey, which is which?

MS. XARHOULAKOS: The one with the stamp in '97 is 1, and the one with the stamp in '99 is 2.

BY MS. XARHOULAKOS:

Q. Do you want some more time to review the documents or --

A. '99, I know he probably didn't have perfect attendance that year because he had knee surgery, so he probably didn't have perfect attendance.

Q. The documents we are looking at, Exhibit 1 is stamped on the bottom D00104; correct?

A. Yes.

Q. And that continues to D00106, the stamps?

A. Yes.

Q. I am just doing this to clarify the record. And the second one is marked D00102 and D00103;

correct?

A. Yes.

Q. Do you see that both of these have a meets expectations ranking on them?

A. Yes.

Q. Do you know why John wouldn't have told you about these?

A. No.

Q. Do you remember speaking with him at all about his evaluations in either '96 to '97 or 1999? I know it is a long time ago.

A. No, I can't remember.

Q. Okay. Do you think a meets expectations is a bad evaluation?

A. I think if you are going over and beyond your work duty, yes, I do think it is a bad one.

Q. Why? Why do you think it is bad?

A. I think if someone is putting -- going above and beyond their job duty, like he was on CERT, teaching QRT, going out and capturing escapees, that that deserves an exceeds expectations.

Q. Do you agree that you could be doing all of those things but still be underperforming in other areas, just generally?

A. Generally, you could. But I don't think that John was -- that would have been John, because he was a hard worker, and he always strived to do his best.

Q. But you didn't work with John; correct?

A. Well, I worked with him with his lawn business. We did it together.

Q. But not at the Department of Correction?

A. No.

Q. Did John think that a meets expectations was a bad evaluation?

A. Yes, he did.

Q. Why?

A. Because he always felt like he gave a hundred percent-plus, and he felt like he deserved an exceeds, and that's why he was so upset when he got the meets before his death.

Q. Was John ever promoted after 1996?

A. I can't remember when he was promoted to corporal.

Q. Do you remember approximately when it was?

A. No.

Q. Do you recall how long he was a corporal for?

evaluator is Billy Smith. Does that name sound familiar to you?

A. No.

Q. Did John generally talk to you about who his supervisors were?

A. Yes. I knew Rudy Drummond and I knew Truman Mears and Johnson. I forgot what his first name was. John -- he had one by the name of Johnson.

Q. And this supervisor --

A. Billy Smith does not ring a bell to me.

Q. It looks like this was while he was at Sussex Work Release Center, '96 to December -- beginning of January '96 to the end of '96. Do you recall John's work during that time period at all?

A. I remember him being at work release, but I don't remember the name, that name.

Q. And during that time he was a correctional officer. That's his rank on top --

A. Yes.

Q. -- do you see that?

So he must have been promoted since that time; is that correct?

A. Correct.

Q. And that would have been after he received a

meets expectations; correct?

A. Yes.

Q. And then on the second evaluation, which is stamped on top April of 1999, this is -- the supervisor here was Johnson. You mentioned him; right?

A. Yes.

Q. So you do recall him working under a Johnson?

A. Yes.

Q. Do you recall anything specifically about that time period?

A. No.

Q. And on this evaluation Johnson did give him a meets expectations; correct?

A. Yes.

Q. The complaint also alleges -- various parts of the complaint allege that John at some point asked either Mike Deloy or Dave Wilkinson or both for a transfer.

A. Yes. Not -- he didn't want a transfer from the property receiving room, but he just wanted a new supervisor.

Q. Okay. So you are not stating that he ever

Q. I see. Okay. Well, thank you. It helps me understand that.

Okay. At some point did John, to your knowledge, fill out a union grievance?

A. Yes.

Q. Okay. When were you aware of this grievance?

A. He told me when he was going to do it. I believe it was in the fall of 2004, September or October, somewhere around there.

Q. Did he -- well, what did he tell you?

A. He told me he was going to file a grievance because he felt like he was being retaliated against because he resigned from CERT.

Q. Did he tell you that the grievance was going to be about retaliation?

A. Yes.

Q. Anything else?

A. It was retaliation on his evaluation.

Q. Did he think that the evaluation was the retaliation?

A. Yes.

Q. Anything else?

A. No, not that I can think of right now.

Q. Did he specifically name anyone to you that he thought was retaliating against him?
A. Yes. Truman Mears.
Q. Anyone else?
A. No.
Q. Did he tell you that he was thinking about filing it first and then tell you he filed it or how did it happen?
A. He just said, "I am going to file a grievance."
Q. And did you -- did he ever tell you that he actually filed it?
A. Yes, I believe he did.
Q. Do you remember when that was?
A. I would say late September, early October.
Q. Did he explain to you at all or tell you how he would go about filing it?
A. I just knew he had to fill out the paperwork.
Q. Did he tell you if he filled it out with anyone?
A. Filled it out with anyone?
Q. Yes.
A. No.

Q. Did he ever mention his shop steward to you?

A. No. But he did say that he got it -- that when he turns it in, he has to get it signed.

Q. So he told you that when he turns the grievance in, he has to get it signed by the shop steward?

A. Yes.

Q. After he told you that he filed it, did he ever tell you anything else about the grievance?

A. Just he was awaiting to have this meeting with the union rep and Wilkinson and Deloy, which it seemed like the meeting was scheduled every week for -- till the time of his death, and it never did occur.

Q. Did he tell you that the meeting was a result of the grievance?

A. No, because he had gone to Wilkinson and had asked that they have this meeting with all of them to discuss this evaluation. He wanted -- he wanted representation when he went in to review his evaluation with Truman.

Q. Other than that, did he ever again reference the grievance or anything that was happening with it or where it was in the process?

A. No.

Q. The grievance that was submitted with the original documents is two pages, and one of the pages had a fax number and one didn't. Have you seen those pages?

A. Yes.

Q. Okay. Do you know why or where the number is?

A. One was -- again, I had prepared my lawyers a book and my book, and one had it and one didn't, and it was because John had several copies and I thought it was the same. I don't look at the little numbers at the top or the bottom of the page, and I didn't realize that they were different.

Q. And I think since, an original copy of the grievance has been turned in. But what I am wondering is have you ever found the second page of the grievance with the fax number on it.

A. The one copy of mine did have it. I think it was 854-69 something was the number.

Q. Right. The number was on the first page; correct?

A. Right.

Q. Did you ever find the second page with the

number on it?

A. No, I don't think so.

Q. And do you know where that number is, what it is for --

A. No.

Q. -- or whose number it is?

A. No.

Q. Did John ever tell you that he faxed the grievance somewhere?

A. No. I am assuming it was faxed from work, but I don't know that for sure. I know it is not our phone number, and the number I didn't recognize, so it is not -- to my knowledge, we are the only one who has a fax machine in our family, so I don't -- it would either have to be our house or somewhere from the jail is my assumption.

MS. XARHOULAKOS: I want to mark this document as Exhibit 5.

(Adkins Deposition Exhibit No. 5 was marked for identification.)

BY MS. XARHOULAKOS:

Q. Okay. The document that I provided to you is marked P523 on the bottom; correct?

A. Yes.

Q. Do you know if she was on the CERT team?

A. No, she wasn't.

Q. Other than stating that she didn't like him, she thought he was an asshole, did she say anything else about him?

A. Not that I can remember.

Q. Okay. I am going to change gears a little bit and speak to you about the events leading up to February 2005. You mentioned before that you thought John had become an alcoholic. At what point do you think that that happened?

A. I would say in July of '04 his drinking picked -- he had actually quit in May. He started drinking from stress from work, and he would come home and drink a couple beers so that he could -- on Sunday nights he would get off at midnight and have to be back at 8:00 in the morning. And the stress from work, he said, "I just have to drink a couple beers so I can get to sleep." He said, "I can't stay up all night because I got to get up and be back."

And then it just progressively got worse and worse and worse. And we had some arguments about that. And I actually was adding up -- we kept all the receipts, and I was adding up, and for one month he

had spent $300 on beer. And I said, "This is ridiculous." And this is -- "150 of that is my money, and I don't want my money to be used like that." And I said, "If this continues, we are going to separate our accounts and you can pay half the bills and I will pay half the bills, because I am not spending $150 a month on booze."

Q. And you said he quit in May?

A. May of '04.

Q. But that impliedly means he was drinking heavily before that; correct?

A. Yes. His drinking started out to just be casual one or two beers a night and then got worse. And I wouldn't say that he was drunk or, you know, drinking every single day, but when he drank, he drank -- he would get drunk. And I said, you know, "You can't be doing this."

And actually, one time I caught him drinking and driving with the children in the car, and I said, "If I ever find out this again, I will call you in DUI myself, because I don't want something to happen to our children."

Q. When --

A. So he quit. He said, "Fine. I will quit."

So in May of '04 he quit. And he didn't go through any, you know, DT's or anything. He just quit. And then in July of '04, when he was on the phone at my aunt's stressing about, you know, the understaffing, being froze at work, talk about going to 12-hour shifts, he was: "I can't do that with a lawn business." It was just totally stressing him out. He started drinking again.

Q. Just going backwards, before he quit in May, how long had he been drinking at that point? When did he start?

A. I would say teaching the QRT the first time with Truman.

Q. And when was that?

A. I think it was like January, February, of '03.

Q. But it wasn't -- you know, he wasn't spending $300 a month on booze. That spring of '04 it really got out of control.

Q. And then is it the spring of '04 it got out of control? He quit in May?

A. But he quit in May, yes.

Q. You said that his shift from Sunday to Monday had an effect on his drinking because he had to

finish at midnight and start at 8:00; is that correct?

A. Yes.

Q. Was that something new or is that something he had always done?

A. That was something new.

Q. When did that begin?

A. I would say in the spring of '04, like January, February, '04. The second time that they were teaching QRT is when it started progressively getting worse.

Q. No. I guess I am asking when the change in his shifts started, when he --

A. Oh, the shifts. He -- they were -- his days off were Friday, Saturday, and Sunday he would have to work -- every other Sunday he would have to work 4:00 to 12:00 and then reported back to work on Monday at 8:00 to 4:00. It was just the way his shift was every other week.

Q. Right. And you said that that was stressful and had an effect on his drinking; correct?

A. Yes.

Q. And I was just wondering when he began doing those Sunday to Monday shifts where he only had eight hours.

A. Well, he had been doing it for a while.

Q. That's what I was getting at.

A. Yes, yes.

Q. That wasn't a change. He had been doing that?

A. He had been doing that.

Q. Okay. And you also said that you caught him drinking and driving one time with the children --

A. Yes.

Q. -- in the car. Both children?

A. Yes.

Q. When was that?

A. It was in the spring of '04.

Q. Do you recall the month?

A. No.

Q. How did you catch him?

A. I came home from work and smelled liquor on his breath, and they had already told me they had been somewhere. And I am, like, "And the kids were with you?" and yeah.

Q. What did you say to him?

A. I was furious. And I said, you know, "You can't afford to lose your license. You know, how are you going to get back and forth to work? Besides

that, you know, I can't be taking you everywhere, because, you know, if you lose that for six months or whatever, I can't be at my job and taking you to your job. How do you plan on getting there?" I said, "You've got to think about consequences," you know. I said, "You might kill somebody." I said, you know, "I have worked hard for this house and," I said, "both of our names are on it." I said, "If you want to continue to drink and drive, then let me take your name off the house, because I don't want to lose my home."

Q. Did that incident result in a prolonged fight between the two of you?

A. No. He thought about it and decided to quit in May.

Q. And so do you think that the time that you caught him drinking and driving with the children, was that closer to May or you just can't recall?

A. Yes, I would say probably.

Q. Had you had other fights during that time period about his drinking?

A. Just, you know, about the amount of money that he was spending.

Q. On liquor?



A. Yes.

Q. Do you recall how often you were fighting about the money and the liquor?

A. No.

Q. Do you think it was more than once a week?

A. No.

Q. Do you think it was once a week?

A. No, because he had -- when our fights first started, he was trying to decrease the amount he was drinking. So he didn't know it, but when he would put beer in the refrigerator, I had a little piece of paper on the side of the refrigerator, and I would count beers, how many were missing, because I wanted to know if he was -- if it was, you know, decreasing.

MR. NEUBERGER: Stacey, I am sorry. Are we still in the spring of '04 timeframe?

MS. XARHOULAKOS: Yes, spring of '04.

BY MS. XARHOULAKOS:

Q. Did he ever discover that you had been doing that?

A. I think the kids pointed it out to him.

Q. Did you fight about that?

A. I just, you know -- I think one time I caught him being dishonest, and I am, like, "Why lie

about it?" you know.

But his brother would also come over sometimes and want to drink, and I said, you know, "It is expensive enough supporting your habit. I am not supporting your brother's habit also."

Q. Okay.

A. So he put a sign on the door that if you take a beer, leave a dollar.

Q. Tell me about the trip. As I understand it, there was a trip that you took with Lee Mears and Jeff Foskey to the psychiatric center with John --

A. Yes.

Q. -- is that correct?

A. Yes.

Q. And when was that?

A. That was January 30th. It was on a Sunday.

Q. And tell me what happened to lead up to that and how the decision came about.

A. On Saturday prior to that, I had been shopping with my mom and the kids, and apparently Lee had gotten a phone call from John, and he was drunk. And so Lee goes, "Where are you?" So Lee went and found him, and he was at Kemp's Liquor Store, which is -- it is on Route 16. I don't know if it is in

Ellendale or a Milton address. And when Lee found him, he had a loaded pistol in the truck and was very drunk.

And they decided that they would go out to dinner that night, the two of them, and celebrate their birthdays. John told me that Lee wanted to go out, but according to Lee, John wanted to go out. So they went to Smitty McGee's and had dinner and drank. But prior to that, when Lee came to pick John up, they were out in our back field. We had dirt piles at the time, and they were target-shooting with a nine-millimeter into the dirt pile, my son and John and Lee. And --

Q. Are you still talking about Saturday, the 29th of January?

A. Yes, yes.

Q. Okay.

A. And so they were target-shooting, and when they finished target-shooting, Lee noticed that John reloaded the nine-millimeter and he left it on top of the gun safe in our garage.

And so Lee and John took off and had dinner, and John got really drunk. And apparently on the way home John told Lee, "I am not going to be living in

the morning." And Lee thought, "Oh, my gosh. He has left that loaded nine-millimeter there at home. I can't take him home. Where am I going to take him?" So he thought, "Well, I could take him to Troop 4 or I could take him to his parents' house, but I can't take him home." So he thought, "Well, I will take him to Troop 4." And then he thought, well, that might jeopardize his job. So he decided to take him to his parents' house.

And when they got to his parents' house, John's mom called me and said, "Lee has brought John here, and he is going to spend the night here." I said okay. And she said, "He is really drunk."

And so after that I was looking out or bedroom window. It was dark or whatever, but I saw a truck go by and I thought, well, that was Lee going home. And at 5:30 in the morning I received a phone call from Lee Mears's wife, Erika, and she said that Lee was still over next door or two doors down with John and that he had spent the whole night with him and that John was suicidal.

Q. Just backing up, when John's mom told you John was staying there, did you ask her why John was staying there and not at your house?

A. She said she had to go because she didn't want John to know that she was calling me.

Q. So did you ask her and she rushed off the phone --

A. Yes.

Q. -- or you didn't get around to it?

A. Yes, she rushed off the phone.

Q. And you said earlier in the day Lee found John at the liquor store sitting in his truck with a weapon; correct?

A. Yes.

Q. And after that Lee took John out drinking?

A. John drove on home, because when they came home, when John came home, he was by himself, and he went upstairs and got a shower. And I didn't even know that he had went and met Lee. I didn't even know he had seen Lee at the time.

Q. Do you have a good recollection of that day?

A. I just remember him getting a shower. And Jonathan and I weren't feeling well, so we were laying on the sofa watching TV, and he came down and asked, "Can I get you anything to eat before I go, go with Lee?" And I said, "No. We will be fine."

Q. Do you recall if he appeared intoxicated to

you?

A. No, he didn't appear.

Q. Could you usually tell when he was?

A. Usually.

Q. And then when did you later find -- did Lee, I guess, later tell you that he had found John in his truck?

A. Yes.

Q. Okay. And at what point were they in the backyard shooting the weapons?

A. When Lee came to pick him up, John wanted -- I think it was John who wanted to go out and target-shoot before -- I don't know what -- I wasn't outside when -- the gun safe is in the garage, so he got the pistol out of the gun safe in the garage. And I don't know what led to it, but I just heard the shooting.

Q. So it was when Lee came over to get John to go out?

A. Yes.

Q. First they stayed at the house and shot in the backyard?

A. Yes.

Q. Okay. And then I think you left off where you received a telephone call from Lee's wife --

A. Erika.

Q. -- correct?

A. Yes.

Q. And that she said that Lee told her that John was suicidal?

A. Yes.

Q. Had you ever heard before that John was suicidal?

A. No.

Q. Had you ever suspected it?

A. No. I knew he was depressed, but I didn't know it was to that point.

Q. Did you ever ask John if he was before this time?

A. No. I never had a reason to ask him.

Q. Is there anything now in hindsight that you can think of that might have at the time led you to suspect that he was suicidal?

A. No.

Q. Okay. So then when was the decision made to take John to the psychiatric center and who made it?

A. I immediately called my mom and said, you know, is there -- from working at Beebe, I knew we didn't have a psych ward, and I didn't want to take

John into the emergency room because I know they handcuff them like they are inmates to haul them up north, you know, for help. And I am, like, John is not going to do that. I know I won't even get him there.

So I called my mom and said -- because she was a State of Delaware employee, and I am, like, "Do you know if there is somewhere I can call to get him help? He is suicidal." And she said, "Yes, there is." And so then I got thinking, got -- I thought John, John won't want to do this through the State of Delaware because he will be afraid this is going to jeopardize his job. So I thought I am going to wait till 8:00, and I am going to page our primary care physician and see what he recommends.

So when I got -- I paged him, and he didn't call me back right away, but he called me back within an hour, an hour and a half, and I said, "He is suicidal. You know, what do I do?" I said, "Dr. Jani, you know that he is not going to go to the emergency room and be handcuffed and hauled away somewhere. He just won't do that. We will never get him there." And he said, "You need to take him to St. Joan's." So he said, "Call St. Joan's."

So when I got off the phone with him, I called St. Joan's and I spoke with a counselor, and I can't remember his name, and I told him, you know, that John had been riding around the day before drunk with a loaded weapon, had said that he wasn't going to be living this morning, and that he had been depressed; you know, what could I do? And he said, "You bring him, bring him right up." And I said, "Do you think you will be keeping him?" And he said, "More than likely." And I said, "What does he need as far as supplies?" And he said, "Bedroom slippers, but they can't have strings. Sweatpants; they can't have strings." He said, "It can't have anything in it that he could possibly harm himself with."

So I packed his bags, and the kids even put some mints in there and because I told them -- I said, "We are going to try to take Daddy somewhere that can help him," because from fall of '04 till the time of his death the kids just kept saying, "What's wrong with Daddy? What's wrong with Daddy?" And he would say mean things to them, and I am, like, "Please don't take anything personal that Daddy is saying to you, because he is saying it at all of us."

And then Lauren said, "Make sure you tell



him that he can only eat one mint a day, because that's all I am putting in here is enough for one mint a day." So I think she put like seven mints in there.

So I called Lee and I said, "Lee, can you go up here with me to take him?" And he said yes. He said, "I am going to call your brother." So Jeff and Lee came over, and then the three of us went over and convinced John to go. And all the way up John never said a word.

MS. XARHOULAKOS: You want to take a break?

THE WITNESS: Sure.

(Recess taken.)

BY MS. XARHOULAKOS:

Q. Back on the record, I think where we left off is you were talking about when you and Lee and Jeff and John were traveling to St. Joan; correct?

A. Yes.

Q. What was John's feeling generally about going there, even before you got into the car?

A. When I went over, he was laying down on the bed at his mom and dad's house, and I said, "John, you need help. And we need to take you somewhere to get you some help." I said, you know, "My dad is not

A. Oh, my gosh. Too many. The gun safe is packed.

Q. And who proceeded to remove the weapons with you?

A. Jeff and Lee. I handed some of them, but mainly those two loaded them in Jeff's car. I got them some blankets so that -- to make sure in the ride that the guns didn't get chipped or torn up. And Jeff took them to his house.

Q. And at some point did John come back to the house?

A. That evening -- well, when we got home, one of the kids wanted to go over, and I think it was Jonathan wanted to go over and be with his dad. So he went over and watched TV with his dad over at Grandma and Grandpa's, and then he decided to come home after a couple hours.

And, I don't know, around dinnertime, they said, "Let's watch some home movies." We had videotaped a lot of the kids when they were -- you know, their birthdays and smooshing cake in their face and everything. And they had been wanting to watch them for a while. And they said, "Can we watch them?" And I said sure.

co-workers?

A. Well, I am not sure that that place was actually his co-workers. It was just a state suicide prevention. I don't -- from the number I called, it wasn't through the jail. It was some type of -- through the state, some type of suicide prevention program.

Q. You are talking about an assistance program provided through the state?

A. Yes.

Q. You said you called them at one point?

A. I just got the number. I never did call them because I got thinking, "I don't think he will want to do this."

Q. Where did you get the number from?

A. The phone book.

Q. Did you ever urge John to speak with any of his supervisors about going to the state program?

A. No.

Q. Do you know if he ever did?

A. No.

Q. Then that week you said you think he worked --

A. Yes.

W&F

take off?

A. No. I don't know if that was a regularly scheduled vacation or not --

Q. You don't know?

A. -- that year. No. I can't remember.

Q. And then we already talked about this, but midweek you convinced him to see Dr. Jani; correct?

A. Yes.

Q. And then you took your trip together; correct?

A. Yes.

Q. And when did you return?

A. Late Thursday night. And it was on the way home, he said, "I have got something that I want you to listen to." And he put in a tape by Tim McGraw that said, "Kill Myself." And so I was listening to that and I am like, oh, my gosh, no wonder he feels like -- if you don't know the background of the song, apparently Tim McGraw in the song wants to kill the old self and become a new self, and if you were in John's state of mind, you would have thought that, you know, the best thing for him to do was to kill himself.

Q. And this was on your way home from your

A. Yes.

Q. Do you recall how and when you found out about that?

A. Yes. I knew that they were like 15 minutes overdue for being home, like, "Where are they?" And Jonathan came -- I was at the kitchen sink, and Jonathan came running up on the deck to the sliding glass door, and he opened it up, and he was panicking, and he goes, "Mom, look what Daddy has done to the Tahoe."

And so I walked out, and this demolished Tahoe -- I couldn't believe it was driveable -- was pulled up in our backyard. And John was standing there and kind of looked like -- I describe it as a cartoon character with stars going. You know, he just looked like he had his bell rung (indicating).

And I am, like, "Are you all right?" And he said yes. And I said, "What happened?" And he said, "I don't know." He said, "I lost control and I rolled it." And I said, "Well, how did you get it home like this?" And he said apparently somebody by the name of Bear from work -- I don't know who. Everybody has nicknames -- was behind him, and a dump truck came up, and they got it pulled back up on its tires, and then

day he was on it -- correct? -- or stumbling, I think you said?

A. He didn't look dazed. He just was stumbling.

Q. Stumbling. Okay. Did John ever tell you that he had contacted anyone else after he got in the accident?

A. No.

Q. Did he ever tell you that he called a police officer who was a friend of his?

A. When he got home, I said, "John, we have got to call and report this accident," and because he said he took somebody's mailbox out. And I said, "We need to call." And he goes, "Well, call John Mitchell." So I can't remember if I looked the number up or he did, but he is the one who called John Mitchell.

Q. So he did that after he got home?

A. Yes.

Q. Did John ever tell you that he called Jennifer after he got in the accident?

A. No, but my son did.

Q. Your son overheard it?

A. Apparently John called from the accident. I found out later from Jonathan that his dad had called

and used a cellphone that wasn't ours and called and spoke to Jennifer or Drugash, somebody. He was on the phone. And Jonathan goes, "Can I have that phone so I can call Mommy?" and he goes, "No, you can't call Mommy from this phone." So I never knew about the accident until they drove up in the backyard.

Q. Had you ever seen this other phone before?

A. No.

Q. Do you know if Jonathan had?

A. I heard that he did.

Q. From Jonathan?

A. Yes.

Q. Did he tell you when he had seen the phone before?

A. He said one day that John was down in Lewes picking up a bike chain and that it rang in the console, and he said, "Dad, this phone was ringing," and that John got furious with him and said that, you know, he is being nosy and he shouldn't having been digging in it and da, da, da. And Jonathan is, like, "But it was ringing."

And Jonathan did come home and tell me that, and I can't remember the date that he said, "Mom, Dad has a cellphone that is not ours." And when I

questioned John about it, he said it was a jail cellphone so that they could get in touch with him when they needed him.

Q. Did you believe that?

A. Yes.

Q. Did you question him any further about it?

A. No.

Q. And do you recall approximately when that was?

A. No.

Q. And you know now that John had been lying to you about that?

A. Yes.

Q. What happened with the telephone call to John Mitchell? Were you present when he made that phone call?

A. I think I was, and John said, "You need to call and report it."

Q. Okay. So John did call and reported it?

A. I can't remember if he did or I did.

Q. Okay.

A. One of us did. I think it was me that did, as a matter of fact, because they said that they knew that a Tahoe had been in an accident and they were

looking for it. But our house is surrounded by leland cyprus, and we had our go-cart trailer pulled out in front of our garage, and John had pulled on the other side of it so they couldn't see it. The only way they would have been able to see it was from the air.

Q. So someone called and said they were looking for a Tahoe. So do you think someone saw the accident?

A. No. When I called to report it, SUSCOM told me that the accident had been reported and that they knew it was a Tahoe.

Q. Okay. I see. And I guess at some point then they came and towed the Tahoe? Was that taken away from the property?

A. Well, John and I pulled it in the garage because we didn't know if it was going to be totaled or not, because there was so much broken glass, and we didn't want it to rain inside. So he got me to back it into the barn.

Q. Okay. Did --

A. But after John died is when they came and got the Tahoe --

Q. Okay.

A. -- and towed it away.

Q. I just want to step back a minute. Was there some point -- maybe I missed something, but another day when -- maybe this was the week before, but when Jeff and Lee convinced John to stop taking the medication he was on? Did that ever happen?

A. No.

Q. No. Okay. And so John was prescribed the medication the 15th; is that correct?

A. And he took it until that Friday --

Q. Until --

A. -- when at the emergency room they told him to quit taking it until he saw Dr. Jani, and they also told him not to drive.

Q. Okay. I guess the day of was a Saturday. The day that John --

A. Yes.

Q. -- killed himself was a Saturday. Did you have anything planned for that day?

A. Yes.

Q. What was the plan?

A. Actually, I was supposed to work that day, and I had gotten somebody to take my place, because we had dogs, and we were going to take them to the SPCA to get their rabies vaccination, and I knew John

there," whatever. And I videotaped all the races, and usually John and him would come home, and I don't care what time it was; we'd get home and they would go over the video, and John is, like, "Do you see what you could have done different there?" And we had done that for five years, and our son had won a championship in 2002, and I credit those videos, because he could see, you know, what he had done and what he needed to do different.

And after John got sick, he had no patience. As a matter of fact, one race he said, "Just get your mom to put your cart out there on the track." And so I went and got a friend of mine that I had gone to school with and I said, "Keith, can you help me get this cart out on the track?" And Jonathan won that race, so I was happy.

Q. Do you remember when that was?

A. That was the fall of 2004.

Q. At what point did you find out that John had been having an affair with another woman?

A. The day that he died.

Q. And how did you find out?

A. My sister-in-law called me, Tina, Jeff's wife.

Q. Do you know why she decided to call you at that time? Had she just found out?

A. Yes.

Q. What did she tell you?

A. She told me that she had just found out.

Q. How did she find out?

A. My brother.

Q. Do you know if your brother had known before that day?

A. She said that he had known for a couple weeks.

Q. Had John ever had an affair that you know of before?

A. Never.

Q. In the fall of 2004 did he tell you that he bought another woman flowers?

A. No.

Q. Did he tell you that he was regularly confiding in another woman?

A. No.

Q. Did he tell you that Jennifer tried to break off the relationship with him in December?

A. No.

Q. Did John tell you that he continued to

pursue her in January?

A. No.

Q. Did you confront John about the relationship when you found out?

A. Yes.

Q. Did John tell you that he called Jennifer multiple times that morning of his death?

A. No.

Q. Did he tell you he called her the night before?

A. No.

Q. Did he tell you he called her at all?

A. No. I didn't know until that morning that he had been having an affair.

Q. What was his reaction when you confronted him?

A. I went out there and I said, "You and I need to talk." And he said, "What?" And I said, "You've been cheating on me, haven't you?" And he nodded his head yeah. And I said, "Are you still seeing her?" And he shook his head no.

Q. And anything else?

A. He said -- I said, "Do you love her?" He said, "I don't know what I think anymore." And he

said -- what was I getting ready to say? He said, "I don't know what I think anymore." Oh, I said, "You and I promised one another we would never do this." I said, "How could you?" And that's what I just kept saying, "How could you?" And he just looked at me, and I turned around and walked out of the barn.

Q. Did you ever ask him when was the last time he spoke to her?

A. No, because he told me the affair was over.

Q. Would you agree now that John was not truthful with you in the months before his death?

A. Yes.

Q. Would you also agree that he was not loyal to you in the months before his death?

A. Yes.

Q. Can you turn back to the calendar for me, which I believe was Exhibit 6, and February 19, you wrote on there, "Found out John cheated from Tina. Confronted him. He killed himself." That's what it says; correct?

A. Yes.

Q. Is that what happened?

A. I found out later, when I found the suicide notes, that they were already in place prior to me

going out and confronting him. So I believe he was going to do it regardless of whether I found out or not.

Q. But you don't have any idea when he might have left those notes there?

A. I think that the notes were in his truck and that's why he asked for the keys to his truck when he said he had to put something in it, because the pad that they were written on came from his truck.

Q. And you don't know when he might have written them in his truck; correct?

A. No.

Q. And you did go out and confront him about the other woman; correct?

A. Yes.

Q. And at that point is when John killed himself; correct?

A. He came back in the house and wanted to know who told me. And I told him -- I asked Tina, because I had her on the phone, because she said, "Call me when you get back in. I want to make sure that he doesn't hurt you." And I said, "Would you care if I tell John who?" And she said, "No, not if it is true."

So I told him, and he said, "I have got one job to finish."

Q. And he left the house?

A. He went out to the barn, and I said, "I have got to go," because our barn is really tall, and I said, "I don't know if he is going" -- because I thought he didn't have any more weapons. I said, "He may try to hang himself. I got to go."

Q. Okay.

A. And when I got to the front door, I heard the side door slam, and I peeked back, and I saw his dog looking over there, and I am like, "Oh, he is going out the side door." So I quick ran around and I was chasing after him, and he turned around and pointed the gun at me and told me to get away.

Q. And did you?

A. I just put my hands up and just froze. And he told me I could pack his bags, because before I left the barn I forgot; I told him, "I think you need to pack your bags and go stay at your mom's." And he was backing up and actually tripped and fell, and he said, "Now you can pack my bags."

And then he turned around, and as he was walking away from me, I said, "Please, can't we go to

counseling and try to work this out? Please, please." And he wouldn't turn around.

Q. Okay. Have you -- since that day, have you learned of any other affairs John had?

A. No. As a matter of fact, his mom even said, "I would have never thought that he would have an affair," she said, "because he thought too much of you and the kids."

Q. Have you learned any more about the affair since that day from anyone else?

A. Lee told -- Lee told me he found out that apparently John had sent her flowers end of August.

Q. Did Lee tell you when he found out about it, when Lee found out about it?

A. After John's death.

Q. So Lee didn't know?

A. Apparently Lee knew about the affair, but he didn't know the details of when it exactly started. Apparently on a duck hunting -- they went duck hunting one day and John told him he was having an affair, and Lee said, "I didn't believe him."

Q. You said earlier that John -- this was in the beginning of the deposition, but you said he had been thinking about filing a lawsuit.

A. No.

Q. You have remarried since John's death; correct?

A. Yes.

Q. When did you remarry?

A. June of 2006.

Q. And what is your husband's name?

A. Ace.

Q. And when did you meet Ace?

A. We were actually friends with John -- Ace, John and I were friends. He was our engine-builder for our go-carts, and we had known him for six years.

Q. And I guess Ace, was he single at the time when John killed himself?

A. He was -- had been separated for over a year.

Q. And then when did you start dating Ace?

A. I would say April of '05.

Q. Did Ace at some point move into your home?

A. Yes.

Q. When did that happen?

A. I would say sometime in the fall of 2005.

Q. Do you have -- I guess I want to talk just real quick specifically about the claims against -- in

the lawsuit Stan Taylor, Alan Machtinger, Mike Deloy and Dave Wilkinson have been named.

A. Yes.

Q. Do you have any personal knowledge or any direct evidence to support any of the allegations against them?

MR. NEUBERGER: Objection; form. Go ahead. You can answer.

MS. XARHOULAKOS: You can answer.

THE WITNESS: No. I think -- I am assuming that my attorneys had to do it because they didn't know the full story of my -- and we were limited on our time, so they listed everybody to make sure that everybody was covered if we needed them.

BY MS. XARHOULAKOS:

Q. Okay. And can you tell me what you are seeking, what relief you want from this lawsuit, what damages you want?

MR. NEUBERGER: Objection; form. You can answer.

THE WITNESS: Economic, for one. I have two kids that I have to put through college. I know it won't bring their father back, but I wish we could. The stress that we went through prior to

salary that John lost during his lifetime as a result of the allegations in the complaint?

A. Definitely.

Q. During his lifetime?

A. During his lifetime.

Q. Yes.

A. Salary he lost?

Q. From Department of Correction.

A. No, because he had vacation time. He got paid when he took off prior.

I don't know if I understand exactly what you are trying to say.

Q. I will rephrase. Was John ever denied overtime?

A. Denied overtime, no.

Q. Was John ever denied a promotion because of the allegations in the complaint?

A. No.

Q. Did John suffer any other economic loss from the Department of Correction because of the allegations in the complaint?

A. Not that I am aware of.

MR. NEUBERGER: What time? What timeframe are we talking about?

MS. XARHOULAKOS: June 2004 to February 2005.

MR. NEUBERGER: Okay.

BY MS. XARHOULAKOS:

Q. Okay. The answer is the same for that time period?

A. Yes.

MS. XARHOULAKOS: Okay. That's all I have.

MR. NEUBERGER: Then I have a few questions.

BY MR. NEUBERGER:

Q. Cindy, do you believe that John or John's estate suffered economic loss from the time of his death forward?

A. Yes, I do.

Q. Okay. Let me see. A couple more questions.

I believe in the very beginning you were asked some questions about whether the workplace was stressful, whether John's workplace was stressful from July of 2004 through his death, and I think the question asked you to compare that to prior periods of time in the workplace. Do you recall that line of questioning?

Washington, D.C.

Winter view of the east side of the House of the Temple

# January 2005

| SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY |
|---|---|---|---|---|---|---|
| DECEMBER 2004 | FEBRUARY | | | | | 1 New Year's Day |
| 2 | 3 Last Quarter | 4 Dr. Stumpf $20 | 5 | 6 | 7 | 8 |
| 9 | 10 New Moon Cingular rebate due | 11 12.00 For Cindy Hair appt | 12 3:30 Lauren Haircut | 13 | 14 (P) | 15 Go-cart banquet |
| 16 | 17 John's Vac 17-23 First Quarter Birthday of Brother Benjamin Franklin, 1706 Martin Luther King, Jr. Day Anna will take kids | 18 | 19 12:40 John Haircut | 20 3:40 Jonathan Haircut | 21 Dr. Peet 10:45 $20 | 22 Heartworm due for all dogs |
| 23 / 30 | 24 John's Vac 24-30 / 31 | 25 Full Moon Birthday of Brother Robert Burns, 1759 | 26 | 27 Birthday of Brother Wolfgang Amadeus Mozart, 1756 | 28 | 29 John went out with Leo, wanted to kill himself. Lee took him to his parents all night. |

DECEMBER 2004

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| | | | 1 | 2 | 3 | 4 |
| 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 19 | 20 | 21 | 22 | 23 | 24 | 25 |
| 26 | 27 | 28 | 29 | 30 | 31 | |

FEBRUARY

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| | | 1 | 2 | 3 | 4 | 5 |
| 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| 20 | 21 | 22 | 23 | 24 | 25 | 26 |
| 27 | 28 | | | | | |

ADKINS
DEPOSITION EXHIBIT
6
PENGAD 800-631-6989

# February 2005

| SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY |
|---|---|---|---|---|---|---|
| | | 1 | 2 Last Quarter | 3 Dr. Poleck Jonathan 330 CANCELLED | 4 | 5 |
| 6 | 7 | 8 New Moon | 9 Ash Wednesday | 10 Jonathan has test | 11 Went to movies to see Robt Hoyt 9:30 in Dagsboro. John + I took our taxes then had breakfast @ Millsboro Diner. Got Lauren's birthday present. | 12 Lincoln's Birthday |
| 13 John got mad because I did not want to go. Shoot @ Club 20 3/12 @ I stayed home to help Lauren c a proj. | 14 Valentine's Day John left @ 0930 + did not come home all night. Left note on bar "Bye." I called + cursed him. | 15 John came home @ 0930. Said he wanted to "salvage what we had left." We decided to leave for Cabela's in am. Went to see Dr. Tom. | 16 First Quarter Left for Cabela's ~ 1100. Stopped in Dover for something to eat + exchange something @ Victoria's. Went to Cabela's + Outdoors Bar. | 17 Had breakfast then went to Cabela's. Ate lunch @ Cabela's. Stopped on way home for dinner then I drove the last home. | 18 3:40 4:00 Hair JTJ John + Jonathan wrecked Tahoe @ 1030. Took John to hosp. | 19 Rabies CANC 1-3 Found out John cheated from Tina. Confronted him. He killed himself. |
| 20 | 21 Presidents' Day | 22 Washington's Birthday | 23 | 24 Full Moon | 25 | 26 |
| 27 | 28 | | | | | |

JANUARY

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| | | | | | | 1 |
| 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| 23 | 24 | 25 | 26 | 27 | 28 | 29 |
| 30 | 31 | | | | | |

MARCH

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| | | 1 | 2 | 3 | 4 | 5 |
| 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| 20 | 21 | 22 | 23 | 24 | 25 | 26 |
| 27 | 28 | 29 | 30 | 31 | | |



Washington, D.C.
original Allyn Cox painting of Shepheard's Tavern
6% Cashback June 13 - Aug 31
June 2005
SUNDAY
MONDAY
TUESDAY
WEDNESDAY
THURSDAY
FRIDAY
SATURDAY
MAY
JULY
9:30 Hair Appt c Amy
6:15 Linda Abbott
PACK LUNCH
Jonathan Haircut ? free Guitar Lessons
Change tags on trucks
4:00 Dr. Pollock
Wear T-shirt Field trip to Lewes
Guitar Lessons
Flag Day
11:00 Dr. Pollock (1½)
9:30 Nails done
John's Vac 20-26
Father's Day
First Day of Summer
10:30 Dr. Pollock (1½)
Concession stand 5-9
Founding of the Grand Lodge of England, 1717
St. John the Baptist Day
ADT Security 9-12
Guitar Lessons
9:30-4
CAMP NEW HOPE
memorial service 2pm

P562

A000067

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

CINDY L. BALAS a/k/a CINDY L. ADKINS, Executrix of the Estate of CORPORAL JOHN J. BALAS,

Plaintiff,

v.

