IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CINDY L. BALAS a/k/a CINDY L. ADKINS, Executrix of the Estate of CORPORAL JOHN J. BALAS, | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| v. | : | C.A.No. 06-592-JJF |
| | : | |
| STANLEY W. TAYLOR, JR., individually and in his official capacity as the Commissioner of Correction; ALAN MACHTINGER, individually and in his official capacity as the Director of Human Resources of the Department of Correction; MICHAEL DELOY, individually and in his official capacity as Deputy Warden of Sussex Correctional Institution; CAPTAIN DAVID WILKINSON, individually; LIEUTENANT TRUMAN MEARS, individually; and DEPARTMENT OF CORRECTION OF THE STATE OF DELAWARE, | : | |
| | : | |
| **Defendants.** | : | |
| | : | |

**PLAINTIFF'S OPENING BRIEF IN SUPPORT OF HER MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST DEFENDANT TRUMAN MEARS**

THE NEUBERGER FIRM, P.A.
THOMAS S. NEUBERGER, ESQ. (#243)
STEPHEN J. NEUBERGER, ESQ. (#4440)
CHERYL A. HERTZOG, ESQ. (*Pro Hac Vice*)
Two East Seventh Street, Suite 302
Wilmington, DE 19801
(302) 655-0582
TSN@NeubergerLaw.com
SJN@NeubergerLaw.com
CherylH@NeubergerLaw.com

Dated: January 31, 2008     Attorneys for Plaintiff

## <u>TABLE OF CONTENTS</u>

NATURE AND STAGE OF THE PROCEEDING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

SUMMARY OF THE ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

A.    Plaintiff . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    1.    DOC Employment History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

        a.    Correction Emergency Response Team ("CERT") . . . . . . . . . . . . . . . . . 2

B.    Plaintiff's Protected Union Association . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

C.    Union Activity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    1.    Negotiating a New Contract With DOC . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    2.    Union Speech to the Media and the Public . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    3.    Union Speech and Petitions to Elected Officials . . . . . . . . . . . . . . . . . . . . . . 3

D.    The Content of the Union Activity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    1.    Severe Understaffing that Endangered Public Safety . . . . . . . . . . . . . . . . . . 3

    2.    Wage Increases to Attract and Retain Skilled Correctional Officers . . . . . . . . . . 4

    3.    Frequent Security Lapses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    4.    The Job Action and Strike . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    5.    Suggested Solutions to These Problems . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

E.    The Overall Context . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

F.    The Content, Form and Context of Plaintiff's Speech . . . . . . . . . . . . . . . . . . . . . . . . 7

    1.    The Activation of the CERT Team . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    2.    Plaintiff's Public Speech During a Meeting with Defendant Mears . . . . . . . . . . 7

    3.    CERT Reports for Duty . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

4.  Plaintiff's Resignation Speech and Symbolic Speech - Refusal to Cross the Picket Line Again . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

5.  Management's Reaction to the Resignation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

G.  Mears' Retaliation Against Plaintiff . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

1.  The Mediocre Performance Evaluation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

a.  Protected Petition - Plaintiff Files a Union Grievance . . . . . . . . . . . . . 12

2.  Plaintiff is Continuously Denied a Meeting with his Supervisors . . . . . . . . . . . 12

3.  Mears Alters Plaintiff's Time Cards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

4.  Plaintiff is Denied a Copy of His Timecard . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

5.  Plaintiff is Denied Transfer to Another Supervisor . . . . . . . . . . . . . . . . . . . . . . 13

6.  Plaintiff is Constantly Monitored and Nit Picked by Mears . . . . . . . . . . . . . . . 14

H.  Evidence of Causation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

1.  Direct Admissions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

2.  Anger, Hostility and Antagonism . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

3.  Temporal Proximity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

4.  Knowledge of the Protected Activity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

5.  Motive to Retaliate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

6.  Disparate Treatment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

7.  Violation of Rules, Policies and Procedures . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

8.  Falsehoods . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

9.  Pretextual Reasons and Cover-Up . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

I.  STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

II.  PLAINTIFF ENGAGED IN THE FIRST AMENDMENT PROTECTED
     ACTIVITY OF HIS UNION MEMBERSHIP, A UNION SOLIDARITY
     DEBATE WITH MEARS, SYMBOLIC SPEECH REFUSING TO CROSS
     A PICKET LINE, RESIGNATION FROM CERT AND FILING A UNION
     GRIEVANCE, ALL OF WHICH PROTECTED ACTIVITY WAS A
     SUBSTANTIAL OR MOTIVATING FACTOR IN CAUSING
     RETALIATION AGAINST HIM  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

     A.   Introduction  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

     B.   Plaintiff Engaged in Protected Union Association  . . . . . . . . . . . . . . . . 21

          1.   Public Concern Requirement  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

     C.   As a Private Citizen Plaintiff Also Engaged in Protected Free Speech . . 22

          1.   Symbolic Speech Was Protected  . . . . . . . . . . . . . . . . . . . . . . . . . 22

          2.   Speech as a Citizen Also Was Protected  . . . . . . . . . . . . . . . . . . . 25

          3.   The Message Also Was on Matters of Public Concern  . . . . . . . . 25

               a.   Content . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

                    (1).   Union Activity  . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

                    (2).   Public Safety Crisis in Prisons . . . . . . . . . . . . . . 26

                    (3).   Wrongdoing and Breach of the Public Trust . . . . 27

                    (4).   Best Position to Know  . . . . . . . . . . . . . . . . . . . . . 27

                    (5).   Informed Electorate and the Conduct of
                           Government  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

                    (6).   Advocacy in a Democracy  . . . . . . . . . . . . . . . . . . 28

               b.   Form and Context  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

                    (1).   Media Coverage  . . . . . . . . . . . . . . . . . . . . . . . . . 29

                    (2).   Legislative Concern  . . . . . . . . . . . . . . . . . . . . . . 29

                    (3).   Public Safety Setting  . . . . . . . . . . . . . . . . . . . . . 29

*iii*

(4).     Motivation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

4.     Disruption and Balancing of Interests Is Not a Defense in
This Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

D.     Protected Petitioning . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

E.     As a Matter of Law Plaintiff Has Proven That Protected Conduct Was
A Substantial or Motivating Factor in a Course of Adverse Action . . . . 32

1.     Direct Evidence Admission . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

2.     Demonstrated Anger, Hostility and Antagonism . . . . . . . . . . . . 32

3.     Unduly Suggestive Temporal Proximity . . . . . . . . . . . . . . . . . . 33

4.     Knowledge of the Protected Activity . . . . . . . . . . . . . . . . . . . . . 33

5.     Motive to Retaliate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

6.     Disparate Treatment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

7.     Violations of Procedures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

8.     Falsehoods . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

9.     Pretext and Cover-Up . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

10.     The Big Picture . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

11.     Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

F.     Same Decision Anyway Affirmative Defense . . . . . . . . . . . . . . . . . . . 35

III.     DEFENDANT MEARS' RETALIATION AGAINST PLAINTIFF WOULD
CHILL A PERSON OF ORDINARY FIRMNESS FROM EXERCISING
THEIR FIRST AMENDMENT RIGHTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

A.     The Basics . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

B.     The Person of Ordinary Firmness Standard . . . . . . . . . . . . . . . . . . . . . 37

C.     Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

## TABLE OF AUTHORITIES

**Cases**                                                                                          **Page**

Adkins v. Rumsfeld, 389 F.Supp.2d 579 (D.Del. 2005) . . . . . . . . . . . . . . . . . . . . . . . . 32,34-35

Agosto-de-Feliciano v. Aponte-Roque, 889 F.2d 1209 (1st Cir. 1989) (en banc) . . . . . . . . . 37,40

Allah v. Seiverling, 229 F.3d 220 (3d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Anderson v. Davila, 125 F.3d 148 (3d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Andrews v. City of Phila,, 895 F.2d 1469 (3d Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . 35,39

Azzaro v. County of Allegheny, 110 F.3d 968 (3d Cir. 1997) (en banc) . . . . . . . . . . . . . . . 28,30

Baca v. Sklar, 398 F.3d 1210 (10th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37-38

Baldassare v. State of N.J., 250 F.3d 188 (3d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Bart v. Telford, 677 F.2d 622 (7th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Bedford v. SEPTA, 867 F.Supp. 288 (E.D.Pa. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Bennett v. Hendrix, 423 F.3d 1247 (11th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Bennis v. Gable, 823 F.2d 723 (3d Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Bloch v. Ribar, 156 F.3d 673 (6th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Boals v. Gray, 775 F.2d 686 (6th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Boyle v. County of Allegheny, Pa., 139 F.3d 386 (3d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . 19-20

Bray v. Marriott Hotels, 110 F.3d 986 (3d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Brennan v. Norton, 350 F.3d 399 (3d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34,39

Buckley v. Valeo, 424 U.S. 1 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Cafeteria Employees Union v. Angelos, 320 U.S. 293 (1943) . . . . . . . . . . . . . . . . . . . . . . . . . 26

Campbell v. Arkansas Dept. of Correction, 155 F.3d 950 (8th Cir. 1998) . . . . . . . . . . . . . . . . 27

Carroll v. Pfeffer, 262 F.3d 847 (8th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Caver v. City of Trenton, 420 F.3d 243 (3d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Charpentier v. Godsil, 937 F.2d 859 (3d Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

City of Erie v. Pap's A.M., 529 U.S. 277 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

City of San Diego v. Roe, 543 U.S. 77 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Clark v. Community for Creative Non-Violence, 468 U.S. 288 (1984) . . . . . . . . . . . . . . . . . . 25

Collins v. State of Ill., 830 F.3d 692 (7th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Connick v. Myers, 461 U.S. 138 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21-22,26-27

Constantine v. Rectors and Visitors of George Mason Univ.,
    411 F.3d 474 (4th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Crane v. Yurick, 287 F.Supp.2d 553 (D.N.J. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Curinga v. City of Clairton, 357 F.3d 305 (3d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Cygan v. Wisconsin Dept. of Corrections, 388 F.3d 1092 (7th Cir. 2004) . . . . . . . . . . . . . . . 27

Czurlanis v. Albanese, 721 F.2d 98 (3d Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Dennison v. Pa. Dept. of Corr., 268 F.Supp.2d 387 (M.D.Pa. 2003) . . . . . . . . . . . . . . . . . . . 31

Fasold v. Justice, 409 F.3d 178 (3d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Feldman v. Philadelphia Hous. Auth., 43 F.3d 823 (3d Cir. 1994) . . . . . . . . . . . . . . . . . . . . 35

Foraker v. Chaffinch, 501 F.3d 231 (3d Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Fuerst v. Clarke, 454 F.3d 770 (7th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Garcetti v. Ceballos, 547 U.S. 410 (2006)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22,25

Garcia v. City of Trenton, 348 F.3d 726 (8th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . 37-38

Hatcher v. Bd. of Pub. Educ. & Orphanage, 809 F.2d 1546 (11th Cir. 1987) . . . . . . . . . . . . . 21

Healy v. James, 408 U.S. 169 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Herrera v. Med. Center Hosp., 241 F.Supp.2d 601 (E.D.La. 2002) . . . . . . . . . . . . . . . . . . . . . . . 26

Hill v. City of Scranton, 411 F.3d 118 (3d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . 20-21,31-32

Holder v. City of Allentown, 987 F.2d 188 (3d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . 35-36

Hotel & Restaurant Employees v. Read, 832 F.2d 263 (3d Cir. 1987) . . . . . . . . . . . . . . . 27,29

Howard v. Bd. of Educ., 90 Fed.Appx. 571 (3d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Hughes v. Bedsole, 913 F.Supp. 420 (E.D.N.C. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Hurley v. Irish-American, 515 U.S. 557 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Jennings v. Warren County Com'rs, 2006 WL 694742 (N.D.Ind. 2006) . . . . . . . . . . . . . . . . . . 27

Kachmar v. Sungard Data Sys., Inc., 109 F.3d 173 (3d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . 33

