times a week.

15.    Further, in 2004, on behalf of COAD, I gave a speech before the Joint Finance Committee addressing the various issues plaguing the prisons.

**D. The Content of the Union Activity**

16.    During the Summer of 2004, union officials were pushing for reform in several areas, mainly dealing with the severe understaffing of the facilities, wage increases for correctional offices to ensure retention and morale, and security lapses which were often a direct result of the understaffing problems.

17.    COAD served as the voice of the rank and file, Sergeants and below, and pushed hard for these issues at every given chance.

**(1) Severe Understaffing that Endangered Public Safety**

18.    Prior to the formation of COAD, Governor Minner had ordered the removal of any vacant job positions within DOC. These cuts however did not eliminate DOC's need for the positions. So where you used to have three people doing the job, now there was only one.

19.    As a result of these cuts, the staffing numbers did not even come close to showing how severely understaffed the institutions were. By eliminating the positions Minner created the appearance that DOC was only short a few officers, while in reality it was severely understaffed.

20.    To add to this, staffing levels kept falling as DOC was losing more officers faster than they could hire them.

21.    By cutting these positions, Minner only sought to distort the actual numbers so they did not appear so bad before the public, she never addressed the DOC's actual need for those positions to be filled.

22.    Staffing became so bad that at DCC there were two buildings which were closed

4

because there was no staff to run them.

23.    Correctional officers have one of the most dangerous jobs in the State of Delaware.  They are tasked with the responsibility of keeping the public safe from some extremely violent inmates.

24.    Officers are only scheduled for eight hour shifts, but policy requires that minimum staffing levels be achieved.  Therefore, at the beginning of a shift if there are not enough officers scheduled to work, other officers are asked to work voluntary overtime or in some cases are forced to work mandatory overtime, a process called "freezing."

25.    In May of 2004, the DOC was over an entire shift short which resulted in a mass amount of involuntary overtime or freezing of officers.

26.    As union officials disclosed to the media, understaffing was the number one problem facing the rank and file.  When officers were frozen it meant they had to work mandatory sixteen hour shifts.  Some officers would not even find out they were working a subsequent eight hour shift until minutes before their first shift ended.

27.    The severe understaffing problem was caused by and also compounded by the large number of officers leaving DOC versus the number of new hires.  The reasons for this massive fleeing from jobs with DOC was a direct result of practices such as freezing, the stress of working in hazardous conditions knowing there was a shortage of officers or officers who were tired from working 16 hour shifts, and low wages.

28.    In June of 2004, as the vice-president for COAD, I publically disclosed that staffing had reached crisis proportions with two officers leaving for every new recruit hired.  This severe understaffing had a negative impact not only on issues such as security, but also the morale of correctional officers.

5

29.     Security and understaffing went hand-in-hand.  The more understaffed a facility was, the higher the risk of harm to the public, the inmates, and the correctional officers.  As I publically stated, it was normal for one officer to be responsible for 60 or more inmates in direct supervision environments and the ratio could even be 1 to 100 or more in some housing and facility areas.

30.     The severe understaffing at DOC impacted many areas including the health and safety of the inmates, the health and safety of correctional officers, the classification of inmates, and morale of correctional officers.

31.     The health and safety of the inmates was in jeopardy because there were not enough officers to man the buildings to ensure safety.

32.     A good illustration of the falling staffing numbers at DOC can be exemplified within the "old" side of the Howard R. Young Correctional Institution.  There Institution has two units containing inmates and each set of two is tied together and connected with a "bubble," or an office with protective glass on both units.  From this "bubble" officers would monitor and watch the inmates.  Prior to the understaffing problems, there were three officers who monitored the inmates.  One would be out on the floors and the other two would monitor from the "bubble".  The floor officer was removed and replaced by a roving officer between multiple units.  Eventually, the numbers decreased and one officer was left to staff the bubble and monitor both rooms at the same time.  So if an incident broke out, this lone officer would have to wait for help.  He could not leave the bubble unmanned because the inmates in the other room would then be unmonitored.  Another issue was confining the offenders for extended periods thus heating up possible situations between the inmates.

33.     Another example of the understaffing problem is seen in the use of "rovers" to

6

monitor buildings. A "rover" would make his rounds to check on the inmates who were locked into their cells. When a shift was understaffed, the rover would have more buildings and rooms to check in on thus slowing down his ability to check on the inmates frequently. As a result, the inmates were only getting checked on by a rover every so often. There was no consistent supervision.

34.    Additionally, due to the understaffing inmates were often locked into buildings for long periods of time without being let out into the open air because there were not enough officers to ensure their safety outside the building. Often times they were not let out of their buildings for more than an hour a day. Their continued confinement led to increased violence among the inmates.

35.    In turn, this increase in violence would effect an inmate's record often times preventing them from being classified and transferred to Level 4 lower security level prisons upon the approach of their release date.

36.    Prisoners in DOC were often transferred to Level 4 facilities when their release date was approaching in an effort to reacquaint them with society. These prisoners would be allowed to spend a certain amount of time at home with their family to allow them to adjust to a life of freedom. Without this opportunity, prisoners often were not ready to be released after spending a significant amount of time behind bars.

37.    For example, one inmate who was denied this opportunity to be transferred to a lower security level prison to reacquaint him with society immediately re-offended upon being released because he was petrified and did not know how to cope outside of captivity. So when inmates caused problems while incarcerated, they could not be classified and would lose out on the opportunity to transfer to Level 4 facilities and reacquaint themselves with society.

7

38.    Along the same lines, the hallways at DCC were only being monitored half of the time DOC policy required them to be monitored.

39.    For example, one building at DCC consisted of five tiers with twelve hallways. Correctional officers were required to walk the hallways to check in on the inmates in their cells. Officers were also required to do "phone punches" to determine that an officer made it to the end of a hallway after checking in on the inmates.  It took approximately five minutes for one officer to walk down a hallway and do a punch.  Therefore, it took at least sixty minutes for all twelve hallways to be monitored.  DOC policy required that two "phone punches" per hallway per hour. The only possible way for this policy to be met is for two officers to perform the monitoring of these hallways at the same time.

40.    With the severe understaffing problem, there were not enough officers for two groups to perform these punches, therefore, a single set of officers were tasked with checking in on the inmates and doing the punches for the entire building.  This meant that inmates were only being checked in on once every hour instead of twice, which was the policy.

41.    To compound this, officers were also tasked with letting inmates out to chow, programs, etc. which required more staff to be pulled off of these required punches.  As a result, punches were getting done less than once an hour and the inmates were getting monitored less and less.

42.    Additionally, the health and safety of correctional officers was in jeopardy.  As stated above, often rooms filled with numerous inmates were only monitored by one officer.

43.    Likewise, with staffing at or near all-time lows, officers were forced to patrol the facility alone with the inmates rather than having a partner.  There was less staff to respond to incidents and frequently there was little or no backup available to respond to incidents.  DOC had

8

an internal response team made up of correctional officers, but that team was short staffed as well. For example, it was possible that if two incidents occurred at the same time the rovers, as well as any spare officers, responded to each incident, no one was left to respond if a third incident were to break out.

44.    Lastly, the morale of the correctional officers was directly impacted as they were often frozen and forced to work sixteen hour shifts. These officers spent significantly less down time at home to enjoy time with their families or for rest and relaxation. After awhile this resulted in many officers burning out. This led to officers seeking employment elsewhere, only escalating the already grievous staffing problem.

**(2) Wage Increases to Attract and Retain Skilled Correctional Officers**

45.    As discussed above, DOC was experiencing a significant decline in the number of officers it was able to retain.

46.    The union began seeing a trend develop where after ten years of service, correctional officers were leaving DOC to seek employment elsewhere. For example, officers were leaving employment with DOC for jobs with companies such as Wal-mart where they received higher wages without having to work in extremely dangerous conditions.

47.    The underlying reason for the large drop-off in correctional officers was mostly due to the fact that there was no incentive to stay. Correctional officers hired by DOC would remain at their initial rate of pay and rank unless they tested and accepted a promotion.

48.    There was no career ladder or longevity pay. So for example, a recruit hired as a correctional officer would remain in that position unless he tested for Corporal and accepted a promotion. If you never tested or accepted a promotion, you would only receive the yearly 1-2% salary increase and by the time you could retire you would only be making 15-20% more than a

9

new hire.

49.     New Jersey on the other hand had a career ladder where a correctional officer

moved from a CO-I to a CO-II and so forth depending on years of service and automatically

received a 5% raise in each of their first nine years on the job.  By the time a New Jersey

correctional officer retired he could receive as much as $70,000 per year without ever having to

test or accept a promotion.

50.     Additionally, DOC allowed anyone who tested for promotion to the rank of

Corporal to accept a Sergeant's position if there was a vacancy.  In other words, there was no

requirement that a correctional officer have a certain amount of time with the department to

move up in rank.  Thus, as long as an officer took the Corporal/Sergeant test, s/he could accept a

position as a Corporal or a Sergeant.

51.     There was no specific requirement for time on the job in order to move up.  This

practice is virtually unheard of in any other paramilitary organization.  Basically, without any

structure to their promotional process, a career ladder or longevity pay, there were no incentives

for officers to stay on the job.

52.     Another problem DOC experienced was officers enrolling in the Delaware

academy, but then taking jobs in surrounding states such as New Jersey and Maryland where the

pay was higher and there were career ladders allowing for upward mobility.  While the starting

salaries between these surrounding state institutions were comparable to Delaware, the difference

was in incentives and the ability to move up in rank and pay simply by putting in time on the job.

53.     The union advocated for changes such as a career ladder and longevity pay which

would result in better working conditions for correctional officers which would in turn help to

keep officers on the job.  As State Merit System employees, salaries and benefits were not

10

included in the contract negotiations with prison officials. The union was left to use only the media as a catalyst for their claims in petitioning the Governor and legislature for higher wages.

## (3) Frequent Security Lapses

54.    Approximately nine months prior to the violent rape of a DOC counselor, I addressed the Joint Finance Committee and stated that the severe levels of understaffing would inevitably lead to murder, injury or even rape with DOC.

55.    As discussed above, the severe understaffing goes hand-in-hand with the security lapses.

56.    Despite the overwhelming amount of attention given to the issues of security at DOC, there were even more lapses that the public was not even aware about. Having one officer multi-task and perform a job meant for several officers inevitably led to breakdowns in security.

57.    For example, to ideally man a Level 4 facility with 225 inmates, four officers were needed which included a stationary log officer who could not leave their post. In 2004, these Level 4 facilities were really operating with three officers, one of which was stationary.

58.    The numbers designated as the minimum staffing levels needed for operation were arbitrary numbers pulled out of the air by the Warden of that facility. These arbitrary numbers never fluctuated with the amount of inmates housed in that facility. For instance, if the Warden declared the minimal staffing level required 4 officers, it remained at that level no matter how many more inmates were added.

59.    This, coupled with the already increased levels of understaffing, made security extremely weak and vulnerable. While the Facility should rune with a minimal staffing level of 4, often times only 3 officers were on duty. This could then drop down to two (2) if an emergency occurred.

11

**(4) The Job Action and Strike**

60.    As the staffing grew worse and tension and stress levels escalated among correctional officers, on July 22, 2004 ten days after the rape of a correctional officer by an inmate COAD members held a special meeting to discuss the problems at DOC.

61.    Many claimed to be burnt-out due to forced overtime and long hours spent at work rather than at home with their families, others feared the increasingly dangerous conditions they were working under with staffing being at an all time low.

62.    As I publically stated, "It's getting dangerous. It's coming to a head."

63.    Soon after this meeting correctional officers and COAD members planned a work action to protest low pay and other issues.

64.    At this time the work action was unsanctioned by COAD.

65.    The officers were refusing to work any voluntary overtime shifts.  By law officers could not strike or refuse mandatory overtime, but no one could force them to work voluntary overtime shifts.

66.    The job action was intended to illustrate their frustration and let the Governor and legislature know there were problems that needed attention and solutions.

67.    Officers, desperate for change, felt this was the only way to make their voices heard by the Governor and the Legislature that in order to get and retain more people is a change in pay.

68.    By law, COAD could not sanction such a work action because they could risk being sued.  However, we stated publically that they were happy to see the rank and file pull together.

69.    The work action, or job action, had the most impact on the court and

12

transportation department.

70.     As a result of the situation created by more than 400 officer vacancies, officers were often asked to work voluntary overtime to help move inmates to and from state prison facilities to courts for scheduled hearings and other appearances.

71.     The impact prompted prison officials and courts to come up with alternative ways to make sure prisoners were present for the preliminary hearings and trial dates as well as forcing overtime and forcing officers to work 16 hour shifts.

72.     With the absence of officers to transport these prisoners to court, if inmates did not receive their preliminary hearing they could be released with all charges dropped.  Despite this, officers threatened to continue the job action until they saw something from union officials in writing.

73.     In order to get officers to accept voluntary overtime, a memo was issued by management to members urging them to resume voluntary overtime which was posted in the prisons.

74.     On July 30, 2004, COAD issued a public press release stating that all three unions - COAD, American Federal of State, County and Municipal Employees ("AFSCME") Local 247, Fraternal Order of Police ("FOP") Lodge 10 - supported their membership's desire not to accept voluntary overtime to ensure the concerns of all DOC personnel are addressed.

75.     As a result, the job action grew in strength.

76.     In late July, prison officials agreed to meet with COAD on August 3rd to discuss the issues plaguing the DOC and Taylor also planned to present a plan to correctional officers.

77.     However Taylor's proposal only included across the board pay raises and recruitment incentives.  We rejected it since it failed to address retention issues and provided no

13

incentives for officers to stay on the job longer.

78.    As a result, officers refused to end the job action and continued to decline voluntary overtime.

79.    On August 6, 2004, Taylor activated five members of the Correction Emergency Response Team ("CERT") to step in and staff the DOC's Court and Transportation unit.

**(5) Suggested Solutions to These Problems**

80.    During legislative meetings and negotiating sessions, we posed several solutions. To help alleviate the understaffing problem and the amount of officers leaving the job, COAD suggested implementing policies such as a career ladder or longevity pay which would provide incentives for correctional officers to remain on the job and not flee to other state institutions or other industries.

81.    Additionally, COAD proposed pay increases commensurate with time on the job. This would help close the gap in pay between Delaware and surrounding states.

82.    In an effort to eliminate some of the strain felt by the understaffing problem DOC recommended changing eight hour shifts to twelve hour shifts.  COAD opposed this change. COAD's fear is that this change would disrupt the schedules of older workers who already have set schedules including weekends off.  This in turn would lead to more officers leaving the job and would enhance the problem, not solve it.

83.    COAD advocated a mass hiring, while prison officials suggested holding job fairs. DOC also took steps to lower employment requirements such as the minimum age and accepting a larger amount of candidates who pass the pre-hire test.

84.    These measures barely helped DOC retain the minimum staffing requirements.

85.    DOC implemented a task force created by Taylor to evaluate the problems at

14

DOC and make recommendations. The task force made several recommendations to management such as allowing officers to retire after 25 years instead of 30, spending $900,000 to increase starting salaries, and changing state law to allow for a career ladder which would create easier movement through the pay scales.

86.    But DOC officials claimed the task force did not come to a lot of conclusions and was short on evaluating what would work best. Essentially, the governor and legislature would make the final decision.

87.    Earlier in the year, the administration granted a $600 increase in hazardous duty pay, as well as a bonus between $600 and $1,000 in June and an increase in salaries by 3% in July. However, this only scratched the surface.

88.    Officers were still without a contract, and to date have yet to reach agreement with DOC officials in contract negotiations.

**F. The Many Contemporaneous Problems at DOC**

**(1) The Abduction and Rape of a Female Counselor**

89.    On July 12, 2004, as COAD had previously warned, inmate Scott A. Miller took Cassandra Arnold, a female counselor, hostage for six and a half hours at Delaware Correctional Center in Smyrna.

90.    In the days following the violent rape, union official publically criticized management because for months they had begged for improvements and had warned the governor and legislature that something like this could happen if no action was taken.

91.    DOC officials denied that staffing played a role in the incident while union officials vigorously continued to attack the legislature and Governor in the media for not addressing pay and staffing issues.

15

92.     Further, union officials explained that while the building where the rape occurred might have only been short one officer, this failed to take into account that seven of the officers were working either voluntary or involuntary overtime.

**(2) Prison Escapes**

93.     In December of 2003, inmate Myron D. Price escaped from two correctional officers while being transported to the Kent County Courthouse.

**(3) Other Security Breakdowns**

94.     On April 26, 2004, inmate Willis T. Matthews, Jr. was on trial in Sussex County Superior Court for allegedly raping a 91 year old woman.  While on trial, he slit his neck with a tiny piece of disposable razor blade.

95.     Shortly thereafter, convicted burglar Sean A. Dupree swallowed a handcuff key as part of an alleged escape plan while in transport to Kent County Superior Court.

96.     The very next day inmate Richard L. Clark had walked away from Sussex Community Corrections Center in Georgetown causing a Wilmington police officer to fire his service weapon at him.

**G. Prison Conditions Were an Issue in the Upcoming Gubernatorial Race**

97.     COAD publically opposed the re-election of the incumbent Governor and actively worked to defeat her.

98.     COAD publically supported Gubernatorial candidate Bill Lee.  On our own time we would hand fliers out at local grocery stores or in housing developments to support his campaign.  In turn, Mr. Lee ran radio ads which pushed the prison issues.

**H.  Retaliation for Union Speech**

99.     Defendant Machtinger was aware that Sgt. Justice was a union official, a member

16

of contract negotiating team and that the union was publically speaking out about the many problems at DOC.

100.   As a result of the union membership refusing to accept voluntary overtime and union officials' speech about DOC management, prison officials such as defendant and HR Director Machtinger began implementing extremely vague policies giving management more control over personnel matters.

101.   Additionally, there was no contract in place to protect the correctional officers or overrule these policies.

102.   Further, while fighting with management in the media and contract negotiations, COAD union officials also were fighting management in grievance hearings on behalf of correctional officers.  The union had almost a 95% success rate against management.

103.   Machtinger was very involved in the grievance process and did not like that union officials were so successful.

104.   Defendant Machtinger did not like when people spoke out against DOC or management.

105.   Machtinger is friends with Commissioner Stan Taylor.

106.   Additionally, Taylor worked at the Governor's discretion.  Accordingly, Minner was able to utilize Stan Taylor and HR Director Machtinger to project her will.

107.   Minner was also having to publically debate other candidates on issues concerning DOC in public forums.

108.   Minner began taking her anger and frustration out on union officials by filing a lawsuit against us.  On August 5, 2004, the State of Delaware and DOC filed a lawsuit against all the COAD union officials in Chancery Court because of our union activities, including our

17

perceived support for a work stoppage by prison guards protesting dangerous working conditions in Delaware prisons. This lawsuit was the result of a last ditch effort by the Governor to put a stop to the correctional officers' defiance of upper management and to end their very successful job action.

109.    When the Chancellor ruled in favor of union officials, Minner lost face in the public eye. The highly successful job action and the Court's refusal to put an end to it left her entirely helpless and without any immediate remedy.

## I. DOC Testing Procedure for Lieutenants

110.    It was DOC's policy to use a testing procedure for promotions to positions with pay grades of 11, such as Lieutenants and the Community Work Program Coordinator position.

111.    The testing process for Lieutenants consisted of taking a test, being placed on the certification list, and then participating in an interview. During the interview process, an applicant was scored by each of the evaluators and eventually ranked based on their scores. The candidate with the highest score was supposed to be awarded the position.

112.    The Lieutenant's test was, as stated in the Department of Corrections Study Guide, available at the Employee Development Center and could be studied for by reading the Borough of Prisons Policy Manual available at each institution. However, the Borough of Prisons Policy Manual is not available in the Borough of Community Correction's Facilities thus limiting all of their staff's ability to study for this important test and move ahead. All DOC promotional tests in the Correctional Officer's Series are based on the Borough of Prisons Policy Manual. The rules, however, can contradict the Borough of Community Correction's policies and the lack of providing needed study material shows an underlying discrimination within the testing process.

18



**David Knight**

I declare under penalty of perjury that the foregoing is true and correct.    Executed on

October 11 , 2007.

Justice / Pleadings /  Declaration / Justice - Knight Declaration.final

19

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CINDY L. BALAS a/k/a CINDY L. ADKINS, | : | |
| Executrix of the Estate of CORPORAL JOHN J. | : | |
| BALAS, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | C.A.No. 06-592-JJF |
| | : | |
| STANLEY W. TAYLOR, JR., individually and | : | |
| in his official capacity as the Commissioner of | : | |
| Correction; ALAN MACHTINGER, | : | |
| individually and in his official capacity as the | : | |
| Director of Human Resources of the Department | : | |
| of Correction; MICHAEL DELOY, individually | : | |
| and in his official capacity as Deputy Warden of | : | |
| Sussex Correctional Institution; CAPTAIN | : | |
| DAVID WILKINSON, individually; | : | |
| LIEUTENANT TRUMAN MEARS, | : | |
| individually; and DEPARTMENT OF | : | |
| CORRECTION OF THE STATE OF | : | |
| DELAWARE, | : | |
| | : | |
| Defendants. | : | |

UNSWORN DECLARATION OF CINDY ADKINS
UNDER 28 U.S.C. § 1746

I, Cindy Adkins, hereby depose and state as follows:

1.     I have personal knowledge of the facts contained in this declaration and, if called

as a witness, I am competent to testify as to those facts.

2.     I am the widow of John J. Balas.  We were married at the time of his untimely

death on February 19, 2005.

3.     On January 30, 2005, around 5:30 a.m. I received a phone call from the wife of

John's friend, Lee Mears, who explained that Lee had been with my husband at his parents'

house all night.  She explained that Lee took John to his parent's house because he made statements that he would not be alive in the morning.  She informed me that Lee was bringing John home.

4.    I was very concerned because while I knew John was depressed, I did not know that he was suicidal.  Around 8:00 a.m. I called Dr. Jani, our family doctor, who instructed me to get him to St. Jones Behavioral Health Center to see a counselor.

5.    I then called St. Jones and asked if there was a counselor who would meet with John.  I told the counselor about the events of the previous day and how John was drinking and driving around with a loaded pistol.

6.    The counselor informed me that I should bring him as soon as possible.  I asked what I needed to bring if they decided to keep him for observation and he instructed me to pack items that were non-hazardous, including shoes without laces, sweatpants with no strings, and other appropriate items for a person on suicide watch.

7.    I called Lee Mears and told him I was taking John to St. Jones for evaluation and asked him to accompany me.

8.    In the early afternoon of January 30, 2005, Lee Mears, my brother Jeff Foskey, and I took John to St. Jones for psychiatric evaluation.

9.    Upon arriving at St. Jones, John met with a male counselor for about 20 to 30 minutes.  After meeting with John, the counselor came out and gave John two lists of counselors and psychiatrists in the area that he should contact.  The counselor also instructed us to remove all guns from the house.  The counselor then released him.

10.    Since we were surprised by the counselor's decision to release him, Lee Mears

2

11.    After leaving St. Jones, we decided to take John to his parents house while Lee, Jeff and I removed all of the guns from our house.

12.    On February 2, 2005, John returned back to work. That week he was supposed to have a meeting with his supervisors regarding his performance evaluation, but the meeting kept being cancelled. That same week he discovered that his evaluation had been sent into his file without his signature. John then took the following week off of work.

13.    In the weeks following his visit to St. Jones, John was very quiet and introverted. He never smiled or laughed. He also refused to contact any of the psychiatrists the counselor had suggested.

14.    Finally, on February 15, 2005, I convinced John to met with Dr. Jani who prescribed some anxiety medication. Dr. Jani also strongly recommended that he call to set up an appointment with a psychiatrist.

15.    On February 18, 2005, John contacted Dr. Pitts, a psychiatrist, who did not have an available appointment until June 8, 2005.

16.    The very next day, on February 19, 2005, John walked into the backyard, shot and killed himself.

_Cindy L Adkins_
**Cindy Adkins**

I declare under penalty of perjury that the foregoing is true and correct. Executed on October 8, 2007.

Balas / Pleadings / Declaration / Cindy Adkins Declaration

3

## CHRISTIANA PSYCHIATRIC SERVICES, P.A.
### 4745 Ogletown-Stanton Road
### Suite 124, Medical Arts Pavilion I
### Newark, DE 19713

CAROL A. TAVANI, M.D., M.S., F.A.P.A.
Diplomate and Distinguished Life Fellow
American Board of Psychiatry & Neurology

Adult and Consultation Psychiatry
Phone (302) 454-9900
Fax    (302) 454-9905

The following is the forensic evaluation regarding Corporal John J. Balas. Corporal Balas was a Correctional Officer for the State of Delaware. He committed suicide on February 19, 2005. His late wife, Cindy Balas, now Cindy Adkins, has brought action against the Department of Corrections alleging retaliation for his actions in refusing to cross a picket line, as having led to an emotional state which resulted in his having taken his own life.

I am asked to analyze Cpl. Balas' mental and emotional state in the time leading up to his death, and to opine whether the retaliation and resultant stress he experienced caused him to end his life.

I have reviewed the following materials:

1. Complaint, dated September 25, 2006

2. Balas Commendations and Awards

3. Additional Commendations and Awards

4. Balas' Resume

5. Balas' Official Grievance to the Correctional Officers Union (COAD)

6. Balas' diary entries

7. Physician's note

8. Newspaper article "in memory of Cpl. John Balas," by Sgt. Jeff Rogers

9. Declaration of Cindy (Balas) Adkins

10. Declaration of Lee Mears

-2-

11. Journal entries of Cpl. Balas

12. Suicide notes of Cpl. Balas

13. Medical Records:

      A. Dr. Uday Jani
      B. Dr. Bhaskar Palekar
      C. Beebe Medical Center Emergency Records
      D. Associated Laboratory reports

In addition, I interviewed Cindy (Balas) Adkins in a lengthy session of nearly four hours.

## PAST MEDICAL HISTORY:

Primary physician: Dr. Jani
Height: 6'2" Weight: 207
Nonsmoker
No illicit substances

Alcohol: Approximately two years prior to his death, after, according to his wife, he began to experience stress at work, he began to drink. He would repeatedly identify to his wife various issues at work as the precipitant of his drinking on arrival home, or before he tried to go to sleep.
Alcohol consumption prior to that as reported in Dr. Palekar's records and as corroborated by his wife consisted of one to two beers per week. This is also corroborated by normal liver function studies in his old records (e.g., 1995 to 2001, the last set I have prior to 2004).
Imaging included in his records, as a significant negative, do not report chronic structural sequelae of alcohol abuse.

When his stress increased over work related events as described below, he would drink on returning home from work to "unwind.". His drinking escalated in the Fall of 2003, about six months after Lieutenant Mears became his supervisor.
Liver function studies were elevated in September 2004.

-3-

He quit in May, 2004, but restarted two months later, in July.
Liver function studies were within normal limits on 2/18/05 labs.

Acute rhinitis/sinusitis with cough and minor headache, 1999, which improved on
medications.

Benign hematuria, 2000, evaluated by Dr. Hosmane.

Migraine/tension headaches, which began in October 2004, CT and MRI of the brain
Labile hypertension, which was diagnosed in the summer of 2004
Sports injury, left groin, 9/29/04

Motor vehicle accident 2/18/05, with contusions. He struck his head but there was no loss
of consciousness.

**Surgical History** includes right shoulder surgery in 1989, while in the Navy, referable to
a football injury, and right ACL repair by Dr. Craig Morgan in 1999.

## PSYCHIATRIC HISTORY:

There was no prior history of anxiety, depression or other psychiatric disorder.

Somatic symptoms consistent with stress response began in the summertime of 2004, in
the form of elevated blood pressure, then migraine/tension headaches, for which he saw
Dr. Peet, a neurologist.

Those notes of 12/20/04 report "has a stressful situation with his job" and "has been
under a considerable amount of stress at work," mentioning a labor dispute, and
referencing that he and ten colleagues have apparently had some type of job strike." They
mention that he was being watched closely.

Notes of January 2005 document that the stress at work persisted.

Dr. Jani's notes dated 2/15/05 report that he had recently been seen in a psychiatric
hospital, but not admitted. Increased stress at work is referenced in those notes.
Depressive symptoms documented included insomnia, fatigue, and anxiety.

-4-

The notes reference that the family had removed all guns from the home, because of his suicidal ideation, although at that visit, he denied any at that time. He eschewed counseling because of a reportedly bad experience in the past. (His wife explained that they had been to a counsellor once, over some issued relating to in-laws in 1992 or 1993, but he never went back a second time (she had a second session, but things had improved after that)).

When advised to see a counsellor at work, his response was that he was afraid of confidentiality issues, so Dr. Jani suggested care away from that venue. He also prescribed Klonopin, an anti-anxiety agent, at that visit.

**Events leading to deterioration of psychological status:**

Although the records from St. Jones were not able to be recovered by the time of this writing, his wife tells me that his stress seemed to begin after Lt. Truman Mears became his supervisor in early 2003.

By Fall 2004, he was noticeably stressed. Conditions at the prison were affecting him - for example, the rape of a counsellor in July 2004 had a major, disturbing impact on him, according to his wife. There had been other serious incidents earlier that year. In addition, he had spoken of abuses of inmates which were disturbing to him, and of his inability to have his superiors listen to him on these matters of concern for safety.

In 2003 and 2004, COAD (Correctional Officers Association of Delaware), the officers' collective bargaining body since 2002, of which Cpl. Balas was a member) had begun to speak out on various such matters of public concern. Security and safety problems created by understaffing resulted in a directive that officers work overtime, at times for sixteen hour shifts. Morale deteriorated and some resigned, exacerbating the shortage.

This eventuated in the officers refusing to work the mandated overtime. As things escalated, the Governor filed a lawsuit, seeking a temporary restraining order against COAD members (that was denied the next day) - but then in August 2004, the CERT team members were ordered to fill the positions of the officers who would not work overtime, transporting prisoners, etc. -- essentially to be strike breakers.

-5-

Cpl. Balas and ten other CERT team members reported to do so - but after one shift of doing so, all decided they could not continue to follow this directive, and at the end of that shift, resigned as CERT team members, and spoke out against this directive. The only CERT member who did not resign was his supervisor, Lt. Mears.

When he resigned, he asked for a transfer to a position not under supervision by Lt. Mears, as he feared retaliation would be likely - but this was not granted.

It was in September 2004 that he received a mediocre performance evaluation - the first ever not documenting that he had exceeded expectations, an achievement in which he took so much pride that he would go to work febrile so as not to tarnish a perfect attendance record. It also failed to acknowledge appropriately his commendations. He was pressured to sign the evaluation despite his stated intention to dispute it.

Despite his disputing the evaluation and his request to meet with Captain Wilkinson and a Union representative in an effort to have his evaluation corrected from Meets" to his usual level of "Exceeds" expectations, and to include the appropriate acknowledgements, and then sign it at a later date, he discovered in January 2005 that the evaluation had been turned in to the Warden as his having refused to sign it.

Relatedly, in September 2004, he became aware that Lt. Mears had misrepresented holidays and legitimate vacation days on his time cards as "emergency vacation days," which are frowned upon in the system. Although the lieutenant was eventually made to correct those misrepresentations, he was never disciplined or had any other consequences from this behavior.

In addition, he became aware, through notes found by other correctional officers, that his comings and goings were being monitored by Lt. Mears. He had become aware of this by January- early February 2005, and confided this to his wife. After his death, officers shared additional details about this with her.

Also in January 2005, Cpl. Balas failed to receive his time cards for the end of 2004, in violation of the rules, leading him understandably to anticipate more irregularities would be contained therein.

-6-

Despite his requests for transfer away from Mears, a transfer never occurred, although he informed Mears' superiors of the above-described retaliation.

By February 2005, he had become so hopeless over the ongoing retaliatory events that he expressed suicidal ideation.

He had developed an entire depressive complex of neurovegetative stigmata, described to me by his wife as having begun in July 2004 and progressed from there forward until in the Fall and Winter of 2004 included the following:

Depressed mood, with inability to smile and loss of humor
Diminution of energy and interest, eschewing activities he previously enjoyed
Decreased libido
Psychomotor slowing
Agitation
Insomnia
Horrendous irritability, blowing up at the family, and denigrating his children uncharacteristically, then followed by tremendous guilt
Lowered self-esteem
Difficulties with concentration, attention and memory - he forgot to pick up their children,
despite reminders
Social withdrawal from coworkers and friends, as well as his children
In addition, in May 2004, he had decided to stop drinking, but in July 2004, he restarted, reporting that he needed to "unwind" after the stress at his work.
In addition, in the Fall of 2004, he exhibited another uncharacteristic behavior - an affair, despite a solid marital relationship and his devotion to his children, which lasted until January 2005.

On January 29, 2005, he confided to a close friend, Lee Mears, that he was going to commit suicide. His wife, her brother and his friend, Lee Mears, took him for psychiatric evaluation to St Jones Behavioral Health Center, of the Bayhealth system. They were under the impression that he would be kept there, and brought an overnight bag as directed.

She tells me that some of the Captains knew of his suicidality, but although there is a program, essentially and Employee Assistance Program, he was never referred to it.

-8-

The next day, she took him to Dr. Jani.

The Wednesday and Thursday before his death, the couple had gone away to a hunting lodge. His wife tells me that they had a nice dinner and some long talks. He bought some hunting things, a "hobby" he had not engaged in for some time, since the depression set in, and she reinforced that she was there for him and supported him.

Then, on Friday, February eighteenth, he had a motor vehicle accident with his son, Jonathan, in the car. Although ER records report he was wearing a seat belt, his wife tells me that when the car rolled over, he fell over on to his son in the passenger seat, thus he must not have been belted. Neurological exam was normal, but he was advised to stop the Klonopin, and sent home. It is unclear whether this was a covert attempt at self harm.

The next day, he walked out of the house with the pistol. His wife ran after him, but he stopped and pointed the gun at her - then turned and walked into the field. She called 911. They arrived, and she heard a shot, and then another. His wife, son and daughter saw him on the ground. He died from a gunshot wound into the mouth, with exit wound out the cranium.

**SOCIAL HISTORY:**

Cpl. Balas was born in Michigan, the son of a Romanian father and a Yugoslavian mother. His parents had come to the United States in their teens, and met in Michigan. His paternal grandparents bought a farm there, where John's father worked.

His father took a job with Vlasic. When he was promoted to Production Manager, he was transferred to a plant in Millsboro, De., so the family relocated. Young John was five at the time, and his younger brother, three. His mother worked for Montgomery Ward, then in a physician's office.

-9-

**Education and Work History:**

He was a graduate of Sussex Central High School.

In 1986, he enlisted in the Navy, where he was on active duty for three years, as an electrician's mate.
He then was in the Reserves, in Lewes, until that unit closed, whereupon he served three more years in the Army National Guard, in the Military Police, until 2002.

He then worked at RM Dowdy electric Col, which he had also done contemporaneously with this time in the National Guard, and then as a Dairy Manager at a Food Lion, for two years, followed by a job at J. Conn Scott, a fine furniture store.

In 1994, he became a Correctional Officer at Sussex Correctional Institute.

Throughout, he maintained his own lawn business, Balas Lawn Care, which was a side job for him since his teens, but which he started more formally while at the furniture store, in the early 1990s.

In addition to that, he obtained a commercial, bus driver's license, working as a substitute. He needed the license to drive inmates to work assignments.

In resuming his education, he obtained an Associate Degree in Criminal Justice at Delaware Technical Community College, being named Criminal Justice Technology Student of the Year . He dreamed of advancing himself, one day perhaps to become a State Trooper or a Warden. However, after he reached the age of thirty five, he could no longer pursue the former option, and by that time he was thirty seven.

His career as a Correctional Officer was a distinguished one. He began training for CERT, the elite rapid response team, began in July 1995. By 1998 he was promoted to Corporal.
I am in possession of numerous awards and commendations, and performance evaluations which consistently document that he exceeded expectations. His awards and letters of appreciation and commendation are replete with compliments from his superiors, complimenting him for his performance, responsiveness, ideas and suggestions, strength of character, and dedication.

-10-

Performance Evaluations provided to me spanning 1999 - 2004 (( am missing 2001) document that he indeed exceeded expectations.

**Relationships:**

He met his wife, Cindy, in 1990. She was at a club with a group from the hospital where she works as a respiratory therapist. John had gone to school with her brother, Jeff Foskey, and she in turn, knew John's brother, Adrian.

He called her afterwards, and they began to date. They were married after a year-long engagement, in December, 1991. They have two children, Lauren and Jonathan. They lived just outside Milton. The relationship is described as having been a close one, with his wife helping him with the lawn business at times, and attendance at church and at their children's activities.

His parents moved two doors away from the couple, which neither wished to happen, but Cindy was close to his father nonetheless. His mother is described as tending to be intrusive.

He had good friends among the other correctional officers, including a best friend, Lee Mears, mentioned above.

**DIAGNOSTIC IMPRESSIONS:**

Cpl. Balas was suffering from a major depressive episode, single episode, in that there was no prior history of psychiatric disorder before the precipitating stressors at work.

He also had a history of two episodes of alcohol abuse, without apparent dependence, which represented an attempt at self medication of his stress, however misguided, and which may have fueled his depression once he resumed intake in July 2004. However, according to his wife he had again stopped drinking by the time of his death, and he was not drinking at the time of the accident the day before his death.

-11-

## DISCUSSION:

There exists a clear temporal correlation between the onset of stressors at work in the form of retaliation for having refused to comply with directives to work despite the other officers' job action and Cpl. Balas' deterioration.

Initially, he coped with work stress by drinking to excess - but he quit on his own in May 2004.

However, in August 2004, when CERT was activated because of the officers' job action, he and others refused to be strikebreakers, and so they, except for Lt. Mears, resigned.

By September, the retaliation had begun, and it was in the Fall of 2004 that his depressive symptoms, some of which had first presented in July, had begun to heighten and took on a life of their own. The performance evaluation issue was a major disturbance for him, one which could not be resolved despite his best efforts to utilize the proper channels to correct it.

He then became aware that he was being scrutinized and monitored, a further assault. He was unable to achieve a transfer from what he knew was a retaliatory and hostile environment.

The time cards' misrepresentation, then being withheld for 2004 represented yet another indication of retaliation and mistreatment.

Nothing happened to Lt. Mears for the above behavior.

All of the above resulted in a situation of hopelessness and helplessness, despite his best efforts to correct the situation in an above-board manner. All of the above resulted in a profound depressive state, due to a situation from which he had come to feel that there was no escape.

-12-

We must examine the role of two factors in Cpl. Balas' depression.

1. The first is the fact of the affair. His wife discovered that the affair had begun in late September. However, the stressors which incepted the depression, and the early signs of his depression had *preceded* the affair. The likelihood is that this behavior, which was uncharacteristic for him, was a symptom of and a result of the depression, another misguided attempt, a way of grasping to feel something positive or escape from a state of misery, than a cause.

Subsequent to the end of the affair, Cpl. Balas had an intimate getaway with his wife, and his journal entries indicate that her presence and support were a source of comfort and sustenance to him - not the ideation of a man who is grieving the loss of a paramour.

2. The second factor we must consider is the effect of alcohol on the depression. Alcohol is known to be a depressogenic substance.

We know that Cpl. Balas had begun to use alcohol to excess in the Fall of 2003, although he self-discontinued in May 2004, after his wife was able to enable him to realize that it was in fact excessive. He admitted that the alcohol represented a means, however unwise, to decompress himself, or in his words to her, "unwind" from what was going on at work.

The rape of the counsellor in July was a great upset to him, as were other incidents that year - but this was a man who had heretofore coped with crisis well, as evidenced by his many awards and accomplishments, his grace under fire.

What followed that was the difficulty with the directive to CERT to break a strike, which resulted in his and others' resignation from the CERT team - an activity which had been important to him, and which was a source of his positive self-esteem. Yet he had no choice but to resign, in order to do what he considered was the right thing. This represented a major loss for him.

Then, he was essentially punished for having thus followed his conscience, by the above-described retaliation - the denigration by an unfair performance evaluation - another blow to his self-esteem, and the necessity of having had to fight to restore his rightful reputation, only to encounter one roadblock after another.

-13-

Moreover, he discovered the surveillance described above, an effort to find grounds to undermine him further.

There appeared no way out of his conundrum except the one he took - the classic thinking of an individual operating out of a depressive posture.

In terms of the role of alcohol, it would have exacerbated the depth of his depression, but clearly did not initiate the depression.

The overwhelming precipitant of his depression was the retaliation he encountered, which rendered him powerless to right the wrongs against which he was struggling.

This was an action-oriented man. He did not, like many other individuals, males among them more than women, trade on words, or on intellectualization.
He was not inclined toward therapy, which may well have represented his salvation.

He coped by self-medication, and unfortunately by trying to internalize his suffering, which tragically eventuated in the profound helplessness and hopelessness which resulted in the only way out he could envision.

In summary, there is clear temporal correlation between the retaliatory events and his deterioration. This, coupled with the lack of preexisting psychopathy, present a compelling and clear cause and effect association between the retaliation and Cpl. Balas' demise.

The above is stated to a reasonable degree of medical certainty. If there are any questions, please do not hesitate to contact me.

Carol A Tavani, MD, MS, FAPA
October 23, 2007

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CINDY L. BALAS a/k/a CINDY L. ADKINS, | : | |
| Executrix of the Estate of CORPORAL JOHN J. | : | |
| BALAS, | : | |
| | : | |
|     Plaintiff, | : | |
| | : | |
|     v. | : | C.A.No. 06-592-JJF |
| | : | |
| STANLEY W. TAYLOR, JR., individually and | : | |
| in his official capacity as the Commissioner of | : | |
| Correction; ALAN MACHTINGER, | : | |
| individually and in his official capacity as the | : | |
| Director of Human Resources of the Department | : | |
| of Correction; MICHAEL DELOY, individually | : | |
| and in his official capacity as Deputy Warden of | : | |
| Sussex Correctional Institution; CAPTAIN | : | |
| DAVID WILKINSON, individually; | : | |
| LIEUTENANT TRUMAN MEARS, | : | |
| individually; and DEPARTMENT OF | : | |
| CORRECTION OF THE STATE OF | : | |
| DELAWARE, | : | |
| | : | |
|     Defendants. | : | |

UNSWORN DECLARATION OF HENRY PURNELL
UNDER 28 U.S.C. § 1746

I, Henry Purnell, hereby depose and state as follows:

1. I have personal knowledge of the facts contained in this declaration and, if called

as a witness, I am competent to testify as to those facts.

2. I was a correctional officer with the Department of Correction ("DOC") for over

twenty two years.  I retired from the DOC in 1999 as a Sergeant.

3. In 1998, I supervised John Balas when he reported to the Sussex Correctional

Institution Key South Building as part of the Vacation-Holiday- Relief pool.

4. John was an honest, hard-working man who believed that hard work paid off.  John got along with everyone.  He often joked around and always had a happy-go-lucky attitude.  He was a good man.

5. John had no problems with and was well liked by his co-workers.  Likewise, John's job performance was always above expectations.

6. After I retired in 1999, I frequently ran into John at the WalMart where I worked.  John would always say hello and sometimes we would have conversations.  He still always joked around with me.

7. In late 2004, I saw John at WalMart and he seemed quieter than usual.  John did not stop to talk as he usually did, rather he only waived and walked past me in a very matter-of-fact way.  His demeanor was totally different from any other time I had been around John.

_____
**Henry Purnell**

I declare under penalty of perjury that the foregoing is true and correct.   Executed on December _5_, 2007.

Balas / Pleadings / Declarations / Purnell Declaration

2



**Security**

**Superintendent**

# Memo

To:        Cpl. John Balas

From:      Major Phil Townsend

Date:      July 8, 2004

Re:        Appreciation

---

I would like to take this opportunity to commend you for "<u>JOB WELL DONE</u>"!  You were instrumental in the recertification of QRT training during February/March of 2004.   Your dedication to this project and SCI are recognized and greatly appreciated.

It is a pleasure to work with such fine staff, and once again, thanks for a job well done.

PT:dmt

Lt. T. Meas
for Cpl. J. Balas

Number  04-04-A                                    Page_____ of  2

# Correctional Officers Association of Delaware
# C.O.A.D.

Office (302) 734-8061
Fax (302) 734-8062

## Official Grievance Form

Date Filed        10-04-04                          Step        1

Name of Grievant   JOHN J. BALAS                    Institution   S.C.I.

Address           _____          Grievant Phone #  _____

                  _____          Classification of Grievant   CPL.

List violation(s) and nature of grievance(s)   C.P.P.A.  FOR THE year 2004

_____

_____

Adjustment Required:  FOR THE PERFORMANCE EVALUATION TO BE INCREASED
FROM "MEETS" EXPECTATIONS, TO "EXCEEDS" DUE TO PERFECT
ATTENDENCE

_____

(Use Continuation Sheet for Additional Space)

I authorize the Correctional Officers Association of Delaware as my representative to act for me in the disposition of this grievance.

Signature of Grievant   _John Balas_               Date   10-04-04

Signature of Representative   W R Cull             Title   COAD S/S

Date Presented to Management   _____

Disposition of Grievance:  _____

_____

_____

_____

COAD Official Grievance Form #12200201

# Correctional Officers Association of Delaware

# C.O.A.D.

Office (302) 734-8061
Fax (302) 734-8062

## Official Grievance Form

ON SUNDAY SEPTEMBER THE 26TH AT APPROXIMATELY 1900hrs, LT. MEARS CAME IN THE RECEIVING ROOM WITH AN EVALUATION FOR MYSELF. LT. MEARS SAID "I NEED YOU LOOK OVER THIS AND SIGN IT." I READ OVER THE EVALUATION AND DID NOT AGREE WITH MY PERFORMANCE THAT I WAS GIVEN. THE EVALUATION I RECEIVED WAS "MEETS EXPECTATIONS." THERE WASN'T ANYTHING ON THE EVALUATION ABOUT A LETTER FROM THE COMMISSIONER ABOUT MY PERFECT ATTENDANCE, A LETTER FROM MAJOR TOWNSEND OF APPRECIATION FOR TEACHING CAPSTUN AND Q.R.T. REFRESHER, AND MY C.E.R.T. MEMBERSHIP. I ASKED LT. MEARS IF HE WORKS MONDAY SEPTEMBER 27TH. HE HESITATED FOR A MOMENT AND SAID "NO" I TOLD LT. MEARS THAT I WOULD SIGN IT AT A LATER DATE. I DID NOT REFUSE TO SIGN IT. LT. MEARS SNATCHED THE EVALUATION OFF THE COUNTER AND WENT TO HIS OFFICE. APPROXIMATELY FIVE MINUTES LATER I WENT TO FIND LT. MEARS AND RESPECTFULLY REQUESTED A COPY OF THE EVALUATION, HE SAID, "YOU DIDN'T SIGN IT, SO YOU ARE NOT GETTING A COPY OF IT." I ASKED WHY WASN'T ANYTHING OF THE LETTERS PUT ON THE EVALUATION. LT. MEARS SAID, "IT DOES NOT WARRANT ENOUGH TO GET "EXCEEDS EXPECTATIONS" AND DID NOT NEED TO BE PUT ON THE EVALUATION." I FEEL THAT LT. MEARS HAS A PERSONAL VENDETTA AGAINST ME SINCE I HAVE RESIGNED FROM C.E.R.T. AND HE IS SHOWING DISCRIMINATION TOWARDS MYSELF. I FEEL THAT IT IS A CONFLICT OF INTEREST, HAVING LT. MEARS AS MY SUPERVISOR.

THE LAST FOUR YEARS, I HAVE RECEIVED "EXCEED EXPECTATIONS" ON MY EVALUATIONS BECAUSE OF MY PERFECT ATTENDANCE. WHY NOT THIS EVALUATION. I BELIEVE THAT LT. MEARS IS EVALUATING ME PERSONALLY NOT PROFESSIONALLY.

COAD Official Grievance Continuation Form #12200201



server.deljis.state.de.us

| DELJIS Menu | Web Searches | Support/Help |

# Complaint Inquiry: 0405007095

**ADDITIONAL INFO:**

Crime Information

Suspect Informatio

Victim Information

Narrative

Complaint Number: **0405007095**          Agency: **TROOP 4 STATE POLICE**

Original Report Date: **02/19/2005**          Report Type: **Crime Report**

Reported Day: **Saturday**          Date: **02/19/2005**          Time: **1053**

Overview:
**The victim died from a self-inflicted gunshot wound to the head.**

Occured:    **BETWEEN**    Day: Saturday    Date: 02/19/2005    Time: 1000
                   **AND**          Day: Saturday    Date: 02/19/2005    Time: 1104

**LOCATION INFORMATION:**

County: **Sussex**     Grid: **162112**       Sector: **42**
Street: **24744**     **Prettyman**     **RD**
City: **Georgetown, Delaware**
Road:
Other: **CR 254 N/O CR 255**

Originating Officer: **SGT HUDSON**

Approved By: **ROBERT HUDSON**

Delaware Criminal Justice Information System

**D000743**

A0589



server.deljis.state.de.us

| DELJIS Menu | Web Searches | Support/Help |

# Crime Inquiry: 0405007095

**ADDITIONAL IN**

Complaint Inform:

Suspect Informati

Victim Information

Narrative

---

### CRIME AND ASSOCIATED INFORMATION: 001

Linked To Victim Sequence: **001**          Crime Sequence: **001**

Statute: **DE:AT:HINV:ESTI:G:A**

Crime Description: **Death Investigation--No Specific Charges Associated**

Location Type: **Residence/Home/Garage**        Status: **Service Clear**

Crime Involved:     Alcohol: **No**     Computer: **No**     Drugs: **No**

General Offense:


Crime Code: **Sudden Death/Death Investigation**          Suspected Hate/Bias: **No**

Number of Premises:        Burglary Force Involved: **No**     Weapon Used:

---

Delaware Criminal Justice Information System

**D000744**

A0590



| DELJIS Menu | Web Searches | Support/Help |

# Victim Inquiry: 0405007095

**ADDITIONAL IN**

Complaint Informa

Crime Information

Suspect Informati

Narrative

### VICTIM SEQUENCE: 1

Complaint Number: 0405007095                    Sequence: **001**

Name: **JOHN J BALAS**                    Victim Type: **Individual**

Sex: **Male**          Race: **White**          Ethnic-Origin: **Non-Hispanic**

DOB: ▓▓▓▓          Age: **37**          Victim Offender Relationship: **Not Specified**

Address:
**24744  Prettyman RD**

**Georgetown,  DE 19947**

Resident Status: **Full-Time Resident**          Resident Telephone: **302-684-3870**

Employer/School:
**DEPARTMENT OF CORRECTIONS**

**PO BOX 500**
**SCI**
**Georgetown,  DE 19947**

Work Telephone: **302-856-5280**

Reporting Person: **No**          Victim Injured: **Yes**          Victim Deceased:
**No**

Delaware Criminal Justice Information System



server.deljis.state.de.us

| DELJIS Menu | Web Searches | Support/Help |

# Narrative Inquiry: 0405007095

ADDITIONAL IN

Complaint Inform:

Suspect Informati

Victim Informatior

Narrative

See Narrative to follow.

## Supplement Narrative: 001

On 02-19-2005 I was dispatched to a suicidal subject located at 24744 Prettyman Rd. While enroute, I was advised by Suscom that the victim had a pistol and walked towards the woods at the rear of his property. They then had a report of one shot being fired. No one could confirm the location of the victim or if he had shot himself at this time. Myself and Tfc Warrington arrived at the scene at 1102 hrs. We briefly contacted the victim's wife, Cindy Balas, she showed us the direction the victim had gone. We then cautiously checked the area for the victim. I observed an object located towards the left rear corner of the property on the ground. I looked further around the object and saw the victim hiding behind a small pine tree. It appeared that he was kneeling or crouched down behind the tree. As soon as I observed the victim we were approx. 50-60 feet away from him and we heard a single gun shot. I then observed the victim fall from his position. We took cover and then approached the victim. I observed a silver revolver laying to the victim's left side of his body. The victim had laid his hat and eyeglasses approx 6-10' in front of the tree he was hiding behind. This is the item I observed as we were looking for the victim. We approached and Tfc Warrington secured the weapon. I checked the victim for other weapons and none were located. The victim was wearing blue jeans, hunting boots, a green jacket, and black Remington gloves. He was laying face up on the ground when we got to him. I observed a large exit wound on the top of the victim's head. The ambulance crew and paramedics arrived and gave the victim first aid and transported him to the hospital. We stood by while the ambulance crew and paramedics treated the victim. We then secured the scene until Sgt Hudson relieved us of our duties. I took photographs of the scene. They are attached to this report.

## Supplement Narrative: 002

On 021905, myself and TFC Reynolds 396 were dispatched to 24744 Prettyman Rd. (C.R. 254 n/o C.R. 255) ref. a suicidal subject. While enroute, suscom advised that V-1 was walking around his back yard with a pistol and was believed to be suicidal as per his wife (Cindy Balas) who was the RP. Suscom then advised that RP reported that a shot was fired but could not confirm if V-1 had shot himself or his exact location on the property. Myself and TFC Reynolds then arrived at the residence and contacted RP at the rear door of their residence. Same advised that she last saw V-1 walking towards the rear of their property but could not advise where he was currently located. Myself and TFC Reynolds then began checking the area for V-1. While checking the rear yard area, TFC Reynolds observed an object laying on the ground at the southeast corner of the rear yard. We then scanned the area around the object and observed V-1 crouching behind a small pine tree approx. 6-10 feet to the west of the object. I could not tell if V-1 was facing us or away from us as his outline was broken by the tree branches. As soon as we observed V-1, a single shot was fired from his direction and I immediately took cover in a row of cypress trees that was approx. 2 feet to the east of where I was located. TFC Reynolds then advised me that V-1 was laying on the ground. We were approx. 50-60 feet away from V-1 when the shot was fired. We then cautiously approached V-1. I approached V-1 with my service pistol aimed at him as I was unsure if V-1 was injured or if he intended to shoot myself or TFC Reynolds. As we approached V-1, I observed same laying on his back with a silver revolver laying on the ground, next to his left hand. I then holstered my weapon and grabbed the revolver, securing same. The revolver had two rounds in it and both appeared to have been fired as the primers had been dented on both. After securing the revolver, I then placed it on the ground a safe distance away. I then responded over to V-1 to assist TFC Reynolds. I observed V-1 to be wearing blue jeans, a green jacket, hunting boots, and black gloves. V-1 was unresponsive but still breathing and had a large area of trauma on the back of his head that appeared to be an exit wound. The Georgetown ambulance and Sussex Co. paramedics then arrived and began treating V-1. Cpl. Parker 966 had also arrived and advised that he had contacted Sgt. Myers at troop 7 and notified same of the situation. He further advised that a detective and EDU were enroute. The Georgetown ambulance then transported V-1 to Beebe E.R. for treatment. Myself and TFC Reynolds then secured the scene and stood by for the

detective. Sgt. Hudson of T-4 CI and Sgt. Swain of T-4 EDU then arrived and began processing the scene. After giving Sgt. Hudson the information that we had gathered, he advised that we could clear the scene. Myself and TFC Reynolds then cleared.

**Supplement Narrative: 003**

Cu-4 Criminalistics Service Report #05-74: On Saturday, 02/19/05 at 1124 hours, I was contacted by Sgt Meyers of Troop 7. Sgt Meyers advised me that the victim, who was a guard at SCI, had committed suicide by shooting himself outside in his back yard in front of his responding troopers. Sgt Meyers requested that I respond to the scene and process same for the suicide investigation. As requested, I responded to the victim's residence. I arrived at 1150 hrs. Upon arrival, I contacted Cpl Parker, who had the entrance to the front driveway secured. Cpl Parker advised writer that the victim had already been transported from the scene to Beebe Hospital. Cpl. Parker also advised writer that the victim had shot himself behind a tree, which was located at the left rear corner of his backyard. Writer responded to that location. Two paramedic units were present as well as the initial responding troopers, which were TFC Reynolds and TFC Warrington. Also, present at the scene was Det Mark Ostroski, who was the responding Victim Services Officer. Shortly afterwards, Lt. Chamberlin and Sgt Hudson, who is the the investigating officer, arrived on the scene as well. Writer conferred with TFC Warrington and TFC Reynolds about what they had witnessed. The victim had shot himself while behind a tree in the left rear of the yard as they were approaching alongside some trees on the left side of the property. They were approximately 50 feet from the victim when he shot himself. For further details, see their supplement reports and Sgt Hudson's report. I began processing the scene by photographing same with Polaroid and 35mm film. A total of 13 Polaroid photos were taken by writer in this case. The Polaroid photos are attached to the Troop 4 copy of this report. The role of 35mm film, which should contain about 21 photos, was sent to the Crime Lab with instructions to retain the negatives on file only. If 35mm photos are desired by the investigating officer, he should contact Elisa Vassas at the Crime Lab to have the photos developed. At the location behind the tree (where the victim had shot himself), the grass was bloodstained. A few feet nearby, a Taurus .357 revolver was on the ground. It had been placed on the ground at this location by TFC Warrington, who made sure same was empty of live rounds by opening the cylinder and observing that it contained only two spent casings. On the ground in front of this tree, the victim had laid his hat (which was actually two hats one on top of the other) and his eyeglasses on the ground. After completing the scene photography, the victim's hats and eyeglasses were turned over to Sgt Hudson, who returned same to the victim's wife at the scene. I collected the weapon and the two spent casings. No other items of evidence were located at this scene by writer. Prior to leaving the backyard, TFC Warrington used his shovel from his patrol car to cover the blood on the grass with dirt. After completing the processing of the exterior scene, I responded inside and listened to the interview of the victim's wife, which was being conducted by Sgt Hudson and Det Ostroski on the dining room table. During this time, at the request of Sgt Hudson, I collected the victim's medication, which was on the same table. The medication I collected was listed as follows: - One container of Inderal LA 120 mg capsules (21 of 30 were present), prescribed by Dr. Peet on 02/01/05

**Supplement Narrative: 003**

-One container of Clonazepam 1 mg pills (50 of 60 were present), prescribed by Dr. Jani on 02/15/05 - One cardboard packaging for Imitrex 50 mg (had contained nine pills, but all were gone), prescribed by Dr. Peet on 02/15/05. After interviewing the victim's wife, Sgt Hudson and writer went inside of the victim's garage. The victim's wife had mentioned that she saw him exit same holding the gun in his hand. Writer and Sgt Hudson looked through the garage for any evidence pertinent to this case. On top of the hood of a riding mower, which was parked in the right rear of the garage, the box to the Taurus revolver was located and collected by writer. No ammunition was found inside of the box or the garage. The victim's Chevrolet Tahoe, which was severely damaged due to a roll over accident the victim was involved in on 02/18/05, was also parked inside of this garage. Lastly at this scene, I obtained two Polaroid photos of a Post-It note that the victim had written "BYE" on same on 02/14/05. For more details of same, see Sgt Hudson's report. After photographing the note, I returned same to the victim's wife. One of these photos of the note was given to Invest Wagner of the Medical Examiner's Office for his investigation. The other Polaroid is attached with the other scene Polaroid photos, which are attached to the Troop 4 copy of this report. Upon completion of the processing of the scene, writer did not find any evidence that was inconsistent with this incident being a suicide as reported (especially with witnesses seeing the victim shoot himself). I left the scene at 1415 hrs with the victim's family, Sgt Hudson, and Det Ostroski still present at the residence. I contacted Investigator Wagner, who advised writer that he was responding to Beebe Hospital to receive the victim's body and transport

same to the Nanticoke Hospital Morgue for the post-mortem examination. I responded to Nanticoke Hospital Morgue and arrived at 1520 hours. Shortly after, Investigator Wagner arrived with the victim's body and Dr Tobin arrived to inspect the victim's body. At 1540 hrs, I gave all of the victim's medication and packaging to Investigator Wagner for his investigation. I obtained the victim's fingerprints, which are attached to this report to be forwarded to SBI. I also took three Polaroid and 35mm photos of the victim (stored as mentioned above). During Dr. Tobin's inspection of the victim's body, she determined that the gunshot entry wound was inside of the victim's mouth in his top palette. The bullet went through his brain and exited out of his head at the top center of his head. Dr. Tobin determined the manner of the victim's death was suicide and the cause was the self-inflicted gunshot wound to his head. I left the morgue at 1730 hours and returned to Troop 4. All items that had been collected that day were stored in the Troop 4 Permanent Evidence Locker at 1804 hours. On Sunday, 02/20/05, 1200 hrs, I contacted Investigator Wagner to inquire about the victim possibly having a black notebook personal journal on his person to see if he had located it with the victim's personal effects. However, Investigator Wagner did not go through the personal effects, some of which were sealed at Beebe Hospital in a sealed bag, due to the case being an obvious suicide. He advised that the body had been released to Short's Funeral Home in Milton. I contacted Harry Fletcher at Short's Funeral Ho

**Supplement Narrative: 003**

me, who agreed to meet writer at the funeral home at 1300 hrs. I responded to the funeral home and contacted Mr. Fletcher. He provided writer access to the bags of the victim's clothing, shoes, and personal effects in a sealed bag. Writer examined the contents of the bag and all pockets in the clothing with negative results in locating the black notebook journal or any possible suicide note. In addition, no wallet or cash were observed in the personal effects by writer. However, one live .357 Federal Magnum round, which was identical to the other spent casings in the revolver, was among the personal effects. I collected same at that time. I also signed a property receipt, which lists the items I examined, but lists that I only took possession of the live round. A copy of this receipt is attached to this report. On Thursday, 02/24/05, the victim's wife (writer attended the victim's viewing) informed writer that she had later found several suicide notes written by the victim addressed to relatives. Writer later informed Sgt Hudson on Monday, 02/28/05 of the existence of these notes. On Wednesday, 03/02/05, I cleaned the majority of the victim's blood off his revolver and hung up same in the gun locker pending final disposition. The serial number was also run through NCIC, but it was negative for being stolen. I also sent the required information to the Intelligence Unit for the required ATF Trace. For a list of all collected items by writer in this case, which are stored in the Permanent Evidence Locker pending final disposition, see the attached Evidence Control Report. A copy of this report was forwarded to Sgt Hudson, the investigating officer. No further action in this case at this time by writer.

**Supplement Narrative: 004**

On 02/19/05 at app 1210hrs, I arrived at 24744 Prettyman Road E/O Georgetown for a suicide. I was advised that the victim was John Balas whom I knew growing up and as a guard at SCI. Upon arrival at the scene, I contacted Detective Ostroski (DSP Victim Services) and the victim's spouse Cindy. I briefly told then I was investigating the case and then responded to the rear of the property. I next contacted Troopers Reynolds and Warrington at the location the victim shot himself. They advised that the 911 call was at app 1053hrs, they arrived at app 1102hrs, and that upon approach of the victim, he shot himself in the head at app 1104hrs. They advised that the were walking across the back yard and saw the victim kneeling down behind a Leland cypress tree. They could barley see him but belive he could clearly see them approaching. Within about 50-60 feet they heard a shot and saw the victim fall to the ground. (see supplements by both officers). I also contacted Sgt. Swain (DSP EDU) at the scene. He advised that the gun was a Taurus .357 magnum chrome in color. He also advised that victim had taken off his hat and glasses and placed them on the ground. The gun was seized while the hat and glasses were turned over to the victim's spouse. I next conducted an interview with the victim's spouse Cindy (see interview section). I was also advised that the victim was deceased. I obtained the medications prescribed by Dr. Jani and turned them over to Sgt. Swain to be given to the Medical Examiner. I did a check of the barn with Sgt. Swain and observed the wrecked Tahoe. In the rear corner of the building was a box for a Taurus .357 handgun. It was on top of a lawn tractor. No ammo was located. I conducted an interview with Lee Mears (see interview section). I remained at the scene until the arrival of the victim's parents John and Anna Balas. I briefly explained the case facts. No interview was conducted. I obtained a copy of the accident report #04-05-7001. It was determined that the victim possibly fell asleep at the wheel. The case is Service Cleared. The victim was observed by two Troopers shoot himself in the head.

**D000748**

A0594

**Supplement Narrative: 005**

On 04/05/05 at app 0920hrs, I returned the below listed items to the victim's spouse Cindy Balas. Control #0400011582 (1) .357 Taurus Revolver serial #ND928221 Control #0400011583 (1) Taurus Revolver Box

**Supplement Narrative: 006**

All evidence in this case needs to be retained. The case is pending civil litigation.

**Supplement Narrative: 007**

The evidence in this case was already returned to the victim's spouse and/or destroyed. On 10/31/2006 this officer mistakenly wrote a supplement that the evidence needed to be retained per civil litigation when the evidence had been returned and/or destroyed.

Delaware Criminal Justice Information System



**STATE OF DELAWARE
DEPARTMENT OF CORRECTION**
245 MCKEE ROAD
DOVER, DE 19904

OFFICE OF
HUMAN RESOURCES

TELEPHONE: (302) 739-5601
FAX: (302) 739-6740

## MEMORANDUM

TO:          John Balas

FROM:        Stan Taylor
             Commissioner

DATE:        April 25, 2002

SUBJECT:     Perfect Attendance

  This letter is to offer you our official congratulations and commend you on your perfect attendance record for the past 2 years.  We personally appreciate this achievement.

  The Department of Correction is particularly dependent on loyal, conscientious and dependable employees.  You have exhibited these qualities by your perfect attendance.

  You and employees like you are the backbone of the Department, enabling it to function smoothly and effectively.  We salute you and ask for your continued commitment.

_____
   Alan Machtinger
  Director, Human Resources &
    Development

_____
    Stan Taylor
    Commissioner

**D000750**

A0596



The State *of* Delaware Employee Performance Plan

Name, Job Title: **Cpl. John Balas [SS# ] 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**
Department-Division-Section: Department of Correction, Sussex Correctional Institution
Supervisor, Job Title: Truman Mears, Correctional Lieutenant
Date, or time period covered:

What is the agency mission and/or operational needs that this employee's job performance will affect?
The DOC is committed to providing programs, policies and services to inmates which at all times places public safety as our top priority whether the offender is in prison or supervised in the community by correctional staff. Your role is to provide discipline and security of inmates inside or outside the secure facility by enforcing institutional rules, regulations and policies while keeping in mind that rehabilitative programming will enhance the long term public safety.

Please list the duties, projects or performance standards that will be used for evaluation purposes. *Note:* current job dimensions may be substituted and/or included.

1. Be knowledgeable of and adhere to all Departmental, Bureau and Institutional policies and procedures. Read, daily, the post orders for the area you are assigned to stay abreast of any and all changes.

2. Report for work assignments and appointments on time every day as scheduled unless leave is prior approved as attendance, reliability and punctuality are an essential part of your job.

3. You are expected to conduct yourself in a professional manner on or off duty keeping in mind that you represent the DOC in dealing with the public. You are a role model for inmates and your appearance and conduct should always be in compliance with departmental guidelines.

4. It is your responsibility to document all activities that occur during your tour of duty. Documentation is expected to be submitted prior to the end of your shift on the proper institutional form. All written communication will be clear, concise and complete. It is also your responsibility to brief the on-coming shift of all events that occur during your shift.

5. Maintain security at all times by being alert and adhering to established security procedures. You are expected to take immediate action when security violations occur.

6. As a lead worker you are expected to provide guidance, supervision, and training to subordinate staff as needed. You may also be expected to assume the duties of the Lieutenant when so directed by the Watch Commander.

| | | |
|---|---|---|
| Employee/date | Evaluator/date | Reviewer/date |

TJM 05-23-03



**The State *of* Delaware Employee Performance Review**

**Name, Job Title: Cpl. John Balas**
**Department-Division-Section:** Department of Correction, Sussex Correctional Institution
**Supervisor, Job Title:** Truman Mears, Correctional Lieutenant
**Date, or time period covered:**   Jan 2002—may 2003

**Areas where performance is distinguished or exceeds expectations, if any:**

**Areas of specific performance deficiencies or unsatisfactory work, if any:**

**Areas where growth or skills/knowledge development is suggested or needed. If not applicable, please use this space and/or attach summary explanation of how employee met expectations.**
**Cpl. Balas is assigned to the receiving room. He is knowledgeable of SCI policies and procedures. He works well with little or no supervision. He has had the role of lead worker in his area many times. Cpl. Balas reports for duty in a timely manner and has had perfect attendance for several years in a row now.**

**Employee documentation of performance events, comments and/or self-review:**

We have met and discussed this document.  The employee's performance is (Distinguished), (Exceeds Expectations), (Meets Expectations), (Needs Improvement), or is (Unsatisfactory).
*Please circle one.*

Employee/date          6-2-03          Evaluator/date     060103          Reviewer/date

**D000752**

A0598



The State *of* Delaware Employee Performance Plan

Name, Job Title: BALAS, John  Correctional Corporal       SS# 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

Department-Division-Section: Department of Correction, Sussex Correctional Institution

Supervisor, Job Title:  Michael Atallian  Correctional Lieutenant

Date, or time period covered: 2-1-00  To  1-31-01

What is the agency mission and/or operational needs that this employee's job performance will affect? The DOC is committed to providing programs, policies and services to inmates which at all times places public safety as our top priority whether the offender is in prison or supervised in the community by correctional staff.  Your role is to provide discipline and security of inmates inside or outside the secure facility by enforcing institutional rules, regulations and policies while keeping in mind that rehabilitative programming will enhance the long term public safety.

Please list the duties, projects or performance standards that will be used for evaluation purposes. *Note:* current job dimensions may be substituted and/or included.

1.  Be knowledgeable of and adhere to all Departmental, Bureau and Institutional policies and procedures. Read, daily, the post orders for the area you are assigned to stay abreast of any and all changes.

2.  Report for work assignments and appointments on time every day as scheduled unless leave is prior approved as attendance, reliability and punctuality are an essential part of your job.

3.  You are expected to conduct yourself in a professional manner on or off duty keeping in mind that you represent the DOC in dealing with the public.  You are a role model for inmates and your appearance and conduct should always be in compliance with departmental guidelines.

4.  It is your responsibility to document all activities that occur during your tour of duty. Documentation is expected to be submitted prior to the end of your shift on the proper institutional form.  All written communication will be clear, concise and complete.  It is also your responsibility to brief the on-coming shift of all events that occur during your shift.

5.  Maintain security at all times by being alert and adhering to established security procedures.  You are expected to take immediate action when security violations occur.

6.  As a lead worker you are expected to provide guidance, supervision, and training to subordinate staff as needed.  You may also be expected to assume the duties of the Lieutenant when so directed by the Watch Commander.

Employee/date  4-18-00        Evaluator/date  4-7-00        Reviewer/date  4/12/00

dtj 08/26/98



The State *of* Delaware Employee Performance Plan
Name, Job Title: BALAS, John  SS# 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
Department-Division-Section: Department of Correction, Sussex Correctional Institution
Supervisor, Job Title:  David Johnson, Correctional Lieutenant
Date, or time period covered:  02/01/99 thru 01/31/00
What is the agency mission and/or operational needs that this employee's job performance will affect?
The DOC  is committed to providing programs, policies and services to inmates which at all times places
public safety as our top priority whether the offender is in prison or supervised in the community by
correctional staff.  Your role is to provide discipline and security of inmates inside or outside the secure
facility by enforcing institutional rules, regulations and policies while keeping in mind that rehabilitative
programming will enhance the long term public safety.
Please list the duties, projects or performance standards that will be used for evaluation purposes. *Note:*
current job dimensions may be substituted and/or included.

1.  Be knowledgeable of and adhere to all Departmental, Bureau and Institutional policies and procedures.
Read, daily, the post orders for the area you are assigned to stay abreast of any and all changes.

2.  Report for work assignments and appointments on time every day as scheduled unless leave is prior
approved as attendance, reliability and punctuality are an essential part of your job.

3.  You are expected to conduct yourself in a professional manner on or off duty keeping in mind that you
represent the DOC in dealing with the public.  You are a role model for inmates and your appearance and
conduct should always be in compliance with departmental guidelines.

4.  It is your responsibility to document all activities that occur during your tour of duty. Documentation is
expected to be submitted prior to the end of your shift on the proper institutional form.  All written
communication will be clear, concise and complete.  It is also your responsibility to brief the on-coming
shift of all events that occur during your shift.

5.  Maintain security at all times by being alert and adhering to established security procedures.  You are
expected to take immediate action when security violations occur.

6.  As a lead worker you are expected to provide guidance, supervision, and training to subordinate staff
as needed.  You may also be expected to assume the duties of the Lieutenant when so directed by the
Watch Commander.

_____ 3-23-99    _____ 3/25/99    _____ 3/24/99
Employee/date                    Evaluator/date                    Reviewer/date
dtj 08/26/98

**D000754**

A0600



The State of Delaware Employee Performance Review
Name, Job Title: BALAS, John Correctional Corporal    SS# 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
Department-Division-Section: Department of Correction, Sussex Correctional Institution
Supervisor, Job Title: Michael Atallian    Correctional Lieutenant
Date, or time period covered: 2-1-99 to 1-31-00

Areas where performance is distinguished or exceeds expectations, if any:
Cpl. Balas received a commendation on 10-31-99 from S/Lt. Messick for apprehension of an inmate that was released early.
Cpl. Balas received a commendation from S/Lt. Johnson on 11-1-99 for participation in a apprehension team.
Cpl. Balas is a member of CERT, and has just completed re-training staff in QRT.

Areas of specific performance deficiencies or unsatisfactory work, if any:




Areas where growth or skills/knowledge development is suggested or needed. If not applicable, please use this space and/or attach summary explanation of how employee met expectations.

Cpl. Balas is assigned to the Receiving Room and as a Pretrial rover. He is knowledgeable of SCI policies and procedures. Works well with little or no supervision. Cpl. Balas reports for duty in a timely manner and uses leave only when nessessary.




Employee documentation of performance events, comments and/or self-review:




NOTE:  The evaluator was not the employee's supervisor during this rating period.  Supervisor's comments were taken from records or personal observation.

We have met and discussed this document.  The employee's performance is (Distinguished), (Exceeds Expectations), (Meets Expectations), (Needs Improvement), or is (Unsatisfactory).  *Please circle one.*

Employee/date    4-18-00        Evaluator/date    4-2-00        Reviewer/date    4/12/00

### State of Delaware
## FORMAL CONTACT PLAN
#### (Purpose: - To Reach an Understanding)

( ) - Disciplinary
(xx) - Commendation
( ) - Other

Name __Cpl. John Balas__                    Date __10/31/99__

Department __FOP / SCI__

Contact Made By __S/Lt. Earl Messick__

Reason for Contact __On 10/27/99, I received a call in reference to Inmate James Moore,__
__who had been released earlier. Information revealed the possibility that Inmate__
__Moore had more level 5 sentence to complete. You and C/O John Taylor responded__
__quickly and while keeping contact with me via a cell phone, were able to apprehend__
__Inmate Moore and return him to the secure confines of SCI.__

Discussion __Intensive research performed by Records Clerk Shirley Johnson, revealed a 3__
__year level 5 sentence that Inmate Moore's record did not contain. Your quick__
__response time prevented the Department from having to conduct a more intense manhunt__
__that would have resulted in much more expense.__

Understanding Established __You, along with C/O Taylor and Records Clerk Johnson brought__
__this incident to a positive end. It is a privilege to work with dedicated staff__
__such as yourself. Congratulations on a job well done.__

Employee's Signature  -  Acknowledging this Coverage

Date _11-9-99_

Signature of Employee's Immediate Supervisor

Date _11/9/99_

Reviewed By

Date _11/9/99_

Was Union Representative covered?            Yes ( )    No ( )

Name of Representative _____            Date _____

**D000756**

A0602



**Delaware Department of Correction**
**Bureau of Prisons**
**Sussex Correctional Institution**
**RT 1, Box 500**
**Georgetown, DE 19947**

November 1, 1999

## LETTER OF COMMENDATION

On October 22, 1999, at approximately 1600 hrs., Records Supervisor Garland Messick reported that Inmate Tony Pate had been released from SCI in error. Records indicated that he should have remained committed on a $500 secured bond. At approximately 1730 hrs., an apprehension team was formed and assigned the task of returning the inmate to custody. The apprehension team consisted of CAPT George Truitt, CPL John Balas, CPL Michael Cathell, and CO Larry Palmer. CAPT Truitt was off-duty at the time and responded from his residence.

CAPT Truitt was assigned as the team leader and coordinated efforts to recover the inmate. CPL Balas reviewed the inmate file and collected other information from other sources, to include CJIS and DELJIS. CPL Cathell and CO Palmer were assigned to prepare the team's equipment and vehicles and act as back-up officers during the search.

At approximately 1830 hrs., the team departed SCI to attempt to locate the inmate, who was believed to be in the Laurel area. Their investigation led them the inmate's employer, a gas station, his residence, and finally to his girlfriend's residence. This operation required the team to enter areas that may be hostile toward law enforcement and question persons who may be reluctant to cooperate. The inmate was located and returned to custody without incident in approximately three hours.

This operation was conducted in a textbook manner according the DOC Escapee Management course. Under CAPT Truitt's direction, the team successfully located the inmate in short time. CPL Balas's research conducted prior to the search was thorough, complete, and provided for a good start to the search. CPL Cathell and CO Palmer ensured the team was properly prepared, as well as providing input and back-up during the operation.

The team's actions during this operation clearly show each member's ability to work together as part of a team under unfavorable, and possibly hostile, conditions. The team clearly focused on the objective and maintained safe and secure surroundings. They demonstrated their ability to plan, research, and execute such an operation, and communicate effectively with potentially hostile persons while maintaining a favorable public image of the Department.

CAPT Truitt, CPL Balas, CPL Cathell, and CO Palmer comprised a successful and efficient team and their actions reflect positively on each as an individual, the apprehension team, and the Department of Correction.

David T. Johnson, SLT
Watch Commander

**D000757**

A0603

DEPARTMENT OF CORRECTION 1998 EMPLOYEE'S TIME CARD

Rate Earned:

Employee Name: BALAS, John

Social Security Number: 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

Class Title: Correctional Officer

Employment Date: 10/03/94

Adjusted Service Date: 10/03/94

D-D-S

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 | HOLIDAY | SICK | VACATION |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| JAN. | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| FEB. | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| MAR. | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| APR. | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| MAY | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| JUNE | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| JULY | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| AUG. | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| SEPT. | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| OCT. | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| NOV. | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| DEC. | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |

REMARKS:

TOTAL HOURS USED

| HOLIDAY | SICK | VACATION |
|---|---|---|

1998

D000758

A0604

DOCUMENT NO. 10bcf3ea0a2c342a

## HOLIDAYS

| | | | | VLS CARRIED | MILITARY LEAVE |
|---|---|---|---|---|---|
| A | - | 1 | New Year's Day X R Paid - D20 | | 08/21/98 |
| B | - | 1 | Martin Luther King's Birthday X R Paid - D20 | | 01/05/98 |
| C | - | 1 | President's Day QR 08/11/98 | | 01/26/98 |
| D | - | 1 | Good Friday X R Paid - D20 | | 5/20/98 |
| E | - | 1 | Memorial Day X Paid - D20 | | 5/31/98 |
| F | - | 1 | Independence Day R 08/12/98 | | 08/8/98 |
| G | - | 1 | Labor Day R 9/19/98 | | 08/20/98 |
| H | - | H | Columbus Day R | | 06/2/98 |
| I | - | 1 | Veterans Day R 11/21/98 | | 02/13/98 |
| J | - | 1 | General Election Day R 10/05/98 | | 07/19/98 |
| K | - | 1 | Thanksgiving Day R | | 08/31/98 |
| L | - | 1 | Day after Thanksgiving R | | 03/14/98 |
| M | - | 1 | Christmas Day R | | 08/15/98 |
| N | - | 1 | Return Day (Sussex County) R | | 02/18/98 |
| O | - | 2 | Special as declared by Governor | | 08/19/98 |

PRIOR YEAR HOLIDAYS CARRIED
FORWARD/DATE TAKEN

6-1-97  01/24/98
X H-1-97  1-26-98
O1-1-97  1-29-98
X K-1-97  1-30-98
X L-1-97  1-31-98
X M-1-97-2-1-98
XO-2-97 Paid - D20

## COMPASSIONATE LEAVE

## SPECIAL NOTATION

## COMPENSATORY TIME

| COMPENSATORY TIME | | BALANCE CARRIED FORWARD | | | MS | | CT TAKEN/FORFEITED | | | FLSA | | BALANCE | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DATE TAKEN-EARNED | OVERTIME WORKED | CT EARNED | | TOTAL | | | | | | | | MS | FLSA |
| | | MS | FLSA | | MS | FLSA | MS | FLSA | TOTAL | | | | |
| MAR/98 | | | 19.0 | 19.0 | | | | | | | | | 12.0 |
| 07/08/98 | | | | | | | | 8.0 | 8.0 | | | | 4.0 |

D000759

A0605

DEPARTMENT OF CORRECTION
STATE OF DELAWARE

INTER-DEPT. MEMO          DATE 7/6/ 19 98

TO: LT D Johnson

FROM: LT G Cordrey

SUBJECT: John Bales

Cpl Bales Grandmother Died
He is on Vac This week 7-6-98
until 7-12-98 with 11 & 12th as days off
I told Him we would put his Vac
time Back on Book and Charge Him C/L

FORM #: 25-C                    SIGNED: _____

for 3 days July 6th, 7th, 8th

**MEMORANDUM**

**TO:**    CPL John Balas

**FROM:** LT David Johnson

**DATE:** 08/28/98

**SUBJ:** Letter of Recognition

Thanks for submitting your suggestions and ideas concerning the Property Room operations and procedures. Your initiative, research, and ability to work with others as a team, has produced many ideas which will be incorporated into new SCI procedures. Your work has resulted in a simpler procedure which provides better accountability and tracking of inmate property. When fully implemented, I believe these procedures will result in fewer grievances and lawsuits involving inmate property.

Good job, John.



# The State *of* Delaware Employee Performance Plan

Name, Job Title: *CPL. BALAS, JOHN J.*                [SS# *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*

Department-Division-Section:

Supervisor, Job Title: *LT. JOHN PAYNE.*

Date, or time period covered:

What is the agency mission and/or operational needs that this employee's job performance will affect?

The DOC is committed to providing programs, policies and services to inmates which at all times places public safety as our top priority whether the offender is in prison or supervised in the community by correctional staff. Your role is to provide discipline and security of inmates inside or outside the secure facility by enforcing institutional rules, regulations and policies while keeping in mind that rehabilitative programming will enhance the long term public safety.

Please list the duties, projects or performance standards that will be used for evaluation purposes. *Note:* current job dimensions may be substituted and/or included.

1. Be knowledgeable of and adhere to all Departmental, Bureau and Institutional policies and procedures. Read, daily, the post orders for the area you are assigned to stay abreast of any and all changes.

2. Report for work assignments and appointments on time every day as scheduled unless leave is prior approved at attendance, reliability, and punctuality are an essential part of your job.

3. You are expected to conduct yourself in a professional manner on or off duty keeping in mind that you represent the DOC when dealing with the public. You are a role model for inmates and your appearance and conduct should always be in compliance with Departmental guidelines.

4. It is your responsibility to document all activities that occur during your tour of duty. Documentation is expected to be submitted prior to the end of your shift on the proper institutional form. All written communication will be clear, concise and complete. It is also your responsibility to brief the on-coming shift of all events that occur during your shift.

5. Maintain security at all times by being alert and adhering to established security procedures. You are expected to take immediate action when security violations occur.

6. As a lead worker you are expected to provide guidance, supervision and training to subordinate staff as needed. You may also be expected to assume the duties of the Lieutenant when so directed by the Watch Commander.

_____ 2-8-98     *Lt. John W. Payne* 2-8-98     _____
Employee/date          Evaluator/date                Reviewer/date
TLF-5/2005

TO: LT. D. JOHNSON,

FROM: CPL. BALAS.

SUBJECT: VACATION / TRAINING.

SIR, BE ADVISED I WAS ON VACTION AND
HAD C.E.R.T. TRAINING ON 7-9-98. I WISH NOT
TO BE CHARGED VACTION TIME.

THANK YOU!

CPL. Jal Balas

## State of Delaware
## FORMAL CONTACT PLAN
### (Purpose: - To Reach an Understanding)

( ) - Disciplinary
(xx) - Commendation
( ) - Other

Name    Cpl. John Balas                          Date    10/31/99

Department    POP / SCI

Contact Made By    S/Lt. Earl Messick


**Reason for Contact**    On 10/27/99, I received a call in reference to Inmate James Moore, who had been released earlier. Information revealed the possibility that Inmate Moore had more level 5 sentence to complete. You and C/O John Taylor responded quickly and while keeping contact with me via a cell phone, were able to apprehend Inmate Moore and return him to the secure confines of SCI.

**Discussion**    Intensive research performed by Records Clerk Shirley Johnson, revealed a 3 year level 5 sentence that Inmate Moore's record did not contain. Your quick response time prevented the Department from having to conduct a more intense manhunt that would have resulted in much more expense.


**Understanding Established**    You, along with C/O Taylor and Records Clerk Johnson brought this incident to a positive end. It is a privilege to work with dedicated staff such as yourself. Congratulations on a job well done.


**Employee's Signature  -  Acknowledging this Coverage**                    Date 11-9-99

**Signature of Employee's Immediate Supervisor**                    Date 11/9/99

S/Lt Earl J. Messick

**Reviewed By**                    Date 11/9/99

Major P. Townsend

**Was Union Representative covered?**        Yes ( )    No ( )        Date _____

Name of Representative _____        **D000764**

A0610

DEPARTMENT OF CORRECTION

INCIDENT REPORT

PRINT or TYPE

| REPORT # 99-10-166 | DATE: 10/27/99 | PAGE 1 OF 1 |
|---|---|---|

| 1. FACILITY/SECTION: SCI | 2. LOCATION: SCI Rec Room | 3. OCCURRED: Mo/Day/Yr 10/27/99 | Time Approx. 1215 Hrs. |
|---|---|---|---|

4. TYPE OF INCIDENT: MIS-REPRESENTED Release — OR ERONIOUS Release

5. PERSONS INVOLVED:   S-1, S-2 Subject;     V-1, V-2 Victim;     W-1, W-2 Witness

| CODE | NAME, TITLE or STATUS | UNIT ASSIGNMENT: |
|---|---|---|
| S-1 | JAMES T. J. MOORE - 00285227 | INMATE |
| W-1 | JOHN BALAS - CPL | Rec. Room |
| W-2 | FREDDIE TAYLOR | MEDICAL TRANS |
| W-3 | WATCH COMMANDER S/LT EARL MESSICK | W/COMMANDER |

6. INJURIES? YES ( ) NO (X) NATURE:

7. HOSPITALIZED? YES ( ) NO (X) WHERE?

8. EVIDENCE   DISCOVERED BY: NONE      SECURED BY: N/A
   YES ( ) NO (X) TYPE:

9. FORCE USED YES ( ) NO (X) PHYSICAL ( ) CHEMICAL ( ) STUN DEVICE ( ) OTHER ( )
   RESTRAINTS USED YES (X) NO ( ) TYPE: HAND CUFFS

10. IMMEDIATE ACTION:
THE TWO OFFICERS LISTED ABOVE LEFT S.C.I TO RETRIEVE I/MATE JAMES T. J. MOORE NORTH BOUND ON 113 JUST PAST RT. 9.

11. DESCRIPTION OF INCIDENT:

CODE | ON THE ABOVE DATE, AND APPROX. TIME, THE OFFICERS LISTED ABOVE WERE WORKING IN THE RECEIVING ROOM, WHEN A CALL CAME ACROSS THE TWO-WAY RADIO FROM THE WATCH COMMANDER, THAT THERE WAS A POSSIBLE DISCREPANCY WITH THE RELEASE OF INMATE MOORE. C/O TAYLOR HAD JUST RETURNED FROM GETTING THE 4537 VAN GASSED-UP AND SAW THE INMATE IN QUESTION STANDING ON THE HAH-WAY INFRONT OF TROOP-7. WITH OUT QUESTION CPL BALAS AND C/O TAYLOR LEFT SCI AND PROCEEDED NORTH ON 113 WITH THE WATCH COMMANDER ON THE OTHER END OF C/O TAYLOR CELL PHONE FOR POSSIBLE INSTRUCTIONS. THE INMATE WAS SEEN ON THE SOUTH BOUND LANE ON 113 JUST PASSED THE EXXON GAS STATION. C/O TAYLOR PULLED THE VAN UP TO THE SUSPECT CPL BALAS GOT OUT OF THE VAN POLITELY PUT I/M MOORE INTO THE VAN CUFFED HIM FROM BEHIND, NOTIFIED ~~THEN~~ THE WATCH COMMANDER WE

(FOR CONTINUATION USE FORM 404-B)

| 12. NOTIFIED/REFERRED TO: | 15. FOLLOW-UP: YES ( ) NO ( ) COMMENTS: |
|---|---|
| 13. REPORTING PERSON'S NAME & TITLE: Freddie Taylor Medical Trans | 16. REVIEWER'S NAME & TITLE: S/LT EARL Messick |
| 14. REPORTING PERSON'S SIGNATURE: Freddie Taylor | 17. REVIEWER'S SIGNATURE: |

FORM #: 404-A     WHITE - SHIFT COMMANDER   YELLOW - INTERNAL AFFAIRS   PINK- REPORT WRITER
REVISED 5/92

CONTINUATION SHEET                    FACILITY/SECTION:

| REPORT # | 99-10-166 | REPORTING PERSON: | PAGE 1 OF 2 |
|---|---|---|---|
| CODE | | | |

We IN ROUTE BACK TO THE JAIL, WITH
THE MAN IN QUESTION NO PROBLEMS.

A150
99-10-172

STATE OF DELAWARE
DEPARTMENT OF CORRECTION

INCIDENT REPORT

PRINT or TYPE

| REPORT # 99-10-166 | DATE: 27 OCT 99 | PAGE 1 OF 1 |
|---|---|---|

| 1. FACILITY/SECTION: S.C.I. | 2. LOCATION: S.C.I. REC. ROOM | 3. OCCURRED: Mo/Day/Yr WED. OCT 27 1999 | Time APPROX 1215 |
|---|---|---|---|

4. TYPE OF INCIDENT:  ERONIOUS RELEASE

PERSONS INVOLVED:   S-1, S-2 Subject;   V-1, V-2 Victim;   W-1, W-2 Witness

| CODE | NAME, TITLE or STATUS | UNIT ASSIGNMENT: |
|---|---|---|
| R.P. | JOHN J. BALAS  CPL. | REC. RM. |
| W-1 | FREDDY T. TAYLOR  C/O | REC. RM MEDICAL TRANSPORT. |
| S-1 | JAMES T. MOORE  INMATE  00285227 | INMATE. |
| W-2 | EARL MESSICK  S/LT | WATCH COMMANDER. |
| | | |
| | | |

INJURIES?  YES ( )  NO (X)  NATURE:
HOSPITALIZED?  YES ( )  NO (X)  WHERE?

EVIDENCE   DISCOVERED BY:                          SECURED BY:
YES ( )  NO (X)  TYPE:

FORCE USED  YES ( )  NO (X)  PHYSICAL ( )  CHEMICAL ( )  STUN DEVICE ( )  OTHER ( )
RESTRAINTS USED  YES (X)  NO ( )  TYPE:  HAND CUFFS

IMMEDIATE ACTION:  TWO OFFICERS LISTED ABOVE LEFT S.C.I TO SEARCH FOR INMATE. INMATE RETURNED TO S.C.I

DESCRIPTION OF INCIDENT:  ON THE ABOVE DATE AND APPROX TIME R.P AND S-1 WERE
CODE R.P. WORKING IN THE RECEIVING ROOM WHEN A CALL CAME ACROSS THE RADIO FOR A 10-21. R.P
CALLED W-2. W-2 INFORMED R.P. ABOUT S-1 MIGHT HAVE BEEN RELEASED EARLY. W-1
WAS INFORMED ABOUT S-1. W-1 SAID HE WAS JUST GASING UP HIS VAN AND HAD SEEN
S-1 WALKING NORTH ON RT. 113 WITH OUT QUESTION R.P. AND S-1 LEFT S.C.I AND PROCEEDED
NORTH ON 113 WITH THE WATCH COMMANDER (W-2) ON THE OTHER END OF W-1'S CELL PHONE
FOR POSSIBLE INSTRUCTIONS S-1 WAS SEEN ON THE SOUTH BOUND LANE ON 113 JUST PASSED
THE EXXON GAS STATION. W-1 PULLED THE VAN UP TO S-1 AND R.P. GOT OUT OF THE VAN
AND POLITELY TALKED TO S-1 AND PUT S-1 IN THE VAN. S-1 WAS HANDCUFFED FROM BEHIND
AND NOTIFIED W-2 THAT WE HAD S-1 IN CUSTODY. R.P AND W-1 HEADED BACK TO S.C.I TO
THE RECEIVING. INMATE WAS PLACED BACK ON S.C.I HEAD COUNT.

(FOR CONTINUATION USE FORM 404-B)

| 14. NOTIFIED/REFERRED TO: S/LT EARL MESSICK | 15. FOLLOW-UP: YES ( )  NO ( ) COMMENTS: |
|---|---|
| REPORTING PERSON'S NAME & TITLE: JOHN J. BALAS  CPL | 16. REVIEWER'S NAME & TITLE: S/LT EARL MESSICK |
| REPORTING PERSON'S SIGNATURE: CPL. | 17. REVIEWER'S SIGNATURE: S/Lt E. Messick |

FORM # 404-A
REVISED 5/92

WHITE - SHIFT COMMANDER    YELLOW - INTERNAL AFFAIRS    PINK- REPORT WRITER

L450 99-10-166

DEPARTMENT OF CORRECTION

OCT 27 1999

INCIDENT REPORT

WATCH COMMANDER
SIGNATURE: _____

PRINT or TYPE

REPORT # 99-10-172    DATE: 10-27-99    PAGE 1 OF 2

FACILITY/SECTION: CCI / RECORDS    2. LOCATION: ADMIN BUILDING    3. OCCURRED: Mo/Day/Yr 10-27-99    Time 12 NOON

TYPE OF INCIDENT:
ERRONEOUS RELEASE — THIS WAS NOT AN ERRONEOUS RELEASE

PERSONS INVOLVED: S-1, S-2 Subject;    V-1, V-2 Victim:    W-1, W-2 Witness

| NAME, TITLE or STATUS | UNIT ASSIGNMENT: |
|---|---|
| MOORE, JAMES    SBI# 00285339   INMATE | |
| STAFF LIEUTENANT MESSICK | |
| SHIRLEY JOHNSON RECORDS CLERK | |
| SHELLY AT PRESENTENCE OFFICE KENT SUPERIOR | |
| | |
| | |

INJURIES? YES ( ) NO (✓) NATURE:
HOSPITALIZED? YES ( ) NO (✓) WHERE?

EVIDENCE    DISCOVERED BY:    SECURED BY:
YES ( ) NO (✓) TYPE:

FORCE USED YES ( ) NO (✓) PHYSICAL ( ) CHEMICAL ( ) STUN DEVICE ( ) OTHER ( )
RESTRAINTS USED YES ( ) NO (✓) TYPE:

IMMEDIATE ACTION:
INMATE WAS PICKED UP FROM STREET BY CCI TRANSPORTATION DESTINED BY STAFF LT. EARL MESSICK, AND SAID JUDGE VAUGHN SENTENCED HIM TO KEY.

DESCRIPTION OF INCIDENT: 10-27-99
AT NOON (APPROXIMATELY) STAFF LT. MESSICK CAME INTO RECORDS ASKING ABOUT JAMES MOORE. HE HAD BEEN BALLED AND TOLD THAT A WOMAN FROM TASC HAD SEEN HIM ON THE STREET AND WAS IN COURT WHEN HE WAS SENTENCED TO ONE YEAR AT KEY. SLT. MESSICK AND I BOTH CHECKED THE FILE — THERE WAS NO KEY SENTENCE, ONLY 10 MONTHS AT LEVEL K FOLLOWED BY HOME CONFINEMENT. I HAD RELEASED HIM TO KENT COUNTY HOME CONFINEMENT THIS A.M. SLT. MESSICK ASKED ME TO CALL KENT SUPERIOR AND SHE (SHELLY AT PRESENTENCE) FAXED THE SIGNED ORDER WHICH VERIFIED MY RELEASE. SLT. MESSICK AGAIN QUESTIONED INMATE MOORE AS TO WHICH JUDGE SENTENCED HIM. I THEN CALLED SHELLY AGAIN FOR A SENTENCING ORDER FROM JUDGE VAUGHN. HE WAS SENTENCED ON 10-15-99

(FOR CONTINUATION USE FORM 404-B)

NOTIFIED/REFERRED TO:

15. FOLLOW-UP: YES ( ) NO ( )
COMMENTS:

REPORTING PERSON'S NAME & TITLE:
SHIRLEY A. JOHNSON, RECORDS CLERK

16. REVIEWER'S NAME & TITLE:
David Johnson Sct

REPORTING PERSON'S SIGNATURE:
Shirley A. Johnson

17. REVIEWER'S SIGNATURE:

404-A
REVISED 5/92    WHITE — SHIFT COMMANDER    YELLOW — INTERNAL AFFAIRS    PINK — REPORT WRITER

D000768

A0614

TO 3 YEARS AT 5 AND PARTICIPATE IN THE KEY
PROGRAM. THIS DEPARTMENT (RECORDS) DID NOT HAVE
THAT ORDER. SHELLY FAXED IT TO US.

D000769

A0615

SENTENCING WORKSHEET COMMITMENT RELEASE

Defendant _James T. Moore Jr._     Sentence Date _10-15-99_
Sent Judge _Vaughn_               Date of Birth _7-5-74_
                                  SBI #
Ct. Clerk _LMJ_                   Ct. Rptr. _O. Cox-Wilkins_
Def. Atty. _L. Schmid_            State's Atty _J. Kilner_

Cr.A.No. _VK97-03-0253_ Charge _Burglary 2nd_  Eff.Sent.Date _____; or
ID/Duc# _9702013248_                    ( )consecutive to sentence now serving.
1. Probation is revoked(✓) continued ( )     _While at Level 5; Defendant to_
2. Costs of prosecution (✓): suspended ( )   _participate in key Program._ TIS or NON-TIS
3. Costs this charge $_____
4. Fine of $_____ : Amount suspended $_____  ( )18% ( )15%
5. Custody for (time) _3 yrs_ at Level _5_, giving credit for _no credit for time_
   ending on _____.  ( ) 11 _Del. C._ § 4204(k) applies. _served after 1/1/99_
   ( )a. Mandatory incarceration_____ per statute
   ( )b. Suspended after_____ for_____ at Level_____
       suspended after_____ for_____ at Level_____
   ( )c. Restitution ordered.
   ( )d. Level IV sentence--hold at Level____ until space is available at Level 4.
   ( )e. Guilty but mentally ill verdict; to be confined at State Hospital until competent to return
       to correctional custody.

Cr.A.No._____ Charge_____ Eff.Sent.Date_____; or
ID/Duct#_____                    ( )consecutive to sentence now serving.
1. Probation is revoked( ): continued ( )     or( )consecutive to above #_____
2. Costs of prosecution ( ): suspended ( )    or( )concurrent prob. to#_____
3. Costs this charge $_____                              TIS or NON-TIS
4. Fine of $_____ : Amount suspended $_____  ( )18% ( )15%
5. Custody for (time)_____ at Level_____, giving credit for_____
   ending on_____.  ( ) 11 _Del. C._ § 4204(k) applies.
   ( )a. Mandatory incarceration_____ per statute
   ( )b. Suspended after_____ for_____ at Level_____
       suspended after_____ for_____ at Level_____
   ( )c. Restitution ordered.
   ( )d. Level IV sentence--hold at Level____ until space is available at Level 4.
   ( )e. Guilty but mentally ill verdict; to be confined at State Hospital until competent to return
       to correctional custody. _After serving serving 1yr at the Key Program_
       _balance to be suspended for 1year at Level._
AS TO ALL CHARGES:
( )a. Pay restitution, fines, costs, etc. ( )during probation ( )as previously ordered. _Work Release_
( )b. Work referral.                                          _followed by 1year at_
( )c. Cost of supervision: $_____ per month - ( ) determined by PO _Level 4 Home Confin_
( )d. Community service hours_____                       _followed by 1yr at Level._
( )e. No contact with_____                     _Concurrent w/ 99-01-0172._
( )f. No driving for_____                      ( )k. All special conditions are reimposed.
( )g. Substance abuse evaluation.
( )h. Mental health evaluation.
( )i. Special program: ( ) Residential drug/alc  ( ) Outpatient drug/alc _disqualified_
       ( ) Home Confinement ( ) Job Training ( ) 21 Del.C. 4177
(✓) Other _if defendant is medically ~~discharged~~ from the Key_
NOLLE PROS ENTERED: _Program; TAC & the Probation_ _Jon A Klenoski_
( )All remaining charges; or _Officer to confer and make_
( )Cr.A.Nos._____ _alternative recommen_/Prothonotary



**Delaware Department of Correction**
**Bureau of Prisons**
**Sussex Correctional Institution**
**RT 1, Box 500**
**Georgetown, DE 19947**

November 1, 1999

### LETTER OF COMMENDATION

On October 22, 1999, at approximately 1600 hrs., Records Supervisor Garland Messick reported that Inmate Tony Pate had been released from SCI in error. Records indicated that he should have remained committed on a $500 secured bond. At approximately 1730 hrs., an apprehension team was formed and assigned the task of returning the inmate to custody. The apprehension team consisted of CAPT George Truitt, CPL John Balas, CPL Michael Cathell, and CO Larry Palmer. CAPT Truitt was off-duty at the time and responded from his residence.

CAPT Truitt was assigned as the team leader and coordinated efforts to recover the inmate. CPL Balas reviewed the inmate file and collected other information from other sources, to include CJIS and DELJIS. CPL Cathell and CO Palmer were assigned to prepare the team's equipment and vehicles and act as back-up officers during the search.

At approximately 1830 hrs., the team departed SCI to attempt to locate the inmate, who was believed to be in the Laurel area. Their investigation led them the inmate's employer, a gas station, his residence, and finally to his girlfriend's residence. This operation required the team to enter areas that may be hostile toward law enforcement and question persons who may be reluctant to cooperate. The inmate was located and returned to custody without incident in approximately three hours.

This operation was conducted in a textbook manner according the DOC Escapee Management course. Under CAPT Truitt's direction, the team successfully located the inmate in short time. CPL Balas's research conducted prior to the search was thorough, complete, and provided for a good start to the search. CPL Cathell and CO Palmer ensured the team was properly prepared, as well as providing input and back-up during the operation.

The team's actions during this operation clearly show each member's ability to work together as part of a team under unfavorable, and possibly hostile, conditions. The team clearly focused on the objective and maintained safe and secure surroundings. They demonstrated their ability to plan, research, and execute such an operation, and communicate effectively with potentially hostile persons while maintaining a favorable public image of the Department.

CAPT Truitt, CPL Balas, CPL Cathell, and CO Palmer comprised a successful and efficient team and their actions reflect positively on each as an individual, the apprehension team, and the Department of Correction.

David T. Johnson, SLT
Watch Commander

**D000771**

A0617

INSTITUTION: _SCI_____

NAME: _BALAS, John_____

## LEAVE AVAILABLE AS OF DECEMBER 31, 1998

**BALANCE/HOURS**                    **HOURS OF ACCRUAL PER MONTH**

SICK __334___                         SICK _____10_____

VACATION __94___                      VACATION ___10____

**ADJUSTED SERVICE DATE** _10 / 03 / 94___

The Department of Correction leave records indicate the above balances as of December 31, 1998. These balances will be carried over into calendar year 1999, and this document will be a permanent part of your personnel file.

**IF YOU AGREE WITH THE BALANCES:** Sign and return this form to the Human Resources Office no later than May 15, 1999.

**IF YOU DO NOT AGREE WITH THE BALANCES:** Consult with your designated timekeeper to adjust any discrepancies then sign and return this form to the Human Resources Office.

**FAILURE TO RETURN THIS VERIFICATION MAY JUSTIFY APPROVAL OF THE ABOVE BALANCES.**

Sincerely,

_Karen F. Candeloro_

Karen F. Candeloro
Senior Human Resources Technician

**I agree with the vacation and sick leave balances indicated above as of December 31, 1998.**

_____        _____
     **Signature**                      **Date**

**D000772**

A0618

RECEIVED & REVIEWED

OCT 22 1999

STATE OF DELAWARE
DEPARTMENT OF CORRECTION

INCIDENT REPORT

SIGNATURE: WATCH COMMANDER _____

PRINT or TYPE

REPORT # _9910127_    DATE: _22 OCT 99_    PAGE _1_ OF _2_

1. FACILITY/SECTION: _S.C.I_    2. LOCATION: _LAUREL, DE._    3. OCCURRED: Mo/Day/Yr    Time
_FRIDAY   OCT. 22, 1999   1600_

4. TYPE OF INCIDENT: _ERONIOUS RELEASE / RECOVERY TEAM._

5. PERSONS INVOLVED; S-1, S-2 Subject;    V-1, V-2 Victim;    W-1, W-2 Witness

| CODE | NAME, TITLE or STATUS | | UNIT ASSIGNMENT: |
|------|------------------------|--|------------------|
| R.P. | JOHN J. BALAS | CPL. | RECEIVING ROOM |
| W-1 | DAVID JOHNSON | S/LT | WATCH COMMANDER |
| W-2 | MIKE CATHELL | CPL | FRONT COUNTER |
| W-3 | LARRY PALMER | C/O | FRONT COUNTER |
| W-4 | GEORGE TRUITT | CAPT | |
| S-1 | TONY L PATE | INMATE   TO892133 | |

6. INJURIES? YES ( ) NO (✓) NATURE:
7. HOSPITALIZED? YES ( ) NO (✓) WHERE?
8. EVIDENCE   DISCOVERED BY:    SECURED BY:
YES ( ) NO (✓) TYPE:

9. FORCE USED YES ( ) NO (✓) PHYSICAL ( ) CHEMICAL ( ) STUN DEVICE ( ) OTHER ( )
RESTRAINTS USED YES (✓) NO ( ) TYPE: _HAND CUFFS, LEG SHACKLES, TRAVEL CHAIN_

10. IMMEDIATE ACTION: _ERONIOUS RELEASE TEAM FORMED_
_INFORMATION GATHERED._

11. DESCRIPTION OF INCIDENT: ON THE ABOVE DATE AND APPROX TIME R.P. WAS NOTIFIED BY
CODE W-1 THAT S-1 WAS ERONIOUSLY RELEASED AND A TEAM NEEDED TO BE FORMED.
R.P. W-1 ASKED MYSELF TO LOOK AT THE SHIFT ROSTER AND PICK TWO PERSONS, I
TOLD W-1 I WANTED W-2 AND W-3, I THAN WENT TO RECEIVING TO GET AS MUCH
INFORMATION, ON S-1, AS POSSIBLE. I FOUND AN ADDRESS AND A JOB LOCATION WHERE
S-1 WORKED. I NOTIFIED W-1 WITH THE INFORMATION, W-4 WAS CALLED TO ASSIST.
W-4 REPORTED TO SCI, R-P BREIFED W-2, W-3, AND W-4 ON THE INFORMATION
THAT WAS GATHERED. AT APPROX. 1830 WE LEFT S.C.I AND WENT TO LAUREL, R.P.
AND W-4 ROAD TOGETHER WHILE W-2 AND W-3 ROAD TOGETHER. THE TEAM DREW THE
PROPER EQUIPMENT, 3(.38 REVOLVERS) 1 SET OF HAND CUFFS, TRAVEL CHAIN, AND LEG
SHACKLES ALONG WITH KEYS TO A CAGED VAN. THE TEAM WENT TO LAUREL
HARDEES TO SEE IF S-1 WAS WORKING OR STILL EMPLOYED THERE. S-1 HAD JUST
GOTTEN OFF FROM WORK. S-1'S BOSS TOLD US THAT HE WOULD BE BACK THE NEXT
DAY AT 0700. R.P AND W-4 FOUND OUT FROM S-1'S BOSS THAT SHE KNEW S-1 HAD HAD
HIS CAR IMPOUNDED AND IT WAS AT REESE CAREY'S. (FOR CONTINUATION USE FORM 404-B)

12. NOTIFIED/REFERRED TO: _S/LT DAVE JOHNSON_

13. REPORTING PERSON'S NAME & TITLE: _JOHN J BALAS   CPL_

14. REPORTING PERSON'S SIGNATURE:

15. FOLLOW-UP: YES (✗) NO ( )
COMMENTS: _review records office procedures_

16. REVIEWER'S NAME & TITLE: _David Johnson   SLT_

17. REVIEWER'S SIGNATURE:

FORM #: 404-A    REVISED 5/92    WHITE - SHIFT COMMANDER   YELLOW - INTERNAL AFFAIRS   PINK- REPORT WRITER

CONTINUATION SHEET          FACILITY/SECTION:

| REPORT # 991027 | REPORTING PERSON: | PAGE 2 OF 2 |
|---|---|---|

CODE

R.P AND W-4 THANKED S-1'S BOSS, INFORMED W-2 AND W-3 WITH THE INFORMATION. THE TEAM DEPARTED LAUREL HARDEE'S AND PROCEEDED TO REESE CARRY'S GARAGE TO FIND OUT WHAT KIND OF CAR S-1 HAD IMPOUNDED, W-4 AND R.P WERE TOLD S-1 HAD JUST GOT HIS CAR OUT OF IMPOUNDMENT, THE MAN AT REESE'S GARAGE TOLD US WHERE S-1'S ADDRESS WAS AND GAVE US DIRECTIONS, W-2, W-3, W-4, AND R.P WENT TO S-1'S ADDRESS. R.P AND W-4 WENT TO THE FRONT DOOR WHILE W-2 AND W-3 WENT TO THE BACK OF THE RESIDENCE, R.P AND W-4 WERE GREETED BY S-1'S FATHER. S-1'S FATHER WAS INFORMED OF THE SITUATION AND KNEW THE WHERE A BOUTS OF S-1, S-1'S FATHER LIVED AT 52 HICKMAN DR. LAUREL, DE. S-1'S FATHER TOOK R.P AND W-4 TO CARVEL APARTMENTS 502 W-2 AND W-3 FOLLOWED R.P AND W-4 TO THE APPARTMENTS, S-1'S FATHER WENT TO THE APPARTMENT WITH R.P AND W-4 WHILE W-2 AND W-3 BACKED US UP FROM THE BACK AND SIDES OF THE APPARTMENT. S-1 CAME OUT, W-4 READ S-1 HIS MIRANDA RIGHTS, S-1 WAS HANDCUFFED, SHACKLED WITH TRAVEL CHAINS AND PLACED IN THE VAN AT APPROX 2110, W-2 NOTIFIED W-1 THAT S-1 WAS IN OUR CUSTODY AND THE TEAM WAS DEPARTING LAUREL, ENROUTE TO S.C.I, S-1 ARRIVED AT S.C.I. AT APPROX 2140.

THIS TEAM WORKED VERY WELL TOGETHER!

DOC 404-B
REVISED 5/92

STATE OF DELAWARE
DEPARTMENT OF CORRECTION

RECEIVED & REVIEWED

OCT 2 2 1999

WATCH COMMANDER
SIGNATURE: _____

INCIDENT REPORT

PRINT or TYPE

| REPORT # 9910127 | DATE: 10-22-99 | PAGE 1 OF 2 |
|---|---|---|

| 1. FACILITY/SECTION: SCI BAC | 2. LOCATION: Laurel De. | 3. OCCURRED: Mo/Day/Yr FRI 10-22-99  Time App 18⁰⁰ |
|---|---|---|

4. TYPE OF INCIDENT: Eronious Release / Recovery team

5. PERSONS INVOLVED:    S-1, S-2 Subject;    V-1, V-2 Victim;    W-1, W-2 Witness

| CODE | NAME, TITLE or STATUS | UNIT ASSIGNMENT: |
|---|---|---|
| RP | Larry Palmer C/O | Visit Room |
| W-1 | Mike Cathell Cpl | Front Counter |
| W-2 | John RAIAS Cpl | Receiving Room |
| W-3 | George Truitt Capt | |
| S-1 | Tony L. White S/M 70892133 | |

6. INJURIES?   YES ( )   NO (X)   NATURE:

7. HOSPITALIZED?   YES ( )   NO (X)   WHERE?

8. EVIDENCE   YES ( )   NO (X)   TYPE:   | DISCOVERED BY: | SECURED BY: |

9. FORCE USED   YES ( )   NO (X)   PHYSICAL ( )   CHEMICAL ( )   STUN DEVICE ( )   OTHER ( )
RESTRAINTS USED   YES (X)   NO ( )   TYPE: Hand cuffs, leg shackles, Waist Chaine

10. IMMEDIATE ACTION:


11. DESCRIPTION OF INCIDENT: On the above date and approx time RP was informed
along with W-1 the we to draw weapons and restraints (cuff shackles, waistchaine)
and were part of the recovery team with W-2 and W-3. At that time we were
told to find S-1 who was an eronious release. RP and W-1 followed W-2 and W-3
to S-1's Last known work adress (Hardees). RP and W-1 waited in the parking lot
out of sight in the VAN while W-2 and W-3 whent inside to talk to
the manager. After a brief wait W-2 and W-3 came out the van RP and W-1
were in, and said S-1 just got off work approx 15 minutes prior to our arrival
RP and W-1 followed W-2 and W-3 to Reese Cary's garage, where S-1's car
was impounded to get a description. According to the manager information and
information and direction from Mr Cary we were able to find S-1's father home.
from there RP and W-1 waited in van covering the back of residenk while W-2 and
W-3 whent into the residence. W-2 contacted W-1 and RP via radio and informed
us that S-1's father was at home and would take us to where S-1 was
located.
(FOR CONTINUATION USE FORM 404-B)

| 12. NOTIFIED/REFERRED TO: S/Lt P. Johnson | 15. FOLLOW-UP: YES (X)   NO ( ) COMMENTS: Review Records office procedure |
|---|---|
| 13. REPORTING PERSON'S NAME & TITLE: LARRY PALMER C/O | 16. REVIEWER'S NAME & TITLE: David Johnson SLT |
| 14. REPORTING PERSON'S SIGNATURE: | 17. REVIEWER'S SIGNATURE: |

FORM #: 404-A    WHITE - SHIFT COMMANDER   YELLOW - INTERNAL AFFAIRS   PINK- REPORT WRITER
REVISED 5/92

CONTINUATION SHEET    FACILITY/SECTION: SCI / BAC

REPORT # 9910127    REPORTING PERSON: Larry D Palmer, C/O    PAGE 2 OF 2

CODE

RP and W-1 followed W-2 and W-3 to Carvel gardens apt complex RP and W-1 covered the back of apt building while W-2 and W-3 went to the front w/ S-1's father. S-1 came out and was informed of the situation by W-2 and W-3. S-1 said he understood and that there wouldn't be any problems. W-3 and W-2 Read S-1 his maranda wrights while W-1 placed S-1 in restraints. RP unlocked the van and and placed S-1 in back and secured the van. Everyone involved in the recovery proceeded back to SCI at approx 2140. S-1 was then delivered to SCI R/R room. (DP)

DOC 404-B
REVISED 5/92

STATE OF DELAWARE
DEPARTMENT OF CORRECTION

RECEIVED & REVIEWED

OCT 2 2 1999

INCIDENT REPORT

WATCH COMMANDER
SIGNATURE:

PRINT or TYPE

| REPORT # 99/0127 | DATE: 102299 | PAGE  OF 2 |
|---|---|---|

| 1. FACILITY/SECTION: BAC / SCI | 2. LOCATION: Laurel DE. | 3. OCCURRED: Mo/Day/Yr SAME   Time App 18:00 |
|---|---|---|

4. TYPE OF INCIDENT: Eronious Release / Recovery team.

5. PERSONS INVOLVED: S-1, S-2 Subject;   V-1, V-2 Victim;   W-1, W-2 Witness

| CODE | NAME, TITLE or STATUS | UNIT ASSIGNMENT: |
|---|---|---|
| W-P | Mike Cathell   COL | Front Cower |
| W-1 | LARRY Palmer   C/O | |
| W-2 | John Balas   CPL | |
| W-3 | George Truitt.   CAPT | |
| S-1 | Tony L. Pate   I/m.   # T082133 | |

6. INJURIES? YES ( ) NO (X)   NATURE:

7. HOSPITALIZED? YES ( ) NO (X)   WHERE?

8. EVIDENCE   DISCOVERED BY:                    SECURED BY:
YES ( ) NO (X)   TYPE:

9. FORCE USED YES ( ) NO (X)   PHYSICAL ( ) CHEMICAL ( ) STUN DEVICE ( ) OTHER ( )
RESTRAINTS USED YES (X) NO ( )   TYPE: HandCuffs, Leg Shackles, Travel Chain.

10. IMMEDIATE ACTION:

11. DESCRIPTION OF INCIDENT: On above stated date and App time. RP was notified along with W-1 by W-2 to draw weapons, CUFFS Shackles and travel chain and keys to a van. RP & W-1 were part of the recovery team along with W-2 and W-3 to find an eronious release (S-1). RP followed W-2 and W-3 to Laurel DE to Hardee's the last known work adress of S-1. RP and W-1 waited out of sight in the parking lot while W-2 and W-3 went inside to talk to the manager. Later W-2 and W-3 came out to RP and W-1's van and informed us that S-1 had just got off wock App 15 mins before we arrived. W-1 and myself followed W-2 and W-3 to Reese Carls garage and found out what kind of car S-1 was trying to get out of impound (according to the managers from Hardee's information) MR Carey gave us the information plus directions to S-1's residence. RP & W-1 then followed W-2 and W-3 to Hickmans estates —

(FOR CONTINUATION USE FORM 404-B)

| 14. NOTIFIED/REFERRED TO: S/LT DAvid Johnson. | 15. FOLLOW-UP: YES (X) NO ( )  COMMENTS: review records office procedure |
|---|---|
| REPORTING PERSON'S NAME & TITLE: Mike Cathell   Col | 16. REVIEWER'S NAME & TITLE: David Johnson   SLT |
| REPORTING PERSON'S SIGNATURE: Mike Cathell | 17. REVIEWER'S SIGNATURE: DtJ |

FORM # 404-A
REVISED 5/92

WHITE - SHIFT COMMANDER   YELLOW - INTERNAL AFFAIRS   PINK- REPORT WRITER

D000777

A0623

CONTINUATION SHEET          FACILITY/SECTION: BAC/SCI

REPORT # 9910127        REPORTING PERSON: Mike Cattell Cpl          PAGE 2 OF 2

CODE

and waited in the van while W-2 and W-3 went into S-1's residence. W-2 contacted RP via radio and informed RP that S-1's father was at home and would take us to where S-1 was at that time. R.P. and W-1 then followed W-2 & W-3 to Carvel gardens. When R.P. and W-1 arrived at Carvel gardens RP and W-1 covered the back of the building while W-2 & W-3 and S-1's father went to the apt. S-1 came out and was instructed by W-2 & W-3 of the situation. S-1 said he understood and that there would be no problems. W-3 read S-1 his miranda warnings while RP placed cuffs, travel chain, and leg shackles on S-1. W-1 unlocked the van and placed S-1 in the back and secured the van. All involved then proceeded back to SCI. at App 2140 All arrived at SCI.

DOC 404-B
REVISED 5/92

Subj: Re-Capture of Erroneous released Inmate

RE: Tony Pate SBI 70892133

At Appox 1730hrs on Friday 10-22-99, while in Telephone conversation with the SCI Watch Commander; S/Lt David Johnson. I was Informed that arround 1600hrs he became aware that a Erronious Release had occurred.

A Tony Pate SBI 70892133 continued to have a $500.00 Secured Bond charge; Endanging a child which had not been disposed of prior to release.

At that time Shift strength at SCI was Minimum and S/Lt Johnson needed to attempt to apprehend this Inmate. I told him to get together ③ Three officers and I would come in, and either work command so he could Lead the Team or I would handle the search and he could continue to Manage the institution.

He as Watch Commander to hold the operation, and send me.

I reported SCI at Appox 6pm. He had arranged to have C.O. Palmer, Cpl Cathell, and Cpl Balas assigned to the Task. At that Time Equipment and status information was gathered and we departed SCI for the Town of Laurel. (Last recorded Addres)

Cpl Bala's efforts to obtain what later proved to be valuable information from Computer sources gave us a lead to Inmate Pates last work site (Hardee's at Laurel Truck stop)

By dividing our Team, placing Two uniformed officers Cpl Cathell and co. Palmer in our Prison Van. And Myself and Cpl Bolas in my Private vehicle (Plain clothes) we were able at each location to do a systematic check off. At the Work site the Manager. Identified Inmate Pate and was willing to assist us by telling me that he had just left that area appox 30 minutes prior to our arrival. I was also able to find out that he was on foot and was going to the Reese Careys Service Station to attempt to retrieve his auto from the inpound yard.

We imediately left the Truck Stop and went to Reese Careys Station. Mr. Carey informed us that T. Pate had just left his Station with his Car. At that Time we obtained a description of his auto (a 1988 Blue Cutlass Olds hiesue tag. De 112385) following the status sheet info we preceded to the address listed; Mr Carey assisted by giving detailed directions to the Trailer court; Located East of Route #13, after several minutes of driving inside the court a citizen on foot assisted us by giving us directions to the Park Caretaker.

The Caretaker gave us directions to Tony Pates Step-father; a Mr. Tony Phillips.

Mr. Phillips was most cooperative with us; said he would call arround and try

To Locate his Son, He got off the Telephone and said Quote "Ive found him" but I dont want him to think I was turning him in. I asked him if he could Take us to were he is, he said yes; but he had been drinking some and if he drove there we would arrest him for drunk driving. At that Time I told him, what if you ride over with me., point out the apt house and the apprehendion could be done without his sons Knowledge. He agreed. At that time Myself Cpl Bales and Mr. Phillips went to Carver Apts in Laurel, in route Mr Phillips decided he would Talk his Son out in My Presents. Mr Phillips did as he stated, Tony. Came outside; surrendered to us, I issued him Miranda as a failsafe, Cpl Cathell and c.o. Palmes placed on the restraing equipment and loaded Tony without incident. We returned to the Laurel Truck stop. I Informed Pates employer that he was apprehended; cooperated and desired to retain his job. She assured us his job would be secured upon his release. At that Time Cpl Cathell contact watch Commander Johnson and informed him the ⑮ was in custody and we were leaving the Laurel area in-route to SCI, on our arrival Inmate Pate was placed back on count to await future disposition of the pending Family ct charge.

All equipment was re-stored, (including ②) two 800 MHz radios borrowed from the SCI/V.O.P. Unit.

All ③ three officers who worked with me on this Task, excelled in there performance and are well-deserving of commendation recognition. There professional, safe, behavior made this apprehendition "Text Book" in nature. I was proud of there interactions and will support any recognition the Watch Commander recommeds.

Capt. GC Truitt

S/tt D. Johnson Packet
Warden
Div.
Supt
Truitt
file - etc.

Revised: 7/9/99         **SCI - NOTIFICATION LIST**         Date: _10/22/99_

Inmate's
Name: _PATE, TONY (ERRONEOUS RELEASE)_    Location: _LAUREL AREA_

Watch Commander: _SLT D JOHNSON_         Time Notification Initiated: _1600_

The Notification List should be initiated as a result of the following: Escapes, rapes, all assaults, discharging weapons, use of chemical agents, attempted suicides, hospital runs, inmate disturbances, or any other serious incident.

| | Time Contacted: | By Officer: |
|---|---|---|
| Deputy Warden DeLoy  645-0443 Home | | |
| 1-800-822-5742 Pin #27470 Beeper | | |
| Warden Kearney      856-2605 Home | | |
| 1-800-822-5742 Pin #27471 Beeper | | |
| Major Townsend      539-5080 Home | _1610 page_ | _DJ contact at 1640_ |
| 1-800-822-5742 Pin #20676 Beeper | _1600 message_ | |
| Bureau Chief Howard (410)-398-1763 Home | | |
| 1-800-946-4646 Pin #1467303 Beeper | | |
| Tony Figario, Inspector  697-9401 Home | | |
| 1-302-242-23690  Car Phone | | |
| Major Hall - Cert -  653-7135 Home | | |
| 1-302-670-7201 Car Phone | | |
| 247-6463 Beeper | | |
| Internal Affairs        739-5601 Office | | |
| Warden will call after hours. | | |
| Media Relations Chief Sheldon 302-349-4608 Home | | |
| 423-0688 car  1-800-822-5742 Pin #31699 Beeper | | |
| DSP SUSCOM 856-5655, 5680 (911) | | |
| GOVERNOR'S OFFICE: MAJOR INCIDENTS | | |
| Tom McGonigle 577-3210 or 2640 Work | | |
| 764-7786 Home  302-584-4165 Car Phone | | |
| Jeff Bullock    577-3210 or 2494 Work | | |
| 764-6224 Home 302-540-6137 Car Phone | | |
| Sheri Woodruff  575-6800 Pager | | |

**Stop notification after reaching one person from the Governor's Office.**

Officer Reporting Incident: _____

Details of Incident: _Attached Reports: + 404's_
_Packet: Slt Johnson (Cpl Pruitt) Cpl Cathed) Cpl Bala) Co Palmer)_

**Note:** In the event of an escape, the sentencing Judge must be notified. The list of numbers is located in the Escape Procedure. Page 1/of ___ continue on 404.

Signature: X _____

**D000783**

A0629



# SUBPOENA

## CRIMINAL CHARGES

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR _____ COUNTY

SUSSEX

You    OFF. JOHN BALAS                          are hereby commanded,
       SUSSEX WORK RELEASE CENTER
       C/O SCI                                  *Contested*
       GEORGETOWN DE  19947                     *Violation of Probation* ▬▬▬▬

by the **SUPERIOR COURT OF THE STATE OF DELAWARE**, to appear for the

**STATE OF DELAWARE V.**    DAVID W FORAKER

ON Monday, December 20, 1999

AT THE COURT HOUSE, THE CIRCLE, GEORGETOWN,
DELAWARE.

TIME 8:30 A.M.

PLEASE REPORT TO THE SUSSEX COUNTY COURTHOUSE.

YOU ARE A WITNESS FOR THE STATE OF DELAWARE.  YOU WILL BE
NOTIFIED IF THERE IS ANY CHANGE IN THE TRIAL DATE.

IF THERE ARE ANY QUESTIONS REGARDING THIS CASE,
PLEASE CONTACT DEPUTY ATTORNEY GENERAL
  AT 856-5353.

## BRING THIS SUBPOENA WITH YOU!

Witness the Judges, Superior Court, at          GEORGETOWN

PER PROTHONOTARY BY _____ , DEPUTY.

PLEASE CALL 856-5353 THE DAY BEFORE THE TRIAL TO SEE IF
YOUR APPEARANCE IS STILL NECESSARY.  IF THERE ARE ANY
QUESTIONS REGARDING THIS CASE PLEASE CONTACT DEPUTY
ATTORNEY GENERAL  .

| I.D. No. | Issue Date | CRA # | Sheriff File # | Deputy |
|----------|-----------|-------|----------------|--------|
| 9706020489 | 12/15/99 | IS98110505IN | | |

DELTA FORMS, INC. 302-652-3266

D000784

A0630



Delaware Department of Correction

This is to certify that the Bureau Chief for the Bureau of Prisons has awarded a

# Bureau Commendation

TO:    Cpl. John Ballas

FOR:    Your quick response in apprehending an inmate, released in error from SCI on October 27, 1999. Your efforts brought this incident to a positive end.

_____
Commissioner

This ___5th___ day of ___May___ 2000

_____
Bureau Chief



**Department of Correction**
**State of Delaware**
**Sussex Correctional Institution**
**RT. 1, Box 500**
**Georgetown, DE 19947**
**Telephone: (302) 856-5280**

TO:        Cpl. John Balas

FROM:      Capt. Mike Brittingham *MCB*

DATE:      Oct. 24, 1999

SUBJECT:   Letter of Appreciation

John,

This is a letter of appreciation for your participation as one of the members that I choose to be part of an apprehension team. On Sept. 10, 1999, I requested that you, along with Sgt. Robert N. Smith 3rd, & C/O Thomas Webster go to the town of Milton and attempt to locate a Leon Williams who was erroneously released from S.C.I. You along with the other two officers went beyond your duties to attempt to find and return this inmate to S.C.I. The inmate was returned to S.C.I. through the efforts of the three of you. Thanks for your dedication to your job.

pc:    Warden Kearney
       Deputy Warden Deloy
       Major Townsend
       file

**D000786**

A0632

# CERTIFICATE OF TRAINING

This certifies that

## John Balas

has successfully completed

## Videophone Users Training

_Lawrence M. Sullivan_

**LAWRENCE M. SULLIVAN, ESQ.**
Chair, Videophone Subcommittee

**January 28, 2000**
Date

D000787

A0633

# Pre-Trial Unit
# Sussex Correctional Institution

**Memorandum:**

To :        Corporal John Balas

From:       Lieutenant Michael Atallian
            Lieutenant Truman Mears
            Pre Trial Unit Managers  B- Shift

RE :        Letter Of Commendation

Date :      May 4, 2001

 

    Recently we had our quarterly inspection by Tony Figario, and as an institution we scored a 98%. This is even better then the last score. It goes without saying that it could never have been done without exceptional staff such as yourself. We would like to take this opportunity to commend you on such an outstanding job that you did in helping us get this building in line. Thank you and please keep up the good work.

    This letter will be part of your evaluation file.

XC:  File

**D000788**

A0634

**DEPARTMENT OF CORRECTION**　　**EMPLOYEE TIME CARD**　　Calendar Year 2001　　DEPTID (DDS): _____

Employee Name: _Balas John_　　SSN: _375 60 9732_　　Class Title: _____

Employment Date: _10-3-94_　　Adjusted Service Date: _____

**Accrual Rate**
Sick: _10_
Vacation: _10_

Sick Accrual (hrs per month) - 37.5 hrs: 9.5 / 40.0 hrs: 10
Vacation (hrs per month) - 37.5 hrs: 9.5, at 10 yrs: 11.25, at 15 yrs: 13.25 / 40 hrs: 10, at 10 yrs: 12, at 15 yrs: 14

**APPLY ACCRUALS ONLY AT END OF MONTH**

| | HOLIDAY | SICK | VACATION |
|---|---|---|---|
| Balance Carried Forward | 18 | 288 | 62 |
| JAN | -0 12 | -0 302 | -16 46 |
| FEB | +16 28 | +10 312 | +10 56 |
| MAR | -8 20 | -0 312 | -8 48 |
| APR | +5 28 | +10 322 | +10 58 |
| MAY | +0 28 | -0 322 | -0 58 |
| JUN | +0 28 | +10 332 | +10 68 |
| JUL | +8 36 | +10 342 | +10 78 |
| AUG | +8 44 | -0 342 | -0 78 |
| SEP | -40 4 | +10 352 | +10 88 |
| OCT | -0 4 | -0 352 | -40 48 |
| NOV | +0 4 | +10 362 | +10 58 |
| DEC | -4 0 | +10 372 | -36 24 |
| | +0 0 | +10 372 | +10 34 |
| | +0 0 | -0 372 | -0 24 |
| | +8 8 | +10 382 | +10 34 |
| HOLIDAY | | SICK | VACATION |

| | HOLIDAY | SICK | VACATION |
|---|---|---|---|
| | -0 8 | +10 392 | +10 44 |
| | +8 16 | +10 402 | +10 54 |
| | +0 16 | -0 402 | -0 54 |
| | +0 16 | +10 412 | +10 64 |
| | -32 16 | -0 412 | -32 32 |
| | +16 16 | +10 422 | +10 42 |
| HOLIDAY | | SICK | VACATION |

**Total Hours Used**

| HOLIDAY | SICK | VACATION |
|---|---|---|

Check here if perfect attendance year 2001 ☐

Remarks: _RED = HOL_

**D000789**

A0635

| | HOLIDAY | | | | | | | | PRIOR YR HOL CARRIED FORWARD | | VAC IN LIEU | MILITARY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TAKEN | PAID | WORKED RESCHED | OFF RESCH | DATE USED | HOLIDAY PD 6/30/01 | | | HOLIDAY | DT TAKEN | OF SICK FORWARDED | LEAVE |
| A - 1 New Year's Day | | | | X | JAN/1 '01 | | | | M-1 00 | 5/15/2001 | | |
| B - 1 Martin Luther King's Birthday | | | | X | JAN/17 '01 | | | | | | | |
| C - 1 President's Day | | | | | JAN 18 '01 | | | | | | | |
| D - 1 Good Friday | | | X | | | | | | | | | |
| E - 1 Memorial Day | | | | | MAY 19 '01 | | | | | | | |
| F - 1 Independence Day | | | | | | | | | | | | |
| G - 1 Labor Day | | | | X | | | | | | | | |
| H - 1 Columbus Day | | | | X | 12/7/01 | | | | | | | |
| I - 1 Veteran's Day | | | | | 10/01/01 | | | | | | | |
| J - 1 | | | X | | 12/11/01 | | | | | | | |
| K - 1 Thanksgiving Day | | | | X | 12/2/01 | | | | | | | |
| L - 1 Day after Thanksgiving | | | | | | | | | | | | |
| M - 1 Christmas Day | | | | | | | | | | | | |
| N - 1 | | | | | | | | | | | | |
| N - 2 Special as declared by Governor | | | | | | | | | | | | |

COMPASSIONATE LEAVE

SPECIAL NOTATIONS

| COMP TIME EARNED/USED/LOST | COMP TIME EARNED | | | COMP TIME USED/LOST | | | |
|---|---|---|---|---|---|---|---|
| Date/Reason | MS | FLSA | TOTAL | MS | FLSA | TOTAL | |
| From 2000 | 5 HRS | | 5 | | | | |
| 03-22-01 Test | 4 HRS | | 9 | | | | |
| 1/30/01 I.A | 8 HRS | | 17 | | | | |
| 2-6-01 | 6 HRS | | 23 | | | | |
| 12-12 12/13-01 -16HR | -14(?) | | | | | | |
| 12-18 Test + 6 | | | 13 | | | | |

02/19/2005     Troop 4 State Police                                        04-05-007095

| Reported Date and Time | | | Occurred: |
| SAT 02/19/2005  1053 | | Initial Crime Report | SAT 02/19/2005  1000 thru SAT  02/19/2005  1104 |

**Location:**
24744  Prettyman RD          Georgetown, DE 19947
CR 254 N/O CR 255

**M.O. and Incident Overview:**
The victim died from a self-inflicted gunshot wound to the head.

| Grid 162-112 | Sector 42 | County Sussex | Domestic Related ☐Yes ☒No | 4-F-14 Sent? ☐Yes ☒No | Gen Broadcast Sent? ☐Yes ☒No |

## Victim Information

| Victim Number 001 | Name BALAS, JOHN J | | | | |
| Type Individual | Sex Male | Race White | | Ethnic Origin Non-Hispanic | Age 37 | D.O.B. ▮▮▮▮ |
| Address 24744 Prettyman RD Georgetown, DE 19947 | | Resident Status Full Time | Home Telephone (302) 684-3870 | Employer/School DEPARTMENT OF CORRECTIONS PO BOX 500 SCI Georgetown, DE 19947 | Work Telephone (302) 856-5280 |

| Reporting Person? ☐Yes ☒No | Victim Injured? ☐Yes ☒No | Victim Deceased? ☐Yes ☒No | Officer Comments | |
| Injuries | | Description of Injuries | |

## Crimes and Associated Information

| Victim Number 001 | Crime Seq 001 | Statute | Crime Description Death Investigation--No Specific Charges Associated |
| Location Of Offense Residence/Home/Garage | | Status Service Clear 02/19/2005 | Involvement ☐Alcohol ☐Drugs ☐Computer | General Offense |
| Suspected Hate/Bias ☐Yes ☒No - N/A | Crime Code 8104 - Sudden Death/Death Investigation | | |
| Burglary Force Involved ☐Yes ☐No | | | |

## Witness Information

| Sequence 001 | Type Reporting Person | Name BALAS, CINDY L | | Sex Female | Race White | Age 39 | D.O.B. ▮▮▮ |
| Address 24744 Prettyman RD Georgetown, DE 19947 | | Home Telephone (302) 684-3870 | Employer/School | | Work Telephone |
| Sequence 002 | Type Person Contacted | Name MEARS, ARTHUR LEE J | | Sex Male | Race White | Age 34 | D.O.B. |
| Address 21379 Paradise RD Georgetown, DE 19947 | | Home Telephone (302) 856-3714 | Employer/School | | Work Telephone |

## Investigative Narrative

See Narrative to follow.

| Reporting Officer SGT HUDSON  - 812 1 | | Supervisor Approval ROBERT HUDSON PSPT812 Date 02/19/2005 1530 | |
| Detective Notified | | Referred To | |
| Solvability Factors | Witness | M. O. | Trace Stolen Property | Suspect Named | Status |
| | Suspect Located | Suspect Described | Suspect Identified | Suspect Vehicle Identified | Closed |

**D000868**

## Supplemental Report

| Original Occurrence Dates and Times: | | Grid | Sector |
|---|---|---|---|
| SAT 02/19/2005 1000 thru SAT 02/19/2005 1104 | | 162-112 | 42 |

Original Location:
**24744 Prettyman RD     Georgetown, DE 19947**
~~CR 254 N/O CR 255~~

### Investigative Narrative

On 02-19-2005 I was dispatched to a suicidal subject located at 24744 Prettyman Rd. While enroute, I was advised by Suscom that the victim had a pistol and walked towards the woods at the rear of his property. They then had a report of one shot being fired. No one could confirm the location of the victim or if he had shot himself at this time.

Myself and Tfc Warrington arrived at the scene at 1102 hrs. We briefly contacted the victim's wife, Cindy Balas, she showed us the direction the victim had gone. We then cautiously checked the area for the victim. I observed an object located towards the left rear corner of the property on the ground. I looked further around the object and saw the victim hiding behind a small pine tree. It appeared that he was kneeling or crouched down behind the tree.

As soon as I observed the victim we were approx. 50-60 feet away from him and we heard a single gun shot. I then observed the victim fall from his position. We took cover and then approached the victim. I observed a silver revolver laying to the victim's left side of his body. The victim had laid his hat and eyeglasses approx 6-10' in front of the tree he was hiding behind. This is the item I observed as we were looking for the victim.

We approached and Tfc Warrington secured the weapon. I checked the victim for other weapons and none were located.  The victim was wearing blue jeans, hunting boots, a green jacket, and black Remington gloves. He was laying face up on the ground when we got to him. I observed a large exit wound on the top of the victim's head.

The ambulance crew and paramedics arrived and gave the victim first aid and transported him to the hospital.  We stood by while the ambulance crew and paramedics treated the victim. We then secured the scene until Sgt Hudson relieved us of our duties.

| Reporting Officer | Supervisor Approval |
|---|---|
| **TFC REYNOLDS** - 5396 001 | **D000869** H S MYERS PSPT548 Date 02/20/2005 0830 |

Investigative Narrative - Continued

I took photographs of the scene. They are attached to this report.

| Reporting Officer | | | Supervisor Approval | | |
|---|---|---|---|---|---|
| TFC REYNOLDS - 5396 001 | | | JOSEPH S MYERS  PSPT548  Date 02/20/2005 0830 | | |
| Solvability Factors | ☐ Witness | ☐ M. O. | ☐ Trace Stolen Property | ☐ Suspect Named | Status |
| | ☐ Suspect Located | ☐ Suspect Described | ☐ Suspect Identified | ☐ Suspect Vehicle Described | Closed |

Supplemental Report

| Original Occurrence Dates and Times: | | Grid | Sector |
|---|---|---|---|
| SAT  02/19/2005  1000 thru  SAT  02/19/2005  1104 | | 162-112 | 42 |

| Original Location: |
|---|
| 24744  Prettyman RD      Georgetown, DE 19947 |
| CR 254 N/O CR 255 |

### Investigative Narrative

On 021905, myself and TFC Reynolds 396 were dispatched to 24744 Prettyman Rd. (C.R. 254 n/o C.R. 255) ref. a suicidal subject. While enroute, suscom advised that V-1 was walking around his back yard with a pistol and was believed to be suicidal as per his wife (Cindy Balas) who was the RP. Suscom then advised that RP reported that a shot was fired but could not confirm if V-1 had shot himself or his exact location on the property. Myself and TFC Reynolds then arrived at the residence and contacted RP at the rear door of their residence. Same advised that she last saw V-1 walking towards the rear of their property but could not advise where he was currently located. Myself and TFC Reynolds then began checking the area for V-1. While checking the rear yard area, TFC Reynolds observed an object laying on the ground at the southeast corner of the rear yard. We then scanned the area around the object and observed V-1 crouching behind a small pine tree approx. 6-10 feet to the west of the object. I could not tell if V-1 was facing us or away from us as his outline was broken by the tree branches. As soon as we observed V-1, a single shot was fired from his direction and I immediately took cover in a row of cypress trees that was approx. 2 feet to the east of where I was located. TFC Reynolds then advised me that V-1 was laying on the ground. We were approx. 50-60 feet away from V-1 when the shot was fired. Me and TFC Reynolds then cautiously approached V-1. I approached V-1 with my service pistol aimed at  him as I was unsure if V-1 was injured or if he intended to shoot myself or TFC Reynolds. As we approached V-1, I observed same laying on his back with a silver revolver laying on the ground, next to his left hand. I then holstered my weapon and grabbed the revolver, securing same. The revolver had two rounds in it and both appeared to have been fired as the primers had been dented on both. After securing the revolver, I then placed it on the ground a safe distance away. I then responded over to V-1 to assist TFC Reynolds. I observed V-1 to be wearing blue jeans, a green jacket, hunting boots, and black gloves. V-1 was unresponsive but still breathing and had a large area of trauma on the back of his head that appeared to be an exit wound. The Georgetown ambulance and Sussex Co. paramedics then arrived and began treating V-1. Cpl. Parker 966 had also arrived and advised that he had contacted Sgt. Myers at troop 7 and notified same of the situation. He further advised that a detective and EDU were enroute. The Georgetown ambulance then transported V-1 to Beebe E.R. for treatment. Myself and TFC Reynolds then secured the scene and stood by for the detective. Sgt. Hudson of T-4 CI and Sgt. Swain of T-4 EDU then arrived and began processing the scene. After giving Sgt. Hudson the information that we had gathered, he advised that we could clear the scene. Myself and TFC Reynolds then cleared.

| Reporting Officer | Supervisor Approval | | | | |
|---|---|---|---|---|---|
| TFC WARRINGTON  - 981 002 | JOSEPH S MYERS  PSPT548  Date 02/20/2005 0919 | | | | |
| Solvability Factors | Witness | M. O. | Trace Stolen Property | Suspect Named | Status |
| | Suspect Located | Suspect Described | Suspect Identified | Suspect Vehicle Described | |

| · I · | 02/24/2005 | Troop 4 State Police | Complaint # 04-05-007095 |

## Supplemental Report

| Original Occurrence Dates and Times:<br>SAT 02/19/2005 1000 thru SAT 02/19/2005 1104 | Grid<br>162-112 | Sector<br>42 |

Original Location:
24744 Prettyman RD     Georgetown, DE 19947
LCR 254 N/O CR 255

### Original Victim Information

| Victim Number<br>001 | Name<br>BALAS, JOHN J |

| Type<br>Individual | Sex<br>Male | Race<br>White | | Ethnic Origin<br>Non-Hispanic | Age<br>37 | D.O.B. |

| Address<br>24744 Prettyman RD<br>Georgetown, DE 19947 | | Resident Status<br>Full Time | Home Telephone<br>(302) 684-5870 | Employer/School<br>DEPARTMENT OF CORRECTIONS<br>PO BOX 500<br>SCI | Work Telephone<br>(302) 856-5280 |

| Reporting Person?<br>☐Yes ☒No | Victim Injured?<br>☐Yes ☒No | Victim Deceased?<br>☐Yes ☒No | Officer Comments |

### Original Crime and Associated Information

| Victim Number<br>001 | Crime Seq<br>001 | Statute | Crime Description<br>Death Investigation--No Specific Charges Associated |

| Location Of Offense<br>Residence/Home/Garage | Status<br>Service Clear 02/19/2005 | Involvement<br>☐Alcohol ☐Drugs ☐Computer | General Offense |

| Suspected Hate/Bias<br>☐Yes ☒No · N/A | Crime Code<br>8104 - Sudden Death/Death Investigation |
| Burglary Force Involved<br>☐Yes ☐No | |

### Investigative Narrative

Cu-4 Criminalistics Service Report #05-74:

On Saturday, 02/19/05 at 1124 hours, I was contacted by Sgt Meyers of Troop 7. Sgt Meyers advised me that the victim, who was a guard at SCI, had committed suicide by shooting himself outside in his back yard in front of his responding troopers. Sgt Meyers requested that I respond to the scene and process same for the suicide investigation.

As requested, I responded to the victim's residence. I arrived at 1150 hrs. Upon arrival, I contacted Cpl Parker, who had the entrance to the front driveway secured. Cpl Parker advised writer that the victim had already been transported from the scene to Beebe Hospital. Cpl. Parker also advised writer that the victim had shot himself behind a tree, which was located at the left rear corner of his backyard. Writer responded to that location. Two paramedic units were present as well as the initial responding troopers, which were TFC Reynolds and TFC Warrington. Also, present at the scene was Det Mark Ostroski, who was the responding Victim Services Officer. Shortly afterwards, Lt. Chamberlin and Sgt Hudson, who is the the investigating officer, arrived on the scene as well.

Writer conferred with TFC Warrington and TFC Reynolds about what they had witnessed. The victim had shot himself while behind a tree in the left rear of the yard as they were approaching alongside some trees on the left side of the property. They were approximately 50 feet from the victim when he shot himself. For further details, see their supplement reports and Sgt Hudson's report.

I began processing the scene by photographing same with Polaroid and 35mm film. A total of 13 Polaroid photos were taken by writer in this case. The Polaroid photos are attached to the Troop 4 copy of this report. The role of 35mm film, which should contain about 21 photos, was sent to the Crime Lab with instructions to retain the negatives on file only. If 35mm photos are desired by the investigating officer, he should contact Elisa Vassas at the Crime Lab to have the photos developed.

| Reporting Officer<br>SGT SWAIN   - 2079 003 | Supervisor Approval<br>STEVE SWAIN PSPT079 Date 03/02/2005 2326 |

**D000872**

## Investigative Narrative - Continued

At the location behind the tree (where the victim had shot himself), the grass was bloodstained. A few feet nearby, a Taurus .357 revolver was on the ground. It had been placed on the ground at this location by TFC Warrington, who made sure same was empty of live rounds by opening the cylinder and observing that it contained only two spent casings. On the ground in front of this tree, the victim had laid his hat (which was actually two hats one on top of the other) and his eyeglasses on the ground. After completing the scene photography, the victim's hats and eyeglasses were turned over to Sgt Hudson, who returned same to the victim's wife at the scene. I collected the weapon and the two spent casings. No other items of evidence were located at this scene by writer. Prior to leaving the backyard, TFC Warrington used his shovel from his patrol car to cover the blood on the grass with dirt.

After completing the processing of the exterior scene, I responded inside and listened to the interview of the victim's wife, which was being conducted by Sgt Hudson and Det Ostroski on the dining room table. During this time, at the request of Sgt Hudson, I collected the victim's medication, which was on the same table. The medication I collected was listed as follows:

-One container of Inderal LA 120 mg capsules (21 of 30 were present), prescribed by Dr. Peet on 02/01/05

-One container of Clonazepam 1 mg pills (50 of 60 were present), prescribed by Dr. Jani on 02/15/05

-One cardboard packaging for Imitrex 50 mg (had contained nine pills, but all were gone), prescribed by Dr. Peet on 02/15/05.

After interviewing the victim's wife, Sgt Hudson and writer went inside the victim's garage. The victim's wife had mentioned that she saw him exit same holding the gun in his hand. Writer and Sgt Hudson looked through the garage for any evidence pertinent to this case. On top of the hood of a riding mower, which was parked in the right rear of the garage, the box to the Taurus revolver was located and collected by writer. No ammunition was found inside of the box or the garage. The victim's Chevrolet Tahoe, which was severely damaged due to a roll over accident the victim was involved in on 02/18/05, was also parked inside of this garage.

Lastly at this scene, I obtained two Polaroid photos of a Post-It note that the victim had written "BYE" on same on 02/14/05. For more details of same, see Sgt Hudson's report. After photographing the note, I returned same to the victim's wife. One of these photos of the note was given to Invest Wagner of the Medical Examiner's Office for his investigation. The other Polaroid is attached with the other scene Polaroid photos, which are attached to the Troop 4 copy of this report.

Upon completion of the processing of the scene, writer did not find any evidence that was inconsistent with this incident being a suicide as reported (especially with witnesses seeing the victim shoot himself). I left the scene at 1415 hrs with the victim's family, Sgt Hudson, and Det Ostroski still present at the residence.

I contacted Investigator Wagner, who advised writer that he was responding to Beebe Hospital to receive the victim's body and transport same to the Nanticoke Hospital Morgue for

Reporting Officer
SGT SWAIN  - 2079 003
Supervisor Approval
SGT SWAIN  PSPT079  Date 03/02/2005 2326
D000873
A0642

## Investigative Narrative - Continued

the post-mortem examination. I responded to Nanticoke Hospital Morgue and arrived at 1520 hours. Shortly after, Investigator Wagner arrived with the victim's body and Dr Tobin arrived to inspect the victim's body. At 1540 hrs, I gave all of the victim's medication and packaging to Investigator Wagner for his investigation. I obtained the victim's fingerprints, which are attached to this report to be forwarded to SBI. I also took three Polaroid and 35mm photos of the victim (stored as mentioned above). During Dr. Tobin's inspection of the victim's body, she determined that the gunshot entry wound was inside of the victim's mouth in his top palette. The bullet went through his brain and exited out of his head at the top center of his head. Dr. Tobin determined the manner of the victim's death was suicide and the cause was the self-inflicted gunshot wound to his head.


I left the morgue at 1730 hours and returned to Troop 4. All items that had been collected that day were stored in the Troop 4 Permanent Evidence Locker at 1804 hours.


On Sunday, 02/20/05, 1200 hrs, I contacted Investigator Wagner to inquire about the victim possibly having a black notebook personal journal on his person to see if he had located it with the victim's personal effects. However, Investigator Wagner did not go through the personal effects, some of which were sealed at Beebe Hospital in a sealed bag, due to the case being an obvious suicide. He advised that the body had been released to Short's Funeral Home in Milton. I contacted Harry Fletcher at Short's Funeral Home, who agreed to meet writer at the funeral home at 1300 hrs. I responded to the funeral home and contacted Mr. Fletcher. He provided writer access to the bags of the victim's clothing, shoes, and personal effects in a sealed bag. Writer examined the contents of the bag and all pockets in the clothing with negative results in locating the black notebook journal or any possible suicide note. In addition, no wallet or cash were observed in the personal effects by writer. However, one live .357 Federal Magnum round, which was identical to the other spent casings in the revolver, was among the personal effects. I collected same at that time. I also signed a property receipt, which lists the items I examined, but lists that I only took possession of the live round. A copy of this receipt is attached to this report.


On Thursday, 02/24/05, the victim's wife (writer attended the victim's viewing) informed writer that she had later found several suicide notes written by the victim addressed to relatives. Writer later informed Sgt Hudson on Monday, 02/28/05 of the existence of these notes.


On Wednesday, 03/02/05, I cleaned the majority of the victim's blood off his revolver and hung up same in the gun locker pending final disposition. The serial number was also run through NCIC, but it was negative for being stolen. I also sent the required information to the Intelligence Unit for the required ATF Trace. For a list of all collected items by writer in this case, which are stored in the Permanent Evidence Locker pending final disposition, see the attached Evidence Control Report. A copy of this report was forwarded to Sgt Hudson, the investigating officer. No further action in this case at this time by writer.

| Reporting Officer SGT SWAIN - 2079 003 | | Supervisor Approval STEVE SWAIN PSPT079 Date 03/02/2005 2326 | | | |
|---|---|---|---|---|---|
| Solvability Factors | ☐ Witness ☐ Suspect Located | ☐ M. O. ☐ Suspect Described | ☐ Trace Stolen Property ☐ Suspect Identified | ☐ Suspect Named ☐ Suspect Vehicle Described | Status **Closed** |







02/28/2005 | Troop 4 State Police | 04-05-007095

## Supplemental Report

**Original Occurrence Dates and Times:**
SAT 02/19/2005 1000 thru SAT 02/19/2005 1104    | Grid 162-112 | Sector 42

**Original Location:**
24744 Prettyman RD     Georgetown, DE 19947
CR 254 N/O CR 255

## Original Victim Information

| Victim Number | Name | | | | | |
|---|---|---|---|---|---|---|
| 001 | BALAS, JOHN J | | | | | |

| Type | Sex | Race | | | Ethnic Origin | Age | D.O.B. |
|---|---|---|---|---|---|---|---|
| Individual | Male | White | | | Non-Hispanic | 37 | |

| Address | | Resident Status | Home Telephone | Employer/School | Work Telephone |
|---|---|---|---|---|---|
| 24744 Prettyman RD Georgetown, DE 19947 | | Full Time | (302) 684-3870 | DEPARTMENT OF CORRECTIONS PO BOX 500 SCI Georgetown, DE 19947 | (302) 856-5280 |

| Reporting Person? ☐Yes ☒No | Victim injured? ☐Yes ☒No | Victim Deceased? ☐Yes ☒No | Officer Comments |
|---|---|---|---|

## Original Crime and Associated Information

| Victim Number | Crime Seq | Statute | Crime Description |
|---|---|---|---|
| 001 | 001 | | Death Investigation--No Specific Charges Associated |

| Location Of Offense | Status | Involvement | General Offense |
|---|---|---|---|
| Residence/Home/Garage | Service Date 02/19/2005 | ☐Alcohol ☐Drugs ☐Computer | |

| Suspected Hate/Bias ☐Yes ☒No - N/A | Crime Code 8104 – Sudden Death/Death Investigation |
|---|---|

| Burglary Force Involved ☐Yes ☐No |
|---|

## Witness Information

| Sequence | Type | Name | Sex | Race | Age | D.O.B. |
|---|---|---|---|---|---|---|
| 001 | Reporting Person | BALAS, CINDY L | Female | White | 39 | |

| Address | Home Telephone | Employer/School | Work Telephone |
|---|---|---|---|
| 24744 Prettyman RD Georgetown, DE 19947 | (302) 684-3870 | | |

| Sequence | Type | Name | Sex | Race | Age | D.O.B. |
|---|---|---|---|---|---|---|
| 002 | Person Contacted | MEARS, ARTHUR LEE J | Male | White | 34 | |

| Address | Home Telephone | Employer/School | Work Telephone |
|---|---|---|---|
| 21379 Paradise RD Georgetown, DE 19947 | (302) 856-3714 | | |

## Investigative Narrative

On 02/19/05 at app 1210hrs, I arrived at 24744 Prettyman Road E/O Georgetown for a suicide. I was advised that the victim was John Balas whom I knew growing up and as a guard at SCI. Upon arrival at the scene, I contacted Detective Ostroski (DSP Victim Services) and the victim's spouse Cindy. I briefly told then I was investigating the case and then responded to the rear of the property.

I next contacted Troopers Reynolds and Warrington at the location the victim shot himself. They advised that the 911 call was at app 1053hrs, they arrived at app 1102hrs, and that upon approach of the victim, he shot himself in the head at app 1104hrs. They advised that the were walking across the back yard and saw the victim kneeling down behind a Leland cypress tree. They could barley see him but belive he could clearly see them approaching. Within about 50-60 feet they heard a shot and saw the victim fall to the ground. (see supplements by both officers).

I also contacted Sgt. Swain (DSP EDU) at the scene. He advised that the gun was a Taurus .357 magnum chrome in color. He also advised that victim had taken off his hat and glasses and placed them on the ground. The gun was seized while the hat and glasses were turned over to the victim's spouse.

I next conducted an interview with the victim's spouse Cindy. (see interview section). I was also advised that the victim was deceased. I obtained the medications prescribed by Dr. Jani and turned them over to Sgt. Swain to be given to the Medical Examiner.

| Reporting Officer | Supervisor Approval |
|---|---|
| SGT HUDSON   - 812 004 | ROBERT HUDSON PSPT812 Date 02/28/2005 1231 |

D000858

Investigative Narrative - Continued

I did a check of the barn with Sgt. Swain and observed the wrecked Tahoe. In the rear corner of the building was a box for a Taurus .357 handgun. It was on top of a lawn tractor. No ammo was located.

~~I conducted an interview with Lee Mears (see interview section).~~

I remained at the scene until the arrival of the victim's parents John and Anna Balas. I briefly explained the case facts. No interview was conducted.

I obtained a copy of the accident report #04-05-7001. It was determined that the victim possibly fell asleep at the wheel.

The case is Service Cleared. The victim was observed by two Troopers shoot himself in the head.

## Statement of Witness 001 - CINDY L BALAS

The RP Cindy Balas was contacted and interviewed at her residence on 02/19/05 at app 1225hrs. Cindy is the victim's spouse. She advised that on Friday 02/18/05, the victim had been involved in a motor vehicle accident. She advised that he was in their Chevy Tahoe and had hit some mailboxes and overturned. She advised that he left the scene and drove home. She stated that he was very upset and had both cuts on his hands and head. Cindy advised that they called a couple of Troopers they know who told the victim to just call it in. She advised that Tpr. Partyka came to their home and handled the accident. She advised that later in the day she convinced the victim to go to the Beebe E/R. She advised that something was not right with the victim and that she told the E/R doctor of her concerns. She advised that he told her to just contact Dr. Jani on Monday 02/21/05. Cindy advised that the victim looked as if he were drunk.

Cindy advised that the victim had slept all night (02/18/05) in his clothes and wasn't sweating. She advised that he got up at app 9 AM on the morning of 02/19/05. She advised that he did not want anything to eat and went outside with the kids to do chores. She advised that she received a call from her sister-in-law (Tina Foskey) who advised that the reason for the victim's recent depression was because of another woman named Jennifer. Cindy stated she went out to the barn and told the victim that she knew he had been cheating on her. She advised that he stated that it was true and that Jennifer had broken it off with him on 01/23/05. Cindy advised that the victim was depressed because Jennifer was seeing another guy. She advised that she went back into the house and that the victim came in asking her who had called her. She advised that she told him it was Tina and that he stated there was only one thing left for him to do. She advised that he went back out to the barn and with in a couple of minutes came out with a gun in his hand. She stated that he told her to stay away from him and walked to the back of the property. She stated she called 911 and that when the Troopers went to confront the victim, he shot himself.

Cindy advised that the victim had not been himself for sometime. She stated that he had been suffering with depression since the Fall. She advised that on 01/29/05 he was seen at St. Jones and released pending follow-up with Dr. Jani. She advised that he was placed on medication for the depression and headaches. She advised that he was neither eating nor sleeping regularly. She advised that from 01/29/05 through 02/14/05 he was still very depressed. She advised that on Valentines Day (02/14/05), the victim left in his vehicle early in the morning. Cindy stated she thought he was just letting her sleep in. However, he left a "Post It" note that only read "Bye" and never returned until the next day. When asked where he had been, the victim stated he had been riding and had been in Maryland, Virginia, and all over. He had filled his truck up four times during his travels. She advised that they talked

## Statement of Witness 001 - CINDY L BALAS - Continued

about the situation and their relationship. She advised that he stated that he wanted to kill himself and that the reason was 70% her and 30% work. She stated that later he told her he wanted things to work and they agree to go away for a few days. Cindy advised that they went to Cabela's in Hamburg, PA. on 02/16/05 and spent the night at a near by hotel. She stated the victim bought hunting stuff and they had a good time. However, he was still not himself. She stated they came home on 02/17/05.

Cindy added that the victim had been unhappy with an evaluation at work and was dreading his return from emergency vacation.

Cindy could add nothing further except the victim was very depressed and not himself.

## Statement of Witness 002 - ARTHUR LEE MEARS J

PC Lee Mears was contacted and interviewed at the scene on 02/19/05 at app 1309hrs. Lee was the victim's friend and a co-worker at SCI. He advised that he had been called at the prison and advised that the victim had shot himself. He advised that he knew the victim and his family very well and responded to the scene to help.

Lee advised that he had spoken to the victim on 02/18/05 prior to him going to the hospital for the accident. He advised that the victim sounded drunk. He advised that was the last time he spoke with him.

Lee advised that the victim had been suffering from depression. He advised that he was aware of the victim having an affair with Jennifer Cox (employee with DOC) and that the victim was very upset about their break-up. He advised that the victim had not been himself and had made the comment that he could not stop drinking. He advised that he spent a lot of time with the victim over the last few weeks and that the victim had made comments about suicide back in January. He advised that on one occasion he was out with the victim who was drunk and belligerent. He advised that they ended up at the victim's parents house and then at St. Jones. He advised that a condition of the victim's return home was that all the guns be removed from the residence. Lee advised that he took all the victim's guns from the house. He advised that he did not know where the victim got the gun with which he shot himself.

Lee concluded that the victim had not been himself and was very depressed.

| Reporting Officer | | Supervisor Approval | | Status |
|---|---|---|---|---|
| SGT HUDSON - 812 004 | | ROBERT HUDSON  PSPT812  Date 02/28/2005 1231 | | |
| Solvability Factors | ☐ Witness | ☐ M. O. | ☐ Trace Stolen Property | ☐ Suspect Named | Closed |
| | ☐ Suspect Located | ☐ Suspect Described | ☐ Suspect Identified | ☐ Suspect Vehicle Described | |

| 1 | 04/05/2005 | Troop 4 State Police | 04-05-007095 |

## Supplemental Report

**Original Occurrence Dates and Times:**
SAT 02/19/2005 1000 thru SAT 02/19/2005 1104

**Grid** 162-112  **Sector** 42

**Original Location:**
24744 Prettyman RD    Georgetown, DE 19947
CR 254 N/O CR 255

## Original Victim Information

| Victim Number | Name |
|---|---|
| 001 | BALAS, JOHN I |

| Type | Sex | Race | | Ethnic Origin | Age | D.O.B. |
|---|---|---|---|---|---|---|
| Individual | Male | White | | Non-Hispanic | 37 | ▬▬▬ |

| Address | Resident Status | Home Telephone | Employer/School | Work Telephone |
|---|---|---|---|---|
| 24744 Prettyman RD Georgetown, DE 19947 | Full Time | (302) 684-3870 | DEPARTMENT OF CORRECTIONS PO BOX 500 SCI Georgetown, DE 19947 | (302) 856-5280 |

| Reporting Person? | Victim Injured? | Victim Deceased? | Officer Comments |
|---|---|---|---|
| ☐ Yes ☒ No | ☐ Yes ☒ No - N/A | ☐ Yes ☒ No | |

## Original Crime and Associated Information

| Victim Number | Crime Seq | Statute | Crime Description |
|---|---|---|---|
| 001 | 001 | | Death Investigation--No Specific Charges Associated |

| Location Of Offense | Status | Involvement | General Offense |
|---|---|---|---|
| Residence/Home/Garage | Service Clear 02/19/2005 | ☐ Alcohol ☐ Drugs ☐ Computer | |

| Suspected Hate/Bias | Crime Code |
|---|---|
| ☐ Yes ☒ No - N/A | 8104 - Sudden Death/Death Investigation |

**Burglary Force Involved**
☐ Yes ☐ No

## Investigative Narrative

On 04/05/05 at app 0920hrs, I returned the below listed items to the victim's spouse Cindy Balas.

Control #0400011582 (1) .357 Taurus Revolver serial #ND928221

Control #0400011583 (1) Taurus Revolver Box

| Reporting Officer | Supervisor Approval |
|---|---|
| SGT HUDSON - 812 005 | ROBERT HUDSON PSPT812 Date 04/05/2005 0934 |

| Solvability Factors | | | | |
|---|---|---|---|---|
| ☐ Witness | ☐ M.O. | ☐ Trace Stolen Property | ☐ Suspect Named | **Status** |
| ☐ Suspect Located | ☐ Suspect Described | ☐ Suspect Identified | ☐ Suspect Vehicle Described | Closed |

**D000884**

**STATE OF DELAWARE**
**UNIFORM TRAFFIC**
**COLLISION REPORT**

TROOP/DEPARTMENT: DSP4

- ☒ REPORTABLE PROPERTY DAMAGE
- ☐ NON-REPORTABLE
- ☐ PERSONAL INJURY
- ☐ LATE REPORT
- ☐ FATALITY
- ☐ HAZ/MAT.
- ☐ COMM. VEH.

COMPLAINT NO.: 04-05-7001
DSP HQ. NO. (LEAVE BLANK)

| 3. MON. - DATE - YEAR | 4. DAY | 5. TIME OCCURRED | 6. NOTIFIED | 7. ARRIVED | 8. GRID NO. | 9. SECTOR | 12. LIGHT CONDITION |
|---|---|---|---|---|---|---|---|
| 02 / 18 / 05 | FR | 1636 | 1636 | 1655 | 158 / 110 | 42 | 18 |

10. NUMBER & NAME OF STREET OR HIGHWAY – CTY. RTE. NO. ● INTERSECTING WITH STREET OR ROAD – CTY. RTE. NO.

ON: (SHINGLE POINT ROAD) CR 249    13. WEATHER CONDITION: 22

NON. INTERSECT. 4 MILES W OF: SR 30 (GRAVEL HILL ROAD) CR 248    14. SURFACE CONDITION: 27

| 16. PRIM. CONTRIB. CIRCUM. | 15. TRAFFIC CONTROL | 15. FUNCT. PROPER |
|---|---|---|
| 7 | 35 | 1 |

8. SPEED TOO FAST
9. FAIL TO YIELD ROW
10. PASSED STOP SIGN
11. DISREGARD TRAFFIC SIGNAL
12. DROVE LEFT OF CENTER
13. IMPROPER PASSING
14. FOLLOWING TOO CLOSE
15. MADE IMPROPER TURN
16. DRIVING UNDER INFLUENCE
17. MECH. DEFECT

| 17. COLLISION INVOLVED | 18. ON RDWY. | 19. EMERG. RESPON. | 20. | CITY OR TOWN | 21. CTY. | 22. CODE | 23. MILE POINT |
|---|---|---|---|---|---|---|---|
| 45 | 1 | 2 | 5 MILES E ▢ of: GEORGETOWN | S | | |

**NO. 1**

| 24. NAME | LAST | FIRST | M.I. |
|---|---|---|---|
| | BALAS | JOHN | J. |

25. STREET ADDRESS: 24744 PRETTYMAN ROAD

| 26. CITY | 27. STATE | 28. ZIP | 29. PHONE |
|---|---|---|---|
| GEORGETOWN | DE | 19947 | 684-2870 |

| 30. DRIVERS LICENSE NO. | 31. STATE | 32. DOB | 33. AGE | 34. SEX |
|---|---|---|---|---|
| 110621 | DE | ▓▓ | 37 | M |

| 35. SOBRIETY | 36. TESTED | 37. TYPE | RESULT 0. % | TEST NUMBER |
|---|---|---|---|---|
| 48 | 2 | 4 | N/A | |

| 38. VEHICLE YR. | 39. VEHICLE MAKE | 40. MODEL | 41. BODY STYLE |
|---|---|---|---|
| 79 | CHEVY | TAHOE | 56 |

| 42. REGISTRATION NO. | 43. STATE | 44. COLOR | 45. DAMAGE | 46. TRAILERS |
|---|---|---|---|---|
| PC 2743 | DE | BLK | $4000 | 0 1 2 3 |

47. VEHICLE/TRACTOR OWNER: LAST FIRST M.I.
48. STREET: SAME    CITY    STATE

**NO. 2**

24. NAME: LAST    FIRST    M.I.
25. STREET ADDRESS
26. CITY    27. STATE   28. ZIP   29. PHONE
30. DRIVERS LICENSE   31. STATE   32. DOB   33. AGE   34. SEX M F
35. SOBRIETY   36. TESTED   37. TYPE   RESULT 0.   %
38. VEHICLE YR.   39. VEHICLE MAKE   40. MODEL   41. BODY STYLE
42. REGISTRATION NO.   43. STATE   44. COLOR   45. DAMAGE $   46. TRAILERS 0 1 2 3
47. VEHICLE/TRACTOR OWNER: LAST    FIRST    M.I.
48. STREET   CITY   STATE

| 49. INSURANCE COMPANY | NUMBER | EXP |
|---|---|---|
| NATIONWIDE GENERAL | 89 075 94632 | 03 05 |

50. CHARGE/SECTION NUMBER: INATTENTIVE DRIVING 21/4176(b)   51. ARREST NO.: SPU06552/NA

52. NO. 1 TOWED BY: DRIVEN TO DESTINATION

49. INSURANCE COMPANY   NUMBER
50. CHARGE/SECTION NO.   51. ARREST NO.
52. NO. 2 TOWED BY:

| CODE | WITNESS INFORMATION: (NAME, ADDRESS, PHONE NO., LOCATION) |
|---|---|
| 16 | 55. INATTENTIVE DRIVING 21/4176(b) |
| 17 | MAILBOX OWNED BY WENDY MARTIN 18316 SHINGLE PT ROAD, GEORGETOWN, DE   VALUE DAMAGE: $60.00 |
| 17 | MAILBOX OWNED BY CHRISTOPHER CLIFTON 18356 SHINGLE PT RD, GEORGETOWN, DE   VALUE DAMAGE: $80.00 |

V1 WAS TRAVELING E/B ON CR 249 JUST W/O SR 30. OP1 FAILED TO GIVE FULL ATTENTION TO ROADWAY (FELL ASLEEP) AND RAN OFF S/EOR CR 249. V1 THEN STRUCK MAILBOX FOR POI #1 APPROX 2' S/O S/EOR CR 249 AND APPROX 2112' W/O W/EOR.

| 56. INVESTIGATING OFFICER | RANK | I.D. NUMBER | 57. SUPERVISOR'S APPROVAL DATE | 58. REVIEWER | 59. |
|---|---|---|---|---|---|
| MARTYKA | CPL. | #179 | 55 George Herbert 1/55 012205 | MC | PAGE 1 OF 2 |

FORM 438 REV. 1/88

**D000889**

☒ 60. CONTINUATION

☐ 80. SUPPLEMENT

INITIAL REPORT DATE
02-18-05

OPERATOR #1
JOHN BALAS

OPERATOR #2
N/A

**STATE OF DELAWARE**

**UNIFORM TRAFFIC**

**COLLISION REPORT**

**CONTINUATION/SUPPLEMENT**

DSP4
TROOP/DEPARTMENT

04-05-7001
COMPLAINT NUMBER

DSP HQ. NO. (LEAVE BLANK)

| CODE | 55. |
|------|-----|

SR30. OP1 WHIPPED THE VEHICLE LEFT BACK ONTO THE ROADWAY
OF CR249. V1 SWERVED OUT OF CONTROL BACK TOWARD S/EDR CR249.
V1 STRUCK SECOND MAILBOX WITH BUMPER AREA FOR POI #2 APPROX
2' S/O S/EDR CR249 AND APPROX 1584' W/O W/EDR SR30. V1 THEN ROLLED
ONTO ITS SIDE FOR POI #3 APPROX 30' S/O S/EDR CR249 AND APPROX
1056' W/O W/EDR SR30. OP1 HAD PASSER BY ASSIST HIM TO PULL
VEHICLE OVER ONTO ITS TIRES. OP1 THEN WENT HOME AND CALLED TO
REPORT ACCIDENT. OP1 ADVISED HE AND HIS SON WERE BOTH
WEARING SEATBELTS AT TIME OF ACCIDENT. OP1 WAS GIVEN ACCIDENT
EXCHANGE SHEETS.

OP1 WAS ISSUE TRAFFIC TICKET SPU 06552 FOR INATTENTIVE
DRIVING. (TICKET PULLED DUE TO HIS DEATH NEXT DAY)

OP1 ADVISED HE DOZED OFF AND THEN RAN OFF EDGE
ROADWAY LOSING CONTROL OF HIS VEHICLE.

| 56. INVESTIGATING OFFICER | RANK | I.D. NUMBER | 57. SUPERVISOR'S APPROVAL DATE | 58. REVIEWER | 59. |
|---|---|---|---|---|---|
| PARTYKA | CPL. | #173 | | | PAGE 2 OF 2 |

FORM 439 A REV 10/87

**D000890**

A0650

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

|                                                                    |     |                      |
| ------------------------------------------------------------------ | --- | -------------------- |
|                                                                    | :   |                      |
|                                                                    | :   |                      |
| CINDY L. BALAS a/k/a CINDY L. ADKINS,                              | :   |                      |
| Executrix of the Estate of CORPORAL JOHN J.                        | :   |                      |
| BALAS,                                                             | :   |                      |
|                                                                    | :   |                      |
| Plaintiff,                                                         | :   | C.A.No. 06-592-JJF   |
|                                                                    | :   |                      |
| v.                                                                 | :   |                      |
|                                                                    | :   |                      |
| STANLEY W. TAYLOR, JR., individually and                           | :   |                      |
| in his official capacity as the Commissioner of                    | :   |                      |
| Correction; ALAN MACHTINGER,                                       | :   |                      |
| individually and in his official capacity as the                   | :   |                      |
| Director of Human Resources of the Department                      | :   |                      |
| of Correction; MICHAEL DELOY, individually                         | :   |                      |
| and in his official capacity as Deputy Warden of                   | :   |                      |
| Sussex Correctional Institution; CAPTAIN                           | :   |                      |
| DAVID WILKINSON, individually;                                     | :   |                      |
| LIEUTENANT TRUMAN MEARS,                                           | :   |                      |
| individually; and DEPARTMENT OF                                    | :   |                      |
| CORRECTION OF THE STATE OF                                         | :   |                      |
| DELAWARE,                                                          | :   |                      |
|                                                                    | :   |                      |
| Defendants.                                                        | :   |                      |

<u>**PLAINTIFF'S ANSWERS AND OBJECTIONS TO DEFENDANTS'**</u>
<u>**FIRST SET OF INTERROGATORIES**</u>

       Plaintiff, by and through her attorneys, hereby objects to Defendants' First Set of

Interrogatories ("Interrogatories") in accordance with the numbered paragraphs as set forth

below. Plaintiff reserves the right to amend or supplement the responses contained herein as may

be necessary or appropriate in the future.

       Discovery has not concluded in this case. Plaintiff reserves the right to supplement her

responses at a later time as discovery is completed.

## GENERAL OBJECTIONS

1.      Plaintiff objects generally to Interrogatories insofar as it requests information or documents which are subject to the attorney-client privilege, or which constitute trial preparation materials or attorney-client work product, or which are otherwise privileged or protected and not subject to discovery.

2.      Plaintiff objects generally to Interrogatories to the extent that it seeks information not relevant to this action or that does not appear reasonably calculated to lead to the discovery of admissible evidence.

3.      Plaintiff objects generally to Interrogatories insofar as it requests information or documents which constitute or contain sensitive and non-public business, medical patient, medical credentials, personal, income tax or other confidential information.  Plaintiff will only produce such information, if not subject to any other objections, pursuant to an appropriate stipulation and order of confidentiality.

4.      Plaintiff objects generally to Interrogatories insofar as it  requests personal or confidential information.  Plaintiff will only produce such information, if not subject to any other objections, pursuant to an appropriate stipulation and order of confidentiality.

5.      Plaintiff objects generally to Interrogatories insofar as it does not specify a reasonable time or place of production or the manner of making the inspection in accordance with Fed.R.Civ.P. 34(b).  Plaintiff will produce the indicated documents for inspection and copying at a time and location to be agreed upon by the parties.

6.      Plaintiff objects generally to Interrogatories insofar as it seeks discovery of agreements with third parties (not parties to or related to this action) which may be subject to nondisclosure and either cannot be produced without agreement of a third party or cannot be

2

produced without an appropriate stipulation and order of confidentiality.

7.     Plaintiff objects generally to Interrogatories insofar as it is unduly burdensome because the discovery it seeks is already in the possession, custody or control of defendants.

8.     Plaintiff's responses that follow are without prejudice to and are not a waiver of the foregoing general objections.

## OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS

1.     Plaintiff objects to Defendants' instructions insofar as they impose burdens on Plaintiff beyond that required by the Federal Rules of Civil Procedure or the case law in the Third Circuit.

2.     Plaintiff objects to Defendants' definitions and instructions to the extent they imply an obligation to supplement answers to Interrogatories which impose upon Plaintiff an obligation beyond that required by Fed.R.Civ.P. 26(e).

3.     Plaintiff objects to Defendants' definitions and instructions insofar as they would require counsel for Plaintiff to disclose their mental impressions, conclusions, opinions or legal theories in violation of Fed.R.Civ.P. 26(b)(3).

4.     Plaintiff objects to Defendants' definitions and instructions regarding claims of privilege insofar as they impose burdens on Plaintiff beyond that required by the Federal Rules of Civil Procedure or the applicable case law.

5.     Plaintiff objects to the extent that Defendants' definitions and instructions cause each interrogatory to ask multiple questions in violation of the Local Rules.

## OBJECTIONS TO SPECIFIC INTERROGATORIES
## (IN ADDITION TO AND SUBJECT TO ALL THE FOREGOING OBJECTIONS)

1.     Identify by name, address, phone number, location, date and persons present, all

3

individuals that have been interviewed by you in connection with this matter and whether any documents or memoranda were prepared relating to that interview.

**Answer:** Objection. Requests information or documents which are subject to the attorney-client privilege, or which constitute trial preparation materials or attorney-client work product. Further, discovery and depositions are just beginning and the record in this regard remains to be developed. Subject to and without waiving the foregoing objection: Lee Mears, Henry Purnell, and Rudy Dummond. The affidavits of these witnesses will be produced.

2.      Identify each and every document or other item of evidence that you intend to use in this lawsuit, for any purpose, including, but not limited to cross-examination, during any pretrial or trial proceedings, either as exhibits, for purposes of impeachment, or as demonstrative evidence.

**Answer:** Objection. Requests information or documents which are subject to the attorney-client privilege, or which constitute trial preparation materials or attorney-client work product. Further, discovery and depositions are just beginning and the record in this regard remains to be developed. Additionally, any identification of trial documents is premature prior to preparation of the pretrial order. Subject to and without waiving the foregoing objection: *See* Rule 26 Disclosures and any subsequent amendments and P1-666. Also, *see* the discovery record in Justice v. Taylor, C.A.No. 06-497-***.

3.      For each claim you are asserting in this matter, state with particularity and specificity the complete factual basis for each allegation and identify all persons having knowledge of facts supporting the allegation, as well as all documents or other items of evidence

4

in your possession that relate to each claim.

**Answer:**  Objection.  Discovery and depositions are just beginning and the record in this regard remains to be developed.  Subject to and without waiving the foregoing objection:  *See* Rule 26 disclosures and any subsequent amendments.  *See also* the depositions that have already been taken in this case and documents.  *See* also P1-666.  Additionally:

   **A.  John J. Balas.**  John was a loving, caring husband and father of two young children. In his downtime John enjoyed family outings and was involved in his children's activities, such as go-cart racing.  John also enjoyed hunting with his friends and coaching little league baseball. He was a good person.  He brought joy and laughter to his job at DOC, which tended to be an uptight and serious environment.  He was extremely dependable and would always lend a helping hand.  John has been described as a loving family man who would give you the clothes off his back if you needed them.  John was an honest, hard-working man who believed that hard work paid off.

      **1.  Military History.**  Prior to being hired by the DOC, he served in the United States Navy from 1986 to 1989 and was subsequently a member of the Naval Reserves until 1999.  He also served for three years in the Army National Guard of Delaware.  While serving the military, John received various commendations and awards for his outstanding performance and dedication.

      **2. DOC Employment History.**  John was a long term eleven year employee of the DOC.  At the time of his death, John held the rank of Corporal at the Sussex Correctional Institution in Georgetown, Delaware.  During the course of his career with DOC, John received numerous accolades and commendations, including for the apprehension of several escapees. Additionally, John received several awards for his perfect attendance and being named to the

Dean's List at the Delaware Technical and Community College where he was pursuing a degree in Criminal Justice. John graduated with an Associates Degree and received an Outstanding Student award for Criminal Justice Technology in 1999. John was also commended for a job well done in being an instrumental part of the re-certification of the Quick Response Team training in 2004.

**a. Property/Receiving Room.** As a Corporal, John worked in the Property/Receiving Room where his essential job duties included processing prisoners and transfers, logging each prisoner's personal belongings upon arrival to the prison, issuing prison attire and collecting the prisoners' paperwork.

**b. Correction Emergency Response Team ("CERT").** Additionally, John also served as a CERT member from 1995 through 2005. CERT is an elite group of correctional officers who serve on the unit in addition to their normal duties as correctional officers. Officers compete for promotion to CERT by passing rigorous physical and mental tests. The CERT unit ensures public safety, as well as the safety of department staff and offenders. CERT develops and implements security programs for institutions based on the individual needs as well as trains and develops selected groups of staff to perform advanced, high-risk, or community operations. CERT command acts as technical advisors to Wardens and its members provide tactical responses during emergency situations. CERT also assists with escapee and erroneous release operations.

**B. John's First Amendment Protected Union Activity and Association.** John's First Amendment protected union activity and association, described below, also provides for the key overall context for his protected speech, which also is described further below.

**1. Associating With the Union as an Active Member.** In August 2004, John

6

was an active member of the Correctional Officers Association of Delaware ("COAD") - the prison guard union.

**2. Negotiating a New Contract With DOC.** During the Summer of 2004, COAD was in contract negotiations with DOC. Director of Personnel Machtinger was involved in all of the contract negotiations and attended every session. These negotiation sessions began as face to face meetings between union and prison officials. However, after several ineffective meetings laden with heated verbal arguments between the two groups, union and prison officials, began meeting at the same time, but in separate rooms. This slowed the process down significantly and resulted in a significant amount of time wasted. After working painstakingly for hours on revisions to the contract provisions, union officials often waited hours to hear management's responses to their proposals only to be told to go home or simply that their suggestions would not work. If any proposal suggested by union officials to address the main issues of the contract negotiations somehow benefitted the staff, the answer from management was always no and that it could not be done. As a result, the contract negotiation sessions were often unproductive and frustrating.

**3. Union Speech to the Media and the Public.** In Spring and Summer of 2004, in an effort to put pressure on DOC management and State elected officials to address reform in prison systems, union officials began speaking to the media and were very successful in disseminating their message of the need for reform in the Department of Correction. As a result, the media ran numerous stories and editorials addressing the very issues union officials were asking management to address. These issues included dire health and safety issues, the severe understaffing present throughout DOC, low wages for correctional officers, the lack of longevity pay or a career ladder, the inability of DOC to retain correctional officers after ten years of

7

service, and lapses in security, among other things.  The union's effort to utilize the media as a

catalyst for their claims was extremely successful.

COAD was also responsible for several large billboards which were posted across the

State in an effort to increase public awareness.  These billboards mainly focused on the

understaffing problem within the prison system.  Several slogans included:

Delaware
The First State
Unable To Staff Its Own Prisons

Delaware Corrections
Doing More With Less
More Inmate Less Staff

Delaware Corrections
Where Minimum Staffing...
Would be an Increase

Welcome to Sussex County
For Your Safety Obey the Law
We Cannot Staff Our Prisons

Delaware
It's Good to be the First
To Build Prisons Without Staff

In fact, one billboard ran directly underneath a billboard paid for by Governor Minner which

supported her re-election.  After a few days, Minner's billboard was changed to simply state

"Vote Democratic."

**4. Union Speech and Petitions to Elected Officials.**  Additionally, union

officials spoke directly with elected officials such as in the Legislature.  During the summer of

2004, union officials were in constant contact with Legislatures, often in their offices one to two

times a week.  Further, COAD officials gave pointed speeches before the Joint Finance

Committee addressing the various issues plaguing the prisons.

8

**C. The Content of the Union Activity.** As discussed above, union officials were pushing for reform in several areas, mainly dealing with the severe understaffing of the facilities, wage increases for correctional offices to ensure retention and morale, and security lapses which were often a direct result of the understaffing problems. As the voice of the rank and file, Sergeants and below, COAD pushed hard for these issues at every given chance.

**1. Severe Understaffing that Endangered Public Safety.** Prior to the formation of COAD, Governor Minner had ordered the removal of any vacant job positions within DOC. These cuts however did not eliminate DOC's need for the positions. So where you used to have three people doing the job, now there was only one. As a result of these cuts, the staffing numbers did not even come close to showing how severely understaffed the institutions were. By eliminating the positions Minner created the appearance that DOC was only short a few officers, while in reality it was severely understaffed. To add to this, staffing levels kept falling as DOC was losing more officers faster than they could hire them. In cutting these positions, Minner only sought to distort the actual numbers so they did not appear so bad before the public, she never addressed the DOC's actual need for those positions to be filled. Staffing became so bad that at DCC there were two buildings which were closed because there was no staff to run them.

Correctional officers have one of the most dangerous jobs in the State of Delaware. They are tasked with the responsibility of keeping the public safe from some extremely violent inmates. Officers are only scheduled for eight hour shifts, but policy requires that minimum staffing levels be achieved. Therefore, at the beginning of a shift if there are not enough officers scheduled to work, other officers are asked to work voluntary overtime or in some cases are forced to work mandatory overtime, a process called "freezing." In May of 2004, the DOC was

9

over an entire shift short which resulted in a mass amount of involuntary overtime or freezing of officers. As union officials disclosed to the media, understaffing was the number one problem facing the rank and file. When officers were frozen it meant they had to work mandatory sixteen hour shifts. Some officers would not even find out they were working a subsequent eight hour shift until minutes before their first shift ended.

The severe understaffing problem was caused by and also compounded by the large number of officers leaving DOC versus the number of new hires. As The News Journal reported, in 2003, DOC hired 152 officers, but lost 179. Likewise, in January of 2004 DOC lost 21 officers and by May of 2004 only 37 officers were hired while 79 had already left to find other jobs. The reasons for this massive fleeing from jobs with DOC was a direct result of practices such as freezing, the stress of working in hazardous conditions knowing there was a shortage of officers or officers who were tired from working 16 hour shifts, and low wages. In June of 2004, COAD vice-president David Knight publically disclosed that staffing had reached crisis proportions with two officers leaving for every new recruit hired. This severe understaffing had a negative impact not only on issues such as security, but also the morale of correctional officers.

Security and understaffing went hand-in-hand. The more understaffed a facility was, the higher the risk of harm to the public, the inmates, and the correctional officers. As Knight stated to The News Journal, it was normal for one officer to be responsible for 60 or more inmates in direct supervision environments and the ratio could even be 1 to 100 or more in some housing and facility areas.

The severe understaffing at DOC impacted many areas including the health and safety of the inmates, the health and safety of correctional officers, the classification of inmates, and morale of correctional officers. The health and safety of the inmates was in jeopardy because

10

there were not enough officers to man the buildings to ensure safety. A good illustration of the falling staffing numbers at DOC is that in one of the housing facilities there are two rooms containing inmates. In the middle of these two rooms was a "bubble," or an office with protective glass on either side where officers would monitor and watch the inmates. Prior to the understaffing problems, there were three officers in the bubble to monitor the inmates, then the number decreased to two and eventually to one. Once this happened, only one officer was left to man the bubble and monitor both rooms at the same time. The impact was if an incident broke out, the officer would have to wait for help since he could not leave the bubble unmanned because the inmates in the other room would then be unmonitored. Another example is seen in the use of "rovers" to monitor buildings. A "rover" would make his rounds to check on the inmates who were locked into their cells. When a shift was understaffed, the rover would have more buildings and rooms to check in on thus slowing down his ability to check on the inmates frequently. As a result, the inmates were only getting checked on by a rover every so often. There was no consistent supervision. Additionally, due to the understaffing inmates were often locked into buildings for long periods of time without being let out into the open air because there were not enough officers to ensure their safety outside the building. Often times they were not let out of their buildings for more than an hour a day. Their continued confinement led to increased violence among the inmates.

In turn, this increase in violence would effect an inmate's record often times preventing them from being classified and transferred to Level 4 lower security level prisons upon the approach of their release date. Prisoners in DOC were often transferred to Level 4 facilities when their release date was approaching in an effort to reacquaint them with society. These prisoners would be allowed to spend a certain amount of time at home with their family to allow

11

them to adjust to a life of freedom. Without this opportunity, prisoners often were not ready to be released after spending a significant amount of time behind bars. For example, one inmate who was denied this opportunity to be transferred to a lower security level prison to reacquaint him with society immediately re-offended upon being released because he was petrified and did not know how to cope outside of captivity. So when inmates caused problems while incarcerated, they could not be classified and would lose out on the opportunity to transfer to Level 4 facilities and reacquaint themselves with society.

Along the same lines, the hallways at DCC were only being monitored half of the time DOC policy required them to be monitored. For example, one building at DCC consisted of five tiers with twelve hallways. Correctional officers were required to walk the hallways to check in on the inmates in their cells. Officers were also required to do "punches" to determine that an officer made it to the end of a hallway after checking in on the inmates. It took approximately five minutes for one officer to walk down a hallway and do a punch. Therefore, it took at least sixty minutes for all twelve hallways to be monitored. DOC policy required that two punches per hallway per hour. The only possible way for this policy to be met is for two officers to perform the monitoring of these hallways at the same time. With the severe understaffing problem, there were not enough officers for two to perform these punches, therefore one officer was tasked with checking in on the inmates and doing the punches for the entire building. This meant that inmates were only getting checked in on once every hour instead of twice, which was the policy. To compound this, officers were also tasked with letting inmates out to chow, programs, etc. which required more staff to be pulled off of these required punches. As a result, punches were getting done less than once an hour and the inmates were getting monitored less and less.

Additionally, the health and safety of correctional officers was in jeopardy. As stated

12

above, often two rooms filled with inmates was only monitored by one officer. Likewise, with staffing at all-time lows, officers were forced to parole the facility alone with the inmates rather than having a partner. There was less staff to respond to incidents and frequently there was no backup available to respond to incidents. DOC had an internal response team made up of correctional officers, but that team was short staffed as well. For example, it was possible that if two incidents occurred at the same time and two officers responded to each incident, no one was left to respond if a third incident were to break out.

Lastly, the morale of the correctional officers was directly impacted as they were often frozen and forced to work sixteen hour shifts. These officers spent significantly less down time at home to enjoy time with their families or for rest and relaxation. After awhile this resulted in many officers burning out. This led to officers seeking employment elsewhere, only escalating the already grievous staffing problem.

      **2. Wage Increases to Attract and Retain Skilled Correctional Officers.** As discussed above, DOC was experiencing a significant decline in the number of officers it was able to retain. Union officials began seeing a trend develop where after ten years of service, correctional officers were leaving DOC to seek employment elsewhere. For example, officers were leaving employment with DOC for jobs with companies such as Wal-mart where they received higher wages without having to work in extremely dangerous conditions. The underlying reason for the large drop-off in correctional officers was mostly due to the fact that there was no incentive to stay. Correctional officers hired by DOC would remain at their initial rate of pay and rank unless they tested and accepted a promotion. There was no career ladder or longevity pay. So for example, a recruit hired as a CO-I would remain in that position unless he tested for Corporal and accepted a promotion. If you never tested or accepted a promotion, you

13

would only receive the yearly 1-2% salary increase and by the time you could retire you would only be making 15-20% more than a new hire. New Jersey on the other hand had a career ladder where a correctional officer moved from a CO-I to a CO-II and so forth depending on years of service and automatically received a 5% raise in each of their first nine years on the job. By the time a New Jersey correctional officer retired he could receive as much as $70,000 per year without ever having to test or accept a promotion.

Additionally, DOC allowed anyone who tested for promotion to the rank of Corporal to accept a Sergeant's position if there was a vacancy. In other words, there was no requirement that a correctional officer have a certain amount of time with the department to move up in rank. Thus, so long as an officer took the test for Corporal, s/he could accept a position as a Corporal or a Sergeant. There was no specific requirement for time on the job in order to move up. This practice is virtually unheard of in any other paramilitary organization. Basically, without any structure to their promotional process, a career ladder or longevity pay, there were no incentives for officers to stay on the job.

Another problem DOC experienced was officers enrolling in the Delaware academy, but then taking jobs in surrounding states such as New Jersey and Maryland where the pay was higher and there were career ladders allowing for upward mobility. While the starting salaries between these surrounding state institutions were comparable to Delaware, the difference was in incentives and the ability to move up in rank and pay simply by putting in time on the job. Union officials advocated for changes such as a career ladder and longevity pay which would result in better working conditions for correctional officers which would in turn help to keep officers on the job. As State Merit System employees, salaries and benefits were not included in the contract negotiations with prison officials. Union officials were left to use only the media as a catalyst for

their claims in petitioning the Governor and legislature for higher wages.

      **3. Frequent Security Lapses.**  Approximately nine months prior to the violent rape of a DOC counselor, union official David Knight addressed the Joint Finance Committee and stated that the severe levels of understaffing would inevitably lead to murder, injury or even rape with DOC.  As discussed above, the severe understaffing goes hand-in-hand with the security lapses.  Despite the overwhelming amount of attention given to the issues of security at DOC, there were even more lapses that the public was not even aware about.  Having one officer multi-task and perform a job meant for several officers inevitably led to breakdowns in security.  For example, to ideally man a Level 4 facility with 225 inmates, four officers were needed which included a stationary log officer who could not leave their post.  In 2004, these Level 4 facilities were really operating with three officers, one of which was stationary.  The numbers designated as the minimum staffing levels needed for operation were arbitrary numbers pulled out of the air by the Warden of that facility.  These arbitrary numbers never fluctuated with the amount of inmates housed in that facility.  For instance, if the Warden declared the minimal staffing level required 4 officers, it remained at that level no matter how many more inmates were added.  This, coupled with the already increased levels of understaffing, made security extremely weak and vulnerable.  While the Warden might declare a minimal staffing level of 4, often times only 3 officers were on duty.

      **4. The Job Action and Strike.**  As the staffing grew worse and tension and stress levels escalated among correctional officers, on July 22, 2004, ten days after the rape of a correctional officer by an inmate (See Section D.1.a. below), 25 COAD members held a special meeting to discuss the problems at DOC.  Many claimed to be burnt-out due to forced overtime and long hours spent at work rather than at home with their families, others feared the

their claims in petitioning the Governor and legislature for higher wages.

     **3. Frequent Security Lapses.** Approximately nine months prior to the violent rape of a DOC counselor, union official David Knight addressed the Joint Finance Committee and stated that the severe levels of understaffing would inevitably lead to murder, injury or even rape with DOC. As discussed above, the severe understaffing goes hand-in-hand with the security lapses. Despite the overwhelming amount of attention given to the issues of security at DOC, there were even more lapses that the public was not even aware about. Having one officer multi-task and perform a job meant for several officers inevitably led to breakdowns in security. For example, to ideally man a Level 4 facility with 225 inmates, four officers were needed which included a stationary log officer who could not leave their post. In 2004, these Level 4 facilities were really operating with three officers, one of which was stationary. The numbers designated as the minimum staffing levels needed for operation were arbitrary numbers pulled out of the air by the Warden of that facility. These arbitrary numbers never fluctuated with the amount of inmates housed in that facility. For instance, if the Warden declared the minimal staffing level required 4 officers, it remained at that level no matter how many more inmates were added. This, coupled with the already increased levels of understaffing, made security extremely weak and vulnerable. While the Warden might declare a minimal staffing level of 4, often times only 3 officers were on duty.

     **4. The Job Action and Strike.** As the staffing grew worse and tension and stress levels escalated among correctional officers, on July 22, 2004, ten days after the rape of a correctional officer by an inmate (See Section D.1.a. below), 25 COAD members held a special meeting to discuss the problems at DOC. Many claimed to be burnt-out due to forced overtime and long hours spent at work rather than at home with their families, others feared the

15

increasingly dangerous conditions they were working under with staffing being at an all time low.  As WBOC quoted David Knight, "It's getting dangerous. It's coming to a head."

Two days after this meeting the media reported that correctional officers were planning a seven-day work action to protest low pay and other issues.  This action, at the time unsanctioned by COAD, would have a severe impact on inmate transportation units because officers would refuse to work any voluntary overtime shifts.  By law officers could not strike or refuse mandatory overtime, but no one could force them to work voluntary overtime shifts.  Cpl. John Smith was one of the organizers of the job action and stated publically that officers were just fed up and that there was "20 years worth of problems."  The job action was intended to illustrate their frustration and let the Governor and legislature know there were problems that needed attention and solutions.  Officers, desperate for change, felt this was the only way to make their voices heard by the Governor and the Legislature that in order to get and retain more people is a change in pay.  By law, COAD could not sanction such a work action because they could risk being sued.  However, they stated publically that they were happy to see the rank and file pull together.

The work action, or job action, had the most impact on the court and transportation department.  As a result of the situation created by more than 400 officer vacancies, officers were often asked to work voluntary overtime to help move inmates to and from state prison facilities to courts for scheduled hearings and other appearances.  At the start of the job action, Cpl. Smith reported to the media that there was about a 99% effort where almost no one showed up for voluntary overtime.  On the first day of the strike, only 59 inmates were transported while 66 were not.  On the second day of the strike, 85 inmates were transported while 53 were not.  One of the main problems the court system faced was the requirement that inmates must receive a

16

preliminary hearing within 10 days.  The impact prompted prison officials and courts to come up with alternative ways to make sure prisoners were present for the preliminary hearings and trial dates as well as forcing overtime and forcing officers to work 16 hour shifts.  With the absence of officers to transport these prisoners to court, if inmates did not receive their preliminary hearing they could be released with all charges dropped.  Despite this, officers threatened to continue the job action until they saw something from union officials in writing.

In a desperate attempt to get officers to accept voluntary overtime, a memo was issued by management to members urging them to resume voluntary overtime which was posted in the prisons.  However, on July 30, 2004, COAD issued a public press release stating that all three unions - COAD, American Federal of State, County and Municipal Employees ("AFSCME") Local 247, Fraternal Order of Police ("FOP) Lodge 10 - supported their membership's desire not to accept voluntary overtime to ensure the concerns of all DOC personnel were addressed.  The job action only grew in strength.

In late July, prison officials agreed to meet with COAD on August 3rd to discuss the issues plaguing the DOC and Taylor planned to present a plan to correctional officers on that date.  However, Taylor's proposal, which included across the board pay raises and recruitment incentives, was vehemently rejected.  Union officials stated that the proposal failed to address retention issues and provided no incentives for officers to stay on the job longer.  It was a "patchwork and piecemeal approach."   As a result, officers refused to end the job action and continued to decline voluntary overtime.

     **a.  The Activation of the CERT Team.**  On August 6, 2004, Taylor activated five members of the Certified Emergency Response Team ("CERT") to step in and staff the DOC's Court and Transportation unit.  John was one of the five CERT members activated that

17

day.  The CERT members showed up for work that day and were forced to cross the picket lines.

However, upon showing up for their assignment, these CERT members were ridiculed and

cursed at by their fellow co-workers and given the cold shoulder.  Thereafter they learned that

there was an extremely light court load that day, only two prisoners needing transfers, and they

were not needed.

  This prompted the CERT members to ask Major Dave Hall, the head of CERT, why they

had been activated given the small amount of prisoners that needed to be transported.  Hall

replied that he had given four operations orders to Stan Taylor.  Generally, when CERT is

activated, DOC Commissioner Stan Taylor allowed CERT command to draw up the operation

orders and then he would pick the best one.  John then asked Major Hall why Taylor had picked

this one.  Dave replied, "He didn't."  Lee Mears then asked Hall who gave the order and he

replied,  "It came from higher than Stan."  It was unheard of and extremely unusual that the

initial command decisions were being made by someone higher than the Commissioner.

  At this point the CERT members discovered that their activation was politically

motivated.  Therefore, at the end of their shift that day, the five assigned CERT members and

five other members met with the Warden and symbolically resigned their positions on CERT in

an effort to show support for the job action and their union brethren.  John and the other CERT

members spoke out, saying they did not feel their activation was right and that they were lied to

and used for political reasons.  When the Warden asked that they reconsider their resignations,

the members stated that they felt betrayed by the department despite their loyal service and

management could no longer be trusted.

  **5.  Suggested Solutions to These Problems.**  During legislative meetings and

negotiating sessions, several solutions were posed by union officials.  To help alleviate the

understaffing problem and the amount of officers leaving the job, COAD suggested

implementing policies such as a career ladder or longevity pay which would provide incentives

for correctional officers to remain on the job and not flee to other state institutions or other

industries. Additionally, COAD proposed pay increases commensurate with time on the job.

This would help close the gap in pay between Delaware and surrounding states.

In an effort to eliminate some of the strain felt by the understaffing problem DOC

recommended changing eight hour shifts to twelve hour shifts. COAD opposed this change.

COAD's fear is that this change would disrupt the schedules of older workers who already have

set schedules including weekends off. This in turn would lead to more officers leaving the job

and would enhance the problem, not solve it. COAD advocated a mass hiring, while prison

officials suggested holding job fairs. DOC also took steps to lower employment requirements

such as the minimum age and accepting a larger amount of candidates who pass the pre-hire test.

But these measures barely helped DOC retain the minimum staffing requirements.

Further, DOC implemented a task force created by Taylor to evaluate the problems at

DOC and make recommendations. The task force made several recommendations to

management such as allowing officers to retire after 25 years instead of 30, spending $900,000 to

increase starting salaries, and changing state law to allow for a career ladder which would create

easier movement through the pay scales. But DOC officials claimed the task force did not come

to a lot of conclusions and was short on evaluating what would work best. Essentially, the

governor and legislature would make the final decision. Early in the year, the administration

granted a $600 increase in hazardous duty pay, as well as a bonus between $600 and $1,000 in

June and an increase in salaries by 3% in July. However, this only scratched the surface.

Officers were still without a contract, and to date have yet to reach agreement with DOC officials

in contract negotiations.

**D. The Form and Context of the Union Activity.**  During the Summer of 2004, union officials were speaking out on matters of public concern to the media, DOC management and the State Legislature in an effort to bring to light the many issues plaguing DOC correctional officers.  There is a wealth of media articles covering these issues, specifically the severe understaffing, security concerns, low wages for officers and the need for high salaries, and retention problems.  Many times during this time period, The News Journal and Delaware State News would run several stories in one day.  Additionally, the union was responsible for several billboards posed throughout the State.

**1. The Many Contemporaneous Problems at DOC.**

**a. The Abduction and Rape of a Female Counselor.**  On July 12, 2004, as COAD had previously warned, inmate Scott A. Miller took Cassandra Arnold, a female counselor, hostage for six and a half hours at Delaware Correctional Center in Smyrna.  Miller was serving a 699 year sentence for 37 counts of rape, kidnapping and robbery.  After a group counseling session, Miller armed with a handmade knife snuck into a secure area and hid in the women's restroom.  Arnold spotted Miller hiding out in the bathroom.  Miller grabbed Arnold and threw her against a wall in the bathroom.  He then drug her down the hallway and into the counselor's work room.  Once inside the room, Miller barricaded the door with metal file cabinets and covered up the windows.  By phone, he requested a one-on-one meeting with DCC Warden Tom Carroll.  His request, however, was granted on the condition that the hostage was released.  Upon hearing this Miller became enraged, stabbing cabinets and walls with his knife.  Miller told Arnold, "This is how I'm going to kill you."  A few hours later he produced a shoelace, tied Arnold's hands behind her back, raped, and sexually assaulted her while holding

20

his knife between his teeth.

In the meantime, DOC activated CERT who gained access to the room where Miller was holding Arnold by climbing through a tile in a false ceiling. From this position, a CERT officer was able to see Miller sexually assaulting Arnold. However, the movement in the ceiling alerted Miller that he was being watched. Miller then threatened the victim with his knife and made an effort to assault the officer. The CERT officer then fired his weapon killing Miller and ending the standoff.

As the investigation unfolded it became apparent that a convicted felon was able to pass through secure doors which had been propped open and into a bathroom undetected. Then while Arnold was being dragged back to her office, there was not one correctional officer in that hallway. Several weeks before the rape, Arnold had warned her supervisors of this door being propped open, but nothing was ever done about it. Arnold's lawyer and family made several media statements calling for an investigation independent of Governor Minner's influence.

In the media frenzy following the violent rape, union officials were quoted in the media criticizing management because for months they had begged for improvements and had warned the governor and legislature that something like this could happen if no action was taken. Three days later, Minner was quoted in The News Journal saying this was the type of thing that you expect to happen in prisons. DOC officials constantly denied that staffing played a role in the incident claiming the facility was only short one officer, while union officials vigorously continued to attack the legislature and Governor in the media for not addressing pay and staffing issues. Further, union officials explained that while the building where the rape occurred might have only been short one officer, this failed to take into account that seven of the officers were working either voluntary or involuntary overtime.

21

**b. Prison Escapes.**  In December of 2003, inmate Myron D. Price escaped from two correctional officers while being transported to the Kent County Courthouse. Price used a paperclip or similar device to loosen his leg shackles and handcuffs.  Then after exiting the transportation van in a wide open parking lot, he took off.  His escape prompted a three week manhunt and ended in his capture in Arkansas.  While on the run Price allegedly robbed two motels and led police on a high-speed chase in a stolen car.

**c. Other Security Breakdowns.**  On April 26, 2004, inmate Willis T. Matthews, Jr. was on trial in Sussex County Superior Court for allegedly raping a 91 year old woman.  While on trial, he slit his neck with a tiny piece of disposable razor blade.  This incident occurred on the heels of an inmate convicted of racketeering being injured by a tiny piece of disposable razor blade.  Then two days later, convicted burglar Sean A. Dupree swallowed a handcuff key as part of an alleged escape plan while in transport to Kent County Superior Court. The very next day inmate Richard L. Clark had walked away from Sussex Community Corrections Center in Georgetown causing a Wilmington police officer to fire his service weapon at him.

Then in June of 2004, Doug Ingram, a private security expert who volunteered his time to conduct a review of DOC's court transportation policies and procedures, released his February report to the media.  Ingram stated that if changes were not made soon to the DOC's transportation procedures, someone would be seriously injured or killed.  Ingram also harshly criticized the administration for severe security lapses and the lack of training transportation officers receive.  The Ingram report identified serious flaws in the transport security including the fact that vans were not equipped with two-way radios to communicate with superiors in cases of emergencies, prisoners are barely patted down and searched before being loaded onto the vans,

22

and van operators are only supplied with a list of inmates being transported and have no face

recognition for the inmates.  Ingram offered several recommendations for improvement

including: photo ID verification of all transports, strip searches, body searches, utilization of full

restraints, having inmates dress in court clothing and shower shoes, and the prohibition of

personal items except court papers.

Ingram's report identified only five full-time court and transportation employees.  All

other officers serving in court and transportation were working overtime.  As COAD President

Allen Deal stated to the media, Ingram's recommendations would be hard to implement given the

severe understaffing problem in the DOC.  They simply did not have the staff to perform extra

security measures such as strip searches.

**d.  The Job Action by Union Members.**  See section C.4 above.

**2.  Widespread Media Attention About These Problems.**  There was a regular

flood of newspaper articles and media attention about these many problems which are in the

record.

**3.  Legislative Concern About These Problems.**  State legislators also regularly

and publically expressed serious concerns about these many problems in the Delaware media.

**4.  Prison Conditions Were an Issue in the Upcoming Gubernatorial Race.**

COAD publically opposed the re-election of the incumbent Governor and actively worked to

defeat her.  The media would often quote candidates who were critical of how Minner was

addressing, or failing to address, the prison issues.  These candidates publically expressed their

concern for the problems and explained how they would work to fix the problems.

**E.  Protected Speech by John and his Fellow CERT Members.**  See generally section

C.4.a above.

23

**1. CERT Members Hold a Meeting to Discuss Their Activation.** On August 5, 2004, five CERT members had been activated to report to Court and Transportation. Those five activated CERT members included John, Lee Mears, Jeff Foskey, Allen Adams, and Scott Bradley. Upon learning this information, CERT members became concerned that if they reported to their assignment, they would be crossing the picket line and not supporting their fellow co-workers and union members in their job action. Lee Mears, a CERT team leader, encouraged the other CERT members to hold a meeting about the situation before making any decisions to resign from the team. Accordingly, a meeting was held the night before the five members were to report for their assignment. In attendance at this meeting was John, Truman Mears, Jeff Foskey, Allen Adams, Scott Bradley, John Mumford, Heath Shockley, Harry Hastings, David West, Dennis Murray and Truman Mears. At the meeting the CERT members discussed whether to resign from CERT in an effort to support the job action.

Prior to a decision being reached, Truman Mears left the meeting and reported to CERT command that the members were having a meeting and discussing whether or not to resign. CERT commanders then contacted Lee Mears and assured them that their presence was needed to ensure public safety because prisoners would be released if they were not transported to their preliminary hearings. Therefore, to ensure the public's safety, the five CERT members decided to report for their assignment the next day.

**2. The Symbolic Resignation.** As briefly discussed in section C.4.a above, John and his fellow CERT members arrived for duty and discovered that they were being used as political pawns in the DOC's war with the union. At the conclusion of their shift, the five assigned CERT members and five other members met with the Warden and resigned their positions on CERT in an effort to both symbolically and substantively support the union job

24

action.  During this meeting, John and the other CERT members spoke out, explaining that they

had been improperly activated for reasons that had nothing to do with public safety - that they

had been betrayed, lied to and used as political pawns by the DOC in its war with the union.

They expressed that management could no longer be trusted.  They expressed that they intended

to support their union brethren in the job action and would no longer be used as political pawns

by the Governor, Stan Taylor and others.  They refused to cross the picket line and then

symbolically resigned their positions on CERT in a show of support for and solidarity with the

union job action.

John and his fellow CERT members then refused the Warden's urging that they

reconsider their resignations from CERT.

At the time of their symbolic resignation on August 6, 2004, defendant Truman Mears

was the only CERT member not on vacation or active miliary duty who refused to resign in

support of the job action.

        **3.  Management's Reaction to the Resignation.**  CERT command was irritated

with the member's decision to resign since it made them look bad in the eyes of management.  It

was made clear to John and the other now former CERT members that they would never again be

welcome on CERT as a result of their decision to resign.  Management was frustrated by their

resignation and support of the job action.  In an email submitted to all ten CERT members who

resigned, CERT command stated that they did not sanction the process utilized in the resignation

and stated that it was unfortunate that during a critical time in DOC history they decided to

resign.  They were then asked to turn in all gear.  Ironically, one of the two officers CERT

command directed these resigned members to turn in their gear and pagers to was Truman Mears.

     **F.  Adverse Action - John Receives a Mediocre Performance Evaluation.**

25

Approximately one month after John spoke out in support of the job action, his direct supervisor, Truman Mears, approached John with his 2004 annual performance evaluation. Unlike previous years when John had been ranked as "Exceeds Expectations," Truman Mears had ranked John as merely "Meets Expectations." For the first time in his career, John had received a mediocre performance evaluation. To add further insult to injury, Truman Mears also refused to recognize John's perfect attendance record for the past four years, his CERT membership, or commendations for his instrumental part in the re-certification of the QRT training during early 2004. In John's 2001-2002 evaluation, Truman Mears recognized John's perfect attendance record for the past two years and his CERT membership. In 2002-2003, Truman Mears again recognized John's perfect attendance record. Yet now, after John's symbolic speech and resignation from CERT in support of the union job action, his meritorious job performance was not being recognized. John believed that Truman Mears was not evaluating him with professional objectivity, but rather with personal bias towards him because of his protected speech.

When Truman Mears approached John and requested that he sign his performance evaluation, John stated he would sign it at a later date and requested a copy of the evaluation. Truman Mears refused to provide John with a copy stating, "You didn't sign it so you are not getting a copy of it." When John questioned Truman Mears regarding why he refused to mention, *inter alia*, his attendance records and CERT membership, Truman Mears replied that his commendations were not enough to warrant a ranking of "Exceeds Expectations." As performance evaluations are considered in determining salary increases, promotions, transfers, and other employment actions under the State Merit Laws, John feared this mediocre performance evaluation would have negative consequences and effects on his salary progression

26

and his ability to rise in the DOC.

**1. John Files an Official Grievance with COAD.**  On October 4, 2004, John filed an official grievance with COAD through his shop steward disputing the performance evaluation and asked that his rating be increased from "Meets Expectations" to "Exceeds Expectations."

**2. John Requests a Meeting with His Supervisors and a Union Representative.**  On January 9, 2005, Truman Mears began pressuring John to sign the performance evaluation.  At this time, John requested a meeting with Captain Wilkinson and a union representative to review the evaluation and raise his concerns about it.  This disgusted Truman Mears who was blatantly attempting to bully and pressure John into signing the mediocre evaluation.  John felt pressured, intimidated, and stressed by Truman Mears because he had resigned from CERT.  John felt that Truman Mears was retaliating against him because he has resigned from CERT and was being vindictive towards him because of this.

Subsequent to his conversation with Truman Mears, John notified Captain Wilkinson who agreed to be present for his review of the evaluation.  This meeting was never held.

**3. Truman Mears Submits the Evaluation Without John's Signature.**  On February 7, 2005, John telephoned the Warden's secretary who informed him that Truman Mears had submitted his performance evaluation but had handwritten "refused to sign" in place of John's signature.  John never refused to sign his performance evaluation.  At this time, John called both defendant Deloy and Wilkinson to inform them of Truman Mears' actions, but nothing was done to rectify the situation.  Truman Mears' actions caused John much stress and anxiety.  Shortly thereafter, John killed himself on February 19, 2005, and had still yet to receive a copy of his performance evaluation or a meeting with his superiors and union representative.

27

**G. Adverse Action - John Notices That Truman Mears is Altering His Time Card.**

John meticulously kept copies of his time cards. In September of 2004, John noticed that Truman Mears had tampered with his timecard and altered it so that he had taken emergency vacation days rather than holidays or vacation days. Emergency vacation days are typically frowned upon in DOC. Contrary to Truman Mears' claims that John had used emergency vacation days, on each of those days John had legitimately used holidays or vacation days. Upon learning of the tampering, John notified defendant Wilkinson who eventually forced Truman Mears to change it back to its original state. However, defendants Wilkinson or Deloy never disciplined, reprimanded, scolded or told Truman Mears to stop retaliating against John.

**H. Adverse Action - John is Denied a Copy of His Timecard.** In January 2005, John was denied a copy of his timecard which is a violation of DOC rules and regulations. Employees are to be provided with a copy of their timecard at the end of the year. Finally, after several requests Truman Mears finally turned over a copy of his timecard. However, in the time between his initial request and when he received the time card, John became paranoid that Truman Mears had been altering and tampering with his vacation days.

**I. Adverse Action - John is Denied Transfer to Another Supervisor.** John constantly requested a transfer to another supervisor so he would not have to work for or report to Truman Mears. Defendants Deloy and Wilkinson never responded or took any actions to transfer John. John had hoped that a transfer would help his deteriorating mental and emotional condition, but the allusive denials of his request only operated to make his conditions worse.

**J. Adverse Action - John is Constantly Monitored by His Supervisor.** John was constantly watched and monitored by Truman Mears who was searching for a performance misstep to use as a basis for discipline against John. For example, John was once shown a note

pad where someone was keeping chronological notes of his performance and whereabouts for Truman Mears.

### K.  Evidence of Causation.

**1.  Knowledge of the Protected Activity.**  John's status as a union member was well known.  Defendants were aware that John was a union member and that the union was publically speaking out about the many problems at DOC.  Additionally, John's membership on the CERT was well known and continuously recognized in his performance evaluations.  His refusal to cross the picket lines and speech in support of his fellow workers and union member's job action also was known to DOC management and defendants.

**2.  Motive to Retaliate.**  As a result of the job action and union officials' speech about DOC management, prison officials felt they were losing control over the correctional officers.  These prison officials, such as defendant and HR Director Machtinger began implementing extremely vague policies giving management more control over personnel matters.  Additionally, there was no contract in place to protect the correctional officers or overrule these policies.  In the past, correctional officers were warned to avoid union activity if they wanted to advance in the Department.

Further, while fighting with management in the media and contract negotiations, COAD union officials also were fighting management in grievance hearings on behalf of correctional officers.  The union had almost a 95% success rate against management.  Machtinger was very involved in the grievance process and did not like that union officials were so successful. Defendant Machtinger did not like when people spoke out against DOC or management.

Machtinger is admittedly friends with Commissioner Stan Taylor.  The two spend time together outside of work, as well as often working side by side on DOC matters.  Additionally,

29

Governor Minner used Taylor and Machtinger as puppets to carry out her personal vendettas. They in turn would make others such as defendants Deloy, Wilkinson and Truman Mears responsible for carrying out Minner's personal vendettas. As a result of the union officials' speech to the media and management, Minner felt pressure from her constituents and was taking constant hits in the media during an election year. As discussed above, Minner was also having to debate other candidates on issues concerning DOC in public forums. As a result, Minner began taking her anger and frustration about the job action out on union officials by filing a lawsuit against them on August 5, 2004.

Truman Mears had a motive to retaliate because he was the only active CERT member in August 2004 who refused to join his fellow co-workers in supporting the job action by not crossing the picket lines. Truman Mears was supportive of DOC management and did not like that John, his subordinate employee, would speak out against management.

### 3. Temporal Proximity. The temporal proximity is unduly suggestive.

| | |
|---|---|
| Aug. 5, 2004 - | Gov. Minner files a lawsuit against COAD and the union officials to stop the job action. |
| Aug. 6, 2004 - | CERT was activated to report to court and transportation as part of a political tactic. At the end of their shift ten CERT members resign. |
| Sept. 2004 - | John learns he is being constantly monitored by Truman Mears. Also, Truman Mears alters John's time card. |
| Sept. 2004 - | John is denied a transfer. After September he continuously requested a transfer and it was always denied. |
| Sept. 26, 2004 - | Truman Mears submits a mediocre performance evaluation of John. |
| Oct. 4, 2004 - | John files an Official Grievance with COAD. |

| Jan. 2005 - | John constantly tries to meet with his supervisors and union representative regarding his performance evaluation, but is pushed aside.  Also, John is denied a copy of his 2004 timecard. |
|---|---|
| Feb. 7, 2005 - | John learns Truman Mears has sent his performance evaluation to the Warden with "refused to sign" written in. |
| Feb. 19, 2005 - | John kills himself. |

**4. Intervening Pattern of Antagonism.**  In the midst of the events that led to this case, on August 5, 2004, the State of Delaware and DOC filed a lawsuit against COAD in Chancery Court because of their union activities, including their perceived support for a devastating work stoppage by prison guards protesting dangerous working conditions in Delaware prisons. See State v. Correctional Officer Association of Delaware, et al., C.A.No. 626-CC (Del.Ch.).  This lawsuit was the result of a last ditch effort by the Governor to put a stop to the correctional officers' defiance of upper management and to end their very successful job action.  When the Chancellor ruled in favor of union officials, Minner became infuriated.  The highly successful job action and the Court's refusal to put an end to it left her entirely helpless and without any immediate remedy.  On August 6, 2004, Minner ordered the activation of CERT to Court and Transportation as a political ploy to show the public they were indeed safe.

Furthermore, by definition the contract negotiation sessions were adversarial.  As explained above, after a few contract negotiation sessions where arguments ensued between prison and union officials, the two parties would keep themselves separate.  Prison officials would often keep union officials waiting hours for their comments.  These sessions were stressful for all parties involved as discussions were taking place in a piecemeal fashion.  Union officials would work painstakingly hard on their revisions and comments, only to be stonewalled by DOC officials who took their time and often came back with no indication they were willing to meet

31

the union's demands.

**5. Disparate Treatment.** John also was singled out for disparate treatment by defendant Truman Mears. As explained above, in prior years his meritorious job performance was regularly recognized in his performance evaluation. Yet after John engaged in symbolic speech and refused to cross the union picket line, Truman Mears refused to recognize his outstanding work accomplishments.

**6. Violations of Procedures.** (1) HR's policy is not to have supervisors complete performance evaluations based on personal animus, rather their policy is for supervisors to complete performance evaluations based on the employee's performance while recognizing any accomplishments such as perfect attendance and CERT membership; (2) HR's policy is not to have supervisors alter an employee's time card; (3) HR's policy is not to deny employee's desperate requests for transfers when they are being treated unfairly by their supervisors; (4) HR's policy is not to have supervisors constantly monitor their employee's every move to promote fear and paranoia; (5) HR's policy also is that when it learns that an employee is suicidal, that it immediately tries to get them help and does not ignore the problem.

**7. Falsehoods and Other Pretextual Reasons.** Truman Mears falsely submitted John's performance evaluation with "refuses to sign" written in when it was clear that John wanted to meet with him as well as Deloy and/or Wilkinson regarding this performance evaluation prior to signing it. John was constantly lied to when he was promised a meeting with his supervisors and union representative regarding this evaluation.

Truman Mears also falsified and altered John's time cards to tarnish John's reputation as a way to harass and retaliate against him.

32

4.      The following Interrogatories refer specifically to incidents, statements or conduct enumerated in your Complaint.  For each listed paragraph and/or statement:  1) describe in detail the basis for your statement, 2) indicate by name and address each and every witness to such incident, statement, or conduct and 3) identify any and all documents that support the statement.

    a.      Your statements in Paragraphs No. 15, 16, 18, 20, 23, and 24 that the decedent engaged in "protected conduct." Also state whether you are asserting that decedent himself directly participated or engaged in any of the activities listed in these paragraphs, and if so, identify which activities.

**Answer:**  Objection.  Discovery relating to this contention is still ongoing and the record in this regard remains to be developed.  Subject to and without waiving the foregoing objection: *See* answer to Interrogatory #3.  Additionally, John was a member of COAD, the prison guard union, symbolically resigned his position on CERT and refused to cross the picket line and in doing so, was speaking out in support of the job action and against management.

    b.      Your statement in Paragraph No. 26 that "Defendant Taylor was embarrassed to learn that many of his court and transportation officers were not delivering prisoners for trial."

**Answer:**  Objection.  Discovery relating to this contention is still ongoing and the record in this regard remains to be developed.  Subject to and without waiving the foregoing objection: *See* answer to Interrogatory #3.

    c.      Your statement in Paragraph No. 28 that the "effect of all this Union

33

action and the public media outcry regarding all these issues antagonized

defendant Taylor."

**Answer:**  Objection.  Discovery relating to this contention is still ongoing and the

record in this regard remains to be developed.  Subject to and without waiving the

foregoing objection: *See* answer to Interrogatory #3.


d.      Your statement in Paragraph No.33 that [sic] court and transportation

officers "were asked to become strike breakers."

**Answer:**  Objection.  Discovery relating to this contention is still ongoing and the

record in this regard remains to be developed.  Subject to and without waiving the

foregoing objection: *See* answer to Interrogatory #3.


e.       Your statement in Paragraph No. 34 that the CERT team members "were

ridiculed by their fellow co-workers who blurted profanities at them and

turned their backs to them because they were crossing the picket lines."

Also identify the names of the co-workers to which you are referring.

**Answer:**  Objection.  Discovery relating to this contention is still ongoing and the

record in this regard remains to be developed.  Subject to and without waiving the

foregoing objection: *See* answer to Interrogatory #3.  Additionally, the names of

these co-workers are unknown.


f.      Your statement in Paragraph No. 34 that "defendant Taylor was fully

informed by his subordinates, including Alan Machtinger, of the

34

decedent's resignation from the CERT team, his symbolic speech and

actual speech, and all of this antagonized him."

**Answer:** Objection. Discovery relating to this contention is still ongoing and the

record in this regard remains to be developed. Subject to and without waiving the

foregoing objection: *See* answer to Interrogatory #3.


g.    Your statement in Paragraph No. 40 that "the decedent's speech and other

protected activity was taken in his capacity as a private citizen

commenting on public concern."

**Answer:** Objection. Discovery relating to this contention is still ongoing and the

record in this regard remains to be developed. Subject to and without waiving the

foregoing objection: *See* answer to Interrogatory #3. Additionally, none of John's

job duties included refusing to cross the picket lines in support of the job action.

(*see* answer to Interrogatory #3 at A.2.a-b). Speech in support of the job action

and against management or association with COAD is not required by these job

duties.


h.    Your statement in Paragraph No. 48 that "Defendants Taylor, Machtinger

and Deloy have an official policy, practice or custom of harassing and

retaliating against COAD Union members."

**Answer:** Objection. Discovery relating to this contention is still ongoing and the

record in this regard remains to be developed. Subject to and without waiving the

foregoing objection: *See* answer to Interrogatory #3.

35

i.      Your statement in Paragraph No. 49 that Defendants "have communicated

this policy to their managers."

**Answer:**  Objection.  Discovery relating to this contention is still ongoing and the

record in this regard remains to be developed.  Subject to and without waiving the

foregoing objection: *See* answer to Interrogatory #3.


j.      Your statement in Paragraph No. 51 that "Defendant Machtinger is viewed

as the enforcer for Commissioner Taylor and managers throughout the

Department are aware of his and Taylor's anti-union animus."  Also

identify the names of the managers to which you are referring.

**Answer:**  Objection.  Discovery relating to this contention is still ongoing and the

record in this regard remains to be developed.  Subject to and without waiving the

foregoing objection: *See* answer to Interrogatory #3.  Additionally, the managers

include defendants Michael Deloy, David Wilkinson and Truman Mears.


k.      Your statement in Paragraph No. 52 that "Defendants Wilkinson and

Mears were aware of the policy, practice, or custom of harassing and

retaliating against COAD members."

**Answer:**  Objection.  Discovery relating to this contention is still ongoing and the

record in this regard remains to be developed.  Subject to and without waiving the

foregoing objection: *See* answer to Interrogatory #3.


l.      Your statement in Paragraph No. 54 that "Defendants Deloy, Machtinger

36

and Taylor were aware of that retaliation and harassment and sanctioned,

authorized, approved or participated in the retaliation and harassment."

**Answer:** Objection. Discovery relating to this contention is still ongoing and the record in this regard remains to be developed. Subject to and without waiving the foregoing objection: *See* answer to Interrogatory #3.

m.    Your statement in Paragraph No. 58 that "Mears was the only active CERT member (not on vacation or on active duty) who refused to stand by his fellow CERT team members and resign in August of 2004."

**Answer:** Objection. Discovery relating to this contention is still ongoing and the record in this regard remains to be developed. Subject to and without waiving the foregoing objection: *See* answer to Interrogatory #3.

n.    Your statement in Paragraph No. 76 that "Mears . . . was seeking a performance misstep to use as a basis for his discipline against him."

**Answer:** Objection. Discovery relating to this contention is still ongoing and the record in this regard remains to be developed. Subject to and without waiving the foregoing objection: *See* answer to Interrogatory #3.

o.    Your statement in Paragraph No. 70 that "This disgusted and frustrated Mears who was trying to bully him into signing the performance evaluation."

**Answer:** Objection. Discovery relating to this contention is still ongoing and the

37

record in this regard remains to be developed.  Subject to and without waiving the foregoing objection: *See* answer to Interrogatory #3.

        p.      Your statement in Paragraph No. 80 that "the decedent constantly demanded a transfer from under Mears" and the statement that "his requests were denied."  Also identify the dates decedent made such requests and to whom the requests were made.

**Answer:**  Objection.  Discovery relating to this contention is still ongoing and the record in this regard remains to be developed.  Documents should be in the possession, custody or control of defendants.  Subject to and without waiving the foregoing objection: *See* answer to Interrogatory #3.  Defendants have yet to produce John's personnel file.  Until plaintiff can review John's full personnel file, the dates of John's transfer requests are unknown.

      5.      Identify the nine other CERT team members you are referring to in Paragraph No. 35.

**Answer:** Objection.  Discovery relating to this contention is still ongoing and the record in this regard remains to be developed.  Further, defendants are in the possession, custody or control of such information as the CERT members were also DOC employees.  Subject to and without waiving the foregoing objection: It is believed that the other nine CERT members included Lee Mears, Jeff Foskey, Heath Shockley, Allen Adams, John Mumford, Scott Bradley, David West, Harry Hastings, and Dennis Murray.

38

6.    With respect to your statement in Paragraph No. 37 of the Complaint that the decedent and other CERT team members "actually spoke out", identify the following:

 a.    the names of the other CERT team members;

 b.    what statements were made;

 c.    when they were made; and

 d.    to whom the statements were made.

**Answer:** Objection. Discovery relating to this contention is still ongoing and the record in this regard remains to be developed.  Subject to and without waiving the foregoing objection: *See* answer to Interrogatory #3 and 5.

7.    With respect to your statements made in Paragraph No. 81 of the Complaint, identify:

 a.    on what date, and in what context, did decedent inform Defendant Wilkinson and Defendant Deloy that he believed he was being retaliated against;

 b.    the basis for your statement that Defendants Wilkinson and Deloy "ratified, sanctioned, and approved of [Mears] misconduct"; and

 c.    any and all documents that support the statements made in Paragraph No. 81.

**Answer:** Objection. Discovery relating to this contention is still ongoing and the record in this regard remains to be developed.  Subject to and without waiving the foregoing objection: *See* answer to Interrogatory #3.  The documents have already been produced. (*See* P529-531).

8.    Identify the names of the "close friends" you are referring to in Paragraph No. 84 of the Complaint and the context in which these statements were made.

39

**Answer:** Objection. Discovery relating to this contention is still ongoing and the record in this regard remains to be developed. Subject to and without waiving the foregoing objection: It is believed that John made statements to his friends Lee Mears and Jennifer Cox.

9. With respect to the statements made in Paragraph No. 86 of the Complaint, identify:

a. the name of the "friend";

b. the date on which the friend spoke with Defendant Deloy;

c. the context in which this conversation occurred;

**Answer:** Objection. Discovery relating to this contention is still ongoing and the record in this regard remains to be developed. Subject to and without waiving the foregoing objection: It is believed that the "friend" was named Jennifer Cox. The date is unknown but believed to have been between January 1, 2004 and February 19, 2004. The context in which the conversation occurred is unknown.

d. the basis for the statement that "Deloy refused to bring any State of Delaware or
    Human Relations Personnel resources to the assistance of the decedent"; and

**Answer:** Objection. Discovery relating to this contention is still ongoing and the record in this regard remains to be developed. Subject to and without waiving the foregoing objection: No one at DOC ever contacted John, his family or friends to ensure John was getting medical care or attention, or to even inquire as to his status. Further, no one from DOC ever intervened to get John much needed mental health counseling.

40

e.       any and all documents that support the statements made in Paragraph No. 86.

**Answer:** Objection. Discovery relating to this contention is still ongoing and the record in this regard remains to be developed. Subject to and without waiving the foregoing objection: None.

10.      With respect to the statements in Paragraph No. 87 of the Complaint, identify:

a.       the date such leave requests were made;

**Answer:** Objection. Discovery relating to this contention is still ongoing and the record in this regard remains to be developed.  Subject to and without waiving the foregoing objection: The leave requests were made on January 5, 2005.

b.       the reasons given for denial of the leave request; and

**Answer:** Objection. Discovery relating to this contention is still ongoing and the record in this regard remains to be developed.  Documents should be in the possession, custody or control of defendants.  Subject to and without waiving the foregoing objection: Defendants have yet to produce John's personnel file.  Until plaintiff can review John's full personnel file, the reasons for the denial of John's leave requests are unknown.

c.       any and all documents that support the statements made in Paragraph No. 87.

**Answer:** Objection. Discovery relating to this contention is still ongoing and the record in this regard remains to be developed.  Subject to and without waiving the foregoing objection: The documents have been produced. (*See* P508-517).

41

11.     Identify the names of the family and friend to which you are referring in Paragraph No. 88 of the Complaint, the dates and context in which they "attempted to get [Balas] help", and any and all documents that support the statements made in Paragraph No. 88.

**Answer:** Objection. Discovery relating to this contention is still ongoing and the record in this regard remains to be developed. Subject to and without waiving the foregoing objection: In addition to John's wife, his family and friends included Lee Mears and Jeff Foskey. Documents, if any, have been produced. (P554-559,562).

12.     List by name, address, occupation, and employer each and every witness to be called to testify at trial on behalf of the plaintiff, and indicate the paragraphs of the amended Complaint as to which each witness will testify.

**Answer:** Objection. Requests information or documents which are subject to the attorney-client privilege, or which constitute trial preparation materials or attorney-client work product. Further, discovery and depositions are just beginning and the record in this regard remains to be developed. Additionally, any identification of trial documents is premature prior to preparation of the pretrial order. Subject to and without waiving the foregoing objection: *See* Plaintiff's Rule 26 Disclosures and any subsequent amendments.

13.     State and identify by names of parties, court or administrative body and case number all civil lawsuits or legal proceedings, at law or equity, of any nature in which you were a party, and the disposition of each such matter.

**Answer:** In addition to the present case: Plaintiff was involved in a Delaware Department of Labor charge for wrongful termination against his employer Food Lion in August of 1991.

42

14.    Identify each and all photographs, videotapes, audio tapes or any other form of recording media that relate to this matter, and state the time, date, location and manner that such were made as well as the names of all individuals that have the originals.

**Answer:** There are four photographs of the John with his two children.  The documents have been produced. (P521-522).


15.    Identify each and every medical record supporting the contention that the John had been treated for mental illness, mental health issues, psychiatric or psychological problems or counseling.

**Answer:** Objection.  Discovery is ongoing and the record in this regard remains to be developed. Subject to and without waiving the foregoing objection: Plaintiff has secured medical records from decedent's medical providers including, Dr. Jani, Dr. Palekar, Dr. Peet, Beebe Medical Center, and Coastal Therapeutic Services.  These medical records will be produced subject to appropriate protective order or confidentiality agreement.  Additionally, plaintiff is still attempting to acquire medical records from St. Jones Behavioral Center where decedent was seen by a male counselor in January of 2005. (P554-559).  If and when these documents are received, they will be produced.


16.    With respect to your allegations of the decedent's mental health, state the nature of any psychological or psychiatric diagnosis, prognosis, treatment, prescriptions, or other analysis rendered prior to death, identifying each health care practitioner involved.

**Answer:** Objection.  Discovery is ongoing and the record in this regard remains to be developed. Subject to and without waiving the foregoing objection: *See* the expert report of Carol A. Tavani,

43

M.D. to be produced in accordance with the scheduling order.

17.    If you contend that the decedent made a complaint to any agent or employee of the Department of Correction regarding mental health issues or threats of suicide before his death, state (a) the date and time of any such complaint(s); (b) to whom such complaint was made; and (c) the nature of any record in any form of such complaint.

**Answer:** Objection. Request is vague and unclear. Further, discovery is ongoing and the record in this regard remains to be developed. Subject to and without waiving the foregoing objection: It is believed that decedent made statements regarding suicide to Lee Mears and Jennifer Cox, both of whom were DOC employees at all times relevant to this case. Additionally, *see* answer to Interrogatory #3, 8 and 9.

18.    To the extent you contend that a defendant violated the plaintiff's clearly established constitutional rights, state with particularity and specificity for each defendant the basis for your contention, and identify the individuals with knowledge, documents or tangible physical evidence that support your contentions.

**Answer:** Objection. Discovery is ongoing and the record in this regard remains to be developed. Subject to and without waiving the foregoing objection: *See* answer to Interrogatory #3.

19.    Identify all individuals retained as experts or that may be called as witnesses under F.R.E. 702, 703 or 705 by plaintiff, and provide the following:

a.    an exact copy of that expert's opinion or report as well as any drafts and all correspondence between you and the proposed expert;

44

b.      an exact copy of all materials that the expert reviewed or will rely upon in forming

his/her opinion;

c.      a current and complete listing of the expert's qualifications;

d.      exact copy of any exhibits to be used by the proposed expert;

e.      a list of all publications authored by the proposed expert within the last ten years;

f.      the amount of compensation to be paid the proposed expert; and

g.      listings of all cases in which the proposed expert has testified or offered an

opinion in the last four years.

**Answer:** Objection.  Overbroad and premature.  Expert discovery is governed by the

scheduling order and the Federal Rules of Civil Procedure.  Moreover, the question is a thinly

veiled attempt to prematurely obtain the mental impressions, conclusions, opinions and/or legal

theories of Plaintiff's counsel in violation of Fed.R.Civ.P. 26(b)(3).  The information required

under the Rules will be produced at the appropriate time.

Subject to and without waiving these objections: *See* Plaintiffs' Rule 26 Disclosures and

any subsequent amendments.  Additionally, the documents have been produced. (P563-666).


20.     State and identify all compensatory, statutory, punitive, and future damages,

including both general and special damages, plaintiff claims as a result of the defendants' alleged

conduct and include your calculations of those amounts, if any.

**Answer:**  Objection.  To the extent this question seeks information on wage and benefit loss and

pension loss it violates the scheduling order and Civil Rule 26.  Plaintiff's forensic economic

expert will issue a timely report on these issues.

As to the other elements of damages plaintiff responds as follows.

45

**(1) Economic Damages.**  For a description of pecuniary damages claimed, see the report entitled "The Financial Losses Arising From the Death of Cpl. John J. Balas" by Thomas C. Borzilleri, Ph.D. to be produced in accordance with the scheduling order.

**(2)  Emotional distress.**

**(a)  Emotional Impact.**  John always strived to be professional in his job.  He was well respected by his colleagues, as well as the prisoners he supervised.  He always felt that if you worked hard, you would be rewarded.  John was employed by the DOC for eleven years and always had superior job evaluations and commendations, until he stood up to DOC management in support of the job action.  When John began being treated unfairly and harassed by his direct supervisor, he grew extremely frustrated.  He knew that he was being retaliated against due to his protected speech in support of the job action.

Prior to the Summer of 2004, John was very patient and understanding.  He was fun to be around and was always laughing and making jokes.  He loved doing things with his friends and family and was a lot of fun to be around.

In the late Summer of 2004, John began experiencing work-related stress which led to an onset of depression.  Further, he began experiencing difficulty with concentration, attention and memory, and low self-esteem.  John began self-medicating by drinking in order to "unwind" after a stressful day at work.  Eventually, he needed to drink alcohol in order to fall asleep at night.  As his stress at work increased, he became a work-a-holic, often burying himself in his lawn care business.  This was his way of withdrawing from his friends and family.  During this time, John also became very moody.  His family never knew what kind of a mood John would be in when he arrived home from work.  He was easily frustrated, agitated and angered causing his family to often walk on egg shells when around him.  In the Fall and Winter of 2004, John's drinking got

46

progressively worse.  He became an alcoholic and would often drink and drive.  He also began spending money foolishly, which was uncharacteristic of him.

**(b) Impact on the Family and Social Relationships.**  Prior to 2004, John and his family would often work on his lawn care business together with his family joining him on projects.  His wife would pack a picnic basket so they could all have lunch together.  The family would go to go-kart and stock car races, to the movies, walk along the boardwalk, go out on the boat tubing or crabbing.  They would also take trips to snow ski or tube.  John was very involved with his children's lives.  He coached little league teams and the kids would go out and play with him outside by riding the go-kart or playing catch.  John would build snowmen with the kids in the winter and would pull the kids, his wife and the family dog on a sled behind a tractor.  One time he bought the family Nerf guns so they could run around the house playing hide-and-seek and an outdoor sprinkler so the kinds could run under it in the Summer.

As stated above, beginning in the Summer of 2004, John began to withdraw from his family and friends.  He no longer wanted to do things as a family.  For example, every year the family would dress up for Halloween and go out "trick or treating," but the Halloween of 2004 John did not want to be involved in the festivities.  He no longer went to the movies with his family or went for long walks with his wife.  Additionally, prior to 2004, John enjoyed hunting, especially waterfowl hunting and owned several hunting guns.  In the Fall of 2004, he lost all interest in hunting.

**(c) Physical Impact.**  When John learned he was being retaliated against, he began experiencing problems including, among others, sleeping, loss of energy and interest, decreased libido, agitation, and irritability.  In October of 2004, John began experiencing severe headaches that could not be treated by over-the-counter medicine.  He visited with his primary

A0697

care physician who referred him to a neurologist. From October to the time of his death, John's headaches never subsided and he was taking both Imitrex and Inderal to treat his headaches. Additionally, from May 2004 to September 2004 his doctor noted that John lost 40 pounds. During this time John also complained of being tired. Beginning in October 2004, for the first time in their marriage John had trouble with impotency.

       **1. John's Suicidal Behavior and Eventual Suicide.** On January 29, 2005, Lee Mears, John's friend, received a phone message from John which he found to be extremely odd. He went looking for John and found him parked in his car with a gun on his lap and discovered he had been drinking. He felt that John was extremely depressed suggested that they go somewhere to sit and talk. The two went to a local establishment and made small talk. Lee thought it was obvious that John was agitated, upset and angry all night. On the way back to John's house, he told Lee that he would not be around in the morning and that he would not be any trouble to anyone else. At one point John got mad and said that he was going to kill himself. Unsure of what to do next, Lee took John to his parent's house so John would not be alone or near any guns. John refused to talk to his parents and would only allow Lee to be around him. Lee stayed up with John all night. Early the next morning Lee called his wife and told her where he was and what had happened the previous night. Lee also had his wife call John's wife and explain what happened and that he needed someone to come stay with John because he was exhausted.

       Later that day, Cindy, who felt that John's behavior was still very concerning, called St. Jones Behavioral Health Center because she felt John needed to talk to someone. Cindy also called Lee to inform him that she had called St. Jones and wanted to talk John there. Therefore, in the early afternoon of January 30, 2005, Cindy, her brother Jeff Foskey, and Lee Mears took

John to St. Jones for psychiatric evaluation.  Upon arriving at St. Jones, John met with a male counselor for about 20 to 30 minutes.  After meeting with John, much to the surprise of his wife and friends, the counselor released him.  The counselor instructed them to remove all guns from the house.  The counselor also recommended that John contact a counselor or psychologist.  He gave John a list of doctors in the area and recommended that he call to set up an appointment.  Since they were confused as to why John was not being admitted for observation, Lee asked to speak with the male counselor directly.  Lee met with the counselor for about 10 to 15 minutes and asked several questions to make sure that John was honest about things going on in his life such as the fact that he was feeling depressed and that he was stressed at work.  The counselor stated that John had signed a contract that he would not hurt himself and to bring him back if things got worse.  Cindy, Jeff and Lee were shocked that the counselor was not going to keep John for observation.  After leaving St. Jones, they took John to his parents house while they removed all of the guns from his house.

On February 2, 2005, John returned back to work.  That week he was supposed to have a meeting with his supervisors regarding his performance evaluation, but the meeting kept being cancelled.  On February 7, 2005, John discovered that his evaluation had been sent into his file without his signature.  John then took the following week off of work.  In the weeks following his visit to St. Jones, John was very quiet and introverted. He never smiled or laughed.  He also refused to contact any of the psychiatrists the counselor had suggested.  On February 14, 2005, Cindy found a note John had left for her early that morning that simply said "Bye."  Knowing that John was suicidal, she became nervous.  She began incessantly calling him and leaving him desperate messages. He finally arrived home and they talked about their relationship and how John was withdrawing from her and the family.  She asked him why he would wanted to leave

49

her and the kids, referring to the fact that John wanted to kill himself.  John started crying, but did not say anything  The next day the two of them took a trip to Cabela's in Pennsylvania.  They spent time together and John decided he might get back into hunting and bought a few things at a hunting store.

Finally, on February 15, 2005, Cindy convinced John to met with Dr. Jani who prescribed Clonazepam, an anxiety medication.  Dr. Jani also strongly recommended that he call to set up an appointment with a psychiatrist.  On February 18, 2005, John contacted Dr. Pitts, a psychiatrist, who did not have an available appointment until June 8, 2005.  That night, while out getting a haircut with his son, John had a motor vehicle accident where he flipped his SUV.  Despite no visible injuries, upon learning of the accident Cindy took John to Beebe Medical Center, but was released shortly thereafter.

The very next morning, Cindy went out to the detached garage on their property and noticed the garage lights were out and it was dark inside.  She saw John's figure walking toward the damaged SUV which they had parked in the garage the previous night.  He appeared to be in a daze.  Cindy startled him by asked what he wanted for breakfast.  They spoke briefly about the damaged car and John stated he wanted to clean it out.  Later, John came into the kitchen and informed Cindy that he had one job to finish outside.  Based on his demeanor, Cindy became concerned and went out to the front door of the garage.  She followed John who turned on her and pointed a loaded gun directly at her.  She put her hands up and walked backwards so as not to upset John.  She then called her sister-in-law and told her to call the police.  Soon after the police arrived and began walking toward the back of the house where John was located.  Since the children were becoming upset and extremely concerned for their father, she instructed them to stay in the house.  John's son went outside to try to find his father, but his daughter remained

50

inside the house with Cindy. Cindy told her daughter to yell out to John that she loved him. As the police officers were heading towards John, a single shot rang out and the officers took cover. Then there was a second shot and Cindy could see John's laying on the ground. She knew at that point he had killed himself.

In the days following his death, Lee Mears and Jeff Foskey searched the garage to find any suicide notes. While searching through the SUV, Lee found ammunition that matched the ammunition in the gun John killed himself with. The police discovered the gun box for the pistol he used to kill himself in the engine compartment of an old Craftman lawnmower. They assumed this is where John had hid the gun no one was aware he owned.

**(d) Humiliation and Embarrassment.** The humiliation of the experiences involving his supervisors also weighed heavily on John. To be retaliated against for speaking out in support of your fellow co-workers who are striving to better working conditions was humiliating and embarrassing. Further, to be monitored and have every move watched by your supervisor who is waiting for you to make one tiny mistake was also humiliating and embarrassing.

Additionally, plaintiff had to endure a non-deserved mediocre performance evaluation and the falsification of his time cards simply because of his protected speech. John simply could not get away from the stress at work. From the embarrassment at work to the intrusive thoughts at home, it was always with him and was a heavy weight for him to carry every day. For over a decade, John worked in extremely dangerous conditions in order to serve and protect the public. Yet because he was outspoken on issues relating to the conditions of employment for his fellow correctional officers, a matter of public concern, he was denied the opportunity to work in peace and be appreciated for a job well done.

51

**(e) Injury to Reputation.** John was a dedicated, hard-worker who never had a flaw on his record with the DOC. To have a supervisor monitor him and give him a mediocre performance evaluation injured his reputation among his co-workers and other DOC management.

21.    State and identify all attorney fees and other costs that have accrued against plaintiff up to and including the date on which these Interrogatories are answered.

**Answer:** Objection. This question seeks information protected by the attorney/client and work product privileges. Counsel knows of no case in the Third Circuit which would permit discovery of such information. Should plaintiff prevail on the merits such information will be provided in any timely attorneys' fees and costs application under the applicable fees statute.

As to Objections:

THE NEUBERGER FIRM, P.A.

/s/ Stephen J. Neuberger
**THOMAS S. NEUBERGER, ESQ. (#243)**
**STEPHEN J. NEUBERGER, ESQ. (#4440)**
Two East Seventh Street, Suite 302
Wilmington, Delaware 19801
(302) 655-0582
TSN@NeubergerLaw.com
SJN@NeubergerLaw.com

Dated: October 29, 2007                    Attorneys for Plaintiff

52

## DECLARATION OF CINDY ADKINS UNDER 28 U.S.C. § 1746

1. I am a Plaintiff in this action. I have personal knowledge of the facts contained in this Declaration and, if called as a witness, I am competent to testify to those facts.

2. I have read the Plaintiff's Answers to Defendant's Interrogatories set out above. The answers contained therein are true and correct to the best of my knowledge, information, and belief.

3. Pursuant to 28 U.S.C. § 1746(2), I declare under penalty of perjury that the foregoing is true and correct.

_Cindy L Adkins_

**CINDY ADKINS, Executrix of the Estate of John J. Balas**

_10-29-07_

**Date**

53



**WILCOX & FETZER LTD.**

## In the Matter Of:

# Balas
### v.
### Taylor, et al.

## C.A. # 06-592-JJF

———————————————

## Transcript of:

## Truman J. Mears

## November 6, 2007

———————————————

Wilcox and Fetzer, Ltd.
Phone:  302-655-0477
Fax:  302-655-0497
Email:  depos@wilfet.com
Internet:  www.wilfet.com

Balas v. Taylor, et al.

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CINDY L. BALAS, a/k/a        )
CINDY L. ADKINS, Executrix   )
of the Estate of CORPORAL    )
JOHN J. BALAS,               )
                             )
        Plaintiff,      )
                        ) Civil Action
v.                      ) No. 06-592-JJF
                        )
STANLEY W. TAYLOR, JR.,      )
individually and in his      )
capacity as the Commissioner )
of Correction, et al.,       )
                             )
        Defendants.     )

    Deposition of TRUMAN J. MEARS taken pursuant to
notice at the law offices of The Neuberger Firm, P.A.,
Two East Seventh Street, Wilmington, Delaware,
beginning at 10:06 a.m. on Tuesday, November 6, 2007,
before Lucinda M. Reeder, Registered Diplomate
Reporter and Notary Public.

APPEARANCES:

        STEPHEN J. NEUBERGER, ESQ.
        The Neuberger Firm, P.A.
         Two East Seventh Street
         Wilmington, Delaware 19801
         for the Plaintiff,

        RALPH DURSTEIN, ESQ.
        STACEY XARHOULAKOS, ESQ.
        Department of Justice
         Carvel State Office Building
         820 N. French Street
         Wilmington, Delaware 19801
         for the Defendants.

ALSO PRESENT:  CINDY L. ADKINS
        WILCOX & FETZER, LTD.
     1330 King Street - Wilmington, Delaware  19801
            (302) 655-0477
            www.wilfet.com

b94d73f0-3eb1-4abe-9dd0-398029a5111f

Balas v. Taylor, et al.

Page 2

1       TRUMAN J. MEARS,
2    the witness herein, having first been
3    duly sworn on oath, was examined and
4    testified as follows:
5    BY MR. NEUBERGER:
6    Q.  Now, Lieutenant Mears, my name is Steve
7    Neuberger.  I'm an attorney for Cindy Atkins, formerly
8    Cindy Balas, the wife of the late John Balas.  Do you
9    understand that?
10   A.  Yes.
11   Q.  Have you ever testified in court before?
12   A.  Yes.
13   Q.  Have you ever had your deposition taken before?
14   A.  No.
15   Q.  I am going to run you through the process here
16   just so you know what's going on.  All right?
17   A.  Okay.
18   Q.  I'm going to ask you some questions and the
19   court reporter is going to type up your answers to
20   those questions.  All right?
21   A.  Okay.
22   Q.  We have to take turns talking because if we
23   talk at the same time, although she's very good, she
24   can't get all the answers down.  Okay?

Page 3

1    A.  I understand.
2    Q.  You also have to verbalize your answers.  If
3    the answer is yes, say yes; if the answer is no, say
4    no.  Don't nod your head and shake your head, things
5    like that.  Okay?
6    A.  All right.
7    Q.  At the end, the court reporter will prepare a
8    deposition transcript, and you will have an
9    opportunity to review the transcript and correct any
10   typographical errors.
11   A.  Okay.
12   Q.  If I ask you a question and you don't
13   understand the question, just say so, and I'll be more
14   than happy to rephrase it for you.  All right?
15   A.  Okay.
16   Q.  The most important thing is I do not want you
17   to guess.  So if you do not know the answer, just say
18   so, and I'll be happy to move on to a new question or
19   try to jog your memory as best I can.  All right?
20   A.  Okay.
21   Q.  Now, are you taking any medications or is there
22   anything else which is happening in your life which
23   would prevent you from testifying truthfully or
24   remembering accurately today?

Page 4

1    A.  No.
2    Q.  Also if you need any breaks to go to the john,
3    do some yoga, just let me know.  Okay?
4    A.  Okay.
5    Q.  You have taken an oath to tell the truth today?
6    A.  Yes.
7    Q.  Do you understand the significance of that
8    oath?
9    A.  Yes.
10   Q.  Do you understand that I am going to be asking
11   you some questions today about a lawsuit brought by
12   Cindy here that was filed, I believe in August of 2006
13   involving some matters that happened in the workplace?
14   A.  Yes.
15   Q.  And you are a defendant in that case; right?
16   A.  Yes.
17   Q.  So you are already familiar with some of the
18   events at issue?
19   A.  Yes.
20   Q.  Now, you met with your attorneys prior to
21   coming here today.  Right?
22   A.  Yes.
23   Q.  Other than your attorneys, have you talked with
24   anyone about your deposition today?

Page 5

1    A.  Other than at work letting them know I was
2    going to be here and not at work today.
3    Q.  Okay.
4    A.  And my wife who drove me up here.
5    Q.  Okay.
6    A.  That's -- you know.
7    Q.  Have you talked to any of the other defendants
8    about it?
9    A.  I have had some come to me and ask what it was
10   about.
11   Q.  Sure.
12   A.  And all I could tell them was, it's about the
13   lawsuit, which they knew about, and I said this is the
14   first time for me, too, so I really don't know what to
15   expect.
16   Q.  Okay.  What's your full name?
17   A.  Truman James Mears.
18   Q.  When were you born?
19   A.  October 30th, 1962.
20   Q.  Where were you raised?
21   A.  Sussex County, Delaware.
22   Q.  So are you a lifelong Sussex Countian?
23   A.  Yes, I am.
24   Q.  Where did you go to school down there?

2 (Pages 2 to 5)

b94d73f0-3eb1-4abe-9dd0-398029a5111f

Balas v. Taylor, et al.
Truman J. Mears

Page 6

1   A.  Indian River.
2   Q.  Got ya.  What year did you graduate from high
3  school?
4   A.  1981.
5   Q.  Do you have any educational experience past
6  high school?
7   A.  No, no college.
8   Q.  Okay.  Now, when did you begin working for the
9  Department of Correction?
10   A.  1989, May of 1989.
11   Q.  Who did you work for prior to working for the
12  DOC?
13   A.  Prior to the DOC, I worked for United Insurance
14  Company of America.
15   Q.  Where were they located at?
16   A.  At that time, they were located out of
17  Georgetown, Delaware.
18   Q.  Got ya.  All right.  So did you start working
19  for them right out of high school, or?
20   A.  For the insurance company?
21   Q.  Yeah.
22   A.  No.  I worked for Nanticoke Homes for a period
23  of time, and I worked for Martin Seafood Company out
24  on the ocean on a clam boat for a period of time.  I

Page 7

1  couldn't tell you the exact dates.
2   Q.  Got ya.
3   A.  Basically, that's what I did until working for
4  the Department.
5   Q.  Got ya.  So you then you began working for the
6  department in May of '89; right?
7   A.  Yes.
8   Q.  What was your position when you joined the
9  Department?
10   A.  CO, correction officer.
11   Q.  CO.  Okay.  Do they have classes of COs?  Are
12  they like the state police, who have various classes
13  of corporals and things like that?
14   A.  No, just CO.  CO, corporal.  Sergeant.  There
15  is a few specialized positions, which make us staff
16  sergeant, and then it's lieutenant, staff lieutenant,
17  captain.
18   Q.  Then major above captain?
19   A.  Yes.  Major, deputy warden, warden.
20   Q.  Got ya.  All right.  Now, how long were you in
21  the CO position once you joined in May of '89?
22   A.  Without my resume in front of me, I am guessing
23  right around '92 or '93, I was promoted to corporal.
24   Q.  Okay.  Now, what institution were you working

Page 8

1  in when you were in the CO position?
2   A.  I started at DCC.  I worked there for about
3  nine months, and I transferred to Sussex Correction.
4  So I was at Sussex when I was promoted.
5   Q.  Did you say you thought it was '91'ish when you
6  were ... ballpark?
7   A.  Right around then, yes.  I can't give you the
8  exact date without my resume or my paperwork in front
9  of me.
10   Q.  All right.
11   A.  I didn't read over any of that before I came
12  here.
13   Q.  Fair enough.  What institution were you serving
14  at when you were promoted to corporal?
15   A.  Sussex Correction.
16   Q.  Did you ever rise above corporal?
17   A.  Yes.  Right around, I guess '96, '97, I was
18  promoted to sergeant, and then 2000, promoted to
19  lieutenant.
20   Q.  Are there different classes of lieutenant?
21   A.  Well, the next step up is staff lieutenant.
22   Q.  Okay.  Got ya.  All right.  Now, when you were
23  promoted to sergeant, which institution were you
24  serving at?

Page 9

1   A.  Sussex Correction.
2   Q.  How about when you were promoted to lieutenant?
3   A.  Sussex Correction.
4   Q.  In the year 2000, it was Sussex?
5   A.  Yes.
6   Q.  How long have you been on the CERT Team?
7   A.  I got on the team approximately a year after
8  starting with the Department.
9   Q.  When you were on the CERT Team, have you always
10  been assigned to the institution where your regular
11  job was?
12   A.  Yes.
13   Q.  Do you remember when you first met John Balas?
14   A.  I couldn't tell you the exact date when I first
15  met John.
16   Q.  Do you recall your rank at the time?
17   A.  I believe it was corporal or sergeant.  He was
18  working at the work release center at that time.
19   Q.  Okay.
20   A.  Next door.
21   Q.  Got ya.  In 2000, you are promoted to
22  lieutenant.  And were you always working in the same
23  facility since you became a lieutenant?
24   A.  At Sussex Correction, yes.

3 (Pages 6 to 9)

b94d73f0-3eb1-4abe-9dd0-398029a5111f

A0707

Balas v. Taylor, et al.
Truman J. Mears

Page 10

1  Q.  Yes. SCI?
2  A.  Yes.
3  Q.  Now, do you recall what your job
4  responsibilities were as a lieutenant at SCI?  Could
5  you describe them to me?
6  A.  Yeah, yes.  I was responsible for the
7  administrative area, the receiving room area, the
8  front counter visiting room area and the educational
9  area of the pretrial building.  I supervised the staff
10 that were assigned to the B shift of those areas.  I
11 had a staff of approximately 15 officers, corporals
12 and sergeants under me.
13 Q.  Now, what is the B shift?
14 A.  Well, we have a rotating 8:00 to 4:00, 4:00 to
15 12:00 shift and a permanent 12:00 to 8:00 shift.  So
16 one shift is considered A shift, one shift is
17 considered B shift as they rotate.
18 Q.  Okay.  Got ya.  And that was the position you
19 were holding in August of 2004?
20 A.  Yes.
21 Q.  And you were holding that position in February
22 of 2005?
23 A.  Yes.
24 Q.  And would it be fair to say you were holding

Page 11

1  that position the time in between August of 2004 and
2  February of 2005?
3  A.  Yes.
4  Q.  Now, as a prison guard, you always have to be
5  alert; right?
6  A.  Yes.
7  Q.  You always have to be sort of on your game, so
8  to speak?
9  A.  Yes.
10 Q.  Is that just because of the nature of prison
11 work?
12 A.  Yes, you should be alert at any job you have,
13 but, yes.
14 Q.  Okay.  Given that you work with -- well, do you
15 work with convicts and felons and people like that?
16 A.  Yes.
17 Q.  On occasion are some of those people dangerous?
18 A.  Yes.
19 Q.  Could that have something to do with the
20 importance of being alert at work?
21 A.  Yes.
22 Q.  All the more so, even?
23 A.  Yes.
24 Q.  It's important to be alert so you can avoid

Page 12

1  dangerous situations; right?
2  A.  Yes.
3  Q.  And can keep a look out for potentially
4  dangerous situations before they become dangerous,
5  sort of nip them in the bud, so to speak?
6  A.  Yes.
7  Q.  Is it important for a prison guard to have --
8  I'm sorry, correctional officer, excuse me -- is it
9  important for a CO to have good powers of observation?
10 A.  Yes.
11 Q.  Is it important for a CO to be able to be good
12 at reading people?
13 A.  Yes.
14 Q.  Their mannerisms, things like that?
15 A.  Yes, that always helps, yes.
16 Q.  How about at observing prisoners and people
17 like that?
18 A.  Yes.
19 Q.  That's just one of the many things which go
20 into being a good CO; right?
21 A.  Yes.
22 Q.  Now, in order to be promoted above the rank of
23 correctional officer to corporal then to sergeant then
24 to lieutenant as you have, you have to be good in --

Page 13

1  you have to be good at those various job skills;
2  right?
3  A.  Yes.
4  Q.  For example, as you move up the chain of
5  command, your areas of responsibility increase;
6  correct?
7  A.  Yes, they do and they change.
8  Q.  And they change.  Okay.  For example, a
9  sergeant would have more job responsibilities or at
10 least a different area of job responsibilities than
11 what a CO or a corporal?
12 A.  Yes.
13 Q.  And so on up the chain of command, like
14 lieutenant as opposed to sergeant?
15 A.  Yes.
16 Q.  Does the importance being able to observe
17 people, does that change as you move up the chain of
18 command?
19 A.  I don't think that changes.
20 Q.  As you move up the chain, does it become
21 more -- as you begin to get more and more supervisory
22 responsibilities, does the -- is it important to be
23 able to not only just be observant of the prisoners
24 that you are guarding, but also your employees, to

4 (Pages 10 to 13)

b94d73f0-3eb1-4abe-9dd0-398029a5111f

A0708

Balas v. Taylor, et al.
Truman J. Mears

Page 14

1 keep an eye on them?
2   A.  Yes.
3   Q.  That's just part of being a good supervisor;
4 right?
5   A.  Yes.
6   Q.  Those powers of observation, is that something
7 that you were naturally good at or is that one of
8 those skills where you had to sort of work at over
9 time?
10   A.  A little bit of both, I believe.
11   Q.  What kind of supervisor are you, are you a
12 hands-on or a hands-off?
13   A.  A little bit of both.
14   Q.  Okay.
15   A.  I have confidence in my people, and if I don't,
16 I step in to -- a little more hands-on at that point.
17   Q.  So until you see a need?
18   A.  Yes.
19   Q.  Got ya.  Just as a lieutenant, you obviously,
20 take your job seriously; right?
21   A.  Yes.
22   Q.  You aren't the kind of supervisor who thinks
23 that rules are made to be broken, are you?
24   A.  No.

Page 15

1   Q.  Do you always try to follow DOC rules and
2 policies and regulations?
3   A.  Yes.
4   Q.  Do you do your best to follow those things at
5 all times?
6   A.  Yes.
7   Q.  Now, do you try to keep an eye out for your
8 employees to see if they're having any problems doing
9 their jobs?
10   A.  Yes, I do.
11   Q.  You want to keep an eye on them to make sure
12 that they're doing their job well and doing it
13 correctly; right?
14   A.  Not to the point of micromanaging.
15   Q.  Okay.
16   A.  But, yes, it is a part of my duties to keep an
17 eye on them, yes.
18   Q.  And you want to make sure that no one in the
19 prison is in danger; right?
20   A.  Yes.
21   Q.  You want to make sure that the officers under
22 your command are keeping things safe; right?
23   A.  Yes.
24   Q.  Have you ever experienced a time when one of

Page 16

1 the COs under your command is working a double shift
2 because of what can be known as freezing?
3   A.  Under my command?
4   Q.  Yeah.
5   A.  I don't believe so.  I don't know for sure.
6 But I don't believe so.
7   Q.  Have you ever experienced a time when one of
8 the officers under your command has gotten sick?
9   A.  Yes.
10   Q.  And come into work anyway despite being sick?
11   A.  Yes.
12   Q.  Have you ever experienced a situation where one
13 of the officers under your command is going through a
14 divorce or is having some kind of stressful
15 relationship problems?
16   A.  Yes.
17   Q.  Have you ever experienced a time when one of
18 the officers under your command experienced a death in
19 the family?
20   A.  Yes.
21   Q.  How about when an officer under your command
22 has been in a bad car accident or something like that?
23   A.  Not that I can recall.
24   Q.  For the ones that you have recalled, people

Page 17

1 being sick, or someone going through a divorce, or
2 someone experiencing a death in the family, would it
3 be fair to say that things like that can be stressful?
4   A.  Yes.
5   Q.  Things like that can take a physical toll on a
6 person, right?
7   A.  Yes.
8   Q.  And they can also take am emotional toll?
9   A.  Yes.
10   Q.  And also a psychological toll?
11   A.  I guess so, yes.
12   Q.  Things like that can affect an employee's work
13 performance; right?
14   A.  Yes.
15   Q.  And as a result, as a supervisor -- strike
16 that.  Your employees aren't just a commodity to you,
17 are they?
18   A.  No.
19   Q.  They're not just like a cog in the big
20 machine --
21   A.  No.
22   Q.  -- that is the DOC?
23   A.  No.
24   Q.  They're not just like a dime a dozen?

5 (Pages 14 to 17)

b94d73f0-3eb1-4abe-9dd0-398029a5111f

Balas v. Taylor, et al.
Truman J. Mears

Page 18

1   A.   No.
2   Q.   Now, the physical well-being of your employees
3   is something that's important to you as a good
4   supervisor; right?
5   A.   Yes.
6   Q.   And their psychological well-being is something
7   that's important as well; right?
8   A.   Yes.
9   Q.   And the same thing with their emotional
10  well-being?
11  A.   Yes.
12  Q.   One of the reasons for that is because all
13  those things can affect an employee's work
14  performance; right?
15  A.   Yes.
16  Q.   And if an employee is distracted or under
17  stress or has something on their minds that has the
18  potential to cause -- or that has the potential to
19  have repercussions as they do their job day in and day
20  out; right?
21  A.   Yes.
22  Q.   Okay.  So as a result of that, do you try to be
23  proactive on those kinds of things?
24  A.   Yes.

Page 19

1   Q.   Do you try to keep an eye out on those
2   employees who are having some kind of trouble in their
3   lives to see if they need any help or if they're doing
4   okay?
5   A.   Yes, communicate with them.
6   Q.   Communicate with them?
7   A.   Yes.
8   Q.   And is that partially to better enable you to
9   know how they're doing?
10  A.   Yes.  I can't -- I'm not going to ask them
11  intimate details.  That's not my business, but I will
12  ask them if there's problems.
13  Q.   Right.  Because to the extent it affects their
14  work performance --
15  A.   Yes, if it affects the work performance, I will
16  talk to them then.
17  Q.   Right.  Now, if it is affecting their work
18  performance and you see that the employee is under
19  that kind of stress, do you tell them tough luck, suck
20  it up, be a man, something like that, or do you take a
21  different approach?
22  A.   A different approach.
23  Q.   What kind of an approach do you take?
24  A.   This is something I haven't experienced a lot

Page 20

1   of, but I --
2   Q.   Based on your experiences, for what you have
3   experienced.
4   A.   Yeah.  You would ask them -- you would bring to
5   their attention the deficiencies in their work and ask
6   them if there is something causing this that I don't
7   know about, and is there anything we can do to help.
8   Q.   Got ya.
9   A.   That sort of approach.
10  Q.   If there is, do you try and get them help?
11  A.   Yes.
12  Q.   What kind of help would you try to get them?
13  A.   There is -- we have programs within the
14  Department.  I can't think of the name of them right
15  now, but it's through human resources where they can
16  get help.
17      Now, this, all you can do is suggest as a
18  supervisor.  I cannot force anyone to go anywhere or
19  get any kind of help as a lieutenant.  All I can do is
20  suggest.
21  Q.   And, now, you said there are these programs
22  available through human resources?
23  A.   Yes.  I don't know the name of them or the
24  details of them without the paperwork in front of me.

Page 21

1   Q.   Do you know how you go about invoking them, for
2   lack of a better term?  Do you contact the HR
3   director?  Do you talk to the employee?
4   A.   I talk to the employee first because that's
5   where my responsibilities are.
6   Q.   What happens if the employee does not want
7   help?
8   A.   The only thing I can do is document through, as
9   a supervisor, their -- it's according to the severity
10  of it, but I can only document according to their work
11  performance.
12  Q.   Do you report things to HR?
13  A.   I have not.  I can only deal with my officers.
14  You know, I can only suggest and offer.  It's up to
15  them to take it further.  I can't force them to do
16  anything.
17  Q.   Okay.  So --
18  A.   That's invasion of their privacy, you know,
19  unless it's -- unless their performance -- again, it
20  gets to the point where the performance becomes
21  dangerous on the job for someone or themselves,
22  sometime you go to -- I would go to my supervisor
23  then.
24  Q.   So what happens when their performance does

6 (Pages 18 to 21)

b94d73f0-3eb1-4abe-9dd0-398029a5111f

Balas v. Taylor, et al.
Truman J. Mears

Page 22

1 reach the point where it's a danger to the --
2   A.  They get taken out of the position.
3   Q.  What's the process there?
4   A.  I couldn't tell you the process right now.  I
5 don't know.  I would have to go to my supervisor and
6 ask.
7   Q.  Got ya.  Do you think that's something that any
8 good supervisor would do --
9   A.  Yes.
10   Q.  -- in that kind of a situation?
11   A.  Yes.
12   Q.  I would like to put a document in front of you.
13 And mark this as Mears Exhibit 1.
14       (Mears Exhibit No. 1 was marked for
15 identification.)
16 BY MR. NEUBERGER:
17   Q.  Do you have this document in front of you?
18   A.  Yes.
19   Q.  Okay.  And at the bottom, in the bottom
20 right-hand corner of the first page, do you see the
21 numbers D00343?
22   A.  Yes.
23   Q.  What does this document appear to be to you?
24   A.  A newsletter.

Page 23

1   Q.  And is it some kind of a Department of
2 Corrections newsletter?
3   A.  It says "DOC" on the top, so I guess that is
4 Department of Corrections.
5   Q.  Have you ever seen this newsletter circulating
6 in various places in DOC?
7   A.  Not that I'm aware of right this moment.  I
8 haven't read it, so.
9   Q.  How about the general publication?
10   A.  I have seen DOC Matters, yes.
11   Q.  What I would like to do is see if I can jog
12 your memory on a couple things with this document.
13 All right?
14   A.  Okay.
15   Q.  Now, on the first page, in the top half of the
16 page, the fourth paragraph, there is reference to a
17 new employee assistance program provided.  Have I
18 directed your attention to that paragraph?
19   A.  Yes.
20   Q.  Why don't you read that paragraph quietly to
21 yourself.
22   A.  It's going to take me a minute.  I just -- I
23 was supposed to pick up glasses today.  I have never
24 worn glasses in my life, and I need bifocals.  I was

Page 24

1 supposed to pick them up today.
2   Q.  Fair enough.  Take your time.
3   A.  Okay.
4   Q.  Would this have been one of the programs that
5 you were referring to where you said you weren't sure
6 if you could remember the name of it, this EAP
7 program?
8   A.  Possible, yes.  I couldn't tell you for sure.
9 I just don't know.
10   Q.  Okay.  Well, that first paragraph -- the
11 paragraph where you just read, the first sentence, it
12 says, "Effective July 1st, 2004"; right?
13   A.  Yes.
14   Q.  This newsletter, this particular page we're
15 looking at up in the top right-hand corner, it's dated
16 September 2004; right?
17   A.  Yes.
18   Q.  Let's go back at that paragraph where you just
19 said, and go down, one, two, three, four, to the fifth
20 line, where it says, "Employees can get confidential
21 help for a number of problems, such as marital, family
22 emotional issues, grief and loss, childcare issues,
23 substance abuse, parenting, anger and stress
24 management."

Page 25

1   A.  Yes.
2   Q.  Do you see that?
3   A.  Yes.
4   Q.  Then do you see the very next sentence where it
5 says, "Supervisors can also refer employees to HMS or
6 contact them to get advice in how to handle troubled
7 employees"?
8   A.  Yes.
9   Q.  Do you see that?
10   A.  Yes.
11   Q.  The first half of that sentence where it says
12 the supervisors can refer employees, that dovetails
13 with what you said earlier about you can try to get
14 the employee help, but it's sort of up to them to also
15 get the help; correct?
16   A.  Yes.
17   Q.  You can sort of urge them?
18   A.  You can tell them what's available.
19   Q.  Okay.  And this would have been one of the
20 programs that was available?
21   A.  Yes.
22   Q.  But it also says you can contact this EAP
23 yourself as a supervisor for advice in how to handle a
24 troubled employee.  Right?

7 (Pages 22 to 25)

b94d73f0-3eb1-4abe-9dd0-398029a5111f

A0711

Balas v. Taylor, et al.
Truman J. Mears

| Page 26 | Page 28 |
|---|---|
| 1   A.  Yes, it does. | 1   Q.  This is talking about that same EAP program I |
| 2   Q.  Have you ever had to do that when it came to an | 2  just asked you some questions about; right? |
| 3  employee under your command who was sort of under some | 3   A.  Correct. |
| 4  kind of stress? | 4   Q.  It's indicating EAP is an underutilized tool? |
| 5   A.  Contact HMS, no, I have not. | 5   A.  Yes, that's what it says. |
| 6   Q.  How come? | 6   Q.  In a supervisor's arsenal? |
| 7   A.  Excuse me? | 7   A.  Yes. |
| 8   Q.  How come? | 8   Q.  Did you ever participate in any discussions in |
| 9   A.  That's not been an issue. | 9  DOC about the need to refer employees to the EAP? |
| 10   Q.  So it's just never come up? | 10   A.  Not that I'm aware of. |
| 11   A.  Exactly. | 11   Q.  Did you ever receive any training as a |
| 12   Q.  You have never faced that situation? | 12  supervisor in dealing with employees with |
| 13   A.  Right. | 13  psychological issues or emotional issues? |
| 14   Q.  Do you think that a supervisor who does face | 14   A.  Not that I can recall. |
| 15  that situation, an employee who is under stress and is | 15   Q.  Do you know who publishes the DOC Matters? |
| 16  falling apart at work, do you think someone like that, | 16   A.  No, I do not. |
| 17  that their supervisor should take some kind of action | 17   Q.  I think you said -- you indicated that you have |
| 18  which could include contacting this employee | 18  seen it in the workplace, the publication itself? |
| 19  assistance program? | 19   A.  Over the years, I have seen DOC Matters, the |
| 20   A.  If the supervisor recognizes that, yes. | 20  headline here.  I couldn't tell you where I saw it, |
| 21   Q.  And do you think that's -- is that just some | 21  but I saw it at the workplace somewhere. |
| 22  supervisors or all supervisors who learn those things? | 22   Q.  Okay.  Let's turn three more pages in.  In the |
| 23   A.  Supervisors that are aware of this, that it's | 23  bottom right-hand corner it says, "DO00348."  Do you |
| 24  available and they can do this, yes, they should. | 24  see that? |

| Page 27 | Page 29 |
|---|---|
| 1   Q.  That goes back to what you said earlier about | 1   A.  Yes. |
| 2  your employees aren't just like a cog in the DOC | 2   Q.  On the top right-hand corner does it say |
| 3  machine; right? | 3  "Newsletter of December 2004"? |
| 4   A.  Yes. | 4   A.  Yes. |
| 5   Q.  They're people, they have feelings, things like | 5   Q.  Now, a little below the halfway mark in the |
| 6  that? | 6  page, there is a paragraph which says, "When Christmas |
| 7   A.  Yes. | 7  is not so jolly."  Do you see that? |
| 8   Q.  You care about your employees; correct? | 8   A.  Yes. |
| 9   A.  Yes. | 9   Q.  Could you read that paragraph quietly to |
| 10   Q.  Let's turn two pages in, two more pages in, | 10  yourself, please? |
| 11  where in the bottom right-hand corner it says, | 11   A.  Okay. |
| 12  "D00345."  Are you on that page? | 12   Q.  Have you ever heard about the holidays being a |
| 13   A.  Yes. | 13  depressing time for people? |
| 14   Q.  In the top right-hand corner it says, | 14   A.  Yeah, I have heard that. |
| 15  "Newsletter October 2004"? | 15   Q.  Now, have you ever heard about the increased |
| 16   A.  Yes. | 16  risk of suicide around the times of holidays? |
| 17   Q.  Now, in the bottom third of the page, there is | 17   A.  I have heard it.  I have not heard anything |
| 18  a paragraph which begins:  "EAP is a strong | 18  official, but I have heard people say that, yes. |
| 19  supervisor's tool, but underutilized."  Do you see | 19   Q.  And this paragraph talks about that a little |
| 20  that? | 20  bit; right? |
| 21   A.  Yes. | 21   A.  Yes. |
| 22   Q.  Could you read that paragraph quietly to | 22   Q.  And this paragraph, it appears to urge people |
| 23  yourself, please? | 23  to get involved with their co-workers and try to be |
| 24   A.  Okay. | 24  cognizant of that risk or cognizant of those problems? |

8 (Pages 26 to 29)

b94d73f0-3eb1-4abe-9dd0-398029a5111f

Balas v. Taylor, et al.
Truman J. Mears

| Page 30 |
|---|

1   A.  Yes.
2   Q.  Okay.  And the very last sentence says, "Don't
3 let inaction result in tragedy"; right?
4   A.  Yes.
5   Q.  I'm sorry.  Strike that.  What would you do if
6 an employee came to you and said that he or she were
7 contemplating suicide?
8   A.  If someone came to me and told me that, I would
9 not leave that person right then.  I would talk to
10 them and get them help, wherever that may be.  I would
11 be calling for my supervisor to come back and ... but
12 I wouldn't leave that person alone.  I would get my
13 supervisor to come back, if they would agree to that,
14 and get someone there that is qualified to deal with
15 that.
16   Q.  Right.  Okay.  So you would try to get them
17 help?
18   A.  Yes.
19   Q.  Okay.  What would you do if a co-worker came to
20 you and said that another co-worker is contemplating
21 suicide?
22   A.  You are asking me what would I do?
23   Q.  Yes, what would your reaction be as a
24 lieutenant in the DOC?

| Page 31 |
|---|

1   A.  I would probably question them a little bit to
2 see if they were being completely honest and serious
3 with me.
4   Q.  So --
5   A.  If they really and truly believed that and it
6 wasn't just an off-the-wall comment, kind of a
7 joking-type thing and if they were serious because
8 they would know I was serious, I would refer them to
9 my supervisor for people that are qualified to deal
10 with that because I am not qualified to try to, you
11 know, convince someone not -- I am not a psychiatrist
12 or anything like that.  I would send them in the right
13 direction.
14   Q.  So are you saying that you would talk to the
15 referring employee or talk to the employee who was
16 talking about killing themselves?
17   A.  First, I would talking to the employee that was
18 talking to me.
19   Q.  Okay.
20   A.  Then I would talk to my supervisor.  It's all
21 according to the situation.  I mean, is he suicidal
22 right this instant or have you overheard him, you
23 know, say this.  And I would refer them to -- I would
24 contact my supervisor, my immediate supervisor and get

| Page 32 |
|---|

1 a qualified person to do it the proper way, deal with
2 that person.  I would not just run over to that person
3 and say, Hey, I heard you're trying -- you're
4 contemplating suicide.
5   Q.  You would sort of send it up the chain of
6 command to get help that way?
7   A.  Yes; it would be a priority.  It would be done
8 right then.
9   Q.  It would be a priority?
10   A.  Yes.
11   Q.  Why would it be a priority?
12   A.  If that person truly believed that, then it is
13 a priority, and there is nothing else to say, it's a
14 priority.
15       MR. NEUBERGER:  Let's put another document
16 in front of you.  Mark this as Mears Exhibit No. 2.
17       (Mears Exhibit No. 2 was marked for
18 identification.)
19 BY MR. NEUBERGER:
20   Q.  Now, Lieutenant, do you have this document in
21 front of you?
22   A.  I have a document in front of me, yes.
23   Q.  And in the very bottom center of the page does
24 it say, "D715"?

| Page 33 |
|---|

1   A.  Yes.
2   Q.  I'm sorry.  Does it say, "D000715"?
3   A.  Yes, it does.
4   Q.  Have you ever seen this document before?
5   A.  I may have, but I couldn't say for sure.  It's
6 a policy, so I possibly have read it, but I can't say
7 for certain.
8   Q.  Okay.  Let's take a look at V on the first page
9 where it says, "Policy"?
10   A.  Yes.
11   Q.  Do you see that?
12   A.  Mm-hmm.
13   Q.  Could you read that paragraph quietly to
14 yourself?
15   A.  Okay.
16   Q.  Okay.  Now, does this appear to be a policy
17 which is geared towards addressing some of the types
18 of psychological problems we have just been talking a
19 little bit about?
20   A.  Yes.
21   Q.  Up top, and in the top right-hand corner
22 underneath where it says, "Policy Number," underneath
23 that, it says, "Related ACA Standards."  Does it say:
24 "Subject:  Psychological Fitness for Duty

9 (Pages 30 to 33)

A0713

b94d73f0-3eb1-4abe-9dd0-398029a5111f

Balas v. Taylor, et al.
Truman J. Mears

| Page 34 | Page 36 |
|---|---|
| 1 Evaluations"? | 1 Q. Okay. Fair enough. You can put that document |
| 2 A. Yes. | 2 away. |
| 3 Q. Let's go down to VI at the very bottom, where | 3 Now, as a supervisor, do you think you have |
| 4 it says "Procedures." Could you read No. 1 there, | 4 a duty to bring psychological problems to the |
| 5 then No. 2 on the next page quietly to yourself, | 5 attention of HR if you learn that the employee may be |
| 6 please? | 6 suicidal? |
| 7 A. Yes. Okay. | 7 A. Yes. |
| 8 Q. Now, let's go back to the first page, VI, then | 8 Q. Let's change gears a little bit. You have been |
| 9 No. 1 underneath there. Right. The first sentence | 9 a public employee since 1989; correct? |
| 10 talks about when wardens or section administrators | 10 A. Yes. |
| 11 become aware of employee behavior or conduct of a | 11 Q. May of '89? |
| 12 certain type. First, what is your understanding what | 12 A. Yes. |
| 13 the term "section administrator" refers to. | 13 Q. Do you know that under our form of government |
| 14 A. Whoever is in charge of the areas, I guess. | 14 the highest law of the land is something called the |
| 15 Q. Right. So the warden would be the person who | 15 U.S. Constitution; right? |
| 16 is in charge of the prison? | 16 A. Yes. |
| 17 A. Yes. | 17 Q. And you know that there is a Bill of Rights and |
| 18 Q. The section administrator would be a person in | 18 there is various amendments to the U.S. Constitution; |
| 19 charge of some subsection within the prison? | 19 right? |
| 20 A. Yes. | 20 A. Yes. |
| 21 Q. Got ya. Then this paragraph goes on to talk a | 21 Q. Okay. Is the U.S. Constitution something |
| 22 little bit about when a warden or a section | 22 that's important in the DOC or has it been important |
| 23 administrator becomes aware of employee behavior or | 23 in the DOC during your tenure there since May of '89? |
| 24 conduct that suggests an employee is experiencing | 24 A. Yes. |

| Page 35 | Page 37 |
|---|---|
| 1 psychological problems that interfere with or prevent | 1 Q. The Constitution is the highest law in the |
| 2 an employee from functioning on a job or otherwise | 2 land; right? |
| 3 present a danger to the workplace for psychological | 3 A. Right, yes. |
| 4 reasons. That person then has to report that behavior | 4 Q. Is the Constitution important to you |
| 5 to HR? | 5 personally? |
| 6 A. That's what it says, yes. | 6 A. Yes. |
| 7 Q. Would it be fair to say this paragraph would | 7 Q. As a public employee, you've received at least |
| 8 reflect policy of the DOC, to the best of your | 8 some training in obeying the Constitution; right? |
| 9 understanding? | 9 A. I am not exactly sure of your question. Do you |
| 10 A. As long as this is an updated policy, yes. I | 10 mean individual little pieces? |
| 11 couldn't tell you for sure. If this policy is now in | 11 Q. Sure. Okay. I can rephrase the question. |
| 12 effect, yes. | 12 A. Okay. |
| 13 Q. And this paragraph sort of talks a little bit | 13 Q. Now, when you took office, you took an oath to |
| 14 about when an employee, when an employee's | 14 uphold the Constitution; right? |
| 15 psychological problems are interfering with work | 15 A. Yes. |
| 16 performance and interfering with the workplace; right? | 16 Q. And you know that prisoners under you care in |
| 17 A. Yes. | 17 the DOC prisons, they have certain rights under the |
| 18 Q. We talked a little bit about that before; | 18 Constitution? |
| 19 right? | 19 A. Yes. |
| 20 A. Mm-hmm. | 20 Q. You can't beat a prisoner with a wet hose |
| 21 Q. Over on the top of the next page, No. 2 talks | 21 because he drops a sandwich on the floor? |
| 22 about some of the things that the HR director is | 22 A. Yes. |
| 23 supposed to do; right? | 23 Q. That could be, perhaps, cruel and unusual |
| 24 A. Yes. | 24 punishment? |

10 (Pages 34 to 37)

b94d73f0-3eb1-4abe-9dd0-398029a5111f

Balas v. Taylor, et al.
Truman J. Mears

| Page 38 | Page 40 |
|---|---|
| 1   A.  Okay. | 1   Q.  Right.  I mean you would expect that employees |
| 2   Q.  So you have received some kind of training at | 2   under your command would have received some kind of |
| 3   least where it comes to Constitutional rights that | 3   training on these issues given that you received it |
| 4   affect prisoners in the prison? | 4   when you went through the academy; right? |
| 5   A.  Yes. | 5   A.  Yes. |
| 6   Q.  Right? | 6   Q.  Would you find it disturbing if the DOC was not |
| 7        And other DOC employees have probably | 7   training its employees about respecting the rights of, |
| 8   received similar training? | 8   the legal rights of prisoners? |
| 9   A.  Yes, that would come through in the academy in | 9   A.  Yes. |
| 10  the beginning. | 10  Q.  Now, there is also correctional officers who |
| 11  Q.  You are also aware that there are various | 11  guard these prisoners every day in prisons; right? |
| 12  rights and protections provided by something called | 12  A.  Yes. |
| 13  the First Amendment to the U.S. Constitution when it | 13  Q.  They provide a very valuable and important |
| 14  comes to prisoners in DOC prisons; right? | 14  public service? |
| 15  A.  I would have to read, but I am sure, yes. | 15  A.  Yes. |
| 16  Q.  For example, you know that you can't punish a | 16  Q.  And you are one of the people that provides |
| 17  prisoner for praying to Buddha? | 17  that service; correct? |
| 18  A.  Correct, yes. | 18  A.  Yes. |
| 19  Q.  You can't punish a prisoner for praying to | 19  Q.  You understand that these correctional officers |
| 20  Allah? | 20  also have certain rights under the U.S. Constitution; |
| 21  A.  Yes. | 21  right? |
| 22  Q.  To Jesus? | 22  A.  Yes. |
| 23  A.  Yes, you are right. | 23  Q.  And these officers and dedicated public |
| 24  Q.  I'm sorry? | 24  employees, they certainly don't have less rights than |

| Page 39 | Page 41 |
|---|---|
| 1   A.  I'm agreeing, yes. | 1   the prisoners they guard, do they? |
| 2   Q.  You know you can't punish them for reading the | 2   A.  No, they do not. |
| 3   Torah, the Qur'an or the Bible; right? | 3   Q.  Okay.  And you know, for example, that under |
| 4   A.  Correct. | 4   the Constitution and under various state and federal |
| 5   Q.  You know you can't punish them for filing | 5   laws you can't discriminate against an employee under |
| 6   lawsuits; right? | 6   your command because of where he goes to church? |
| 7   A.  Correct. | 7   A.  Correct. |
| 8   Q.  You know you can't punish them for filing | 8   Q.  You can't discriminate against that employee |
| 9   grievances; right? | 9   because of her race? |
| 10  A.  Correct. | 10  A.  Correct. |
| 11  Q.  And you know you can't punish them for writing | 11  Q.  You can't discriminate against that employees |
| 12  letters to the General Assembly asking for changes in | 12  because of his or her gender? |
| 13  the law; right? | 13  A.  Correct. |
| 14  A.  Yes. | 14  Q.  Do you know that the Constitution forbids you |
| 15  Q.  And you always try to respect the rights of | 15  from punishing or discriminating against an employee |
| 16  prisoners; right? | 16  or retaliating against an employee because of where |
| 17  A.  Yes. | 17  they go to church; right? |
| 18  Q.  And you have had at least some training in the | 18  A.  Correct. |
| 19  academy on that; right? | 19  Q.  You know you can't punish the employee because |
| 20  A.  Yes. | 20  they voted for George Bush or John Kerry in the last |
| 21  Q.  And DOC employees have had some kind of | 21  election; right? |
| 22  training in the academy on that; right? | 22  A.  Correct. |
| 23  A.  I say, yes, but I couldn't give you exact | 23  Q.  And the same thing for whether they voted for |
| 24  training that was there. | 24  Governor Minner or Judge Lee in the last election? |

11 (Pages 38 to 41)

b94d73f0-3eb1-4abe-9dd0-398029a5111f

A0715

Balas v. Taylor, et al.
Truman J. Mears

| Page 42 | Page 44 |
|---|---|
| 1  A.  Correct. | 1  Q.  COAD, C-O-A-D, is an acronym.  Do you know what |
| 2  Q.  You know you can't punish an officer who files | 2  the acronym stands for? |
| 3  a lawsuit in state or federal court; right? | 3  A.  Correction officers -- no.  They've changed it |
| 4  A.  Correct. | 4  so many times.  Correctional Officers Association of |
| 5  Q.  You know you can't punish an officer who files | 5  Delaware, I believe it is. |
| 6  a formal grievance with the Equal Employment | 6  Q.  So in addition to staff shortage problems, were |
| 7  Opportunity Commission up in Philadelphia; right? | 7  there also concerns being raised by officers and by |
| 8  A.  Correct. | 8  the unions about low wages? |
| 9  Q.  You know you can't punish an officer who | 9  A.  Yes. |
| 10  petitions the General Assembly for redressing | 10  Q.  Do you recall there also being concerns raised |
| 11  grievances in some way; right? | 11  about retaining qualified officers in the DOC system |
| 12  A.  Correct. | 12  versus losing officers -- |
| 13  Q.  You know you can't punish an officer who | 13  A.  Yes. |
| 14  belongs to a union? | 14  Q.  -- to prison systems in states outside of |
| 15  A.  Correct. | 15  Delaware? |
| 16  Q.  Now, I would like focus your attention a little | 16  A.  Yes. |
| 17  bit on the summer of 2004.  Okay? | 17  Q.  I think you mentioned issues with this |
| 18  A.  Okay. | 18  voluntary/involuntary freezing overtime issues? |
| 19  Q.  Do you recall there being a lot of uproar in | 19  A.  Yes. |
| 20  the DOC that summer? | 20  Q.  I think you said that was more of an upstate |
| 21  A.  Yes. | 21  problem than a downstate problem? |
| 22  Q.  Would that be an understatement? | 22  A.  Correct. |
| 23  A.  Could be. | 23  Q.  Do you recall somewhat of an uproar from |
| 24  Q.  Would it be? | 24  correctional officers, the union, the public and the |

| Page 43 | Page 45 |
|---|---|
| 1  A.  There was an uproar, yes. | 1  media when it came to security lapses in DOC prisons? |
| 2  Q.  Do you recall what the uproar was about? | 2  A.  Yes. |
| 3  A.  Staff shortage. | 3  Q.  And there was a very tragic incident involving |
| 4  Q.  Could you describe the staff shortage uproar to | 4  a counselor at -- was it at Smyrna? |
| 5  me? | 5  A.  Yes, it was. |
| 6  A.  Well, they were -- everyone was complaining | 6  Q.  Who was taken hostage and raped? |
| 7  about the shortage of staff, mainly in the upstate | 7  A.  Yes. |
| 8  area, Smyrna and Gander Hill, where the officers were | 8  Q.  And do you recall that there being some other |
| 9  being frozen.  They call it a freeze or a forced | 9  incidents in various prisons or during prison |
| 10  overtime.  That sort of thing.  Being made to work a | 10  transports in that same time frame? |
| 11  double shift, that sort of thing.  Most of that | 11  A.  Yes. |
| 12  happened upstate.  We didn't see much of it downstate. | 12  Q.  And eventually, the correctional officers |
| 13  Q.  Yes, sir.  Okay. | 13  conducted some kind of a job action.  Do you recall |
| 14  A.  And that was due to shortage of staff. | 14  that? |
| 15  Q.  You said "everyone."  Who were you referring to | 15  A.  Yes.  I don't know if that was an official job |
| 16  by "everyone"? | 16  action or ... but there was something, something |
| 17  A.  Well, I should say, a good majority of the | 17  there. |
| 18  officers. | 18  Q.  How would you describe it? |
| 19  Q.  Was the union also raising concerns about these | 19  A.  Voluntary refusal of overtime. |
| 20  issues? | 20  Q.  Okay.  And you recall at some point the DOC |
| 21  A.  Yes. | 21  filed a lawsuit against the union and various union |
| 22  Q.  If I said COAD, you know who I'm referring to; | 22  officers; right? |
| 23  right? | 23  A.  I don't recall that, but it's possible. |
| 24  A.  Yes. | 24  Q.  Do you recall that in the midst of all these |

12 (Pages 42 to 45)

b94d73f0-3eb1-4abe-9dd0-398029a5111f

A0716

Balas v. Taylor, et al.
Truman J. Mears

Page 46

1   things which you have been talking about, about staff
2   shortages, low wages concerns about retaining
3   officers, some security lapses in the prisons, do you
4   recall that in the midst of all that COAD was trying
5   to negotiate a new contract for the prison guards?
6      A.  Yes, that's being going on for a long time.
7      Q.  Right.  So that's been a longstanding concern
8   or a longstanding issue?
9      A.  Yes.
10     Q.  Do you recall hearing about some disagreements
11  or differences of opinion between the union and
12  management on some of these issues?
13     A.  Not details, but, yes.
14     Q.  In general?
15     A.  Yes.
16     Q.  Do you recall if these issues received
17  attention in the Delaware media?
18     A.  Without recalling the individual problems, I
19  can't say.
20     Q.  Okay.  For example, do you recall the
21  Wilmington News Journal running stories about a prison
22  expert by the name of Doug Ingraham releasing a report
23  criticizing security and security transport issues in
24  DOC?

Page 47

1      A.  I remember something about that, yes.
2      Q.  Do you recall the Delaware State News running
3   articles about the rape incident?
4      A.  Yes.
5      Q.  And do you recall the News Journal and the
6   Delaware State News running articles about the
7   correctional officers' refusal to work voluntary
8   overtime?
9      A.  Right now I can't remember that in the paper.
10  But it probably was.  I'm pretty sure it was.
11     Q.  Right.  It's been more than three years; right?
12     A.  Yeah.
13     Q.  A lot of things happened in three years; right?
14     A.  Yes.
15     Q.  Just moving off of the media.  Do you recall
16  there being any concern in the Delaware Legislature,
17  the Delaware General Assembly about these various
18  issues involving the prisons?
19     A.  I don't recall right now.
20     Q.  Do you recall those issues being -- those
21  issues coming up in the gubernatorial race which was
22  gearing up at that time?
23     A.  Yes, I believe I do.
24     Q.  For example, there was Governor Minner; right?

Page 48

1      A.  Yes.
2      Q.  She was running for office, for reelection, I
3   guess.
4      A.  Yes.
5      Q.  Then there was Judge Lee, who was running as a
6   Republican?
7      A.  Yes.
8      Q.  There was Mr. Frank Infante, who was running as
9   an independent or something like that; right?
10     A.  Yes.
11     Q.  Would that have been one of the elections where
12  Mr. Protack was running as well?
13     A.  I think so.
14     Q.  Okay.  Okay.  Got ya.  All right.  Let's change
15  gears a little bit.
16         Actually, do you guys want to take a break
17  or anything?
18         MR. DURSTEIN:  That would be great.
19         MR. NEUBERGER:  Let's go off of the record.
20         (Recess taken.)
21  BY MR. NEUBERGER:
22     Q.  Now, Lieutenant Mears, did you know John Balas?
23     A.  Yes.
24     Q.  How did you know him?

Page 49

1      A.  I knew him through work.  He was on my staff.
2   He was on the CERT Team -- not on the same team, but
3   he was on the CERT Team along with me.  And as far as
4   socially, we duck-hunted together a couple times, and
5   that sort of thing.  That was about it.
6      Q.  Okay.  Do you recall when you would have gone
7   duck-hunting?
8      A.  When?
9      Q.  Yeah.
10     A.  I couldn't give you a date.  I am not sure.  We
11  went two or three times together.
12     Q.  Where did you go?
13     A.  We went to Prime Hook.  We went to Assawoman
14  Game Refuge.  And we went just to some private fields.
15     Q.  Did you get any?
16     A.  Actually, the -- I think it was the last time
17  him and I hunted together, we killed -- I should say,
18  we harvested two Blue-winged Teal.
19     Q.  Got ya.  Okay.  What kind of an employee was
20  John?
21     A.  For the most that I knew him, John was a good
22  employee.
23     Q.  Was he a hard worker?
24     A.  Yes, he was.

13 (Pages 46 to 49)

b94d73f0-3eb1-4abe-9dd0-398029a5111f

Balas v. Taylor, et al.
Truman J. Mears

| Page 50 | Page 52 |
|---|---|
| 1   Q.  Was he dedicated? | 1   Q.  And how about -- |
| 2   A.  Yes, he was. | 2   A.  Not constant. |
| 3   Q.  Was he loyal? | 3   Q.  Not constant? |
| 4   A.  Yes. | 4   A.  No. |
| 5   Q.  Was he conscientious? | 5   Q.  Okay.  Was he well-liked by his co-workers? |
| 6   A.  Yes. | 6   A.  I can't speak for all of his co-workers, but |
| 7   Q.  Was he dependable? | 7 the feeling you got from his co-workers was, no.  He |
| 8   A.  Yes. | 8 had a few close friends, and I considered myself a |
| 9   Q.  Was he a self-starter? | 9 friend of his.  I liked John. |
| 10   A.  I don't recall what I would call him a | 10   Q.  Okay.  So the feeling you got was that he was |
| 11 self-starter. | 11 not well-liked by his co-workers? |
| 12   Q.  You don't recall whether he was? | 12   A.  Not well-liked. |
| 13   A.  I don't have an opinion on that.  I couldn't | 13   Q.  Was he disliked by his co-workers? |
| 14 say no, he was not or yes, he was.  I didn't | 14   A.  Some. |
| 15 experience that with him. | 15   Q.  Do you know why? |
| 16   Q.  Was he motivated? | 16   A.  Personality conflicts. |
| 17   A.  John could be very motivated. | 17   Q.  Could you elaborate on that a little? |
| 18   Q.  You said, "could be." | 18   A.  All I can say, the kind of personality he had, |
| 19   A.  According to the situation. | 19 you either liked him or you disliked him.  There |
| 20   Q.  So would there be situations where he was not | 20 wasn't a whole lot of in between. |
| 21 motivated? | 21   Q.  Was he respected by his co-workers? |
| 22   A.  Yes. | 22   A.  Again, a little of both. |
| 23   Q.  What would they be? | 23   Q.  Was he respected by inmates? |
| 24   A.  He didn't -- he didn't like change in the area | 24   A.  I can't really say because he -- the inmates |

| Page 51 | Page 53 |
|---|---|
| 1 that he worked.  And when there was changes, he | 1 that he was around, he was only around for a few |
| 2 would -- he would go along with it, but he wouldn't -- | 2 minutes at a time and then they would be gone.  He |
| 3 it took a little coaxing sometimes.  But, there again, | 3 wasn't in where they were housed and where he was |
| 4 that's with a lot of officers.  I'm not saying that's | 4 around them every day. |
| 5 something bad. | 5   Q.  What kind of personality did he have? |
| 6   Q.  So you are saying he kind of liked the old ways | 6   A.  If he liked you or if you had a mutual |
| 7 of doing things? | 7 interest, he would sit and talk with you; and if not, |
| 8   A.  Not always.  It was according to the situation. | 8 he really didn't have much to do with you.  I am not |
| 9   Q.  But when it came to changing the way things | 9 sure how to describe a personality. |
| 10 worked in his work area -- | 10   Q.  Are you saying that he was sort of uppity? |
| 11   A.  Yes. | 11   A.  No, not -- not to me, I mean. |
| 12   Q.  -- in those times, he would not be motivated? | 12   Q.  Did you ever observe him being uppity to other |
| 13   A.  Sometimes.  If the change was something that he | 13 people? |
| 14 really liked, of course, he would be very motivated | 14   A.  Yes. |
| 15 for that. | 15   Q.  Like who? |
| 16   Q.  Okay. | 16   A.  Other employees. |
| 17   A.  But if it was something maybe he disagreed | 17   Q.  Do you recall the circumstance or the |
| 18 with, then there was no motivation or maybe the | 18 situation? |
| 19 opposite of it.  But there again, a lot of officers | 19   A.  The sergeant that was in the area that was over |
| 20 are like that.  They don't like change, unless it's to | 20 him, his team leader on CERT.  Just, in general, |
| 21 their benefit. | 21 people coming back to the receiving room, where he |
| 22   Q.  Okay.  Was he exceptional? | 22 worked. |
| 23   A.  There were times that John was -- he went | 23   Q.  So he would be uppity towards his supervisors? |
| 24 beyond, yes. | 24   A.  Sometimes. |

14 (Pages 50 to 53)

b94d73f0-3eb1-4abe-9dd0-398029a5111f

A0718

Balas v. Taylor, et al.
Truman J. Mears

| Page 54 | Page 56 |
|---|---|
| 1  Q.  Does that go over well in a supervisory<br>2  relationship?<br>3    A.  It's according to the supervisor, I guess.<br>4    Q.  Was he uppity towards you?<br>5    A.  The only -- when the CERT -- when he quit the<br>6  CERT Team, from that point on, he refused to talk to<br>7  me, and I had to force him to try to talk to me, you<br>8  know, as a supervisor.  So if you want to call that<br>9  uppity, he was uppity from that point on, but it was<br>10  more he -- you know, he just didn't want to talk to me<br>11  after that.<br>12    Q.  Was he a soft, sensitive person?<br>13    A.  No.<br>14    Q.  Was he a tough guy of, let's say, the John<br>15  Wayne mold?<br>16    A.  No, I wouldn't say that either.<br>17    Q.  Okay.  How would you describe him in that<br>18  respect?<br>19    A.  Quiet.<br>20    Q.  Okay.  Was he a man of personal integrity?<br>21    A.  Up until he quit CERT, when we talked and<br>22  stuff, I can give you an opinion up until then.  After<br>23  that, there was very little communication between us.<br>24    Q.  So up until he quit CERT, he was a man of | 1  think his job was completely receiving room, but he<br>2  would fill in in the property room at times.<br>3    Q.  Got ya.  Could you describe for me what his job<br>4  duties were?<br>5    A.  They would, the corporal and sergeant of the<br>6  receiving room, would process all new commitments and<br>7  process the releasing inmates.  We also housed,<br>8  temporarily housed females in that area and they would<br>9  see to their needs while they were there waiting for<br>10  transportation.<br>11    Q.  Anything else?<br>12    A.  As far as in the receiving room, that's it.  I<br>13  mean, I can go into detail, but.<br>14    Q.  Okay.  Please go into detail.<br>15    A.  Okay.  On processing a new commitment, they<br>16  come in through the receiving room.  They, one of the<br>17  officers either the corporal, the sergeant, would go<br>18  out into the alcove with the police officer bringing<br>19  the inmate in; take all of the paperwork from the<br>20  officer; do a pat search of the inmate; take custody<br>21  of the inmate; bring them into the areal, fingerprint<br>22  them; take pictures of them; get all the vital<br>23  statistics from the inmate; then take them over to the<br>24  property room to be stripsearched and processed; give |

| Page 55 | Page 57 |
|---|---|
| 1  personal integrity?<br>2    A.  Yes.<br>3    Q.  And that would have in August of 2004?<br>4    A.  Yes.<br>5    Q.  Was he trustworthy?<br>6    A.  Yes.<br>7    Q.  Was he honest?<br>8    A.  Yes.  To the best of my knowledge with all<br>9  this, yes.<br>10    Q.  Was he a liar?<br>11    A.  Not that I'm aware of.<br>12    Q.  Now, do you recall what position John held?<br>13    A.  He was corporal on B shift with Fridays and<br>14  Saturdays off in the receiving room.<br>15    Q.  In the receiving room?<br>16    A.  Yes.<br>17    Q.  Okay.  Is that also known as the property room?<br>18    A.  The property room is in the receiving room.<br>19    Q.  Okay.  Did John work in the property subset of<br>20  the receiving room, or?<br>21    A.  I believe his job was a little of both,<br>22  receiving room and property room.<br>23    Q.  Okay.<br>24    A.  He worked mainly in the receiving room.  I | 1  them new property and that sort of thing.  And<br>2  whichever one was doing that, the other one would be<br>3  doing the computer work.<br>4    Q.  Okay.<br>5    A.  And notifying the housing unit that a new<br>6  commitment is coming.<br>7    Q.  Okay.  So that's what John would do on a --<br>8    A.  That's bringing an inmate in, yes.  Processing<br>9  a new commitment.  And they swapped around, the<br>10  corporal and the sergeant; one would do one job, one<br>11  would do the other.  There were no specific duties<br>12  that just the corporal had to do.  They shared the<br>13  duties.<br>14    Q.  Got ya.  Okay.  So that's the inmate processing<br>15  coming in?<br>16    A.  Yes.<br>17    Q.  Would that be the only type of job duty that he<br>18  would have during the course of his days?  Would he do<br>19  other things?<br>20    A.  We all would respond to codes, if there is a<br>21  code called anywhere on the compound, an emergency<br>22  situation, to respond to that.<br>23    Q.  What would that entail?<br>24    A.  It's according to the code.  If it's, you know, |

15 (Pages 54 to 57)

b94d73f0-3eb1-4abe-9dd0-398029a5111f

A0719

Balas v. Taylor, et al.
Truman J. Mears

| Page 58 | Page 60 |
|---|---|

**Page 58**

1  a fight or a medical code, you would respond and along
2  with any other officers that were available to take
3  care of the situation. Then you would come back to
4  your area of responsibility and finish out your day.
5     Q.  How about out-processing, prisoners being
6  transferred into other institutions or to other
7  institutions, would John have involvement in that?
8     A.  Yes, he would -- in the receiving area, we
9  would bring the inmate back, confirm that we have the
10  right inmate with IDs and other information.
11    Q.  Okay.
12    A.  And then get their personal property, if they
13  had any, and have them held in a holding cell until
14  the transportation officers come. Then we recheck
15  the information to make sure we got the right inmates.
16  And transportation takes them.
17    Q.  So other than inmate processing coming in and
18  inmate out-processing going out and responding to
19  various codes throughout the institution, did John
20  have any other job duties?
21    A.  That's it.
22    Q.  Now, what would have happened if he had refused
23  to perform those job duties?
24    A.  What would happen if he had refused to do any

**Page 59**

1  of those job duties?
2     Q.  Yeah. What would happen if he said, no, I am
3  not going to process prisoners today?
4     A.  I would ask him why.
5     Q.  Okay. And what if he still refused to process
6  prisoners? Would he eventually be disciplined?
7     A.  Yes.
8     Q.  Is that just sort of a fundamental thing in the
9  employee/employer relationship, you have to do the job
10  you're told?
11    A.  Yes.
12    Q.  Could you describe John's job performance in
13  the receiving room while you were his supervisor?
14  Let's narrow the time frame.
15    A.  He did a very good job back there for a period
16  of years. I mean, he didn't have to be micromanaged
17  or that sort of thing. He did a very good job.
18    Q.  And do you recall how many years you were his
19  supervisor while he was in the property room?
20    A.  Three or four, something like that. I couldn't
21  tell you exactly, unless, again, I had the paperwork
22  in front of me.
23    Q.  Okay.
24    A.  I would say three or four years.

**Page 60**

1     Q.  All right. Now --
2     A.  Now, his -- the last year, his job performance
3  in the receiving room did drop -- not drastically, but
4  there was a change.
5     Q.  So it was not consistently very good?
6     A.  It wasn't like it had been.
7     Q.  So it was not consistently very good?
8     A.  It was up until, like I said, the last year.
9  It was consistent up until then.
10    Q.  Do you recall when in the last year it stopped
11  being consistently very good?
12    A.  It was around -- it was just about a year
13  before his death.
14    Q.  So that would be February of 2004?
15    A.  I am not sure of the dates, but about a year
16  before -- approximately a year before.
17    Q.  Okay.
18    A.  Again, it wasn't a terrible, terrible change,
19  but there was a change.
20    Q.  So as his supervisor, you documented those
21  problems; right?
22    A.  Yes.
23    Q.  Where?
24    A.  In his evaluation and in personal notes,

**Page 61**

1  e-mails, that type thing.
2     Q.  Have you given those personal notes, e-mails
3  and what not to your attorneys?
4     A.  I think I have the one attachment to his
5  evaluation. I think I gave that to them.
6     Q.  What I am trying to get at --
7     A.  I'm not --
8     Q.  I'm sorry. Go ahead.
9     A.  There may have been a note of a, like a -- at
10  one time I talked to John, but I am not sure if I did
11  or not. I am not are sure if I give that to them or
12  not. I don't know.
13         MR. NEUBERGER: I would like to renew the
14  request if there is something that he hasn't turned
15  over. We could renew a document request. I think
16  it's probably covered by one of the earlier ones.
17         MR. DURSTEIN: Sure.
18  BY MR. NEUBERGER:
19    Q.  Now, John also was on the CERT Team; right?
20    A.  Yes.
21    Q.  What were his job duties on the CERT Team?
22    A.  He was a team member. To respond any time we
23  were activated to handle whatever situation may arise.
24    Q.  What kinds of things would he do on the CERT

16 (Pages 58 to 61)

b94d73f0-3eb1-4abe-9dd0-398029a5111f

Balas v. Taylor, et al.
Truman J. Mears

Page 62

1  Team as a team member?
2    A.  Everything from basic shakedowns of
3  institutions to level 5 escapes, that sort of thing.
4  I mean, we were a tactical unit that did everything
5  from the dirty work of doing shakedowns to looking for
6  escapees.
7    Q.  Do you recall who were the other CERT Team
8  members at SCI during that time frame off the top of
9  your head?
10   A.  I can name most of them.
11   Q.  How about before we do that, I'll put a
12  document in front of you.  Hopefully, it will make
13  this a little easier on you.
14       (Mears Exhibit No. 3 was marked for
15  identification.)
16  BY MR. NEUBERGER:
17   Q.  Let's turn to the second page of this.
18   A.  Mm-hmm.
19   Q.  Do you see where under No. 5 there is two lists
20  of names -- I'm sorry, three lists of names?
21   A.  Yes.
22   Q.  Do you see the one on the right-hand side which
23  has "SCI"?
24   A.  Yes.

Page 63

1    Q.  To the best of your recollection, aren't these
2  various CERT members at SCI from June 1st of '04
3  through September 1st of '04?
4    A.  Off the top of my head, this looks like it's
5  correct.
6    Q.  Right.  There is not somebody missing there, to
7  the best of your recollection right now; right?
8    A.  Without looking at my sheet, I couldn't say for
9  a hundred percent sure, but it looks correct.
10   Q.  Okay.  All right.  You can put that down.  Now,
11  could you describe John's job performance on CERT
12  while you served with him there?
13   A.  Shaky.
14   Q.  Shaky.  Okay.  How was his job performance on
15  CERT shaky while you served with him there?
16   A.  He was removed from CERT twice --
17   Q.  When?
18   A.  -- while I was there.  Once in late 2003, I
19  believe.  I'm not exactly sure.  CERT headquarters
20  would have the date.  And once a couple years before
21  that.
22   Q.  Do you recall why he was removed?
23   A.  Refusing to show up for activations.
24   Q.  The time around, I think you said the couple

Page 64

1  years before that, is that because he was away on
2  vacation at the time?
3    A.  I don't know the details of it.  I just know
4  that's why.
5    Q.  Okay.  Was he later accepted back on CERT
6  Team --
7    A.  Yes.
8    Q.  -- after each of these incidents?
9    A.  Yes, he was.
10   Q.  Is that unusual for an officer to be booted off
11  an elite squad like CERT and be accepted back on?
12   A.  Yes, it is.
13   Q.  How many years have you been on CERT?
14   A.  I got on a year after I was with the
15  Department, so.
16   Q.  So 1990?
17   A.  Yeah.
18   Q.  Have you ever seen that happen before?
19   A.  Not with the Sussex team -- my experience with
20  the Sussex teams.  I don't recall right now.  I've not
21  really thought about it.
22   Q.  Okay.
23   A.  I don't know a lot of the circumstances with
24  the first time.

Page 65

1    Q.  Who would know?
2    A.  Corporal Jay King.  Excuse me.  He's job
3  counselor now at Sussex Work Release Center.
4    Q.  What was his?
5    A.  He was the team leader.
6    Q.  He was the team leader then?
7    A.  Yes.
8        MR. NEUBERGER:  Counsel, we'll get a
9  document request out today or tomorrow for any
10  documentation relating to these two incidents.  We
11  didn't see a whole lot in the production on Friday.
12       MR. DURSTEIN:  Which incidents are these?
13       MS. XARHOULAKOS:  The two from CERT you
14  mean?
15       MR. NEUBERGER:  Yes, the two CERT
16  incidents.
17       MS. XARHOULAKOS:  We have already asked for
18  anything that they would have in CERT.  There is no
19  CERT file.  Anything would be in his HR file.
20       MR. NEUBERGER:  Right.  So anything in
21  there, would have been turned over --
22       MS. XARHOULAKOS:  Right.
23       MR. NEUBERGER:  -- Because you guys turned
24  it over?

17 (Pages 62 to 65)

b94d73f0-3eb1-4abe-9dd0-398029a5111f

A0721

Case 1:06-cv-00592-JJF    Document 63-5    Filed 01/31/2008    Page 58 of 146

Balas v. Taylor, et al.
Truman J. Mears

Page 66

1      MS. XARHOULAKOS:  Yeah.  Anything we have
2  on Balas has been turned over.
3      MR. NEUBERGER:  All right.
4      MS. XARHOULAKOS:  But we'll take another
5  look.
6  BY MR. NEUBERGER:
7    Q.  I think you said the gentleman's name was King?
8    A.  Jay King.
9    Q.  So he would have been on CERT then, right, as
10  the team leader?
11    A.  Yes, at that time.  He was John's team leader.
12    Q.  And so that would have been before June of
13  2004?
14    A.  Yes.
15    Q.  Who was the team leader after June of 2004?
16    A.  I think John's team leader was Lee Mears or
17  Kenny Hichman.  It would have had to have been one of
18  the two.  I couldn't tell you for sure who it was.
19    Q.  Would they have been on the team back when John
20  was thrown off of it?
21    A.  The second time?
22    Q.  Either time.
23    A.  I believe -- well, both of them were the second
24  time.  The first time, I think they were, but I

Page 67

1  couldn't say for sure.
2    Q.  You were on the team both times; right?
3    A.  Yes.
4    Q.  So his problems of getting him booted off of
5  CERT -- his problems that resulted in him being thrown
6  off of CERT, would those be reflected in his job
7  evaluations?
8    A.  No.
9    Q.  Why not?
10    A.  He was right back on again.
11    Q.  So getting thrown off an elite squad wouldn't
12  result in some kind of comment about that on his job
13  evaluations?
14    A.  No, they result -- whatever that problem was
15  was resolved within CERT headquarters.  He was still
16  on the team.
17    Q.  So he wasn't thrown off?
18    A.  He was told he was thrown off.  I was told he
19  was thrown off by CERT headquarters.  And then the
20  second -- I know a little bit of the details.
21      Evidently, the major removed him from the
22  CERT Team.  Before the major could get to the warden,
23  who was in charge of the CERT Team, John had talked to
24  the warden and give his side of the story, and he

Page 68

1  says, "You are still on the team."  And the major
2  didn't -- they had words and didn't pursue it.  He
3  wasn't going to override the warden.
4    Q.  So he wasn't thrown off twice?
5    A.  Well, he was.  I was notified that he was, but
6  then the warden reinstated him.
7    Q.  I thought you said the major hadn't gotten to
8  the warden yet.
9    A.  But the major is the one who threw him off.  He
10  has that right, too.
11    Q.  That's just one of the things within his
12  bailiwick of responsibilities?
13    A.  Excuse me?
14    Q.  That's just one of the things within his scope
15  of responsibilities?
16    A.  Yes.  That's just one of the issues with CERT
17  with him.
18    Q.  Do you recall why he was thrown off the second
19  time?
20    A.  Refusing to come to an activation.
21    Q.  Was he on vacation at the time?
22    A.  I have no clue.
23    Q.  Are you familiar --
24    A.  I don't believe so.

Page 69

1    Q.  Okay.
2    A.  I was given an explanation later on by someone
3  else, but.
4    Q.  What was the explanation you were given later
5  on by someone else?
6    A.  Lee Mears told me the reason he didn't show up
7  for the activation was because he was about to go
8  through a divorce and he needed to change his checking
9  accounts and move some money around so his wife
10  couldn't get it.
11    Q.  Okay.  When would this have been?
12    A.  This was -- I don't know the exact date.  This
13  was after John had quit CERT, and I was talking to Lee
14  Mears about John.
15    Q.  So John quit CERT in August of 2004; right?
16    A.  Yes.
17    Q.  So sometime after August of 2004 you are saying
18  you had this conversation with Lee?
19    A.  Yes.
20      MR. NEUBERGER:  Let's put another document
21  in front of you.  We'll call this Mears Exhibit No. 4.
22      (Mears Exhibit No. 4 was marked for
23  identification.)
24

18 (Pages 66 to 69)

Balas v. Taylor, et al.
Truman J. Mears

| Page 70 | Page 72 |
|---|---|
| 1  BY MR. NEUBERGER:<br>2    Q.  Do you have this document in front of you?<br>3    A.  Employee performance, yes.<br>4    Q.  Up top it says, "Evaluation Period from<br>5  10/15/94 through 10/15/95"?<br>6    A.  Yes.<br>7    Q.  Now, do you see down towards the bottom where<br>8  it has a little stamp, where it says, "D00107"?<br>9    A.  Yes.<br>10    Q.  Does this appear to be some kind of an employee<br>11  evaluation for John Balas back in '94-95?<br>12    A.  Yes, it does.<br>13    Q.  Let's turn to the second page.  Do you see<br>14  where it says "Rater Comments" down towards the --<br>15    A.  Yes.<br>16    Q.  -- bottom right?  Could you read that to me,<br>17  please?<br>18    A.  You say you want me to read it to you?<br>19    Q.  Yes, please.<br>20    A.  "Balas is a hard working, self-motivating<br>21  officer who does not" -- it's hard to read.  It's<br>22  scratched out.<br>23    Q.  Could it be "wait"?<br>24        MS. XARHOULAKOS:  Perhaps he could read it | 1  says -- I'll read this part to you as best as I can.<br>2        "I have reviewed this evaluation and do not<br>3  concur.  Attendance is not exceeding the expectation.<br>4  If it was perfect attendance, I would agree.  This<br>5  area should be a 5.0."  Do you see that?<br>6    A.  Okay.  Yes.<br>7    Q.  Okay.  And the supervisor reviewing this, at<br>8  least from this document, would it appear to be<br>9  indicating that John's performance was not exceeding<br>10  the expectations because he did not have perfect<br>11  attendance?<br>12    A.  That's what it appears, yes.<br>13    Q.  All right.  You can put that document down.<br>14  Let's fast-forward about five years.  Let's put<br>15  another document in front of you.  This will be Mears<br>16  Exhibit No. 5.<br>17        (Mears Exhibit No. 5 was marked for<br>18  identification.)<br>19  BY MR. NEUBERGER:<br>20    Q.  Do you have this document in front of you?<br>21    A.  Yes, I do.<br>22    Q.  Now, do you see where it says, "Date or time<br>23  period covered" on the first page?<br>24    A.  Yes. |

| Page 71 | Page 73 |
|---|---|
| 1  to the extent it's legible.<br>2  BY MR. NEUBERGER:<br>3    Q.  How about you read it to the extent that it's<br>4  legible?<br>5    A.  Okay.  "Does not wait for his co-workers, but<br>6  takes the initiative in supervising in matter or<br>7  solving the problems he has.  Also takes on the added<br>8  responsibility to become a CERT Team member.  He<br>9  should be commended for his quick development."<br>10    Q.  Underneath that there is a section that says,<br>11  "Reviewer Comments"; right?<br>12    A.  Mm-hmm.  Yes.<br>13    Q.  Were you serving with John during this time<br>14  frame?  It's the '94 to '95 time frame?<br>15    A.  I am not sure where he was working at at that<br>16  time.<br>17    Q.  Does the front page say at all?<br>18    A.  "Correction officer."  "Holiday relief."  I<br>19  don't believe this is SCI or work release.  I am not<br>20  sure.<br>21    Q.  Okay.  Then did you know John during that time<br>22  frame?<br>23    A.  I don't believe so, no.<br>24    Q.  Do you see under "Reviewer Comments" where it | 1    Q.  It says, "2/1/99 through 1/31/2000"?<br>2    A.  Yes.<br>3    Q.  This was before you were the supervisor; right?<br>4    A.  Yes.<br>5    Q.  Now, on the first page, right underneath where<br>6  it has "The date or time period covered," where it<br>7  says, "Areas where performance is distinguished or<br>8  exceeds expectations, if any."<br>9    A.  Mm-hmm.<br>10    Q.  Do you see that?<br>11    A.  Yes, mm-hmm.<br>12    Q.  It talks about a couple commendations that John<br>13  received.<br>14    A.  Okay.<br>15    Q.  Do you see those?<br>16    A.  Yes.<br>17    Q.  And it mentions that he's as member of CERT and<br>18  has just completed re-training staff in QRT?<br>19    A.  Yes.<br>20    Q.  What does "QRT" stand for?<br>21    A.  QRT is quick response training.<br>22    Q.  Now, do you see where underneath that it says,<br>23  "Areas of specific performance deficiencies or<br>24  unsatisfactory work, if any"? |

19 (Pages 70 to 73)

b94d73f0-3eb1-4abe-9dd0-398029a5111f

A0723

Case 1:06-cv-00592-JJF    Document 63-5    Filed 01/31/2008    Page 60 of 146

Balas v. Taylor, et al.
Truman J. Mears

Page 74

1    A.  Yes.
2    Q.  And what's there?
3    A.  There is nothing.
4    Q.  There is nothing there.  If he had -- if John
5  had been booted off of CERT in that time frame, do you
6  think that would have made it into this area?
7    A.  No.
8    Q.  Do you think it would have made it onto the
9  evaluation at all?
10    A.  The only thing it would have been, it wouldn't
11  have been recognized as something going above or
12  beyond.  It wouldn't have been a negative thing.
13    Q.  If he was booted off?
14    A.  CERT is a voluntary unit.  And if you quit or
15  you get kicked off, personally, I don't see how that's
16  going to -- it can be a plus if you are on the team,
17  but if you are not on the team, you can't use it
18  against them because it's a voluntary thing to go
19  above.
20    Q.  So irrespective of their performance during the
21  course of their CERT duties, they can never -- an
22  employee can never receive negative criticism on their
23  evaluation because of their performance of those
24  duties?

Page 75

1    A.  I think the negative thing in the evaluation
2  would be:  No longer with the CERT unit.
3    Q.  So it would say, No longer with the CERT unit?
4    A.  Not necessarily.  It's something that's extra,
5  it's above.  It's not a part of their daily duties at
6  the institution.  And that's what this -- you know.
7  Putting -- I can't agree with putting something
8  negative in here --
9    Q.  Okay.
10    A.  -- for something they were doing above and no
11  longer doing.
12    Q.  What if during a CERT deployment a prisoner is
13  on the ground on his knees, his hands behind his head
14  and a CERT officer puts a gun to the prisoner's head
15  and executes them?  Would that --
16    A.  He doesn't have to worry about a evaluation
17  after that.  There is going to be disciplinary.  He's
18  going to become an inmate.
19    Q.  What if there was an evaluation after that,
20  would something like that make it in as a negative
21  performance event?
22    A.  I guess something that extreme may.  I can't
23  imagine something like that.
24    Q.  So something like that would not make it in?

Page 76

1    A.  I didn't say that.  I said something that
2  extreme may make it extreme.  But that's really out
3  there.
4    Q.  Okay.  What if a CERT member bashes a
5  prisoner's head against the wall repeatedly until
6  they're unconscious?
7    A.  He's going to face disciplinary action.
8    Q.  Would an event like that be reflected in his
9  performance evaluation as a negative?
10    A.  The disciplinary action within the department
11  would reflect, yes.
12    Q.  But not the beating of the prisoner?
13    A.  The disciplinary would be directly connected
14  with the beating of the prisoner.
15    Q.  Okay.  Now, under "Areas where growth or
16  skills/knowledge, development is suggested or needed,"
17  do you see that section?
18    A.  Yes.
19    Q.  What does it say in the text of that?
20    A.  "Corporal Balas is assigned to the receiving
21  room and as a pretrial rover.  He is knowledgeable of
22  SCI policies and procedures.  Works well with little
23  or no supervision.  Corporal Balas reports for duty in
24  a timely manner and uses leave only when necessary."

Page 77

1    Q.  Down at the bottom, what is John's performance
2  ranked as?
3    A.  It's at exceeds expectations.
4    Q.  Okay.  What's this dated at the very bottom
5  next to the "Evaluator/Date"?
6    A.  4/12/2000.
7    Q.  Just so we're clear, at the very bottom
8  right-hand corner of this page, it says, "D00098"?
9    A.  Yes.
10    Q.  You can put that down.  Let's put an evaluation
11  in front of you where you are the evaluator.
12      This will be Mears Exhibit No. 6.
13      (Mears Exhibit No. 6 was marked for
14  identification.)
15  BY MR. NEUBERGER:
16    Q.  Now, do you have this document in front of you?
17    A.  Yes.
18    Q.  It appears to be a two-page document?
19    A.  Yes.
20    Q.  At the bottom of the very first page it says,
21  "D00095"?
22    A.  Yes.
23    Q.  What's the date or time period covered by this
24  document?  I think it says in the first page, the

20  (Pages 74 to 77)

Balas v. Taylor, et al.
Truman J. Mears

Page 78

1  fifth line down.
2    A.  1/1/01 to 07/28/02.
3    Q.  Is it normal to have an evaluation period which
4  stretches more than a year?
5    A.  Sometimes it goes years without -- people go
6  years without an evaluation.
7    Q.  Okay.  Got ya.  Now, where it says "Supervisor,
8  Job Title," that's your name there, right, right above
9  the date?
10   A.  Yes.
11   Q.  I guess your official position is as a
12 correctional lieutenant?
13   A.  Yes.
14   Q.  Anything listed where it says, "Distinguished
15 or exceeds expectations"?
16   A.  Yes, there is.
17   Q.  Could you read that to me?
18   A.  "Corporal Balas is a member of the Correctional
19 Emergency Response Team.  He maintains his skills in
20 emergency response by maintaining CERT training.
21 Corporal Balas has maintained perfect attendance for
22 the past two years."
23   Q.  Is there anything in there about him getting
24 booted off CERT?

Page 79

1    A.  No, there is not.
2    Q.  The next section, where it says, "Areas of
3  specific performance deficiency or unsatisfactory
4  work, if any," is there anything listed there?
5    A.  No.
6    Q.  Why not?  Why not?
7    A.  I didn't see any at that time.
8    Q.  Okay.  The next section down, where it says --
9  where it's talking about how the employee met
10 expectations, what's listed there?  Or what's written
11 there?
12   A.  "Corporal Balas is assigned to the receiving
13 room.  He has a good knowledge of all post orders and
14 procedures and uses leave in appropriate manner.
15 Always reports for duty on time."
16   Q.  Is that your signature at the bottom?
17   A.  Yes.
18   Q.  The date is 8/5/02?  There.
19   A.  Yes.
20   Q.  It even says, if you go up one section to
21 "Employee documentation of performance events" -- on
22 the first page, still.  It says, "Copy of perfect
23 attendance attached."
24   A.  Yes.

Page 80

1    Q.  So even though it's not reflected in the two
2  page document I have here, if it says that it was
3  attached to the original eval, would it have been
4  there?
5    A.  I take it it was.  It says -- without seeing
6  the original, I can't say for sure.
7    Q.  Okay.  You can put that down.
8        Let's look at Mears Exhibit 7.
9        (Mears Exhibit No. 7 was marked for
10 identification.)
11 BY MR. NEUBERGER:
12   Q.  Now, do you have this document in front of you?
13   A.  Yes.
14   Q.  In the bottom right-hand corner, does it say,
15 "D00093"?
16   A.  Yes.
17   Q.  Up top, where it says, "Date or time period
18 covered," does it say "January of '02 through May of
19 '03"?
20   A.  Yes, it does.
21   Q.  Where it says, "Supervisor Job Title," is that
22 your name right above it?
23   A.  Yes.
24   Q.  So would this be a performance review that you

Page 81

1  filled out?
2    A.  Yes.
3    Q.  For example, there is your signature --
4    A.  Yes.
5    Q.  -- in the very bottom middle; correct?
6    A.  Yes.
7    Q.  Okay.  Now, where it says, in the middle
8  section, where there is that paragraph of text --
9    A.  Yes.
10   Q.  -- do you see that?  Could you read that to me?
11   A.  "Corporal Balas is assigned to receiving room.
12 He's knowledgeable of SCI policies and procedures.  He
13 works well with little or no supervision.  He has had
14 the work of lead worker in his area many times.
15 Corporal Balas reports for duty in a timely manner and
16 has had perfect attendance for several years."
17   Q.  Why did you mention the perfect attendance?
18   A.  Why did I mention it?
19   Q.  Yeah.
20   A.  Because it's something that's worth mentioning.
21 It's commendable.
22   Q.  Did you -- it doesn't seem you listed any
23 awards or commendations that he received up top, where
24 it says, "Areas where performance is distinguished or

21 (Pages 78 to 81)

b94d73f0-3eb1-4abe-9dd0-398029a5111f

A0725

Balas v. Taylor, et al.
Truman J. Mears

| Page 82 | Page 84 |
|---|---|
| 1 exceeds expectations." | 1   A.  Yes. |
| 2   A.  Okay. | 2   Q.  Do you think that's commendable? |
| 3   Q.  Do you recall why? | 3   A.  Yes. |
| 4   A.  If I didn't have any in front of me, I | 4   Q.  Let's turn four more pages.  In the bottom of |
| 5 couldn't -- that may have been why. | 5 the page, does it say, "P448"? |
| 6   Q.  So there just may not have been any? | 6   A.  Yes. |
| 7   A.  Yes. | 7   Q.  Could you read this quietly to yourself? |
| 8   Q.  Like, for example, a CO can receive letters of | 8   A.  Okay. |
| 9 commendation or letters of recommendation? | 9   Q.  Do you know this Lieutenant David Johnson? |
| 10   A.  Yes. | 10   A.  He's -- if it's the same one, he is now a |
| 11   Q.  Or letters of recognition? | 11 sergeant by choice. |
| 12   A.  Yes. | 12   Q.  Okay.  And this appears to be a letter of |
| 13   Q.  Down at the bottom, how did you rank John's | 13 recognition? |
| 14 performance? | 14   A.  Yes, it is. |
| 15   A.  Exceeds expectations. | 15   Q.  What is it a letter of recognition for? |
| 16   Q.  So that ranking of exceeds expectations, just | 16   A.  It's just recognizing something that someone, |
| 17 looking at this first page, would appear to be based | 17 an officer has done to help the institution. |
| 18 on the things on the first page? | 18   Q.  What did John do here? |
| 19   A.  Yes. | 19   A.  It appears that he, when they opened up -- when |
| 20   Q.  Because you mentioned you didn't think he had | 20 they were designing or opening up the new property |
| 21 received any letters of commendation or things like | 21 room, he had some input in how it should work with his |
| 22 that? | 22 experience working a property room to make things work |
| 23   A.  Unless they were attached to the original. | 23 better. |
| 24   Q.  Okay. | 24   Q.  So he contributed in some positive way and he |

| Page 83 | Page 85 |
|---|---|
| 1   A.  Which I can't tell by this. | 1 was given a letter of recognition? |
| 2   Q.  Got ya. | 2   A.  Yes. |
| 3   A.  They may have been in attachment form. | 3   Q.  By his lieutenant? |
| 4   Q.  But his perfect attendance, that was part of | 4   A.  Yes. |
| 5 it? | 5   Q.  At the very bottom -- I'm sorry, at the very |
| 6   A.  Yes. | 6 last line of text, it actually says, "Good job, John"? |
| 7   Q.  Okay.  All right.  You can put that down. | 7   A.  Yes. |
| 8       Let's put another document in front of | 8   Q.  Turn two more pages.  Does this appear to be a |
| 9 you.  We'll call this Mears Exhibit No. 8. | 9 letter, dated May 6th of '99? |
| 10       (Mears Exhibit No. 8 was marked for | 10   A.  Yes. |
| 11 identification.) | 11   Q.  At the very bottom right-hand corner, it says, |
| 12 BY MR. NEUBERGER: | 12 "D00128"? |
| 13   Q.  Don't worry.  We're not going to go through | 13   A.  Yes. |
| 14 every page of this, although you are more than welcome | 14   Q.  Why don't you read that quietly to yourself? |
| 15 to read the entire thing, if you wish.  Let's turn | 15   A.  Okay. |
| 16 five pages in.  At the bottom right-hand corner, does | 16   Q.  Does this appear to be a letter congratulating |
| 17 it say, "D000134"? | 17 John for his perfect attendance during the year 1998? |
| 18   A.  Yes. | 18   A.  Yes, it is. |
| 19   Q.  Could you take a look at this, just look at | 19   Q.  Turn eight more pages.  Why don't you review |
| 20 this quietly to yourself? | 20 this quietly to yourself? |
| 21   A.  Okay. | 21   A.  Okay. |
| 22   Q.  Does this appear to be a letter to John from | 22   Q.  Does this appear to be a memo to John |
| 23 the director of HR and the commissioner congratulating | 23 congratulating him on his perfect attendance for the |
| 24 him on his perfect attendance for the year 1996? | 24 prior year, which I guess would have been 2000? |

22 (Pages 82 to 85)

b94d73f0-3eb1-4abe-9dd0-398029a5111f

A0726

Balas v. Taylor, et al.
Truman J. Mears

| Page 86 | Page 88 |
|---|---|

**Page 86**

1  A.  Yes, it is.

2  Q.  At the very bottom it says, "D291," the bottom

3  right-hand corner?

4  A.  Yes.

5  Q.  Let's turn two more pages.  Could you read this

6  document quietly to yourself?

7      Is this a memo from you to John?

8  A.  Yes.

9  Q.  It is also a memo to another lieutenant; right?

10  A.  Yes.

11  Q.  It's dated May 2004?

12  A.  Yes.

13  Q.  At the bottom it says, "P461"?

14  A.  Yes.

15  Q.  In this memo are you congratulating John and

16  commending him for his exceptional performance and

17  outstanding performance of his job?

18  A.  Yes, everyone in that area got these.

19  Q.  Why?

20  A.  We had a quarterly inspection, and we put it on

21  all the officers of all the areas that we were, me and

22  Lieutenant Atallian, were in charge of to make sure

23  that they got everything in order for inspection and

24  all our officers pulled together and did a good job.

**Page 87**

1  Q.  When you send an officer a letter of

2  recommendation, do you send to it his personnel file,

3  too?

4  A.  I send it to his file that I keep and a file up

5  front, and then -- or to the administration, and then

6  they take care of sending it on up.

7  Q.  Right.  You said you sent it to the

8  administration.  Would that be the administration of

9  the prison that you are in?

10  A.  Of SCI, yes.

11  Q.  Is it your understanding that they pass it on

12  to human resources or whoever keeps the file?

13  A.  Yes.

14  Q.  But you said you also put a copy in your file?

15  A.  Yes.

16  Q.  And so you keep a file on your employees?

17  A.  Yes.

18  Q.  And what kinds of things go into those files?

19  A.  Things like letters of commendation, bureau

20  commendations.  Anything that they receive, even if I

21  don't give it to them, if they receive something

22  positive, they can give me a copy to go in their file.

23  And also with the negative, any type of disciplinary

24  action or counselings and that sort of thing goes in

**Page 88**

1  there also.

2  Q.  Right.  So you are supposed to -- well, do you

3  keep track of those things simply because it's -- you

4  just like keeping track of those things or is that

5  something you are supposed to do under DOC policies?

6  A.  I believe we're supposed to.  I could not quote

7  a policy number for that, but we're supposed to

8  keep -- it's the only way you can get an accurate

9  accounting of an officer.

10  Q.  So -- let's put that policy in front of you

11  right now.

12  A.  Okay.

13  Q.  Leave that open to the page that it's on

14  because we'll be coming back to it.

15      (Mears Exhibit No. 9 was marked for

16  identification.)

17  BY MR. NEUBERGER:

18  Q.  Let's put in front of you Mears Exhibit 9.  Do

19  you have this document in front of you?

20  A.  Yes.

21  Q.  At the very bottom, it says, "D000667"?

22  A.  Yes.

23  Q.  Okay.  Now, let's look at the very top of the

24  page where it says, "Personnel Policy Manual."  Does

**Page 89**

1  this appear to be some kind of a DOC policy from your

2  policy book or however it's kept?

3  A.  Yes.

4  Q.  Let's turn three pages in.  See if we can find

5  the policy we were just talking about.  Do you see the

6  very top of the page here, where it says, "Personnel

7  File"?

8  A.  Yes.

9  Q.  Do you see where it says, "The employee's

10  official file maintained in the Department of

11  Correction Personnel Office"?

12  A.  Yes.

13  Q.  Underneath that, it says, "Supervisor's

14  Employee File."  Right?

15  A.  Yes.

16  Q.  Could you read that paragraph quietly to

17  yourself?

18  A.  Yes.  Okay.

19  Q.  Do you think this could be the policy that you

20  were referencing before?

21  A.  The policy that I was referencing?

22  Q.  Yeah.  Does this appear to be talking about a

23  supervisor's file that supervisors are supposed to

24  keep on their employees?

23 (Pages 86 to 89)

b94d73f0-3eb1-4abe-9dd0-398029a5111f

A0727

Balas v. Taylor, et al.
Truman J. Mears

| Page 90 | Page 92 |
|---|---|
| 1   A.  Yes, yes, it does. | 1   warning, you would memorialize it somehow according to |
| 2   Q.  It talks about how these files are supposed to | 2   policy? |
| 3   be used when preparing employment evaluations? | 3   A.  Yes, an official verbal warning, yes. |
| 4   A.  Yes. | 4   Q.  Right.  And you would put a copy of that in |
| 5   Q.  Right? | 5   your supervisor's file; right? |
| 6   A.  Yes. | 6   A.  Yes. |
| 7   Q.  And commendations and things like that are | 7   Q.  And would you give a copy of that to the |
| 8   supposed to make their way into the file under this | 8   employee? |
| 9   description here; right? | 9   A.  Yes. |
| 10   A.  Yes. | 10   Q.  Something like that, like an official verbal |
| 11   Q.  The same things with disciplinary -- | 11   warning, would that make its way up the chain of |
| 12   A.  Yes. | 12   command to HR? |
| 13   Q.  -- items; right? | 13   A.  I guess it could, but I'm not exactly sure if |
| 14   A.  Yes. | 14   it has to or not.  I haven't -- I don't know. |
| 15   Q.  It even talks about verbal discussions and | 15   Q.  Got ya.  So do you keep these supervisor's |
| 16   supervisory conferences? | 16   files for all the employees under your command? |
| 17   A.  Yes. | 17   A.  Yes. |
| 18   Q.  References to those are supposed to be put in | 18   Q.  Do you try to be diligent in keeping them |
| 19   the supervisory file; right? | 19   updated? |
| 20   A.  Yes. | 20   A.  Yes. |
| 21   Q.  Towards the end of it, it even says that when | 21   Q.  Do you try to be diligent in putting in copies |
| 22   an employee is transferred, his file is supposed to | 22   of letters of commendation? |
| 23   follow him to his new supervisor? | 23   A.  Yes. |
| 24   A.  Correct. | 24   Q.  Do you try to be diligent in putting in copies |

| Page 91 | Page 93 |
|---|---|
| 1   Q.  Right?  Okay.  Now, at the very bottom of the | 1   of disciplinary warnings or things like that? |
| 2   page, do you see where it says, "Warning"? | 2   A.  Yes.  Now with that, commendations and things |
| 3   A.  Yes. | 3   like this don't always make it to the supervisor.  It |
| 4   Q.  Is it your understanding that a warning is one | 4   is up to the employee to give the supervisor a copy of |
| 5   form of corrective discipline, one of many forms that | 5   that.  So they may have a stack of commendations and |
| 6   you have in your arsenal as a supervisor? | 6   letters of appreciation that the supervisor is not |
| 7   A.  Yes. | 7   even aware of. |
| 8   Q.  Could you read this paragraph quietly to | 8   Q.  Right.  For example, you would only be aware of |
| 9   yourself, please? | 9   letters of commendation which, for example, came from |
| 10   A.  Okay. | 10   you? |
| 11   Q.  Does this paragraph indicate that when you give | 11   A.  Or if another -- another supervisor, another |
| 12   an officer under your command a warning, you are | 12   employee wrote the letter of commendation and gave me |
| 13   supposed to memorialize it somehow in writing? | 13   a copy and him or -- excuse me, my -- the officer a |
| 14   A.  Yes. | 14   copy.  Or if the officer is the only one who got a |
| 15   Q.  You put a copy of that in your supervisor's | 15   copy, they made a copy of it and gave it to me for |
| 16   file; right? | 16   their file. |
| 17   A.  Yes. | 17   Q.  So whenever you are aware of such a thing, you |
| 18   Q.  Then you give a copy of that to the employee so | 18   put it in your file? |
| 19   they have it for their own purposes? | 19   A.  Yes. |
| 20   A.  Correct. | 20   Q.  Does the same thing apply for disciplinary -- |
| 21   Q.  Is that, roughly, how you try to -- how you | 21   A.  Yes. |
| 22   always try to operate as a supervisor in the DOC? | 22   Q.  -- warnings or writings or documents? |
| 23   A.  Yes. | 23   A.  Yes. |
| 24   Q.  So even when you were giving someone a verbal | 24   Q.  And if you warn an employee about performance |

24 (Pages 90 to 93)

b94d73f0-3eb1-4abe-9dd0-398029a5111f

A0728

Balas v. Taylor, et al.
Truman J. Mears

Page 94

1  problems, would you put a copy of that in your
2  supervisor's file?
3     A.   If it's an official warning, yes.
4     Q.   So are there official warnings and unofficial
5  warnings?
6     A.   Well, as a supervisor, you may see someone
7  faltering a little bit in their duties and you correct
8  it on the spot or you talk to them, and that takes
9  care of the problem.  There is no need in disciplining
10  every mistake, every little problem.
11     Q.   So someone could be having a bad day and just
12  be falling behind on something, and you could go up to
13  them, pat them on the back and give them a little --
14     A.   Yes.
15     Q.   -- hey, get your head on right today, something
16  like that?
17     A.   Yes.  And that doesn't have to go into their
18  file.
19     Q.   What if it happens more than just once?
20     A.   If it's a continuing thing, then you are
21  looking at an issue that needs to be addressed
22  formally.
23     Q.   Formally.  That would go to like an official
24  verbal warning or some other kind of formal --

Page 95

1     A.   Yes.
2     Q.   Yes?
3     A.   Yes.
4     Q.   Okay.  Can you put that down.
5          Let's go back to Mears Exhibit 8, which I
6  think is still open in front of you.
7     A.   Okay.
8     Q.   Right?  Let's turn two more pages.  And at the
9  very bottom right-hand corner, does it say, "D00290"?
10     A.   Yes.
11     Q.   Does this appear to be a memo to John, dated
12  April 25th of 2002, congratulating him on his perfect
13  attendance for the prior year?
14     A.   For the past two years, yes.
15     Q.   For the past two years.  Do you think that's
16  commendable?
17     A.   Yes.
18     Q.   Do a lot of employees have perfect attendance?
19     A.   No.
20     Q.   Do you have perfect attendance?
21     A.   No.
22     Q.   Sometimes things come up and you miss a day;
23  right?
24     A.   Yes.

Page 96

1     Q.   In this memo, for example, in the second
2  paragraph, it mentions that the DOC is particularly
3  dependent on loyal, conscientious and dependable
4  employees.  It goes on and says that John has
5  exhibited these qualities by his perfect attendance.
6     A.   Yes.
7     Q.   And in the last paragraph, it says that John
8  and employees like him are the backbone of the
9  department, enabling it to function smoothly and
10  effectively.  And Stan Taylor and the director of HR
11  Alan Machtinger, they say that, "We salute you and ask
12  you for your continuing commitment."
13     A.   Yes, it is.
14     Q.   Let's turn two more pages.  In the bottom
15  right-hand corner, does it say, "D00284"?
16     A.   Yes.
17     Q.   It's a little bit faded.  Does this appear to
18  be another memo to John of one year later, dated
19  June 9th of 2003, congratulating him on his perfect
20  attendance for the past three consecutive years?
21     A.   Yes, it is.
22     Q.   Do you think this is commendable as well?
23     A.   Yes.
24     Q.   Let's turn one more page.  In the bottom

Page 97

1  right-hand corner, does it say, "D00280"?
2     A.   Yes.
3     Q.   All right.  Now, does this appear to be a memo
4  to John from Commissioner Taylor, dated April 15th of
5  2004?
6     A.   Yes.
7     Q.   At the very bottom, it's signed by both the
8  commissioner and the director of HR?
9     A.   Yes.
10     Q.   Is this commending John for his perfect
11  attendance record for the last four consecutive years?
12     A.   Yes, it is.
13     Q.   Now, I think you said a few minutes ago that
14  you thought two years of consecutive attendance was
15  commendable; right?
16     A.   Yes.  One year is commendable.
17     Q.   How about two years?
18     A.   Yes.
19     Q.   How about three years?
20     A.   Yes.
21     Q.   How about four years?
22     A.   Yes.
23     Q.   So all those things are commendable?
24     A.   Yes.

25 (Pages 94 to 97)

b94d73f0-3eb1-4abe-9dd0-398029a5111f

A0729

Balas v. Taylor, et al.
Truman J. Mears

Page 98

1    Q.  Something like this, would this be something
2    which might find its way into an employment
3    evaluation?
4    A.  Yes.
5    Q.  Do you think you would have had a copy of this?
6    A.  Yes.  If John made sure I got copies of them,
7    yes.
8    Q.  John was diligent about those kinds of things?
9    A.  Oh, yes.
10   Q.  Let's turn one more page.  Does this appear to
11   be a memo, dated July 8th of 2004?
12   A.  Yes, it is.
13   Q.  From Major Phil Townsend?
14   A.  Yes.
15   Q.  It's addressed to John; right?
16   A.  Yes.
17   Q.  And on the re: line it says, "Appreciation"?
18   A.  Yes.
19   Q.  In the bottom right-hand corner, it says,
20   "D00281"?
21   A.  Yes.
22   Q.  Could you read this memo to me?
23   A.  "I would like to take this opportunity to
24   commend you for a job well done.  You are instrumental

Page 99

1    in the recertification of QRT training during February
2    and March of 2004.  Your dedication to this project
3    and SCI are recognized and greatly appreciated.  It is
4    a pleasure to work with such fine staff.  And once
5    again, thanks for a job well done."
6    Q.  Do you know Major Townsend?
7    A.  Yes.  I knew him.
8    Q.  He's passed away?
9    A.  Yes.
10   Q.  Got ya.  He mentions here the QRT training
11   during February March par of 2004?
12   A.  Yes.
13   Q.  This is the Quick Response Team?
14   A.  Yes.
15   Q.  I think you testified a little earlier that
16   John had some problems during QRT training.  Or do you
17   recall that at all?
18   A.  I don't recall saying anything today about
19   problems with QRT training.
20   Q.  Do you recall saying to someone else other than
21   your attorneys previously that John had had problems
22   during his QRT training?
23   A.  The last, the last year, yes.  That would be
24   this year.

Page 100

1    Q.  I'm sorry?
2    A.  The last year that he trained.
3    Q.  Which would be 2004?
4    A.  Yes, I believe.  Yes.
5    Q.  Okay.  John died in February of 2005?
6    A.  Yes, that would be it then.
7    Q.  So this would be the last year of QRT training
8    for him, this 2004?
9    A.  Yes.
10   Q.  Does this appear to be a memo commending him on
11   a job well done?
12   A.  Yes.
13   Q.  During his QRT training?
14   A.  Yes.
15   Q.  So did John have problems during his QRT
16   training --
17   A.  Yes, he did.
18   Q.  -- to the best of your recollection?
19   A.  Yes, he did.
20   Q.  What were they?
21   A.  I am in charge of the QRT training.  I have
22   been since it started.
23       I had John and another officer helping me
24   with the training.  And at the end of the training --

Page 101

1    well, during the training, John would constantly come
2    in late, want to leave early, need the night off.  And
3    we only had a small window to get these 300 officers
4    trained, which left the burden on myself and the other
5    officer training.  And we tried to get him to come in
6    more.  We tried to get him to do his job.  It just
7    wasn't working.  But that was between us three at that
8    point.  Major Townsend was not involved in it at that
9    point.
10       At the end of it, the other officer that
11   was helping told me they would not train anymore if
12   John was going to be teaching.  I told him I felt the
13   same way and I would take care of it because of those
14   issues.
15   Q.  Okay.
16   A.  So I went to Major Townsend and told him what
17   was going on and I went to Deputy Warden Deloy -- he
18   was deputy warden at that time -- and I explained to
19   them, if you want someone else to teach it, I am fine
20   with that, but I will not teach it with John anymore.
21   So you make your decision on who you want to do this.
22   And I explained to them the problems.  And they said
23   right away, he will not be teaching anymore, that he
24   will continue to do it.

26 (Pages 98 to 101)

b94d73f0-3eb1-4abe-9dd0-398029a5111f

Balas v. Taylor, et al.
Truman J. Mears

| Page 102 | Page 104 |
|---|---|
| 1  Q.  Right.  So that's a problem when someone is<br>2  coming in late, wanting to leave early and always<br>3  asking for the nights off?<br>4  A.  Yes.  But, again, that was a voluntary thing.<br>5  This was not a part of their daily jobs in the<br>6  receiving room.  This was something that was a<br>7  volunteer thing, extra.  You understand.  So to me,<br>8  this is something that is a positive.  If you refuse<br>9  to do it, it's just a positive that you don't have.<br>10  You take it away from them and they don't have it<br>11  anymore.<br>12  Q.  Who was the other officer that was serving with<br>13  you and John?<br>14  A.  Jeff Foskey.<br>15  Q.  Now, what did Jeff Foskey say to you<br>16  specifically?<br>17  A.  He told me: "This is my last year.  I am not<br>18  teaching this anymore."  I asked him, "Why?"  He told<br>19  me, basically, the same thing I was feeling, that John<br>20  was taking advantage of us.<br>21  Q.  Did he say anything else to you?<br>22  A.  He just said that if John was teaching, he<br>23  wasn't going to teach it anymore.<br>24  Q.  Okay. | 1  sure that year just when we completed the training.<br>2  Q.  You went to Major Townsend in March or April,<br>3  ballpark?<br>4  A.  And Deputy Warden Deloy, yes.<br>5  Q.  And Deputy Warden Deloy?<br>6  A.  Deputy warden, yes.  He was deputy warden then.<br>7  Q.  He's warden now?<br>8  A.  Yes.<br>9  Q.  What was Major Townsend's reaction to learning<br>10  these things about John?<br>11  A.  That it was a shame, that he understood, and he<br>12  had heard it.  I guess he heard it from someone else.<br>13  I don't know.  He said, that's fine.  He's -- you<br>14  know.  John was working under me.  I was in charge of<br>15  it, so.<br>16  Q.  Had you complained about this before?<br>17  A.  No.<br>18  Q.  What did you --<br>19  A.  When we do the training, we're working straight<br>20  4:00 to 12:00 and into the 12:00 to 8:00 shift, and it<br>21  is very hectic.  You have 300 inmates -- excuse me,<br>22  300 officers to train in a short period of time, and<br>23  the job is just to get it done.<br>24  Q.  Okay. |

| Page 103 | Page 105 |
|---|---|
| 1  A.  And I said, "Well, I agree with you.  It has<br>2  gone too far.  We can't get him to, you know, tighten<br>3  up, so."<br>4  Q.  Right.  So that was when you had to make the<br>5  decision about whether you were going to teach again;<br>6  right?<br>7  A.  Yes.  Like I said, I went to the Major and<br>8  explained the situation and gave him the opportunity<br>9  to either -- if I was going to teach, I was not going<br>10  to teach with John as a part of the team teaching the<br>11  classes.  It was too important to mess it up.<br>12  Q.  Okay.<br>13  A.  And I just told him, if you want me to teach,<br>14  it's going to be without John.  But if you want<br>15  someone else to teach it, I am okay with that, too.<br>16  Q.  Okay.  So when did you go to the Major?<br>17  A.  This would have been right after the training<br>18  was complete.  I am not exactly sure of the date.  I<br>19  don't know.<br>20  Q.  So when did the training complete?<br>21  A.  Around March or April, I believe.  That's when<br>22  we usually complete it.<br>23  Q.  I'm sorry?<br>24  A.  That's when we usually complete it.  I am not | 1  A.  And then we worry about the cleanup afterwards.<br>2  Q.  What did you say to then Deputy Warden Deloy?<br>3  A.  Basically, that if you want me to continue,<br>4  John is not going to teach with me, and when John<br>5  finds out, it's not going to be pretty.  He's going to<br>6  be mad.<br>7  Q.  Okay.  And you would have talked to the deputy<br>8  warden in the same time frame you talked to the major?<br>9  A.  I don't know the date or the time, but very<br>10  close together, yes.<br>11  Q.  Did then deputy warden and the current Warden<br>12  Deloy, did he take his job seriously?<br>13  A.  Excuse me.  Who take their job seriously?<br>14  Q.  Of Deputy Warden Deloy.<br>15  A.  Yes.<br>16  Q.  To the best of your knowledge, does he take his<br>17  job seriously?<br>18  A.  Yes.<br>19  Q.  He was deputy warden then?<br>20  A.  Yes.<br>21  Q.  And he took his job seriously then, right?<br>22  A.  Yes.<br>23  Q.  He's the warden now, right?<br>24  A.  Yes. |

27 (Pages 102 to 105)

b94d73f0-3eb1-4abe-9dd0-398029a5111f

A0731

Balas v. Taylor, et al.
Truman J. Mears

| Page 106 | Page 108 |
|---|---|
| 1  Q. He's a defendant in this lawsuit, right? | 1  A. Yes, it is. |
| 2  A. Yes. | 2  Q. You can put that document down. Actually, |
| 3  Q. Do you think he takes his job seriously now? | 3  let's go to the last page of the document. I'm sorry. |
| 4  A. Yes. | 4  In the bottom right-hand corner, does it say, |
| 5  Q. Do you take your job seriously? | 5  "D00273"? |
| 6  A. Yes, I do. | 6  A. Yes. |
| 7  Q. Who was your captain at the time? | 7  Q. Does this appear to be a March 6th, 2005 letter |
| 8  A. That would have been Captain David Wilkinson. | 8  to John from the director of HR? |
| 9  Q. Captain Wilkinson. Do you know if | 9  A. Yes, it is. |
| 10 Captain Wilkinson took his job seriously during that | 10 Q. Is this commending him on his perfect |
| 11 time frame? | 11 attendance record for the year 2004? |
| 12 A. Yes. | 12 A. Yes. |
| 13 Q. You take your job seriously, the Captain does. | 13 Q. So this would have been the fifth year that |
| 14 Does the Major above him, is that this Major Townsend? | 14 John had received or had achieved perfect attendance; |
| 15 A. Yes. | 15 right? |
| 16 Q. So it's all in the same chain of command? | 16 A. I believe so. |
| 17 A. Yes. | 17 Q. Now you can put the document away. |
| 18 Q. Did Major Townsend take his job seriously? | 18     MR. NEUBERGER: Counsel, how about we take |
| 19 A. Yes, he did. Major Townsend was in charge of | 19 a break? Let's go off the record. |
| 20 the training, of the QRT training over me. | 20     (Luncheon recess taken.) |
| 21 Q. Got ya. Did the late Major Townsend take his | 21 BY MR. NEUBERGER: |
| 22 job seriously? | 22 Q. All right. Now, Lieutenant, did you have a |
| 23 A. Yes. | 23 nice lunch? |
| 24 Q. Well, see, here, we have this memo, dated | 24 A. Yes. |

| Page 107 | Page 109 |
|---|---|
| 1  July 8th of 2004, from Major Townsend to | 1  Q. Okay. Now, I want to focus your attention on |
| 2  Corporal Balas? | 2  August of 2004. All right? |
| 3  A. Yes. | 3  A. Okay. |
| 4  Q. Do you know why this memo doesn't make any | 4  Q. And specifically, I would like to focus you on |
| 5  mention whatsoever of John's alleged performance | 5  the activation of CERT, which I believe happened on |
| 6  deficiencies? | 6  August 5th of 2004, when CERT was activated to help |
| 7  A. No, I don't. | 7  with the understaffing problems in the court and |
| 8  Q. Instead, this memo commends John for a job well | 8  transportation unit. |
| 9  done; right? | 9  A. Okay. |
| 10 A. Yes. | 10 Q. Just so we're on the same page. Okay? |
| 11 Q. And it recognizes and says it appreciates his | 11 A. Okay. |
| 12 dedication to the project and to SCI? | 12 Q. All right. Do you recall how CERT was |
| 13 A. Yes, it does. | 13 activated that day? |
| 14 Q. It goes on and says, "It is a pleasure to work | 14 A. By page. |
| 15 with such fine staff. And once again, thanks for a | 15 Q. By page. Okay. And is by page the normal -- |
| 16 job well done." | 16 A. Yes. |
| 17 A. Yes, it does. | 17 Q. -- form of activation? Page or telephone. |
| 18 Q. Can we agree that this memo from Major | 18 A. Okay. |
| 19 Townsend, dated July 8th, 2004, makes no mention of | 19 Q. So did you find out the day before that you |
| 20 any of these alleged performance deficiencies on | 20 were going to be activated for the next day? |
| 21 John's part? | 21 A. I believe it was the day before. I am not |
| 22 A. No, it does not. | 22 exactly sure. It's been awhile. |
| 23 Q. Would you agree July 2004 is after March or | 23 Q. Does the date August 5th of 2004 ring a bell to |
| 24 April of 2004? | 24 you at all? |

28 (Pages 106 to 109)

A0732

Balas v. Taylor, et al.
Truman J. Mears

| Page 110 | Page 112 |
|---|---|
| 1  A. That sounds correct. | 1  Q. How about Lee Mears? |
| 2  Q. Do you recall how many of you were activated? | 2  A. Yes, he was. |
| 3  A. No. There was, I believe -- statewide or just | 3  Q. Now, do you recall where the CERT members had |
| 4  at Sussex? | 4  been activated to report to?  What was their |
| 5  Q. How about just at Sussex? | 5  assignment going to be? |
| 6  A. I believe there was six or eight activated. | 6  A. It was for a -- to transport inmates from the |
| 7  Q. Do you recall who the activated personnel were? | 7  institutions to Court. |
| 8  A. I remember all ten that responded, but a couple | 8  Q. And would that be the Court and transportation |
| 9  of them were voluntary. | 9  unit? |
| 10  Q. Got ya.  Okay.  Can you tell me who the ten | 10  A. Yes, CERT falls under court and transportation. |
| 11  were? | 11  Q. Now, did the members at that meeting on |
| 12  A. Lee Mears; John Balas; Allen Adams. | 12  August 5th, did they express their concerns about the |
| 13      MS. XARHOULAKOS:  Perhaps it would help if | 13  activation? |
| 14  he could look at the list of CERT members. | 14  A. Yes. |
| 15      THE WITNESS:  Bradley.  John Mumford. | 15  Q. Could you tell me what concerns were expressed? |
| 16      MS. XARHOULAKOS:  This is Exhibit 3. | 16  A. It was as very unpopular activation with |
| 17  BY MR. NEUBERGER: | 17  everyone.  No one wanted to -- no one wanted to, I |
| 18  Q. Let's put Mears Exhibit No. 3 in front of you. | 18  guess, break the job action.  No one wanted to go |
| 19  A. Okay. | 19  inside of their institutions to transport these |
| 20  Q. And see -- take a look at page 2 on that. | 20  inmates to court, feeling that it would be undermining |
| 21  A. Scott Bradley.  You know, I have a good | 21  the efforts of this supposed job action. |
| 22  knowledge of the ten that quit, but I don't believe | 22  Q. So before we get into that more, maybe we |
| 23  all ten of those were activated. | 23  should talk a little bit more about the job action.  I |
| 24  Q. Okay.  Do you -- were you one of the ones who | 24  think I asked you a couple basic questions before |

| Page 111 | Page 113 |
|---|---|
| 1  was activated? | 1  about that. |
| 2  A. No, I was not. | 2  A. Yes. |
| 3  Q. Was John? | 3  Q. Do you recall that? |
| 4  A. I believe he was. | 4  A. Yes. |
| 5  Q. Got ya.  I think you mentioned Lee Mears, | 5  Q. Okay.  And I think you mentioned that various |
| 6  Arthur Mears -- | 6  correctional officers were declining or refusing to, |
| 7  A. Yes.  I think he volunteered. | 7  was it work voluntary overtime or what was the phrase |
| 8  Q. Got ya.  So on August 5th, various members of | 8  that you used? |
| 9  CERT were activated; right? | 9  A. I believe it was refusing voluntary overtime. |
| 10  A. Yes. | 10  Q. Right.  They were refusing -- |
| 11  Q. Do you recall if the CERT members held a | 11  A. C & T operates or operated heavily under |
| 12  meeting to discuss their activation? | 12  overtime. |
| 13  A. Yes, they did. | 13  Q. Right.  And C & T is -- |
| 14  Q. And so did you attend that meeting? | 14  A. Relied on overtime. |
| 15  A. Yes, I did. | 15  Q. Okay.  And C & T is court and transportation; |
| 16  Q. Do you recall approximately how many | 16  right? |
| 17  individuals were at that meeting? | 17  A. Yes. |
| 18  A. I couldn't give you a real accurate number. | 18  Q. And so when officers were refusing to work the |
| 19  Might have been six.  It might have been 12.  I am not | 19  voluntary overtime, was that causing staff shortages |
| 20  exactly sure. | 20  with C & T? |
| 21  Q. Was John at that meeting? | 21  A. Yes. |
| 22  A. Yes, he was. | 22  Q. What happens if C & T does not have personnel? |
| 23  Q. And you were at that meeting? | 23  A. Inmates don't get to court. |
| 24  A. Yes, I was. | 24  Q. So that's their function, to transport inmates |

29 (Pages 110 to 113)

b94d73f0-3eb1-4abe-9dd0-398029a5111f

A0733

Balas v. Taylor, et al.
Truman J. Mears

|  | Page 114 |  | Page 116 |
|---|---|---|---|

**Page 114**

1  from --
2    A. Well, yes they transport them to and from
3  court. That's their biggest job. They also transport
4  them from one institution to another. That sort of
5  thing.
6    Q. Right. So if inmates aren't getting to court,
7  does that have ramifications for the criminal justice
8  system in Delaware?
9    A. Absolutely.
10    Q. What would some of those ramifications be?
11    A. Well, inmates would not be making their court
12  dates. There would be -- it would be the State's
13  fault, not the inmates' fault. Still, you would have
14  capiases and things put on inmates for reasons beyond
15  their control.
16    Q. Right. And so why do you use the term "job
17  action" to describe this refusal --
18    A. That's what I've heard it -- excuse me. That's
19  what I heard it referred to as.
20    Q. Okay. And were there picket lines formed
21  anywhere?
22    A. Not that I'm aware of.
23    Q. Okay. Were there correctional officers
24  standing outside the gates in groups and things like

**Page 115**

1  that?
2    A. Not that I'm aware of.
3    Q. Okay, okay. Okay, now, going back to this
4  meeting on August 5th of 2004. Okay?
5    A. Okay.
6    Q. All right. Now, you said that the activation
7  was very unpopular with everyone and that no one
8  wanted to break the job action?
9    A. Correct.
10    Q. Were there concerns amongst the activated CERT
11  members about going to the -- about going to C & T to
12  staff the unit?
13    A. Yes.
14    Q. And so the members did not want to break that
15  job action in that sense; right?
16    A. Correct.
17    Q. Do you recall any more detail what was said by
18  the various CERT members at that meeting?
19    A. Yes, some of the things I do.
20    Q. What are some of those things?
21    A. They didn't want to feel like strike-breakers
22  or picket-breakers, that sort of thing, even though
23  there wasn't an actual strike or a picket. They felt
24  that CERT wasn't designed to be transportation. And

**Page 116**

1  there was a lot of dialogue towards CERT headquarters
2  itself, a lot of personal feelings that had nothing to
3  do with the job action.
4    Q. Okay.
5    A. Disgruntled CERT members because of individuals
6  getting promotions within CERT and that sort of thing.
7    Q. Okay. Do you recall any other concerns raised
8  during that meeting?
9    A. Not wanting to go inside the institutions where
10  their fellow officers were, that sort of thing. And
11  it was raised about everyone quitting and, basically,
12  destroying CERT, and that everybody would be begged to
13  come back within 24 hours if they all did that.
14    Q. All right. Now, was the decision made that day
15  or that night to resign and quit CERT?
16    A. While I was there, no.
17    Q. You said while you were there.
18    A. Yes.
19    Q. Did you ever leave that meeting?
20    A. At the end of it to go home.
21    Q. Okay. Did you ever leave that meeting and
22  report back to CERT command and discuss discussions
23  amongst officers?
24    A. I spoke to CERT command absolutely, yes.

**Page 117**

1    Q. Who did you speak to?
2    A. Warden Hall.
3    Q. Was it that same day?
4    A. Let me back up.
5    Q. Sure.
6    A. It was either Warden Hall or Major Radcliffe.
7  I can't remember exactly who.
8    Q. Was it the same day?
9    A. Yes.
10    Q. Was it before, during, or after the meeting?
11    A. It was after the meeting.
12    Q. It was after the meeting?
13    A. And I reassured him that he would have his team
14  there.
15    Q. Were you the commander for CERT?
16    A. I was team leader.
17    Q. You were team leader?
18    A. Yes.
19    Q. Did you explain to CERT command what was being
20  said at the meeting?
21    A. I didn't go into detail.
22    Q. What did you say?
23    A. I told him that his team would be there, nobody
24  wants to do this mission, but they have all said they

30 (Pages 114 to 117)

b94d73f0-3eb1-4abe-9dd0-398029a5111f

Balas v. Taylor, et al.
Truman J. Mears

Page 118

1 would be there to do the mission.  You need to work on
2 getting the mission stopped.
3 Q.  Did you say anything else during that report?
4 A.  That was the basis of it.  I can't remember
5 word for word exactly what I said.  I did not go into
6 detail about that meeting.  Not that there was
7 anything wrong about that.  It wasn't long and drawn.
8 He just needed to know if there would be people there
9 or not.
10 Q.  Going back to this meeting, before you left it.
11 A.  Yes.
12 Q.  You said that there were concerns, that one of
13 the areas of concern was not wanting to break the job
14 action.  Right?
15 A.  Yes.
16 Q.  Was that a universal concern amongst the
17 various CERT members at the meeting?
18 A.  That was a big concern.  There was just as much
19 talk about disgruntled with the warden making warden
20 the major making major and one of the training
21 educators getting bumped up a notch.  There was a lot
22 of discussion about that.
23 Q.  Did you voice your opinion on the job action?
24 A.  Yes, I did.

Page 119

1 Q.  What did you say?
2 A.  Well, I said it was unpopular, but quitting
3 was -- well, we discussed different options, and they
4 were talking about we all need to quit -- excuse me.
5 After some time, John said, John Balas said, we all
6 need to quit, everybody quit at one time, and they
7 will beg us to come back within 24 hours; they can't
8 operate without us.
9 Q.  Okay.
10 A.  When that was said, I stood up, and I said,
11 "Listen, everybody here joined CERT as an individual.
12 You have to make your choice as an individual to stay
13 or quit.  Personally, quitting is not the answer.
14 Never be a quitter."
15 Q.  Okay.
16 A.  "Force someone else's hand."  I said, "But if
17 you do decide to quit, it's got to be your decision,
18 and you better be willing to live with it the rest of
19 your career because I don't think anybody is going to
20 beg us to come back."
21 Q.  Did you say anything else?
22 A.  Before I left, it was agreed upon by everybody
23 that nothing would happen the next day, other than the
24 operation would go through.

Page 120

1 Q.  Okay.
2 A.  And then at the -- after the operation was
3 through, everyone would try to contact everybody
4 statewide to discuss what had happened.
5 Q.  Okay.
6 A.  And what would be best for CERT, for all the
7 members, from that point on.  Because they were --
8 everyone was under the belief that the action was
9 going to continue; it was not going to be a one-day
10 action, it was going to continue.  Over the weekend,
11 it was going to be discussed statewide, what is our
12 options.
13 Q.  Okay.
14 A.  If we don't want to continue this operation,
15 what do we have to do?
16 And when that was said and it was pretty
17 well over, I said, well, if there is any changes,
18 contact me beforehand.  Because I was the watch
19 commander of the institution the next day on the
20 4:00 to 12:00 shift.  I said, "Contact me, let me know
21 if there is any kind of changes, and we'll go with it
22 from there."
23 Q.  Okay.
24 A.  Also you asked anything else I said.  When I

Page 121

1 first walked into the meeting, I wasn't aware at first
2 that this was a secret meeting.  I was contacted by, I
3 think it was Lee and told me that they were going to
4 have this meeting about the mission, and that sort of
5 thing, at his house and wanted me to come.  I told him
6 I would try my best to be there.  I was way across
7 town in Rehoboth or Lewes with my family, and he was
8 getting ready to have the meeting in a short time.  I
9 said, "I'll do my best to be there.  I may not be
10 there when it starts."
11 In the meantime, Major Radcliffe calls me
12 on the other line, and he says, "Truman, what's going
13 on?  I hear all the members are getting ready to quit
14 from Sussex."  I said, "Sir, I have no clue, but I'll
15 find out because I'm going to the meeting and find
16 out."
17 He was saying, "What meeting?  What are you
18 talking about?"  I said, "Well, the guys are going to
19 get together to discuss this."  He said, "I don't know
20 anything about a meeting."  I said, "Okay."
21 In the meantime, I get back on the line
22 with Lee and Lee is saying, "Did you tell them we're
23 having a meeting?"  I said, "Yeah; you didn't say
24 anything about this being a secret meeting."

31 (Pages 118 to 121)

A0735

b94d73f0-3eb1-4abe-9dd0-398029a5111f

Balas v. Taylor, et al.
Truman J. Mears

| Page 122 | Page 124 |
|---|---|

Page 122

1    So when that conversation was done, and I
2 got to Lee's house, and everybody was there, I spoke
3 up. I said, "First of all, I want to say something."
4 I said, "I did not realize this was a secret meeting.
5 I thought this was an open meeting. Everything in
6 CERT has always been open. If you have got a problem
7 with CERT command, they've always had an open door
8 policy to speak your mind." I said, "I don't agree
9 with a secret meeting." And I said, "If Warden Hall
10 was to walk in this house right now and kick every one
11 off of CERT for having a secret meeting to decide
12 whether or not you are going to respond to an
13 activation that you have already been activated for,
14 he would be right to do that because we don't do that;
15 we complete our mission and we take it from there."
16 Then I said, "With that being said, let's have this
17 meeting."
18    I was not real popular after that. But
19 that was how I felt.
20    Q.  So you said you -- so you said you were not
21 real popular after that?
22    A.  Yeah.
23    Q.  How did you know that you were not real popular
24 after that in the meeting?

Page 123

1    A.  Well, I shouldn't say, not real popular. I am
2 popular with a couple of them. It had already been
3 put out that I was a spy and I was this and that, and,
4 you know, I was there for CERT command and that sort
5 of thing, which was, you know, untrue.
6    Q.  But when the meeting was over, you did report
7 back to CERT command?
8    A.  Absolutely. I never made a secret of that.
9    Q.  Okay.
10    A.  But I did not report back to CERT saying, oh,
11 this was said and that was said. I said, "You are
12 going to have your guys there." And as team leader,
13 that's part of my job.
14    Q.  Were there any other team members at the
15 meeting?
16    A.  Lee Mears.
17    Q.  Did Lee report back, to the best of your
18 knowledge?
19    A.  No, I think Lee was one of the ones that -- Lee
20 was one of the ones that organized the meeting.
21    Q.  Right. So to the best of your knowledge, Lee
22 did not report back?
23    A.  I don't believe so. He may have. He may have.
24 I don't have any knowledge of that.

Page 124

1    Q.  You don't know either way?
2    A.  Right.
3    Q.  Now, let's move forward to the next day,
4 August 6th of 2004. Okay?
5    A.  Yes.
6    Q.  All right. Did you and John and the other
7 three CERT members show up for work at the C & T unit?
8    A.  Excuse me?
9    Q.  I'm sorry. The next day, did, when -- the day
10 that you were activated for, did you report for duty?
11    A.  I was not activated.
12    Q.  Do you know if the other five reported for
13 duty?
14    A.  For the activation, yes. I believe everyone
15 that was activated showed up.
16    Q.  You say that you were the watch commander for
17 that shift?
18    A.  For the 4:00 to 12:00 -- or 3:00 to 11:00
19 shift, I was watch commander of SCI that day.
20    Q.  So did that overlap the activation period for
21 the CERT members?
22    A.  The activation had stood down prior to me
23 taking the duty, going on duty.
24    Q.  Got ya. Okay. Do you know -- so were you

Page 125

1 there when the CERT members showed up?
2    A.  I was there when they showed up at the end of
3 the day to go speak with the warden.
4    Q.  Were you there when they arrived at the
5 institution in the beginning of the day?
6    A.  No, I was not.
7    Q.  So if -- do you have any knowledge as to things
8 that may have been said to those CERT members when
9 they arrived?
10    A.  Only what they have told me.
11    Q.  Okay. What have they told you?
12    A.  That a couple of the officers in the front half
13 of the institution, there were only a couple officers
14 there, had made off-handed comments toward them about
15 picket-breakers. I can't even remember exactly what
16 they were called, but it was not pleasant.
17    Q.  So it was reported to you that they were called
18 unpleasant things?
19    A.  Not as watch commander, but later on.
20    Q.  Sure. Someone told you that?
21    A.  Yes.
22    Q.  Did you ever investigate that?
23    A.  No. That would have been done by the watch
24 commander that morning when they were there. I have

Wilcox and Fetzer, Ltd.  Registered Professional Reporters        302-655-0477

b94d73f0-3eb1-4abe-9dd0-398029a5111f

A0736

Balas v. Taylor, et al.
Truman J. Mears

|  | Page 126 |
|---|---|

1  no clue.
2   Q.  Do you know if that watch commander ever
3  investigated that?
4   A.  I do not know.  I don't think anybody even
5  pursued it, but I'm not a hundred percent sure.  As
6  far as the officers, you know.  The officers didn't --
7  the CERT members didn't come to me and say, Hey,
8  Truman, they did this to me.  I heard it secondhand
9  from other officers.
10   Q.  Okay.  Got ya.  Do you have any knowledge about
11  what the workload was for the C & T unit that day?
12   A.  No clue right now.
13   Q.  Was there a time when you did know?
14   A.  No, not exactly.  I had heard rumors, but I
15  don't know.
16   Q.  What were the rumors that you had heard?
17   A.  I had heard rumors that they had a full load --
18  basically, they had a full load of all types of
19  transportations that day, not just major court cases,
20  but everyday C & T stuff.
21   Q.  In order to find someone with firsthand
22  information, I guess the people to ask would be the
23  CERT members who were activated that day?
24   A.  Well, CERT headquarters or C & T -- it's the

|  | Page 127 |
|---|---|

1  same thing --
2   Q.  Okay.
3   A.  -- would -- should have records of that.
4   Q.  Those would be other people to ask for other
5  places to look for documents?
6   A.  Yes.
7   Q.  Do you have any knowledge of a discussion that
8  day between Major David Hall and Lee Mears and some of
9  the other CERT members, any personal knowledge?
10   A.  I wasn't there, so.
11   Q.  Did you ever hear secondhand or otherwise about
12  conversations that were had between Major David Hall,
13  Lee Mears and some of the other CERT members that day?
14   A.  Some of the other CERT members, but not Lee
15  Mears, personally.
16   Q.  Right.  So some of the other CERT members may
17  have said something to you?
18   A.  Yes.
19   Q.  Was John Balas one of the other CERT members
20  who may have said something to you?
21   A.  No.
22   Q.  Who was?
23   A.  Scott Bradley.  That's the one.  That's the one
24  I knew of that told me that he spoke to Dave Hall that

|  | Page 128 |
|---|---|

1  morning.
2   Q.  Did Scott Bradley tell you anything about what
3  was said during that discussion?
4   A.  He told me he voiced his dislike for the
5  mission and that at the end of the mission, he would
6  be resigning from CERT.
7   Q.  Did Scott Bradley indicate that he was the only
8  one who said anything to Major Hall?
9   A.  Yes, he's the only one that has told me that I
10  said this to them.  And he didn't say anything about
11  anyone else saying anything.
12   Q.  Right, so Mr. Bradley just said what he said?
13   A.  He told me what he had said, and that's all I
14  have knowledge of.
15   Q.  Okay.  Did you ever hear that the decision to
16  activate CERT that day was made by someone higher than
17  Commissioner Stan Taylor?
18   A.  There was rumor it was the governor.
19   Q.  Who did you hear the rumor from?
20   A.  I couldn't tell you.  It was just one of those
21  things everybody talked about.
22   Q.  Is life in DOC sometimes like a soap opera?
23   A.  Sometimes it is.
24   Q.  It has that quality?

|  | Page 129 |
|---|---|

1   A.  Yes.
2   Q.  It has?
3   A.  Especially when it's dramatic like that.
4   Q.  Right.  You can have work-related things
5  circulating, right?  Like someone like who the
6  activation order came from?
7   A.  Yes.
8   Q.  Then you can have personal things circulating,
9  who is sleeping with who or who went to a ballgame
10  with who or things like that?
11   A.  That's any place you work.
12   Q.  Right.  But DOC does have that soap opera
13  quality to it?
14   A.  No different than anywhere else.
15   Q.  Okay.  Got ya.  You said you were present for a
16  meeting at the end of the shift or at the end of the
17  day?
18   A.  I wasn't present for the meeting.  I was there
19  as the guys went in to talk to the warden.  They
20  walked past me to get to the warden as I was bringing
21  in the shift.
22   Q.  So the guys that walked past you to meet with
23  the warden, who would that have been?
24   A.  That was the ten that quit.

33 (Pages 126 to 129)

b94d73f0-3eb1-4abe-9dd0-398029a5111f

A0737

## Balas v. Taylor, et al.
## Truman J. Mears

|  |  |
|---|---|
| Page 130 | Page 132 |

Page 130

1    Q.   The ten that quit.  So would that have included
2  John Balas?
3    A.   Yes.
4    Q.   That would have included Lee Mears?
5    A.   Yes.
6    Q.   Just so the record is clear.  Are you related
7  to Lee Mears?
8    A.   No.
9    Q.   So do you have any knowledge of what happened
10  during that meeting, any personal knowledge?
11    A.   A little bit.
12    Q.   From where -- what is your source of that
13  personally knowledge?
14    A.   The warden.
15    Q.   What did the warden tell you?  Just so we're
16  clear.  Who is the warden?
17    A.   At the time, it was Warden Rick Kearney.
18    Q.   What did the warden tell you?
19    A.   Once the guys came out of the meeting with the
20  warden and they left, went out and left, the warden
21  stepped out to me and said that:  "Did those guys get
22  the page?"  I said, "What page are you referring to?"
23  He said, "The page that the mission was over, stand
24  down, mission complete."  I said, "Yes, they all

Page 131

1  received it."  He said, "Well, when did they receive
2  it?"  I said, "Probably an hour before they came in."
3  I said, "I got the same page, all of us did at the
4  same time."  And he said, "So they knew that the
5  mission was over before they came in my office?"  I
6  said, "Yes, sir, they did."  He said, "Okay."  And he
7  didn't appear to be happy because the warden and
8  different ones had been working all day on getting the
9  mission, you know, squashed.
10    Q.   You said that warden -- is it?
11    A.   Kearney.
12    Q.   Kearney.  That's how it's pronounced?
13    A.   Yes.
14    Q.   How is it spelled?
15    A.   K-E-A-R-N-E-Y, I believe.
16    Q.   Okay.  Kearney.  You said that Warden Kearney
17  didn't seem happen or didn't appear happy.
18    A.   Didn't appear.  I mean, I can't -- to me, he
19  just didn't appear happy.  It was a rough day.
20    Q.   Was his brow furrowed?
21    A.   I don't know.
22    Q.   Did he have a look of displeasure on his face?
23    A.   Yes.
24    Q.   Did he curse?

Page 132

1    A.   I don't recall him cursing, no.
2    Q.   Is he the kind of person who does curse?
3    A.   I have heard him curse, yes.  I don't believe
4  I've heard him curse at work, but I have had a
5  occasion or two to be around him outside of work.
6    Q.   Right.  So you know him from work and you know
7  him from outside of work?
8    A.   Very little outside of work.
9    Q.   Okay.  Was his face red?
10    A.   I don't remember.
11    Q.   Was he sweating?
12    A.   I don't remember.
13    Q.   Was he -- how would you describe his tone of
14  voice?
15    A.   He was calm when he was talking to me until I
16  told him that -- well, I should say that he was calm
17  during our conversation, and when he found out that
18  they were -- I should say he was -- he seemed
19  disappointed more than aggravated.  He seemed
20  disappointed.
21    Q.   Did he seem annoyed?
22    A.   Maybe a little.
23    Q.   Maybe I can come up with a better word.
24    A.   But it was more disappointment.

Page 133

1    Q.   How about displeased?
2    A.   I would say more just disappointment, you know.
3    Q.   Okay.
4    A.   We didn't continue a long conversation after
5  that.  That was the end of the conversation.  He
6  turned around and walked back.
7    Q.   So was it a short conversation?
8    A.   Yes.
9    Q.   Okay.  Got ya.  Now, did you ever talk to any
10  of the various CERT members who had resigned during
11  that meeting about what was said during the meeting?
12    A.   I asked John Mumford on the way out of the
13  meeting:  "How did the meeting go?"  Because he said
14  they were quitting.  He said, "It went okay."  I said,
15  "What's the outcome?"  He said, "We all quit."  And
16  that was my first knowledge of their quitting.
17    Q.   What was your reaction to their quitting?
18    A.   Disappointment.
19    Q.   Why?
20    A.   Because I didn't have the knowledge of it ahead
21  of time, you know.
22    Q.   Were you disappointed they hadn't talked to you
23  about it first?
24    A.   Right.

34 (Pages 130 to 133)

b94d73f0-3eb1-4abe-9dd0-398029a5111f

A0738

Balas v. Taylor, et al.
Truman J. Mears

| Page 134 | Page 136 |
|---|---|

**Page 134**

1　Q.　Because you had asked the night before that
2　they speak to you?
3　A.　Yes. I asked John Mumford: "Why didn't --
4　wasn't I notified?" He said, "John Balas said, 'Don't
5　tell him because he'll talk you out of it.'" I said,
6　"Okay."
7　Q.　Okay. What was your reaction to learning that?
8　A.　I said, "Well, that was my right, if I wanted
9　to try, you know, voice my side of it, that was my
10　right. But, you know, you did what you did."
11　Q.　What was your reaction to learning that John
12　had said don't talk to you?
13　A.　It didn't surprise me, but, you know.
14　Q.　Why?
15　A.　He was very displeased with me the night before
16　for speaking up against him, you know.
17　Q.　Okay.
18　A.　So it didn't surprise me.
19　Q.　Let's focus on this standdown order.
20　A.　Mm-hmm.
21　Q.　When did that come down?
22　A.　It was that afternoon. I had just come on
23　duty. I couldn't give you the exact time. CERT
24　headquarters may be able to give you that.

**Page 135**

1　Q.　Was it near the end of their shift, of the CERT
2　members?
3　A.　Close to it, yes.
4　Q.　So they had already -- what's the term you
5　used? They had already crossed the line, so to speak,
6　to break the job action. It came down after they had
7　shown up?
8　A.　Yes.
9　Q.　So it came down at least -- strike that. Okay.
10　It came down toward the end of the shift?
11　A.　I believe so, yes.
12　　　MS. XARHOULAKOS: Just to clarify. Which
13　shift are we talking about?
14　　　MR. NEUBERGER: The shift of the CERT
15　members who were activated to substitute in the C & T
16　unit.
17　　　MS. XARHOULAKOS: Okay.
18　　　THE WITNESS: I should say, I am not sure
19　about that because they had a workload of taking so
20　many to court. I am not sure that was -- there would
21　have been no hours. It wouldn't have been you are
22　working 8:00 to 4:00 today. It would have been you
23　are working until the mission is complete for that
24　day.

**Page 136**

1　　　MR. NEUBERGER: Right.
2　　　THE WITNESS: I don't know how much they
3　completed that day.
4　BY MR. NEUBERGER:
5　Q.　Do you know what time the courts open?
6　A.　Well, I mean the courts would be open
7　9:00 o'clock that morning. I'm not -- I don't even
8　know what all they were going to do, if it was just
9　taking them to court or if they were going to do full
10　transportation, you know. I believe this was all done
11　by around between 2:00 and 3:00.
12　Q.　Got ya. Okay.
13　A.　But, again, CERT headquarters should have that
14　knowledge, you know, pretty close when they sent out
15　the page.
16　Q.　Okay. Did you ever speak to anyone else above
17　you in the chain of command and learn their reaction
18　to the mass CERT resignation?
19　A.　Could you ask that question again?
20　Q.　Sure. You had mentioned you had spoken to the
21　warden.
22　A.　Yes. He came out to ask me a question.
23　Q.　Did you ever talk to him about that
24　subsequently?

**Page 137**

1　　　MS. XARHOULAKOS: Perhaps you could clarify
2　the question. About that, about what?
3　BY MR. NEUBERGER:
4　Q.　Sure. Did you ever speak to the warden about
5　the mass CERT resignation afterwards, after that
6　initial conversation that you had with him after the
7　CERT members resigned?
8　A.　With the warden, no.
9　Q.　Did you ever discuss the CERT mass resignation
10　with anyone else above you in the chain of command
11　thereafter?
12　A.　No. We have a bimonthly, sometimes it's every
13　three months meeting, with the deputy warden and the
14　major as the CERT Team leaders.
15　Q.　Okay.
16　A.　The next time we met with them, it was
17　discussed briefly about that.
18　Q.　Who was the major and who was the deputy
19　warden?
20　A.　It would have been -- it was Deputy Warden
21　Deloy at that time. I am not are sure if there was
22　anybody else there or not.
23　Q.　You are not sure if the major was there?
24　A.　The major is always invited, but I can't

35 (Pages 134 to 137)

b94d73f0-3eb1-4abe-9dd0-398029a5111f

Balas v. Taylor, et al.
Truman J. Mears

| Page 138 | Page 140 |
|---|---|
| 1 remember if the major was there at that time or not. | 1 been undercut? |
| 2 Q. What was said about the mass CERT resignation | 2 A. No. I told them the night before that you got |
| 3 at this meeting? | 3 to make your own decisions. |
| 4 A. Basically, that they had come up with a list of | 4 Q. Okay. |
| 5 demands if they were going to be reinstated. I gave | 5 A. And they're all men, they can make their |
| 6 that to them. Lee Mears gave me that list. And that | 6 decision on that; they just have to live with their |
| 7 we wanted to continue with a strong CERT Team from | 7 decision afterwards. It stung, yes. |
| 8 that point on. | 8 Q. It stung? |
| 9 Q. What was the reaction? | 9 A. It stung a little, yes. We were all close. We |
| 10 A. And that was pretty much the end of the | 10 were all in a unit together. And to have that happen |
| 11 discussion about the guys that quit. | 11 was not a pleasurable experience. But we all, we all |
| 12 Q. Was there a reaction from the warden -- I'm | 12 moved on and got over it very quickly. |
| 13 sorry, fro the Deputy Warden, Deloy? | 13 Q. Do you think it made you look bad in the eyes |
| 14 A. He was all for us moving forward and building | 14 of your bosses? |
| 15 our teams back. | 15 A. No. |
| 16 Q. What was Deloy's reaction to the resignation in | 16 Q. Why not? |
| 17 general? | 17 A. Because I stood my ground for what I believed |
| 18 A. I wasn't around him at that time, so I didn't | 18 in. |
| 19 really get to get a, see a reaction from him. | 19 Q. Okay. |
| 20 Q. How about the general reaction from management? | 20 A. And I told them the night before that the very |
| 21 A. I didn't really speak to many people about it, | 21 existence of CERT far outweighs any personal issues |
| 22 you know, within management. | 22 you have with CERT headquarters. And if anybody in |
| 23 Q. Okay. Well, all right. So you are a | 23 that room had been a part of the entry team during the |
| 24 lieutenant; right? | 24 hostage situation, which I was, they would understand |

| Page 139 | Page 141 |
|---|---|
| 1 A. Yes. | 1 that, and see that the very existence of CERT far |
| 2 Q. And then you are also one of the CERT Team | 2 outweighs any personal issues with CERT command. |
| 3 leaders at SCI? | 3 Q. Okay. |
| 4 A. Yes. | 4 A. And so I was looking at it a little differently |
| 5 Q. And you had met with the CERT members on the | 5 than some of them, maybe. |
| 6 evening of August 5th; right? | 6 Q. Is that something that you feel strongly about? |
| 7 A. Yes. | 7 A. CERT? |
| 8 Q. At the so-called secret meeting? | 8 Q. What you just said to me, about there being |
| 9 A. Yes. | 9 bigger issues involved? |
| 10 Q. And you tried to talk them out of a mass | 10 A. Yes. |
| 11 resignation? | 11 Q. Okay. Let's put another document in front of |
| 12 A. I tried to tell them that there was other | 12 you. We'll call this Mears Exhibit 10. |
| 13 options other than just quitting. | 13 (Mears Exhibit No. 10 was marked for |
| 14 Q. Okay. | 14 identification.) |
| 15 A. And we needed to explore those. | 15 BY MR. NEUBERGER: |
| 16 Q. You asked them to speak to you the next day if | 16 Q. Now, do you have this document in front of you? |
| 17 something changed; right? | 17 A. Yes, I do. |
| 18 A. Yes. | 18 Q. On the very bottom, does it say, "P518"? |
| 19 Q. They didn't speak to you the next day? | 19 A. Yes. |
| 20 A. No. | 20 Q. Does this appear to be an e-mail from Major Tim |
| 21 Q. They all resigned without speaking to you about | 21 Radcliffe, dated Thursday, August 12th, 2004? |
| 22 it beforehand? | 22 A. Yes, it is. |
| 23 A. Yes. | 23 Q. Were you copied on this e-mail? |
| 24 Q. And so did you feel like your authority had | 24 A. Yes, I was. |

Wilcox and Fetzer, Ltd.  Registered Professional Reporters          302-655-0477

b94d73f0-3eb1-4abe-9dd0-398029a5111f

A0740

Balas v. Taylor, et al.
Truman J. Mears

| Page 142 | Page 144 |
|---|---|

**Page 142**

1   Q.  Did there appear to be ten recipients under the
2   to line where it says who the e-mail was directly sent
3   to?
4   A.  Yes, ten.
5   Q.  Do those names all appear to be the individuals
6   who resigned from CERT?
7   A.  Yes.
8   Q.  Does this appear to be an e-mail from
9   Major Radcliffe in which he's thanking the various
10  members for their years of dedicated service and
11  saying that in the past they have been valued members
12  of the team?
13  A.  Yes.
14  Q.  Then we go on to the second paragraph, where he
15  says, "It is unfortunate at this critical time in the
16  history of the Delaware Department of Correction you
17  have decided to resign from the CERT Team."  Do you
18  see that?
19  A.  Yes.
20  Q.  And it goes on and says, "While I do not
21  sanction the process that was utilized, I respect your
22  decision and wish you the best of luck in your future
23  endeavors."
24  A.  Yes.

**Page 143**

1   Q.  I want to focus on the part where it says, "I
2   do not sanction the process that was utilized."
3   A.  Mm-hmm.
4   Q.  Do you know what he was referring to there?
5   A.  Not exactly.  I mean, I would guess just by
6   them resigning or quitting.
7   Q.  The mass resignation?
8   A.  Yes.
9   Q.  Okay.  Then down at the bottom, there is a
10  Latin phrase, the last line in the e-mail.  Do you
11  know what that means?
12  A.  Yes.  Respondeo Citatio.  That's answering the
13  call.
14  Q.  That's the CERT motto?
15  A.  Yes.
16  Q.  Were the ten members who resigned from CERT
17  answering the call?
18  A.  On that mission?
19  Q.  Mm-hmm.
20  A.  Yes, they were.
21  Q.  How about when they were resigned?
22  A.  When they resigned, they were no longer part of
23  CERT.
24  Q.  So when they resigned, would they be answering

**Page 144**

1   the call any longer?
2   A.  No.
3   Q.  You can put that down.
4        Now, to the best of your recollection, were
5   you the only -- prior to the mass resignation from
6   CERT, you were also John's supervisor?
7   A.  Yes.
8   Q.  You were also his supervisor after he resigned
9   from CERT?
10  A.  Yes.
11  Q.  Do you know if any of the other CERT members
12  were supervised by other CERT members?
13  A.  I don't recall if Kendall Hickman was over any
14  of those.  I'm not exactly sure.  He was another team
15  leader.  I am sure he was.  I couldn't tell you which
16  ones, though.
17  Q.  Why didn't you resign in solidarity with the
18  other members?
19  A.  I didn't agree with it.
20  Q.  We talked about that a little bit?
21  A.  Yes.
22  Q.  Right?
23  A.  Yes.
24  Q.  Now, about a month later, you prepared a

**Page 145**

1   performance evaluation of John, right?
2   A.  Yes.
3   Q.  I would like to put this document in front of
4   you.  This will be Mears Exhibit No. 11.
5        (Mears Exhibit No. 11 was marked for
6   identification.)
7   BY MR. NEUBERGER:
8   Q.  Do you have this document in front of you?
9   A.  Yes.
10  Q.  All right.  Let's focus on the first page where
11  at the bottom right-hand corner it says, "D00084."
12  A.  Yes.
13  Q.  Can you see that?
14  A.  Yes.
15  Q.  Okay.  Up top, it says, "Supervisor job title,
16  Lieutenant Truman Mears."  Right?
17  A.  Yes.
18  Q.  It says, "Date or time period covered:
19  September of '03 through September of '04"?
20  A.  Yes.
21  Q.  Then under areas where it says -- the next
22  section down, "Areas where performance is
23  distinguished or exceeds expectations, if any."  Can
24  you read to me what you typed there?

37 (Pages 142 to 145)

b94d73f0-3eb1-4abe-9dd0-398029a5111f

A0741

Balas v. Taylor, et al.
Truman J. Mears

|  | Page 146 |  | Page 148 |
|---|---|---|---|
| 1 | A. Which section do you want me to read now? | 1 | A. No, I think it's saying that -- it's try -- |
| 2 | Q. I'm sorry. The section under -- the text of | 2 | it's not -- it's saying something good, you know, |
| 3 | the section where it says, "Areas where performance is | 3 | about his perfect attendance. It's trying to |
| 4 | distinguished or exceeds expectations, if any." | 4 | recognize that. |
| 5 | A. Oh, okay. "Corporal Balas has perfect | 5 | Q. Okay. How about the part after the perfect |
| 6 | attendance and that is commendable, however, in this | 6 | attendance, where it starts with "however"? |
| 7 | case, I do not feel that his perfect attendance is | 7 | A. Right; because there is more to the story than |
| 8 | justification for an exceeds." | 8 | just perfect attendance. |
| 9 | Q. Was this in the original draft which you showed | 9 | Q. So you don't think this sounds defensive? |
| 10 | to Corporal Balas in September of '04, that line that | 10 | A. Possibly, yes. |
| 11 | you just read to me? | 11 | Q. Do you think it could be perceived as |
| 12 | A. I couldn't tell you. I don't know. As far as | 12 | defensive? |
| 13 | I know, Corporal Balas never looked at the evaluation. | 13 | A. It could be. |
| 14 | Q. Okay. Maybe we should -- do you recall a time | 14 | Q. Did you intend it that way? |
| 15 | when you prepared this document? | 15 | A. I intended it as an explanation. |
| 16 | A. Yeah. I know I prepared it, yes. | 16 | Q. Why did you feel an explanation was needed? |
| 17 | Q. Do you recall when that was? | 17 | A. Because on this evaluation, he was going to be |
| 18 | A. I couldn't tell you right offhand, no. | 18 | dropping from an exceeds to a meets, and I wanted to |
| 19 | Whatever the date is on it. It would ... | 19 | explain things without putting it in a negative light |
| 20 | Q. Does the date September 26th, 2004 ring a bell? | 20 | on John. |
| 21 | A. Not really. But I mean, if that's when this | 21 | Q. Okay. And so do you always do that when you |
| 22 | was done, I guess that's when it was done. | 22 | are dropping someone from an exceeds to a meets? |
| 23 | Q. Do you prepare drafts of evaluations? | 23 | A. It's according to the situation. |
| 24 | A. Sometimes. It's according. I do drafts on | 24 | Q. Have you done it before, before September of |

|  | Page 147 |  | Page 149 |
|---|---|---|---|
| 1 | just about everything, you know, before I type it out | 1 | 2004? |
| 2 | final. | 2 | A. Not -- not from exceeds to a meets, but from, |
| 3 | Q. Do you think you did drafts on this? | 3 | like, meets to needs improvement, that sort of thing. |
| 4 | A. I don't know. | 4 | Q. Okay. In the next section down, where it says, |
| 5 | Q. Are you the kind of person who saves your | 5 | "Areas of specific performance deficiencies or |
| 6 | drafts? | 6 | unsatisfactory work, if any," it says, "See attached |
| 7 | A. Sometimes. | 7 | summary." |
| 8 | Q. Do you -- | 8 | A. Okay. |
| 9 | A. Not always. | 9 | Q. Do you see that? |
| 10 | Q. Do you think you have saved drafts of this? | 10 | A. Mm-hmm. |
| 11 | A. I have no clue. | 11 | Q. Do you know if the "see attached summary" |
| 12 | Q. Have you looked? | 12 | reference was in the first draft of this that you |
| 13 | A. No. | 13 | prepared and showed to John Balas? |
| 14 | MR. NEUBERGER: Counsel, I would like to, | 14 | MS. XARHOULAKOS: I am just going to |
| 15 | just for the record, ask that he look at this stuff -- | 15 | object. He already said he believed Balas never saw |
| 16 | I think it falls within the scope of some of our | 16 | it. |
| 17 | earlier document requests -- and look to see whether | 17 | MR. NEUBERGER: I'm sorry? |
| 18 | he has earlier drafts of this September of '03 to | 18 | MS. XARHOULAKOS: He already said he |
| 19 | September of '04 performance evaluation. | 19 | doesn't believe Balas ever saw it, the evaluation. So |
| 20 | MS. XARHOULAKOS: Sure. | 20 | clarify the question. |
| 21 | BY MR. NEUBERGER: | 21 | MR. NEUBERGER: I will clarify the |
| 22 | Q. Now, Lieutenant, what I am trying to get at is | 22 | question. |
| 23 | in this first section that you just read to me, do you | 23 | THE WITNESS: He never opened it up. He |
| 24 | think that first section sounds defensive? | 24 | never once looked at it. |

38 (Pages 146 to 149)

b94d73f0-3eb1-4abe-9dd0-398029a5111f

A0742

Balas v. Taylor, et al.
Truman J. Mears

| Page 150 | Page 152 |
|---|---|
| BY MR. NEUBERGER:<br>1<br>2  Q.  Do you believe this section, where it says "see<br>3 attached summary," do you believe that was there when<br>4 you first asked John Balas to review his evaluation?<br>5 Or is that something you added later?<br>6  A.  I am not sure.<br>7  Q.  So it could have been something you added<br>8 later?<br>9  A.  There is a possibility.  I am not sure.<br>10  Q.  It's just --<br>11  A.  A lot of this stuff I haven't seen in a long<br>12 time.<br>13  Q.  So it's been three years.  Actually, it's been<br>14 more than three years, right?<br>15  A.  Yes, it's been more than that.<br>16  Q.  So sometimes it's hard to remember things that<br>17 happen that long ago?<br>18  A.  Yes, it is.<br>19  Q.  Memories fade?<br>20  A.  Yes.<br>21  Q.  Life happens; right?<br>22  A.  Yes.<br>23  Q.  A lot of things have happened over the course<br>24 of three plus years? | 1  Q.  So it could be you just don't remember?<br>2  A.  It could be.<br>3  Q.  And also it could not be?  You just don't<br>4 remember either way?<br>5  A.  Right.  This is the first time I have seen this<br>6 in awhile, so.<br>7  Q.  And at the very bottom it says, "Meets<br>8 expectations," is circled; right?<br>9  A.  Yes.<br>10  Q.  That's your signature underneath there?<br>11  A.  Yes, it is.<br>12  Q.  It's dated 12/6/04; right?<br>13  A.  Yes.<br>14  Q.  It's not signed by John?<br>15  A.  Correct.<br>16  Q.  Okay.  Well, first -- okay.  Do you know why<br>17 John didn't sign this?<br>18  A.  No.  He never would even look at it, so.  Prior<br>19 to this, John wouldn't talk to me.  He had -- you<br>20 know, since he quit CERT, he kind of stayed away from<br>21 me, and --<br>22  Q.  Okay.<br>23  A.  -- I still did the same thing every day, I<br>24 walked back, made a pot of coffee for the guys, said, |

| Page 151 | Page 153 |
|---|---|
| 1  A.  Yes.<br>2  Q.  Right now I'm just trying to get to your best<br>3 recollection.<br>4    All right.  Now, the next section down<br>5 where it says, "Areas where growth or<br>6 skills/knowledge, development, is suggested or needed.<br>7 If not applicable, please use this space and/or attach<br>8 summary explanation of how employee met expectations."<br>9 Do you see that?<br>10    Here we go.  Sorry.  Right here.<br>11  A.  Yes.  Okay.<br>12  Q.  Could you read what you typed there, where it<br>13 starts with "Corporal Balas"?<br>14  A.  "Corporal Balas is knowledgeable of SCI<br>15 policies and procedures.  He shows up for duty in a<br>16 timely manner.  He uses leave in accordance with<br>17 policy."<br>18  Q.  Then underneath that it says, "NOTE:  See<br>19 attached summary."  Do you see that?<br>20  A.  Yes.<br>21  Q.  Do you think that could be something you added<br>22 later where it says, "NOTE:  See attached summary."?<br>23  A.  Again, same as before.  I really can't honestly<br>24 tell you right now. | 1 "Good morning" to everybody.  John just wouldn't<br>2 respond to me.<br>3  Q.  Okay.<br>4  A.  So when I did his evaluation, I approached him<br>5 and asked him to come to my office to review it.  And<br>6 he kind of blew up a little bit and wouldn't do it,<br>7 wouldn't look at it, you know.  I backed off to give<br>8 him some more space because he just seemed like he was<br>9 still holding grudges.<br>10  Q.  John say to you why he wouldn't look at it?<br>11  A.  The first time, no.  He just said -- you know.<br>12 He said -- I believe he said, "Is it an exceeds?"<br>13  Q.  Okay.<br>14  A.  I said, "John, we'll discuss it in the office.<br>15 You can take a look at it."  "It's not an exceeds, I<br>16 don't want it."  That was his attitude from that<br>17 point.  He would not even -- and then he asked for a<br>18 copy of it.  I said, "If you come to the office, we'll<br>19 review it; you can express your opinion, and you'll<br>20 get a copy."  But he would not, would not do it.<br>21  Q.  Do you recall if this could have been in<br>22 September of '04 or you are just not sure either way?<br>23  A.  Possibly, yeah.  Because I tried over a period<br>24 of time to get him to come in and review it, and he |

Wilcox and Fetzer, Ltd.  Registered Professional Reporters        302-655-0477

b94d73f0-3eb1-4abe-9dd0-398029a5111f

A0743

Balas v. Taylor, et al.
Truman J. Mears

| Page 154 | Page 156 |
|---|---|
| 1  wouldn't do it.<br>2   Q.   Okay.  So it's your testimony that John never<br>3  looked at it?<br>4   A.   Yes.<br>5   Q.   And you do remember that?<br>6   A.   Yes.<br>7   Q.   Clearly?<br>8   A.   He would not acknowledge it.  Once he asked me<br>9  if it was an exceeds, and I told him to come in and<br>10  review it, he said, "It's not an exceeds; I don't want<br>11  it," and that was the end of it.<br>12   Q.   Okay.  Let's turn to the second page of this<br>13  exhibit.  At the very bottom, it says, "D85."<br>14   A.   Yes.<br>15   Q.   Does this appear to be the attachment<br>16  referenced in the, on page 1?<br>17   A.   Excuse me?<br>18   Q.   Does this page 2 of this exhibit where it says,<br>19  "D0085," does this appear to be the attachment<br>20  referenced in page 1 of this exhibit or -- I'm sorry,<br>21  the attachment --<br>22   A.   No, this isn't the attachment, that I am aware<br>23  of.<br>24   Q.   What is this? | 1   A.   I believe so.<br>2   Q.   What was your reaction to that?<br>3   A.   I didn't know where this come from, you know,<br>4  union representation and Captain Wilkinson.  I had<br>5  spoken to Captain Wilkinson.  He was my supervisor.<br>6  He was aware of the situation between me and John and<br>7  the evaluation.<br>8   Q.   Okay.<br>9   A.   And I asked him one night, I said, "I can't get<br>10  him to take a look at his evaluation.  If you are here<br>11  one night, and John is here one night, would you mind<br>12  sitting in my office with me and maybe he'll come and<br>13  review his evaluation like that."  Captain Wilkinson<br>14  said, "Sure, no problem."  And that was the extent of<br>15  that conversation.<br>16       As far as, you know, Captain Wilkinson has<br>17  since told me that he told John that he would do that.<br>18  But I didn't have knowledge of that, you know.  I only<br>19  knew what I had talked to Captain Wilkinson about.  So<br>20  I guess that's where that's -- when he come up, he<br>21  wanted union representation and Captain Wilkinson in<br>22  there, you know, demanding all these things, just to<br>23  review an evaluation.<br>24   Q.   Right.  Did you find that demand to be |

| Page 155 | Page 157 |
|---|---|
| 1   A.   This is an explanation of him not signing it.<br>2  Well, let me check now.<br>3   Q.   Yeah, please read it.<br>4   A.   Yes, this is my explanation as to why it was<br>5  turned in without his signature.<br>6   Q.   Right, so this wasn't -- do you know if this<br>7  document was part of the performance evaluation, this<br>8  page of this document, was this part of the<br>9  performance evaluation?<br>10   A.   I am not sure if it was attached to it or just<br>11  turned in with it as an explanation.  It was not<br>12  intended to be a part of the evaluation.<br>13   Q.   Okay.<br>14   A.   It was an explanation.<br>15   Q.   Right.  So let's go to this first paragraph of<br>16  this explanation.  Have you read that to yourself yet?<br>17   A.   Yes.<br>18   Q.   Do you recall John Balas saying that he would<br>19  not review this with you unless Captain Wilkinson and<br>20  a union representative were present?<br>21   A.   Yes, yes, I do.  That was, like, the last time<br>22  I tried to get him to sign -- to look at it.<br>23   Q.   This would have been in, at least according to<br>24  this document, January 9th of 2005? | 1  unreasonable?<br>2   A.   Under the circumstances, yes, because a period<br>3  of time had lapsed, multiple opportunities had been<br>4  given for him to look at it.  None of that had been<br>5  brought forward before, and, you know.<br>6   Q.   Okay.  I'm sorry.<br>7   A.   So I felt that at that point, it was just time<br>8  to turn it in.<br>9   Q.   Didn't John file a union grievance against you?<br>10   A.   Not that I'm aware of.<br>11   Q.   Because of this evaluation?<br>12   A.   Not that I'm aware of.  I don't believe that<br>13  will meets expectation is a grievable issue, but I may<br>14  be wrong.<br>15   Q.   Right.  You are saying you don't think it's a<br>16  grievable issue or you don't know if he filed a<br>17  grievance?<br>18   A.   I have no knowledge of him filing a grievance.<br>19   Q.   Have you ever heard that he filed such a<br>20  grievance?<br>21   A.   Only recently Captain Wilkinson said something<br>22  about it, that he had heard about it, but he didn't<br>23  have any knowledge of it either.  So it was just<br>24  hearsay.  But I never had any knowledge of him filing |

40 (Pages 154 to 157)

b94d73f0-3eb1-4abe-9dd0-398029a5111f

A0744

Balas v. Taylor, et al.
Truman J. Mears

| | |
|---|---|
| Page 158 | Page 160 |

**Page 158**

1  a grievance.
2   Q.  How about a complaint?
3   A.  About?
4   Q.  I'm sorry.  Do you have any knowledge of John
5  filing a complaint about your evaluation of him?
6   A.  No, I do not have any knowledge of that either.
7   Q.  Let's turn to page 3 of this exhibit.  Why
8  don't you read this quietly to yourself?
9       MR. NEUBERGER:  I guess this would be a
10  good spot for a break.  It's been about an hour.
11      MS. XARHOULAKOS:  Very good.
12      MR. NEUBERGER:  So off the record.
13      (Recess taken.)
14  BY MR. NEUBERGER:
15   Q.  Now, Lieutenant, do you have this page 3 of
16  Mears Exhibit 11 in front of you?
17   A.  Yes.
18   Q.  Have you reviewed that?
19   A.  Yes.
20   Q.  Now, does this appear to be the attachment
21  referenced on page 1?
22   A.  Yes.
23   Q.  So this would have been the attachment which
24  you attached at some point to John's performance

**Page 159**

1  evaluation?
2   A.  Yes.  And this was for John to read.
3   Q.  I'm sorry?
4   A.  And this was for John to read.
5   Q.  Right, right.  Okay.  Now, in this you -- would
6  you agree with the characterization that in this you
7  tried to justify why John had not received an exceeds
8  expectations ranking?
9   A.  It was, yes, without putting a lot of negative
10  stuff in his evaluation.
11   Q.  Okay.
12   A.  That wasn't my goal.
13   Q.  Right.  And I think you said before that you
14  didn't remember if you had prepared this attachment
15  initially or whether you prepared it later; you
16  couldn't remember either way?
17   A.  Right.
18   Q.  Okay.  Now, what I'd like to do is just -- and
19  the reason I'm asking that is because the attachment
20  does not have a date on it.
21   A.  Okay.
22   Q.  You see that there is no date on this page;
23  right?
24   A.  Yes, I know.

**Page 160**

1   Q.  Now, on the first paragraph, I think you
2  mentioned that just because someone receives exceeds
3  expectations in the past doesn't mean they're going to
4  receive exceeds expectations in the future; right?
5   A.  Yes.
6   Q.  And let's go to the second paragraph.  It
7  begins by saying that John had previously received
8  exceeds expectations in the past because he deserved
9  it because of his job performance; and the extra
10  effort he put forth with CERT; his assistance to you
11  in training officers in the QRT; his job performance
12  in the receiving room; and because of his perfect
13  attendance.  It says that; right?
14   A.  Yes, it does.
15   Q.  Then you go on and you list about four, what I
16  counted there were about four reasons why he did not
17  receive that ranking here.  I would like to walk
18  through them with you.
19   A.  Sure.
20   Q.  Okay?  You begin by saying this year, "However,
21  there have been several events to change that.  First,
22  after completing the training of QRT, I sent Major
23  Townsend an e-mail stating that I did not want
24  Corporal Balas to help teach any classes under me in

**Page 161**

1  the future because of his performance."  Then you go
2  on and say, "The next time I talked to Major Townsend
3  in detail, he agreed to this."  Right?
4   A.  Yes, and --
5   Q.  I'm sorry?
6   A.  And at that time talking to Major Townsend,
7  other issues had come up with John, and I said, "If he
8  continues on this road, he's not going to make an
9  exceeds this year."
10   Q.  Right.
11   A.  "And it's not going to be pretty, John is not
12  going to accept that well."  And he was in agreement.
13  Knowing John, that wouldn't go over well.
14   Q.  Now, where is this e-mail that you sent to
15  Major Townsend?
16   A.  I don't know.  I didn't save it.
17   Q.  You didn't save it?
18   A.  No.
19   Q.  Do you have a sent mail folder, or something
20  like that?
21       MS. XARHOULAKOS:  Counsel, if I may
22  interject there.
23       MR. NEUBERGER:  Sure.
24       MS. XARHOULAKOS:  We do have a hold already

41 (Pages 158 to 161)

b94d73f0-3eb1-4abe-9dd0-398029a5111f

A0745

Balas v. Taylor, et al.
Truman J. Mears

Page 162

1  on the electronic data for discovery, but as you all
2  know, we have been unable to search it yet. We're
3  trying to hire someone to do that. It may be it comes
4  out when we do the search of records. It's not in the
5  documents we produced yet.
6         MR. NEUBERGER: So it wasn't in the Friday
7  documents?
8         MS. XARHOULAKOS: Right, right.
9         MR. NEUBERGER: We're not going to be able
10 to end the deposition today, then. I thought all the
11 stuff was in the Friday, so which means we may have to
12 come back again.
13        MS. XARHOULAKOS: So long as we don't go
14 over our time here. We're already getting pretty late
15 in the day. I don't know how much time we have set
16 for the depo.
17        MR. NEUBERGER: That's fine.
18        MS. XARHOULAKOS: We do have some
19 electronic documents, I believe, that we'll produce,
20 still. Assuming that we recover any documents after
21 we do a search.
22 BY MR. NEUBERGER:
23   Q.  Now, would you have put a copy of that e-mail
24 in your supervisory file?

Page 163

1   A.  No.
2   Q.  Why?
3   A.  Again, this was something that was extra that
4  he did above his duties in the receiving room, which
5  he was being evaluated on.
6   Q.  Okay.
7   A.  And it just meant that he didn't have that
8  extra now. So I didn't want to put negative stuff in
9  there.
10  Q.  Okay.
11  A.  Because it was extras that he was doing.
12  Q.  So you are saying because his job performance
13 was lacking in the extras?
14  A.  Yes, and in that instance. And, you know, if
15 somebody is doing the extra thing that they don't
16 really have to do, they're volunteering to do, and
17 then they just choose to quit it or not doing so good
18 at it and they're removed from it, well, that was
19 extras to make things go up.
20  Q.  Are you saying that's not enough to make things
21 to go down?
22  A.  No, that's not what I'm saying. The extras put
23 him over the top of going higher, but in the same
24 term, since it was voluntary, I can't see it affecting

Page 164

1  an evaluation for his daily duties.
2   Q.  Okay.
3   A.  In a negative way.
4   Q.  Okay. This is the same QRT stuff which we
5  talked about earlier in Mears Exhibit 8, where John
6  received a memo of appreciation from Major Townsend?
7   A.  Yes, it is.
8   Q.  Right.
9   A.  Yes.
10  Q.  You don't mention that memo of appreciation in
11 this evaluation, do you? Either on the first, second
12 or third pages of this exhibit?
13  A.  No, it's not.
14  Q.  Why?
15  A.  I don't have an answer right now.
16  Q.  I'm sorry?
17  A.  I don't have an answer for that. I don't know
18 why it's not in there other than the fact that due to
19 his poor performance, he was taken out of it.
20  Q.  I'm sorry. I am not following you. The memo
21 was dated July 8th of 2004; right?
22  A.  Yes, it was.
23  Q.  And you are saying that somehow due to his poor
24 performance the memo would be taken out of the

Page 165

1  evaluation?
2   A.  No, no.
3   Q.  Okay. Could you explain that to me, then? I
4  am not following what your explanation is.
5   A.  I thought you were referring to why the QRT
6  wasn't referred to in there. You are saying the --
7  rephrase or ask the question again, please.
8   Q.  Okay, sure. In the evaluation that we're
9  looking at, the QRT is not referenced as a positive;
10 correct?
11  A.  Exactly.
12  Q.  It's referenced in this attachment here as a
13 negative?
14  A.  Exactly.
15  Q.  You are saying that John's performance during
16 the QRT was lacking?
17  A.  Yes.
18  Q.  This is the same performance for which he
19 received a memo of appreciation from major --
20  A.  From the major.
21  Q.  Right?
22  A.  Yes.
23  Q.  The memo of appreciation is not mentioned in
24 the evaluation; right?

42 (Pages 162 to 165)

b94d73f0-3eb1-4abe-9dd0-398029a5111f

A0746

Balas v. Taylor, et al.
Truman J. Mears

Page 166

1   A.  Yes.
2   Q.  The memo of appreciation is not mentioned in
3   the evaluation under areas where his performance is
4   distinguished or exceeds expectations; right?
5   A.  Correct.
6   Q.  The memo of appreciation is not mentioned in
7   the other areas on the first page of Mears Exhibit 11
8   under "Areas of specific performance deficiencies or
9   unsatisfactory work."
10  A.  Okay.
11  Q.  Correct?
12  A.  Correct.
13  Q.  And the memo is not mentioned in any other
14  place in this exhibit; correct?
15  A.  Correct.
16  Q.  Okay.  And I think I asked you why.
17  A.  Okay.
18  Q.  You said you didn't know.
19  A.  It could be -- I don't have the answer.  It
20  could be several reasons.  I may not have had a copy
21  of it.  I don't know.
22  Q.  Was John good about giving you copies --
23  A.  Yes, he was; yes, he was.
24  Q.  Let me finish.  Was John good about giving you

Page 167

1   copies of positive letters or memos that he received
2   from his supervisors or from others?
3   A.  Yes, he was.
4   Q.  Would it have been out of character for John
5   not to give you a copy of this?
6   A.  At this time, in his career, nothing was out of
7   character.  That would not have been out of character.
8   Q.  How about July of 2004, this is prior to the
9   CERT resignation and the CERT problems in August of
10  2004?
11  A.  Yes, it still would have been in character of
12  him.  He was a little different.
13  Q.  So you are saying, I think you testified
14  earlier this morning that you began to notice changes
15  in his behavior one year before he died?
16  A.  Some changes.
17  Q.  Okay.
18  A.  Nothing, I mean, not major, not major
19  deficiencies, but uncharacteristic for him.
20  Q.  Right.  And let's talk about some of those
21  things because we're still on page 3 of Mears Exhibit
22  11.  The second area of problems that you mentioned is
23  that you had two meetings with the sergeant in charge
24  of the area where John worked about his poor work

Page 168

1   performance, poor attitude and his unwillingness to
2   get along with other staff?
3   A.  Exactly.
4   Q.  Do you have any documentation for that?
5   A.  No, I don't.
6   Q.  Why?
7   A.  I didn't document it.
8   Q.  Why?
9   A.  I don't know why.
10  Q.  Aren't you supposed to document things like
11  that?
12  A.  If it gets to the point that it is -- I felt
13  that John could pull out of it.  I felt that John was
14  going to bounce back and he was just going through
15  something.  Again, I didn't want negative stuff on --
16  I just felt that John was going to bounce back.
17  Q.  And so that's why you didn't make a record?
18  A.  Of the meeting with the sergeant, yes.  It was
19  just the sergeant came into the office and said, you
20  know, can't get along with him; you know, he's not
21  wanting to get along with anybody, that sort of thing.
22  Q.  Right.  So it was one meeting, so you just
23  didn't make a record of it?
24  A.  No, it was a couple times that he came in.

Page 169

1   Q.  So it happened more than once?
2   A.  My office was right next to the receiving room.
3   So people came in and out, you know.  I'd go back and
4   talk: Hey, you know, can't you get along?  That sort
5   of thing.  Yeah, yeah.  Okay.
6   Q.  So it happened more than once?
7   A.  With Sergeant Cassase, yes.
8   Q.  It wasn't just an isolated incident?
9   A.  And, you know -- exactly.  And I would go talk
10  to John, you know.  "Look, we need to try to get
11  along."  Yeah.  Okay, yeah.  He would agree.
12  Q.  Okay.
13  A.  And then, okay.  Problem solved, you know.
14  Hopefully, problem solved.  And that would be the end
15  of it.
16  Q.  But you are saying it happened more than once?
17  A.  It happened at least -- it happened twice that
18  I can recall.
19  Q.  Do you recall the time frame?
20  A.  Not exactly.  I have to look at some records of
21  when Sergeant Cassase was in that area and that sort
22  of thing to narrow it down.
23  Q.  So do employees who demonstrate poor work
24  performance, poor attitude and an unwillingness to get

43 (Pages 166 to 169)

b94d73f0-3eb1-4abe-9dd0-398029a5111f

A0747

Balas v. Taylor, et al.
Truman J. Mears

| Page 170 | Page 172 |
|---|---|
| 1 along with other staff, is that your standard for<br>2 giving somebody a meets expectations ranking?<br>3   A.  No.  He was still performing his duties pretty<br>4 good.  It wasn't to where his standards had been<br>5 before.<br>6   Q.  Okay.  And it's your testimony that it's just<br>7 not necessary to put things like that in a performance<br>8 evaluation?  Actually, strike that.  It's your<br>9 testimony that it's not necessary to document those<br>10 types of things in the supervisory file, which is<br>11 required to be kept by the DOC?<br>12        MS. XARHOULAKOS:  Counsel, what types of<br>13 things are you referring to?<br>14        MR. NEUBERGER:  Problems of poor work<br>15 performance, poor attitude, unwillingness to get along<br>16 with staff and repeated meetings with the supervisor<br>17 about those problems.<br>18        THE WITNESS:  I guess if it appears to the<br>19 point you are going to have to do disciplinary, that<br>20 sort of thing, yeah, you need documentation in that.<br>21 I was not looking at disciplinary on John for this at<br>22 all.  I was looking for it to work itself -- where<br>23 John was willing to work it out and get along with<br>24 other officers.  Hopefully, that was going to be the | 1   A.  Other than here.<br>2   Q.  Other than here.  Correct?<br>3   A.  Yes.<br>4   Q.  For example, in supervisory files, where you<br>5 are supposed to put things to reference when you are<br>6 creating the performance evaluation.  Right?<br>7   A.  Excuse me?<br>8   Q.  In the supervisory file, in the supervisor's<br>9 file that you keep on all of your employees.<br>10   A.  Mm-hmm.<br>11   Q.  And you kept such a file on John?<br>12   A.  Yes.<br>13   Q.  Okay.  Isn't it true that in one of the<br>14 policies that we went through earlier line by line<br>15 that it specifically references that is the location<br>16 where you are supposed to keep documentation so that<br>17 you can refer back to it when preparing the<br>18 performance evaluation?<br>19   A.  Correct.<br>20   Q.  You would agree there is no such documentation,<br>21 wouldn't you?<br>22   A.  Yes.<br>23   Q.  So the only place we have this is in this<br>24 performance evaluation on this attachment; right? |

| Page 171 | Page 173 |
|---|---|
| 1 end of it.  If it would continue, then we would have<br>2 to take further steps.<br>3 BY MR. NEUBERGER:<br>4   Q.  So you only document things when they're going<br>5 to result in disciplinary action?<br>6   A.  No.<br>7   Q.  So why didn't you document these things?<br>8   A.  I don't know.<br>9   Q.  You have been a supervisor of the Department of<br>10 Corrections since 1990 -- what year were you promoted<br>11 to sergeant?  Ballpark?<br>12   A.  1995, '96, somewhere in there.<br>13   Q.  I think you testified earlier that you always<br>14 try to follow DOC policies, practices and regulations;<br>15 right?<br>16   A.  Yes, I do.<br>17   Q.  We talked a little bit about some of these<br>18 earlier involving the supervisory files and<br>19 documentation of things and warnings about things;<br>20 right?<br>21   A.  Yes.<br>22   Q.  Despite all those things, despite your trying<br>23 to follow DOC policies, practices and regulations, you<br>24 still did not document these problems? | 1   A.  As far as I know, that's correct.  I would have<br>2 to dig and look, but I don't believe there is.<br>3   Q.  Right.  So you are telling me that you haven't<br>4 dug and looked?<br>5   A.  I have looked through his file, but, I mean, I<br>6 wasn't looking for this.<br>7   Q.  Why?<br>8   A.  I didn't know that I would need this.  I have<br>9 never been in a situation like this before in my life.<br>10        MR. NEUBERGER:  Counsel, we'll actually get<br>11 out a specific document request tonight on this just<br>12 to --<br>13        MS. XARHOULAKOS:  Go right ahead.<br>14        MR. NEUBERGER:  I think it's covered by the<br>15 earlier ones.<br>16        MS. XARHOULAKOS:  I think so, too, but you<br>17 are welcome.<br>18 BY MR. NEUBERGER:<br>19   Q.  Okay.  Let's go on to the third thing.<br>20 "Corporal Balas is no longer a member of CERT."  It's<br>21 about the time that you gave this evaluation he was no<br>22 longer a member of CERT; right?<br>23   A.  Correct.<br>24   Q.  The evaluation covers the period from September |

44 (Pages 170 to 173)

b94d73f0-3eb1-4abe-9dd0-398029a5111f

Balas v. Taylor, et al.
Truman J. Mears

|  | Page 174 |
|---|---|

'03 through September of '04?
1
2  A.  Correct.
3  Q.  How much of that time period was John a member
4  of CERT?  Does ten and a half months sound about
5  right?
6  A.  If you say so, yeah.  I mean.
7  Q.  Here -- okay.
8  A.  Through September.  yes.
9  Q.  So the reason -- so one of the reasons you did
10  not give him an exceeds expectations is because he
11  resigned from CERT?
12  A.  It was a small part of it.
13  Q.  It was a part of it?
14  A.  But it was a part of it, yes.
15  Q.  So it was a fact --
16  A.  If he was still on CERT -- at this point, if he
17  had still on CERT, it wouldn't have changed it.
18  Q.  Okay.  But you are saying it was a factor,
19  though?
20  A.  Yes.
21  Q.  It wasn't the only factor?
22  A.  No.
23  Q.  It wasn't the but for factor?
24  A.  No.

|  | Page 175 |
|---|---|

1  Q.  But it was a factor?
2  A.  Yes.
3  Q.  So you are saying because he had so many
4  performance problems during the relevant time frame?
5  Even had he been on CERT, you still would have given
6  him a meets expectations?
7  A.  I would have still given him a very good meets
8  expectations, yes.
9  Q.  So you are sure --
10  A.  Meets expectations is a good evaluation.
11  Q.  You are giving him this good evaluation, even
12  though he had all these performance problems; right?
13  A.  Yes, yes.
14  Q.  Okay.  You also say a little later in this
15  paragraph that, "Giving John an exceeds expectations
16  would hurt the morale of officers working with him on
17  a daily basis in the receiving room."
18  A.  They all, in the receiving room, just about
19  every one of them were:  He needs to have a needs to
20  have improvement.  They just -- this was, you know,
21  people saying that, you know, because --
22  Q.  So these would be his co-workers?
23  A.  Yeah.  Because this, you know -- you would hear
24  it, yeah.

|  | Page 176 |
|---|---|

1  Q.  Okay.
2  A.  But that was a part of you can't just give
3  somebody exceeds because they've got perfect
4  attendance and different things like that.  Not
5  always.
6  Q.  So you are saying sometimes you can give an
7  exceeds when they have perfect attendance?
8  A.  Exceeds expectations can be a part of it, yes.
9  But it's not a deciding factor.  Not the only thing
10  that would decide that.
11  Q.  Okay.  Who were his co-workers who criticized
12  his job performance and would have had their morale
13  hurt had he received an exceeds expectations?
14  A.  You could ask any one that worked with him.  I
15  mean, I don't have to give a name.  You can take the
16  whole roster and ask anyone you wanted.
17  Q.  Give me names.  Who are they?
18  A.  Mike Santini; Darryl Hastings; Kenny Mayer;
19  Jeff Rogers; Jeff Johnson.  I am trying to think of
20  just everybody that worked back there when he worked,
21  so I have to think for a minute.
22  Q.  Okay.
23  A.  Dennis Murray.  If I looked at the roster, I
24  could give you plenty of names of people that worked

|  | Page 177 |
|---|---|

1  with him that could give you an honest opinion.
2  Q.  Who was the sergeant again?
3  A.  Sergeant Cassase.  He's no longer with the
4  Department.
5  Q.  Where is he?
6  A.  I think he moved to New York doing some type of
7  computer work.
8      Gary Pierce.  And Gary Pierce knows how to
9  contact Sergeant Cassase.  Gary Pierce works in the
10  receiving room.  Tim Dorey.
11      I'm sorry.  I say a name, and it gives me a
12  couple more names, but it's hard to think of it right
13  here and now.
14  Q.  Okay.  Is it your testimony that despite all
15  these things which you listed here on page 3 that this
16  is still a good performance review?
17  A.  All in all of what John did in the receiving
18  room, I believed that it didn't warrant dropping down
19  to a needs improvements.  I believe he was still at an
20  exceeds.  The things that brought him over the top was
21  a lot of the extras that he had faltered in.  But I
22  believed he was still at a meets expectations, yes.
23  Q.  Even though he can't get along with his
24  co-workers?

45 (Pages 174 to 177)

b94d73f0-3eb1-4abe-9dd0-398029a5111f

A0749

Balas v. Taylor, et al.
Truman J. Mears

|  | Page 178 |  | Page 180 |
|---|---|---|---|

**Page 178**

1  A.  We were working on that.
2  Q.  Even though he's not performing well?
3  A.  At that time, yes.
4  Q.  Even though he has a poor attitude such that
5  his supervisor has to come to you more than one time
6  to complain about it?
7  A.  Yes, he was still doing his duties.
8  Q.  Okay.
9  A.  Had plenty of room for improvement.
10  Q.  Okay.  Let's turn one more page.  The bottom
11  right-hand corner, does it say, "D00087"?
12  A.  Yes.
13  Q.  Okay.  Do these appear to be the expectations
14  that John was expected to meet in his job?
15  A.  Performance.  Yes.
16  Q.  This 1 through 6?
17  A.  Yes.
18  Q.  This is one of the things --
19  A.  Yes.
20  Q.  I'm sorry.
21  A.  This is the standard performance plan.
22  Q.  Right.  So by you giving him a meets
23  expectations, you are saying that he met these
24  expectations, he met these six things?

**Page 179**

1  A.  These are the things that would need to
2  continue to do in order to get at least a meets
3  expectations.
4  Q.  Right.  So you are saying that, and he was
5  doing them, that's why he got the meets expectations;
6  right?
7  A.  Yes.  For the most part, yes.
8  Q.  All right.  You can put that down.
9      Let's put another document in front of you.
10  Call this Mears Exhibit 12.
11      (Mears Exhibit No. 12 was marked for
12  identification.)
13  BY MR. NEUBERGER:
14  Q.  Now, do you have this document in front of you?
15  A.  Yes, I do.
16  Q.  Have you ever seen this document before?
17  A.  Never.
18  Q.  Do you see the case number up at the top?  It
19  says, "04-04-A"?
20  A.  Yes.
21  Q.  Does this at least appear to be an official
22  grievance form of the Correctional Officers
23  Association of Delaware?
24  A.  I have never seen one before, but it appears,

**Page 180**

1  yes.
2  Q.  Does it appear to be dated October 4th of 2004?
3  A.  Yes.
4  Q.  And do you see where it says, "Signature of
5  Grievant" in the bottom third of the page?
6  A.  Yes.
7  Q.  Does that appear to be John Balas's signature?
8  A.  Yes.
9  Q.  It says, "Signature of Representative"
10  underneath?
11  A.  Mm-hmm, yes.
12  Q.  Whose signature is that?
13  A.  I have no clue.
14  Q.  Do you see where it says, "Title" over to the
15  right of where it says, "Signature of Representative"?
16  A.  Yes.
17  Q.  What does that say?
18  A.  It says, "COAD s/s."
19  Q.  Do you know what "s/s" stands for?
20  A.  No.
21  Q.  Although you haven't ever seen this before --
22  which is your testimony, right?
23  A.  Yes.
24  Q.  On the face of this, it appears to be a

**Page 181**

1  grievance that John filed regarding his performance
2  evaluation?
3  A.  Yes, it does appear that.
4  Q.  Let's turn to the second page.  Why don't you
5  read this quietly to yourself.  And let me know when
6  you're done.
7  A.  Okay.
8  Q.  I think you testified a little earlier that
9  John was a man of integrity.
10  A.  Okay.
11  Q.  Do you recall that testimony?
12  A.  Yes.
13  Q.  Do you recall testifying that he was -- let me
14  get this correct -- trustworthy, right?
15  A.  Yes.
16  Q.  And that he was honest?
17  A.  Yes.
18  Q.  And I think you said he was not a liar?
19  A.  Correct.
20  Q.  Do you recall that testimony?
21  A.  Correct.
22  Q.  Do you agree or disagree with what John says on
23  page 2 of Mears Exhibit 12?
24  A.  I disagree with it.

46 (Pages 178 to 181)

b94d73f0-3eb1-4abe-9dd0-398029a5111f

Balas v. Taylor, et al.
Truman J. Mears

| Page 182 | Page 184 |
|---|---|
| 1   Q.  So you deny that you had a personal vendetta | 1   four, five, six, seven, eight, nine, ten -- I'm sorry. |
| 2   against John because he resigned from CERT? | 2   I lost count.  The eleventh line from the bottom where |
| 3   A.  No vendetta at all.  Absolutely incorrect. | 3   it begins, he said, "You didn't sign it...?" |
| 4   Q.  So you don't deny it or you do deny it? | 4   A.  Okay. |
| 5   A.  I deny having a vendetta against him.  Yes, I | 5   Q.  Do you see that? |
| 6   deny that. | 6   A.  Yes, I do. |
| 7   Q.  So you deny refusing to give John a copy of his | 7   Q.  Go to the end of that line where it begins, "I |
| 8   evaluation? | 8   asked ..."  It's a new sentence. |
| 9   A.  No, I don't deny that.  I -- but he -- I told | 9   A.  Yes. |
| 10  him he could not have a copy of it until he reviewed | 10  Q.  "I asked, 'Why wasn't anything of the letters |
| 11  it with me. | 11  put on the evaluation?'  Lieutenant Mears said, 'It |
| 12  Q.  Okay.  Why wouldn't you give him a copy of it | 12  does not warrant enough to get 'exceeds expectations' |
| 13  then? | 13  and did not need to be put on the evaluation.'" |
| 14  A.  I wanted him to review it, and then he would | 14  Do you recall having a conversation of that |
| 15  get a copy of it. | 15  nature with John talking about why his letter of |
| 16  Q.  Why wouldn't you have just given him a copy | 16  appreciation wasn't on there? |
| 17  before? | 17  A.  I don't recall that. |
| 18  A.  Because I wanted him to review it with me to | 18  Q.  Do you dispute it or you just don't recall |
| 19  discuss and work out any discrepancies we may have. | 19  either way? |
| 20  Q.  Okay. | 20  A.  I don't recall it. |
| 21  A.  But he refused and flat out wouldn't even look | 21  Q.  All right.  You can put that down. |
| 22  at it. | 22  Let's put another document and call this |
| 23  Q.  Right.  So you are saying that if John had | 23  Mears Exhibit 13. |
| 24  discussed with you the missing letter of -- the | 24  (Mears Exhibit No. 13 was marked for |

| Page 183 | Page 185 |
|---|---|
| 1   missing memo of appreciation from Major Townsend that | 1   identification.) |
| 2   you might have included that if he talked to you about | 2   BY MR. NEUBERGER: |
| 3   it? | 3   Q.  Have you ever seen this document before? |
| 4   A.  Yeah.  I mean, if I didn't have it in there. | 4   A.  Never. |
| 5   He -- from that moment on, he wouldn't talk to me. | 5   Q.  How about you read it quietly to yourself, |
| 6   Well, he wouldn't before that either, but.  He | 6   then. |
| 7   wouldn't discuss anything about the evaluation. | 7   A.  Okay. |
| 8   Q.  Do you believe that you were holding a grudge | 8   Q.  All right.  All set? |
| 9   against John? | 9   A.  Yes. |
| 10  A.  No. | 10  Q.  Now, do you agree or disagree with John's |
| 11  Q.  In any way? | 11  recitation of these incidents? |
| 12  A.  No. | 12  A.  I disagree. |
| 13  Q.  Because of the August of 2004 -- | 13  Q.  You disagree.  So do you disagree with the fact |
| 14  A.  No. | 14  that after John asked for a union representative to be |
| 15  Q.  -- CERT resignation? | 15  present that you acted disgusted and walked away? |
| 16  A.  No. | 16  A.  Yeah, I disagree with that. |
| 17  Q.  Okay. | 17  Q.  Do you believe your mannerisms and how you were |
| 18  A.  Everybody involved in that was getting along | 18  acting came across as bullying? |
| 19  with everybody after that. | 19  A.  I disagree. |
| 20  Q.  Okay. | 20  Q.  Do you think your mannerisms and your actions |
| 21  A.  Except for John. | 21  there could have been interpreted as bullying? |
| 22  Q.  Except for John? | 22  A.  No.  I disagree. |
| 23  A.  Except for John. | 23  Q.  Okay.  The very last line of the page |
| 24  Q.  Now, let's go down to the one, two, three, | 24  references John not receiving a copy of his 2004 time |

47 (Pages 182 to 185)

b94d73f0-3eb1-4abe-9dd0-398029a5111f

A0751

Balas v. Taylor, et al.
Truman J. Mears

| Page 186 | Page 188 |
|---|---|
| 1  card. | 1  to Captain Wilkinson about being there for the review? |
| 2  A.  Okay. | 2  A.  That was before.  I spoke with him before that. |
| 3  Q.  Do you recall the circumstances surrounding why | 3  Q.  Okay.  So why didn't that ever happen? |
| 4  John didn't get a copy of his 2004 time card until a | 4  A.  Just from scheduling.  With my days off, John's |
| 5  little bit later? | 5  days off, the captain's days off, we all only worked |
| 6  A.  Yes.  We, at the end of the year, we total out | 6  together once or twice every couple of weeks. |
| 7  our time cards with no specific timeline to get this | 7  Q.  Okay. |
| 8  done.  We total them out.  They get audited.  And then | 8  A.  The way it came about was I asked |
| 9  we give the officers copies of them. | 9  Captain Wilkinson to sit in if it worked out. |
| 10      John asked for a copy of his time card.  I | 10  Q.  Okay. |
| 11  went right in -- and I was just finishing them up.  I | 11  A.  And that's the only thing with |
| 12  finished them up.  And I was running copies off.  And | 12  Captain Wilkinson that I was aware of.  If |
| 13  he came back to my office and he got the very first | 13  Captain Wilkinson had promised John that that would |
| 14  one of all my staff.  He got the first one that went | 14  in fact happen along with the union rep, I have no |
| 15  out. | 15  knowledge of it.  I am not saying he did or didn't |
| 16  Q.  Okay. | 16  tell John that.  I just didn't have any knowledge of |
| 17  A.  I don't know how I could have got it to him any | 17  it. |
| 18  quicker.  He was the first one. | 18  Q.  Why didn't you ask him, Captain Wilkinson? |
| 19  Q.  Let's go to the last page of this.  Use this as | 19  A.  Ask him what? |
| 20  a basis to ask you some questions about you turning in | 20  Q.  Does John have a right to have you be there for |
| 21  John's time card -- John's evaluation. | 21  a review and a right to have a union rep there? |
| 22  A.  Okay. | 22  A.  I believe I did speak to him about that before. |
| 23  Q.  Did there come a time when eventually you | 23  He said, It's an evaluation.  It's a good evaluation, |
| 24  turned in John's evaluation without his signing it? | 24  there is no need for it.  Something in that order.  I |

| Page 187 | Page 189 |
|---|---|
| 1  A.  Yes. | 1  don't remember the exact words. |
| 2  Q.  When was that? | 2  Q.  We can ask him about the conversation, then. |
| 3  A.  I don't know the exact date. | 3  A.  Yeah. |
| 4  Q.  Could it have been in February of '05? | 4  Q.  Let's put another document in front of you. |
| 5  A.  I guess.  I am not exactly sure.  I can't tell | 5  We'll mark this as Mears Exhibit 14. |
| 6  you exact date.  I don't know.  It was around that | 6      (Mears Exhibit No. 14 was marked for |
| 7  time. | 7  identification.) |
| 8  Q.  Who did you turn them into? | 8  BY MR. NEUBERGER: |
| 9  A.  Captain Wilkinson. | 9  Q.  Why don't you take a quick look at this |
| 10  Q.  Captain Wilkinson.  You wrote: "Refused to | 10  document to see if you recognize it. |
| 11  sign it on it"; right? | 11  A.  John's time card, or -- yeah. |
| 12  A.  Yes. | 12  Q.  It's John's time card for a certain period of |
| 13  Q.  Why did you do that? | 13  time? |
| 14  A.  Because he refused to review it or sign it.  I | 14  A.  It appears to be, yes. |
| 15  told him the last time I went back there when he was | 15  Q.  Okay.  Who fills out John's time cards, you or |
| 16  saying he wanted a union rep and Captain Wilkinson, | 16  him? |
| 17  and that sort of thing, which was, you know, news to | 17  A.  I fill it out.  He has been known to write on |
| 18  me, and new and all, and this was after several | 18  it, but I fill it out for the most part. |
| 19  attempts.  And I told John, I said, "Well, it's going | 19  Q.  You fill it out for the most part? |
| 20  to get turned in the way it is if you don't want to | 20  A.  Yes.  It was available for anybody to pick up |
| 21  review it." | 21  at any time. |
| 22  Q.  Okay. | 22  Q.  Right.  So for example, like page 1 here, |
| 23  A.  And then I turned it in. | 23  that's your handwriting? |
| 24  Q.  Was it before this or after this that you spoke | 24  A.  Appears to be. |

48  (Pages 186 to 189)

Wilcox and Fetzer, Ltd.  Registered Professional Reporters        302-655-0477

b94d73f0-3eb1-4abe-9dd0-398029a5111f

Balas v. Taylor, et al.
Truman J. Mears

|  | Page 190 |  | Page 192 |
|---|---|---|---|

**Page 190**

1    Q.  It appears to be?
2    A.  Yes.  If I was on vacation, another lieutenant
3    would do it or a sergeant would do it.
4    Q.  Okay.  So let's turn to page -- let's turn to
5    the third page in.  It says, "P496" at the bottom.  I
6    guess it would be on the side if you are holding it
7    sideways.
8    A.  Okay.
9    Q.  Are we on the same page?
10   A.  Yes.
11   Q.  Okay.  I want to direct your attention to the
12   date of January 26th up top.
13   A.  Okay.
14   Q.  Do you see that?
15   A.  Yes.
16   Q.  What's that marked as?
17   A.  A vacation day.
18   Q.  Looks like that was a Monday; right?
19   A.  Yes.
20   Q.  It says vacation.  How about May 11th?
21   A.  Vacation day.
22   Q.  Okay.  Looks like that was a Tuesday; right?
23   A.  I lost it here.
24   Q.  Sure.  It's May 11th.

**Page 191**

1    A.  Yes.
2    Q.  Let's turn one more page, to page 497.
3    A.  Mm-hmm.
4    Q.  Let's go to May 11th there.  Appears to be
5    something scribbled in above the "V."
6    A.  Yes.
7    Q.  What is that?
8    A.  Emergency.
9    Q.  Why is it on this one, but not on the previous
10   pages?
11   A.  That came about for something that had nothing
12   to do with John.
13   Q.  It's written on his time card.
14   A.  Yes.  Well, he -- that was an emergency
15   vacation day that was given to him.  From the
16   Captain's schedule, it was an emergency vacation day.
17   No difference from a regular vacation day.
18   Q.  Well, why isn't it marked on page 494, 495 and
19   496?
20   A.  The reason that was changed, I had two staff
21   members on my staff, they came to me complaining about
22   not being able to get emergency vacation days or
23   emergency holidays, and they were complaining that it
24   was due to their race.

**Page 192**

1    Q.  Okay.
2    A.  So I checked all of my staff.  And if they got
3    emergency days or didn't get emergency days, all time
4    cards reflected emergency vacation days from that
5    point on or emergency holidays.  So if what they were
6    telling me was true, it could go further.
7          But as far as the time card for the
8    officer, it means no difference.  Vacation day is a
9    vacation day.  It's not looked upon any differently.
10   Q.  So you went back and you changed records you
11   had already created?
12   A.  I put the "E" on there, yes, I did.  But now
13   this time card was for my benefit.  The official time
14   card is in the timekeeper's office.  This was just for
15   my benefit.  And these are audited, you know,
16   quarterly.
17   Q.  So it's your testimony that emergency vacation
18   days are viewed the same as regular vacation days?
19   A.  As far as how it affects that officer, yes.
20   Q.  How about as it affects you as a supervisor?
21   With a regular vacation day, do you get lead time?
22   A.  Excuse me?
23   Q.  With a regular vacation day, do you have lead
24   time?  Do you know it's coming up?

**Page 193**

1    A.  Right, because it's prescheduled.
2    Q.  How about a emergency vacation day, do you know
3    about that beforehand?
4    A.  Me, no.  I don't know what anybody has until I
5    pick up the schedule from that day or when we used the
6    do time cards.  I would pick up the week's time cards
7    or the schedules that the captain wrote down what they
8    got and then transfer it onto the hard card.  And then
9    the business office, who took care of the real genuine
10   time card, would do it there, too.
11   Q.  Okay.
12   A.  And then they would, you know, audit our time
13   cards to make sure everything was being on track,
14   nobody was being charged too much time, or.
15   Q.  So when an employee takes am emergency vacation
16   day, can that cause some problems in the unit where
17   they're assigned to?
18   A.  No.
19   Q.  Why?  Or why not?
20   A.  It's just it's a vacation day.  I mean, what
21   could it do?
22   Q.  What if it's not scheduled beforehand?
23   A.  It's no different than taking a holiday or a
24   sick day as far as how the shift runs, if that's what

49 (Pages 190 to 193)

b94d73f0-3eb1-4abe-9dd0-398029a5111f

Balas v. Taylor, et al.
Truman J. Mears

| Page 194 | Page 196 |
|---|---|
| 1  you mean.<br>2    Q.   What I am trying to get at is why you put in<br>3  the emergency vacation.<br>4    A.   Because it was an emergency vacation day.<br>5    Q.   But it hadn't been originally marked that way.<br>6    A.   Okay.  But that was -- it was my mistake to<br>7  begin with.  It was an emergency vacation day issued<br>8  by the captain on the schedule.<br>9    Q.   Okay.  Even though it wasn't originally<br>10  reflected that way on these time cards, you went back<br>11  and changed them?<br>12    A.   Yes.  But it makes no difference, a vacation<br>13  day is the same whether it's emergency or<br>14  prescheduled, it's all the same.<br>15    Q.   Let's turn two more pages, to P499.<br>16    A.   Yes.<br>17    Q.   And if you'd look at May 11th, that's still<br>18  marked emergency vacation; right?<br>19    A.   Mm-hmm.<br>20    Q.   Then it looks like you have altered<br>21  January 26th and written in emergency vacation there,<br>22  too; right?<br>23    A.   Yes.<br>24    Q.   It looks like you have written in emergency | 1  it would calm John down if you would just change his<br>2  to plain vacation day.  For whatever reason, it will<br>3  calm him down.  Do you mind doing it?"  I said, "Well,<br>4  you're the boss.  I'll do it.  I'll change.  It's no<br>5  big deal for me.  It doesn't change anything as far<br>6  as -- it wasn't affecting him anyhow."<br>7    Q.   So you went back and you changed the records a<br>8  second time?<br>9    A.   Yes, I changed it on my time card to reflect<br>10  just a vacation day instead of emergency vacation day.<br>11  This was -- like I said, these time cards were for my<br>12  benefit only.  It wasn't what he was being paid by --<br>13  he was being paid by the business office, and that<br>14  sort of thing, so.<br>15    Q.   Okay.<br>16    A.   I still kept my other officers the way I kept<br>17  them.<br>18    Q.   All right.<br>19    A.   I didn't really agree with it, but, you know,<br>20  if it calmed somebody down, that's fine.<br>21    Q.   So you only changed his?<br>22    A.   Yeah.<br>23    Q.   Now we're still on this page P502?<br>24    A.   Yes. |

| Page 195 | Page 197 |
|---|---|
| 1  vacation for September 5th and 12th; right?<br>2    A.   Correct.  I was doing it for every employee for<br>3  the whole year.<br>4    Q.   Okay.<br>5    A.   Of my staff.<br>6    Q.   We go on to the next page, P500, and those same<br>7  dates are still marked as emergency vacation days;<br>8  right?<br>9    A.   Yes.<br>10    Q.   Turn to page P501, the same things are marked;<br>11  right?<br>12    A.   Yes.<br>13    Q.   Turn to page P502.  And all of a sudden, all<br>14  the emergency notations are gone?<br>15    A.   Correct.<br>16    Q.   Why?<br>17    A.   Captain Wilkinson came to me and said, "John<br>18  Balas is flipping his lid.  He's worried to death<br>19  about these emergency vacation days you put on here."<br>20  And I explained to him what I was doing.<br>21    Q.   Okay.<br>22    A.   And he was in agreement with that.  That's<br>23  fine.  That's what it is, it's an emergency vacation<br>24  day, and that's fine.  Then he said, "Well, you know, | 1    Q.   Go up to January 26th, there is another symbol<br>2  written above the "V" for vacation?<br>3    A.   Yes.<br>4    Q.   What is that?<br>5    A.   I believe that was compassionate leave.  Later<br>6  on, his -- well, it looks like compassionate leave.<br>7  And I believe John was on vacation when he had someone<br>8  in his family pass away.<br>9    Q.   Okay.<br>10    A.   If I am correct on this.  I may be wrong, but I<br>11  believe he was on vacation.  He had to travel for a<br>12  death in his family.  Then later on he saw the time<br>13  card and said, "I wasn't vacation, I was compassionate<br>14  leave," which then I contacted the business office and<br>15  they confirmed it and they changed their card, I<br>16  changed my card so they correspond.<br>17    Q.   Okay.<br>18    A.   I know that happened with John.  I am pretty<br>19  sure that's the dates, but I may be wrong.  But it<br>20  does look like compassionate leave, and I believe<br>21  that's what it is.<br>22    Q.   Got ya.  Okay.  You can --<br>23    A.   That way he gets his vacation holidays back.<br>24  It doesn't charge him for that time. |

50 (Pages 194 to 197)

b94d73f0-3eb1-4abe-9dd0-398029a5111f

A0754

# Balas v. Taylor, et al.
## Truman J. Mears

|  |  |
|---|---|
| Page 198 | Page 200 |

**Page 198**

1 Q. Got ya. All right. You can close that up.
2 It's your testimony on the changes for the
3 time card that you weren't doing anything wrong;
4 right?
5 A. Yeah, exactly. It was really a nonissue, I
6 felt.
7 Q. John ever ask you for -- this is after
8 September -- I'm sorry. After August of 2004, did he
9 ever ask you for a transfer to a different supervisor?
10 A. No, he never asked me for a transfer.
11 Q. Did you ever hear that John was asking for a
12 transfer to a different supervisor?
13 A. After, yes, I did hear that, but it was shortly
14 before his death. I couldn't tell you the exact date.
15 He didn't tell me. I heard it from someone else.
16 Q. Do you know if any steps were ever taken to
17 grant him a transfer?
18 A. I asked either the warden or the deputy warden,
19 I can't remember who --
20 Q. Okay.
21 A. -- if it was true that he was asking for
22 another supervisor, and they told me, yes. And they
23 told me no decision had been made. I said, Okay, I
24 just wanted to see if it was a rumor or the truth, and

**Page 199**

1 I left it at that.
2 Q. Did you think that it would be a good thing if
3 John received -- was transferred to another
4 supervisor?
5 A. No.
6 Q. Why not?
7 A. I was responsible for that area that he worked
8 in. As long as he worked in that area on my shift, I
9 am responsible for that area. I don't know how
10 someone else could supervise that area, someone that
11 is not on that shift, you know. He could request to
12 be moved. He could have been moved very easily.
13 Q. Okay.
14 A. But he never requested that, that I am aware
15 of. He could have been -- request to move to another
16 area of the compound, another area of the building
17 under a different supervisor.
18 Q. All right.
19 A. Then they would have been in charge of that
20 area, which would have made sense, to be in charge of
21 those people. Maybe he did, but I am not aware he
22 requested that.
23 Q. When it comes to supervising employees under
24 your command, employees within your purview, so to

**Page 200**

1 speak, do you keep notes on them?
2 A. I don't keep daily notes on anybody, no, only
3 when there is an issue.
4 Q. Did you keep daily notes on John?
5 A. No.
6 Q. Did you keep regular notes on John?
7 A. No.
8 Q. Did you keep irregular notes on John?
9 A. I only kept a couple notes on John.
10 Q. Okay. Do you still have those notes?
11 A. Yes.
12 Q. Where are they?
13 A. I guess I gave them to you.
14 It was just one occurrence where he was
15 irate about another officer trying to tell him, a
16 sergeant in the building, telling him what he had to
17 do in the receiving room, and he didn't like it. And
18 I explained to him, you know, how I felt about that --
19 Q. Right.
20 A. -- where I had a halfway decent conversation.
21 And the rest would have been in the evaluation.
22 Q. Okay.
23 A. So that's, basically, it. I didn't keep notes
24 on him.

**Page 201**

1 Q. So it was one of those occurrences in the
2 receiving room?
3 A. Yes.
4 Q. And it's your testimony that you gave those
5 documents to your attorney?
6 A. Yeah. I believe you have it. I think it's
7 just the stuff there that's in the evaluation.
8 Q. You are saying it's a typed up one versus being
9 a handwritten note?
10 A. Oh, yeah. I never kept any handwritten notes
11 on him, no.
12 Q. Okay. Got ya.
13 A. Anything I have, I think you are aware of.
14 Q. Now, do you remember your testimony from this
15 morning about the importance of powers of observation
16 when it comes to supervising inmates?
17 A. Yes.
18 Q. Do you remember your testimony this morning
19 about wanting to keep an eye on your employees?
20 A. Yes.
21 Q. Now, during the time frame from September of
22 '04 until John's suicide in February of '05, did you
23 observe that John was under any stress at work?
24 A. Right towards the end, he kind of pulled -- the

51 (Pages 198 to 201)

b94d73f0-3eb1-4abe-9dd0-398029a5111f

A0755

Balas v. Taylor, et al.
Truman J. Mears

Page 202

1  problem was he had pulled away from me, so I didn't
2  get to see the daily functions of him.  You know what
3  I mean?
4    Q.  Okay.  What did you observe towards the end?
5    A.  Spent a lot of time on the computer, but. I
6  felt that that was just him trying to avoid me.
7    Q.  That was a sign of stress to you?
8    A.  Not really stress.  But then, like I said
9  earlier, when Lee Mears had told me that John was
10 having problems at home, you know, and that was
11 shortly before his death.  And those guys, Lee was
12 working with him on that and stuff, so.
13   Q.  Okay.
14   A.  But that would be stressful for anybody.
15   Q.  Did you have any indications that he was going
16 to kill himself?
17   A.  Absolutely not.
18   Q.  If you had heard that John was talking about
19 suicide, what would you have done?
20   A.  I would have went to my supervisors.  Again,
21 according to the situation.  If somebody said John is
22 in the property room saying he's going to do this, of
23 course, you handle that differently.  But if I just
24 heard that John was suicidal, I would have done

Page 203

1  whatever I could, contacted my supervisors and look
2  for somebody who knew how to handle that situation.
3    Q.  Right.  For example, you can report to your
4  supervisor, then go to HR, HR can get involved, bring
5  in a psychologist or psychiatrist, like they talk in
6  some of those policies that we went through this
7  morning?
8    A.  Exactly, someone who is qualified to deal with
9  that.
10   Q.  There is the employee assistance program that
11 we talked about a little bit this morning; right?
12   A.  Yes.
13   Q.  Those are all resources that are out there for
14 Department of Correction personnel?
15   A.  Yes.  And a lot of that, hardly anyone was
16 aware of until after this.
17   Q.  I'm sorry?
18   A.  A lot of this, we weren't really aware of --
19 it's not something that you go pick up and say, hey,
20 I'm going to read about this.  You know what I mean?
21 It's not common knowledge to everybody at that time.
22 After the fact, you know, it's different.
23   Q.  Right, when you are kicking yourself and
24 saying, like, what if, that kind of thing?

Page 204

1    A.  Yes, exactly.  Everybody was kicking themselves
2  with what ifs, but nobody -- farthest thought, you
3  know.  People I knew never thought he would do that.
4    Q.  Okay.
5    A.  I thought -- you know, I thought John -- I just
6  didn't think he would do that.  He loved his kids too
7  damn much.
8    Q.  Okay.  Then the employee assistance program has
9  been around for awhile; right?
10   A.  Yeah.
11   Q.  And that policy we went through earlier has
12 been around for awhile, the DOC psychological fitness
13 for duty policy?
14   A.  Yes.
15   Q.  We don't need to go through all the DOC matters
16 exhibits, right, we did all that this morning where
17 they talk about everything there?
18   A.  Right.
19   Q.  Just to wrap up this section.  Getting involved
20 in a situation like that, that's just something that a
21 good manager should do if they have some kind of
22 knowledge of it; right?
23   A.  Yes, if you have knowledge of it, yes.
24   Q.  You knew John was a union member; right?

Page 205

1    A.  Yeah, everyone there is a union member.
2       MR. NEUBERGER:  Now, counsel we're going to
3  go under seal now to do some of the punitive damages
4  discovery questions.
5       MS. XARHOULAKOS:  We're going to object to
6  those at this time.
7       MR. NEUBERGER:  Are you going to instruct
8  him not to answer?
9       MS. XARHOULAKOS:  Yes, I am.  It's
10 premature.  That would be my objection.
11      MR. NEUBERGER:  So we have that on the
12 record, then.
13      MS. XARHOULAKOS:  Yes.
14      MR. NEUBERGER:  I'll say for the record I
15 have a whole host of questions related to punitive
16 damages, net worth and assets and things of that
17 nature, which defense counsel has indicated she'll not
18 allow her client to answer.  So we'll preserve the
19 issue and deal with it later.
20      MS. XARHOULAKOS:  That sounds fine.
21      MR. NEUBERGER:  Let's take a break, and
22 I'll see if I have any more questions I need to go
23 through.  If not, we can get the heck out of here.
24      MS. XARHOULAKOS:  Great.

52 (Pages 202 to 205)

b94d73f0-3eb1-4abe-9dd0-398029a5111f

Balas v. Taylor, et al.
Truman J. Mears

Page 206

```
1          MR. NEUBERGER:  Off the record.
2       (Recess taken.)
3          MR. NEUBERGER:  Back on the record.
4    Subject to the discussions we had on the record about
5    punitive damages and electronic discovery issues, I'm
6    going to recess the deposition for continuation at a
7    later time.  And I have no questions.  We can recess.
8       (Deposition adjourned at 3:29 p.m.)
9          -- -- -- --
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 208

```
1
2       REPLACE THIS PAGE
3       WITH THE ERRATA SHEET
4       AFTER IT HAS BEEN
5       COMPLETED AND SIGNED
6       BY THE DEPONENT.
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 207

```
1              I N D E X
2   WITNESS: TRUMAN J. MEARS            PAGE
3     EXAMINATION BY MR. NEUBERGER          2
4      MEARS DEPOSITION EXHIBITS
5   NO.       MARKED
6    1   Document stamped D00343 - 351      22
7    2   Document stamped D000715 - 718     32
8    3   Defendants' Answers to Plaintiff's 62
         First Set of Interrogatories
9
     4   Document stamped D00107 - 114      70
10
     5   Document stamped D00098 and 101    72
11
     6   Document stamped D00095 and 97     77
12
     7   Document stamped D00093 and 94     80
13
     8   Document stamped P442, D00324,     83
14     D00323, P468, D00135, D00134,
       D00133, P446, P447, P448, P449,
15     D00128, P451, P452, D00300,
       D00127, D00298, P456, D00297,
16     D00291, P459, P461, P463, D00290,
       D00122, D00284, D00280, D00281 and
17     D00273
18   9   Document stamped D00667 - 685      88
19  10   Document stamped P518            141
20  11   Document stamped D00084 - 92     145
       and D00378
21
     12   Document stamped P519 and P520   179
22
     13   Document stamped P529 - 531      185
23
     14   Document stamped P494 - 502      189
24
```

Page 209

```
1   State of Delaware  )
                        )
2   New Castle County  )
3
4          CERTIFICATE OF REPORTER
5
6       I, Lucinda M. Reeder, Registered Diplomate
    Reporter, Certified Real-time Reporter and Notary
    Public, do hereby certify that there came before me on
7   November 6, 2007, the witness herein, TRUMAN J. MEARS,
    who was first duly sworn by me and thereafter examined
8   by counsel for the respective parties; that the
    questions asked of said witness and the answers given
9   were taken down by me in Stenotype notes and
    thereafter transcribed by use of computer-aided
10  transcription and computer printer under my direction.
11      I further certify that the foregoing is a true
    and correct transcript of the testimony given at said
12  examination of said witness.
13      I further certify that I am not counsel,
    attorney, or relative of either party, or otherwise
14  interested in the event of this suit.
15
16
17
                          Lucinda M. Reeder
18                    Lucinda M. Reeder, RDR, CRR
                      Certification No. 132-RPR
                      (Expires January 31, 2008)
19
20
21  DATED:   11-24-07
22
23
24
```

53 (Pages 206 to 209)

b94d73f0-3eb1-4abe-9dd0-398029a5111f

A0757

| Corrections | **DOC Matters** | Newsletter |
|---|---|---|
| Vol 1, Issue 1 | | September 2004 |

*Our Commitment to Public Safety – The Foundation and Driving Force Behind Corrections*

**DOC Launches Recruitment and Referral Incentive Program (RRIP):** DOC Commissioner Stan Taylor recently announced the implementation of a Recruitment & Referral Incentive Program, effective September 1, 2004, to enhance recruitment efforts. DOC employees will receive cash incentives for their efforts in recruiting successful Correctional Officers. This program will provide both the referring employee (recruiter) and the referred applicant (recruit) with a $500.00 cash incentive, to be split into two payments of $250.00 each. The first payment will be after the recruit's graduation from the Correctional Employee Initial Training (CEIT), and the second payment will be after the recruit's 1-year anniversary. To view the Procedures and the Correctional Officer Referral Form, visit the Department's Intranet site or contact the Human Resources Office at 739-5601.

**Next DOC Job Fair:** On September 25, 2004, DOC will hold a Job Fair at the Stanton Campus in Wilmington for Correctional Officer, Food Service and Maintenance positions. Testing sessions begin at 9 a.m. and 1 p.m., with interviews to follow.

**Benefits for Activated Military Extended:** Governor Minner recently signed legislation relating to military leave of absence. Senate Bill 296 protects State employees on military leave by ensuring that the State will continue to provide the employee with their chosen State provided health care insurance for a minimum period of two years, provided they continue to pay the employee share of premiums. This bill is not retroactive. Any employees currently within their first two years of military leave, will be contacted and informed that they are entitled to State share for a total of two years provided they pay the employee share of premiums. Employees who are activated in the future should be informed of this prior to their departure.

**New Employee Assistance Program Provider:** Effective July 1, 2004, Human Management Services, Inc. took over the State's Employee Assistance Program. HMS has professional counselors who are available to listen and help define a problem, assess the type of help needed and provide the required help or make appropriate cost effective referrals. Service is available 24 hours a day, every day of the year, to all employees, pensioners under 65 and covered dependents who are enrolled in the State's Group Health Insurance Plan. Employees can get confidential help for a number of problems such as marital, family, emotional issues, grief and loss, child care issues, substance abuse, parenting, anger and stress management. Supervisors can also refer employees to HMS or contact them to get advice in how to handle troubled employees. HMS can be reached at 1-800-343-2186.

**Got News?** Suggestions for future newsletters are always welcome. Contact John Smart in Human Resources at 739-5601.

---

## *Recognizing Length of Service*

### As of October 2004

**Mgt. Serv.:** Linda Riddagh, 25 yrs. **Food Services:** Richard Crockett, Sr., 5 yrs. **DCC:** Jerry Jarman, 30 yrs; Benjamin Blake III, 20 yrs; Bernard Garnett and Joseph Simon, 10 yrs; Timothy Leyanna and John Spray, Jr., 5 yrs. **SCI:** Prentice Perry, 25 yrs; John Balas, Rene Flores and Allen Smiley, 10 yrs; Richard Arnold, John Baum III, Clayton Morgan, Ryan Bradford, William Cloughy, Carla Dalton, Donna Short and Judith Steiner; 5 yrs. **Boot Camp:** Dion Brown, 10 yrs. **HRYCI:** Anthony Suvie, 20 yrs; Charles Burrell, 10 yrs; Phillip Dietrich, Zachary Rodriguez, Clifford Terrell and Garland Williams Jr., 5 yrs. **C&T:** Paul Smith Jr. and Tammy Patterson, 20 yrs; Kenneth Hockensmith, 10 yrs. **P&P:** Margaret McAlevy, 20 yrs; James Buchanan II, 15 yrs; Lisa Davidson and George Ramsburg Jr., 10 yrs; William Coyle, Chirstoher Denunzio, William Dupont Jr., Michael McCafferty, Jennifer Riley and Georgiana Staley, 5 yrs. **Plummer:** Darren Carter, 20 yrs. **SCCC:** Eric Adams, 25 yrs; Brenda Gooner and Joseph Clark II, 5 yrs. **KentWRC:** Stephen Trice, 10 yrs. **CVOP:** Dewayne Battle, 10 yrs.

### As of November 2004

**IA:** Jim Lupinetti, 15 years; **Public Relations:** Gail Stallings-Minor, 15 years; **MIS:** Sam Eaton, 25 yrs; **Webb:** Frank Durso Jr., 25 yrs; **DCC:** Willis Seaman, Jr. and Paul Unsworth, 25 yrs; **BWCI:** Claudette Cain, 10 years; **HRYCI:** Denisha Young, 5 yrs; **P&P:** Sodonia Parker, 25 yrs; Karen Keough and Don St. Jean, 15 years.



DEPOSITION EXHIBIT

ₒ00343

## *In Transition*

# Retirements

**August 2004:** Fay Dunning, Administration; LuAnn Maxey, Mgt. Services; William Jones, Warehouse; James R. Morris, Webb; Stanley Richardson, DCC; Stephen Mumford, SCI; Francesco Cristiano, Pris. Ind.; Larry Rife, CDS; Jerold Burch, Norm Kugel, Ronald Turner and Vanessa Richardson, Probation and Parole.

# August Promotions

**Human Resources** - Florence Richardson to Tele/Network Technician I (MIS); **Mgt Services:** Fannie Dill to Purchasing Services Administrator; **MIS:** Mary Ann McKenna to Tele/Network Technician III; **Maint:** Michael Newman to CO Trades Mechanic III; **SCI:** Walter Taylor Jr. to Trades Instructor I, Kevin Bates to Sergeant; **Boot Camp:** Gary Taylor to Sergeant; **Probation and Parole:** Raymond Diclemente, Wanda Laberge and Scott Willey to Senior P & P Officer; **SCCI:** Richard Norwood and Eddie Shockley to Sergeant.

---

### - *It's a Diverse Universe* -

**The Demographic Future:** The US Dept. of Labor forecasts a changing workforce in which average employee age will grow and the pool of younger workers will shrink. More women will enter the workplace and the workforce will include a higher percentage of immigrants than at any time since the First World War. By 2012, women will comprise 47.5% of the nation's workforce, while men will comprise 52.5%. The U. S. labor force will continue to age, with the "55 and older" age group increasing from 14% to 19% percent of the total workforce. At present, 11.5% of the DOC workforce is 55 years or older. The projected US workforce in 2012 is 65.5% White, 15% Hispanic, 12% Black, 5.5% Asian and 2% other races.

**You're Not Alone:** We all know the holidays that Americans typically celebrate and that October brings us a day off for Columbus Day. But, we're not alone. Columbus Day is also celebrated in Honduras, the Virgin Islands, the Turks & Caicos Islands, Costa Rica, Uruguay and Guam. Here's what others around the globe celebrate in October - Oct 1: Unification Day in Cameroon; Independence Day in Cyprus; National Day in Nigeria, China, Hong Kong and Macau. Oct 2: Mahatma Gandhi's Birthday in India. Oct 4: Independence Day in Lesotho; Republic Day in Portugal; Thanksgiving in Saint Lucia; and Labor Day in Australia. Oct 6: Armed Forces Day in Egypt; Commemoration of the Great Earthquake in Turkmenistan. Oct 7: Expulsion of the Fascist Settler's Day in Libya. Oct 8: Martyr's Day in the Maldives; Independence Day in Croatia. Oct. 10: Independence War Day in Cuba. Oct 11: Physical Fitness Day in Japan; Thanksgiving in Canada. Oct 17: End of Spring in Brazil and Western Australia. Oct 23: Paris Peace Talks Anniversary in Cambodia; 1956 Revolution Anniversary in Hungary. Oct 24: United Nations Day in Swaziland; Oct 25: Gospel Day in the Cook Islands and Labor Day in New Zealand.

---

### *Your Co-Workers in Action*

If it weren't for the way DOC employees pull together, many of the things we accomplish on a daily basis would not get done. There are many stories that go unheralded, but here are just a few of your co-workers in action over the last several months:

**Sharp Eye for Detail ends Reign of Terror:** In working with the wife of an offender serving a DUI sentence, Georgetown Day Reporting Center Social Service Specialist Victoria Rollison was able to uncover incriminating facts concerning the offender. Concerned for the wife's safety, Ms. Rollison took careful notes and notified her supervisor. Because of her careful attention to detail, Ms. Rollison was able to testify against the husband leading to him being sentenced to prison for 129 years and ending the reign of a violent sex offender. Sussex County Deputy Attorney General Adam Gelof said, "I fully believe that Ms. Rollison was the most important factor in the case and I for one am thankful for her efforts."

**Quick Responses Saves Lives:** On June 26 at Sussex Work Release, Sgt. John Kimbler and CO Brian Atkins were instrumental in saving the life of a female resident who attempted suicide. Notifying medical personnel and tending to the resident until they arrived, the two prevented a potentially tragic event. Also from SWRC, during an August 24 visit to the Administration Building in Dover, Lt. Dean Blades came upon an employee choking in the lunch room. Without hesitation, Lt. Blades immediately applied the Heimlich Maneuver and freed up the individual's blocked air passages.

**back in the "Slammer" for an "On the Lammer":** Outstanding Service Award to Probation and Parole Officer's Kecia Winchester and Kerry Bittenbender for their April 26 arrest of a violent sex offender on the lam from police and probation officers. While doing surveillance on a victim's residence, the two witnessed the offender gaining entry through a side door. They notified Delaware State Police and made apprehension, sending a convicted felon back to prison and preventing serious injury to one of his previous victims.

000344



| Corrections | | Newsletter |
|---|---|---|
| Vol 1, Issue 2 | **DOC Matters** | October 2004 |

*Our Commitment to Public Safety – The Foundation and Driving Force Behind Corrections*

**College Credit Available from CEIT/BOTC:** The EDC has passed a stringent examination of its initial training courses for Correctional Officers and Probation and Parole Officers, which resulted in the awarding of college credit by Excelsior College of Albany, New York. According to EDC Training Administrator Ron Sauls, graduates of DOC's CEIT can potentially receive 11.5 college credit hours and BOTC graduates 10.5 credits. Details are still being worked out with the college as to time limits on eligibility. The EDC presented its case to the College's Board of Regents and passed an evaluation by a team of Academic and Correctional experts. Excelsior College is accredited by the Commission on Higher Education of the Middle States Association of Colleges and Schools and is recognized by the U.S. Secretary of Education and the Council on Higher Education Accreditation (CHEA). Program specifics and contact information on applying for the credit will be forthcoming.

**Revised DOC Policy - Arrest and Conviction:** DOC has revised its policy concerning employees arrested or convicted of a crime. Because DOC is a law enforcement agency, its employees must avoid conduct that undermines the respect and confidence of the public and their faith in the criminal justice system. Any employee who is arrested for a criminal offense or is convicted of or receives deferred adjudication for such an offense, shall be subject to disciplinary action. The policy includes employee reporting responsibilities and a list of convictions for which the Department will pursue dismissal.

**Flex-Serv Open Enrollment:** runs from Nov 1 to Nov 20, for the year 2005. Flex-Serv allows employees to have money set aside from their paycheck to pay periodic medical or daycare expenses. Paycheck amounts deducted are not taxed. For more information, contact Tracy Scott, HR Benefits Coordinator at 739-5601.

**The next CO Job Fair** will be held Nov 13 at Del Tech's Wilmington Campus for Correctional Officer, Food Service and Maintenance positions. Testing begins at 9 a.m. and 1 p.m., with interviews to follow. September's Job Fair netted 105 hire recommendations. So far, 7 people have been referred by DOC employees under the new $500 cash incentive recruitment program.

**A "Staff Supervision for Correctional Professionals" Training Course** will run from Oct. 25-28, from 8:30 am to 4:30 pm. at EDC. The 3 day course is designed to help new supervisors improve their effectiveness. Supervising requires a different perspective on one's role within the organization and this course will give ideas, insight and new perspectives to prepare supervisors for the challenges they will face. To sign up, submit a Travel Training Request to Barbara Roscoe at EDC no later than Oct 20.

**October is Domestic Violence Awareness Month:** As supervisor or co-worker, you may come upon someone who is a victim of domestic violence. Nationally, 77% of domestic violence victims are employed, 74% are harassed in the workplace by their batterers, and 96% of them experience problems at work because of abuse by a partner. Each year, one in six domestic violence victims lose time from work, which adds up nationally to 9.5 million days of work or other activity. Homicide is the leading cause of death for women in the workplace. Employers have a range of actions they can take to protect their employees from workplace violence, including moving a victim to an office location out of sight of those who enter; evaluating parking arrangements and considering an escort, or obtaining a no-trespass order from the court. Batterers may stay away if they know the victim's workplace will support prosecution if an order is violated. Keep in mind that getting involved could prove dangerous to you and the victim. If you have any reservations about getting involved or need assistance, make a referral to Human Management Services (EAP).

**EAP is a Strong Supervisor's Tool but Underutilized:** The Employee Assistance Program (EAP) is a tool that has long been underutilized by supervisors and managers. Human Management Services, the State's EAP provider, offers 24/7 counseling services not only for employees, but also for supervisors and managers to get advice in dealing with workplace issues. This could run from working with a victim of domestic violence to an employee's sudden behavior change. The Supervisor can call HMS and get help in defining the problem, uncovering underlying reasons for the behavior and arriving at possible solutions. HMS Counselors are certified in a number of areas and have in-depth experience in dealing with emotional and workplace issues. While good supervisors may have motivational and counseling skills, there are times when problems go to the psychological underpinnings of an individual's mood or behavior. That type of understanding can only come from a professional. Call HMS at 1-800-343-2186.

**Return Day:** Those who work or live in Sussex County get 3.75 or 4 hours holiday on Nov 4, paid or taken like any other holiday.

**Express Scripts Removes Vioxx:** Express Scripts has removed Vioxx from its formulary, due to increased risk for heart attack and stroke, and will no longer process prescriptions or refills for it. Express Scripts recommends the alternative medications Celebrex and Bextra and will process prescriptions for alternative treatments regardless of how recently a patient filled or refilled a prescription for Vioxx. If patients have unused quantities of Vioxx, its maker Merck will reimburse them. Reimbursement information can be found on the web site vioxx.com or by calling 1-888-36VIOXX.

**Got News?** Suggestions for future newsletters are always welcome. Contact John Smart in Human Resources at 739-5601.

U00345

## Recognizing Length of Service

**Looking ahead to November 2004** — Internal Affairs: Jim Lupinetti, 15 yrs; Public Relations: il Stallings-Minor, 15 yrs; MIS: Sam Eaton, 25 yrs; Webb: Frank Durso Jr., 25 yrs; DCC: Willis Seaman, Jr. and Paul Unsworth, 25 yrs; BWCI: Claudette Cain, 10 yrs; HRYCI: Denisha Young, 5 yrs; P&P: Sodonia Parker, 25 yrs; Karen Keough and Don St. Jean, 15 yrs.

## In Transition

**Welcome Aboard** — H. R.: HR Technician Terri Jones; **Food Services:** Food Service Specialist I Kenneth Kresge, Shaneta Ayers and Cecilia Durham; **DCC:** Ops Support Specialist Heather McCabe; Admin Specialist I Catherine Malay; COs Molly Gross and Harold Johnson Jr.; **BWCI:** COs Tiffanie Andrade and Demetrious McIntire; **HRYCI:** COs Bobby Mack Jr., Tysean Milligan, David Whaley and Darrel Wiley Jr.

### September Retirements

Sherry Parks, Administration
Gloria Green, DCC
Robin Pratt, DCC
Alan Hammond, HRYCI

### September Promotions

**EDC:** Louise Layton to Training Administrator II; **Food Services:** Christie Baysinger, Richard Crockett Sr., and Andre Johnson to Food Service Specialist III; **DCC:** Marilyn Carson-Scott to DOC Safety/Risk Manager; **SCI:** Regina Burgess to Sergeant; **BWCI:** Kenneth Stagg to Corporal; **HRYCI:** Jacqueline Whilby-Rice to Master Counselor, Walter Dych, Allen Pedrick and Kevin Senato to Lieutenant, Joseph Sabato to Staff Lieutenant; **Plummer:** Darren Carter to Captain.

## - It's a Diverse Universe -

**As America Evolves:** After hitting a 7 year high in 2002, the number of job discrimination complaints against private employers declined 3.7 percent in 2003. Currently, women-owned businesses generate nearly $2.3 trillion in annual revenues in the United States. Between 1996 and 2000, the voting rate for African Americans increased 4 percent while the rate for Whites grew just 1 percent. Latinos comprise the majority (52%) of the country's foreign-born population. Asians are second with 26%, Europeans third at 14% and other regions, such as Africa and the Middle East, comprise 8%. Through 2020, the Asian and Pacific Islander population is expected to grow faster than other racial groups, including Latinos.

**Discovering Discovery:** We celebrate Columbus Day for the Italian explorer who discovered America for the Spanish crown. But, some historians say America was discovered over and over, well before Columbus. Some believe the Chinese Admiral Zheng-He, discovered America 72 years before Columbus, leading a fleet of 1,000 ft. long ships, with 500 sailors each, on a world quest for riches for the Emperor Zhui Di. He circumnavigated the world before Magellan (who got the credit), reached South America in 1420 and beat explorer James Cook's discovery of Australia by 337 years. Some say the Viking Leif Erickson landed in Northeast Canada 500 years before Columbus, in 1001 AD, but he actually arrived later than the lesser known Bjarni Herjolfsson, who led Norse expeditions to North America in 986. Even before the Vikings, there's evidence that early Hebrews sailed to the Western Hemisphere 2,500 years before Columbus. Early settlers of Peru were white-skinned and red bearded and there is overwhelming evidence of cultural contacts betweens the ancient Peruvians and the Israelites. Ancient stone inscriptions reflect Bronze Age transatlantic communication between the Mediterranean and the New World around the middle of the second millennium B.C. Columbus reported encountering natives when he landed, calling them "Indians" because he thought he was in the East Indies. The first Native Americans were Asiatic people who crossed a 1,000 mile wide land bridge between Asia and North America over 20,000 years ago. By 1492 about one million American "Indians" lived in the United States and Canada and about 20 million "Indians" lived in South America. To his death, Columbus always believed he discovered the West Indies and the New World didn't become America until a German scholar named Martin Waldseemuller gave it that name in honor of Americus Vespucius (aka Amerigo Vespucci), a Columbus contemporary whose maps the professor published. So remember, just because people say it's so, doesn't make it so. Our world is as diverse as the ways America came to be discovered, so look beyond first impressions and open up a "new world" of discovery for yourself.

## Your Co-Workers In Action

If it weren't for the way DOC employees pull together, many of the things we accomplish on a daily basis would not get done. There are many stories that go unheralded, but here are just a few of your co-workers in action over the last several months:

**The Eyes Have It:** On June 28, Probation and Parole Officers Faith Leies and Christopher Bradley spotted a probationer acting suspiciously. In responding, they recovered 200 bags of heroin, 20 bags of crack cocaine and marijuana. Investigation of the subject's residence yielded more drugs and drug packaging paraphernalia. Their actions took a predatory narcotics trafficker off the streets.

**Improving Service in Tough Times:** During the budget freeze, CO Auto Mechanics Wilford Yelverton, James Massie, David iley, William Mason and Fleet Services Manager Francesco Cristiano increased Prison Industries' Vehicle Repair work order volume by 18%. Their extra efforts raised DOC's share of all State Vehicle repairs and maintenance to 58%, where it stands today.

**Handled with Kid Gloves?** In early 2004, Probation and Parole Officers Mark Herron, Brian Kananen, David Santobianco, Kevin Dunlap, Jodie Hawkins, Cheryl McLaughlin, John Mueller, Janet New and Supervisor Danny O'Connor were involved in the arrest of an extremely violent criminal and defused a potentially dangerous situation. After investigation led them to a residence, the team forced their way in, searched the home and found the criminal in an upstairs bedroom. He had surrounded himself with three toddlers. With special care, the team worked diligently to safely free the children and take the criminal into custody.

000347

| Corrections | | Newsletter |
|---|---|---|
| Vol 1, Issue 4 |  | December 2004 |

*Our Commitment to Public Safety – The Foundation and Driving Force Behind Corrections*

**In hot pursuit of donated leave:** DOC is one of the most active agencies participating in the State's Donated Leave Program. In 2004, 106 DOC employees donated their leave time and 27 employees were recipients. With the end of the year approaching, those in a use or lose situation can help out a fellow employee by donating leave to them or to the State's Donated Leave Bank. Leave must be donated in equal amounts of sick and vacation. Recipients must have been a state employee for at least six months and have used all their sick and half their vacation leave. Your donations are not limited to DOC only. If your donation is not used by the recipient, and you were in a lose or use situation, your carryover is automatic and you will not lose the leave. All donation forms must be completed by December 31, 2004. If you are interested, contact HR Specialist Jill Rush at 739-5601, ext. 310.

**...And the last word on carrying over leave accrual is:** Annual leave credit carried into a new calendar year may not exceed 318 hours (37.5 hour schedule) or 336 hours (40 hour schedule). Agencies may request approval to carry over annual leave in excess of the maximum allowed, but must go through their chain of command and present a good reason for the carry over. Employees should also be aware that they are entitled to know where they stand in leave accrual at the end of the year. Timekeeper methods for providing this information may vary from providing a copy of the entire timecard to providing only the final numbers.

**Will the taxman knock on the right door?:** Whether you start as soon as possible on your taxes or wait until April 15th, you still need your W-2. The State will send your W-2 to the address on your paycheck, so if that address is wrong, you need to contact Human Resources to change it. You need to make this change before the end of the year. Even if you have left a forwarding address at the Post Office, they will not forward the W-2s, but return them to the State. Your HR Representative can be reached at 739-5601.

**January training at EDC:** The Employee Development Center is offering the following training in January and February: Refresher IPC Training on Jan 5 or 6 for all IPC Instructors (signup deadline is Dec 31). "Thinking for a Change: an Integrated proach to Changing Offender Behavior" from Jan 24 thru 27 for Counselors and Probation Officers to develop problem solving ...lls for offender groups (signup deadline is Jan 14). "New IP for T" from Jan 24 thru 28 to provide skills for effectively communicating with offenders in a correctional setting (deadline is Jan 14). "Staff Supervision for Correctional Professionals" on Feb 9, 10, 11, 14 and 15 to help new supervisors gain insight and skills for the new challenges they will face (signup deadline is Jan 31). To sign up, submit a Travel Training Request to Barbara Roscoe at EDC.

**When Christmas is not so jolly:** While the holidays are filled with joy for many, some are not so lucky. Depression and the development of suicidal thoughts are greater at this time of year. 80% of suicide victims communicate their intentions verbally, while 20% communicate through their behavior. Take the time to tune in to your loved ones or your co-workers. Don't let inaction result in tragedy. Health Management Services, the State's EAP provider, can help and offers 24 hour counseling at 1-800-343-2186.

**Got News?** Suggestions for future newsletters are always welcome. Contact John Smart in Human Resources at 739-5601.

## *Recognizing Length of Service*

**As of   January 2005**

**Warehouse:** David Wilson, 10 yrs. **Maintenance:** Eric Smeltzer, 15 yrs. **DCC:** Joseph Belanger, 25 yrs; Audrey Swing, 10 yrs. **SCI:** David Elliott and Lester Rickards, Jr., 25 yrs. **HRYCI:** Louis Neal, 15 yrs. **Plummer Center:** Michael Ewasko, 30 years. **SWRC:** Douglas Davis, 20 yrs. **Probation and Parole:** David Cole, 30 yrs; Joseph Durney and Thomas Scully, 15 yrs; Valerie Douty, Donna Smith and John Savage II, 10 yrs; **KWRC:** Stephen Ballinger, 15 yrs;

## *In Transition*

**November Retirements -** Rudolph Drummond, Court and Transportation.

**November Promotions -** Human Resources – Jill Rush to HR Specialist I. DCC – James abella, Gladys Little, Keith Lovett, Michael Trader, Andre Walker, Marvin Edwards and Marvin Pigott to Sergeant; Michael Burton Jr. and Robert Bowie to Corporal at C&T; Donna Jones and David Hamrick to Corporal at SCCC; and Lisa David to Lieutenant at Plummer. HRYCI – Pamela Bates to Corporal at C&T and Phillip Lawrence to Lieutenant at CVOP.

000348

## - It's a Diverse Universe -

**Christmas styles differ but substance the same:** Though Christmas is celebrated differently around the world, its main ...me remains the same. Santa Claus may be known as "Father Christmas" in Africa, "Father Frost" in the Ukraine, "Papa Noel" in Brazil and "Dun Che Lao Ren" or "Christmas Old Man" in China, but the celebration of traditions and giving is universal. In the African Congo, Christmas day begins with carolers walking through villages and ends with an outdoor feast with friends and neighbors. In Ghana, on Africa's west coast, the feast is a tradition of rice and yam paste called fufu with stew or okra soup and meat. Christmas there coincides with the cocoa harvest so it represents a time of wealth. In **South Africa**, citizens decorate for Christmas, but December is in the summer season so many enjoy the beaches, rivers and shaded mountain slopes or have an afternoon lunch in the outdoors. On Christmas Eve children hang stockings awaiting gifts from "Father Christmas." In **China**, fireworks end a day geared for children where they decorate trees with colorful paper ornaments in the shape of flowers, chains and lanterns. They hang stockings in the hopes that "Christmas Old Man" will fill them with gifts and treats. Chinese Christmas Trees are called "Trees of Light." In the Ukraine, tables for the Christmas Eve celebration called Sviata Vechera, or "Holy Supper," are set with wisps of hay to represent the manger and, in farming communities, the head of the household brings in a sheaf of wheat called the didukh, meaning "grandfather spirit" and symbolizing the family's ancestors. Christmas Carols in the Ukraine are ancient pagan songs of a thousand years ago converted into Christian carols. The Ukrainian Christmas is on January 7th. "Father Frost" visits all the children in a sleigh pulled by three reindeer. He brings along a little girl named "Snowflake Girl". She wears a silver blue costume trimmed with white fur and a crown shaped like a snowflake. In **Bangladesh**, the Christian village men cut down banana trees and replant them in pairs along paths to churches and homes. They bend the leaves over to form an arch, make small holes in bamboo poles, fill them with oil and then tie them across the arches. When the oil is lit, the way to church burns brightly. In **Iran**, Christmas is known as "Little Feast." It ends a 25 day fast that includes meditation and attending church. On Christmas Day, the fast ends and the feast begins. The main dish is a kind of chicken stew that is cooked in large quantities and lasts several days. Children receive new clothes instead of toys. In **South America**, Native **Bolivians** celebrate Christmas as a harvest festival giving thanks for the year's crops and making plans for the next year's work, celebrating the "Goddess Mother Earth" so she blesses the crops and keeps away plague. In **Brazil**, they have no Christmas trees but they do have "Papa Noel," who brings gifts for the children. In **Equador**, children write letters to the Christ child and place them in shoes in the window so that he may place toys there as he passes by on Christmas Eve. Christmas day ends with firecrackers, noise makers, brass bands and dancing in the streets. Closer to home, in **Mexico**, Christmas is called "La Posada," highlighted by a religious procession ...enacting the search for shelter by Mary and Joseph. During the procession, participants go from house to house, with pictures of ...ry and Joseph, looking for shelter. Children get candy on Christmas day from a piñata and then gifts from the Three Wise Men on January 6. It's not Santa Claus who gets the attention in Mexico, but the traditional flower of the season – the poinsettia. It's believed that a young boy walked to church to see a nativity scene but had no gift, so he offered green branches he picked on his way in. He was laughed at, but as he placed the branches near the manger, they started to bloom a bright red poinsettia flower on each branch. *Whether your holiday is magical, traditional, full of gift giving or just spending time with family and friends, remember that your celebration may differ with others around the world in style, but when it comes to substance, we're all looking for the same thing. Celebrating life is universal.*

## Your Co-Workers in Action

On December 2, 2004, the DOC and the Council on Correction hosted the **Thirteenth Annual Recognition Ceremony** at the Modern Maturity Center in Dover. Selected as **2004 Correctional Supervisor of the Year** was BWCI Deputy Warden Grace Martin who is in her 41st year of service with DOC. **Correctional Officer of the Year** was Angela Endres for her work at the visitors center at BWCI, **Probation & Parole Officers of the Year** were the Absconder Team of Mark Herron and David Santobianco. **Staff Employee of the Year** was Operations Support Specialist Gerda Street of Management Services. Other award winners were:

**Bureau of Community Corrections:  Service Provider Award:** Reverend James M. Jackson; **P&P Director's Award:** Curt Shockley, Dover P&P; **Volunteer Award:** Rev Ty Johnson; **Employees' Choice Awards:** Penny Saroukos, Kent County and Reverend Lawrence Lilly, Sussex County; **Golden Arm Award:** Deborah Trice, Seaford P&P; Bruce Williamson, Plummer; and Brenda Gooner, SCCC; **Warden's Award:** Cheryl Simms, Plummer Center; William Oettel and Barbara Costello, SCCC. **Golden Key Award:** Doug Davis, SCCC; **Special Forces Award:** Michael Costello, Charles Larsen, Cindy Murray, Eric Adams, Susan Henry, Travis Lowe, Joseph Clark and Linwood Chatman, SCCC.

**Bureau of Prisons:  Warden's Award:** Angela Atkins, Boot Camp; Roberta Wright, Veronica Wright-Downing and Renee Coppedge, BWCI; Frank Durso, Webb; Kerry Carmean, SCI; Mark Emig, HRYCI; Donna Jones, Randall Dotson, David Pierce, Lashena Fuentes, Guy Crawford, Barry Burman, Maggielean Neal and Clifton Outten, DCC; **Golden Arm Award:** Amelia M. ...ani and Brenda Brown, BWCI; Carol Powell, Webb; Ann Downey-Carlton, HRYCI; Maria Lyons, DCC; Colleen Shotzberger, CI; Gerry Gregg, Webb; Diane Plummer, SCI; Michelle Salter, HRYCI; Michael McMahon, Kenneth Milbourne, DCC.

**Special Forces Award: DCC:** Karol Ann Smith, Jayme Jackson, David Holman, William Todd Kramer, Charles Cunningham, Ronald Hosterman, Ricky Porter, Bryan Andrews, Patricia Johnson, Thomas Zanda, James Simms, Jeremy McEntyre, Tonya Smith

B00349

and Arthur Mintz. **CERT:** Dave Hall, Tim Radcliffe, Bernard Garnett, Jack Evans, Kennard Demby, Mark Russell, Harold Vandunk, Kenny Hickman, Truman Mears, Orlando Dejesus, Keith Hoffer.

U00359

A Fri 4-12

| Post | Name | Rank | Status | Relief | Rank | Fri |
|------|------|------|--------|--------|------|-----|
| Adm/PT | | | | | | X  QRE |
| | Mc Broom, Ernest | LT | | | | 1 NGHTS |
| | Devern, Dan | LT | Mlwop | Dukes, Wayne | LT | |
| Perimtr | | | | | | X  ELO |
| | Beckett, Alfred | LT | | | | |
| #14 | | | | | | X |
| | Palmer, Larry | Cpl | | | | |
| Control | | | | | | X |
| | Chorman, Wayne | CO | | | | |
| Counter | | | | | | X  QRT5 |
| | Donovan, Richard | Cpl | | | | |
| Gym  MSB | | | | | | |
| | Waples, Mickey | CO | | | | |
| K-9 | | | | | | X |
| | West, David | CO | | | | |
| Key | | | | SICK | | X  *17*1 |
| VIR | Van Heckle, Richard | Sgt | | | | X |
| | Holmes, Jerrilyn | CO | | | | X |
| | Karol, Matt | CO | | | | X |
| | Osorio, Javier | CO | | | | X |
| | Clay, Kirk | CO | | | | X |
| Med | | | | | | X |
| | West, Cheryl | CO | | | | X |
| | Smith, Gregory | CO | | Resigned | | X |
| OIC | Banks, Tiana | CO | | | | |
| Merit | | | | SICK | | Ø  *21* |
| | Hawkins, Andrew | Sgt | | | | X |
| | Watson, Veronica | Cpl | | | | X |
| | Hopkins, Alesia | CO | | | | X |
| | Bess, Deigne | CO | | | | X |
| Min | | | | SICK | | Ø  *21* |
| | Hall, Ron | Cpl | | | | |
| MSB | | | | | | c/L (Blu) |
| | Gibbs, Cliff | Sgt  NO | | | | X |
| | Elliot, David | Cpl | | | | X |
| | Wilson, Larry | CO | | | | X  DS |
| | Morgan, Ryan | CO  NO | | SICK | | X |
| | Norwood, Sylvia | CO | | | | X |
| | Kinsler, John | CO | | | | X |
| MSB#7 | | | | | | ŞKIC MCA |
| | Besnoska, Jill | CO | | | | |
| Prop Rm  REC Rm | West, Richard | Cpl | | | | X |
| PT | | | | | | X |
| | Rogers, Jeff | Sgt | | | | |
| PT PrgRvr | | | | | | |
| | Hammond, Lamonte | CO  NO | | | | X |
| PT Ptrl | | | | | | X  QRT1 |
| | Morris, Joe | Cpl | | | | |
| PT Rvr | | | | | | Ø  DS |
| | Morgan, Rae | CO  NO | | SICK FAMILY | | X |
| | Morgan, Greg | CO | | | | |
| PT Unit 1 | | | | | | X |
| | Jacobs, David | CO | | | | |

24  23

000351

A0766

| POLICY OF<br>STATE OF DELAWARE | POLICY NUMBER<br>9.19 | PAGE NUMBER<br>1 OF 4 |
|---|---|---|
| DEPARTMENT OF CORRECTION | RELATED ACA STANDARDS: | |
| CHAPTER: 9 - PERSONNEL, TRAINING AND EMPLOYEE-MANAGEMENT RELATIONS | SUBJECT: PSYCHOLOGICAL FITNESS FOR DUTY EVALUATIONS | |
| APPROVED BY THE COMMISSIONER: | | |
| EFFECTIVE DATE: | October 1, 1998 | |

I.  **AUTHORITY:** Merit Rule 14.0300, Applicable Collective Bargaining Agreements.

II.  **PURPOSE:** To establish Department of Correction guidelines for referral of employees for psychological evaluations to determine if they are fit to perform all or some of the responsibilities of their jobs.

III.  **APPLICABILITY:** This policy is applicable to all Department of Correction employees.

IV.  **DEFINITIONS:**

> **Fitness for Duty** - An employee's ability to perform job tasks which are essential to the effective performance of a particular job and interact with other staff and inmates/offenders as necessary.

> **Psychological Evaluation** - An assessment by a licensed psychologist which includes administration of appropriate psychological tests, at least one in-person interview with the employee and review of any other information deemed appropriate.

V.  **POLICY:** It is the policy of the Department of Correction to minimize the risk that psychological impairments of employees jeopardize the safety and security of other employees, the public, inmates or offenders. When employee performance, behavior or conduct or other documentation establishes that the potential for such an inordinate risk exists, the Department will utilize the services of a licensed clinical or forensic psychologist to evaluate the employee and take necessary and appropriate actions.

VI.  **PROCEDURES**

1.  When Wardens or Section Administrators become aware of employee behavior or conduct or have other documentation (e.g., Incident Reports, employee correspondence) that suggests that an employee is experiencing psychological problems that interfere with or prevent an employee from functioning on the job or otherwise present a danger to the workplace for psychological reasons, they will report that behavior or conduct and transmit the appropriate documentation to the Department's Director of Human Resources & Development (HR Director).

**D000715**



DEPOSITION EXHIBIT

| STATE OF DELAWARE DEPARTMENT OF CORRECTION | POLICY NUMBER 9.19 | PAGE NUMBER 2 OF 4 |
|---|---|---|

| SUBJECT:  PSYCHOLOGICAL FITNESS FOR DUTY EVALUATIONS | | |

2. The HR Director will contact a licensed forensic or clinical psychologist to determine if the behavior or conduct warrants a fitness for duty psychological evaluation. The HR Director and psychologist will also determine if the employee should be removed from the workplace, or if other interim measures are warranted (e.g., pulling weapon's card) pending the outcome of the evaluation. If employees are removed from the workplace, they will receive their regular pay or be placed on sick leave, annual leave or rescheduled holidays, depending on the circumstances, as long as they cooperate fully with the evaluation process. If employees fail to cooperate with the evaluation process, they will be subject to discipline, in accordance with their union contract or the Merit Rules for employees not covered by a collective bargaining agreement.

3. If a fitness for duty psychological evaluation is deemed to be justified, the HR Director will prepare a letter to the Department-selected psychologist. The letter must specify the reasons for the evaluation and describe the employee's job responsibilities. Supporting documentation should be attached. The employee will receive a courtesy copy of the letter with instructions to contact the psychologist. On the advice of the psychologist, the HR Director may omit selected information from the letter.

4. Prior to transmitting the letter, the HR Director will meet with the employee to explain the reasons for the referral and the employee's responsibilities relative to the process and respond to any questions the employee may have. The HR Director will also consider any information provided by the employee. If the employee is in a collective bargaining unit, the employee may have union representation, if desired.

5. The requesting budget unit will pay all costs associated with the evaluation.

6. The employee will schedule the evaluation in accordance with instructions included in the referral letter. Employees who continue to work during the evaluation process will schedule appointments on their workdays and will be excused from the workplace for the time of the interview and reasonable travel time to and from the interview. Non-day shift employees will be excused for the same equivalent of time on the day of the appointment. Employees will be reimbursed for expenses in the same manner as reimbursement for outside training.

7. Employees will comply with requests from the psychologist for other medical or mental health documentation. Such documentation will not be shared with the Department except on a need-to-know basis.

**D000716**

| STATE OF DELAWARE<br>DEPARTMENT OF CORRECTION | POLICY NUMBER<br>9.19 | PAGE NUMBER<br>3 OF 4 |
|---|---|---|
| SUBJECT:  PSYCHOLOGICAL FITNESS FOR<br>DUTY EVALUATIONS | | |

8. The psychologist will provide the evaluation report to the HR Director.  The employee may designate report recipients; however, the Department will not provide a copy of the report directly to the employee.  In most instances, the Department will provide a copy through the employee's legal counsel or health care provider.  The report will remain confidential, and information will only be shared on a need-to-know basis.  The report will be maintained in a file separate from the employee's Personnel File.

9. An employee may request a second opinion from a licensed  forensic or clinical psychologist of the employee's choosing.  However, the evaluation must be conducted on the employee's time, and the employee must bear all costs of the second opinion.  The second opinion must be in the form of a psychological evaluation.

10. If the first and second opinion psychologists do not agree, the two psychologists will select a psychologist for a third opinion.  The third evaluation will be conducted on 50% employee time and 50% Department time, and the cost will be shared equally between the Department and the employee.  The third opinion must also be in the form of a psychological evaluation.

11. The Warden or Section Administrator will meet with the HR Director to discuss the results of the evaluation(s).

12. The Department and employee must comply with the final results of the evaluation process.  If it is determined that the employee cannot continue to work in his or her position, the Department will offer the following options:

    a.    A disability pension if the employee is eligible.

    b.    Immediate separation.

    c.    A delayed separation of up to 90 days (longer with consent of the Department) while the Department attempts to identify an alternate position (same paygrade or lower) in the Department or elsewhere in State government.  The alternate position must satisfy the requirements of the evaluation.

**D000717**

| STATE OF DELAWARE DEPARTMENT OF CORRECTION | POLICY NUMBER 9.19 | PAGE NUMBER 4 OF 4 |
|---|---|---|
| SUBJECT: PSYCHOLOGICAL FITNESS FOR DUTY EVALUATIONS | | |

If it is determined that the employee may be able to return to the workplace following treatment or therapy, the employee may request to use sick or annual leave or leave without pay, as appropriate. Such requests must be for reasonable time periods, not to exceed one (1) year. In lieu of leave, the Department may consider temporary light or alternative duty assignments, in accordance with Policy 9.15.

The Department will also consider reasonable accommodations, as recommended by the psychologist, to retain employees in their present positions. Accommodations must allow employees to perform all of the essential functions of their jobs.

13. These procedures must be included in each bureau/section manual.

D000718

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CINDY L. BALAS a/k/a CINDY L. ADKINS,  )
Executrix of the Estate of CORPORAL JOHN  )
J. BALAS,  )
            )
        Plaintiff,  )            C.A. No. 06-592-JJF
            )
    v.  )
            )
STANLEY W. TAYLOR, JR., individually and  )
in his official capacity as the Commissioner of  )
Correction; ALAN MACHTINGER,  )
individually and in his official capacity as the  )
Director of Human Resources of the Department  )
of Correction; MICHAEL DELOY, individually  )
and in his official capacity as Deputy Warden of  )
Sussex Correctional Institution; CAPTAIN  )
DAVID WILKINSON, individually;  )
LIEUTENANT TRUMAN MEARS,  )
individually; and DEPARTMENT OF  )
CORRECTION OF THE STATE OF  )
DELAWARE,  )
            )
        Defendants.  )

## DEFENDANTS' ANSWERS TO
## PLAINTIFF'S FIRST SET OF INTERROGATORIES

1.      Identify Cpt. John J. Balas' ("decedent's") dates of employment with the

State of Delaware and Department of Correction.

**Answer:**

Balas was employed with the Department of Correction from October 3, 1994 to

February 19, 2005.

2.      What was the decedent's hourly rate of pay at the time of his death?

**Answer:**

$15.289706 per hour.



A0771

3.    What were the decedent's gross earnings every calendar year during the course of his employment with defendant?

**Answer:**    Response provided electronically.

4.    What are the total number of overtime hours worked by decedent for each of the years he was employed? Please break this answer down by specific years.

**Answer:**    Response provided electronically.

5.    Identify all CERT team members known to defendants from June 1, 2004 through September 1, 2004.

**Answer:**

**DCC**
Beall, Wayne
Cannon, Jeremiah
DeJesus, Orlando
Demby, Kennard
Evans, Jack
Fetzer, Larry M/L
Nichols, Peter
Flint, Robert
McDonald, Dave
Kuerner, Mike
Garnett, Dino
Hoffer, Keith
Russell, Marc
Jefferson, Kerry M/L
Potts, Larry
Ritchey, Todd
Wells, Dave
Troxler, Shane
Vandunk, Harold
Walker, Andre
Wallace, Eric
Wolken, Keith

**HRYCI**
Apa, Bradford
Coleman, Alan
Daniello, Angelo
Defeo, Gregory
Fields, Michael
Frisby, Francis
Lewis, Mike
Hopkins, Kevin
Hitchens, Melvin
Ivy, Scott
Kerns, Frank
Rivera, Edward
Senato, Kevin
Wilson, Wayne
Taylor, Ramon

**SCI**
Adams, Allen
Balas, John
Bradley, Scott
Foskey, Jeff
Harmon, Felix
Hasting, Harry
Mears, Arthur
Hickman, Kenny
Kelley, Robert
Mears, Truman
Moore, Tracy M/L
Mumford, Jon
Murray, Dennis
Paglusch, Erik M/L
Rutkowski, Edward
Sanchez, Andrew M/L
Shockley, William
Truluck, John
West, David

**CERT HQ**
Dave Hall
Timothy Radcliffe
Didier Gulledge
Scott Taylor

6.    Identify each person who has been interviewed on your behalf or from whom an oral or written statement has been taken concerning the facts alleged in any pleading.

**Answer:**

Stanley Taylor, Alan Machtinger, Warden Michael Deloy, Captain David Wilkinson, Lieutenant Truman Mears, Corporal John B. Mitchell

Counsel transcribed notes from these interviews for the purposes of trial preparation. This information is protected from discovery by the information protected from discovery by the attorney-client privilege and the work product doctrine.

7.    Identify each person who has supplied information for the answers to each of these interrogatories and all requests for production of documents filed by Plaintiff.

**Answer:**

Stanley Taylor, Alan Machtinger, Warden Michael Deloy, Captain David Wilkinson, Lieutenant Truman Mears, Corporal John B. Mitchell, and Department of Correction Human Resources personnel.

8.    Identify each person whom you expect to call as an expert witness at trial, and state the subject matter on which the expert is expected to testify, the substance of the facts and opinions to which the expert is expected to testify, a summary of the grounds

for each opinion, and the dates of any reports relating thereto.

**Answer:**

Defendants have not yet retained any experts but reserve the right to do so and will supplement this Response as required by the Federal Rules of Civil Procedure.

/s/ Ralph K. Durstein, III
Ralph K. Durstein, III (ID# 912)
Stacey Xarhoulakos (ID#4667)
Deputy Attorneys General
Department of Justice
State of Delaware
820 N. French Street, 6th Floor
Wilmington, DE 19801
(302)577-8510

DATED: October 26, 2007

# STATE OF DELAWARE
## EMPLOYEE PERFORMANCE PLANNING AND APPRAISAL - EPPA - DOCUMENT A

Evaluation Period: From _10/15/94_ To _10/5/95_

**SECTION 1 - EMPLOYEE IDENTIFICATION** (Print or type)

Name _Dolas, John J._ (Last, First, MI)   Social Security No. _____

*RECEIVED DEC 19 1995*

Classification _Correctional Officer_ (Class Title)

_Vacation Holiday Relief (VHR)_ (Assignment, if applicable)   ☒ Full time ☐ Part-time (Employment Status - check one)

Department/Division/Section (Facility) _____

Supervisor/Rater _Patterson, James R.   Corr. Staff Lieutenant_

**SECTION 2 - PERFORMANCE PLANNING** (To be signed when SECTION 6 is completed)

We have met to discuss the Job Dimensions and related responsibilities (required tasks, actions and expected results) indicated in SECTION 6. This Performance Plan is the basis upon which job performance will be appraised and rated. The employee has had an opportunity to submit and discuss proposed responsibilities for consideration in the Performance Plan.

Rater _(Signature)_ _12/21/94_   Reviewer _(Signature)_ _12-21-94_

Employee _(Signature)_ _12/21/94_   ☐ I have included written comments concerning the Performance Plan (optional on the part of the employee).

**SECTION 3 - PERFORMANCE APPRAISAL**

FINAL SCORE: _1980_ (Total Raw Score) ÷ _350_ (Total Weight) = _5.65_ (Final Score)

### FINAL SCORES

When the Final Score calculation is completed, the Final Score will fall in the range of 1.00 thru 7.00.

-7.00 Performance consistently exceeds expectations. Employee is acknowledged for exceptional effort.

-5.00 Performance meets expectations. Employee's performance is fully competent and reliable.

-3.00 Performance may meet some expectations but, in general, improvement is required.

-1.00 Performance is completely unacceptable. Immediate change in performance is required.

I have met with the employee to discuss the employee's performance during the rating period and to develop a plan for improved performance, if necessary.

Rater _(Signature)_ _(Date)_

I have had an opportunity to complete the self appraisal. My supervisor and I have discussed this appraisal.

___ I agree with this appraisal.
___ I disagree with this appraisal.

Employee _(Signature)_ _19DEC95_

*DEPOSITION EXHIBIT Mears 4 11-6-07*

**SECTION 4 - RECOMMENDED PERSONNEL ACTIONS**
In accordance with State Merit Rules and/or applicable collective bargaining agreements.

COMPULSORY REEVALUATION:
___ Reevaluation required
___ Successful improvement, no further action required
___ Dismiss

Other:
___ No action required at this time
___ Other

PROBATION:
___ Change status to permanent
___ Return to former or other available position for which qualified
___ Extend probation, then reevaluate
___ Dismiss

Date of Next Scheduled Appraisal: _12/96_

000107

**SECTION 5 - REVIEW** _I have reviewed this completed employee performance appraisal. - 12/26/95_

Reviewer _(Signature)_ _12-21-95_

Personnel Officer: _(Initials)_ _1/23/96_

PURPOSE OF APPRAISAL
___ Probationary Appraisal
X Annual Appraisal
___ Compulsory Reevaluation
___ Change of Supervision
___ Exit Appraisal
___ Other

Document No. 10-04/88/02/06

A0775

**INSTRUCTIONS** - Performance Appraisal for each employee should be completed in accordance with State Merit Rules and/or applicable collective bargaining agreements. SECTIONS 6, 7, 8 and 9 of the EPPA Form are located on DOCUMENT A. DOCUMENT B to DOCUMENT A. DOCUMENT A and DOCUMENT B together comprise the EPPA Form

## SECTION 6 - PERFORMANCE PLAN

Choose Job Dimensions, from the Job Dimensions Menu, which best describe the job responsibilities (see the Job Dimensions Menu in the EPPA Manual). List one Job Dimension on the appropriate line of each box. Under each Job Dimension, describe the employee's specific responsibilities, listing tasks, actions and expected results. Weight each Job Dimension according to its importance to the overall job expectations. Use between 5 and 18 Job Dimensions to develop a Performance Plan.

WEIGHTING SCALE:

| 50 | 40 | 30 | 20 | 10 |
|---|---|---|---|---|
| ESSENTIAL | | VERY IMPORTANT | | SIGNIFICANT |

After completing this SECTION at the beginning of the evaluation period, the employee, rater and reviewer must sign SECTION 2.

## SECTION 7 - PERFORMANCE APPRAISAL

Both the employee and the rater should separately choose the Level of Performance which best describes the actual performance for each Job Dimension. Levels of Performance are described in the Job Dimension Menu, in the EPPA Manual. A rating scale with the numbers 1, 2, 3, 4, 5, 6, 7 corresponds to the Levels of Performance. The rater writes the number which corresponds to the rater's appraisal of the employee's actual level of performance, in the block labeled "Rater." The employee writes the number which corresponds to the employee's appraisal of his/her own Level of Performance, in the block labeled "Self." The rater determines the "Final" rating, taking into consideration the discussion which takes place during the appraisal interview.

## SECTION 8 - COMMENTS AND IMPROVEMENT PLAN

**COMMENTS:** Both the rater and the employee are to write comments about factors which have positively or negatively affected performance ratings and about the employee's strengths and weaknesses in carrying out the responsibilities within each Job Dimension. **Comments are required to support a performance rating of 1, 2, 3, 6 or 7 on any Job Dimension.**

**IMPROVEMENT PLAN: An Improvement Plan is required for any Job Dimension where performance was rated 1, 2, or 3.** An Improvement Plan is recommended whenever performance could be improved. The rater and employee are to work together to outline the ⌐ormance would be improved. The rater and employee are to work together to outline the ⌐cific steps which can be taken to improve performance. Recommendations can include more effective methods for carrying out responsibilities, changes in behavior, assistance from others, on-the-job training, formal training, etc.

## DISTRIBUTION

The rater and the employee should each keep a copy of the Performance Plan during the evaluation period.

When the Performance Appraisal has been completed, distribute copies as follows:

- Original to the agency personnel file
- 1 copy of the completed EPPA Form to the employee
- 1 copy of the completed EPPA Form to the rater

## SECTION 9 - EMPLOYEE DEVELOPMENT

Employees should list other types of activities/assignments which are of interest to them, which could develop their strengths, further their career goals, broaden their experience and/or exposure and develop new knowledge, skills and abilities

## SECTION 10 - ADDITIONAL COMMENTS

The spaces below are provided for additional comments by the employee, rater and reviewer.

EMPLOYEE COMMENTS

RATER COMMENTS    [handwritten] Up Bates is a hard working self-motivated officer who does not want to be cuddled but takes the initiative to supervise, is motivated or solving these problems. Up has also taken on the added responsibility to become a cert team member. He should be commended for his team development.

REVIEWER COMMENTS    [handwritten] I have reviewed this evaluation and do not concur. Attendance is not exceedingly fine preparation. If it was perfect attendance it would agree. This area should be a 5.0.

[handwritten signature/initials]

[stamp] 100103

EMPLOYEE PERFORMANCE PLANNING AND APPRAISAL :: EPPA : DOCUMENT B

Page 1 of 3

REVISED 2/92

EMPLOYEE: Name _Balas, John_     Classification: Correctional Officer     Date: _____

| | SELF | RATER | FINAL | WEIGHT | RAW SCORE |
|---|---|---|---|---|---|

**SECTION 6 - PERFORMANCE PLAN** - Describe and weight Job Dimensions, chosen from the Job Dimension Menu.

**WEIGHT: JOB DIMENSION**
50  Critical/Emergency Response

| | 6 | 5 | 5 | X 50 | = 200 |

Responds to emergency and/or critical situations as directed, whether on or off duty.

Responds quickly in a calm orderly manner.

**SECTION 7 - APPRAISAL**

**SECTION 8 - COMMENTS** - Appraisal ratings of 1,2,3,6 or 7 require written comments.  **IMPROVEMENT PLAN**-Appraisal ratings of 1,2, or 3 require an Improvement Plan.

COMMENTS - Refer Comments c/o Balas Responded appropriately to critical and emergency situations as directed skills to contain area.

Employee Comments Responds in this area.

IMPROVEMENT PLAN -

---

**WEIGHT: JOB DIMENSION**
50  Inmate Supervision

| | 5 | 5 | 5 | X 50 | = 250 |

Monitors and directs inmate activities during tour of duty.

Corrects and reports negative behavior to immediate supervisor.

Responsible for the custody and care of all inmates assigned to area of responsibility.

Reports extraordinarily positive behavior to immediate supervisor.

Interacts with inmates to assist in problem solving.

COMMENTS - Refer Comments c/o Balas Appropriately monitored and directs the activities of inmates and provides for the care and control of inmates as required.

Employee Comments

IMPROVEMENT PLAN -

---

**WEIGHT: JOB DIMENSION**
50  Security

| | 6 | 6 | 6 | X 50 | = 300 |

Performs headcounts, census and security checks of inmates in accordance with established procedures and post orders.

Performs routine cell checks, shakedowns, strip searches, door checks, fence checks and ground checks as applicable to duty assignment.

Observes and provides backup for co-workers and other employees and/or visitors.

COMMENTS - Refer Comments c/o Balas Consistently follows his established security procedures, he reacts signs of post and acts accordingly.

Employee Comments

IMPROVEMENT PLAN -

---

**WEIGHT: JOB DIMENSION**
50  Attendance

| | 7 | 7 | 7 | X 50 | = 350 |

Reports for duty on time as scheduled or as directed based on the operational needs of the facility or duty assignment.

Requests and utilizes leave in accordance with Merit Rules, DOC policy, BOP and facility procedures.

COMMENTS - Refer Comments c/o Balas can be depended upon to make every effort to report for duty as scheduled. He is punctual and has only had one (1) occurrence of absences this year.

Employee Comments

IMPROVEMENT PLAN -

---

200  WEIGHT
(this page)

TOTAL RAW  1100
(this page)

RE 1/30

000109

000110

Classification: Correctional Officer                                    Page 2 of 3

EMPLOYEE: Name: _Balos, Jose____

**SECTION 6 - PERFORMANCE PLAN -**

| | SELF | RATER | FINAL | WEIGHT | SCORE |
|---|---|---|---|---|---|
| | | | **SECTION 7 - APPRAISAL** | | RAW |

**WEIGHT** | **JOB DIMENSION**
40 | Safety

| | 5 | 5 | 5 | X | 40 | = | 200 |

Takes necessary steps to ensure the safety of inmates, staff and visitors in accordance with established procedure.

Be alert in recognizing safety hazards and prompt in reporting them.

Practices and promotes safety awareness.

**SECTION 8 - COMMENTS and IMPROVEMENT PLAN**

**COMMENTS -** Rater Comments c/o Balos is attentive to safety measures and adheres to effective safety practices and procedures and a lot of the time. we continue to pleasing efforts to his sole Employee Comments practices.

**IMPROVEMENT PLAN -**

---

**WEIGHT** | **JOB DIMENSION**
30 | Compliance

| | 6 | 5 | 6 | X | 30 | = | 180 |

Reads and follows established written procedure, post orders, emergency reaction plans.

Complies with verbal instructions of lead worker and/or supervisor.

Follows orders and completes daily assignments without constant supervision.

**COMMENTS -** Rater Comments c/o Balos consistently instructions, established procedures and displays without supervisory intervention.

Employee Comments

**IMPROVEMENT PLAN -**

---

**WEIGHT** | **JOB DIMENSION**
30 | Verbal Communication

| | 6 | 5 | 5 | X | 30 | = | 150 |

Organizes and expresses thoughts, ideas and facts to inmates, staff, representatives of other public agencies, and the public, as applicable, in a clear concise manner.

Answers and initiates telephone communications in a professional manner, obtaining and/or providing routine assistance and information from and/or to others.

**COMMENTS -** Rater Comments c/o Balos presents ideas and concepts which can be easily and clearly and address issues well.

Employee Comments

**IMPROVEMENT PLAN -** We will be using his seft skills and his oral presentation. We be used.

---

**WEIGHT** | **JOB DIMENSION**
30 | Written Communication

| | 6 | 6 | 6 | X | 30 | = | 180 |

Prepares and submits written reports in accordance with established procedures to include who, what, when, where, how, and why incident or event occurred.

Written communication is complete, concise, factual and clear.

Completes all written communication within established time frame and is submitted through proper channels.

**COMMENTS -** Rater Comments c/o Balos is skilled in prepared facts, ideas and complex concepts which are clearly and complete, well organized, and easily read. Clearly and easily read. his reports require minimal correction. Employee Comments

**IMPROVEMENT PLAN -**

---

130 | **TOTAL WEIGHT**
(this page)

**TOTAL** (this | **SCORE** | 710
page) | |

A0778

EMPLOYEE: Name _Bales, Jim_    Classification: _Correctional Officer_    Page 3 of 3

SECTION 6 -- PERFORMANCE PLAN -

SECTION 6 -- COMMENTS and IMPROVEMENT PLAN

| | SECTION 7 - APPRAISAL | | | |
|---|---|---|---|---|
| WEIGHT | JOB DIMENSION | SELF | RATER | FINAL | X | WEIGHT | = | SCORE |

WEIGHT | JOB DIMENSION
20 | Interpersonal Interaction

| SELF | RATER | FINAL | X | WEIGHT | = | SCORE |
|---|---|---|---|---|---|---|
| 6 | 6 | 6 | X | 20 | = | 1/20 |

Shows courtesy and respect to all department staff at all times.

Works cooperatively with department staff to ensure effective task completion.

Provides support and assistance to co-workers.

Maintains a professional bearing at all times and is a positive role model.

Deals with others in a fair, polite, tactful and equitable manner.

Adheres to DOC policy, BOP and facility procedures when discussing department business with the public or inmates.

20 | TOTAL WEIGHT
___ | (this page)

TOTAL RAW SCORE | 1/20
(this page)

COMMENTS - Rater Comments _Jim Bales always goes the_
_exceptional effort and is impressive, impressive_
_with inmates, the public and co-workers._
_The treatment of persons is equitably and with_
_respect._

Employee Comments

IMPROVEMENT PLAN -

A0779

Case 1:06-cv-00592-JJF   Document 63-5   Filed 01/31/2008   Page 116 of 146

DEPARTMENT OF CORRECTION 1995 EMPLOYEE'S TIME CARD

Balas, John
Employee Name
380400-400

Social Security Number
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

C/O
Class Title
10-03-94

Rate Earned:

A0780

DEPARTMENT OF CORRECTION 1994 EMPLOYEE'S TIME CARD

Rate Ear—  
s 10.0  
v 10.0

**BALAS, JOHN**  
Employee Name

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  
Social Security Number  
10-03-94  
Employment Date

CORRECTIONAL CADET C.C.I.I.T. #75  
Class Title

Adjusted Service Date

D - D - S

| | Month | HOLIDAY | SICK | VACATION |
|---|---|---|---|---|
| | JAN. | | | |
| | FEB. | | | |
| | MAR. | | | |
| | APR. | | | |
| | MAY | | | |
| | JUNE | | | |
| | JULY | | | |
| | AUG. | | | |
| | SEPT. | | | |
| | OCT. | | | |
| | NOV. | | | |
| | DEC. | | | |

BALANCE  
HOLIDAY | SICK | VACATION

1994 TOTAL HOURS USED

RKS:

A0781



**STATE OF DELAWARE**
**DEPARTMENT OF CORRECTION**
**BUREAU OF ADULT CORRECTION**
**DELAWARE CORRECTIONAL CENTER**
SMYRNA, DELAWARE 19977                TELEPHONE: (302)

**MEMORANDUM**

TO:    *John J. Balas*

FROM:    Deputy Warden Thomas C. Gulledge    *Thomas C. Gulledge*

DATE:    12/26/95

RE:    Correction of EPPA

    Upon a review of calculations on the attached EPPA, error(s) were detected in the following:

✓ 1.    Calculations in raw scores/weights/totals incorrect.

_____ 2.    Finals score calculations (must be computed to two (2) decimals – not rounded up or down).

_____ 3.    Other:_____

All mistakes have been corrected as annotated on the attached sheets. By a copy of this memorandum you are being advised of these changes as they relate to your final score.

    If you have any questions, please contact this office.


TCG/ca

cc:  EPPA File

U00114

A0782



The State of Delaware Employee Performance Review
Name, Job Title: BALAS, John Correctional Corporal     SS# 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
Department-Division-Section: Department of Correction, Sussex Correctional Institution
Supervisor, Job Title: Michael Atallian     Correctional Lieutenant
Date, or time period covered: *2-1-99 to 1-31-00*

Areas where performance is distinguished or exceeds expectations, if any:
Cpl. Balas received a commendation on 10-31-99 from S/Lt. Messick for apprehension of an inmate that was released early.
Cpl. Balas received a commendation from S/Lt. Johnson on 11-1-99 for participation in a apprehension team.
Cpl. Balas is a member of CERT, and has just completed re-training staff in QRT.

Areas of specific performance deficiencies or unsatisfactory work, if any:




Areas where growth or skills/knowledge development is suggested or needed. If not applicable, please use this space and/or attach summary explanation of how employee met expectations.

Cpl. Balas is assigned to the Receiving Room and as a Pretrial rover. He is knowledgeable of SCI policies and procedures. Works well with little or no supervision. Cpl. Balas reports for duty in a timely manner and uses leave only when nessesary.

RECEIVED
MAY 2 2 2000
DOC Human Resources

Employee documentation of performance events, comments and/or self-review:

RECEIVED
MAY 0 8 2000
SCI WARDEN'S OFFICE

NOTE: The evaluator was not the employee's supervisor during this rating period. Supervisor's comments were taken from records or personal observation.

We have met and discussed this document. The employee's performance is (Distinguished), (Exceeds Expectations), (Meets Expectations), (Needs Improvement), or is (Unsatisfactory). *Please circle one.*

Employee/date          Evaluator/date          Reviewer/date

DEPOSITION
EXHIBIT
Mears 5
ENGAD 800-631-6989

C00098

A0783



The State of Delaware Employee Performance Plan
Name, Job Title: BALAS, John  SS# 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
Department-Division-Section: Department of Correction, Sussex Correctional Institution
Supervisor, Job Title:  David Johnson, Correctional Lieutenant
Date, or time period covered;  02/01/99 thru 01/31/00.

What is the agency mission and/or operational needs that this employee's job performance will affect?
The DOC is committed to providing programs, policies and services to inmates which at all times places public safety as our top priority whether the offender is in prison or supervised in the community by correctional staff.  Your role is to provide discipline and security of inmates inside or outside the secure facility by enforcing institutional rules, regulations and policies while keeping in mind that rehabilitative programming will enhance the long term public safety.

Please list the duties, projects or performance standards that will be used for evaluation purposes.  *Note:* current job dimensions may be substituted and/or included.

1. Be knowledgeable of and adhere to all Departmental, Bureau and Institutional policies and procedures. Read, daily, the post orders for the area you are assigned to stay abreast of any and all changes.

2. Report for work assignments and appointments on time every day as scheduled unless leave is prior approved as attendance, reliability and punctuality are an essential part of your job.

3. You are expected to conduct yourself in a professional manner on or off duty keeping in mind that you represent the DOC in dealing with the public.  You are a role model for inmates and your appearance and conduct should always be in compliance with departmental guidelines.

4. It is your responsibility to document all activities that occur during your tour of duty. Documentation is expected to be submitted prior to the end of your shift on the proper institutional form.  All written communication will be clear, concise and complete.  It is also your responsibility to brief the on-coming shift of all events that occur during your shift.

5. Maintain security at all times by being alert and adhering to established security procedures. You are expected to take immediate action when security violations occur.

6. As a lead worker you are expected to provide guidance, supervision, and training to subordinate staff as needed.  You may also be expected to assume the duties of the Lieutenant when so directed by the Watch Commander.

_____ 3-23-99    _____ 03/25/99    _____ 3/24/99
Employee/date            Evaluator/date             Reviewer/date
dtj 08/26/98

000101



The State of Delaware Employee Performance Review

Name, Job Title: Balas, John : Correctional Corporal    SS# 9723
Department-Division-Section: Department of Correction, Sussex Correctional Institution
Supervisor, Job Title: Mears Truman :    Correctional Lieutenant
Date, or time period covered: 01/01/01--- 07/28/02

Areas where performance is distinguished or exceeds expectations, if any:

Cpl. Balas is a member of the Correctional Emergency Response Team. He maintains his skills in
emergency response by attending regular CERT training.
Cpl. Balas has maintained perfect attendance for the past two years.

Areas of specific performance deficiencies or unsatisfactory work, if any:

Areas where growth or skills/knowledge development is suggested or needed. If not applicable, please
use this space and/or attach summary explanation of how employee met expectations.

Cpl. Balas is assigned to the receiving room. He has a good knowledge of all post orders and procedures.
He uses leave in an appropriate manner and always reports for duty on time.

Employee documentation of performance events, comments and/or self-review:

Copy of perfect attendance attached.

**RECEIVED**

DEC 0 2 2002

**HUMAN RESOURCES**

NOTE: We have met and discussed this document. The employee's performance is (Distinguished),
(Exceeds Expectations), (Meets Expectations), (Needs Improvement), or is (Unsatisfactory). *Please circle
one.*

Employee/date                    Evaluator/date  08 05 02    Reviewer/date   8/5/02

8-5-02

**RECEIVED**

NOV 2 5 2002

SCI WARDEN'S OFFICE

DEPOSITION
EXHIBIT
Mears 6
11-16-07

Ú00095

A0785



The State *of* Delaware Employee Performance Plan
Name, Job Title: BALAS, John  SS# 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
Department-Division-Section: Department of Correction, Sussex Correctional Institution
Supervisor, Job Title:  David Johnson, Correctional Lieutenant
Date, or time period covered:  02/01/99 thru 01/31/00

What is the agency mission and/or operational needs that this employee's job performance will affect?
The DOC  is committed to providing programs, policies and services to inmates which at all times places public safety as our top priority whether the offender is in prison or supervised in the community by correctional staff.  Your role is to provide discipline and security of inmates inside or outside the secure facility by enforcing institutional rules, regulations and policies while keeping in mind that rehabilitative programming will enhance the long term public safety.

Please list the duties, projects or performance standards that will be used for evaluation purposes.  *Note:* current job dimensions may be substituted and/or included.

1.  Be knowledgeable of and adhere to all Departmental, Bureau and Institutional policies and procedures. Read, daily, the post orders for the area you are assigned to stay abreast of any and all changes.

2.  Report for work assignments and appointments on time every day as scheduled unless leave is prior approved as attendance, reliability and punctuality are an essential part of your job.

3.  You are expected to conduct yourself in a professional manner on or off duty keeping in mind that you represent the DOC in dealing with the public. You are a role model for inmates and your appearance and conduct should always be in compliance with departmental guidelines.

4.  It is your responsibility to document all activities that occur during your tour of duty. Documentation is expected to be submitted prior to the end of your shift on the proper institutional form.  All written communication will be clear, concise and complete.  It is also your responsibility to brief the on-coming shift of all events that occur during your shift.

5.  Maintain security at all times by being alert and adhering to established security procedures.  You are expected to take immediate action when security violations occur.

6.  As a lead worker you are expected to provide guidance, supervision, and training to subordinate staff as needed.  You may also be expected to assume the duties of the Lieutenant when so directed by the Watch Commander.

_____ 3-23-99     _____ 03/23/99     _____ 3/24/99
Employee/date                Evaluator/date                Reviewer/date
dtj 08/26/98

Û00097

A0786



The State of Delaware Employee Performance Review

**Name, Job Title:** Cpl. John Balas
**Department-Division-Section:** Department of Correction, Sussex Correctional Institution
**Supervisor, Job Title:** Truman Mears, Correctional Lieutenant
**Date, or time period covered:** Jan 2002—may 2003

Areas where performance is distinguished or exceeds expectations, if any:

Areas of specific performance deficiencies or unsatisfactory work, if any:

Areas where growth or skills/knowledge development is suggested or needed. If not applicable, please use this space and/or attach summary explanation of how employee met expectations.
Cpl. Balas is assigned to the receiving room. He is knowledgeable of SCI policies and procedures. He works well with little or no supervision. He has had the role of lead worker in his area many times. Cpl. Balas reports for duty in a timely manner and has had perfect attendance for several years in a row now.

RECEIVED

Employee documentation of performance events, comments and/or self-review: JUL 11 2003

HUMAN RESOURCES

We have met and discussed this document. The employee's performance is (Distinguished), (Exceeds Expectations), (Meets Expectations), (Needs Improvement), or is (Unsatisfactory). Please circle one.

Employee/date      Evaluator/date      Reviewer/date

RECEIVED
JUL 0 7 2003
SCI WARDEN'S OFFICE

DEPOSITION
EXHIBIT
Mears 7
11-6-07

00093



The State of Delaware Employee Performance Plan
Name, Job Title: Balas John : Correctional Corporal      SS# 9732
Department-Division-Section: Department of Correction, Sussex Correctional Institution
Supervisor, Job Title: Mears Truman      Correctional Lieutenant
Date, or time period covered:  01/01/01 --- 07/28/02

What is the agency mission and/or operational needs that this employee's job performance will affect?
The DOC  is committed to providing programs, policies and services to inmates which at all times places
public safety as our top priority whether the offender is in prison or supervised in the community by
correctional staff.  Your role is to provide discipline and security of inmates inside or outside the secure
facility by enforcing institutional rules, regulations and policies while keeping in mind that rehabilitative
programming will enhance the long term public safety.

Please list the duties, projects or performance standards that will be used for evaluation purposes.  *Note:*
current job dimensions may be substituted and/or included.

1. Be knowledgeable of and adhere to all Departmental, Bureau and Institutional policies and procedures.
Read, daily, the post orders for the area you are assigned to stay abreast of any and all changes.

2. Report for work assignments and appointments on time every day as scheduled unless leave is prior
approved as attendance, reliability and punctuality are an essential part of your job.

3. You are expected to conduct yourself in a professional manner on or off duty keeping in mind that you
represent the DOC in dealing with the public.  You are a role model for inmates and your appearance and
conduct should always be in compliance with departmental guidelines.

4. It is your responsibility to document all activities that occur during your tour of duty. Documentation is
expected to be submitted prior to the end of your shift on the proper institutional form.  All written
communication will be clear, concise and complete.  It is also your responsibility to brief the on-coming
shift of all events that occur during your shift.

5. Maintain security at all times by being alert and adhering to established security procedures.  You are
expected to take immediate action when security violations occur.

6. As a lead worker you are expected to provide guidance, supervision, and training to subordinate staff
as needed.  You may also be expected to assume the duties of the Lieutenant when so directed by the
Watch Commander.

CPL.

Employee/date                    Evaluator/date  08 05 02      Reviewer/date  8/5/02

8-5-02

Ü00094

A0788

July 12, 1995

## MEMORANDUM

To:       C/O John Balas, DCC

From:     Lt. David Hall, CERT Headquarters *LT. Dobson*

Subject:  CERT Basic Training

---

Congratulations, you have been accepted as a candidate for CERT membership and are scheduled to participate in CERT Basic Course #11. Training will begin on July 31, 1995, at the Training Academy, at 0800 hrs. This is a three week course, ending on August 18th. You are to wear physical training gear appropriate for whatever weather conditions exist each and every day. The first three (3) days will consist of Defensive Tactics. You may want to bring additional physical training gear as you will be working in close proximity of each other. Showers will be available at the academy.

Please notify me if any of the following conditions arise prior to training. I can be reached at 653-2828 ext. 216.

1.   changes in Institution, shift, days off

2.   any physical injuries that will prohibit attending training.

3.   sickness. The only authorized sickness during this training period is <u>death.</u> Any sickness due to your death must have prior approval and be accompanied by a doctors excuse.

It is in your best interest to begin your physical training now to avoid injuries and fatigue during training.



DEPOSITION EXHIBIT
*Mears 8.*
11-6-07  *LR*

PENGAD 800-631-6989



STATE OF DELAWARE
DEPARTMENT OF CORRECTION
240 E. COMMERCE STREET
SMYRNA, DELAWARE 19977

STAFF TRAINING
ACADEMY

TELEPHONE: (302) 736 - 5601

### TRAINING ANNOUNCEMENT

**WHAT:**    ESCAPE MANAGEMENT

**WHEN:**    NOVEMBER 18 - NOVEMBER 22, 1996

**WHERE:**    EMPLOYEE DEVELOPMENT CENTER

**TIME:**    9:00 A.M. TO 3:00 P.M.

THIS FIVE DAY (40 HOURS) COURSE PREPARES SPECIFICALLY DESIGNATED PERSONNEL FOR ESCAPE RECOVERY IN THE COMMUNITY. IT INVOLVES INDIVIDUAL SKILLS TRAINING AND TECHNIQUES AS WELL AS TEAM OPERATIONS.

**THE DEADLINE DATE FOR THIS COURSE IS MONDAY, NOVEMBER 4, 1996.**

==================================================================

ESCAPE MANAGEMENT
NOVEMBER 18 - NOVEMBER 22, 1996
9:00 A.M. TO 3:00 P.M.

**NAME:** John Balas

**JOB CLASS:** C/O          **INSTITUTION:** SWRC

**SHIFT:** 4-12          **WORK PHONE #:** 856-5790

**RELIEF NEEDED: YES** X **NO** ____          **DAYS OFF:** Tues. & Wed.

**PRINT SUPERVISOR'S NAME:** Sgt. Thomas Baker

**SUPERVISOR'S SIGNATURE:** Sgt. Thom Bak

/leh

cc: file (escape)

000324

A0790



**STATE OF DELAWARE**
**DEPARTMENT OF CORRECTION**
**240 E. COMMERCE STREET**
**SMYRNA, DELAWARE  19977**

EMPLOYEE DEVELOPMENT CENTER

TELEPHONE: (302) 739-5601
FAX: (302) 739-6737

## TRAINING ANNOUNCEMENT

WHAT:     INVESTIGATIVE REPORT WRITING

WHEN:     JANUARY 21 & 22, 1997

WHERE:    EMPLOYEE DEVELOPMENT CENTER

TIME:     9:00 A.M. TO 3:00 P.M.

COURSE DESCRIPTION:  THIS IS A TWO DAY COURSE (JANUARY 21 & 22, 1997)WHICH PREPARES PERSONNEL IN THE PROCEDURES FOR COMPLETING AND SUBMITTING OFFICIAL CRIME REPORTS.

DEADLINE DATE FOR THIS COURSE IS TUESDAY, JANUARY 7, 1997.

=============================================================
INVESTIGATIVE REPORT WRITING
JANUARY 21 & 22, 1997
9:00 A.M. TO 3:00 P.M.

NAME:  _John Balas_

JOB CLASS: _C/o_     INSTITUTION: _SWRC_

SHIFT: _4-12_     WORK PHONE: _856-5790_

RELIEF NEEDED: (YES) ___ NO: ___ DAYS OFF: _TW_

PRINT SUPERVISOR'S NAME: _Billie R Smith_

SUPERVISOR'S SIGNATURE: _Billie R Sm th_

/leh
cc: file (bic)

000323

A0791





STATE OF DELAWARE
DEPARTMENT OF CORRECTION
EMPLOYEE DEVELOPMENT CENTER
240 EAST COMMERCE STREET
SMYRNA, DELAWARE 19977
Telephone: (302) 653-2828
Fax: (302) 739-6737

**TO:**        Correction Officer John Balas
               Sussex Work Release Center

**FROM:**      LT. Guy Fowler
               Employee Development Center

**DATE:**      May 3, 1997

**RE:**        Letter of Commendation

On May 1, 1997, I worked at Sussex Work Release Center during the 1600-2400 shift. I noticed you were the only "regular" officer there. I, along with STRO Kidd and STRO Hall, depended greatly on you to answer questions. You made sure that we understood whatever we needed to do and helped us feel as though we could depend on you for any information.

At approximately 2030 hrs. a disturbance erupted on B-Tier. You remained calm and professional through it all. Once you were aware of the disturbance, you were most instrumental in helping to quell it before it grew. You initiated calls for back up, to Warden George, and upon approval from the warden - called K-9 in for show of force/assistance. Your quick actions ensured back up came in force. I feel this action alone may have put a stop to any further escalation of the disturbance. Your knowledge of the Duty Office and its equipment added to the smooth issuance of CapStun and handcuffs. Once everything had calmed down, again you were there to assist with the proper paperwork needed.

I commend you, Officer Balas, for your expertise, knowledge, and leadership skills. I thank you for all of your assistance and hope that you continue your professional attitude.

cc:    Warden R. George
       Lt. Bill Smith
       Personnel File

000135



STATE OF DELAWARE
DEPARTMENT OF CORRECTION
80 MONROVIA AVENUE
SMYRNA, DELAWARE 19977

OFFICE OF
THE COMMISSIONER

TELEPHONE:    (302)739-5601
FAX:    (302)739-6740

May 7, 1997

John Balas
Rt. 4 Box 137 C
Milton, Delaware  19968-9632

Dear Mr. Balas:

This letter is to offer you our official congratulations and commend you on your perfect attendance record for 1996.  We personally appreciate this achievement.

The Department of Correction is particularly dependent on loyal, conscientious and dependable employees.  You have exhibited these qualities by your perfect attendance.

You and employees like you are the backbone of the Department, enabling it to function smoothly and effectively.  We salute you and ask for your continued commitment.

Alan Machtinger
Director, Human Resources &
Development

Stan Taylor
Commissioner

000134

A0794





State of Delaware
Department of Correction
Division of Community Corrections
RD#1, P.O. Box 500, Georgetown, DE  19947

Telephone (302) 856-5790
FaxFax  # (302) 856-5797

September 18, 1997

## Commendation

Correctional Officer John Balas
4-12 Shift SWRC

Officer Balas:

I want to commend you Officer Balas for your actions on September 7, 1997 at 2330 hrs. Your actions in the apprehension of escapee's Harry Vaughn and Robert Betts is a credit to your dedication to duty and your profession. Thanks to you two escapee's were apprehended very quickly and without incident. Thanks again for a job well done.

Sincerely

Billie R. Smith
4-12 Shift Supervisor

cc: Warden George
    Personnel file
    Facility file

U00133

STATE OF DELAWARE
DEPARTMENT OF CORRECTION
SUSSEX CORRECTIONAL INSTITUTION
R.D. 1, Box 500
GEORGETOWN, DELAWARE 19947

TELEPHONE (302) 856 - 5280

January 26, 1998

To: *John Bales*

    I would like to take this opportunity to congratulate you on your promotion to Correctional Corporal. Your new position is of vital importance in the future as the responsibilities of the shift Corporal become more involved. I am confident that you will work along with your Unit Managers, (Lieutenants), and and Sergeants to accomplish the tasks ahead of us. Positions in the New Admin. / Pretrial Unit will be posted for when you come on board. *Effective 2-1-98*

Sincerely,

*Capt. Flaherty*

Gerard Flaherty, Captain

In-House Job Bids Chairman

xc: Candidate
    file



**HOUSE OF REPRESENTATIVES**
**STATE OF DELAWARE**
**LEGISLATIVE HALL**
**DOVER, DELAWARE 19901**

**V. GEORGE CAREY**
R.D. 1, BOX 161
MILFORD, DELAWARE 19963
HOME: 302-684-8858
OFFICE: 302-422-4191
HOUSE OFFICE: 302-739-4119
HOUSE FAX: 302-739-2773

COMMITTEES
NATURAL RESOURCES, VICE CHAIRMAN
AGRICULTURE, VICE CHAIRMAN
BOND BILL
ENVIRONMENTAL MANAGEMENT

June 9, 1998

John Balas
Route 4, Box 137-C
Milton, DE  19968

Dear John:

    I have just recently received word that you are to be congratulated on being named to the Dean's List at the Delaware Technical and Community College.  This is indeed an honor and proof that you have been working very hard in order to achieve such excellence.

    You have proven yourself to be a dedicated student, willing to go that extra mile in order to achieve greatness.  Your college education will stand by you throughout your life.

    Best wishes for your continued success.

Sincerely,

*George*

V. George Carey
State Representative
36th District

VGC:jcw

**MEMORANDUM**

**TO:**    CPL John Balas

**FROM:** LT David Johnson

**DATE:** 08/28/98

**SUBJ:** Letter of Recognition

Thanks for submitting your suggestions and ideas concerning the Property Room operations and procedures. Your initiative, research, and ability to work with others as a team, has produced many ideas which will be incorporated into new SCI procedures. Your work has resulted in a simpler procedure which provides better accountability and tracking of inmate property. When fully implemented, I believe these procedures will result in fewer grievances and lawsuits involving inmate property.

Good job, John.



**DELAWARE TECH**

◆ *Dover* ◆ *Georgetown* ◆ *Stanton* ◆ *Wilmington*

*April 1, 1999*

Mr. John J. Balas
Route 4, Box 137C
Milton, DE 19968

Dear Mr. Balas:

It is with great pleasure that I inform you of your selection as the "Outstanding Student" for 1999 in Criminal Justice Technology. This award will be presented to you at the Nineteenth Annual Student Awards Banquet to be held on Friday, May 14, 1999, at 6 p.m. in the William A. Carter Partnership Center, Room 540.

You will be receiving a formal invitation to this special event in the mail. Your complimentary dinner ticket may be picked up from the Cashier in the Business Office of the Jason Technology Center. This ticket will be your admission to the banquet.

I encourage you to invite your family and friends so that they may participate and celebrate with you at this special awards presentation. Award recipients need to arrive between 5:30 and 6 p.m. to register, pick up your name tag, and receive any additional information.

In addition to your complimentary ticket, guest tickets are available from the Cashier at $12.95 per person. Award recipients and guest tickets will be available beginning April 16, 1999, and tickets are available until May 10, 1999.

If you have any questions, please contact Ann Athey or Joanne Howell, Awards Banquet Co-Chairs, at 856-5400, or your academic department chairperson.

Sincerely,

*Judith S. Caldwell*

Judith S. Caldwell
Dean of Instruction

smp

---

*Delaware Technical & Community College*

**Jack F. Owens Campus**

Post Office Box 610, Route 18     ◆     Georgetown, Delaware 19947     ◆     Telephone: (302) 856-5400

Equal Opportunity/Affirmative Action Institution



STATE OF DELAWARE

# DEPARTMENT OF CORRECTION

245 MCKEE ROAD
DOVER, DE 19904

OFFICE OF THE
COMMISSIONER

TELEPHONE: (302) 739-5601
FAX: (302) 739-8221

May 6, 1999

John Balas
RT 4, Box 137 C
Milton, DE 19968

Dear John :

This letter is to offer you our official congratulations and commend you on your perfect attendance record for 1998. We personally appreciate this achievement.

The Department of Correction is particularly dependent on loyal, conscientious, and dependable employees. You have exhibited these qualities by your perfect attendance.

You and employees like you are the backbone of the Department, enabling it to function smoothly and effectively. We salute you and ask for your continued commitment.

Alan Machtinger
Director
Human Resources and Development

Stan Taylor
Commissioner

A0800



Sussex Correctional Institution

**MEMORANDUM**

**TO:**    MAJ P. Townsend
CAPT G. Flaherty
CAPT G. Truitt

**FROM:** LT David Johnson

**DATE:** 06/26/99

**SUBJ:** Power failure and key drill

On SAT 06/26/99 at 1200 hrs., a power failure drill was conducted in the Pre-trial BLDG. The scenario was a total power failure on HU#2, with loss of the control panel and all lights. All inmates were locked in during the drill and there was no other situation requiring immediate action. The purpose was to ensure staff responded appropriately with the proper keys.

STANDARDS: This scenario requires two sets of keys to be issued from Central Control to allow access to all areas of HU#2; the HU#2 emergency keys and PT hallway emergency keys. It would also require an electrical panel key to check breakers. A minimum of two officers would be required to gain access to HU#2 and deliver the HU#2 emergency keys; one officer would maintain the hallway keys in the hallway while the other would enter the housing unit to assist. Entry in the housing unit should be made within 5 minutes and one cell door opened to ensure the proper set of keys was issued. Safety and security must be maintained at all times.

RESPONSE: At 1200 hrs., CO Alvin Hudson notified CPL J. Balas in Central Control of the situation by telephone. CO S. Fernandez was also assigned to Control at the time. The third officer, CPL K. Rogers, was removed from Control for purposes of the drill and instructed not respond if requested. All other PT personnel were available to respond, if requested. CPL Balas notified CPL D. Searle, the BLDG OIC, of the situation by telephone. CPL Searle instructed CO J. B. Morris to obtain the keys from Central Control, while he attempted to locate the electrical panel for that area. CO Morris obtained the keys and entry was made at 1205 hrs. At 1206 hrs., one cell door was opened by key and the drill was terminated. After the keys were issued from Central Control, CPL Balas and CO Fernandez monitored HU#2 by camera, and took control of HU#2 panel in Central Control. The HU#2 inner sallyport door was opened from Central Control. They continued to monitor the situation until the drill was terminated.

RESULTS: The response met all objectives as observed by LT Al Beckett and myself. The electrical panel key is carried on the BLDG OIC key ring and was not required to be issued by Control. There was some discussion that the institution should have been notified of the situation by radio. There is no directive in this matter and consensus was that it was not necessary since the area was secure and there was no emergency. There was also some discussion concerning additional staff in Central Control since one officer was not available. Consensus was to have one additional staff respond to assist in operations as needed and to be available in the event the situation became more serious.



RECEIVED

OCT 2 6 1999

SCI WARDEN'S OFFICE

**Department of Correction**
**State of Delaware**
**Sussex Correctional Institution**
**RT. 1, Box 500**
**Georgetown, DE 19947**
**Telephone: (302) 856-5280**

TO:     Cpl. John Balas

FROM:   Capt. Mike Brittingham

DATE:   Oct. 24, 1999

SUBJECT:  Letter of Appreciation

RECEIVED, S.C.I.

OCT 2 6 1999

DEPUTY WARDEN

John,

This is a letter of appreciation for your participation as one of the members that I choose to be part of an apprehension team. On Sept. 10, 1999, I requested that you, along with Sgt. Robert N. Smith 3rd, & C/O Thomas Webster go to the town of Milton and attempt to locate a Leon Williams who was erroneously released from S.C.I. You along with the other two officers went beyond your duties to attempt to find and return this inmate to S.C.I. The inmate was returned to S.C.I. through the efforts of the three of you. Thanks for your dedication to your job.

pc:    Warden Kearney
       Deputy Warden Deloy
       Major Townsend
       file

000300

State of Delaware

# FORMAL CONTACT PLAN

(Purpose: - To Reach an Understanding)

( ) - Disciplinary
(xx) - Commendation
( ) - Other

RECEIVED

NOV 23 1999

DOC Human Resources

Name ___Cpl. John Balas___              Date ___10/31/99___

Department ___POP / SCI___

Contact Made By ___S/Lt. Earl Messick___

RECEIVED

NOV 0 9 1999

SCI WARDEN'S OFFICE

Reason for Contact ___On 10/27/99, I received a call in reference to Inmate James Moore,___

who had been released earlier. Information revealed the possibility that Inmate

Moore had more level 5 sentence to complete. You and C/O John Taylor responded

quickly and while keeping contact with me via a cell phone, were able to apprehend

Inmate Moore and return him to the secure confines of SCI.

Discussion ___Intensive research performed by Records Clerk Shirley Johnson, revealed a 3___

year level 5 sentence that Inmate Moore's record did not contain. Your quick

response time prevented the Department from having to conduct a more intense manhunt

that would have resulted in much more expense.

Understanding Established ___You, along with C/O Taylor and Records Clerk Johnson brought___

this incident to a positive end. It is a privilege to work with dedicated staff

such as yourself. Congratulations on a job well done.

Employee's Signature  -  Acknowledging this Coverage

Date _11-9-99_

Signature of Employee's Immediate Supervisor

_S/Lt Earl J. Messick_                                    Date _11/9/99_

Reviewed By

_Major P. Townsend_                     C00127          Date _11/9/99_

Was Union Representative covered?          Yes ( )   No ( )

A0804

RECEIVED

NOV 29 1999

SCI WARDEN'S OFFICE



**Delaware Department of Correction**
**Bureau of Prisons**
**Sussex Correctional Institution**
**RT 1, Box 500**
**Georgetown, DE 19947**

November 1, 1999

### LETTER OF COMMENDATION

On October 22, 1999, at approximately 1600 hrs., Records Supervisor Garland Messick reported that Inmate Tony Pate had been released from SCI in error. Records indicated that he should have remained committed on a $500 secured bond. At approximately 1730 hrs., an apprehension team was formed and assigned the task of returning the inmate to custody. The apprehension team consisted of CAPT George Truitt, CPL John Balas, CPL Michael Cathell, and CO Larry Palmer. CAPT Truitt was off-duty at the time and responded from his residence.

CAPT Truitt was assigned as the team leader and coordinated efforts to recover the inmate. CPL Balas reviewed the inmate file and collected other information from other sources, to include CJIS and DELJIS. CPL Cathell and CO Palmer were assigned to prepare the team's equipment and vehicles and act as back-up officers during the search.

At approximately 1830 hrs., the team departed SCI to attempt to locate the inmate, who was believed to be in the Laurel area. Their investigation led them the inmate's employer, a gas station, his residence, and finally to his girlfriend's residence. This operation required the team to enter areas that may be hostile toward law enforcement and question persons who may be reluctant to cooperate. The inmate was located and returned to custody without incident in approximately three hours.

This operation was conducted in a textbook manner according the DOC Escapee Management course. Under CAPT Truitt's direction, the team successfully located the inmate in short time. CPL Balas's research conducted prior to the search was thorough, complete, and provided for a good start to the search. CPL Cathell and CO Palmer ensured the team was properly prepared, as well as providing input and back-up during the operation.

The team's actions during this operation clearly show each member's ability to work together as part of a team under unfavorable, and possibly hostile, conditions. The team clearly focused on the objective and maintained safe and secure surroundings. They demonstrated their ability to plan, research, and execute such an operation, and communicate effectively with potentially hostile persons while maintaining a favorable public image of the Department.

CAPT Truitt, CPL Balas, CPL Cathell, and CO Palmer comprised a successful and efficient team and their actions reflect positively on each as an individual, the apprehension team, and the Department of Correction.

David T. Johnson, SLT
Watch Commander

U00290



**Delaware Department of Correction**

This is to certify that the Bureau Chief for the Bureau of Prisons has awarded a

# *Bureau Commendation*

**TO:**     Cpl. John Balas

**FOR:**    Your quick response in apprehending an inmate, released in error from SCI on October 27, 1999. Your efforts brought this incident to a positive end.

This ____5th____ day of __May__, 2000

_____
Bureau Chief

_____
Commissioner



# Certificate of Appreciation

This certificate is awarded to

*Pte. John Balas*

In recognition to your valuable contributions at the funeral
*of*
**S/Lt. James Tyndall**

Richard Kearny    5/8/06
Signature                          Date

_____    5/12/06
Signature                          Date

Mayor Phil Townsend    5/-00
Signature                          Date

000297



STATE OF DELAWARE
DEPARTMENT OF CORRECTION
245 McKee Road
Dover, Delaware 19904

Stan Taylor
Commissioner

(302) 739-5601
Fax:  (302) 739-8221
E-Mail:  sttaylor@state.de.us

## MEMORANDUM

**TO:**        John  Balas

**FROM:**      Stan Taylor
               Commissioner

**DATE:**      April 25, 2001

**SUBJECT:**   Perfect Attendance

This letter is to offer you our official congratulations and commend you on your perfect attendance record for the past year.  We personally appreciate this achievement.

The Department of Correction is particularly dependent on loyal, conscientious and dependable employees.  You have exhibited these qualities by your perfect attendance.

You and employees like you are the backbone of the Department, enabling it to function smoothly and effectively.  We salute you and ask for your continued commitment.

_____
Alan Machtinger
Director, Human Resources &
Development

_____
Stan Taylor
Commissioner

000291



State of Delaware
Career Enrichment Program

# Certificate of Training

*This is to certify that*

## John Balas

*has satisfactorily completed the course of*

### Train the Trainer

given this ___ 26th ___ day of ___ April ___, 20 01

_Instructor_

_Manager of Employee Development_

# Pre-Trial Unit
# Sussex Correctional Institution

**Memorandum:**

To :         Corporal John Balas

From:        Lieutenant Michael Atallian
             Lieutenant Truman Mears
             Pre Trial Unit Managers  B- Shift

RE :         Letter Of Commendation

Date :       May 4, 2001


   Recently we had our quarterly inspection by Tony Figario, and as an institution we scored a 98%. This is even better then the last score. It goes without saying that it could never have been done without exceptional staff such as yourself. We would like to take this opportunity to commend you on such an outstanding job that you did in helping us get this building in line. Thank you and please keep up the good work.


   This letter will be part of your evaluation file.


XC: File

# CERTIFICATE OF APPRECIATION

*This certificate is awarded to*

## Cpl. J. Balas

in recognition of valuable contributions to assist in the apprehension of an escape inmate on March 27th, 2002.

Presented by:

*State of Delaware*
## Department of Correction
"Our Top Priority Is To Ensure Public Safety"



**STATE OF DELAWARE**
**DEPARTMENT OF CORRECTION**
245 MCKEE ROAD
DOVER, DE 19904

OFFICE OF
HUMAN RESOURCES

TELEPHONE: (302) 739-5601
FAX: (302) 739-6740

## MEMORANDUM

TO:      John Balas

FROM:    Stan Taylor
         Commissioner

DATE:    April 25, 2002

SUBJECT:   Perfect Attendance

This letter is to offer you our official congratulations and commend you on your perfect attendance record for the past 2 years. We personally appreciate this achievement.

The Department of Correction is particularly dependent on loyal, conscientious and dependable employees. You have exhibited these qualities by your perfect attendance.

You and employees like you are the backbone of the Department, enabling it to function smoothly and effectively. We salute you and ask for your continued commitment.

_____
Alan Machtinger
Director, Human Resources &
Development

_____
Stan Taylor
Commissioner

000290

Date: 02/18/03

RECEIVED

FEB 2 0 2003

SCI WARDEN'S OFFICE

To: Cpl. John Balas - Cert

From: SCI Watch Commander
Capt. George Truitt

RECEIVED
FEB 2 4 2003
HUMAN RESOURCES

Subject: Letter of Appreciation

I want to express my sincere appreciation for your assistance in accomplishing the task of recovering the two (2) improper inmate releases on 2/14/03.

Understand your efforts and teamwork; along with several others prevented these two inmates from evading there imposed sentences.

Therefore fulfilling our obligation to the court orders, and the public we represent.

Sincerely Submitted:

*Capt G.C. Truitt.*

CC:  Warden Kearney
     D. W. Deloy
     Major Townsend
     File

000122



STATE OF DELAWARE
DEPARTMENT OF CORRECTION
245 McKee Road
Dover, Delaware 19904

Stan Taylor
Commissioner

(302) 739-5601
Fax: (302) 739-8221
E-Mail: sttaylor@state.de.us

## MEMORANDUM

TO:          John Balas

FROM:        Stan Taylor
             Commissioner

DATE:        June 9, 2003

SUBJECT:     Perfect Attendance

This letter is to offer you our official congratulations and commend you on your perfect attendance record for the past three consecutive years. We personally appreciate this achievement.

The Department of Correction is particularly dependent on loyal, conscientious and dependable employees. You have exhibited these qualities by your perfect attendance. In recognition of this achievement, you will receive one paid leave day.

You and employees like you are the backbone of the Department, enabling it to function smoothly and effectively. We salute you and ask for your continued commitment.

Alan Machtinger
Director, Human Resources &
Development

Stan Taylor
Commissioner

U00284

A0814



STATE OF DELAWARE
DEPARTMENT OF CORRECTION
245 McKee Road
Dover, Delaware 19904

Stan Taylor
Commissioner

(302) 739-5601
Fax: (302) 739-8221
E-Mail: sttaylor@state.de.us

## MEMORANDUM

TO:       John  Balas

FROM:     Stan Taylor
          Commissioner

DATE:     April 15, 2004

SUBJECT:  Perfect Attendance

This letter is to offer you our official congratulations and commend you on your perfect attendance record for the past 4 consecutive years. We personally appreciate this achievement.

The Department of Correction is particularly dependent on loyal, conscientious and dependable employees. You have exhibited these qualities by your perfect attendance. In recognition of this achievement, you will receive one paid leave day.

You and employees like you are the backbone of the Department, enabling it to function smoothly and effectively. We salute you and ask for your continued commitment.

_____
Alan Machtinger
Director, Human Resources &
Development

_____
Stan Taylor
Commissioner

000280

A0815



Security

Superintendent

# **Memo**

To:       Cpl. John Balas

From:     Major Phil Townsend

Date:     July 8, 2004

Re:       Appreciation

---

I would like to take this opportunity to commend you for "JOB WELL DONE"! You were instrumental in the recertification of QRT training during February/March of 2004. Your dedication to this project and SCI are recognized and greatly appreciated.

It is a pleasure to work with such fine staff, and once again, thanks for a job well done.

PT:dmt

Ü00281



**STATE OF DELAWARE
DEPARTMENT OF CORRECTION**
245 MCKEE ROAD
DOVER, DE 19904
*"Taking care of those who safeguard the citizens of Delaware"*

OFFICE OF
HUMAN RESOURCES

TELEPHONE: (302) 739-5601
FAX: (302) 739-6740

March 16, 2005

Mr. John Balas
SCI

Dear Mr. Balas,

This letter of commendation is presented to you in recognition of your perfect attendance record for the year of 2004.

The Department of Correction is particularly dependent on loyal, conscientious, and dependable employees. You have exhibited these qualities by your perfect attendance.

Attendance and reliability are key ingredients to the success of the department and I salute you for making it a priority in your life. Again, thank you for your dedication.

Sincerely,

Alan Machtinger
Director, Human Resources &
Development

cc:    Personnel File

000273

A0817

| PERSONNEL POLICY MANUAL<br>DEPARTMENT OF CORRECTION<br>STATE OF DELAWARE | POLICY NUMBER<br>9.12 | PAGE NUMBER<br>1 of 18 |
|---|---|---|
| | RELATED ACA STANDARD: 109 | |
| CHAPTER: | SUBJECT: Employee Disciplinary<br>Action | |
| APPROVED BY COMMISSIONER: *Robert J Watson* | | |
| EFFECTIVE DATE: *September 26, 1990* | | |

## I.   AUTHORITY

    11 Del C. 6517
    29 Del C. 8903
    Merit Rules 15.0000

## II.  PURPOSE

-   To establish guidelines, inform employees, and assure
    consistency with disciplinary processes.

-   To maximize the efficiency and effectiveness of the
    disciplinary processes.

-   To grant each institution and appointing supervisor
    more authority and accountability in disciplinary
    processes.

## III. APPLICABILITY

-   This policy is applicable to all Department of
    Correction Employees.

-   This policy applies only to administrative
    disciplinary action.  It does not apply to criminal
    investigations, charges or proceedings which have a
    different standard.

## IV.  DEFINITIONS

Demotion - Reduction in rank and salary to a less
responsible position.  The rate of pay shall be at any
percentage of the midpoint of the lower paygrade deemed
appropriate by the Bureau Chief, who is the approval
authority for demotions.

1



DEPOSITION
EXHIBIT
*Mears 9*
*11-6-07*

| STATE OF DELAWARE<br>DEPARTMENT OF CORRECTION | POLICY NUMBER | PAGE NUMBER<br>2 of 18 |
|---|---|---|
| SUBJECT:    Employee Disciplinary Action | | |

Dept. of Correction Investigation Report. - The document used to assist supervisors in conducting fact-finding investigations.  After the facts are gathered through the investigation and organized on the form, the decision on whether disciplinary action should be taken or not can be made.

Disciplinary Action - Includes only the following actions: warning, written reprimand, suspension, fine, demotion and dismissal.  Disciplinary action will be retained in the employee's file for a two year period unless, requested and approved to be removed prior to two years.  Disciplinary action more than two (2) years old will not be cited in any action involving a similar subsequent offense unless the employee's past work record is raised as a defense or mitigating factor.

Disciplinary Charge Letter - The document used to record disciplinary action.  It must include the reasons for the disciplinary action and the penalty proposed.  The Department Personnel Office must approve all disciplinary charge letters before they are presented to employees.  A copy is given to the employee, and a union representative if applicable, and the original is forwarded to the Department Personnel Office for the employee's personnel file.

Dismissal - Involuntary termination of an employee's employment with the Department.  The Commissioner of Correction is the approval authority for dismissals.

Docking - The withholding of an employee's pay for a scheduled work period when the employee did not work and was not on approved leave.  Docking is not disciplinary action.

Fact Finding Meeting - A meeting held at each institution/section for the purpose of gathering all relevant facts so the fact finding officer can determine if an employee committed a violation and if so determine the appropriate penalty.

Fact Finding Officer - A manager who conducts a fact-finding meeting after completion of the investigation.  The fact finding officer will be the Deputy Warden or designee at Sussex Correctional Institution, Delaware Correctional Center, Multi-Purpose Criminal Justice Facility, Women's Correctional Institution; Warden or Captain at Morris Correctional Institution, Pre-Trial Annex, Plummer Halfway House and Sussex Halfway House;

2

D000668

| STATE OF DELAWARE DEPARTMENT OF CORRECTION | POLICY NUMBER | PAGE NUMBER 3 of 18 |
|---|---|---|
| SUBJECT: Employee Disciplinary Action | | |

comparable positions in other sections as appointed by the appropriate Bureau Chief or Commissioner.

<u>Fine</u> - An alternative to suspension without pay; it may be deducted from pay or worked off at the overtime rate.

Employees should be given the option of working off the fine (rather than having the fine decucted from their pay). This decision is the employees'.

If the employee decides to work off the fine, the scheduling of the additional work is the supervisor's discretion and it should be scheduled for a period when overtime would otherwise be paid due to a shortage of staff.

The amount of the fine cannot be so large as to reduce the employee's pay for the pay period below the Federal Minimum wage as stipulated in the Fair Labor Standards Act. Therefore, <u>the maximum number of days any employee can be fined in one pay period is five (5)</u>. If the amount of the fine imposed exceeds five (5) days, the maximum of 5 days shall be imposed in one pay period and the remaining days in the next pay period.

To determine the total amount of the fine: the employee's daily rate (including shift differential and hazardous duty pay, if applicable) shall be multiplied by the number of days fined.

There is a maximum fine of 10 days pay in any year for those employees covered by the merit rules. There is no maximum amount for those employees covered by a union contract unless such a provision was negotiated in the contract. The union contract governs for employees covered by that contract.

The employee must indicate in writing if he/she desires to work off the fine; this shall be placed in the employee's personnel file using the Fine Work-Off Form.

The Fine Deduction Form must be completed and distributed to initiate and document the actual withholding of the employee's pay.

Wardens/Section Administrators are the approval authorities for fines.

3

D000669

| STATE OF DELAWARE DEPARTMENT OF CORRECTION | POLICY NUMBER | PAGE NUMBER 4 of 18 |
|---|---|---|
| SUBJECT:    Employee Disciplinary Action | | |

**Personnel File** - The employee's official file maintained in the Department of Correction Personnel Office.

**Supervisor's Employee File** - A file the immediate supervisor maintains on each subordinate employee to be used in the preparation of employee performance evaluations and in determining appropriate disciplinary action. Supervisor's Employee File will contain copies of EPPA's and commendations; disciplinary actions and investigation reports (see definition of disciplinary action); verbal discussions and supervisory conferences. Upon a reasonable request, the employee will be allowed to review the supervisor's file. Upon the transfer of the employee to a new supervisor, the supervisor's file will be forwarded to the new supervisor by the old supervisor.

**Suspension** - Removal of an employee from work and withholding of the employee's pay. There is a maximum of thirty (30) calendar days in any year for employees covered by the merit rules. There is no maximum for employees covered by a union contract unless such a provision is negotiated in the contract. Suspensions of less than 30 days are calculated using work days, i.e. a 5-day suspension is 5 work days. Suspension days must be consecutive, i.e., a 10-day suspension must be imposed on 10 consecutive work days.

Determination as to the amount of the suspension will be dependent on the seriousness of the offense in consideration as well as the past history of the employee. Suspension should be used where it is necessary to remove an employee from the workplace or where it would be more likely than a fine to correct an employee's misconduct.

The Suspension Notification Form must be completed and distributed to document the actual dates of suspension. Wardens/Section Administrators are the approval authorities for suspensions.

**Warning** - A notice to an employee that specific behavior is unacceptable. It is used only for very minor violations. A record of the warning will be made in a memo and the employee given a copy. The original memo is forwarded by the supervisor to the employee's personnel file. Employees may have a union representative present during the meeting to present a warning. Immediate supervisors are the approval authorities for warnings.

4

D000670

| STATE OF DELAWARE DEPARTMENT OF CORRECTION | POLICY NUMBER | PAGE NUMBER 5 of 18 |
|---|---|---|
| SUBJECT:    Employee Disciplinary Action | | |

<u>Written Reprimand</u> - A formal written censure used when warning was unsuccessful or for more serious violations. Wardens/Section Administrators are the approval authority for written reprimands.

V.    POLICY

It is the policy of the Department of Correction that disciplinary action be used to correct behavior of employees, be progressive, be consistent and be prompt as is reasonably appropriate under the circumstances of each case.

- <u>To Correct Behavior</u> - It is the objective of all supervisors to accomplish work through the employees they supervise. The supervisor's responsibility is to ensure the employees understand what they are supposed to do using clear procedures, coaching, on-the-job training and feedback on how the employee is performing. These actions must be an on-going part of a supervisor's interaction with employees. After taking these actions, if the employee commits an infraction, then disciplinary action is appropriate.

- <u>Be Progressive</u> - Since the goal of disciplinary action is to correct behavior, it is important to use the least severe disciplinary action that will correct the behavior, keeping in mind the importance of appropriate consistency. If that least severe action does not correct behavior, then more severe action should follow until the behavior is corrected or the employee is dismissed.

- <u>Be Consistent</u> - Employees have a right to expect that if their behavior results in disciplinary action, then all similar behavior will result in disciplinary action. Consistency does not mean that the exact same penalty must be imposed for the same violation.

Penalties are based on an employee's prior record and the special circumstances in each case as well as the nature of the violation. Consistency does mean that all similar behavior must be addressed.

| STATE OF DELAWARE DEPARTMENT OF CORRECTION | POLICY | PAGE NUMBER 6 of 18 |
|---|---|---|
| SUBJECT:    Employee Disciplinary Action | | |

Be Prompt ~ To be effective in correcting behavior, disciplinary action should be imposed as reasonably soon after the violation as possible. Too long of a delay between the behavior and the disciplining action weakens the connection between the two. Any disciplinary action taken after a long delay is viewed as punishment only and not corrective.

## VI. PROCEDURE OF DISCIPLINARY ACTION

1. The immediate supervisor or designee is responsible for submitting a complete and thorough investigation with disciplinary recommendations to the Fact Finding Officer in an expeditious manner.

2. Whenever a supervisor is coordinating an investigation and/or report on a complex case and/or needs further information, he/she should contact the designated Personnel Staff at the Department Personnel Office.

3. The designated Personnel Staff will provide professional guidance by interpreting the applicable regulations, contract provisions or Merit Rules as they apply to the facts of of a given case.

## STEPS IN BEGINNING THE INVESTIGATION

1. When you are not the immediate supervisor of the alleged violator and become aware of an incident.

HOW:    A. Own observation.
        B. Information from another person or document.

ACTION:  Complete Incident Report and forward the form to the immediate supervisor or to the immediate supervisor's supervisor if the immediate supervisor is not available.

2. When you are the immediate supervisor of the alleged violator and become aware of an incident.

HOW:    A. Own Observation
        B. Incident Report
        C. Information from another person or document.

6

**D000672**

| STATE OF DELAWARE DEPARTMENT OF CORRECTION | POLICY | PAGE NUMBER 7 of 18 |
|---|---|---|
| SUBJECT: Employee Disciplinary Action | | |

ACTION:  A.  Begin investigation immediately.

3.  <u>Immediate supervisor or designee begins investigation.</u>

HOW:  A.  Review relevant written documentation and interview witnessess.

      B.  Use Investigation Report.

PURPOSE:  A.  To determine if a violation occurred.

      B.  To determine who committed the violation.

      C.  To collect information to determine the proper penalty.

ACTION:  A.  Review relevant documentation.

    (1)  Require each witness to write his/her version of the incident.

    (2)  Make notes of all facts that are relevant to the incident.  The notes should be direct quotations from the document.

    (2)  Assure that the document is clearly identified in your notes.

      B.  Review any physical evidence including the scene of the incident, where appropriate.

    (1)  Make notes of all facts relevant to the incident.

    (2)  The source of the facts must be identified clearly (e.g. Source: a personal examination of the scene by this investigator on May 1, 1989, 10:00 a.m.).

      C.  Interview all witnessess.

    (1)  Be sure to record the time, date, place and name of person interviewed.

    (2)  Make notes of all facts relevant to the incident.  The notes should be direct quotations from the witness.

7

**D000673**

| STATE OF DELAWARE DEPARTMENT OF CORRECTION | POLICY | PAGE NUMBER 8 of 18 |
|---|---|---|
| SUBJECT:  Employee Disciplinary Action | | |

(3) During the interview if you change from considering the person being interviewed as a witness to considering the person a violator, you must stop the interview to notify the employee that he/she is now considered a possible violator and allow the person representation (union official if a bargaining unit member).  If the employee wants a representative, do not proceed with the interview until the representative is present.  The representative does not have to be a specific person, i.e. any shop steward is acceptable for bargaining unit members.  This is termed Weingarten rights.

D. Interview alleged violators.

(1) This interview is conducted in the same manner as "c" except that union representation must be allowed from the beginning of the interview (Weigarten rights).

(2) Be sure to take complete notes on this person's version of the incident and be sure to investigate this version thoroughly, including any witnesses the employee mentions.

4. __Complete Investigation Report through #13.__

PURPOSE:  This Report has four functions:

A. To provide a frame work for the supervisor to organize information and ensure all appropriate information is collected.

B. To be used by higher authority to determine if an objective, impartial investigation was conducted and to determine the factual basis for the supervisor's action.

C. To be used as a training tool for supervisors to improve the immediate supervisor's ability to conduct investigations.

8

D000674

| STATE OF DELAWARE DEPARTMENT OF CORRECTION | POLICY | PAGE NUMBER |
|---|---|---|
| SUBJECT: Employee Disciplinary Action | | 9 of 18 |

D. To be used in the preparation of management's case in the event of appeal of the action.

ACTION:  A. Blocks #1 - #3 are self-explanatory.

B. In block #4, describe the incident in general terms. EXAMPLE: On July 5, 1989, Inmate John Jones was discovered missing from the Pre-Release Building during the 4-12 shift. EXAMPLE: On December 24, 1989 Correctional Officer James Smith did not report for work on the 12-8 shift. No call-off was received.

C. In block #5 list the appropriate administrative regulation or institutional procedures, if applicable. If there is no specific rule, state that.

D. Blocks #6 and #7 are self-explanatory.

E. In block #8 be sure to list every fact that is relevant. Use additional pages if necessary. Pay particular attention to list only facts, do not list assumptions, opinions or personal conclusions.

F. Blocks #9 and #10 are used to prove that the investigation was objective and impartial. Be sure to include all facts relevant to that version. In block #10 list only facts, not assumptions.

Do not just list what the employee says. Interview the employee. Ask questions to clarify points and to obtain all relevant information both aggravating and mitigating. When no criminal charges are pending, the employee may not refuse to answer questions.

G. In block #11 include only those disciplinary actions that are documented in the employee's file in the Department of Correction Personnel Office. Anything else is not official and is to be treated as though it never existed.

9

D000675

| STATE OF DELAWARE DEPARTMENT OF CORRECTION | POLICY | PAGE NUMBER 10 of 18 |
|---|---|---|
| SUBJECT:  Employee Disciplinary Action | | |

H.    In block #12 include only the performance ratings as documented in the employee's personnel file in the Department of Correction Personnel Office.  List the final score for each performance appraisal.  Also, list all PPPR's given to the employee with date and reason for PPPR.

I.    In block #13 list the employee's hire date or adjusted hire date if there has been a break in service.  Do not use a union seniority date or seniority in classification date.

J.    Attach all supporting documents to the Report.

5.    Supervisor's Recommended Finding.

PURPOSE:    Based on a thorough review of the facts, the supervisor determines if the alleged violator(s) committed a violation or not.

ACTION:    Proceed as follows:

A.    Finding of No Violation.

   (1)   Sign and date the form.

   (2)   Review with supervisor's supervisor.

B.    Finding of Violation.

   (1)   If following questions are answered "yes", proceed to step #6.  If any question is answered "no", contact the Personnel Office.

   (2)   Was the employee given notice of the consequences of the employee's conduct (This may be written, oral or something that any employee should be expected to know without being specifically told)?

10

D000676

A0827

(3) Did the supervisor, before administering discipline to an employee, make an effort to discover whether the employee did in fact violate or disobey a rule or order of management?

(4) Was the supervisor's investigation conducted fairly and objectively?

(5) Did the supervisor obtain sufficient facts that the employee committed the violation?

(6) Has the Department applied its rules, orders and penalties in a reasonable manner?

6. Decision-Making Factors In Determining a Penalty.

In determining the appropriate disciplinary sanction a variety of factors enter into the decision-making process. These factors include:

(1) Employee's length of service.
(2) Employee's over-all work record.
(3) Seriousness of violation.
(4) Related or repeated violations.
(5) Length of time between violations.
(6) Whether the employee is probationary or permanent.
(7) Mitigating or aggravating circumstances.

Two individuals may, therefore, be treated differently for the same offense, depending on the circumstances.

ACTION: A. Considerations that may result in a greater penalty:

(1) The employee has previous disciplinary actions documented in the Department of Correction Personnel Office and/or has PPPR's. Recent, within 2 years, disciplinary actions warrant a more severe penalty.

(2) The employee has a poor past work performance as documented in the recent (within 2 years) employee performance evaluations and EPPA's.

11

D000677

| STATE OF DELAWARE DEPARTMENT OF CORRECTION | POLICY | PAGE NUMBER 12 of 18 |
|---|---|---|
| SUBJECT:  Employee Disciplinary Action | | |

(3) <u>Aggravating</u> <u>Circumstances</u>.  These circumstances make the violation more serious and justify a more severe penalty.  When aggravating circumstances exist, describe in block #14 of the Investigation Report.

EXAMPLE:  Tardiness of one hour without notification in advance.  The lack of notification would be an aggravating circumstance.

B.  Considerations that may result in a <u>lesser</u> penalty.

(1) The employee has a <u>long period of service</u>.  The employee is a good employee who has strayed a bit.

(2) The employee has <u>no prior disciplinary actions</u> documented in the employee's file in the department of Correction Personnel Office.

(3) The employee has a <u>good past work performance record</u>.  This is defined as no unsatisfactory (below standard) ratings on the last 2 years' employee performance evaluations or ratings below 3 on the EPPA.

(4) <u>Mitigating</u> <u>Circumstances</u>.  These are circumstances that argue for a lesser sanction or no sanction at all. Mitigating circumstances must be described in block #14 on the Investigation Report.

EXAMPLE:  An employee hits a co-worker after being verbally taunted for half an hour and then pushed physically.  The verbal taunting and pushing would be mitigating circumstances.

7. <u>Fact Finding Meeting</u>

PURPOSE: A.  To give the employee an opportunity to be heard before a Fact Finding Officer.

12

D000678

| STATE OF DELAWARE DEPARTMENT OF CORRECTION | POLICY | PAGE NUMBER 13 of 18 |
|---|---|---|
| SUBJECT: Employee Disciplinary Action | | |

    B.   For the Fact Finding Officer to obtain relevant facts, to permit a decision to be made on whether a violation occurred.

    C.   To recommend a penalty, for implementation or review by higher authority. The penalty will be determined in conjunction with the personnel office to ensure consistency.

ACTION:  A.   The immediate supervisor or supervisor's supervisor notifies the Fact Finding Officer of the need for a meeting.

    B.   The Fact Finding Officer will schedule the meeting. The employee is responsible for obtaining representation if desired.

    C.   At least one day before the meeting, the supervisor will provide a copy of the Investigation Report to the employee after removing any information that was not used in support of the supervisor's recommendation.

    D.   After the meeting, the Fact Finding Officer will make a determination on whether the employee committed the violation. If so, the Facing Finding Officer will contact the Personnel Office to determine the appropriate penalty. The Fact Finding Officer will proceed as follows:

        (1)   If warning, direct the supervisor to prepare the memorandum, give a copy to the employee and send the original to the Personnel Office. If written reprimand, prepare the disciplinary charge letter and have it approved by the Department Personnel Office. After approval, present a copy of the letter to the employee. The original must be forwarded to the Personnel Office.

        (2)   If suspension or fine, make a recommendation accompanied by all relevant documents to the Warden/Section Administrator who will make the final decision, prepare the disciplinary charge letter and have it approved by the Department Personnel Office. After

13

D000679

| STATE OF DELAWARE DEPARTMENT OF CORRECTION | POLICY | PAGE NUMBER 14 of 18 |
|---|---|---|
| SUBJECT:  Employee Disciplinary Action | | |

approval, present a copy of the letter to the employee.  The original must be forwarded to  the Personnel Office.

(3)  If demotion or dismissal make  a recommendation to the Warden/Section Administrator who will review the case and make a recommendation to the Bureau Chief who will make the final decision for demotion and make a recommendation on dismissal.  The Bureau Chief will notify the Department Personnel Office who will prepare and forward to the employee the disciplinary charge letter. When necessary, a pre-termination hearing will be scheduled.

(4)  When the recommendation from the Fact Finding Officer is for dismissal, the Fact Finding Officer officer will immediately notify the Warden/Section Administrator.  The Warden/Section Administrator may suspend the employee with concurrence of the Bureau Chief pending the final disposition.

8.  Warden/Section Administrator Review

PURPOSE:  A.  A final review after the employee's arguments and comments have been included.

B.  To approve or recommend for approval the penalty.

ACTION:  A.  The Warden/Section Administrator will review the disciplinary package, paying particular attention to the employee's position.  The Warden/Section Administrator will approve or change the recommended penalty

B.  If the penalty is a suspension or fine, the Warden/Section Administrator is the approval authority.

A copy of the disciplinary charge letter (after approval by the Department Personnel Office) will be given to the employee and immediate supervisor.  The original will be sent through the Bureau Chief to the

14

D000680

A0831

| STATE OF DELAWARE DEPARTMENT OF CORRECTION | POLICY | PAGE NUMBER 15 of 18 |
|---|---|---|
| SUBJECT:  Employee Disciplinary Action | | |

Personnel Office for inclusion in the employee's personnel file.

C.  If the penalty is demotion or dismissal, the Warden/Section Administrator will forward the disciplinary package with supporting documents to the appropriate Bureau Chief.

9.  <u>Bureau Chief or Designee Review.</u>

PURPOSE: A.  To review the actions taken for appropriateness.

B.  To approve or recommend approval of the penalty.

ACTION: A.  The Bureau Chief will review the disciplinary package.  The Bureau Chief may request further investigation.

B.  The Bureau Chief will approve the recommended penalty or will change the recommended penalty:

(1)  If the recommended penalty is changed to a suspension, the Bureau Chief will notify the Department Personnel Office who will prepare the disciplinary charge letter and forward a copy to the Warden/Section Administrator for presentation to the employee and immediate supervisor.  The Department Personnel Office will keep the original for the employee's personnel file.

(2)  If the recommended penalty is demotion or dismissal and the Bureau Chief concurs, it will be forwarded to the Personnel Office with the disciplinary package.  The Personnel Office will prepare the disciplinary charge letter and distribute copies to the employee and Warden/Section Administrator.  The Personnel Office will schedule a Pre-Temination Hearing if requested by the employee.

15

D000681

| STATE OF DELAWARE DEPARTMENT OF CORRECTION | POLICY | PAGE NUMBER 16 of 18 |
|---|---|---|
| SUBJECT:  Employee Disciplinary Action | | |

10. <u>Disciplinary Charge Letter Meeting</u>

PURPOSE:  To notify the employee of the disciplinary action to be imposed.

ACTION:   A.  The immediate supervisor will arrange to meet with the employee.  The employee may be accompanied by a union representative.

B.  The immediate supervisor gives the employee a copy of the disciplinary charge letter.

C.  Discussion should be limited to why the behavior was unacceptable and what the supervisor's expectations are for the future.  This is not a grievance hearing and employee arguments about the disciplinary action should not be allowed.

11. <u>Pre-Termination Hearing</u>

WHEN:       The hearing will be scheduled by the Personnel Office as soon as possible after receipt of the request for a hearing from the employee.

PURPOSE:  A.  To allow the employee to be heard concerning the proposed termination.

B.  To determine if a lesser penalty is appropriate.

ACTION:   A.  The hearing officer will be the Department of Correction Personnel Administrator except as designated by the Commissioner.

B.  The Personnel Office will notify the Warden/Section Administrator, the employee and the union (if applicable) of the date, time and location of the hearing.

C.  The Warden/Section Administrator or designee(s) may attend the hearing.

D.  The employee and union representatives (if applicable) may present their position.

16

D000682

A0833

| STATE OF DELAWARE DEPARTMENT OF CORRECTION | POLICY | PAGE NUMBER 17 of 18 |
|---|---|---|

SUBJECT:   Employee Disciplinary Action

E.  The conduct of the hearing, the decision on allowing other persons to attend and the determination on what information can be presented will be the sole discretion of the hearing officer.

F.  The Personnel Office will distribute copies of the decision to the appropriate Bureau Chief, Warden/Section Administrator, employee and union representatives.

12.  **Responsibility for Imposing the Penalty**

1.  The Warden and/or equivalent position shall assure that the penalty is imposed upon the employee in a timely manner if there is no appeal or following the third step grievance (for a union member).

2.  The Personnel Office shall retain the disciplinary charge letter in the personnel file.  A disciplinary charge letter will remain in the personnel file for a minimum of ninety (90) days. After that it may be removed by written request from the Warden/Section Administrators to the Personnel Office.  All disciplinary charge letters will be removed after two (2) years have elapsed.

3.  The Personnel Office shall process applicable paper work as designated in the Personnel Internal

   Procedures Manual upon the receipt of all necessary information.

13.  **Miscellaneous Provisions**

(1)  Suspension Pending Dismissal.

An employee may be immediately suspended without pay pending a final decision on a dismissal recommendation.  Such suspension will be used if the continued presence of the employee would interfere with or pose a potential hazard to the operation or security of the organization.  It must be approved by the respective Bureau Chief. Otherwise,  the employee will continue working

17

D000683

A0834

| STATE OF DELAWARE DEPARTMENT OF CORRECTION | POLICY | PAGE NUMBER 18 of 18 |
|---|---|---|
| SUBJECT:  Employee Disciplinary Action | | |

pending a final decision on the dismissal recommendation.  If the employee is reinstated, the employee will be paid for the period of suspension; however, if a lesser penalty of suspension is imposed, the period of suspension pending dismissal will apply to the period of disciplinary suspension.

(2)   Suspension Pending Court Action.

When an employee is charged with a criminal offense, the employee may be suspended without pay or may continue working.  This decision will be made by the appropriate Bureau Chief after the Warden/Section Administrator has made a recommendation.  If the criminal charge is a felony or the charge arose at work, the employee will normally be suspended without pay.  The Warden/Section Administrator should contact Internal Affairs and the Personnel Office to coordinate the investigation.  If sufficient information is available through arrest reports or investigative reports to make a decision on disciplinary action, the disciplinary process should proceed.  The criminal proceeding is a separate matter.  If the decision is made to wait for completion of court action, it is the responsibility of the Warden/Section Administrator to follow-up with the appropriate agency and to take action expeditiously at the completion of the court action.

Any reports of arrests or alleged criminal actions by employees received by any Department section or facility will be forwarded to the appropriate Warden/Section Administrator with copies to the Personnel Office and Internal Affairs section.

(3)   Suspension of employees covered by a union contract.

Review the union contract before actually suspending an employee covered by that contract. The contract may contain special provisions such as delaying a suspension that is grieved until after the Commissioner's step of the Grievance procedure.  Contact the Personnel Office if there are any questions.

18

D000684

| POLICY OF<br><br>STATE OF DELAWARE<br><br>DEPARTMENT OF CORRECTION | POLICY NUMBER<br>9.13 | PAGE NUMBER<br>1 OF 1 |
|---|---|---|
| | RELATED ACA STANDARDS: | |
| CHAPTER: 9-PERSONNEL, TRAINING &<br>EMPLOYEE-MANAGEMENT RELATIONS | SUBJECT: INTERVIEW EXPENSE<br>REIMBURSEMENT | |
| APPROVED BY COMMISSIONER: *Robert J Watson* | | |
| EFFECTIVE DATE:July 1, 1992 | | |

I. **AUTHORITY:**  11 Del. C. 6517, 29 Del. C. 8903

II. **PURPOSE:**  To authorize reimbursement of interview expenses.

III. **APPLICABILITY:**  All out of state candidates for Department of Correction positions.

IV. **DEFINITIONS:**  NONE

V. **POLICY:**  It is the policy of the Department of Correction to reimburse out of state candidates from national searches or other comprehensive searches, as authorized by the Commissioner, for expenses incurred for Department interviews. These may include travel, lodging, meals or any combination of these expenses as approved by the Commissioner of Correction. The Department Personnel Administrator shall be responsible for developing procedures to implement this policy.

These procedures, contingent upon the availability of Department funds, must provide for a fair and equal distribution process and comply with Department of Correction Policy 8.24 -- Comprehensive Reimbursement.

These procedures must be included in each bureau/section manual.

**D000685**

**Balas John (DOC)**

| | |
|---|---|
| **From:** | Radcliffe Timothy (DOC) |
| **Sent:** | Thursday, August 12, 2004 11:39 AM |
| **To:** | Shockley William (DOC); West David A (DOC); Foskey Jeff (DOC); Bradley Scott E (DOC); Balas John (DOC); Mumford Jon (DOC); Mears Lee (DOC); Hastings Harry (DOC); Adams Allen (DOC); Murray Dennis (DOC) |
| **Cc:** | Hickman Kenny (DOC); Mears Truman (DOC); Kearney Richard (DOC); Hall Dave (DOC); Taylor Scott (DOC) |
| **Subject:** | CERT membership |

I want to personally thank you for the time you dedicated to the Department of Correction Emergency Response Team. A high level of personal integrity, motivation, and perseverance is required to be successful as a CERT member. You have, in the past, proven yourself as a valued member of the team.

It is unfortunate that at this critical time in the Delaware Department of Correction history, you have decided to resign from the CERT Team. While I do not sanction the process that was utilized, I respect your person decision, and wish you the best of luck in your future endeavors.

Warden Kearney and I need to finalize this process by having your CERT gear and pagers turned in as soon as possible. Lt Hickman and Lt Mears will be available to receive your equipment. Please make arraignments with one of them and have the gear returned no later than 1600 hrs on August 26, 2004.

Respondeo Citatio

Major Timothy Radcliffe
CERT/K9 Program Manager
302-659-6070

1





RECEIVED

JAN 2 6 2005

HUMAN RESOURCES

**The State of Delaware Employee Performance Review**
**Name, Job Title: CPL. John Balas      SS# 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**
**Department-Division-Section: Department of Correction, Sussex Correctional Institution**
**Supervisor, Job Title: LT. Truman Mears        Correctional Lieutenant**
**Date, or time period covered:   Sept. 2003- Sept 2004**

**Areas where performance is distinguished or exceeds expectations, if any:**
Cpl. Balas has perfect attendance and that is commendable however in this case I do not
feel that perfect attendance is justification for an exceeds.

**Areas of specific performance deficiencies or unsatisfactory work, if any:**
See attached summary.

**Are as where growth or skills/knowledge development is suggested or needed. If not**
**applicable, please use this space and/or attach summary explanation of how employee met**
**expectations.** Cpl. Balas is knowledgeable of SCI policies and procedures. He shows up
for duty in a timely manner. He uses leave in accordance with policy.

**NOTE :** See attached summary.

**Employee documentation of performance events, comments and/or self-review:**

We have met and discussed this document. The employee's performance is (Distinguished),
(Exceeds Expectations), (Meets Expectations), (Needs Improvement), or is (Unsatisfactory).
Please circle one.

_____        _____        _____    12/06/04
Employee/date              Evaluator/date          Reviewer/date

RECEIVED

JAN 1 0 2005

SCI WARDEN'S OFFICE

DEPOSITION
EXHIBIT
Mears 11
11-6-07  YE
PENGAD 800-631-6989

U00084

A0838



**Delaware Department of Correction**
**Bureau of Prisons**
**Sussex Correctional Institution**
**RT 1, Box 500**
**Georgetown, DE 19947**

Sir. On 01-09-05 I asked Cpl. Balas to review and sign his evaluation for the year. He told me that he thought that Cpt. Wilkinson would be present during it. I informed him that he (Cpl. Balas) was going to be on Vacation next week and Cpt. Wilkinson was not working tonight.. Cpl. Balas informed me that he would not look at it without Cpt. Wilkinson and a Union Rep.

The evaluation has been completed and turned in once.
I am turning it in again without his signature.
I am not aware that an officer has to have a union rep. present for this.
I do not feel that I have to comply with Cpl. Balas demands at this point.
Cpl. Balas by his own choice has not seen or signed this evaluation.

**Received, SCI.**

**JAN 1 0 2005**

**Deputy Warden**

ü00085



**Delaware Department of Correction**
**Bureau of Prisons**
**Sussex Correctional Institution**
**RT 1, Box 500**
**Georgetown, DE 19947**

This is an attachment for Cpl. John Balas Performance Review to show justification for meets expectations. If someone receives exceeds expectations on prior performance reviews it should not automatically guarantee them exceeds for future performance reviews.

In the past Cpl. Balas has received exceeds expectations and deserved it because of his job performance and the extra effort he put forth such as C.E.R.T. , his assistance to me in training Officers in Q.R.T. , his job performance in the receiving room, and perfect attendance.
This year however there has been several events to change that. First,after completing training of Q.R.T. I sent Major Townsend an e-mail stating that I did not want Cpl. Balas to help teach any classes under me in the future because of his performance. The next time I talked to Major Townsend in detail he agreed to this.
I had 2 meetings with the Sgt. In charge of the area Cpl. Balas works about Cpl. Balas poor work performance, poor attitude, and his unwillingness to get along with other staff.
Cpl. Balas is no longer a member of C.E.R.T.
This leaves only perfect attendance. In light of the rest of Cpl. Balas performance I do not feel that perfect attendance alone (although commendable) is enough to justify exceeds.
Also an exceeds would hurt moral of the Officers working with Cpl. Balas on a daily basis in the receiving room.
Cpl. Balas has a lot of potential and can work towards exceeds in the future.

I put this in attachment form because I feel that it is not necessary and not my goal to place a lot of negative statements in a performance review for some one that receives a good review, a meets expectations. This I feel would put someone to the needs improvements level.
Because Cpl. Balas has received exceeds for several years in the past the drop from exceeds to meets may need written justification.

LT. Truman Mears

A00086



The State *of* Delaware Employee Performance Plan

Name, Job Title: **Cpl. John Balas [SS# ] 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**
Department-Division-Section: Department of Correction, Sussex Correctional Institution
Supervisor, Job Title: Truman Mears, CorrectionalLieutenant
Date, or time period covered:

What is the agency mission and/or operational needs that this employee's job performance will affect?
The DOC is committed to providing programs, policies and services to inmates which at all times places public safety as our top priority whether the offender is in prison or supervised in the community by correctional staff. Your role is to provide discipline and security of inmates inside or outside the secure facility by enforcing institutional rules, regulations and policies while keeping in mind that rehabilitative programming will enhance the long term public safety.

Please list the duties, projects or performance standards that will be used for evaluation purposes. *Note:* current job dimensions may be substituted and/or included.

1. Be knowledgeable of and adhere to all Departmental, Bureau and Institutional policies and procedures. Read, daily, the post orders for the area you are assigned to stay abreast of any and all changes.

2. Report for work assignments and appointments on time every day as scheduled unless leave is prior approved as attendance, reliability and punctuality are an essential part of your job.

3. You are expected to conduct yourself in a professional manner on or off duty keeping in mind that you represent the DOC in dealing with the public. You are a role model for inmates and your appearance and conduct should always be in compliance with departmental guidelines.

4. It is your responsibility to document all activities that occur during your tour of duty. Documentation is expected to be submitted prior to the end of your shift on the proper institutional form. All written communication will be clear, concise and complete. It is also your responsibility to brief the on-coming shift of all events that occur during your shift.

5. Maintain security at all times by being alert and adhering to established security procedures. You are expected to take immediate action when security violations occur.

6. As a lead worker you are expected to provide guidance, supervision, and training to subordinate staff as needed. You may also be expected to assume the duties of the Lieutenant when so directed by the Watch Commander.

_____        _____        _____
Employee/date               Evaluator/date                    Reviewer/date
TJM 05-23-03

Ḋ00027

**Jones Margie (DOC)**

| | |
|---|---|
| **From:** | Davis Diane (DOC) |
| **Sent:** | Friday, February 11, 2005 8:20 AM |
| **o:** | Jones Margie (DOC) |
| **Cc:** | Kearney Richard (DOC) |
| **Subject:** | FW: John Balas performance evaluation |

Good Morning Warden Kearney,

I am no longer working in the Employee Services Unit.
I am still in the H/R office, but working with the Recruitment Selection Unit.
My replacement is Ms. Margie Jones.


Margie,
Can you please take care of this.

Thanks,
Diane

-----Original Message-----

| | |
|---|---|
| **From:** | Kearney Richard (DOC) |
| **Sent:** | Friday, February 11, 2005 8:09 AM |
| **To:** | Davis Diane (DOC) |
| **Subject:** | John Balas performance evaluation |

Good morning Diane,
Could you please send me John Balas' original performance evaluation for 2004. He has filed a complaint and is meeting with his supervisor and the reviewer to discuss the evaluation. Thanks
Rick

*Mailed 2/11/05*

1

U00089

A0842



RECEIVED

JAN 2 6 2005

HUMAN RESOURCES

**The State of Delaware Employee Performance Review**
**Name, Job Title: CPL. John Balas      SS# 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**
**Department-Division-Section: Department of Correction, Sussex Correctional Institution**
**Supervisor, Job Title: LT. Truman Mears      Correctional Lieutenant**
**Date, or time period covered:   Sept. 2003- Sept 2004**

**Areas where performance is distinguished or exceeds expectations, if any:**
Cpl. Balas has perfect attendance and that is commendable however in this case I do not
feel that perfect attendance is justification for an exceeds.

**Areas of specific performance deficiencies or unsatisfactory work, if any:**
See attached summary.

**Are as where growth or skills/knowledge development is suggested or needed. If not**
**applicable, please use this space and/or attach summary explanation of how employee met**
**expectations. Cpl. Balas is knowledgeable of SCI policies and procedures. He shows up**
**for duty in a timely manner. He uses leave in accordance with policy.**

NOTE : See attached summary.

**Employee documentation of performance events, comments and/or self-review:**

We have met and discussed this document.  The employee's performance is (Distinguished),
(Exceeds Expectations), (Meets Expectations), (Needs Improvement), or is (Unsatisfactory).
*Please circle one.*

_____          _____          _____
Employee/date                  Evaluator/date                  Reviewer/date          12/06/04

RECEIVED

JAN 1 0 2005

SCI WARDEN'S OFFICE

U00089



**Delaware Department of Correction**
**Bureau of Prisons**
**Sussex Correctional Institution**
**RT 1, Box 500**
**Georgetown, DE 19947**

Sir. On 01-09-05 I asked Cpl. Balas to review and sign his evaluation for the year. He told me that he thought that Cpt. Wilkinson would be present during it. I informed him that he (Cpl. Balas) was going to be on Vacation next week and Cpt. Wilkinson was not working tonight.. Cpl. Balas informed me that he would not look at it without Cpt. Wilkinson and a Union Rep.

The evaluation has been completed and turned in once.
I am turning it in again without his signature.
I am not aware that an officer has to have a union rep. present for this.
I do not feel that I have to comply with Cpl. Balas demands at this point.
Cpl. Balas by his own choice has not seen or signed this evaluation.

Received, SCI.

JAN 1 0 2005

Deputy Warden

Ū 0 0 0 9 0



**Delaware Department of Correction**
**Bureau of Prisons**
**Sussex Correctional Institution**
**RT 1, Box 500**
**Georgetown, DE 19947**

This is an attachment for Cpl. John Balas Performance Review to show justification for meets expectations. If someone receives exceeds expectations on prior performance reviews it should not automatically guarantee them exceeds for future performance reviews.

In the past Cpl. Balas has received exceeds expectations and deserved it because of his job performance and the extra effort he put forth such as C.E.R.T. , his assistance to me in training Officers in Q.R.T. , his job performance in the receiving room, and perfect attendance.
This year however there has been several events to change that. First, after completing training of Q.R.T. I sent Major Townsend an e-mail stating that I did not want Cpl. Balas to help teach any classes under me in the future because of his performance. The next time I talked to Major Townsend in detail he agreed to this.
I had 2 meetings with the Sgt. In charge of the area Cpl. Balas works about Cpl. Balas poor work performance, poor attitude, and his unwillingness to get along with other staff.
Cpl. Balas is no longer a member of C.E.R.T.
This leaves only perfect attendance. In light of the rest of Cpl. Balas performance I do not feel that perfect attendance alone (although commendable) is enough to justify exceeds.
Also an exceeds would hurt moral of the Officers working with Cpl. Balas on a daily basis in the receiving room.
Cpl. Balas has a lot of potential and can work towards exceeds in the future.


I put this in attachment form because I feel that it is not necessary and not my goal to place a lot of negative statements in a performance review for some one that receives a good review, a meets expectations. This I feel would put someone to the needs improvements level.
Because Cpl. Balas has received exceeds for several years in the past the drop from exceeds to meets may need written justification.


LT. Truman Mears

C00091



The State *of* Delaware Employee Performance Plan

Name, Job Title: **Cpl. John Balas [SS# ] 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**
Department-Division-Section: Department of Correction, Sussex Correctional Institution
Supervisor, Job Title: Truman Mears, CorrectionalLieutenant
Date, or time period covered:

What is the agency mission and/or operational needs that this employee's job performance will affect?
The DOC is committed to providing programs, policies and services to inmates which at all times places public safety as our top priority whether the offender is in prison or supervised in the community by correctional staff. Your role is to provide discipline and security of inmates inside or outside the secure facility by enforcing institutional rules, regulations and policies while keeping in mind that rehabilitative programming will enhance the long term public safety.

Please list the duties, projects or performance standards that will be used for evaluation purposes. Note: current job dimensions may be substituted and/or included.

1. Be knowledgeable of and adhere to all Departmental, Bureau and Institutional policies and procedures. Read, daily, the post orders for the area you are assigned to stay abreast of any and all changes.

2. Report for work assignments and appointments on time every day as scheduled unless leave is prior approved as attendance, reliability and punctuality are an essential part of your job.

3. You are expected to conduct yourself in a professional manner on or off duty keeping in mind that you represent the DOC in dealing with the public. You are a role model for inmates and your appearance and conduct should always be in compliance with departmental guidelines.

4. It is your responsibility to document all activities that occur during your tour of duty. Documentation is expected to be submitted prior to the end of your shift on the proper institutional form. All written communication will be clear, concise and complete. It is also your responsibility to brief the on-coming shift of all events that occur during your shift.

5. Maintain security at all times by being alert and adhering to established security procedures. You are expected to take immediate action when security violations occur.

6. As a lead worker you are expected to provide guidance, supervision, and training to subordinate staff as needed. You may also be expected to assume the duties of the Lieutenant when so directed by the Watch Commander.

_____    _____  06.01.03    _____
Employee/date                Evaluator/date                          Reviewer/date
TJM 05-23-03

B00092

A0846

**Mears Truman (DOC)**

| | |
|---|---|
| **From:** | **Sent:** Thu 1/20/2005 7:08 AM |
| **To:** | |
| **Cc:** | |
| **Subject:** | On Jan 9th. I aproached Cpl. Balas in the recieving room and asked him to come to my office and review his eval. for the year. He refused to sign or even look at the review. His demands were that he have a union rep present along with Cpt. Wilkenson . His |
| **Attachments:** | |

On Jan 9th. I aproached Cpl. Balas in the recieving room and asked him to come to my office and review his eval. for the year. He refused to sign or even look at the review. His demands were that he have a union rep present along with Cpt. Wilkenson . His eval was turned in without his signiture.

U00379

Number __04-04-A__                                    Page __1__ of __2__

# Correctional Officers Association of Delaware
# C.O.A.D.

Office (302) 734-8061
Fax (302) 734-8062

## Official Grievance Form                                    /

Date Filed __10-04-04__                               Step _____

Name of Grievant __JOHN J. BALAS__          Institution __S.C.I.__

Address _____                          Grievant Phone # _____

                                              Classification of Grievant __CPL.__

List violation(s) and nature of grievance(s) __E.P.I.A. FOR THE YEAR 2004__

_____

_____

Adjustment Required: __FOR THE PERFORMANCE EVALUATION TO BE INCREASED__
__FROM "MEETS" EXPECTATIONS, TO "EXCEEDS" DUE TO PERFECT__
__ATTENDENCE'__

_____

(Use Continuation Sheet for Additional Space)

I authorize the **C**orrectional **O**fficers **A**ssociation of **D**elaware as my representative to act for me in the disposition of this grievance.

Signature of Grievant _____    Date __10-04-04__

Signature of Representative _____    Title __COAD S/S__

Date Presented to Management _____

Disposition of Grievance: _____

_____

_____

_____

_____

_____

COAD Official Grievance Form #12200201

DEPOSITION
EXHIBIT
__Balas 12__
__11-6-07__

File Number _____          Continuation Form          Page_____of_____

# Correctional Officers Association of Delaware

# C.O.A.D.

Office (302) 734-8061
Fax (302) 734-8062

## Official Grievance Form

ON SUNDAY SEPTEMBER THE 26TH, AT APPROXIMATELY 1900 hrs, LT. MEARS CAME IN THE RECEIVING ROOM WITH AN EVALUATION FOR MYSELF. LT. MEARS SAID "I NEED YOU LOOK OVER THIS AND SIGN IT." I READ OVER THE EVALUATION AND DID NOT AGREE WITH MY PERFORMANCE THAT I WAS GIVEN. THE EVALUATION I RECEIVED WAS "MEETS EXPECTATIONS." THERE WASN'T ANYTHING ON THE EVALUATION ABOUT A LETTER FROM THE COMMISSIONER ABOUT MY PERFECT ATTENDANCE, A LETTER FROM MAJOR TOWNSEND OF APPRECIATION FOR TEACHING CAP-STUN AND Q.R.T. REFRESHER, AND MY C.E.R.T. MEMBERSHIP. I ASKED LT. MEARS IF HE WORKS MONDAY SEPTEMBER 27TH. HE HESITATED FOR A MOMENT AND SAID "NO." I TOLD LT. MEARS THAT I WOULD SIGN IT AT A LATER DATE. I DID NOT REFUSE TO SIGN IT. LT. MEARS SNATCHED THE EVALUATION OFF THE COUNTER AND WENT TO HIS OFFICE. APPROXIMATELY FIVE MINUTES LATER I WENT TO FIND LT. MEARS AND RESPECTFULLY REQUESTED A COPY OF THE EVALUATION, HE SAID, "YOU DIDN'T SIGN IT, SO YOU ARE NOT GETTING A COPY OF IT." I ASKED WHY WASN'T ANYTHING OF THE LETTERS PUT ON THE EVALUATION. LT. MEARS SAID, "IT DOES NOT WARRANT ENOUGH TO GET "EXCEEDS EXPECTATIONS" AND DID NOT NEED TO BE PUT ON THE EVALUATION." I FEEL THAT LT. MEARS HAS A PERSONAL VENDETTA AGAINST ME SINCE I HAVE RESIGNED FROM C.E.R.T. AND HE IS SHOWING DISCRIMINATION TOWARDS MYSELF. I FEEL THAT IT IS A CONFLICT OF INTEREST, HAVING LT. MEARS AS MY SUPERVISOR.

THE LAST FOUR YEARS, I HAVE RECEIVED "EXCEED EXPECTATIONS" ON MY EVALUATIONS BECAUSE OF MY PERFECT ATTENDANCE. WHY NOT THIS EVALUATION. I BELIEVE THAT LT. MEARS IS EVALUATING ME PERSONALLY NOT PROFESSIONALLY.

COAD Official Grievance Continuation Form #12200201

1-9-05

AT APPROXIMATELY 1638, LT. TRUMAN MEARS CAME

IN TO THE RECEIVING ROOM AREA. LT. MEARS SAID "JOHN, I NEED TO
TURN MY EVALUATIONS IN AND I WANT YOU AND I TO FINISH IT UP,
YOU'RE HOLDING IT UP." "ARE YOU STANDING ON WHAT YOU BELIEF OR ARE
YOU WILLING TO SIGN OFF ON MEET EXPECTATIONS" I SAID "WHAT
DO YOU MEAN?" HE SAID, "WILL YOU SIGN OFF ON THESE EXPECTATIONS
ON NOT" I SAID "WHAT ABOUT CAPT. WILKINSON BEING PRESENT
FOR THIS." LT. MEARS SAID THAT CAPT. WILKINSON DOESN'T NEED TO BE
HERE FOR YOU TO SIGN IT. IN FACT I REQUEST CAPT. WILKINSON TO BE THERE
BUT HE DOESN'T HAVE TO BE." I TOLD LT. MEARS, "I ALSO REQUESTED
THAT CAPT. WILKINSON BE THERE WHEN THE EVALUATION WAS TO BE
REVIEWED BY MYSELF AND A UNION REP." LT. MEARS SAID "A UNION
REP TO BE PRESENT FOR YOUR EVALUATION" I SAID "YES" LT MEARS ACTED
DISGUSTED AND WALKED AWAY. LT. MEARS CAME ACROSS AS TO BE BULLY-ING ME
PRESSURING ME TO DO THIS, WITHOUT HAVING CAPT. WILKINSON AND A UNION
REP. PRESENT. I FEEL THAT I NEED OTHER PERSONS PRESENT IN CASE
ANY THING IS MIS INTERPRETED ON BOTH PARTIES. I FEEL
PRESSURED, INTIMATED, AND STRESSED WITH THIS INDIVIDUAL. (LT. MEARS)
BECAUSE, I FEEL HE IS USING HIS AUTHORITY TO MAKE ME FEEL THIS
WAY BECAUSE I RESIGNED FROM E.E.R.T AND THIS IS HIS WAY TO
BE VANDICTIVE TOWARDS ME. I STILL DON'T HAVE A COPY OF
MY 2004'S TIME CARD.

DEPOSITION
EXHIBIT
Mears 13

AFTER MY CONVERSATION WITH LT. MEARS I CALLED

AND NOTIFIED CAPT. WILKINSON & CAPT. WILKINSON ADVISED ME THAT

HE WANTED TO BE THERE FOR THE REVIEW OF THE EVALUATION

AND IT WOULD BE CAPT. WILKINSON — LT. MEARS — CPL. BALDS AND

A UNION REP.


1-9-05 AT 17:11 I SENT LT. MEARS AN E-MAIL
REQUESTING A COPY OF MY 2004 TIME CARD.

1-9-05 — AT 20:35 LT. MEARS PRESENTS ME WITH A
COPY OF MY TIME CARD FOR YEAR 2004.

2-7-05    0915

ON THE ABOVE DATE AND APPROX. TIME, I CALLED THE WARDEN'S SECRETARY AND ASKED IF MY EVALUATION HAS BEEN TURNED IN. SHE SAID YES. I ASKED IF IT WAS SENT UP STATE AND SHE SAID YES. I THAN ASKED WHAT DID MY SUPERVISOR PUT FOR MY SIGNITURE. SHE SAID REFUSED TO SIGN. I NEVER SAW MY EVALUATION. I CALLED CAPT. WILKINSON TO NOTIFY HE OF THIS. I LEFT A MESSAGE FOR AIM TO CALL ME. I ALSO CALLED DEPUTY WARDEN DELOY AND TOLD HIM WHAT HAPPEN AND HE ADVISED ME TALK TO CAPT. WILKINSON. CAPT. WILKINSON CALLED ME BACK AROUND 11:30/12:00. HE INFORMED ME THIS WOULD BE TAKEN CARE OF.

DEPTID (DDS):

Employee N... J. Bolos, John     SSN: 376 60 9232    Class Title: [ ]    704

Employment Date: 10-03-94     Adjusted Service Date:

DEPOSITION EXHIBIT
PENGAD 800-631-6989

Mears 14
1607 LR

Sick Accrual (hrs per month) - 37.5 hrs: 9.5 / 40.0 hrs: 10
Vacation (hrs per month) - 37.5 hrs: 9.5, at 10 yrs: 11.25, at 15 yrs: 13.25 / 40 hrs: 10, at 10 yrs: 12, at 15 yrs: 14
ACCRUALS ARE NOT APPLIED UNTIL THE END OF THE MONTH

**Accrual Rate**
Sick: 10
Vacation: 10

Balance Carried Forward

| | HOLIDAY | | SICK | | VACATION |
|---|---|---|---|---|---|
| 24 | | | 662 | | |
| 24 | 16 | 10 | 672 | 10 | 8 |
| +8 | 24 | 10 | 682 | 10 | 10 |
| | 24 | 10 | 692 | 10 | 10 |
| 8 | 32 | 10 | 702 | 10 | 10 |
| | 32 | 10 | 712 | | |
| | | | | | 12 |

Remarks:  Res

NOTE TO TIMEKEEPER: Provide each employee a copy of their timecard at the end of 2004. Forward the original to Human Resources.
NOTE TO EMPLOYEES: Your leave balances for 2004 are displayed here>>
Review and note accruals at top of card. Resolve discrepancies with your timekeeper.

Leave balances at end of 2004

| HOLIDAY | SICK | VACATION |
|---|---|---|

| | HOLIDAY | | SICK | | VACATION |
|---|---|---|---|---|---|
| | Used In 2004 | | Used In 2004 | | Used In 2004 |

Check here if perfect attendance 2004

DEPT OF CORRECTION  EMPLOYEE TIME CARD  Calendar '04

DEPTID (DDS): _____

Employee N. J. Bala S. John  SSN: 378 60 9732  Class TH,

Employment Date: 10-03-94  Adjusted Service Date: _____

Sick Accrual (hrs per month) - 37.5 hrs 9.5 / 40.0 hrs 10
Vacation (hrs per month) - 37.5 hrs 9.5, at 15 yrs 11.25, at 10 yrs 13.25 / 40 hrs 10, at 10 yrs 12, at 15 yrs 14
ACCRUALS ARE NOT APPLIED UNTIL THE END OF THE MONTH

Accrual Rate
Sick: 10
Vacation: 10

| | Balance Carried Forward | HOLIDAY | | SICK | | VACATION | |
|---|---|---|---|---|---|---|---|
| | | 24 | | 662 | | 8 | |
| | | -24 | 16 | 10 | 672 | 10 | |
| | | + 8 | 24 | 10 | 682 | 10 | |
| | | | 24 | 10 | 692 | 10 | |
| | | 8 | 32 | 10 | 702 | 8 | |
| | | 8 | 40 | 10 | 712 | 10 | |
| | | 40 | 0 | 10 | 782 | 10 | |
| | | | | | | 12 | |

Leave balances at end of 2004

| | HOLIDAY | | SICK | | VACATION | |
|---|---|---|---|---|---|---|
| Used in 2004 | | | | | | |

Check here if perfect attendance 2004

Remarks: Res

NOTE TO TIMEKEEPER: Provide each employee a copy of their timecard at the end of 2004. Forward the original to Human Resources.
NOTE TO EMPLOYEES: Your leave balances for 2004 are displayed here>>
Review and note accruals at top of card. Resolve discrepancies with your timekeeper.

DEPARTMENT OF CORRECTION    EMPLOYEE TIME CARD    Calendar Year 2004

DEPT ID (DDS):

Employee Name: Bolos John    SSN: 375 60 9732    Class Title: pl

Employment Date: 10-03-94    Adjusted Service Date:

**Accrual Rate**
Sick: 10
Vacation: 10

Sick Accrual (hrs per month): 37.5 hrs: 9.5 / 40.0 hrs: 10
Vacation (hrs per month): 37.5 hrs: 9.5, at 10 yrs: 11.25, at 15 yrs: 13.25 / 40 hrs: 10, at 10 yrs: 12, at 15 yrs: 14
ACCRUALS ARE NOT APPLIED UNTIL THE END OF THE MONTH

| | Balance Carried Forward | | | |
| --- | --- | --- | --- | --- |
| | HOLIDAY | | SICK | VACA |
| | 24 | | 662 | 8 |
| JAN | -24 | | | |
| FEB | 16 | 16 | 672 | 10 |
| MAR | +8 24 | 10 | 682 | 10 |
| APR | 24 | 10 | 692 | 10 |
| MAY | 8 32 | 10 | 702 | 10 |
| JUN | 8 -40 48 | 10 | 712 | 10 |
| JUL | -48 | 10 | 722 | 10 |
| AUG | 3+8 10 | | | 12 |

Leave balances at end of 2004

| | HOLIDAY | | SICK | VACAT |
| --- | --- | --- | --- | --- |
| Used in 2004 | | | Used in 2004 | Used in 2004 |

*Check here if perfect attendance 200*

Remarks: ReS

NOTE TO TIMEKEEPER: Provide each employee a copy of their timecard at the end of 2004. Forward the original to Human Resources.
NOTE TO EMPLOYEES: Your leave balances for 2004 are displayed here>>

**DEPARTM-NT OF CORRECTION   EMPLOYEE TIME CARD**   Calendar Year _004    DEPT/ID (DDS): _____

Employee Name: Bolos John    SSN: 375 60 9732    Class Title: _____

Employment Date: 10-03-94    Adjusted Service Date: _____

**Accrual Rate**
Sick: 10
Vacation: 10

Sick Accrual (hrs per month) - 37.5 hrs: 9.5 / 40.0 hrs: 10
Vacation (hrs per month) - 37.5 hrs: 9.5, at 10 yrs: 11.25, at 15 yrs: 13.25 / 40 hrs: 10, at 10 yrs: 12, at 15 yrs: 14
ACCRUALS ARE NOT APPLIED UNTIL THE END OF THE MONTH

| | HOLIDAY | | SICK | | VACA |
|---|---|---|---|---|---|
| Balance Carried Forward | 24 | | | 66? | 8 |
| | | | 16 | 67? | |
| | 16 | 16 | 10 | 68? | 100 |
| | | 24 | 10 | 69? | |
| | 24 | | | 70? | 100 |
| | | 32 | 40 | 71? | 32 |
| | -4? | 40 | 10 | 72? | |
| | 18 | 8 | 15 | 72? | 12 |
| | 18 | 16 | 15 | 73? | |

| | HOLIDAY | SICK | VACA? |
|---|---|---|---|
| Leave balances at end of 2004 | Used in 2004 | Used in 2004 | Used in 2004 |

Check here if perfect attendance 2004

Remarks: RCS

NOTE TO TIMEKEEPER: Provide each employee a copy of their timecard at the end of 2004. Forward the original to Human Resources.
NOTE TO EMPLOYEES: Your leave balances for 2004 are displayed here>>

P497

A0856

Vacation04

11/29/2004

| Rank | Name | Form | Week1 | Week2 | Week3 | Week4 | Week5 | Week6 |
|------|------|------|-------|-------|-------|-------|-------|-------|
| CPL | Balas, John ^ | ☑ | 12/13/2004 | 7/5/2004 | 6/21/2004 | 12/6/2004 | 1/26/2004 | 3/22/2004 |

DE  "T OF CORRECTION  EMPLOYEE TIME CARD  Calendar  04  DEPTID (DDS):

Employee N.  Balas John  SSN: 375 60 9732  Class Tit.  pl

Employment Date: 10-03-94  Adjusted Service Date:

Sick Accrual (hrs per month) - 37.5 hrs: 9.5 / 40.0 hrs: 10
Vacation (hrs per month) - 37.5 hrs: 9.5, at 10 yrs: 11.25, at 15 yrs: 13.25 / 40 hrs: 10, at 10 yrs: 12, at 15 yrs: 14
ACCRUALS ARE NOT APPLIED UNTIL THE END OF THE MONTH

**Accrual Rate**
Sick: 10
Vacation: 10

| | HOLIDAY | | SICK | | VACAT |
|---|---|---|---|---|---|
| Balance Carried Forward | | | | | |
| 24 | | 662 | | 8 | |
| -24 | 16 | 16 | 672 | 10 | 8 |
| + | 8 | 24 | 682 | 10 | 10 |
| | 24 | 692 | 10 | 10 | |
| 8 | 32 | 702 | 10 | 8 | |
| 8 | 48 | 712 | 10 | 10 | |
| -40 | 8 | 722 | 10 | 32 | |
| +8 | 16 | 732 | 10 | 16 | |
| | 16 | 742 | 10 | 10 | |
| 8 | 24 | 752 | 10 | 16 | |
| | | | | 10 | |
| | | | | 12 | |

| | Used in 2004 | Used in 2004 | Used in 2004 | Used in 2004 |
|---|---|---|---|---|
| HOLIDAY | | SICK | | VACATION |

Check here if perfect attendance in 2004

Leave balances at end of 2004

Remarks:  Res

**NOTE TO TIMEKEEPER:** Provide each employee a copy of their timecard at the end of 2004. Forward the original to Human Resources.

**NOTE TO EMPLOYEES:** Your leave balances for 2004 are displayed here>>

P499

A0858

DEPARTMENT OF CORRECTION   EMPLOYEE TIME CARD   Calendar    J04        DEPTID (니다):

Employee N: J. Bolos John    SSN: 375 60 9732    Class Titl: ___

Employment Date: 10-03-94    Adjusted Service Date: ___

Accrual Rate
Sick: 10
Vacation: 10

Sick Accrual (hrs per month) - 37.5 hrs: 9.5 / 40.0 hrs: 10
Vacation (hrs per month) - 37.5 hrs: 9.5, at 10 yrs: 11.25, at 15 yrs: 13.25 / 40 hrs: 10, at 10 yrs: 12, at 15 yrs: 14
ACCRUALS ARE NOT APPLIED UNTIL THE END OF THE MONTH

| | HOLIDAY | | SICK | | VACA |
|---|---|---|---|---|---|
| | | | | Balance Carried Forward | |
| | 24 | | 662 | | 8 |
| -24 | 16 | 10 | 672 | 10 | 10 |
| +8 | 24 | 10 | 682 | 10 | 8 |
| 8 | 24 | 10 | 692 | 10 | 10 |
| -40 | 32 | 10 | 702 | 10 | 10 |
| | -40 | 10 | 712 | 102 | 10 |
| +8 | 16 | 10 | 722 | 10 | 32 |
| | 16 | 10 | 732 | 10 | 10 |
| 8 | 24 | 10 | 742 | 10 | 10 |
| 8 | 32 | 10 | 752 | 10 | 10 |
| | | 10 | 762 | 10 | 12 |

| Used In 2004 | HOLIDAY | | SICK | Used In 2004 | VACATION Used In 2004 |
|---|---|---|---|---|---|

Check here if perfect attendance 2004

Leave balances at end of 2004

Remarks: ___ Res ___

NOTE TO TIMEKEEPER: Provide each employee a copy of their timecard at the end of 2004. Forward the original to Human Resources.
NOTE TO EMPLOYEES: Your leave balances for 2004 are displayed here>>

P500

A0859

10C COP
(407.0215)

STATE OF ... N OF CORRECTION  EMPLOYEE TIME CARD  Calend ... 004  DEPT ID (DDS): _____

Employee Na ... : Balas John  SSN: 375 60 9232  Class Title _____

Employment Date: 10-03-94  Adjusted Service Date: _____

**Accrual Rate**
Sick: 10
Vacation: 10

Sick Accrual (hrs per month) - 37.5 hrs 9.5 / 40.0 hrs 10
Vacation (hrs per month) - 37.5 hrs 9.5, at 10 yrs: 11.25, at 15 yrs 13.25 / 40 hrs: 10, at 10 yrs: 12, at 15 yrs: 14
ACCRUALS ARE NOT APPLIED UNTIL THE END OF THE MONTH

| | HOLIDAY | | SICK | | VAC/ |
|---|---|---|---|---|---|
| Balance Carried Forward | 24 | | 662 | | (6) |
| JAN | 16 | 16 | 10 | 672 | 10 |
| FEB | +8 | 24 | 10 | 682 | 10 |
| MAR | | 24 | 10 | 692 | 10 |
| APR | +8 | 32 | 10 | 702 | 8 |
| MAY | -40 | 40 | 10 | 712 | 10 |
| JUN | -8 | 8 | 10 | 722 | 32 |
| JUL | +8 | 16 | 10 | 732 | 10 |
| AUG | | 16 | 10 | 742 | 16 |
| SEP | +8 | 24 | 10 | 752 | 10 |
| OCT | | 32 | 10 | 762 | 12 |
| NOV | | | | | |
| DEC | | | | | |

| | HOLIDAY | | SICK | | VACA |
|---|---|---|---|---|---|
| Used in 2004 | Used in 2004 | | Used in 2004 | | Used in 2004 |

Check here if perfect attendance 2004

Leave balances at end of 2004

Remarks: _____ ReS

NOTE TO TIMEKEEPER: Provide each employee a copy of their timecard at the end of 2004. Forward the original to Human Resources.
NOTE TO EMPLOYEES: Your leave balances for 2004 are displayed here>>

Review and note accruals at top of card. Resolve discrepancies with your...

DEPARTMENT OF CORRECTION   EMPLOYEE TIME CARD   Calendar Year 2004   DEPTID (DDS): _____

Employee: Balas John   SSN: 375 60 9732   Class Ttl: pt

Employment Date: 10-03-94   Adjusted Service Date: _____

Accrual Rate
Sick: 10
Vacation: 10-12

Sick Accrual (hrs per month) - 37.5 hrs: 9.5 / 40.0 hrs: 10
Vacation (hrs per month) - 37.5 hrs: 9.5, at 10 yrs: 11.25, at 15 yrs: 13.25 / 40 hrs: 10, at 10 yrs: 12, at 15 yrs: 14
ACCRUALS ARE NOT APPLIED UNTIL THE END OF THE MONTH

Remarks: Res

NOTE TO TIMEKEEPER:  Provide each employee a copy of their timecard at the end of 2004. Forward the original to Human Resources.
NOTE TO EMPLOYEES:  Your leave balances for 2004 are displayed here>>
Review and note accruals at top of card.  Resolve discrepancies with your timekeeper.

| | HOLIDAY | | SICK | | VACATION | |
|---|---|---|---|---|---|---|
| Balance Carried Forward | | 24 | | 662 | | 166 |
| JAN | -24 | | 10 | 672 | 8 | 158 |
| FEB | +8 | 16 | 10 | 672 | 10 | 168 |
| MAR | +8 | 24 | 10 | 682 | 10 | 178 |
| APR | | 24 | 10 | 692 | 10 | 188 |
| MAY | +8 | 32 | 10 | 702 | 10 | 198 |
| JUN | +8 | 40 | 10 | 712 | -8 | 200 |
| JUL | -40 | | 10 | 722 | 10 | 210 |
| AUG | +8 | 8 | 10 | 732 | 32 | |
| SEP | +8 | 16 | 10 | 742 | 10 | 188 |
| OCT | | 16 | 10 | 752 | 16 | 198 |
| NOV | +8 | 24 | 10 | 762 | 12 | 192 |
| DEC | +8 | 32 | | | 12 | 204 |
| | Used in 2004 | HOLIDAY | Used in 2004 | SICK | Used in 2004 | VACATION |

Check here if perfect attendance 2004 ☐

Leave balances at end of 2004

| HOLIDAY | SICK | VACATION |
|---|---|---|

DEPARTMENT OF CORRECTION   EMPLOYEE TIME CARD   Calendar Year 2004

DEPTID (DDS): _____

Employee Name: _L. (os) John_    SSN: _375 60 9732_   Class Title: _Cpl._

Employment Date: _10-03-94_    Adjusted Service Date: _____

Accrual Rate
Sick: _10_
Vacation: _12-12_

Accrual (hrs per month) - 37.5 hrs: 9.5 / 40.0 hrs: 10
ation (hrs per month) - 37.5 hrs: 9.5, at 10 yrs: 11.25, at 15 yrs: 13.25 / 40 hrs: 10, at 10 yrs: 12, at 15 yrs: 14
CRUALS ARE NOT APPLIED UNTIL THE END OF THE MONTH

Balance Carried Forward

| | HOLIDAY | | SICK | | VACATION |
|---|---|---|---|---|---|
| | | 24 | | 662 | 166 |
| | -16 | 24 | 10 | 672 | 10 | 176 |
| | -8 | 24 | 10 | 682 | 10 | 186 |
| | | 24 | 10 | 692 | 10 | 196 |
| | +8 | 32 | 10 | 702 | 10 | 206 |
| | +8 | 40 | 10 | 712 | -8 | 208 |
| | -40 | | 10 | 722 | 10 | 218 |
| | +8 | 8 | 10 | 732 | -32 | 196 |
| | +8 | 16 | 10 | 742 | 10 | 206 |
| | +8 | 24 | 10 | 752 | 16 | 200 |
| | +8 | 32 | 10 | 762 | 12 | 212 |
| | +36 | 68 | 10 | 772 | 12 | 204 |
| | -68 | | | 782 | 4 | 232 |

| | HOLIDAY | SICK | VACATION |
|---|---|---|---|
| Used in 2004 | 72 | 0 | 60 |

Check here if perfect attendance 2004

Remarks: _Res._

Leave balances at end of 2004

| 8 | 782 | 232 |

E TO TIMEKEEPER: Provide each employee a copy of their timecard
at the end of 2004. Forward the original to Human Resources.
E TO EMPLOYEES: Your leave balances for 2004 are displayed here>>
Review and note accruals at top of card. Resolve discrepancies with your timekeeper.



**WILCOX & FETZER LTD.**

## In the Matter Of:

# Balas

## v.

## Taylor, et al.

### C.A. # 06-592-JJF

_____

### Transcript of:

### Allen Adams

### November 7, 2007

_____

Wilcox and Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: depos@wilfet.com
Internet: www.wilfet.com

Balas v. Taylor, et al.

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CINDY L. BALAS, a/k/a        )
CINDY L. ADKINS, Executrix   )
of the Estate of CORPORAL    )
JOHN J. BALAS,               )
                             )
        Plaintiff,       )
                         ) Civil Action
v.                   )  No. 06-592-JJF
                         )
STANLEY W. TAYLOR, JR.,      )
individually and in his      )
capacity as the Commissioner )
of Correction, et al.,       )
                             )
        Defendants.      )

    Deposition of ALLEN ADAMS taken pursuant to notice
at the law offices of The Neuberger Firm, P.A., Two
East Seventh Street, Wilmington, Delaware, beginning
at 9:38 a.m. on Wednesday, November 7, 2007, before
Lucinda M. Reeder, Registered Diplomate Reporter and
Notary Public.

APPEARANCES:

        STEPHEN J. NEUBERGER, ESQ.
        CHERYL HERTZOG, ESQ.
        The Neuberger Firm, P.A.
          Two East Seventh Street, Suite 302
          Wilmington, Delaware 19801
          for the Plaintiff,

        RALPH DURSTEIN, ESQ.
        STACEY XARHOULAKOS, ESQ.
        Department of Justice
          Carvel State Office Building
          820 N. French Street
          Wilmington, Delaware 19801
          for the Defendants.

        WILCOX & FETZER, LTD.
    1330 King Street - Wilmington, Delaware  19801
            (302) 655-0477
            www.wilfet.com

A0864

## Balas v. Taylor, et al.

| Page 2 |
|---|

1      ALLEN ADAMS,
2    the witness herein, having first been
3    duly sworn on oath, was examined and
4    testified as follows:
5    BY MR. NEUBERGER:
6      Q.  Mr. Adams, my name is Steve Neuberger, and I'm
7    an attorney for the plaintiff in this case, Mrs. Cindy
8    Adkins, formerly Cindy Balas, who is the widow of the
9    late John Balas.
10     A.  Mm-hmm.
11     Q.  Have you ever testified in court before?
12     A.  No.
13     Q.  Have you ever had a deposition taken before?
14     A.  No.
15     Q.  What I am going to do now is, I'll run you
16   through the process just so you know how it works.
17   Okay?
18        I am going to ask you some questions, and
19   the court reporter here is going to type up your
20   answers to those questions.  Okay?
21     A.  Right.
22     Q.  We have to take turns talking because, although
23   she's very good, if we talk at the same time -- we ran
24   into this somewhat yesterday -- she can't get

| Page 3 |
|---|

1    everything down.  Okay?
2      A.  Okay.
3      Q.  You also have to verbalize your answers.  If
4    the answer is no, say no, instead of shaking your
5    head.  If the answer is yes, say yes, instead of
6    nodding your head.  Okay?
7      A.  Okay.
8      Q.  After we're done here, you'll have the
9    opportunity to review the deposition transcript to
10   correct any typographical errors.  Do you understand
11   that?
12     A.  Yes.
13     Q.  If you don't understand a question, just ask me
14   to rephrase it, and I'd be happy to.  All right?
15     A.  Okay.
16     Q.  And the most important thing is I don't want
17   you to guess.  So if you just don't know the answer,
18   just say so.  Okay?
19     A.  Okay.
20     Q.  Now, are you taking any medications today or is
21   there anything else that might prevent you from
22   remembering accurately or testifying truthfully?
23     A.  No.
24     Q.  Also, if you need any breaks just to stretch

| Page 4 |
|---|

1    out your back, run to the john, just let me know.  All
2    right?
3      A.  Okay.
4      Q.  You have taken an oath to tell the truth today.
5    Do you understand the significance of that oath?
6      A.  Yes.
7      Q.  Do you understand that I'm going to be asking
8    you some questions today about a lawsuit brought by
9    Cindy Adkins on behalf of herself and the estate of
10   her late husband?
11     A.  Yes.
12     Q.  Have you talked with anyone about your
13   testimony and your deposition today?
14     A.  Not really.
15     Q.  You said, "Not really."
16     A.  Not really.  I told K9 West.  I told him, I
17   said, "Did you get an e-mail you got to go upstate to
18   give a deposition?"  He said, "I haven't got mine yet.
19   I heard we got to go upstate to give a deposition."  I
20   said, "I got an e-mail."  I told him, "I got an
21   e-mail.  That's a long ride."
22     Q.  So other than that, have you talked with anyone
23   substantively about --
24     A.  No.

| Page 5 |
|---|

1      Q.  -- anything?
2      A.  No.
3      Q.  What's your full name?
4      A.  Allen Isaac Adams.
5      Q.  When were you born?
6      A.  8/27/1977.
7      Q.  Where were you raised?
8      A.  Sussex County.
9      Q.  Where did you go to high school?
10     A.  Sussex Tech.
11     Q.  Okay.  So did you have Carol Schreffler as one
12   of your --
13     A.  She got there after I left.
14     Q.  Okay.  Got ya.  How long have you been working
15   for the DOC?
16     A.  Since 2/4/99.
17     Q.  And what is your current rank?
18     A.  Sergeant.
19     Q.  When were you promoted to sergeant?
20     A.  September of '06.  18th, I believe.
21     Q.  Prior to being promoted to sergeant, what was
22   your rank?
23     A.  Corporal.
24     Q.  And when were you promoted to corporal?

2 (Pages 2 to 5)

Balas v. Taylor, et al.
Allen Adams

| Page 6 | Page 8 |
|---|---|

**Page 6**

1   A.  10/17/04.
2   Q.  Okay.  So in August of 2004, you would have
3   been a CO; right?
4   A.  That's correct.
5   Q.  And do you recall where you were stationed in
6   August of 2004?
7   A.  I was working 12:00 to 8:00 max building at
8   SCI.
9   Q.  Okay, okay.  Were you also serving on the CERT
10  Team at that time?
11  A.  That's correct.
12  Q.  Your CERT assignments usually were they also at
13  SCI?
14  A.  Well, when you are on CERT, you pretty much --
15  you carry a pager, and if there is any emergencies to
16  respond to --
17  Q.  Okay.
18  A.  -- there will be a message sent out over the
19  pager.  So you're SCI CERT Team, but you respond
20  wherever.
21  Q.  Got ya.
22  A.  Okay.
23  Q.  Now, do you recall any happenings in the DOC
24  regarding the union and a public uproar during the

**Page 7**

1   summer of 2004?
2   A.  Yeah.
3   Q.  Could you describe what you remember to me
4   about all that?
5   A.  They had a -- pretty much everybody quit during
6   the overtime at court and trans --
7   Q.  Okay.
8   A.  -- which held up the court system.
9   Q.  Okay.
10  A.  Which started kind of a -- make everything a
11  little tight for administrators and all that kind of
12  stuff, and judges were mad.  And it got in the papers,
13  and then we were called in to do C & T.
14  Q.  By "we," do you mean the CERT Team?
15  A.  The CERT Team, yes.
16  Q.  Was that a big deal back then?
17  A.  Yeah, because, I mean, there were people
18  hollering at us and mad with us because we were going
19  to work and all that kind of stuff.  I mean, it was
20  kind of awkward.
21  Q.  Who was hollering at you?
22  A.  Other officers.  They were mad.  They were --
23  they weren't irate.  They were just kind of like, you
24  guys are doing wrong, you are doing wrong, and all

**Page 8**

1   that kind of stuff.
2   Q.  What was your understanding of why they were
3   yelling that at you?
4   A.  They were upset because we were going to
5   alleviate the situation.
6   Q.  Okay.
7   A.  A little bit.  There wasn't that many.  There
8   was only ten of us that resigned, and I think -- I do
9   remember that there might have been only ten of us
10  there.
11  Q.  Okay.
12  A.  So.
13  Q.  You mentioned the overtime.  You mentioned the
14  staffing of the C & T unit?
15  A.  Right.
16  Q.  Do you recall something which I'll call a job
17  action?
18  A.  Yeah.
19  Q.  Just to jog your memory.
20  A.  That's what some people call it, yeah.
21  Q.  What was your understanding of what that was?
22  A.  They were trying -- the union -- I mean, not
23  the union, but.  I mean, blue shirts in general were
24  just trying to get more money.  We were overworked and

**Page 9**

1   underpaid, and that's what we -- a lot of people
2   said -- you know.
3   I never worked C & T anyway.  I never went
4   out there and worked.  At the time, I didn't need a
5   whole lot of money.  A lot of people, that was a way
6   to get publicity, I mean, to go ahead and stop working
7   at C & T and slow up the court system.
8   Q.  By blue shirts, you are referring to the
9   members of COAD, the rank and file?
10  A.  Right, from CO to sergeant.
11  Q.  At some point, a decision was made and the COs
12  to sergeants for the most part stopped working this
13  overtime?
14  A.  That's correct.
15  Q.  And so then there came a time when CERT was
16  activated?
17  A.  Yes.
18  Q.  Does the date of August 5th or August 6th,
19  2004, does that --
20  A.  Sometime, yes, right around there, yeah.
21  Q.  Do you recall receiving the activation the day
22  before you were supposed to actually show up?
23  A.  Yes.
24  Q.  Now, I would like to focus on that a little

3 (Pages 6 to 9)

Balas v. Taylor, et al.
Allen Adams

Page 10

1  bit. Were you one of the ones who was activated?
2    A.  Yes.
3    Q.  Do you recall who else was?
4    A.  There's ten of us.
5    Q.  Okay.
6    A.  I can't -- Dennis Murray; John Mumford; Lee
7  Mears; David West.
8    Q.  Was John Balas one of them?
9    A.  John Balas, yeah, he was one.  I mean,
10  there's ...
11    Q.  Okay.
12    A.  Who have resigned that day was activated.
13    Q.  Got ya.  So let's still focus on the day before
14  then.  How were you activated?
15    A.  By pager.
16    Q.  By pager.  Okay.  And did you have a meeting
17  with the other CERT members?
18    A.  Yes.
19    Q.  Where was the meeting?
20    A.  At Lee Mears' house.
21    Q.  Lee Mears' house.  Okay.  Was Lee Mears one of
22  the team leaders?
23    A.  Yes.
24    Q.  Did all of these CERT members, all ten -- did

Page 11

1  all ten of the CERT members that you just mentioned,
2  did they all attend the meeting?
3    A.  I don't know if all of them did.
4    Q.  Did most of them attend?
5    A.  I would say eight or nine, maybe.  I don't know
6  if every one of them.
7    Q.  Was John Balas there?
8    A.  Yes.
9    Q.  Do you recall what was discussed at that
10  meeting?
11    A.  Just union -- I mean, like the displeasure of
12  having to do what we had to do.  That's pretty much
13  what was discussed.
14    Q.  The displeasure of doing what we had to do,
15  that would mean staffing the C & T unit?
16    A.  Yes.
17    Q.  Okay, okay.  Do you recall the CERT members who
18  attended the meeting on August 5th of 2004, were they
19  generally in favor of --
20    A.  No.
21    Q.  So, in general, the CERT members who attended
22  that meeting, they were against staffing the C & T
23  unit the next day?
24    A.  For the most -- yeah, I would say so, yeah.

Page 12

1    Q.  Okay, okay.  Do you recall if John Balas spoke
2  up at that meeting at all?
3    A.  Yeah.
4    Q.  Do you recall what he said?
5    A.  Just that he didn't believe that we were doing
6  right, that we were doing blue shirts wrong by going
7  in and working.
8    Q.  Was it your understanding that John was
9  expressing sentiment that you guys should support the
10  union's actions or the actions of the blue shirts?
11    A.  Pretty much, yeah.
12    Q.  Do you recall anyone at the meeting who
13  expressed a different view?
14    A.  Truman was there.  He was there.
15    Q.  Now, that's Truman Mears?
16    A.  Yeah.
17    Q.  He's different than Lee Mears; right?
18    A.  Yes.
19    Q.  Do you recall what Truman said?
20    A.  Truman said, "Wait, and let's not be angry.
21  Let's not make a decision in anger and have a clear
22  head when we make these decisions."
23    Q.  Okay.  Now, what was the reaction to his view
24  at the meeting?

Page 13

1    A.  There was, like, three people that said, Oh,
2  that's crazy, you know, BS, you know.  But there was
3  people like me, hold, you know, and a couple
4  others, you know, you needed to wait and just see.
5  And then it was just kind of an awkward situation.  I
6  was weighing both options.
7    Q.  Was John one of the people who spoke up against
8  what Truman said?
9    A.  He disagreed with him, yeah.
10    Q.  Did Truman seem annoyed?
11    A.  No.  There was no hostility between anybody
12  like that.
13    Q.  So it was just a discussion?
14    A.  It was just a disagreement.
15    Q.  Okay.
16    A.  But it weren't like he did or nothing like
17  that.  I mean nobody stood up.  It weren't like that.
18    Q.  It didn't come to blows or anything?
19    A.  Not even an angry word spoken.  It was just a
20  disagreement, pretty much.  I mean, no, you are wrong
21  no, you are wrong.  It was counterpoint, all that kind
22  of stuff.  People were just sitting there listening.
23  Lee, Balas, Truman, they did most of the talking.
24    Q.  Who organized this meeting?

4 (Pages 10 to 13)

11e0cf30-6e39-42b4-9783-3a9a162947f9

Balas v. Taylor, et al.
Allen Adams

Page 14

1   A.  I think Lee did.
2   Q.  And was it your understanding that it was
3  supposed to be a somewhat secret meeting?
4   A.  I thought it was just whatever CERT members
5  wanted to go.  Truman was on CERT.  But I don't think
6  it was a secret meeting.
7   Q.  Was it your understanding that management was
8  supposed to know about the meeting?
9   A.  I can't -- I don't remember that part.  I mean,
10  they can't stop you from going to somebody's house.
11   Q.  Sure.
12   A.  You know what I mean?
13   Q.  Okay.  Let's move forward to the very next day.
14   A.  Right.
15   Q.  Which I think the record will show was
16  August 6th of 2004.
17   A.  Mm-hmm.
18   Q.  This will be the day where you guys were
19  activated --
20   A.  Right.
21   Q.  -- for your CERT assignment on the C & T unit.
22  Okay?
23   A.  Right.
24   Q.  Do you recall roughly or approximately what

Page 15

1  time you reported to the unit?
2   A.  It was maybe between 6:00 and 7:00.  I can't
3  give a direct time.
4   Q.  Then so you showed up at the -- and the unit is
5  at SCI; right?
6   A.  That's correct.
7   Q.  So you show up at SCI?
8   A.  Mm-hmm.
9   Q.  Did you run into any other COs while you were
10  there?
11   A.  Yeah.
12   Q.  And I think you mentioned this before, but I
13  want to focus on it a little bit now.  What was the
14  general reaction of the other COs that you ran into?
15   A.  Negative.
16   Q.  Negative.  Do you recall the kinds of things or
17  the types of things that they said?
18   A.  Just like: "You are not doing right, you are
19  doing wrong."  That type of thing.  "Make sure you do
20  your duty, good Lord."  You know, that kind of -- you
21  know, just little wise cracks.
22   Q.  What was your understanding of what they were
23  referring to?
24   A.  Just us going and doing our job, I mean.

Page 16

1   Q.  This would be the --
2   A.  Going in and running the C & T because no one
3  was there to run it.
4   Q.  And no one was there to run it because of the
5  job action; right?
6   A.  Because nobody was doing the overtime.
7   Q.  So was it your understanding that these other
8  officers appeared to be unhappy with you and your
9  fellow CERT officers for showing up and filling those
10  vacancies which were being caused by the general
11  refusal --
12   A.  Yes.
13   Q.  -- of the COs to work overtime?
14   A.  That's probably right, yeah.
15   Q.  So you showed up that day and you did your job;
16  right?
17   A.  Yeah.
18   Q.  Do you recall if -- was the C & T unit busy
19  that day?
20   A.  I don't know.  I never worked C & T before, so
21  I couldn't gauge that.
22   Q.  Do you recall how many prisoners were
23  transported that day?
24   A.  I didn't transport none.  I went directly to

Page 17

1  the courthouse.  They made the C & T people -- the
2  people that worked the unit, they took them to
3  wherever they needed to go.  We just went to Sussex
4  County Courthouse, worked cell block, took guys up to
5  see the judge.
6   Q.  Did you actually transport anybody between
7  courthouse and the prisons?
8   A.  And the prisons?  No.  I didn't.  I don't know
9  anybody did.  Might have.  I didn't.
10   Q.  Got ya.  Did you ever talk to a major,
11  Major David Hall about why CERT had been activated?
12   A.  Yeah.
13   Q.  Could you recall that conversation for me?
14   A.  He was telling us that there was a couple plans
15  to be used -- we were kind of angry that we had to be
16  used.  He said people above him made a call that we
17  were to be used, and we were to do our job.
18   Q.  Okay.
19   A.  And he was sorry we had to be put into this
20  position, but, you know, we had to do the things that
21  were asked of us.  So we told him, okay, but we're
22  going to resign at the end of the day.
23   Q.  What was his reaction to that?
24   A.  He didn't -- he weren't -- didn't get really

5 (Pages 14 to 17)

11e0cf30-6e39-42b4-9783-3a9a162947f9

A0868

Balas v. Taylor, et al.
Allen Adams

Page 18

1  angry.  He was disappointed, maybe, a little, like.  I
2  mean, it weren't a positive reaction.
3     Q.  Did you perceive it as being a negative
4  reaction?
5     A.  Not negative, like.  He didn't use no foul
6  language to us or nothing like that.  He just said,
7  "Are you sure you guys want to do this?"  We like:
8  "Yeah, we don't agree with what's going on."  He's
9  like, all right.  He tried to talk us out of it a
10  little bit, but then he just went on.
11     Q.  Did he seem happy with your decision?
12     A.  No, he didn't seem happy, no.
13     Q.  Did he ever say who the order came from, the
14  order to activate you?
15     A.  No.
16     Q.  Now, when your shift ended, did you resign?
17     A.  Yeah, we went into the warden's office.  And we
18  all had a little -- one of these tablets that we
19  resign our position as CERT members of SCI and we
20  signed at the bottom, and there was ten of us.
21     Q.  Who was the warden at the time?
22     A.  Rick Kearney.
23     Q.  Rick Kearney.  So he was the warden, not the
24  deputy warden; right?

Page 19

1     A.  Right.  That's correct.
2     Q.  So at some point during the day prior to going
3  to the warden's office, did you and the other CERT
4  members discuss what you were going to do?
5     A.  Yes.
6     Q.  Do you recall any of those discussions?
7     A.  Rick Kearney came out there and talked to us
8  about resigning.  He said, "I wouldn't do it."  Rick
9  always had very good relations with officers.
10     Q.  Okay.
11     A.  I mean, he was looked upon positively as a good
12  administrator --
13     Q.  Okay.
14     A.  -- in his regards to us and him.  And he came
15  out there.  Dave had him come out there and talk to us
16  to try to change our minds.  He said, "I think you
17  guys are going to lose the court case today," which we
18  didn't.  You know what I mean?
19     Q.  Sure.
20     A.  He said, "I think you're making the wrong
21  decision."
22     Q.  So the record is clear, by the court case, you
23  are referring to the lawsuit that was brought against
24  the Union in the Delaware Court of Chancery by the

Page 20

1  Department of Corrections?
2     A.  Yes.
3     Q.  Sorry.  Correction.  It's singular, not plural.
4  There is no S on it?
5     A.  Department of correction.  Yes.
6     Q.  Okay.
7     A.  Correct.
8     Q.  All right.  So do you recall anything John said
9  during your discussion prior to going to the warden's
10  office and resigning?
11     A.  He just said, "We're doing the right thing."
12     Q.  "We're doing the right thing."  And what was
13  your understanding of what he was referring to?
14     A.  Just resigning at the end of the day.  A lot of
15  people on the team thought we were doing the right
16  thing.
17     Q.  Was John one of them?
18     A.  Yeah.
19     Q.  Was John a supporter of the union in this
20  regard?
21     A.  Yeah, I guess.  Yeah.
22     Q.  Now, when you went into the warden's office,
23  you and the other nine CERT members --
24     A.  Right.

Page 21

1     Q.  -- did you go in and close the door behind you?
2     A.  We sat at a table like this.
3     Q.  Okay.
4     A.  A round circular table that went to the left as
5  you walk into the office.  And we all sat down, and
6  Rick sat down, and he's like talking to us, and he
7  says, "Are you sure you guys want to do this?"  And
8  we're, like, yeah.  He says, "All right."  He says, I
9  know, you know, wages are low and all that stuff."  He
10  was very -- he wasn't negative at all.  I mean, he
11  just wasn't.  I mean, he was disappointed because, you
12  know, you lost ten guys that have been trained and
13  went through all the stuff we had to go through to get
14  on the team and all that kind of stuff.  I mean, he
15  wasn't -- he was very -- I wouldn't say understanding.
16  I could tell he didn't want us to do it, but.  He was
17  okay with it.  You know what I mean?
18     Q.  Sure.  Did any of the other CERT members say
19  anything to the warden about why this was being done,
20  why you were resigning?
21     A.  We talked about it.  There was a couple guys.
22  We said, "We just don't believe we're being treated
23  fairly."
24     Q.  Okay.

Wilcox and Fetzer, Ltd.  Registered Professional Reporters          302-655-0477

11e0cf30-6e39-42b4-9783-3a9a162947f9

A0869

Balas v. Taylor, et al.
Allen Adams

| Page 22 | Page 24 |
|---|---|
| 1   A.  You know.  And Rick said, "I understand your<br>2  guys' decision.  I don't agree with it, but I can<br>3  understand your decision."<br>4   Q.  Was John one of the --<br>5   A.  He talked.  John did most of the talking.<br>6   Q.  John did most of the talking?<br>7   A.  John and Lee Mears, them two.  They were --<br>8  well, I don't know if Balas -- he wasn't a team<br>9  leader, but Lee was.  Lee was very looked upon -- I<br>10  mean, he was a leader, you know.<br>11   Q.  It was John and Lee Mears who did most of the<br>12  talking during this meeting?<br>13   A.  Yes.<br>14   Q.  Ultimately, the meeting ended with all of you<br>15  resigning?<br>16   A.  Yes.<br>17   Q.  You mentioned you all signed some kind of a<br>18  pad?<br>19   A.  Something like that, a yellow note pad?<br>20   Q.  Like a yellow legal pad, a yellow note pad of<br>21  some kind?<br>22   A.  Yes.<br>23   Q.  What did the pad say, do you recall?<br>24   A.  We're just resigning.  I can't recall exact | 1   A.  No.<br>2   Q.  Did you ever talk to Truman about it?<br>3   A.  Not really.  Not -- I didn't talk to Truman<br>4  till -- he was on swing shift.  I was on midnight to<br>5  8:00.  I probably didn't talk to Truman till<br>6  Major Townsend died.<br>7   Q.  When did Major Townsend die?<br>8   A.  He died in August of '05.<br>9   Q.  Okay.<br>10   A.  And they had a thing.  He talked about me going<br>11  back on CERT.  I told him I wasn't mad with him and<br>12  drank a couple beers.  It's ....<br>13   Q.  Okay.  All right.  Did you ever hear about<br>14  management being angry with John?<br>15   A.  No, no.<br>16   Q.  Did you ever receive any negative comments or<br>17  disapproving looks from members of management which<br>18  you understood to be in reference to your resignation<br>19  from CERT?<br>20   A.  Right.  No.<br>21   Q.  Did you ever talk to John about the CERT<br>22  resignation after August 6th of 2004?<br>23   A.  Not really, no.  Because pretty much, I never<br>24  seen him after that because the only connection we had |

| Page 23 | Page 25 |
|---|---|
| 1  word for word, verbatim.  But we are resigning our<br>2  position as CERT members effective this date and we<br>3  signed at the bottom of it.  We had ten signatures at<br>4  the bottom of it.  That was it.<br>5   MR. NEUBERGER:  Counsel, was that document<br>6  in the document production?<br>7   MR. DURSTEIN:  I don't think I've ever seen<br>8  it.<br>9   MS. XARHOULAKOS:  I have never seen or<br>10  heard of it, no.<br>11   MR. NEUBERGER:  I guess I would like to<br>12  renew a request that you guys can see if it is still<br>13  around in the warden's office or whatever his position<br>14  is now, whether he still has it.  Okay?<br>15   MS. XARHOULAKOS:  Sure.<br>16  BY MR. NEUBERGER:<br>17   Q.  Now, after you resigned, did you get any -- you<br>18  resigned on August 6th of 2004.<br>19   A.  Mm-hmm.<br>20   Q.  From that point thereafter, for the next couple<br>21  months, did you get any grief from management about<br>22  your resignation?<br>23   A.  No.<br>24   Q.  Okay.  Did you ever hear that anyone else did? | 1  was the CERT Team.<br>2   Q.  Got ya.<br>3   A.  I might see him coming through, and he saw I<br>4  got promoted to corporal.  He said, "Oh, you lost<br>5  5 percent; you got it right back."  I mean, that's<br>6  with John.<br>7   Q.  Okay.<br>8   A.  I didn't drink -- other than that, I wasn't<br>9  real close with John like that.<br>10   Q.  Did John have a good way about him?<br>11   A.  Yeah.  I liked John.  I did.<br>12   Q.  Just from your experiences working with him,<br>13  was he a hard worker?<br>14   A.  I never worked with him like -- he worked in<br>15  the receiving room, and I never worked with him like<br>16  that.  But from CERT Team, he was very supportive of<br>17  all us.  That's my relationship with John, was:  We<br>18  were all on CERT together; he was together with all<br>19  us.<br>20   Q.  From what you were able to observe, was he well<br>21  liked?<br>22   A.  By some and disliked by others.<br>23   Q.  Did he have that kind of personality where<br>24  either you love him or you hate him? |

Wilcox and Fetzer, Ltd.  Registered Professional Reporters          302-655-0477

11e0cf30-6e39-42b4-9783-3a9a162947f9

A0870

Balas v. Taylor, et al.
Allen Adams

| Page 26 |
| --- |

1   A.  Yeah, I guess.  That's probably correct.
2   Q.  Now, putting aside whether he was well liked or
3   not, do you think he was respected by his co-workers?
4   A.  Yeah.
5   Q.  From your interactions, did you think he was a
6   man of personal integrity?
7   A.  I mean, from what I knew of him, I never knew
8   him to lie to me or nothing like that.  I don't know,
9   like, when you say integrity, I mean.
10  Q.  Just from your own interactions with him.
11  A.  I thought he was a pretty good guy.  That's
12  about it.
13  Q.  During the course of your daily duties, you
14  have to sort of fill out a time card sometimes?
15  A.  No.
16  Q.  No?
17  A.  No.
18  Q.  Who does that?
19  A.  There is a lady in the business office that
20  does it.
21  Q.  So even when you were a CO and then a corporal,
22  how was your time kept track of?
23  A.  It changed.  It did change.  Your lieutenant
24  did that.

| Page 27 |
| --- |

1   Q.  So there was a time --
2   A.  At the time, at the time, your lieutenant did
3   it, but then it changed and the people in the business
4   office do it now.
5   Q.  So let's talk about the time -- focus on the
6   time period and the time frame when the lieutenant
7   kept track of those things.
8   A.  Mm-hmm.
9   Q.  Did you ever take a look at your time cards?
10  A.  Yeah, he would stop -- at the time, the
11  lieutenant would come in.  You would have this sheet
12  and it was all the days of the year.  And it said:
13  You were sick this amount of days; and you were
14  healthy and you came to work this amount of days; you
15  used this amount of vacation; and used this amount of
16  holidays.
17  Q.  Okay.
18  A.  And you would sign it, and that was it.
19  Q.  So there is, like, vacation days, there's sick
20  days, there's holidays?
21  A.  And there is FMLA.  There is a few things.
22  Q.  Right.  There is compassionate leave --
23  A.  Right.
24  Q.  -- if you have a death in the family?

| Page 28 |
| --- |

1   A.  Comp time, if you got it.
2   Q.  Okay.  Have you ever heard of emergency
3   vacation days?
4   A.  Yes.
5   Q.  What is that?
6   A.  It's like, I don't know, you call in, and my
7   car broke down or, you know, my chickens are dying or
8   something.  You know what I mean?  And I need to get
9   in there to fix the water line to the chicken house.
10  You know what I mean?  Just something like that
11  happened.  Say, all right, I'll give you emergency
12  vacation.
13  Q.  So an emergency vacation day, is that more of a
14  last-minute thing?
15  A.  Yeah.  My kid, he just got really sick, and I
16  have to take him to the hospital, broke his arm, or
17  God forbid, something really bad happened, you know.
18  Q.  Versus, like, a month in advance taking a week
19  off to go down to --
20  A.  That's not an emergency, that's a vacation.
21  Q.  So, like if you want to take a week off to go,
22  like, see some stock car races in North Carolina --
23  A.  Yeah, you have to fill out what the department
24  has, a 59-D form.  You fill it out.  You give it to

| Page 29 |
| --- |

1   Joe McGrath.  He's the scheduling officer.  He says,
2   "Okay, Bud."  Clips the thing, and you go on your way.
3   Q.  If you take an emergency vacation day, does
4   that sort of leave your shift or your assigned shift
5   in a little bit of flux to sort of fill in your spot?
6   A.  Yeah, I guess.
7   Q.  Is that viewed upon well by management, these
8   last-minute callouts because the water line in the
9   chicken house broke?
10  A.  Well, you know, it depends on the numbers.  You
11  have got sixty-some people you have to have on shift
12  or fifty-some on midnights.  If the watch commander
13  has 51, it's not a big deal.  Or if we were down to 48
14  and -- 47, and one calls out, then you're really in a
15  bind, you know.
16  Q.  Got ya.  So it depends on staffing levels?
17  A.  That's correct.
18  Q.  So it could be a --
19  A.  Or if the State has a thing with, you know,
20  they want to cut back on money, it goes through that,
21  too.  I mean, there is cycles of that, too, where they
22  don't want to use overtime.  Then they can just run
23  short.  It goes back to staffing.  You're, you know,
24  probably correct.

8 (Pages 26 to 29)

11e0cf30-6e39-42b4-9783-3a9a162947f9

A0871

Balas v. Taylor, et al.
Allen Adams

Page 30

1    Q.  So sometimes emergency vacation days could be a
2  nonissue, sometimes they could be an issue depending
3  on staffing?
4    A.  Yeah.
5    Q.  I'm still back on the chicken house thing.
6    A.  I messed you up.  I'm sorry.
7    Q.  I'm sorry.
8    A.  There is officers there that have farms and
9  stuff, you know.
10   Q.  When did you join CERT?
11   A.  May of 2000.  Well, I graduated from CERT
12 May of '05 after two months, so.  Basic.  You are not
13 really a CERT member till you graduate.
14   Q.  May of '05 or May of '04?
15   A.  No.  May of 2000.  I'm sorry.  It's been so
16 long ago.
17   Q.  Okay.  Fair enough.
18   A.  May of 2000.
19   Q.  Do you recall working with John Balas on any
20 CERT call-ups in the year 2004 prior to the August '04
21 call-up regarding the C & T unit?
22   A.  No, not working with him, no.
23   Q.  I mean, on CERT.
24   A.  Right.  The only thing I can remember was there

Page 31

1  was a time that we had a shakedown work release a
2  couple times, something like that.  And I don't know
3  if he was even there or not.  I am not sure.  I think
4  there was -- if it was on a Friday, it is his day off.
5  And his kid was go-cart racing and all that kind of
6  stuff.
7    Q.  Okay.
8    A.  So he might not have been there.  And that
9  wasn't a big deal.  Nobody even cared, sometimes, if
10 you call Radcliffe upstate and said, you know, I'm on
11 my day off and I ain't going to be here, if it's --
12 there is a difference between a riot and somebody has
13 got a knife to their throat and doing a shakedown in
14 work release, you know.
15        MR. NEUBERGER:  Okay.  Got ya.
16        Counsel, I have no further questions.
17        MS. XARHOULAKOS:  Okay.  I guess reading
18 and signing.
19        (Deposition concluded at 10:09 a.m.)
20        -- -- -- --
21
22
23
24

Page 32

REPLACE THIS PAGE

WITH THE ERRATA SHEET

AFTER IT HAS BEEN

COMPLETED AND SIGNED

BY THE DEPONENT.

Page 33

1  State of Delaware  )
2  New Castle County  )
3
4        CERTIFICATE OF REPORTER
5
6        I, Lucinda M. Reeder, Registered Diplomate
   Reporter, Certified Real-time Reporter and Notary
   Public, do hereby certify that there came before me on
7  November 7, 2007, the witness herein, ALLEN ADAMS, who
   was first duly sworn by me and thereafter examined by
8  counsel for the respective parties; that the questions
   asked of said witness and the answers given were taken
9  down by me in Stenotype notes and thereafter
   transcribed by use of computer-aided transcription and
10 computer printer under my direction.
11      I further certify that the foregoing is a true
   and correct transcript of the testimony given at said
12 examination of said witness.
13      I further certify that I am not counsel,
   attorney, or relative of either party, or otherwise
14 interested in the event of this suit.
15
16
17
                              Lucinda M. Reeder
18 Lucinda M. Reeder, RDR, CRR
   Certification No. 132-RPR
   (Expires January 31, 2008)
19
20
21 DATED:   11-24-07
22
23
24

9 (Pages 30 to 33)

11e0cf30-6e39-42b4-9783-3a9a162947f9



WILCOX & FETZER LTD.

# In the Matter Of:

# Balas

## v.

# Taylor, et al.

### C.A. # 06-592-JJF

———————————————

## Transcript of:

### Scott E. Bradley, Sr.

### November 13, 2007

———————————————

Wilcox and Fetzer, Ltd.
Phone:  302-655-0477
Fax:  302-655-0497
Email:  depos@wilfet.com
Internet:  www.wilfet.com

Balas v. Taylor, et al.

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CINDY L. BALAS, a/k/a        )
CINDY L. ADKINS, Executrix   )
of the Estate of CORPORAL    )
JOHN J. BALAS,               )
                             )
        Plaintiff,      )
                        ) Civil Action
v.                      ) No. 06-592-JJF
                        )
STANLEY W. TAYLOR, JR.,    )
individually and in his      )
capacity as the Commissioner )
of Correction, et al.,       )
                        )
        Defendants.    )

   Deposition of SCOTT E. BRADLEY, SR., taken
pursuant to notice at the law offices of The Neuberger
Firm, P.A., Two East Seventh Street, Wilmington,
Delaware, beginning at 9:38 a.m. on Tuesday,
November 13, 2007, before Lucinda M. Reeder,
Registered Diplomate Reporter and Notary Public.

APPEARANCES:

        STEPHEN J. NEUBERGER, ESQ.
        CHERYL HERTZOG, ESQ.
        The Neuberger Firm, P.A.
          Two East Seventh Street
          Wilmington, Delaware 19801
          for the Plaintiff,

        STACEY XARHOULAKOS, ESQ.
        Department of Justice
          Carvel State Office Building
          820 N. French Street
          Wilmington, Delaware 19801
          for the Defendants.

        WILCOX & FETZER, LTD.
     1330 King Street - Wilmington, Delaware  19801
            (302) 655-0477
            www.wilfet.com

224d72b2-6e9c-499e-883a-a8d5252cef53

Balas v. Taylor, et al.

Page 2

1      SCOTT EDWARD BRADLEY, SR.,
2      the witness herein, having first been
3      duly sworn on oath, was examined and
4      testified as follows:
5  BY MS. HERTZOG:
6   Q.  Is it corporal?
7   A.  Yes, ma'am.
8   Q.  My name is Cheryl Hertzog.  I am the lawyer for
9  the plaintiff, Cindy Adkins, formerly Cindy Balas, and
10 she's the widow of Corporal John Balas.  Have you ever
11 testified in Court before?
12  A.  No, ma'am.
13  Q.  Have you ever had your deposition taken before?
14  A.  I have talked to a group of lawyers before.  I
15 don't know if -- we didn't have a court person there,
16 but.
17  Q.  Okay.  I am going to ask you some questions,
18 and the court reporter here is going to type up your
19 answers to those questions.  Okay?
20  A.  Okay.
21  Q.  We have to take turns talking.  If we talk at
22 the same time, she can't get down everything that
23 we're saying.  Okay?
24  A.  Okay.

Page 3

1   Q.  Also, you have to verbalize your answers.  For
2  example, you can't nod your head.  You'll just have to
3  say, "Yes."  Okay?
4   A.  Fine.
5   Q.  After we're done here today, you'll have an
6  opportunity to review the transcript of the deposition
7  and to make any corrections if there are any
8  typographical errors.  Okay?
9   A.  Okay.
10  Q.  If I ask you a question you don't understand,
11 just ask me to rephrase it.  I'll be happy to do that
12 for you.  Okay?
13  A.  Okay.
14  Q.  Also, I don't want you to guess.  If you don't
15 know the answer to the question, just say so.
16  A.  Fine.
17  Q.  Are you taking any medications today or is
18 there anything else that would prevent you from
19 remembering accurately or testifying truthfully today?
20  A.  No, ma'am.
21  Q.  If you need any breaks, just let me know.
22  A.  Okay.
23  Q.  Now, you have taken an oath to tell the truth
24 today and you understand the significance of that

Page 4

1  oath?
2   A.  Yes, ma'am.
3   Q.  Do you understand I'm going to be asking you
4  questions today about the allegations related to a
5  lawsuit filed by Cindy on behalf of her late husband,
6  Corporal John Balas, in U.S. District Court for the
7  District of Delaware in September of '06?
8   A.  Yes, ma'am.
9   Q.  Have you met with anyone prior to your
10 deposition?
11  A.  I met with her.
12  Q.  "Her" being defense counsel?
13  A.  Yes, ma'am.  I'm sorry.
14  Q.  That's fine.  Anybody else?
15     MS. XARHOULAKOS:  Mr. Durstein.
16     THE WITNESS:  Yes.
17 BY MS. HERTZOG:
18  Q.  Nobody else?
19  A.  No.
20  Q.  Have you talked to anybody in your office about
21 this at all or any co-workers?
22  A.  We might discuss amongst each other in passing
23 as far as if we have been up here yet or not, but
24 nothing in depth, no.

Page 5

1   Q.  I'm just going to go through a little
2  background.  What is your full name?
3   A.  Scott Edward Bradley, Sr.
4   Q.  Where were you born?
5   A.  In Milford, Delaware.
6   Q.  You were raised in?
7   A.  Georgetown.
8   Q.  Where did you go to high school?
9   A.  Sussex Central High School.
10  Q.  What did you do after high school?
11  A.  Went to work.
12  Q.  For?
13  A.  I worked for Nanticoke Hospital for a little
14 while, Baker's Hardware, and now the Department of
15 Corrections.
16  Q.  When did you start working at the Department of
17 Corrections?
18  A.  April of 2000.
19  Q.  You started out as a CO, correctional officer?
20  A.  Yes, ma'am.
21  Q.  When did you get promoted to corporal?
22  A.  December 24th of 2006.
23  Q.  Your current rank is corporal?
24  A.  Yes, ma'am.

2 (Pages 2 to 5)

224d72b2-6e9c-499e-883a-a8d5252cef53

Balas v. Taylor, et al.
Scott E. Bradley, Sr.

| Page 6 | Page 8 |
|---|---|
| 1   Q.   What do your responsibilities entail as a<br>2 corporal?<br>3   A.   What my job is at the jail?<br>4   Q.   Yes.<br>5   A.   I work at the front counter.  I wand officers<br>6 and people as they come into the institution.<br>7   Q.   What position did you hold from August of '04<br>8 to, let's say, February of '05?<br>9   A.   I was a CO working at the program counter in<br>10 admin building in the pretrial section.<br>11   Q.   That is at the Sussex Correctional Institution?<br>12   A.   Yes, ma'am.<br>13   Q.   Have you ever worked anywhere else?<br>14   A.   I worked at DCC from 2000 till, I believe it<br>15 was between right around the year 2002.  I was there<br>16 almost two years.<br>17   Q.   Now, since you started working with the<br>18 Department of Corrections in April of 2000, have you<br>19 been a member of COAD, the Correctional Officers<br>20 Association of Delaware?<br>21   A.   Yes, ma'am.<br>22   Q.   Were you a member of COAD in August of 2004?<br>23   A.   Yes, ma'am.<br>24   Q.   Do you know if John Balas was a member of COAD | 1   Q.   So you don't know if he was respected by<br>2 inmates or other co-workers?<br>3   A.   That I am not sure about, say, because if we<br>4 worked together, it would be a lot easier.  But we<br>5 never worked together.  The only time we really seen<br>6 each other was on CERT, and that's once a month.<br>7   Q.   Are you familiar with his personality, though,<br>8 outside of work?<br>9   A.   Mm-hmm.<br>10   Q.   What kind of person was he?<br>11   A.   I liked him.  He was fun.  He kept things<br>12 interesting.<br>13   Q.   Was he a tough guy?<br>14   A.   He lied to act tough.<br>15   Q.   Was he sensitive?<br>16   A.   He was a joker.  Let's put it that way.  He<br>17 would joke around.  He kept things interesting,<br>18 especially on CERT.<br>19   Q.   Was he a man of personal integrity?<br>20   A.   I know he liked his kids.  He loved his kids to<br>21 death.  He always talked about them, the racing and<br>22 stuff like that, so.<br>23   Q.   Was he trustworthy at all?<br>24   A.   I would trust him. |

| Page 7 | Page 9 |
|---|---|
| 1 in August of 2004?<br>2   A.   I'm not sure.<br>3   Q.   Did you know John Balas?<br>4   A.   Yes, ma'am.<br>5   Q.   How did you know him?<br>6   A.   We were, I guess you could say, friends.  I<br>7 mean, we knew of one another prior to me coming down<br>8 to SCI and then we were on CERT together.<br>9   Q.   How did you know him before coming to SCI?<br>10   A.   Just from working at the hardware store.<br>11   Q.   Are you aware of what kind of employee John<br>12 Balas was?<br>13   A.   We never worked together.  So, I mean, if we<br>14 seen each other at work, it was just in passing,<br>15 either him coming or me leaving or vice versa.  We<br>16 never -- we wasn't on the same shift.<br>17   Q.   Do you know if he was a hard worker at all?<br>18   A.   I am not sure.  I can't answer that honestly.<br>19 We never worked together.<br>20   Q.   Do you know if he was well liked by his<br>21 co-workers?<br>22   A.   I, I would say -- I mean, a couple of us were<br>23 on CERT together.  But as far as how they got along<br>24 together, I am not sure.  We never worked together. | 1   Q.   Was he honest?<br>2   A.   I would say -- you know, I would say, towards<br>3 us he would be, yeah.  He never did anything to me to<br>4 show any different.<br>5   Q.   So you wouldn't consider him a liar?<br>6   A.   Not that -- I mean, he's never lied to me, but<br>7 that doesn't -- I mean, we were friends, so I guess he<br>8 wouldn't.<br>9   Q.   I am going to take you back to the summer of<br>10 2004.<br>11   A.   Okay.<br>12   Q.   Were there a lot of things going on in the<br>13 Department of Corrections during that time?<br>14   A.   Are you talking about with the overtime and all<br>15 that?<br>16   Q.   Right.<br>17   A.   Yes, ma'am.<br>18   Q.   Can you describe what was going on?<br>19   A.   Well, we're not allowed to do a work stoppages,<br>20 as everybody is aware of.  The only thing we did was<br>21 stopped doing overtime for C & T, all the people<br>22 working inside just wouldn't do overtime for C & T.<br>23 And that's when the CERT time got activated.<br>24   Q.   Were you aware that the Department of |

3 (Pages 6 to 9)

224d72b2-6e9c-499e-883a-a8d5252cef53

A0876

Balas v. Taylor, et al.
Scott E. Bradley, Sr.

| Page 10 |
|---|

1  Correction was facing various issues, like staffing
2  levels or understaffing?
3    A.  Yes, ma'am.
4    Q.  How about concerns about low wages?
5    A.  That's all of our concerns.
6    Q.  How about concerns about retaining qualified
7  officers?
8    A.  I would say yes to that because, I mean, they
9  get training, they leave to go get more money.  You
10 can't blame them, so.
11   Q.  But did the Department of Correction have
12 trouble retaining officers?
13   A.  You want my personal opinion or what the State
14 is going to tell you?
15   Q.  I want to hear your personal opinion.
16   A.  My personal opinion is, yes.  But if you ask
17 them, we don't have a problem.
18   Q.  I think you said earlier a little bit there
19 were some problems with overtime, and that included
20 voluntary and involuntary overtime?
21   A.  Correct.
22   Q.  Were there also some security lapses in the
23 Department of Correction prisons at that time?
24   A.  I would say, no.

| Page 11 |
|---|

1    Q.  Are you aware of the Cassie Arnold rape
2  incident?
3    A.  Yes.
4    Q.  Was that a security breach?
5    A.  I wasn't there.  I couldn't make any comments
6  on that.  I was at SCI at that time.
7    Q.  Eventually, there was a job action, where there
8  was a refusal to accept voluntary overtime; correct?
9    A.  Correct, for C & T.
10   Q.  In about August of '04, the Department of
11 Correction filed a lawsuit against the COAD union and
12 its officers.  Are you aware of that?
13   A.  I don't remember anything about that.  But it's
14 possible.
15   Q.  During the midst of all this, and I believe you
16 said you were a COAD member, the union was trying to
17 negotiate a new contract With the Department of
18 Correction; correct?
19   A.  Correct.
20   Q.  There were, we'll call them, differences of
21 opinions, as to -- between the union and management
22 about how to address those various issues?
23   A.  Okay.
24   Q.  Are you aware of that?

| Page 12 |
|---|

1    A.  Well, I say -- okay.  It's -- I don't -- I'm a
2  member of the COAD, but I don't go to the meetings.  I
3  don't do none of that mess.
4    Q.  So you weren't really --
5    A.  I am not -- I don't get to all that gibber,
6  jabber mess that they get into, the papers, and
7  everything.  I just go there, do my job.  They get the
8  money out of my check each pay period.  And we stroke
9  on.
10   Q.  Okay.  During that time, were you aware that
11 there was a lot of media attention --
12   A.  Yes.
13   Q.  -- to the types of issues I just --
14   A.  Yes, I do remember all that.
15   Q.  Do you remember the legislature was giving some
16 attention to the issues?
17   A.  Are you talking -- is that where they were
18 trying to get us more money or trying to look into the
19 shortages and all that?
20   Q.  Yeah, the legislature being the State Senate
21 and the House of Representatives.
22   A.  Yes.
23   Q.  Are you aware if this was an issue in the
24 upcoming gubernatorial election?

| Page 13 |
|---|

1    A.  I am not sure.
2    Q.  Are you aware in August of 2004 through
3  November of 2004 what job John Balas was in?
4    A.  I would say he was in the receiving room.
5  That's where he always worked at.
6    Q.  And that was at SCI?
7    A.  Yes, ma'am.  That's where I would assume he was
8  still at.  That's where he was at as far as I knew,
9  so.
10   Q.  Okay.  And I believe you said you were a member
11 of CERT and CERT is the correctional -- what does CERT
12 stand for?
13   A.  Correctional Emergency Response Team.
14   Q.  What were your duties on the CERT Team?
15   A.  The same as everybody else's, we just -- if we
16 had an emergency situation, then they would activate
17 us and then we would go in and answer to our CERT
18 commanders and carry out the duties as needed to end
19 the emergency.
20   Q.  Was John a member of CERT?
21   A.  Yes.
22   Q.  Were his duties the same as what you just
23 described?
24   A.  Yes, ma'am.

4 (Pages 10 to 13)

224d72b2-6e9c-499e-883a-a8d5252cef53

A0877

Balas v. Taylor, et al.
Scott E. Bradley, Sr.

Page 14

1  Q.  Are you aware of John's performance on the CERT
2  Team?
3   A.  We would see each other once a month, and
4  that's where it would be, at CERT training.
5   Q.  Were you aware of any problems with John on the
6  CERT Team.
7   A.  That's the interesting part with John. That's
8  remember where I told you he was interesting. Because
9  he would keep things stirred up, if you would say. He
10  knew which buttons to push for people head of CERT.
11  He would push their buttons to make things go a lot
12  longer during the day when we had trainings.
13   Q.  What do you mean by go a lot longer during the
14  day?
15   A.  Well, like if we were doing riot control for
16  training that day, for example, he would bring up
17  something, I guess that they had trained before just
18  to get them in an uproar so we would have to stay out
19  there longer, it seemed like. Because we used to
20  tease him when we rode together he had to be quiet
21  that day when we went to training so we could get out
22  of there sooner.
23   Q.  Now, we talked a little bit about the job
24  duties of CERT. What would have happened if John had

Page 15

1  refused to perform those job duties?
2   A.  Well, if you refuse a mission, then you can be
3  kicked off the team.
4   Q.  In early of August of '04, I want to focus on
5  that, that time area. I know you talked a little bit
6  about it. You said that there were CERT members
7  activated. Do you remember when that was?
8   A.  I don't remember the exact date. I was one of
9  the five, so.
10   Q.  If I told you about August 5th of '04, would
11  that --
12   A.  I wouldn't be able to argue. I can't remember
13  the exact date. I knew there was a group of us that
14  got activated from SCI. There was a group, I think it
15  was five of us.
16   Q.  Would August 5th sound about right?
17   A.  It could have been, yes, ma'am.
18   Q.  Who were the -- you said there were five. Who
19  were the five CERT members activated that day?
20   A.  I know it was myself, John, Jeff Foskey, Lee
21  Mears, and I believe it was Allen Adams, I think is
22  the five of us.
23   Q.  You said John was activated that day?
24   A.  Yes.

Page 16

1   Q.  How did you find out about the activation?
2   A.  We go through our pagers.
3   Q.  Are you aware who gave the official order?
4   A.  No, ma'am. We get it through our pagers. It
5  would come across you would be activated, you know, at
6  this time, or whatever, and where to report to.
7   Q.  So you didn't hear anything about who gave the
8  official order to activate the CERT Team that day?
9   A.  No, ma'am.
10   Q.  The night before you were activated -- I'm
11  sorry, the night, I guess -- well, you got the
12  notification on August 5th, you think?
13   A.  We get the activation, I think it was the day
14  prior to our true activation.
15   Q.  And the night that you got the activation, was
16  there a meeting held?
17   A.  Yes, ma'am.
18   Q.  Where was that meeting held?
19   A.  Lee Mears' house.
20   Q.  Was it a secret meeting?
21   A.  No, ma'am. We met at his house because he had
22  his kids -- he couldn't leave because he had his
23  children, so we all chose to meet there so we could --
24  since he was one of the five being activated, that's

Page 17

1  where we met at.
2   Q.  What was the purpose of the meeting?
3   A.  To discuss the activation.
4   Q.  What was said at the meeting?
5   A.  That we were going to do the activation and
6  after it was done, it's up to everybody's choice on
7  what they felt needed to be done, whether they wanted
8  to stay or whether they wanted to quit.
9   Q.  So there were people talking about not
10  wanting --
11   A.  Yes, ma'am. And most of them were the ones who
12  were not activated.
13   Q.  Let me just finish. There were some people
14  talking about not reporting or not reporting for their
15  activation?
16   A.  No, ma'am. The five of us were not happy with
17  the activation, but we still chose to do the
18  activation. Because we were under the impression that
19  it was taking to court or they get released. That was
20  the emergency part of the activation, apparently.
21   Q.  Why weren't you unhappy with being activated?
22   A.  Because it was another way for the State to
23  smack us, I guess you could say, because they knew we
24  weren't going to turn it down. It's just a thing with

5 (Pages 14 to 17)

224d72b2-6e9c-499e-883a-a8d5252cef53

A0878

Balas v. Taylor, et al.
Scott E. Bradley, Sr.

Page 18

1  CERT. After you become CERT, you don't -- I guess it
2  would be like the Marine Corps, you know, you stick
3  together, you work together until it's all done. And
4  that's what we did.
5     Q.  So because of the job action and not taking
6  voluntary overtime --
7     A.  They activated us to do the court.
8     Q.  Right. And you weren't happy because you were
9  a part of the job action?
10    A.  If you want to call it that, yes, ma'am.
11    Q.  Do you remember anybody in particular speaking
12  out opposing the activation?
13    A.  No, because, every -- I mean, of the ones that
14  were there, it was just everybody was still
15  hot-tempered because of the way they activated us to
16  take them to court. Because, you know, it was more or
17  less our way of trying to, I guess, get more money or
18  whatever was going on at that time, better working
19  conditions or whatever had the --
20    Q.  Do you remember John making any comments at
21  all?
22    A.  John always has comments. I don't know. I
23  can't sit here and tell you that he made this comment
24  or that comment, no.

Page 19

1     Q.  Was Truman Mears at that meeting?
2     A.  Yes, ma'am.
3     Q.  Did he make any statements?
4     A.  Everybody did, ma'am.
5     Q.  Was he in support of the activation?
6     A.  I think he was like the rest of us, he had
7  mixed feelings.
8     Q.  Did there come a time when Truman Mears left
9  the meeting?
10    A.  There was allegations -- I know what you are
11  hinting around. There was allegations that he called
12  headquarters. Whether he did or he did not, I don't
13  know. I mean, he received a phone call. He stepped
14  outside. He came back in. He left again. Now,
15  whether that was CERT headquarters or not, I am not
16  sure. I am not going to point fingers at the man
17  because he's never done nothing to me, and ....
18    Q.  That's fine. Did he leave before the meeting
19  was over?
20    A.  It was right around the end of the meeting when
21  he left. I mean, it wasn't like he got there, got
22  information, left in the middle, and we sat there and
23  completed the meeting. It was nothing like that. I
24  mean, everybody is calling it a meeting. It was more

Page 20

1  or less just us voicing our opinions together. There
2  wasn't no minutes taken or nothing like that.
3     Q.  Do you know if CERT command was made aware of
4  the meeting? Do you have personal knowledge of that?
5     A.  I said there was allegations of it. No, I
6  don't know personally, no. To be definite positive
7  with you, no, I don't know.
8     Q.  So at the end of the meeting, was there a final
9  decision made?
10    A.  Yes, us five went the next morning and went to
11  court, carried inmates back and forth to court.
12    Q.  Real quick. Do you know who else was at the
13  meeting of the -- can you remember?
14    A.  There was probably -- I don't know how many
15  people were there. I am not exactly sure of everybody
16  that was there. I would be guessing now as to who all
17  was there.
18    Q.  If I read you some names, could it jog your
19  memory, possibly?
20    A.  I mean, I know of a couple. I know Truman
21  there. I know Lee was there, Lee Mears. Jeff Foskey.
22  I am not sure. Everybody else I would just be
23  guessing on. I do remember those couple people there.
24    Q.  Was John there?

Page 21

1     A.  I believe so.
2     Q.  Heath Shockley, was he there?
3     A.  I am not sure.
4     Q.  Allen Adams?
5        MS. XARHOULAKOS: Objection, counsel. He
6  said lack of knowledge.
7  BY MS. HERTZOG:
8     Q.  Are you aware if Allen Adams was there?
9     A.  I am not sure. I do remember a couple people
10  there, but, I mean, everybody, to me, that was just --
11  I mean, you know, I know people are making a big deal
12  out of that meeting, but it wasn't -- you know, to me
13  it was no big thing.
14    Q.  That's fine. I wanted to see if I can jog your
15  memory.
16    A.  The only ones I do remember was Truman, Jeff
17  Foskey, Lee Mears and myself and John was there.
18  Other than that, I am not sure. I would be guessing
19  there on out.
20    Q.  Okay. What happened the next day, I guess that
21  would be August 6th when you arrived for work at
22  C & T, which is Court & Transportation; correct?
23    A.  Yes.
24    Q.  What happened when you reported to work?

6 (Pages 18 to 21)

224d72b2-6e9c-499e-883a-a8d5252cef53

A0879

Balas v. Taylor, et al.
Scott E. Bradley, Sr.

Page 22

1    A.  Us guys met out by the C & T trailer.  Shortly
2  after that Scott Taylor, from CERT headquarters,
3  showed up, and we were told then that we had to go
4  inside the institution to draw our weapons, which was
5  upsetting to me because it was during shift change.
6  It was bad enough that we got activated, but now we
7  have to go into our own institution and face people
8  because they were more or less looking at us as being,
9  I don't want to say backstabbers, but we were going
10  against what everybody was doing.
11         We walked in, got our weapons.  We came
12  back out.  There was a little conversation with Scott
13  on why we didn't like the situation.  And then the
14  commander showed up, Dave Hall.  And he made some dumb
15  comments, and he really got opinions voiced towards
16  him.  And he called our warden, Rick Kearney, out.
17  And Rick more or less told us what we have to do, and
18  he would be in favor of whatever we'd done.  So we
19  went ahead and did the mission.  We went to court.
20  After court was over at 3:00 o'clock, ten of us walked
21  in and turned in our resignations.
22    Q.  You said that -- is it Dave Hall?
23    A.  Mm-hmm.
24    Q.  He made some comments.  What were the comments

Page 23

1  that he made?
2    A.  That it was no big deal for what we're doing
3  because he did it back in the '80s.  And that's when
4  that kind of struck me the wrong way.  And I told him
5  then that after the mission was over, I was done;
6  didn't care what everybody else done.  And that's when
7  he told us that either we're going to do the mission
8  or we can go home now.  So we all chose to do the
9  mission, and we left at 3:00 o'clock.
10    Q.  Now, just to backtrack a little bit.  You said
11  when you showed up you had to go inside to get your
12  weapon?
13    A.  Yes, ma'am.
14    Q.  And you saw other co-workers who were non-CERT
15  members; correct?
16    A.  Correct.
17    Q.  Were any comments made to you by those
18  co-workers?
19    A.  Yes, ma'am.
20    Q.  What kind of comments were made?
21    A.  Just derogatory comments towards us doing the
22  mission because apparently when they -- the court list
23  came out.  Apparently, it was a full court list.  It
24  wasn't just people that had to go to court.

Page 24

1    Q.  What do you mean by that, full court list?
2    A.  It was, I guess people that they filled in and
3  that I guess haven't met that time period yet or
4  whatever they go by in the court system.
5    Q.  Because you have a certain amount of days
6  before --
7    A.  That was my understanding of it, yes, ma'am.
8    Q.  And so do you remember:  Was it a light court
9  load, the mandatories that you had to transport, was
10  that light that day?
11    A.  It was a couple pages.  I don't know what their
12  normal day is, but the guy that was the head of the
13  court said it was a full court list.
14    Q.  Do you know who the head of that was?
15    A.  Rudy Drummond at the time.  He's retired now.
16    Q.  So you completed --
17    A.  The day.
18    Q.  -- your day?  What time was your mission, for
19  lack of a better term, completed?
20    A.  It wasn't -- when the commander -- when Dave
21  Hall put out the -- I take it, it was Dave Hall put
22  out the mission or put out the page that the mission
23  was completed, everybody did a great job, which was at
24  2:58.

Page 25

1    Q.  Okay.
2    A.  Because that was another thing that made me he
3  mad because he knew at 3:00 o'clock we were done.  So
4  two minutes prior, he thought he could save face with
5  us.
6    Q.  Got it.  So at 2:58 when you all got the page,
7  can you tell me what happened from there?
8    A.  We left, went inside the institution and met
9  with Rick and told him we were done.
10    Q.  And Rick Kearney was the warden?
11    A.  Was the warden at SCI.  We told him we are
12  done; if he needed anything we would definitely help
13  him out at our own institution, but as far as CERT
14  goes, we were done.
15    Q.  Do you remember any comments that were made
16  specifically to Rick Kearney by the 10?  You said it
17  was 10 that resigned?
18    A.  It was 10 of us in the room.  I don't remember
19  the exact comments, no.  Everybody pretty much was
20  just letting him know that we were done with CERT and
21  that -- but if he needed something at the institution,
22  we would definitely be there for him.  Because it was
23  nothing against him.
24    Q.  Do you remember if John made any comments?

7 (Pages 22 to 25)

224d72b2-6e9c-499e-883a-a8d5252cef53

Balas v. Taylor, et al.
Scott E. Bradley, Sr.

Page 26

1    A.  I am not sure.
2    Q.  So after you resigned, were you aware of
3  management's attitude towards your resignation?
4    A.  As far as?
5    Q.  I'll rephrase.  Are you -- was management happy
6  that you had resigned?
7    A.  I don't know if they were happy or upset or
8  whatever.  They never treated me any different than
9  prior.
10    Q.  So you never heard any comments from management
11  that they were displeased with your decision to
12  resign?
13    A.  No, I mean, they -- you had the same thing
14  as -- inside the jail is about, like, I guess you
15  could say, in the girl's room, the rumors go wild.  I
16  mean, it's just the way it is.  You know, you believe
17  half of the stuff you hear because you can guarantee
18  the rest of it is just nonsense.  There was comments
19  going around that the management wasn't going to let
20  us back on CERT for quitting, but.  You know, I am not
21  sure those were true or if that was just some, you
22  know, people trying stir stuff up again.
23    Q.  Right.  Are you aware of if management was
24  unhappy with the job action going on at that time?

Page 27

1    A.  I am not sure.
2    Q.  Did anyone from management say anything to you
3  about the job action either way?
4    A.  No.
5    Q.  Did anyone from management say anything to you
6  about the CERT resignation?
7    A.  They questioned me on why -- what was my
8  decision on at first, I think, thought it was, say, follow-the-leader-type thing.  I
9  thought it was, say, follow-the-leader-type thing.  I
10  told them it didn't make a difference who quit because
11  I was done anyway because my reason was for the
12  comment that Dave Hall made and his attitude towards
13  us, I guess you could say that day, just struck me the
14  wrong way.
15    Q.  What kind of attitude?
16    A.  It was just, you know, he wasn't -- people that
17  do not work at SCI don't understand the way we look
18  after one another.  I mean, we have your back no
19  matter what happens.  And there was people looking
20  around trying to, I guess, see who we were, this and
21  that.  Like I told him, I told Dave Hall that morning,
22  I said you wanted me, more or less, to walk away.  I
23  said, and that's just -- you know, you have people
24  looking at us.  I said, I depend on these guys to back

Page 28

1  me up every day.
2    Q.  When Dave Hall came out to meet with the five
3  of you that were activated, did anyone say anything to
4  Dave Hall?
5    A.  Just about all of us were voicing opinions
6  towards him about not liking the way he handled --
7  they could have brought weapons down to us.  We didn't
8  have to go into the institution.  But for some reason,
9  they chose not to.
10    Q.  Do you remember any specific comments made?
11    A.  No, ma'am.
12    Q.  It's been awhile?
13    A.  It's been a long while since then.  Other
14  people have, I guess, been ate up with it, but it
15  didn't bother me.
16    Q.  Okay.  Did you get any feelings after, I guess
17  we'll say, towards the end of August through the end
18  of the year from management at all like they were
19  irritated at what was going on with the job action?
20        MS. XARHOULAKOS:  Objection.  Asked.
21    Q.  You can answer.
22        MS. XARHOULAKOS:  You can answer.
23    A.  No, ma'am. Me and the warden, we golf together
24  every day, and deputy warden.  We don't have any

Page 29

1  problems.  I don't -- there's never been a problem
2  between, per se, me and the management.  We all golf
3  together.  We don't have -- we played softball
4  together.  I have never had a problem with them.
5    Q.  Okay.  You have to fill out a time card,
6  correct, for your job?
7    A.  No, ma'am.  We have -- we use a thing we punch
8  or that they scan us in and out of the institution,
9  and then people keep our time cards.
10    Q.  Okay.
11    A.  We have the ability to keep our own time card,
12  but it's not our official time card.
13    Q.  Let me ask it a different way.  In 2004, was
14  there a paper that maybe your supervisor kept of your
15  vacation days, time off, things like that?
16    A.  Yes, ma'am.
17    Q.  Was that considered the official time card?
18    A.  That's -- yes, ma'am.
19    Q.  Have things changed?
20    A.  Well, now, the lieutenants don't keep them.  A
21  lady at the business office does.
22    Q.  Would you review your time cards at all?
23    A.  Yes.  We -- as a matter of fact, I just got a
24  copy of 2007's and -- I keep my own just to have

8 (Pages 26 to 29)

224d72b2-6e9c-499e-883a-a8d5252cef53

Balas v. Taylor, et al.
Scott E. Bradley, Sr.

Page 30

1 something to go by instead of relying on -- when the
2 lieutenants done it, it was a lot easier, in my
3 personal opinion, because you could go to them and
4 they understood -- you could voice your opinions
5 towards them. It seemed like a lot easier than you
6 can with the lady in the business office.
7   Q. Opinions about what?
8   A. Like holidays and all that. When the
9 lieutenants had it, you know, they knew that you take
10 your holiday -- that certain -- personally, myself, if
11 I take a vacation, I much rather them use my holidays
12 I have on the books first instead of using up vacation
13 time. It always happened when the lieutenant kept it.
14 And then, now, when it went out to the business
15 office, apparently, she doesn't understand that or
16 doesn't work that way or whatever had to be. And now,
17 you know, I'll take a vacation, and when I looked at
18 my card -- because people are talking about having
19 problems with their time, so when I went to look at my
20 card and I still had holidays and she used all my
21 vacations, which doesn't hurt me because I don't take
22 off that much, but. My personal opinion, it worked a
23 lot better when the lieutenants kept it.
24   Q. Are you familiar with the term "emergency

Page 31

1 vacation day"?
2   A. Yes, ma'am.
3   Q. What is that?
4   A. If I went to work tonight and I needed off
5 tomorrow, tomorrow night, since the schedule is
6 already made up and I don't -- and instead of going
7 through the scheduling officer to try to get it done,
8 the watch commander would put emergency vacation, or
9 if you call in and something came up, they would put
10 emergency vacation down.
11   Q. So it's different from a regular vacation day,
12 which may be scheduled --
13   A. In advance.
14   Q. -- far in advance?
15   A. Yes.
16   Q. Are emergency vacation days looked down upon?
17   A. I, I don't know.
18   Q. You mentioned that the schedule was already
19 set. So would it put your supervisor or the --
20   A. It would put the watch commander down a person
21 for that shift.
22   Q. So it would make things more difficult as far
23 as scheduling for that particular shift?
24   A. Well, it would make the watch commander have to

Page 32

1 find a person for that shift.
2   Q. So do they look favorably on people that take
3 emergency vacation days?
4       MS. XARHOULAKOS: Objection. Asked.
5   A. I am not sure. You know, say, I've only had to
6 use one or two since I have been there, and they've
7 never, you know, hollered at me about it or nothing.
8       MS. HERTZOG: Okay. I have no further
9 questions.
10       MS. XARHOULAKOS: Okay. I think we'd like
11 to do reading and signing.
12       And I have no questions.
13       (Deposition concluded at 10:12 a.m.)
14       -- -- -- --
15
16
17
18
19
20
21
22
23
24

Page 33

1
2
3
4      REPLACE THIS PAGE
5
6      WITH THE ERRATA SHEET
7
8      AFTER IT HAS BEEN
9
10      COMPLETED AND SIGNED
11
12      BY THE DEPONENT.
13
14
15
16
17
18
19
20
21
22
23
24

9 (Pages 30 to 33)

224d72b2-6e9c-499e-883a-a8d5252cef53

A0882

Balas v. Taylor, et al.

Page 34

1   State of Delaware   )
                        )
2   New Castle County   )
3
4           CERTIFICATE OF REPORTER
5
        I, Lucinda M. Reeder, Registered Diplomate
6   Reporter, Certified Real-time Reporter and Notary
    Public, do hereby certify that there came before me on
7   November 13, 2007, the witness herein, [!WITNESS], who
    was first duly sworn by me and thereafter examined by
8   counsel for the respective parties; that the questions
    asked of said witness and the answers given were taken
9   down by me in Stenotype notes and thereafter
    transcribed by use of computer-aided transcription and
10  computer printer under my direction.
11      I further certify that the foregoing is a true
    and correct transcript of the testimony given at said
12  examination of said witness.
13      I further certify that I am not counsel,
    attorney, or relative of either party, or otherwise
14  interested in the event of this suit:
15
16
17
                        Lucinda M. Reeder
18          Lucinda M. Reeder, RDR, CRR
            Certification No. 132-RPR
            (Expires January 31, 2008)
19
20
21  DATED:    11-29-07
22
23
24

Wilcox and Fetzer, Ltd.  Registered Professional Reporters        302-655-0477

224d72b2-6e9c-499e-883a-a8d5252cef53

A0883



**WILCOX & FETZER LTD.**

In the Matter Of:

# Balas

## v.

## Taylor, et al.

C.A. # 06-592-JJF

_____

Transcript of:

David A. West

November 13, 2007

_____

Wilcox and Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: depos@wilfet.com
Internet: www.wilfet.com

Balas v. Taylor, et al.

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CINDY L. BALAS, a/k/a           )
CINDY L. ADKINS, Executrix   )
of the Estate of CORPORAL   )
JOHN J. BALAS,               )
                             )
        Plaintiff,      )
                       ) Civil Action
v.                    ) No. 06-592-JJF
                       )
STANLEY W. TAYLOR, JR.,    )
individually and in his      )
capacity as the Commissioner )
of Correction, et al.,       )
                       )
        Defendants.      )

    Deposition of DAVID A. WEST taken pursuant to
notice at the law offices of The Neuberger Firm, P.A.,
Two East Seventh Street, Wilmington, Delaware,
beginning at 12:34 p.m. on Tuesday, November 13, 2007,
before Lucinda M. Reeder, Registered Diplomate
Reporter and Notary Public.

APPEARANCES:

        CHERYL HERTZOG, ESQ.
        RAEANN WARNER, ESQ.
        The Neuberger Firm, P.A.
          Two East Seventh Street
          Wilmington, Delaware 19801
          for the Plaintiff,

        RALPH DURSTEIN, ESQ.
        Department of Justice
          Carvel State Office Building
          820 N. French Street
          Wilmington, Delaware 19801
          for the Defendants.


        WILCOX & FETZER, LTD.
    1330 King Street - Wilmington, Delaware  19801
            (302) 655-0477
            www.wilfet.com

05e3a6fe-9c28-44c3-ac3a-56a51c02c70c

Balas v. Taylor, et al.

| Page 2 |
| --- |

1      DAVID A. WEST,
2   the witness herein, having first been
3   duly sworn on oath, was examined and
4   testified as follows:
5   BY MS. HERTZOG:
6   Q.  Hi, Mr. West.  My name is Cheryl Hertzog.  I'm
7   the attorney for Cindy Balas -- Cindy Adkins, formerly
8   Cindy Balas, the widow of Corporal John Balas.  Have
9   you ever testified in court before?
10   A.  No.
11   Q.  Have you ever had your deposition taken before?
12   A.  Yes.
13   Q.  And when was that?
14   A.  Probably about 15 years ago.
15   Q.  I am just going to review some of the
16   procedures preliminarily.  I am going to ask you some
17   questions, and the court reporter is going to type up
18   your answers to those questions.  Okay.
19      We have to take turns talking because if we
20   talk at the same time, she's not going to be able to
21   take everything down.  Okay?  You are going to
22   verbalize your answers because she can't take down a
23   nod, so.
24   A.  Okay.

| Page 3 |
| --- |

1   Q.  So if you are nodding your head, you are going
2   to have to say yes.  Okay?
3   A.  Okay.
4   Q.  After we're done here today, you'll have an
5   opportunity to review the transcript of the deposition
6   and make any corrections, such like if there is
7   typographical errors or anything like that.  Okay?
8   A.  All right.
9   Q.  If I ask you a question, you don't understand
10   it, just ask me to rephrase it, and I'll be more than
11   happy to do that.
12   A.  All right.
13   Q.  Also, I don't want you to guess.  So if you
14   don't know the answer to the question, just say so.
15   A.  Okay.
16   Q.  Are you taking any medications today or is
17   there anything else that would prevent you from
18   remembering accurately or testifying truthfully?
19   A.  No.
20   Q.  If you need any breaks, just let me know.
21   A.  Okay.
22   Q.  Now, you have taken an oath to tell the truth.
23   Do you understand the significance of that oath?
24   A.  Yes, ma'am.

| Page 4 |
| --- |

1   Q.  Do you understand I am going to be asking you
2   questions today about allegations related to a lawsuit
3   filed by Cindy Adkins on behalf of her late husband,
4   Corporal John Balas, in the U.S. District Court for
5   the District of Delaware in September of 2006?
6   A.  Yes.
7   Q.  Have you met with anyone prior to your
8   deposition today?
9   A.  Yes.
10   Q.  Who was that?
11   A.  The gentleman next to me.
12   Q.  The gentleman next to you --
13   A.  Yes.
14   Q.  -- for the record is Mr. Ralph Durstein?
15   A.  Yes.  Mr. Durstein.  I'm sorry.
16      MR. DURSTEIN:  That's okay.
17   BY MS. HERTZOG:
18   Q.  Have you talked to anybody else about the
19   deposition?
20   A.  No.
21   Q.  I am just going to do a little background.
22   What's your full name?
23   A.  David Alan West, A-L-A-N.
24   Q.  A-L-A-N.  Okay.  Where were you born?

| Page 5 |
| --- |

1   A.  Salisbury, Maryland.
2   Q.  Where were you raised?
3   A.  Millsboro, Delaware.
4   Q.  What high school did you go to?
5   A.  Laurel.
6   Q.  That was in Maryland?
7   A.  Delaware.
8   Q.  I always get confused.  When did you start
9   working for the Department of Corrections?
10   A.  7/6/2000.
11   Q.  Okay.  And where did you start out working
12   there?
13   A.  Smyrna.
14   Q.  In what department were you in?
15   A.  Corrections.
16   Q.  So you were just a correctional officer?
17   A.  Yes, ma'am.
18   Q.  How long did you stay as a correctional officer
19   there?
20   A.  I think a year.
21   Q.  Okay.  So about 2001?
22   A.  Yeah.
23   Q.  Where did you go from there?
24   A.  Sussex Correctional Institution.

2 (Pages 2 to 5)

05e3a6fe-9c28-44c3-ac3a-56a51c02c70c

## Balas v. Taylor, et al.

| | |
|---|---|
| Page 6 | Page 8 |

**Page 6**

1   Q.  Is that otherwise known as SCI?
2   A.  Yes.
3   Q.  What did you do at SCI?
4   A.  Just correctional officer until 2005.
5   Q.  What did you do in 2005?
6   A.  K-9 unit.
7   Q.  Is that where you are currently working?
8   A.  Yes, ma'am.
9   Q.  What are your responsibilities in the K-9 unit?
10   A.  Supervision, patrol the perimeters, violence,
11 anything and everything.
12   Q.  In August of 2004, you were at SCI; correct?
13   A.  Yes.
14   Q.  Were you a member of the Correctional Officers
15 Association of Delaware, otherwise known as COAD?
16   A.  Yes.
17   Q.  Are you aware if John Balas was a member of
18 COAD in August of 2004?
19   A.  We all are.
20   Q.  I'm sorry?
21   A.  Everybody, all correctional officers are.  It's
22 our union.
23   Q.  Okay.  Did you know John Balas?
24   A.  Yes.

**Page 7**

1   Q.  How did you know John Balas?
2   A.  Through work.
3   Q.  Were you friends or were you just co-workers?
4   A.  Just co-workers.
5   Q.  Can you kind of describe your relationship with
6 John Balas for me?
7   A.  We were co-workers.  We were on CERT together.
8 That's about it.
9   Q.  Are you aware of what kind of employee John
10 Balas was?
11   A.  No, I didn't work with him firsthand.
12   Q.  Are you aware if he was well liked by his
13 co-workers?
14   A.  Yeah.
15   Q.  What makes you say that?
16   A.  He got along with everybody that I know of.
17   Q.  Do you know if he was respected by his
18 co-workers?
19   A.  Yes.
20   Q.  Was he respected by the inmates?
21   A.  I don't know.
22   Q.  Are you familiar with John's personality?
23   A.  Yeah.
24   Q.  What kind of personality did he have?

**Page 8**

1   A.  He always happy.  I mean, he was, towards me,
2 he was never in a bad mood; he was always in a good
3 mood, I mean.
4   Q.  Did he have tough guy appearance or was he more
5 sensitive, or?
6   A.  No, he was more laid back.
7   Q.  Would you say that John was a man of personal
8 integrity?
9   A.  I couldn't tell you.
10   Q.  Was he trustworthy?
11   A.  Yes.
12   Q.  The type of guy you could depend on?
13   A.  Yes.
14   Q.  Was he honest?
15   A.  Yes.
16   Q.  To your knowledge, was he a liar?
17   A.  No.
18   Q.  I am going to take you back to the summer of
19 2004.  I want to focus on that time frame.  Were there
20 a lot of things happening in the Department of
21 Corrections during that summer?
22   A.  You'd have to be specific.  I mean, there's a
23 lot of things every day.
24   Q.  Okay.  I'll rephrase.  Was the Department of

**Page 9**

1 Correction facing issues, such as staffing levels or
2 understaffing problems?
3   A.  I think every institution was, yes.
4   Q.  Were there concerns at that time about low
5 wages --
6   A.  Yes.
7   Q.  -- for correctional officers?  Okay.  Were
8 there also concerns about retaining officers or
9 qualified officers in the institutions?
10   A.  What do you mean, "retaining"?  What do you
11 mean?
12   Q.  Meaning, were they having trouble keeping
13 officers in the Delaware Correctional institutions and
14 were they leaving to go elsewhere?
15   A.  Yes.
16   Q.  Were there also problems with voluntary and
17 involuntary overtime?
18   A.  Yes.
19   Q.  Were there also problems with security lapses
20 in the Department of Corrections?
21   A.  Yes.
22   Q.  And that would include incidences such as the
23 Cassie Arnold rape, for example?
24   A.  Yes.

3 (Pages 6 to 9)

05e3a6fe-9c28-44c3-ac3a-56a51c02c70c

A0887

Balas v. Taylor, et al.

Page 10

1    Q.  Was there eventually what has been termed a job
2  action, meaning that correctional officers were
3  refusing to accept voluntary overtime?
4    A.  Yes.
5    Q.  Can you tell me anything, what your
6  understanding of what that job action was?
7    A.  I mean, they're making you stay to work.  You
8  do your eight-hour shift, and after your eight-hour
9  shift, they would make you stay.
10   Q.  Was that also called freezing?
11   A.  Yeah.
12   Q.  So what did the job action -- what was the
13  point of the job action?
14   A.  Either come up with more money or get more
15  people.
16   Q.  So correctional officers were refusing to
17  accept voluntary overtime?
18   A.  Yes.
19   Q.  Are you aware in August of '04 that the
20  Department of Corrections filed a lawsuit against
21  union and its officers?
22   A.  Yes.
23   Q.  Now, in the midst of all this going on in 2004,
24  the Union, COAD, are you aware that they were trying

Page 11

1  to negotiate a new contract With the Department of
2  Corrections?  You don't --
3    A.  I, I don't know.  We're still to this day
4  without a contract, so.
5    Q.  Were you aware that contract negotiations were
6  going on during that time, though?
7    A.  Yes.
8    Q.  Were there differences of opinions between the
9  union and management and how to address the issues
10  that we went through before?
11   A.  Yes.
12   Q.  During that time, was there also a lot of media
13  attention given to these issues?
14   A.  I can't remember.
15   Q.  Do you remember if the legislature was giving
16  attention to these issues during that time?
17   A.  I can't remember.
18   Q.  Do you remember if these issues were part of --
19  were issues in the election for governor during that
20  time?
21   A.  I don't -- I don't know.
22   Q.  Are you aware in August -- we'll say from
23  August '04 to about November of '04 -- do you know
24  what job John was in?

Page 12

1    A.  He's worked in receiving ever since I've known
2  him.
3    Q.  Was that at SCI?
4    A.  Yes.
5    Q.  Now, you mentioned you worked together with him
6  on CERT?
7    A.  Yes.
8    Q.  And CERT stands for?
9    A.  Correctional Emergency Response Team.
10   Q.  Thank you.  I can never get that right.  What
11  were your duties on CERT?
12   A.  Everybody had the same duties.
13   Q.  And what were those?
14   A.  When you got paged, you went to a major
15  disturbances or escapes, whatever emergency we had.
16   Q.  Were John's the same duties as yours?
17   A.  Yes.
18   Q.  Are you familiar with John's job performance on
19  CERT?
20   A.  No.
21   Q.  Did you work any assignments with him ever?
22   A.  No.
23   Q.  Were you aware of any problems John had on the
24  CERT Team?

Page 13

1    A.  We all problems.  I mean, they were just not
2  one person's.
3    Q.  What kind of problems were those?
4    A.  Problems with, I mean, the guys that run CERT.
5  That was it.
6    Q.  Can you explain that a little bit more?
7    A.  We just didn't always see eye-to-eye.  That's
8  about it.
9    Q.  What would happen if John were to have refused
10  his job duties on the CERT Team?
11   A.  I don't know.  He probably would have been
12  suspended right off the bat.
13   Q.  Was there a time during the summer of '04 that
14  CERT was activated to report to the Court &
15  Transportation Unit?
16   A.  Yes.
17   Q.  Do you remember when that was?
18   A.  I can't remember the exact date, no.
19   Q.  If I told you early August, would that sound
20  about right?
21   A.  Yes.
22   Q.  Do you remember who the CERT members were
23  activated that day?
24   A.  I think it was John, Scott Bradley, Lee Mears.

4 (Pages 10 to 13)

05e3a6fe-9c28-44c3-ac3a-56a51c02c70c

A0888

Balas v. Taylor, et al.

Page 14

1  I think Lee Mears. And that's all I can remember.
2  Q. Would Jeff Foskey have been activated that day?
3  A. He might have. I can't remember. I just
4  remember seeing John and Scott in the morning.
5  Q. Okay.
6  A. And that was it.
7  Q. Do you know who gave the official order for
8  this activation?
9  A. It would come from the Major Radcliffe or
10 Warden Dave Hall.
11 Q. Are they part of CERT command?
12 A. Yes.
13 Q. The night before the activation or the day, I
14 guess the night of the activation --
15 A. Mm-hmm.
16 Q. -- was there a meeting held?
17 A. Supposedly.
18 Q. Were you at that meeting?
19 A. No.
20 Q. So when the -- there were five -- I think the
21 record will show there were five CERT members
22 activated that day. Do you know what happened when
23 they arrived?
24 A. Somebody from CERT headquarters met them at the

Page 15

1  CERT office or the Court & Transportation Office and
2  told them everything they had to do, give them packets
3  of who to pick up, who to take to court, who to bring
4  back.
5  Q. What happened that day -- you were not
6  activated; correct?
7  A. Mm-hmm.
8  Q. Was there a time when you showed up to SCI?
9  A. I showed up before work and met them that
10 morning. And I went to work. Then after work, we all
11 went to the warden's office after, after work.
12 Q. Would that have been at the end of the shift?
13 A. Yeah, it was at 4:00 o'clock.
14 Q. What happened when you went to the warden?
15 A. We just all quit. We all quit CERT. That was
16 it.
17 Q. Was there a reason that you all quit CERT?
18 A. I guess we had -- all had our reasons.
19 Q. What was your reason for quitting CERT?
20 A. You can ask me to do something and you can tell
21 me to do something. If you ask me, I'll do it; if you
22 tell me, I am not going to do it.
23 Q. What were other people's concerns with the
24 activation that day?

Page 16

1  A. A lot of things. I mean, we had done this, for
2  one, to stop overtime or stop volunteering for it and
3  then they activated us. So we pretty much had to do
4  it. It was just the governor's way of saying you are
5  going to do it and that's the end of it. So, I mean,
6  that's why everybody quit. I mean, I don't know what
7  you're -- I mean, what are you ....
8  Q. No, that's fine. So you went in to talk. Who
9  was the -- who did you go in to talk to? Who was the
10 warden?
11 A. Warden Rick Kearney.
12 Q. Do you remember any statements that were made
13 to the warden?
14 A. No.
15 Q. Do you know if John made any statements to the
16 warden?
17 A. No.
18 Q. Do you remember if John was vocal at all?
19 A. Yeah, he spoke his mind. I wasn't in there
20 very long. I just turned my stuff in and left. That
21 was it.
22 Q. Now, you say you met with CERT in the morning?
23 A. No, I just met with John and Scott.
24 Q. Okay. You met with John and Scott. Did they

Page 17

1  say anything to you that morning that you can
2  remember?
3  A. No. Just that they had enough of it, and that
4  that day was probably going to be their last day.
5  Q. Were you there when Dave Hall spoke with the
6  CERT members?
7  A. I had left right after they had -- he had
8  showed up.
9  Q. So you didn't hear him make any statements to
10 the CERT members?
11 A. No.
12 Q. Was it a group decision to resign?
13 A. More or less.
14 Q. You said there were ten CERT members that
15 resigned?
16 A. I can't remember how many.
17 Q. But John was one of the ones who resigned?
18 A. Yes.
19 Q. After the resignation in early August of 2004,
20 did you witness any change in demeanor by management
21 towards you?
22 A. Not towards me, no. I have been promoted
23 since, so.
24 Q. Did you get the feeling that anybody was angry

5 (Pages 14 to 17)

Wilcox and Fetzer, Ltd. Registered Professional Reporters         302-655-0477

05e3a6fe-9c28-44c3-ac3a-56a51c02c70c

Balas v. Taylor, et al.

Page 18

1  with you?
2     A.  No.
3     Q.  Are you aware that they were in general unhappy
4  with the decision to resign?
5     A.  With me or with everybody?
6     Q.  With everybody.
7     A.  Oh, yeah, they were, they were mad.
8     Q.  What makes you say that?
9     A.  Not management at SCI.  I think it was all
10  people that run CERT, like Dave Hall and Tim
11  Radcliffe, were mad about it.  I don't think anybody
12  at SCI was mad at us.
13     Q.  What makes you think that Dave Hall and
14  Radcliffe were made at the CERT members who resigned?
15     A.  Just hearsay.  I mean, that's it.  Just things
16  that were told and things that are said that come back
17  to the institution.
18     Q.  Like what?
19     A.  Just, you know, they couldn't understand why we
20  did it and if we ever applied for it again, they
21  wouldn't let us back on.  But that's --
22     Q.  So did anyone from management ever say anything
23  to you directly?
24     A.  No.

Page 19

1     Q.  Are you aware of management's attitude towards
2  the job action, the refusal to accept voluntary
3  overtime?
4     A.  No.
5     Q.  Do you have to fill out a time card in your
6  job?
7     A.  No.
8     Q.  How about when you were at SCI in 2004, did you
9  have to fill out a time card then?
10     A.  No.  Lieutenants take care of that.
11     Q.  Your lieutenant filled out a time card for you?
12     A.  Yes.
13     Q.  Are you familiar with the term "emergency
14  vacation day"?
15     A.  Yes.
16     Q.  What does that term mean?
17     A.  If you have a problem, instead of calling sick
18  or something, you just take emergency vacation.
19     Q.  So it's not like you planned it in advance like
20  a normal vacation day?
21     A.  No.
22     Q.  Are you aware that if your lieutenant or
23  supervisor would frown upon people using vacation
24  days -- emergency vacation days?  Excuse me.

Page 20

1     A.  They frown upon it?  I don't -- it's your time.
2  You can use it how you want.  I don't see how they can
3  frown on it.
4     Q.  Do they look unfavorably on people using
5  emergency vacation days because they might have to
6  rearrange the schedule on a short -- on short notice?
7     A.  Yes.
8        MS. HERTZOG:  I'm almost done.  I just want
9  to step out and review my notes real quick.
10        MR. DURSTEIN:  Sure.
11        MS. HERTZOG:  Shortly.
12        MR. DURSTEIN:  No problem.
13        MS. HERTZOG:  Go off the record.
14        (Recess taken.)
15  BY MS. HERTZOG:
16     Q.  I just have maybe two more questions for you.
17  When you went to meet with the warden and resigned,
18  were there CERT members resigning as a way of showing
19  support for the job action?
20     A.  Yes.
21     Q.  Was that part of their decision?
22     A.  Yes.
23     Q.  Were comments made to the warden informing him
24  of that?

Page 21

1     A.  Oh, yeah.  He knew why we were doing it.  I
2  mean, that day coming into work, I mean, we got
3  cussed, we got everything from fellow officers.  We
4  got called every name in the book.
5     Q.  By the co-workers --
6     A.  Yes.
7     Q.  -- who are non- CERT members?
8     A.  Then once it all came to an end and we all
9  quit, everybody was apologizing and everything else.
10  So I mean, Rick, he knew why we done it.
11     Q.  Even though you were not activated, you were
12  still cussed out?
13     A.  Oh, yeah.
14     Q.  Now, when the CERT members, the five CERT
15  members who were activated, when they reported back to
16  SCI after their mission --
17     A.  Mm-hmm.
18     Q.  -- when did you meet up with them?
19     A.  It was in the warden's office after, at
20  4:00 o'clock.
21     Q.  So did you all meet as a group before going
22  into the warden's office?
23     A.  No.
24     Q.  So how did you all get there at the same time

6 (Pages 18 to 21)

Balas v. Taylor, et al.

Page 22

1  to the warden's office?
2     A.  I was called, told to come to the warden's
3  office after I got off work.
4     Q.  Who called you?
5     A.  I don't remember.
6          MS. HERTZOG:  I think that's all the
7  questions I have.
8          MR. DURSTEIN:  I think we'll waive reading
9  and signing.
10         (Deposition concluded at 1:00 p.m.)
11              -- -- -- --
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 23

1   State of Delaware   )
                        )
2   New Castle County   )
3
            CERTIFICATE OF REPORTER
4
5      I, Lucinda M. Reeder, Registered Diplomate
    Reporter, Certified Real-time Reporter and Notary
6   Public, do hereby certify that there came before me on
    November 13, 2007, the witness herein, DAVID A. WEST,
7   who was first duly sworn and thereafter examined by
    counsel for the respective parties; that the questions
8   asked of said witness and the answers given were taken
    down by me in Stenotype notes and thereafter
9   transcribed by use of computer-aided transcription and
    computer printer under my direction.
10
       I further certify that the foregoing is a true
11  and correct transcript of the testimony given at said
    examination of said witness.
12
       I further certify that reading and signing of
13  the deposition were waived by the witness.
14     I further certify that I am not counsel,
    attorney, or relative of either party, or otherwise
15  interested in the event of this suit.
16
17                        _Lucinda M. Reeder_
18
           Lucinda M. Reeder, RDR, CRR
19         Certification No. 132-RPR
           (Expires January 31, 2008)
20
    DATED:    11-29-07
21
22
23
24

7 (Pages 22 to 23)

05e3a6fe-9c28-44c3-ac3a-56a51c02c70c



**WILCOX & FETZER LTD.**

In the Matter Of:

# Balas
## v.
## Taylor, et al.

### C.A. # 06-592-JJF

---

### Transcript of:

### Michael E. DeLoy

### November 27, 2007

---

Wilcox and Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: depos@wilfet.com
Internet: www.wilfet.com

Balas v. Taylor, et al.

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

CINDY L. BALAS a/k/a CINDY L.        )
ADKINS, Executrix of the Estate of )
CORPORAL JOHN J. BALAS,              )
                                     )
          Plaintiff,                 )
                                     ) Civil Action
v.                                   ) No. 06-592-JJF
                                     )
STANLEY W. TAYLOR, JR., individu-    )
ally and in his official capacity    )
as the Comissioner of Correction;    )
ALAN MACHTINGER, individually and    )
in his official capacity as the      )
Director of Human Resources of the   )
Department of Correction; MICHAEL    )
DELOY, individually and in his       )
official capacity as Deputy Warden   )
of Sussex Correctional Institution;  )
CAPTAIN DAVID WILKINSON, individu-   )
ally; LIEUTENANT TRUMAN MEARS,       )
individually; and DEPARTMENT OF      )
CORRECTION OF THE STATE OF           )
DELAWARE,                            )
                                     )
          Defendants.                )

          Deposition of MICHAEL E. DeLOY taken
pursuant to notice at the law offices of The Neuberger
Firm, P.A., Two East Seventh Street - Suite 302,
Wilmington, Delaware, beginning at 10:03 a.m. on
Tuesday, November 27, 2007, before Christina M.
Vitale, Certified Shorthand Reporter and Notary
Public.


Continued. . . . . . . . . .


          WILCOX & FETZER
     1330 King Street -  Wilmington, Delaware 19801
               (302) 655-0477
               www.wilfet.com

Balas v. Taylor, et al.
Michael E. DeLoy

Page 2

1  APPEARANCES:
2
    STEPHEN J. NEUBERGER, ESQUIRE
3  THE NEUBERGER FIRM, P.A.
    Two East 7th Street, Suite 302
4  Wilmington, Delaware 19801
    For the Plaintiff
5
6  RALPH K. DURSTEIN, III, ESQUIRE
    DEPARTMENT OF JUSTICE
7  Carvel State Office Building
    820 N. French Street
8  Wilmington, Delaware 19801
    For the Defendants
9
   - - - - - - - - - - - - - - - -
10
11      MICHAEL E. DeLOY, the deponent herein,
12  having first been duly sworn on oath, was examined and
13  testified as follows:
14  BY MR. NEUBERGER:
15   Q.  Warden DeLoy, my name is Steve Neuberger and
16  I'm one of the attorneys for Cindy Adkins who is
17  formerly Cindy Balas, the wife of the late John Balas.
18  Do you understand that?
19   A.  Yes.
20   Q.  Have you ever testified in court before?
21   A.  Yes.
22   Q.  Have you ever had a deposition taken before?
23   A.  Yes.
24   Q.  You are familiar with the procedure how I ask

Page 3

1  you the questions and the court reporter types up your
2  answers and everything?
3   A.  Yes.
4   Q.  Now, I want to review some of the basic rules
5  of the deposition for you just to make sure we are all
6  on the same page from the very beginning.  Okay?
7   A.  Okay.
8   Q.  We have to take turns talking.  The court
9  reporter, although she is very good, if we both talk
10  at the same time she can't get everything down.  All
11  right?
12   A.  Got it.
13   Q.  You have to verbalize your answers.  If the
14  answer is no, say no instead of shaking your head; or,
15  if the answer is yes, say yes instead of nodding your
16  head.
17   A.  All right.
18   Q.  When all this is done, when the deposition is
19  over, you will have a chance to review the deposition
20  to correct any typographical errors.  All right?
21   A.  Okay.
22   Q.  If I ask you a question that you don't
23  understand, ask me to rephrase it and I will be more
24  than happy to.

Page 4

1   A.  I will.
2   Q.  I don't want you to guess.  If you don't know
3  the answer to a question, just say so and I'll be
4  happy to either ask you a new question or try to jog
5  your memory a little bit or just move on.  All right?
6   A.  Okay.
7   Q.  Are you taking any medications or is there
8  anything else happening with you today that might
9  prevent you from remembering accurately or testifying
10  truthfully?
11   A.  No.
12   Q.  If you need any breaks, run to the John or
13  something, let me know and I would be happy to do
14  that.  All right?
15   A.  Okay.
16   Q.  You have taken an oath to tell the truth today.
17  Do you understand the significance of that oath?
18   A.  Yes.
19   Q.  Do you understand that I'm going to be asking
20  you some questions today related to a lawsuit filed by
21  Cindy Adkins on behalf of her late husband, John?
22   A.  Yes.
23   Q.  And you are a defendant in that case, right?
24   A.  Yes.

Page 5

1   Q.  You are already familiar with some of the
2  events at least that the case deals with?
3   A.  Yes.
4   Q.  Now, you met with your attorneys prior to your
5  deposition today, right?
6   A.  Yes.
7   Q.  Other than your attorneys have you talked with
8  anyone about your deposition or your testimony today?
9   A.  About my testimony?
10   Q.  Sure.
11   A.  No.
12   Q.  Have you talked to anyone about the fact that
13  you were coming up here?
14   A.  Yes.
15   Q.  Was that just like a scheduling thing to let
16  people know where you were going to be?
17   A.  Yes.
18   Q.  But you haven't talked about the substance of
19  your testimony at all.  Right?
20   A.  No.
21   Q.  What is your full name?
22   A.  Michael E. DeLoy.
23   Q.  Where were you born?
24   A.  I was born at Beebe Hospital, Lewes, Delaware.

2 (Pages 2 to 5)

b4df1416-6237-4460-9996-6282f42762be

Balas v. Taylor, et al.
Michael E. DeLoy

<table>
<tr><td>

**Page 6**

1   Q.   You are a lifelong Delawarian?
2   A.   Sussex County.
3   Q.   Got you. And how old are you?
4   A.   Fifty-two.
5   Q.   And so were you raised in Sussex County as
6   well?
7   A.   Yes.
8   Q.   Where did you go to high school?
9   A.   Rehoboth Beach, I went to Cape Henlopen High
10   School.
11   Q.   I take it you graduated from Cape then?
12   A.   I did.
13   Q.   Did you continue your education at any point
14   past high school?
15   A.   Yes, Wesley College, Dover, Delaware.
16   Q.   What year did you graduate from Wesley?
17   A.   1997.
18   Q.   What was your degree in?
19   A.   Business administration.
20   Q.   Do you have any other education above and
21   beyond Wesley?
22   A.   No.
23   Q.   What year did you start working for the
24   Department of Correction?

</td><td>

**Page 8**

1   Q.   When you were deputy warden and when you were
2   promoted to the rank of deputy warden in 1996, where
3   were you stationed at?
4   A.   SCI, Sussex Correctional.
5   Q.   How long were you at SCI?
6   A.   A ballpark, I think I transferred to SCI in
7   1984.
8   Q.   And after you were promoted to the rank of
9   deputy warden did you serve your entire time at SCI?
10   A.   Yes.
11   Q.   That's the position you would have held in
12   August of 2004?
13   A.   Yes.
14   Q.   What are the job responsibilities of the warden
15   at SCI?
16   A.   Of the warden?
17   Q.   I'm sorry, of the deputy warden.
18   A.   Basically to oversee all the processes that
19   occur at the facility on a day-to-day basis and
20   probably plan out to 60 or 90 days in the future.
21   That's kind of in a nutshell what the deputy warden
22   does.
23   Q.   You have been a public employee for 27 years,
24   right?

</td></tr>
<tr><td>

**Page 7**

1   A.   1980.
2   Q.   What position did you hold then?
3   A.   Correctional officer.
4   Q.   And where were you working then?
5   A.   Delaware Correctional Center.
6   Q.   Now, when you were promoted as a corporal -- is
7   that the next level up?
8   A.   Not at that time.
9   Q.   Could you run me through your work history
10   then.
11   A.   Sure. I went from correctional officer to
12   lieutenant to captain to deputy warden and then to
13   warden.
14   Q.   Do you recall ballpark approximately when you
15   were promoted to the rank of lieutenant?
16   A.   I can ballpark it. I think lieutenant was
17   1983.
18   Q.   So, three years? Wow.
19   A.   Three years. Do you want me to continue?
20   Q.   Yes. Captain?
21   A.   Captain, 1993, deputy warden, 1996, and warden,
22   2007.
23   Q.   Congratulations on your recent promotion.
24   A.   Thank you.

</td><td>

**Page 9**

1   A.   Yes.
2   Q.   You know under our form of government something
3   that is the highest law of the land is something
4   called the U.S. constitution?
5   A.   Yes.
6   Q.   And you know there is a bill of rights to that
7   constitution?
8   A.   Yes.
9   Q.   And there are amendments to that constitution?
10   A.   Yes.
11   Q.   And you have received training in those types
12   of things during your 27 years at Department of
13   Correction?
14   A.   In constitutional law?
15   Q.   I can run through in more detail for you. You
16   know there is an 8th amendment right of a prisoner to
17   be free of cruel and unusual punishments, right?
18   A.   Yes.
19   Q.   Is that something that has been important to
20   the Department of Correction during your tenure there?
21   A.   Yes.
22   Q.   Is that something that is important to you
23   personally as a deputy warden and now as a warden?
24   A.   Yes.

</td></tr>
</table>

3 (Pages 6 to 9)

b4df1416-6237-4460-9996-6282f42762be

A0895

Balas v. Taylor, et al.
Michael E. DeLoy

Page 10

1    Q.  And you have received some kind of training at
2    least in what not to do with prisoners, correct?
3    A.  Experience?
4    Q.  Experience.
5    A.  Yeah.
6    Q.  And you are aware that in addition to the 8th
7    amendment right of prisoners to be free of cruel and
8    unusual punishment that prisoners have certain first
9    amendment rights in the prison?
10   A.  Yes.
11   Q.  A person can't be punished -- you know they
12   can't be punished for reading the Torah, the Koran or
13   the Bible?
14   A.  Yes.
15   Q.  They can't be punished for filing lawsuits or
16   formal grievances?
17   A.  Yes.
18   Q.  For example, you know they can't be punished if
19   they write a letter to their legislator asking for
20   changes in the prison system, right?
21   A.  Yes.
22   Q.  You have always tried to respect the rights of
23   Department of Correction prisoners?
24   A.  Yes.

Page 11

1    Q.  And that's something that all DOC employees try
2    to do, at least the ones under your command?
3    A.  Yes.
4    Q.  There are also correctional officers who guard
5    these prisoners in the prisons every day, right?
6    A.  Yes.
7    Q.  And they provide a valuable and important
8    public service?
9    A.  Yes.
10   Q.  You understand that these correctional officers
11   who work in the prison every day they also have rights
12   under the U.S. constitution, right?
13   A.  Yes.
14   Q.  And these officers they certainly don't have
15   less rights than the prisoners that they're guarding,
16   do they?
17   A.  No.
18   Q.  Do you know that under the constitution as well
19   and state and federal law you can't discriminate
20   against an officer in transfers or promotions or
21   things like that because of the color of their skin?
22   A.  Yes.
23   Q.  And/or because of their race?
24   A.  Yes.

Page 12

1    Q.  Or because of their gender?
2    A.  Yes.
3    Q.  That's because at least that there is a certain
4    constitutional protection out there that forbids that,
5    right?
6    A.  Yes.
7    Q.  You know under the constitution you can't
8    punish or transfer an officer because of where he goes
9    to church?
10   A.  Correct.
11   Q.  Or because he voted for George Bush or John
12   Kerry in the last election?
13   A.  Correct.
14   Q.  Or because he voted for Judge or Governor
15   Minner in the last election?
16   A.  Correct.
17   Q.  That's because there is also a constitutional
18   protection out there that forbids that, right?
19   A.  Yes.
20   Q.  And you know you can't punish an officer who
21   files a lawsuit or formal grievance in the state or
22   federal court?
23   A.  Right.
24   Q.  You can't punish an officer who petitions the

Page 13

1    general assembly for redress of grievances?
2    A.  Correct.
3    Q.  Do you know you can't punish an officer who
4    belongs to a union?
5    A.  Right.
6    Q.  You can't punish an officer because he publicly
7    supports his union?
8    A.  Can I back up to -- you said you can't punish
9    an officer because he belongs to -- could you explain
10   that one to me?
11   Q.  You can't use -- would you agree you can't use
12   an officer's union membership as a reason for
13   punishing?
14   A.  I will agree to that, yes.
15   Q.  And then I think -- I can't recall if you
16   answered the last question so I'll ask it again.
17   Would you agree that you know you can't punish an
18   officer because he is publicly supporting his union?
19   A.  Correct.
20        MR. NEUBERGER:  Ralph, Stacey and I talked
21   a little bit about this at the last deposition.  The
22   punitive damages questions which I'm about to ask, are
23   you guys going to register the same objections?
24        MR. DURSTEIN:  Yes.

4 (Pages 10 to 13)

b4df1416-6237-4460-9996-6282f42762be

A0896

Balas v. Taylor, et al.
Michael E. DeLoy

Page 14

1       MR. NEUBERGER:  Then, that issue is
2   preserved and we'll take it up with the judge when the
3   time comes up.
4       MR. DURSTEIN:  Fair enough.
5   BY MR. NEUBERGER:
6   Q.   Warden DeLoy, there are rules and regulations
7   in the Department of Correction, right?
8   A.   Yes.
9   Q.   And there are rules governing prisoners and how
10  to go about guarding them, right?
11  A.   Yes.
12  Q.   And rules governing employees and their
13  conduct?
14  A.   Yes.
15  Q.   And these rules they apply to corporals, CO's,
16  sergeants and others, right?
17  A.   Yes.
18  Q.   Same rules govern wardens and deputy wardens?
19  A.   Right.
20  Q.   You don't contend that the Department of
21  Correction rules and regulations and policies don't
22  apply to you, do you?
23  A.   I do not.
24  Q.   You don't contend you are above those rules,

Page 15

1   regulations or policies or anything like that?
2   A.   No.
3   Q.   Do you receive employment evaluations?
4   A.   Yes.
5   Q.   What kind of marks do you generally receive?
6   A.   I believe my last evaluation was distinguished.
7   Q.   Congratulations.  So, would you characterize
8   that evaluation as saying that at the least you were a
9   good employee?
10  A.   Yes.
11  Q.   And you take your job seriously, right?
12  A.   Yes.
13  Q.   And you always strive to do your job well?
14  A.   Yes.
15  Q.   You aren't one of those employees who thinks
16  that rules are made to be broken, are you?
17  A.   No.
18  Q.   And you always strive to follow those rules,
19  regulations and policies, right?
20  A.   Yes.
21  Q.   Has an employee under your command ever had to
22  work a double shift?
23  A.   Yes.
24  Q.   Has an employee under your command ever gotten

Page 16

1   sick?
2   A.   Yes.
3   Q.   Has an employee under your command ever been in
4   a bad car accident?
5   A.   Yes.
6   Q.   Has one ever gone through a divorce or
7   otherwise had some kind of relationship problems that
8   you ultimately became aware of?
9   A.   Yes.
10  Q.   Has an employee under your command ever
11  experienced a death in the family?
12  A.   Yes.
13  Q.   Things like that can be stressful, can't they?
14  A.   Yes.
15  Q.   And they can take a physical, emotional and
16  psychological toll on a person, can't they?
17  A.   Sure.
18  Q.   As a result those kinds of things can affect an
19  employee's work performance in the prisons where he is
20  doing his job, right?
21  A.   Yes.
22  Q.   Those kinds of things can also affect an
23  employee's life in general, right?
24  A.   Yes.

Page 17

1   Q.   As a result you as a supervisor or to you as a
2   supervisor your employees aren't a dime a dozen, are
3   they?
4   A.   No.
5   Q.   They aren't just a piece of meat?
6   A.   No.
7   Q.   Or a cog in a machine, that is, the Department
8   of Correction, right?
9   A.   Yes.
10  Q.   You care about your employees?
11  A.   Yes.
12  Q.   And the physical well-being of your employees
13  is something that is important to you as a good
14  supervisor, right?
15  A.   Yes.
16  Q.   That includes their physical, their emotional
17  well-being as well as their psychological well-being,
18  right?
19  A.   Yes.
20  Q.   If an employee is distracted or under stress or
21  has something on their mind, that has the potential to
22  have repercussions in the prison system, right?
23  A.   Yes, if he is exhibiting poor behavior, poor
24  work behavior, because of it.

5 (Pages 14 to 17)

Balas v. Taylor, et al.
Michael E. DeLoy

| Page 18 |
|---|
| 1    Q.  And that can affect a wide variety of things |
| 2   such as prison security if their job is prison |
| 3   security; or, if their job is administrative, that can |
| 4   affect how they do their administrative job, correct? |
| 5    A.  If he or she is performing poorly, yes. |
| 6    Q.  It can, it doesn't necessarily have to, is that |
| 7   right? |
| 8    A.  That's correct. |
| 9    Q.  As a result you try to be proactive about those |
| 10  kinds of problems that an employee may be experienc- |
| 11  ing, would that be fair to say? |
| 12   A.  I'm not sure that I understand that. |
| 13   Q.  Well, if an employee is having some kind of |
| 14  psychological problems as a result of a death in the |
| 15  family and you are aware of that and it's brought to |
| 16  your attention, do you sort of sit back and watch the |
| 17  employee flounder or do you try to help him? |
| 18   A.  I watch the job performance.  It really comes |
| 19  down to job performance.  If an employee's job |
| 20  performance is affected in a negative way, a good |
| 21  supervisor would try to find out why. |
| 22   Q.  Would a good supervisor only get involved if |
| 23  their job performance is being affected in a negative |
| 24  way? |

| Page 19 |
|---|
| 1    A.  That's what we are taught. |
| 2    Q.  That's what you are taught, okay.  So, if you |
| 3   know an employee is undergoing a lot of stress as a |
| 4   result of a death in the family, for example, as long |
| 5   as their job performance is not affected his |
| 6   supervisor wouldn't get involved? |
| 7    A.  They could ask for help.  If the work |
| 8   performance is not suffering, if they ask for help, it |
| 9   would be another avenue. |
| 10   Q.  Would you agree or disagree with a statement |
| 11  that a supervisor in the Department of Correction has |
| 12  an affirmative obligation and duty to try to get an |
| 13  employee help if they're experiencing psychological or |
| 14  emotional problems even if their job performance is |
| 15  not affected? |
| 16   A.  You have to narrow that one down for me.  I |
| 17  don't understand the question. |
| 18   Q.  If an employee is having psychological |
| 19  problems, but it's not affecting their job |
| 20  performance, does their supervisor have a duty to try |
| 21  to get them help? |
| 22   A.  I wouldn't think that a supervisor would know |
| 23  that they were having psychological problems if the |
| 24  work performance wasn't affected. |

| Page 20 |
|---|
| 1    Q.  What if they did? |
| 2    A.  How would they know?  In what way did they find |
| 3   out? |
| 4    Q.  What if someone told them. |
| 5    A.  Okay. |
| 6    Q.  I'm sorry? |
| 7    A.  Then, yes, you would offer help. |
| 8    Q.  You would have a duty? |
| 9    A.  Yes. |
| 10   Q.  Now, in that type of a situation would you try |
| 11  to keep an eye on the employee in addition to trying |
| 12  to get them psychological help -- strike that.  In |
| 13  that type of a situation would you also try to keep an |
| 14  eye on the employee to try to make sure their work |
| 15  performance wasn't suffering? |
| 16   A.  I'm not sure if I understood the preceding |
| 17  question.  If the employee came forward and said I |
| 18  have a psychological problem, could you help me, |
| 19  that's what I was answering, the preceding question. |
| 20  I think we got confused there. |
| 21   Q.  Let me try to go back.  If you learn that an |
| 22  employee is experiencing emotional and psychological |
| 23  problems and you were told about that by either the |
| 24  employee or someone else, would a supervisor in the |

| Page 21 |
|---|
| 1   Department of Correction have a duty to try to get |
| 2   that employee help? |
| 3    A.  If you were told by the employee, you would |
| 4   have that duty.  If you were told by someone else, you |
| 5   might ask the employee if everything was okay. |
| 6    Q.  Why is that? |
| 7    A.  I'm not sure that you would ask, but really -- |
| 8   I guess I'm going to have to back up.  Really it's up |
| 9   to the employee to let you know that he is |
| 10  experiencing some kind of problem and needs help if |
| 11  you can't see it in the work performance. |
| 12   Q.  Even if someone else comes to you and tells you |
| 13  that the employee is experiencing those kinds of |
| 14  problems, either psychological, emotional or physical, |
| 15  even if that happens, is it your testimony that a |
| 16  supervisor still should not do anything unless the |
| 17  employee himself comes to them? |
| 18   A.  If the employee is not in distress and not |
| 19  suffering work performance issues, I would say that |
| 20  you would not take any action. |
| 21   Q.  What if they are suffering work performance |
| 22  issues? |
| 23   A.  Well, then, you obviously take some kind of |
| 24  action, seek to find out what the issues may be. |

6 (Pages 18 to 21)

b4df1416-6237-4460-9996-6282f42762be

A0898

Balas v. Taylor, et al.
Michael E. DeLoy

Page 22

1  Q.  And what if you find out that the issues are
2  the employee is suicidal, what kind of action would a
3  -- what type of action should a supervisor in the
4  Department of Correction take under those circum-
5  stances?
6  A.  He should refer them to our Employee Assistance
7  Program immediately.
8  Q.  The EAP?
9  A.  Yes.
10  Q.  Is that how it's generally referred to in the
11  DOC?
12  A.  Yes.
13  Q.  And by "DOC" you understand I'm referring to
14  the Department of Correction?
15  A.  Yes.
16  Q.  And it's singular, not plural, correction?
17  A.  Yes.
18  Q.  Let's talk about the Employee Assistance
19  Program a little bit.
20      MR. NEUBERGER:  Ralph, this is marked
21  previously as Mears Exhibit Number 1.  If you don't
22  have a copy, I have two.  Here, one for each of you.
23      MR. DURSTEIN:  Thank you.
24

Page 23

1  BY MR. NEUBERGER:
2  Q.  Warden DeLoy, do you have this document in
3  front of you?
4  A.  Yes.
5  Q.  Have you ever seen a document which looked
6  similar to this before?
7  A.  I have.
8  Q.  What is this?
9  A.  I believe this is a Department of Correction
10  newsletter.
11  Q.  And at least on the first page in the top right
12  does it say "Newsletter September 2004"?
13  A.  It does.
14  Q.  Let's go down to the fourth paragraph and could
15  you read that quietly to yourself.
16  A.  (Witness complies.)  Okay, I've done that.
17  Q.  Does this paragraph reference some of the
18  Employee Assistance Program benefits that are out
19  there to help an employee who might be experiencing
20  emotional or psychological troubles?
21  A.  Yes.
22  Q.  And do you see the second to last line in that
23  paragraph where it says, "Supervisors can also refer
24  employees to HMS --"

Page 24

1  A.  Yes.
2  Q.  "-- or contact them to get advice in how to
3  handle troubled employees."
4  A.  Yes.
5  Q.  Now, have you ever had a supervisor do that, a
6  supervisor under your command?
7  A.  Yes.
8  Q.  And from what you know about those situations
9  was it only after the employee asked for help?
10  A.  Or if it was a work performance issue.
11  Q.  Or if it was a work performance issue?
12  A.  Yes.
13  Q.  If an employee's job performance is dropping
14  from what it usually is, that might be a work
15  performance issue?
16  A.  Yes.
17  Q.  Let's turn two more pages and in the top
18  right-hand corner does it say "Newsletter October
19  2004"?
20  A.  Yes.
21  Q.  In bottom right-hand corner does it say
22  "D00345" as the Bates stamp?
23  A.  Yes.
24  Q.  Do you see in the forth paragraph up from the

Page 25

1  bottom where it says, "EAP is a strong supervisor's
2  tool, but is underutilized"?
3  A.  Yes.
4  Q.  Could you read that to yourself, please, and
5  let me know when you are done.
6  A.  (Witness complies.)  Okay, I have done that.
7  Q.  Does the first sentence of this paragraph
8  roughly state that the EAP is a tool that has been
9  underutilized by supervisors and managers in the
10  Department of correction?
11  A.  It does state that.
12  Q.  Would you agree or disagree with that
13  statement?
14  A.  I would do neither.
15  Q.  You would neither agree or disagree?
16  A.  Correct.
17  Q.  What would your reaction to that statement be
18  then?
19  A.  Well, I know that we use it at SCI frequently.
20  I don't know what underutilized would mean.
21  Q.  Let's try narrowing the time frame then.
22  A.  Okay.
23  Q.  For example, you are the warden at SCI now,
24  right?

7 (Pages 22 to 25)

b4df1416-6237-4460-9996-6282f42762be

A0899

Balas v. Taylor, et al.
Michael E. DeLoy

| Page 26 |
|---|

1   A.  Yes.
2   Q.  And do you try to encourage the supervisors and
3   managers under your command to utilize the EAP in
4   appropriate circumstances?
5   A.  Yes.
6   Q.  Is that something that is important to you?
7   A.  Yes.
8   Q.  And then before you were warden you were deputy
9   warden, right?
10   A.  Correct.
11   Q.  Who was the warden while you were deputy
12   warden?
13   A.  Richard Kearney.
14   Q.  Let's focus on the time frame from August of
15   2004 through approximately February of 2005.
16   A.  Okay.
17   Q.  Okay?
18   A.  Yes.
19   Q.  Now, do you think that the EAP program was
20   underutilized in that time frame?
21   A.  I don't know.  I don't have any statistics to
22   make a judgment on that.
23   Q.  How about based on everything that you have
24   observed in your position as deputy warden?  Was it

| Page 27 |
|---|

1   underutilized during that time frame?
2   A.  Again, I don't have numbers in front of me to
3   make a decision whether it was underutilized, over-
4   utilized.
5   Q.  As deputy warden you were second in command of
6   the entire SCI facility, weren't you?
7   A.  Yes.
8   Q.  And other than the warden everybody reported up
9   the chain of command and they came to you, right?
10   A.  Yes.
11   Q.  And ultimately you were at the top of that
12   chain?
13   A.  Yes.
14   Q.  And if there is a problem out there and it
15   can't be resolved by a supervisor lower in the chain
16   of command, it ultimately finds its way up to you?
17   A.  Possibly.
18   Q.  If there is a disciplinary process in the
19   prison, are you involved in that in some way?
20   A.  Yes.
21   Q.  If there is a security problem, are you
22   involved in that in some way?
23   A.  Yes.
24   Q.  Whatever type of problem in the prison does

| Page 28 |
|---|

1   that eventually make its way up to you?
2   A.  Could you repeat that, please.
3   Q.  We talked about security problems and we talked
4   about personnel problems in the prison.  If there are
5   other kinds of problems, if the facilities are
6   crumbling, would that eventually find its way up the
7   chain of command to you?
8   A.  Yes.
9   Q.  If there is a medical problem in the prison,
10   would that eventually find its way up to you?
11   A.  Probably.
12   Q.  If there is a program which is being under-
13   utilized in the prison, would that issue eventually
14   find its way up to you?
15   A.  Not necessarily.
16   Q.  Who would it go to?
17   A.  I know that you are referring to --
18   Q.  I'm referring to the EAP program.
19   A.  The EAP program.  That is not always reported
20   up the chain of command.  That may be a program that
21   is undertaken by the employee.  It may be -- you may
22   be referred by a supervisor, but there is some
23   confidentiality that goes along with that.  That may
24   not be reported up through the chain of command.

| Page 29 |
|---|

1   There may be instances out there that I'm not aware
2   of.
3   Q.  How about we focus on the instances you are
4   aware of.
5   A.  Okay.
6   Q.  In your position as deputy warden did you have
7   any observations that it wasn't being used enough and
8   that employees in the prison were suffering under
9   stress and it was affecting their performance in the
10   workplace and those employees were not being referred
11   to the EAP program?
12   A.  I'm sorry, you will have to repeat that for me.
13   You lost me.
14   Q.  In your position as deputy warden during that
15   time frame from August of 2004 until February of 2005,
16   during that time frame, did it come to your attention
17   that supervisors and managers in the prison were not
18   referring their employees to the EAP program despite
19   the fact that the employee's job performance was
20   suffering?
21   A.  No, that did not come to my attention.
22   Q.  Let's turn three more pages.  Does this appear
23   to be another newsletter, dated December of 2004?
24   A.  Yes.

8 (Pages 26 to 29)

b4df1416-6237-4460-9996-6282f42762be

A0900

Balas v. Taylor, et al.
Michael E. DeLoy

| Page 30 | Page 32 |
|---|---|
| 1   Q.  And let's go down to the fifth paragraph down | 1   two? |
| 2   where it says, "When Christmas is not so jolly"? | 2   Q.  Yes, the one numbered number two. |
| 3   A.  Okay. | 3   A.  Okay.  Okay. |
| 4   Q.  Could you read that quietly to yourself, | 4   Q.  I think we covered some of this already in your |
| 5   please. | 5   testimony, but I just want to use this document to try |
| 6   A.  (Witness complies.)  Okay, I have read that. | 6   to get out some of the specifics.  All right? |
| 7   Q.  Before we start talking about that specific | 7   A.  Okay. |
| 8   paragraph do you see these DOC newsletters in the | 8   Q.  I think you testified a little bit before about |
| 9   prison? | 9   how if an employee's work performance is being |
| 10   A.  Yes, you do see them in prisons. | 10   affected that the supervisor or manager in the DOC |
| 11   Q.  Do you read them, you as in specifically you? | 11   would have an obligation to try to get them some help, |
| 12   A.  Sometimes I may. | 12   right? |
| 13   Q.  Do you have any present recollection of whether | 13   A.  That would be a sign they need some type of |
| 14   you may have read or may not have read these three | 14   help. |
| 15   newsletters that we are looking at? | 15   Q.  If they are having psychological or emotional |
| 16   A.  I have no recollection of having read them or | 16   problems and it's affecting their day-to-day job |
| 17   not having read them. | 17   performance, this Mears Exhibit 2, which is in front |
| 18   Q.  It was a long time ago? | 18   of you right now, this talks about psychological |
| 19   A.  Yes. | 19   fitness for duty exams, right? |
| 20   Q.  Three years or more? | 20   A.  Yes. |
| 21   A.  Yes. | 21   Q.  Is that one of the tools that is out there to |
| 22   Q.  Let's talk about this paragraph where it says, | 22   try to help an employee? |
| 23   "When Christmas is not so jolly."  Does this paragraph | 23   A.  It appears so by this document. |
| 24   speak about how depression and development of suicidal | 24   Q.  Are you familiar with this document? |

| Page 31 | Page 33 |
|---|---|
| 1   thoughts are greater around the time of the Christmas | 1   A.  Not familiar with this document. |
| 2   holidays for some people? | 2   Q.  Got you.  At the very top does it say, "Policy |
| 3   A.  It does. | 3   of State of Delaware, Department of Correction"? |
| 4   Q.  Does it talk about 80 percent of suicide | 4   A.  Yes. |
| 5   victims communicate their intentions verbally while 20 | 5   Q.  And "Policy Number 9.19""? |
| 6   percent communicate through their behavior? | 6   A.  Yes. |
| 7   A.  It does say that. | 7   Q.  And it's under "Chapter 9-Personnel, Training |
| 8   Q.  Does it also urge persons to take the time to | 8   and Employee-Management Relations"? |
| 9   tune in to your loved ones or co-workers and don't let | 9   A.  Yes. |
| 10   inaction result in tragedy? | 10   Q.  And it says, "Approved By The Commissioner," |
| 11   A.  Yes. | 11   and would that be Stan Taylor's signature? |
| 12   Q.  And it talks about how the state's EAP program | 12   A.  Correct. |
| 13   can offer help and 24-hour counseling if you need it? | 13   Q.  And does it say, "Effective Date:  October 1, |
| 14   A.  Yes. | 14   1998"? |
| 15   Q.  Let's take a look at what was previously marked | 15   A.  Yes. |
| 16   as Mears Exhibit 2.  Do you have this document in | 16   Q.  Let's turn to the very last page of this |
| 17   front of you? | 17   document, does it say, "These procedures must be |
| 18   A.  Yes, I do. | 18   included in each bureau/section manual"? |
| 19   Q.  What I would like you to do is just read the | 19   A.  Yes. |
| 20   first page and then the first paragraph on the second | 20   Q.  Are there a lot of policies and procedures and |
| 21   page quietly to yourself so you can familiarize | 21   rules and regulations in the various manuals that |
| 22   yourself with it.  That's all I am going to ask you | 22   govern everything at SCI? |
| 23   questions about.  Okay? | 23   A.  Yes. |
| 24   A.  Okay.  Did you say the first paragraph on page | 24   Q.  Just because there is a lot of things happening |

9 (Pages 30 to 33)

b4df1416-6237-4460-9996-6282f42762be

A0901

Balas v. Taylor, et al.
Michael E. DeLoy

| Page 34 | Page 36 |
|---|---|
| 1  at SCI, there is a lot of employees, a lot of<br>2  prisoners, things like that?<br>3  A.  Yes.<br>4  Q.  Would you have any reason to contest the fact<br>5  that this is one of the policies which governs?<br>6  A.  No.<br>7  Q.  Let's go down on the very first page where it<br>8  says number six, "Procedures."  I would like to focus<br>9  on this paragraph a little bit.  Does this paragraph<br>10  indicate that when a warden or a section administrator<br>11  becomes aware of employee behavior or conduct that<br>12  suggests that an employee is experiencing<br>13  psychological problems that interfere or prevent the<br>14  employee from functioning on the job, would otherwise<br>15  present a danger to the workplace for psychological<br>16  reasons, that they will make some kind of mandatory<br>17  report to the human resources directory?<br>18  A.  Yes, that is what that says.<br>19  Q.  And I would like to focus on whether this<br>20  policy just applies if an employee tells you these<br>21  things.  That's where I'm going to focus my<br>22  questioning on, okay?<br>23  A.  Yes.<br>24  Q.  Now, where the policy talks about employee | 1  A.  Those things would trigger the policy.<br>2  Q.  It's only if an employee says it to you?<br>3  A.  Or if I know that the employee is under-<br>4  performing.<br>5  Q.  If they're not performing up to their usual<br>6  standards?<br>7  A.  Yup.<br>8  Q.  Let's focus on that a little bit more.  So, if<br>9  a prison guard comes to you and says, My fellow prison<br>10  guard has a gun in his locker and he is ready to shoot<br>11  himself in the head, but he is doing his job very<br>12  well, would that not trigger some kind of<br>13  intervention?<br>14  A.  That would trigger an investigation.  I would<br>15  have that officer report to the investigative officer<br>16  and have an investigation begun.<br>17  Q.  What if a prison guard came to you and said<br>18  that a fellow prison guard he doesn't have a gun, but<br>19  he is going to kill himself in the prison today, would<br>20  that trigger this kind of a policy?<br>21  A.  That would trigger another investigation.  That<br>22  would trigger an investigation.  I would have someone<br>23  investigate that claim by that officer.<br>24  Q.  Once the investigation was concluded and if it |

| Page 35 | Page 37 |
|---|---|
| 1  behavior that could be his behavior in work release,<br>2  correct?<br>3  A.  Yes.<br>4  Q.  Like he is not doing his job right or things<br>5  like that?<br>6  A.  Yes.<br>7  Q.  Same thing with employee conduct?<br>8  A.  Yes.<br>9  Q.  For example, if an employee hits a supervisor,<br>10  that could put your antenna up, so to speak, right?<br>11  A.  Yes.<br>12  Q.  Now, if an employee is suicidal, could that<br>13  interfere with an employee's ability to do their job<br>14  each day?<br>15  A.  It could.<br>16  Q.  Now, what happens if a co-worker comes and<br>17  tells you that one of their fellow employees is<br>18  suicidal, would this policy be triggered?<br>19  A.  We are trained -- I need to go back to that --<br>20  to really look at the employee, the employee's<br>21  performance and employee's conduct or what the<br>22  employee may say to you.  So, that's what -- did you<br>23  say trigger?<br>24  Q.  Would it trigger this policy? | 1  was verified that the employee intended to kill<br>2  themselves, then would this policy be triggered and HR<br>3  be notified?<br>4  A.  Yes.  Well, currently we would notify HMS, not<br>5  HR.<br>6  Q.  How about we focus on the time frame of the<br>7  August of 2004 to February of 2005.<br>8  A.  I'm sorry, that's what I meant, during that<br>9  time frame HMS is who we would have contacted.<br>10  Q.  Not HR?<br>11  A.  I think during that process HR gets notified.<br>12  I'm not positive.  It's my understanding that HR has<br>13  contracted with HMS to provide those services that may<br>14  be talked about here.<br>15  Q.  How would a psychological fitness for duty<br>16  evaluation be launched?<br>17  A.  Probably through the disciplinary process.<br>18  Q.  It's considered a disciplinary mechanism,<br>19  though?<br>20  A.  What?<br>21  Q.  The psychological fitness for duty process.<br>22  A.  You asked me how one might be launched?<br>23  Q.  Yes.<br>24  A.  It might be launched in the disciplinary |

Wilcox and Fetzer, Ltd.  Registered Professional Reporters        302-655-0477

b4df1416-6237-4460-9996-6282f42762be

A0902

Balas v. Taylor, et al.
Michael E. DeLoy

Page 38

1 process.
2   Q.  Is it considered a disciplinary mechanism?
3   A.  Depending on what circumstances were that
4 caused me for a psychological referral.
5   Q.  What if it was just the employee that told
6 another employee that they were going to kill themself
7 in the workplace?
8   A.  As I stated earlier, we would have that
9 investigated.
10   Q.  If that investigation was confirmed?
11   A.  We would notify the supervisor.
12   Q.  To do what?
13   A.  To contact employee assistance.
14   Q.  That wouldn't trigger a psychological fitness
15 for duty exam?
16   A.  I'm not sure.  That would probably be part of
17 what HMS would tell us.
18   Q.  You would defer to the expert, so to speak?
19   A.  Yes.
20   Q.  Got you.  You can put that down.  I would like
21 to focus your attention on the summer of 2004 in the
22 Department of Correction.  Okay?
23   A.  Okay.
24   Q.  Do you have any memories of some of the broad

Page 39

1 issues that the DOC was facing during that time frame?
2   A.  I probably do.
3   Q.  Could you name a couple of them for me?
4   A.  Some of the broad issues?
5   Q.  Yes.
6   A.  I'm sure referring to the COAD work action that
7 occurred that summer.
8   Q.  So, COAD is the union for the prison guards and
9 correctional officers, right?
10   A.  Correctional officer through correctional
11 sergeant.
12   Q.  And there is some kind of work action that
13 happened during that summer?
14   A.  There was a lot of union activity that summer,
15 yes.
16   Q.  At some point did COAD members stop accepting
17 what is known as voluntary overtime to staff the court
18 and transportation unit?
19   A.  They did.
20   Q.  Did that cause any problems in the DOC?
21   A.  It did.  Transporting prisoners, yes.
22   Q.  In addition to that I think you said there was
23 a lot of union activity that summer, right?
24   A.  Yes.

Page 40

1   Q.  Do you recall published media reports about
2 various security breakdowns in the prisons?
3   A.  I do, but vaguely.
4   Q.  And were there also published -- do you recall
5 published media reports addressing the union activity
6 that you are referring to?
7   A.  I do.
8   Q.  And do you recall the Department of Correction
9 filing a lawsuit against COAD and its union
10 leadership?
11   A.  I vaguely remember that, yes.
12   Q.  Let's try to focus a little bit more on August
13 of 2004.  All right?
14   A.  Okay.
15   Q.  Did there come a time when -- I think you
16 mentioned before when the court and transportation
17 unit was having problems getting officers to staff it,
18 right?
19   A.  Yes.
20   Q.  And one of the reasons for that was because of
21 the refusal of COAD members to work the voluntary
22 overtime required to staff it?
23   A.  Yes.
24   Q.  Right?  Do you recall a time in August of 2004

Page 41

1 when the CERT, C-E-R-T, team was activated to staff
2 the court and transportation unit?
3   A.  I do recall that.
4   Q.  And do you recall that ultimately most of the
5 members of the CERT team resigned as a result of that
6 call-up?
7   A.  Yes.
8   Q.  Do you recall why they resigned?
9   A.  I believe -- I don't know for certain why they
10 resigned, no.  I don't want to guess.
11   Q.  Did you ever learn later why?
12   A.  I don't think I really know why.  I would
13 imagine it was probably individual decisions on each
14 of those CERT team members.
15   Q.  Did you ever talk to the warden about it?
16   A.  Yes.
17   Q.  Did the warden ever tell you that they had met
18 with him and told you why?
19   A.  I don't know if he did or not.
20   Q.  Did you know John Balas?
21   A.  Yes.
22   Q.  How did you know him?
23   A.  I knew John as a co-worker and as a -- I don't
24 know how to describe it, but maybe a little bit more

11 (Pages 38 to 41)

b4df1416-6237-4460-9996-6282f42762be

A0903

Balas v. Taylor, et al.
Michael E. DeLoy

Page 42

1  than co-worker.
2    Q.  Like friends?
3    A.  Friend, yeah.  He had a side business and I
4  hired him to cut my lawn and my neighbor's lawn, we
5  played on a softball team together and so however you
6  would describe that.
7    Q.  He was someone that you in addition to knowing
8  him from work you also knew him outside of work?
9    A.  Yes, to a degree.
10   Q.  To a --
11   A.  To a degree.  John and I weren't really good
12 friends, but we did things together outside of work.
13   Q.  Like softball, for example?
14   A.  Right.
15   Q.  Did he ever talk to you about how much he loved
16 taking his kids go-cart racing?
17   A.  Yes.
18   Q.  Did he do that a lot?
19   A.  Yes.
20   Q.  From what you knew of John was he a hard
21 worker?
22   A.  Yes.
23   Q.  Was he dedicated?
24   A.  When John put his mind to something he was

Page 43

1  good, yeah.
2    Q.  Was he conscientious?
3    A.  Again, if he put his mind to it he could be
4  conscientious.
5    Q.  What do you know about him as an employee --
6  how would you describe what you know about him as an
7  employee?
8    A.  I would describe John as a good employee who
9  sometimes was a little bit stubborn or hard-headed,
10 which would occasionally affect his job performance.
11   Q.  Do you think John was a man of personnel
12 integrity from what you knew of him?
13   A.  I don't know if I would go that far.
14   Q.  How far would you go?
15   A.  Do you want to give me another description?
16   Q.  How would you describe John's personal
17 integrity, lacking or being there or he has it or
18 doesn't have it?
19   A.  I would say he has a degree of integrity.  I
20 think your first statement may have been too strong.
21   Q.  Is it your testimony that he was not a man of
22 personal integrity?
23   A.  Did you first say high integrity?
24   Q.  I thought I said personal integrity.

Page 44

1    A.  Oh, he had some integrity, okay, I would agree
2  with that.
3    Q.  But he wasn't a man --
4    A.  Here we go, let me try this.  Of all people out
5  there and all the degrees of integrity John would not
6  have been the highest in my opinion, which may not
7  amount to much anyway.
8    Q.  On a scale of one to ten, ten being the highest
9  and one being the lowest --
10   A.  Five, six, seven.
11   Q.  Average?  Above average?  Below average?
12   A.  Average.
13   Q.  Was he trustworthy?
14   A.  I would say to a degree.
15   Q.  To a degree --
16   A.  Probably the same degree as his integrity.  His
17 trustworthiness was average, maybe a little bit above.
18   Q.  I'm sorry, maybe a little --
19   A.  Maybe a little bit above average.
20   Q.  Was he honest?
21   A.  Again, I would give him the same grade.
22   Q.  A little above average?
23   A.  For all those descriptors, yes.
24   Q.  Would that grade be a little above average?

Page 45

1    A.  A little above average.
2    Q.  Was he a liar?
3    A.  I believe he was.
4    Q.  Do you have any specific instances that you can
5  point to as to where he would have lied?
6    A.  No.  I was never able to confirm any instances
7  where he lied.
8    Q.  If there was a -- let's go back to the
9  trustworthy questions.  If there was a riot in the
10 prison, would you want John next to you?
11   A.  Yes.
12   Q.  Now, back on the honesty and liar questions,
13 all right?  Now, if John had problems with truthful-
14 ness, do you think that would be reflected in his
15 employee file somewhere?
16   A.  I don't think it would be.  I don't know if it
17 is.
18   Q.  Right.
19   A.  But I don't think it would be.
20   Q.  Why not?
21   A.  The things that I'm aware of that John may or
22 may not have done --
23   Q.  Right, because you said you never got
24 confirmation on these things, right?

12 (Pages 42 to 45)

b4df1416-6237-4460-9996-6282f42762be

A0904

Balas v. Taylor, et al.
Michael E. DeLoy

| Page 46 | Page 48 |
|---|---|

**Page 46**

1   A.  Yes. -- weren't necessarily work-related; or,
2   if they were, they were never proven or never brought
3   up.
4   Q.  So, it was nothing related to his job
5   performance?
6   A.  I would not say that.
7   Q.  So, there was something related to his job
8   performance?
9   A.  There were some things that John may or may not
10  have done that were never proven that at least in my
11  mind would reflect on his honesty or trustworthiness.
12  Q.  Would this be the resignation from the CERT
13  team?
14  A.  No.
15  Q.  What would it be?
16  A.  Again, without evidence I don't want to make
17  the claim.
18  Q.  I'm just asking about the rumors that you have
19  heard.
20  A.  I'm not going to repeat rumors.  You were
21  asking -- this evolves from that question about
22  honesty, integrity and truthfulness.
23  Q.  I'm trying to get to the foundation of your
24  opinion.

**Page 47**

1   A.  I would just say overall over the few years
2   that I knew John there may have been some things that
3   affected the way I rated John in those categories.
4   Q.  And these are things that I think you said that
5   some were not work-related, but some were?
6   A.  Yes.
7   Q.  And I want to focus on those work-related ones.
8   What were they?
9   A.  Well, I can't think of those right now.  If you
10  are going to really press me for an example I can give
11  you a non-work related one.
12  Q.  I'm trying to focus on the workplace stuff, but
13  you just can't think of any right now.
14  A.  No.  Again, there was never any evidence that
15  would support that so I would not make that claim.
16  Q.  I can move on then.  Let's focus on the period
17  of time after August of 2004 in relation to John and
18  things you may or may not have heard or seen or
19  interactions you may or may not have had with him,
20  okay?
21  A.  Okay.
22  Q.  I would like to explore that a little bit.  Did
23  there come a time when you learned John was disputing
24  or that there was some kind of dispute surrounding

**Page 48**

1   John's employment evaluation?
2   A.  Yes.
3   Q.  Do you recall who gave him that employment
4   evaluation?
5   A.  Truman Mears.
6   Q.  Do you recall what the problems were?
7   A.  That John didn't agree with his meets
8   expectations evaluation.
9   Q.  And how did that come to your attention?
10  A.  I don't know if it was John or Truman.  One of
11  those guys brought it to my attention.
12  Q.  Was the issue ever resolved?
13  A.  No, not in John's mind.
14  Q.  Was it ever resolved in your mind?
15  A.  Yes.
16  Q.  How was it resolved in your mind?
17  A.  The evaluation was done, completed.  The
18  evaluation was completed.
19  Q.  And that was the end of it in your mind?
20  A.  Yes.
21  Q.  Do you recall if John ever came to you and
22  complained that Truman Mears had submitted his
23  performance evaluation to the warden, but had written
24  refused to sign where John's signature was supposed to

**Page 49**

1   be?
2   A.  I don't know if John came to me with that or
3   not.
4   Q.  Do you recall if that issue ever came to your
5   attention?
6   A.  The signature issue?
7   Q.  Yes.
8   A.  Yes, I believe it did come to my attention.
9   Q.  Do you recall what was said to you about it and
10  who said it or has it just been too long?
11  A.  I'm sorry, I don't remember who brought it to
12  me.  I'm aware John's signature was not on the
13  evaluation and I'm not sure who brought that to me,
14  who informed me of that.
15  Q.  Do you recall if John was unhappy that the
16  evaluation was submitted without his signature?
17  A.  I know that John was unhappy.
18  Q.  You are saying in general?
19  A.  With that evaluation.
20  Q.  With that evaluation?
21  A.  Yes.
22  Q.  With the entire course of events surrounding
23  the evaluation?
24  A.  Yes.

13 (Pages 46 to 49)

b4df1416-6237-4460-9996-6282f42762be

A0905

Balas v. Taylor, et al.
Michael E. DeLoy

| Page 50 | Page 52 |
|---|---|

**Page 50**

1  Q. Or was there something specific?
2  A. John came to me about being unhappy about his
3  evaluation.
4  Q. What did John say to you?
5  A. That he was unhappy about his evaluation. I
6  think it has been rated higher previously and he was
7  upset about the lower rating.
8  Q. Did he say why he was upset about the lower
9  rating?
10  A. I can't recall. I'm sure he did.
11  Q. Let me try to jog your memory a little bit
12  then. Did John say to you that he thought Truman had
13  given him a lower evaluation because John had resigned
14  from the CERT team in solidarity with the union
15  action?
16  A. I can't recall.
17  Q. Let's put in front of you what was previously
18  marked as Mears Exhibit Number 13. Now, you can read
19  this quietly to yourself to familiarize yourself with
20  it or I would be happy to go to the specific sentences
21  that I would like to ask you about. The call is
22  yours.
23  A. That would be fine. I don't recognize this
24  document.

**Page 51**

1  Q. Would you like to read it or would you like me
2  to direct you to certain parts of it?
3  A. Could you tell me what it is?
4  Q. This document is written in John Balas'
5  handwriting and these are personal notes that he was
6  contemporaneously keeping during the January to
7  February 2005 time frame and I would like to see if
8  this jogs your memory about some things John may have
9  said to you.
10  A. Okay.
11  Q. Would you like to read it or would you like me
12  to just point things out?
13  A. No, you can just point out.
14  Q. Okay. Let's go from the sixth line up from the
15  bottom towards the end of the line where there is a
16  new sentence and it says, "I feel"?
17  A. Yes.
18  Q. Could you read from those words to the end of
19  the page quietly to yourself, please.
20  A. Yes, (witness complies.) Okay.
21  Q. Did John ever tell you that he was feeling
22  pressured, intimidated and stressed by Lieutenant
23  Mears and Lieutenant Mears' actions?
24  A. You know, I can testify that John verbally told

**Page 52**

1  me that he was unhappy with the evaluation that he
2  got. I cannot remember exact words that he used to
3  describe his unhappiness, but I can testify that John
4  did tell me that he was unhappy with his evaluation.
5  Q. Then, I would like to focus on the why and what
6  John may have said about the why he was unhappy or why
7  he thought he had received that type of an evaluation.
8  Do you recall John coming to you and saying that he
9  was unhappy or that he thought that Truman was unhappy
10  with him because he had resigned from the CERT team?
11  A. Do I recall that John came to me and said that
12  he believed Truman was unhappy with him because he
13  resigned from the CERT team?
14  Q. Right, that John believed that, yes.
15  A. Yes, I don't recall that. John may have said
16  that to me.
17  Q. He may have said that to you?
18  A. He may have said that to me.
19  Q. It has been three years or a little less than
20  three years since these events happened, right?
21  A. Yes.
22  Q. And that's a long time?
23  A. Yes, it is a long time.
24  Q. And memories can fade and things like that,

**Page 53**

1  right?
2  A. Yes.
3  Q. And you are doing your best to recall?
4  A. I'm trying to remember. I mean, I can testify,
5  like I said before, that John came to me and said he
6  was unhappy about his meets expectations evaluation.
7  I don't remember the details of that conversation.
8  Q. But I think you are also testifying that he may
9  have said to you that he thought Truman was unhappy
10  with him because John had resigned from the CERT team?
11  A. John may have said that.
12  Q. He may have said that?
13  A. Yes.
14  Q. Trying to focus a little bit more on
15  conversations John may have had with you surrounding
16  the evaluation issue or other issues. Do you recall
17  if John ever came to you and said he thought Truman
18  was going after him and was angry at him because he
19  had resigned from the CERT team?
20  A. I think what John wanted me to do was remove
21  Truman as his supervisor.
22  Q. Did John ever say why?
23  A. Because he was unhappy with the evaluation and
24  did not think that he would get a better evaluation.

14 (Pages 50 to 53)

b4df1416-6237-4460-9996-6282f42762be

A0906

Balas v. Taylor, et al.
Michael E. DeLoy

Page 54

1   Q.   And did John ever explain to you why he was
2   unhappy with the evaluation and why he thought he
3   received the evaluation he did from Truman?
4   A.   He may have, but I do not remember the details
5   of that conversation.  The detail I remember is that
6   John wanted me to change his supervisor.
7   Q.   Could he have said to you during one of those
8   conversations that he felt that Truman was angry at
9   him because he had resigned from the CERT team?
10  A.   I don't recall the details.  I really don't
11  want to say something that I don't recall, so.
12  Q.   He may not have said it, but he also may have
13  said it?
14  A.   Yes.
15  Q.   You just don't remember either way?
16  A.   Yes.
17      MR. NEUBERGER:  Let's take that break now.
18      (Brief recess.)
19  BY MR. NEUBERGER:
20  Q.   Warden DeLoy, one thing I forgot to ask you
21  about the transfer issue.  I think you mentioned that
22  John wanted a transfer to a different supervisor or he
23  wanted his supervisor transferred or something?
24  A.   Yes.

Page 55

1   Q.   Which was it?
2   A.   He wanted a different supervisor.
3   Q.   Do you recall how many times he asked you about
4   that?
5   A.   No, I don't.
6   Q.   Do you recall if it was more than one time?
7   A.   It may have been more than one time.
8   Q.   And it has been so long it's hard to remember
9   the specifics, right?
10  A.   Yeah.  I clearly knew that he wanted a new
11  supervisor.
12  Q.   Do you recall any conversations with John and I
13  want to focus with conversations with John not about
14  the employment evaluation, okay?
15  A.   Okay.
16  Q.   Any other conversations with John where he
17  complained that Lieutenant Mears was harassing him?
18  A.   That were separate from the evaluation?
19  Q.   Yes, because we have talked about the
20  evaluation a bit so far.
21  A.   No.  Okay, my answer to that is no.  I think
22  all the conversations we had were about the
23  evaluation.
24  Q.   John during those conversations I think you

Page 56

1   said the word you used was he appeared to be unhappy?
2   A.   Yes.
3   Q.   Did he seem stressed about the issue?
4   A.   Yes, he was unhappy.
5   Q.   And there eventually came a time when John
6   died, right?
7   A.   Yes.
8   Q.   And he killed himself?
9   A.   Yes.
10  Q.   Did you go to his funeral?
11  A.   I went to his -- I went to one of the services
12  at the funeral home.
13  Q.   And do you recall which funeral home it was?
14  A.   I believe it was the funeral home in
15  Georgetown, Delaware.  Maybe called Shorts, I'm not
16  sure.
17  Q.   So, did you think that there were multiple
18  services there or multiple viewings or do you recall
19  if there was one or you just went to one?  I guess do
20  you recall the specifics of that?
21  A.   Of John's funeral?
22  Q.   I think you said you went to one of the
23  services.  Was it your understanding there were two
24  viewings or multiple church services?

Page 57

1   A.   You know sometimes how they have a viewing the
2   night before and the next day they have a service and
3   then on to the grave site.  I went to one of those for
4   John.  I'm not sure if it was -- I'm not sure if he
5   had a viewing actually, but, yes, I did attend part of
6   John's funeral service.
7   Q.   And like all funerals those are sad occasions,
8   right?
9   A.   Oh, yeah.
10  Q.   And did you talk to anybody there?
11  A.   I'm sure I did.
12  Q.   Did you express your condolences to the widow
13  or anything?
14  A.   Yes, I did, I recall that.
15  Q.   Do you recall talking to any other family
16  members, friends, co-workers, people there?
17  A.   I'm sure I did.  I can't remember any
18  specifics.
19  Q.   Do you recall meeting someone by the name of
20  John Owens?
21  A.   I know John Owens.
22  Q.   You know John Owens?
23  A.   Yes.
24  Q.   Did you talk to him there?

15 (Pages 54 to 57)

b4df1416-6237-4460-9996-6282f42762be

A0907

Balas v. Taylor, et al.
Michael E. DeLoy

| Page 58 | Page 60 |
|---|---|
| 1   A.  I can't remember.  If John were there at the | 1   A.  No. |
| 2  time I was there, I'm sure I would have spoken to him. | 2   Q.  Did you ever receive a phone call from Jennifer |
| 3   Q.  Because you knew him from something, from some | 3  Cox or Jennifer Weldon asking for help because John |
| 4  other contacts? | 4  Balas was going to kill himself? |
| 5   A.  Yes. | 5   A.  No. |
| 6   Q.  How would you know him? | 6   Q.  Who is Jennifer Cox or Jennifer Weldon? |
| 7   A.  His daughter played on the same softball team | 7   A.  She is the administrative assistant for the |
| 8  that my daughter played on. | 8  medical vender at SCI. |
| 9   Q.  Okay, got you.  In talking to John Owens at the | 9   Q.  And that's -- is that the CMS company? |
| 10  funeral or at the viewing or whatever it was did you | 10   A.  Yes, right now it's CMS. |
| 11  tell John that you feared for your job?  Did you tell | 11   Q.  What does the abbreviation stand for? |
| 12  John Owens that you feared for your job? | 12   A.  Correctional Medical Services. |
| 13   A.  No. | 13   Q.  Have you ever talked to Jennifer Weldon about |
| 14   Q.  Did you tell him that you knew that John Balas | 14  John Balas? |
| 15  was suicidal and you did nothing about it? | 15   A.  Yes. |
| 16   A.  No. | 16   Q.  And just so we are clear when I say Jennifer |
| 17   Q.  Are you sure? | 17  Weldon you also understand I'm referring to Jennifer |
| 18   A.  Yes. | 18  Cox, it's the same person? |
| 19   Q.  Do you remember the details of your | 19   A.  Yes. |
| 20  conversation with John Owens? | 20   Q.  When did you talk to her about John? |
| 21   A.  No, but I know I've never told anyone that. | 21   A.  Jennifer stopped by my office about two days |
| 22   Q.  You don't recall the details of your | 22  before John killed himself. |
| 23  conversation with John Owens, but you know for sure | 23   Q.  What did Jennifer say to you during that visit? |
| 24  that you never told anybody that, be it John Owens or | 24   A.  She told me that she had just broken up with |

| Page 59 | Page 61 |
|---|---|
| 1  anybody else, correct? | 1  John or was trying to break up with John and that she |
| 2   A.  Correct. | 2  was afraid that he may do something. |
| 3   Q.  Is John Owens an honest person? | 3   Q.  Did she specify what that do something was? |
| 4   A.  I don't know John that well. | 4   A.  Yes.  She said that she had started a |
| 5   Q.  You just know him from the sidelines at your | 5  relationship with another correctional officer and she |
| 6  daughter's softball games? | 6  was not sure how John was going to respond to all |
| 7   A.  Hanging on the fence and talking about the | 7  that. |
| 8  softball, the girls. | 8   Q.  Did she ever imply that he might kill himself? |
| 9   Q.  Let's re-wind to prior to John Balas killing | 9   A.  Yes. |
| 10  himself, okay? | 10   Q.  Do you recall what she said? |
| 11   A.  Okay. | 11   A.  She at first said that she didn't know -- there |
| 12   Q.  Did there come a time when you received a phone | 12  may be a fight between the two of them, that there |
| 13  call from a Jennifer Weldon also known as Jennifer | 13  were certainly hard feelings between the two of them, |
| 14  Cox?  I think she may have gotten married or | 14  and that she really wasn't sure what John might do. |
| 15  something. | 15   Q.  Did she use the words "suicide" or "kill |
| 16   A.  Have I ever received a phone call? | 16  himself" or something like that? |
| 17   Q.  Yes, from Jennifer Weldon or Jennifer Cox? | 17   A.  She said hurt himself.  She said get in a |
| 18   A.  Yes. | 18  fight, hurt himself.  She was upset. |
| 19   Q.  Have you ever received a phone call from her | 19   Q.  Was she worried about him that you observed? |
| 20  about John Balas? | 20   A.  I think she was worried about what might happen |
| 21   A.  No. | 21  at work.  I think she was worried that something was |
| 22   Q.  Did you ever receive a phone call from Jennifer | 22  going to occur at the site. |
| 23  Cox or Jennifer Weldon telling you that John Balas was | 23   Q.  At the site? |
| 24  thinking about killing himself? | 24   A.  Yes, I think that's why she came to me. |

16 (Pages 58 to 61)

b4df1416-6237-4460-9996-6282f42762be

A0908

Balas v. Taylor, et al.
Michael E. DeLoy

| Page 62 | Page 64 |
|---|---|
| 1    Q.  Because if something happened at the site that | 1    Q.  Do you recall what you said to her which would |
| 2  would be within your purview as deputy warden? | 2  express those sentiments? |
| 3    A.  Yes. | 3    A.  Not exactly, no. |
| 4    Q.  Do you recall anything else she said during | 4    Q.  So, then the meeting ended or did you talk to |
| 5  that conversation? | 5  her about -- do you know her from outside, does your |
| 6    A.  That's pretty much it. | 6  daughter play softball with her kids or something? |
| 7    Q.  You say "pretty much"? | 7    A.  No.  The meeting pretty much ended then. |
| 8    A.  That, you know, she basically said that she had | 8    Q.  Was the meeting in your office? |
| 9  been going with John Balas, dating him, romantically | 9    A.  Yes. |
| 10  involved, that she was trying to break it off, that | 10    Q.  At SCI? |
| 11  she wanted to -- or she had started a relationship | 11    A.  Yes. |
| 12  with another correctional officer, that John knew | 12    Q.  When the meeting ended, did she get up and walk |
| 13  about all that, that John wanted to get back with her | 13  out? |
| 14  and that she was afraid of what he might do. | 14    A.  Yes. |
| 15    Q.  Was she afraid John might do something violent | 15    Q.  Did she close the door behind her? |
| 16  towards her? | 16    A.  No. |
| 17    A.  She didn't mention that. | 17    Q.  She left the door open? |
| 18    Q.  When you are saying she was afraid of what John | 18    A.  Door is always open. |
| 19  might do -- this is what I'm trying to get at -- you | 19    Q.  It's like an open door policy? |
| 20  meant that he might do something to himself? | 20    A.  Yup. |
| 21    A.  To himself or to the other officer. | 21    Q.  What did you do then? |
| 22    Q.  Or to the other officer? | 22    A.  I talked to my supervisor about it. |
| 23    A.  Yes. | 23    Q.  Who was your supervisor? |
| 24    Q.  Did you understand her concern to be that he | 24    A.  The warden. |

| Page 63 | Page 65 |
|---|---|
| 1  might do something violent either to himself or to the | 1    Q.  And that would be Rich -- |
| 2  other officer? | 2    A.  Richard Kearney. |
| 3    A.  Yes. | 3    Q.  And what did you say to Warden Kearney? |
| 4    Q.  Do you recall anything else that she said | 4    A.  I just relayed the conversation I had with |
| 5  during that meeting? | 5  Jennifer. |
| 6    A.  I think that pretty much covers it. | 6    Q.  Other than relaying the conversation did you |
| 7    Q.  What was her demeanor? | 7  say anything else to him other than what she had told |
| 8    A.  She was calm.  I think she was just relating a | 8  you? |
| 9  concern.  Calm.  She wasn't hysterical or anything. | 9    A.  I don't believe so. |
| 10  She was calm. | 10    Q.  Did you launch an investigation? |
| 11    Q.  What was your reaction to her? | 11    A.  No, we did not.. |
| 12    A.  I thanked her for telling me that and that if, | 12    Q.  Did you call human resources? |
| 13  you know, something else came up to let me know.  You | 13    A.  No, we did not. |
| 14  know, I wasn't going to discuss with her what I may or | 14    Q.  Did you call the Employee Assistance Program? |
| 15  may not do.  I was just kind of receiving information | 15    A.  No. |
| 16  from her at that time. | 16    Q.  I guess which is run by the Human Management |
| 17    Q.  So, you are gathering the information up to try | 17  Services, HMS? |
| 18  to make an informed decision basically? | 18    A.  Yes. |
| 19    A.  Yeah, basically. | 19    Q.  So, you didn't call them? |
| 20    Q.  Did you say anything else to her during that | 20    A.  No. |
| 21  meeting? | 21    Q.  Did you launch a psychological fitness for duty |
| 22    A.  I may have tried to let her believe that | 22  evaluation for John? |
| 23  something would be done, something -- it would be | 23    A.  No. |
| 24  handled some sort of way. | 24    Q.  Did you call his union rep? |

17 (Pages 62 to 65)

b4df1416-6237-4460-9996-6282f42762be

A0909

Balas v. Taylor, et al.
Michael E. DeLoy

Page 66

1   A.  No.
2   Q.  Did you call John?
3   A.  No.
4   Q.  Did you call John's wife?
5   A.  No.
6   Q.  Did you call the other CO that Jennifer Weldon
7   was starting a relationship with?
8   A.  No.
9   Q.  What did you do?
10  A.  We determined that John had been given vacation
11  for that weekend, that particular week.  This was, I
12  believe, on a Thursday night.
13  Q.  It was Thursday night when you found out about
14  it?
15  A.  Yes, Thursday afternoon, I believe, after work.
16  Q.  Go ahead, I'm sorry.
17  A.  We determined that John was on vacation that
18  particular week.  I think it was emergency vacation to
19  spend time with his family.  I think they were going
20  to go to Cabella's.  I think between Rick and I we
21  kind of knew that somehow.  So, we discussed that and
22  thought it could probably wait until he came back from
23  his vacation.
24  Q.  What did the warden say to you in response to

Page 67

1   you relaying what Jennifer Weldon told you?
2   A.  I don't recall what he said.  We talked
3   obviously.  Discussed what we had just heard.
4   Probably discussed what we knew about John and made
5   the decision to wait until John came back to work.
6   Q.  Do you recall anything else that was talked
7   about by you or the warden during that meeting?
8   A.  (Nod of head.)
9   Q.  No?
10  A.  I'm still thinking.  I think that covers it.
11  Q.  Did the warden order any investigation
12  launched?
13  A.  No.
14  Q.  Did he call HR?
15  A.  No.
16  Q.  Did he order John for a fitness for duty
17  psychological evaluation?
18  A.  Not that I'm aware of.  All three of those
19  questions should be not that I'm aware of.
20  Q.  Okay, not that you are aware of.  Did he call
21  John's union rep or anything?
22  A.  Not that I'm aware of.
23  Q.  Did he call John?
24  A.  Not that I'm aware of.

Page 68

1   Q.  Did he call John's spouse?
2   A.  Not that I'm aware of.
3   Q.  Did he call the other CO that was referenced by
4   Jennifer Weldon?
5   A.  Not that I'm aware of.
6   Q.  Would a fight between two CO's be something
7   that would affect prison security if it happens on the
8   prison grounds?
9   A.  Yes.
10  Q.  Was that a concern to you and the warden?
11  A.  Yes, that was probably our biggest concern.
12  Q.  Right, that something might happen between two
13  CO's?
14  A.  Yes.
15  Q.  And that was one of the things you discussed
16  with the warden, right?
17  A.  Yes.
18  Q.  And ultimately it was decided that it could
19  wait until John got back from vacation?
20  A.  Yes.
21  Q.  So, then I think you said it was two days later
22  that John killed himself?
23  A.  Yes.
24  Q.  And is that a regret -- actually, strike that.

Page 69

1   Do you regret that -- you regret that you and the
2   warden hadn't reached a different decision?
3   A.  I regret that I did not know that John was
4   suicidal and as with anyone, you know, who commits
5   suicide you always wonder if there was something you
6   could have done to help them.
7   Q.  Have you ever had that happen before where a
8   prison employee comes to you and says that another
9   employee might kill themself?
10  A.  I don't believe so.  I mean, let me rephrase
11  that.  Sure, I've had people say that all the time,
12  but never had someone actually kill themselves.
13  Q.  People say that to you all the time that
14  someone is going to kill himself?
15  A.  No, not all the time.  I mean, I'm sure over
16  the course of my career that someone at work has told
17  me, made a statement, that guy might kill himself or
18  something like that.  So, I don't want to just say
19  flat no over 20-some years of working at the
20  Department of Correction.  Has it ever happened to me
21  before?  I can't remember, but it could have.
22  Q.  I mean, those instances would those be -- would
23  those be instances where someone was joking around and
24  saying that guy is really freaking pissed off and he

18 (Pages 66 to 69)

Wilcox and Fetzer, Ltd.  Registered Professional Reporters        302-655-0477

b4df1416-6237-4460-9996-6282f42762be

Balas v. Taylor, et al.
Michael E. DeLoy

Page 70

1  might go kill himself, something like that?
2    A.  That certainly could have happened, yes.
3    Q.  I guess what I'm trying to say is because the
4  paper won't pick that up, that kind of more of a
5  light-hearted not joking demeanor, but something
6  between people who know each other?
7    A.  Yeah, but I guess my point is I would give no
8  more credence to what Jennifer told me than if that
9  guy who was joking around told me because I just did
10  not know John was in that distress.  I didn't.  I did
11  not believe that John would hurt himself.
12    Q.  Did you and the warden make any reports on
13  that?  Did you put something in writing about this?
14    A.  No.
15    Q.  Did you put something in writing about Jennifer
16  Weldon coming to you about this?
17    A.  No.
18    Q.  Why not?
19    A.  We just had that discussion.  I mean, obviously
20  if the following week when John came back to work some
21  things would have occurred, but John never made it
22  back to work.
23    Q.  There were no memos to the file or things like
24  that written to preserve your thoughts while

Page 72

3  REPLACE THIS PAGE
4  WITH THE ERRATA SHEET
5  AFTER IT HAS BEEN
6  COMPLETED AND SIGNED
7  BY THE DEPONENT.

Page 71

1  everything was fresh in your mind?
2    A.  No.  I didn't think there would be a lawsuit.
3  I thought it was just a tragedy.
4        MR. NEUBERGER:  Ralph, I have no further
5  questions.
6        MR. DURSTEIN:  I have no questions.  I
7  think we want to read and sign.
8        (The deposition was concluded at 11:44
9  a.m.)
10          I N D E X
11  DEPONENT:  Michael E. DeLoy          PAGE
12    Examination by Mr. Neuberger          2
13
14        E X H I B I T S
15
16  (There were no exhibits marked for identification.)
17  ERRATA SHEET/DEPONENT'S SIGNATURE      PAGE 72
18  CERTIFICATE OF REPORTER          PAGE 73
19
20
21
22
23
24

Page 73

1  State of Delaware  )
2                    )
2  New Castle County  )
3
4
5        CERTIFICATE OF REPORTER
5
6    I, Christina M. Vitale, Certified Shorthand
  Reporter and Notary Public, do hereby certify that
6  there came before me on Tuesday, November 27, 2007,
  the deponent herein, MICHAEL E. DELOY, who was duly
7  sworn by me and thereafter examined by counsel for the
  respective parties; that the questions asked of said
8  deponent and the answers given were taken down by me
  in Stenotype notes and thereafter transcribed by use
9  of computer-aided transcription and computer printer
  under my direction.
10
11    I further certify that the foregoing is a true
  and correct transcript of the testimony given at said
12  examination of said witness.
13    I further certify that I am not counsel,
  attorney, or relative of either party, or otherwise
14  interested in the event of this suit.
15
16
17    Christina M. Vitale, CSR
    Certification No. 261-RPR
18  (Expires January 31, 2008)
19
20  DATED:
21
22
23
24

19 (Pages 70 to 73)

b4df1416-6237-4460-9996-6282f42762be



**WILCOX & FETZER LTD.**

In the Matter Of:

# Balas

## v.

## Taylor, et al.

### C.A. # 06-592-JJF

―――――――――――――――

### Transcript of:

David W. Wilkinson

### November 28, 2007

―――――――――――――――

Wilcox and Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: depos@wilfet.com
Internet: www.wilfet.com

Balas v. Taylor, et al.

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

```
CINDY L. BALAS a/k/a CINDY L.      )
ADKINS, Executrix of the Estate of )
CORPORAL JOHN J. BALAS,            )
                                   )
        Plaintiff,                 )
                                   ) Civil Action
v.                                 ) No. 06-592-JJF
                                   )
STANLEY W. TAYLOR, JR., individu-  )
ally and in his official capacity  )
as the Comissioner of Correction;  )
ALAN MACHTINGER, individually and  )
in his official capacity as the    )
Director of Human Resources of the )
Department of Correction; MICHAEL  )
DELOY, individually and in his     )
official capacity as Deputy Warden )
of Sussex Correctional Institution;)
CAPTAIN DAVID WILKINSON, individu- )
ally; LIEUTENANT TRUMAN MEARS,     )
individually; and DEPARTMENT OF    )
CORRECTION OF THE STATE OF         )
DELAWARE,                          )
                                   )
        Defendants.                )
```

        Deposition of DAVID W. WILKINSON taken
pursuant to notice at the law offices of The Neuberger
Firm, P.A., Two East Seventh Street - Suite 302,
Wilmington, Delaware, beginning at 10:18 a.m. on
Wednesday, November 28, 2007, before Christina M.
Vitale, Certified Shorthand Reporter and Notary
Public.

Continued. . . . . . . . . .

        WILCOX & FETZER
1330 King Street -  Wilmington, Delaware 19801
        (302) 655-0477
        www.wilfet.com

7340cd43-2484-4ac7-98c9-ef8fed9ec45f

Balas v. Taylor, et al.
David W. Wilkinson

|  | Page 2 |
|---|---|
1  APPEARANCES:
2
3  STEPHEN J. NEUBERGER, ESQUIRE
   CHERYL A. HERTZOG, ESQUIRE
   THE NEUBERGER FIRM, P.A.
4    Two East 7th Street, Suite 302
     Wilmington, Delaware 19801
5    For the Plaintiff
6
   STACEY XARHOULAKOS, ESQUIRE
7  DEPARTMENT OF JUSTICE
     Carvel State Office Building
8    820 N. French Street
     Wilmington, Delaware 19801
9    For the Defendants
10   - - - - - - - - - - - - - -
11       DAVID W. WILKINSON, the deponent herein,
12 having first been duly sworn on oath, was examined and
13 testified as follows:
14 BY MR. NEUBERGER:
15   Q.  Major Wilkinson, my name is Steve Neuberger and
16 I'm one of the attorneys for the plaintiff in this
17 case, Cindy Adkins, who is formerly known as Cindy
18 Balas.
19   A.  Yes, sir.
20   Q.  Have you ever testified in court before?
21   A.  Not that I can recall.
22   Q.  Have you ever been lucky enough to give a
23 deposition before?
24   A.  No.

|  | Page 3 |
|---|---|
1    Q.  I'm going to run you through some of the
2  procedures --
3    A.  I have been in court before a long time ago
4  putting charges on an inmate at jail.
5    Q.  But you haven't had a deposition taken before?
6    A.  Not that I can remember.
7    Q.  I'm going to run through the procedure so you
8  know what to expect and everything. I'm going to ask
9  you some questions and you will hopefully give me some
10 answers to those questions and the court reporter is
11 going to type up the questions and the answers. Okay?
12   A.  No problem.
13   Q.  And although she is very good she can't get
14 everything down if we talk at the same time so we have
15 to take turns talking. All right?
16   A.  Yes.
17   Q.  Then, if the answer to a question is no, say no
18 instead of shaking your head; or, if the answer is
19 yes, say yes instead of nodding your head. All right?
20   A.  Yes.
21   Q.  After we are done here today you will have the
22 opportunity to review the deposition transcript to
23 review any typographical errors or anything like that.
24 All right?

|  | Page 4 |
|---|---|
1    A.  Yes.
2    Q.  If I ask you a question and you don't
3  understand it, just ask me to rephrase it. All right?
4    A.  Yes.
5    Q.  Probably the most important thing is I don't
6  want you to guess. If you don't know an answer, just
7  tell me. Okay?
8    A.  Yes.
9    Q.  Are you taking any medications or is there
10 anything else happening with you today which would
11 prevent you from remembering accurately or testifying
12 truthfully?
13   A.  Not to my knowledge, no.
14   Q.  Also, if you need any breaks, if you need to
15 run to the John or something, let me know.
16   A.  Yes.
17   Q.  You have taken an oath to tell the truth today?
18   A.  Yes, I did.
19   Q.  And you understand the significance of that
20 oath?
21   A.  Yes.
22   Q.  And you understand I'm going to be asking you
23 some questions today about a lawsuit filed by Cindy
24 Adkins on behalf of her late husband, John Balas?

|  | Page 5 |
|---|---|
1    A.  Yes.
2    Q.  And you are a defendant in that case, right?
3    A.  Yes.
4    Q.  And you are already familiar both from that,
5  but also from experiencing some of the events in that
6  case, right?
7    A.  Yes.
8    Q.  You met with your attorneys prior to coming
9  here today?
10   A.  Yes.
11   Q.  Other than meeting with and talking with your
12 attorneys have you talked with anybody else about your
13 testimony today?
14   A.  No.
15   Q.  What is your full name?
16   A.  David Wayne Wilkinson.
17   Q.  And how old are you?
18   A.  I am 48.
19   Q.  Where were you raised?
20   A.  Milford, Delaware.
21   Q.  You are a lifelong Delawarian?
22   A.  Yes.
23   Q.  Where did you go to school at?
24   A.  Milford Senior High, Milford.

2 (Pages 2 to 5)

7340cd43-2484-4ac7-98c9-ef8fed9ec45f

A0914

Balas v. Taylor, et al.
David W. Wilkinson

Page 6

1   Q.  Did you continue your education at all after
2   high school?
3   A.  No.
4   Q.  When did you first begin working for the State
5   of Delaware?
6   A.  March of '83, I believe.
7   Q.  And was that with the Department of Correction?
8   A.  Yes, it was.
9   Q.  Department of Correction I guess?
10  A.  Correct, yes.
11  Q.  In March of '83 what was your rank?
12  A.  Correction officer.
13  Q.  CO, okay.  I guess there came a time when you
14  were promoted above the rank of CO, correct?
15  A.  Correct.
16  Q.  What was the next rank up then?
17  A.  I went to lieutenant.
18  Q.  Ballpark do you recall when that was?
19  A.  I'm going to say '86, '87.
20  Q.  And after lieutenant would be captain?
21  A.  Correct.
22  Q.  When were you promoted to the rank of captain?
23  A.  I believe that was '96 or '97, somewhere in
24  that vicinity.

Page 7

1   Q.  When you were promoted to the rank of captain,
2   where were you serving?
3   A.  Sussex Correctional Institution, Georgetown.
4   Q.  So, your rank now is major, right?
5   A.  Correct.
6   Q.  When were you promoted to major?
7   A.  December of 2005.
8   Q.  Did you serve in Georgetown your entire time
9   when you were captain?
10  A.  No.  While I was captain, yes, yes.
11  Q.  What were your responsibilities while you were
12  the captain there?
13  A.  I was the shift commander on the ten to six
14  shift and I was also the unit commander of the
15  pretrial command.
16  Q.  And what is that?
17  A.  It's a pretrial unit where we have new
18  commitments come in and we house them there.  It
19  consists of housing, receiving, booking and receiving,
20  and the education administration area.
21  Q.  So, you have been a public employee for 24
22  years, almost 25?
23  A.  Twenty-five this March.
24  Q.  So, as a public employee for 25 years you know

Page 8

1   the highest law of the land is something called the
2   U.S. constitution, right?
3   A.  Correct.
4   Q.  When you first came on board as an employee I
5   guess as a CO for the department you took an oath and
6   you swore to uphold and protect the constitution,
7   right?
8   A.  Correct.
9   Q.  You know what the constitution is?
10  A.  Yes.
11  Q.  You know there are amendments to the U.S.
12  constitution?
13  A.  Yes.
14  Q.  You know the first ten amendments are called
15  the bill of rights, correct?
16  A.  Correct.
17  Q.  And is the U.S. constitution something that is
18  important to you?
19  A.  Yes.
20  Q.  Has it been important to the Department of
21  Correction during your tenure there?
22  A.  As far as I know.
23  Q.  As a public employee you have also sought to
24  obey the U.S. constitution, right?

Page 9

1   A.  Correct.
2   Q.  For example, as a correction officer and now as
3   a major, but also in the Department of Correction, you
4   are aware that the 8th amendment to the U.S.
5   constitution forbids cruel and unusual punishment
6   inflicted upon prisoners, right?
7   A.  Yes.
8   Q.  Is that something that the Department of
9   Correction has always strived to obey and comply with?
10  A.  Correct, yes.
11  Q.  You also know that in addition to the
12  prohibition on cruel and unusual punishment on
13  prisoners prisoners also have certain first amendment
14  rights under the U.S. constitution, right?
15  A.  I guess, yes.
16  Q.  Are you aware that you can't punish a prisoner
17  because he is praying to God, Allah or Buddah or
18  something like that?
19  A.  Yes.
20  Q.  You are aware you can't punish a prisoner for
21  reading the Torah, Koran or Bible?
22  A.  Yes.
23  Q.  You know you can't punish a prisoner for filing
24  a lawsuit or formal grievance with the prison

3 (Pages 6 to 9)

7340cd43-2484-4ac7-98c9-ef8fed9ec45f

A0915

Balas v. Taylor, et al.
David W. Wilkinson

Page 10

1  administration?
2    A.  Yes.
3    Q.  And you know you can't punish a prisoner who
4  writes a letter to the general assembly asking for
5  changes in laws of some kind, right?
6    A.  Yes.
7    Q.  And you have always tried to respect the rights
8  of prisoners in the Department of Correction, right?
9    A.  Yes.
10   Q.  Has the DOC always tried to do that while you
11 have been an employee there?
12   A.  Yes.
13   Q.  In addition to there being prisoners in the
14 various prisons in the DOC there is also correctional
15 officers who guard those prisoners, right?
16   A.  Yes.
17   Q.  And those correctional officers they're
18 dedicated public employees, right?
19   A.  Yes.
20   Q.  They certainly don't have less constitutional
21 rights than the prisoners have, right?
22   A.  Yes.
23   Q.  For example, you know under the constitution
24 and various state and federal laws you can't

Page 11

1  discriminate against an officer because of the color
2  of his skin?
3    A.  Yes.
4    Q.  Or because of his or her gender?
5    A.  Yes.
6    Q.  Or because where of they go to church?
7    A.  Right.
8    Q.  You know that you can't punish an officer
9  because he voted for Governor Minner or Judge Lee in
10 the last election?
11   A.  Yes.
12   Q.  Or because they voted for George Bush or John
13 Kerry or whoever is running in this next election?
14   A.  Yes.
15   Q.  That's because some provision of the U.S.
16 constitution forbids that, right?
17   A.  Right.
18   Q.  You know you can't punish an officer because he
19 has filed a lawsuit in state or federal court, right?
20   A.  Correct.
21   Q.  You can't punish an officer because he has
22 petitioned the general assembly for some kind of
23 redress of grievances, right?
24   A.  Yes.

Page 12

1    Q.  You can't punish an officer because of that?
2    A.  Correct.
3    Q.  You can't punish an officer because he publicly
4  supports his union, right?
5    A.  Yes.
6          MR. NEUBERGER:  Are you guys going to
7  register the same objections to the punitive damages
8  question?
9          MS. XARHOULAKOS:  We are, yes.
10         MR. NEUBERGER:  Would you agree that issue
11 is preserved?
12         MS. XARHOULAKOS:  Yes.
13 BY MR. NEUBERGER:
14   Q.  Have the rank levels in the DOC changed since
15 you first came up?
16   A.  Since I was a correction officer?
17   Q.  Yes.
18   A.  Yes.
19   Q.  What comes after CO now?
20   A.  Corporal.
21   Q.  And then?
22   A.  Sergeant.
23   Q.  And then lieutenant?
24   A.  Then lieutenant.

Page 13

1    Q.  Then, everything on up is the same?
2    A.  Staff lieutenant, captain, major, yes.
3    Q.  And above major is deputy warden?
4    A.  Major is deputy warden and warden.
5    Q.  Got you.  As a prison guard, as a correctional
6  officer, was it important for you be alert on the job?
7    A.  Yes.
8    Q.  And was it important that you be able to try to
9  read prisoners and try to keep an eye out for any
10 signs of trouble?
11   A.  Yes.
12   Q.  Do you think that was something that you were
13 good at?
14   A.  Yes.
15   Q.  And you served as a CO for how many years?
16   A.  Approximately four.
17   Q.  And then --
18   A.  Lieutenant after that.
19   Q.  Right, and then lieutenant.  Okay.  Do you
20 think you would have been promoted to the rank of
21 lieutenant if you weren't good at your job?
22   A.  No.
23   Q.  Do you think you would have been promoted to
24 the rank of captain if you weren't good at your job?

4 (Pages 10 to 13)

7340cd43-2484-4ac7-98c9-ef8fed9ec45f

A0916

Balas v. Taylor, et al.
David W. Wilkinson

Page 14

1   A.  No.
2   Q.  Reading prisoners and observing people those
3  are important qualities for any correctional officer
4  to have, right?
5   A.  Yes.
6   Q.  Do you consider yourself to be a hands-on or
7  hands-off supervisor?
8   A.  Hands-on.
9   Q.  I'm sorry?
10   A.  Hands-on.
11   Q.  Is it important to you to try to keep an eye on
12  the employees under you to make sure they're doing
13  their jobs well?
14   A.  Yes.
15   Q.  And one of the reasons for that would be
16  because you are guarding dangerous prisoners, right?
17   A.  Yes.
18   Q.  And security is a very important thing?
19   A.  Yes.
20   Q.  As a result of that I'm sure you take your job
21  seriously, right?
22   A.  Yes, I do.
23   Q.  Are you the kind of employee and supervisor who
24  thinks the rules are made to be broken?

Page 15

1   A.  No.
2   Q.  Do you try to follow the DOC rules and policies
3  and whatever procedures there are out there to the
4  best of your ability?
5   A.  To the best of my ability, yes.
6   Q.  Do you try to ensure that the employees under
7  your command do the same?
8   A.  Yes.
9   Q.  Have you ever had a CO or other officer under
10  your command who had to work a double shift?
11   A.  Yes.
12   Q.  Have you ever had a CO or other officer under
13  your command who came down with the flu or something
14  like that?
15   A.  Yes.
16   Q.  Have you ever had a CO or other officer under
17  your command be in a bad car accident?
18   A.  Yes.
19   Q.  Have you ever had an officer under your command
20  who was having some kind of personal or family, some
21  kind of relationship trouble?
22   A.  Yes.
23   Q.  Have you ever had an officer under your command
24  who experienced a death in the family?

Page 16

1   A.  Yes.
2   Q.  Things like that can be stressful, can't they?
3   A.  To whom?
4   Q.  To the officer who is experiencing those
5  things.
6   A.  Yes.
7   Q.  Right, things like a death in the family or
8  those other five things I listed they can take a
9  physical or emotional or a psychological toll on an
10  officer who is experiencing them, right?
11   A.  Yes.
12   Q.  An officer who is experiencing those things
13  sometimes they can suffer a decline in their work
14  performance, right?
15   A.  Yes.
16   Q.  Not necessarily, but it can happen sometimes,
17  right?
18   A.  Yes.
19   Q.  And you care about the employees who are under
20  your command, right?
21   A.  Yes.
22   Q.  They're not like a replaceable cog in the big
23  machine, that is, the DOC?
24   A.  I care, yes.

Page 17

1   Q.  So the physical well-being of your employees is
2  important to you, right?
3   A.  Yes.
4   Q.  Is the psychological well-being of your
5  employees important to you as well?
6   A.  Yes.
7   Q.  How about the emotional well-being?
8   A.  Yes.
9   Q.  And one of the reasons for that is because
10  those things can affect their work performance too,
11  right?
12   A.  Correct.
13   Q.  And another reason is what you just mentioned a
14  few minutes ago is you actually care about your
15  employees?
16   A.  Correct.
17   Q.  If an employee is distracted or under stress or
18  has something on their minds, one of the work impacts
19  of that is it has the potential to affect prison
20  security or prison operations or things of that
21  nature, right?
22   A.  Correct.
23   Q.  As a result you try to be proactive in keeping
24  an eye on your employees who are experiencing those

5 (Pages 14 to 17)

7340cd43-2484-4ac7-98c9-ef8fed9ec45f

A0917

Balas v. Taylor, et al.
David W. Wilkinson

Page 18

1  type of issues?
2    A.  Correct.
3    Q.  Do you try to keep an eye on those employees to
4  make sure they're doing okay?
5    A.  Yes.
6    Q.  That they're not like cracking under the stress
7  caused by whatever it is?
8    A.  If I'm made aware, yes.
9    Q.  Only if you are aware?
10   A.  Yes.
11   Q.  If you don't know about something, you can't do
12  anything about it?
13   A.  Can't read minds, correct.
14   Q.  When you are made aware of an employee who is
15  under that kind of stress do you tell them, Tough
16  luck, suck it up, be a man?
17   A.  No.
18   Q.  Or do you try to get them some help?
19   A.  I have -- I have helped as far as talking to
20  them, help as far as referring them for help.  I have
21  done both.
22   Q.  Sometimes maybe a kind word or listening ear
23  can help an employee who is experiencing some kind of
24  workplace stress, right?

Page 19

1    A.  Yes, correct.
2    Q.  But then for more serious things the DOC also
3  has something called an Employee Assistance Program,
4  right?
5    A.  Correct.
6    Q.  Would you agree that the DOC encourages
7  supervisors that if the proposition arises to try to
8  get an employee who needs help involved in the
9  Employee Assistance Program?
10   A.  I do, yes.
11   Q.  Now, do you think that is just something that
12  you do or is that --
13   A.  No, others have, but I can't speak for others.
14  I don't know each and every case.  I know what cases
15  I've dealt with.
16   Q.  Based on the things you have personally
17  observed you are telling me you have done that?
18   A.  Yes, and I have seen others.
19   Q.  And in addition to the Employee Assistance
20  Program if there is an officer who is undergoing an
21  extreme amount of either psychological or emotional
22  stress affecting their work performance sometimes
23  those officers can be sent for psychological for
24  fitness duty examinations, right?

Page 20

1    A.  Yes.
2    Q.  And that's just another tool in the toolbox
3  which is there to try to help an employee sometimes?
4    A.  I don't know, I want to try to get it a little
5  bit more clear.
6    Q.  Sure.
7    A.  What I do if there is a problem I notify HMS.
8    Q.  And that's the employee assistance people?
9    A.  I explain to them what I have observed.  I have
10  scheduled staff to go to HMS and they evaluate them
11  there and take care of the problems.  My goal is to
12  try to keep everybody as an asset to the department,
13  be a productive asset, but that's what I have done.  I
14  can speak for what I do.
15   Q.  HMS in general do they try to report back to
16  you?
17   A.  Yes.
18   Q.  And let you know if the employee is either
19  doing better or they're seeking proper help, do they
20  try to give you a report of some kind?
21   A.  Yes.
22   Q.  Sometimes speaking to HMS might help the
23  employee, right?
24   A.  Yes.

Page 21

1    Q.  Or they might get the employee in touch with a
2  psychiatrist or psychologist or whatever type of help
3  they might need?
4    A.  Yes.
5    Q.  Have you ever experienced a situation where
6  speaking to HMS did not resolve the problem with the
7  employee?
8    A.  Yes.
9    Q.  What did you do in those circumstances?
10   A.  The individual never came back to work.  I've
11  never -- as a matter of fact, she went and started
12  working for another state agency.
13   Q.  Are you aware there is probably several large
14  policy books which contain Department of Correction
15  rules, regulations, policies and procedures?
16   A.  Yes.
17   Q.  Are you aware there is a policy in there
18  related to psychological for fitness duty exams?
19   A.  Yes.
20   Q.  Have you ever heard about that?
21   A.  Yes.
22   Q.  Have you ever read about it or anything like
23  that?
24   A.  When I was seeking help for people I have

6 (Pages 18 to 21)

7340cd43-2484-4ac7-98c9-ef8fed9ec45f

A0918

Balas v. Taylor, et al.
David W. Wilkinson

Page 22

1  looked for avenues of help.
2    Q.  And that's one avenue which is available to
3  employees or to supervisors or managers in the DOC,
4  right?
5    A.  Yes.
6    Q.  What would you do if you found out that an
7  employee was suicidal?
8        MS. XARHOULAKOS:  Objection, calls for
9  speculation.  Go ahead, you can answer.
10   A.  Is that the employee telling me this?  Or is
11  this --
12   Q.  We can break it down.  What happens if the
13  employee tells you that they're suicidal?
14   A.  Then, the first thing I do is I pick up the
15  phone -- talk to them try to find out what their
16  problem is and then I notify HMS, refer them to them.
17  Then, I make sure they show up for their appointment
18  because most of the time they deal with a gentleman
19  named Joe Morocco.  He is a counselor for HMS.  He
20  will then in turn let you know they showed for their
21  appointments, how many more appointments they're going
22  to be having, not necessarily their problem, but he
23  would confirm there is a problem.
24   Q.  I think one of the first things you mentioned

Page 23

1  is that you would call him?
2    A.  Yes.
3    Q.  Why?
4    A.  To initiate it, to initiate help.
5    Q.  Would that also be sort of the reaching out to
6  talk to them to maybe get a feel themselves?
7    A.  They're more trained to handle somebody who is
8  suicidal than myself.
9    Q.  How many employees did you supervise when you
10  were a lieutenant?
11   A.  When I was a lieutenant?
12   Q.  Yes.
13   A.  Whew, I don't even want to guess, I don't know.
14   Q.  How about when you were a captain?
15   A.  Captain I supervised I want to say five
16  lieutenants and upwards of -- I'm just guessing.  I
17  don't want to guess.  I would say plus 50 staff
18  members on any shift.  On the four to twelve shift I
19  was supervising up to three to five lieutenants and 70
20  staff members at any given time.
21   Q.  And now you are on the three to five shift --
22  I'm sorry?
23   A.  The ten to six shift.
24   Q.  Now you are a major, right?

Page 24

1    A.  Yes.
2    Q.  And you are a major who served in the
3  Department of Correction for almost 25 years now?
4    A.  Yes.
5    Q.  That's a long time, right?
6    A.  Yes.
7    Q.  And do you think you have a lot of experience
8  under your belt arising from those 25 years?
9    A.  Yes.
10   Q.  You have been around a lot of employees in the
11  Department of Correction over those years?
12   A.  Yes.
13   Q.  And you have supervised a large number of
14  people over those years?
15   A.  Yes.
16   Q.  Do you think you have had the opportunity to
17  deal with problems of all kinds as they arise in the
18  DOC over those 25 years?
19   A.  Yes.
20   Q.  You have had the opportunity to deal with
21  personnel issues over those 25 years?
22   A.  Yes.
23   Q.  You have had the opportunity to deal with
24  security issues in the prisons?

Page 25

1    A.  Yes.
2    Q.  One of the kinds of personnel issues that you
3  have had to deal with over those 25 years has been,
4  for example, an employee who is continually late to
5  work, right?
6    A.  Yes.
7    Q.  Employees where there is attendance problems,
8  right?
9    A.  Yes.
10   Q.  Employees who can't get along with co-workers,
11  right, or not?
12   A.  I haven't encountered those, but it's possible.
13   Q.  Have you encountered employees who are not
14  performing up to par?
15   A.  Yes.
16   Q.  Have you encountered employhees who are having
17  emotional or psychological problems?
18   A.  Yes.
19   Q.  You have had to deal with HMS and the Employee
20  Assistance Program, right?
21   A.  Yes.
22   Q.  You are familiar with the psychological for
23  fitness duty policy which is out there somewhere,
24  right?

7 (Pages 22 to 25)

7340cd43-2484-4ac7-98c9-ef8fed9ec45f

Balas v. Taylor, et al.
David W. Wilkinson

Page 26

1    A.  Yes.
2    Q.  And that would sort of -- would those be some
3  of the background, some of the foundation, on which
4  you draw for how to deal with problems as they arise
5  now?
6    A.  What type problems?
7    Q.  For example, if there is -- if an employee has
8  some kind of personal issue, would that be one of the
9  things that you draw on -- one of your bases of
10  knowledge as to how you dealt with those issues in the
11  past or how you have seen them addressed in the past?
12    A.  Yes.
13    Q.  Same thing with psychological problems?
14    A.  Yes.
15    Q.  Same thing for emotional problems?
16    A.  Yes.
17    Q.  I think I asked you some questions before I
18  went down that road about an employee who comes to you
19  and says that they're suicidal, right?
20    A.  Yes.
21    Q.  And you drew the distinction whether the
22  employee had told you about it personally versus
23  whether someone else had told you about it, right?
24    A.  Yes.

Page 27

1        MS. XARHOULAKOS:  I'm going to object,
2  misstating the testimony.
3    A.  In other words, it would depend if it's
4  somebody that is a friend, somebody that is an enemy,
5  somebody that heard a rumor.
6    Q.  As to?
7    A.  As to the reaction.
8    Q.  You are saying --
9    A.  If it's somebody dependable, somebody reliable.
10    Q.  The person who comes to you to report it?
11    A.  Yes.
12    Q.  It would depend on whether they're a friend or
13  enemy of the person who is reporting it -- let me
14  strike that.  Let's re-wind.  If the person who comes
15  to you and reports that another employee is suicidal,
16  are you saying that part of your reaction might depend
17  upon whether the person who is reporting it is a
18  friend, an enemy, a friend or enemy, of the person who
19  may or may not be suicidal?
20    A.  No.  The reaction, you would react, but you
21  would have to take -- I'm not going -- I don't want to
22  walk up to an employee and say, Are you suicidal?  I
23  would have to go talk to the person and see if he
24  gives me any signs of anything.

Page 28

1    Q.  If another co-worker comes to you and reports
2  that a second co-worker is suicidal -- actually, what
3  would your reaction be?
4    A.  Oh, I would listen to that employee.
5    Q.  Would you take notes on it?
6    A.  Yes, probably.  I'm not saying I would.  I'm
7  not saying it's policy.  If they say that somebody is
8  experiencing a problem, I would listen, yes.  Then, I
9  would probably get the opportunity to talk to that
10  individual to find out if I can detect if there is any
11  problem or not.  I mean, God, it's so hard to answer
12  your questions because there is so many avenues that
13  you are looking at.
14        I mean, I think it has to be more specific
15  of a question.  I mean, because I would deal with
16  issues in very many different ways and we're looking
17  at it if this guy said this, but in all actuality you
18  take a lot of things into consideration when you are
19  dealing with those issues and you are trying to pin me
20  one way and it's not that.  That's not the way it
21  works.
22    Q.  Tell me how it works.
23    A.  You know, in other words, for example, if
24  somebody came to me and said this officer is suicidal,

Page 29

1  I would see there is a problem with attendance, I
2  would see there is a problem happening, I see the work
3  level has failed.  First thing I do is get the guy in
4  and we would start a conversation, but we would start
5  with the work issues and then we would see if those
6  work issues led into that person trying to seek some
7  type of help.  If that person opens up and tells me
8  they got a problem, then naturally I'll act on it.
9        If that person does not tell me they got a
10  problem, I can't act on anything.  I can't assume
11  everybody -- if it's nothing dealing work-related and
12  I don't see work issue problems, his personal life and
13  what is going on out there I don't get into myself
14  personally.
15    Q.  Even if he might kill himself?
16    A.  Only if I knew, he tells me that.
17    Q.  It's only --
18    A.  If he tells me he is suicidal and I see signs
19  of if a man breaks down and cries, if a man starts
20  acting like he is having some type of nervous
21  breakdown, I refer them.  I have done it in the past,
22  I will continue to do that, but, you know, it's
23  different.  I see in this particular case I seen this
24  individual probably less than three hours every two

8 (Pages 26 to 29)

7340cd43-2484-4ac7-98c9-ef8fed9ec45f

A0920

Balas v. Taylor, et al.
David W. Wilkinson

Page 30

1  weeks. So, personally I had to make that effort to go
2  see this person.
3      Q.  Right now I'm trying to ask you general
4  questions. We'll get into the specifics of this case
5  later. Right now I'm trying to get a feel for your
6  approach as a manager and as a supervisor.
7      A.  Right.
8      Q.  To try to get a feel for you because I have
9  never met you before, have I?
10     A.  Correct.
11     Q.  We haven't talked outside of this deposition,
12  have we?
13     A.  No.
14     Q.  You didn't come up to my office and meet with
15  me?
16     A.  No.
17     Q.  We didn't have a beer at a bar together?
18     A.  Not that I can recall.
19     Q.  We didn't do shots or something like that?
20     A.  No.
21     Q.  That's why I'm trying to feel out what your
22  management approach is --
23     A.  Okay.
24     Q.  -- based on your 25 years of experience in the

Page 31

1  DOC.
2      A.  Okay.
3      Q.  So, I just asked you a whole lot of questions
4  about what your approach would be if you hear in some
5  way that an employee might be suicidal. Towards the
6  end I think you pointed out that one of the factors
7  that you would consider is whether the employee's
8  personal problems are affecting their work
9  performance, would that be fair to say?
10         MS. XARHOULAKOS: Would you like the
11  question rephrased?
12         THE WITNESS: Yes.
13         MS. XARHOULAKOS: Would you like to reask
14  or rephrase the question to clarify?
15  BY MR. NEUBERGER:
16     Q.  You looked like you were deep in thought,
17  that's why I didn't want to pose a new one.
18     A.  Yeah, I mean, it was kind of -- there has been
19  issues in the past where I deal with work-related
20  issues and then also it involves going into personal
21  things. I try to refrain from the personal side. I'm
22  not saying it's always that way. That's the best
23  answer I can give you.
24     Q.  If a problem arises in a person's personal

Page 32

1  life, but it affects their professional life, does
2  that then become more of a concern?
3      A.  Yes.
4      Q.  That's what I was trying to get at, it's my
5  fault for not asking a more clear question. I've
6  asked you some questions about an employee who might
7  pose a danger to themselves and I think the term I was
8  using is one who might be suicidal.
9      A.  Right.
10     Q.  Have you ever encountered a situation where an
11  employee may pose a danger to another employee in the
12  workplace?
13     A.  Yes.
14     Q.  How did you deal with those situations?
15     A.  Got them apart. We talked. Disciplinary
16  process. That type thing.
17     Q.  You said you got them apart?
18     A.  Separated.
19     Q.  Did you wait a month to meet with the employee
20  who might be the cause of the problem, the one making
21  the threat?
22     A.  Sometimes sooner, sometimes longer.
23     Q.  How do you determine whether you try to get
24  involved with that employee and speak to them sooner

Page 33

1  or later?
2      A.  It depends on the issue.
3      Q.  For example --
4      A.  If it's a security issue, ASAP. If it's
5  something that didn't affect the security, didn't
6  affect the safety and well-being of the inmates, staff
7  or public, it could wait a little longer.
8      Q.  Because that doesn't get as high a priority?
9      A.  Correct.
10     Q.  What happens if someone comes to you and
11  reports that one employee may do something violent to
12  another employee in the workplace?
13     A.  If someone reports that to me?
14     Q.  Yes.
15     A.  Then it's the same, I would have to use the
16  same theory I did if somebody came to me and told me
17  somebody was suicidal.
18     Q.  So, you would --
19     A.  I would have to talk to people.
20     Q.  Would you wait to do that?
21     A.  It depends if people were at work, if it was
22  something they heard last week, last month. You know,
23  I would have to know the situation before I can answer
24  your question correctly.

9 (Pages 30 to 33)

7340cd43-2484-4ac7-98c9-ef8fed9ec45f

A0921

Balas v. Taylor, et al.
David W. Wilkinson

Page 34

1        MS. XARHOULAKOS:  I'm going to enter a
2   standing objection so I don't have to keep
3   interrupting to the extent these questions are
4   hypothetical it seems to be where some of the
5   confusion is coming from and calling for a lot of
6   speculation.  So, I will just enter a standing
7   objection that they call for speculation.
8        MR. NEUBERGER:  That works.  All right.
9   BY MR. NEUBERGER:
10   Q.  Do you have any recollection of the summer of
11  2004 in the Department of Correction?
12   A.  No.
13   Q.  Do you --
14   A.  I'm sorry, I cannot -- I worked for the
15  Department of Correction in the summer of 2004.
16   Q.  You were there, you didn't take like a three-
17  month vacation?
18   A.  Not a three-month, no.
19   Q.  Do you recall that there may have been some
20  security concerns that summer some of which may have
21  culminated in the abduction and rape of a correctional
22  counselor at the prison in Smyrna?
23   A.  Yes.
24   Q.  Do you recall there being media attention,

Page 35

1   newspaper articles, radio, newscasts, about that
2   problem, for example?
3    A.  Yes.
4    Q.  And do you recall there being some
5   disagreements between the union known as COAD, the
6   Correctional Officers Association of Delaware, and
7   management in the DOC that summer?
8    A.  Yes.
9    Q.  And do you recall that some of the
10  disagreements centered on staffing levels, salaries
11  and things like that?
12   A.  Yes.
13   Q.  Do you recall there came a time that summer
14  where the Department of Correction filed a lawsuit
15  against the union and the union officials?  When I say
16  "union" I mean COAD.
17   A.  Yes.
18   Q.  You do recall a time when that occurred?
19   A.  Yes.
20   Q.  And do you recall there being some type of a
21  job action that summer by the union members, whether
22  official or unofficial?
23   A.  Yes.
24   Q.  Yes?

Page 36

1    A.  Yes.
2    Q.  And do you recall a time when members of COAD
3   stopped accepting something called voluntary overtime
4   to staff the court and transportation unit?
5    A.  Yes.
6    Q.  Do you recall that causing problems in the
7   Department of Correction?
8    A.  Yes.
9    Q.  For example, if there is no one there to staff
10  the unit the unit has problems operating, right?
11   A.  The transportation unit?
12   Q.  Yes.
13   A.  Yes.
14   Q.  In general, if there is no one to staff a
15  position if there is enough understaffed positions
16  that can cause problems, right?
17   A.  Yes.
18   Q.  For example, if you need 20 guards to guard a
19  section of a prison and you don't have those 20
20  guards, that could cause problems?
21   A.  Yes.
22   Q.  The same concept applies as to the court and
23  transportation unit, right?
24   A.  Yes.

Page 37

1    Q.  If there is not staff for it --
2    A.  Doesn't happen.
3    Q.  -- then prisoners can't get transported to the
4   court?
5    A.  Yes.
6    Q.  That in turn would have some kind of domino
7   effect on the criminal justice system of prisoners
8   getting to hearings and things like that?
9    A.  Yes.
10   Q.  Were you serving in Georgetown or were you on
11  vacation in the beginning of August of 2004?  Do you
12  recall?
13   A.  No, I don't recall.
14   Q.  Do you recall a time when the CERT team was
15  activated to staff the court and transportation unit?
16   A.  Yes, I do.
17   Q.  Do you think you were at work in that time
18  frame?
19   A.  Yes.
20   Q.  So, do you recall that the CERT members showed
21  up to work that day to staff the unit, right?
22   A.  Yes.
23   Q.  And are you aware that when the shift was over
24  most of the CERT members walked into the warden's

10 (Pages 34 to 37)

7340cd43-2484-4ac7-98c9-ef8fed9ec45f

Balas v. Taylor, et al.
David W. Wilkinson

Page 38

1  office and resigned, right?
2    A.  I need to ask a question.
3    Q.  Sure.
4    A.  When you say aware, I was not physically there.
5  I had heard.
6    Q.  So, you heard about it at some point?
7    A.  Yes.
8    Q.  Did you hear about it contemporaneously or
9  three years later?
10    A.  A day or so later.
11    Q.  For example, you weren't one of the CERT
12  members who was activated?
13    A.  No.
14    Q.  You weren't in the warden's office when they
15  resigned, right?
16    A.  No.
17    Q.  With that understanding you did eventually
18  become aware of that?
19    A.  Yes.
20    Q.  Then, that takes us back to what I asked you
21  about earlier.  If there is not people to staff a
22  unit, the unit has trouble functioning, right?
23    A.  Yes.
24    Q.  For example, the court and transportation was

Page 39

1  having trouble functioning to begin with because of
2  the job action by the union, right?
3    A.  Yes.
4    Q.  And various members of the union were refusing
5  to work that voluntary overtime, right?
6    A.  Yes.
7    Q.  And the CERT team was activated to staff the
8  unit, right?
9    A.  Yes.
10    Q.  And then the CERT team apparently staffed the
11  unit for one day and then the members resigned, right?
12    A.  Yes.
13    Q.  At the end of that the DOC was still faced with
14  the problem of staffing the court and transportation
15  unit?
16    A.  Yes.
17    Q.  I think you testified earlier that not having
18  staff to staff that unit has the potential to cause
19  problems with transporting prisoners to court, right?
20    A.  Yes.
21    Q.  Because if the prisoners don't get to court
22  they don't get their day in court, right?
23    A.  Yes.
24    Q.  And that might -- well, strike that.  Did you

Page 40

1  ever talk to any of your co-workers about the CERT
2  resignation?
3    A.  Yes.
4    Q.  Do you recall who you talked to about it?
5    A.  John Balas, Jeff Foskey, F-O-S-K-E-Y.
6    Q.  Did you ever talk to anybody in management
7  about it?
8    A.  Not that I can recall.
9    Q.  Did you ever talk to -- who would have been the
10  major above you then?
11    A.  Phil Townsend.
12    Q.  Did you ever talk to Major Townsend about it?
13    A.  No.
14    Q.  How about Deputy Warden DeLoy?
15    A.  No.
16    Q.  Warden Kearney?
17    A.  No.  Remember, I worked the evening shift.
18    Q.  That's right, okay.  How about Lieutenant
19  Mears?
20    A.  No.
21    Q.  As of August of 2004 had you ever worked with
22  Lieutenant Mears?
23    A.  Yes.
24    Q.  Do you know him to be an officer who follows

Page 41

1  orders?
2    A.  Yes.
3    Q.  Did you ever give an order that he refused to
4  follow that you can recall?
5    A.  Not that I can recall.
6    Q.  And I think you said earlier that you are the
7  kind of officer who tries to follow rules and
8  regulations, right?
9    A.  Yes.
10    Q.  Do you also try to follow orders?
11    A.  Yes.
12    Q.  And you work with Major Townsend, right?
13    A.  I worked for him, yes.
14    Q.  You worked for him, right?
15    A.  Yes.
16    Q.  Did you ever experience him not to follow an
17  order that he was given?
18    A.  I wouldn't be privy to that information.
19    Q.  Did you ever learn of it in any way, shape or
20  form about not following an order he was given?
21    A.  No.
22    Q.  Did you ever know Major Townsend not to follow
23  an order given by Commissioner Stan Taylor?
24    A.  No.

11 (Pages 38 to 41)

7340cd43-2484-4ac7-98c9-ef8fed9ec45f

A0923

Balas v. Taylor, et al.
David W. Wilkinson

| Page 42 | Page 44 |
|---|---|

**Page 42**

1    Q.  You also worked with Deputy Warden DeLoy,
2  right?
3    A.  Yes.
4    Q.  How long did you work with him?
5    A.  I have -- man, as deputy warden?
6    Q.  How about ever?
7    A.  I'm trying -- I think I transferred to
8  Georgetown in '86.  I'm trying to remember.
9    Q.  Has it been --
10    A.  We didn't work side-by-side.  We worked in the
11  same prison.
12    Q.  You have worked in the same prison for 20-some
13  years now?
14    A.  Since I think it was '86, yes.
15    Q.  For about 21 years now?
16    A.  Yes.
17    Q.  And he was the deputy warden in the prison in
18  August of 2004, right?
19    A.  Yes.
20    Q.  Based on your 21 years of experience with
21  Deputy Warden DeLoy do you know him to be a man who
22  doesn't follow orders?
23    A.  No.
24    Q.  Do you know him to be a man who disregards

**Page 43**

1  orders given by the commissioner?
2    A.  No.
3    Q.  How about Warden Kearney -- how do you say his
4  name?
5    A.  Kearney.
6    Q.  How about Warden Kearney?
7    A.  No.
8    Q.  I think you also testified that you were aware
9  at some point that summer a lawsuit was filed by the
10  Department of Correction against the COAD union and
11  various union officials?
12    A.  Yes.
13    Q.  In talking to Lieutenant Mears, just basically
14  interactions with Lieutenant Mears, did he ever tell
15  you he did not support the position taken by the
16  department in that lawsuit?
17    A.  No.
18    Q.  Did you support the position taken by the
19  department in that lawsuit or do you just have no
20  opinion on it one way or the other?
21    A.  No opinion at all.
22    Q.  Did you ever hear Major Townsend say he did not
23  support the position taken by the DOC in that lawsuit?
24    A.  No.

**Page 44**

1    Q.  Did you ever hear Deputy Warden DeLoy say he
2  did not support the position taken by the DOC in that
3  lawsuit?
4    A.  Not that I can recall.
5    Q.  Same thing with the warden?
6    A.  Correct.
7    Q.  Let's change gears a little bit.  You mentioned
8  before that you had talked to John Balas, right?
9    A.  Yes.
10    Q.  And so would it be fair to say you worked with
11  John?
12    A.  Yes.
13    Q.  Do you recall ten years or so maybe?
14    A.  Yes.
15    Q.  Was John a good worker?
16    A.  He was -- whew, God, John -- he was an average
17  employee, yes.
18    Q.  Let's put some documents in front of you.
19    A.  Okay.
20    Q.  This was previously marked as Mears Exhibit
21  Number 6.  Do you have this document in front of you?
22    A.  Yes, I do.
23    Q.  Could you take a quick look at it for me and
24  tell me once you have looked at it.

**Page 45**

1    A.  (Witness complies.)  Okay.
2    Q.  Have you looked at it?
3    A.  Yes, I have.
4    Q.  Does this appear to be an employment evaluation
5  issued for John Balas for the time period January 1st
6  of 2001 through July 28th of 2002?
7    A.  Correct.
8    Q.  And is that your signature in the bottom right-
9  hand corner of the first page?
10    A.  Yes.
11    Q.  You were the reviewer of this evaluation on
12  August 5, 2002?
13    A.  Yes.
14    Q.  And looks like the evaluator was Lieutenant
15  Truman Mears, right?
16    A.  Yes.
17    Q.  And this evaluation gave John a ranking of
18  exceeds expectations?
19    A.  Yes.
20    Q.  And do you see up top where it says, "Areas
21  where performance is distinguished or exceeds
22  expectations, if any"?
23    A.  Yes.
24    Q.  And does that next paragraph talk about John's

12 (Pages 42 to 45)

7340cd43-2484-4ac7-98c9-ef8fed9ec45f

Balas v. Taylor, et al.
David W. Wilkinson

Page 46

1   membership on the CERT team, his CERT training and
2   talks about his perfect attendance as well, right?
3   A.  Yes.
4   Q.  Right, it talks about his perfect attendance
5   for the past two years?
6   A.  Yes.
7   Q.  Then, it goes down, two sections down, and
8   talks about how John was assigned to the receiving
9   room and he has a good knowledge of post orders and
10  procedures?
11  A.  Yes.
12  Q.  And he talks about how he uses leave in an
13  appropriate manner and always reports for duty on
14  time?
15  A.  Yes.
16  Q.  You can put that away.  Then, we'll put in
17  front of you what was previously marked as Mears
18  Deposition Exhibit 7.  Does this appear to be another
19  employment evaluation of John Balas?
20  A.  Yes.
21  Q.  Does this appear to be dated January of 2002
22  through May of 2003, first page, fourth line?
23  A.  Yes.
24  Q.  Yes?

Page 47

1   A.  This is not correct.
2   Q.  You are saying the second page aren't his --
3   A.  That's the same as this exhibit, isn't it?  Let
4   me look.
5   Q.  I think it's a different time frame.
6   A.  Yeah, it is, I'm sorry.  Go ahead, yes.  Okay.
7   Q.  Isn't the second page a list of goals that an
8   employee is given during his previous evaluation
9   period and then he is judged on whether he has met
10  those employment goals during his next evaluation
11  period?
12  A.  Yes.
13  Q.  Let's turn to the first page of Mears Exhibit
14  7.
15  A.  Okay.
16  Q.  I think we agreed that it covers the time frame
17  January of 2002 through May of 2003?
18  A.  Correct.
19  Q.  And, again, this gives John a ranking of
20  exceeds expectations, right?
21  A.  Correct.
22  Q.  And you also reviewed and signed this
23  evaluation, right?
24  A.  Correct.

Page 48

1   Q.  And there doesn't appear to be a date when you
2   reviewed it, but would it be fair to say it was
3   probably sometime in 2003?
4   A.  Yes.
5   Q.  Do you recall why you approved this evaluation?
6   A.  Because it read appropriate.
7   Q.  I'm sorry?
8   A.  It read appropriately.
9   Q.  You can put that away.  Based on your
10  experiences with John was he the kind of person who
11  would lie to you in speaking to you?
12  A.  I've never known him to.
13  Q.  Did you know him to lie to his superior
14  officers about things?
15  A.  I wouldn't have knowledge of it.
16  Q.  But in his communications with you he has been
17  honest?
18  A.  As far as I know.
19  Q.  As far as you know?
20  A.  Yes.
21  Q.  Because you can only testify to things that you
22  have personal knowledge of, right?
23  A.  Correct, yes.
24      MR. NEUBERGER:  Actually, let's take a

Page 49

1   break here, we have been here about an hour.
2       (Brief recess.)
3   BY MR. NEUBERGER:
4   Q.  Now, Major, I asked you some questions a little
5   earlier about the CERT activation and CERT
6   resignation, right?
7   A.  Yes.
8   Q.  And you mentioned that you had spoken to John
9   Balas and Jeff Foskey?
10  A.  Yes.
11  Q.  Do you recall could you relay to me the content
12  of those conversations to the best of your knowledge,
13  best of your recollection.  What did you guys talk
14  about?
15  A.  The quitting CERT itself.
16  Q.  What did John say?
17  A.  That they quit, they had all got together and
18  had a meeting and quit, and agreed to quit.
19  Q.  Did he say why?
20  A.  More or less to back the rest of the staff.
21  Q.  I'm sorry?
22  A.  To back the rest of his staff, you know, CO's.
23  Q.  You mean the union members?
24  A.  Yes.

13 (Pages 46 to 49)

7340cd43-2484-4ac7-98c9-ef8fed9ec45f

A0925

Balas v. Taylor, et al.
David W. Wilkinson

Page 50

1    Q. I'm sorry, let's be specific, the COAD members?
2    A. Yes.
3    Q. Because there is multiple unions, right?
4    A. Yes.
5    Q. And to back the rest of the staff, did he
6  indicate to you it was because of backing the rest of
7  the staff in the job action that they were taking?
8    A. I believe, yes.
9    Q. And that would be the refusal to work the
10 voluntary overtime, which was causing staffing
11 problems in the court and transportation unit, right?
12   A. That was not talked about between me, John and
13 Foskey. Just the quitting the CERT.
14   Q. In solidarity with the rest of the staff or the
15 rest of the union members? I asked you -- let's --
16   A. In other words, our conversation was dealing
17 with certain members quitting CERT, period, nothing
18 else.
19   Q. So, he didn't say why?
20   A. To support COAD.
21   Q. Right, to support COAD?
22   A. Yes.
23   Q. Did you talk to John and Jeff Foskey at the
24 same time?

Page 51

1    A. Yes.
2    Q. Did Jeff Foskey say anything?
3    A. No, he just listened most of the time. John
4  was the talker.
5    Q. Was John a talker in general?
6    A. Most of the time.
7    Q. I think somebody testified yesterday that John
8  may have been a little hard-headed?
9    A. I don't know.
10   Q. In your experiences with John was he
11 hard-headed or outspoken at all?
12   A. A little outspoken sometimes.
13   Q. But not hard-headed?
14   A. No. Could we back up and you re-ask that last
15 question again to make sure what it was, how I
16 answered.
17       MR. NEUBERGER: I'm not sure what you're
18 asking. Could you repeat the last question?
19   A. In other words, what I was asking is when John
20 Balas and Foskey and myself were talking I said that
21 we talked about the quitting CERT.
22   Q. Yes.
23   A. That was all. He also elaborated on the
24 disapproval of Truman Mears reporting to CERT

Page 52

1  supervisors their plan on quitting CERT.
2    Q. So, that came up during the conversation?
3    A. Yes, that was all about quitting CERT. I just
4  wanted to make sure I didn't leave anything out and
5  you would say I thought you said that's all you talked
6  about. It was the quitting CERT, the whole thing.
7    Q. I appreciate you bringing that up so we can
8  ensure that the record is complete.
9    A. Okay.
10   Q. Lieutenant Truman Mears was a member of CERT?
11   A. Yes.
12   Q. And he was the highest ranking member of CERT?
13   A. No.
14   Q. No?
15   A. No. He is the highest ranking at SCI.
16   Q. Highest ranking member of CERT at SCI?
17   A. Yes.
18   Q. It came up during that conversation that John
19 disapproved of Truman Mears reporting the resignation
20 plan?
21   A. Correct.
22   Q. To DOC management?
23   A. Correct.
24   Q. Let's move into the period after the CERT team

Page 53

1  resigned, okay?
2    A. Yes.
3    Q. I'll put a document in front of you which was
4  previously marked as Mears Exhibit Number 13. Let's
5  put these over here so they are out of the way for
6  you. If you would like to take a look at this
7  document first, that's fine.
8    A. Yes, I have never seen it before.
9    Q. Would you like to take a few minutes and read
10 it over.
11   A. Yes, please.
12   Q. Have you reviewed that document?
13   A. Yes.
14   Q. I'll represent to you that this is a document
15 created by John Balas in his handwriting and these are
16 contemporaneous notes he was keeping in the month of
17 January and I think in February of 2005, okay?
18   A. Yes.
19   Q. Do you recognize John's handwriting?
20   A. No.
21   Q. I would like to ask you some questions about
22 some of the things that are mentioned in John's notes
23 here and I would like to use this to try to jog your
24 memory and see if you have any memory about some of

14 (Pages 50 to 53)

7340cd43-2484-4ac7-98c9-ef8fed9ec45f

Balas v. Taylor, et al.
David W. Wilkinson

Page 54

1  these same events, okay?
2   A.  Yes.
3   Q.  Do you recall a time where in the fall of '05
4  -- fall of '04, beginning of '05 where a dispute arose
5  between John and Truman Mears about John's evaluation?
6   A.  Yes.
7   Q.  And that may have begun -- do you recall if
8  that dispute lasted for several months?
9   A.  I don't recall about the time.
10   Q.  Do you recall John coming to you about his
11  disagreement with the evaluation that Truman Mears had
12  given him?
13   A.  Yes.
14   Q.  That happened more than once, didn't it?
15   A.  Yes.
16   Q.  Now, on here, on this document Mears Exhibit
17  Number 13, John down towards the bottom of the first
18  page, which you just read, John talks about -- in the
19  fifth line from the bottom John talks about how he
20  feels pressured, intimidated and stressed by
21  Lieutenant Mears and he feels that Lieutenant Mears
22  has given him this evaluation because Lieutenant Mears
23  is angry at him because he resigned from the CERT
24  team.  You see those sentiments expressed on this

Page 55

1  document, right?
2   A.  Yes.
3   Q.  Did John ever speak to you about that?
4   A.  No.
5   Q.  He never spoke to you about --
6   A.  Parts of it.  I mean, he never spoke about
7  being stressed, this, that, no.
8   Q.  Did he speak about being angry?
9   A.  He stressed that -- you asked what question?
10   Q.  Did he ever speak to you about being angry --
11   A.  No.
12   Q.  -- about the evaluation?
13   A.  No.  I wouldn't use the term "angry," no.
14   Q.  What term would you use?
15   A.  Dissatisfied.
16   Q.  He spoke to you about being dissatisfied with
17  the evaluation?
18   A.  Correct.
19   Q.  And did he speak to you repeatedly about this?
20   A.  Twice.
21   Q.  Do you recall when?
22   A.  No.
23   Q.  Would they have been meetings in your office,
24  by telephone, just run into him in the hallway?

Page 56

1   A.  I don't remember.  I know we talked a couple
2  times.  I can't remember if they were actually phone
3  calls or by the office or when I was in the receiving
4  room or if I was at the program counter.  I can't
5  remember.
6   Q.  At some point somewhere --
7   A.  We did talk.
8   Q.  -- you did talk with John, right?
9   A.  Yes.
10   Q.  And I think you said he talked twice about the
11  evaluation issue?
12   A.  Yes.
13   Q.  And John seemed dissatisfied?
14   A.  Right, the first time dissatisfied.  Second
15  time upset.
16   Q.  The first time John seemed dissatisfied and the
17  second time he seemed upset?
18   A.  Yes.
19   Q.  Do you recall John explaining to you why he was
20  dissatisfied the first time?
21   A.  Yes -- the first time?
22   Q.  Yes.
23   A.  Yes.
24   Q.  Because I think you said he was upset the

Page 57

1  second time.  Did he tell you why?
2   A.  Yes.
3   Q.  What did John say?
4   A.  He thought that Mears -- his exact words almost
5  was that he thought Mears was going to screw him
6  because he quit CERT on his evaluation.
7   Q.  He thought --
8   A.  That's his exact words.
9   Q.  His exact words were --
10   A.  Screw him.
11   Q.  -- I think Mears is going to screw me because I
12  quit CERT?
13   A.  Yes.
14   Q.  Do you recall if he said anything else during
15  that conversation?
16   A.  Not about that, no.
17   Q.  What was your reaction to that?
18   A.  I told him -- well, he requested that I be
19  present when he got his evaluation and I told him I
20  would.
21   Q.  You told him you would?
22   A.  Yes.
23   Q.  I think that was mentioned here on the second
24  page of this Mears Exhibit 13.  Do you see where

15 (Pages 54 to 57)

7340cd43-2484-4ac7-98c9-ef8fed9ec45f

A0927

Balas v. Taylor, et al.
David W. Wilkinson

Page 58

1  that's mentioned in that first paragraph at the top?
2    A.  Yes.
3    Q.  Now, I'm going to read this first paragraph to
4  you.  "After my conversation with Lieutenant Mears I
5  called and notified Captain Wilkinson.  Captain
6  Wilkinson advised me that he wanted to be there for
7  the review of the evaluation and it would be Captain
8  Wilkinson, Lieutenant Mears, Corporal Balas and a
9  union rep."  This says that, right?
10   A.  The paper says that.
11   Q.  Do you think that would have been -- do you
12  think -- strike that.  Do you recall saying that the
13  meeting would be you, John, Lieutenant Mears and the
14  union rep?
15   A.  No.
16   Q.  Do you recall for sure or you just don't
17  remember?
18   A.  I recall for sure.
19   Q.  You recall for sure.  So, if this first
20  paragraph on Mears Exhibit Number 13, page two, at the
21  top of page two, that first paragraph, if this says --
22  if this is John's written recollection that you said a
23  union rep, would John be mistaken?
24   A.  Yes.  To the best of my knowledge, yes.

Page 59

1    Q.  To the best of your knowledge?
2    A.  Yeah, I don't remember that.
3    Q.  Are you saying that it could have happened or
4  that you are sure it did not happen?
5    A.  I do not remember.
6    Q.  You do not remember it?
7    A.  No.
8    Q.  The reason I want to be careful is because I
9  think there is a distinction between you don't
10  remember something was said --
11   A.  To me personally it wouldn't make a difference
12  if he asked for a union member, I would not deny him
13  in the first place.  It was no issue.
14   Q.  If John had asked for a union member, you
15  wouldn't have denied that?
16   A.  Correct.
17   Q.  I'm sorry, a union representative?
18   A.  I would not deny that.
19   Q.  You would not deny that?
20   A.  Right, but I don't remember the union being
21  spoken about.
22   Q.  This would have been in the period of time
23  where the disputes between the union and management
24  were still in fresh in everyone's mind, would that be

Page 60

1  fair to say?
2    A.  Yes.
3    Q.  For example, there had been the job action that
4  summer, right?
5    A.  Yes.
6    Q.  And the Delaware State News was reporting on
7  the job action, various issues affecting the prison,
8  right?
9    A.  Yes.
10   Q.  And News Journal up here was reporting on the
11  job action and the issues affecting the prisons,
12  right?
13   A.  Yes.
14   Q.  Do you recall in the fall of 2004 Governor
15  Minner was running for re-election during that time
16  frame?
17   A.  Yes, I do.
18   Q.  And she was running against Judge Lee and Mr.
19  Protak and I think Frank Infante were also running for
20  governor on some party platform, is that fair to say?
21   A.  Correct.
22   Q.  Do you recall the condition of the DOC prisons
23  being an issue in the upcoming election and the
24  candidates were debating it?

Page 61

1    A.  Yes.
2    Q.  Did John say that was why he wanted a union
3  representative there because these issues were still
4  fresh in his mind?
5    A.  No.
6    Q.  But John did reference that he thought that
7  Truman was trying to screw him because he retired with
8  CERT in solidarity with the COAD action, right?
9    A.  At one point.
10   Q.  At one point he mentioned that?
11   A.  Yes, not during the evaluation.
12   Q.  Not during this evaluation?
13   A.  Yes.
14   Q.  When did he mention that to you?
15   A.  We were standing at the program counter, me,
16  Jeff and John.
17   Q.  And that was where --
18   A.  His disapproval of what Truman Mears did, went
19  back and reported to CERT headquarters.
20   Q.  But then it was during the meeting --
21   A.  That wasn't a meeting.  We were just standing
22  around shooting the fat.
23   Q.  And during a later meeting about the evaluation
24  is that that first meeting where John was -- what was

16 (Pages 58 to 61)

7340cd43-2484-4ac7-98c9-ef8fed9ec45f

A0928

Balas v. Taylor, et al.
David W. Wilkinson

Page 62

1  the word you used, disputed? I don't want to put
2  words in your mouth.
3     A.  Yeah, disgusted.
4        MS. XARHOULAKOS:  I think it was
5  dissatisfied.
6  BY MR. NEUBERGER:
7     Q.  Was John also disgusted?
8     A.  At that point he was just dissatisfied that
9  Truman was wanting to do an evaluation and he wasn't
10 getting anything above meets expectations.
11       MS. XARHOULAKOS:  To clarify the record
12 also, you keep referencing a meeting, but I believe he
13 testified it wasn't a meeting.
14 BY MR. NEUBERGER:
15    Q.  Wherever the conversation was had.
16    A.  Correct, it was a conversation.
17       MR. NEUBERGER:  Thank you.
18       THE WITNESS:  I'm sorry.
19       MS. XARHOULAKOS:  That's all right, don't
20 apologize.
21 BY MR. NEUBERGER:
22    Q.  At some point you also had a conversation with
23 John about the evaluation where John indicated that he
24 thought that Truman was trying to screw him because he

Page 63

1  thought he had resigned from the CERT team.  I'm
2  trying to pinpoint when that conversation took place.
3     A.  I'm having a hard time recollecting myself.
4     Q.  Fair enough, I can move off of that then.
5     A.  Okay.
6     Q.  Because it has been more than three years for
7  these events, right?
8     A.  I believe so, yes.
9     Q.  A lot of things happen in three years?
10    A.  Yes.
11    Q.  A lot of things happen in work and lot of
12 things happen in personal lives, right?
13    A.  Yes.
14    Q.  You have since got promoted to major?
15    A.  Yes, I did.
16    Q.  A lot of things happen in the course of one day
17 much less three years of days?
18    A.  Correct.
19    Q.  And it's hard to remember things going that far
20 back?
21    A.  Correct.
22    Q.  But you are certainly doing your best to
23 remember --
24    A.  I'm trying.  I might be getting myself in some

Page 64

1  trouble --
2     Q.  But you are trying to remember to the best of
3  your recollection?
4     A.  Yes.
5     Q.  And that's in accordance with those
6  instructions I gave you at the beginning of the
7  deposition, is that right?
8     A.  Yes, it is.
9     Q.  Do you recall who John's union representative
10 would have been in the receiving room where he worked?
11    A.  No.
12    Q.  Would there be records on that somewhere in the
13 Department of Correction?
14    A.  I'm sure there would be.
15    Q.  Would it be like the same union rep for the
16 entire receiving room or would there have been
17 multiple union reps for a division or section of a
18 prison?  Do you have any idea how that worked?
19    A.  No.  I'm not that sure that I could sit here
20 and swear on it, no.
21    Q.  When you were a CO, how were union reps
22 assigned?
23    A.  They had elected union representatives and they
24 were posted throughout the institution, the people

Page 65

1  that were available for Sussex County, Kent County,
2  you know, SCI, boot camp, this and this.
3     Q.  When John raised those concerns with you about
4  the evaluation, what was your response?
5     A.  I told him that I would sit in on the
6  evaluation process with him and Lieutenant Mears.  I
7  told him that I had already went over the evaluation
8  and had signed off on the evaluation and I was willing
9  to sit with them.
10    Q.  I'm sorry?
11    A.  And that I was willing to sit with them.
12    Q.  And this is during your first --
13    A.  That was the very first.
14    Q.  First conversation?
15    A.  Yes.
16    Q.  Because we are not sure if it was a meeting or
17 not because it has been so long?
18    A.  No, I think it was a phone call.  I'm not sure.
19 I don't want to swear.  That's not the only thing I
20 talked to John about.
21    Q.  Got you.  Did you think that John's request to
22 have you sit in on a meeting was unreasonable?
23    A.  Doesn't happen often, but not unusual to me,
24 no.

17 (Pages 62 to 65)

7340cd43-2484-4ac7-98c9-ef8fed9ec45f

A0929

Balas v. Taylor, et al.
David W. Wilkinson

Page 66

1    Q.  If John had requested a union rep to be there
2  in light of everything that was happening in that time
3  frame with all the issues about the DOC and the union
4  being in the media and being in the headlines and that
5  general environment, would a request to have a union
6  rep be unreasonable in your opinion?
7          MS. XARHOULAKOS:  Object to the form.  You
8  can answer.
9  BY MR. NEUBERGER:
10   Q.  You can answer.
11   A.  No.
12   Q.  I think you already told me you have no idea
13  who the union rep was then, right?
14   A.  No, no.
15   Q.  Did you later -- let's focus on that second
16  conversation you had with John wherever it might have
17  occurred.
18   A.  I know where that occurred.
19   Q.  Where did that occur?
20   A.  He called me at home.
21   Q.  And I think you said during that conversation
22  John may have been a little more towards the upset or
23  disgusted stage?
24   A.  Yes.

Page 67

1    Q.  Let me strike that.  During that conversation
2  John might have been upset or disgusted about the
3  evaluation issue?
4    A.  Upset.
5    Q.  Upset?
6    A.  Yes.
7    Q.  Do you recall what John said during that
8  conversation?
9    A.  That Truman sent the evaluation up, he found it
10  out through Donna Green.
11   Q.  Who is Donna Green?
12   A.  That is the warden's secretary.  And that he
13  never got the opportunity to sign it and see it like
14  we agreed to.
15   Q.  And John was very upset about it?
16   A.  Very upset.
17   Q.  What was your reaction?
18   A.  I told him I would try and take care of it.
19   Q.  Did you?
20   A.  I tried.
21   Q.  How did you try and take care of it?
22   A.  I went to work, went up to the warden's office.
23  I asked the warden if he had John Balas' evaluation.
24  He said he had already sent it up north.  I told him I

Page 68

1  needed it back because we were going to sit down and
2  review Balas' evaluation, me, him and Mears.  He said
3  okay.  He got it for me on -- the next day that I
4  talked to him was a Tuesday.  I got the evaluation
5  because he goes up for some type meetings on Tuesday
6  mornings, that's how I know it was a Tuesday.  I got
7  the evaluation back I think it was Wednesday or
8  Wednesday night, Tuesday or Wednesday night in my
9  mailbox, and then on Saturday John Balas kills
10  himself.
11   Q.  Did ever speak to Truman about submitting the
12  evaluation to the warden's office without John's
13  signature?
14   A.  Indirectly.  I mean, you are asking a question
15  that is very hard to answer.  You need to be more
16  specific.  If I talked to him about the evaluation,
17  the answer is yes.  If you needed any more detail than
18  that, I need you to be more specific.
19   Q.  Did you ever speak to Lieutenant Truman Mears
20  about submitting John's evaluation to the warden's
21  office without John's signature?
22   A.  No, not that I can recall.
23   Q.  But you did speak to Lieutenant Mears about the
24  evaluation at some point?

Page 69

1    A.  Yes.
2    Q.  In general?
3    A.  Yes.
4    Q.  Do you recall what you spoke about?
5    A.  Yeah, yes.  I asked -- I told Truman that I
6  wanted to sit down with him and John to do the
7  evaluation.  Then, Truman tried to do it that evening,
8  but I was getting ready to start a shift change and
9  couldn't do it.  I think he may have came to me one
10  more time and I don't know what was going on, but
11  something was going on and I couldn't do the
12  evaluation then; but, meanwhile Truman was off on
13  vacation, John took vacation, I took vacation and then
14  came back to a lot of trouble.
15   Q.  There was some kind of a scheduling problem
16  with getting it set up?
17   A.  Due to shifts that we work was the main reason
18  and then vacation time.
19   Q.  So --
20   A.  We were only together I think one or two days
21  every other week.  You know, we didn't -- because
22  their shift rotated and mine stayed the same and then,
23  of course, their days off conflicted with some days I
24  had off and so forth and so on.

18 (Pages 66 to 69)

Balas v. Taylor, et al.
David W. Wilkinson

| Page 70 | Page 72 |
|---|---|
| 1   Q.   Instead of waiting for a day when all your<br>2   schedules meshed Truman just submitted the evaluation<br>3   to the warden?<br>4   A.   To someone.<br>5   Q.   To someone?<br>6   A.   The warden ended up getting it, yes.<br>7   Q.   Let's put that evaluation in front of you,<br>8   okay?<br>9   A.   Yes, sir.<br>10   Q.   It's Mears Exhibit Number 11.<br>11   A.   Okay.<br>12   Q.   Have you ever seen this document before?<br>13   Actually I'll give you a chance to review it before<br>14   you answer a question.<br>15   A.   Please let me review it, please.   Yes.<br>16   Q.   You have seen this document?<br>17   A.   Yes.<br>18   Q.   I would like to ask you some questions about<br>19   some of the first pages in this document.   I think<br>20   four of the last five pages of this document I believe<br>21   are actually a duplicate, although the last page is<br>22   not, so you may want to take a quick look at that just<br>23   so you can review everything.<br>24   A.   (Witness complies.) | 1   expectations, right?<br>2   A.   Yes.<br>3   Q.   Do you recall the first time you saw this<br>4   evaluation?<br>5   A.   No.<br>6   Q.   Do you recall how many pages it was?<br>7   A.   No.   I knew it had attachments, that's all I<br>8   know.<br>9   Q.   Is that normal for there to be attachments to<br>10   an evaluation?<br>11   A.   Yes.<br>12   Q.   What kind of attachments are usually attached<br>13   to evaluations that you have seen?<br>14   A.   Anything to substantiate raising or lowering of<br>15   an evaluation.<br>16   Q.   There could be good things or bad things<br>17   attached, right?<br>18   A.   Correct.<br>19   Q.   Now, up top on the first page of Mears Exhibit<br>20   11 -- I'm sorry, you might want to turn to the first<br>21   page.   The first page up top underneath the section<br>22   where it talks about the time frame covered there is a<br>23   section that says, "Areas where performance is<br>24   distinguished or exceeds expectations, if any." |

| Page 71 | Page 73 |
|---|---|
| 1   Q.   Okay?<br>2   A.   Yes.<br>3   Q.   You can put the other document away, the<br>4   previous exhibit.   Let's focus on the first page of<br>5   Mears Exhibit 11, okay?<br>6   A.   Yes.<br>7   Q.   Does this evaluation appear to cover the time<br>8   frame from September of 2003 through September of<br>9   2004?<br>10   A.   Yes.<br>11   Q.   And that's your signature in the bottom<br>12   right-hand corner, right?<br>13   A.   Yes, it is.<br>14   Q.   And does your signature appear to be dated<br>15   December 6th, 2004?<br>16   A.   Yes, it does.<br>17   Q.   At least circumstantially this document would<br>18   suggest that's when you signed it, right?<br>19   A.   Correct.<br>20   Q.   This is the evaluation we have just been<br>21   talking about, the one that John disputed with<br>22   Lieutenant Mears?<br>23   A.   Yes.<br>24   Q.   And this gives him a ranking of meets | 1   A.   Yes.<br>2   Q.   It talks about John has perfect attendance for<br>3   another year and that is commendable?<br>4   A.   Yes.<br>5   Q.   And it goes on to say, "I do not feel that<br>6   perfect attendance is justification for an exceeds."<br>7   A.   Yes.<br>8   Q.   Does that sound offensive to you?<br>9   A.   No.<br>10   Q.   Do you know if there are multiple drafts of<br>11   this document created and circulated by Lieutenant<br>12   Mears?<br>13   A.   No.<br>14   Q.   Then, we go down two more areas where it says,<br>15   "Where growth or skills/knowledge development is<br>16   suggested or needed."   Do you see that section there?<br>17   A.   Yes.<br>18   Q.   And it talks about how John is knowledgeable<br>19   about SCI policies and procedures, how he shows up for<br>20   work and uses leave in accordance with policy?<br>21   A.   Yes.<br>22   Q.   And then underneath that it says, "See attached<br>23   summary"?<br>24   A.   Yes. |

19 (Pages 70 to 73)

7340cd43-2484-4ac7-98c9-ef8fed9ec45f

A0931

Balas v. Taylor, et al.
David W. Wilkinson

| Page 74 |
| --- |

1   Q.   And the section above that also says, "See
2   attached summary"?
3   A.   Correct.
4   Q.   Let's turn the page.  At the bottom of the
5   second page in the bottom right-hand corner it says
6   D00085, right?
7   A.   Correct.
8   Q.   Does this appear to be some kind of an
9   attachment or memo from Lieutenant Mears?
10   A.   Yes.
11   Q.   And you read this to yourself quietly a few
12   minutes ago, is that right?
13   A.   Yes, I did.
14   Q.   Does this memo appear to address some of the
15   circumstances surrounding the submission of this
16   evaluation to the warden's office without John's
17   signature?
18   A.   Yes.
19   Q.   Now, the first paragraph, end of the third
20   line, do you see where it says, "Corporal Balas
21   informed me he would not look at it without Captain
22   Wilkinson and a union rep"?
23   A.   Yes, I do.
24   Q.   I asked you some questions about that earlier,

| Page 75 |
| --- |

1   right?
2   A.   Yes, you did.
3   Q.   If we go down to the next paragraph where it's
4   that five sentence paragraph, do you see that?
5   A.   Yes.
6   Q.   Do you see the last sentence where it says --
7   third sentence where it says, "I am not aware that an
8   officer has to have a union rep present for this"?
9   A.   Yes.
10   Q.   And line above this says he is turning this in
11   without John's signature?
12   A.   Yes.
13   Q.   What was your reaction to Lieutenant Mears
14   turning this in without John's signature in the
15   absence of meeting with you and a union rep?
16   A.   As stated before, I contacted the warden,
17   retrieved the evaluation from personnel so we could do
18   that.
19   Q.   Were you happy with Lieutenant Mears about
20   that?
21   A.   No, I mean, you know, I'm a man of my word.  I
22   said we would do something and we would do that.
23   Q.   And that wasn't done, right?
24   A.   No.

| Page 76 |
| --- |

1   Q.   Do you expect officers below you in the chain
2   of command to do what you tell them?
3   A.   Yes.
4   Q.   And that's one of the important things in a
5   paramilitary organization like the DOC, right?
6   A.   Yes.
7   Q.   Lower ranking officers have to follow orders or
8   commands given to them by higher ranking officers,
9   right?
10   A.   Yes.
11   Q.   Same way Lieutenant Mears would take orders
12   from the captain above him in the chain of command?
13   A.   Yes.
14   Q.   And you take your marching orders from majors
15   or wardens above you in the chain of command, right?
16   A.   Yes.
17   Q.   And the warden himself would take his marching
18   orders from the commissioner, right?
19   A.   Yes.
20   Q.   And the commissioner would take his marching
21   orders from the governor, right?
22   A.   Yes.
23   Q.   That's the way it works in the Department of
24   Correction, right?

| Page 77 |
| --- |

1   A.   Yes, it is.
2   Q.   Same thing with when the commissioner says
3   jump, you guys say how high?
4   A.   Yes.
5   Q.   Just the nature of the organization you have
6   worked in for 25 years, right?
7   A.   Yes.
8   Q.   You have to follow commands given to you by a
9   higher ranking officer, right?
10   A.   Yes.
11   Q.   And Lieutenant Mears didn't do that, did he?
12   A.   It was perceived not to have been done that
13   way.  I mean, that's what you are assuming.  I know
14   more -- there is a lot more to it.
15   Q.   And that's what I'm trying to get at.
16   A.   You want me to say no, he did not do what he
17   was told to do.
18   Q.   You just said you know more so tell me what you
19   know.
20   A.   Okay.  When I told Lieutenant Mears that I
21   wanted to sit down with him and Balas, I did not
22   explain to Mr. Mears that I've already told John Balas
23   that.  Okay?  So, he did not know that I had told John
24   Balas that I'm going to tell Truman and we are going

20 (Pages 74 to 77)

7340cd43-2484-4ac7-98c9-ef8fed9ec45f

A0932

Balas v. Taylor, et al.
David W. Wilkinson

Page 78

1  to sit down. When Truman came in I said, I want to
2  sit down and talk to you. I did not give Truman a
3  direct order. What stemmed Truman to turn it in was
4  something other had happened while I was off. I don't
5  know what took place. So, I mean, but Truman was not
6  given a direct order, no, he was not. He did not know
7  that I had already agreed with John Balas to sit down
8  with this man. I don't need to tell every low-lying
9  officer my business about other people's business.
10        That's why that was -- you know, it was
11 kind of hard to answer. You asked me did he follow
12 orders? I didn't give him a direct order.
13   Q.  Right, and that was the reason why in the
14 beginning of the deposition I asked if you don't
15 understand a question to ask me.
16   A.  That's why I tried to stop, you know, so we can
17 re-group here and kind of get it straight.
18   Q.  Okay, good. Now, you said you did not give
19 Lieutenant Mears a direct order?
20   A.  No, I did not.
21   Q.  You just told him you wanted to do something?
22   A.  Yes. As a matter of fact, I think the way I
23 said it is I would like to or I want to sit down with
24 you and Balas and do that evaluation. He said no

Page 79

1  problem. Do you want to do it tonight? I said I
2  can't tonight, I doing a shift change.
3   Q.  So, a lower ranking officer only has to follow
4  a direct order from a superior officer, they can
5  disregard everything else?
6   A.  It was like a general conversation, not
7  dealing with a Balas issue at the time. In other
8  words, I was sitting there doing the schedule and I
9  looked up when Truman came in and I said, By the way,
10 I want to sit with you and John when you do that
11 evaluation and he said okay.
12   Q.  You were just saying something you wanted to
13 do?
14   A.  Right.
15   Q.  If the warden tells you he wants something done
16 in the prison, you don't have to do it?
17   A.  I'm not saying that, no, sir.
18   Q.  I'm trying to draw the distinction between when
19 a lower ranking officer has to follow an order and
20 when a lower ranking officer does not have to do
21 something that a superior officer says he wants to do?
22   A.  Yes.
23   Q.  So, it's only orders then?
24   A.  They follow orders and requests, sir, I follow

Page 80

1  any requests by my superior that is work-related.
2   Q.  Right, if your superior tells you to go to a
3  Phillies game you don't have to do that, correct?
4   A.  Yes.
5   Q.  That's not work-related?
6   A.  Correct.
7   Q.  So, if a superior officer tells you short of
8  giving a direct order that he wants something done,
9  you do that, right?
10   A.  Yes.
11   Q.  Why?
12   A.  Because that's the way it works.
13   Q.  So, that's the way it works?
14   A.  Yes.
15   Q.  So, you told Truman Mears, Lieutenant Truman
16 Mears, that you wanted something done, that you wanted
17 to sit in on a meeting with he and John Balas and
18 Lieutenant Mears did not follow your direction?
19   A.  Correct.
20   Q.  I think we explained that distinction so thank
21 you for pointing out how it was unclear.
22   A.  Okay.
23   Q.  Still on the same second page, the one that
24 says D00085 in the bottom right-hand corner, you see

Page 81

1  Lieutenant Mears' signature there, right?
2   A.  Yes.
3   Q.  And does that appear to be Deputy Warden
4  DeLoy's signature there?
5   A.  Yes.
6   Q.  Where it says "Deputy Warden"?
7   A.  Yes, it does.
8   Q.  Your signature is not on that page, right?
9   A.  No, it is not.
10   Q.  Let's turn in one more page. Does this page
11 where in the bottom right-hand corner it has D00086,
12 does this appear to be the attachment referenced on
13 the first page?
14   A.  Yes.
15   Q.  And in this one-page attachment this references
16 various performance deficiencies that John had, right,
17 would you agree with that?
18   A.  Yes.
19   Q.  I'm just asking do you agree that this page
20 reflects that. I'm not asking do you agree he had
21 these performance deficiencies, okay?
22   A.  Okay, no problem, yes.
23   Q.  In the second paragraph I would like to direct
24 your attention to the fourth, fifth, sixth and seventh

21 (Pages 78 to 81)

7340cd43-2484-4ac7-98c9-ef8fed9ec45f

A0933

Balas v. Taylor, et al.
David W. Wilkinson

| Page 82 | Page 84 |
|---|---|

**Page 82**

1  line where it talks about there have been several
2  events to change John's previous exceeds expectations
3  performance ranking.
4     A.  Yes.
5     Q.  How about you read the fourth, fifth, sixth and
6  seventh lines of that paragraph quietly to yourself.
7     A.  Okay.
8     Q.  This talks about some problems that Truman
9  Mears alleges John has had regarding something called
10  QRT training, right?
11     A.  Yes.
12     Q.  Did you ever hear about this independently of
13  this document?
14     A.  No.
15     Q.  Are you aware John Balas actually received an
16  accommodation from Major Townsend for his
17  participation and his actions in the QRT training?
18     A.  No.
19     Q.  Let's put that in front of you then.
20     A.  Not that I can recall.
21     Q.  We can use this to jog your memory.
22         MR. NEUBERGER:  I would like to mark this
23  as Wilkinson Exhibit 1.
24         (Wilkinson Deposition Exhibit No. 1 was

**Page 83**

1  marked for identification.)
2     Q.  Major, could you just review that document
3  quietly to yourself, please.
4     A.  (Witness complies.)  Okay.
5     Q.  Major Townsend has since passed away, is that
6  right?
7     A.  Yes, he has.
8     Q.  Does this appear to be a memo Major Townsend to
9  John Balas?
10     A.  Yes.
11     Q.  And in the top right-hand corner it says,
12  "Security Superintendent," right?
13     A.  Yes.
14     Q.  Was that Major Townsend's position?
15     A.  Yes.
16     Q.  He was in charge of --
17     A.  Security.
18     Q.  And it says in the re line, "Appreciation,"
19  right?
20     A.  Yes.
21     Q.  Does this say, "I would like to take this
22  opportunity to commend you for, quote, job well done,"
23  and job well done is all in caps, right?
24     A.  Yes.

**Page 84**

1     Q.  And there is an exclamation point after that,
2  right?
3     A.  Yes.
4     Q.  Does it continue and say, quote, You were
5  instrumental in the recertification of QRT training
6  during February/March of 2004"?  Does it say that?
7     A.  Yes, it does.
8     Q.  And it goes on to say, "Your dedication to this
9  project and SCI are recognized and appreciated."
10     A.  Yes.
11     Q.  Does it go on to say, "It is a pleasure to work
12  with such fine staff, and once again, thanks for a job
13  well done"?
14     A.  Yes.
15     Q.  Let's go back to this third page of Mears
16  Exhibit Number 11, okay?
17     A.  Yes.
18     Q.  Do you have that in front of you still?
19     A.  Yes.
20     Q.  This memo of appreciation is not referenced in
21  that paragraph, right?
22     A.  No.
23     Q.  Do you know why?
24     A.  No.

**Page 85**

1     Q.  Wilkinson Exhibit 1, does this memo from Major
2  Townsend to John Balas appear to criticize him for his
3  performance in the QRT training?
4     A.  Yes.
5     Q.  This criticizes him?
6     A.  Doesn't criticize him.  Says he does a good
7  job, job well done.
8     Q.  So, it does not criticize him?
9     A.  Right.  I'm sorry.
10     Q.  No problem.  How long did you work with Major
11  Townsend?
12     A.  Twenty-plus years.
13     Q.  Was he a good man?
14     A.  Yes.
15     Q.  Was he an honest man?
16     A.  Yes.
17     Q.  Do you have any reason to doubt his
18  trustworthiness?
19     A.  No.
20     Q.  The reason I'm asking you these things is
21  because Major Townsend is no longer with us and I
22  can't take his deposition.  So, I'm trying to get the
23  feel for the man from various witnesses in this case,
24  okay?

22 (Pages 82 to 85)

7340cd43-2484-4ac7-98c9-ef8fed9ec45f

A0934

Balas v. Taylor, et al.
David W. Wilkinson

|  | Page 86 |
|---|---|

1   A.  Yes.
2     Q.  Let's go down to -- we're still on Mears
3   Exhibit 11, let's go down to the two lines below the
4   four lines we just read where it says I had two
5   meetings with the sergeant in charge, do you see that?
6     A.  Yes.
7     Q.  Could you read that line and the next line
8   quietly to yourself, please?
9     A.  (Witness complies.)  Yes.
10    Q.  Does that appear to indicate that John -- that
11  Lieutenant Mears had two meetings with the sergeant in
12  charge of the area where John Balas worked and they
13  talked about John's poor work performance, poor
14  attitude and his unwillingness to get along with other
15  staff?
16    A.  Yes.
17    Q.  Do you have any firsthand knowledge of that?
18    A.  No.
19    Q.  So, you are relying on Lieutenant Mears'
20  recollection with this?
21    A.  Yes.
22    Q.  It's important for you to back up your
23  officers, right?  Would you like me to rephrase the
24  question?

|  | Page 87 |
|---|---|

1   A.  Yes, please.
2     Q.  Do you rely on the officers below you in the
3   chain of command to do their jobs?
4     A.  Yes.
5     Q.  Are you what is known as a micro-manager?
6     A.  No.
7     Q.  Did you ask Lieutenant Mears to put
8   documentation in front of you to prove each and every
9   thing he stated in this evaluation?
10    A.  No.
11    Q.  If Lieutenant Mears stated in this evaluation
12  that John had performance problems in the workplace,
13  would you expect those to be documented somewhere?
14    A.  Yes.
15    Q.  For example, there is such a thing as a
16  supervisor's file, right?
17    A.  Yes.
18    Q.  And that file is mandated by DOC rules,
19  regulations or policies, right?
20    A.  I don't know.  I think that there is --
21  supervisors have files, but I don't think they can
22  refer to it for disciplinary.  I think that's the big
23  file that is up in Dover.
24    Q.  You are saying --

|  | Page 88 |
|---|---|

1   A.  There is two different.
2     Q.  Go ahead.
3     A.  There is two different files.
4     Q.  A big disciplinary file somewhere there is?
5     A.  No.  There is an institutional supervisor file,
6   which we don't pull from that often, and then there is
7   the main file in Dover.
8     Q.  That's like the main personnel file, so to
9   speak?
10    A.  Yes.
11    Q.  You said don't pull from the supervisor's file
12  too often, what do you mean by that?
13    A.  In other words, we may look in it for copies of
14  evaluations, inter-departmental memos, that type
15  thing, dealing with the individual.
16    Q.  And based on your 25 years of experience in the
17  Department of Correction when an employee receives
18  some kind of verbal counseling there is a memorandum
19  which is supposed to be placed into the supervisor's
20  file, right?
21    A.  Yes.
22    Q.  You testified earlier about the importance of
23  following rules and regulations in the DOC?
24    A.  Yes.

|  | Page 89 |
|---|---|

1   Q.  You testified about how, for example, you in
2   your 25 years of your distinguished career you have
3   always sought to follow those rules, regulations,
4   policies, procedures, those type of things, right?
5     A.  Yes.
6     Q.  You expect the same from the officers under
7   your command, right?
8     A.  Yes.
9     Q.  And you testified earlier you try to keep an
10  eye on them when there is a rules infraction or an
11  officer on your command is violating a rule,
12  regulation, policy or procedure of the DOC, it's true
13  you try to make sure those rules, regulations,
14  policies and procedures are, in fact, followed, right?
15    A.  Yes.
16    Q.  That's just part of being a good manager,
17  right?
18    A.  Yes.
19    Q.  And you have been recognized for your good
20  skills as a captain given you were promoted to the
21  rank of major?
22    A.  Yes.
23    Q.  That's a promotion you are proud of, right?
24    A.  Yes.

23 (Pages 86 to 89)

7340cd43-2484-4ac7-98c9-ef8fed9ec45f

A0935

Balas v. Taylor, et al.
David W. Wilkinson

Page 90

1    Q.  It's true that a supervisor's file is supposed
2  to be used by a supervisor in preparing an employee's
3  evaluation, right?
4    A.  Yes.
5    Q.  That's just how it's done, right?
6    A.  Yes.
7    Q.  Is it your understanding that the policies
8  reflect that as well?
9    A.  My understanding, yes.
10   Q.  And in addition to verbal counseling -- which
11  are supposed to be memorialized there, right?
12   A.  Yes.
13   Q.  -- if there is a written warning about
14  something, that should find its way there as well,
15  right?  If there is a formal memo sent by a supervisor
16  to the supervisee --
17   A.  Yes.
18   Q.  -- a copy of that memo is supposed to be put in
19  the supervisor's file, right?
20   A.  Yes.
21   Q.  And then however many months later when the
22  whatever evaluations are done the supervisor's file is
23  supposed to be one place where the supervisor can look
24  to try to maybe reconstruct the problems or the

Page 91

1  performance praises that the employee has had over
2  that past supervisory period?
3    A.  Yes.
4    Q.  If there are problems the employee is having,
5  they should be reflected in the supervisor's file?
6    A.  They should.
7    Q.  For example, if there is a written warning
8  given to an employee, a copy of that is supposed to go
9  to the file?
10   A.  Yes.
11   Q.  If there is a verbal warning to the file, that
12  is supposed to be memorialized in a memo of some type
13  that is supposed to go to the file, right?
14   A.  Yes.
15   Q.  Let's go on to the next line down on Mears
16  Exhibit 11 where it says, "Corporal Balas is no longer
17  a member of CERT."  Do you see that?
18   A.  Yes, I do.
19   Q.  Do you know -- you knew that was true as of
20  September 2004, right?  Would you like me to rephrase
21  the question?  I would be happy to.
22   A.  Yes, please.
23   Q.  You recall that the CERT was activated to staff
24  the court and transportation unit in August of 2004,

Page 92

1  correct?
2    A.  Correct.
3    Q.  And then most of the members of the CERT team
4  then resigned after their first day staffing the unit
5  in solidarity with the union, right?
6    A.  Yes.
7    Q.  So, when John resigned from the CERT unit,
8  would it be fair to say he was no longer a member of
9  the CERT unit --
10   A.  Correct.
11   Q.  -- given his resignation from it?
12   A.  Yes.
13   Q.  If this evaluation was prepared in September of
14  2004 or later, you would agree that John was not a
15  member of the CERT unit at that time?
16   A.  Correct.
17   Q.  If you go to the first page you would agree
18  that this evaluation covers the time frame from
19  September of 2003 through September of 2004?
20   A.  Yes.
21   Q.  So, if John resigned in August of 2004, would
22  you agree that John had been a member of the CERT team
23  for approximately ten to ten and a half months of this
24  evaluation period?

Page 93

1    A.  Yes.
2    Q.  Do you recall when you had the conversation
3  with John when John stated to you that he thought that
4  Lieutenant Mears was trying to screw him because of
5  his resignation from the CERT team?
6    A.  It was after they quit.  That's all I can tell
7  you.  I do not recall.
8    Q.  Fair enough, fair enough.  Then, let's go back
9  on Mears Exhibit 11, third page of that.  Let's go
10  down to the next couple lines where it says, "This
11  leaves only perfect attendance."  Do you see that?
12   A.  Yes.
13   Q.  And you see where it says that, "In light of
14  the rest of Corporal Balas' performance I do not feel
15  that perfect attendance alone, although commendable,
16  is enough to justify exceeds"?
17   A.  Yes.
18   Q.  You read this exhibit when I put it in front of
19  you, right?
20   A.  Yes.
21   Q.  And based on your review of that exhibit would
22  you agree that Wilkinson Exhibit 1, this memo from
23  Major Townsend commending John for his service with
24  the QRT team, is not mentioned in the exhibit, right?

24 (Pages 90 to 93)

7340cd43-2484-4ac7-98c9-ef8fed9ec45f

Balas v. Taylor, et al.
David W. Wilkinson

<table>
<tr><td>

Page 94

1  A. It is not.
2  Q. Do you recall if this may have been attached to
3  the performance evaluation?
4  A. Don't remember at all. First I've ever seen
5  it.
6  Q. First you have ever seen it?
7  A. Yes.
8  Q. That's helpful, thank you. Do you feel that an
9  officer that demonstrates poor work performance and
10 poor attitude and is unwilling to get along with his
11 fellow staff meets the expectations set by the
12 Department of Correction for officers in the DOC?
13 A. No.
14 Q. Is that like the standard, is that supposed to
15 be the standards in the DOC?
16 A. No.
17 Q. I mean, would it -- would you agree that the
18 DOC expects its employees to do their work and do it
19 at least average?
20 A. Yes.
21 Q. Would you agree that the DOC expects their
22 employees to at least have an average attitude in the
23 workplace each day?
24 A. Yes.

</td><td>

Page 96

1  A. Repeat it, please.
2     MR. NEUBERGER: Could you repeat the
3  question, please.
4     (The pending question was read back by the
5  court reporter.)
6  A. An evaluation is based on this date to this
7  date, particular dates.
8  Q. Yes.
9  A. One incident -- you don't grade a whole
10 evaluation on one incident.
11 Q. What if it's multiple incidents?
12 A. Then, yes, and some type of corrective action
13 should have taken place.
14 Q. Would that employee in light of multiple
15 incidents of the kind that I just asked you about
16 would that employee meet expectations in your eyes?
17 A. No.
18 Q. At a bare minimum would you expect those
19 multiple incidents of problems to be reflected in the
20 supervisor's file as required by DOC policies?
21 A. Yes.
22 Q. Turn one more page in Mears Exhibit Number 11
23 to the page in the bottom right-hand corner, D00087 it
24 says?

</td></tr>
<tr><td>

Page 95

1  Q. Would you expect that the DOC expects its
2  employees to at least be willing to get along with
3  staff even if they don't?
4  A. Yes.
5  Q. If the DOC kept employees who didn't get along
6  with staff, had a poor work performance, had a poor
7  attitude and just fought with everybody, would you
8  agree that performance efficiency in the DOC prisons
9  might suffer?
10 A. Yes.
11 Q. I'm not going out on a limb there, am I?
12 A. No.
13 Q. Now, an employee who has problems during QRT
14 training such that the major in charge says he never
15 wants the employee involved again an employee, same
16 employee, who demonstrates poor work performance,
17 demonstrates a poor attitude and demonstrates an
18 apparent unwillingness to get along with other staff
19 such that his sergeant has to speak to the lieutenant
20 about it more than once, does such an employee meet
21 expectations in your eyes?
22    MS. XARHOULAKOS: Object to form.
23 BY MR. NEUBERGER:
24 Q. You can answer.

</td><td>

Page 97

1  A. Yes.
2  Q. Do these appear to be the -- like John's
3  performance duties that he was expected to meet that
4  were written during the prior evaluation period for
5  him to meet during the evaluation period at issue in
6  this evaluation?
7  A. Yes.
8  Q. Okay, do you see where it says -- it has
9  numbering 1 through 6?
10 A. Yes.
11 Q. A ranking of meets expectations on page one of
12 this document that would mean that he met these six
13 expectations of his job, right?
14 A. Correct.
15 Q. And number one here is, "Be knowledgeable of
16 and adhere to all departmental, bureau and
17 institutional policies and procedures. Read, daily,
18 the post orders for the area you are assigned to stay
19 abreast of any and all changes." Right?
20 A. Yes.
21 Q. And is there a departmental policies or
22 procedure or practice or something out there about you
23 are supposed to do your work?
24 A. Yes.

</td></tr>
</table>

25 (Pages 94 to 97)

7340cd43-2484-4ac7-98c9-ef8fed9ec45f

A0937

Balas v. Taylor, et al.
David W. Wilkinson

Page 98

1  Q.  You are supposed to have good work performance?
2  A.  Yes.
3  Q.  Or at the bare minimum you should have average
4  work performance.  You are supposed to get along with
5  co-workers?
6  A.  Yes.
7  Q.  Number three where it says, "You are expected
8  to conduct yourself in a professional manner," and it
9  goes down to the next line that says about how you are
10 a role model for inmates and your appearance and
11 conduct should always comply with department
12 guidelines, right?
13 A.  Yes.
14 Q.  You can close that document and put it away.
15      (Brief recess.)
16 BY MR. NEUBERGER:
17 Q.  We were just talking about the evaluation and I
18 would like to ask about something a little bit related
19 to that and see if something can jog your memory here.
20 Let me fine the right document.  This is previously
21 marked as Mears Exhibit Number 12.  Why don't you
22 review that quietly to yourself.
23 A.  (Witness complies.)  Okay.
24 Q.  Have you reviewed the document?

Page 99

1  A.  Yes.
2  Q.  Does this appear to be an official grievance
3  form for COAD, the Correctional Officers Association
4  of Delaware?
5  A.  Yes.
6  Q.  And does it appear to be one that would have
7  been filed by John J. Balas?
8  A.  Yes.
9  Q.  Did John ever talk to you about his filing of a
10 grievance over his evaluation?
11 A.  No.
12 Q.  Did you ever hear about it?
13 A.  No.
14 Q.  Now, this grievance would at least appear on
15 its face to be dated October 4, 2004, right?
16 A.  Yes.
17 Q.  I'm sorry, up top where it says, "Date Filed"?
18 A.  Yes.
19 Q.  You go down where it says, "Signature of
20 Grievant," do you see that on the first page?
21 A.  Yes.
22 Q.  Does that appear to be John's signature?
23 A.  I don't know.
24 Q.  Underneath that it says, "Signature of

Page 100

1  Representative"?
2  A.  Yes.
3  Q.  Do you have any idea what name that is?
4  A.  None whatsoever.
5  Q.  Where it says, "Title," it says, "COAD S/S,"
6  right?
7  A.  Yes.
8  Q.  Would you understand that to mean COAD shop
9  steward?
10 A.  That's what I would assume.
11 Q.  Have you ever seen grievances from -- have you
12 ever seen COAD grievance forms before filed by CO's?
13 A.  No.  This is my first.
14 Q.  Let's turn to the second page now.
15 A.  Okay.
16 Q.  We can skip past most of this because I already
17 asked you questions about the evaluation.
18 A.  Okay.
19 Q.  Would it be fair to say this document which at
20 least purports to be a grievance form addresses the
21 evaluation issue?
22 A.  Yes.
23 Q.  On the second page I would like to go to the
24 eighth line from the bottom.  Do you see where it

Page 101

1  says, "I feel that Lieutenant Mears has a personal
2  vendetta against me since I have resigned from CERT
3  and he is showing discrimination towards myself.  I
4  feel that as a conflict of interest having Lieutenant
5  Mears as my supervisor"?
6  A.  Yes.
7  Q.  John used the words "personal vendetta."  I
8  think you mentioned that in a conversation with you he
9  used the term something to the effect of Lieutenant
10 Mears wants to screw me because I retired from --
11 because I resigned from CERT.
12      MS. XARHOULAKOS:  Let me interject to the
13 questioning on this document as to lack of foundation.
14 BY MR. NEUBERGER:
15 Q.  You used that term "screw," right?
16 A.  Yes.
17 Q.  Do you recall John ever saying to you that he
18 thought that Lieutenant Mears had a personal vendetta
19 against him?
20 A.  He said that in the incident that we were
21 talking about earlier he thinks that he was out to get
22 him, he was trying to screw him, out to get him.  I
23 told you that earlier in the deposition.
24 Q.  But there wasn't another conversation where he

26 (Pages 98 to 101)

7340cd43-2484-4ac7-98c9-ef8fed9ec45f

A0938

Balas v. Taylor, et al.
David W. Wilkinson

Page 102

1  may have said that he thought that there -- where he
2  may have used the words "personal vendetta"?
3     A.  No, no, I never heard the term "vendetta" until
4  I saw this.
5     Q.  The second to last line where it begins, "I
6  believe Lieutenant Mears is evaluating me personally,
7  not professionally."
8     A.  Yes, I see that.
9     Q.  Do you recall ever having a conversation with
10  John about that?
11    A.  Not particularly that way, no.
12    Q.  Based on your 25 years in the DOC would it be
13  appropriate for a supervisor to base a performance
14  evaluation upon personal feelings towards an employee
15  rather than their work performance?
16    A.  No.
17    Q.  You can put that away.  Do you recall a time
18  when John came to you about issues with his time cards
19  and Lieutenant Mears?
20    A.  Yes.
21    Q.  And do you recall that John had some concerns
22  that Lieutenant Mears was changing vacation days on
23  the time card slip and marking them as emergency
24  vacation days?

Page 103

1     A.  Yes.
2     Q.  John was concerned about that?
3     A.  Yes.
4     Q.  Would that be fair to say?
5     A.  Yes.
6     Q.  Was he upset about that?
7     A.  Yes.  I would use the term "upset," yes.
8     Q.  Based on your interactions with John did John
9  pride himself on his perfect attendance, for example,
10  or do you not know either way?
11    A.  No, I don't know either way.
12    Q.  At some point you gave an order to Lieutenant
13  Mears to change his notations of emergency vacation
14  days back to regular vacation days, right?
15    A.  Yes.
16    Q.  Did that come about because of your
17  conversation with John about the time card issue?
18    A.  Yes.
19    Q.  And then at some time thereafter you gave the
20  order to Lieutenant Mears to change them?
21    A.  Yes.
22    Q.  Why?
23    A.  To shut John up.
24    Q.  Do you usually give orders to inferior officers

Page 104

1  to make other officers shut up?
2     A.  Yes.  Not like that.  Me using that term, you
3  asked me why I said, I said.  I didn't go to Truman
4  and say do this.  I guess I did.  There is a whole
5  incident behind the time card.  Next question.  Go
6  ahead.
7     Q.  There is a whole incident, what did you say to
8  Truman?
9     A.  In other words, I went to Truman and I said,
10  Truman, what is up with the time cards and John Balas?
11  He is complaining about you marking these time cards.
12  He said that's what on the rosters and he showed me
13  the rosters and the captains were marking emergency
14  vacation.  In other words, they were granting -- I
15  said, Listen, to keep John happy, I said, just fix it.
16  He said, I'm doing it to everybody's card and he
17  showed me other employees.  It wasn't just John's card
18  like that, it was other people's.
19         I said, Go in and change it, our
20  timekeepers don't need that mess anyhow.  The watch
21  commanders took care of who was given emergency
22  vacation and who wasn't.
23    Q.  Is the taking of emergency vacation days
24  frowned upon?

Page 105

1     A.  No, we issue them.  I issue them.  I have given
2  them.  I have given John them, you know.
3     Q.  Did it appear to be that -- do you think John's
4  concern was that his cards were being changed after
5  they had been submitted?
6     A.  Yes.
7     Q.  And that upset him?
8     A.  Yes.
9     Q.  And then eventually you ordered Truman to
10  change them back to the way they were before Truman
11  changed them?
12    A.  From the first time -- yes, I have.
13    Q.  Truman was never disciplined or reprimanded,
14  you just told him to change them?
15    A.  Wasn't nothing to be reprimanded about.
16    Q.  You just ordered him to change them back to the
17  way they were and he did that, right?
18    A.  Yes.
19    Q.  Do you recall a time when John came to you
20  about being denied a copy of his time card?
21    A.  Never, to me, no.
22    Q.  Never to you?
23    A.  No.  That I can recall, no.  I don't recall.
24    Q.  I can't find the document I want so we'll move

27 (Pages 102 to 105)

7340cd43-2484-4ac7-98c9-ef8fed9ec45f

A0939

Balas v. Taylor, et al.
David W. Wilkinson

| Page 106 | Page 108 |
|---|---|
| 1 on. | 1 believed that Truman Mears was excessively monitoring |
| 2   A. I don't recall. | 2 him and trying to find a reason to discipline him? |
| 3   Q. Fair enough. Did John ever ask you -- this | 3   A. No. |
| 4 would be in the time frame sometime between August of | 4   Q. Would that have been proper for a supervisor to |
| 5 2004 and his unfortunate death in February of 2005 -- | 5 try to nit-pick on a supervisee? |
| 6 did John ever ask you for a transfer to a different | 6   A. No. |
| 7 supervisor? | 7   Q. I think in your conversations with John from |
| 8   A. No. | 8 August of '04 through February of '05 I think you |
| 9   Q. Did he ever ask you to have a different | 9 mentioned that in one conversation he seemed not |
| 10 supervisor transferred in over him? | 10 disgusted -- |
| 11   A. No. | 11       MR. NEUBERGER: Stacey, what was the word? |
| 12   Q. Did he ever ask for just a transfer, period? | 12       MS. XARHOULAKOS: Dissatisfied. |
| 13   A. No. Ask of me, correct? | 13 BY MR. NEUBERGER: |
| 14   Q. Yes, ask of you. | 14   Q. I think in one conversation you said John |
| 15   A. No. | 15 appeared dissatisfied? |
| 16   Q. Did you ever learn of John asking anyone else | 16   A. Yes. |
| 17 for either a transfer himself or a transfer -- or to | 17   Q. And that was the conversation about the |
| 18 have a different supervisor transferred in over him? | 18 evaluation, right? |
| 19   A. Yes. | 19   A. No. |
| 20   Q. Do you know who John talked to about that? | 20   Q. In some conversation with John about problems |
| 21   A. Whew, hearsay, no, I don't know. | 21 in the workplace regarding Truman he appeared |
| 22   Q. How did you learn about it? | 22 dissatisfied, right? |
| 23   A. I was told by, whew, I'm trying to remember. | 23   A. Yes. |
| 24 Somebody told me. Somebody told me. | 24   Q. And in a later conversation he appeared upset |

| Page 107 | Page 109 |
|---|---|
| 1   Q. Do you recall whether it was Lieutenant Mears? | 1 or disgusted, right? |
| 2   A. No, it was not Lieutenant Mears. It was | 2   A. Yes. |
| 3 somebody in administration. | 3   Q. And then you also dealt with him, for example, |
| 4   Q. So -- | 4 about the time card issue? |
| 5   A. It was an administrator. | 5   A. Yes. |
| 6   Q. So we are on the same page -- | 6   Q. And John seemed upset about that, right? |
| 7   A. This was after Balas' death. | 7   A. Yes. |
| 8   Q. After John's death? | 8   Q. Did he seem worried? |
| 9   A. Yeah, that's when I learned about it. | 9   A. No. |
| 10   Q. Would it have been Deputy Warden DeLoy? | 10   Q. Just based on what you observed. |
| 11   A. Might have been. | 11   A. No. |
| 12   Q. Is he considered an administrator? | 12   Q. Did he seem stressed? |
| 13   A. Yes. | 13   A. No, no more than -- you know, he acted normal, |
| 14   Q. Who else is? | 14 just the same. |
| 15   A. Mike DeLoy, Rick Kearney and the security | 15   Q. Did you ever talk to Deputy Warden DeLoy about |
| 16 superintendent, which was Major Townsend at the time. | 16 the problems John was having with Truman Mears as his |
| 17   Q. There was the security superintendent, deputy | 17 lieutenant? |
| 18 warden and warden are all considered members of the | 18   A. I don't recall, I don't recall if I did. |
| 19 administration at SCI and Georgetown? | 19   Q. Did you ever tell Deputy Warden DeLoy that John |
| 20   A. Yes. | 20 believed Truman was trying to screw him because of his |
| 21   Q. But you only heard about that after John's | 21 CERT resignation? |
| 22 death? | 22   A. I don't think so. I don't know, I don't |
| 23   A. Yes. | 23 recall. |
| 24   Q. Did John ever come to you and state that he | 24   Q. Do you think that's something you might have |

28 (Pages 106 to 109)

7340cd43-2484-4ac7-98c9-ef8fed9ec45f

A0940

Balas v. Taylor, et al.
David W. Wilkinson

| Page 110 |
|---|

1  made a record of if -- strike that. On the screw him
2  comment do you think that might be something you may
3  have made a record of at some point?
4    A.  Myself?
5    Q.  Yes.
6    A.  No.
7    Q.  Let's focus on January of '05 and February of
8  '05 time frame.
9    A.  Okay.
10   Q.  I would like to ask you about your observations
11  of John in that time frame.
12   A.  Okay.
13   Q.  I asked you a general question about whether
14  John seem stressed or things like that, but I would
15  like to ask you that same question in this time frame.
16  In the January of '05 to February of '05 time frame
17  based on your interactions with John did he appear to
18  be stressed?
19   A.  I see no change in attitude. John was always
20  just John. I never seen him -- he didn't bounce off
21  the walls.
22   Q.  Could you explain to me what John being John
23  means?
24   A.  You know, just walk in, if you see him, you

| Page 111 |
|---|

1  speak. He talks about his kids and go-cart racing and
2  Jonathan and his racing carts and things of that
3  nature. John and me, we -- he would call me back
4  every once in a while and made him pork chops and
5  potatoes and sit and eat and talk and most of it
6  dealing with his child. I never could remember his
7  daughter's name, but he always mentioned Jonathan.
8    Q.  I think her name is Lauren.
9    A.  See, I don't know, he always spoke of John.
10   Q.  No one ever came to you or maybe the better
11  question is did anyone ever come to you and say that
12  John was suicidal?
13   A.  No.
14   Q.  What would you have done if someone had done
15  that?
16        MS. XARHOULAKOS:  Objection, calls for
17  speculation.
18  BY MR. NEUBERGER:
19   Q.  You can answer.
20   A.  You know, I didn't get to see John that often.
21  So, I would have to get the opportunity to talk to
22  John. You know, I would make the opportunity to talk
23  to him. If there was any indication, I would have
24  gotten him help, but I would not have believed that of

| Page 112 |
|---|

1  John Balas. He was not -- I did not believe he was
2  that type of person.
3    Q.  I mean, someone taking their own life is a
4  serious matter, would you agree with that?
5    A.  Very serious.
6    Q.  If someone came to you and told you John was
7  talking about killing himself, would you have tried to
8  catch up with John as soon as you could?
9    A.  Yes.
10   Q.  Would you have called his cell phone or called
11  his house to speak to him directly?
12   A.  I returned several of John's calls in the past.
13  I have returned several of John's calls in the past so
14  the answer would be yes.
15   Q.  For example, if he was in the next office over,
16  would you go over there and try to maybe have a
17  private meeting with him?
18   A.  Yes, I would.
19   Q.  One of the reasons for that is because suicide
20  is serious matter?
21   A.  Yes.
22   Q.  And would you agree one of the reasons the
23  Employee Assistance Program is out there is to help
24  employees who are experiencing emotional or

| Page 113 |
|---|

1  psychological turmoil or problems?
2    A.  Yes.
3    Q.  And you think that -- strike that. If another
4  employee came into your office and reported that John
5  was talking about committing suicide, would you put
6  that on the back burner as far as priority goes as a
7  matter to address?
8        MS. XARHOULAKOS:  Objection, calls for
9  speculation.
10   A.  No. You know, I would have to -- whew, I would
11  have to -- you know we are talking directly about John
12  Balas now, you are asking a question about John Balas?
13  If someone came to me and said John Balas was going to
14  kill himself, would I do something about it? Yes. I
15  would ask questions, I would talk, I would try to find
16  out -- first of all, in my mind I would not have
17  believed it. I would have to talk for some type signs
18  and we would try and get some help for him, but never
19  knew.
20   Q.  And you testified about that, that no one ever
21  came to you?
22   A.  Yes, no.
23   Q.  One of the reasons why you would try to talk to
24  the employee in that kind of situation is because like

29 (Pages 110 to 113)

7340cd43-2484-4ac7-98c9-ef8fed9ec45f

A0941

Balas v. Taylor, et al.
David W. Wilkinson

| | |
|---|---|
| Page 114 | Page 116 |

**Page 114**

1  you testified earlier you care about your employees,
2  right?
3    A.  Yes.
4    Q.  They're not just a replaceable cog in the
5  machine that is the DOC?
6    A.  Right.
7    Q.  They're not just a body to you?
8    A.  No.
9    Q.  They're people?
10    A.  Right.
11    Q.  And you care about your people?
12    A.  Some are even friends.
13    Q.  Some are even friends?
14    A.  Yes.
15    Q.  Do you think that's a mark of a good
16  supervisor?
17    A.  Yes.
18    Q.  Now, let's just re-wind a little bit and then
19  we are just about done.
20    A.  Good.
21    Q.  Did you care one way or the other about the
22  CERT resignation?
23    A.  No.
24        MR. NEUBERGER:  Stacey, I have no further

**Page 115**

1  questions.
2        MS. XARHOULAKOS:  I do have a few questions
3  just to clarify.
4  BY MS. XARHOULAKOS:
5    Q.  Going back to the evaluation when you were
6  questioned about it we jumped around a lot so I want
7  to clarify the timeline.  Understanding that you can't
8  remember specific dates do you remember when you first
9  learned about the problem with the evaluation done by
10  Lieutenant Mears for John Balas in 2003 and 2004?
11    A.  When John Balas made note of -- you know, I
12  signed off on the evaluation and then John Balas
13  called me and talked to me about the evaluation.
14    Q.  And that was when John said he was
15  dissatisfied?
16    A.  Yes.
17    Q.  Or you felt that he was dissatisfied?
18    A.  Yes.
19    Q.  Do you recall how soon after that you spoke to
20  Lieutenant Mears about the evaluation?
21    A.  I don't know the length of time because of our
22  work schedules and things, but it was the very first
23  time I had seen him at work standing in my doorway at
24  my office.

**Page 116**

1    Q.  Do you see him often at work?
2    A.  No.  No, as a matter of fact, I seen him less
3  than I did John.
4    Q.  What did you say to him when you saw him?  Do
5  you recall?
6    A.  I told Truman, I said, Look, I'm going to sit
7  down with you and John to do that evaluation.  He said
8  okay and that was the end of it.  It was just general
9  passing.
10    Q.  Did he ever --
11    A.  He said, Do you want to do it tonight?  I said,
12  No.
13    Q.  Lieutenant Mears asked to do the meeting that
14  night?
15    A.  Yes.
16    Q.  And you were unavailable that evening?
17    A.  Correct.
18    Q.  Do you recall how many times you or Lieutenant
19  Mears tried to arrange this meeting?
20    A.  I think -- I'm guessing, I think twice.
21    Q.  Did you or Lieutenant Mears try to arrange the
22  meeting?
23    A.  Two, Truman Mears, twice, Truman Mears.
24    Q.  Remind me again the second time why the meeting

**Page 117**

1  couldn't hapen, if you recall.
2    A.  Repeat that.
3    Q.  The second meeting that Lieutenant Mears tried
4  to arrange do you recall why that did not happen?
5    A.  No.  I -- see -- no, I do not.  I believe it
6  was -- I don't know if it was shift change or if it
7  was -- it was something going on and I can't recall
8  what it was.  It was just inconvenient at the time.
9    Q.  Do you recall how many times you and Lieutenant
10  Mears discussed the evaluation?
11    A.  No.  I think once, I'm not sure.
12    Q.  Do you think there was any other time other
13  than that first night?
14    A.  Could have been.
15    Q.  How did you learn that the evaluation had been
16  sent to HR?
17    A.  From John Balas calling me at home.
18    Q.  Do you know why Lieutenant Mears sent the
19  evaluation to HR?
20    A.  No.
21        MS. XARHOULAKOS:  That's all I have.
22        MR. NEUBERGER:  Read and sign?
23        MS. XARHOULAKOS:  Yes, we are doing reading
24  and signing.

30 (Pages 114 to 117)

7340cd43-2484-4ac7-98c9-ef8fed9ec45f

A0942

Balas v. Taylor, et al.

Page 118

1    (The deposition was concluded at 12:47
2  p.m.)
3         I N D E X
4  DEPONENT:  David Wayne Wilkinson        PAGE
5     Examination by Mr. Neuberger          2
6     Examination by Ms. Xarhoulakos       115
7
8         E X H I B I T S
8
   WILKINSON DEPOSITION EXHIBITS        MARKED
9
   1  Memo, dated 7/8/04, to John Balas
10    from Phil Townsend            82
11
   ERRATA SHEET/DEPONENT'S SIGNATURE    PAGE 119
12
   CERTIFICATE OF REPORTER        PAGE 120
13
14
15
16
17
18
19
20
21
22
23
24

Page 120

1  State of Delaware  )
                      )
2  New Castle County  )
3
4       CERTIFICATE OF REPORTER
5
6     I, Christina M. Vitale, Certified Shorthand
   Reporter and Notary Public, do hereby certify that
7  there came before me on Wednesday, November 28, 2007,
   the deponent herein, David W. Wilkinson, who was duly
8  sworn by me and thereafter examined by counsel for the
   respective parties; that the questions asked of said
9  deponent and the answers given were taken down by me
   in Stenotype notes and thereafter transcribed by use
10 of computer-aided transcription and computer printer
   under my direction.
11    I further certify that the foregoing is a true
   and correct transcript of the testimony given at said
12 examination of said witness.
13    I further certify that I am not counsel,
   attorney, or relative of either party, or otherwise
14 interested in the event of this suit.
15
16                        Christina M Vitale
17      Christina M. Vitale, CSR
        Certification No. 261-RPR
18     (Expires January 31, 2008)
19
   DATED:
20
21
22
23
24

Page 119

1
2
3      REPLACE THIS PAGE
4      WITH THE ERRATA SHEET
5      AFTER IT HAS BEEN
6      COMPLETED AND SIGNED
7      BY THE DEPONENT.
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

31 (Pages 118 to 120)

7340cd43-2484-4ac7-98c9-ef8fed9ec45f



Security

Superintendent

# Memo

To:      Cpl. John Balas

From:    Major Phil Townsend

Date:    July 8, 2004

Re:      Appreciation

I would like to take this opportunity to commend you for "JOB WELL DONE"!  You were instrumental in the recertification of QRT training during February/March of 2004.  Your dedication to this project and SCI are recognized and greatly appreciated.

It is a pleasure to work with such fine staff, and once again, thanks for a job well done.

PT:dmt



DEPOSITION EXHIBIT
PENGAD 800-631-6989
WILKINSON - 1
11/28/07-cm

D00281



**WILCOX & FETZER LTD.**

## In the Matter Of:

# Balas
## v.
## Taylor, et al.

### C.A. # 06-592-JJF

---

### Transcript of:

### Jennifer P. Weldon

### December 3, 2007

---

Wilcox and Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: depos@wilfet.com
Internet: www.wilfet.com

## Balas v. Taylor, et al.

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

```
CINDY L. BALAS a/k/a CINDY L.      )
ADKINS, Executrix of the Estate of )
CORPORAL JOHN J. BALAS,            )
                                   )
          Plaintiff,               )
                                   ) Civil Action
v.                                 ) No. 06-592-JJF
                                   )
STANLEY W. TAYLOR, JR., individu-  )
ally and in his official capacity  )
as the Comissioner of Correction;  )
ALAN MACHTINGER, individually and  )
in his official capacity as the    )
Director of Human Resources of the )
Department of Correction; MICHAEL  )
DELOY, individually and in his     )
official capacity as Deputy Warden )
of Sussex Correctional Institution;)
CAPTAIN DAVID WILKINSON, individu- )
ally; LIEUTENANT TRUMAN MEARS,     )
individually; and DEPARTMENT OF    )
CORRECTION OF THE STATE OF         )
DELAWARE,                          )
                                   )
          Defendants.              )
```

          Deposition of JENNIFER P. WELDON taken
pursuant to notice at the law offices of The Neuberger
Firm, P.A., Two East Seventh Street - Suite 302,
Wilmington, Delaware, beginning at 10:33 a.m. on
Monday, December 3, 2007, before Christina M. Vitale,
Certified Shorthand Reporter and Notary Public.


Continued. . . . . . . . . .


          WILCOX & FETZER
     1330 King Street - Wilmington, Delaware 19801
          (302) 655-0477

          www.wilfet.com

c7821e3a-554f-428f-b449-1a76da72cf69

Balas v. Taylor, et al.
Jennifer P. Weldon

---

Page 2

1  APPEARANCES:
2
   STEPHEN J. NEUBERGER, ESQUIRE
3  THE NEUBERGER FIRM, P.A.
     Two East 7th Street, Suite 302
4    Wilmington, Delaware  19801
     For the Plaintiff
5
6  RALPH K. DURSTEIN, III, ESQUIRE
   STACEY XARHOULAKOS, ESQUIRE
7  DEPARTMENT OF JUSTICE
     Carvel State Office Building
8    820 N. French Street
     Wilmington, Delaware  19801
9    For the Defendants
10  - - - - - - - - - - - - - - -
11     JENNIFER P. WELDON, the deponent herein,
12  having first been duly sworn on oath, was examined and
13  testified as follows:
14  BY MR. NEUBERGER:
15   Q.  Ms. Weldon my name is Steve Neuberger and I'm
16  an attorney for Cindy Adkins, formerly Cindy Balas,
17  the spouse of the late John J. Balas, okay?
18   A.  Um-hum.
19   Q.  Have you ever testified in court before?
20   A.  No.
21   Q.  Have you ever had the pleasure of having your
22  deposition taken before?
23   A.  No.
24   Q.  I'm going to run through the procedures here

---

Page 3

1   just so that you know what is going to happen so we
2   are all on the same page.  I'm going to ask you some
3   questions and the court reporter here is going to type
4   up your answers to those questions.  Okay?
5    A.  Um-hum.
6    Q.  One of the more important things is you have to
7   verbalize your answers.  Instead of saying um-hum or
8   nodding your head, you have to say yes; or, if the
9   answer is no, just say no instead of shaking your
10  head.  Okay?
11   A.  Okay.
12   Q.  We have to take turns talking because although
13  the court reporter is very good, she can't get
14  everything down is we both talk at the same time.
15  After we are done here today you will have an
16  opportunity to review the deposition transcript to
17  correct any typographical errors or things like that.
18  Okay?
19   A.  Okay.
20   Q.  And if I ask you a question that you don't
21  understand, just ask me to rephrase it and I will be
22  more than happy to.  Okay?
23   A.  Yes.
24   Q.  If you don't know the answer, say so and I

---

Page 4

1   would be happy to ask you a different question and
2   we'll move on to the next question.  All right?
3    A.  Okay.
4    Q.  Are you taking any medications or is there
5   anything else happening in your life today which would
6   prevent you from remembering accurately or testifying
7   truthfully today?
8    A.  No.
9    Q.  If you need any break, just let me know.  You
10  have taken an oath to tell the truth today, right?
11   A.  Yes.
12   Q.  You understand the significance of that oath,
13  correct?
14   A.  Yes.
15   Q.  And do you understand that I'm going to be
16  asking you some questions today about some allegations
17  related to a lawsuit filed by Cindy Balas on behalf of
18  her late husband, John?
19   A.  Yes.
20   Q.  Now, you met with your attorneys prior to the
21  deposition today, right?
22   A.  Yes.
23   Q.  And other than meeting with your attorneys have
24  you talked to anybody else about your deposition

---

Page 5

1   today?
2    A.  No.
3    Q.  Have you talked to anybody else about your
4   expected testimony today?
5    A.  No.
6    Q.  What is your full name?
7    A.  Jennifer Pearl Weldon.
8    Q.  And if you don't mind my asking, how old are
9   you?
10   A.  Thirty-five.
11   Q.  And where were you raised?
12   A.  Southern Delaware.
13   Q.  Specifically where in southern Delaware?
14   A.  Well, it depends.  My young years I was raised
15  in Galesville, Maryland, and I graduated from Seaford,
16  Delaware.
17   Q.  And who is your current employer?
18   A.  Correctional Medical Services.
19   Q.  And they work in the prisons in the State of
20  Delaware?
21   A.  They are a vendor for the State of Delaware
22  correctional system, yes.
23   Q.  Where is the specific location where you work?
24   A.  Georgetown, Delaware.

---

2 (Pages 2 to 5)

c7821e3a-554f-428f-b449-1a76da72cf69

A0947

Balas v. Taylor, et al.
Jennifer P. Weldon

Page 6

1   Q.  Were you working there in 2004?
2   A.  Yes.
3   Q.  Were you working there in 2005?
4   A.  Yes.
5   Q.  Did you know John Balas?
6   A.  Yes.
7   Q.  And do you recall when you first met John?
8   A.  Yes.
9   Q.  When would that have been?
10  A.  September of '04.
11  Q.  September of 2004.  Where did you meet him?
12  A.  In the parking lot of work.
13  Q.  That would be at the SCI in Georgetown?
14  A.  Yes.
15  Q.  And at some point thereafter did you begin a
16  romantic relationship with John?
17  A.  Yes.
18  Q.  Do you recall when that began?
19  A.  He approached me in late August anonymously.  I
20  met him in September, did not know him prior to that.
21  To answer your question it was in the fall.
22  Q.  And when did the romantic relationship end?
23  A.  December.
24  Q.  Why did it end?

Page 7

1   A.  I don't know if I can sum that up briefly.
2   Things weren't working out.
3   Q.  Could you try to -- you don't have to sum it up
4   briefly.  You can give me as long an answer as would
5   be necessary to answer the question.
6   A.  It just appeared to me that he had a lot of
7   personal problems that were interfering with our
8   relationship.
9   Q.  Would one of those personal problems have been
10  his marriage and his relationship with his wife?
11  A.  In part.
12  Q.  Okay.  So, the romantic relationship ended in
13  December of '04, correct?
14  A.  Yes.
15  Q.  And did you run into John at work at any point
16  thereafter?
17  A.  Yes.
18  Q.  Did you communicate with him at all --
19  A.  Yes.
20  Q.  -- in the time frame after December of 2004?
21  A.  Yes.
22  Q.  Was it in person or was it by telephone or by
23  E-mail?
24  A.  Mostly by telephone.  We did not interact very

Page 8

1   much at work, during work.
2   Q.  Is that because your jobs didn't require
3   interaction?
4   A.  Partly.  We were in different locations.
5   Q.  I'm hesitating because I'm not sure if you are
6   done talking yet.
7   A.  Yes.
8   Q.  From September of 2004 through December of 2004
9   do you think you got to know John on a personal level?
10  A.  Yes.
11  Q.  Did you talk about your workdays and things
12  like that?
13  A.  Yes.
14  Q.  From what you were able to observe and in your
15  interactions with John was John under stress because
16  of work during that time frame?
17  A.  Can you ask me that again?
18  Q.  Sure.  Did John appear to be stressed out about
19  his job?
20  A.  I wouldn't say that -- he had a lot of things
21  going on.  Specifically about his job I would say no.
22  Q.  Did John ever come to you and talk to you about
23  a performance evaluation given him to by a supervisory
24  officer?

Page 9

1   A.  He did.
2   Q.  Did John ever talk to you about how he felt
3   that his supervisor was angry at him because he was
4   out of the CERT team in August of 2004?
5   A.  No.
6   Q.  Did he ever talk to you about how his
7   supervisor was out to get him?
8   A.  No.
9   Q.  What did you talk about with John?
10  A.  Regarding work?
11  Q.  Sure.
12  A.  I'm not sure I understand.
13  Q.  Maybe a better question would be did you really
14  talk about work with John?
15  A.  Yes.
16  Q.  During those conversations when you talked
17  about work specifically what was discussed?
18  A.  How busy he was, how many intakes he had.  Just
19  general -- I mean, just general work conversations.  I
20  don't really remember.
21  Q.  Do you think there could have been work
22  conversations you had with John which you don't
23  remember now because it's more than three years later?
24  A.  I don't believe so.

3 (Pages 6 to 9)

Balas v. Taylor, et al.
Jennifer P. Weldon

| Page 10 |
|---|

1   Q.  Is it your testimony that you recall the
2  substance of every work-related conversation you had
3  with John that you had during that three-month time
4  frame?
5   A.  That's all, yeah -- yes.
6   Q.  So, how often were you seeing John during that
7  time frame?
8   A.  Weekly.
9   Q.  Did John ever talk to you about a grievance he
10  had filed with the union because of the performance
11  evaluation a supervisor had given him?
12   A.  I believe he mentioned it.
13   Q.  And I would like to focus on that because you
14  testified that you recall all of the work-related
15  conversations you had with John, okay?
16   A.  Yes.
17   Q.  Do you recall what exactly he mentioned about
18  the union grievance he filed over the evaluation?
19   A.  No.
20   Q.  You don't recall specifically what was
21  discussed during that conversation?
22   A.  I remember him mentioning a grievance.  I
23  remember him stating that he had a qualm about his
24  evaluation, but he never -- we never got into in-depth

| Page 11 |
|---|

1  conversations about that.
2   Q.  Did John seem happy about his evaluation?
3   A.  No.
4   Q.  Did he seem unhappy about his evaluation?
5   A.  Yes.
6   Q.  Did he seem displeased about it?
7   A.  Yes.
8   Q.  Did he seem upset about it?
9   A.  I wouldn't say upset.  Unhappy, not satisified.
10  I wouldn't say upset.
11   Q.  Did he ever explain to you why he was unhappy
12  or unsatisfied with it?
13   A.  Vaguely.
14   Q.  What did he say?
15   A.  Just that he didn't agree with it, and I don't
16  remember anything after that.
17   Q.  Did John ever talk to you about how his union
18  grievance was ultimately resolved?
19   A.  No.
20   Q.  Now, after your romantic relationship with John
21  ended in December of 2004 did you continue to keep in
22  contact?
23   A.  Yes.
24   Q.  How?

| Page 12 |
|---|

1   A.  By telephone.
2   Q.  So, I want to focus on the time frame from
3  December of 2004 through February of 2005, okay?
4   A.  Yes.
5   Q.  During that time frame in your discussions with
6  John did the subject of work ever come up during those
7  conversations?
8   A.  From January through February?
9   Q.  From whenever it ended in December of 2004
10  through January of 2005 through February of 2005.
11   A.  No.
12   Q.  The conversations was more of a personal
13  nature?
14   A.  Yes.
15   Q.  Eventually in January or February of 2005 did
16  you go to then Deputy Warden DeLoy and express some
17  concerns about John and his potential for suicide?
18   A.  Yes.
19   Q.  Do you recall when that was?
20   A.  The week before.
21   Q.  The week before he ultimately killed himself?
22   A.  Yes.
23   Q.  Do you recall how long before within that week
24  it was?

| Page 13 |
|---|

1   A.  Wednesday.
2   Q.  Okay.  Why did you go and talk to Deputy Warden
3  DeLoy about that?
4   A.  Because he was the only mutual person that I
5  felt knew John that I could express the concern to.
6   Q.  Did you talk to anyone else about that same
7  concern?
8   A.  Lee Mears and I had a conversation.  I don't
9  know that I initiated the conversation.  I believe it
10  was Lee who stated to me that that was how he felt
11  John felt and that was it.
12   Q.  Did you speak to someone by the name of
13  Brittingham?
14   A.  Going back to your conversation with Deputy
15  Warden DeLoy do you recall where the conversation took
16  place?
17   A.  In his office.
18   Q.  And when you had the conversation was the door
19  open or was it shut?
20   A.  I believe it was open.
21   Q.  And do you recall what you said to him?
22   A.  I went to him and expressed that I felt that
23  John was going to hurt himself because I had tried to
24  break things off and he expressed this to me and I did

4 (Pages 10 to 13)

c7821e3a-554f-428f-b449-1a76da72cf69

A0949

Balas v. Taylor, et al.
Jennifer P. Weldon

Page 14

1  not know where else to go.
2    Q.  So, would it be fair to say that you were
3  reaching out for help?
4    A.  Yes.
5    Q.  Other than telling the deputy warden that you
6  thought that John might be a danger to himself did you
7  tell the deputy warden that you felt John might be a
8  physical threat to someone else?
9    A.  No.
10   Q.  Did you express to the deputy warden that John
11  might be a danger to a subsequent boyfriend of yours?
12   A.  No.
13   Q.  So, the concern that you expressed to Deputy
14  Warden DeLoy was solely that John might do something
15  violent to himself?
16   A.  That he was threatening that.
17   Q.  That he was threatening to do something violent
18  to himself?
19   A.  Yes.
20   Q.  What did the deputy warden say in response to
21  your concerns?
22   A.  I believe he stated that John took time off to
23  be with his family at that time.  I really don't
24  remember specifically what he said.

Page 15

1    Q.  Was there anyone else in the office in the
2  meeting other than you and the deputy warden?
3    A.  No.
4    Q.  When was the last time you spoke to John prior
5  to the suicide?
6    A.  That morning.
7    Q.  The morning that he killed himself?
8    A.  Yes.
9    Q.  What did John say?
10   A.  He stated that he rolled his truck the night
11  before, that he was cleaning his truck out.
12   Q.  Did he say anything else?
13   A.  I asked him if he had been drinking the night
14  before.  He insisted no.  I stated to him that his
15  speech was slurred the night before, that I worried
16  about him.  He insisted he had not been drinking.  Our
17  conversation went back and forth and he was
18  interrupted and that's when our conversation ended.
19   Q.  He was interrupted as in he had to get off the
20  phone or just that the phone cut off somehow?
21   A.  No, that he was interrupted by someone or
22  something.  Just ended.
23   Q.  And so that's the morning, that Saturday?
24   A.  Yes.

Page 16

1    Q.  And then I think you mentioned you talked to
2  him the night before, right?
3    A.  Yes.
4    Q.  And had you talked to him several times that
5  same week, several additional times that same week?
6    A.  I believe he left me several voice messages
7  that week.  I was trying to remove myself from the
8  relationship and from communication from him.  The
9  Friday night before he left me several messages.  I
10  believe I spoke to him once after he wrecked the
11  vehicle.  His speech was very slurred.  I really
12  didn't want to talk to him.  Saturday morning, like I
13  said earlier, our conversation ended and I just turned
14  the phone off.
15   Q.  So, you hung up on him?
16   A.  No.  He hung up on me and that was it.
17   Q.  Did John mention to you at all that week that
18  he was trying to patch things up with his wife, Cindy?
19   A.  No.
20   Q.  Did he mention to you that week he and Cindy
21  had a long talk and discussed their relationship in
22  great detail and they were trying to make things work?
23   A.  No.
24       MR. NEUBERGER:  Guys, I have no further

Page 17

1  questions.
2       MS. XARHOULAKOS:  I have no questions.
3       MR. NEUBERGER:  Would you like to read and
4  sign?
5       MR. DURSTEIN:  I think so, that's a good
6  idea.
7       (The deposition was concluded at 11 o'clock
8  a.m.)
9           I N D E X
10  DEPONENT:  Jennifer P. Weldon          PAGE
11    Examination by Mr. Neuberger          2
12
13        E X H I B I T S
14  (There were no exhibits marked for identification.)
15
16  ERRATA SHEET/DEPONENT'S SIGNATURE    PAGE 18
17  CERTIFICATE OF REPORTER              PAGE 19
18
19
20
21
22
23
24

5 (Pages 14 to 17)

c7821e3a-554f-428f-b449-1a76da72cf69

Balas v. Taylor, et al.

Page 18

1
2
3        REPLACE THIS PAGE
4        WITH THE ERRATA SHEET
5        AFTER IT HAS BEEN
6        COMPLETED AND SIGNED
7        BY THE DEPONENT.
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 19

1   State of Delaware   )
                        )
2   New Castle County   )
3
4           CERTIFICATE OF REPORTER
5
6       I, Christina M. Vitale, Certified Shorthand
    Reporter and Notary Public, do hereby certify that
    there came before me on Monday, December 3, 2007, the
7   deponent herein, JENNIFER P. WELDON, who was duly
    sworn by me and thereafter examined by counsel for the
8   respective parties; that the questions asked of said
    deponent and the answers given were taken down by me
9   in Stenotype notes and thereafter transcribed by use
    of computer-aided transcription and computer printer
10  under my direction.
11      I further certify that the foregoing is a true
    and correct transcript of the testimony given at said
12  examination of said witness.
13      I further certify that I am not counsel,
    attorney, or relative of either party, or otherwise
14  interested in the event of this suit.
15
16                          _Christina M Vitale_
17          Christina M. Vitale, CSR
            Certification No. 261-RPR
18          (Expires January 31, 2008)
19
    DATED:
20
21
22
23
24

6 (Pages 18 to 19)

Wilcox and Fetzer, Ltd.   Registered Professional Reporters        302-655-0477

c7821e3a-554f-428f-b449-1a76da72cf69



In the Matter Of:

# Balas
## v.
## Taylor, et al.

### C.A. # 06-592-JJF

_____

### Transcript of:

### William H. Shockley

### December 4, 2007

_____

Wilcox and Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: depos@wilfet.com
Internet: www.wilfet.com

## Balas v. Taylor, et al.

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

CINDY L. BALAS a/k/a CINDY L.          )
ADKINS, Executrix of the Estate of )
CORPORAL JOHN J. BALAS,          )
                                                 )
          Plaintiff,           )
                                 )  Civil Action
v.                             )  No. 06-592-JJF
                                 )
STANLEY W. TAYLOR, JR., individu-  )
ally and in his official capacity  )
as the Comissioner of Correction;  )
ALAN MACHTINGER, individually and  )
in his official capacity as the    )
Director of Human Resources of the )
Department of Correction; MICHAEL  )
DELOY, individually and in his    )
official capacity as Deputy Warden )
of Sussex Correctional Institution;)
CAPTAIN DAVID WILKINSON, individu- )
ally; LIEUTENANT TRUMAN MEARS,    )
individually; and DEPARTMENT OF    )
CORRECTION OF THE STATE OF         )
DELAWARE,                    )
                             )
          Defendants.          )

          Deposition of WILLIAM H. SHOCKLEY taken
pursuant to notice at the law offices of The Neuberger
Firm, P.A., Two East Seventh Street - Suite 302,
Wilmington, Delaware, beginning at 9:33 a.m. on
Tuesday, December 4, 2007, before Christina M. Vitale,
Certified Shorthand Reporter and Notary Public.

Continued. . . . . . . . . .

          WILCOX & FETZER
     1330 King Street -  Wilmington, Delaware 19801
          (302) 655-0477

          www.wilfet.com

c962d412-a012-46e6-8bf5-6c1254368def

Balas v. Taylor, et al.
William H. Shockley

Page 2

1  APPEARANCES:
2
      CHERYL A. HERTZOG, ESQUIRE
3    THE NEUBERGER FIRM, P.A.
        Two East 7th Street, Suite 302
4      Wilmington, Delaware  19801
        For the Plaintiff
5
6    STACEY XARHOULAKOS, ESQUIRE
      DEPARTMENT OF JUSTICE
7      Carvel State Office Building
        820 N. French Street
8      Wilmington, Delaware  19801
        For the Defendants
9

10
11        WILLIAM H. SHOCKLEY, the deponent herein,
12  having first been duly sworn on oath, was examined and
13  testified as follows:
14  BY MS. HERTZOG:
15    Q.  My name is Cheryl Hertzog and I'm a lawyer for
16  the plaintiff, Cindy Adkins, formerly Cindy Balas, the
17  widow of Corporal John Balas.  Have you ever testified
18  in court before?
19    A.  Yes.
20    Q.  Have you ever had your deposition taken before?
21    A.  No.
22    Q.  I'm going to ask you some questions and the
23  court reporter is going to type them up.  She is going
24  to type up the answers to those questions.  Okay?

Page 3

1    A.  Um-hum.
2    Q.  We have to take turns talking because she can't
3  type us both down at the same time, okay?  You have to
4  verbalize your answers, for example, instead of
5  shaking your head you have to say yes or no.  Okay?
6    A.  Yes.
7    Q.  After we are done here today you will have an
8  opportunity to review the transcript to make any
9  typographical error corrections or anything like that.
10  Okay?
11    A.  Yes.
12    Q.  If I ask you a question and you do not
13  understand, just ask me to rephrase it.  I don't want
14  you to guess.  So, if you don't know the answer to
15  something, just say so.
16    A.  Okay.
17    Q.  Are you taking any medications or is there
18  anything else that would prevent you from remembering
19  accurately or testifying truthfully today?
20    A.  No.
21    Q.  If you need any breaks, let me know.  I think
22  we have bathroom keys and water.  Now, you have taken
23  an oath to tell the truth.  Do you understand the
24  significance of that oath?

Page 4

1    A.  Yes.
2    Q.  Do you understand that I'm going to be asking
3  you questions today about allegations related to a
4  lawsuit filed by Cindy on behalf of her late husband,
5  John Balas?
6    A.  Yes.
7    Q.  And there is a lawsuit that has been filed in
8  the U.S. District Court for the District of Delaware
9  in September of 2006?
10    A.  Yes.
11    Q.  Have you met with anyone prior to your
12  deposition today?
13    A.  Just the attorney general's office.
14    Q.  And have you talked to anyone else aside from
15  your attorneys about your deposition today?
16    A.  No.
17    Q.  What is your full name?
18    A.  William Heath Shockley, H-E-A-T-H.
19    Q.  And where were you born?
20    A.  Seaford, Delaware.
21    Q.  And were you raised in Seaford?
22    A.  No.  I was raised in Frankford, Delaware.
23    Q.  Where did you go to high school?
24    A.  Indian River High School.

Page 5

1    Q.  What did you do after high school?
2    A.  I went to college for a year at University of
3  North Carolina in Charlotte and a year at the
4  University of Delaware and then back down to Delaware
5  Tech and Community College in Georgetown.
6    Q.  When did you start with the Department of
7  Correction?
8    A.  April of '98.
9    Q.  And you started there as a correctional
10  officer?
11    A.  No.  I worked in the maintenance department.  I
12  started strictly as a maintenance mechanic.
13    Q.  When did you become a CO?
14    A.  You have to be a CO before you can work for the
15  Department of Correction.  So, I went through the
16  Academy and am a CO.  I just went into a specialized
17  field as a maintenance mechanic.
18    Q.  While you were working as a maintenance
19  mechanic you were a CO?
20    A.  Yes, still am.
21    Q.  When were you promoted to corporal?
22    A.  I'm actually a staff sergeant.  That's just a
23  rank they use in our side of the thing because we have
24  three different grades of mechanics.  They went by

2 (Pages 2 to 5)

c962d412-a012-46e6-8bf5-6c1254368def

Balas v. Taylor, et al.
William H. Shockley

| | |
|---|---|
| **Page 6** | **Page 8** |

**Page 6**

1  your pay grade.  So, corporal is a mechanic I,
2  sergeant is mechanic II and a staff sergeant is
3  mechanic III and that's where I am at this time.
4  Q.  You went from CO to corporal?
5  A.  When I got out of the Academy, I went to
6  corporal and then a year later I went to sergeant and
7  two years after that I went to a staff sergeant.
8  Q.  You have been a staff sergeant since when?
9  A.  2001, 2002, something like that.
10  Q.  What position did you hold from August 2004 to
11  February 2005?
12  A.  I believe that was when I was a member of the
13  CERT team.
14  Q.  Were you also a staff sergeant in the
15  maintenance department as well then?
16  A.  Yes.
17  Q.  In August of 2004 were you a member of COAD or
18  otherwise know as Correctional Officers Association of
19  Delaware?
20  A.  Yes.
21  Q.  Are you aware if John Balas was a member of
22  COAD in August of 2004?
23  A.  I believe he was, yes.
24  Q.  I'm going to ask you some questions about the

**Page 7**

1  summer of 2004 so I'm going to take you back a little
2  bit.  Were you aware a lot of things were going on in
3  the Department of Correction during that time?  Let me
4  ask a more specific question.  Was the Department of
5  Correction facing issues such as problems with
6  staffing levels or understaffing?
7  A.  Yes.
8  Q.  What about concerns about low wages?
9  A.  Yes.
10  Q.  Were there also concerns about retaining
11  qualified officers?
12  A.  Yes.
13  Q.  Were there problems with overtime, both
14  voluntary and involuntary?
15  A.  Yes, there was.
16  Q.  Were there also security lapses in the prison
17  security such as the Cassie Arnold rape incident?
18  A.  I don't know anything about that.
19  Q.  Are you aware there was eventually what has
20  been termed a job action where CO's were refusing to
21  accept voluntary overtime?
22  A.  Yes, I do.
23  Q.  Are you also aware the Department of Correction
24  filed a lawsuit against COAD, the union, and its

**Page 8**

1  officers?
2  A.  Yes, I am.
3  Q.  Now, during this time are you aware that COAD
4  was also trying to negotiate a new contract?
5  A.  Yes.
6  Q.  And there were some differences of opinion as
7  to how -- between the union and management as to how
8  to address the issues I just went through with you?
9  A.  Yes.
10  Q.  Are you aware there was any media attention
11  given to these issues during that time?
12  A.  Yes, there was.
13  Q.  Are you aware if there was any legislative
14  action by the Delaware State legislature?
15  A.  The legislature I don't know.  I do remember
16  there was a lot of going back and forth with the
17  governor.
18  Q.  Are you aware some of these issues regarding
19  the Department of Correction were issues in the
20  upcoming gubernatorial election during that time
21  between Ruth Ann Minner and --
22  A.  Yes.
23  Q.  -- and I guess it was Infante, Protak and Lee?
24  A.  Yes.

**Page 9**

1  Q.  I think you said before you were a member of
2  CERT between August of 2004 and February of 2005?
3  A.  Yes.
4  Q.  And CERT stands for?
5  A.  Correction Emergency Response Team.
6  MS. XARHOULAKOS:  Can you clarify the dates
7  please again?  I think you said until February 2005,
8  would that be correct?
9  THE WITNESS:  I believe we quit it was in
10  August.
11  BY MS. HERTZOG:
12  Q.  We'll just stick with August of 2004, were you
13  a CERT member in August of 2005?
14  A.  I was until that's the time we quit, yes.
15  Q.  Do you remember when it was that the CERT
16  members resigned?
17  A.  Not the exact date, no.  You probably would
18  know the date as far as -- I have no idea what date
19  exactly.  I just know it was around that time frame.
20  Q.  What were your job duties on the CERT team?
21  A.  Pretty much the same as most of the other guys.
22  You are assigned a job duty as you come on -- when you
23  go to any kind of a situation -- other than the team
24  leaders you are not given a job duty that you do all

3 (Pages 6 to 9)

c962d412-a012-46e6-8bf5-6c1254368def

Balas v. Taylor, et al.
William H. Shockley

Page 10

1  the time. You do everything and you train to be able
2  to do everything.
3     Q. For instance, would you get activated to
4  respond to certain uproars in the prison?
5     A. Yes.
6     Q. And you would be activated by pager?
7     A. Yes, we carried pagers.
8     Q. The CERT members that were on the CERT team
9  were all their job duties similar to yours?
10    A. As far as CERT or --
11    Q. As far as CERT.
12    A. Yes, everybody, except, like I said, there were
13 certain guys who were team leaders who were trained a
14 little bit differently, but everybody trained to do
15 the same jobs all the time.
16    Q. Was John Balas a CERT member during that time?
17    A. Yes.
18    Q. He was not a team leader, correct?
19    A. I don't think he was.
20    Q. I think the records will reflect that the CERT
21 resignation happened on August 6th of 2004, would that
22 sound about right?
23    A. That's about right, yes.
24    Q. You were activated, you actually received your

Page 11

1  activation page on the day before that, so it would
2  have been August 5th, correct?
3     A. I wasn't activated for the incident you are
4  talking about on the 6th.
5     Q. Do you know who the CERT members that were
6  activated that day were?
7     A. The two I do know was Lee Mears and John Balas.
8  Other than that I'm not really sure which ones were
9  activated and which ones were not.
10    Q. Did you attend a meeting the night before these
11 other CERT members were activated?
12    A. No, I did not.
13    Q. Were you aware that a meeting was held the
14 night before they were activated?
15    A. Yes.
16    Q. Do you know where the meeting was held?
17    A. I don't know specifically, no.
18    Q. Can you explain the events of August 6th to me
19 since you were not activated that day.
20    A. My memory is fairly minimal. Officers that
21 were activated for the C & T were reporting to what
22 they have as a C & T trailer where they go and get
23 their job duties in the morning and my job location is
24 right next to there. So, they were in the parking lot

Page 12

1  waiting for one of the CERT commanders to get down.
2        I stopped to talk to Lee Mears and some of
3  the other ones that were there and they were talking
4  about the events, that they had been activated and
5  they were going to be the ones doing the C & T job
6  duties that day.
7     Q. Do you remember who else you spoke with aside
8  from Lee Mears that morning?
9     A. Not really. I do remember Lee and John, but
10 other than that that's almost four years ago.
11    Q. A lot has happened since then, right?
12    A. Yes.
13    Q. To the best of your memory do you remember if
14 John made any statements to you about the activation?
15    A. Specifically, no. I don't remember -- I'm not
16 going to sit here and tell you I do remember
17 something.
18    Q. Do you remember what their overall attitude
19 towards their activation was?
20    A. They weren't very happy. Like I said, I only
21 talked to them in the morning and then I met again
22 with Lee and a couple other guys in the afternoon.
23 That's when they told me that they were going to
24 resign.

Page 13

1     Q. We'll get to that in one minute. When you say
2  they weren't happy, why is it that they weren't happy
3  about the activation?
4     A. Well, the only thing that I got out of it was
5  they weren't very happy about being forced to do a job
6  when we are in the middle of a job action and with the
7  state suing the correction officers and they just
8  didn't want to be a part of that.
9     Q. The correction officers as part of this job
10 action were refusing to do voluntary overtime and they
11 felt this was maybe going against the job action?
12    A. Somewhat, yes.
13    Q. What happened later in the day? You said you
14 met with them again?
15    A. I spoke with them in the afternoon when they
16 were -- sometime in the afternoon, I don't know when
17 it was, and they told me that they were going to
18 resign. They weren't going to be put in the position
19 to go against the union members again after some of
20 the comments that were made when they were -- when
21 they went inside the prison that morning. So, they
22 asked me if I was willing to resign with them as a
23 team and I told them yes.
24    Q. What comments are you referring to?

4 (Pages 10 to 13)

Balas v. Taylor, et al.
William H. Shockley

---

Page 14

1    A.  They said they were called -- people who cross
2  picket lines, I'm not sure of the terminology, but
3  they were just called names and made -- by fellow
4  officers as far as being union busting and stuff like
5  that, but similar to those kind of things.  Exactly
6  the words that were used, I don't know.  I was just
7  paraphrasing some of the things that were happening.
8    Q.  Who did you speak with in the afternoon?
9    A.  Lee Mears.
10   Q.  Was John Balas also present?
11   A.  I believe he was.
12   Q.  Do you remember to the best of your memory who
13  resigned with you that day?
14   A.  There was ten of us.  It would be Lee Mears,
15  John Balas, me, John Mumford, Harry Hastings, I think
16  Alan Adams, Dennis Murray, Jeff Foskey and David West
17  I believe was another one.
18   Q.  Do you remember what statements were made
19  before you went in to actually resign -- let me
20  rephrase that.  Did John make any statements to you
21  before you resigned when you were speaking about it?
22   A.  Only that they didn't think that Paul Howard
23  would allow that many people of one institution CERT
24  team resign without having some kind of -- trying to

---

Page 15

1  make some kind of deal to stop that from happening.
2    Q.  Who is Paul Howard?
3    A.  At the time he was the bureau chief.
4    Q.  Eventually the ten of you make a decision to
5  resign and what happens from there and who did you
6  meet with?
7    A.  We decided to resign as soon as they were
8  finished the C & T for the day and I finished work.
9  So, probably around 3:30, four o'clock we met with the
10  warden at SCI, which was Rick Kearney, and told him we
11  were resigning as far as kind of like a protest
12  against the using of CERT to do a C & T job.
13   Q.  You said it was Warden Kearney?
14   A.  Yes.
15   Q.  Did he make any statements to you after you --
16  to the ten of you after you told him you were going to
17  resign?
18   A.  I think he said he didn't really agree with
19  what we did, but he wasn't going to try to stop.  I
20  mean, we decided to do it as a team and he respected
21  that.  He wasn't going to hold it against anybody as
22  far as the reason that they were quitting.
23   Q.  After you tell him you are resigning you leave
24  his office and what happened from there?

---

Page 16

1    A.  A couple of the people were in the parking lot
2  talking and pretty much we went home for the day
3  because it was a Friday afternoon.
4    Q.  You said a couple people were talking, who
5  might that have been?
6    A.  I think I stopped to talk to Lee Mears and I
7  don't know if I talked to anybody else, but, like I
8  said, it was a Friday afternoon and everybody was
9  ready to go home because it had been pretty much a bad
10  day.
11   Q.  Did you know John Balas?
12   A.  I had a working relationship with him.  I
13  didn't know much about him.  I didn't associate with
14  him outside of the institution other than CERT.
15   Q.  So, you didn't work with him in the receiving
16  room, correct?
17   A.  No, because, like I said, I worked in
18  maintenance and those guys were correction officers
19  and I would see him as I passed through or going back
20  and forth; or, if he had something he had a question
21  about mechanically or something like that, he called
22  me because he was real big into his son's go-carts and
23  stuff like that.  If he had a question on something I
24  might be able to answer, he would ask me when I would

---

Page 17

1  come through; but, as far as anything other than that,
2  not really.
3    Q.  Are you aware if he was well-liked by his
4  co-workers?
5    A.  Most of the people that I -- that we talked to
6  or that we hung around with most people liked him,
7  yes.
8    Q.  What kind of a personality did he have?
9    A.  Very outgoing, very friendly as far as people
10  that he associated with.
11   Q.  Was he more of a tough guy or more on the
12  sensitive side?
13   A.  I'm not really sure.  I only saw him at work.
14   Q.  Do you know if he was a hard worker?
15   A.  Yes, he was very professional on his job.
16   Q.  Was he dedicated?
17   A.  Yes, he enjoyed what he did.
18   Q.  Would you consider him a loyal employee to the
19  Department of Correction?
20   A.  From what I seen, yes.
21   Q.  Do you know if he was respected by his
22  co-workers?
23   A.  As far as I know, yes.
24   Q.  How about the inmates, are you aware of his

5 (Pages 14 to 17)

c962d412-a012-46e6-8bf5-6c1254368def

A0957

Balas v. Taylor, et al.
William H. Shockley

Page 18

1  interactions with the inmates?
2     A.  Not really.  Like I said, I didn't work around
3  him when he was -- because he only saw the inmates
4  when they came in or went out.  So, as far as an
5  interaction with him I didn't get to observe a whole
6  lot of that.
7     Q.  In your interactions with John did you become
8  familiar with the kind of person he was?
9     A.  As far as?
10    Q.  Like was he trustworthy?
11    A.  To me, yes.
12    Q.  Was he honest?
13    A.  As far as I could tell he was honest with me.
14    Q.  Do you know if he was prone to lying?
15    A.  Not in my experiences I had with him.
16    Q.  After your resignation from the CERT team did
17  you experience -- strike that.  After your resignation
18  from the CERT team were you aware of the demeanor of
19  management towards the ten of you who resigned?
20    A.  I'm not real sure.  What do you mean as far as
21  management?
22    Q.  Supervisors, lieutenants, up the chain of
23  command, I would say lieutenant and above.
24    A.  Not really because, like I said, I worked in a

Page 19

1  totally different agency than they did so I didn't
2  fall under the same guidelines as far as I didn't
3  report to lieutenants or captains or stuff like that.
4  I had my own set of supervisors.
5     Q.  Did anyone in a management position ever say
6  anything to you about the resignation?
7     A.  At that time, no.
8     Q.  You say "at that time."  Did someone say
9  something to you later?
10    A.  Yes, I had an incident dealing with the guy who
11  was head of the CERT at an interview, he brought the
12  incident back up when I was in an interview.
13    Q.  Who was that?
14    A.  Dave Hall.
15    Q.  And what did he say to you?
16    A.  I had applied for a job and he was on the
17  interview panel and he just told me that he had been
18  waiting a while to ask me questions about the incident
19  that happened and the reason that I quit.
20    Q.  And what did you tell him?
21    A.  I told him that it was a team decision and that
22  I volunteered to do the resigning as a team effort in
23  protest of the action that they were using CERT
24  members for.

Page 20

1     Q.  Did he make any statements after you explained
2  that to him?
3     A.  Not really.  He was trying to make it relevant
4  to a question in the interview.  That was pretty much
5  it.
6     Q.  Did you get the position?
7     A.  I don't know.
8     Q.  When was this?
9     A.  I interviewed about a month and a half ago, but
10  they told us that they were running behind as far as
11  getting things started.  It's a new position.  So,
12  they would not be making a decision until January or
13  February.
14    Q.  What position was Dave Hall in in August of
15  2004?
16    A.  He was the head of CERT.
17    Q.  Same position he is in now?
18    A.  Yes.
19    Q.  When you were talking to Dave Hall about this,
20  did you get a negative feeling from him about his
21  questions regarding your CERT resignation?
22    A.  Yes.
23    Q.  Negative meaning what?
24    A.  It felt like he still held some kind of I guess

Page 21

1  -- I don't know if you want to call it resentment, but
2  I think he was still a little bit upset that the guys
3  resigned under the situation that had happened.
4     Q.  Still -- I'm sorry, what was your word?
5     A.  He kind of had a -- it was not really
6  resentment -- I guess you could say resentment.  He
7  just had that he was still a little bit upset as far
8  as the reason that we resigned and under the circum-
9  stances we resigned.
10    Q.  He was still a little bit upset or having some
11  resentment to use your words three years later after
12  you resigned?
13    A.  Yes.
14    Q.  You don't know if you got the position or not
15  yet?
16    A.  No, I do not.
17    Q.  Who else was on the board with Dave Hall?
18    A.  Tim Radcliffe and Ernie McBroom.
19    Q.  You said he was trying to link it to some
20  question he asked you at the interview?
21    A.  Yes.
22    Q.  What question was that?
23    A.  They had a question on there if you were
24  investigating officers that you worked with would you

6 (Pages 18 to 21)

c962d412-a012-46e6-8bf5-6c1254368def

A0958

Balas v. Taylor, et al.
William H. Shockley

Page 22

1  have a problem having your name attached to the
2  investigation or pending litigation for termination or
3  something like that. He was trying to link it to
4  being the same kind of situation of having my name
5  linked with a job action or something like that
6  towards -- he tried to make the connection as far as
7  they were the same type of situation that I would have
8  my name and be considered an outcast.
9      Q.  What position were you applying for?
10     A.  It was a new position they started up for CERT
11 called central intelligence group.
12     Q.  And that was for the CERT team?
13     A.  It is a part of CERT, but it's like a separate
14 entity to CERT.
15     Q.  You are not back on the CERT team, are you?
16     A.  No.
17     Q.  After August of 2004 to present have you heard
18 any statements by anybody saying that the ten of you
19 would no longer be welcome on the CERT team?
20     A.  Yes.
21     Q.  Who did you hear those from?
22     A.  Actually, when I applied for this job I made
23 the statement to one of the guys on CERT that told me
24 to apply for it. I said, "They're not going to let us

Page 23

1  back on." Then, at the time Ernie McBroom was a
2  lieutenant at Sussex and I asked him and he said he
3  had talked to Dave and I was allowed to apply for this
4  position, but he really did not want me back on CERT.
5      Q.  Do you have to fill out a time card in your
6  position?
7      A.  No.
8      Q.  Because you are in a different section from
9  what -- like a correctional officer in the receiving
10 room might have to do you might have different
11 standards to follow?
12     A.  I'm not sure what you are saying.
13     Q.  CO's in the receiving room such as John Balas
14 have to fill out time cards and I'm asking if you have
15 a similar experience?
16     A.  Personal time cards?
17     Q.  Yes.
18     A.  Yes, everybody has a state time card that tells
19 you if you are at work, you are off, sick, vacation or
20 whatever your reason for not being there for the day.
21     Q.  Who fills out your time card?
22     A.  Mine is my supervisor, but I also keep one of
23 my own.
24     Q.  And your supervisor what rank is he?

Page 24

1      A.  A lieutenant.
2      Q.  In 2004 did your lieutenant still fill out your
3  time card?
4      A.  Yes, mine is always done.
5      Q.  Are you familiar with the term Emergency
6  Vacation Day?
7      A.  I've heard of it.
8      Q.  What is your understanding of the term?
9      A.  If you need a day off and it's not a sick
10 issue, something comes up and you need a day off,
11 sometimes they will label it -- if you don't want to
12 use sick time or they don't want you to use sick time,
13 they will label it as emergency vacation. I've never
14 used one.
15     Q.  Do you know if emergency vacation days are
16 looked down upon by management such as your
17 lieutenant?
18     A.  I don't know because, like I said, I've never
19 used one personally.
20         MS. HERTZOG: I'm going to take a quick
21 break.
22         (Brief recess.)
23 BY MS. HERTZOG:
24     Q.  What was Dave Hall's rank in 2004? Do you

Page 25

1  remember?
2      A.  I believe he was still a major at the time.
3      Q.  And now what rank is he?
4      A.  A warden.
5      Q.  In 2004 -- let me ask you this. Are you aware
6  of who Lieutenant Truman Mears is?
7      A.  Yes.
8      Q.  Are you aware if Lieutenant Truman Mears fell under
9  the CERT chain of command from Dave Hall?
10     A.  Yes, Truman was a team leader.
11     Q.  And how would he have fallen -- let me ask you
12 a better question. What was the makeup of the CERT
13 chain of command?
14     A.  Dave Hall was the overall person, but he wasn't
15 the one that ran a lot of the stuff. It was -- at the
16 time it was Captain Radcliffe and then you had your
17 team leaders, which at the time Sussex had four team
18 leaders to make up the four different teams, and then
19 each team had seven to eight people on each one.
20     Q.  And Lieutenant Truman Mears was a team leader?
21     A.  Yes, he was.
22     Q.  For SCI?
23     A.  Yes.
24     Q.  Would Lieutenant Truman Mears have gotten

c962d412-a012-46e6-8bf5-6c1254368def

A0959

Balas v. Taylor, et al.
William H. Shockley

Page 26

```
1  orders from Dave Hall?
2  A.  Yes.
3       MS. HERTZOG:  I think that's all I have.
4       MS. XARHOULAKOS:  I don't have any
5  questions, but I will do reading and signing.
6       (The deposition was concluded at 10:08
7  a.m.)
8            I N D E X
9  DEPONENT:  William H. Shockley        PAGE
10   Examination by Ms. Hertzog        2
11
           E X H I B I T S
12
13  (There were no exhibits marked for identification.)
14
    ERRATA SHEET/DEPONENT'S SIGNATURE    PAGE 27
15
    CERTIFICATE OF REPORTER        PAGE 28
16
17
18
19
20
21
22
23
24
```

Page 28

```
1  State of Delaware  )
                      )
2  New Castle County  )
3
4        CERTIFICATE OF REPORTER
5
     I, Christina M. Vitale, Certified Shorthand
6  Reporter and Notary Public, do hereby certify that
   there came before me on Tuesday, December 4, 2007, the
7  deponent herein, WILLIAM H. SHOCKLEY, who was duly
   sworn by me and thereafter examined by counsel for the
8  respective parties; that the questions asked of said
   deponent and the answers given were taken down by me
9  in Stenotype notes and thereafter transcribed by use
   of computer-aided transcription and computer printer
10  under my direction.
11     I further certify that the foregoing is a true
   and correct transcript of the testimony given at said
12  examination of said witness.
13     I further certify that I am not counsel,
   attorney, or relative of either party, or otherwise
14  interested in the event of this suit.
15
16
17        Christina M. Vitale, CSR
          Certification No. 261-RPR
18        (Expires January 31, 2008)
19
   DATED:
20
21
22
23
24
```

Page 27

```
1
2
3       REPLACE THIS PAGE
4       WITH THE ERRATA SHEET
5       AFTER IT HAS BEEN
6       COMPLETED AND SIGNED
7       BY THE DEPONENT.
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

8 (Pages 26 to 28)

Wilcox and Fetzer, Ltd.   Registered Professional Reporters            302-655-0477

c962d412-a012-46e6-8bf5-6c1254368def



**WILCOX & FETZER LTD.**

In the Matter Of:

# Balas

## v.

## Taylor, et al.

### C.A. # 06-592-JJF

———————————————

### Transcript of:

### Harry P. Hastings, III

### December 4, 2007

———————————————

Wilcox and Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: depos@wilfet.com
Internet: www.wilfet.com

Balas v. Taylor, et al.

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

CINDY L. BALAS a/k/a CINDY L.          )
ADKINS, Executrix of the Estate of )
CORPORAL JOHN J. BALAS,             )
                                    )
          Plaintiff,           )
                                    ) Civil Action
v.                             ) No. 06-592-JJF
                                    )
STANLEY W. TAYLOR, JR., individu-  )
ally and in his official capacity  )
as the Comissioner of Correction;  )
ALAN MACHTINGER, individually and  )
in his official capacity as the    )
Director of Human Resources of the )
Department of Correction; MICHAEL  )
DELOY, individually and in his     )
official capacity as Deputy Warden )
of Sussex Correctional Institution;)
CAPTAIN DAVID WILKINSON, individu- )
ally; LIEUTENANT TRUMAN MEARS,     )
individually; and DEPARTMENT OF    )
CORRECTION OF THE STATE OF         )
DELAWARE,                          )
                                    )
          Defendants.          )

          Deposition of HARRY P. HASTINGS, III,
taken pursuant to notice at the law offices of The
Neuberger Firm, P.A., Two East Seventh Street - Suite
302, Wilmington, Delaware, beginning at 12:43 p.m. on
Tuesday, December 4, 2007, before Christina M. Vitale,
Certified Shorthand Reporter and Notary Public.

Continued. . . . . . . . . .

          WILCOX & FETZER
     1330 King Street - Wilmington, Delaware 19801
          (302) 655-0477

          www.wilfet.com

8d32bb17-9419-45aa-9530-fd0730e2b937

Balas v. Taylor, et al.
Harry P. Hastings,

Page 2

1  APPEARANCES:
2
3      CHERYL A. HERTZOG, ESQUIRE
       THE NEUBERGER FIRM, P.A.
       Two East 7th Street, Suite 302
4      Wilmington, Delaware 19801
       For the Plaintiff
5
6      STACEY XARHOULAKOS, ESQUIRE
       DEPARTMENT OF JUSTICE
7      Carvel State Office Building
       820 N. French Street
8      Wilmington, Delaware 19801
       For the Defendants
9
10
             - - - - - - - - - - - - - -
11         HARRY P. HASTINGS, the deponent herein,
12  having first been duly sworn on oath, was examined and
13  testified as follows:
14  BY MS. HERTZOG:
15    Q.  My name is Cheryl Hertzog and I'm a lawyer for
16  the plaintiff, Cindy Adkins, formerly Cindy Balas.
17  Have you ever testified in court before?
18    A.  No, ma'am, I don't believe I have.
19    Q.  Have you ever given a deposition before?
20    A.  No, never a deposition before.
21    Q.  I'm going to explain a little bit of the
22  process to you. I'm going to ask you some questions
23  and the court reporter is going to type up the answers
24  to those questions.

Page 3

1     A.  Okay.
2     Q.  We have to take turns talking because she can't
3   type everything down at the same time if we are going
4   back and forth. You have to verbalize your answers.
5   For instance, if you shake your head yes instead of
6   shaking your head, say yes. After we are done here
7   today you will have an opportunity to review the
8   transcript of the deposition and make any corrections
9   like typographical errors. Okay?
10    A.  Right.
11    Q.  If I ask you a question that you don't
12  understand, ask me to rephrase it and I'll be more
13  than happy to do that. Okay?
14    A.  Okay.
15    Q.  I don't want you to guess so if you don't know
16  the answer, just say so. Okay?
17    A.  Okay.
18    Q.  Are you taking any medications today or is
19  there anything else that would prevent you from
20  testifying truthfully today?
21    A.  No.
22    Q.  If you need any breaks, let me know. We have
23  water if you need some.
24    A.  Okay.

Page 4

1     Q.  You have taken an oath to tell the truth today.
2   Do you understand the significance of that oath?
3     A.  Yes, ma'am, sure do.
4     Q.  Do you understand I will be asking you
5   questions today about allegations related to a lawsuit
6   filed by Cindy on behalf of her late husband, John
7   Balas?
8     A.  Yes.
9     Q.  Have you met with anyone prior to your
10  deposition today?
11    A.  No.
12    Q.  Did you meet with your attorneys about the
13  deposition today?
14    A.  I'm sorry, I'm not sure I understand.
15    Q.  Did you meet with the attorneys?
16    A.  Oh, yes, I met with the deputy attorney
17  general.
18    Q.  Did you talk with anyone else about the
19  deposition today aside from your attorneys?
20    A.  I mean, I have mentioned it to some of my
21  co-workers that I was going to be coming up here for a
22  deposition, but other than that, that's it.
23    Q.  Your full name is?
24    A.  Harry Paul Hastings, III.

Page 5

1     Q.  Where were you born?
2     A.  Well, Milford Hospital.
3     Q.  Is that in Milford?
4     A.  Yes, Milford, Delaware.
5     Q.  Were you raised in Milford?
6     A.  No, I was raised in Georgetown.
7     Q.  What high school did you go to?
8     A.  Sussex Central.
9     Q.  What did you do after you graduated high
10  school?
11    A.  After I graduated my school I worked for my
12  uncle for several years who owns Smith's Used Cars.
13  From there I went to a locating company called -- one
14  called Concepts and from there I went to the
15  Department of Correction.
16    Q.  And what year was that?
17    A.  1993 -- wait, no, I'm sorry. That has been ten
18  years, 1997.
19    Q.  You started with the Department of Correction
20  in 1997?
21    A.  August 7, 1997.
22    Q.  And you started as a correction officer?
23    A.  Yes, ma'am.
24    Q.  Were you promoted?

2 (Pages 2 to 5)

8d32bb17-9419-45aa-9530-fd0730e2b937

Balas v. Taylor, et al.
Harry P. Hastings,

|  | Page 6 |
|---|---|
| 1 | A.  No. |
| 2 | Q.  Are you a corporal? |
| 3 | A.  No, I'm an officer. |
| 4 | Q.  You are still a correction officer? |
| 5 | A.  Yes. |
| 6 | Q.  Were you working at Sussex Correctional |
| 7 | Institution? |
| 8 | A.  Yes. |
| 9 | Q.  I'm sorry, when you started were you working |
| 10 | there? |
| 11 | A.  No.  After I finished the Academy I went to |
| 12 | Delaware Correctional Center, Smyrna, for |
| 13 | approximately ten months and from there I was |
| 14 | transferred to Sussex Corrections. |
| 15 | Q.  You have been with SCI roughly -- |
| 16 | A.  Nine years about. |
| 17 | Q.  Where do you work at SCI? |
| 18 | A.  Key South building. |
| 19 | Q.  What do you do there? |
| 20 | A.  Basically the Key South building is a court- |
| 21 | ordered program for drug and alcohol offenders and we |
| 22 | just oversee the inmates in that building. |
| 23 | Q.  What position did you hold from August 2004 to |
| 24 | February 2005? |

|  | Page 7 |
|---|---|
| 1 | A.  What position? |
| 2 | Q.  Yes. |
| 3 | A.  Officer. |
| 4 | Q.  Were you in the Key South building at that |
| 5 | time? |
| 6 | A.  Yes, ma'am. |
| 7 | Q.  In August of 2004 were you a member of COAD, |
| 8 | which is the Correction Officers Association of |
| 9 | Delaware? |
| 10 | A.  Yes. |
| 11 | Q.  Were you aware if John Balas was a member of |
| 12 | COAD in August of 2004? |
| 13 | A.  To the best of my knowledge he was. |
| 14 | Q.  We are going to go back to the summer of '04 |
| 15 | and I will ask you some questions about that specific |
| 16 | time frame.  Were you aware the Department of |
| 17 | Correction was facing several issues such as staffing |
| 18 | levels and understaffing problems? |
| 19 | A.  Yes. |
| 20 | Q.  Were there also concerns about low wages? |
| 21 | A.  Yes. |
| 22 | Q.  How about concerns about retaining qualified |
| 23 | officers? |
| 24 | A.  Yes. |

|  | Page 8 |
|---|---|
| 1 | Q.  Were there problems with officers being forced |
| 2 | to work overtime? |
| 3 | A.  Yes, although it was much rarer at SCI than it |
| 4 | was at the other institutions. |
| 5 | Q.  Were there also some security lapses in the DOC |
| 6 | prison such as the Cassie Arnold rape incident? |
| 7 | A.  Yes. |
| 8 | Q.  Eventually at some time during that summer what |
| 9 | was termed a job action was ensued where officers were |
| 10 | refusing to work voluntary overtime? |
| 11 | A.  Yes. |
| 12 | Q.  Are you aware the Department of Correction |
| 13 | filed a lawsuit against the COAD union and its |
| 14 | officers? |
| 15 | A.  Yes, I am. |
| 16 | Q.  During the midst of all that COAD, the union, |
| 17 | are you aware they were trying to negotiate a new |
| 18 | contract? |
| 19 | A.  Yes. |
| 20 | Q.  And there were some differences of opinion |
| 21 | between management and the union as to how to address |
| 22 | those issues? |
| 23 | A.  Yes, that's correct. |
| 24 | Q.  Are you aware that the events we just walked |

|  | Page 9 |
|---|---|
| 1 | through were given any media attention during that |
| 2 | time? |
| 3 | A.  Yes, they were. |
| 4 | Q.  Was there any legislative attention given to |
| 5 | these issues? |
| 6 | A.  Yes. |
| 7 | Q.  Were you aware that these issues were issues in |
| 8 | the upcoming gubernatorial election at that time? |
| 9 | A.  Yes. |
| 10 | Q.  Did you know John Balas? |
| 11 | A.  Yes. |
| 12 | Q.  How did you know him? |
| 13 | A.  I met him shortly after being transferred to |
| 14 | SCI.  Of course, I mean, I've known him since then.  I |
| 15 | didn't work with him very often because we worked |
| 16 | different sections of the prison, but I know him from |
| 17 | working with him and from being on the CERT team |
| 18 | together. |
| 19 | Q.  Were you friends outside of work? |
| 20 | A.  I consider most of the people I work with |
| 21 | friends, but as far as being involved with them |
| 22 | outside of work I'm not involved with hardly anyone |
| 23 | outside of work. |
| 24 | Q.  Do you know what job John was in from August |

3 (Pages 6 to 9)

8d32bb17-9419-45aa-9530-fd0730e2b937

Balas v. Taylor, et al.
Harry P. Hastings,

Page 10

1  2004 to November 2004?
2    A.  Do I know what job he was in?
3    Q.  Yes.
4    A.  I believe he was working receiving room, I
5  believe.  I'm not 100 percent sure.
6    Q.  He was at SCI?
7    A.  Yes, he was at SCI.
8    Q.  Are you aware of what kind of an employee John
9  was?
10   A.  Like I said, I didn't work directly with John,
11 but, I mean, he had a good reputation with the
12 department with his co-workers.  He was pretty well-
13 liked.  He was known for being very outspoken.
14   Q.  Do you know if he was respected by his
15 co-workers?
16   A.  Yes, I would say so.
17   Q.  What about the inmates, do you know if he was
18 respected by the inmates?
19   A.  I would say so.  I mean, I had very little
20 interaction with him around inmates.
21   Q.  What kind of personality did he have?
22   A.  I would describe John as kind of a jokester.
23 Around work he would joke around a lot.  He was easy-
24 going, easy to get along with.

Page 11

1    Q.  Do you know if he was trustworthy?
2    A.  I don't know.
3    Q.  That's fine, if you don't know, please just say
4  so.
5    Q.  Do you know if he was honest?
6    A.  I don't know that either.
7    Q.  Are you aware if John was a hard worker?
8    A.  From the reputation he had at the department I
9  would say so.
10   Q.  Would you consider him as a dedicated employee?
11   A.  Yes.
12   Q.  A loyal employee?
13   A.  Yes.
14   Q.  Was he dependable?
15   A.  From my -- I don't know how much sick time, you
16 know, and that kind of stuff he used, but as far as
17 like our interaction together on CERT he was
18 definitely dependable, yes.
19   Q.  We have been talking a little bit about CERT
20 and that stands for the Correction Emergency Response
21 Team?
22   A.  Yes, that's correct.
23   Q.  What were your duties on the CERT team?
24   A.  Our duties?  Basically that we got called out

Page 12

1  for or activated for.
2    Q.  What type of things would you guys get
3  activated for?
4    A.  Mass shakedowns to search institutions for
5  contraband.  Escape recovery, if an inmate escaped we
6  would go out to look for the escapee.  I mean, we
7  could get called out for riot control or anything.  Of
8  course, we were never called out for that while I was
9  on the team, but that's the thing, emergency
10 situations.
11   Q.  Were all the CERT members' job duties the same?
12   A.  Yes.
13   Q.  What was John's performance like on the CERT
14 team?
15   A.  From when I was around John he pulled his own
16 weight.  He was as dedicated as any of the rest of us.
17 Any time we were called for a mission he was there
18 doing whatever we were supposed to do, whatever it
19 might be at the time.
20   Q.  Let's go back to the summer of '04.  In August
21 of 2004 was there a time that certain CERT members
22 were activated to report for duty to the court and
23 transportation unit?
24   A.  Yes.

Page 13

1    Q.  Were you one of the members activated?
2    A.  No, I was not.
3    Q.  Do you know who was?
4    A.  I know for certain that Scott Bradley, Lee
5  Mears.  It has been over three years now.  I honestly
6  don't recall exactly who was other than those two.
7    Q.  Do you know if John was activated?
8    A.  I believe he was, but I'm not 100 percent sure.
9    Q.  I think the record will reflect that on August
10 6th five CERT members were activated to report to
11 court and transportation.  The day before I believe
12 they received an activation by pager.  You guys would
13 get activated by pager, correct?
14   A.  Yes, that's correct.
15   Q.  Were you aware there was a meeting held that
16 certain CERT members attended the day before they were
17 activated?
18   A.  Yes.
19   Q.  Were you at that meeting?
20   A.  Yes, I was.
21   Q.  Where was that meeting held?
22   A.  The home of Lee Mears.
23   Q.  Do you know who was at that meeting to the best
24 of your knowledge?

4 (Pages 10 to 13)

8d32bb17-9419-45aa-9530-fd0730e2b937

A0965

Balas v. Taylor, et al.
Harry P. Hastings,

| Page 14 |
| --- |

1    A.   As I recall I was there, Jeff Foskey was there,
2  Lee Mears, of course, John Balas, Truman Mears was
3  there.  I believe Alan Adams was there.  Scott Bradley
4  was there.  I believe John Mumford was there and other
5  than that I can't be too certain.
6    Q.   Do you remember what was said at the meeting?
7    A.   We basically discussed what we should do as far
8  as the activation, whether we should go through with
9  the mission or not.  There was a lot of pressure on us
10 as CERT members from our fellow co-workers that
11 weren't CERT.  The officers that we worked with at the
12 institutions were giving us a lot of pressure.  We
13 were basically being looked at as traders for -- if we
14 went through with the mission because we would be
15 going against what the rest of the state employees --
16 what the rest of the correctional employees were
17 trying to accomplish a work action.  You
18 understand what I'm saying?
19   Q.   You mean the job action?
20   A.   Right, the job action, yes.
21   Q.   By reporting you felt you were going against --
22   A.   Yeah, by doing the CERT mission we were
23 basically underhanding the efforts of the job action.
24   Q.   At the meeting were certain people more vocal

| Page 15 |
| --- |

1  than others?
2    A.   I wouldn't say anybody was more vocal than
3  anybody else.  We all put our input in freely, yeah.
4    Q.   Do you remember if John made any comments?
5    A.   Yes, I know that John was against us being
6  activated for the CERT mission.  Most of us were.
7  That's what the meeting was about.
8    Q.   And you mentioned that Truman Mears was at this
9  meeting?
10   A.   Yes, he was there.  I believe he left earlier
11 than most of the rest of us, though.
12   Q.   Did Truman Mears make any statements at the
13 meeting?
14   A.   I recall Truman basically being of the opinion
15 that we should just do the mission the next day and
16 see what happens from there.
17   Q.   And you mentioned he left the meeting, do you
18 know why?
19   A.   I don't recall.
20   Q.   Are you aware that if CERT command was made
21 aware that a meeting was being held?
22   A.   CERT command found out somehow.  I don't know
23 how.
24   Q.   And what happened when they found out?

| Page 16 |
| --- |

1    A.   The next morning when those officers that were
2  activated or those CERT members that were activated
3  for the mission, the CERT warden and major, which was
4  Dave Hall and Tim Radcliffe -- I'm sorry, I take that
5  back.  I don't believe Tim Radcliffe came down.  I
6  believe it was Dave Hall and Scott Taylor came down
7  from CERT command to speak to those officers the
8  following morning before they did the court and
9  transportation in Georgetown.
10   Q.   At the meeting you don't know -- CERT command
11 didn't call Lee Mears' house?
12   A.   I don't know about that.
13   Q.   Are you aware of what happened when the CERT
14 members that were activated arrived for work that day?
15   A.   I recal Lee Mears stating that they were
16 getting a hard time from some of our fellow employees
17 that worked inside the prison.  They were stating
18 things such as I can't believe you guys are going to
19 do this or run court and trans or whatever statements,
20 statements along those lines.  Other than that and the
21 meeting, you know, with Dave Hall and Scott Taylor I
22 don't really know because I wasn't there.
23   Q.   What happened the rest of the day?  They were
24 activated in the morning and what happened the rest of

| Page 17 |
| --- |

1  the day for you?
2    A.   I believe I was off that day.  Was it on a
3  Friday?  Can you tell me that?  I believe it was, but
4  I'm not 100 percent sure.
5    Q.   I'm not either.  I think it might have been.
6    A.   I believe I was off that day and I just
7  basically waited to receive a call from the rest of
8  the CERT members as to what was going on and what they
9  were -- you know, what they were going to do.
10   Q.   Did you ever receive a call?
11   A.   Yes, I did.
12   Q.   From who?
13   A.   I believe I received a call from John Mumford.
14   Q.   Do you remember what he said to you?
15   A.   I believe it was along the lines of we have
16 decided to resign, meet us at SCI at such and such a
17 time.  I don't remember the time.
18   Q.   Did you meet them at SCI?
19   A.   Yes, I did.
20   Q.   And what happened?
21   A.   Once we were all together we met with Warden
22 Rick Kearney and the ten of us resigned and we gave
23 him our reasons for resigning.
24   Q.   And what were those reasons?

5 (Pages 14 to 17)

8d32bb17-9419-45aa-9530-fd0730e2b937

A0966

Balas v. Taylor, et al.
Harry P. Hastings,

Page 18

1   A.  Basically we just felt that it was -- that it
2   was wrong for the state and the department to put us
3   in a situation where we were working against our
4   fellow officers, which is what we felt like they were
5   doing.  We felt like we had a moral obligation to back
6   up our fellow officers that we work with above
7   anything else.
8   Q.  Do you remember any other statements you made
9   when you met with the warden to resign?
10  A.  I remember Lee Mears stating that even though
11  we were resigning that any incidents or situations
12  that might arise at SCI that we would be there to help
13  him out because we still had the training regardless
14  of whether we were CERT or not and we would be there
15  whether we were off work, on work, to help out in any
16  way we could.
17  Q.  Meaning like for safety reasons?
18  A.  Yeah, for security reasons.
19  Q.  Did the warden make any statements after you
20  resigned?
21  A.  I believe I recall Rick stating that he was sad
22  to see us resign, but that he understood the reasons
23  behind it.
24  Q.  Was anything else said at that meeting?

Page 19

1   A.  There was other stuff said.  I don't recall
2   much of it now three years later.
3   Q.  A lot has happened since then?
4   A.  Yeah.
5   Q.  After your meeting you left the warden's office
6   and did anything else happen that day?
7   A.  No.  I mean, we all just pretty much went home
8   at that point, I believe.
9   Q.  Following the resignation did you experience --
10  did anyone from management ever say anything to you
11  about the resignation?
12  A.  No, not that I recall.
13  Q.  What was your take on the demeanor of
14  management towards the resignation?
15  A.  I don't recall them really -- I don't recall
16  any difference, I mean, towards their attitudes
17  towards any of us.
18  Q.  What about towards the job action, what was
19  their demeanor towards that?
20  A.  I couldn't really tell you because my contact
21  was mostly with -- with the rank only up to sergeant
22  and occasionally seeing the lieutenant and, of course,
23  most of our staff up to the rank sergeant were
24  supportive of it.  Actually, most of the lieutenants

Page 20

1   that I talked to were supportive of it, they
2   understood our reasons for it.  Although they are in a
3   different union they totally understood what we were
4   fighting for.
5   Q.  And I think at some point that their union
6   actually joined in the job action, do you remember
7   that?
8   A.  Yes, I believe so.
9   Q.  To the best of your knowledge are you aware of
10  anybody experiencing problems because of their
11  resignation from CERT?
12  A.  No.
13  Q.  As a CO do you have time cards that you have to
14  fill out?
15  A.  No, we don't have time cards, at least not that
16  we fill out.  Our lieutenants are responsible for
17  keeping track of time cards, I believe.  We're not directly
18  involved with time cards.
19  Q.  Do you know if late 2004, early 2005 if that
20  practice was different?
21  A.  I don't believe so.  I believe it's the same as
22  it is now.
23  Q.  Your lieutenant will fill out your time card
24  for you then?

Page 21

1   A.  I believe that's -- from my understanding, and
2   I could be somewhat mistaken, but from my
3   understanding the lieutenants keep track of our time.
4   Well, I believe it was recently changed like real
5   recently, within the last several months, that now the
6   business office, I believe, takes care of time cards.
7   Q.  Are you familiar with the term "emergency
8   vacation day"?
9   A.  Am I familiar with it?  Not really.
10  Q.  So, you don't know what an emergency vacation
11  day is?
12  A.  No, I've never used that.
13  Q.  Could there be a time when an officer would say
14  he needs the next day off, something would come up?
15  A.  Yeah, oh, yeah, definitely.
16  Q.  Do you know if the management, meaning a
17  lieutenant or your lieutenant, would look down upon
18  officers using vacation leave on such short notice?
19  A.  No.  We all do it.  I mean, things come up,
20  that's how life is.
21       MS. HERTZOG:  That's all I have for him
22  right now.
23       MS. XARHOULAKOS:  We don't have any
24  questions.

6 (Pages 18 to 21)

8d32bb17-9419-45aa-9530-fd0730e2b937

A0967

Balas v. Taylor, et al.

Page 22

1    (The deposition was concluded at 1:10 p.m.)
2        I N D E X
3  DEPONENT:  Harry P. Hastings        PAGE
4    Examination by Ms. Hertzog        2
5
         E X H I B I T S
6
7  (There were no exhibits marked for identification.)
8
   ERRATA SHEET/DEPONENT'S SIGNATURE      PAGE 23
9
   CERTIFICATE OF REPORTER        PAGE 24
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 23

1
2
3        REPLACE THIS PAGE
4        WITH THE ERRATA SHEET
5        AFTER IT HAS BEEN
6        COMPLETED AND SIGNED
7        BY THE DEPONENT.
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 24

1  State of Delaware   )
                       )
2  New Castle County   )
3
4        CERTIFICATE OF REPORTER
5
6        I, Christina M. Vitale, Certified Shorthand
   Reporter and Notary Public, do hereby certify that
   there came before me on Tuesday, December 4, 2007, the
7  deponent herein, HARRY P. HASTINGS, who was duly sworn
   by me and thereafter examined by counsel for the
8  respective parties; that the questions asked of said
   deponent and the answers given were taken down by me
9  in Stenotype notes and thereafter transcribed by use
   of computer-aided transcription and computer printer
10 under my direction.
11       I further certify that the foregoing is a true
   and correct transcript of the testimony given at said
12 examination of said witness.
13       I further certify that I am not counsel,
   attorney, or relative of either party, or otherwise
14 interested in the event of this suit.
15
16                              Christina M Vitale
17       Christina M. Vitale, CSR
         Certification No. 261-RPR
18       (Expires January 31, 2008)
19
   DATED:
20
21
22
23
24

                    7 (Pages 22 to 24)



**WILCOX & FETZER LTD.**

In the Matter Of:

# Balas

## v.

## Taylor, et al.

### C.A. # 06-592-JJF

_____

### Transcript of:

### Jon W. Mumford

### December 4, 2007

_____

Wilcox and Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: depos@wilfet.com
Internet: www.wilfet.com

Balas v. Taylor, et al.

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

```
CINDY L. BALAS a/k/a CINDY L.     )
ADKINS, Executrix of the Estate of )
CORPORAL JOHN J. BALAS,           )
                                  )
        Plaintiff,                )
                                  ) Civil Action
v.                                ) No. 06-592-JJF
                                  )
STANLEY W. TAYLOR, JR., individu- )
ally and in his official capacity  )
as the Comissioner of Correction;  )
ALAN MACHTINGER, individually and  )
in his official capacity as the    )
Director of Human Resources of the )
Department of Correction; MICHAEL  )
DELOY, individually and in his     )
official capacity as Deputy Warden )
of Sussex Correctional Institution;)
CAPTAIN DAVID WILKINSON, individu- )
ally; LIEUTENANT TRUMAN MEARS,     )
individually; and DEPARTMENT OF    )
CORRECTION OF THE STATE OF         )
DELAWARE,                          )
                                   )
        Defendants.                )
```

        Deposition of JON W. MUMFORD, taken
pursuant to notice at the law offices of The Neuberger
Firm, P.A., Two East Seventh Street - Suite 302,
Wilmington, Delaware, beginning at 3:01 p.m. on
Tuesday, December 4, 2007, before Christina M. Vitale,
Certified Shorthand Reporter and Notary Public.


Continued. . . . . . . . . .


        WILCOX & FETZER
    1330 King Street -  Wilmington, Delaware 19801
        (302) 655-0477

        www.wilfet.com

e3404541-6796-40ea-8f82-fff39691efc2

## Balas v. Taylor, et al.
## Jon W. Mumford

---

**Page 2**

1  APPEARANCES:
2
    CHERYL A. HERTZOG, ESQUIRE
3   THE NEUBERGER FIRM, P.A.
     Two East 7th Street, Suite 302
4    Wilmington, Delaware  19801
     For the Plaintiff
5
6   STACEY XARHOULAKOS, ESQUIRE
     DEPARTMENT OF JUSTICE
7    Carvel State Office Building
     820 N. French Street
8    Wilmington, Delaware  19801
     For the Defendants
9
      - - - - - - - - - - - - - -
10
11        JON W. MUMFORD, the deponent herein,
12  having first been duly sworn on oath, was examined and
13  testified as follows:
14  BY MS. HERTZOG:
15   Q.  My name is Cheryl Hertz and I'm an attorney for
16  the plaintiff, Cindy Adkins, formerly Cindy Balas.
17  Have you ever testified in court before?
18   A.  No, ma'am.
19   Q.  Have you ever had your deposition taken before?
20   A.  This is the first time.
21   Q.  Are you here under a subpoena?
22   A.  Yes.
23   Q.  I'm just going to explain a little bit of the
24  process for you.  I'm going to ask you some questions

---

**Page 3**

1  and the court reporter here is going to type them up.
2  We have to take turns talking.  If we talk at the same
3  time, she can't get everything down.
4   A.  Right.
5   Q.  Also, you have to verbalize your answers, for
6  instance, instead of nodding your head you just say
7  yes.  Okay?  After we are done here today you will
8  have the opportunity to review the transcript and to
9  make any corrections for typographical errors.
10   A.  Right.
11   Q.  If you don't understand a question, just say
12  you don't understand and I'll be more than happy to
13  rephrase it?
14   A.  Sure.
15   Q.  Also, I don't want you to guess so if you don't
16  know the answer to it, just say so.
17   A.  Got you.
18   Q.  If you need any breaks, let me know, we have
19  the key to the restroom.  Are you taking any
20  medications today or is there anything else that would
21  prevent you from testifying truthfully today?
22   A.  No.
23   Q.  You have taken an oath to tell the truth.  Do
24  you understand the significance of that oath?

---

**Page 4**

1   A.  Yes, I do.
2   Q.  Do you understand I am going to be asking you
3  some questions about allegations related to a lawsuit
4  filed by Cindy on behalf of her late husband, John
5  Balas, in the District Court of Delaware?
6   A.  Yes.
7   Q.  Have you met with anyone prior to your
8  deposition today?
9   A.  I met with her --
10       MS. XARHOULAKOS:  And Mr. Durstein.
11   A.  Yes, down at Sussex.
12   Q.  Have you talked to anybody else about your
13  deposition today?
14   A.  No.
15   Q.  What is your full name?
16   A.  First name, Jon, J-O-N, middle name Wesley,
17  W-E-S-L-E-Y, last name Mumford, M-U-M-F-O-R-D.
18   Q.  Where were you born?
19   A.  Milford, Delaware.
20   Q.  And you were raised in?
21   A.  Millsboro, Delaware.
22   Q.  Where did you go to high school?
23   A.  Sussex Central.
24   Q.  What did you do after high school?

---

**Page 5**

1   A.  Went to college for a few years, played
2  baseball, tore my rotator cuff, quit school and
3  started working at the jail when I was 22-years old.
4   Q.  What year was that?
5   A.  I was 23 years.  1997 I started working.
6   Q.  And you started as a correction officer?
7   A.  Yes, ma'am.
8   Q.  Have you received any promotions?
9   A.  No.
10   Q.  Where are you assigned right now?
11   A.  I'm assigned pretrial.
12   Q.  Are you at SCI?
13   A.  Yes, ma'am.
14   Q.  Where were you assigned in August of 2004?
15   A.  Pretrial.
16   Q.  So, the same position?
17   A.  Yup.
18   Q.  What do you do in pretrial?
19   A.  Well, pretrial is the area of the prison where
20  inmates first come in before they have been sentenced.
21  Before they have been classified they stay in pretrial
22  housing area until after all that is done.  Once they
23  have been sentenced they move to other parts of the
24  compound and basically I just -- I monitor their

---

Balas v. Taylor, et al.
Jon W. Mumford

Page 6

1  movement. Pretrial inmates aren't allowed the liberty
2  to move around unsupervised like sentenced inmates
3  are. That was my job, taking them back and forth to
4  the receiving room, taking them across the compound to
5  the dental office, which is in a different building.
6  All the inmates had to be escorted and that was
7  primarily my job.
8     Q. In August of 2004 were you a member of the
9  Correction Officers Association of Delaware?
10    A. Yes.
11    Q. Were you aware if John Balas was a member of
12 COAD in August of 2004?
13    A. Yes, um-hum.
14    Q. I'm going to talk a little bit about what was
15 going on during the summer of '04 just to limit the
16 time frame here. Were there things happening during
17 that time with the Department of Correction such as
18 problems with staffing levels or understaffing?
19    A. Yeah, there was -- well, understaffing has been
20 a problem ever since I've been there, but really we
21 did -- pretty much everybody in the department-wide
22 did a work action to stop working the voluntary
23 overtime, which basically our court and transportation
24 relies heavily on, voluntary overtime. We did that in

Page 7

1  order to try to get a raise and it worked for a little
2  while. I mean, it worked, but.
3     Q. During the summer of '04 there were concerns
4  about low wages?
5     A. Yes.
6     Q. Were there also concerns about retaining
7  qualified officers?
8     A. Oh, yes.
9     Q. Were there also issues involving security
10 lapses, things such as the Cassie Arnold rape
11 incident?
12    A. Yes, that was a big issue then.
13    Q. And we talked a little bit about the job action
14 or work action where officers were refusing voluntary
15 overtime?
16    A. Right, correct.
17    Q. Are you aware at that time the Department of
18 Correction also filed a lawsuit against the union and
19 its officers?
20    A. I'm not sure. I don't know if I can remember
21 that.
22    Q. Do you know if during that time the union was
23 trying to negotiate a new contract?
24    A. Yeah, I knew they were trying to negotiate a

Page 8

1  new contract. We have been trying that for years.
2     Q. Were there issues or differences of opinion
3  between the union and management as to how to address
4  some of the concerns we just talked about?
5     A. I -- what do you mean as far as management,
6  like the --
7     Q. The higher-ups, the wardens?
8     A. Not really, they're not even part of our union.
9  What we did as far as -- they had nothing to do with
10 contract issues because they're not part of our union,
11 okay? They really had no say in it. They didn't go
12 to the meetings. It was just basically anyone from --
13 that was not the rank of lieutenant or higher. Anyone
14 below that -- I mean, you are automatically a member
15 of COAD and it was just an ongoing thing that we had
16 to try to get a contract.
17       Of course, president and vice-president of
18 COAD is the ones that handled all that as far as the
19 negotiations. Me personally I wasn't really a big
20 part of it. I think I went to two meetings the whole
21 time I have been there. Management really didn't have
22 anything to do with that.
23    Q. But the union officials were discussing with
24 management on trying to come to a contract?

Page 9

1     A. Oh, yeah, I mean, yeah, they discussed certain
2  ways to do that, but, I mean, as far as they really
3  didn't have a helping hand in it. That was something
4  that our president of the union decided on himself for
5  the most part.
6     Q. Right, and then the president and
7  vice-president in some of the prisons -- I guess
8  they're prison vice-presidents -- would go to meetings
9  with management?
10    A. Right, shop stewards.
11    Q. And try and hack out this contract?
12    A. Yes.
13    Q. And at those meetings are you aware there were
14 some issues between the COAD officials and how
15 management wanted to address some of the issues such
16 as low wages and there were conflicts between the two
17 groups there?
18    A. I'm sure there was. I know that the department
19 tried to handle the -- I mean, they really didn't do a
20 whole lot for us as far as trying to get us better
21 wages. They were more concerned about fixing the
22 understaffing problems and the way management wanted
23 to do it, meaning the department, was to lower job
24 standards. I think when I first came aboard I think

3 (Pages 6 to 9)

Balas v. Taylor, et al.
Jon W. Mumford

Page 10

1  you had to get a 70 or higher to pass.  I know they
2  dropped the score to like 55 or 56.
3          That was one of the reasons they were
4  having problems retaining people is they weren't
5  hiring people that are qualified to do the job.  We
6  try to get the problem fixed by better wages and they
7  try to fix the problem by lowering standards, hiring
8  procedures and stuff like that.  I know there was some
9  animosity there, but I really didn't get too heavily
10  involved with the meetings and stuff like that.  Only
11  way I really knew anything was going on by word of
12  mouth and people talking about it in jail.  As far as
13  how credible that stuff is I don't know.
14          Like I said, I went to two meetings and
15  both of those were way before.  That might have been
16  2001, 2002.  I think that was on a major vote.  I
17  think it was when we were trying to get the Teamsters
18  to represent us and that really didn't pan out.
19  Q.  During this time for all of the issues we
20  talked about before was there media attention at all
21  to them?
22  A.  No.  There is always you can pick up a paper
23  just about any day and read about something going on
24  with the department, but that was really -- that never

Page 11

1  really made it into the media too much, not like other
2  things did with medical care and stuff like that has
3  always been a big issue.
4  Q.  Are you aware there was any legislative
5  attention given to the issues that we talked about?
6  A.  How do you mean?
7  Q.  Let me ask a better question.  Are you aware
8  that the legislature addressed any of the issues that
9  we talked about such as understaffing or low wages?
10  A.  I'm sure they were addressed.  As far as what
11  they did I'm not sure.  I mean, I know they did
12  propose -- we did get -- become starting to get I
13  think they call it a selective market value, something
14  they adjust every six months.  They adjust our wages
15  anywhere from two to five percent depending on
16  staffing levels.  I think they agreed to that and I
17  think the first six months we got something.  I know
18  it wasn't five percent, I think we got two percent.  I
19  know the last two times the six-month period has come
20  around we haven't gotten anything.
21          Of course, they were counting cadets and
22  probation and parole officers and anybody that was
23  qualified to work at the prison they were counting as
24  staff, which was wrong.  You know, it gives you a

Page 12

1  false number.  If there is 60 people in the academy
2  class they're not actually working in the prison yet
3  so you can't count them.  That's how they were getting
4  by -- I know last January we didn't get nothing and we
5  were supposed to if we were under a certain percentage
6  and from my understanding we were.  As far as the
7  number of people actually working in prisons we were
8  way under it and we didn't get nothing.
9          Like I said, the first time they
10  implemented it, first couple times, we did get a raise
11  and we got a pretty significant raise that one time,
12  but after that was done we haven't received much of
13  anything since.
14  Q.  You are saying sometimes when they issue the
15  staffing levels they would include people that aren't
16  necessarily in the prisons?
17  A.  Right, they would include like probation and
18  parole officers who -- I don't know, maybe it was two
19  years ago they gave probation and parole officers the
20  opportunity to take it was like a week or two-week
21  cross training course so they could work overtime
22  inside the prisons.  You see what I'm saying?  They
23  were allowing counselors to do it and so they were
24  including -- my brother is a P & P officer and he was

Page 13

1  actually included in the numbers as far as staffing
2  for the prison and that was just wrong.  That is how
3  they came up with the numbers that they did and that's
4  why we didn't get no raise.
5  Q.  Are you aware some of the issues we talked
6  about before were part of -- they were larger issues
7  in the election for a new governor at that time, do
8  you remember any of that?
9  A.  Well, I know we didn't -- I know most people
10  down in Sussex did not want Ruth Ann Minner as the
11  governor, I can tell you that right now.
12  Q.  Were some of these prison issues concerns that
13  were brought up during the re-election period?
14  A.  Well, you mean when she got re-elected?
15  Q.  Correct.
16  A.  Yes, obviously that was an issue and we all --
17  most of us supported somebody else.  I think it was --
18  who was that she ran against?  Lee, is that who it
19  was?
20  Q.  There was Judge Bill Lee, Mike Protak, Frank
21  Infante running as an independent?
22  A.  I think it was Judge Lee was the one we were
23  pushing to get down there.
24  Q.  Did you know John Balas?

4 (Pages 10 to 13)

e3404541-6796-40ea-8f82-fff39691efc2

Balas v. Taylor, et al.
Jon W. Mumford

Page 14

1    A.  Yes.
2    Q.  How did you know him?
3    A.  I met him at work when I started working there.
4  We kind of worked in the same area.  He worked in the
5  receiving room, I worked pretrial, which is normally
6  the distance between here and the bathrooms.  I was
7  constantly going back there and taking inmates back
8  there and he was constantly coming in there.  So, I
9  knew him pretty well.  Went duck hunting with him.  We
10  used to hunt a lot together.
11    Q.  You had a lot of interaction with him on the
12  job?
13    A.  Oh, yeah, yes, we worked same shift, same
14  general area.  We did have different days off, but for
15  the most part I'd say at least three days a week we
16  worked together.
17    Q.  Do you know what kind of employee he was?
18    A.  He was a good employee.  I mean, he did his
19  job.
20    Q.  Was he a hard worker?
21    A.  I would say so.
22    Q.  Would you say he was dedicated?
23    A.  Yeah.  I mean, I don't think he was the kind of
24  person to go -- there is probably a lot of people

Page 15

1  wouldn't go up and beyond.  Just like me, come to work
2  and did his eight hours, did it to the best he could
3  and then went home.
4    Q.  Was he a loyal employee?
5    A.  I think so.  I mean, he didn't miss a lot of
6  time.  I mean, he was there when he was supposed to
7  be.
8    Q.  So, was he dependable?
9    A.  Yes, he was dependable as far as being to work
10  and stuff like that.
11    Q.  Do you know if he was motivated at all?
12    A.  I don't know, it's kind of hard to tell with
13  him because John had a certain personality that he
14  just had a certain way about himself and he had been
15  that -- he had been that way ever since I met him.
16  So, if he did have any motivation, you really didn't
17  see it.
18    Q.  What kind of personality did he have?
19    A.  Let me think of the right word to use here.  I
20  mean, he liked to kid around a lot, but he could
21  switch from kidding around to being serious like
22  really quick, like really quick.  I mean, he was a
23  pleasure to work with, but, I mean, I mean, he had the
24  type of personality where you either liked him or you

Page 16

1  didn't like him.
2    There wasn't a whole lot of officers there
3  that were in between.  They were either on this side
4  or this side and that's just the kind of personality
5  that he had.  It was nothing personal that he did
6  towards these people.  It was just how he was and
7  everybody is like that, everybody has their own way.
8  I happened to be one of the persons that liked him and
9  got along with him and most people did, most people
10  that interacted with him every day.
11    People that worked across the compound
12  really didn't know him well enough and the few times
13  they did run into him they would think, What is wrong
14  with him?  If he didn't know you, he wouldn't even
15  speak to you if you walked by.  That's just how he
16  was.
17    Q.  Was he well-liked by his co-workers?
18    A.  He was well-liked -- I can't speak for people
19  that worked in different buildings because it's not
20  like we talked about him, but I know the people that I
21  worked with and the people we were on the correction
22  emergency response team together, we all liked him.
23  Just about anybody that had immediate contact with him
24  like that pretty much got along with him.

Page 17

1    Q.  Do you think those that had immediate contact
2  with him also respected him?
3    A.  Yes, I think so.
4    Q.  Are you familiar with his contact with the
5  inmates at all?
6    A.  Not really because he worked in the receiving
7  room and it's not like he worked on a housing unit
8  with 64 inmates and had constant contact with them on
9  a personal basis.  He worked in an area where inmates
10  would come through there and would leave and go to
11  court.  That's where they come before they went
12  back to the housing unit.  So, it wasn't a lot of one-
13  on-one and, like I said, I wasn't back there all the
14  time sitting there watching how he interacts with
15  inmates.
16    I mean, I would go back there to take
17  inmates that -- you know, inmates that are going to
18  court in the morning they had to be escorted back
19  there and, of course, when they come back they have to
20  be escorted back; but, I never actually would go back
21  there and would just sit and watch and for any length
22  of period of time to see how he would act around
23  inmates.  They -- the officers that worked receiving
24  room have a lot of initial inmate contact because the

5 (Pages 14 to 17)

e3404541-6796-40ea-8f82-fff39691efc2

Balas v. Taylor, et al.
Jon W. Mumford

Page 18

1  receiving room is where they process them at, change
2  their clothes into prison uniforms, but it's never a
3  lot of inmates. It's usually one-on-one, you know,
4  inmate here, inmate there. It's not like sitting on a
5  housing unit with 64 inmates. It's a little bit
6  different. I really didn't see how he responded with
7  inmates.
8  Q. Back to August of '04 was John still working in
9  the receiving room at Sussex Correctional?
10  A. Yes.
11  Q. And you mentioned CERT and that stands for the
12  Correction Emergency Response Team?
13  A. Yeah.
14  Q. And you and John were on CERT together?
15  A. Yes.
16  Q. What were your job duties on CERT?
17  A. We were on-call to respond and handle any type
18  of what we would call major disturbances, something
19  that happened inside a prison that normal staff
20  couldn't handle, if it's something that got bigger
21  than that. That's what we were trained to do. We
22  went away and had special training more than what your
23  original regular correction officer has. We actually
24  had to go through five weeks of specialized training

Page 19

1  on weapons and tatics and stuff like that. That was
2  our primary job duties.
3         I mean, we would do major shakedowns. We
4  would go to the Smyrna prison and shake down like an
5  entire section and dig out contraband and stuff like
6  that. When Myron Price escaped, we were activated for
7  that and we worked two weeks. I didn't work at the
8  jail for two weeks because I was working that. He
9  escaped from outside the courthouse and they activated
10  the entire CERT team. Each prison has their own
11  response team and they activated all of us because
12  each prison has about 20, 15, 20 head.
13  Q. Do you remember when that was?
14  A. I do remember. I do know it was in December
15  and I think it might have been in '03. I think that's
16  when it was. All I know is it was cold because I had
17  to sit outside one night for twelve hours from four at
18  night until four in the morning.
19  Q. I keep hearing the term "shakedown," what is a
20  shakedown?
21  A. Shakedown basically -- that's actually
22  something that is done in prisons on a day-to-day
23  basis, but we do it on a much larger scale. A
24  shakedown is simply you are an inmate, you are in your

Page 20

1  cell, I go to your door, I ask you to step out and I
2  just go through your room looking for contraband,
3  shanks, drugs, cigarettes now because cigarettes
4  aren't allowed in there. Anything that is not given
5  to you by prison staff or it's not bought in the
6  commissary is considered contraband. It could be a
7  rubber band and that is done on a daily day-to-day
8  basis by the normal staff to prevent that kind of
9  stuff from happening. We just did it on a much larger
10  scale.
11         I think the warden from Gander Hill Prison
12  here in Wilmington called down one day saying that he
13  had received -- I don't know if he received a phone
14  call or letter, something about a 22 caliber pistol
15  has been smuggled in through a visit. So, they
16  brought us in to do a mass shakedown. We shook down
17  pretty much the whole new side. It took us 12, 15
18  hours to do it, but that's essentially what a
19  shakedown is.
20  Q. We were talking about your duties on the CERT
21  team and were John's the same as yours?
22  A. Yes, everybody was the same.
23  Q. Are you familiar with John's performance as a
24  CERT member?

Page 21

1  A. Oh, yeah.
2  Q. Can you describe his job performance?
3  A. Very good. I mean, he was very -- of course,
4  he was on CERT before I got on there and he was very
5  knowledgeable, had a lot of information to offer if
6  you asked him. He wasn't the kind of person just to
7  generally give it out, but he was very good with fire-
8  arms, I mean, he shot really well. He just knew the
9  job inside and out.
10  Q. Was John outspoken?
11  A. Yes.
12  Q. He wasn't the type of person to keep something
13  in?
14  A. He spoke his mind. That's one thing we really
15  liked about him.
16  Q. Do you know if there are any problems with
17  John's performance on the CERT team?
18  A. No, I can't think of any problems at all.
19  Q. Back in early August of 2004, and I think the
20  record will reflect that it was August 5th of '04,
21  that the five CERT members were activated to report to
22  the court and transportation unit, does that ring a
23  bell?
24  A. Yes, I remember the day. I wasn't one of the

6 (Pages 18 to 21)

e3404541-6796-40ea-8f82-fff39691efc2

Balas v. Taylor, et al.
Jon W. Mumford

Page 22

1  ones that was activated because I worked that day, but
2  I knew of the activation and -- I didn't know the
3  exact number was five, but it wasn't a whole lot.  It
4  was five or six.
5     Q.  Do you remember who they were?
6     A.  Scott Bradley, David West was one of them, I
7  think Lee Mears, I think John -- I can't honestly sit
8  here and say -- I know for a fact that Bradley and
9  David West were activated, Lee Mears, John was, but,
10  like I said, it was only a handful of them.  They
11  didn't activate 19 of us I think is how many we had.
12     Q.  Do you know who the official order came down
13  from?
14     A.  I don't know for a fact, no.  I just know from
15  what I heard.
16     Q.  How did you find out about the activation?
17     A.  I knew about it that morning when I went to
18  work because I had to work eight to four shift and
19  that's when court and trans runs is on eight to four
20  and I heard about it then.
21     Q.  From who?  Do you remember?
22     A.  No, I don't.
23     Q.  The CERT team was activated on the 5th, was
24  there a meeting held that night?

Page 23

1     A.  The night before.
2     Q.  I think the record will say they were activated
3  on the 5th and they were to report on the 6th?
4     A.  Right, yeah, but they did have a meeting the
5  night before the day that the activation was to
6  actually begin.
7     Q.  Got you.  Do you know where this meeting was?
8     A.  No, I don't know where it was.
9     Q.  Were you there?
10     A.  No, I had to work four to twelve.  I was
11  working, but I had knowledge of it.
12     Q.  Do you remember how you have knowledge of that?
13     A.  Yeah.  I was called to -- I think it was Lee
14  Mears is the one who told me about it and wanted me to
15  attend, but obviously I couldn't.  I was actually
16  working for somebody else.  I was doing a shift trade
17  that I was honored to fulfill.  So, I had to work.  I
18  couldn't cancel a shift trade to go to a meeting, so.
19     Q.  Do you know what the meeting was to be about?
20     A.  I wasn't there, but as far as I know they were
21  just discussing I guess what was going to happen if
22  the CERT team did get activated to help out with C & T
23  and what they were planning on doing, but, like I
24  said, that's what I just heard from other people.  I

Page 24

1  wasn't actually there, but that's what it had to do
2  with, I mean.
3     Q.  Do you know if CERT members were happy about
4  the activation?
5     A.  We were unhappy about it.
6     Q.  Why was that?
7     A.  Well, we were -- basically they were -- they
8  were making us go against what we were trying to do.
9  I'm a blue shirt just like everybody else is, but I'm
10  also a CERT team member.  We were doing the voluntary
11  overtime, we were not working it, and it's almost like
12  they forced us to cross picket lines, so to speak,
13  okay?  I was ones of the ones who refused to work
14  overtime because I did work C & T overtime a little
15  bit.  I don't do it a lot, but, you know, I'm not
16  going to do it.  Then, they turned around and
17  activated us, some of us, to kind of help out and it's
18  kind of like making us look like the bad person.
19     Q.  By "blue shirt" you mean correction officer,
20  right?
21     A.  Correction officer, correct.
22     Q.  Who was your team leader at the time?
23     A.  I think my team leader -- I know I was on team
24  III.  I'm trying to remember who the team III leader

Page 25

1  was.  It has been so long.  It hasn't been that long,
2  but I can't remember who my team leader was.  It -- I
3  know it wasn't Kenny Hickman and I know it wasn't --
4  because there is a couple of guys that work over at
5  the VOP that were actually CERT team members, but they
6  didn't work over at SCI with us.  It might have been
7  Truman.
8     Q.  Would that be Truman Mears?
9     A.  Yeah.  To be honest with you I can't answer
10  that with a hundred percent honesty.  I can't remember
11  who my team head was.  Actually, I know they did
12  switch everybody around one time because I was on team
13  II when I first started and then they switched
14  everybody around and I got moved to team III because
15  they had a lot of people quitting and seemed like all
16  the people quitting were from one team and they had to
17  take some people from this team just so they had even
18  numbers all the way around.  I don't think my team
19  leader ever changed, but I just can't remember who it
20  was.
21     Q.  Going back to the meeting did you hear from
22  anybody at the meeting or anyone else that CERT
23  command was eventually made aware that a meeting was
24  being held?

7 (Pages 22 to 25)

e3404541-6796-40ea-8f82-fff39691efc2

A0976

Balas v. Taylor, et al.
Jon W. Mumford

| Page 26 | Page 28 |
|---|---|

Page 26

1  A.  I didn't find out that night.  I think I heard
2  about it the next day that CERT command had found out
3  that they had held a meeting.  I'm not 100 percent
4  sure, but that's what I was told, but the actual night
5  of the meeting I didn't know that they knew about it.
6  Q.  On August 6th, the day that they were to report
7  for their activation --
8  A.  Yeah, that Friday.
9  Q.  -- what happened?  Were you at work?
10  A.  Yes, I was working eight to four.  I was
11  working the front door, which is where the -- anybody
12  that enters the institution that's where they come in
13  at.  Some people call it the front entrance.  That's
14  where I was working that day.  That's where I was
15  until three o'clock.
16  Q.  Did you talk to anybody in the morning before
17  your shift or at the start of your shift about the
18  activation?
19  A.  I'm sure I did because I'm sure I mentioned --
20  because, like I said, everybody that worked there has
21  to go by me and I'm pretty sure I did talk about it
22  because everybody knew about it because apparently the
23  CERT team was out there early that morning because
24  court leaves pretty early.  They get out there like

Page 27

1  6:30, which I didn't have to be to work until eight.
2  So, a lot of people, oncoming shifts, saw them
3  standing out there by the C & T trailer, which is
4  where they were at.  Of course, then they had to go in
5  a draw their weapons.  They were already in and out
6  before I took my post at eight o'clock because, like I
7  said, they have to be ready to leave by 6:30, quarter
8  of seven.  So, they had already been in.
9       So, they knew, everybody knew why CERT was
10  there and what they were doing.  Like I said, I can't
11  remember any one conversation I had with anybody, but
12  I'm sure it was talked about because everybody was
13  displeased with it and everybody was kind of mad at us
14  and we really didn't have nothing to do with it.  We
15  had an activation, we had to honor it, so to speak,
16  you know what I mean?
17  Q.  Right, right.
18  A.  But we just did it that day, that's it.
19  Q.  Do you know what happened when the CERT members
20  actually reported?
21  A.  No.
22  Q.  You worked the eight to four shift?
23  A.  Yes.
24  Q.  What happened at the end of your shift?

Page 28

1  A.  At the end of my shift the CERT members along
2  with some other guys that were on CERT that were off
3  that day came in.  I was made aware that this was
4  going to happen.  I had gotten a phone call saying
5  that as soon as this day was over that we were going
6  to resign from CERT and I agreed with it.  I said,
7  Okay, I'm in, because I felt the same way about it.  I
8  guess it was about three o'clock when they all came
9  in.  I had somebody relieve me to cover my post while
10  I went inside with the rest of them and went into the
11  warden's office.
12  Q.  Who did you receive a phone call from?
13  A.  Lee Mears.
14  Q.  Did you all meet before you went to the
15  warden's office?
16  A.  No, we didn't even meet.  No, they came in the
17  front door, somebody relieved me to cover my post so I
18  could go in.  I mean, we didn't huddle together and
19  say this.  We just went right in there and sat down
20  and talked to Rick and explained to him what we were
21  doing.  He tried to talk us out of it, but it didn't
22  work.  We actually received a deactivation page --
23  about two minutes before we walked in there and quit
24  everybody's pager went off including mine because I

Page 29

1  was required to wear it 24 hours a day saying that the
2  activation had been canceled.
3       My assumption is that CERT headquarters
4  had gotten word of what we were planning on doing so
5  they decided to send out the deactivation page, but by
6  then it was too late and to me, honestly, that would
7  have only been temporary.  They would have deactivated
8  us for the weekend because there is no court on the
9  weekend and probably come Monday morning they were
10  going to activate us again, which they planned on it
11  because they had over like 140-some people scheduled
12  to go to court Monday morning and there is no way they
13  could do that without getting some help.
14       So, the court schedule is already out.
15  So, they knew they were get to reactivate us over the
16  weekend sometime.  I think they did the deactivation
17  to keep us from quitting.  Boy, if we could have got
18  everybody statewide to quit that would have been nice,
19  but the other institutions didn't follow through with
20  it.
21  Q.  You went to meet with the warden?
22  A.  Yes.
23  Q.  How many of the CERT members were with you?
24  A.  Ten, there were ten of us.

8 (Pages 26 to 29)

e3404541-6796-40ea-8f82-fff39691efc2

A0977

Balas v. Taylor, et al.
Jon W. Mumford

| Page 30 |
| --- |

1    Q.  Do you remember who they were?
2    A.  Let me try this, myself, John Balas, Lee Mears,
3   Scott Bradley, David West, Heath Shockley, Alan Adams,
4   Harry Hastings, Dennis Murray.  I'm forgetting one --
5   maybe there was only nine.  I thought there was ten,
6   though.
7    Q.  Would Jeff Foskey ring a bell?
8    A.  Yes, Jeff Foskey, yeah, Pickle.
9    Q.  I'm sorry?
10    A.  Pickle, that's his nickname.
11    Q.  And what was said to the warden?
12    A.  Just basically expressed our displeasure in the
13   way things were handled and the way that we were used.
14   I mean, the Correction Emergency Response Team was not
15   designed to handle court and transportation.  In my
16   five weeks training I never got trained on court and
17   transportation procedures.  It just wasn't something
18   that I felt that we should have been used for.  I
19   didn't personally hear the negative things that were
20   being said, but apparently the guys that did get
21   activated that morning that were coming in and getting
22   their weapons, apparently there was some fellow
23   officers that we work with expressing their
24   displeasure with us for doing it.

| Page 31 |
| --- |

1        A lot of those guys don't understand that
2   we really didn't want to be there doing it either, but
3   we were activated, we had to honor it.  We talked
4   about that to Rick and, you know, people were
5   basically just shitting on us.  Like I said, not me
6   personally, but those guys, and I can only imagine
7   what that is like.  He listened to us and he did try
8   and talk us out of it, tried to get us to reconsider,
9   you know, doing what we were doing and he explained to
10   us that the activation was over.  Obviously, we knew
11   that, but we also knew that that was only going to be
12   temporary, you know.
13    Q.  Do you remember how he tried to talk you guys
14   out of it?
15    A.  No, I don't actually, no.
16    Q.  Do you remember any other statements by CERT
17   members that were made to him during the resignation?
18    A.  No, not without any certainty, no.
19    Q.  Do you know if John Balas made any statements
20   to the warden during that meeting?
21    A.  I'm sure he did.  As far as what he actually
22   said I can't remember.
23    Q.  After the resignation did you get a chance to
24   witness management's demeanor toward the CERT members

| Page 32 |
| --- |

1   that resigned?
2    A.  Oh, yeah.
3    Q.  What was it like?
4    A.  Same as it was before.
5    Q.  And what was that?
6    A.  It just was.  I mean, I didn't feel like there
7   was any animosity.  Nobody tried to, you know, so to
8   speak -- nobody treated us bad.  I'm talking about
9   management just like you are.  Nobody treated us bad.
10   They didn't, you know, turn their nose up at us or
11   anything like that.  Nobody expressed any hard
12   feelings about us quitting.
13        I mean, Truman and I were really good
14   friends, we went duck hunting all together.  We went
15   duck hunting last Friday.  Him, Kenny Hickman, both of
16   them are team leaders, they don't have a mean bone in
17   their body.  I don't think they could be mean if they
18   tried to be.  I don't think I ever got mistreated
19   because I quit CERT.  Shoot, within a week or two it
20   was almost like it never happened.  Things were just
21   back to normal.
22    Q.  What about management's demeanor towards the
23   job action that was going on at that time?
24    A.  Well, the job action was pretty much done after

| Page 33 |
| --- |

1   that because after -- we all resigned from CERT and I
2   think the work stoppage lasted maybe another couple
3   days before I think our union president of our union signed
4   off on something, whatever it was.  Whatever it was, I
5   don't know what it was, but apparently he signed off
6   on something that maybe the state had offered or the
7   legislators or whatever had offered us something that
8   they signed off on and everybody was mad because they
9   didn't call a meeting to say, hey, this is what they
10   propose.  Apparently, the president took it in his own
11   hands, signed off on it.  So, everybody started to go
12   back to work I think the following week as far as
13   working the voluntary overtime.
14    Q.  What about before you guys resigned because the
15   job action started earlier in the summer?
16    A.  Oh, yeah, started earlier in the summer, but I
17   never saw any -- I never saw any kind of negative
18   reaction from Mike or Rick or anybody as far as the
19   job action goes.
20    Q.  And by Mike you mean Mike DeLoy?
21    A.  Yeah, Mike DeLoy, he was the deputy warden at
22   the time and Rick was the warden.
23    Q.  Do you have to fill out a time card at your
24   job?

9 (Pages 30 to 33)

e3404541-6796-40ea-8f82-fff39691efc2

A0978

Balas v. Taylor, et al.
Jon W. Mumford

**Page 34**

1   A.  No.
2   Q.  Did your lieutenant fill out a time card for
3  you?
4   A.  Yeah, either the lieutenant or someone acting
5  in the lieutenant's spot.
6   Q.  In late 2004 would your lieutenant have filled
7  out your time card for you?
8   A.  Actually, I don't think mine would have because
9  my lieutenant was National Guard, he had been
10  activated.  So, my time card I think my sergeant
11  handled it for a little while, I'm thinking another
12  lieutenant, a VHR lieutenant might have took it over.
13  I haven't had anybody consistent doing my time card.
14  That's why I got a copy and I kind of do my own just
15  to make sure there is no mistakes, but Dan Devlin was
16  my lieutenant, but I haven't seen him in three years
17  because he has been active military.  So, we have had
18  everybody from my sergeant doing it to another
19  lieutenant.  I didn't have the same person
20  continuously like everybody else does.
21   Q.  Now does somebody in HR, human resources, would
22  they fill out your time card now?
23   A.  I guess.  Well, I know if I have any problems
24  with my time card I call Eva Harris, she is payroll.

**Page 35**

1  There is two John Mumfords that work down there and
2  sometimes there is some discrepancies on overtime.
3  Sometimes he will get mine and sometimes I'll get his.
4   Q.  Is he J-O-H-N?
5   A.  He is J-O-H-N.  In the ten years I have been
6  there I can only remember twice when they actually
7  messed mine up.  If you ask me who is doing my time
8  card right now, I couldn't even tell you.
9   Q.  Are you familiar with the term "emergency
10  vacation day"?
11   A.  I'm familiar with the term because a lot of
12  people use it.
13   Q.  What is it?
14   A.  I would assume -- I guess if you have something
15  happen -- I've never used an emergency vacation day at
16  least not that I can remember, but I know people do
17  use them liberally around there to get off work.  I
18  guess an example of an emergency vacation would be
19  maybe if it's an hour before you got to come to work
20  and you have a water line bust in your house,
21  something that is not planned, wasn't scheduled; but,
22  instead of taking sick time from you, they write it
23  down as emergency vacation and they just take the
24  hours away from your vacation.  You still get paid for

**Page 36**

1  it and the reason it's emergency vacation instead of
2  straight vacation because straight vacation day, which
3  would mean it was pre-scheduled.
4   So, I mean, there was a lot of people that
5  use it liberally.  Even if it's not an emergency they
6  will use it, but I think I've used it once maybe.
7   Q.  Do you know if they're frowned upon versus
8  regular vacation days?
9   A.  No, I don't think so.
10   Q.  Are they looked favorably upon?  They would
11  probably rather have more time or --
12   A.  Yeah, yeah, I would say so.
13   Q.  -- give more notice than a day?
14   A.  Well, yeah.  I mean, no watch commander, you
15  know, you don't want somebody to call you and say they
16  can't make the shift an hour before the shift starts,
17  but it does happen.
18   Q.  Like if that happens it puts pressure on them
19  to try and fill the slot?
20   A.  Yeah, because they are going to fill a slot
21  with overtime.  It has never been a problem at SCI,
22  not like it is at the other prisons like Smyrna
23  because officers there get froze two or three times a
24  week sometimes, you know, made -- forced to work.

**Page 37**

1   Q.  Overtime?
2   A.  Yeah.  I mean, four o'clock comes, you are
3  ready to go home and the captain tells you you are on
4  the bottom of the totem pole, you got to stay.  That
5  doesn't happen at SCI because we got enough people
6  that are willing to work the overtime and we're a much
7  smaller institution.  We don't have nowhere near as
8  many officers, so.
9       MS. HERTZOG:  I think that's all I have.
10       MS. XARHOULAKOS:  We'll be reading and
11  signing.
12       (The deposition was concluded at 3:48 p.m.)
13            I N D E X
14  DEPONENT: Jon W. Mumford          PAGE
15    Examination by Ms. Hertzog          2
16

           E X H I B I T S
17
18  (There were no exhibits marked for identification.)
19
  ERRATA SHEET/DEPONENT'S SIGNATURE     PAGE 38
20
  CERTIFICATE OF REPORTER               PAGE 39
21
22
23
24

10  (Pages 34 to 37)

e3404541-6796-40ea-8f82-fff39691efc2

A0979

Balas v. Taylor, et al.

Page 38

```
 1
 2
 3        REPLACE THIS PAGE
 4        WITH THE ERRATA SHEET
 5        AFTER IT HAS BEEN
 6        COMPLETED AND SIGNED
 7        BY THE DEPONENT.
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 39

```
 1   State of Delaware   )
                         )
 2   New Castle County   )
 3
 4            CERTIFICATE OF REPORTER
 5
         I, Christina M. Vitale, Certified Shorthand
 6   Reporter and Notary Public, do hereby certify that
     there came before me on Tuesday, December 4, 2007, the
 7   deponent herein, JON W. MUMFORD, who was duly sworn by
     me and thereafter examined by counsel for the
 8   respective parties; that the questions asked of said
     deponent and the answers given were taken down by me
 9   in Stenotype notes and thereafter transcribed by use
     of computer-aided transcription and computer printer
10   under my direction.
11       I further certify that the foregoing is a true
     and correct transcript of the testimony given at said
12   examination of said witness.
13       I further certify that I am not counsel,
     attorney, or relative of either party, or otherwise
14   interested in the event of this suit.
15
16
17        Christina M. Vitale, CSR
          Certification No. 261-RPR
18        (Expires January 31, 2008)
19
     DATED:
20
21
22
23
24
```

11 (Pages 38 to 39)

e3404541-6796-40ea-8f82-fff39691efc2