STANLEY W. TAYLOR, JR., individually and in his official capacity as the Comissioner of Correction; ALAN MACHTINGER, individually and in his official capacity as the Director of Human Resources of the Department of Correction; MICHAEL DELOY, individually and in his official capacity as Deputy Warden of Sussex Correctional Institution; CAPTAIN DAVID WILKINSON, individually; LIEUTENANT TRUMAN MEARS, individually; and DEPARTMENT OF CORRECTION OF THE STATE OF DELAWARE,

Defendants.

Civil Action No. 06-592-JJF

Deposition of MICHAEL E. DeLOY taken pursuant to notice at the law offices of The Neuberger Firm, P.A., Two East Seventh Street - Suite 302, Wilmington, Delaware, beginning at 10:03 a.m. on Tuesday, November 27, 2007, before Christina M. Vitale, Certified Shorthand Reporter and Notary Public.

Continued. . . . . . . . . . .

that eventually make its way up to you?

A. Could you repeat that, please.

Q. We talked about security problems and we talked about personnel problems in the prison. If there are other kinds of problems, if the facilities are crumbling, would that eventually find its way up the chain of command to you?

A. Yes.

Q. If there is a medical problem in the prison, would that eventually find its way up to you?

A. Probably.

Q. If there is a program which is being under-utilized in the prison, would that issue eventually find its way up to you?

A. Not necessarily.

Q. Who would it go to?

A. I know that you are referring to --

Q. I'm referring to the EAP program.

A. The EAP program. That is not always reported up the chain of command. That may be a program that is undertaken by the employee. It may be -- you may be referred by a supervisor, but there is some confidentiality that goes along with that. That may not be reported up through the chain of command.

thoughts are greater around the time of the Christmas holidays for some people?

A. It does.

Q. Does it talk about 80 percent of suicide victims communicate their intentions verbally while 20 percent communicate through their behavior?

A. It does say that.

Q. Does it also urge persons to take the time to tune in to your loved ones or co-workers and don't let inaction result in tragedy?

A. Yes.

Q. And it talks about how the state's EAP program can offer help and 24-hour counseling if you need it?

A. Yes.

Q. Let's take a look at what was previously marked as Mears Exhibit 2. Do you have this document in front of you?

A. Yes, I do.

Q. What I would like you to do is just read the first page and then the first paragraph on the second page quietly to yourself so you can familiarize yourself with it. That's all I am going to ask you questions about. Okay?

A. Okay. Did you say the first paragraph on page

at SCI, there is a lot of employees, a lot of prisoners, things like that?

A. Yes.

Q. Would you have any reason to contest the fact that this is one of the policies which governs?

A. No.

Q. Let's go down on the very first page where it says number six, "Procedures." I would like to focus on this paragraph a little bit. Does this paragraph indicate that when a warden or a section administrator becomes aware of employee behavior or conduct that suggests that an employee is experiencing psychological problems that interfere or prevent the employee from functioning on the job, would otherwise present a danger to the workplace for psychological reasons, that they will make some kind of mandatory report to the human resources directory?

A. Yes, that is what that says.

Q. And I would like to focus on whether this policy just applies if an employee tells you these things. That's where I'm going to focus my questioning on, okay?

A. Yes.

Q. Now, where the policy talks about employee

when the CERT, C-E-R-T, team was activated to staff the court and transportation unit?

A. I do recall that.

Q. And do you recall that ultimately most of the members of the CERT team resigned as a result of that call-up?

A. Yes.

Q. Do you recall why they resigned?

A. I believe -- I don't know for certain why they resigned, no. I don't want to guess.

Q. Did you ever learn later why?

A. I don't think I really know why. I would imagine it was probably individual decisions on each of those CERT team members.

Q. Did you ever talk to the warden about it?

A. Yes.

Q. Did the warden ever tell you that they had met with him and told him why?

A. I don't know if he did or not.

Q. Did you know John Balas?

A. Yes.

Q. How did you know him?

A. I knew John as a co-worker and as a -- I don't know how to describe it, but maybe a little bit more

me that he was unhappy with the evaluation that he got. I cannot remember exact words that he used to describe his unhappiness, but I can testify that John did tell me that he was unhappy with his evaluation.

Q. Then, I would like to focus on the why and what John may have said about the why he was unhappy or why he thought he had received that type of an evaluation. Do you recall John coming to you and saying that he was unhappy or that he thought that Truman was unhappy with him because he had resigned from the CERT team?

A. Do I recall that John came to me and said that he believed Truman was unhappy with him because he resigned from the CERT team?

Q. Right, that John believed that, yes.

A. Yes, I don't recall that. John may have said that to me.

Q. He may have said that to you?

A. He may have said that to me.

Q. It has been three years or a little less than three years since these events happened, right?

A. Yes.

Q. And that's a long time?

A. Yes, it is a long time.

Q. And memories can fade and things like that,

right?

A. Yes.

Q. And you are doing your best to recall?

A. I'm trying to remember. I mean, I can testify, like I said before, that John came to me and said he was unhappy about his meets expectations evaluation. I don't remember the details of that conversation.

Q. But I think you are also testifying that he may have said to you that he thought Truman was unhappy with him because John had resigned from the CERT team?

A. John may have said that.

Q. He may have said that?

A. Yes.

Q. Trying to focus a little bit more on conversations John may have had with you surrounding the evaluation issue or other issues. Do you recall if John ever came to you and said he thought Truman was going after him and was angry at him because he had resigned from the CERT team?

A. I think what John wanted me to do was remove Truman as his supervisor.

Q. Did John ever say why?

A. Because he was unhappy with the evaluation and did not think that he would get a better evaluation.

Q. And did John ever explain to you why he was unhappy with the evaluation and why he thought he received the evaluation he did from Truman?

A. He may have, but I do not remember the details of that conversation. The detail I remember is that John wanted me to change his supervisor.

Q. Could he have said to you during one of those conversations that he felt that Truman was angry at him because he had resigned from the CERT team?

A. I don't recall the details. I really don't want to say something that I don't recall, so.

Q. He may not have said it, but he also may have said it?

A. Yes.

Q. You just don't remember either way?

A. Yes.

MR. NEUBERGER: Let's take that break now.

(Brief recess.)

BY MR. NEUBERGER:

Q. Warden DeLoy, one thing I forgot to ask you about the transfer issue. I think you mentioned that John wanted a transfer to a different supervisor or he wanted his supervisor transferred or something?

A. Yes.

Q. Which was it?

A. He wanted a different supervisor.

Q. Do you recall how many times he asked you about that?

A. No, I don't.

Q. Do you recall if it was more than one time?

A. It may have been more than one time.

Q. And it has been so long it's hard to remember the specifics, right?

A. Yeah. I clearly knew that he wanted a new supervisor.

Q. Do you recall any conversations with John and I want to focus with conversations with John not about the employment evaluation, okay?

A. Okay.

Q. Any other conversations with John where he complained that Lieutenant Mears was harassing him?

A. That were separate from the evaluation?

Q. Yes, because we have talked about the evaluation a bit so far.

A. No. Okay, my answer to that is no. I think all the conversations we had were about the evaluation.

Q. John during those conversations I think you

A. No.

Q. Did you ever receive a phone call from Jennifer Cox or Jennifer Weldon asking for help because John Balas was going to kill himself?

A. No.

Q. Who is Jennifer Cox or Jennifer Weldon?

A. She is the administrative assistant for the medical vender at SCI.

Q. And that's -- is that the CMS company?

A. Yes, right now it's CMS.

Q. What does the abbreviation stand for?

A. Correctional Medical Services.

Q. Have you ever talked to Jennifer Weldon about John Balas?

A. Yes.

Q. And just so we are clear when I say Jennifer Weldon you also understand I'm referring to Jennifer Cox, it's the same person?

A. Yes.

Q. When did you talk to her about John?

A. Jennifer stopped by my office about two days before John killed himself.

Q. What did Jennifer say to you during that visit?

A. She told me that she had just broken up with

John or was trying to break up with John and that she was afraid that he may do something.

Q. Did she specify what that do something was?

A. Yes. She said that she had started a relationship with another correctional officer and she was not sure how John was going to respond to all that.

Q. Did she ever imply that he might kill himself?

A. Yes.

Q. Do you recall what she said?

A. She at first said that she didn't know -- there may be a fight between the two of them, that there were certainly hard feelings between the two of them, and that she really wasn't sure what John might do.

Q. Did she use the words "suicide" or "kill himself" or something like that?

A. She said hurt himself. She said get in a fight, hurt himself. She was upset.

Q. Was she worried about him that you observed?

A. I think she was worried about what might happen at work. I think she was worried that something was going to occur at the site.

Q. At the site?

A. Yes, I think that's why she came to me.

Q. Because if something happened at the site that would be within your purview as deputy warden?

A. Yes.

Q. Do you recall anything else she said during that conversation?

A. That's pretty much it.

Q. You say "pretty much"?

A. That, you know, she basically said that she had been going with John Balas, dating him, romantically involved, that she was trying to break it off, that she wanted to -- or she had started a relationship with another correctional officer, that John knew about all that, that John wanted to get back with her and that she was afraid of what he might do.

Q. Was she afraid John might do something violent towards her?

A. She didn't mention that.

Q. When you are saying she was afraid of what John might do -- this is what I'm trying to get at -- you meanthat he might do something to himself?

A. To himself or to the other officer.

Q. Or to the other officer?

A. Yes.

Q. Did you understand her concern to be that he

might do something violent either to himself or to the other officer?

A. Yes.

Q. Do you recall anything else that she said during that meeting?

A. I think that pretty much covers it.

Q. What was her demeanor?

A. She was calm. I think she was just relating a concern. Calm. She wasn't hysterical or anything. She was calm.

Q. What was your reaction to her?

A. I thanked her for telling me that and that if, you know, something else came up to let me know. You know, I wasn't going to discuss with her what I may or may not do. I was just kind of receiving information from her at that time.

Q. So, you are gathering the information up to try to make an informed decision basically?

A. Yeah, basically.

Q. Did you say anything else to her during that meeting?

A. I may have tried to let her believe that something would be done, something -- it would be handled some sort of way.

Q. And that would be Rich --

A. Richard Kearney.

Q. And what did you say to Warden Kearney?

A. I just relayed the conversation I had with Jennifer.

Q. Other than relaying the conversation did you say anything else to him other than what she had told you?

A. I don't believe so.

Q. Did you launch an investigation?

A. No, we did not..

Q. Did you call human resources?

A. No, we did not.

Q. Did you call the Employee Assistance Program?

A. No.

Q. I guess which is run by the Human Management Services, HMS?

A. Yes.

Q. So, you didn't call them?

A. No.

Q. Did you launch a psychological fitness for duty evaluation for John?

A. No.

Q. Did you call his union rep?

A. No.

Q. Did you call John?

A. No.

Q. Did you call John's wife?

A. No.

Q. Did you call the other CO that Jennifer Weldon was starting a relationship with?

A. No.

Q. What did you do?

A. We determined that John had been given vacation for that weekend, that particular week. This was, I believe, on a Thursday night.

Q. It was Thursday night when you found out about it?

A. Yes, Thursday afternoon, I believe, after work.

Q. Go ahead, I'm sorry.

A. We determined that John was on vacation that particular week. I think it was emergency vacation to spend time with his family. I think they were going to go to Cabella's. I think between Rick and I we kind of knew that somehow. So, we discussed that and thought it could probably wait until he came back from his vacation.

Q. What did the warden say to you in response to

you relaying what Jennifer Weldon told you?

A. I don't recall what he said. We talked obviously. Discussed what we had just heard. Probably discussed what we knew about John and made the decision to wait until John came back to work.

Q. Do you recall anything else that was talked about by you or the warden during that meeting?

A. (Nod of head.)

Q. No?

A. I'm still thinking. I think that covers it.

Q. Did the warden order any investigation launched?

A. No.

Q. Did he call HR?

A. No.

Q. Did he order John for a fitness for duty psychological evaluation?

A. Not that I'm aware of. All three of those questions should be not that I'm aware of.

Q. Okay, not that you are aware of. Did he call John's union rep or anything?

A. Not that I'm aware of.

Q. Did he call John?

A. Not that I'm aware of.

Q. Did he call John's spouse?

A. Not that I'm aware of.

Q. Did he call the other CO that was referenced by Jennifer Weldon?

A. Not that I'm aware of.

Q. Would a fight between two CO's be something that would affect prison security if it happens on the prison grounds?

A. Yes.

Q. Was that a concern to you and the warden?

A. Yes, that was probably our biggest concern.

Q. Right, that something might happen between two CO's?

A. Yes.

Q. And that was one of the things you discussed with the warden, right?

A. Yes.

Q. And ultimately it was decided that it could wait until John got back from vacation?

A. Yes.

Q. So, then I think you said it was two days later that John killed himself?

A. Yes.

Q. And is that a regret -- actually, strike that.

might go kill himself, something like that?

A. That certainly could have happened, yes.

Q. I guess what I'm trying to say is because the paper won't pick that up, that kind of more of a light-hearted not joking demeanor, but something between people who know each other?

A. Yeah, but I guess my point is I would give no more credence to what Jennifer told me than if that guy who was joking around told me because I just did not know John was in that distress. I didn't. I did not believe that John would hurt himself.

Q. Did you and the warden make any reports on that? Did you put something in writing about this?

A. No.

Q. Did you put something in writing about Jennifer Weldon coming to you about this?

A. No.

Q. Why not?

A. We just had that discussion. I mean, obviously if the following week when John came back to work some things would have occurred, but John never made it back to work.

Q. There were no memos to the file or things like that written to preserve your thoughts while

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

CINDY L. BALAS a/k/a CINDY L. ADKINS, Executrix of the Estate of CORPORAL JOHN J. BALAS,

Plaintiff,

v.

STANLEY W. TAYLOR, JR., individually and in his official capacity as the Comissioner of Correction; ALAN MACHTINGER, individually and in his official capacity as the Director of Human Resources of the Department of Correction; MICHAEL DELOY, individually and in his official capacity as Deputy Warden of Sussex Correctional Institution; CAPTAIN DAVID WILKINSON, individually; LIEUTENANT TRUMAN MEARS, individually; and DEPARTMENT OF CORRECTION OF THE STATE OF DELAWARE,

Defendants.

Civil Action No. 06-592-JJF

Deposition of JEFFREY K. FOSKEY taken pursuant to notice at the law offices of The Neuberger Firm, P.A., Two East Seventh Street - Suite 302, Wilmington, Delaware, beginning at 10:40 a.m. on Thursday, December 6, 2007, before Christina M. Vitale, Certified Shorthand Reporter and Notary Public.

Continued. . . . . . . . . . .

WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
(302) 655-0477
www.wilfet.com

W&F
WILCOX & FETZER LTD.
Registered Professional Reporters

COPY



Q. So, that would mean you were working for the Department of Correction in the year 2004, right?

A. Yes.

Q. And that would also mean you were working for the DOC in the year 2005, right?

A. Yes.

Q. Do you recall what job you held in August of 2004 with the DOC?

A. I believe it was a correction officer at Sussex Correctional Institution.

Q. And that's in Georgetown as well?

A. Yes.

Q. Do you recall how long you were in that job?

A. No.

Q. Do you think you were in that job in August of 2004?

A. Yes.

Q. Do you think you were in that job in August of 2005?

A. Yes.

Q. Who was your supervisor during that time frame?

A. Lieutenant Truman Mears.

Q. Truman Mears was your supervisor?

A. Yes. Not all of that, though, I don't think.

I also had Lieutenant G.R. Johnson.

Q. Was Lieutenant Truman Mears your supervisor for your regular job as a CO?

A. For part of that, yes.

Q. For part?

A. Yes.

Q. Then, you were also on something called the CERT team, right?

A. Yes.

Q. What does CERT stand for?

A. Correctional emergency response team.

Q. And Lieutenant Mears was also on that team, right?

A. Yes.

Q. What was his title on that team?

A. It was just a CERT team member just as I was.

Q. Even though he was a lieutenant?

A. Um-hum.

Q. That's just the way it works?

A. Um-hum.

Q. Yes?

A. Yes.

Q. Do you recall the summer of 2004 being a time of turmoil in the Department of Correction?

A. No.

Q. It's like you are all equals?

A. He was one of the senior members of the CERT team so he organized the meeting.

Q. So, you went to the meeting, right?

A. Yes.

Q. Do you recall that John was there?

A. Yes.

Q. And the meeting was at Lee's house?

A. Yes.

Q. Do you recall what you talked about at the meeting?

A. Just what we were going to do if they made us work court and transportation.

Q. What were you going to do if they made you work court and transportation?

A. They told us that we were taking people to court that if we didn't show up were going to have to be released. We said if that was the case we were going to go to work. When we showed up for work the next morning, we found out we were taking a full court schedule to court. So, we called the head of the transportation unit and told him if that's what he was going to make us do we were all going to quit.

Basically we said we would work that day, we didn't want to get in trouble or nothing for not showing up to work. So, we worked until three o'clock and then we all went in and quit.

Q. Let's focus on the meeting at Lee Mears' house the night before. Do you recall anything that John said at that meeting?

A. No. Everybody spoke their mind. I can't recall what one person said.

Q. Do you recall what the general sentiment was of that meeting?

A. Everybody pretty much had the same feelings that if they made us do something that we didn't think was right, that we would quit.

Q. And this was occurring right in the midst of the union job action?

A. Yes.

Q. And it was the job action by the union which was causing the staffing problems in the court and transportation unit, right?

A. Yes.

Q. It was your understanding that you were being called up to fill those vacant positions in the court and transportation unit, right?

A. No. Our initial response was that we thought we were taking people to court that we thought were going to be released and we didn't want to see that happen.

Q. Right, you were going to be transporting people to the court?

A. Exactly, the people that were going to get released.

Q. People that you were told that were criminals or people in jail that were going to be released on the streets unless you did this?

A. Yes.

Q. And you didn't want that to happen, right?

A. No.

Q. You are a dedicated public servant, right?

A. Yes.

Q. You care about public safety?

A. Yes.

Q. You care about the health and welfare of the general public?

A. Yes.

Q. So, you didn't want anything bad to happen to the public. That comes from you being an experienced CO, right?

A. Yes.

Q. And also just simply because of on a personal level you care?

A. Yes.

Q. And you understand that you were being called to transport those prisoners to the court?

A. Yes.

Q. And that was being done because there wasn't staff to do it, right?

A. Yes.

Q. And the reason there wasn't staff to do it was because of the job action, right?

A. Yes.

Q. What were the sentiments expressed at the meeting about staffing a unit which was vacant because of the job action?

A. Like I say, nobody wanted to do it, but the only reason we all agreed to do it is because we thought these people were going to get released from prison.

Q. Is it your testimony that everyone wanted to support the union, but that there were some larger considerations at play?

A. Public safety, yes.

Q. And that's a very large consideration, right?
A. Yes.
Q. Especially for you?
A. Yes.
Q. The next day you show up to work, right?
A. Yes.
Q. To staff the unit and transport those prisoners to the court?
A. Yes.
Q. And you find out there is -- how did you --
A. Full court, they were taking everybody to court, not just the people that were going to get released because they hadn't showed up and we were taking everybody.
Q. And were you happy about that?
A. No.
Q. Did you feel that you had been lied to?
A. Yes.
Q. Did you feel you were now going to be going against what the union was doing and it wasn't a public safety issue?
A. Yes.
Q. And how did that make you feel?
A. Pretty low.

Q. Did it make you feel unhappy or displeased?

A. Yeah.

Q. How about angry?

A. Yes.

Q. Do you expect better from your superiors than to be lied to?

A. Yes.

Q. And that's disappointing when that doesn't happen, right?

A. Yes.

Q. When you walked into the prison in Georgetown to walk to where the C & T unit is located --

A. The C & T is not in the prison.

Q. Where is it?

A. It's on the outskirts, outside, it has its own separate building.

Q. How do prisoners get from the prison to the C & T?

A. The safety officer reports to the C & T trailer. You get your van and then you drive inside the prison to get your inmates and put them in your van and you take them up to court.

Q. When you and the other members of the CERT team -- which included John, right?

A. Um-hum.

Q. Yes?

A. Yes.

Q. When you guys got in your vans and drove into the prison --

A. We didn't get vans.

Q. What happened?

A. They got somebody else to go in and pick up the inmates. All we did was had to go to court and help with the taking the inmates from the cell block to courtrooms is all we did.

Q. During the course of that day at the prison or at the unit in Georgetown did you interact with any other CO's?

A. Yes. We had to go in and draw our weapons -- you have to go partially inside to draw your weapon for court and transportation. So, we were passing the people that were getting off and going to work as we were going in to do that.

Q. Did the people who were getting off say anything to you as you were passing in the hallway or wherever you passed?

A. Yes.

Q. What did they say?



A. Called us traitors, turned their back on us.

Q. And what was your understanding for why that was being done?

A. Because they thought we were betraying them by working in court and transportation. They thought we were betraying the union.

Q. And that's a bad thing, right?

A. Yes. To them it was, yes.

Q. And I think you indicated that the night before at Lee Mears' house there was a lot of discussion about not wanting to betray the union?

A. Yes.

Q. And you guys wanted to support the union in the job action, right?

A. Yes.

Q. Unless some dramatic public safety considerations overrode that, right?

A. Yes.

Q. Was John with you as you guys were walking in to draw your weapons?

A. All of us went in together, yes.

Q. Before three o'clock that day came when your shift ended did you talk with John at all or the other officers about what you were going to do at the end of

the shift?

A. We all discussed it the morning before we started the shift.

Q. And what was discussed?

A. That if they made us run the full court list that we were all going to quit at three o'clock when our shift was over.

Q. Do you recall anything that John said during those discussions?

A. No.

Q. Was John the type to be quiet during a discussion like that?

A. No, but he didn't say any more than anybody else did.

Q. He said just as much as everybody else did?

A. Yes.

Q. So, three o'clock comes and your shift ends, right?

A. Yes.

Q. Where did you then go?

A. To turn in our weapons.

Q. And was that everybody?

A. Yes.

Q. So, you guys go and turn in your weapons,

right?

A. Yes.

Q. Where did you go after that?

A. To the warden's office.

Q. Who was the warden there then?

A. Rick Kearney.

Q. Was Warden Kearney a good guy?

A. Yes.

Q. Was he good supervisor?

A. Yes.

Q. Was he a good warden?

A. Yes.

Q. How many of you, if you recall, how many of you walked into the warden's office?

A. Ten.

Q. When you walked in, did you guys close the door behind you?

A. Yes.

Q. And did you talk to the warden?

A. Yes.

Q. What did you talk to the warden about?

A. We just told him we were handing in our resignation from the CERT team.

Q. Did you tell him you were doing that because

you had been lied to?

A. It has been so long I can't really remember what was discussed in there, but all I remember is we all resigned.

Q. Is it your recollection that the resignation was done to show solidarity with the union's job action?

A. Yes.

Q. Do you recall John being in that meeting with the warden?

A. He was there, yes.

Q. Do you recall John saying anything?

A. No.

Q. I think you testified a little earlier that John was outspoken, right?

A. Yes.

Q. It has been more than three years since that time, right?

A. Yes.

Q. Memories fade?

A. Yes.

Q. And a lot of things have happened in the last three years?

A. Like I say, we all spoke in there. I can't

remember what each of us said.

Q. You guys were very unhappy about what happened, correct?

A. Yes.

Q. And you guys were very displeased about it, right?

A. Yes.

Q. And you felt betrayed?

A. Yes.

Q. And you felt a little bit angry about that, right?

A. Yes.

Q. And as a result of those things you marched into the warden's office and resigned from the CERT team?

A. Yes.

Q. What was the warden's reaction?

A. I believe he said he didn't blame us, but, you know, he understood that we were all upset and what we went through. He wouldn't hold it against us for resigning.

Q. I think you indicated that you think a lot of Warden Kearney?

A. Yeah.

Q. He has since been promoted, right?

A. Yes.

Q. After the resignation from the CERT team in August of 2004 do you recall who your immediate supervisor was at that time?

A. G.R. Johnson.

Q. G.R. Johnson?

A. I think it might have been G.R. Johnson by then, but I'm not positive.

Q. Did any of your superior officers ever give you a hard time in the workplace because you resigned?

A. No. As a matter of fact, they all looked up to us for what we had done.

Q. For example, I think you mentioned G.R. Johnson, right?

A. Yes.

Q. Was he a good supervisor?

A. Yes, excellent, yes.

Q. I think it's your testimony that -- was he one of the people that thought you had done the right thing --

A. Yes.

Q. -- based on his interactions with you?

A. Yes.

Q. Did he ever tell you that?

A. I think he did, yes.

Q. And he respected the decision you had made?

A. Yes. Put it this way, he never treated me any different after I did it.

Q. And you appreciated that, didn't you?

A. Yes.

Q. Were you happy that he hadn't treated you any differently?

A. I really didn't care, tell you the truth. I worked there eight hours a day and I knew I did the right thing in my mind, so.

Q. Did John ever come to you, John Balas, ever come to you and tell you that he thought that Truman Mears was angry at him for resigning?

A. No.

Q. Truman Mears was on the CERT team, right?

A. Yes.

Q. But he wasn't one of the members that resigned, right?

A. No.

Q. He had actually been at the meeting the night before?

A. Yes, he was there and he was the first one to

leave.

Q. Is it your understanding that after he left the meeting he reported to DOC management that you guys were planning on resigning?

A. No, I don't know anything about that.

Q. Did you ever hear that somewhere?

A. Not that I recall.

Q. Do you have any reason to dispute it if it did happen or you just don't know one way or the other?

A. I wouldn't dispute it, but, like I said, we told them all the next morning anyway, so.

Q. Putting aside the CERT resignation what was your perception of management's reaction to the job action in general?

A. I don't know. I guess they didn't want us to go through with it, but they didn't really have any control over it.

Q. Did you ever get the feeling while working at the DOC that the management was not happy about it?

A. Not really, not that I can say. I mean, they never treated me any differently.

Q. Did you ever hear any of the managers in the DOC talking about how they were unhappy that there were front page stories being run in the Delaware

State News by Tom Eldred or in the News Journal by whoever the reporter was up here?

A. No, I never heard them talking about it.

Q. Did you ever talk to Captain Wilkinson at the time about the job action?

A. Yeah, I did back then, but I haven't talked to him in a couple years.

Q. Let's focus on back then. I think you indicated that you talked to him back then about the job action?

A. Um-hum.

Q. Do you recall the substance of the conversation?

A. No. Just really talked about what was going on with it, I mean.

Q. Did you ever talk to him about the CERT resignation?

A. No. I mean, he said -- he was another one that backed us 100 percent for quitting, so.

Q. He was supportive?

A. Yes. Well, he said he was anyway.

Q. Did you ever talk to Mike DeLoy about it, the deputy warden at the time?

A. No, never spoke to him at all.

Q. Did he indicate that he thought that Truman Mears was altering his time cards?

A. Yeah.

Q. He was altering his time cards after the fact?

A. I don't know about that. He did say something about him altering.

Q. Was John unhappy about that or was he overjoyed his time cards were being altered?

A. He was unhappy.

Q. January of 2005 or thereabouts, in that time frame, did John ever talk to you about Truman Mears denying him a final copy of his time card for the year?

A. No.

Q. Did John ever talk to you about the grievance he filed with COAD?

A. No.

Q. Did John indicate that he was going to file a grievance?

A. I think he did mention something about it, but I never heard anything more about it after he said he was going to.

Q. Specifically what did you hear him talk about?

A. He said he was going to file a grievance over

his time card and, like I said, after that I never heard anything more about that.

MS. XARHOULAKOS: There has not been any testimony from Mr. Foskey or anyone else that the grievance was actually filed so you probably want to clarify the record and re-ask your question.

MR. NEUBERGER: I'm just asking if John talked to him about it.

BY MR. NEUBERGER:

Q. I think you mentioned John may have said he was going to be filing a grievance to deal with the time card issue, right?

A. Um-hum.

Q. Yes?

A. Yes.

Q. Did John ever mention that he might be filing a grievance to address the issue of the performance evaluation?

A. No. Like I say, he said something about filing a grievance. I don't know what he was filing it on.

Q. Who was your shop steward then?

A. I couldn't even tell you.

Q. Do you know who John's was?

A. No. They switch monthly so I couldn't tell

you.

Q. Did John ever tell you that Truman was out to get him?

A. No.

Q. Did John ever express any sentiments generally along those lines?

A. I assumed that when he said something about his time card, switching it, he was out to get him.

Q. Did John ever tell you that he thought Truman was excessively monitoring him trying to find a reason to discipline him?

A. No.

Q. During the August of 2004 through February of 2005 time frame do you recall John being stressed out at work?

A. Yeah.

Q. And you recall him being stressed out about work?

A. I don't know if it was about work or not, but I could tell an attitude change, yes.

Q. You noticed an attitude change with John during that time frame?

A. Yes.

Q. Is it your testimony you don't know what the

attitude change was caused by?

A. Yes.

Q. How did his attitude change?

A. He just got more to himself at work and wouldn't really talk to anybody else at work.

Q. And was that unusual for John?

A. Yes.

Q. Do you recall a time in or about February of 2005 when you, your sister, Cindy, and Lee Mears took John to a place called the St. Joan's Behavior Institute?

A. Yes.

Q. Do you recall that it was approximately February of 2005?

A. I can't remember. It was either the end of January or early February, yes.

Q. But it was sometime during that time frame?

A. Yes.

Q. How did that come about, you guys going there?

A. He had told Lee that he was going to harm himself and Lee spent the whole night up with him I guess the night before or something.

Q. And so did Lee call you?

A. Yes.

Q. And what did -- and Lee asked you to come with them to take John to St. Joan's?

A. Yes.

Q. Right?

A. Yes.

Q. Did he indicate that your sister, Cindy, was worried about John?

A. Yes.

Q. Where is St. Joan's?

A. I think it's in Dover, a little north of Dover.

Q. Did you guys all drive there together?

A. Yes.

Q. Would it have been the four of you?

A. Yes.

Q. What was John's demeanor like?

A. He never said a word the whole way up there.

Q. Do you recall if you went there in the morning or in the afternoon?

A. It was before lunch, I believe.

Q. So, eventually you got to St. Joan's?

A. Yes.

Q. Did the four of you go inside?

A. Yes.

Q. Is there a front desk or waiting area or

reception area?

A. There is, but there was nobody there because it was on a Sunday we took him.

Q. You walked in and there was no one there?

A. The one man we went to see was there, but there was no receptionist or nobody else there.

Q. Do you recall the name of that gentleman?

A. No.

Q. But there was someone there?

A. He talked to John, yes.

Q. He talked to John?

A. Yes.

Q. Did he talk to John in front of you guys?

A. No.

Q. He took John back?

A. He took John back.

Q. Do you recall how long John was in there?

A. Probably 45 minutes to an hour.

Q. What did you and Cindy and Lee Mears do during that span of time?

A. We just knew they were going to keep John. We sat there and talked while he was there.

Q. You knew --

A. We figured they were going to keep him there.



Q. Because he was suicidal?

A. Yes.

Q. Did there come a time when either John came back from the meeting or when the doctor came back from the meeting?

A. They both came out together.

Q. What was said?

A. He said, "He is good to go."

Q. Do you recall if it was a doctor?

A. I assume that's what he was.

Q. Was he wearing a white coat?

A. No.

Q. Was he wearing a suit and tie?

A. I believe he had a tie on, but he didn't have a suit on, no.

Q. Was he wearing a blazer or something like that?

A. Just a shirt and tie, I believe.

Q. There came a time after their meeting was over John and the gentleman at St. Joan's came back out to where you, Cindy and Lee were waiting?

A. Yes.

Q. And the gentleman said, "He is good to go"?

A. Basically he said, "He is good to go home, he is not going to harm himself." Then, Lee jumped up and

said, "I need to talk to you," and they went back there and talked.

Q. What was your reaction to hearing John was good to go?

A. I knew he wasn't.

Q. Did that suprise you?

A. Suprise me what?

Q. That the gentleman at St. Joan's said John was good to go?

A. Yes, yes.

Q. Do you recall how long Lee was back there talking to him?

A. No. About a half hour.

Q. And so while Lee was back there talking with him what were you, John and Cindy doing?

A. Sitting in the waiting room.

Q. Were you talking?

A. Like I said, John never said a word all the way up there and all the way back.

Q. John didn't say a word either?

A. No.

Q. Were you and your sister talking?

A. We never said a whole lot because we were afraid he might go off or something, so.

Q. Eventually Lee came back?

A. Yes.

Q. Did Lee come back out with the doctor or the gentleman from St. Joan's?

A. Yes.

Q. Do you recall what was said when they came back out?

A. No. All I know is we all loaded up and came back home.

Q. Who drove?

A. Me.

Q. When you drove home, where did you go?

A. Back to John's house.

Q. And did you then take John to his parents' house?

A. I can't remember if he went into his house and went upstairs and went to bed or went back to his parents, I can't remember.

Q. Do you recall a time when you helped remove the guns from John's house?

A. Yes, we did that that day.

Q. And you were doing that because John was suicidal, right?

A. Yeah, we assumed he was, yes.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

CINDY L. BALAS a/k/a CINDY L. ADKINS, Executrix of the Estate of CORPORAL JOHN J. BALAS,

Plaintiff,

v.

STANLEY W. TAYLOR, JR., individually and in his official capacity as the Comissioner of Correction; ALAN MACHTINGER, individually and in his official capacity as the Director of Human Resources of the Department of Correction; MICHAEL DELOY, individually and in his official capacity as Deputy Warden of Sussex Correctional Institution; CAPTAIN DAVID WILKINSON, individually; LIEUTENANT TRUMAN MEARS, individually; and DEPARTMENT OF CORRECTION OF THE STATE OF DELAWARE,

Defendants.

Civil Action No. 06-592-JJF

Deposition of HARRY P. HASTINGS, III, taken pursuant to notice at the law offices of The Neuberger Firm, P.A., Two East Seventh Street - Suite 302, Wilmington, Delaware, beginning at 12:43 p.m. on Tuesday, December 4, 2007, before Christina M. Vitale, Certified Shorthand Reporter and Notary Public.

Continued. . . . . . . . . . .

WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
(302) 655-0477

www.wilfet.com

WILCOX & FETZER LTD.
Registered Professional Reporters

COPY

A. I believe that's -- from my understanding, and I could be somewhat mistaken, but from my understanding the lieutenants keep track of our time. Well, I believe it was recently changed like real recently, within the last several months, that now the business office, I believe, takes care of time cards.

Q. Are you familiar with the term "emergency vacation day"?

A. Am I familiar with it? Not really.

Q. So, you don't know what an emergency vacation day is?

A. No, I've never used that.

Q. Could there be a time when an officer would say he needs the next day off, something would come up?

A. Yeah, oh, yeah, definitely.

Q. Do you know if the management, meaning a lieutenant or your lieutenant, would look down upon officers using vacation leave on such short notice?

A. No. We all do it. I mean, things come up, that's how life is.

MS. HERTZOG: That's all I have for him right now.

MS. XARHOULAKOS: We don't have any questions.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CINDY L. BALAS, a/k/a CINDY L. ADKINS, Executrix of the Estate of CORPORAL JOHN J. BALAS,

Plaintiff,

v.

STANLEY W. TAYLOR, JR., individually and in his capacity as the Commissioner of Correction, et al.,

Defendants.

Civil Action No. 06-592-JJF

Telephone deposition of ARTHUR LEE MEARS taken pursuant to notice at the law offices of the Department of Justice, 5th Floor Conference Room, Carvel State Office Building, 820 N. French Street, Wilmington, Delaware, beginning at 8:06 a.m. on Tuesday, January 22, 2008, before Lucinda M. Reeder, Registered Diplomate Reporter and Notary Public.

APPEARANCES:

STEPHEN J. NEUBERGER, ESQ.
CHERYL A. HERTZOG, ESQ.
The Neuberger Firm, P.A.
Two East Seventh Street, Suite 302
Wilmington, Delaware 19801
for the Plaintiff,

RALPH DURSTEIN, ESQ.
STACEY XARHOULAKOS, ESQ.
Department of Justice
Carvel State Office Building
820 N. French Street
Wilmington, Delaware 19801
for the Defendants.

spot where we didn't want to be.

That wasn't very professional. It wasn't what the CERT Team was designed for. If it can't be what it's designed for, then I didn't want to be on it. And I didn't want to go against the other officers that were fighting for change.

Q. Now, after you resigned from the CERT Team, did you see any impact on you and your job, your assignment or your daily work with the DOC?

A. Somewhat, but not to the extent that John did. I really -- it was more of a cold shoulder to me from some of the administration, whereas I think John got, you know, more of the brunt of it. But I have to mention that they knew at the time that I was leaving the Department, so.

Q. Had you ever given notice?

A. I hadn't given notice, but it was pretty much known because of, I had told them that I had been hired, but I hadn't had a start date yet. And the background investigators had been to the institution and talked to everybody involved. So, yeah, I hadn't given notice, but I had been hired by the border patrol.

Q. What you are saying is that your decision to go

with the border patrol is something that had started, the processes had started for hiring before the CERT resignations. Is that correct?