Keenan v. City of Phila., 983 F.2d 459 (3d Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Keenan v. Tejeda, 290 F.3d 252 (5th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Kiddy-Brown v. Blagojevich, 408 F.3d 346 (7th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Labov v. Lalley, 809 F.2d 220 (3d Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Lapinski v. Bd. of Educ. of the Brandywine Sch. Dist.,
     2006 WL 167443 (3d Cir. Jan. 24, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Mascetta v. Miranda, 957 F.Supp. 1346 (S.D.N.Y. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

McGill v. Bd. of Educ., 602 F.2d 774 (7th Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

McGreevy v. Stroup, 413 F.3d 359 (3d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Melzer v. Bd. of Educ. of City Sch. Dist. of City of N.Y., 336 F.3d 185 (2d Cir. 2003) . . . . . . 29

Miller v. Cigna Corp., 47 F.3d 586 (3d Cir. 1995) (en banc) . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Mitchell v. Street, 415 F.Supp.2d 490 (E.D.Pa. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Morris v. Lindau, 196 F.3d 102 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Mount Healthy City Bd. of Educ. v. Doyle, 429 U.S. 274 (1977) . . . . . . . . . . . . . . . . . . . . . . . 32

Nicholas v. Pa. State Univ., 227 F.3d 133 (3d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

O'Connor v. City of Newark, 440 F.3d 125 (3d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . 37-40

Petrario v. Cutler, 187 F.Supp.2d 26 (D.Conn. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Pickering v. Bd. of Educ., 391 U.S. 563 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22,27-29

Price v. Chaffinch, 2006 WL 1313178 (D.Del. May 12, 2006) . . . . . . . . . . . . . . . . . . . . . . . . 38

Pro v. Donatucci, 81 F.3d 1283 (3d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Rankin v. McPherson, 483 U.S. 378 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133 (2000) . . . . . . . . . . . . . . . . . . . . 34

Republican Party of Minnesota v. White, 536 U.S. 765 (2002) . . . . . . . . . . . . . . . . . . . . . . . . 28

Rhodes v. Robinson, 408 F.3d 559 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Rivera-Jimenez v. Pierluisi, 362 F.3d 87 (1st Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Rode v. Dellarciprete, 845 F.2d 1195 (3d Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Rodriguez v. Torres, 60 F.Supp.2d 334 (D.N.J. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Rutan v. Republican Party, 497 U.S. 62 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37-38

San Filippo v. Bongiovanni, 30 F.3d 424 (3d Cir. 1994) . . . . . . . . . . . . . . . . . . . . 30-31,33-34

Sanguigni v. Pittsburgh Bd. of Public Educ., 968 F.2d 393 (3d Cir. 1992) . . . . . . . . . . . . . . . 21

Senn v. Tile Layers Protective Union, 301 U.S. 468 (1937) . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Shefcik v. Village of Calumet Park, 2007 WL 3334329 (N.D.Ill. Nov. 7, 2007) . . . . . . . . . . . 25

Shehee v. City of Wilmington, 67 Fed.Appx. 692 (3d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . 37

Sheridan v. E.I. du Pont de Nemours and Co., 100 F.3d 1061 (3d Cir. 1996) (en banc) . . . . 34-35

Smith v. Plati, 258 F.3d 1167 (10th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Spence v. Washington, 418 U.S. 405 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Spiegla v. Hull, 371 F.3d 928 (7th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

<u>Springer v. Henry</u>, 435 F.3d 268 (3d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20,22

<u>Springer v. Henry</u>, 2002 WL 389136 (D.Del. March 11, 2002) . . . . . . . . . . . . . . . . . . . . . 26,29

<u>Stewart v. Rutgers, The State Univ.,</u> 120 F.3d 426 (3d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . 34

<u>Suppan v. Dadonna</u>, 203 F.3d 228 (3d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . 32,35,37-40

<u>Tenafly v. Borough of Tenafly</u>, 309 F.3d 144 (3d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . 23-24

<u>Texas v. Johnson</u>, 491 U.S. 397 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

<u>Thomas v. Collins</u>, 323 U.S. 516 (1945) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

<u>Thornhill v. Alabama</u>, 310 U.S. 88 (1940) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

<u>Tinker v. Des Moines Indep. Community Sch. Dist.</u>, 393 U.S. 503 (1969) . . . . . . . . . . . . . . . 25

<u>Troster v. Pennsylvania State Dept. of Corrections</u>, 65 F.3d 1086 (3d Cir. 1995) . . . . . . . . . . 23

<u>Versarge v. Township of Clinton, N.J.</u>, 984 F.2d 1359 (3d Cir. 1993) . . . . . . . . . . . . . . . . . . . 30

<u>Village of Arlington Heights v. Metropolitan Hous. Develop. Corp.</u>, 429 U.S. 252 (1977) . . . . 34

<u>Virginia v. Black</u>, 538 U.S. 343 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

<u>Washington v. County of Rockland,</u> 373 F.3d 310 (2d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . 37

<u>Waters v. Churchill</u>, 511 U.S. 611 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

<u>Watters v. City of Phila.</u> 55 F.3d 886 (3d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29-30

<u>Wilcher v. City of Wilmington</u>, 60 F.Supp.2d 298 (D.Del. 1999) . . . . . . . . . . . . . . . . . . . . . . . 26

<u>Woodson v. Scott Paper Co.</u>, 109 F.3d 913 (3d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

## Constitutions, Statutes, and Rules

U.S. Const., Amend. I . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . <u>passim</u>

Federal Rule of Civil Procedure 8(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Federal Rule of Civil Procedure 56(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

## NATURE AND STAGE OF THE PROCEEDING

This is a civil survival action brought by the Estate of a deceased Correctional Officer, John J. Balas, whose suicide was proximately caused by a Department wide policy of retaliation against Correctional Officers who refused to engage in anti-Union activity or become strike breakers, in violation of the his rights to free speech, association, assembly and petition under the First and Fourteenth Amendments of the U.S. Constitution.

The record includes various depositions, declarations, plaintiff's interrogatory answers, documents and the Complaint and Answer. (D.I. 1 and 9 - hereinafter "Compl.&Ans.").

This is plaintiff's opening brief and appendix in support of her motion for partial summary judgment against defendant Truman Mears. The focus of relevant facts is events in the year 2004 and an immediate supervisor's retaliation against his subordinate which drove John Balas to kill himself.

## SUMMARY OF THE ARGUMENT

1.     Plaintiff engaged in the First Amendment protected activity of his union membership, a union solidarity debate with Mears, symbolic speech refusing to cross a picket line, resignation from CERT and filing a union grievance, all of which protected activity was a substantial or motivating factor in causing retaliation against him.

2.     Defendant Mears' retaliation against plaintiff would chill a person of ordinary firmness from exercising their First Amendment rights.

## STATEMENT OF FACTS

**A.  Plaintiff.**[1]  Plaintiff was a loving, caring husband and father of two young children. (Plaintiff's Interrogatory Responses (hereinafter "Inter.") #3 p.5;P521-22; A655,537-38). On the

---

[1]  To reduce confusion, the decedent John J. Balas will be referenced as "plaintiff."

job he was professional, dependable and helpful. (Inter. #3 p.5;Shockley 17;West 8;Mumford 15-17;L.Mears Ex.2 #29 p.5; A655,957,887,974,1072).

      **1. DOC Employment History.**  Plaintiff was a Corporal and an eleven year employee of the DOC. (Inter. #3 p.5; A655).  During his career, he received numerous accolades and commendations. (Id. p.5-6;P442-68; Mears Ex.8; A655-56,490-516,789-817)

      **a.  Correction Emergency Response Team ("CERT").**  He also served as a CERT member from 1995 through 2005. (Inter. #3 p.6; Bradley 13; West 7; Shockley 10; Hastings 10; Mumford 18; Foskey 14; A656,877,887,956,975,986).  CERT is an elite group of correctional officers who serve on that unit in addition to their normal duties.  They compete for promotion to CERT by passing rigorous physical and mental tests. (Inter. #3 p.6; DOC webpage p.3; T.Mears 61-62; A656-1076,721). The CERT unit ensures public safety, as well as the safety of department staff and offenders. (Inter. #3 p.6; T.Mears 61-62; Shockley 9-10; Hastings 12; Mumford 18-20; A656,721,955-56,965,975).

     **B.  Plaintiff's Protected Union Association.**  In August 2004, plaintiff was an active member of the Correctional Officers Association of Delaware ("COAD") - a union for prison guards of the rank of sergeant and below. (Inter. #3 p.6-7; T.Mears 204-05; West 6; Shockley 6; Hastings 7; Mumford 6; L.Mears 15-16; A656-57,756,887,955,964,972,1053).

    **C.  Union Activity.**

      **1.  Negotiating a New Contract With DOC.**  During the Summer of 2004, COAD was involved in protracted, divisive and confrontational contract negotiations with DOC. (Knight Decl. #4-7 p.2; L.Mears Ex.2 #5 p. 2; T.Mears 45-46; A549,1069,716-17).

      **2.  Union Speech to the Media and the Public.**  In the Spring and Summer of 2004, in an effort to publicly pressure DOC management and State elected officials to enact

workplace reform, union officials began successfully speaking to the media about dire health and safety issues, severe understaffing, low wages, the lack of longevity pay or a career ladder, the inability of DOC to retain correctional officers after ten years of service, and lapses in security, among other issues. (Knight Decl. #9,11 at p.2-3; T.Mears 42-46; Wilkinson 34-36; Deloy 40; L.Mears Ex.2 #6 p.2; Shockley 7-8; West 9-10; Hastings 7-9; Bradley 10-12; Mumford 7-13; A549-50,716-17,922,903,1069,955,887,964,877,972-73).  This resulted in a flood of newspaper articles and media attention adverse to DOC about these issues. (Knight Decl. #10 p.2; P1-441; A549,49-489).  COAD also was responsible for several large billboards which were posted across the State in an effort to increase public awareness. (Knight Decl. #12-13 p.3; A550).[2]

      **3.  Union Speech and Petitions to Elected Officials.**  Union officials also spoke directly with elected officials during the summer of 2004 and even made pointed speeches before the Joint Finance Committee. (Id. #14-15 p.4; A550-51).

    **D.  The Content of the Union Activity.**  As discussed above, union officials were pushing for reform in several areas. (See section **C.1-3** supra; Knight Decl. #16 p.4; A551).  As the voice of the rank and file, Sergeants and below, COAD lobbied hard for these issues at every opportunity. (Knight Decl. #17 p.4; A551).

      **1.  Severe Understaffing that Endangered Public Safety.**  Correctional officers have one of the most dangerous jobs in the State of Delaware. (Id. #23 p.5; A552).  Yet jobs cuts had made this already dangerous job even worse.

---

     [2]  These billboards included three lined statements such as: "Delaware - The First State - Unable To Staff Its Own Prisons;" "Delaware Corrections - Doing More With Less - More Inmates Less Staff;" "Delaware Corrections - Where Minimum Staffing... - Would be an Increase;" "Welcome to Sussex County - For Your Safety Obey the Law - We Cannot Staff Our Prisons;" and "Delaware - It's Good to be the First - To Build Prisons Without Staff." (Knight Decl. #12 p.3; A550).

Such cuts had resulted in one officer doing the job of three throughout the entire prison system. (Knight Decl. #18 p.4; A551). As a consequence, at the beginning of a shift if there were not enough officers to work, other officers were asked to work voluntary overtime or in some cases were forced to work mandatory overtime, a process called "freezing." (Id. #24 p.5; A552). In May of 2004, the DOC was over an entire shift short, which resulted in a mass amount of involuntary overtime or freezing of officers. (Id. #25 p.5; A552). As union officials disclosed to the media, understaffing was the number one problem facing officers. (Id. #26 p.5; A552).

A severe understaffing problem was caused and also compounded by a large number of officers leaving DOC versus a small number of new hires. (Knight Decl. #27 p.5; A552). The reasons for this massive exodus from DOC jobs was a direct result of practices such as freezing, the stress of working in hazardous conditions due to the shortage of officers or exhaustion from working 16 hour shifts with low wages. (Id.). In June of 2004, COAD vice-president David Knight publically disclosed that staffing had reached crisis proportions with two officers leaving for every new recruit hired. (Id. #28 p.5; A552).