A. Yes, yes.

Q. Did John Balas ever talk about leaving the Department of Corrections?

A. Yeah. But I don't really think he was ever really decided on what he was going to do or what he wanted to do. I think he liked working there. I don't think it was necessarily him wanting to leave the Department.

I know after we resigned CERT and after I had said that I was leaving and after his affair, we had talked a couple times, and he had mentioned he may be interested in finding other employment or getting another job. I know that he was not happy with the way he was being treated. I know he had mentioned it, but just never really anything about what he was going to do. Just mentioned it in the fact that he may be interested in finding another job.

Q. To your knowledge, have any of the other CERT Team members who resigned left the DOC?

A. To the best of my knowledge, I don't believe so.

Q. Are you still in communication with any of those persons?

A. A few, a few. I speak with Scott Bradley on occasion, Harry Hastings on occasion. I speak with quite a few of the other CERT members that had resigned prior to this. On occasion, I'll speak to some of them. I don't really -- it's not -- I don't call them all the time. Scott Bradley, Harry Hastings, Allen Adams are probably the three that I talk to the most.

Q. Of those that you have contact with, have any of those individuals complained of any kind of mistreatment or this cold shoulder you mentioned from the DOC as a result of those resignations?

A. No, I don't believe so.

Q. Let me ask you about Truman Mears. First, I guess for the record, you and he are no relation; is that correct?

A. We are distantly related. It's pretty distant, though.

Q. Did you ever work with him or for him at the DOC?

A. Yeah. I can't recall if he was ever my supervisor. I do believe he was. But if it was, it

was for a short time. But we did work together daily, and we were both on the CERT Team and we were both CERT Team leaders.

Q. Did you have any issues or problems with him, either working with him or, perhaps, for him or working CERT with him?

A. Yeah. I did have problems with Truman when we were working CERT. The whole thing with CERT was, it was a team concept. And from the time I got on -- I was on it, I think about seven years -- from the time I got on CERT until the time I got off, it was just -- it was a team. Everything was done as a team. Decisions were made as a team. When you go on CERT, rank goes out on the window. There is no rank. Everybody is equal.

The day when we resigned -- the night before we resigned, we had a meeting because some of the guys were wanting to quit right away. I told them, no. I said, I didn't think it was a good idea, and I suggested we have a meeting. Truman Mears came to that meeting and left early. And within five minutes of him leaving the meeting, I got a phone call from CERT Command. And they were irate and accusing me of being an instigator and all kinds of things, as

well as -- me and John. They automatically brought John into it, saying it was John and I that were trying to get everybody to quit.

There was only one person that knew about the meeting and that was Truman. And I had some problems with that.

Q. Who was it you spoke to on the phone?

A. That would be Tim Radcliffe.

Q. What was his position at that time?

A. He changed positions so many times with CERT Command. He was always second in command, but they changed the rank structure. So at that time, he was either a major or staff lieutenant --

Q. Before that night --

A. -- or captain. I can't remember. I think he changed, like, three times in the course of like three years.

Q. But that night, was he speaking to you as a CERT Team member?

A. He was -- CERT Command would be one step higher than a team member. So he was speaking to me as a supervisor.

Q. As a CERT supervisor?

A. Yes.

Q. Before the night of the resignations, had you encountered any problems with Truman Mears?

A. I am going to have to think about that one, but. Me personally, probably not. Nothing, nothing serious. We had disagreements, but that's to be expected in that line of work. But nothing, nothing, really, I don't believe.

Q. You mentioned that John Balas at some point talked about filing a grievance against the Department of Correction; correct?

A. Yes.

Q. Did you ever actually see the grievance document, the paper he filled out?

A. No, I don't believe I did.

Q. What did he say about it? What was your understanding of what he was attempting to accomplish with the grievance?

A. I just know that it -- the grievance. I believe the grievance was about the time or it was a conflict over annual leave that he had used or sick leave that he had used and that it shouldn't have been reported, but he was saying that Truman had changed his attendance record. Forgive me if I am mistaken on the terminology. It's been almost three years.

Q. Right.

A. So. Whatever his attendance record was, he felt that Truman had changed it or had manipulated it in some way. And I don't recall all the details of that.

Q. Are you familiar with a term called "emergency leave" or "emergency vacation"?

A. Yes. I believe they used emergency leave before.

Q. Do you know if that terminology was involved in John Balas wanting to file a grievance?

A. It may have been. I know that officers there would get emergency leave on occasion. But there was several ways to get time off. You know, emergency leave, or the schedule was just low, it would just be leave -- or I mean, the schedule was full and they had enough people, they would just give you leave.

Q. Was there any difference, to your knowledge, between emergency leave and regular leave in terms of how much time you lost or how you were paid or anything of that nature?

A. The only difference that I know in emergency leave and leave is the terminology. One, leave is scheduled in advance. I believe you do it, like, in

November, and it is for the following year.

Emergency leave, I believe it's just anything that's short notice, where you want to call up and say, hey, I want to take this. And to the best of my knowledge, it could be a week out or it could be call up the captain that morning and say, hey, I need emergency leave today if you can give it to me, and they'll give it to you or they won't.

Q. Did John ever tell you what happened to that grievance?

A. No, I don't really recall what happened to the grievance. I think it was still in motion at the time.

Q. Do you know if he actually filed it?

A. I believe he met with Deputy Warden Deloy on that. I believe he met with him. John only told me about these facts. I never actually saw him go into the deputy warden's office, but I do believe that's who he met with.

Q. What kind of -- let me back up. Strike that question. You were a member of the union COAD when you worked at DOC?

A. Yes, yes.

Q. John was also a member?

ran into a couple of the other CERT members who had also been told that they were to report. And also, I started getting -- I guess some of the other CERT members had heard about it. So within a matter of probably a half an hour, I started getting phone calls. We were all standing in the parking lot. I started getting phone calls. And people wanted to resign right there from CERT because they felt that it was a political move and everything. I told them, no. I was like, look, we've always gone when we have been gone. CERT, the entire time I was on, we never refused to do anything. So I said, "We can't just resign. Let's have a meeting, let's talk about this." Normally, we would have just gone somewhere, you know, a local restaurant or whatever, but we had to do it at my house because my wife had to work and I had to watch my kids that night.

Q. Okay.

A. So everybody met at my house, and we discussed it. And we decided that we were not going to resign because we felt like that we had never refused to report before, and we weren't going to start then. But we also decided that if we got there the next morning and found that it was a low court schedule, if

we felt we were used, yeah, we would quit, but we would make the decision as a team.

We got to the Court & Transportation building the next morning. When we arrived, I met with Rudy Drummond. He came out into the parking lot, and he told -- he asked me why we were there. I told Rudy, I said, "Rudy, we're just here. We're not taking everybody to court." I said, "I have been assured by the warden as well as CERT Command that we are only taking the people to court that would otherwise be released if they did not get to court. And we felt obligated to make sure those people got to court." And he said, "Well, I don't know why they sent you." He said, "My guys can handle that." And I asked him what he meant. He said, "Well, there is only two today." And I believe it was two. It may have been three. But I believe it was two. And so we felt, well, we're here, we're going to do it.

So we went and got our weapons from the armory at the control center inside the institution. When we pulled into the main parking lot to go into the main building to get our weapons, we were ridiculed. We had agents stand -- or officers standing in front of the institution that were just

irate, yelling at us, couldn't believe we were crossing, you know, and turning our backs on them. And people that I have worked with for 12 years would turn around and walk away from me and wouldn't say a word to me.

We got inside, got our weapons, walked out, and it was pretty quiet. We didn't say a word to each other until we got back over -- and we drove in separate vehicles, but. Walked out to our vehicles, got in our vehicles, drove back to the Court & Transportation building in the parking lot right there.

We were all pretty upset about that. We called CERT Command. No, actually we didn't call CERT Command. Scott Taylor from CERT Command arrived in the parking lot. He had been, I guess sent down either to check on us or watch over us, or whatever. I don't know what the reason was. He got there. We told him how we felt, that we were a little concerned about things, being there was only two on the court list, and that it was pretty rough, didn't really feel like it was fair, and that it wasn't very professional of the Border Patrol -- I mean, the Department of Corrections to do that.

order. And he said it wasn't Stan. And we all were confused and asked: "Well, what do you mean it wasn't Stan?" He said, "It came from higher than Stan."

At that point, we all felt that it was a political issue, and that we were just being used. so at that point, we told him we were resigning at 3:00 o'clock that afternoon, that we would finish out the day because we had been called, but we were going to resign that afternoon.

And at 3:00 o'clock that afternoon, we walked into the warden's office and resigned from CERT. We also advised Warden Kearney that even though we resigned from CERT, that just meant we would not respond on a CERT level to anything that CERT wanted. But off the record, if a situation arose to him in the institution, feel free to call us, we would do anything for the institution. As employees of the institution, we would come in and do what we could do, so. And that's pretty much it, unless you have any other questions.

Q. Let me just go back and clarify a couple things. Rudy Drummond, what was his capacity?

A. He was a sergeant in charge of Court & Transportation for Sussex County.

Q. All right. Now, as a result of this, and while you are still at the DOC, are you aware of any of the CERT Team members who resigned who suffered a consequence, such as being denied a raise because of that?

A. Denied a raise?

Q. Yeah.

A. No.

Q. Were any of the CERT Team members who resigned, including yourself, denied a transfer they requested?

A. I don't recall. And I didn't apply for any transfers at that time.

Q. And, again, I am asking not just yourself, but others that you might be aware of. Did you ever hear of any of the CERT Team members who resigned being denied a promotion they were entitled to or thought they were entitled to?

A. No.

Q. I think you may have mentioned this before, but. Your co-workers who you mentioned have been criticizing the CERT team members when you were going to get your weapons, what was the attitude of co-workers after the resignations?

A. It was completely different. They were

appreciative. They thanked us. They felt sorry for us. They knew we all liked CERT. That was it. They were happy, but at the same time, they were -- several of them told us -- told me that they were sorry that we had to resign, that they appreciated us doing it, but they knew how much we liked CERT.

Q. What was the warden's reaction when the members told him that they were resigning?

A. Shocked, I believe. He couldn't understand why we were resigning. I explained it to him the best I could. And I told him it was nothing personal against him or the institution, that it was -- we felt we were being used by the upper management, Court & Transportation unit, CERT unit. Which CERT and Court & Transportation are all one unit.

Q. Right.

A. They're just separate entities of those units. But Major Dave Hall is in charge of both of them. He was surprised, so.

Q. You mentioned when you spoke to him. Were you speaking as the leader of the group?

A. I was the team leader, so I felt that it was my responsibility to tell him. And all of us actually spoke in there that day. It wasn't just me. I think

A. I never saw it. It's just what John told me. I really don't know.

Q. But John did see it?

A. John apparently saw it because he mentioned it to -- I don't know if he saw or maybe Dave Wilkinson told him about it. I am not sure. But I believe he saw it because I now that -- I believe he told me Dave Wilkinson had a copy of it.

Q. Did John have any issues that you know of or problems with Dave Wilkinson?

A. I don't believe so. I don't believe so.

Q. How about Mike Deloy?

A. I don't recall. I don't think there was any -- I don't think there were any problems. I would say not that I recall.

Q. Is it your understanding that John's issue was primarily centered on Truman Mears?

A. To the best of my knowledge, that's what it was.

Q. Okay.

A. And, well, and CERT Command.

Q. Yeah. Before the resignations that we've spoken about in the summer of 2004, before that time, are you aware of any problems that John Balas had with

Truman Mears?

A. Yeah. I mean, I don't recall exactly what it was, but there was tension between them. Prior to this, we had all hunted together, Truman, John and I. But I don't know what happened. Something happened, and there was a rift between John and Truman.

Q. To your knowledge, did the rating that John received in this evaluation have any affect on his compensation?

A. No, I don't believe so.

Q. Did it have any affect on his job assignment? Did that change in any way?

A. John's assignment was bidded. It wouldn't have changed. Well, I -- his primary job assignment would not have changed. John had additional assignments outside of the property room, where he worked. He was also a instructor for, I believe pepper spray and QRT. And I know that Truman had tried several times to get him and -- at least John, but I believe it was John and Jeff Foskey thrown off of the QRT training. John had told me that Truman had gone to Major Phil Townsend to try to get John and Jeff thrown off. I believe it was Jeff, but I know at least John thrown off the QRT training. It was -- I am not exactly sure

believe.

Q. Jennifer Cox. Yeah. Who is that?

A. She was -- she worked at the jail there. She was -- when I first met her, she was a -- I don't know. I don't know what her position was, but it was records clerk or secretary or something like that at the medical department. At one point, I guess she became involved with John. I believe they had an affair.

Q. When did you learn about that?

A. November, I believe.

Q. Of 2004?

A. Yeah, yeah, I believe it had to be November 2004, yeah.

Q. How did you learn about it?

A. John told me.

Q. What did he say?

A. It was kind of a strange conversation. He just told me that -- he said that he had been out or that he was seeing somebody new. I don't recall exactly how he put it. He just said that -- he was laughing and joking. And he said something about having a girlfriend. I laughed. I didn't believe him. And I thought, yeah, right, you know. And I told him I

didn't believe him. We were hunting. So I just kept on doing what I was doing. And he told me, no, I am serious, and he had to convince me that he was. And then he actually told me some details that day. So I ended up believing him.

Q. Did he tell you how long it had been going on?

A. Yeah, I believe so. But I don't recall exactly what it was. I believe the end of September, maybe, early October.

Q. Did he give you by any indication by what he said or the conversation as to why the affair happened?

A. Not really, I don't believe. I am sure, I am sure we talked about it. I am positive we talked about it, but I don't recall exactly why. At that point anyway. Later on we talked about it more, and he told me that -- he told me that he felt that -- to tell you the truth, I really don't recall what he exactly said. In my words, I guess he felt -- you know, I really don't recall exactly why, why it started.

Q. Mm-hmm.

A. I know he stayed in it, you know. He said he felt that he -- at times, he told me he loved that

girl, Jennifer, but at other times, he said he wanted to break it off with her. And it just -- it kind of went back and forth until late January. And then he finally told me that he wanted to break it off with her, so.

Q. Did he ever tell you that she broke it off with him?

A. To tell you the truth, it went back and forth. I believe at one time it did. She had -- he told me that she had broken off with him because he wouldn't leave his wife.

Q. And when was that, if you know, that she --

A. I believe that was December, I believe.

Q. And --

A. Like late December, early January. I think it was December because I think it was right around Christmas.

Q. Did he -- did John say whether he was considering what Jennifer was requesting, that is, breaking up his marriage?

A. He never said -- I don't recall him ever saying that he was going to do it. But I think -- he told me that he had thought about it, but that he -- for whatever reason, I don't know what it was, but he just

wasn't going to do it. And I don't know that it was going to be a long-term thing or a short-term thing that he wasn't going to do it. I don't know. Until later on, like I said, in January, he told me that he wanted to end it. I believe it was January.

Q. From that point up until his death, do you have any idea what kind of contact John was having with Jennifer?

A. Not really. I know they talked at work some when he was on day shift. I know they had -- she had given him a cell phone, and that was according to John. He showed me a cell phone that he claimed that she had given him. Then, yeah, outside of that, I really don't know other than I know he apparently made time to go see her outside of work, but I don't know exactly when or have any details of that.

Q. I am going to ask you in a moment about when you took John to seek some psychological help or some counseling.

A. Yes.

Q. Do you know if at that time period, and we're in, I guess, late January, early February, John was still having contact with Jennifer?

A. Yeah. Um, yeah, he did, as a matter of fact.

He did still have contact with her. I believe that -- John had told me that he hadn't had contact with her, but then after a week or so he had told me that he had had contact with her. I forget the exact date. It was -- I took John to -- John called me. He was kind of upset. I went and found him. This was the night before we took him to St. Jones. He had told me that he had had contact with her. As a matter of fact, he called her while I was with him that night. I don't know what he told her because he got -- we were in my pickup, and he got out of the truck and went to, I believe, a pay phone and he called her. I didn't hear the conversation. But I do know he called her that night.

Q. By "her," you mean called Jennifer?

A. Jennifer, yes.

Q. What was his state of mind that night?

A. He was irate, upset. This was prior to me -- this is prior to him talking to her -- at least that I saw him talk to her. And then he was pretty upset, pretty irate. That's the night he told me that he was going to -- he wouldn't be around in the morning and made some other comments that made me feel that he was possibly suicidal. That's when everything went in

motion for the next day getting him to St. Jones.

Q. Why don't you go ahead and talk about that. What action did you take when you realized that John might be suicidal?

A. Well, I didn't really know what to do, so. I knew I wasn't going to let him go back to his house. So I took him to his parents' house and thought that I -- I knew that I was going to need more than just me to control him if he got real bad. And so I took him there, and his mom and I talked to him. He wouldn't let anybody else around him but me. So I ended up staying up with him all night long in his garage, his mom and dad's garage. They have a room, it's like an apartment, on the end of the garage. We sat up all night long in there. He made several threats to me about, you know, he's going to not be around in the morning. He told me that if I fell asleep that he would be gone, you know. So I, basically, stayed away all night long. He eventually fell asleep. And I was able to go out. I called my wife. I had her call Cindy. And Cindy called, I guess John's dad, and his dad came over. And his dad and mom stayed with him. I was mentally and physically exhausted, so I knew I couldn't stay any longer. I had been with him for

probably eight or ten hours like that. So I went home. I had to get some -- get away, get a break.

Q. Sure.

A. Cindy, I guess had -- I believe she spoke with Dr. Angel. And then I guess he had recommended St. Jones, so. And he recommended that, I believe it was him that recommended that I go with John as well up there. So Jeff came and picked me up, and it was me and Jeff and Cindy and John all went to St. Jones.

Q. What happened at Jones?

A. St. Jones, we walked in. A male counselor came out or a psychologist. I am not sure what his title was. Came out. We walked in. He took John into a back room. We brought, you know, bags with us. We thought John would be staying. John was pretty open to it, and -- which surprised me. I thought he would fight it, but he didn't. And anyway, we went in, and within about 15 minutes, 20 minutes, maybe, John and the counselor both came back out. And the counselor was, like, he's free to go; he's not going to do anything; he's -- you know. We were all shocked.

And then the counselor asked to speak with me there in the -- in front of everybody, he asked to speak with me off on the side. I told him I wanted to

talk to him in his office. So I went into the office with the counselor, and with John, and I asked the counselor if John had told him about everything, including the affair, including the stuff that was going on at work, and, you know, and the stress, you know, resigning from CERT, with -- the thing with Truman, with everything. I don't think I mentioned Truman's name, but just the grievances and things at work. And the counselor said, yeah, he was told about everything, and that John -- I believe that he said John signed a contract saying he wouldn't hurt himself.

And he told us to remove all the guns from the house and for him to see a psychologist, counselor or something like that. And anyway, I do remember him giving him a list of some psychiatrists or psychologists or counselors to speak with. He told us that John was free to go.

So we took him back home, kind of in shock the whole way home, but. We took him back to his mom and dad's house. Then Jeff and Cindy and I went and got all the guns out, the guns we knew of, out of the house. Apparently, he had one we didn't know about, so. We went and got all of those out of the house,

so.

Q. What was John's state of mind as you came back from St. Jones?

A. He was actually -- he actually looked a lot better. He seemed a lot better, seemed better than I had seen him in weeks, so. And he and I had several discussions that day because at that point, he was scared to death -- well, he told me, he said -- he asked me if Cindy knew about the affair, and I told him, no. And he said, "That's it." He said, "What do I do? How do I fix this?" I said, "You are going to have to end it with Jennifer." He said, "That's done." I said, "Okay," you know. And I told him this counselor agreed he should take time off from work. I told him he needed to take time off from work. I think he -- I don't know how he did it. I know he didn't want to use any sick time. I think he may have called George Truitt, who was a captain at SCI. I believe he got some time off that way. I believe George may have given him some emergency leave or done something. I don't know what the situation was.

Q. Was it your understanding that part of the reason for the leave was so John could spend some time with Cindy, his wife?

A. That was part of it, yes. They went away. He wanted to go away. That was a suggestion that I made. I believe Dr. Angel even mentioned that would probably be a good thing just to get away, just the two of them.

Q. Was one reason for getting away -- this is your understanding -- that John was going to tell Cindy about the affair with Jennifer?

A. No, I don't believe so.

Q. Let me ask you about another thing. Were you aware at the time that DOC provided an employee assistance program?

A. Yeah, yeah, I was.

Q. Do you know if John was aware of that?

A. Possibly. I don't know. They mention it when you go through your basic academy. And then in the time that I was there, I saw it mentioned one or two other times. Once -- one time I believe it was brought up in a pamphlet or something they handed out and one time I think it may have come out in like a newsletter or something with our paycheck.

Q. During this time that it became apparent that John might be a suicide risk, I am talking late John, do you remember if you or Jeff mentioned this to John

or he mentioned to you the possibility of pursuing the employee assistance program?

A. No, I don't believe so. I think he wanted to handle it through outside care.

Q. Let me just ask you a couple questions about Jeff. Jeff Foskey was John's brother-in-law, Cindy's brother; is that correct?

A. Yes.

Q. Also a friend of yours?

A. Yes, yes. I do speak with Jeff on occasion.

Q. Was Jeff also close with John?

A. Pretty close. We all hunted together. They cut grass together. We all three of us had our own side lawn care business, as do a lot of the officers at SCI.

Q. Have you spoken to Jeff about the lawsuit that Cindy filed?

A. Not really. We've talked about it when she -- right after John died, you know, when she first -- I'm saying right after. Within probably a year when she decided that she was probably going to pursue it. But I don't recall what was said. Just the fact that she was going to file a lawsuit.

Q. Have you spoken to Jeff since you have been out

in Montana?

A. I believe so. I am not sure. We don't talk all the time. I'll call him, you know, every couple months or maybe once every six months. If I am coming home, I usually call him because I usually -- we'll either go out or I'll stop in and see him.

Q. Have you talked with Jeff about John, John's death and these issues we have been talking about today, the affair, and work situation?

A. Not since, not since the time that John died, around that time.

Q. Just a few more questions from me. The other attorneys may have some questions for you.

A. Okay.

Q. If you need to take a break at any time, I should have said that at the beginning, feel free to tell us.

A. No, that's all right.

Q. Did you become aware that John had had a rollover accident in his truck, I think that was February 17th or 18th of 2005?

A. Yeah, I was aware of that.

Q. How did you find out about it?

A. I believe Jeff told me.

Q. Was that before John's death or not?

A. That Jeff told me? Yeah. I believe it was the night that -- it was either the night that it happened -- I mean, Cindy and I talked about it, too. I believe it was Jeff that told me. But I also talked to Cindy about it.

Q. What did she say?

A. I don't recall. It was just that John had had a rollover. Him and Jonathan were in the vehicle, and they had a rollover on kind of a back, winded country road. That was, basically, it. I don't think she knew what to say. I knew she said they took him to the hospital, I believe. I don't really recall.

Q. In your mind when you heard about that, did you have any concern that the accident was somehow related to John's state of mind?

A. Not really. Only because -- at first when I heard, okay, he had a rollover, yeah, I did. But then when they said Jonathan was in the car with him, then, no, because he wouldn't do anything to hurt his son -- at all, I know that.

Q. From the time of the St. Jones incident until his death, do you know if John continued to have any contact with Jennifer?

A. I was under the impression -- I believe, I believe that he was going to have one contact with her to just break it off, completely finish it, and that was going to be it. Now, whether he made that contact or not I don't -- I don't know. I don't really -- he never really said if he had any more contact with her.

Q. When was the last time that you saw John alive?

A. Probably, I don't know, maybe the day before he died. I was over -- at that point, I was over there just about every day or at least every other day. Usually, I think it was every day at that time, just stopping in, visiting, checking on him.

Q. How did he seem when you saw him?

A. He seemed fine. He seemed a lot better.

Q. Now, did you learn from Cindy that at some point she did find out about the affair with Jennifer?

A. I first found out from Jeff that Cindy found out.

Q. What did Jeff tell you?

A. Well, it was the morning that John died. It was early -- I think it was early. I can't remember. I called Jeff to find out how -- if he had heard from Cindy or John to see how he was doing that day. And I was at work. I called Jeff. Jeff said that he didn't

know. Jeff's wife's name is Tina. He said that Tina was on the phone, the other phone with Cindy at the same time. And he said, "Things aren't good," or something like that. I was like, "What do you mean?" He said, "Cindy found out about the affair" and said that -- you know, he's -- that she had talked to him about it and said that he had just gone out of the house. And, anyway, she -- at that point, that's when John told her -- Jeff told me -- I heard Cindy -- not Cindy. I heard Tina yell at Jeff that John had a gun. I guess Cindy had told Tina. It was kind of confusing because it was like four people on the phone at one time.

Q. Right, right.

A. I guess Cindy had told Tina; Tina yelled at Jeff; and Jeff told me that John had a gun and that he was walking towards the back of their property. Then she said that, I guess, Jonathan was running after him. And then Cindy went after him. Then Cindy yelled for Jonathan to come back. I guess they talked in the yard there. Apparently, John told Cindy to go back in the house and get away from him or whatever.

Anyway, at that point, I hung up the phone and left work and went over to John's house as fast as

I could. When I got there, there were already -- Jeff had told me that the state police had already been called.

Q. Mm-hmm.

A. When I got there, there were two state troopers' vehicles in the yard, one out by the yard and one up in the driveway. And it was just quiet when I walked up there. I walked up to the front door and Cindy came to the door and just crying and said that John had killed hisself.

Q. Did Jeff tell you how Cindy found out about the affair?

A. Yeah. Cindy -- well, somebody, I believe, called Tina and told Tina that they knew about it or something. And I believe they were going to tell Cindy. And Tina decided that if they were going to tell Cindy that it would be better if it came from Tina because -- I guess they felt that, you know, let's work on getting John better before, you know, he finds out that Cindy knows about the affair. So Tina is the one I believe that told Cindy.

Q. But it's your understanding at that point that -- see if I get this right -- that John knew that Cindy knew?

A. I guess when -- from what I understand, when John -- when Tina told Cindy, Cindy said something to John about it. I don't know the exact timing of how it was put. I don't know -- I guess Cindy had mentioned to John, hey, I know about this. I don't know what was said. I just know that Cindy did tell John that she knew about it, about the affair. And then when I got there that day, after John had killed himself, Cindy said that she had told John, you know, I know about it, we can work this out. And I don't recall whatever else. I do recall that.

Q. And that was right before he took the gun and killed himself?

A. Apparently, yes.

MR. DURSTEIN: All right. I appreciate you having the patience to answer these questions particularly when we just talked about this a week ago, but it's now on the record.

THE WITNESS: Okay.

MR. DURSTEIN: That's all the questions I have, but stand by because the other attorneys may have some for you. Let us know if you have trouble hearing.

BY MR. NEUBERGER:



W&F
WILCOX & FETZER LTD.

RECEIVED
NOV 27 2007
CIVIL DIVISION

In the Matter Of:

# Balas
# v.
# Taylor, et al.

C.A. # 06-592-JJF

OFFICE OF
ATTORNEY GENERAL
NOV 28 2007
RECEIVED
CORRECTION UNIT

Transcript of:

Truman J. Mears

November 6, 2007

Wilcox and Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: depos@wilfet.com
Internet: www.wilfet.com

reach the point where it's a danger to the --
A. They get taken out of the position.
Q. What's the process there?
A. I couldn't tell you the process right now. I don't know. I would have to go to my supervisor and ask.
Q. Got ya. Do you think that's something that any good supervisor would do --
A. Yes.
Q. -- in that kind of a situation?
A. Yes.
Q. I would like to put a document in front of you. And mark this as Mears Exhibit 1.
(Mears Exhibit No. 1 was marked for identification.)
BY MR. NEUBERGER:
Q. Do you have this document in front of you?
A. Yes.
Q. Okay. And at the bottom, in the bottom right-hand corner of the first page, do you see the numbers D00343?
A. Yes.
Q. What does this document appear to be to you?
A. A newsletter.

Q. And is it some kind of a Department of Corrections newsletter?
A. It says "DOC" on the top, so I guess that is Department of Corrections.
Q. Have you ever seen this newsletter circulating in various places in DOC?
A. Not that I'm aware of right this moment. I haven't read it, so.
Q. How about the general publication?
A. I have seen DOC Matters, yes.
Q. What I would like to do is see if I can jog your memory on a couple things with this document. All right?
A. Okay.
Q. Now, on the first page, in the top half of the page, the fourth paragraph, there is reference to a new employee assistance program provided. Have I directed your attention to that paragraph?
A. Yes.
Q. Why don't you read that paragraph quietly to yourself.
A. It's going to take me a minute. I just -- I was supposed to pick up glasses today. I have never worn glasses in my life, and I need bifocals. I was

supposed to pick them up today.
Q. Fair enough. Take your time.
A. Okay.
Q. Would this have been one of the programs that you were referring to where you said you weren't sure if you could remember the name of it, this EAP program?
A. Possible, yes. I couldn't tell you for sure. I just don't know.
Q. Okay. Well, that first paragraph -- the paragraph where you just read, the first sentence, it says, "Effective July 1st, 2004"; right?
A. Yes.
Q. This newsletter, this particular page we're looking at up in the top right-hand corner, it's dated September 2004; right?
A. Yes.
Q. Let's go back at that paragraph where you just said, and go down, one, two, three, four, to the fifth line, where it says, "Employees can get confidential help for a number of problems, such as marital, family emotional issues, grief and loss, childcare issues, substance abuse, parenting, anger and stress management."

A. Yes.
Q. Do you see that?
A. Yes.
Q. Then do you see the very next sentence where it says, "Supervisors can also refer employees to HMS or contact them to get advice in how to handle troubled employees"?
A. Yes.
Q. Do you see that?
A. Yes.
Q. The first half of that sentence where it says the supervisors can refer employees, that dovetails with what you said earlier about you can try to get the employee help, but it's sort of up to them to also get the help; correct?
A. Yes.
Q. You can sort of urge them?
A. You can tell them what's available.
Q. Okay. And this would have been one of the programs that was available?
A. Yes.
Q. But it also says you can contact this EAP yourself as a supervisor for advice in how to handle a troubled employee. Right?

Q. Does that go over well in a supervisory relationship?
A. It's according to the supervisor, I guess.
Q. Was he uppity towards you?
A. The only -- when the CERT -- when he quit the CERT Team, from that point on, he refused to talk to me, and I had to force him to try to talk to me, you know, as a supervisor. So if you want to call that uppity, he was uppity from that point on, but it was more he -- you know, he just didn't want to talk to me after that.
Q. Was he a soft, sensitive person?
A. No.
Q. Was he a tough guy of, let's say, the John Wayne mold?
A. No, I wouldn't say that either.
Q. Okay. How would you describe him in that respect?
A. Quiet.
Q. Okay. Was he a man of personal integrity?
A. Up until he quit CERT, when we talked and stuff, I can give you an opinion up until then. After that, there was very little communication between us.
Q. So up until he quit CERT, he was a man of

personal integrity?
A. Yes.
Q. And that would have in August of 2004?
A. Yes.
Q. Was he trustworthy?
A. Yes.
Q. Was he honest?
A. Yes. To the best of my knowledge with all this, yes.
Q. Was he a liar?
A. Not that I'm aware of.
Q. Now, do you recall what position John held?
A. He was corporal on B shift with Fridays and Saturdays off in the receiving room.
Q. In the receiving room?
A. Yes.
Q. Okay. Is that also known as the property room?
A. The property room is in the receiving room.
Q. Okay. Did John work in the property subset of the receiving room, or?
A. I believe his job was a little of both, receiving room and property room.
Q. Okay.
A. He worked mainly in the receiving room. I

think his job was completely receiving room, but he would fill in in the property room at times.
Q. Got ya. Could you describe for me what his job duties were?
A. They would, the corporal and sergeant of the receiving room, would process all new commitments and process the releasing inmates. We also housed, temporarily housed females in that area and they would see to their needs while they were there waiting for transportation.
Q. Anything else?
A. As far as in the receiving room, that's it. I mean, I can go into detail, but.
Q. Okay. Please go into detail.
A. Okay. On processing a new commitment, they come in through the receiving room. They, one of the officers either the corporal, the sergeant, would go out into the alcove with the police officer bringing the inmate in; take all of the paperwork from the officer; do a pat search of the inmate; take custody of the inmate; bring them into the areal, fingerprint them; take pictures of them; get all the vital statistics from the inmate; then take them over to the property room to be stripsearched and processed; give

them new property and that sort of thing. And whichever one was doing that, the other one would be doing the computer work.
Q. Okay.
A. And notifying the housing unit that a new commitment is coming.
Q. Okay. So that's what John would do on a --
A. That's bringing an inmate in, yes. Processing a new commitment. And they swapped around, the corporal and the sergeant; one would do one job, one would do the other. There were no specific duties that just the corporal had to do. They shared the duties.
Q. Got ya. Okay. So that's the inmate processing coming in?
A. Yes.
Q. Would that be the only type of job duty that he would have during the course of his days? Would he do other things?
A. We all would respond to codes, if there is a code called anywhere on the compound, an emergency situation, to respond to that.
Q. What would that entail?
A. It's according to the code. If it's, you know,

a fight or a medical code, you would respond and along with any other officers that were available to take care of the situation. Then you would come back to your area of responsibility and finish out your day.

Q. How about out-processing, prisoners being transferred into other institutions or to other institutions, would John have involvement in that?

A. Yes, he would -- in the receiving area, we would bring the inmate back, confirm that we have the right inmate with IDs and other information.

Q. Okay.

A. And then get their personal property, if they had any, and have them held in a holding cell until the transportation officers come. And they recheck the information to make sure we got the right inmates. And transportation takes them.

Q. So other than inmate processing coming in and inmate out-processing going out and responding to various codes throughout the institution, did John have any other job duties?

A. That's it.

Q. Now, what would have happened if he had refused to perform those job duties?

A. What would happen if he had refused to do any

of those job duties?

Q. Yeah. What would happen if he said, no, I am not going to process prisoners today?

A. I would ask him why.

Q. Okay. And what if he still refused to process prisoners? Would he eventually be disciplined?

A. Yes.

Q. Is that just sort of a fundamental thing in the employee/employer relationship, you have to do the job you're told?

A. Yes.

Q. Could you describe John's job performance in the receiving room while you were his supervisor? Let's narrow the time frame.

A. He did a very good job back there for a period of years. I mean, he didn't have to be micromanaged or that sort of thing. He did a very good job.

Q. And do you recall how many years you were his supervisor while he was in the property room?

A. Three or four, something like that. I couldn't tell you exactly, unless, again, I had the paperwork in front of me.

Q. Okay.

A. I would say three or four years.

Q. All right. Now --

A. Now, his -- the last year, his job performance in the receiving room did drop -- not drastically, but there was a change.

Q. So it was not consistently very good?

A. It wasn't like it had been.

Q. So it was not consistently very good?

A. It was up until, like I said, the last year. It was consistent up until then.

Q. Do you recall when in the last year it stopped being consistently very good?

A. It was around -- it was just about a year before his death.

Q. So that would be February of 2004?

A. I am not sure of the dates, but about a year before -- approximately a year before.

Q. Okay.

A. Again, it wasn't a terrible, terrible change, but there was a change.

Q. So as his supervisor, you documented those problems; right?

A. Yes.

Q. Where?

A. In his evaluation and in personal notes,

e-mails, that type thing.

Q. Have you given those personal notes, e-mails and what not to your attorneys?

A. I think I have the one attachment to his evaluation. I think I gave that to them.

Q. What I am trying to get at --

A. I'm not --

Q. I'm sorry. Go ahead.

A. There may have been a note of a, like a -- at one time I talked to John, but I am not sure if I did or not. I am not are sure if I give that to them or not. I don't know.

MR. NEUBERGER: I would like to renew the request if there is something that he hasn't turned over. We could renew a document request. I think it's probably covered by one of the earlier ones.

MR. DURSTEIN: Sure.

BY MR. NEUBERGER:

Q. Now, John also was on the CERT Team; right?

A. Yes.

Q. What were his job duties on the CERT Team?

A. He was a team member. To respond any time we were activated to handle whatever situation may arise.

Q. What kinds of things would he do on the CERT

Team as a team member?
A. Everything from basic shakedowns of institutions to level 5 escapes, that sort of thing. I mean, we were a tactical unit that did everything from the dirty work of doing shakedowns to looking for escapees.
Q. Do you recall who were the other CERT Team members at SCI during that time frame off the top of your head?
A. I can name most of them.
Q. How about before we do that, I'll put a document in front of you. Hopefully, it will make this a little easier on you.
(Mears Exhibit No. 3 was marked for identification.)
BY MR. NEUBERGER:
Q. Let's turn to the second page of this.
A. Mm-hmm.
Q. Do you see where under No. 5 there is two lists of names -- I'm sorry, three lists of names?
A. Yes.
Q. Do you see the one on the right-hand side which has "SCI"?
A. Yes.

Q. To the best of your recollection, aren't these various CERT members at SCI from June 1st of '04 through September 1st of '04?
A. Off the top of my head, this looks like it's correct.
Q. Right. There is not somebody missing there, to the best of your recollection right now; right?
A. Without looking at my sheet, I couldn't say for a hundred percent sure, but it looks correct.
Q. Okay. All right. You can put that down. Now, could you describe John's job performance on CERT while you served with him there?
A. Shaky.
Q. Shaky. Okay. How was his job performance on CERT shaky while you served with him there?
A. He was removed from CERT twice --
Q. When?
A. -- while I was there. Once in late 2003, I believe. I'm not exactly sure. CERT headquarters would have the date. And once a couple years before that.
Q. Do you recall why he was removed?
A. Refusing to show up for activations.
Q. The time around, I think you said the couple

years before that, is that because he was away on vacation at the time?
A. I don't know the details of it. I just know that's why.
Q. Okay. Was he later accepted back on CERT Team --
A. Yes.
Q. -- after each of these incidents?
A. Yes, he was.
Q. Is that unusual for an officer to be booted off an elite squad like CERT and be accepted back on?
A. Yes, it is.
Q. How many years have you been on CERT?
A. I got on a year after I was with the Department, so.
Q. So 1990?
A. Yeah.
Q. Have you ever seen that happen before?
A. Not with the Sussex team -- my experience with the Sussex teams. I don't recall right now. I've not really thought about it.
Q. Okay.
A. I don't know a lot of the circumstances with the first time.