Security and understaffing went hand-in-hand. (Id. #29 p.6; A552). The more understaffed a facility was, the higher the risk of harm to the public, the inmates, and the correctional officers. (Id.) As Knight stated to The News Journal, it was normal for one officer to be responsible for 60 or more inmates in direct supervision environments and the ratio could even be 1 to 100 or more in some housing and facility areas. (Id.)

**2. Wage Increases to Attract and Retain Skilled Correctional Officers.**

Union officials advocated for wage changes such as a career ladder and longevity pay which would result in better working conditions for correctional officers which in turn would help to keep officers on the job. (Id. #53 p.10; A557).

4

   **3.  Frequent Security Lapses.**  Approximately nine months prior to the violent rape of a DOC counselor, union official David Knight prophetically addressed the Joint Finance Committee and stated that the severe levels of understaffing would inevitably lead to murder, injury or even rape within DOC. (Id. #54 p.11; A558).  There were other lapses of which the public was not even aware. (Id. #56 p.11; A558).  Having one officer multi-task and perform a job designed for several officers inevitably led to security breakdowns. (Id. #56-57 p.11; A558).

   **4.  The Job Action and Strike.**  As the staffing crisis worsened and tension and stress levels escalated among correctional officers, on July 22, 2004, ten days after the rape of a staffer by an inmate (See Section **E(1)** infra), 25 COAD members held a special meeting to discuss the problems at DOC. (Knight Decl. #60 p.12; A559; see A141).  Many claimed to be burnt-out due to forced overtime and long hours spent at work rather than at home with their families, others feared the increasingly dangerous conditions they were working under with staffing being at an all time low. (Knight Decl #61 p.12; A559).  As WBOC quoted David Knight, "It's getting dangerous. It's coming to a head." (Id. #62 p.12; A559; see WBOC article at A141).

   Two days after this meeting the media reported that correctional officers were planning a seven-day work action to protest low pay and other issues. (Knight Decl. #63 p.12; A559).  The job action was intended to demonstrate to the Governor and Legislature over "20 years worth of problems." (Knight Decl. #66 p.12; A559; see A142).  Officers, desperate for change, felt this was the only way to make their voices heard by the Governor and the Legislature. (Knight Decl. #67 p. 12; L.Mears Ex.2 #7 p. 2; A559,1069).  This job action would have a severe impact on the court and transportation unit because officers would refuse to work any of the voluntary overtime shifts which the unit depended upon due to the critically low staffing levels. (Knight Decl. #69-

72 p.12-13; Adams 7; Deloy 39; Wilkinson 36-37; T.Mears 113-14; L.Mears Ex.2 #7 p. 2; A559-60,866,903,922,733-34,1069 ).[3]

In a desperate attempt to get officers to staff the unit, management issued a memo to members urging them to resume voluntary overtime. (Id. #73 p.13; A560). However, on July 30, 2004, COAD issued a public press release stating that all three prison unions - COAD, AFSCME and FOP Lodge 10 - supported their membership's desire not to accept voluntary overtime. (Id. #74 p.13; A560). The job action grew in strength. (Id. #75 p.13; A560). As a result, in late July, management agreed to meet with COAD on August 3rd to discuss the issues plaguing the DOC (Id. #76 p.13; A560) but its proposal was vehemently rejected. (Id. #77 p.13-14; A560). As a result, officers refused to end the job action and continued to decline voluntary overtime. (Id. #78 p.14; A561). Angry and frustrated, DOC filed a lawsuit against the union on August 5, 2004. (Id. #108 p.17-18; A564-65; see A222-231).

**5. Suggested Solutions to These Problems.** During legislative meetings and negotiating sessions, solutions to these many problems were presented by union officials. (Knight Decl. #80 p.14; A561).

**E. The Overall Context.** During the Summer of 2004, all this union activity occurred in a setting of: (1) the rape of a female DOC employee;[4] (2) escapes;[5] (3) security breakdowns;[6] (4)

---

[3] By law officers could not strike or refuse mandatory overtime, but no one could force them to work voluntary overtime shifts. (Id. #65 p.12; A559).

[4] On July 12, 2004, as COAD had prophetically warned, an inmate took a female counselor hostage and brutally raped her before being killed by a CERT officer. (Knight Decl. #89-92 p.15-16; A562-63). The subsequent investigation revealed that this convicted felon was able to pass through secure prison doors which had been propped open due to understaffing. (See various media articles at A93-121).

[5] In December of 2003, another inmate escaped from two correctional officers while traveling to the Kent County Courthouse. (Knight Decl. #93 p.16; A563-). This inmate then robbed two motels and led police on a high-speed chase in a stolen car, prompting a three week

a highly critical public report by a security expert;[7] and (5) a race for the reelection of the

Governor.[8]  Many times during this time period, The News Journal and Delaware State News

would run several stories in one day. (See e.g. A203,208; A220,226,230; A235-239).

Additionally, the union was responsible for several billboards posed throughout the State.

(Knight Decl. #12-13 p. 3; A550).

### F.  The Content, Form and Context of Plaintiff's Speech.

**1.  The Activation of the CERT Team.**  On August 5, 2004, Commissioner

Taylor activated five members of the CERT Team, including plaintiff, to step in the next day and

staff the DOC's Court and Transportation unit. (Id. #79 p. 14; L.Mears Ex.2 #8 p. 2; Wilkinson

37; Deloy 41; Adams 10; A561,1069,922,903,867).

**2.  Plaintiff's Public Speech During a Meeting with Defendant Mears.**

Because plaintiff and his team members were concerned about crossing a picket line and not

supporting their fellow co-workers and union members in their job action, a meeting was held

that same night to discuss the activation. (L.Mears 11,18; L.Mears 2nd Decl #10-12 p.3; T.Mears

---

manhunt which eventually ended with his capture in Arkansas. (See A53-55).

   [6]  On April 26, 2004, another inmate slit his own throat in open court while on trial for
rape.  This occurred on the heels of another inmate being injured by a tiny piece of disposable
razor blade.  Then two days later another convict swallowed a handcuff key as part of an escape
plan while in transport to court.  The very next day another inmate escaped from Sussex
Community Correction Center in Georgetown, leading to a police shooting incident. (Knight
Decl. #94-96 p.16; A563).

   [7]  Then in June of 2004, a private security expert reviewed DOC's court transportation
policies and procedures and released his report to the media.  It stated that if changes were not
made, someone would be seriously injured or killed.  The report also harshly criticized the
administration for severe security lapses and the lack of training for transportation officers. (See
A64-76).

   [8]  COAD publically opposed the re-election of the incumbent Governor and actively
worked to defeat her. (Knight Decl. #97-98 p.16; Mumford 13; Wilkinson 60-61; A563,973,
928).

111; Adams 10; A1052,1054,1070,733,867).

At the meeting the CERT members discussed whether to resign from CERT to show solidarity with the union and job action. (Adams 11-12; <u>see</u> T.Mears 112,115; A867,733-34). Plaintiff was vocal stating in the presence of defendant Truman Mears, "he didn't believe that we were doing right, that we were doing blue shirts wrong by going in and working." (Adams 12; <u>see</u> T.Mears 119; A867,735). Conversely, defendant Truman Mears wanted to back management. (T.Mears 119; <u>see</u> Adams 12; A735,867). Plaintiff spoke up against what defendant Mears said and verbally disagreed with him on the need to resign. (Adams 12; A867).[9]

Defendant Mears then admittedly left the meeting and reported to CERT command and upper management that the members were having a meeting and actively discussing resignation. (T. Mears 116-18; L.Mears 11-12; A734-35,1052). CERT command then contacted Lee Mears by telephone and accused he and plaintiff of "instigating" the entire problem. (L.Mears 11-12,51; A1052,1062). CERT Command then explained to them that public safety would be endangered if they did not staff the unit because otherwise, prisoners would be released if they were not transported to their preliminary hearings. (L.Mears Ex.2 #14 p.3; A1070). Therefore, to ensure the public's safety, the five CERT members decided to report for their assignment the next day. (L.Mears 18-19; T.Mears 119; A1054,735).

**3. CERT Reports for Duty.** When they arrived for their assignment, the CERT members were ridiculed, cursed and given the cold shoulder by their fellow co-workers as they crossed the picket line. (L.Mears 19-20; L.Mears Ex.2 #16 p.3; Adams 15-16; A1054,1070,868).

---

[9] Defendant Lt. Truman Mears was the highest ranking officer at this CERT meeting. (Wilkinson 52; A926). He also was plaintiff's supervisor for plaintiff's regular job in the prison receiving room. (Compl & Ans. ¶10; A4,34). Plaintiff was the only CERT member to be supervised during his regular job by another CERT member. (Adkins 40; A1007).

When CERT reported for duty they learned there were only two prisoners who would have been released if they were not taken to court; a job the five full time Court and Transportation officers could have handled. (L.Mears 19; L.Mears Ex.2 #17 p.3; A1054,1070). Contrary to CERT Command's assertion, there was no dire necessity for CERT's activation. (See L.Mears Ex.2 #14 and 17 p.3; A1070). In fact, the head of the unit told them they did not even need CERT's help that day. (L.Mears 19; A1054). This prompted plaintiff to ask Major Dave Hall, the head of CERT, why they had even been activated. (L.Mears 21; L.Mears Ex.2 #19 p.4; A1054,1071). Hall replied that he had given four operations orders to Commissioner Taylor. (L.Mears 21-22; L.Mears Ex.2 #19 p.4; Adams 17; A1054-55,1071). Plaintiff then asked Major Hall why defendant Taylor had picked this one to which Hall replied, "He didn't." (L.Mears Ex.2 #19 p.4; A1071). Lee Mears then asked Hall who gave the order and he replied, "It came from higher than Stan." (Id.; L.Mears 22; Adams 17; T.Mears 128; A1071,1055,737) The only person higher than Taylor was Governor Minner. (L.Mears 53; T.Mears 128; A1062,737). It was unheard of and unprecedented that command decisions were being made by someone higher than the Commissioner. (L.Mears Ex.2 #19 p.4; A1071).

At this point the CERT members concluded that their activation was politically motivated by the Governor and that they had been lied to and used as pawns in managements's battle with the union. (L.Mears 18,22; L.Mears Ex.2 #20 p.4; A1054-55,1071). CERT members told Hall that they would be resigning at the end of their shift. (L.Mears 22; Adams 17; A1055,868). Hall did not have a "positive reaction" and tried to talk them out of it. (Adams 18; A869).

**4. Plaintiff's Resignation Speech and Symbolic Speech - Refusal to Cross the Picket Line Again.** At the conclusion of their shift, the five assigned CERT members and five additional members met with the Warden and resigned their positions on CERT in an effort to

support the union job action and they refused to cross the picket line. (Wilkinson 37-39,49-50;Deloy 41; L.Mears 22; L.Mears Ex.2 #22-23 p.4; Adams 18-22; Bradley 25,27; West 16,20-21; Shockley 15,19; Hastings 17-18; Mumford 24,28-31; Foskey 21,24,29-31; A923,925,1055,1062, 1071,869-70,880-81,889-90,957,966-67,976-78,987-90). The Warden understood that the CERT members were resigning to show support for the job action. (West 20-21; A890). They told the Warden they had "a moral obligation to back up [their] fellow officers...above anything else." (Hastings 18; A966).

During this meeting, plaintiff and Lee Mears did most of the talking and plaintiff "spoke his mind." (Adams 22; West 16; A870,889).  Later, plaintiff stated to defendant Wilkinson that they had resigned "[t]o support COAD." (Wilkinson 50; A926).  Notably, plaintiff's supervisor, defendant Truman Mears, did not resign, (T.Mears 144; A741); and he immediately learned of plaintiff's pro union speech. (T.Mears 130-33; A738).

**5. Management's Reaction to the Resignation.**  Management was "disappointed," "annoyed" and "frustrated" by their resignation in support of the job action. (T.Mears 132; L.Mears Ex.2 #25 p.5; A738,1072). CERT Command was "mad." (West 18; A890).  It was made clear to plaintiff and the others that they would never again be welcome on CERT because of their decision. (West 18; Bradley 26; Shockley 22-23; A890,881,959). CERT command stated it did not sanction the process utilized and that it was unfortunate that during a critical time in DOC history they decided to resign. (T.Mears Ex.10; A837).