Q. Who would know?
A. Corporal Jay King. Excuse me. He's job counselor now at Sussex Work Release Center.
Q. What was his?
A. He was the team leader.
Q. He was the team leader then?
A. Yes.
MR. NEUBERGER: Counsel, we'll get a document request out today or tomorrow for any documentation relating to these two incidents. We didn't see a whole lot in the production on Friday.
MR. DURSTEIN: Which incidents are these?
MS. XARHOULAKOS: The two from CERT you mean?
MR. NEUBERGER: Yes, the two CERT incidents.
MS. XARHOULAKOS: We have already asked for anything that they would have in CERT. There is no CERT file. Anything would be in his HR file.
MR. NEUBERGER: Right. So anything in there, would have been turned over --
MS. XARHOULAKOS: Right.
MR. NEUBERGER: -- Because you guys turned it over?

MS. XARHOULAKOS: Yeah. Anything we have on Balas has been turned over.
MR. NEUBERGER: All right.
MS. XARHOULAKOS: But we'll take another look.
BY MR. NEUBERGER:
Q. I think you said the gentleman's name was King?
A. Jay King.
Q. So he would have been on CERT then, right, as the team leader?
A. Yes, at that time. He was John's team leader.
Q. And so that would have been before June of 2004?
A. Yes.
Q. Who was the team leader after June of 2004?
A. I think John's team leader was Lee Mears or Kenny Hichman. It would have had to have been one of the two. I couldn't tell you for sure who it was.
Q. Would they have been on the team back when John was thrown off of it?
A. The second time?
Q. Either time.
A. I believe -- well, both of them were the second time. The first time, I think they were, but I

couldn't say for sure.
Q. You were on the team both times; right?
A. Yes.
Q. So his problems of getting him booted off of CERT -- his problems that resulted in him being thrown off of CERT, would those be reflected in his job evaluations?
A. No.
Q. Why not?
A. He was right back on again.
Q. So getting thrown off an elite squad wouldn't result in some kind of comment about that on his job evaluations?
A. No, they result -- whatever that problem was was resolved within CERT headquarters. He was still on the team.
Q. So he wasn't thrown off?
A. He was told he was thrown off. I was told he was thrown off by CERT headquarters. And then the second -- I know a little bit of the details.
Evidently, the major removed him from the CERT Team. Before the major could get to the warden, who was in charge of the CERT Team, John had talked to the warden and give his side of the story, and he

says, "You are still on the team." And the major didn't -- they had words and didn't pursue it. He wasn't going to override the warden.
Q. So he wasn't thrown off twice?
A. Well, he was. I was notified that he was, but then the warden reinstated him.
Q. I thought you said the major hadn't gotten to the warden yet.
A. But the major is the one who threw him off. He has that right, too.
Q. Okay. That's just one of the things within his bailiwick of responsibilities?
A. Excuse me?
Q. That's just one of the things within his scope of responsibilities?
A. Yes. That's just one of the issues with CERT with him.
Q. Do you recall why he was thrown off the second time?
A. Refusing to come to an activation.
Q. Was he on vacation at the time?
A. I have no clue.
Q. Are you familiar --
A. I don't believe so.

Q. Okay.
A. I was given an explanation later on by someone else, but.
Q. What was the explanation you were given later on by someone else?
A. Lee Mears told me the reason he didn't show up for the activation was because he was about to go through a divorce and he needed to change his checking accounts and move some money around so his wife couldn't get it.
Q. Okay. When would this have been?
A. This was -- I don't know the exact date. This was after John had quit CERT, and I was talking to Lee Mears about John.
Q. So John quit CERT in August of 2004; right?
A. Yes.
Q. So sometime after August of 2004 you are saying you had this conversation with Lee?
A. Yes.
MR. NEUBERGER: Let's put another document in front of you. We'll call this Mears Exhibit No. 4.
(Mears Exhibit No. 4 was marked for identification.)

A. Yes.
Q. And what's there?
A. There is nothing.
Q. There is nothing there. If he had -- if John had been booted off of CERT in that time frame, do you think that would have made it into this area?
A. No.
Q. Do you think it would have made it onto the evaluation at all?
A. The only thing it would have been, it wouldn't have been recognized as something going above or beyond. It wouldn't have been a negative thing.
Q. If he was booted off?
A. CERT is a voluntary unit. And if you quit or you get kicked off, personally, I don't see how that's going to -- it can be a plus if you are on the team, but if you are not on the team, you can't use it against them because it's a voluntary thing to go above.
Q. So irrespective of their performance during the course of their CERT duties, they can never -- an employee can never receive negative criticism on their evaluation because of their performance of those duties?

A. I think the negative thing in the evaluation would be: No longer with the CERT unit.
Q. So it would say, No longer with the CERT unit?
A. Not necessarily. It's something that's extra, it's above. It's not a part of their daily duties at the institution. And that's what this -- you know. Putting -- I can't agree with putting something negative in here --
Q. Okay.
A. -- for something they were doing above and no longer doing.
Q. What if during a CERT deployment a prisoner is on the ground on his knees, his hands behind his head and a CERT officer puts a gun to the prisoner's head and executes them? Would that --
A. He doesn't have to worry about a evaluation after that. There is going to be disciplinary. He's going to become an inmate.
Q. What if there was an evaluation after that, would something like that make it in as a negative performance event?
A. I guess something that extreme may. I can't imagine something like that.
Q. So something like that would not make it in?

A. I didn't say that. I said something that extreme may make it extreme. But that's really out there.
Q. Okay. What if a CERT member bashes a prisoner's head against the wall repeatedly until they're unconscious?
A. He's going to face disciplinary action.
Q. Would an event like that be reflected in his performance evaluation as a negative?
A. The disciplinary action within the department would reflect, yes.
Q. But not the beating of the prisoner?
A. The disciplinary would be directly connected with the beating of the prisoner.
Q. Okay. Now, under "Areas where growth or skills/knowledge, development is suggested or needed," do you see that section?
A. Yes.
Q. What does it say in the text of that?
A. "Corporal Balas is assigned to the receiving room and as a pretrial rover. He is knowledgeable of SCI policies and procedures. Works well with little or no supervision. Corporal Balas reports for duty in a timely manner and uses leave only when necessary."

Q. Down at the bottom, what is John's performance ranked as?
A. It's at exceeds expectations.
Q. Okay. What's this dated at the very bottom next to the "Evaluator/Date"?
A. 4/12/2000.
Q. Just so we're clear, at the very bottom right-hand corner of this page, it says, "D00098"?
A. Yes.
Q. You can put that down. Let's put an evaluation in front of you where you are the evaluator.
This will be Mears Exhibit No. 6.
(Mears Exhibit No. 6 was marked for identification.)
BY MR. NEUBERGER:
Q. Now, do you have this document in front of you?
A. Yes.
Q. It appears to be a two-page document?
A. Yes.
Q. At the bottom of the very first page it says, "D00095"?
A. Yes.
Q. What's the date or time period covered by this document? I think it says in the first page, the

fifth line down.
A. 1/1/01 to 07/28/02.
Q. Is it normal to have an evaluation period which stretches more than a year?
A. Sometimes it goes years without -- people go years without an evaluation.
Q. Okay. Got ya. Now, where it says "Supervisor, Job Title," that's your name there, right, right above the date?
A. Yes.
Q. I guess your official position is as a correctional lieutenant?
A. Yes.
Q. Anything listed where it says, "Distinguished or exceeds expectations"?
A. Yes, there is.
Q. Could you read that to me?
A. "Corporal Balas is a member of the Correctional Emergency Response Team. He maintains his skills in emergency response by maintaining CERT training. Corporal Balas has maintained perfect attendance for the past two years."
Q. Is there anything in there about him getting booted off CERT?

A. No, there is not.
Q. The next section, where it says, "Areas of specific performance deficiency or unsatisfactory work, if any," is there anything listed there?
A. No.
Q. Why not? Why not?
A. I didn't see any at that time.
Q. Okay. The next section down, where it says -- where it's talking about how the employee met expectations, what's listed there? Or what's written there?
A. "Corporal Balas is assigned to the receiving room. He has a good knowledge of all post orders and procedures and uses leave in appropriate manner. Always reports for duty on time."
Q. Is that your signature at the bottom?
A. Yes.
Q. The date is 8/5/02? There.
A. Yes.
Q. It even says, if you go up one section to "Employee documentation of performance events" -- on the first page, still. It says, "Copy of perfect attendance attached."
A. Yes.

Q. So even though it's not reflected in the two page document I have here, if it says that it was attached to the original eval, would it have been there?
A. I take it it was. It says -- without seeing the original, I can't say for sure.
Q. Okay. You can put that down.
Let's look at Mears Exhibit 7.
(Mears Exhibit No. 7 was marked for identification.)
BY MR. NEUBERGER:
Q. Now, do you have this document in front of you?
A. Yes.
Q. In the bottom right-hand corner, does it say, "D00093"?
A. Yes.
Q. Up top, where it says, "Date or time period covered," does it say "January of '02 through May of '03"?
A. Yes, it does.
Q. Where it says, "Supervisor Job Title," is that your name right above it?
A. Yes.
Q. So would this be a performance review that you

filled out?
A. Yes.
Q. For example, there is your signature --
A. Yes.
Q. -- in the very bottom middle; correct?
A. Yes.
Q. Okay. Now, where it says, in the middle section, where there is that paragraph of text --
A. Yes.
Q. -- do you see that? Could you read that to me?
A. "Corporal Balas is assigned to receiving room. He's knowledgeable of SCI policies and procedures. He works well with little or no supervision. He has had the work of lead worker in his area many times. Corporal Balas reports for duty in a timely manner and has had perfect attendance for several years."
Q. Why did you mention the perfect attendance?
A. Why did I mention it?
Q. Yeah.
A. Because it's something that's worth mentioning. It's commendable.
Q. Did you -- it doesn't seem you listed any awards or commendations that he received up top, where it says, "Areas where performance is distinguished or

exceeds expectations."
A. Okay.
Q. Do you recall why?
A. If I didn't have any in front of me, I couldn't -- that may have been why.
Q. So there just may not have been any?
A. Yes.
Q. Like, for example, a CO can receive letters of commendation or letters of recommendation?
A. Yes.
Q. Or letters of recognition?
A. Yes.
Q. Down at the bottom, how did you rank John's performance?
A. Exceeds expectations.
Q. So that ranking of exceeds expectations, just looking at this first page, would appear to be based on the things on the first page?
A. Yes.
Q. Because you mentioned you didn't think he had received any letters of commendation or things like that?
A. Unless they were attached to the original.
Q. Okay.

A. Which I can't tell by this.
Q. Got ya.
A. They may have been in attachment form.
Q. But his perfect attendance, that was part of it?
A. Yes.
Q. Okay. All right. You can put that down.
Let's put another document in front of you. We'll call this Mears Exhibit No. 8.
(Mears Exhibit No. 8 was marked for identification.)
BY MR. NEUBERGER:
Q. Don't worry. We're not going to go through every page of this, although you are more than welcome to read the entire thing, if you wish. Let's turn five pages in. At the bottom right-hand corner, does it say, "D000134"?
A. Yes.
Q. Could you take a look at this, just look at this quietly to yourself?
A. Okay.
Q. Does this appear to be a letter to John from the director of HR and the commissioner congratulating him on his perfect attendance for the year 1996?

A. Yes.
Q. Do you think that's commendable?
A. Yes.
Q. Let's turn four more pages. In the bottom of the page, does it say, "P448"?
A. Yes.
Q. Could you read this quietly to yourself?
A. Okay.
Q. Do you know this Lieutenant David Johnson?
A. He's -- if it's the same one, he is now a sergeant by choice.
Q. Okay. And this appears to be a letter of recognition?
A. Yes, it is.
Q. What is it a letter of recognition for?
A. It's just recognizing something that someone, an officer has done to help the institution.
Q. What did John do here?
A. It appears that he, when they opened up -- when they were designing or opening up the new property room, he had some input in how it should work with his experience working a property room to make things work better.
Q. So he contributed in some positive way and he

was given a letter of recognition?
A. Yes.
Q. By his lieutenant?
A. Yes.
Q. At the very bottom -- I'm sorry, at the very last line of text, it actually says, "Good job, John"?
A. Yes.
Q. Turn two more pages. Does this appear to be a letter, dated May 6th of '99?
A. Yes.
Q. At the very bottom right-hand corner, it says, "D00128"?
A. Yes.
Q. Why don't you read that quietly to yourself?
A. Okay.
Q. Does this appear to be a letter congratulating John for his perfect attendance during the year 1998?
A. Yes, it is.
Q. Turn eight more pages. Why don't you review this quietly to yourself?
A. Okay.
Q. Does this appear to be a memo to John congratulating him on his perfect attendance for the prior year, which I guess would have been 2000?

A. Yes, it is.
Q. At the very bottom it says, "D291," the bottom right-hand corner?
A. Yes.
Q. Let's turn two more pages. Could you read this document quietly to yourself?
Is this a memo from you to John?
A. Yes.
Q. It is also a memo to another lieutenant; right?
A. Yes.
Q. It's dated May 2004?
A. Yes.
Q. At the bottom it says, "P461"?
A. Yes.
Q. In this memo are you congratulating John and commending him for his exceptional performance and outstanding performance of his job?
A. Yes, everyone in that area got these.
Q. Why?
A. We had a quarterly inspection, and we put it on all the officers of all the areas that we were, me and Lieutenant Atallian, were in charge of to make sure that they got everything in order for inspection and all our officers pulled together and did a good job.

Q. When you send an officer a letter of recommendation, do you send to it his personnel file, too?
A. I send it to his file that I keep and a file up front, and then -- or to the administration, and then they take care of sending it on up.
Q. Right. You said you sent it to the administration. Would that be the administration of the prison that you are in?
A. Of SCI, yes.
Q. Is it your understanding that they pass it on to human resources or whoever keeps the file?
A. Yes.
Q. But you said you also put a copy in your file?
A. Yes.
Q. And so you keep a file on your employees?
A. Yes.
Q. And what kinds of things go into those files?
A. Things like letters of commendation, bureau commendations. Anything that they receive, even if I don't give it to them, if they receive something positive, they can give me a copy to go in their file. And also with the negative, any type of disciplinary action or counselings and that sort of thing goes in

there also.
Q. Right. So you are supposed to -- well, do you keep track of those things simply because it's -- you just like keeping track of those things or is that something you are supposed to do under DOC policies?
A. I believe we're supposed to. I could not quote a policy number for that, but we're supposed to keep -- it's the only way you can get an accurate accounting of an officer.
Q. So -- let's put that policy in front of you right now.
A. Okay.
Q. Leave that open to the page that it's on because we'll be coming back to it.
(Mears Exhibit No. 9 was marked for identification.)
BY MR. NEUBERGER:
Q. Let's put in front of you Mears Exhibit 9. Do you have this document in front of you?
A. Yes.
Q. At the very bottom, it says, "D000667"?
A. Yes.
Q. Okay. Now, let's look at the very top of the page where it says, "Personnel Policy Manual." Does

this appear to be some kind of a DOC policy from your policy book or however it's kept?
A. Yes.
Q. Let's turn three pages in. See if we can find the policy we were just talking about. Do you see the very top of the page here, where it says, "Personnel File"?
A. Yes.
Q. Do you see where it says, "The employee's official file maintained in the Department of Correction Personnel Office"?
A. Yes.
Q. Underneath that, it says, "Supervisor's Employee File." Right?
A. Yes.
Q. Could you read that paragraph quietly to yourself?
A. Yes. Okay.
Q. Do you think this could be the policy that you were referencing before?
A. The policy that I was referencing?
Q. Yeah. Does this appear to be talking about a supervisor's file that supervisors are supposed to keep on their employees?

problems, would you put a copy of that in your supervisor's file?
A. If it's an official warning, yes.
Q. So are there official warnings and unofficial warnings?
A. Well, as a supervisor, you may see someone faltering a little bit in their duties and you correct it on the spot or you talk to them, and that takes care of the problem. There is no need in disciplining every mistake, every little problem.
Q. So someone could be having a bad day and just be falling behind on something, and you could go up to them, pat them on the back and give them a little --
A. Yes.
Q. -- hey, get your head on right today, something like that?
A. Yes. And that doesn't have to go into their file.
Q. What if it happens more than just once?
A. If it's a continuing thing, then you are looking at an issue that needs to be addressed formally.
Q. Formally. That would go to like an official verbal warning or some other kind of formal --

A. Yes.
Q. Yes?
A. Yes.
Q. Okay. Can you put that down.
Let's go back to Mears Exhibit 8, which I think is still open in front of you.
A. Okay.
Q. Right? Let's turn two more pages. And at the very bottom right-hand corner, does it say, "D00290"?
A. Yes.
Q. Does this appear to be a memo to John, dated April 25th of 2002, congratulating him on his perfect attendance for the prior year?
A. For the past two years, yes.
Q. For the past two years. Do you think that's commendable?
A. Yes.
Q. Do a lot of employees have perfect attendance?
A. No.
Q. Do you have perfect attendance?
A. No.
Q. Sometimes things come up and you miss a day; right?
A. Yes.

Q. In this memo, for example, in the second paragraph, it mentions that the DOC is particularly dependent on loyal, conscientious and dependable employees. It goes on and says that John has exhibited these qualities by his perfect attendance.
A. Yes.
Q. And in the last paragraph, it says that John and employees like him are the backbone of the department, enabling it to function smoothly and effectively. And Stan Taylor and the director of HR Alan Machtinger, they say that, "We salute you and ask you for your continuing commitment."
A. Yes, it is.
Q. Let's turn two more pages. In the bottom right-hand corner, does it say, "D00284"?
A. Yes.
Q. It's a little bit faded. Does this appear to be another memo to John of one year later, dated June 9th of 2003, congratulating him on his perfect attendance for the past three consecutive years?
A. Yes, it is.
Q. Do you think this is commendable as well?
A. Yes.
Q. Let's turn one more page. In the bottom

right-hand corner, does it say, "D00280"?
A. Yes.
Q. All right. Now, does this appear to be a memo to John from Commissioner Taylor, dated April 15th of 2004?
A. Yes.
Q. At the very bottom, it's signed by both the commissioner and the director of HR?
A. Yes.
Q. Is this commending John for his perfect attendance record for the last four consecutive years?
A. Yes, it is.
Q. Now, I think you said a few minutes ago that you thought two years of consecutive attendance was commendable; right?
A. Yes. One year is commendable.
Q. How about two years?
A. Yes.
Q. How about three years?
A. Yes.
Q. How about four years?
A. Yes.
Q. So all those things are commendable?
A. Yes.

Q. Something like this, would this be something which might find its way into an employment evaluation?
A. Yes.
Q. Do you think you would have had a copy of this?
A. Yes. If John made sure I got copies of them, yes.
Q. John was diligent about those kinds of things?
A. Oh, yes.
Q. Let's turn one more page. Does this appear to be a memo, dated July 8th of 2004?
A. Yes, it is.
Q. From Major Phil Townsend?
A. Yes.
Q. It's addressed to John; right?
A. Yes.
Q. And on the re: line it says, "Appreciation"?
A. Yes.
Q. In the bottom right-hand corner, it says, "D00281"?
A. Yes.
Q. Could you read this memo to me?
A. "I would like to take this opportunity to commend you for a job well done. You are instrumental

in the recertification of QRT training during February and March of 2004. Your dedication to this project and SCI are recognized and greatly appreciated. It is a pleasure to work with such fine staff. And once again, thanks for a job well done."
Q. Do you know Major Townsend?
A. Yes. I knew him.
Q. He's passed away?
A. Yes.
Q. Got ya. He mentions here the QRT training during February March par of 2004?
A. Yes.
Q. This is the Quick Response Team?
A. Yes.
Q. I think you testified a little earlier that John had some problems during QRT training. Or do you recall that at all?
A. I don't recall saying anything today about problems with QRT training.
Q. Do you recall saying to someone else other than your attorneys previously that John had had problems during his QRT training?
A. The last, the last year, yes. That would be this year.

Q. I'm sorry?
A. The last year that he trained.
Q. Which would be 2004?
A. Yes, I believe. Yes.
Q. Okay. John died in February of 2005?
A. Yes, that would be it then.
Q. So this would be the last year of QRT training for him, this 2004?
A. Yes.
Q. Does this appear to be a memo commending him on a job well done?
A. Yes.
Q. During his QRT training?
A. Yes.
Q. So did John have problems during his QRT training --
A. Yes, he did.
Q. -- to the best of your recollection?
A. Yes, he did.
Q. What were they?
A. I am in charge of the QRT training. I have been since it started.

I had John and another officer helping me with the training. And at the end of the training --

well, during the training, John would constantly come in late, want to leave early, need the night off. And we only had a small window to get these 300 officers trained, which left the burden on myself and the other officer training. And we tried to get him to come in more. We tried to get him to do his job. It just wasn't working. But that was between us three at that point. Major Townsend was not involved in it at that point.

At the end of it, the other officer that was helping told me they would not train anymore if John was going to be teaching. I told him I felt the same way and I would take care of it because of those issues.
Q. Okay.
A. So I went to Major Townsend and told him what was going on and I went to Deputy Warden Deloy -- he was deputy warden at that time -- and I explained to them, if you want someone else to teach it, I am fine with that, but I will not teach it with John anymore. So you make your decision on who you want to do this. And I explained to them the problems. And they said right away, he will not be teaching anymore, that you will continue to do it.

Q. Right. So that's a problem when someone is coming in late, wanting to leave early and always asking for the nights off?
A. Yes. But, again, that was a voluntary thing. This was not a part of their daily jobs in the receiving room. This was something that was a volunteer thing, extra. You understand. So to me, this is something that is a positive. If you refuse to do it, it's just a positive that you don't have. You take it away from them and they don't have it anymore.
Q. Who was the other officer that was serving with you and John?
A. Jeff Foskey.
Q. Now, what did Jeff Foskey say to you specifically?
A. He told me: "This is my last year. I am not teaching this anymore." I asked him, "Why?" He told me, basically, the same thing I was feeling, that John was taking advantage of us.
Q. Did he say anything else to you?
A. He just said that if John was teaching, he wasn't going to teach it anymore.
Q. Okay.

A. And I said, "Well, I agree with you. It has gone too far. We can't get him to, you know, tighten up, so."
Q. Right. So that was when you had to make the decision about whether you were going to teach again; right?
A. Yes. Like I said, I went to the Major and explained the situation and gave him the opportunity to either -- if I was going to teach, I was not going to teach with John as a part of the team teaching the classes. It was too important to mess it up.
Q. Okay.
A. And I just told him, if you want me to teach, it's going to be without John. But if you want someone else to teach it, I am okay with that, too.
Q. Okay. So when did you go to the Major?
A. This would have been right after the training was complete. I am not exactly sure of the date. I don't know.
Q. So when did the training complete?
A. Around March or April, I believe. That's when we usually complete it.
Q. I'm sorry?
A. That's when we usually complete it. I am not

sure that year just when we completed the training.
Q. You went to Major Townsend in March or April, ballpark?
A. And Deputy Warden Deloy, yes.
Q. And Deputy Warden Deloy?
A. Deputy warden, yes. He was deputy warden then.
Q. He's warden now?
A. Yes.
Q. What was Major Townsend's reaction to learning these things about John?
A. That it was a shame, that he understood, and he had heard it. I guess he heard it from someone else. I don't know. He said, that's fine. He's -- you know. John was working under me. I was in charge of it, so.
Q. Had you complained about this before?
A. No.
Q. What did you --
A. When we do the training, we're working straight 4:00 to 12:00 and into the 12:00 to 8:00 shift, and it is very hectic. You have 300 inmates -- excuse me, 300 officers to train in a short period of time, and the job is just to get it done.
Q. Okay.

A. And then we worry about the cleanup afterwards.
Q. What did you say to then Deputy Warden Deloy?
A. Basically, that if you want me to continue, John is not going to teach with me, and when John finds out, it's not going to be pretty. He's going to be mad.
Q. Okay. And you would have talked to the deputy warden in the same time frame you talked to the major?
A. I don't know the date or the time, but very close together, yes.
Q. Did then deputy warden and the current Warden Deloy, did he take his job seriously?
A. Excuse me. Who take their job seriously?
Q. Of Deputy Warden Deloy.
A. Yes.
Q. To the best of your knowledge, does he take his job seriously?
A. Yes.
Q. He was deputy warden then?
A. Yes.
Q. And he took his job seriously then, right?
A. Yes.
Q. He's the warden now, right?
A. Yes.

Q. He's a defendant in this lawsuit, right?
A. Yes.
Q. Do you think he takes his job seriously now?
A. Yes.
Q. Do you take your job seriously?
A. Yes, I do.
Q. Who was your captain at the time?
A. That would have been Captain David Wilkinson.
Q. Captain Wilkinson. Do you know if Captain Wilkinson took his job seriously during that time frame?
A. Yes.
Q. You take your job seriously, the Captain does. Does the Major above him, is that this Major Townsend?
A. Yes.
Q. So it's all in the same chain of command?
A. Yes.
Q. Did Major Townsend take his job seriously?
A. Yes, he did. Major Townsend was in charge of the training, of the QRT training over me.
Q. Got ya. Did the late Major Townsend take his job seriously?
A. Yes.
Q. Well, see, here, we have this memo, dated

July 8th of 2004, from Major Townsend to Corporal Balas?
A. Yes.
Q. Do you know why this memo doesn't make any mention whatsoever of John's alleged performance deficiencies?
A. No, I don't.
Q. Instead, this memo commends John for a job well done; right?
A. Yes.
Q. And it recognizes and says it appreciates his dedication to the project and to SCI?
A. Yes, it does.
Q. It goes on and says, "It is a pleasure to work with such fine staff. And once again, thanks for a job well done."
A. Yes, it does.
Q. Can we agree that this memo from Major Townsend, dated July 8th, 2004, makes no mention of any of these alleged performance deficiencies on John's part?
A. No, it does not.
Q. Would you agree July 2004 is after March or April of 2004?

A. Yes, it is.
Q. You can put that document down. Actually, let's go to the last page of the document. I'm sorry. In the bottom right-hand corner, does it say, "D00273"?
A. Yes.
Q. Does this appear to be a March 6th, 2005 letter to John from the director of HR?
A. Yes, it is.
Q. Is this commending him on his perfect attendance record for the year 2004?
A. Yes.
Q. So this would have been the fifth year that John had received or had achieved perfect attendance; right?
A. I believe so.
Q. Now you can put the document away.
MR. NEUBERGER: Counsel, how about we take a break? Let's go off the record.
(Luncheon recess taken.)
BY MR. NEUBERGER:
Q. All right. Now, Lieutenant, did you have a nice lunch?
A. Yes.

Q. Okay. Now, I want to focus your attention on August of 2004. All right?
A. Okay.
Q. And specifically, I would like to focus you on the activation of CERT, which I believe happened on August 5th of 2004, when CERT was activated to help with the understaffing problems in the court and transportation unit.
A. Okay.
Q. Just so we're on the same page. Okay?
A. Okay.
Q. All right. Do you recall how CERT was activated that day?
A. By page.
Q. By page. Okay. And is by page the normal --
A. Yes.
Q. -- form of activation? Page or telephone.
A. Okay.
Q. So did you find out the day before that you were going to be activated for the next day?
A. I believe it was the day before. I am not exactly sure. It's been awhile.
Q. Does the date August 5th of 2004 ring a bell to you at all?

A. That sounds correct.
Q. Do you recall how many of you were activated?
A. No. There was, I believe -- statewide or just at Sussex?
Q. How about just at Sussex?
A. I believe there was six or eight activated.
Q. Do you recall who the activated personnel were?
A. I remember all ten that responded, but a couple of them were voluntary.
Q. Got ya. Okay. Can you tell me who the ten were?
A. Lee Mears; John Balas; Allen Adams.
MS. XARHOULAKOS: Perhaps it would help if he could look at the list of CERT members.
THE WITNESS: Bradley. John Mumford.
MS. XARHOULAKOS: This is Exhibit 3.
BY MR. NEUBERGER:
Q. Let's put Mears Exhibit No. 3 in front of you.
A. Okay.
Q. And see -- take a look at page 2 on that.
A. Scott Bradley. You know, I have a good knowledge of the ten that quit, but I don't believe all ten of those were activated.
Q. Okay. Do you -- were you one of the ones who

was activated?
A. No, I was not.
Q. Was John?
A. I believe he was.
Q. Got ya. I think you mentioned Lee Mears, Arthur Mears --
A. Yes. I think he volunteered.
Q. Got ya. So on August 5th, various members of CERT were activated; right?
A. Yes.
Q. Do you recall if the CERT members held a meeting to discuss their activation?
A. Yes, they did.
Q. And so did you attend that meeting?
A. Yes, I did.
Q. Do you recall approximately how many individuals were at that meeting?
A. I couldn't give you a real accurate number. Might have been six. It might have been 12. I am not exactly sure.
Q. Was John at that meeting?
A. Yes, he was.
Q. And you were at that meeting?
A. Yes, I was.

Q. How about Lee Mears?
A. Yes, he was.
Q. Now, do you recall where the CERT members had been activated to report to? What was their assignment going to be?
A. It was for a -- to transport inmates from the institutions to Court.
Q. And would that be the Court and transportation unit?
A. Yes, CERT falls under court and transportation.
Q. Now, did the members at that meeting on August 5th, did they express their concerns about the activation?
A. Yes.
Q. Could you tell me what concerns were expressed?
A. It was as very unpopular activation with everyone. No one wanted to -- no one wanted to, I guess, break the job action. No one wanted to go inside of their institutions to transport these inmates to court, feeling that it would be undermining the efforts of this supposed job action.
Q. So before we get into that more, maybe we should talk a little bit more about the job action. I think I asked you a couple basic questions before

about that.
A. Yes.
Q. Do you recall that?
A. Yes.
Q. Okay. And I think you mentioned that various correctional officers were declining or refusing to, was it work voluntary overtime or what was the phrase that you used?
A. I believe it was refusing voluntary overtime.
Q. Right. They were refusing --
A. C & T operates or operated heavily under overtime.
Q. Right. And C & T is --
A. Relied on overtime.
Q. Okay. And C & T is court and transportation; right?
A. Yes.
Q. And so when officers were refusing to work the voluntary overtime, was that causing staff shortages with C & T?
A. Yes.
Q. What happens if C & T does not have personnel?
A. Inmates don't get to court.
Q. So that's their function, to transport inmates

from --
A. Well, yes they transport them to and from court. That's their biggest job. They also transport them from one institution to another. That sort of thing.
Q. Right. So if inmates aren't getting to court, does that have ramifications for the criminal justice system in Delaware?
A. Absolutely.
Q. What would some of those ramifications be?
A. Well, inmates would not be making their court dates. There would be -- it would be the State's fault, not the inmates' fault. Still, you would have capiases and things put on inmates for reasons beyond their control.
Q. Right. And so why do you use the term "job action" to describe this refusal --
A. That's what I've heard it -- excuse me. That's what I heard it referred to as.
Q. Okay. And were there picket lines formed anywhere?
A. Not that I'm aware of.
Q. Okay. Were there correctional officers standing outside the gates in groups and things like

that?
A. Not that I'm aware of.
Q. Okay, okay. Okay, now, going back to this meeting on August 5th of 2004. Okay?
A. Okay.
Q. All right. Now, you said that the activation was very unpopular with everyone and that no one wanted to break the job action?
A. Correct.
Q. Were there concerns amongst the activated CERT members about going to the -- about going to C & T to staff the unit?
A. Yes.
Q. And so the members did not want to break that job action in that sense; right?
A. Correct.
Q. Do you recall any more detail what was said by the various CERT members at that meeting?
A. Yes, some of the things I do.
Q. What are some of those things?
A. They didn't want to feel like strike-breakers or picket-breakers, that sort of thing, even though there wasn't an actual strike or a picket. They felt that CERT wasn't designed to be transportation. And

there was a lot of dialogue towards CERT headquarters itself, a lot of personal feelings that had nothing to do with the job action.
Q. Okay.
A. Disgruntled CERT members because of individuals getting promotions within CERT and that sort of thing.
Q. Okay. Do you recall any other concerns raised during that meeting?
A. Not wanting to go inside the institutions where their fellow officers were, that sort of thing. And it was raised about everyone quitting and, basically, destroying CERT, and that everybody would be begged to come back within 24 hours if they all did that.
Q. All right. Now, was the decision made that day or that night to resign and quit CERT?
A. While I was there, no.
Q. You said while you were there.
A. Yes.
Q. Did you ever leave that meeting?
A. At the end of it to go home.
Q. Okay. Did you ever leave that meeting and report back to CERT command and discuss discussions amongst officers?
A. I spoke to CERT command absolutely, yes.

Q. Who did you speak to?
A. Warden Hall.
Q. Was it that same day?
A. Let me back up.
Q. Sure.
A. It was either Warden Hall or Major Radcliffe. I can't remember exactly who.
Q. Was it the same day?
A. Yes.
Q. Was it before, during, or after the meeting?
A. It was after the meeting.
Q. It was after the meeting?
A. And I reassured him that he would have his team there.
Q. Were you the commander for CERT?
A. I was team leader.
Q. You were team leader?
A. Yes.
Q. Did you explain to CERT command what was being said at the meeting?
A. I didn't go into detail.
Q. What did you say?
A. I told him that his team would be there, nobody wants to do this mission, but they have all said they

would be there to do the mission. You need to work on getting the mission stopped.
Q. Did you say anything else during that report?
A. That was the basis of it. I can't remember word for word exactly what I said. I did not go into detail about that meeting. Not that there was anything wrong about that. It wasn't long and drawn. He just needed to know if there would be people there or not.
Q. Going back to this meeting, before you left it.
A. Yes.
Q. You said that there were concerns, that one of the areas of concern was not wanting to break the job action. Right?
A. Yes.
Q. Was that a universal concern amongst the various CERT members at the meeting?
A. That was a big concern. There was just as much talk about disgruntled with the warden making warden the major making major and one of the training educators getting bumped up a notch. There was a lot of discussion about that.
Q. Did you voice your opinion on the job action?
A. Yes, I did.

Q. What did you say?
A. Well, I said it was unpopular, but quitting was -- well, we discussed different options, and they were talking about we all need to quit -- excuse me. After some time, John said, John Balas said, we all need to quit, everybody quit at one time, and they will beg us to come back within 24 hours; they can't operate without us.
Q. Okay.
A. When that was said, I stood up, and I said, "Listen, everybody here joined CERT as an individual. You have to make your choice as an individual to stay or quit. Personally, quitting is not the answer. Never be a quitter."
Q. Okay.
A. "Force someone else's hand." I said, "But if you do decide to quit, it's got to be your decision, and you better be willing to live with it the rest of your career because I don't think anybody is going to beg us to come back."
Q. Did you say anything else?
A. Before I left, it was agreed upon by everybody that nothing would happen the next day, other than the operation would go through.

Q. Okay.
A. And then at the -- after the operation was through, everyone would try to contact everybody statewide to discuss what had happened.
Q. Okay.
A. And what would be best for CERT, for all the members, from that point on. Because they were -- everyone was under the belief that the action was going to continue; it was not going to be a one-day action, it was going to continue. Over the weekend, it was going to be discussed statewide, what is our options.
Q. Okay.
A. If we don't want to continue this operation, what do we have to do?
And when that was said and it was pretty well over, I said, well, if there is any changes, contact me beforehand. Because I was the watch commander of the institution the next day on the 4:00 to 12:00 shift. I said, "Contact me, let me know if there is any kind of changes, and we'll go with it from there."
Q. Okay.
A. Also you asked anything else I said. When I

first walked into the meeting, I wasn't aware at first that this was a secret meeting. I was contacted by, I think it was Lee and told me that they were going to have this meeting about the mission, and that sort of thing, at his house and wanted me to come. I told him I would try my best to be there. I was way across town in Rehoboth or Lewes with my family, and he was getting ready to have the meeting in a short time. I said, "I'll do my best to be there. I may not be there when it starts."
In the meantime, Major Radcliffe calls me on the other line, and he says, "Truman, what's going on? I hear all the members are getting ready to quit from Sussex." I said, "Sir, I have no clue, but I'll find out because I'm going to the meeting and find out."
He was saying, "What meeting? What are you talking about?" I said, "Well, the guys are going to get together to discuss this." He said, "I don't know anything about a meeting." I said, "Okay."
In the meantime, I get back on the line with Lee and Lee is saying, "Did you tell them we're having a meeting?" I said, "Yeah; you didn't say anything about this being a secret meeting."

So when that conversation was done, and I got to Lee's house, and everybody was there, I spoke up. I said, "First of all, I want to say something." I said, "I did not realize this was a secret meeting. I thought this was an open meeting. Everything in CERT has always been open. If you have got a problem with CERT command, they've always had an open door policy to speak your mind." I said, "I don't agree with a secret meeting." And I said, "If Warden Hall was to walk in this house right now and kick every one off of CERT for having a secret meeting to decide whether or not you are going to respond to an activation that you have already been activated for, he would be right to do that because we don't do that; we complete our mission and we take it from there." Then I said, "With that being said, let's have this meeting."

I was not real popular after that. But that was how I felt.

Q. So you said you -- so you said you were not real popular after that?

A. Yeah.

Q. How did you know that you were not real popular after that in the meeting?

A. Well, I shouldn't say, not real popular. I am popular with a couple of them. It had already been put out that I was a spy and I was this and that, and, you know, I was there for CERT command and that sort of thing, which was, you know, untrue.

Q. But when the meeting was over, you did report back to CERT command?

A. Absolutely. I never made a secret of that.

Q. Okay.

A. But I did not report back to CERT saying, oh, this was said and that was said. I said, "You are going to have your guys there." And as team leader, that's part of my job.

Q. Were there any other team members at the meeting?

A. Lee Mears.

Q. Did Lee report back, to the best of your knowledge?

A. No, I think Lee was one of the ones that -- Lee was one of the ones that organized the meeting.

Q. Right. So to the best of your knowledge, Lee did not report back?

A. I don't believe so. He may have. He may have. I don't have any knowledge of that.

Q. You don't know either way?

A. Right.

Q. Now, let's move forward to the next day, August 6th of 2004. Okay?

A. Yes.

Q. All right. Did you and John and the other three CERT members show up for work at the C & T unit?

A. Excuse me?

Q. I'm sorry. The next day, did, when -- the day that you were activated for, did you report for duty?

A. I was not activated.

Q. Do you know if the other five reported for duty?

A. For the activation, yes. I believe everyone that was activated showed up.

Q. You say that you were the watch commander for that shift?

A. For the 4:00 to 12:00 -- or 3:00 to 11:00 shift, I was watch commander of SCI that day.

Q. So did that overlap the activation period for the CERT members?

A. The activation had stood down prior to me taking the duty, going on duty.

Q. Got ya. Okay. Do you know -- so were you

there when the CERT members showed up?