At the time of their resignation on August 6, 2004, defendant Mears was the only CERT member not on vacation or active miliary duty who refused to resign in support of the job action. (Inter. #3 p.25; A675).  Defendant Mears was admittedly disappointed by their decision to resign and he did not agree with it. (T.Mears 133,144; A738,741).  He also was disappointed that the

CERT members did not first discuss with him their decision to resign. (Id. at 133; A738)  Jon

Mumford informed defendant Mears that plaintiff had said not to bother calling Mears because

he would "talk you out of it." (T.Mears 134; A739).  "It stung," stated defendant Mears about

this statement by plaintiff. (T.Mears 140; A740).

### G.  Mears' Retaliation Against Plaintiff.

**1.  The Mediocre Performance Evaluation.**  Just one month later, defendant

Mears gave plaintiff his first ever poor performance evaluation.  Unlike prior years, he now

refused to recognize plaintiff's perfect attendance record for the past four years, his CERT

membership, or even his numerous commendations as reasons to give plaintiff a ranking of

"Exceeds Expectations" which he had consistently received previously. (T.Mears Ex.5-7,13;

A783-88,850).  Instead, Mears dropped plaintiff's ranking to just a passing grade of "Meets

Expectations." (T.Mears Ex.11; A838).[10]

To try to justify this lowered evaluation, defendant Mears attached a multi-page

supplement to the evaluation in which he heavily criticized plaintiff's job performance. (T.Mears

Ex.11 at 2-3; A839-40).  Importantly however, in the words of the supervising Captain above

Mears in the chain of command, if plaintiff's performance had actually been as poor as Mears

claimed in this attachment, plaintiff should have flunked the evaluation entirely. (Wilkinson 94,

96; A937).  As Captain Wilkinson explained, an employee with the performance problems that

defendant Mears claimed plaintiff had does not meet the performance standards set by the DOC

which are expected of every correctional officer. (Id.).

---

[10]  To an employee like plaintiff who took great pride in his job performance, a "meets
expectations" was the equivalent of a failing grade. (Adkins 32,36; see Deloy 50; A1005-6,906).
Because performance evaluations are considered in determining salary increases, promotions and
transfers, plaintiff believed this mediocre evaluation would have negative consequences and
effect on his salary progression and his ability to rise in the DOC. (Compl&Ans. ¶68; A16,40).

As discussed in section **H.7** below, despite DOC policies and practices which explicitly require any and all performance deficiencies to be documented (T.Mears Ex.9 at 4; Wilkinson 87-91; T.Mears 89-94; A821,935-36,727-29), there is no written record whatsoever to support any of these claimed deficiencies (T.Mears 160-61,167-68,171-73; <u>see</u> Wilkinson 87; A745,747-48,935). Indeed, the written record that does exist actually contradicts Mears' claims and demonstrates that plaintiff was actually commended by Major Townsend for a "job well done" for his performance in one of the areas in which Mears contradictorily had criticized him. (T.Mears Ex.8; P827-28; A816,585-86).

        **a. Protected Petition - Plaintiff Files a Union Grievance.** As a result, on October 4, 2004, plaintiff filed an official grievance disputing the performance evaluation and asked that his rating be increased from "Meets Expectations" to "Exceeds Expectations." (P831-32; T.Mears Ex.12; Adkins 55-56; Ackenbrack 30-31; A587-88,849,1011,1045). Plaintiff filed this grievance because he felt he was being retaliated against by Truman Mears for resigning from CERT. (P832; Adkins 55-56; Deloy 52; A588,1011,906). He thought Mears was going to "screw him" on his evaluation. (Wilkinson 57; A927). Plaintiff felt Mears had "a personal vendetta" against him and was evaluating him "personally not professionally."(P832; L.Mears 28; A588,1056).

        **2. Plaintiff is Continuously Denied a Meeting with his Supervisors.** After learning that Mears gave him a mediocre rating, plaintiff requested a meeting with Captain Wilkinson and a union representative to review his evaluation. (Wilkinson 57; T.Mears 155; Adkins 57; T.Mears Ex.13;T.Mears Ex.11; A927,850,842,844,847,1011). However, despite his requests, this meeting never took place. (Wilkinson 68-69; T.Mears 188; Adkins 51,57; A 930,752,1010-11). Instead, Mears decided to submit the evaluation without plaintiff's signature,

despite his Captain's request that a meeting be held. (T.Mears Ex.11;Wilkinson 67,70,80; T.Mears 155-57; A839,930-31,933,744).

       **3. Mears Alters Plaintiff's Time Cards.** Plaintiff always kept copies of his time cards because he prided himself on his work attendance. (Adkins 31,33; <u>see</u> T.Mears 98,166-67; A1005,730,747). Then in September of 2004, he discovered that Mears had tampered with his timecard and altered it so that he had taken frowned upon emergency vacation days rather than holidays or vacation days.[11] (T.Mears Ex.14; A853-62). Mears admits this falsehood. (T.Mears 189-198; A752-55). Contrary to Mears' claims that plaintiff had used emergency vacation days, on each of those days plaintiff had legitimately used holidays or vacation days. (Inter. #3 p.28; A678). Upon notification, Captain Wilkinson ordered Mears to correct them. (Wilkinson 102-05; T.Mears 195-96; A939,754).

       **4. Plaintiff is Denied a Copy of His Timecard.** In January 2005, plaintiff also was denied a copy of his timecard, which is another violation of DOC rules and regulations. (T.Mears 186; T.Mears Ex.13; Inter. #3 p.28; A752,850,678).

       **5. Plaintiff is Denied Transfer to Another Supervisor.** Plaintiff repeatedly requested a transfer to another supervisor so he would no longer have to work for or report to defendant Mears. (Deloy 53-55; Wilkinson 106; T.Mears 198; Adkins 39-40; A906-7,940,755,1007). But defendants Deloy and Wilkinson never responded to or granted this transfer request. (Inter. #3 p.28; A678). Plaintiff hoped that a transfer would alleviate the stress

---

       [11] Emergency vacation days are reserved for last minute call outs versus vacation days which are planned months ahead. (Adams 28; Bradley 31; A871,882). If an officer uses an emergency vacation day that means he has called out at the last minute and has left his shift in a flux and someone will have to fill that position. (Adams 28; A871). If staffing levels were low, which they often were, this could leave the shift commander in a bind. (Adams 29; Bradley 31-32; Mumford 36; A871,882,979).

resulting from working for a supervisor who was trying to "screw him," (Wilkinson 57,93,101), but his requests were denied. (Inter. #3 p.28; A678).

      **6. Plaintiff is Constantly Monitored and Nit Picked by Mears.** Plaintiff also was constantly watched and monitored by Mears who was searching for a performance misstep to use as a basis for discipline. (Adkins 137-38; A1031-32). For example, plaintiff was shown a note pad where someone was keeping chronological notes for Mears of plaintiff's performance and whereabouts. (Adkins 137; A1031). Mears also admits he is a "hands-on" supervisor if he does not have confidence in his employee. (T.Mears 14; A709). Such nit-picking was improper. (Wilkinson 108; A940).

      **H. Evidence of Causation.**

      **1. Direct Admissions.** Defendant Mears admitted at his deposition that plaintiff's resignation from CERT "was a factor" in his decision not to give him a ranking of "Exceeds Expectations." (T.Mears 174-75; A749).

      **2. Anger, Hostility and Antagonism.** When plaintiff resigned from CERT, Mears began "a personal vendetta" against him. (P832; A588). This personal vendetta manifested itself when Mears completed a performance evaluation of plaintiff a mere month after the two had heated disagreements about the CERT resignation. (Adams 12;T.Mears 119; A867,735). Mears was so angry with plaintiff he decided to lower his performance rating and falsely accuse plaintiff of being derelict in his duties. (T.Mears Ex.11; A838-40). Because of his anger, resentment and overall vendetta against plaintiff, Mears evaluated him "personally, not professionally." (P832; A588). Mears was out to "screw" him. (Wilkinson 57; A927).

      At his deposition Mears readily admitted his antagonism towards plaintiff. Mears stated that plaintiff was a man of integrity up until the time he quit CERT. (T.Mears 54-55; A719).

Further, at the meeting the night before the activation, Mears directly opposed plaintiff's views on a mass resignation and stated that quitting was not the answer. (T.Mears 119; A735). Mears was disappointed with plaintiff's decision. (T.Mears 54-55,133; A719,738).

As former CERT team member Lee Mears described, after their resignation Lee Mears received a "cold shoulder" from people in management, while plaintiff got "more of the brunt of it." (L.Mears 8; A1051). As plaintiff discussed, Mears was "out to get him."(L.Mears 28;A1056).

The day before plaintiff's resignation, on August 5, 2004, the State of Delaware and DOC filed a lawsuit against COAD in Chancery Court to try to force an end to the job action. (Wilkinson 35; A922). This lawsuit was the result of a last ditch effort by the Governor to put a stop to the correctional officers' defiance of upper management and to end their very successful job action. (Knight Decl. #108 p.18; A565). Additionally, in the past, correctional officers were warned to avoid union activity if they wanted to progress in the DOC. (Inter. #3 p.29; A679).

Moreover, another former CERT member who resigned with plaintiff testified that more than three years later, the resignation is still being explicitly raised by management during personnel interviews as a reason to deny positions. (Shockley 19-21; A958).

      **3. Temporal Proximity.** The temporal proximity here is unduly suggestive also.

| | |
|---|---|
| Aug. 5, 2004 | Plaintiff debates Mears on union solidarity. |
| | Gov. Minner files a lawsuit against COAD and the union officials to stop the job action. (<u>See</u> section **H.2** above.) |
| Aug. 6, 2004 | Plaintiff resigns and refuses to cross picket line. |
| Sept. 26, 2004 | Mears falsifies a mediocre performance evaluation of plaintiff. |
| Sept. 2004 | Plaintiff learns he is being constantly monitored by Mears. Also, Mears alters Plaintiff's time card. (<u>See</u> section **G.4** and **G.6** above.) |
| Sept. 2004 | Plaintiff is denied a transfer. After September he continuously requested a transfer and it was always denied. (<u>See</u> section **G.5** above.) |

| | |
|---|---|
| Oct. 4, 2004 | Plaintiff files an Official COAD Grievance. (See section **G.1.a** above) |
| Jan. 2005 | Plaintiff constantly tries to meet with his supervisors and union representative regarding his evaluation, but is pushed aside.  Also, plaintiff is denied a copy of his 2004 timecard. (See section **G.2-3** above). |
| Feb. 7, 2005 | Plaintiff learns Mears has sent his performance evaluation to the Warden without his signature. (T.Mears Ex.13; A852). |
| Feb. 19, 2005 | Plaintiff kills himself. (Inter. #20 p.49-51;D868-74; A699-701,637-43). [12] |

**4.  Knowledge of the Protected Activity.**  Plaintiff's status as a member of the ever vocal union was well known. (T.Mears 204-5; West 6; Shockley 6; Hastings 7; Mumford 6; A756,887,955,964,972 ).  As indicated, defendant Mears knew every word plaintiff spoke disagreeing with him about the picket line. (See section **F** above).  Plaintiff even was accused of "instigating" the resignation by management. (L.Mears 11-12,51; A1052,1062).

**5.  Motive to Retaliate.**  First, as a result of the job action and the union's highly publicized campaign, the public perception was that DOC was losing control over its correctional officers. (See Knight Decl. #100 p.17; A564).  Accordingly, the Governor and Commissioner began monitoring the effects the job action had on the Court and Transportation Unit. (Compl. &Ans. ¶29; A8,36).  The job action made "everything a little tight for administrators." (Adams 7; A866). Additionally, the Governor was criticized in the news media and took political heat in the

---

[12]  Beginning in the Summer of 2004, plaintiff became depressed and extremely stressed due to the deteriorating situation at work. (Tavani report p.3-6,10;Inter. #20 p.46-48; A572-75,696-98). As the stress at work increased, plaintiff's depressive symptoms grew worse. (Tavani report p.11,13; A580,582).  There is a clear temporal correlation between plaintiff's stress at work due to the retaliation and his "deterioration," culminating in his suicide. (Id.)  In the Fall of 2004, after the CERT resignation, plaintiff's personality changed. (Adkins 141,145; A1032-33). While before he was "outgoing" and "lovable," now he was easily agitated, withdrawn and had little patience with his children. (Adkins 20,89,112-14,128-9;Inter. #20 p.46-47; A1002,1019, 1025-26,1029,696-97).  "He was not himself at all." (Adkins 112; A1025). There is a "compelling and clear cause and effect association between the retaliation and Cpl. Balas' demise." (Tavani report p.13; A582)

midst of a hotly contested reelection campaign. (Knight Decl. #107 p.17; A564).