A. I was there when they showed up at the end of the day to go speak with the warden.

Q. Were you there when they arrived at the institution in the beginning of the day?

A. No, I was not.

Q. So if -- do you have any knowledge as to things that may have been said to those CERT members when they arrived?

A. Only what they have told me.

Q. Okay. What have they told you?

A. That a couple of the officers in the front half of the institution, there were only a couple officers there, had made off-handed comments toward them about picket-breakers. I can't even remember exactly what they were called, but it was not pleasant.

Q. So it was reported to you that they were called unpleasant things?

A. Not as watch commander, but later on.

Q. Sure. Someone told you that?

A. Yes.

Q. Did you ever investigate that?

A. No. That would have been done by the watch commander that morning when they were there. I have

no clue.
Q. Do you know if that watch commander ever investigated that?
A. I do not know. I don't think anybody even pursued it, but I'm not a hundred percent sure. As far as the officers, you know. The officers didn't -- the CERT members didn't come to me and say, Hey, Truman, they did this to me. I heard it secondhand from other officers.
Q. Okay. Got ya. Do you have any knowledge about what the workload was for the C & T unit that day?
A. No clue right now.
Q. Was there a time when you did know?
A. No, not exactly. I had heard rumors, but I don't know.
Q. What were the rumors that you had heard?
A. I had heard rumors that they had a full load -- basically, they had a full load of all types of transportations that day, not just major court cases, but everyday C & T stuff.
Q. In order to find someone with firsthand information, I guess the people to ask would be the CERT members who were activated that day?
A. Well, CERT headquarters or C & T -- it's the

same thing --
Q. Okay.
A. -- would -- should have records of that.
Q. Those would be other people to ask for other places to look for documents?
A. Yes.
Q. Do you have any knowledge of a discussion that day between Major David Hall and Lee Mears and some of the other CERT members, any personal knowledge?
A. I wasn't there, so.
Q. Did you ever hear secondhand or otherwise about conversations that were had between Major David Hall, Lee Mears and some of the other CERT members that day?
A. Some of the other CERT members, but not Lee Mears, personally.
Q. Right. So some of the other CERT members may have said something to you?
A. Yes.
Q. Was John Balas one of the other CERT members who may have said something to you?
A. No.
Q. Who was?
A. Scott Bradley. That's the one. That's the one I knew of that told me that he spoke to Dave Hall that

morning.
Q. Did Scott Bradley tell you anything about what was said during that discussion?
A. He told me he voiced his dislike for the mission and that at the end of the mission, he would be resigning from CERT.
Q. Did Scott Bradley indicate that he was the only one who said anything to Major Hall?
A. Yes, he's the only one that has told me that I said this to them. And he didn't say anything about anyone else saying anything.
Q. Right, so Mr. Bradley just said what he said?
A. He told me what he had said, and that's all I have knowledge of.
Q. Okay. Did you ever hear that the decision to activate CERT that day was made by someone higher than Commissioner Stan Taylor?
A. There was rumor it was the governor.
Q. Who did you hear the rumor from?
A. I couldn't tell you. It was just one of those things everybody talked about.
Q. Is life in DOC sometimes like a soap opera?
A. Sometimes it is.
Q. It has that quality?

A. Yes.
Q. It has --
A. Especially when it's dramatic like that.
Q. Right. You can have work-related things circulating, right? Like someone like who the activation order came from?
A. Yes.
Q. Then you can have personal things circulating, who is sleeping with who or who went to a ballgame with who or things like that?
A. That's any place you work.
Q. Right. But DOC does have that soap opera quality to it?
A. No different than anywhere else.
Q. Okay. Got ya. You said you were present for a meeting at the end of the shift or at the end of the day?
A. I wasn't present for the meeting. I was there as the guys went in to talk to the warden. They walked past me to get to the warden as I was bringing in the shift.
Q. So the guys that walked past you to meet with the warden, who would that have been?
A. That was the ten that quit.

Q. The ten that quit. So would that have included John Balas?
A. Yes.
Q. That would have included Lee Mears?
A. Yes.
Q. Just so the record is clear. Are you related to Lee Mears?
A. No.
Q. So do you have any knowledge of what happened during that meeting, any personal knowledge?
A. A little bit.
Q. From where -- what is your source of that personally knowledge?
A. The warden.
Q. What did the warden tell you? Just so we're clear. Who is the warden?
A. At the time, it was Warden Rick Kearney.
Q. What did the warden tell you?
A. Once the guys came out of the meeting with the warden and they left, went out and left, the warden stepped out to me and said that: "Did those guys get the page?" I said, "What page are you referring to? He said, "The page that the mission was over, stand down, mission complete." I said, "Yes, they all

received it." He said, "Well, when did they receive it?" I said, "Probably an hour before they came in." I said, "I got the same page, all of us did at the same time." And he said, "So they knew that the mission was over before they came in my office?" I said, "Yes, sir, they did." He said, "Okay." And he didn't appear to be happy because the warden and different ones had been working all day on getting the mission, you know, squashed.
Q. You said that warden -- is it?
A. Kearney.
Q. Kearney. That's how it's pronounced?
A. Yes.
Q. How is it spelled?
A. K-E-A-R-N-E-Y, I believe.
Q. Okay. Kearney. You said that Warden Kearney didn't seem happen or didn't appear happy.
A. Didn't appear. I mean, I can't -- to me, he just didn't appear happy. It was a rough day.
Q. Was his brow furrowed?
A. I don't know.
Q. Did he have a look of displeasure on his face?
A. Yes.
Q. Did he curse?

A. I don't recall him cursing, no.
Q. Is he the kind of person who does curse?
A. I have heard him curse, yes. I don't believe I've heard him curse at work, but I have had a occasion or two to be around him outside of work.
Q. Right. So you know him from work and you know him from outside of work?
A. Very little outside of work.
Q. Okay. Was his face red?
A. I don't remember.
Q. Was he sweating?
A. I don't remember.
Q. Was he -- how would you describe his tone of voice?
A. He was calm when he was talking to me until I told him that -- well, I should say that he was calm during our conversation, and when he found out that they were -- I should say he was -- he seemed disappointed more than aggravated. He seemed disappointed.
Q. Did he seem annoyed?
A. Maybe a little.
Q. Maybe I can come up with a better word.
A. But it was more disappointment.

Q. How about displeased?
A. I would say more just disappointment, you know.
Q. Okay.
A. We didn't continue a long conversation after that. That was the end of the conversation. He turned around and walked back.
Q. So was it a short conversation?
A. Yes.
Q. Okay. Got ya. Now, did you ever talk to any of the various CERT members who had resigned during that meeting about what was said during the meeting?
A. I asked John Mumford on the way out of the meeting: "How did the meeting go?" Because he said they were quitting. He said, "It went okay." I said, "What's the outcome?" He said, "We all quit." And that was my first knowledge of their quitting.
Q. What was your reaction to their quitting?
A. Disappointment.
Q. Why?
A. Because I didn't have the knowledge of it ahead of time, you know.
Q. Were you disappointed they hadn't talked to you about it first?
A. Right.

Q. Because you had asked the night before that they speak to you?
A. Yes. I asked John Mumford: "Why didn't -- wasn't I notified?" He said, "John Balas said, 'Don't tell him because he'll talk you out of it.'" I said, "Okay."
Q. Okay. What was your reaction to learning that?
A. I said, "Well, that was my right, if I wanted to try, you know, voice my side of it, that was my right. But, you know, you did what you did."
Q. What was your reaction to learning that John had said don't talk to you?
A. It didn't surprise me, but, you know.
Q. Why?
A. He was very displeased with me the night before for speaking up against him, you know.
Q. Okay.
A. So it didn't surprise me.
Q. Let's focus on this standdown order.
A. Mm-hmm.
Q. When did that come down?
A. It was that afternoon. I had just come on duty. I couldn't give you the exact time. CERT headquarters may be able to give you that.

Q. Was it near the end of their shift, of the CERT members?
A. Close to it, yes.
Q. So they had already -- what's the term you used? They had already crossed the line, so to speak, to break the job action. It came down after they had shown up?
A. Yes.
Q. So it came down at least -- strike that. Okay. It came down toward the end of the shift?
A. I believe so, yes.
MS. XARHOULAKOS: Just to clarify. Which shift are we talking about?
MR. NEUBERGER: The shift of the CERT members who were activated to substitute in the C & T unit.
MS. XARHOULAKOS: Okay.
THE WITNESS: I should say, I am not sure about that because they had a workload of taking so many to court. I am not sure that was -- there would have been no hours. It wouldn't have been you are working 8:00 to 4:00 today. It would have been you are working until the mission is complete for that day.

MR. NEUBERGER: Right.
THE WITNESS: I don't know how much they completed that day.
BY MR. NEUBERGER:
Q. Do you know what time the courts open?
A. Well, I mean the courts would be open 9:00 o'clock that morning. I'm not -- I don't even know what all they were going to do, if it was just taking them to court or if they were going to do full transportation, you know. I believe this was all done by around between 2:00 and 3:00.
Q. Got ya. Okay.
A. But, again, CERT headquarters should have that knowledge, you know, pretty close when they sent out the page.
Q. Okay. Did you ever speak to anyone else above you in the chain of command and learn their reaction to the mass CERT resignation?
A. Could you ask that question again?
Q. Sure. You had mentioned you had spoken to the warden.
A. Yes. He came out to ask me a question.
Q. Did you ever talk to him about that subsequently?

MS. XARHOULAKOS: Perhaps you could clarify the question. About that, about what?
BY MR. NEUBERGER:
Q. Sure. Did you ever speak to the warden about the mass CERT resignation afterwards, after that initial conversation that you had with him after the CERT members resigned?
A. With the warden, no.
Q. Did you ever discuss the CERT mass resignation with anyone else above you in the chain of command thereafter?
A. No. We have a bimonthly, sometimes it's every three months meeting, with the deputy warden and the major as the CERT Team leaders.
Q. Okay.
A. The next time we met with them, it was discussed briefly about that.
Q. Who was the major and who was the deputy warden?
A. It would have been -- it was Deputy Warden Deloy at that time. I am not are sure if there was anybody else there or not.
Q. You are not sure if the major was there?
A. The major is always invited, but I can't

A. Which section do you want me to read now?
Q. I'm sorry. The section under -- the text of the section where it says, "Areas where performance is distinguished or exceeds expectations, if any."
A. Oh, okay. "Corporal Balas has perfect attendance and that is commendable, however, in this case, I do not feel that his perfect attendance is justification for an exceeds."
Q. Was this in the original draft which you showed to Corporal Balas in September of '04, that line that you just read to me?
A. I couldn't tell you. I don't know. As far as I know, Corporal Balas never looked at the evaluation.
Q. Okay. Maybe we should -- do you recall a time when you prepared this document?
A. Yeah. I know I prepared it, yes.
Q. Do you recall when that was?
A. I couldn't tell you right offhand, no. Whatever the date is on it. It would ...
Q. Does the date September 26th, 2004 ring a bell?
A. Not really. But I mean, if that's when this was done, I guess that's when it was done.
Q. Do you prepare drafts of evaluations?
A. Sometimes. It's according. I do drafts on

just about everything, you know, before I type it out final.
Q. Do you think you did drafts on this?
A. I don't know.
Q. Are you the kind of person who saves your drafts?
A. Sometimes.
Q. Do you --
A. Not always.
Q. Do you think you have saved drafts of this?
A. I have no clue.
Q. Have you looked?
A. No.
MR. NEUBERGER: Counsel, I would like to, just for the record, ask that he look at this stuff -- I think it falls within the scope of some of our earlier document requests -- and look to see whether he has earlier drafts of this September of '03 to September of '04 performance evaluation.
MS. XARHOULAKOS: Sure.
BY MR. NEUBERGER:
Q. Now, Lieutenant, what I am trying to get at is in this first section that you just read to me, do you think that first section sounds defensive?

A. No, I think it's saying that -- it's try -- it's not -- it's saying something good, you know, about his perfect attendance. It's trying to recognize that.
Q. Okay. How about the part after the perfect attendance, where it starts with "however"?
A. Right; because there is more to the story than just perfect attendance.
Q. So you don't think this sounds defensive?
A. Possibly, yes.
Q. Do you think it could be perceived as defensive?
A. It could be.
Q. Did you intend it that way?
A. I intended it as an explanation.
Q. Why did you feel an explanation was needed?
A. Because on this evaluation, he was going to be dropping from an exceeds to a meets, and I wanted to explain things without putting it in a negative light on John.
Q. Okay. And so do you always do that when you are dropping someone from an exceeds to a meets?
A. It's according to the situation.
Q. Have you done it before, before September of

2004?
A. Not -- not from exceeds to a meets, but from, like, meets to needs improvement, that sort of thing.
Q. Okay. In the next section down, where it says, "Areas of specific performance deficiencies or unsatisfactory work, if any," it says, "See attached summary."
A. Okay.
Q. Do you see that?
A. Mm-hmm.
Q. Do you know if the "see attached summary" reference was in the first draft of this that you prepared and showed to John Balas?
MS. XARHOULAKOS: I am just going to object. He already said he believed Balas never saw it.
MR. NEUBERGER: I'm sorry?
MS. XARHOULAKOS: He already said he doesn't believe Balas ever saw it, the evaluation. So clarify the question.
MR. NEUBERGER: I will clarify the question.
THE WITNESS: He never opened it up. He never once looked at it.

BY MR. NEUBERGER:
Q. Do you believe this section, where it says "see attached summary," do you believe that was there when you first asked John Balas to review his evaluation? Or is that something you added later?
A. I am not sure.
Q. So it could have been something you added later?
A. There is a possibility. I am not sure.
Q. It's just --
A. A lot of this stuff I haven't seen in a long time.
Q. So it's been three years. Actually, it's been more than three years, right?
A. Yes, it's been more than that.
Q. So sometimes it's hard to remember things that happen that long ago?
A. Yes, it is.
Q. Memories fade?
A. Yes.
Q. Life happens; right?
A. Yes.
Q. A lot of things have happened over the course of three plus years?

A. Yes.
Q. Right now I'm just trying to get to your best recollection.
All right. Now, the next section down where it says, "Areas where growth or skills/knowledge, development, is suggested or needed. If not applicable, please use this space and/or attach summary explanation of how employee met expectations." Do you see that?
Here we go. Sorry. Right here.
A. Yes. Okay.
Q. Could you read what you typed there, where it starts with "Corporal Balas"?
A. "Corporal Balas is knowledgeable of SCI policies and procedures. He shows up for duty in a timely manner. He uses leave in accordance with policy."
Q. Then underneath that it says, "NOTE: See attached summary." Do you see that?
A. Yes.
Q. Do you think that could be something you added later where it says, "NOTE: See attached summary."?
A. Again, same as before. I really can't honestly tell you right now.

Q. So it could be you just don't remember?
A. It could be.
Q. And also it could not be? You just don't remember either way?
A. Right. This is the first time I have seen this in awhile, so.
Q. And at the very bottom it says, "Meets expectations," is circled; right?
A. Yes.
Q. That's your signature underneath there?
A. Yes, it is.
Q. It's dated 12/6/04; right?
A. Yes.
Q. It's not signed by John?
A. Correct.
Q. Okay. Well, first -- okay. Do you know why John didn't sign this?
A. No. He never would even look at it, so. Prior to this, John wouldn't talk to me. He had -- you know, since he quit CERT, he kind of stayed away from me, and --
Q. Okay.
A. -- I still did the same thing every day, I walked back, made a pot of coffee for the guys, said,

"Good morning" to everybody. John just wouldn't respond to me.
Q. Okay.
A. So when I did his evaluation, I approached him and asked him to come to my office to review it. And he kind of blew up a little bit and wouldn't do it, wouldn't look at it, you know. I backed off to give him some space because he just seemed like he was still holding grudges.
Q. John say to you why he wouldn't look at it?
A. The first time, no. He just said -- you know. He said -- I believe he said, "Is it an exceeds?"
Q. Okay.
A. I said, "John, we'll discuss it in the office. You can take a look at it." "It's not an exceeds, I don't want it." That was his attitude from that point. He would not even -- and then he asked for a copy of it. I said, "If you come to the office, we'll review it; you can express your opinion, and you'll get a copy." But he would not, would not do it.
Q. Do you recall if this could have been in September of '04 or you are just not sure either way?
A. Possibly, yeah. Because I tried over a period of time to get him to come in and review it, and he

wouldn't do it.
Q. Okay. So it's your testimony that John never looked at it?
A. Yes.
Q. And you do remember that?
A. Yes.
Q. Clearly?
A. He would not acknowledge it. Once he asked me if it was an exceeds, and I told him to come in and review it, he said, "It's not an exceeds; I don't want it," and that was the end of it.
Q. Okay. Let's turn to the second page of this exhibit. At the very bottom, it says, "D85."
A. Yes.
Q. Does this appear to be the attachment referenced in the, on page 1?
A. Excuse me?
Q. Does this page 2 of this exhibit where it says, "D0085," does this appear to be the attachment referenced in page 1 of this exhibit or -- I'm sorry, the attachment --
A. No, this isn't the attachment, that I am aware of.
Q. What is this?

A. This is an explanation of him not signing it. Well, let me check now.
Q. Yeah, please read it.
A. Yes, this is my explanation as to why it was turned in without his signature.
Q. Right, so this wasn't -- do you know if this document was part of the performance evaluation, this page of this document, was this part of the performance evaluation?
A. I am not sure if it was attached to it or just turned in with it as an explanation. It was not intended to be a part of the evaluation.
Q. Okay.
A. It was an explanation.
Q. Right. So let's go to this first paragraph of this explanation. Have you read that to yourself yet?
A. Yes.
Q. Do you recall John Balas saying that he would not review this with you unless Captain Wilkinson and a union representative were present?
A. Yes, yes, I do. That was, like, the last time I tried to get him to sign -- to look at it.
Q. This would have been in, at least according to this document, January 9th of 2005?

A. I believe so.
Q. What was your reaction to that?
A. I didn't know where this come from, you know, union representation and Captain Wilkinson. I had spoken to Captain Wilkinson. He was my supervisor. He was aware of the situation between me and John and the evaluation.
Q. Okay.
A. And I asked him one night, I said, "I can't get him to take a look at his evaluation. If you are here one night, and John is here one night, would you mind sitting in my office with me and maybe he'll come and review his evaluation like that." Captain Wilkinson said, "Sure, no problem." And that was the extent of that conversation.
As far as, you know, Captain Wilkinson has since told me that he told John that he would do that. But I didn't have knowledge of that, you know. I only knew what I had talked to Captain Wilkinson about. So I guess that's where that's -- when he come up, he wanted union representation and Captain Wilkinson in there, you know, demanding all these things, just to review an evaluation.
Q. Right. Did you find that demand to be

unreasonable?
A. Under the circumstances, yes, because a period of time had lapsed, multiple opportunities have been given for him to look at it. None of that had been brought forward before, and, you know.
Q. Okay. I'm sorry.
A. So I felt that at that point, it was just time to turn it in.
Q. Didn't John file a union grievance against you?
A. Not that I'm aware of.
Q. Because of this evaluation?
A. Not that I'm aware of. I don't believe that will meets expectation is a grievable issue, but I may be wrong.
Q. Right. You are saying you don't think it's a grievable issue or you don't know if he filed a grievance?
A. I have no knowledge of him filing a grievance.
Q. Have you ever heard that he filed such a grievance?
A. Only recently Captain Wilkinson said something about it, that he had heard about it, but he didn't have any knowledge of it either. So it was just hearsay. But I never had any knowledge of him filing

a grievance.
Q. How about a complaint?
A. About?
Q. I'm sorry. Do you have any knowledge of John filing a complaint about your evaluation of him?
A. No, I do not have any knowledge of that either.
Q. Let's turn to page 3 of this exhibit. Why don't you read this quietly to yourself?
MR. NEUBERGER: I guess this would be a good spot for a break. It's been about an hour.
MS. XARHOULAKOS: Very good.
MR. NEUBERGER: So off the record.
(Recess taken.)
BY MR. NEUBERGER:
Q. Now, Lieutenant, do you have this page 3 of Mears Exhibit 11 in front of you?
A. Yes.
Q. Have you reviewed that?
A. Yes.
Q. Now, does this appear to be the attachment referenced on page 1?
A. Yes.
Q. So this would have been the attachment which you attached at some point to John's performance

evaluation?
A. Yes. And this was for John to read.
Q. I'm sorry?
A. And this was for John to read.
Q. Right, right. Okay. Now, in this you -- would you agree with the characterization that in this you tried to justify why John had not received an exceeds expectations ranking?
A. It was, yes, without putting a lot of negative stuff in his evaluation.
Q. Okay.
A. That wasn't my goal.
Q. Right. And I think you said before that you didn't remember if you had prepared this attachment initially or whether you prepared it later; you couldn't remember either way?
A. Right.
Q. Okay. Now, what I'd like to do is just -- and the reason I'm asking that is because the attachment does not have a date on it.
A. Okay.
Q. You see that there is no date on this page; right?
A. Yes, I know.

Q. Now, on the first paragraph, I think you mentioned that just because someone receives exceeds expectations in the past doesn't mean they're going to receive exceeds expectations in the future; right?
A. Yes.
Q. And let's go to the second paragraph. It begins by saying that John had previously received exceeds expectations in the past because he deserved it because of his job performance; and the extra effort he put forth with CERT; his assistance to you in training officers in the QRT; his job performance in the receiving room; and because of his perfect attendance. It says that; right?
A. Yes, it does.
Q. Then you go on and you list about four, what I counted there were about four reasons why he did not receive that ranking here. I would like to walk through them with you.
A. Sure.
Q. Okay? You begin by saying this year, "However, there have been several events to change that. First, after completing the training of QRT, I sent Major Townsend an e-mail stating that I did not want Corporal Balas to help teach any classes under me in

the future because of his performance." Then you go on and say, "The next time I talked to Major Townsend in detail, he agreed to this." Right?
A. Yes, and --
Q. I'm sorry?
A. And at that time talking to Major Townsend, other issues had come up with John, and I said, "If he continues on this road, he's not going to make an exceeds this year."
Q. Right.
A. "And it's not going to be pretty, John is not going to accept that well." And he was in agreement. Knowing John, that wouldn't go over well.
Q. Now, where is this e-mail that you sent to Major Townsend?
A. I don't know. I didn't save it.
Q. You didn't save it?
A. No.
Q. Do you have a sent mail folder, or something like that?
MS. XARHOULAKOS: Counsel, if I may interject there.
MR. NEUBERGER: Sure.
MS. XARHOULAKOS: We do have a hold already

A. Yes.
Q. The memo of appreciation is not mentioned in the evaluation under areas where his performance is distinguished or exceeds expectations; right?
A. Correct.
Q. The memo of appreciation is not mentioned in the other areas on the first page of Mears Exhibit 11 under "Areas of specific performance deficiencies or unsatisfactory work."
A. Okay.
Q. Correct?
A. Correct.
Q. And the memo is not mentioned in any other place in this exhibit; correct?
A. Correct.
Q. Okay. And I think I asked you why.
A. Okay.
Q. You said you didn't know.
A. It could be -- I don't have the answer. It could be several reasons. I may not have had a copy of it. I don't know.
Q. Was John good about giving you copies --
A. Yes, he was; yes, he was.
Q. Let me finish. Was John good about giving you

copies of positive letters or memos that he received from his supervisors or from others?
A. Yes, he was.
Q. Would it have been out of character for John not to give you a copy of this?
A. At this time, in his career, nothing was out of character. That would not have been out of character.
Q. How about in July of 2004, this is prior to the CERT resignation and the CERT problems in August of 2004?
A. Yes, it still would have been in character of him. He was a little different.
Q. So you are saying, I think you testified earlier this morning that you began to notice changes in his behavior one year before he died?
A. Some changes.
Q. Okay.
A. Nothing, I mean, not major, not major deficiencies, but uncharacteristic for him.
Q. Right. And let's talk about some of those things because we're still on page 3 of Mears Exhibit 11. The second area of problems that you mentioned is that you had two meetings with the sergeant in charge of the area where John worked about his poor work

performance, poor attitude and his unwillingness to get along with other staff?
A. Exactly.
Q. Do you have any documentation for that?
A. No, I don't.
Q. Why?
A. I didn't document it.
Q. Why?
A. I don't know why.
Q. Aren't you supposed to document things like that?
A. If it gets to the point that it is -- I felt that John could pull out of it. I felt that John was going to bounce back and he was just going through something. Again, I didn't want negative stuff on -- I just felt that John was going to bounce back.
Q. And so that's why you didn't make a record?
A. Of the meeting with the sergeant, yes. It was just the sergeant came into the office and said, you know, can't get along with him; you know, he's not wanting to get along with anybody, that sort of thing.
Q. Right. So it was one meeting, so you just didn't make a record of it?
A. No, it was a couple times that he came in.

Q. So it happened more than once?
A. My office was right next to the receiving room. So people came in and out, you know. I'd go back and talk: Hey, you know, can't you get along? That sort of thing. Yeah, yeah. Okay.
Q. So it happened more than once?
A. With Sergeant Cassase, yes.
Q. It wasn't just an isolated incident?
A. And, you know -- exactly. And I would go talk to John, you know. "Look, we need to try to get along." Yeah. Okay, yeah. He would agree.
Q. Okay.
A. And then, okay. Problem solved, you know. Hopefully, problem solved. And that would be the end of it.
Q. But you are saying it happened more than once?
A. It happened at least -- it happened twice that I can recall.
Q. Do you recall the time frame?
A. Not exactly. I have to look at some records of when Sergeant Cassase was in that area and that sort of thing to narrow it down.
Q. So do employees who demonstrate poor work performance, poor attitude and an unwillingness to get

170

along with other staff, is that your standard for giving somebody a meets expectations ranking?
A. No. He was still performing his duties pretty good. It wasn't to where his standards had been before.
Q. Okay. And it's your testimony that it's just not necessary to put things like that in a performance evaluation? Actually, strike that. It's your testimony that it's not necessary to document those types of things in the supervisory file, which is required to be kept by the DOC?
MS. XARHOULAKOS: Counsel, what types of things are you referring to?
MR. NEUBERGER: Problems of poor work performance, poor attitude, unwillingness to get along with staff and repeated meetings with the supervisor about those problems.
THE WITNESS: I guess if it appears to the point you are going to have to do disciplinary, that sort of thing, yeah, you need documentation in that. I was not looking at disciplinary on John for this at all. I was looking for it to work itself -- where John was willing to work it out and get along with other officers. Hopefully, that was going to be the

171

end of it. If it would continue, then we would have to take further steps.
BY MR. NEUBERGER:
Q. So you only document things when they're going to result in disciplinary action?
A. No.
Q. So why didn't you document these things?
A. I don't know.
Q. You have been a supervisor of the Department of Corrections since 1990 -- what year were you promoted to sergeant? Ballpark?
A. 1995, '96, somewhere in there.
Q. I think you testified earlier that you always try to follow DOC policies, practices and regulations; right?
A. Yes, I do.
Q. We talked a little bit about some of these earlier involving the supervisory files and documentation of things and warnings about things; right?
A. Yes.
Q. Despite all those things, despite your trying to follow DOC policies, practices and regulations, you still did not document these problems?

172

A. Other than here.
Q. Other than here. Correct?
A. Yes.
Q. For example, in supervisory files, where you are supposed to put things to reference when you are creating the performance evaluation. Right?
A. Excuse me?
Q. In the supervisory file, in the supervisor's file that you keep on all of your employees.
A. Mm-hmm.
Q. And you kept such a file on John?
A. Yes.
Q. Okay. Isn't it true that in one of the policies that we went through earlier line by line that it specifically references that is the location where you are supposed to keep documentation so that you can refer back to it when preparing the performance evaluation?
A. Correct.
Q. You would agree there is no such documentation, wouldn't you?
A. Yes.
Q. So the only place we have this is in this performance evaluation on this attachment; right?

173

A. As far as I know, that's correct. I would have to dig and look, but I don't believe there is.
Q. Right. So you are telling me that you haven't dug and looked?
A. I have looked through his file, but, I mean, I wasn't looking for this.
Q. Why?
A. I didn't know that I would need this. I have never been in a situation like this before in my life.
MR. NEUBERGER: Counsel, we'll actually get out a specific document request tonight on this just to --
MS. XARHOULAKOS: Go right ahead.
MR. NEUBERGER: I think it's covered by the earlier ones.
MS. XARHOULAKOS: I think so, too, but you are welcome.
BY MR. NEUBERGER:
Q. Okay. Let's go on to the third thing. "Corporal Balas is no longer a member of CERT." It's about the time that you gave this evaluation he was no longer a member of CERT; right?
A. Correct.
Q. The evaluation covers the period from September

'03 through September of '04?
A. Correct.
Q. How much of that time period was John a member of CERT? Does ten and a half months sound about right?
A. If you say so, yeah. I mean.
Q. Here -- okay.
A. Through September. yes.
Q. So the reason -- so one of the reasons you did not give him an exceeds expectations is because he resigned from CERT?
A. It was a small part of it.
Q. It was a part of it?
A. But it was a part of it, yes.
Q. So it was a fact --
A. If he was still on CERT -- at this point, if he had still been on CERT, it wouldn't have changed it.
Q. Okay. But you are saying it was a factor, though?
A. Yes.
Q. It wasn't the only factor?
A. No.
Q. It wasn't the but for factor?
A. No.

Q. But it was a factor?
A. Yes.
Q. So you are saying because he had so many performance problems during the relevant time frame? Even had he been on CERT, you still would have given him a meets expectations?
A. I would have still given him a very good meets expectations, yes.
Q. So you are sure --
A. Meets expectations is a good evaluation.
Q. You are giving him this good evaluation, even though he had all these performance problems; right?
A. Yes, yes.
Q. Okay. You also say a little later in this paragraph that, "Giving John an exceeds expectations would hurt the morale of officers working with him on a daily basis in the receiving room."
A. They all, in the receiving room, just about every one of them were: He needs to have a needs to have improvement. They just -- this was, you know, people saying that, you know, because --
Q. So these would be his co-workers?
A. Yeah. Because this, you know -- you would hear it, yeah.

Q. Okay.
A. But that was a part of you can't just give somebody exceeds because they've got perfect attendance and different things like that. Not always.
Q. So you are saying sometimes you can give an exceeds when they have perfect attendance?
A. Exceeds expectations can be a part of it, yes. But it's not a deciding factor. Not the only thing that would decide that.
Q. Okay. Who were his co-workers who criticized his job performance and would have had their morale hurt had he received an exceeds expectations?
A. You could ask any one that worked with him. I mean, I don't have to give a name. You can take the whole roster and ask anyone you wanted.
Q. Give me names. Who are they?
A. Mike Santini; Darryl Hastings; Kenny Mayer; Jeff Rogers; Jeff Johnson. I am trying to think of just everybody that worked back there when he worked, so I have to think for a minute.
Q. Okay.
A. Dennis Murray. If I looked at the roster, I could give you plenty of names of people that worked

with him that could give you an honest opinion.
Q. Who was the sergeant again?
A. Sergeant Cassase. He's no longer with the Department.
Q. Where is he?
A. I think he moved to New York doing some type of computer work.
Gary Pierce. And Gary Pierce knows how to contact Sergeant Cassase. Gary Pierce works in the receiving room. Tim Dorey.
I'm sorry. I say a name, and it gives me a couple more names, but it's hard to think of it right here and now.
Q. Okay. Is it your testimony that despite all these things which you listed here on page 3 that this is still a good performance review?
A. All in all of what John did in the receiving room, I believed that it didn't warrant dropping down to a needs improvements. I believe he was still at an exceeds. The things that brought him over the top was a lot of the extras that he had faltered in. But I believed he was still at a meets expectations, yes.
Q. Even though he can't get along with his co-workers?

Q. So you deny that you had a personal vendetta against John because he resigned from CERT?
A. No vendetta at all. Absolutely incorrect.
Q. So you don't deny it or you do deny it?
A. I deny having a vendetta against him. Yes, I deny that.
Q. So you deny refusing to give John a copy of his evaluation?
A. No, I don't deny that. I -- but he -- I told him he could not have a copy of it until he reviewed it with me.
Q. Okay. Why wouldn't you give him a copy of it then?
A. I wanted him to review it, and then he would get a copy of it.
Q. Why wouldn't you have just given him a copy before?
A. Because I wanted him to review it with me to discuss and work out any discrepancies we may have.
Q. Okay.
A. But he refused and flat out wouldn't even look at it.
Q. Right. So you are saying that if John had discussed with you the missing letter of -- the

missing memo of appreciation from Major Townsend that you might have included that if he talked to you about it?
A. Yeah. I mean, if I didn't have it in there. He -- from that moment on, he wouldn't talk to me. Well, he wouldn't before that either, but. He wouldn't discuss anything about the evaluation.
Q. Do you believe that you were holding a grudge against John?
A. No.
Q. In any way?
A. No.
Q. Because of the August of 2004 --
A. No.
Q. -- CERT resignation?
A. No.
Q. Okay.
A. Everybody involved in that was getting along with everybody after that.
Q. Okay.
A. Except for John.
Q. Except for John?
A. Except for John.
Q. Now, let's go down to the one, two, three,

four, five, six, seven, eight, nine, ten -- I'm sorry. I lost count. The eleventh line from the bottom where it begins, he said, "You didn't sign it...?"
A. Okay.
Q. Do you see that?
A. Yes, I do.
Q. Go to the end of that line where it begins, "I asked ..." It's a new sentence.
A. Yes.
Q. "I asked, 'Why wasn't anything of the letters put on the evaluation?' Lieutenant Mears said, 'It does not warrant enough to get 'exceeds expectations' and did not need to be put on the evaluation.'"
Do you recall having a conversation of that nature with John talking about why his letter of appreciation wasn't on there?
A. I don't recall that.
Q. Do you dispute it or you just don't recall either way?
A. I don't recall it.
Q. All right. You can put that down.
Let's put another document and call this Mears Exhibit 13.
(Mears Exhibit No. 13 was marked for

identification.)
BY MR. NEUBERGER:
Q. Have you ever seen this document before?
A. Never.
Q. How about you read it quietly to yourself, then.
A. Okay.
Q. All right. All set?
A. Yes.
Q. Now, do you agree or disagree with John's recitation of these incidents?
A. I disagree.
Q. You disagree. So do you disagree with the fact that after John asked for a union representative to be present that you acted disgusted and walked away?
A. Yeah, I disagree with that.
Q. Do you believe your mannerisms and how you were acting came across as bullying?
A. I disagree.
Q. Do you think your mannerisms and your actions there could have been interpreted as bullying?
A. No. I disagree.
Q. Okay. The very last line of the page references John not receiving a copy of his 2004 time

card.
A. Okay.
Q. Do you recall the circumstances surrounding why John didn't get a copy of his 2004 time card until a little bit later?
A. Yes. We, at the end of the year, we total out our time cards with no specific timeline to get this done. We total them out. They get audited. And then we give the officers copies of them.
John asked for a copy of his time card. I went right in -- and I was just finishing them up. I finished them up. And I was running copies off. And he came back to my office and he got the very first one of all my staff. He got the first one that went out.
Q. Okay.
A. I don't know how I could have got it to him any quicker. He was the first one.
Q. Let's go to the last page of this. Use this as a basis to ask you some questions about you turning in John's time card -- John's evaluation.
A. Okay.
Q. Did there come a time when eventually you turned in John's evaluation without his signing it?

A. Yes.
Q. When was that?
A. I don't know the exact date.
Q. Could it have been in February of '05?
A. I guess. I am not exactly sure. I can't tell you exact date. I don't know. It was around that time.
Q. Who did you turn them into?
A. Captain Wilkinson.
Q. Captain Wilkinson. You wrote: "Refused to sign it on it"; right?
A. Yes.
Q. Why did you do that?
A. Because he refused to review it or sign it. I told him the last time I went back there when he was saying he wanted a union rep and Captain Wilkinson, and that sort of thing, which was, you know, news to me, and new and all, and this was after several attempts. And I told John, I said, "Well, it's going to get turned in the way it is if you don't want to review it."
Q. Okay.
A. And then I turned it in.
Q. Was it before this or after this that you spoke

to Captain Wilkinson about being there for the review?
A. That was before. I spoke with him before that.
Q. Okay. So why didn't that ever happen?
A. Just from scheduling. With my days off, John's days off, the captain's days off, we all only worked together once or twice every couple of weeks.
Q. Okay.
A. The way it came about was I asked Captain Wilkinson to sit in if it worked out.
Q. Okay.
A. And that's the only thing with Captain Wilkinson that I was aware of. If Captain Wilkinson had promised John that that would in fact happen along with the union rep, I have no knowledge of it. I am not saying he did or didn't tell John that. I just didn't have any knowledge of it.
Q. Why didn't you ask him, Captain Wilkinson?
A. Ask him what?
Q. Does John have a right to have you be there for a review and a right to have a union rep there?
A. I believe I did speak to him about that before. He said, It's an evaluation. It's a good evaluation, there is no need for it. Something in that order. I

don't remember the exact words.
Q. We can ask him about the conversation, then.
A. Yeah.
Q. Let's put another document in front of you. We'll mark this as Mears Exhibit 14.
(Mears Exhibit No. 14 was marked for identification.)
BY MR. NEUBERGER:
Q. Why don't you take a quick look at this document to see if you recognize it.
A. John's time card, or -- yeah.
Q. It's John's time card for a certain period of time?
A. It appears to be, yes.
Q. Okay. Who fills out John's time cards, you or him?
A. I fill it out. He has been known to write on it, but I fill it out for the most part.
Q. You fill it out for the most part?
A. Yes. It was available for anybody to pick up at any time.
Q. Right. So for example, like page 1 here, that's your handwriting?
A. Appears to be.