Second, as the head of CERT disclosed, the CERT activation order came from the Governor herself. (L.Mears 21-22,53; Adams 17; T.Mears 128; L.Mears Ex.2 #19 p.4; A1054-55,1062,868,737,1070). Never before had DOC command decisions been made by someone other than the Commissioner. (L.Mears Ex.2 #19 p.4; A1071). The Governor directly interfered with the department and her decision was politically motivated. (L.Mears Ex.2 #20 p.4; A1071). Thus, when the CERT members resigned in support of the job action, they were working against the Governor. As defendant Wilkinson described, lower ranking officers must follow orders given by higher ranking officers - the Commissioner takes marching orders from the Governor, the Warden from the Commissioner, and so forth. (Wilkinson 76; A932). Accordingly, as a current CERT team leader and Lieutenant, the burden fell on defendant Mears to take out management's disdain for the resignation on plaintiff. (See T.Mears 132,144; A738,741).

Lastly, Mears himself had a motive to retaliate because he was the only active CERT member in August 2004 who refused to join his fellow co-workers in supporting the job action. (T.Mears 144; A741). Mears was supportive of DOC management and did not like that plaintiff, his subordinate employee, spoke against management. (Inter. #3 p.30; A680).

**6. Disparate Treatment.** Plaintiff also was singled out for disparate treatment. In prior years his meritorious job performance was regularly recognized in his performance evaluation. (T.Mears Ex.5-7; A783-88). Yet after refusing to cross the picket line and resigning, plaintiff was singled out in his evaluation and his supervisor refused to recognize his outstanding work accomplishments as they had previously been. (T.Mears Ex.11; A838-40). Instead, unlike in all previous years, his supervisor fabricated purported performance deficiencies, ones which contradict the actual written record. (See section **H.7-8** below).

17

**7.  Violation of Rules, Policies and Procedures.**  First, DOC rules, policies and procedures explicitly require that any and all performance deficiencies - from warnings to verbal counseling to written reports - be documented in writing and placed in the Supervisor's Employee File so they may be used to prepare the employee's performance evaluation. (T.Mears Ex.9 at 4; Wilkinson 87-91; T.Mears 90-94; A821,935-56,728-29).  Contradictorily however, despite the fact that Mears keeps such a file per policy (T.Mears 87-90; A727-28), there simply is nothing in it whatsoever to support the performance deficiencies that Mears identified in plaintiff's evaluation. (D750-90; A596-636).  There is nothing there at all about any performance deficiencies whatsoever. (Id.).  In fact, the record flatly contradicts these false claims and instead shows that plaintiff received a written commendation from Major Townsend commending him for a "job well done" during the QRT training - the very area for which Mears criticized him. (T.Mears Ex.8;P827-28; A816,585-86).

Second, Mears claimed that he submitted plaintiff's evaluation to DOC headquarters without plaintiff's signature because plaintiff purportedly refused to sign it. (T.Mears 155-57; T.Mears Ex.11; A744,844).  However, as Captain Wilkinson testified and plaintiff's writings reveal, Captain Wilkinson had instructed that he wanted to be present at a meeting between plaintiff and Mears to review the evaluation to address its problem before its submission. (Wilkinson 57,67,70,80; T.Mears 155,188; Adkins 51,57; T.Mears Ex.11,13; A 927,930-31,933,744,752,1010-11,839,847,50-51).  But Mears disobeyed Captain Wilkinson's instruction on this, despite his duty to follow it. (T.Mears Ex.11;Wilkinson 67,70,80;T.Mears 155-57; A850-51,930-31,933744).

**8.  Falsehoods.**  Defendant Mears' justification for plaintiff's poor performance evaluation is flatly contradicted by the record, which demonstrates that Mears' claims are simple

falsehoods.

First, the claims of plaintiff's poor performance in QRT training and claim that Corporal Foskey complained about him are contradicted by his QRT commendation and Foskey's own testimony. (Foskey 17-18; T.Mears Ex.8;P827-28; A986-87,816,585-86).  Second, the claims of poor performance in the receiving room are contradicted by the utter lack of any written record documenting those problems, in violation of DOC policies which require all such problems to be documented. (T.Mears 89-94;160-61;167-68;171-73; Wilkinson 87-91; T.Mears Ex.9; A727-29,745,747-48,935-36,821).  Third, the claim that plaintiff's evaluation was justified because he was no longer on CERT are contradicted by the fact that plaintiff was on CERT for 10 ½ - 11 months of the 12 month evaluation time frame. (T.Mears 173-74; A748-49).

**9.  Pretextual Reasons and Cover-Up.**  Defendant Mears claims that plaintiff had a multiplicity of performance problems. (T.Mears 60,100-04,161-78; T.Mears Ex.11; A720,730-31,745-50,838-40).  But review of plaintiff's performance record reveals that he had no performance deficiencies whatsoever and was instead repeatedly commended for his exceptional job performance and attendance. (P442-68; D750-90; T.Mears Ex.4-8; Wilkinson Ex.1; A490-516,596-636,775-817).

## ARGUMENT

### I.   STANDARD OF REVIEW.

A motion for summary judgment shall be granted if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  Boyle v. County of Allegheny, Pa., 139 F.3d 386, 393 (3d Cir. 1998); Fed.R.Civ.P. 56(c).  The substantive law will identify which facts are "material." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). Therefore, "[o]nly disputes over facts that might affect the outcome of the suit under the

governing law will properly preclude the entry of summary judgment." Id. at 248.  An issue is "genuine" if a reasonable jury could possibly hold in the nonmovant's favor with regard to that issue. Id.  "[I]f a moving party satisfies its initial burden of proving a prima facie case for summary judgment, the opposing party must do more than simply show that there is some metaphysical doubt as to material facts." Boyle, 139 F.3d at 393.  "[I]f the evidence is merely colorable or not significantly probative, summary judgment should be granted."  Id.

## II.    PLAINTIFF ENGAGED IN THE FIRST AMENDMENT PROTECTED ACTIVITY OF HIS UNION MEMBERSHIP, A UNION SOLIDARITY DEBATE WITH MEARS, SYMBOLIC SPEECH REFUSING TO CROSS A PICKET LINE, RESIGNATION FROM CERT AND FILING A UNION GRIEVANCE, ALL OF WHICH PROTECTED ACTIVITY WAS A SUBSTANTIAL OR MOTIVATING FACTOR IN CAUSING RETALIATION AGAINST HIM.

**A. Introduction.**  Public employee claims of retaliation for engaging in protected First Amendment activity are analyzed using a three-step process.  Hill v. City of Scranton, 411 F.3d 118, 125 (3d Cir. 2005); Springer v. Henry, 435 F.3d 268, 275 (3d Cir. 2006).  First, the employee must show that the activity is protected.  Second, the employee must show that the protected activity was a substantial or motivating factor in causing a retaliatory action.  Lastly, the employer has the affirmative defense of demonstrating that it would have taken the same adverse action even in the absence of protected conduct.  Springer, 435 F.3d at 275; Hill v. City of Scranton, 411 F.3d at 125.

In our present case, plaintiff was a longstanding member of an aggressive union which in 2004 was at war with management, the DOC and the Governor.  In the midst of a work stoppage he openly debated defendant Mears, his antagonist, about joining the union action.  Then the next day, after initially crossing the picket line, with many others he symbolically resigned his CERT position to convey a message of union solidarity and he refused to cross the picket line ever

20

again.   During the immediate course of subsequent harassment and retaliation by his direct

supervisor, defendant Mears, he also grieved his mistreatment.  Significantly, Mears under

questioning admitted that this protected activity "was a factor" in his downgrading plaintiff's

previous stellar performance record.

   **B.  Plaintiff Engaged in Protected Union Association.**  The protected status of First

Amendment activity is a question of law.  Hill v. City of Scranton, 411 F.3d at 127.

   "While the freedom of association is not explicitly set out in the [First] Amendment, it

has long been held to be implicit in the freedoms of speech, assembly and petition."  Healy v.

James, 408 U.S. 169, 181 (1972).  In the case at bar, plaintiff engaged in protected First

Amendment activity by joining and associating with COAD, the correctional officer's union

which was actively sounding the alarm about the prison public safety crisis.  "[T]he First

Amendment protects the right of public employees to join together in a union, to seek redress for

grievances through that collective entity, and to be free from retaliation for engaging in such

activities."  Petrario v. Cutler, 187 F.Supp.2d 26, 31-32 (D.Conn. 2002). As the Third Circuit has

explained, "efforts of public employees to associate together for the purpose of collective

bargaining involve associational interests which the first amendment protects from hostile state

action." Labov v. Lalley, 809 F.2d 220, 222-223 (3d Cir. 1987).

   **1.  Public Concern Requirement.**  The Circuits are split on whether the public

concern requirement of Connick v. Myers, 461 U.S. 138, 147-48 (1983), applies to public

employee association claims.  Compare Hatcher v. Bd. of Pub. Educ., 809 F.2d 1546, 1558 (11th

Cir.1987) with Boals v. Gray, 775 F.2d 686, 691-693 (6th Cir.1985).  The Third Circuit has

declined to address whether Connick generally applies to association claims.  Sanguigni v.

Pittsburgh Bd. of Public Educ., 968 F.2d 393, 400 (3d Cir. 1992).  In so declining, the Third

Circuit also held that Connick applies when a claim of association is based on expression that does not independently implicate associational rights to any significantly greater degree than does the speech at issue. Id.

Here, even though the nature of plaintiff's association with COAD implicates rights above and beyond traditional free speech interests, as explained in Argument **II.C.3** below, plaintiff's union association clearly implicates matters of public concern. Accordingly, this Court need not resolve the issue of whether Connick applies to association claims since COAD was clearly addressing matters of public concern, such as security lapses and understaffing which endangered public safety.

Thus the Court should hold that plaintiff's union membership was protected activity under the First Amendment which could not serve as a basis for adverse action.

**C. As a Private Citizen Plaintiff Also Engaged in Protected Free Speech.** Speech is protected when a public employee speaks on a matter of public concern and the employee's interests as a citizen outweigh the government's interest as employer. See Pickering v. Bd. of Educ., 391 U.S. 563, 568 (1968); Garcetti v. Ceballos, 547 U.S. 410, 126 S.Ct. 1951, 1958 (2006); Springer, 435 F.3d at 275. Here plaintiff first debated defendant Mears on the question of solidarity with his union brothers on August 5th, 2004. Mears wanted to back management, and plaintiff strongly disagreed. The next day, after being cursed for crossing a picket line, plaintiff and others spoke out and resigned their CERT membership and engaged in the symbolic act of further refusal to be a scab and cross the picket line. Mears immediately learned of this speech and symbolic act and set out on his course of retaliation of plaintiff who was under his direct command.

**1. Symbolic Speech Was Protected.** Plaintiff engaged in symbolic speech when

he resigned his position on CERT to support the union job action and, to show solidarity with his union brethren, he also refused to cross the picket line again. As the Third Circuit has explained, "'[s]peech' is not construed literally, or even limited to the use of words." Tenafly v. The Borough of Tenafly, 309 F.3d 144, 158 (3d Cir. 2002). "Constitutional protection is afforded not only to speaking and writing, but also to some nonverbal acts of communication, *viz.,* 'expressive conduct' (or 'symbolic speech')." Id.; Virginia v. Black, 538 U.S. 343, 358 (2003).