Q. It appears to be?
A. Yes. If I was on vacation, another lieutenant would do it or a sergeant would do it.
Q. Okay. So let's turn to page -- let's turn to the third page in. It says, "P496" at the bottom. I guess it would be on the side if you are holding it sideways.
A. Okay.
Q. Are we on the same page?
A. Yes.
Q. Okay. I want to direct your attention to the date of January 26th up top.
A. Okay.
Q. Do you see that?
A. Yes.
Q. What's that marked as?
A. A vacation day.
Q. Looks like that was a Monday; right?
A. Yes.
Q. It says vacation. How about May 11th?
A. Vacation day.
Q. Okay. Looks like that was a Tuesday; right?
A. I lost it here.
Q. Sure. It's May 11th.

A. Yes.
Q. Let's turn one more page, to page 497.
A. Mm-hmm.
Q. Let's go to May 11th there. Appears to be something scribbled in above the "V."
A. Yes.
Q. What is that?
A. Emergency.
Q. Why is it on this one, but not on the previous pages?
A. That came about for something that had nothing to do with John.
Q. It's written on his time card.
A. Yes. Well, he -- that was an emergency vacation day that was given to him. From the Captain's schedule, it was an emergency vacation day. No difference from a regular vacation day.
Q. Well, why isn't it marked on page 494, 495 and 496?
A. The reason that was changed, I had two staff members on my staff, they came to me complaining about not being able to get emergency vacation days or emergency holidays, and they were complaining that it was due to their race.

Q. Okay.
A. So I checked all of my staff. And if they got emergency days or didn't get emergency days, all time cards reflected emergency vacation days from that point on or emergency holidays. So if what they were telling me was true, it could go further.
But as far as the time card for the officer, it means no difference. Vacation day is a vacation day. It's not looked upon any differently.
Q. So you went back and you changed records you had already created?
A. I put the "E" on there, yes, I did. But now this time card was for my benefit. The official time card is in the timekeeper's office. This was just for my benefit. And these are audited, you know, quarterly.
Q. So it's your testimony that emergency vacation days are viewed the same as regular vacation days?
A. As far as how it affects that officer, yes.
Q. How about as it affects you as a supervisor? With a regular vacation day, do you get lead time?
A. Excuse me?
Q. With a regular vacation day, do you have lead time? Do you know it's coming up?

A. Right, because it's prescheduled.
Q. How about a emergency vacation day, do you know about that beforehand?
A. Me, no. I don't know what anybody has until I pick up the schedule from that day or when we used the do time cards. I would pick up the week's time cards or the schedules that the captain wrote down what they got and then transfer it onto the hard card. And then the business office, who took care of the real genuine time card, would do it there, too.
Q. Okay.
A. And then they would, you know, audit our time cards to make sure everything was being on track, nobody was being charged too much time, or.
Q. So when an employee takes am emergency vacation day, can that cause some problems in the unit where they're assigned to?
A. No.
Q. Why? Or why not?
A. It's just it's a vacation day. I mean, what could it do?
Q. What if it's not scheduled beforehand?
A. It's no different than taking a holiday or a sick day as far as how the shift runs, if that's what

you mean.
Q. What I am trying to get at is why you put in the emergency vacation.
A. Because it was an emergency vacation day.
Q. But it hadn't been originally marked that way.
A. Okay. But that was -- it was my mistake to begin with. It was an emergency vacation day issued by the captain on the schedule.
Q. Okay. Even though it wasn't originally reflected that way on these time cards, you went back and changed them?
A. Yes. But it makes no difference, a vacation day is the same whether it's emergency or prescheduled, it's all the same.
Q. Let's turn two more pages, to P499.
A. Yes.
Q. And if you'd look at May 11th, that's still marked emergency vacation; right?
A. Mm-hmm.
Q. Then it looks like you have altered January 26th and written in emergency vacation there, too; right?
A. Yes.
Q. It looks like you have written in emergency

vacation for September 5th and 12th; right?
A. Correct. I was doing it for every employee for the whole year.
Q. Okay.
A. Of my staff.
Q. We go on to the next page, P500, and those same dates are still marked as emergency vacation days; right?
A. Yes.
Q. Turn to page P501, the same things are marked; right?
A. Yes.
Q. Turn to page P502. And all of a sudden, all the emergency notations are gone?
A. Correct.
Q. Why?
A. Captain Wilkinson came to me and said, "John Balas is flipping his lid. He's worried to death about these emergency vacation days you put on here." And I explained to him what I was doing.
Q. Okay.
A. And he was in agreement with that. That's fine. That's what it is, it's an emergency vacation day, and that's fine. Then he said, "Well, you know,

it would calm John down if you would just change his to plain vacation day. For whatever reason, it will calm him down. Do you mind doing it?" I said, "Well, you're the boss. I'll do it. I'll change. It's no big deal for me. It doesn't change anything as far as -- it wasn't affecting him anyhow."
Q. So you went back and you changed the records a second time?
A. Yes, I changed it on my time card to reflect just a vacation day instead of emergency vacation day. This was -- like I said, these time cards were for my benefit only. It wasn't what he was being paid by -- he was being paid by the business office, and that sort of thing, so.
Q. Okay.
A. I still kept my other officers the way I kept them.
Q. All right.
A. I didn't really agree with it, but, you know, if it calmed somebody down, that's fine.
Q. So you only changed his?
A. Yeah.
Q. Now we're still on this page P502?
A. Yes.

Q. Go up to January 26th, there is another symbol written above the "V" for vacation?
A. Yes.
Q. What is that?
A. I believe that was compassionate leave. Later on, his -- well, it looks like compassionate leave. And I believe John was on vacation when he had someone in his family pass away.
Q. Okay.
A. If I am correct on this. I may be wrong, but I believe he was on vacation. He had to travel for a death in his family. Then later on he saw the time card and said, "I wasn't vacation, I was compassionate leave," which then I contacted the business office and they confirmed it and they changed their card, I changed my card so they correspond.
Q. Okay.
A. I know that happened with John. I am pretty sure that's the dates, but I may be wrong. But it does look like compassionate leave, and I believe that's what it is.
Q. Got ya. Okay. You can --
A. That way he gets his vacation holidays back. It doesn't charge him for that time.

Q. Got ya. All right. You can close that up.
It's your testimony on the changes for the time card that you weren't doing anything wrong; right?
A. Yeah, exactly. It was really a nonissue, I felt.
Q. John ever ask you for -- this is after September -- I'm sorry. After August of 2004, did he ever ask you for a transfer to a different supervisor?
A. No, he never asked me for a transfer.
Q. Did you ever hear that John was asking for a transfer to a different supervisor?
A. After, yes, I did hear that, but it was shortly before his death. I couldn't tell you the exact date. He didn't tell me. I heard it from someone else.
Q. Do you know if any steps were ever taken to grant him a transfer?
A. I asked either the warden or the deputy warden, I can't remember who --
Q. Okay.
A. -- if it was true that he was asking for another supervisor, and they told me, yes. And they told me no decision had been made. I said, Okay, I just wanted to see if it was a rumor or the truth, and

I left it at that.
Q. Did you think that it would be a good thing if John received -- was transferred to another supervisor?
A. No.
Q. Why not?
A. I was responsible for that area that he worked in. As long as he worked in that area on my shift, I am responsible for that area. I don't know how someone else could supervise that area, someone that is not on that shift, you know. He could request to be moved. He could have been moved very easily.
Q. Okay.
A. But he never requested that, that I am aware of. He could have been -- request to move to another area of the compound, another area of the building under a different supervisor.
Q. All right.
A. Then they would have been in charge of that area, which would have made sense, to be in charge of those people. Maybe he did, but I am not aware he requested that.
Q. When it comes to supervising employees under your command, employees within your purview, so to

speak, do you keep notes on them?
A. I don't keep daily notes on anybody, no, only when there is an issue.
Q. Did you keep daily notes on John?
A. No.
Q. Did you keep regular notes on John?
A. No.
Q. Did you keep irregular notes on John?
A. I only kept a couple notes on John.
Q. Okay. Do you still have those notes?
A. Yes.
Q. Where are they?
A. I guess I gave them to you.
It was just one occurrence where he was irate about another officer trying to tell him, a sergeant in the building, telling him what he had to do in the receiving room, and he didn't like it. And I explained to him, you know, how I felt about that --
Q. Right.
A. -- where I had a halfway decent conversation. And the rest would have been in the evaluation.
Q. Okay.
A. So that's, basically, it. I didn't keep notes on him.

Q. So it was one of those occurrences in the receiving room?
A. Yes.
Q. And it's your testimony that you gave those documents to your attorney?
A. Yeah. I believe you have it. I think it's just the stuff there that's in the evaluation.
Q. You are saying it's a typed up one versus being a handwritten note?
A. Oh, yeah. I never kept any handwritten notes on him, no.
Q. Okay. Got ya.
A. Anything I have, I think you are aware of.
Q. Now, do you remember your testimony from this morning about the importance of powers of observation when it comes to supervising inmates?
A. Yes.
Q. Do you remember your testimony this morning about wanting to keep an eye on your employees?
A. Yes.
Q. Now, during the time frame from September of '04 until John's suicide in February of '05, did you observe that John was under any stress at work?
A. Right towards the end, he kind of pulled -- the

problem was he had pulled away from me, so I didn't get to see the daily functions of him. You know what I mean?

Q. Okay. What did you observe towards the end?

A. Spent a lot of time on the computer, but. I felt that that was just him trying to avoid me.

Q. That was a sign of stress to you?

A. Not really stress. But then, like I said earlier, when Lee Mears had told me that John was having problems at home, you know, and that was shortly before his death. And those guys, Lee was working with him on that and stuff, so.

Q. Okay.

A. But that would be stressful for anybody.

Q. Did you have any indications that he was going to kill himself?

A. Absolutely not.

Q. If you had heard that John was talking about suicide, what would you have done?

A. I would have went to my supervisors. Again, according to the situation. If somebody said John is in the property room saying he's going to do this, of course, you handle that differently. But if I just heard that John was suicidal, I would have done

whatever I could, contacted my supervisors and look for somebody who knew how to handle that situation.

Q. Right. For example, you can report to your supervisor, then go to HR, HR can get involved, bring in a psychologist or psychiatrist, like they talk in some of those policies that we went through this morning?

A. Exactly, someone who is qualified to deal with that.

Q. There is the employee assistance program that we talked about a little bit this morning; right?

A. Yes.

Q. Those are all resources that are out there for Department of Correction personnel?

A. Yes. And a lot of that, hardly anyone was aware of until after this.

Q. I'm sorry?

A. A lot of this, we weren't really aware of -- it's not something that you go pick up and say, hey, I'm going to read about this. You know what I mean? It's not common knowledge to everybody at that time. After the fact, you know, it's different.

Q. Right, when you are kicking yourself and saying, like, what if, that kind of thing?

A. Yes, exactly. Everybody was kicking themselves with what ifs, but nobody -- farthest thought, you know. People I knew never thought he would do that.

Q. Okay.

A. I thought -- you know, I thought John -- I just didn't think he would do that. He loved his kids too damn much.

Q. Okay. Then the employee assistance program has been around for awhile; right?

A. Yeah.

Q. And that policy we went through earlier has been around for awhile, the DOC psychological fitness for duty policy?

A. Yes.

Q. We don't need to go through all the DOC matters exhibits, right, we did all that this morning where they talk about everything there?

A. Right.

Q. Just to wrap up this section. Getting involved in a situation like that, that's just something that a good manager should do if they have some kind of knowledge of it; right?

A. Yes, if you have knowledge of it, yes.

Q. You knew John was a union member; right?

A. Yeah, everyone there is a union member.

MR. NEUBERGER: Now, counsel we're going to go under seal now to do some of the punitive damages discovery questions.

MS. XARHOULAKOS: We're going to object to those at this time.

MR. NEUBERGER: Are you going to instruct him not to answer?

MS. XARHOULAKOS: Yes, I am. It's premature. That would be my objection.

MR. NEUBERGER: So we have that on the record, then.

MS. XARHOULAKOS: Yes.

MR. NEUBERGER: I'll say for the record I have a whole host of questions related to punitive damages, net worth and assets and things of that nature, which defense counsel has indicated she'll not allow her client to answer. So we'll preserve the issue and deal with it later.

MS. XARHOULAKOS: That sounds fine.

MR. NEUBERGER: Let's take a break, and I'll see if I have any more questions I need to go through. If not, we can get the heck out of here.

MS. XARHOULAKOS: Great.



RECEIVED
JAN 26 2005
HUMAN RESOURCES

**The State of Delaware Employee Performance Review**
**Name, Job Title: CPL. John Balas** **SS# 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**
**Department-Division-Section:** Department of Correction, Sussex Correctional Institution
**Supervisor, Job Title: LT. Truman Mears** Correctional Lieutenant
**Date, or time period covered:** Sept. 2003- Sept 2004

**Areas where performance is distinguished or exceeds expectations, if any:**
**Cpl. Balas has perfect attendance and that is commendable however in this case I do not feel that perfect attendance is justification for an exceeds.**

**Areas of specific performance deficiencies or unsatisfactory work, if any:**
See attached summary.

**Are as where growth or skills/knowledge development is suggested or needed. If not applicable, please use this space and/or attach summary explanation of how employee met expectations. Cpl. Balas is knowledgeable of SCI policies and procedures. He shows up for duty in a timely manner. He uses leave in accordance with policy.**

**NOTE : See attached summary.**

**Employee documentation of performance events, comments and/or self-review:**

We have met and discussed this document. The employee's performance is (Distinguished), (Exceeds Expectations), (Meets Expectations), (Needs Improvement), or is (Unsatisfactory).
*Please circle one..*

| Employee/date | Evaluator/date | Reviewer/date |
|---|---|---|
| | [signature] 12/06/04 | [signature] 12/06/04 |

KB 1.27.05

DEPOSITION EXHIBIT Mears 11 11-6-07 KP

RECEIVED
JAN 10 2005
SCI WARDEN'S OFFICE

A000184

D00084



Delaware Department of Correction
Bureau of Prisons
Sussex Correctional Institution
RT 1, Box 500
Georgetown, DE 19947

Sir. On 01-09-05 I asked Cpl. Balas to review and sign his evaluation for the year. He told me that he thought that Cpt. Wilkinson would be present during it. I informed him that he (Cpl. Balas) was going to be on Vacation next week and Cpt. Wilkinson was not working tonight.. Cpl. Balas informed me that he would not look at it without Cpt. Wilkinson and a Union Rep.

The evaluation has been completed and turned in once.
I am turning it in again without his signature.
I am not aware that an officer has to have a union rep. present for this.
I do not feel that I have to comply with Cpl. Balas demands at this point.
Cpl. Balas by his own choice has not seen or signed this evaluation.

Received, SCI.
JAN 10 2005
Deputy Warden

**Delaware Department of Correction**
**Bureau of Prisons**
**Sussex Correctional Institution**
**RT 1, Box 500**
**Georgetown, DE 19947**

This is an attachment for Cpl. John Balas Performance Review to show justification for meets expectations. If someone receives exceeds expectations on prior performance reviews it should not automatically guarantee them exceeds for future performance reviews.

In the past Cpl. Balas has received exceeds expectations and deserved it because of his job performance and the extra effort he put forth such as C.E.R.T. , his assistance to me in training Officers in Q.R.T. , his job performance in the receiving room, and perfect attendance.
This year however there has been several events to change that. First,after completing training of Q.R.T. I sent Major Townsend an e-mail stating that I did not want Cpl. Balas to help teach any classes under me in the future because of his performance. The next time I talked to Major Townsend in detail he agreed to this.
I had 2 meetings with the Sgt. in charge of the area Cpl. Balas works about Cpl. Balas poor work performance, poor attitude, and his unwillingness to get along with other staff.
Cpl. Balas is no longer a member of C.E.R.T.
This leaves only perfect attendance. In light of the rest of Cpl. Balas performance I do not feel that perfect attendance alone (although commendable) is enough to justify exceeds.
Also an exceeds would hurt moral of the Officers working with Cpl. Balas on a daily basis in the receiving room.
Cpl. Balas has a lot of potential and can work towards exceeds in the future.

I put this in attachment form because I feel that it is not necessary and not my goal to place a lot of negative statements in a performance review for some one that receives a good review, a meets expectations. This I feel would put someone to the needs improvements level.
Because Cpl. Balas has received exceeds for several years in the past the drop from exceeds to meets may need written justification.

LT. Truman Mears



The State of Delaware Employee Performance Plan

Name, Job Title: **Cpl. John Balas [SS# ] 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**
Department-Division-Section: Department of Correction, Sussex Correctional Institution
Supervisor, Job Title: Truman Mears, CorrectionalLieutenant
Date, or time period covered:

What is the agency mission and/or operational needs that this employee's job performance will affect?
The DOC is committed to providing programs, policies and services to inmates which at all times places public safety as our top priority whether the offender is in prison or supervised in the community by correctional staff. Your role is to provide discipline and security of inmates inside or outside the secure facility by enforcing institutional rules, regulations and policies while keeping in mind that rehabilitative programming will enhance the long term public safety.

Please list the duties, projects or performance standards that will be used for evaluation purposes. *Note:* current job dimensions may be substituted and/or included.

1. Be knowledgeable of and adhere to all Departmental, Bureau and Institutional policies and procedures. Read, daily, the post orders for the area you are assigned to stay abreast of any and all changes.

2. Report for work assignments and appointments on time every day as scheduled unless leave is prior approved as attendance, reliability and punctuality are an essential part of your job.

3. You are expected to conduct yourself in a professional manner on or off duty keeping in mind that you represent the DOC in dealing with the public. You are a role model for inmates and your appearance and conduct should always be in compliance with departmental guidelines.

4. It is your responsibility to document all activities that occur during your tour of duty. Documentation is expected to be submitted prior to the end of your shift on the proper institutional form. All written communication will be clear, concise and complete. It is also your responsibility to brief the on-coming shift of all events that occur during your shift.

5. Maintain security at all times by being alert and adhering to established security procedures. You are expected to take immediate action when security violations occur.

6. As a lead worker you are expected to provide guidance, supervision, and training to subordinate staff as needed. You may also be expected to assume the duties of the Lieutenant when so directed by the Watch Commander.

060103

Employee/date Evaluator/date Reviewer/date

TJM 05-23-03

000087

**Jones Margie (DOC)**

**From:** Davis Diane (DOC)
**Sent:** Friday, February 11, 2005 8:20 AM
**To:** Jones Margie (DOC)
**Cc:** Kearney Richard (DOC)
**Subject:** FW: John Balas performance evaluation

Good Morning Warden Kearney,

I am no longer working in the Employee Services Unit.
I am still in the H/R office, but working with the Recruitment Selection Unit.
My replacement is Ms. Margie Jones.

Margie,
Can you please take care of this.

Thanks,
Diane

-----Original Message-----
**From:** Kearney Richard (DOC)
**Sent:** Friday, February 11, 2005 8:09 AM
**To:** Davis Diane (DOC)
**Subject:** John Balas performance evaluation

Good morning Diane,
Could you please send me John Balas' original performance evaluation for 2004. He has filed a complaint and is meeting with his supervisor and the reviewer to discuss the evaluation. Thanks
Rick

Mailed 2/11/05



RECEIVED

JAN 26 2005

HUMAN RESOURCES

**The State of Delaware Employee Performance Review**

**Name, Job Title: CPL. John Balas** **SS# 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**

**Department-Division-Section:** Department of Correction, Sussex Correctional Institution

**Supervisor, Job Title: LT. Truman Mears** Correctional Lieutenant

**Date, or time period covered:** Sept. 2003- Sept 2004

**Areas where performance is distinguished or exceeds expectations, if any:**
**Cpl. Balas has perfect attendance and that is commendable however in this case I do not feel that perfect attendance is justification for an exceeds.**

**Areas of specific performance deficiencies or unsatisfactory work, if any:**
See attached summary.

**Are as where growth or skills/knowledge development is suggested or needed. If not applicable, please use this space and/or attach summary explanation of how employee met expectations. Cpl. Balas is knowledgeable of SCI policies and procedures. He shows up for duty in a timely manner. He uses leave in accordance with policy.**

**NOTE : See attached summary.**

**Employee documentation of performance events, comments and/or self-review:**

We have met and discussed this document. The employee's performance is (Distinguished), (Exceeds Expectations), (Meets Expectations), (Needs Improvement), or is (Unsatisfactory).
*Please circle one.*

Employee/date | Evaluator/date 12/06/04 | Reviewer/date 12/06/04

KC 1.27.05

RECEIVED

JAN 10 2005

SCI WARDEN'S OFFICE

000089



**Delaware Department of Correction**
**Bureau of Prisons**
**Sussex Correctional Institution**
**RT 1, Box 500**
**Georgetown, DE 19947**

Sir. On 01-09-05 I asked Cpl. Balas to review and sign his evaluation for the year. He told me that he thought that Cpt. Wilkinson would be present during it. I informed him that he (Cpl. Balas) was going to be on Vacation next week and Cpt. Wilkinson was not working tonight.. Cpl. Balas informed me that he would not look at it without Cpt. Wilkinson and a Union Rep.

The evaluation has been completed and turned in once.
I am turning it in again without his signature.
I am not aware that an officer has to have a union rep. present for this.
I do not feel that I have to comply with Cpl. Balas demands at this point.
Cpl. Balas by his own choice has not seen or signed this evaluation.

[signature]

Received, SCI.
JAN 10 2005
[initials]
Deputy Warden

U00090



**Delaware Department of Correction**
**Bureau of Prisons**
**Sussex Correctional Institution**
**RT 1, Box 500**
**Georgetown, DE 19947**

This is an attachment for Cpl. John Balas Performance Review to show justification for meets expectations. If someone receives exceeds expectations on prior performance reviews it should not automatically guarantee them exceeds for future performance reviews.

In the past Cpl. Balas has received exceeds expectations and deserved it because of his job performance and the extra effort he put forth such as C.E.R.T., his assistance to me in training Officers in Q.R.T., his job performance in the receiving room, and perfect attendance.
This year however there has been several events to change that. First,after completing training of Q.R.T. I sent Major Townsend an e-mail stating that I did not want Cpl. Balas to help teach any classes under me in the future because of his performance. The next time I talked to Major Townsend in detail he agreed to this.
I had 2 meetings with the Sgt. In charge of the area Cpl. Balas works about Cpl. Balas poor work performance, poor attitude, and his unwillingness to get along with other staff.
Cpl. Balas is no longer a member of C.E.R.T.
This leaves only perfect attendance. In light of the rest of Cpl. Balas performance I do not feel that perfect attendance alone (although commendable) is enough to justify exceeds.
Also an exceeds would hurt moral of the Officers working with Cpl. Balas on a daily basis in the receiving room.
Cpl. Balas has a lot of potential and can work towards exceeds in the future.

I put this in attachment form because I feel that it is not necessary and not my goal to place a lot of negative statements in a performance review for some one that receives a good review, a meets expectations. This I feel would put someone to the needs improvements level.
Because Cpl. Balas has received exceeds for several years in the past the drop from exceeds to meets may need written justification.

LT. Truman Mears

E00091



The State *of* Delaware Employee Performance Plan

Name, Job Title: **Cpl. John Balas [SS# ] 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**
Department-Division-Section: Department of Correction, Sussex Correctional Institution
Supervisor, Job Title: Truman Mears, CorrectionalLieutenant
Date, or time period covered:

What is the agency mission and/or operational needs that this employee's job performance will affect?
The DOC is committed to providing programs, policies and services to inmates which at all times places public safety as our top priority whether the offender is in prison or supervised in the community by correctional staff. Your role is to provide discipline and security of inmates inside or outside the secure facility by enforcing institutional rules, regulations and policies while keeping in mind that rehabilitative programming will enhance the long term public safety.

Please list the duties, projects or performance standards that will be used for evaluation purposes. *Note:* current job dimensions may be substituted and/or included.

1. Be knowledgeable of and adhere to all Departmental, Bureau and Institutional policies and procedures. Read, daily, the post orders for the area you are assigned to stay abreast of any and all changes.

2. Report for work assignments and appointments on time every day as scheduled unless leave is prior approved as attendance, reliability and punctuality are an essential part of your job.

3. You are expected to conduct yourself in a professional manner on or off duty keeping in mind that you represent the DOC in dealing with the public. You are a role model for inmates and your appearance and conduct should always be in compliance with departmental guidelines.

4. It is your responsibility to document all activities that occur during your tour of duty. Documentation is expected to be submitted prior to the end of your shift on the proper institutional form. All written communication will be clear, concise and complete. It is also your responsibility to brief the on-coming shift of all events that occur during your shift.

5. Maintain security at all times by being alert and adhering to established security procedures. You are expected to take immediate action when security violations occur.

6. As a lead worker you are expected to provide guidance, supervision, and training to subordinate staff as needed. You may also be expected to assume the duties of the Lieutenant when so directed by the Watch Commander.

060103

Employee/date Evaluator/date Reviewer/date

TJM 05-23-03

B00092

**Mears Truman (DOC)**

**From:** | **Sent:** Thu 1/20/2005 7:08 AM

**To:**

**Cc:**

**Subject:** On Jan 9th. I aproached Cpl. Balas in the recieving room and asked him to come to my office and review his eval. for the year. He refused to sign or even look at the review. His demands were that he have a union rep present along with Cpt. Wilkenson . His

**Attachments:**

On Jan 9th. I aproached Cpl. Balas in the recieving room and asked him to come to my office and review his eval. for the year. He refused to sign or even look at the review. His demands were that he have a union rep present along with Cpt. Wilkenson . His eval was turned in without his signiture.

000378

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

CINDY L. BALAS a/k/a CINDY L. ADKINS, Executrix of the Estate of CORPORAL JOHN J. BALAS,

Plaintiff,

v.

STANLEY W. TAYLOR, JR., individually and in his official capacity as the Comissioner of Correction; ALAN MACHTINGER, individually and in his official capacity as the Director of Human Resources of the Department of Correction; MICHAEL DELOY, individually and in his official capacity as Deputy Warden of Sussex Correctional Institution; CAPTAIN DAVID WILKINSON, individually; LIEUTENANT TRUMAN MEARS, individually; and DEPARTMENT OF CORRECTION OF THE STATE OF DELAWARE,

Defendants.

Civil Action No. 06-592-JJF

Deposition of JON W. MUMFORD, taken pursuant to notice at the law offices of The Neuberger Firm, P.A., Two East Seventh Street - Suite 302, Wilmington, Delaware, beginning at 3:01 p.m. on Tuesday, December 4, 2007, before Christina M. Vitale, Certified Shorthand Reporter and Notary Public.

Continued. . . . . . . . . . . .

WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
(302) 655-0477

www.wilfet.com

WILCOX & FETZER LTD.
Registered Professional Reporters



A lot of those guys don't understand that we really didn't want to be there doing it either, but we were activated, we had to honor it. We talked about that to Rick and, you know, people were basically just shitting on us. Like I said, not me personally, but those guys, and I can only imagine what that is like. He listened to us and he did try and talk us out of it, tried to get us to reconsider, you know, doing what we were doing and he explained to us that the activation was over. Obviously, we knew that, but we also knew that that was only going to be temporary, you know.

Q. Do you remember how he tried to talk you guys out of it?

A. No, I don't actually, no.

Q. Do you remember any other statements by CERT members that were made to him during the resignation?

A. No, not without any certainty, no.

Q. Do you know if John Balas made any statements to the warden during that meeting?

A. I'm sure he did. As far as what he actually said I can't remember.

Q. After the resignation did you get a chance to witness management's demeanor toward the CERT members

that resigned?

A. Oh, yeah.

Q. What was it like?

A. Same as it was before.

Q. And what was that?

A. It just was. I mean, I didn't feel like there was any animosity. Nobody tried to, you know, so to speak -- nobody treated us bad. I'm talking about management just like you are. Nobody treated us bad. They didn't, you know, turn their nose up at us or anything like that. Nobody expressed any hard feelings about us quitting.

I mean, Truman and I were really good friends, we went duck hunting all together. We went duck hunting last Friday. Him, Kenny Hickman, both of them are team leaders, they don't have a mean bone in their body. I don't think they could be mean if they tried to be. I don't think I ever got mistreated because I quit CERT. Shoot, within a week or two it was almost like it never happened. Things were just back to normal.

Q. What about management's demeanor towards the job action that was going on at that time?

A. Well, the job action was pretty much done after

it and the reason it's emergency vacation instead of straight vacation because straight vacation day, which would mean it was pre-scheduled.

So, I mean, there was a lot of people that use it liberally. Even if it's not an emergency they will use it, but I think I've used it once maybe.

Q. Do you know if they're frowned upon versus regular vacation days?

A. No, I don't think so.

Q. Are they looked favorably upon? They would probably rather you have more time or --

A. Yeah, yeah, I would say so.

Q. -- give more notice than a day?

A. Well, yeah. I mean, no watch commander, you know, you don't want somebody to call you and say they can't make the shift an hour before the shift starts, but it does happen.

Q. Like if that happens it puts pressure on them to try and fill the slot?

A. Yeah, because they are going to fill a slot with overtime. It has never been a problem at SCI, not like it is at the other prisons like Smyrna because officers there get froze two or three times a week sometimes, you know, made -- forced to work.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CINDY L. BALAS a/k/a CINDY L. ADKINS, Executrix of the Estate of CORPORAL JOHN J. BALAS, | ) | |
| Plaintiff, | ) | Civil Action |
| v. | ) | No. 06-592-JJF |
| STANLEY W. TAYLOR, JR., individually and in his official capacity as the Comissioner of Correction; ALAN MACHTINGER, individually and in his official capacity as the Director of Human Resources of the Department of Correction; MICHAEL DELOY, individually and in his official capacity as Deputy Warden of Sussex Correctional Institution; CAPTAIN DAVID WILKINSON, individually; LIEUTENANT TRUMAN MEARS, individually; and DEPARTMENT OF CORRECTION OF THE STATE OF DELAWARE, | ) | |
| Defendants. | ) | |

Deposition of WILLIAM H. SHOCKLEY taken pursuant to notice at the law offices of The Neuberger Firm, P.A., Two East Seventh Street - Suite 302, Wilmington, Delaware, beginning at 9:33 a.m. on Tuesday, December 4, 2007, before Christina M. Vitale, Certified Shorthand Reporter and Notary Public.

Continued. . . . . . . . . . . .

WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
(302) 655-0477

www.wilfet.com

WILCOX & FETZER LTD.
Registered Professional Reporters

totally different agency than they did so I didn't fall under the same guidelines as far as I didn't report to lieutenants or captains or stuff like that. I had my own set of supervisors.

Q. Did anyone in a management position ever say anything to you about the resignation?

A. At that time, no.

Q. You say "at that time." Did someone say something to you later?

A. Yes, I had an incident dealing with the guy who was head of the CERT at an interview, he brought the incident back up when I was in an interview.

Q. Who was that?

A. Dave Hall.

Q. And what did he say to you?

A. I had applied for a job and he was on the interview panel and he just told me that he had been waiting a while to ask me questions about the incident that happened and the reason that I quit.

Q. And what did you tell him?

A. I told him that it was a team decision and that I volunteered to do the resigning as a team effort in protest of the action that they were using CERT members for.

Q. Did he make any statements after you explained that to him?

A. Not really. He was trying to make it relevant to a question in the interview. That was pretty much it.

Q. Did you get the position?

A. I don't know.

Q. When was this?

A. I interviewed about a month and a half ago, but they told us that they were running behind as far as getting things started. It's a new position. So, they would not be making a decision until January or February.

Q. What position was Dave Hall in in August of 2004?

A. He was the head of CERT.

Q. Same position he is in now?

A. Yes.

Q. When you were talking to Dave Hall about this, did you get a negative feeling from him about his questions regarding your CERT resignation?

A. Yes.

Q. Negative meaning what?

A. It felt like he still held some kind of I guess

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

CINDY L. BALAS a/k/a CINDY L. ADKINS, Executrix of the Estate of CORPORAL JOHN J. BALAS,

Plaintiff,

v.

STANLEY W. TAYLOR, JR., individually and in his official capacity as the Comissioner of Correction; ALAN MACHTINGER, individually and in his official capacity as the Director of Human Resources of the Department of Correction; MICHAEL DELOY, individually and in his official capacity as Deputy Warden of Sussex Correctional Institution; CAPTAIN DAVID WILKINSON, individually; LIEUTENANT TRUMAN MEARS, individually; and DEPARTMENT OF CORRECTION OF THE STATE OF DELAWARE,

Defendants.

Civil Action No. 06-592-JJF

Deposition of JENNIFER P. WELDON taken pursuant to notice at the law offices of The Neuberger Firm, P.A., Two East Seventh Street - Suite 302, Wilmington, Delaware, beginning at 10:33 a.m. on Monday, December 3, 2007, before Christina M. Vitale, Certified Shorthand Reporter and Notary Public.

Continued. . . . . . . . . . .

WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
(302) 655-0477

www.wilfet.com

W&F
WILCOX & FETZER LTD.
Registered Professional Reporters

COPY

Q. Were you working there in 2004?

A. Yes.

Q. Were you working there in 2005?

A. Yes.

Q. Did you know John Balas?

A. Yes.

Q. And do you recall when you first met John?

A. Yes.

Q. When would that have been?

A. September of '04.

Q. September of 2004. Where did you meet him?

A. In the parking lot of work.

Q. That would be at the SCI in Georgetown?

A. Yes.

Q. And at some point thereafter did you begin a romantic relationship with John?

A. Yes.

Q. Do you recall when that began?

A. He approached me in late August anonymously. I met him in September, did not know him prior to that. To answer your question it was in the fall.

Q. And when did the romantic relationship end?

A. December.

Q. Why did it end?

A. I don't know if I can sum that up briefly. Things weren't working out.

Q. Could you try to -- you don't have to sum it up briefly. You can give me as long an answer as would be necessary to answer the question.

A. It just appeared to me that he had a lot of personal problems that were interfering with our relationship.

Q. Would one of those personal problems have been his marriage and his relationship with his wife?

A. In part.

Q. Okay. So, the romantic relationship ended in December of '04, correct?

A. Yes.

Q. And did you run into John at work at any point thereafter?

A. Yes.

Q. Did you communicate with him at all --

A. Yes.

Q. -- in the time frame after December of 2004?

A. Yes.

Q. Was it in person or was it by telephone or by E-mail?

A. Mostly by telephone. We did not interact very

much at work, during work.

Q. Is that because your jobs didn't require interaction?

A. Partly. We were in different locations.

Q. I'm hesitating because I'm not sure if you are done talking yet.

A. Yes.

Q. From September of 2004 through December of 2004 do you think you got to know John on a personal level?

A. Yes.

Q. Did you talk about your workdays and things like that?

A. Yes.

Q. From what you were able to observe and in your interactions with John was John under stress because of work during that time frame?

A. Can you ask me that again?

Q. Sure. Did John appear to be stressed out about his job?

A. I wouldn't say that -- he had a lot of things going on. Specifically about his job I would say no.

Q. Did John ever come to you and talk to you about a performance evaluation given him to by a supervisory officer?

A. He did.

Q. Did John ever talk to you about how he felt that his supervisor was angry at him because he was out of the CERT team in August of 2004?

A. No.

Q. Did he ever talk to you about how his supervisor was out to get him?

A. No.

Q. What did you talk about with John?

A. Regarding work?

Q. Sure.

A. I'm not sure I understand.

Q. Maybe a better question would be did you really talk about work with John?

A. Yes.

Q. During those conversations when you talked about work specifically what was discussed?

A. How busy he was, how many intakes he had. Just general -- I mean, just general work conversations. I don't really remember.

Q. Do you think there could have been work conversations you had with John which you don't remember now because it's more than three years later?

A. I don't believe so.

Q. Is it your testimony that you recall the substance of every work-related conversation you had with John that you had during that three-month time frame?

A. That's all, yeah -- yes.

Q. So, how often were you seeing John during that time frame?

A. Weekly.

Q. Did John ever talk to you about a grievance he had filed with the union because of the performance evaluation a supervisor had given him?

A. I believe he mentioned it.

Q. And I would like to focus on that because you testified that you recall all of the work-related conversations you had with John, okay?

A. Yes.

Q. Do you recall what exactly he mentioned about the union grievance he filed over the evaluation?

A. No.

Q. You don't recall specifically what was discussed during that conversation?

A. I remember him mentioning a grievance. I remember him stating that he had a qualm about his evaluation, but he never -- we never got into in-depth

conversations about that.

Q. Did John seem happy about his evaluation?

A. No.

Q. Did he seem unhappy about his evaluation?

A. Yes.

Q. Did he seem displeased about it?

A. Yes.

Q. Did he seem upset about it?

A. I wouldn't say upset. Unhappy, not satisified. I wouldn't say upset.

Q. Did he ever explain to you why he was unhappy or unsatisfied with it?

A. Vaguely.

Q. What did he say?

A. Just that he didn't agree with it, and I don't remember anything after that.

Q. Did John ever talk to you about how his union grievance was ultimately resolved?

A. No.

Q. Now, after your romantic relationship with John ended in December of 2004 did you continue to keep in contact?

A. Yes.

Q. How?



A. By telephone.

Q. So, I want to focus on the time frame from December of 2004 through February of 2005, okay?

A. Yes.

Q. During that time frame in your discussions with John did the subject of work ever come up during those conversations?

A. From January through February?

Q. From whenever it ended in December of 2004 through January of 2005 through February of 2005.

A. No.

Q. The conversations was more of a personal nature?

A. Yes.

Q. Eventually in January or February of 2005 did you go to then Deputy Warden DeLoy and express some concerns about John and his potential for suicide?

A. Yes.

Q. Do you recall when that was?

A. The week before.

Q. The week before he ultimately killed himself?

A. Yes.

Q. Do you recall how long before within that week it was?

A. Wednesday.

Q. Okay. Why did you go and talk to Deputy Warden DeLoy about that?

A. Because he was the only mutual person that I felt knew John that I could express the concern to.

Q. Did you talk to anyone else about that same concern?

A. Lee Mears and I had a conversation. I don't know that I initiated the conversation. I believe it was Lee who stated to me that that was how he felt John felt and that was it.

Q. Did you speak to someone by the name of Brittingham?

Q. Going back to your conversation with Deputy Warden DeLoy do you recall where the conversation took place?

A. In his office.

Q. And when you had the conversation was the door open or was it shut?

A. I believe it was open.

Q. And do you recall what you said to him?

A. I went to him and expressed that I felt that John was going to hurt himself because I had tried to break things off and he expressed this to me and I did

not know where else to go.