Expressive conduct is protected by the First Amendment when "the nature of the activity, combined with the factual context and environment in which it was undertaken, shows that the activity was sufficiently imbued with elements of communication to fall within the First Amendment's scope." Tenafly, 309 F.3d at 158 (internal punctuation omitted); Troster v. Pennsylvania State Department of Corrections, 65 F.3d 1086, 1090 (3d Cir. 1995); Spence v. Washington, 418 U.S. 405, 409-10 (1974). This is a "fact-sensitive, context-dependent inquiry" and "the speaker bears the burden of proving that his or her conduct is expressive." Tenafly, 309 F.3d at 161. Certainly that burden has been carried here. As a matter of law, in the midst of a job action and a year of heated anti-management activity by his union, plaintiff's resignation from CERT and his refusal to ever again cross the picket line said to management and the Governor loud and clear - "I Corporal John Balas stand in solidarity with the men and women of COAD in their job action which is designed to draw attention to our legitimate grievances about mismanagement which endangers the public safety and welfare!"

In Troster, the Third Circuit explained that this inquiry is twofold. 65 F.3d at 1090. First, the court must examine "whether the officer intended subjectively (*i.e.,* actually intended) for his conduct to communicate to persons whom he expected to observe it (*i.e.*, his intended audience)." Tenafly, 309 F.3d at 161. Here, the record is undisputed that plaintiff (and the other

resigning CERT members) subjectively intended their resignation to communicate their support

of the job action to DOC management. (Wilkinson 37-39,49-50;Deloy 41; T.Mears 115,118;

L.Mears 52-53; L.Mears Ex.2 #22-23 p.4; Adams 18-22; Bradley 25,27; West 16,20-21;

Shockley 15,19; Hastings 17-18; Mumford 24,28-31; Foskey 21,24,29-31; A922-23,925-26,903,

734-35,1062,1071,869-70,880-81,889-90,957,966-67,976-78,987-90). Their message was clear

that they were resigning as a way of showing support for the job action. (West 20-21; A890).

"We felt like we had a moral obligation to back up our fellow officers that we work with above

anything else."(Hastings 18; A967). They resigned from CERT "[t]o support COAD."(Wilkinson

50; A926).

 Second, the court must consider "whether observers understood the message the officer

intended his conduct to convey." Tenafly, 309 F.3d at 161.  As several former CERT members

stated, the Warden understood why the CERT members were resigning even though he did not

agree with it or the method the members employed. (Adams 19,22; Shockley 15; Hastings 18;

Mumford 31; Foskey 31; A869-70,957,967,978,990).  Defendant Mears was well aware of the

message intended by their conduct. (T.Mears 112,115,118-19; A733-35).  Additionally, plaintiff

directly informed defendant Wilkinson that they resigned to back the union members and "[t]o

support COAD." (Wilkinson 49-50; A925-26).

 Furthermore, "[c]ontext is crucial" in evaluating expressive conduct. Tenafly, 309 F.3d at

158.  Plaintiff's symbolic resignation came in the midst of a long running public battle and media

firestorm about the hazardous conditions in DOC prisons.  COAD was speaking out to the media,

petitioning elected officials and conducting a symbolic job action to force the public, the

Legislature and the Governor to take notice of the many problems plaguing the prison system.

Plaintiff's symbolic speech taken in its proper context is clearly expressive conduct protected by

the First Amendment.[13]

      **2. Speech as a Citizen Also Was Protected.** In <u>Garcetti</u>, the Supreme Court

held that speech by public employees made "pursuant to their official duties" is not protected.

<u>Garcetti</u>, 126 S.Ct. at 1960. Here, neither plaintiff's job duties as a correctional officer in the

receiving room (Inter. #3 p-; West 11-12; Hastings 10; Bradley 13; Mears 56-57; A656,888,87,

719), nor as a member of CERT (Inter #3 p.; T.Mears 61-62; Shockley 9-10; Hastings 12;

Mumford 18-20; A656,720-21,955-56,965,975), required him to debate Mears the night before

and take an anti-management position opposed to the pro-management Mears. Nor did his job

duties require him to symbolically resign from CERT or refuse to cross a picket line to show

solidarity with his union brethren and the job action. (Id.). Indeed, if anything, plaintiff refused

to perform his CERT duties when he resigned from CERT. As a matter of logic, refusing to

perform one's job duties cannot be a part of one's job duties. Such an action was not part of his

official duties as a CERT member or correctional officer. Similarly, plaintiff's association and

support for COAD also does not fall within the scope of his job duties. <u>See</u> <u>Fuerst v. Clarke</u>, 454

F.3d 770, 774 (7th Cir. 2006) (holding that a union representative's criticism of his public

employer falls outside the scope of <u>Garcetti</u>); <u>Shefcik v. Village of Calumet Park</u>, 2007 WL

3334329, *4-5 (N.D.Ill. Nov. 7, 2007) (union official's union speech not required by his job

duties)

      **3. The Message Also Was on Matters of Public Concern.** "An employee's

---

    [13] The Supreme Court has long recognized that a multitude of expressive conduct can implicate First Amendment protections. <u>See, e.g.</u> <u>City of Erie v. Pap's A.M.</u>, 529 U.S. 277, 289 (2000) (nude erotic dancing); . <u>Hurley v. Irish-American</u>, 515 U.S. 557, 568 (1995) (marching in a parade); <u>Texas v. Johnson</u>, 491 U.S. 397, 406 (1989) (burning an American flag); <u>Clark v. Community for Creative Non-Violence</u>, 468 U.S. 288, 293 (1984) (sleeping in a public park to protest homelessness); <u>Tinker v. Des Moines Indep. Community Sch. Dist.</u>, 393 U.S. 503, 505-06 (1969) (wearing black armbands to protest the Vietnam War).

speech addresses a matter of public concern when it can be 'fairly considered as relating to any matter of political, social, or other concern to the community.'" Pro v. Donatucci, 81 F.3d 1283, 1288 (3d Cir. 1996). This is determined by reference to the "content, form, and context of a given statement, as revealed by the whole record." Connick, 461 U.S. at 147-48.

### a. Content.

(1). **Union Activity.** Speech involving union activity and other related union efforts is inherently a matter of public concern. See, e.g. Crane v. Yurick, 287 F.Supp.2d 553, 560 (D.N.J. 2003); Herrera v. Med. Center Hosp., 241 F.Supp.2d 601, 610-11 (E.D.La. 2002); see also Thomas v. Collins, 323 U.S. 516, 531-32 (1945); Thornhill v. Alabama, 310 U.S. 88,102-03 (1940); Hotel & Restaurant Employees, 832 F.2d 263, 265 (3d Cir. 1987); McGill v. Bd. of Educ., 602 F.2d 774, 778 (7th Cir. 1979); Cafeteria Employees Union v. Angelos, 320 U.S. 293 (1943); Senn v. Tile Layers Protective Union, 301 U.S. 468 (1937). Here, the union was locked in public battle intended to resolve the crisis conditions in Delaware prisons. Plaintiff's anti-management solidarity speech and his symbolic resignation was part of that battle and it was intended to show his support for the union's efforts.

(2). **Public Safety Crisis in Prisons.** Correctional officers hold a unique status among public employees given that their job is to guard and maintain those deemed to be too dangerous to function in society. Cf. Wilcher v. City of Wilmington, 60 F.Supp.2d 298, 304 (D.Del.1999). Similarly, speech related to systemwide crisis levels of understaffing in all of the DOC prisons as well as dire health and safety issues, security lapses, and the inability to retain qualified correctional officers inherently relates to matters of public concern. See Morris v. Lindau, 196 F.3d 102, 111 (2d Cir. 1999); Springer v. Henry, 2002 WL 389136, *4 (D.Del March 11, 2002) (speech involving suicides and escapes are "concerns of a grave nature that

would be relevant to the...taxpayers who financed the operation."). "Without doubt, issues of prison security, public safety, and official corruption are matters of concern to the community, particularly to one hosting a correctional facility." Spiegla v. Hull, 371 F.3d 928, 936 (7th Cir. 2004).[14]

(3). **Wrongdoing and Breach of the Public Trust.** "The content of the speech may help to characterize it as relating to a matter of social or political concern of the community if . . . the speaker seeks to 'bring to light actual or potential wrongdoing or breach of public trust' on the part of government officials." Holder v. City of Allentown, 987 F.2d 188, 195 (3d Cir. 1993) (quoting Connick, 461 U.S. at 148). Here, the union's long public campaign sought to expose "specific wrongs and abuses" in the prison system relating to its mismanagement. Baldassare v. State of N.J., 250 F.3d 188, 196 (3d Cir. 2001). These included the Governor's removal of vacant job positions to skew the actual staffing numbers, (Knight Decl. #18-19 p.4; A551), and management's decision to lower employment requirements just to maintain minimum staffing levels. (Id. #83 p. 14; A561). More importantly, however, the union sought to expose the Governor and management's outright refusal to take drastic measures to fix the problems affecting the DOC.

(4). **Best Position to Know.** By virtue of their jobs, certain persons are in better positions to speak out on certain issues than the public at large and "it is essential that they be able to [do so] without fear of retaliatory dismissal." Pickering, 391 U.S. at 572 . The Third Circuit has adopted this same principle.

---

[14] Accord Campbell v. Arkansas Dept. of Correction, 155 F.3d 950, 958 (8th Cir. 1998); Kiddy- Brown v. Blagojevich, 408 F.3d 346, 358 n.9 (7th Cir. 2005); Cygan v. Wisconsin Dept. of Corrections, 388 F.3d 1092, 1100 (7th Cir. 2004); Jennings v. Warren County Com'rs, 2006 WL 694742, *5-6 (N.D.Ind. 2006); Hughes v. Bedsole, 913 F.Supp. 420, 428 (E.D.N.C. 1994); Mascetta v. Miranda, 957 F.Supp. 1346, 1356 (S.D.N.Y 1997).

> Silencing a public employee seeking to speak on a matter of public concern deprives a self-governing society of information that may be vital to informed decision-making . . . [t]his can be a particularly serious loss because public employees, by virtue of their constant interactions with a public office, are often in the best position to know what ails that office.

Azzaro v. County of Allegheny, 110 F.3d 968, 977 (3d Cir. 1997) (en banc); accord Pickering, 391 U.S. at 571-72. In the case at bar, this speech is protected because correctional officers are in the best to know what is ailing the prison system so it is essential that the public be able to hear their informed voice on such important public issues.

### (5). Informed Electorate and the Conduct of Government.

Relatedly, public employees also have an "interest in ... enabling the electorate to make informed decisions." Curinga v. City of Clairton, 357 F.3d 305, 310 (3d Cir.2004). Speech on matters about government during the time of elections falls at the heart of First Amendment protection. See, e.g. Buckley v. Valeo, 424 U.S. 1, 49 n.55 (1976); Republican Party of Minnesota v. White, 536 U.S. 765, 781 (2002).

During the Summer of 2004, COAD was speaking out and informing the public about the dramatic shortcomings of the prison system under the stewardship of our Governor, shortcomings that were endangering public safety in the midst of a hotly contested gubernatorial campaign. In doing so, the union was speaking out about public officials "discharging [their] governmental responsibilities" and "[brought] to light actual or potential wrongdoing or breach of the public trust" on the part of these officials. Czurlanis v. Albanese, 721 F.2d 98, 104 (3d Cir. 1983). In the same way, the union was publicly opposing the Governor's reelection because of the disastrous conditions in the prisons.

### (6). Advocacy in a Democracy. Likewise, "[a]dvocacy for a

change in public perception and law, a fundamental component of democracy, is certainly a

matter of public concern, regardless of the underlying subject matter."  Melzer v. Bd. of Educ. of City Sch. Dist. of City of N.Y., 336 F.3d 185, 196 (2d Cir. 2003).  Here, the union was advocating for change in the entire Delaware prison system.

### b.  Form and Context.

#### (1).  Media Coverage.

Whether a particular issue receives news coverage also is relevant in determining the public import of speech.[15]  In the Supreme Court's words, "public concern is something that is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public at the time of publication."  City of San Diego v. Roe, 543 U.S. 77, 83-84 (2004) (per curiam).  The widespread media coverage regarding the issues at the DOC during the summer of 2004 speaks for itself in support of the proposition that plaintiff's activity was on matters of public concern. (P1-441; A49-489).