Q. So, would it be fair to say that you were reaching out for help?

A. Yes.

Q. Other than telling the deputy warden that you thought that John might be a danger to himself did you tell the deputy warden that you felt John might be a physical threat to someone else?

A. No.

Q. Did you express to the deputy warden that John might be a danger to a subsequent boyfriend of yours?

A. No.

Q. So, the concern that you expressed to Deputy Warden DeLoy was solely that John might do something violent to himself?

A. That he was threatening that.

Q. That he was threatening to do something violent to himself?

A. Yes.

Q. What did the deputy warden say in response to your concerns?

A. I believe he stated that John took time off to be with his family at that time. I really don't remember specifically what he said.

Q. And then I think you mentioned you talked to him the night before, right?

A. Yes.

Q. And had you talked to him several times that same week, several additional times that same week?

A. I believe he left me several voice messages that week. I was trying to remove myself from the relationship and from communication from him. The Friday night before he left me several messages. I believe I spoke to him once after he wrecked the vehicle. His speech was very slurred. I really didn't want to talk to him. Saturday morning, like I said earlier, our conversation ended and I just turned the phone off.

Q. So, you hung up on him?

A. No. He hung up on me and that was it.

Q. Did John mention to you at all that week that he was trying to patch things up with his wife, Cindy?

A. No.

Q. Did he mention to you that week he and Cindy had a long talk and discussed their relationship in great detail and they were trying to make things work?

A. No.

MR. NEUBERGER: Guys, I have no further



In the Matter Of:

# Balas
v.
# Taylor, et al.

C.A. # 06-592-JJF

---

Transcript of:

David A. West

November 13, 2007

---

Wilcox and Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: depos@wilfet.com
Internet: www.wilfet.com

with you?
A. No.
Q. Are you aware that they were in general unhappy with the decision to resign?
A. With me or with everybody?
Q. With everybody.
A. Oh, yeah, they were, they were mad.
Q. What makes you say that?
A. Not management at SCI. I think it was all people that run CERT, like Dave Hall and Tim Radcliffe, were mad about it. I don't think anybody at SCI was mad at us.
Q. What makes you think that Dave Hall and Radcliffe were made at the CERT members who resigned?
A. Just hearsay. I mean, that's it. Just things that were told and things that are said that come back to the institution.
Q. Like what?
A. Just, you know, they couldn't understand why we did it and if we ever applied for it again, they wouldn't let us back on. But that's --
Q. So did anyone from management ever say anything to you directly?
A. No.

Q. Are you aware of management's attitude towards the job action, the refusal to accept voluntary overtime?
A. No.
Q. Do you have to fill out a time card in your job?
A. No.
Q. How about when you were at SCI in 2004, did you have to fill out a time card then?
A. No. Lieutenants take care of that.
Q. Your lieutenant filled out a time card for you?
A. Yes.
Q. Are you familiar with the term "emergency vacation day"?
A. Yes.
Q. What does that term mean?
A. If you have a problem, instead of calling sick or something, you just take emergency vacation.
Q. So it's not like you planned it in advance like a normal vacation day?
A. No.
Q. Are you aware that if your lieutenant or supervisor would frown upon people using vacation days -- emergency vacation days? Excuse me.

A. They frown upon it? I don't -- it's your time. You can use it how you want. I don't see how they can frown on it.
Q. Do they look unfavorably on people using emergency vacation days because they might have to rearrange the schedule on a short -- on short notice?
A. Yes.
MS. HERTZOG: I'm almost done. I just want to step out and review my notes real quick.
MR. DURSTEIN: Sure.
MS. HERTZOG: Shortly.
MS. DURSTEIN: No problem.
MS. HERTZOG: Go off the record.
(Recess taken.)
BY MS. HERTZOG:
Q. I just have maybe two more questions for you. When you went to meet with the warden and resigned, were there CERT members resigning as a way of showing support for the job action?
A. Yes.
Q. Was that part of their decision?
A. Yes.
Q. Were comments made to the warden informing him of that?

A. Oh, yeah. He knew why we were doing it. I mean, that day coming into work, I mean, we got cussed, we got everything from fellow officers. We got called every name in the book.
Q. By the co-workers --
A. Yes.
Q. -- who are non- CERT members?
A. Then once it all came to an end and we all quit, everybody was apologizing and everything else. So I mean, Rick, he knew why we done it.
Q. Even though you were not activated, you were still cussed out?
A. Oh, yeah.
Q. Now, when the CERT members, the five CERT members who were activated, when they reported back to SCI after their mission --
A. Mm-hmm.
Q. -- when did you meet up with them?
A. It was in the warden's office after, at 4:00 o'clock.
Q. So did you all meet as a group before going into the warden's office?
A. No.
Q. So how did you all get there at the same time

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

CINDY L. BALAS a/k/a CINDY L. ADKINS, Executrix of the Estate of CORPORAL JOHN J. BALAS,

Plaintiff,

v.

STANLEY W. TAYLOR, JR., individually and in his official capacity as the Comissioner of Correction; ALAN MACHTINGER, individually and in his official capacity as the Director of Human Resources of the Department of Correction; MICHAEL DELOY, individually and in his official capacity as Deputy Warden of Sussex Correctional Institution; CAPTAIN DAVID WILKINSON, individually; LIEUTENANT TRUMAN MEARS, individually; and DEPARTMENT OF CORRECTION OF THE STATE OF DELAWARE,

Defendants.

Civil Action No. 06-592-JJF

Deposition of DAVID W. WILKINSON taken pursuant to notice at the law offices of The Neuberger Firm, P.A., Two East Seventh Street - Suite 302, Wilmington, Delaware, beginning at 10:18 a.m. on Wednesday, November 28, 2007, before Christina M. Vitale, Certified Shorthand Reporter and Notary Public.

Continued. . . . . . . . . . .

WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
(302) 655-0477
www.wilfet.com

WILCOX & FETZER LTD.
Registered Professional Reporters

A. Yes.

Q. Did Jeff Foskey say anything?

A. No, he just listened most of the time. John was the talker.

Q. Was John a talker in general?

A. Most of the time.

Q. I think somebody testified yesterday that John may have been a little hard-headed?

A. I don't know.

Q. In your experiences with John was he hard-headed or outspoken at all?

A. A little outspoken sometimes.

Q. But not hard-headed?

A. No. Could we back up and you re-ask that last question again to make sure what it was, how I answered.

MR. NEUBERGER: I'm not sure what you're asking. Could you repeat the last question?

A. In other words, what I was asking is when John Balas and Foskey and myself were talking I said that we talked about the quitting CERT.

Q. Yes.

A. That was all. He also elaborated on the disapproval of Truman Mears reporting to CERT

supervisors their plan on quitting CERT.

Q. So, that came up during the conversation?

A. Yes, that was all about quitting CERT. I just wanted to make sure I didn't leave anything out and you would say I thought you said that's all you talked about. It was the quitting CERT, the whole thing.

Q. I appreciate you bringing that up so we can ensure that the record is complete.

A. Okay.

Q. Lieutenant Truman Mears was a member of CERT?

A. Yes.

Q. And he was the highest ranking member of CERT?

A. No.

Q. No?

A. No. He is the highest ranking at SCI.

Q. Highest ranking member of CERT at SCI?

A. Yes.

Q. It came up during that conversation that John disapproved of Truman Mears reporting the resignation plan?

A. Correct.

Q. To DOC management?

A. Correct.

Q. Let's move into the period after the CERT team

resigned, okay?

A. Yes.

Q. I'll put a document in front of you which was previously marked as Mears Exhibit Number 13. Let's put these over here so they are out of the way for you. If you would like to take a look at this document first, that's fine.

A. Yes, I have never seen it before.

Q. Would you like to take a few minutes and read it over.

A. Yes, please.

Q. Have you reviewed that document?

A. Yes.

Q. I'll represent to you that this is a document created by John Balas in his handwriting and these are contemporaneous notes he was keeping in the month of January and I think in February of 2005, okay?

A. Yes.

Q. Do you recognize John's handwriting?

A. No.

Q. I would like to ask you some questions about some of the things that are mentioned in John's notes here and I would like to use this to try to jog your memory and see if you have any memory about some of

these same events, okay?

A. Yes.

Q. Do you recall a time where in the fall of '05 -- fall of '04, beginning of '05 where a dispute arose between John and Truman Mears about John's evaluation?

A. Yes.

Q. And that may have begun -- do you recall if that dispute lasted for several months?

A. I don't recall about the time.

Q. Do you recall John coming to you about his disagreement with the evaluation that Truman Mears had given him?

A. Yes.

Q. That happened more than once, didn't it?

A. Yes.

Q. Now, on here, on this document Mears Exhibit Number 13, John down towards the bottom of the first page, which you just read, John talks about -- in the fifth line from the bottom John talks about how he feels pressured, intimidated and stressed by Lieutenant Mears and he feels that Lieutenant Mears has given him this evaluation because Lieutenant Mears is angry at him because he resigned from the CERT team. You see those sentiments expressed on this

second time. Did he tell you why?

A. Yes.

Q. What did John say?

A. He thought that Mears -- his exact words almost was that he thought Mears was going to screw him because he quit CERT on his evaluation.

Q. He thought --

A. That's his exact words.

Q. His exact words were --

A. Screw him.

Q. -- I think Mears is going to screw me because I quit CERT?

A. Yes.

Q. Do you recall if he said anything else during that conversation?

A. Not about that, no.

Q. What was your reaction to that?

A. I told him -- well, he requested that I be present when he got his evaluation and I told him I would.

Q. You told him you would?

A. Yes.

Q. I think that was mentioned here on the second page of this Mears Exhibit 13. Do you see where

the word you used, disputed? I don't want to put words in your mouth.

A. Yeah, disgusted.

MS. XARHOULAKOS: I think it was dissatisfied.

BY MR. NEUBERGER:

Q. Was John also disgusted?

A. At that point he was just dissatisfied that Truman was wanting to do an evaluation and he wasn't getting anything above meets expectations.

MS. XARHOULAKOS: To clarify the record also, you keep referencing a meeting, but I believe he testified it wasn't a meeting.

BY MR. NEUBERGER:

Q. Wherever the conversation was had.

A. Correct, it was a conversation.

MR. NEUBERGER: Thank you.

THE WITNESS: I'm sorry.

MS. XARHOULAKOS: That's all right, don't apologize.

BY MR. NEUBERGER:

Q. At some point you also had a conversation with John about the evaluation where John indicated that he thought that Truman was trying to screw him because he

that were available for Sussex County, Kent County, you know, SCI, boot camp, this and this.

Q. When John raised those concerns with you about the evaluation, what was your response?

A. I told him that I would sit in on the evaluation process with him and Lieutenant Mears. I told him that I had already went over the evaluation and had signed off on the evaluation and I was willing to sit with them.

Q. I'm sorry?

A. And that I was willing to sit with them.

Q. And this is during your first --

A. That was the very first.

Q. First conversation?

A. Yes.

Q. Because we are not sure if it was a meeting or not because it has been so long?

A. No, I think it was a phone call. I'm not sure. I don't want to swear. That's not the only thing I talked to John about.

Q. Got you. Did you think that John's request to have you sit in on a meeting was unreasonable?

A. Doesn't happen often, but not unusual to me, no.

Q. Let me strike that. During that conversation John might have been upset or disgusted about the evaluation issue?

A. Upset.

Q. Upset?

A. Yes.

Q. Do you recall what John said during that conversation?

A. That Truman sent the evaluation up, he found it out through Donna Green.

Q. Who is Donna Green?

A. That is the warden's secretary. And that he never got the opportunity to sign it and see it like we agreed to.

Q. And John was very upset about it?

A. Very upset.

Q. What was your reaction?

A. I told him I would try and take care of it.

Q. Did you?

A. I tried.

Q. How did you try and take care of it?

A. I went to work, went up to the warden's office. I asked the warden if he had John Balas' evaluation. He said he had already sent it up north. I told him I

needed it back because we were going to sit down and review Balas' evaluation, me, him and Mears. He said okay. He got it for me on -- the next day that I talked to him was a Tuesday. I got the evaluation because he goes up for some type meetings on Tuesday mornings, that's how I know it was a Tuesday. I got the evaluation back I think it was Wednesday or Wednesday night, Tuesday or Wednesday night in my mailbox, and then on Saturday John Balas kills himself.

Q. Did ever speak to Truman about submitting the evaluation to the warden's office without John's signature?

A. Indirectly. I mean, you are asking a question that is very hard to answer. You need to be more specific. If I talked to him about the evaluation, the answer is yes. If you needed any more detail than that, I need you to be more specific.

Q. Did you ever speak to Lieutenant Truman Mears about submitting John's evaluation to the warden's office without John's signature?

A. No, not that I can recall.

Q. But you did speak to Lieutenant Mears about the evaluation at some point?

A. Yes.

Q. In general?

A. Yes.

Q. Do you recall what you spoke about?

A. Yeah, yes. I asked -- I told Truman that I wanted to sit down with him and John to do the evaluation. Then, Truman tried to do it that evening, but I was getting ready to start a shift change and couldn't do it. I think he may have came to me one more time and I don't know what was going on, but something was going on and I couldn't do the evaluation then; but, meanwhile Truman was off on vacation, John took vacation, I took vacation and then came back to a lot of trouble.

Q. There was some kind of a scheduling problem with getting it set up?

A. Due to shifts that we work was the main reason and then vacation time.

Q. So --

A. We were only together I think one or two days every other week. You know, we didn't -- because their shift rotated and mine stayed the same and then, of course, their days off conflicted with some days I had off and so forth and so on.

right?

A. Yes, you did.

Q. If we go down to the next paragraph where it's that five sentence paragraph, do you see that?

A. Yes.

Q. Do you see the last sentence where it says -- third sentence where it says, "I am not aware that an officer has to have a union rep present for this"?

A. Yes.

Q. And line above this says he is turning this in without John's signature?

A. Yes.

Q. What was your reaction to Lieutenant Mears turning this in without John's signature in the absence of meeting with you and a union rep?

A. As stated before, I contacted the warden, retrieved the evaluation from personnel so we could do that.

Q. Were you happy with Lieutenant Mears about that?

A. No, I mean, you know, I'm a man of my word. I said we would do something and we would do that.

Q. And that wasn't done, right?

A. No.

A. Yes, it is.

Q. Same thing with when the commissioner says jump, you guys say how high?

A. Yes.

Q. Just the nature of the organization you have worked in for 25 years, right?

A. Yes.

Q. You have to follow commands given to you by a higher ranking officer, right?

A. Yes.

Q. And Lieutenant Mears didn't do that, did he?

A. It was perceived not to have been done that way. I mean, that's what you are assuming. I know more -- there is a lot more to it.

Q. And that's what I'm trying to get at.

A. You want me to say no, he did not do what he was told to do.

Q. You just said you know more so tell me what you know.

A. Okay. When I told Lieutenant Mears that I wanted to sit down with him and Balas, I did not explain to Mr. Mears that I've already told John Balas that. Okay? So, he did not know that I had told John Balas that I'm going to tell Truman and we are going

to sit down. When Truman came in I said, I want to sit down and talk to you. I did not give Truman a direct order. What stemmed Truman to turn it in was something other had happened while I was off. I don't know what took place. So, I mean, but Truman was not given a direct order, no, he was not. He did not know that I had already agreed with John Balas to sit down with this man. I don't need to tell every low-lying officer my business about other people's business.

That's why that was -- you know, it was kind of hard to answer. You asked me did he follow orders? I didn't give him a direct order.

Q. Right, and that was the reason why in the beginning of the deposition I asked if you don't understand a question to ask me.

A. That's why I tried to stop, you know, so we can re-group here and kind of get it straight.

Q. Okay, good. Now, you said you did not give Lieutenant Mears a direct order?

A. No, I did not.

Q. You just told him you wanted to do something?

A. Yes. As a matter of fact, I think the way I said it is I would like to or I want to sit down with you and Balas and do that evaluation. He said no

problem. Do you want to do it tonight? I said I can't tonight, I doing a shift change.

Q. So, a lower ranking officer only has to follow a direct order from a superior officer, they can disregard everything else?

A. It was like in a general conversation, not dealing with a Balas issue at the time. In other words, I was sitting there doing the schedule and I looked up when Truman came in and I said, By the way, I want to sit with you and John when you do that evaluation and he said okay.

Q. You were just saying something you wanted to do?

A. Right.

Q. If the warden tells you he wants something done in the prison, you don't have to do it?

A. I'm not saying that, no, sir.

Q. I'm trying to draw the distinction between when a lower ranking officer has to follow an order and when a lower ranking officer does not have to do something that a superior officer says he wants to do?

A. Yes.

Q. So, it's only orders then?

A. They follow orders and requests, sir, I follow

A. Yes.

Q. Do you recall when you had the conversation with John when John stated to you that he thought that Lieutenant Mears was trying to screw him because of his resignation from the CERT team?

A. It was after they quit. That's all I can tell you. I do not recall.

Q. Fair enough, fair enough. Then, let's go back on Mears Exhibit 11, third page of that. Let's go down to the next couple lines where it says, "This leaves only perfect attendance." Do you see that?

A. Yes.

Q. And you see where it says that, "In light of the rest of Corporal Balas' performance I do not feel that perfect attendance alone, although commendable, is enough to justify exceeds"?

A. Yes.

Q. You read this exhibit when I put it in front of you, right?

A. Yes.

Q. And based on your review of that exhibit would you agree that Wilkinson Exhibit 1, this memo from Major Townsend commending John for his service with the QRT team, is not mentioned in the exhibit, right?

Q. You are supposed to have good work performance?

A. Yes.

Q. Or at the bare minimum you should have average work performance. You are supposed to get along with co-workers?

A. Yes.

Q. Number three where it says, "You are expected to conduct yourself in a professional manner," and it goes down to the next line that says about how you are a role model for inmates and your appearance and conduct should always comply with department guidelines, right?

A. Yes.

Q. You can close that document and put it away.

(Brief recess.)

BY MR. NEUBERGER:

Q. We were just talking about the evaluation and I would like to ask about something a little bit related to that and see if something can jog your memory here. Let me fine the right document. This is previously marked as Mears Exhibit Number 12. Why don't you review that quietly to yourself.

A. (Witness complies.) Okay.

Q. Have you reviewed the document?

A. Yes.

Q. Does this appear to be an official grievance form for COAD, the Correctional Officers Association of Delaware?

A. Yes.

Q. And does it appear to be one that would have been filed by John J. Balas?

A. Yes.

Q. Did John ever talk to you about his filing of a grievance over his evaluation?

A. No.

Q. Did you ever hear about it?

A. No.

Q. Now, this grievance would at least appear on its face to be dated October 4, 2004, right?

A. Yes.

Q. I'm sorry, up top where it says, "Date Filed"?

A. Yes.

Q. You go down where it says, "Signature of Grievant," do you see that on the first page?

A. Yes.

Q. Does that appear to be John's signature?

A. I don't know.

Q. Underneath that it says, "Signature of

Representative"?

A. Yes.

Q. Do you have any idea what name that is?

A. None whatsoever.

Q. Where it says, "Title," it says, "COAD S/S," right?

A. Yes.

Q. Would you understand that to mean COAD shop steward?

A. That's what I would assume.

Q. Have you ever seen grievances from -- have you ever seen COAD grievance forms before filed by CO's?

A. No. This is my first.

Q. Let's turn to the second page now.

A. Okay.

Q. We can skip past most of this because I already asked you questions about the evaluation.

A. Okay.

Q. Would it be fair to say this document which at least purports to be a grievance form addresses the evaluation issue?

A. Yes.

Q. On the second page I would like to go to the eighth line from the bottom. Do you see where it

says, "I feel that Lieutenant Mears has a personal vendetta against me since I have resigned from CERT and he is showing discrimination towards myself. I feel that as a conflict of interest having Lieutenant Mears as my supervisor"?

A. Yes.

Q. John used the words "personal vendetta." I think you mentioned that in a conversation with you he used the term something to the effect of Lieutenant Mears wants to screw me because I retired from -- because I resigned from CERT.

MS. XARHOULAKOS: Let me interject to the questioning on this document as to lack of foundation.

BY MR. NEUBERGER:

Q. You used that term "screw," right?

A. Yes.

Q. Do you recall John ever saying to you that he thought that Lieutenant Mears had a personal vendetta against him?

A. He said that in the incident that we were talking about earlier he thinks that he was out to get him, he was trying to screw him, out to get him. I told you that earlier in the deposition.

Q. But there wasn't another conversation where he

may have said that he thought that there -- where he may have used the words "personal vendetta"?

A. No, no, I never heard the term "vendetta" until I saw this.

Q. The second to last line where it begins, "I believe Lieutenant Mears is evaluating me personally, not professionally."

A. Yes, I see that.

Q. Do you recall ever having a conversation with John about that?

A. Not particularly that way, no.

Q. Based on your 25 years in the DOC would it be appropriate for a supervisor to base a performance evaluation upon personal feelings towards an employee rather than their work performance?

A. No.

Q. You can put that away. Do you recall a time when John came to you about issues with his time cards and Lieutenant Mears?

A. Yes.

Q. And do you recall that John had some concerns that Lieutenant Mears was changing vacation days on the time card slip and marking them as emergency vacation days?

A. Yes.

Q. John was concerned about that?

A. Yes.

Q. Would that be fair to say?

A. Yes.

Q. Was he upset about that?

A. Yes. I would use the term "upset," yes.

Q. Based on your interactions with John did John pride himself on his perfect attendance, for example, or do you not know either way?

A. No, I don't know either way.

Q. At some point you gave an order to Lieutenant Mears to change his notations of emergency vacation days back to regular vacation days, right?

A. Yes.

Q. Did that come about because of your conversation with John about the time card issue?

A. Yes.

Q. And then at some time thereafter you gave the order to Lieutenant Mears to change them?

A. Yes.

Q. Why?

A. To shut John up.

Q. Do you usually give orders to inferior officers

to make other officers shut up?

A. Yes. Not like that. Me using that term, you asked me why I said, I said. I didn't go to Truman and say do this. I guess I did. There is a whole incident behind the time card. Next question. Go ahead.

Q. There is a whole incident, what did you say to Truman?

A. In other words, I went to Truman and I said, Truman, what is up with the time cards and John Balas? He is complaining about you marking these time cards. He said that's what on the rosters and he showed me the rosters and the captains were marking emergency vacation. In other words, they were granting -- I said, Listen, to keep John happy, I said, just fix it. He said, I'm doing it to everybody's card and he showed me other employees. It wasn't just John's card like that, it was other people's.

I said, Go in and change it, our timekeepers don't need that mess anyhow. The watch commanders took care of who was given emergency vacation and who wasn't.

Q. Is the taking of emergency vacation days frowned upon?

A. No, we issue them. I issue them. I have given them. I have given John them, you know.

Q. Did it appear to be that -- do you think John's concern was that his cards were being changed after they had been submitted?

A. Yes.

Q. And that upset him?

A. Yes.

Q. And then eventually you ordered Truman to change them back to the way they were before Truman changed them?

A. From the first time -- yes, I have.

Q. Truman was never disciplined or reprimanded, you just told him to change them?

A. Wasn't nothing to be reprimanded about.

Q. You just ordered him to change them back to the way they were and he did that, right?

A. Yes.

Q. Do you recall a time when John came to you about being denied a copy of his time card?

A. Never, to me, no.

Q. Never to you?

A. No. That I can recall, no. I don't recall.

Q. I can't find the document I want so we'll move

on.

A. I don't recall.

Q. Fair enough. Did John ever ask you -- this would be in the time frame sometime between August of 2004 and his unfortunate death in February of 2005 -- did John ever ask you for a transfer to a different supervisor?

A. No.

Q. Did he ever ask you to have a different supervisor transferred in over him?

A. No.

Q. Did he ever ask for just a transfer, period?

A. No. Ask of me, correct?

Q. Yes, ask of you.

A. No.

Q. Did you ever learn of John asking anyone else for either a transfer himself or a transfer -- or to have a different supervisor transferred in over him?

A. Yes.

Q. Do you know who John talked to about that?

A. Whew, hearsay, no, I don't know.

Q. How did you learn about it?

A. I was told by, whew, I'm trying to remember. Somebody told me. Somebody told me.

Q. Do you recall whether it was Lieutenant Mears?

A. No, it was not Lieutenant Mears. It was somebody in administration.

Q. So --

A. It was an administrator.

Q. So we are on the same page --

A. This was after Balas' death.

Q. After John's death?

A. Yeah, that's when I learned about it.

Q. Would it have been Deputy Warden DeLoy?

A. Might have been.

Q. Is he considered an administrator?

A. Yes.

Q. Who else is?

A. Mike DeLoy, Rick Kearney and the security superintendent, which was Major Townsend at the time.

Q. There was the security superintendent, deputy warden and warden are all considered members of the administration at SCI and Georgetown?

A. Yes.

Q. But you only heard about that after John's death?

A. Yes.

Q. Did John ever come to you and state that he

believed that Truman Mears was excessively monitoring him and trying to find a reason to discipline him?

A. No.

Q. Would that have been proper for a supervisor to try to nit-pick on a supervisee?

A. No.

Q. I think in your conversations with John from August of '04 through February of '05 I think you mentioned that in one conversation he seemed not disgusted --

MR. NEUBERGER: Stacey, what was the word?

MS. XARHOULAKOS: Dissatisfied.

BY MR. NEUBERGER:

Q. I think in one conversation you said John appeared dissatisfied?

A. Yes.

Q. And that was the conversation about the evaluation, right?

A. No.

Q. In some conversation with John about problems in the workplace regarding Truman he appeared dissatisfied, right?

A. Yes.

Q. And in a later conversation he appeared upset

or disgusted, right?

A. Yes.

Q. And then you also dealt with him, for example, about the time card issue?

A. Yes.

Q. And John seemed upset about that, right?

A. Yes.

Q. Did he seem worried?

A. No.

Q. Just based on what you observed.

A. No.

Q. Did he seem stressed?

A. No, no more than -- you know, he acted normal, just the same.

Q. Did you ever talk to Deputy Warden DeLoy about the problems John was having with Truman Mears as his lieutenant?

A. I don't recall, I don't recall if I did.

Q. Did you ever tell Deputy Warden DeLoy that John believed Truman was trying to screw him because of his CERT resignation?

A. I don't think so. I don't know, I don't recall.

Q. Do you think that's something you might have

made a record of if -- strike that. On the screw him comment do you think that might be something you may have made a record of at some point?

A. Myself?

Q. Yes.

A. No.

Q. Let's focus on January of '05 and February of '05 time frame.

A. Okay.

Q. I would like to ask you about your observations of John in that time frame.

A. Okay.

Q. I asked you a general question about whether John seem stressed or things like that, but I would like to ask you that same question in this time frame. In the January of '05 to February of '05 time frame based on your interactions with John did he appear to be stressed?

A. I see no change in attitude. John was always just John. I never seen him -- he didn't bounce off the walls.

Q. Could you explain to me what John being John means?

A. You know, just walk in, if you see him, you

speak. He talks about his kids and go-cart racing and Jonathan and his racing carts and things of that nature. John and me, we -- he would call me back every once in a while and made him pork chops and potatoes and sit and eat and talk and most of it dealing with his child. I never could remember his daughter's name, but he always mentioned Jonathan.

Q. I think her name is Lauren.

A. See, I don't know, he always spoke of John.

Q. No one ever came to you or maybe the better question is did anyone ever come to you and say that John was suicidal?

A. No.

Q. What would you have done if someone had done that?

MS. XARHOULAKOS: Objection, calls for speculation.

BY MR. NEUBERGER:

Q. You can answer.

A. You know, I didn't get to see John that often. So, I would have to get the opportunity to talk to John. You know, I would make the opportunity to talk to him. If there was any indication, I would have gotten him help, but I would not have believed that of

you testified earlier you care about your employees, right?

A. Yes.

Q. They're not just a replaceable cog in the machine that is the DOC?

A. Right.

Q. They're not just a body to you?

A. No.

Q. They're people?

A. Right.

Q. And you care about your people?

A. Some are even friends.

Q. Some are even friends?

A. Yes.

Q. Do you think that's a mark of a good supervisor?

A. Yes.

Q. Now, let's just re-wind a little bit and then we are just about done.

A. Good.

Q. Did you care one way or the other about the CERT resignation?

A. No.

MR. NEUBERGER: Stacey, I have no further

questions.

MS. XARHOULAKOS: I do have a few questions just to clarify.

BY MS. XARHOULAKOS:

Q. Going back to the evaluation when you were questioned about it we jumped around a lot so I want to clarify the timeline. Understanding that you can't remember specific dates do you remember when you first learned about the problem with the evaluation done by Lieutenant Mears for John Balas in 2003 and 2004?

A. When John Balas made note of -- you know, I signed off on the evaluation and then John Balas called me and talked to me about the evaluation.

Q. And that was when John said he was dissatisfied?

A. Yes.

Q. Or you felt that he was dissatisfied?

A. Yes.

Q. Do you recall how soon after that you spoke to Lieutenant Mears about the evaluation?

A. I don't know the length of time because of our work schedules and things, but it was the very first time I had seen him at work standing in my doorway at my office.

Q. Do you see him often at work?

A. No. No, as a matter of fact, I seen him less than I did John.

Q. What did you say to him when you saw him? Do you recall?

A. I told Truman, I said, Look, I'm going to sit down with you and John to do that evaluation. He said okay and that was the end of it. It was just general passing.

Q. Did he ever --

A. He said, Do you want to do it tonight? I said, No.

Q. Lieutenant Mears asked to do the meeting that night?

A. Yes.

Q. And you were unavailable that evening?

A. Correct.

Q. Do you recall how many times you or Lieutenant Mears tried to arrange this meeting?

A. I think -- I'm guessing, I think twice.

Q. Did you or Lieutenant Mears try to arrange the meeting?

A. Two, Truman Mears, twice, Truman Mears.

Q. Remind me again the second time why the meeting

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CINDY L. BALAS a/k/a CINDY L. ADKINS, Executrix of the Estate of CORPORAL JOHN J. BALAS,<br><br>Plaintiff,<br><br>v.<br><br>STANLEY W. TAYLOR, JR., individually and in his official capacity as the Commissioner of Correction; ALAN MACHTINGER, individually and in his official capacity as the Director of Human Resources of the Department of Correction; MICHAEL DELOY, individually and in his official capacity as Deputy Warden of Sussex Correctional Institution; CAPTAIN DAVID WILKINSON, individually; LIEUTENANT TRUMAN MEARS, individually; and DEPARTMENT OF CORRECTION OF THE STATE OF DELAWARE,<br><br>Defendants. | : | C.A.No.<br><br>Jury Trial Demanded |

COMPLAINT

1. This is a civil survival action for compensatory and punitive damages and for injunctive relief brought by the Estate of a deceased Correctional Officer whose death was proximately caused by a Department wide policy of retaliation against Correctional Officers who refused to engage in anti-Union activity or become strike breakers, in violation of the decedent's rights to free speech, association, assembly and

petition under the First and Fourteenth Amendments of the U.S. Constitution. As a citizen the decedent engaged in protected conduct under the First Amendment, by speaking out on matters of public concern, actively associating with his Union and refusing to become a strike breaker in a job action by over 1,187 Union members who also were petitioning government for the redress of grievances and engaging in collective bargaining. The defendants then retaliated against him in such a severe fashion that as a direct and proximate result the decedent committed suicide on February 19, 2005 as a result of their continued retaliation.

## I. JURISDICTION

2. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) and (4), 28 U.S.C. §§ 2201 and 2202, and the First and Fourteenth Amendments to the U.S. Constitution. The cause of action arises under 42 U.S.C. § 1983. The claim arose in this judicial district.

## II. THE PARTIES

3. Plaintiff is the widow of Corporal John J. Balas, a citizen of the United States and a resident of Sussex County, Delaware. She is the executrix of the Estate of John J. Balas, appointed under his Last Will and Testament dated June 15, 1994, and brings this survival action on behalf of the Estate.

4. Corporal John J. Balas was a long term 11 year employee of the Department of Correction who at the time of his death on

February 19, 2005 held the rank of Corporal at the Sussex Correctional Institution. Cpl. Balas had a distinguished career and was a capable and courageous employee. He also was an active member of the Correctional Officers Association of Delaware ("COAD"), the collective bargaining agent for approximately 1,187 employees of the Department of Correction ("Department").

5. Prior to being hired by the Department of Correction, he served in the United States Navy from 1986 to 1989 and subsequently he was a member of the Naval Reserves until 1999. He also served for three years in the Army National Guard of Delaware.

6. Stanley W. Taylor, Jr., at all times relevant hereto, was the Commissioner of Correction of the State of Delaware. He is sued in his individual and official capacity. Defendant Taylor ratified, sanctioned, authorized, approved or participated in the actions challenged in this case. He was aware of the decedent's protected conduct described below and it antagonized him.

7. Alan Machtinger, at all times relevant hereto, was the Director of Human Resources and Development of the Department. He is sued in his individual and official capacity. Defendant Machtinger ratified, sanctioned, authorized, approved or participated in the actions challenged in this case. He was aware of the decedent's protected conduct described below and it

antagonized him.

8. Michael Deloy, at all times relevant hereto, was the Deputy Warden of the Sussex Correctional Institution. He is sued in his individual and official capacity. Defendant Deloy ratified, sanctioned, authorized, approved or participated in the actions challenged in this case. He was aware of the decedent's protected conduct described below and it antagonized him.

9. Captain David Wilkinson, at all times relevant hereto, was the superior officer in the chain of command over the decedent. He is sued in his individual capacity. Defendant Wilkinson ratified, sanctioned, authorized, approved or participated in the actions challenged in this case. He was aware of the decedent's protected conduct described below and it antagonized him.

10. Lieutenant Truman Mears, at all times relevant hereto, was the superior officer for the decedent. He is sued in his individual capacity. Defendant Mears participated in the actions challenged in this case. He was aware of the decedent's protected conduct described below and it antagonized him.

11. Defendant Department of Correction of the State of Delaware (the "Department") is an agency of the State of Delaware, which is only joined in this action for purposes of collecting attorneys' fees and costs.

## III. FACTS GIVING RISE TO THE ACTION

### A. The Context of Protected Speech and Other Activity

12. After several years of ineffective Union representation, on June 1, 2002, COAD was certified as the exclusive bargaining representative for all correctional officers up to and including Sergeants and also for other positions which require basic correctional officer training plus a primary skill.

13. The decedent became an active member of COAD in June of 2002.

14. Throughout 2003 and 2004, COAD began an aggressive campaign of informing the media, elected officials and the general public about various matters of public concern. COAD also engaged in continuing contract negotiations directly with defendant Machtinger who has never missed a contract negotiating session.

15. On behalf of the decedent and other Union members, in 2003 and 2004 COAD engaged in protected conduct in the following areas.

16. First, in the media and before the General Assembly, COAD advocated solutions for the chronic problem of understaffing found throughout the correctional system of Delaware.

17. For example, understaffing created security concerns among officers who as a result were being forced to work overtime. This forced overtime, aka "freezing," resulted in many

officers working 16 hour shifts because the Department was unable to find voluntary replacements. Officers were often forced to work these unexpected overtime shifts instead of being home with their families, making divorces a common occurrence among correctional officers. As a result, morale among the officers sank and officers were quitting faster than new ones could be trained.

18. Second, in the media and before the General Assembly, COAD also advocated wage increases to help recruit and retain trained correctional officers.

19. For example, when COAD's lobbying began, the starting salary was under $27,000 - less than both what Maryland and New Jersey paid. Delaware correctional officers also often remained at their starting salary grade until retirement, to their great economic detriment.

20. Third, in the media and before the General Assembly COAD also exposed security lapses caused by understaffing which led to hazardous conditions within the central and largest prison in the State.

21. For example, in 2004, the danger to the public became real as four separate incidents involving security lapses put the public at risk. One inmate slit his own throat during a trial, another managed to get out of shackles with a paper clip and remained at large for three weeks, one walked away from a work release facility, and one inmate cut another inmate.

Additionally, incidents of attacks on officers within the facilities were increasing.

22. Then on July 12, 2004, a female counselor was taken hostage for hours at the Sussex Correctional Institution which housed 2,400 inmates. She was raped, and almost murdered before a Corrections Emergency Response Team ("CERT") officer was able to reach them from the ceiling and shoot the inmate. The next day, the news media ran stories quoting COAD officials criticizing the Administration for not heeding their warnings about security.

23. As a consequence of COAD's efforts in trying to make the public aware of the difficulties correctional officers were facing, the media began to run headlines and stories disclosing the problems within the correctional system.

24. Despite these efforts, the officer members of COAD grew increasingly upset as they saw no relief in sight, in spite of the barrage of publicity. They were continuously faced with an Administration which did nothing to help the problems with understaffing and freezing, low wages and security lapses.

25. As tempers mounted, officers at the Sussex Correctional Institution spontaneously demanded an acceptable response to their complaints. Despite being promised an increase in hazardous duty pay and small raises by the General Assembly, correctional officers in the Court and Transportation Unit

organized a job action and refused to work the voluntary overtime that was critical to their assignment.

26. As a result of this job action, on July 26, 2004 defendant Taylor was embarrassed to learn that many of his court and transportation officers were not delivering prisoners for trial. Judges and prosecutors grew increasingly concerned as prisoners were missing deadlines for arraignments and trials were postponed.

27. Defendant Taylor tried to end the job action by meeting with Union leaders to discuss implementing salary adjustments already authorized by the Legislature, but which had been delayed. Instead, Union leaders decided to endorse the spontaneous correctional officers' job action.

28. The effect of all this Union action and the public media outcry regarding all these issues antagonized defendant Taylor, his administration, and all the other defendants.

29. Additionally, the Governor became more concerned about her chances for re-election in November 2004 and she issued statements trying to defuse the situation. But her remarks were seen by the Union and the public as inflammatory.

30. As the job action grew more successful, the Governor filed a lawsuit in Chancery Court and sought a Temporary Restraining Order ("TRO") naming COAD leaders as defendants. The TRO was denied the next day.

31. On August 6, 2004, the same day as the TRO hearing, defendant Taylor activated the CERT Team members to work as court and transportation officers to fill the void of correctional officers who refused to work voluntary overtime. Because he had ordered this remedy to the job action by his employees, he was kept fully informed by his subordinates of the decedent's refusal, and that of other CERT Team members, to be strike breakers, contrary to his orders. Their opposition to his orders antagonized him.

32. Cpl. John J. Balas was a CERT Team member who was ordered by defendant Taylor to help break this job action by his co-workers and Union members.