#### (2).  Legislative Concern.

Moreover, legislative interest also may be used to demonstrate the public value of speech.  See Rode, 845 F.2d at 1201-02.  Here, the legislature and members of the Joint Finance Committee were involved and concerned about the issues union officials were speaking about, including the understaffing problem addressed by the job action. (Knight Decl. #14-15 p.3-4;A550-51).

#### (3).  Public Safety Setting.

It also is well established that speech occurring in the public safety setting raises the public's level of concern.  See Caver v. City of Trenton, 420 F.3d 243, 256 n.11 (3d Cir. 2005).  Similarly, the speech at issue addressed staffing levels which directly related to the protection of inmates, officers and the public.

---

[15]  See, e.g. Pickering, 391 U.S. 563 (newspaper); Holder, 987 F.2d 188 (newspaper); Rode v. Dellarciprete, 845 F.2d 1195 (3d Cir. 1988) (newspaper); Watters v. City of Phila., 55 F.3d 886 (3d Cir. 1995) (newspaper); Springer v. Henry, 2002 WL 389136 (D.Del. March 11, 2002) (newspaper).

(4).  **Motivation.**  Finally, the union's motive to keep the public informed and plaintiff' personal motive to stand up for the rights of his fellow union members in calling public attention to the crisis in the Delaware prisons serve the public interest and are not purely personal.  See Versarge v. Township of Clinton, N.J., 984 F.2d 1359, 1364 (3d Cir. 1993) ("[M]otiv[e] is relevant to the extent that it indicates whether the speaker is speaking as a citizen upon matters of public concern or . . . upon matters only of personal interest.").

**4.  Disruption and Balancing of Interests Is Not a Defense in This Case.**  Next, the trial court ordinarily must balance the interests of the government as an employer in promoting the effective and efficient fulfillment of its public responsibilities against the public employee's interest as a citizen in speaking out on matters of public concern and the value to the community at large of being free to hear such speech.  Azzaro, 110 F.3d at 980.  The burden is on the employer here to make a "substantial showing."  Waters v. Churchill, 511 U.S. 611, 674 (1994) (plurality opinion); Watters v. City of Phila., 55 F.3d at 896.

"The more tightly the First Amendment embraces the speech the more vigorous a showing of disruption must be made."  McGreevy v. Stroup, 413 F.3d 359, 365 (3d Cir. 2005) (internal punctuation omitted).  As the Supreme Court has warned, "[v]igilance is necessary to ensure that public employers do not use authority over employees to silence discourse, not because it hampers public functions but simply because superiors disagree with the content of employees' speech."  Rankin v. McPherson, 483 U.S. 378, 384 (1987).

Importantly however, "[t]his balancing test comes into play _only_ if the public employer concedes that it dismissed an employee because of the employee's protected speech but contends that it was justified in doing so."  San Filippo v. Bongiovanni, 30 F.3d 424, 434 n.11 (3d Cir.

1994)(emphasis added).[16]  If the employer denies that is dismissed the employee for his protected speech, the balancing test "has no application."  Id.; accord Howard v. Bd. of Educ., 90 Fed.Appx. 571, 575 n.6 (3d Cir. 2003).  Accordingly, in our present case because defendants flatly deny any retaliation whatsoever against plaintiff because of his protected conduct the balancing test "has no application." Id.; (See Compl & Ans. ¶59-81; A15-19,39-42). Consequently, plaintiff's speech is protected by the First Amendment since it was on matters of public concern and no disruption defense has been raised.

   **D.  Protected Petitioning.**  The First Amendment also protects the "right to petition the Government for a redress of grievances." U.S. Const., Amend. I.  "The right to petition the government for grievances is a fundamental component of a just and orderly society." Anderson v. Davila, 125 F.3d 148, 164 (3d Cir. 1997).  "[W]hen one files a 'petition' one is addressing [the] government and asking government to fix what ... government has broken or has failed in its duty to repair." San Filippo, 30 F.3d at 442.

   Here, plaintiff invoked the formal mechanism of his union grievance procedure to petition the government for redress concerning his downgraded evaluation. San Filippo, 30 F.3d at 439 n.18; Foraker v. Chaffinch, 501 F.3d 231, 236 (3d Cir. 2007).  Because plaintiff invoked a formal mechanism, no public concern analysis comes into play. San Filippo, 30 F.3d at 442; Foraker, 501 F.3d at 236.  Instead, matters of purely private concern are protected, as long as the petition is not a sham.  Hill v. City of Scranton, 411 F.3d at 126.  Review of plaintiff's union grievance reveals that it is not a sham. (Ackenbrack Ex.1;T.Mears Ex.12;P831-32; A1046-47,848-49,587-88).  Accordingly, it was protected conduct and cannot be the basis for retaliation.

---

   [16]  Accord Dennison v. Pa. Dept. of Corr., 268 F.Supp.2d 387, 399 (M.D.Pa. 2003); Mitchell v. Street, 415 F.Supp.2d 490, 494 n.5 (E.D.Pa. 2005); Bedford v. SEPTA, 867 F.Supp. 288, 295 n.8 (E.D.Pa. 1994).

**E.  As a Matter of Law Plaintiff Has Proven That Protected Conduct Was A Substantial or Motivating Factor in a Course of Adverse Action.**  Following the determination that his conduct was constitutionally protected, plaintiff also must demonstrate that this conduct was a "substantial" or "motivating factor" in the relevant decision. Suppan v. Dadonna, 203 F.3d 228, 235 (3d Cir. 2000); Mount Healthy City Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977).  "But for" causation is not needed. Suppan, 203 F.3d at 236.  "'Substantial factor' does not mean 'dominant' or 'primary' factor." Hill v. City of Scranton, 411 F.3d at 126 n.11.  Instead, a plaintiff need only show that his protected First Amendment rights "played any substantial role" in the relevant decision. Suppan, 203 F.3d at 236; see Miller v. Cigna Corp., 47 F.3d 586, 597 n.9 (3d Cir. 1995) (en banc) ("played a role" in the adverse decision).  This is a question of fact.  Hill v. City of Scranton, 411 F.3d at 127.  The evidence follows.

       **1.  Direct Evidence Admission.**  Mears actually admitted at his deposition that plaintiff's resignation from CERT "was a factor" in his decision to not give him a ranking of "Exceeds Expectations." (T.Mears 174-75; A749).

       **2.  Demonstrated Anger, Hostility and Antagonism.**  At his deposition defendant Mears was forced to admit his upset and antagonism towards plaintiff.  Mears was disappointed in the CERT members' decision to resign. (T.Mears 133; A738).  Mears' antagonism for plaintiff is best illustrated by his comment that plaintiff was a man of integrity up until the time he quit CERT. (T.Mears 54-55; A719).  "[A] plaintiff [also] can establish a link between his or her protected behavior and subsequent discharge if the employer engaged in a pattern of antagonism in the intervening period." Woodson v. Scott Paper Co., 109 F.3d 913, 920-21 (3d Cir. 1997); accord Adkins v. Rumsfeld, 389 F.Supp.2d 579, 586 (D.Del. 2005).  For example, evidence that a defendant is "irritated" or otherwise angered by a plaintiff can be

compelling evidence of causation. <u>See</u> <u>Fasold v. Justice</u>, 409 F.3d 178, 190 (3d Cir. 2005) (defendant "irritated" by protected conduct). Here, defendant Mears had a "personal vendetta" against plaintiff. (P832;T.Mears Ex.13; A588,850). Mears was out to "screw" him. (Wilkinson 57; A927). <u>See</u> Facts at section **H.2** above.

      **3. Unduly Suggestive Temporal Proximity.** Temporal proximity "is an obvious method by which a plaintiff can proffer circumstantial evidence sufficient to raise the inference that [his] protected activity was the likely reason for the adverse action." <u>Kachmar v. Sungard Data Sys., Inc.</u>, 109 F.3d 173, 177 (3d Cir. 1997) (internal punctuation omitted). When a plaintiff engages in a pattern of protected activity and is

> dismissed shortly after the final episode of such protected activity, a fact-finder may reasonably infer that it was the aggregate of the protected activities that led to retaliatory dismissal. This inference would be particularly strong if the plaintiff can show that the decisionmaker lacked a pretext on which to dismiss the plaintiff until shortly before the time of dismissal.

<u>San Filippo</u>, 30 F.3d at 444. Here, Balas was retaliated against and given the mediocre evaluation just one month after his resignation from CERT. <u>See</u> Facts at section **H.3** above.

      **4. Knowledge of the Protected Activity.** Sufficient evidence must be produced to demonstrate that the defendants knew of the protected activity. <u>Keenan v. City of Phila.</u>, 983 F.2d 459, 466 (3d Cir. 1992). Here, Mears was present when plaintiff debated him on union solidarity and the next day he immediately learned of plaintiff's symbolic speech and resignation. Moreover, all the defendants were aware of the fact that plaintiff and the union were speaking out. <u>See</u> Facts at section **H.4** above.

      **5. Motive to Retaliate.** Mears and all the defendants had a distinct motive to retaliate against plaintiff. Here, the job action and union speech gave the appearance that DOC management was losing control of its officers. Additionally, the CERT activation was politically

motivated and ordered by the Governor.  The CERT resignation went completely against management's desires to squelch the successful job action.  Mears carried forth this antagonism by retaliating against plaintiff.  See Facts at section **H.5** above.

  **6. Disparate Treatment.**  Similarly, evidence of disparate treatment also can demonstrate causation.  San Filippo, 30 F.3d at 444; Brennan v. Norton, 350 F.3d 399, 421 (3d Cir. 2003); Adkins, 389 F.Supp.2d at 586.  Prior to the resignation, plaintiff received good evaluations from Mears who recognized his meritorious job performance.  After speaking out in support of the union and job action, Mears refused to recognize his outstanding accomplishments and instead fabricated performance deficiencies.  See Facts at section **H.6** above.

  **7. Violations of Procedures.**  Violations of laws, rules, policies and procedures also are proof of wrongdoing.  See Village of Arlington Heights v. Metropolitan Hous. Develop. Corp., 429 U.S. 252, 267 (1977); Stewart v. Rutgers, The State Univ., 120 F.3d 426, 434 (3d Cir. 1997); Bray v. Marriott Hotels, 110 F.3d 986, 992, 994 (3d Cir. 1997).  Here, defendant Mears has no documentary record of plaintiff's alleged performance deficiencies in violation of DOC policy.  Mears also disobeyed his direct supervisor's instruction when he submitted plaintiff's evaluation without a meeting taking place.  See Facts at section **H.7** above.

  **8. Falsehoods.**  As the Supreme Court has held, it is a "general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as affirmative evidence of guilt."  Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 147 (2000).  "We routinely expect that a party give honest testimony in a court of law; there is no reason to expect less of an employer charged with unlawful [retaliation]."  Sheridan, 100 F.3d at 1069.  Here, it is clear that defendant Mears fabricated numerous claimed performance deficiencies to somehow try to justify his retaliatory actions.  See Facts at section **H.8** above.

**9. Pretext and Cover-Up.** Pretextual explanations by a defendant also are proof of causation. <u>Feldman v. Phila. Hous. Auth.</u>, 43 F.3d 823, 831 (3d Cir. 1994); <u>Adkins</u>, 389 F.Supp.2d at 586. This is because "[r]esort to a pretextual explanation is, like flight from the scene of a crime, evidence indicating consciousness of guilt, which is, of course, evidence of illegal conduct." <u>Sheridan</u>, 100 F.3d at 1069. Record evidence is sound in this regard. <u>See</u> Facts at section **H.9** above.

**10. The Big Picture.** "A play cannot be understood on the basis of some of its scenes but only on its entire performance, and similarly, a [retaliation] analysis must concentrate not only on individual incidents, but on the overall scenario." <u>Andrews v. City of Phila.</u>, 895 F.2d 1469, 1484 (3d Cir. 1990). The big picture in our case makes it clear that defendants illicitly retaliated against plaintiff because he engaged in protected speech when he resigned from CERT to support the job action and by virtue of being a COAD member.