**B. THE FORM AND CONTENT OF SPEECH AND PROTECTED ACTIVITY**

33. In the midst of the job action in August of 2004, decedent and many other correctional officers who served on the elite CERT Team were asked to abandon their normal job duties, in effect cross the picket line, and work voluntary overtime as court and transportation officers. They were asked to become strike breakers.

34. However, when the ten CERT Team members reported for duty to serve as court and transportation officers, they were ridiculed by their fellow co-workers who blurted profanities at them and turned their backs to them because they were crossing the picket lines.

35. The decedent, as well as the other nine CERT team members, then decided at the end of their shift to make a statement in support: of the job action; of COAD their Union; of the many issues, like forced overtime and freezing, low wages and security lapses, which Union members were advancing through proper channels both within the prison system, in the media, with the general public, and with legislators.

36. At the end of their shift as court and transportation officers, decedent and the nine other CERT members tendered their resignation directly to the Warden and handed in their equipment. By this action they engaged in symbolic speech in opposition to defendant Taylor's orders to break the job action by his employees.

37. The decedent and the other CERT Team members also actually spoke out and refused to be strike breakers and in effect cross the picket line. Each of them spoke out and conveyed the message that they supported the job action, opposed forced overtime and freezing, low wages and security lapses. This message was communicated up the chain of command to each individual defendant and they were antagonized by it.

38. As stated, defendant Taylor was fully informed by his subordinates, including defendant Machtinger, of the decedent's resignation from the CERT Team, his symbolic and actual speech, and all of this antagonized him.

39. On August 7, 2004, the Delaware State News also ran an article discussing the problems surrounding the overtime issues in the Department of Correction and specifically mentioned that ten CERT Team members handed in their equipment and resigned their positions on the team after being forced to cross the picket line and work voluntary overtime as court and transportation officers. All the defendants read this news story.

**C. THE DECEDENT ACTED AS A PRIVATE CITIZEN**

40. All of the decedent's speech and other protected activity was taken in his capacity as a private citizen commenting on matters of public concern.

41. Nothing he said or did was pursuant to his ordinary and regular job duties.

42. Decedent served as a Corporal in the Property/Receiving Room. His essential job duties included processing prisoners and transfers, logging each prisoner's personal belongings upon arrival to the prison, issuing prison attire and collecting the prisoners' paperwork.

43. In addition, decedent also served as a CERT Team member. CERT is an elite group of chosen correctional officers who serve on the CERT unit in addition to their normal duties as correctional officers. CERT officers compete for promotion to the CERT team by passing rigorous physical and mental tests. The

CERT unit ensures public safety, as well as, the safety of department staff and offenders. CERT develops and implements security programs for institutions based on the individual needs as well as trains and develops selected groups of staff to perform advanced, high-risk, or community operations. CERT acts as technical advisors to Wardens and provides tactical responses during emergency situations. CERT also assists with escapee and erroneous release operations.

44. In August, the ten CERT members were asked to fill in for the court and transportation officers who usually would be forced to work overtime to accommodate the prisoners' court schedules. These court and transportation officers were responsible for the transportation of DOC offenders to their court appearances and for the transfer of offenders from one facility to another.

45. None of the three aforementioned jobs required decedent to speak out in support of union activity.

46. When decedent spoke up in support of his Union's activity, decedent was speaking as a union member and private citizen and not as a correctional officer, CERT member or temporary court and transportation officer.

47. All of the decedent's protected speech and activity was taken in his capacity as a private citizen reflecting matters of public concern. He knew the dangerous conditions under which

correctional officers worked threatened their own safety, the safety of inmates and the public. Upon realizing that the Union members' job action could improve those conditions, he elected to side with his fellow union members.

**D. THE POLICY, PRACTICE AND CUSTOM OF RETALIATION**

48. Defendants Taylor, Machtinger and Deloy have an official policy, practice or custom of harassing and retaliating against any COAD Union member who speaks out on or acts to advance issues of concern to the Union membership, such as opposition to understaffing, forced overtime, low pay, security lapses, or other issues facing the workforce.

49. They have communicated this policy to their managers throughout the Department.

50. Defendant Machtinger is in a position to implement this policy through the Human Resources Division which controls, among other things, the terms, conditions and privileges of employment, promotions, assignments, transfers, shifts and days off.

51. Machtinger is viewed as the enforcer for Commissioner Taylor and managers throughout the Department are aware of his and Taylor's anti-union animus. In the past, officers have been warned to avoid union activity if they want to advance in the Department. See Del. Correction Officers Ass'n. v. State of DE, Dept. of Correction, et al., 2003 WL 23021927 (Del.Ch. Dec. 18, 2003).

52. Defendants Wilkinson and Mears were aware of the policy, practice or custom of harassing and retaliating against COAD members and took steps to implement it with reference to the speech and other protected activity of the decedent.

53. Defendants Wilkinson and Mears then retaliated against and harassed the decedent.

54. Defendants Deloy, Machtinger and Taylor were aware of that retaliation and harassment and sanctioned, authorized, approved or participated in the retaliation and harassment.

**E. ADVERSE ACTION AGAINST THE DECEDENT**

55. After the decedent resigned from the CERT Team, he feared immediate retaliation by Mears, who still served as his direct supervisor. Decedent asked Capt. Wilkinson and Deputy Warden Deloy for a transfer to a different supervisor. But they refused, despite the fact that they each knew of the symbolic and actual speech of the decedent in opposition to defendant Taylor's orders and that this would cause defendant Mears to be antagonistic to the decedent.

56. At all times, defendant Mears was aware of the reasons the ten CERT team members resigned. He had even participated in a CERT team meeting to discuss their possible resignation.

57. In fact, Mears was one of the CERT Team members.

58. Mears was the only active CERT member (not on vacation or on active duty) who refused to stand by his fellow CERT team members and resign in August of 2004.

59. The month after the decedent resigned from the CERT team, the retaliation by Mears began. It included, but was not limited to, the following.

60. First, on September 26, 2004, Mears approached decedent with his 2004 annual performance evaluation and asked him to review and sign it. The decedent learned that for the first time in his career he had received a mediocre performance evaluation, rating him only at "Meets Expectations."

61. Prior to his resigning from the CERT team, the decedent had consistently received rankings of "Exceeds Expectations."

62. In previous evaluations Mears had recognized the decedent's perfect attendance records and also had mentioned his CERT membership, as areas where his performance was distinguished or exceeded expectations and ranked him as "Exceeds Expectations."

63. However, in the September 26, 2004 evaluation, Mears refused to recognize decedent's commendations for his perfect attendance record for four consecutive years and his CERT membership for the majority of the year.

64. Mears also refused to mention or consider decedent's commendation for his instrumental part in the recertification of

the Quick Response Team ("QRT") training during February and March of 2004.

65. The decedent believed that Mears was evaluating him with personal bias as opposed to professional objectivity. He then stated that he would sign the evaluation at a later date.

66. When the decedent requested a copy of the evaluation, Mears refused and upon further questioning stated that decedent's commendations were not enough to warrant a ranking of "Exceeds Expectations" and they did not need to be on the evaluation as they had been previously.

67. Since the decedent had dreams of one day rising to the rank of a prison Warden, he reasonably feared that this mediocre performance evaluation and his supervisor's hostility would hinder his rising up the ranks.

68. Further, under the State Merit Law, 29 Del.C. §5927, performance records are considered in determining salary increases, promotions, transfers, and other employment actions. So this bad evaluation would have a direct negative effect on the decedent's salary progression and other terms and conditions of employment.

69. On October 4, 2004, the decedent then filed an Official Grievance with COAD through his shop steward disputing the performance evaluation and asked that the rating to be increased from "Meets Expectations" to "Exceeds Expectations."

70. Later on January 9, 2005, Mears again began pressuring the decedent to sign the mediocre performance evaluation. But the decedent stated he would not sign it until Capt. Wilkinson and a union representative were present to review the evaluation. This disgusted and frustrated Mears who was trying to bully him into signing the performance evaluation.

71. That same day decedent called and advised Capt. Wilkinson of Mears' actions and reiterated his request that he and a union representative be present to review the evaluation.

72. By February 7, 2005, the decedent still had not received a copy of his evaluation.

73. He later learned from the Warden's secretary that his evaluation had been submitted without his knowledge and "Refused to Sign" had been written in place of his signature.

74. Upon learning this, the decedent immediately called Capt. Wilkinson and Mike Deloy to inform them of this fact.

75. Prior to his death on February 19, 2005, the decedent never received his 2004 evaluation and he was never given the opportunity to meet with Capt. Wilkinson and a union representative to review his mediocre performance evaluation which he expected to have a crushing effect on his career.

76. Second, the decedent also was watched and monitored constantly by defendant Mears who was seeking a performance misstep to use as a basis for discipline against him. For

example, he was once shown a note pad where someone was keeping chronological notes of his performance and whereabouts.

77. Third, as part of his home record keeping, the decedent periodically made copies of his time cards. In September of 2004 he noticed that Mears was tampering with and altering his timecard to show that he had taken "emergency vacation days," which are frowned upon. But on each of those days the decedent had legitimately taken holidays or vacation days, contrary to Mear's false claim.

78. The decedent immediately brought this to the attention of Capt. Wilkinson. Eventually Mears was forced to change the decedent's timecard back to its original state. But Mears was never disciplined, reprimanded or told to stop his retaliatory behavior.

79. Fourth, in January of 2005 the decedent did not receive a copy of his updated timecard from Mears. This violated work rules which require each record keeper to give the employee a copy of his timecard at the end of the year. This delay caused the decedent to fear that Mears was up to something else to prejudice his career path. Finally, after specifically demanding a copy, Mears reluctantly turned over a copy of the timecard.

80. Fifth, the decedent constantly demanded a transfer from under Mears, to whom he had to report, so that the retaliation against him would be alleviated. It was hoped that this would

help his deteriorating mental and emotional condition. But defendants Wilkinson and Deloy never took any action to transfer the decedent. In fact, his requests were denied.

81. Sixth, the decedent informed defendant Wilkinson, and often defendant Deloy, of the retaliatory actions taken against him by Mears. But they never took steps to stop Mears from retaliating against the decedent. Instead they ratified, sanctioned, and approved of his misconduct, despite their personal awareness of it.

82. As a direct and proximate result of the harassment he was experiencing from Mears, the decedent began to experience excruciating headaches. He underwent medical tests and he was prescribed medication.

83. The decedent then concluded that the harassment would continue and that the career advancement which he hoped for would never happen.

84. In February of 2005, operating under extreme work-related stress, the decedent warned his close friends that he intended to kill himself.

85. Immediately the decedent's friends and family attempted to get him professional help by taking him to a mental health facility, where his suicidal ideation was recorded.

86. In an attempt to get the decedent as much medical assistance as possible, one of his friends reported his suicidal

ideation to defendant Deloy, three weeks before he committed suicide. As his manager who had driven the decedent to this state, Deloy refused to bring any State of Delaware or Human Relations Personnel resources to the assistance of the decedent. No preventative or therapeutic action was taken by Deloy or any manager of the decedent to prevent his suicide despite the forewarning that a suicide was imminent. This inaction violated all standards of professional personnel management and State of Delaware training and procedures.

87. The decedent also continued to be stressed due to his unbearable working conditions and he submitted Leave Request Forms for vacation to relieve his stress. He was not granted vacation leave.

88. During this time, the decedent's family and friends continuously attempted to get him help. Finally, on February 15, 2005 the decedent agreed to see his family doctor who prescribed Colanzepam for his work-related anxiety.

89. Then, at the insistence of his wife, on February 18, 2005, the decedent called and scheduled an appointment with a psychiatrist, but the only available appointment was for June 8, 2005, four months later.

90. As a direct and proximate result of the actions of the defendants, on February 19, 2005, Corporal John J. Balas committed suicide in his backyard while his wife and children were in their home. He administered a self-inflicted gunshot

wound to his head, leaving as his survivors his dear wife, Cindy L. Balas, his beloved son, Jonathan Balas, presently age 11, and his beloved daughter, Lauren Balas, presently age 9. His widow has subsequently remarried and is now known as Cindy L. Adkins.

**F. DAMAGES**

91. As a direct and proximate result of the actions of the defendants as detailed herein, the continued harassment and stress was too much for the decedent to bear.

92. Correctional officers experiencing job-related stress have an average life expectancy about 20 years less than the general population.

93. As a direct and proximate result of the actions of the defendants, the decedent's Estate has suffered damages which include burial costs, pain and suffering of the decedent prior to his death, loss of earnings and pension benefits over his expected lifetime had he not killed himself, loss of consortium with his wife, and other pecuniary losses, emotional pain, suffering, disappointment, anger, inconvenience, mental anguish, loss of enjoyment of life, mental and physical pain, anguish, humiliation, embarrassment, injury to reputation, and other non-pecuniary losses and injury.

**G. EVIDENCE OF CAUSATION**

94. There is a causal link between First Amendment protected activity and adverse action, as set forth above. This is demonstrated by the following:

(a) Defendants were personally aware of decedent's protected activity.

(b) They had a motive to retaliate against decedent who was a member of the newly certified Union which on all fronts was pressing management and the Department for better treatment of its members, while also exposing mismanagement within the Department.

(c) The temporal proximity is unduly suggestive. The retaliation began the month after Cpl. Balas resigned from the CERT team.

(d) There is circumstantial evidence of a pattern of antagonism towards plaintiff. For example, defendant Deloy ignored a direct warning that his employee was suicidal, in violation of all professional management training and standards. Cpl. Balas also was denied a requested transfer, requested vacation, received a mediocre performance evaluation, was refused a meeting to review this evaluation, endured having his timecard altered, and had his every move watched and monitored.

(e) Lies and manufactured false reasons have been offered by the defendants to explain the suicide of the decedent.

(f) State law was violated when his timecard records were violated. Altering a public document generated by a State employee is against the laws of Delaware.

(g) The evidence as a whole shows that at a time of intense public dispute with COAD, defendants saw to it that decedent was punished for his pro Union activity so that a message was sent to the membership that this also would happen to their careers if they pushed management too hard.

95. First Amendment protected activity was a substantial or motivating factor in the adverse action against the decedent.

96. The natural probative force of the evidence demonstrates causation.

97. A reasonable person of ordinary firmness would be deterred from exercising their First Amendment rights when defendants humiliated him by refusing to recognize his exceptional achievements and stellar attendance in his performance evaluation, altered his time cards to reflect poorly on his attendance, and further attacked his professionalism, loyalty, leadership, and character by monitoring and tracking his every move.

98. The totality of retaliatory adverse action taken by defendants against decedent is sufficient to deter any person of ordinary firmness from exercising their First Amendment rights to free speech, association, assembly and petition.

99. Any reasonable person of ordinary firmness would be deterred from exercising their First Amendment rights to free speech, association, assembly and petition knowing that subsequent harassment would be so severe that it would lead to his suicide.

100. The defendants cannot prove by a preponderance of the evidence that absent a constitutional violation they would have

any other reason to treat the decedent unfairly and take adverse action against him.

## IV. ALLEGATIONS REGARDING THE DEFENDANTS' CONDUCT

101. The individual defendant's actions violated clearly established federal constitutional rights of which any official would have known, including two decades of Third Circuit case law prohibiting retaliation against public employees for protected speech.

102. At all times material hereto the individual defendants participated in, authorized, and sanctioned the federal constitutional deprivations described above.

103. At all times material hereto the individual defendants and their agents were acting under color of law. The federal constitutional deprivations described herein are fairly attributable to the State.

104. The actions of the defendants and their agents or employees were deliberately, intentionally, willfully, purposefully, and knowingly done in violation of federal constitutional rights and because of the exercise of those rights.

105. The defendants either knew or showed a negligent or reckless disregard for the matter of whether their conduct violated federal constitutional rights.

106. Their actions were outrageous and taken with evil

motive, in bad faith, out of personal animus and without any reasonable grounds to support them.

107. Their actions were wanton and malicious or taken with reckless indifference to federal constitutional rights.

108. The exercise of rights under the U.S. Constitution made a difference in all actions adverse to the decedent.

109. The exercise of these rights was a motivating, substantial or determinative factor in all actions adverse to Plaintiff.

110. The defendants did not reasonably believe that the actions they took were necessary to accomplish any legitimate governmental purpose.

111. The defendants' actions were motivated by bias, bad faith, and improper motive.

112. The defendants' actions constitute an abuse of governmental power.

113. The defendants' actions do not further any narrowly drawn important, substantial or compelling governmental interest.

114. The defendants' actions are not so reasonable as to further any governmental interest asserted and do not closely fit the goal of serving those governmental interests.

**COUNT I (First Amendment - Public Employee Free Speech Retaliation)**

115. Plaintiff repeats and realleges paragraphs 1-114 set out above.

116. The decedent in his private capacity as a citizen spoke out on issues of public concern under the First Amendment, for example, understaffing, forced overtime, low wages and security lapses. It was not part of his routine job duties to engage in such speech.

117. By its content, form and context, at all times the decedent spoke out about matters of public concern.

118. All of the decedent's speech was non-disruptive of any interest of his employer and it was on matters of concern to the public at large. His speech related to matters of political, social and other concern to the community.

119. The individual defendants were aware of the decedent's protected speech and it antagonized them.

120. There is a causal link between First Amendment protected activity on matters of public concern and adverse action.

121. The defendants took action adverse to the decedent as a direct and proximate result of and in retaliation for his First Amendment protected speech on matters of public concern. There is a temporal and causal relationship between the decedent's aforementioned protected speech and conduct, and adverse employment action. First Amendment protected activity was a substantial or motivating factor in the adverse employment action. The defendants cannot prove by a preponderance of the

evidence that absent a constitutional violation they would have other grounds to act against the decedent.

122. The decedent's constitutional right to freedom of speech was denied under the First Amendment of the U.S. Constitution and 42 U.S.C. § 1983.

**COUNT II (First Amendment - Public Employee Petition Clause Retaliation)**

123. Plaintiff repeats and realleges paragraphs 1-122 set forth above.

124. The decedent participated in historically recognized petitions of government for a redress of grievances which were not a sham.

125. For example, through his Union he petitioned the General Assembly for salary increases as a resolution for the chronic understaffing and forced overtime problems within the Department.

126. Through his Union he also informed legislators of the fact that the correctional system is broken and in need of repair. Security lapses occur frequently and endanger the lives of many persons due to understaffing and forced overtime.

127. Through his Union he also petitioned the Governor about many of the same matters.

128. The defendants took action against the decedent as a direct and proximate result of and in retaliation for the exercise of his First Amendment right to petition the government

for redress of grievances. There is a temporal and causal relationship between the decedent's aforementioned protected petitioning and adverse employment action. First Amendment protected activity was a substantial or motivating factor in the adverse employment action. The defendants cannot prove by a preponderance of the evidence that absent a constitutional violation they would have had reasons to adversely treat the decedent.

129. The decedent's constitutional right to petition the government for redress of grievances was denied under the First Amendment of the U.S. Constitution and 42 U.S.C. § 1983.

**COUNT III (First Amendment - Assembly, Petition, Association and Expression - Retaliation for Union Activities)**

130. Plaintiff repeats and realleges paragraphs 1-129 set out above.

131. The decedent has maintained an active affiliation with COAD from its being certified as the collective bargaining agent through the present. He was a member of COAD and each of the defendants were personally aware of his membership.

132. The decedent in effect refused to cross a Union picket line. He engaged in symbolic speech in support of a work action by members of his Union. He also publically spoke out and refused to be a strike breaker.

133. The Defendants were aware of the decedent's protected Union activities and they were antagonized by the protected activity.

134. There is a causal link between First Amendment protected Union membership and other activities and adverse action.

135. First Amendment protected assembly, petition, association and expression were a substantial or motivating factor in the adverse action against the decedent. The natural probative force of the evidence demonstrates causation.

136. The defendants cannot prove by a preponderance of the evidence that absent a constitutional violation they would have reasons to take adverse action against the decedent.

137. The totality of retaliatory adverse action taken by the defendants against decedent is sufficient to deter any person of ordinary firmness from exercising their First Amendment rights to assembly, petition, association and expression.

138. The defendants took action adverse to the decedent as a direct and proximate result of and in retaliation for his First Amendment protected assembly, petition, association and expression. There is a temporal and causal relationship between his aforementioned protected activity and adverse employment action. First Amendment protected activity was a substantial or motivating factor in the adverse employment action. The

defendants cannot prove by a preponderance of the evidence that absent a constitutional violation they would have grounds to take action adverse to the decedent.

139. The decedent's constitutional rights to assembly, petition, association and expression have been denied under the First Amendment of the U.S. Constitution and 42 U.S.C. § 1983.

**Wherefore,** Plaintiff prays that the Court:

A. Enter judgment against the defendants.

B. Enter a declaratory judgment declaring the acts of the defendants to be a violation of the decedent's constitutional rights.

C. Enter a judgment against the individual defendants, jointly and severally, for funeral expenses and other compensatory damages, including lost wages, back pay, pension and other benefits, for future or front pay, loss of earning capacity, emotional distress, humiliation, embarrassment, and injury to reputation.

D. Enter separate judgments against the individual defendants for punitive damages.

E. Issue a mandatory injunction ending the continuing illegal actions of defendant Taylor, Machtinger and Deloy and baring them from considering protected speech, assembly, association, or petition, whenever considering the terms, conditions and privileges of employment of any correctional officer who is a member of COAD; and also ordering him to send a directive to all administrators in the Department advising that protected speech, association, assembly and petition by COAD members is not to be considered as a negative factor in terms, conditions or privileges of employment in the Department.

F. Issue a reparative injunction directing that the individual defendants place a signed document in

the decedent's personnel file apologizing for violating decedent's constitutional rights.

G. Award Plaintiff attorney's fees, costs and pre and post judgment interest for this action.

H. Require such other and further relief as the Court deems just and proper under the circumstances.

**THE NEUBERGER FIRM, P.A.**

/s/ Thomas S. Neuberger
**THOMAS S. NEUBERGER, ESQ. (#243)**
**STEPHEN J. NEUBERGER, ESQ. (#4440)**
Two East Seventh Street, Suite 302
Wilmington, Delaware 19801
(302) 655-0582
TSN@NeubergerLaw.com
SJN@NeubergerLaw.com

Attorneys for Plaintiff

Dated: September 25, 2006

Cindy Adkins\PLEADING\COMPLAINT - FINAL.wpd

Office of Management and Budget/Human Resource Management

Correctional Lieutenant (#MBDB04 )

$38,528.00 Yearly Min / $51,371.00 Yearly Mid / $64,214.00 Yearly Max

 Email Me when a Job Opens for the above position(s)

Summary Statement

A class incumbent is responsible for supervising and participating in the maintenance of discipline and security within a correctional and/or detention facility for an assigned program.

Nature and Scope

A class incumbent reports to a technical superior, typically a Staff Lieutenant, and is responsible for directing and participating in the enforcement of all rules and regulations affecting discipline, security and housekeeping within a designated security location, for an assigned shift or an assigned program. An incumbent is responsible for overseeing one or more of the following posts depending upon specific assignment: inmate living quarters, dining hall, infirmary, transportation, visiting rooms, CERT, tower work detail, recreation, control room, mailroom, booking/receiving and perimeter patrol. A class incumbent is responsible for implementing and interpreting policies and procedures ensuring the redeployment of staff, and for the enforcement of rules, regulations and policies of the institution and the department. An incumbent directs and may participate in periodic counts of inmates to assure their location and custody and the searching of inmates, employees, visitors, cellblocks and/or other structures to detect prohibited contraband or defects in the security system. A class incumbent provides training and guidance to both newly hired and experienced employees. Incumbents conduct inspections of staff assigned to the shift/location to insure timely arrivals, proper uniforms and conduct. Incumbents counsel and conduct performance appraisals of assigned staff. In addition, a class incumbent works with counseling staff and institutional administration regarding inmate security classifications, parole eligibility and disciplinary proceedings. An incumbent conducts ongoing inspections of assigned areas to ensure institutional and departmental policies and procedures are enforced. Incumbents also work with the more difficult inmates concerning personal and behavior problems. An incumbent maintains records and prepares or oversees the preparation of various reports regarding activities, problems and/or incidents which occurred during the assigned shift or at assigned locations. A significant aspect of the work involves working effectively with the inmates in order to obtain their confidence and cooperation.

Essential Functions

Essential functions are fundamental, core functions common to all positions in the class series and are not intended to be an exhaustive list of all job duties for any one position in the class. Since class specifications are descriptive and not restrictive, incumbents can complete job duties of similar kind not specifically listed here.

- Directs and participates in the maintenance of discipline, order, security and housekeeping of assigned locations or shift.
- Directs and participates in periodic shakedowns of buildings, grounds and cell blocks to detect contraband or defects in the security system.
- Implements prescribed policies and procedures, insures the enforcement of institutional/departmental rules and regulations and interprets for staff and inmates.
- Reviews and evaluates the work of assigned staff. Provides training to newly hired and experienced

000387

A000278

employees.

- Works with institutional administration, counseling and classification staff in the determination of inmate security classifications, parole eligibility and disciplinary proceedings.
- Prepares reports and maintains records.
- May be responsible for scheduling of security staff.
- Oversees inmate timekeeping and payroll activities.

Knowledge, Skills and Abilities

The intent of the listed knowledge, skills and abilities is to give a general indication of the core requirements for all positions in the class series; therefore, the KSA's listed are not exhaustive or necessarily inclusive of the requirements of every position in the class.

- Knowledge of the rules, regulations, policies and procedures of the facility and department.
- Knowledge of standard procedures for maintaining security.
- Knowledge of supervisory principles and practices.
- Knowledge of self defense, riot control and the use of firearms and other protective equipment.
- Knowledge of federal/state laws governing the rights of inmates.
- Knowledge of the techniques used in the detection of weapons and other contraband.
- Knowledge of the attitudes, behaviors and group habits of persons in custody.
- Skill in self defense techniques and the use of restraint procedures.
- Skill in the use of assigned weapons and other protective equipment.
- Skill in the motivating, directing, training and guiding assigned correctional staff.
- Skill in the interpretation and application of institutional/departmental rules, regulations, policies and procedures.
- Ability to act quickly and calmly in an emergency.
- Ability to communicate effectively both orally and in writing.
- Ability to establish and maintain effective working relationships with employees and inmates or detainees.

Job Requirements

**JOB REQUIREMENTS for Correctional Lieutenant**
Applicants must have education, training and/or experience demonstrating competence in each of the following areas:

1. At least two years experience as a Correctional Sergeant or equivalent experience OR at least four years experience as a Correctional Officer or equivalent experience.
2. Possession of a Drivers License.

CLASS: MBDB04 EST: 7/1/1987 REV: FORMERLY JOB CLASS: 45727

B00388



STATE OF DELAWARE
DEPARTMENT OF CORRECTION
80 MONROVIA AVENUE
SMYRNA, DELAWARE 19977

OFFICE OF
THE COMMISSIONER

TELEPHONE: (302)739-5601
FAX: (302)739-6740

May 7, 1997

John Balas
Rt. 4 Box 137 C
Milton, Delaware 19968-9632

Dear Mr. Balas:

This letter is to offer you our official congratulations and commend you on your perfect attendance record for 1996. We personally appreciate this achievement.

The Department of Correction is particularly dependent on loyal, conscientious and dependable employees. You have exhibited these qualities by your perfect attendance.

You and employees like you are the backbone of the Department, enabling it to function smoothly and effectively. We salute you and ask for your continued commitment.

Alan Machtinger
Director, Human Resources & Development

Stan Taylor
Commissioner

U00134



STATE OF DELAWARE

DEPARTMENT OF CORRECTION

245 MCKEE ROAD
DOVER, DE 19904

OFFICE OF THE
COMMISSIONER

TELEPHONE: (302) 739-5601
FAX: (302) 739-8221

May 6, 1999

John Balas
RT 4, Box 137 C
Milton, DE 19968

Dear John :

This letter is to offer you our official congratulations and commend you on your perfect attendance record for 1998. We personally appreciate this achievement.

The Department of Correction is particularly dependent on loyal, conscientious, and dependable employees. You have exhibited these qualities by your perfect attendance.

You and employees like you are the backbone of the Department, enabling it to function smoothly and effectively. We salute you and ask for your continued commitment.

Alan Machtinger
Director
Human Resources and Development

Stan Taylor
Commissioner



STATE OF DELAWARE
DEPARTMENT OF CORRECTION
SUSSEX CORRECTIONAL INSTITUTION
R.D. 1, Box 500
GEORGETOWN, DELAWARE 19947

TELEPHONE (302) 856 - 5280

January 26, 1998

To: John Bales

I would like to take this opportunity to congratulate you on your promotion to Correctional Corporal. Your new position is of vital importance in the future as the responsibilities of the shift Corporal become more involved. I am confident that you will work along with your Unit Managers, (Lieutenants), and and Sergeants to accomplish the tasks ahead of us. Positions in the New Admin. / Pretrial Unit will be posted for bid when you come on board. Effective 2-1-98

Sincerely,

Capt. Flaherty

Gerard Flaherty, Captain
In-House Job Bids Chairman

xc: Candidate
file

RECEIVED
JAN 0 8 1997
PERSONNEL

The State *of* Delaware

# Employee Performance Plan

Name, Job Title: Correctional Officer [SS# ]Balas, John 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
Department-Division-Section: Department of Correction, Sussex Work Release Center, 38-06-00-007
Supervisor, Job Title: Billie R. Smith, Correctional Lieutenant
Date, or time period covered: January 1, 1996 to December 15, 1996November 15, 1996

What is the agency mission and/or operational needs that this employee's job performance will affect?

The mission of the Deparment of Correction is to: provide protection to the public by incapacitating offenders in prison and by providing supervision for offenders in the community; provide safe and humane facilities and services for offenders in prison; promote long-term public safety through programs of rehabilitation for offenders by addressing problems which lead to future criminal activity; provide a range of correctional programs necessary to meet the needs of both society and the individual while implementing court ordered sanctions in the least restrictive environment consistent with public safety. To that end, a correctional officer is responsible for maintaining security and discipline in the work release facility and for the supervision of residents while in the community.

Please list the duties, projects or performance standards that will be used for evaluation purposes. *Note:* current job dimensions may be substituted and/or included.

Attendence-reports for duty on time and uses leave in accordance with established procedure.
Compliance-follows verbal/written instructions and established procedures with little supervisory intervention.
Critical/emergency response-maintains composure and responds quickly and appropriately to critical/emergency situations.
Interpersonal Interaction-treats others equitably with respect and fairness; is polite and tactful; is cooperative, supportive, and effective in interactions with co-workers.
Resident supervision-appropriately monitors and/or directs the activities of residents; controls residents activities as required.
Safety-attentive to safety measures and adheres to effective safety practices and procedures.
Security-follows security procedures; is alert to risks/threats to security.
Verbal/written communication-presents facts, ideas, and concepts which can be easily and clearly understood; listens well and responds appropriately; written material addresses the issue at hand and requires minimal corrections/changes.

[signature] 23DEC96 — Employee/date
Billie R. Smith 23 Dec 96 — Evaluator/date
[signature] 12/23/96 — Reviewer/date

000104



The State *of* Delaware Employee Performance Plan

Name, Job Title: Correctional Officer [SS#] Balas, John J.- Correctional Officer-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
Department-Division-Section: Department of Correction, Sussex Work Release Center, 38-06-00-007
Supervisor, Job Title: Billie R. Smith- Correctional Lieutenant
Date, or time period covered: January 1, 1996 to December 15, 1996

What is the agency mission and/or operational needs that this employee's job performance will affect?

The mission of the Department of Correction is to: provide protection to the public by incapacitating offenders in prison and by providing supervision for offenders in the community; provide safe and humane facilities and services for offenders in prison; promote long-term public safety through programs of rehabilitation for offenders by addressing problems which lead to future criminal activity; provide a range of correctional programs necessary to meet the needs of both society and the individual while implementing court ordered sanctions in the least restrictive environment consistent with public safety. To that end, a Correctional Officer is responsible for maintaining security and discipline in the work release facility and for the supervision of residents while in the community.

Please list the duties, projects or performance standards that will be used for evaluation purposes. *Note:* current job dimensions may be substituted and/or included.

ATTENDANCE: employee can be depended upon to report for duty/appointments/assignments as scheduled; uses leave in accordance with established procedure.

COMPLIANCE: employee can be depended upon to follow verbal/written instructions, established procedures, and standards with little supervisory intervention.

CRITICAL/EMERGENCY RESPONSE: employee maintains composure and responds quickly and appropriately to critical/emergency situations.

INTERPERSONAL INTERACTION: employee treats others equitably with respect and fairness; is polite, tactful, and effective in interactions with residents and/or the public; is cooperative, supportive, and effective in interactions with co-workers.

RESIDENT SUPERVISION: employee appropriately monitors and/or directs the activities of residents with emphasis on eliminating risks in the community and compliance with program rules and court-imposed conditions of supervision; controls resident activities as required.

SAFETY: employee is attentive to safety measures and adheres to effective safety practices and procedures.

SECURITY: employee follows security procedures; is alert to risks/threats to security and acts accordingly.

VERBAL COMMUNICATION: employee presents facts, ideas, and concepts which can be easily and clearly understood; listens well and responds appropriately; can elicit information from others.

WRITTEN COMMUNICATION: employee presents facts, ideas, and concepts which can be easily and clearly understood; written material addresses the issue at hand and requires minimal corrections/changes.

[signature] 23 Dec 96 — Employee/date

[signature] 12/23/96 — Evaluator/date

[signature] 12/23/96 — Reviewer/date

000105

 

**The State of Delaware Employee Performance Review**

**Name, Job Title: John J. Balas , Correctional Officer** [SS# 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 ]
**Department-Division-Section:** Department of Correction, Sussex Work Release Center, 38-06-00-007
**Supervisor, Job Title:** Billie R. Smith , Correctional Lieutenant
**Date, or time period covered:** January 1, 1996 through December 15, 1996

**Areas where performance is distinguished or exceeds expectations, if any:**

**Areas of specific performance deficiencies or unsatisfactory work, if any:**
NONE

**Areas where growth or skills/knowledge development is suggested or needed. If not applicable, please use this space and/or attach summary explanation of how employee met expectations.**
Officer Balas has not had the opportunity to take the basic investigators course or the crime report writing course and should apply when the course is made available by the training academy.

**Employee documentation of performance events, comments and/or self-review:**

**We have met and discussed this document. The employee's overall performance is (DISTINGUISHED), (EXCEEDS EXPECTATIONS), (MEETS EXPECTATIONS), (NEEDS IMPROVEMENT), or (UNSATISFACTORY).** *Circle one.*

| [signature] 23 DEC 96 | Billie R. Smith 12/23/96 | [signature] 12/27/96 |
|---|---|---|
| **Employee/date** | **Evaluator/date** | **Reviewer/date** |

U00106



The State *of* Delaware Employee Performance Plan

Name, Job Title: BALAS, John Correctional Corporal [SS# ]
Department-Division-Section: Department of Correction, Sussex Correctional Institution, 38-04-004
Supervisor, Job Title: David Johnson Correctional Lieutenant
Date, or time period covered: 02/01/98 - 12/31/98

What is the agency mission and/or operational needs that this employee's job performance will affect?

The DOC is committed to providing programs, policies and services to inmates which at all times places public safety as our top priority whether the offender is in prison or supervised in the community by correctional staff. Your role is to provide discipline and security of inmates inside or outside the secure facility by enforcing institutional rules, regulations and policies while keeping in mind that rehabilitative programming will enhance the long term public safety.

Please list the duties, projects or performance standards that will be used for evaluation purposes. *Note:* current job dimensions may be substituted and/or included.

1. Be knowledgeable of and adhere to all Departmental, Bureau and Institutional policies and procedures. Read, daily, the post orders for the area you are assigned to stay abreast of any and all changes.

2. Report for work assignments and appointments on time every day as scheduled unless leave is prior approved as attendance, reliability and punctuality are an essential part of your job.

3. You are expected to conduct yourself in a professional manner on or off duty keeping in mind that you represent the DOC in dealing with the public. You are a role model for inmates and your appearance and conduct should always be in compliance with departmental guidelines.

4. It is your responsibility to document all activities that occur during your tour of duty. Documentation is expected to be submitted prior to the end of your shift on the proper institutional form. All written communication will be clear, concise and complete. It is also your responsibility to brief the on-coming shift of all events that occur during your shift.

5. Maintain security at all times by being alert and adhering to established security procedures. You are expected to take immediate action when security violations occur.

6. As a lead worker you are expected to provide guidance, supervision, and training to subordinate staff as needed. You may also be expected to assume the duties of the Lieutenant when so directed by the Watch Commander.

[signature] Employee/date — [signature] 04/21/98 Evaluator/date — Capt. [signature] 4/29/98 Reviewer/date

RECEIVED
MAY 06 1998
SCI WARDEN'S OFFICE

U00103





RECEIVED
APR 19 1999
DOC Human Resources

**The State of Delaware Employee Performance Review**
**Name, Job Title:** BALAS, John **SS#:** 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
**Department-Division-Section:** Department of Correction, Sussex Correctional Institution
**Supervisor, Job Title:** David T. Johnson, Correctional Lieutenant
**Date, or time period covered:** 02/01/98-01/31/99

**Areas where performance is distinguished or exceeds expectations, if any:**

CPL Balas has attended and completed the Correctional Emergency Response Team (CERT) training and maintains his skills in emergency responses by attending regular CERT refresher and proficiency training.

**Areas of specific performance deficiencies or unsatisfactory work, if any:**

None noted.

**Areas where growth or skills/knowledge development is suggested or needed. If not applicable, please use this space and/or attach summary explanation of how employee met expectations.**

CPL Balas is assigned to the Receiving Room and Pre-Trial Rover. He has a good working knowledge of his post orders and SCI procedures. He always reports for duty on time and uses leave in an appropriate manner. He maintains a professional demeanor while on duty and assists subordinates when needed.

**Employee documentation of performance events, comments and/or self-review:**

We have met and discussed this document. The employee's performance is (Distinguished), (Exceeds Expectations), (Meets Expectations), (Needs Improvement), or is (Unsatisfactory). *Please circle one.*

[signature] 3-23-99 [signature] 03/23/99 [signature] 3/24/99
**Employee/date** **Evaluator/date** **Reviewer/date**

RECEIVED
APR 15 1999
SCI WARDEN'S OFFICE

[signature]

000102