**11. Conclusion.** Thus, in light of the overwhelming record evidence outlined above, it is clear that plaintiff has met his burden and demonstrated that his First Amendment protected activity consisting of his union association, solidarity debate with Mears, resignation, symbolic speech and refusal to cross the picket line, together with his union grievance, as a matter of law  played a "substantial role in the relevant decision." <u>Suppan</u>, 203 F.3d at 236. Importantly, "but for" causation is not needed. <u>Id.</u> "'[S]ubstantial factor' does not mean 'dominant' or 'primary' factor." <u>Hill v. City of Scranton</u>, 411 F.3d at 126 n.11. As a matter of law, due to the overwhelming evidence outlined above - including defendant Mears' own admission of the same - no reasonable jury could conclude otherwise.

**F. Same Decision Anyway Affirmative Defense.** The burden of proof then "shifts to the defendant to show 'by a preponderance of the evidence that it would have reached the same

decision even in the absence of the protected conduct.'"  Nicholas v. Pa. State Univ., 227 F.3d

133, 144 (3d Cir. 2000). This last step is an "affirmative defense" to be met by the defendants,

id., and also is a question of fact.  Hill v. City of Scranton, 411 F.3d at 127.

But defendants failed to plead this affirmative defense in their Answer to the Complaint

as required under the Federal Rules, see Fed.R.Civ.P. 8(c) (a party must plead any "matter

constituting an avoidance or affirmative defense"), so no discovery was needed on this issue.

(See D.I. 9 p.16).  Accordingly, it has been waived and plaintiff seeks such a ruling from the

Court at this time.  See Charpentier v. Godsil, 937 F.2d 859, 863 (3d Cir. 1991) (noting the

general rule that "[f]ailure to raise an affirmative defense by response pleading or by appropriate

motion generally results in the waiver of that defense.") (internal footnotes omitted).

As a matter of law, plaintiff engaged in protected conduct and, in light of the

overwhelming record evidence, his speech certainly played a motivating or substantial role in the

unprecedented retaliation that occurred.  Lastly, because defendants chose not to assert their

affirmative defense, liability has been established and all that is needed is a trial on damages.

## III.    DEFENDANT MEARS' RETALIATION AGAINST PLAINTIFF WOULD CHILL A PERSON OF ORDINARY FIRMNESS FROM EXERCISING THEIR FIRST AMENDMENT RIGHTS

**A. The Basics.**  In the First Amendment context, "the constitutional violation is not in

the harshness of the sanction applied, but in the imposition of *any* disciplinary action for the

exercise of permissible free speech."  Bennis v. Gable, 823 F.2d 723, 731 (3d Cir. 1987)

(emphasis added).  The First Amendment "is implicated whenever a government employee is

disciplined for his speech."  Id.  The breadth of its protection is demonstrated by the Supreme

Court and the Third Circuit's repeated recognition that the First Amendment "protects state

employees not only from patronage dismissals but also from even an act of retaliation as trivial as

36

failing to hold a birthday party for a public employee . . . when intended to punish her for exercising her free speech rights." Suppan, 203 F.3d at 234 (quoting Rutan v. Republican Party, 497 U.S. 62, 76 n.8) (internal punctuation omitted); accord O'Connor v. City of Newark, 440 F.3d 125, 128 (3d Cir. 2006). "The effect on freedom of speech may be small, but since there is no justification for harassing people for exercising their constitutional rights it need not be great in order to be actionable." Suppan, 203 F.3d at 235 (quoting Bart v. Telford, 677 F.2d 622, 625 (7th Cir. 1982)).

   **B. The Person of Ordinary Firmness Standard.**  Accordingly, adverse action is found if "retaliatory conduct [is] *sufficient to deter a person of ordinary firmness* from exercising his First Amendment rights." Suppan, 203 F.3d at 235 (citing Bart, 677 F.2d at 625) (internal punctuation omitted) (emphasis added); accord O'Connor, 440 F.3d at 128; Allah v. Seiverling, 229 F.3d 220, 225 (3d Cir. 2000); Shehee v. City of Wilm., 67 Fed.Appx. 692, 694 (3d Cir. May 13, 2003) (public employee context); see Lapinski v. Bd. of Educ. of the Brandywine Sch. Dist., 2006 WL 167443, *2 (3d Cir. Jan. 24, 2006) (public employee context) (reversing the district court for failing to apply the person of ordinary firmness standard in a First Amendment retaliation case).[17]  Put another way, the retaliatory actions must be sufficient to "cause reasonably hardy individuals" to refrain from protected activity. Agosto-de-Feliciano, 889 F.2d at 1217.[18]  This is an objective test, not a subjective one. Garcia v. City of Trenton, 348 F.3d

_____

   [17]  Numerous other courts have adopted this standard.  See e.g. Bennett v. Hendrix, 423 F.3d 1247, 1254-55 (11th Cir. 2005); Washington v. County of Rockland, 373 F.3d 310, 320 (2d Cir. 2004); Keenan v. Tejeda, 290 F.3d 252, 258 (5th Cir. 2002); Carroll v. Pfeffer, 262 F.3d 847, 850 (8th Cir. 2001); Smith v. Plati, 258 F.3d 1167, 1176 (10th Cir. 2001); Bloch v. Ribar, 156 F.3d 673, 678 (6th Cir. 1998); Agosto-Feliciano v. Aponte-Rogue, 889 F.2d 1209, 1217 (1st Cir. 1989) (en banc); Bart, 677 F.2d at 625;

   [18]  The person of ordinary firmness standard is an easier standard to meet than in the statutory Title VII discrimination context. See, e.g. Rivera-Jimenez v. Pierluisi, 362 F.3d 87, 94

726, 729 (8th Cir. 2003).[19]

As the Third Circuit has explained, a "First Amendment retaliation claim will lie for any individual act which meets this 'deterrence threshold,' *and that threshold is very low*." O'Connor, 440 F.3d at 127-28 (emphasis added); accord Price v. Chaffinch, 2006 WL 1313178, *3 (D.Del. May 12, 2006). "First Amendment retaliation claims are always individually actionable, even when relatively minor." O'Connor, 440 F.3d at 127-28. As the Supreme Court, Third Circuit and District of Delaware have repeatedly noted, the person of ordinary firmness standard may be satisfied even for acts of "retaliation as trivial as failing to hold a birthday party for a public employee if intended to punish her for exercising her free speech rights." Id. (internal punctuation omitted); accord Rutan, 497 U.S. at 76 n.8; Suppan, 203 F.3d at 234-35; Price, 2006 WL 1313178, *3. This is not surprising in the employment context given that, as one Court has observed,"[o]ne does not have to be an employment expert to know that an employer can make an employee's job undesirable or even unbearable without money or benefits ever entering into the picture." Collins v. State of Ill., 830 F.2d 692, 703 (7th Cir. 1987).

"Determining whether a plaintiff's First Amendment rights were adversely affected by

---

(1st Cir. 2004) ("the standard for showing an adverse employment action is lower in the First Amendment retaliation context than it is in other contexts (such as Title VII)."); Baca v. Sklar, 398 F.3d 1210, 1220 (10th Cir. 2005) ("we have repeatedly concluded that a public employer can violate an employee's First Amendment rights by subjecting an employee to repercussions that would not be actionable under Title VII."); Rodriguez v. Torres, 60 F.Supp.2d 334, 345 n.10 (D.N.J. 1999) (recognizing the distinction between the adverse action standards in the First Amendment and Title VII contexts).

[19] Because this is an objective standard, a plaintiff need not demonstrate that he actually was deprived of his First Amendment rights. See Constantine v. Rectors and Visitors of George Mason Univ., 411 F.3d 474, 500 (4th Cir. 2005). Indeed, "[s]peech can be chilled even when not completely silenced." Rhodes v. Robinson, 408 F.3d 559, 568 (9th Cir. 2005); see Constantine, 411 F.3d at 500 ("The cause of action targets conduct that tends to *chill* such activity, not just conduct that *freezes* it completely").

retaliatory conduct is a fact intensive inquiry focusing on the status of the speaker, the status of
the retaliator, the relationship between the speaker and the retaliator, and the nature of the
retaliatory acts." Brennan, 350 F.3d at 419; see Andrews v. City of Phila., 895 F.2d at 1484 ( "A
play cannot be understood on the basis of some of its scenes but only on its entire performance,
and similarly, a [retaliation] analysis must concentrate not on individual incidents, but on the
overall scenario").   Importantly liability may be established "based upon a continuing course of
conduct even though some or all of the conduct complained of would be *de minimis* by itself or if
viewed in isolation." Id. at 419 n.16; see Suppan, 203 F.3d at 235 (noting that what is "trivial in
detail may have been substantial in gross"); O'Connor,440 F.3d at 128.

    **C.  Discussion.**  As discussed at length in the facts section **G** above, defendant Mears'
course of retaliatory harassment and acts of adverse action against plaintiff include the following:

- Giving plaintiff a mediocre evaluation of his job performance, job performance which, as Captain Wilkinson explained, does not meet the expectations set for correctional officers in the DOC. (See Facts section **G.1** above).

- Falsifying plaintiff's evaluation and fabricating allegations of misconduct to justify Mears' actions. (See Facts section **G.1** and **H.7-9** above).

- Violating Captain Wilkinson's order to meet with he and plaintiff before Mears turned in the evaluation to HR. (See Facts section **H.7** above).

- Denying plaintiff a meeting with Mears himself and his union representative. (See Facts section **G.2** above).

- Altering plaintiff's time card. (See Facts section **G.3** above).

- Denying plaintiff a copy of his time card. (See Facts section **G.4** above).

- Repeatedly denying plaintiff transfer to a new supervisor. (See Facts section **G.5** above).

- Nitpicking plaintiff's work performance. (See Facts section **G.6** above).

This long course of retaliatory conduct is certainly "sufficient to deter a person of

ordinary firmness from exercising his First Amendment rights."  Suppan, 203 F.3d at 235;

O'Connor, 440 F.3d at 128.  Indeed, in light of this retaliation, as a matter of law a "reasonably

hardy individual[]" would to refrain from exercising his First Amendment rights.

Agosto-de-Feliciano, 889 F.2d at 1217.

## CONCLUSION

For the reasons discussed above, the Court should grant partial summary judgment to

plaintiff as follows:

(1) Plaintiff engaged in protected First Amendment activity under the association, free

speech and petition clauses when he debated defendant Mears about union solidarity on August

5, 2004; resigned from CERT and refused to cross a union picket line on August 6, 2004; filed a

union grievance about his downgraded job evaluation; and was a member of COAD.

(2) Plaintiff has suffered adverse employment action in that a course of retaliatory action

was taken against him which would chill a person of ordinary firmness.

(3) Plaintiff has proven that his protected First Amendment activity was a substantial or

motivating factor in the retaliatory actions defendant Mears took against him.

(4) Defendants have waived and failed to prove or offer evidence of a same decision

anyway defense to plaintiff's claims.

Accordingly, with liability established, a trial on damages only should be ordered against

defendant Mears.

Respectfully Submitted,

**THE NEUBERGER FIRM, P.A.**

/s/ Stephen J. Neuberger
**STEPHEN J. NEUBERGER, ESQ. (#4440)**

40

**THOMAS S. NEUBERGER, ESQ. (#243)**
**CHERYL A. HERTZOG, ESQ. (*Pro Hac Vice*)**
Two East Seventh Street, Suite 302
Wilmington, Delaware 19801
(302) 655-0582
TSN@NeubergerLaw.com
SJN@NeubergerLaw.com
CherylH@NeubergerLaw.com

Dated: January 31, 2008                    Attorneys for Plaintiff

## <u>CERTIFICATE OF SERVICE</u>

I, Thomas S. Neuberger, being a member of the bar of this Court do hereby certify that on

January 31, 2008, I filed this **Brief** with the Clerk of the Court using CM/ECF which will send

notification of such filing to the following:

> Ralph Durstein, Esquire
> Stacey Xarhoulakos, Esquire
> Department of Justice
> Carvel State Office Building
> 820 North French Street
> Wilmington, DE 19801

> /s/ Thomas S. Neuberger
> **THOMAS S. NEUBERGER, ESQ.**

Balas \ Briefs \ SJOB.final