## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

CINDY L. BALAS a/k/a CINDY L. ADKINS,  :
Executrix of the Estate of CORPORAL JOHN J.  :
BALAS,  :
                                     :
        Plaintiff,  :
                                     :
        v.  :        C.A.No. 06-592-JJF
                                     :
STANLEY W. TAYLOR, JR., individually and  :
in his official capacity as the Commissioner of  :
Correction; ALAN MACHTINGER,  :
individually and in his official capacity as the  :
Director of Human Resources of the Department  :
of Correction; MICHAEL DELOY, individually  :
and in his official capacity as Deputy Warden of  :
Sussex Correctional Institution; CAPTAIN  :
DAVID WILKINSON, individually;  :
LIEUTENANT TRUMAN MEARS,  :
individually; and DEPARTMENT OF  :
CORRECTION OF THE STATE OF  :
DELAWARE,  :
                                     :
        Defendants.  :
                                     :

**APPENDIX TO PLAINTIFF'S OPENING BRIEF IN SUPPORT OF HER MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST DEFENDANT TRUMAN MEARS (VOLUME 3 - A0981-1077)**

THE NEUBERGER FIRM, P.A.
THOMAS S. NEUBERGER, ESQ. (#243)
STEPHEN J. NEUBERGER, ESQ. (#4440)
CHERYL A. HERTZOG, ESQ. (*Pro Hac Vice*)
Two East Seventh Street, Suite 302
Wilmington, DE 19801
(302) 655-0582
TSN@NeubergerLaw.com
SJN@NeubergerLaw.com
CherylH@NeubergerLaw.com

Dated: January 31, 2008            Attorneys for Plaintiff

<u>**TABLE OF CONTENTS**</u>

**VOLUME 1:**

Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A0001

Answer . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A0032

Plaintiff's Document Production:

    2004 Media Articles (P1-441) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A0049

    Balas DOC Commendations (P442-68) . . . . . . . . . . . . . . . . . . . . . . . . . . . A0490

    Balas Navy Commendations (P469-84) . . . . . . . . . . . . . . . . . . . . . . . . . . . A0517

    Resume of John J. Balas (P485-88) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A0533

    Pictures of John J. Balas (P521-22) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A0537

    Suicide Notes (P523-28) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A0539

    Remembrances of John J. Balas (P532-34) . . . . . . . . . . . . . . . . . . . . . . . . . A0545

    Declaration of David Knight (P535-53) . . . . . . . . . . . . . . . . . . . . . . . . . . . A0548

    Declaration of Cindy Adkins (P554-56) . . . . . . . . . . . . . . . . . . . . . . . . . . . A0567

    Expert Report of Dr. Carol A. Tavani, M.D. (P595-607) . . . . . . . . . . . . . . . . A0570

    Declaration of Henry Purnell (P825-26) . . . . . . . . . . . . . . . . . . . . . . . . . . . A0583

    Memo from Phil Townsend to John Balas Given to Truman Mears (P827-28) . . . A0585

    Copy of Official COAD Greivance, dated Oct. 4, 2004 (P831-32) . . . . . . . . . . . A0587

**VOLUME 2:**

Defendants' Document Production:

    Deljis Report of John Balas' Suicide (D743-49) . . . . . . . . . . . . . . . . . . . . . . . A0589

    Lt. Truman Mears' Supervisor's File on John Balas (D750-90) . . . . . . . . . . . . . . A0596

    Police Reports (D868-74,877,881-84) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A0637

Plaintiff's Answers and Objections to Defendants' First Set of Interrogatories (D.I.31) . . A0651

Deposition of Truman J. Mears, Nov. 6, 2007 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A0704

    Exhibit 1: DOC Matters Newsletter (D343-50) . . . . . . . . . . . . . . . . . . . . . . . . . A0758

    Exhibit 2: DOC Psychological Fitness for Duty Policy (D715-18) . . . . . . . . . . . . A0767

    Exhibit 3: Defendants' Answers to Plaintiff's First Set of Interrogatories . . . . . . . A0771

    Exhibit 4: Performance Evaluation of John Balas - 10/94-10/95 (D107-14) . . . . . A0775

    Exhibit 5: Performance Evaluation of John Balas - 2/99-1/00 (D98,101) . . . . . . . . A0783

    Exhibit 6: Performance Evaluation of John Balas - 1/01-7/02 (D95,97) . . . . . . . . . A0785

    Exhibit 7: Performance Evaluation of John Balas - 1/02-5/03 (D93-94) . . . . . . . . A0787

    Exhibit 8: John Balas' Various Awards and Commendations . . . . . . . . . . . . . . . . . A0789

    Exhibit 9: DOC Policy - Supervisor's File on Employee (D667-84) . . . . . . . . . . . A0818

    Exhibit 10: 8/12/04 E-mail From Timothy Radcliffe, dated Aug. 12, 2004
        (P518) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A0837

    Exhibit 11: Performance Evaluation of John Balas - 9/03-9/04 (D84-92, 378) . . . A0838

    Exhibit 12: Copy of COAD Grievance, dated Oct. 4, 2004 (P519-20) . . . . . . . . . A0848

    Exhibit 13: John's Recorded Recollection (P529-31) . . . . . . . . . . . . . . . . . . . . . . A0850

    Exhibit 14: John Balas' Time Card Records (P494-503) . . . . . . . . . . . . . . . . . . . . A0853

Deposition of Allen Adams, Nov. 7, 2007 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A0863

Deposition of Scott E. Bradley, Sr., Nov. 13, 2007 . . . . . . . . . . . . . . . . . . . . . . . . . . . A0873

Deposition of David A. West, Nov. 13, 2007 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A0884

Deposition of Michael E. DeLoy, Nov. 27, 2007 . . . . . . . . . . . . . . . . . . . . . . . . . . . . A0892

Deposition of David W. Wilkinson, Nov. 28, 2007 . . . . . . . . . . . . . . . . . . . . . . . . . . A0912

    Exhibit 1: Memo from Phil Townsend to John Balas, dated July 8, 2004
        (D281) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A0944

Deposition of Jennifer P. Weldon, Dec. 3, 2007 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A0945

Deposition of William H. Shockley, Dec. 4, 2007 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A0952

Deposition of Harry P. Hastings, III, Dec. 4, 2007 . . . . . . . . . . . . . . . . . . . . . . . . . . . . A0961

Deposition of Jon W. Mumford, Dec. 4, 2007 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A0969

**VOLUME 3:**

Deposition of Jeffrey K. Foskey, Dec. 6, 2007 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A0981

Deposition of Cindy L. Adkins, Dec. 20, 2007 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A0996

Deposition of Michael Ackenbrack, Jan. 8, 2008 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A1036

     Exhibit 1: Copy of Original COAD Greivance, dated Oct. 4, 2004 (P831-32) . . . . A1046

Deposition of Lee Mears, Jan. 22, 2008 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A1048

     Exhibit 1: Declaration of Lee Mears (P557-59) . . . . . . . . . . . . . . . . . . . . . . . . . . . . A1065

     Exhibit 2: Second Declaration of Lee Mears (P835-40) . . . . . . . . . . . . . . . . . . . . A1068

State of Delaware - Bureau of Prisons webpage
     (http://doc.delaware.gov/BOP/BOP.shtml) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A1074



In the Matter Of:

# Balas
## v.
## Taylor, et al.

### C.A. # 06-592-JJF

―――――――――――――――――――

### Transcript of:

### Jeffrey K. Foskey

### December 6, 2007

―――――――――――――――――――

Wilcox and Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: depos@wilfet.com
Internet: www.wilfet.com

A0981

Balas v. Taylor, et al.

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

CINDY L. BALAS a/k/a CINDY L.       )
ADKINS, Executrix of the Estate of )
CORPORAL JOHN J. BALAS,        )
                                 )
        Plaintiff,        )
                          ) Civil Action
v.                        ) No. 06-592-JJF
                          )
STANLEY W. TAYLOR, JR., individu-  )
ally and in his official capacity  )
as the Comissioner of Correction;  )
ALAN MACHTINGER, individually and  )
in his official capacity as the    )
Director of Human Resources of the )
Department of Correction; MICHAEL  )
DELOY, individually and in his     )
official capacity as Deputy Warden )
of Sussex Correctional Institution;)
CAPTAIN DAVID WILKINSON, individu- )
ally; LIEUTENANT TRUMAN MEARS,     )
individually; and DEPARTMENT OF    )
CORRECTION OF THE STATE OF         )
DELAWARE,                    )
                             )
        Defendants.        )

        Deposition of JEFFREY K. FOSKEY taken
pursuant to notice at the law offices of The Neuberger
Firm, P.A., Two East Seventh Street - Suite 302,
Wilmington, Delaware, beginning at 10:40 a.m. on
Thursday, December 6, 2007, before Christina M.
Vitale, Certified Shorthand Reporter and Notary
Public.


Continued. . . . . . . . . .


        WILCOX & FETZER
    1330 King Street -  Wilmington, Delaware 19801
            (302) 655-0477
            www.wilfet.com

d90715b1-b883-46a8-b065-df19f94e023c

Balas v. Taylor, et al.
Jeffrey K. Foskey

Page 2

1  APPEARANCES:
2
      STEPHEN J. NEUBERGER, ESQUIRE
3     CHERYL A. HERTZOG, ESQUIRE
      THE NEUBERGER FIRM, P.A.
4       Two East 7th Street, Suite 302
        Wilmington, Delaware  19801
5       For the Plaintiff
6
      RALPH K. DURSTEIN, III, ESQUIRE
7     STACEY XARHOULAKOS, ESQUIRE
      DEPARTMENT OF JUSTICE
8       Carvel State Office Building
        820 N. French Street
9       Wilmington, Delaware  19801
        For the Defendants
10
11  ALSO PRESENT:  Cindy L. Balas
12      - - - - - - - - - - - - - -
13      JEFFREY K. FOSKEY, the deponent herein,
14  having first been duly sworn on oath, was examined and
15  testified as follows:
16  BY MR. NEUBERGER:
17    Q.  Mr. Foskey, my name is Steve Neuberger and I'm
18  one of the attorneys for Cindy Adkins, formerly Cindy
19  Balas, wife of late John Balas.  You understand that,
20  right?
21    A.  Um-hum.
22    Q.  Yes?
23    A.  Yes.
24    Q.  Have you ever testified in court before?

Page 3

1     A.  No.
2     Q.  Have you ever been lucky enough to have your
3  deposition taken before?
4     A.  No.
5     Q.  What I'm going to do is I'm going to run you
6  through the process so we are on the same page about
7  how this deposition is going to work.  Okay?
8     A.  Um-hum.
9     Q.  Yes?
10    A.  Yes.
11    Q.  First thing is you have to verbalize your
12  answers instead of nodding your head.  If the answer
13  is question, say yes.  Instead of shaking your head,
14  say no.  Okay?
15    A.  Yes.
16    Q.  Have you -- actually, we have to take turns
17  talking because the court reporter, although she is
18  very good, she can't get everything down at the same
19  time if we are talking over each other.  All right?
20    A.  Yes.
21    Q.  And if you don't understand a question that I
22  ask you, just say so and I would be more than happy to
23  rephrase it to try to make it a little bit more
24  palatable.  Okay?

Page 4

1     A.  All right.
2     Q.  Probably the most important thing is I don't
3  want you to guess.  If you don't know the answer to a
4  question, just say so and I will be more than happy to
5  move on.  All right?
6     A.  All right.
7     Q.  After we are done here today you will have an
8  opportunity to review the transcript of the deposition
9  to correct any typographical errors that may be on the
10  transcript.  For example, if you said yes to a
11  question, but the transcript says you said no, you
12  will have an opportunity to correct things like that.
13  All right?
14    A.  All right.
15    Q.  Are you taking any medications or is there
16  anything else happening in your life today which would
17  prevent you from testifying truthfully or remembering
18  accurately?
19    A.  No.
20    Q.  If you need to take any break, if you have to
21  run to the John or stretch out your back, let me know
22  and we'll be happy to take a break.  Okay?
23    A.  Okay.
24    Q.  You have taken an oath to tell the truth today?

Page 5

1     A.  Yes.
2     Q.  You understand the significance of that oath,
3  right?
4     A.  Yes.
5     Q.  And you understand that I am going to be asking
6  you some questions about a lawsuit filed by Cindy
7  Adkins on behalf of her late husband, John, right?
8     A.  Yes.
9     Q.  You have some familiarity with the underlying
10  facts involved in that lawsuit, right?
11    A.  Yes.
12    Q.  Now, were you subpoenaed to be here today?
13    A.  No.
14    Q.  You are here of your own accord, right?
15    A.  Yes.
16    Q.  And did you meet with the defense attorneys
17  prior to today?
18    A.  Yes.
19    Q.  Were you meeting with them as your lawyers or
20  were you meeting with them just as a witness?
21    A.  Witness, I guess.
22    Q.  What did you talk about?
23    A.  The case.
24    Q.  Specifically what?

2 (Pages 2 to 5)

d90715b1-b883-46a8-b065-df19f94e023c

Balas v. Taylor, et al.
Jeffrey K. Foskey

Page 6

1           MS. XARHOULAKOS:  Objection.  I think that
2  as to attorney/client we do represent the Department
3  of Correction and Mr. Foskey is an employee of the
4  Department of Correction just as the rest of the CERT
5  team members were.  Be careful about treading on the
6  substance of our conversations.
7           MR. NEUBERGER:  If you are representing
8  him, then I have no problem --
9           MS. XARHOULAKOS:  Yes.
10          MR. NEUBERGER:  So, you would assert that
11  you guys represent him?
12          MS. XARHOULAKOS:  Right.
13          MR. NEUBERGER:  All right, then we'll move
14  on from that.
15  BY MR. NEUBERGER:
16   Q.   Other than your attorneys here have you talked
17  to anybody about your testimony here today?
18   A.   No.
19   Q.   For example, you drove up here today, right?
20   A.   Yes.
21   Q.   Who did you drive up with?
22   A.   Johnny Owens and Bill Owens.
23   Q.   Who are they?
24   A.   Bill Owens is my stepfather I guess you would

Page 7

1  say.  John is his son.
2   Q.   He would be your stepbrother, right?
3   A.   Yeah, I guess.
4   Q.   And you guys talked about hunting on the way up
5  here?
6   A.   Pretty much.
7   Q.   What kind of hunting were you talking about?
8   A.   Goose hunting, deer hunting, duck hunting.
9   Q.   You also talked about your testimony here
10  today, right?
11   A.   No, I didn't.
12   Q.   John Owens did?
13   A.   He just said he didn't know anything, but I
14  didn't say anything.
15   Q.   What else did John Owens say on the way up
16  here?
17   A.   He didn't understand why he was coming because
18  he didn't have anything for it.  He said he told you
19  all that on the phone and that was it.
20   Q.   Got you.  Now, did you talk to anybody else
21  about your testimony here today?
22   A.   No.
23   Q.   Are you married?
24   A.   Yes.

Page 8

1   Q.   Now, how old are you?
2   A.   Forty.
3   Q.   And where were you born?
4   A.   Milford, Delaware.
5   Q.   Where were you raised?
6   A.   Georgetown, Delaware.
7   Q.   Where did you go to high school at?
8   A.   Sussex Central.
9   Q.   What year did you graduate from high school?
10   A.   1986.
11   Q.   And you know Cindy who is sitting here to my
12  right?
13   A.   Yes.
14   Q.   How do you know Cindy who is sitting here to my
15  right?
16   A.   She is my sister.
17   Q.   She is your full sister or she is your
18  stepsister or what?
19   A.   She is my full sister.
20   Q.   So, you are her big brother?
21   A.   No.
22   Q.   She is older than you?
23   A.   I'm her little brother.
24   Q.   Do you guys have a sibling rivalry or things

Page 9

1  like that?
2   A.   I don't understand what you are coming at.
3   Q.   Do you guys get along?
4   A.   No.
5   Q.   You don't get along.  Are you happy to be here
6  today testifying?
7   A.   I came.  I wasn't subpoenaed, so.  No, I didn't
8  really want to come, no.
9   Q.   Now, where are you presently employed?
10   A.   Department of Correction.
11   Q.   Where at?
12   A.   Sussex Community Correction Center.
13   Q.   That's in Georgetown?
14   A.   Yes.
15   Q.   What position do you hold there?
16   A.   I'm a corporal.
17   Q.   What job do you hold there?
18   A.   I'm a road crew officer.
19   Q.   What does a road crew officer do?
20   A.   I take inmates out to do various community
21  service in the community.
22   Q.   How long have you been employed by the
23  Department of Correction?
24   A.   Nineteen years, six months.

3 (Pages 6 to 9)

d90715b1-b883-46a8-b065-df19f94e023c

A0984

Balas v. Taylor, et al.
Jeffrey K. Foskey

Page 10

1    Q.  So, that would mean you were working for the
2  Department of Correction in the year 2004, right?
3    A.  Yes.
4    Q.  And that would also mean you were working for
5  the DOC in the year 2005, right?
6    A.  Yes.
7    Q.  Do you recall what job you held in August of
8  2004 with the DOC?
9    A.  I believe it was a correction officer at Sussex
10  Correctional Institution.
11    Q.  And that's in Georgetown as well?
12    A.  Yes.
13    Q.  Do you recall how long you were in that job?
14    A.  No.
15    Q.  Do you think you were in that job in August of
16  2004?
17    A.  Yes.
18    Q.  Do you think you were in that job in August of
19  2005?
20    A.  Yes.
21    Q.  Who was your supervisor during that time frame?
22    A.  Lieutenant Truman Mears.
23    Q.  Truman Mears was your supervisor?
24    A.  Yes.  Not all of that, though, I don't think.

Page 11

1  I also had Lieutenant G.R. Johnson.
2    Q.  Was Lieutenant Truman Mears your supervisor for
3  your regular job as a CO?
4    A.  For part of that, yes.
5    Q.  For part?
6    A.  Yes.
7    Q.  Then, you were also on something called the
8  CERT team, right?
9    A.  Yes.
10    Q.  What does CERT stand for?
11    A.  Correctional emergency response team.
12    Q.  And Lieutenant Mears was also on that team,
13  right?
14    A.  Yes.
15    Q.  What was his title on that team?
16    A.  It was just a CERT team member just as I was.
17    Q.  Even though he was a lieutenant?
18    A.  Um-hum.
19    Q.  That's just the way it works?
20    A.  Um-hum.
21    Q.  Yes?
22    A.  Yes.
23    Q.  Do you recall the summer of 2004 being a time
24  of turmoil in the Department of Correction?

Page 12

1    A.  I mean, I had my point of turmoil, but I don't
2  remember the year.
3    Q.  I'm sorry?
4    A.  We had our points of turmoil, but I don't
5  remember if it was 2004 or 2005.  I assume you are
6  talking about when we all resigned.
7    Q.  Yes.  I'll try to get into some of the back
8  story before that.  Okay?
9    A.  All right.
10    Q.  Do you recall a time when a correctional
11  officer was raped up at the Smyrna prison?
12    A.  Yes.
13    Q.  Do you recall in that same time frame there
14  were some ongoing battles between the union and
15  management and the DOC?
16    A.  Yes.
17    Q.  Do you recall that there were issues about
18  wages paid to CO's?
19    A.  No.
20    Q.  Do you recall there were issues about staffing
21  levels in DOC prisons?
22    A.  Yes.
23    Q.  When I say union you understand that I'm
24  referring to COAD, the Correctional Officers

Page 13

1  Association of Delaware?
2    A.  Yes.
3    Q.  And you are a member of that union?
4    A.  Yes.
5    Q.  And you have been a member of that union for at
6  least several years?
7    A.  Yes.
8    Q.  As long as they have been certified as the
9  bargaining agent on behalf of CO's?
10    A.  Yes.
11    Q.  Do you recall a time that summer when a job
12  action of sorts occurred in the DOC?
13    A.  Yes.
14    Q.  And do you recall a time when correctional
15  officers stopped working voluntary overtime?
16    A.  They stopped working voluntary overtime at the
17  court and transportation, yes, not inside the
18  institution.
19    Q.  Right, they stopped working voluntary overtime
20  in the court and transportation unit, right?
21    A.  Yes.
22    Q.  And that caused some problems in the court and
23  transportation unit?
24    A.  Yes.

4 (Pages 10 to 13)

d90715b1-b883-46a8-b065-df19f94e023c

A0985

Balas v. Taylor, et al.
Jeffrey K. Foskey

Page 14

1    Q.  For example, the prisoners weren't necessarily
2  getting transferred to court?
3    A.  Yes.
4    Q.  Because there weren't officers to transport
5  them, right?
6    A.  Yes.
7    Q.  Hence the name court and transportation?
8    A.  Yes.
9    Q.  Do you recall there came a time that summer
10  when the Department of Correction filed a lawsuit
11  against COAD and this union leadership, right?
12    A.  Yes.
13    Q.  Do you recall reading about those things in the
14  papers during that time frame?
15    A.  Somewhat, yes.
16    Q.  Like did you read the News Journal or Delaware
17  State News?
18    A.  Basically whatever article came out we read.
19  So, I mean.
20    Q.  It could be in either paper, but you would
21  eventually find a way to read it?
22    A.  Yes.
23    Q.  Did you ever work with John Balas?
24    A.  I worked around him, not with him.

Page 15

1    Q.  Did you work with John on the CERT team?
2    A.  Yes.
3    Q.  What do you mean you worked around him?
4    A.  Basically each man has his own post.  I mean,
5  there is not two people on the post.  You are not
6  working right together, so.  He worked in the same
7  building as me, but not with me.
8    Q.  Is there a locker room or changing room for the
9  CO's at the prison?
10    A.  No.
11    Q.  You come in fully dressed and ready to go?
12    A.  You came in fully dressed and you report to the
13  watch commander and he tells you where to go to work.
14    Q.  In addition to that you also worked with John
15  on the CERT team?
16    A.  Yes.
17    Q.  And you also had training sessions and things
18  like that together?
19    A.  Yes.
20    Q.  Did you know a Major Phil Townsend?
21    A.  Yes.
22    Q.  Who is he?
23    A.  He was the security superintendent at Sussex
24  Correctional Institution.

Page 16

1    Q.  And was he a good man?
2    A.  Yes.
3    Q.  Is he a good supervisor?
4    A.  Yes.
5    Q.  Was he a good major?
6    A.  Yes.
7    Q.  Kind of officer that you like to serve under?
8    A.  Yes.
9    Q.  Is he honest and truthful and forthright based
10  on your experience?
11    A.  Yes.
12    Q.  I need to put a document in front of you, which
13  was previously marked as Wilkinson Exhibit Number 1.
14  Could you take a look at that document, please.  Tell
15  me once you are done reviewing it.
16    A.  (Witness complies.) I'm done.
17    Q.  Does this appear to be a memo to Corporal John
18  Balas from Major Phil Townsend?
19    A.  Yes.
20    Q.  And dated July 8, 2004?
21    A.  Right.
22    Q.  And the re line says, "Appreciation," right?
23    A.  Yes.
24    Q.  Would you agree this memo is commending John

Page 17

1  for a job well done in the recertification of QRT
2  training in February or March of 2004?
3    A.  Yes.
4    Q.  And this is like a nice memo of appreciation,
5  right?
6    A.  Yes.
7    Q.  This is a nice thing to have in your file,
8  right?
9    A.  Yes.
10    Q.  Last line of it says, "It is a pleasure to work
11  with such fine staff, and once again, thanks for a job
12  well done."  Right?
13    A.  Yes.
14    Q.  Did you work on the QRT training with John?
15    A.  Yes.
16    Q.  Do you have any reason to dispute what Major
17  Townsend put in this official memo?
18    A.  No.  I got one myself.
19    Q.  You got one yourself?
20    A.  Yes.
21    Q.  You did an excellent job in QRT training too,
22  right?
23    A.  I assume, yes.
24    Q.  Do you think John did a good or excellent job

5 (Pages 14 to 17)

Balas v. Taylor, et al.
Jeffrey K. Foskey

Page 18

1  in the QRT training?
2    A.  Yes.
3    Q.  That's why he got a memo of appreciation from
4  Major Phil Townsend, right?
5    A.  Yes.
6    Q.  Now, do you have any reason to dispute what is
7  said in this memo?
8    A.  No.
9    Q.  You can put that away.  Was John a hard worker
10 based on your experiences with him in the workplace?
11   A.  Yes.
12   Q.  Was he dedicated?
13   A.  Yes.
14   Q.  Was he outspoken?
15   A.  Very, yes.
16   Q.  Did John would speak his mind?
17   A.  Yes.
18   Q.  You never had to wander about what John was
19 feeling about a particular topic?
20   A.  No.
21   Q.  Because he would let you know?
22   A.  Yes.
23   Q.  Did he take his job seriously?
24   A.  Yes.

Page 19

1    Q.  Did he lie to his superior officers?
2    A.  I can't tell you if he lied to them or not.
3    Q.  Based on your experienced and interactions with
4  him?
5    A.  No, I never knew him to, but.
6    Q.  Let's focus on that CERT resignation which you
7  mentioned earlier.  Okay?
8    A.  Yes.
9    Q.  That occurred in approximately August of 2004,
10 right?
11   A.  Yes.
12   Q.  And did you attend the meeting at Lee Mears'
13 house the night before the resignation?
14   A.  Yes.
15   Q.  And was Lee --
16   A.  Excuse me?
17   Q.  Who was Lee, what role did Lee hold?
18   A.  Lee was the one that organized the meeting
19 pretty much.
20   Q.  Did he hold a particular position on the CERT
21 team?
22   A.  No.  CERT doesn't have any rank.
23   Q.  He wasn't like a team leader or something like
24 that?

Page 20

1    A.  No.
2    Q.  It's like you are all equals?
3    A.  He was one of the senior members of the CERT
4  team so he organized the meeting.
5    Q.  So, you went to the meeting, right?
6    A.  Yes.
7    Q.  Do you recall that John was there?
8    A.  Yes.
9    Q.  And the meeting was at Lee's house?
10   A.  Yes.
11   Q.  Do you recall what you talked about at the
12 meeting?
13   A.  Just what we were going to do if they made us
14 work court and transportation.
15   Q.  What were you going to do if they made you work
16 court and transportation?
17   A.  They told us that we were taking people to
18 court that if we didn't show up were going to have to
19 be released.  We said if that was the case we were
20 going to go to work.  When we showed up for work the
21 next morning, we found out we were taking a full court
22 schedule to court.  So, we called the head of the
23 transportation unit and told him if that's what he was
24 going to make us do we were all going to quit.

Page 21

1  Basically we said we would work that day, we didn't
2  want to get in trouble or nothing for not showing up
3  to work.  So, we worked until three o'clock and then
4  we all went in and quit.
5    Q.  Let's focus on the meeting at Lee Mears' house
6  the night before.  Do you recall anything that John
7  said at that meeting?
8    A.  No.  Everybody spoke their mind.  I can't
9  recall what one person said.
10   Q.  Do you recall what the general sentiment was of
11 that meeting?
12   A.  Everybody pretty much had the same feelings
13 that if they made us do something that we didn't think
14 was right, that we would quit.
15   Q.  And this was occurring right in the midst of
16 the union job action?
17   A.  Yes.
18   Q.  And it was the job action by the union which
19 was causing the staffing problems in the court and
20 transportation unit, right?
21   A.  Yes.
22   Q.  It was your understanding that you were being
23 called up to fill those vacant positions in the court
24 and transportation unit, right?

6 (Pages 18 to 21)

d90715b1-b883-46a8-b065-df19f94e023c

Balas v. Taylor, et al.
Jeffrey K. Foskey

Page 22

1    A.  No.  Our initial response was that we thought
2  we were taking people to court that we thought were
3  going to be released and we didn't want to see that
4  happen.
5    Q.  Right, you were going to be transporting people
6  to the court?
7    A.  Exactly, the people that were going to get
8  released.
9    Q.  People that you were told that were criminals
10  or people in jail that were going to be released on
11  the streets unless you did this?
12    A.  Yes.
13    Q.  And you didn't want that to happen, right?
14    A.  No.
15    Q.  You are a dedicated public servant, right?
16    A.  Yes.
17    Q.  You care about public safety?
18    A.  Yes.
19    Q.  You care about the health and welfare of the
20  general public?
21    A.  Yes.
22    Q.  So, you didn't want anything bad to happen to
23  the public.  That comes from you being an experienced
24  CO, right?

Page 23

1    A.  Yes.
2    Q.  And also just simply because of on a personal
3  level you care?
4    A.  Yes.
5    Q.  And you understand that you were being called
6  to transport those prisoners to the court?
7    A.  Yes.
8    Q.  And that was being done because there wasn't
9  staff to do it, right?
10    A.  Yes.
11    Q.  And the reason there wasn't staff to do it was
12  because of the job action, right?
13    A.  Yes.
14    Q.  What were the sentiments expressed at the
15  meeting about staffing a unit which was vacant because
16  of the job action?
17    A.  Like I say, nobody wanted to do it, but the
18  only reason we all agreed to do it is because we
19  thought these people were going to get released from
20  prison.
21    Q.  Is it your testimony that everyone wanted to
22  support the union, but that there were some larger
23  considerations at play?
24    A.  Public safety, yes.

Page 24

1    Q.  And that's a very large consideration, right?
2    A.  Yes.
3    Q.  Especially for you?
4    A.  Yes.
5    Q.  The next day you show up to work, right?
6    A.  Yes.
7    Q.  To staff the unit and transport those prisoners
8  to the court?
9    A.  Yes.
10    Q.  And you find out there is -- how did you --
11    A.  Full court, they were taking everybody to
12  court, not just the people that were going to get
13  released because they hadn't showed up and we were
14  taking everybody.
15    Q.  And were you happy about that?
16    A.  No.
17    Q.  Did you feel that you had been lied to?
18    A.  Yes.
19    Q.  Did you feel you were now going to be going
20  against what the union was doing and it wasn't a
21  public safety issue?
22    A.  Yes.
23    Q.  And how did that make you feel?
24    A.  Pretty low.

Page 25

1    Q.  Did it make you feel unhappy or displeased?
2    A.  Yeah.
3    Q.  How about angry?
4    A.  Yes.
5    Q.  Do you expect better from your superiors than
6  to be lied to?
7    A.  Yes.
8    Q.  And that's disappointing when that doesn't
9  happen, right?
10    A.  Yes.
11    Q.  When you walked into the prison in Georgetown
12  to walk to where the C & T unit is located --
13    A.  The C & T is not in the prison.
14    Q.  Where is it?
15    A.  It's on the outskirts, outside, it has its own
16  separate building.
17    Q.  How do prisoners get from the prison to the
18  C & T?
19    A.  The safety officer reports to the C & T
20  trailer.  You get your van and then you drive inside
21  the prison to get your inmates and put them in your
22  van and you take them up to court.
23    Q.  When you and the other members of the CERT
24  team -- which included John, right?

7 (Pages 22 to 25)

Wilcox and Fetzer, Ltd.  Registered Professional Reporters          302-655-0477

d90715b1-b883-46a8-b065-df19f94e023c

Balas v. Taylor, et al.
Jeffrey K. Foskey

Page 26

1   A.  Um-hum.
2   Q.  Yes?
3   A.  Yes.
4   Q.  When you guys got in your vans and drove into
5   the prison --
6   A.  We didn't get vans.
7   Q.  What happened?
8   A.  They got somebody else to go in and pick up the
9   inmates.  All we did was had to go to court and help
10  with the taking the inmates from the cell block to
11  courtrooms is all we did.
12  Q.  During the course of that day at the prison or
13  at the unit in Georgetown did you interact with any
14  other CO's?
15  A.  Yes.  We had to go in and draw our weapons --
16  you have to go partially inside to draw your weapon
17  for court and transportation.  So, we were passing the
18  people that were getting off and going to work as we
19  were going in to do that.
20  Q.  Did the people who were getting off say
21  anything to you as you were passing in the hallway or
22  wherever you passed?
23  A.  Yes.
24  Q.  What did they say?

Page 27

1   A.  Called us traitors, turned their back on us.
2   Q.  And what was your understanding for why that
3   was being done?
4   A.  Because they thought we were betraying them by
5   working in court and transportation.  They thought we
6   were betraying the union.
7   Q.  And that's a bad thing, right?
8   A.  Yes.  To them it was, yes.
9   Q.  And I think you indicated that the night before
10  at Lee Mears' house there was a lot of discussion
11  about not wanting to betray the union?
12  A.  Yes.
13  Q.  And you guys wanted to support the union in the
14  job action, right?
15  A.  Yes.
16  Q.  Unless some dramatic public safety considera-
17  tions overrode that, right?
18  A.  Yes.
19  Q.  Was John with you as you guys were walking in
20  to draw your weapons?
21  A.  All of us went in together, yes.
22  Q.  Before three o'clock that day came when your
23  shift ended did you talk with John at all or the other
24  officers about what you were going to do at the end of

Page 28

1   the shift?
2   A.  We all discussed it the morning before we
3   started the shift.
4   Q.  And what was discussed?
5   A.  That if they made us run the full court list
6   that we were all going to quit at three o'clock when
7   our shift was over.
8   Q.  Do you recall anything that John said during
9   those discussions?
10  A.  No.
11  Q.  Was John the type to be quiet during a
12  discussion like that?
13  A.  No, but he didn't say any more than anybody
14  else did.
15  Q.  He said just as much as everybody else did?
16  A.  Yes.
17  Q.  So, three o'clock comes and your shift ends,
18  right?
19  A.  Yes.
20  Q.  Where did you then go?
21  A.  To turn in our weapons.
22  Q.  And was that everybody?
23  A.  Yes.
24  Q.  So, you guys go and turn in your weapons,

Page 29

1   right?
2   A.  Yes.
3   Q.  Where did you go after that?
4   A.  To the warden's office.
5   Q.  Who was the warden there then?
6   A.  Rick Kearney.
7   Q.  Was Warden Kearney a good guy?
8   A.  Yes.
9   Q.  Was he good supervisor?
10  A.  Yes.
11  Q.  Was he a good warden?
12  A.  Yes.
13  Q.  How many of you, if you recall, how many of you
14  walked into the warden's office?
15  A.  Ten.
16  Q.  When you walked in, did you guys close the door
17  behind you?
18  A.  Yes.
19  Q.  And did you talk to the warden?
20  A.  Yes.
21  Q.  What did you talk to the warden about?
22  A.  We just told him we were handing in our
23  resignation from the CERT team.
24  Q.  Did you tell him you were doing that because

8 (Pages 26 to 29)

d90715b1-b883-46a8-b065-df19f94e023c

Balas v. Taylor, et al.
Jeffrey K. Foskey

Page 30

1  you had been lied to?
2    A.  It has been so long I can't really remember
3  what was discussed in there, but all I remember is we
4  all resigned.
5    Q.  Is it your recollection that the resignation
6  was done to show solidarity with the union's job
7  action?
8    A.  Yes.
9    Q.  Do you recall John being in that meeting with
10  the warden?
11    A.  He was there, yes.
12    Q.  Do you recall John saying anything?
13    A.  No.
14    Q.  I think you testified a little earlier that
15  John was outspoken, right?
16    A.  Yes.
17    Q.  It has been more than three years since that
18  time, right?
19    A.  Yes.
20    Q.  Memories fade?
21    A.  Yes.
22    Q.  And a lot of things have happened in the last
23  three years?
24    A.  Like I say, we all spoke in there.  I can't

Page 31

1  remember what each of us said.
2    Q.  You guys were very unhappy about what happened,
3  correct?
4    A.  Yes.
5    Q.  And you guys were very displeased about it,
6  right?
7    A.  Yes.
8    Q.  And you felt betrayed?
9    A.  Yes.
10    Q.  And you felt a little bit angry about that,
11  right?
12    A.  Yes.
13    Q.  And as a result of those things you marched
14  into the warden's office and resigned from the CERT
15  team?
16    A.  Yes.
17    Q.  What was the warden's reaction?
18    A.  I believe he said he didn't blame us, but, you
19  know, he understood that we were all upset and what we
20  went through.  He wouldn't hold it against us for
21  resigning.
22    Q.  I think you indicated that you think a lot of
23  Warden Kearney?
24    A.  Yeah.

Page 32

1    Q.  He has since been promoted, right?
2    A.  Yes.
3    Q.  After the resignation from the CERT team in
4  August of 2004 do you recall who your immediate
5  supervisor was at that time?
6    A.  G.R. Johnson.
7    Q.  G.R. Johnson?
8    A.  I think it might have been G.R. Johnson by
9  then, but I'm not positive.
10    Q.  Did any of your superior officers ever give you
11  a hard time in the workplace because you resigned?
12    A.  No.  As a matter of fact, they all looked up to
13  us for what we had done.
14    Q.  For example, I think you mentioned G.R.
15  Johnson, right?
16    A.  Yes.
17    Q.  Was he a good supervisor?
18    A.  Yes, excellent, yes.
19    Q.  I think it's your testimony that -- was he one
20  of the people that thought you had done the right
21  thing --
22    A.  Yes.
23    Q.  -- based on his interactions with you?
24    A.  Yes.

Page 33

1    Q.  Did he ever tell you that?
2    A.  I think he did, yes.
3    Q.  And he respected the decision you had made?
4    A.  Yes.  Put it this way, he never treated me any
5  different after I did it.
6    Q.  And you appreciated that, didn't you?
7    A.  Yes.
8    Q.  Were you happy that he hadn't treated you any
9  differently?
10    A.  I really didn't care, tell you the truth.  I
11  worked there eight hours a day and I knew I did the
12  right thing in my mind, so.
13    Q.  Did John ever come to you, John Balas, ever
14  come to you and tell you that he thought that Truman
15  Mears was angry at him for resigning?
16    A.  No.
17    Q.  Truman Mears was on the CERT team, right?
18    A.  Yes.
19    Q.  But he wasn't one of the members that resigned,
20  right?
21    A.  No.
22    Q.  He had actually been at the meeting the night
23  before?
24    A.  Yes, he was there and he was the first one to

9 (Pages 30 to 33)

d90715b1-b883-46a8-b065-df19f94e023c

A0990

Balas v. Taylor, et al.
Jeffrey K. Foskey

Page 34

1  leave.
2    Q.  Is it your understanding that after he left the
3  meeting he reported to DOC management that you guys
4  were planning on resigning?
5    A.  No, I don't know anything about that.
6    Q.  Did you ever hear that somewhere?
7    A.  Not that I recall.
8    Q.  Do you have any reason to dispute it if it did
9  happen or you just don't know one way or the other?
10   A.  I wouldn't dispute it, but, like I said, we
11  told them all the next morning anyway, so.
12   Q.  Putting aside the CERT resignation what was
13  your perception of management's reaction to the job
14  action in general?
15   A.  I don't know.  I guess they didn't want us to
16  go through with it, but they didn't really have any
17  control over it.
18   Q.  Did you ever get the feeling while working at
19  the DOC that the management was not happy about it?
20   A.  Not really, not that I can say.  I mean, they
21  never treated me any differently.
22   Q.  Did you ever hear any of the managers in the
23  DOC talking about how they were unhappy that there
24  were front page stories being run in the Delaware

Page 35

1  State News by Tom Eldred or in the News Journal by
2  whoever the reporter was up here?
3    A.  No, I never heard them talking about it.
4    Q.  Did you ever talk to Captain Wilkinson at the
5  time about the job action?
6    A.  Yeah, I did back then, but I haven't talked to
7  him in a couple years.
8    Q.  Let's focus on back then.  I think you
9  indicated that you talked to him back then about the
10  job action?
11   A.  Um-hum.
12   Q.  Do you recall the substance of the
13  conversation?
14   A.  No.  Just really talked about what was going on
15  with it, I mean.
16   Q.  Did you ever talk to him about the CERT
17  resignation?
18   A.  No.  I mean, he said -- he was another one that
19  backed us 100 percent for quitting, so.
20   Q.  He was supportive?
21   A.  Yes.  Well, he said he was anyway.
22   Q.  Did you ever talk to Mike DeLoy about it, the
23  deputy warden at the time?
24   A.  No, never spoke to him at all.

Page 36

1    Q.  Did you ever hear any rumors about his reaction
2  to it?
3    A.  No.
4    Q.  Let's focus on the time frame between August of
5  2004 and February of 2005.  Okay?
6    A.  Yes.
7    Q.  Do you recall hearing during that time frame
8  that John Balas had received a negative performance
9  evaluation?
10   A.  Yeah, he mentioned it to me.
11   Q.  What did John say?
12   A.  He was upset about it.
13   Q.  Did he say why?
14   A.  Because John was always one -- he had perfect
15  attendance I think from the day he started.  So, he
16  was really up with keeping that going and I guess
17  that's what ruined his perfect evaluation.
18   Q.  Do you know who John's supervisor was?
19   A.  I believe it was Truman Mears.
20   Q.  During those conversations talking about the
21  evaluation did John ever say anything to you that
22  Truman was going after him because of the CERT
23  resignation?
24   A.  Yeah, I think he did say something to me about

Page 37

1  that.
2    Q.  Did he indicate that -- did he indicate that it
3  was wrong what Truman was doing?
4    A.  No.  I overheard him saying something about he
5  was going after him, but he didn't really speculate on
6  what he was doing to him.
7    Q.  Was it your understanding in the context of
8  those conversations that John was talking about the
9  performance evaluation?
10   A.  Yeah, that's what I assumed he was talking
11  about.
12   Q.  Did John ever talk to you about his time cards
13  being falsified or otherwise altered?
14   A.  Yeah, he showed them to me one time and the
15  copies he made of them were so blurry I couldn't even
16  hardly read them.  I don't know if John made the
17  copies or where he got them from.
18   Q.  Did John put those copies in front of you?
19   A.  Like I say, he showed them to me, but the copy
20  machine I guess was running out of ink or something
21  and I couldn't hardly even read what was on there.
22   Q.  Did John explain to you what the problem he had
23  with those time cards was?
24   A.  No.

10 (Pages 34 to 37)

d90715b1-b883-46a8-b065-df19f94e023c

A0991

Balas v. Taylor, et al.
Jeffrey K. Foskey

Page 38

1  Q.  Did he indicate that he thought that Truman
2  Mears was altering his time cards?
3  A.  Yeah.
4  Q.  He was altering his time cards after the fact?
5  A.  I don't know about that.  He did say something
6  about him altering.
7  Q.  Was John unhappy about that or was he overjoyed
8  his time cards were being altered?
9  A.  He was unhappy.
10  Q.  January of 2005 or thereabouts, in that time
11  frame, did John ever talk to you about Truman Mears
12  denying him a final copy of his time card for the
13  year?
14  A.  No.
15  Q.  Did John ever talk to you about the grievance
16  he filed with COAD?
17  A.  No.
18  Q.  Did John indicate that he was going to file a
19  grievance?
20  A.  I think he did mention something about it, but
21  I never heard anything more about it after he said he
22  was going to.
23  Q.  Specifically what did you hear him talk about?
24  A.  He said he was going to file a grievance over

Page 39

1  his time card and, like I said, after that I never
2  heard anything more about that.
3  MS. XARHOULAKOS:  There has not been any
4  testimony from Mr. Foskey or anyone else that the
5  grievance was actually filed so you probably want to
6  clarify the record and re-ask your question.
7  MR. NEUBERGER:  I'm just asking if John
8  talked to him about it.
9  BY MR. NEUBERGER:
10  Q.  I think you mentioned John may have said he was
11  going to be filing a grievance to deal with the time
12  card issue, right?
13  A.  Um-hum.
14  Q.  Yes?
15  A.  Yes.
16  Q.  Did John ever mention that he might be filing a
17  grievance to address the issue of the performance
18  evaluation?
19  A.  No.  Like I say, he said something about filing
20  a grievance.  I don't know what he was filing it on.
21  Q.  Who was your shop steward then?
22  A.  I couldn't even tell you.
23  Q.  Do you know who John's was?
24  A.  No.  They switch monthly so I couldn't tell

Page 40

1  you.
2  Q.  Did John ever tell you that Truman was out to
3  get him?
4  A.  No.
5  Q.  Did John ever express any sentiments generally
6  along those lines?
7  A.  I assumed that when he said something about his
8  time card, switching it, he was out to get him.
9  Q.  Did John ever tell you that he thought Truman
10  was excessively monitoring him trying to find a reason
11  to discipline him?
12  A.  No.
13  Q.  During the August of 2004 through February of
14  2005 time frame do you recall John being stressed out
15  at work?
16  A.  Yeah.
17  Q.  And you recall him being stressed out about
18  work?
19  A.  I don't know if it was about work or not, but I
20  could tell an attitude change, yes.
21  Q.  You noticed an attitude change with John during
22  that time frame?
23  A.  Yes.
24  Q.  Is it your testimony you don't know what the

Page 41

1  attitude change was caused by?
2  A.  Yes.
3  Q.  How did his attitude change?
4  A.  He just got more to himself at work and
5  wouldn't really talk to anybody else at work.
6  Q.  And was that unusual for John?
7  A.  Yes.
8  Q.  Do you recall a time in or about February of
9  2005 when you, your sister, Cindy, and Lee Mears took
10  John to a place called the St. Joan's Behavior
11  Institute?
12  A.  Yes.
13  Q.  Do you recall that it was approximately
14  February of 2005?
15  A.  I can't remember.  It was either the end of
16  January or early February, yes.
17  Q.  But it was sometime during that time frame?
18  A.  Yes.
19  Q.  How did that come about, you guys going there?
20  A.  He had told Lee that he was going to harm
21  himself and Lee spent the whole night up with him I
22  guess the night before or something.
23  Q.  And so did Lee call you?
24  A.  Yes.

11 (Pages 38 to 41)

d90715b1-b883-46a8-b065-df19f94e023c

A0992

Balas v. Taylor, et al.
Jeffrey K. Foskey

Page 42

1    Q.  And what did -- and Lee asked you to come with
2    them to take John to St. Joan's?
3    A.  Yes.
4    Q.  Right?
5    A.  Yes.
6    Q.  Did he indicate that your sister, Cindy, was
7    worried about John?
8    A.  Yes.
9    Q.  Where is St. Joan's?
10   A.  I think it's in Dover, a little north of Dover.
11   Q.  Did you guys all drive there together?
12   A.  Yes.
13   Q.  Would it have been the four of you?
14   A.  Yes.
15   Q.  What was John's demeanor like?
16   A.  He never said a word the whole way up there.
17   Q.  Do you recall if you went there in the morning
18   or in the afternoon?
19   A.  It was before lunch, I believe.
20   Q.  So, eventually you got to St. Joan's?
21   A.  Yes.
22   Q.  Did the four of you go inside?
23   A.  Yes.
24   Q.  Is there a front desk or waiting area or

Page 43

1    reception area?
2    A.  There is, but there was nobody there because it
3    was on a Sunday we took him.
4    Q.  You walked in and there was no one there?
5    A.  The one man we went to see was there, but there
6    was no receptionist or nobody else there.
7    Q.  Do you recall the name of that gentleman?
8    A.  No.
9    Q.  But there was someone there?
10   A.  He talked to John, yes.
11   Q.  He talked to John?
12   A.  Yes.
13   Q.  Did he talk to John in front of you guys?
14   A.  No.
15   Q.  He took John back?
16   A.  He took John back.
17   Q.  Do you recall how long John was in there?
18   A.  Probably 45 minutes to an hour.
19   Q.  What did you and Cindy and Lee Mears do during
20   that span of time?
21   A.  We just knew they were going to keep John.  We
22   sat there and talked while he was there.
23   Q.  You knew --
24   A.  We figured they were going to keep him there.

Page 44

1    Q.  Because he was suicidal?
2    A.  Yes.
3    Q.  Did there come a time when either John came
4    back from the meeting or when the doctor came back
5    from the meeting?
6    A.  They both came out together.
7    Q.  What was said?
8    A.  He said, "He is good to go."
9    Q.  Do you recall if it was a doctor?
10   A.  I assume that's what he was.
11   Q.  Was he wearing a white coat?
12   A.  No.
13   Q.  Was he wearing a suit and tie?
14   A.  I believe he had a tie on, but he didn't have a
15   suit on, no.
16   Q.  Was he wearing a blazer or something like that?
17   A.  Just a shirt and tie, I believe.
18   Q.  There came a time after their meeting was over
19   John and the gentleman at St. Joan's came back out to
20   where you, Cindy and Lee were waiting?
21   A.  Yes.
22   Q.  And the gentleman said, "He is good to go"?
23   A.  Basically he said, "He is good to go home, he
24   is not going to harm himself." Then, Lee jumped up and

Page 45

1    said, "I need to talk to you," and they went back
2    there and talked.
3    Q.  What was your reaction to hearing John was good
4    to go?
5    A.  I knew he wasn't.
6    Q.  Did that suprise you?
7    A.  Suprise me what?
8    Q.  That the gentleman at St. Joan's said John was
9    good to go?
10   A.  Yes, yes.
11   Q.  Do you recall how long Lee was back there
12   talking to him?
13   A.  No.  About a half hour.
14   Q.  And so while Lee was back there talking with
15   him what were you, John and Cindy doing?
16   A.  Sitting in the waiting room.
17   Q.  Were you talking?
18   A.  Like I said, John never said a word all the way
19   up there and all the way back.
20   Q.  John didn't say a word either?
21   A.  No.
22   Q.  Were you and your sister talking?
23   A.  We never said a whole lot because we were
24   afraid he might go off or something, so.

12 (Pages 42 to 45)

Wilcox and Fetzer, Ltd.  Registered Professional Reporters          302-655-0477

d90715b1-b883-46a8-b065-df19f94e023c

Balas v. Taylor, et al.
Jeffrey K. Foskey

Page 46

1  Q.  Eventually Lee came back?
2  A.  Yes.
3  Q.  Did Lee come back out with the doctor or the
4  gentleman from St. Joan's?
5  A.  Yes.
6  Q.  Do you recall what was said when they came back
7  out?
8  A.  No.  All I know is we all loaded up and came
9  back home.
10  Q.  Who drove?
11  A.  Me.
12  Q.  When you drove home, where did you go?
13  A.  Back to John's house.
14  Q.  And did you then take John to his parents'
15  house?
16  A.  I can't remember if he went into his house and
17  went upstairs and went to bed or went back to his
18  parents, I can't remember.
19  Q.  Do you recall a time when you helped remove the
20  guns from John's house?
21  A.  Yes, we did that that day.
22  Q.  And you were doing that because John was
23  suicidal, right?
24  A.  Yeah, we assumed he was, yes.

Page 47

1  Q.  Were you worried about John?
2  A.  Yeah.
3  Q.  Did you ever report to any of your superiors
4  what happened that day?
5  A.  No.
6       MR. NEUBERGER:  Let's take a short five-
7  minute break, okay?
8       (Brief recess.)
9  BY MR. NEUBERGER:
10  Q.  Do you recall what the gentleman at St. Joan's
11  looked like?
12  A.  No.
13  Q.  Was he tall?  Was he short?
14  A.  He was kind of medium build I'm thinking.
15  Q.  Was he white or black?
16  A.  He was a white guy.
17  Q.  Was he wearing glasses?
18  A.  I believe he was.
19  Q.  A white guy about medium build?
20  A.  Kind of a little bit overweight.
21  Q.  Do you recall if he had a mustache or beard or
22  goatee?
23  A.  I don't believe he had any of it.
24  Q.  Did he limp when he walked?

Page 48

1  A.  I really couldn't tell you because his office
2  was right there next to us and he walked to the door
3  and he came in and shut the door.  So, I didn't really
4  see him walk.
5  Q.  Where was his office in relation to the waiting
6  room?
7  A.  I think it was right beside it.  The waiting
8  room is right here and his doorway is here.
9  Q.  Could you draw for me the waiting room and
10  where the office was.
11  A.  (Drawing.)  I think his doorway and his office
12  was right here, I think.
13  Q.  Where it says "waiting" just for the purposes
14  of the record is where the waiting room is?
15  A.  That's where we were sitting, yes.
16  Q.  Then, you drew a little -- this other square
17  here is where his office was?
18  A.  Yes, I believe.
19  Q.  I'm going to write "office" next to this and
20  just point to it.
21       MR. NEUBERGER:  Okay?
22       MS. XARHOULAKOS:  Yes.
23       MR. NEUBERGER:  That's where his office
24  was.

Page 49

1  BY MR. NEUBERGER:
2  Q.  Did the guy talk in a loud tone of voice?  Was
3  he quiet?
4  A.  I really can't remember.
5  Q.  Was he friendly?
6  A.  Seemed to be, yes.
7  Q.  Introverted?  Extroverted?
8  A.  It has been so long I can't remember.
9       MR. NEUBERGER:  Let's mark this as Foskey
10  Exhibit 1.
11       (Foskey Deposition Exhibit No. 1 was marked
12  for identification.)
13       MR. NEUBERGER:  In light of that I have no
14  further questions.
15       MS. XARHOULAKOS:  I have a couple, I want
16  to clarify something.
17  BY MS. XARHOULAKOS:
18  Q.  Mr. Foskey, you testified earlier, we didn't
19  really specify a time frame, so I'm going to ask you,
20  who is your supervisor now?
21  A.  My supervisor now is Lieutenant Dean Blades.
22  Q.  Where are you now?
23  A.  I'm at the Sussex Community Correctional
24  Center.

13 (Pages 46 to 49)

Balas v. Taylor, et al.
Jeffrey K. Foskey

Page 50

1    Q.   When did you go to Sussex Community
2  Correctional Center?
3    A.   I think it was in March of 2005.
4    Q.   Prior to March of 2005 -- no, actually, it was
5  March 2006.
6    Q.   Prior, before, March of 2006 when you went to
7  Sussex Community Correctional where were you?
8    A.   I was at the Sussex Correctional Institution.
9    Q.   You were in the same place you all were when
10 you resigned from the CERT team?
11   A.   Yes.
12   Q.   Do you recall who your supervisor was prior to
13 you leaving?
14   A.   G.R. Johnson.
15   Q.   And you also testified that Lieutenant Mears,
16 Truman Mears, was at one point your supervisor?
17   A.   He was, but I can't remember if it was before
18 all this happened or during it.  See, I switched
19 shifts in there somewhere and that's when I got
20 Johnson instead of Mears.
21   Q.   I understand.  Do you recall how long
22 Lieutenant Mears was your supervisor?
23   A.   It was probably for probably a year or two, but
24 I think it was before all this happened.

Page 51

1    Q.   He was your supervisor at one point, but you
2  are just not entirely sure when G.R. Johnson --
3    A.   I could probably look it up at home.
4    Q.   Was G.R. Johnson your lieutenant after Officer
5  Mears?
6    A.   Yes.
7        MS. XARHOULAKOS:  That's all I have.
8        MR. NEUBERGER:  That leads to a question
9  from me.
10 BY MR. NEUBERGER:
11   Q.   It's your testimony today that to the best of
12 your recollection that Truman Mears was your
13 supervisor before the CERT resignation?
14   A.   I believe so, yes.
15       MR. NEUBERGER:  I have no further
16 questions.
17       (The deposition was concluded at 11:28
18 a.m.)
19
20
21
22
23
24

Page 52

1             I N D E X
2
DEPONENT:  Jeffrey K. Foskey          PAGE
3
4    Examination by Mr. Neuberger       2, 51
5    Examination by Ms. Xarhoulakos       49
6
7          E X H I B I T S
8  FOSKEY DEPOSITION EXHIBITS          MARKED
9
10   1  Diagram prepared by Jeffrey K.
     Foskey              49
11
     CERTIFICATE OF REPORTER          PAGE 53
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 53

1  State of Delaware  )
                       )
2  New Castle County  )
3
          CERTIFICATE OF REPORTER
4
5      I, Christina M. Vitale, Certified Shorthand
   Reporter and Notary Public, do hereby certify that
6  there came before me on Thursday, December 6, 2007,
   the deponent herein, JEFFREY K. FOSKEY, who was duly
7  sworn by me and thereafter examined by counsel for the
   respective parties; that the questions asked of said
8  deponent and the answers given were taken down by me
   in Stenotype notes and thereafter transcribed by use
9  of computer-aided transcription and computer printer
   under my direction;
10     I further certify that the foregoing is a true
   and correct transcript of the testimony given at said
11 examination of said witness.
12     I further certify that reading and signing of
   the deposition were waived by the deponent and
13 counsel.
14     I further certify that I am not counsel,
   attorney, or relative of either party, or otherwise
15 interested in the event of this suit.
16
17
18       Christina M. Vitale, CSR
19       Certification No. 261-RPR
20       (Expires January 31, 2008)
21
22 DATED:
23
24

14  (Pages 50 to 53)

d90715b1-b883-46a8-b065-df19f94e023c



**WILCOX & FETZER LTD.**

# In the Matter Of:

# Balas

## v.

## Taylor, et al.

### C.A. # 06-592-JJF

_____

## Transcript of:

### Cindy L. Adkins

### December 20, 2007

_____

Wilcox and Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: depos@wilfet.com
Internet: www.wilfet.com

Balas v. Taylor, et al.

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

CINDY L. BALAS a/k/a CINDY L.  :
ADKINS, Execiutrix of the Estate
of CORPORAL JOHN J. BALAS,    :

          Plaintiff,  :

          vs.        :   Civil Action
                         No. 06-592-JJF
STANLEY W. TAYLOR, JR.,       :
individually and in his
official capacit as the       :
Commissioner of Correction,
et al.,                 :

          Defendants.  :

               - - -

          Deposition of CINDY L. ADKINS, taken
pursuant to notice in the offices of Delaware
Department of Justice, Sixth Floor, Carvel State
Office Building, 820 North French Street, Wilmington,
Delaware, on Thursday, December 20, 2007, at 9:41
a.m., before Lorraine B. Marino, Registered Diplomate
Reporter and Notary Public.

               - - -

               WILCOX & FETZER
        1330 King Street - Wilmington, Delaware 19801
                 (302) 655-0477
                 www.wilfet.com

## Balas v. Taylor, et al.

Page 2

1  APPEARANCES:
2      STEPHEN J. NEUBERGER, ESQ.
       CHERYL A. HERTZOG, ESQ.
3      The Neuberger Firm, P.A.
       2 East Seventh Street - Suite 302
4      Wilmington, DE  19801
         for Plaintiff
5
       STACEY XARHOULAKOS, ESQ.
6      RALPH K. DURSTEIN, ESQ.
       Deputy Attorneys General
7      Delaware Department of Justice
       Carvel State Office Building
8      820 North French Street - Sixth Floor
       Wilmington, DE 19801
9        for Defendants
10              - - -
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 3

1         CINDY LEE ADKINS, having been first
2  duly sworn, was examined and testified as follows:
3  BY MS. XARHOULAKOS:
4     Q.     Ms. Adkins, my name is Stacey Xarhoulakos.
5  We have met before, not formally but in previous
6  depositions.  And you have sat in other depositions in
7  this case; correct?
8     A.     Yes.
9     Q.     So you are familiar with the process;
10  correct?
11    A.     Yes.
12    Q.     I guess the only important things that I
13  will tell you then is please remember to verbalize
14  your answers, because the court reporter is taking it
15  down.  And people have a tendency to nod.  I even do
16  it sometimes.  So just remember to say yes or no.  And
17  if you forget, I will gently remind you.
18    A.     Okay.
19    Q.     Also really important, tell me when you want
20  a break.  I tend to just kind of shoot through and go
21  on, so if you find that you need a little break and it
22  has been a long time, just let me know.  Okay?
23    A.     Yes.
24    Q.     Did you discuss your deposition with anyone

Page 4

1  other than your attorneys before today?
2     A.     No.
3     Q.     Have you been involved in any other civil
4  lawsuits before?
5     A.     No.
6     Q.     Are you involved in any other now?
7     A.     No.
8     Q.     Are you intending to sue anyone else?
9     A.     No.
10    Q.     I would like to walk a little bit through
11  your relationship with John, starting from the
12  beginning.  So can you tell me when and where you met?
13    A.     We met at a bar in Lewes, Delaware.  I was
14  out with the girls from Beebe.  Thursday night was
15  called ladies night, and I met him there.  And after
16  that he called me and asked me out for a date.
17    Q.     And when was that?
18    A.     It was the summer of 1990.  I don't know the
19  exact date.
20    Q.     And you were working at Beebe at the time?
21    A.     Yes.
22    Q.     Do you still work there?
23    A.     Yes.
24    Q.     How long have you been there?

Page 5

1     A.     Nineteen-and-a-half years.
2     Q.     What do you do there?
3     A.     I am a respiratory therapist.
4     Q.     Did you know John before you met him at the
5  bar?
6     A.     No.
7     Q.     Did you know any of his family?
8     A.     His brother.
9     Q.     Did you know John through his brother at
10  all?
11    A.     No.
12    Q.     And how soon after he called you did you
13  begin dating?
14    A.     I would say the next week.
15    Q.     And how long did you date before you were
16  married?
17    A.     We dated for eight months, and then we got
18  engaged, and then we were married a year later.
19    Q.     Did you live with John before you were
20  married to him?
21    A.     No.
22    Q.     And when you did get married, did you marry
23  in Delaware?
24    A.     Yes.

2 (Pages 2 to 5)

d0285672-15be-4495-b93f-26036f9d2e3c

Balas v. Taylor, et al.
Cindy L. Adkins

Page 6

1  Q.     And did you move into a home together in
2  Delaware?
3  A.     We actually lived with my parents while we
4  were looking for land, because we wanted to build a
5  home.
6  Q.     And when did you begin living with your
7  parents?
8  A.     As soon as we got married.
9  Q.     Were you already there or did you move in
10 there together?
11 A.     I was still living at home, and John moved
12 in.
13 Q.     And how long did you live together, you and
14 John, with your parents?
15 A.     Approximately three years.
16 Q.     What was that like?
17 A.     It was difficult at times.  It is hard, two
18 families living in one home.
19 Q.     Was there anyone else living there besides
20 your parents and you and John?
21 A.     I am trying to think.  My brother.  I think
22 my brother was still there, but shortly after he moved
23 in -- we had a summer cottage, and he moved out to
24 live in our summer cottage.

Page 7

1  Q.     Is that in Delaware also?
2  A.     Yes.
3  Q.     Where is that?
4  A.     It is called Blackwater Creek, Bennett's
5  Beach.  It is like Ocean View.
6  Q.     So the three years that you were living with
7  your parents in their home, is that like '92 to '95?
8  A.     We moved into our new home in August of '94.
9  Q.     '94.  So the three years before that is when
10 you were living with your parents?
11 A.     Yes.
12 Q.     How did John get along with your parents?
13 A.     Good.
14 Q.     Were there any problems?
15 A.     My mom would get upset when he on the way
16 home from work -- because he worked in Selbyville at
17 J. Conn Scott Furniture, and he stopped at his
18 parents' house after work and did not come straight
19 home for dinner.  And my dad was one who liked to eat
20 dinner and get it out of the way.  He liked to eat at
21 4:30, 5:00.  And John didn't get off work till 5:00,
22 so by the time he got home it was 6:00 or 6:30, so we
23 did have -- and my mom is, like, you know, "Why can't
24 he come home right away?"  And I was, like, "I can't

Page 8

1  control that."
2         And so we ended up going to counseling to
3  try to work through that, and we only -- he went once
4  with me, and I went twice, and after that things got
5  better.
6  Q.     What made you decide to go to counseling?
7  A.     Just there were -- I felt like I was the
8  middleman, like I was having to, you know, tell John
9  what my parents were saying, and my parents were, you
10 know -- and then I'd have to stop and tell them what
11 John was saying, and I just got tired of being in the
12 middle.
13 Q.     Did your parents also go to counseling?
14 A.     No.
15 Q.     Did you and John communicate with him about
16 the problems you were having?
17 A.     Yes.
18 Q.     How did that work out?
19 A.     After we went to counseling and we discussed
20 it with him, we had a great relationship.
21 Q.     So you and John went together to a
22 counselor?
23 A.     Yes.
24 Q.     And how many times did you go together?

Page 9

1  A.     Once.
2  Q.     And did either of you go any additional
3  times after that to a counselor?
4  A.     I just went one additional time.
5  Q.     Whose idea was it to do that?
6  A.     Mine.
7  Q.     How did John feel about that?
8  A.     At first he was a little lenient about -- is
9  "lenient" the word I am looking for?  Hesitant about
10 going, because he had talked to other people at the
11 prison who had gone for marriage counseling and they
12 had ended up in a divorce.  So he was kind of hesitant
13 on using the particular counselor that I had chosen.
14 Q.     Was he hesitant because of the counseling or
15 because of the counselor?
16 A.     I think it was the counselor.
17 Q.     Did you ever discuss going to a different
18 counselor?
19 A.     At the time I didn't know of another one,
20 another counselor, and my aunt had recommended me to go
21 to this counselor, and I said, "Let's just give her a
22 try."
23 Q.     Did you ask John after the first time to go
24 back with you again?

3 (Pages 6 to 9)

d0285672-15be-4495-b93f-26036f9d2e3c

Balas v. Taylor, et al.
Cindy L. Adkins

Page 10

1  A.    No.
2  Q.    Did he indicate to you that he didn't want
3  to go back to the counselor?
4  A.    After we went to counseling, he didn't speak
5  to me for three days because just her questioning had
6  made him feel, you know, that everything that had
7  happened was his fault. So I don't think he wanted to
8  go back, no. But he did improve after, after he had
9  time to think about it.
10  Q.    Did you have any other problems with your
11  parents when you were living in the house other than
12  the one you had already mentioned?
13  A.    No.
14  Q.    And when you did move out in August of '94,
15  where did you move to?
16  A.    Our new home in -- at the time it was a
17  Milton address. It is now a Georgetown address. It
18  is in the outskirts of Milton, but it is a Georgetown
19  address.
20  Q.    So the home stayed the same but the address
21  changed?
22  A.    Right.
23  Q.    How far is that from your parents?
24  A.    About 12 minutes.

Page 11

1  Q.    Twelve minutes?
2  A.    Yes, about ten miles.
3  Q.    And how about from John's parents?
4  A.    It was the same at the time.
5  Q.    You said at the time?
6  A.    His parents later moved in two doors down
7  from us. They built a new home.
8  Q.    So you and John had a home built in a new
9  neighborhood?
10  A.    We were the first home out there out in the
11  country.
12  Q.    And then at some point later on his parents
13  moved into the neighborhood?
14  A.    Built, yes.
15  Q.    When?
16  A.    I am not sure if it was like 2000. I am not
17  sure of the exact year.
18  Q.    So it was sometime after you had already
19  moved in?
20  A.    Yes.
21  Q.    A significant amount of time after?
22  A.    Yes.
23  Q.    Did your parents, when you first married
24  John, did they like him?

Page 12

1  A.    Yes.
2  Q.    Did they continue to like him throughout the
3  relationship?
4  A.    Yes. Him and my dad were actually very
5  close.
6  Q.    They were?
7  A.    Yes.
8  Q.    From the beginning?
9  A.    In the beginning, my brother had gone to
10  school with John and had told my dad that John wasn't
11  well liked by his schoolmates, and part of the reason
12  was because John had brand new cars in school. He had
13  actually wrecked three cars, and his mom and dad would
14  just keep buying him. So it was more of a jealousy
15  thing than anything.
16  Q.    Is that what your brother told you or what
17  John told you?
18  A.    My brother didn't tell me. He told my dad.
19  And he said, you know, "I am afraid that the marriage
20  won't work because, you know, everybody that went to
21  school with him doesn't like him." I never saw that
22  personally.
23  Q.    Did Jeff like him?
24  A.    Yes.

Page 13

1  Q.    So were Jeff and him friends in high school
2  or they just kind of knew each other, acquaintances?
3  A.    I think they knew each other and they had
4  actually gone to some parties together.
5  Q.    Okay.
6  A.    And after we got married, they hunted
7  together.
8  Q.    And what was your relationship like with
9  John's parents?
10  A.    Good.
11  Q.    Did you ever have any problems with them?
12  A.    When John and I first started dating, his
13  mom, I believe, was jealous that he wanted to spend --
14  he was spending every single minute with me, and I
15  think she didn't like that. She wanted him to spend
16  more time with her, with the family.
17          But after we got engaged, she actually went
18  out and, you know, helped me shop for my wedding gown,
19  helped me prepare for the wedding, gave me way too
20  many gifts at the bridal shower. And when we were
21  building our house, she actually was the one who went
22  shopping with me to buy the things for the house.
23  Q.    Is John an only child?
24  A.    No. He has a brother, Adrian.

4 (Pages 10 to 13)

d0285672-15be-4495-b93f-26036f9d2e3c

A1000

Balas v. Taylor, et al.
Cindy L. Adkins

Page 14

1  Q.    How old is Adrian?
2  A.    Adrian is five years younger than me, so he
3  was, I think, about two and a half years younger than
4  John.
5  Q.    Are both John and Adrian spoiled by their
6  parents --
7  A.    Yes.
8  Q.    -- or were they?
9        And those are the only siblings?
10 A.    Yes.
11 Q.    How did you feel when you found out that
12 John's parents were moving into the neighborhood?
13 A.    Both John and I were upset.
14 Q.    Why?
15 A.    I had, or I have an aunt who was married,
16 and they lived next door to their in-laws, and their
17 marriage fell apart as a result of that, because he
18 would stop by there and eat dinner prior to coming
19 home, and she would have a nice dinner on the table.
20 And she said that that was the main thing that
21 destroyed their marriage was the in-laws were too
22 close.
23       So that's why John and I -- I mean, 12
24 minutes from each parent was good. And we wanted our

Page 15

1  privacy.
2        And actually, when we were shopping for our
3  land, his parents wanted to go with us, and we picked
4  up on when we were looking one time that they were
5  also looking for land. And I am, like, "John, I think
6  they are wanting to buy with us," you know. And I am,
7  like, you know, "I love your parents, but I don't want
8  to live next -- I don't want our marriage to be
9  destroyed like my Aunt Martha's."
10       And so John actually told them. He said,
11 you know, "We love you, but we don't want to live next
12 to you." So they bought two doors down instead of
13 next door.
14 Q.    What was their reaction when John told them
15 that?
16 A.    They didn't say anything. And we bought our
17 land, and we were there for, I think, five or six
18 years. And when we saw the surveyor out there
19 surveying, John goes, "I am going to go ask if these
20 lots have been sold." And the surveyor is the one who
21 told John that Balas had bought. And there is not
22 many Balases in Delaware.
23 Q.    Is that right?
24 A.    So I am, like, "Let's not tell them. I want

Page 16

1  to see how they are going to tell us."
2        Well, like three weeks went by, and we were
3  out in the yard, and we caught a snake, and I was,
4  like, "Don't kill it, you know. Let's just turn it
5  loose." I said, "As a matter of fact, go put it over
6  there on your mother and dad's property. They hate
7  snakes."
8        So when we returned from doing that, the
9  phone rang, and it was her. And she goes, "Hey, what
10 are you guys doing?" He said, "Well, now that you
11 ask, we just turned a snake loose over there on your
12 property." Well, she was furious. She actually
13 called the guy who lived behind -- the guy that lived
14 behind us is actually the Realtor who had sold us the
15 property. And she actually called him and accused him
16 of being the one who had told us that they had the
17 property.
18 Q.    Do you mean "she" meaning John's mom?
19 A.    John's mom, yes.
20 Q.    During the course of your relationship with
21 John, did you have typical marital problems?
22 A.    On and off, just like everybody else.
23 Q.    What types?
24 A.    Well, when I was pregnant with Jonathan, a

Page 17

1  couple of guys would go to Pickles in Georgetown to
2  have a drink after work, and I was towards the end of
3  my pregnancy, and, you know, I said, you know, "I am
4  expecting anytime, and I don't think you need to be at
5  the bar drinking while I am" -- and actually, he
6  didn't drink a lot, but he was just going to be
7  sociable with his co-workers. At that time he didn't
8  drink a lot. And so he quit going.
9  Q.    What year were you pregnant with your son?
10 A.    I had him in '95, March of '95.
11 Q.    Okay. And your son is older or your
12 daughter?
13 A.    Twelve. My son is older.
14 Q.    Okay. So your son was your first child?
15 A.    Yes.
16 Q.    So after you talked to John about it, he
17 stopped going to the bar?
18 A.    Yes.
19 Q.    Did you argue about it?
20 A.    No.
21 Q.    What other types of problems did you have
22 during the course of your marriage?
23 A.    We actually -- we didn't fight a lot. We
24 worked shift work, and so there were some weeks where

5 (Pages 14 to 17)

d0285672-15be-4495-b93f-26036f9d2e3c

Balas v. Taylor, et al.
Cindy L. Adkins

| Page 18 | Page 20 |
|---|---|

**Page 18**

1  we saw each other in passing, practically every other
2  week, because I worked 7A to 7P, and he worked 8:00 to
3  4:00 or 4:00 to 12:00.  So on his 4:00 to 12:00 weeks
4  he was still in bed when I got up to go to work,
5  because I have to be at work at quarter of 7:00.  And
6  when I got home, he wasn't home, and when he got home,
7  I was in bed, because I don't stay up till midnight
8  when I have to get up to go to work the next morning
9  at quarter of 7:00.
10  Q.     So there were times during your marriage
11  where you really didn't see much of each other?
12  A.     Practically every other week.
13  Q.     For how long?
14  A.     From the time he started with the Department
15  of Corrections.  I was already working at Beebe when
16  we met.
17  Q.     Okay.  So he started in '94.  Does that
18  sound accurate?
19  A.     Yes.
20  Q.     So from '94 forward every other week you
21  didn't see much of each other?
22  A.     Correct.
23  Q.     Was not seeing each other a problem in your
24  marriage?

**Page 19**

1  A.     No.  We had grown accustomed to -- you know,
2  it was -- it was just like it was routine to us.
3  Q.     Did it create any distance between the two
4  of you?
5  A.     No.
6  Q.     Did you ever argue over money?
7  A.     When he first started working for the
8  Department of Corrections, it upset him that I was
9  making more than he was.  And I said it doesn't matter
10  because it is all going in one pot, and it doesn't
11  matter who is making it.  And so he got over that,
12  because he was used to his dad made more money than
13  his mom, and I think it made him feel inferior to me
14  that he made less.
15  Q.     Did he express that to you?
16  A.     Yes, that it bothered him.  And I said it
17  doesn't matter.  It is all going in one pot.  You
18  know, we pay the bills and we share.  It is no big
19  deal.
20  Q.     Did you ever have arguments about your
21  children?
22  A.     No.
23  Q.     You never disagreed about how you were
24  disciplining or raising them?

**Page 20**

1  A.     No, not until the stress from the jail
2  started in the fall of 2004.  He became very easily
3  agitated and aggravated and would come home screaming
4  and hollering at the kids.  And, you know, I would
5  pull him to the side and say, you know, "That's not
6  fair to the kids."  So, yes, it did bother me.
7  Q.     Who was -- during the course of your whole
8  marriage, who was the primary disciplinarian?
9  A.     We shared it equally.  We had to, because
10  there was times when I was gone and he was the only
11  one home with them.
12  Q.     Was one of you more stern than the other
13  with the children?
14  A.     I would say I probably did it more often,
15  but he would step in when he thought it was needed.
16  Q.     What was John's relationship like with his
17  children?
18  A.     Excellent.  He was very loving.  There was
19  usually once, probably once a week he would -- they
20  would ask him, you know, "Dad, will you sleep with
21  me?" because they loved to cuddle up with him.
22         He would play with them in the floor,
23  wrestle with them.  And he actually bought a Nerf --
24  those Nerf pistols, and for all of us, and we would

**Page 21**

1  play hide-and-seek in the house and just -- we played
2  all the time.  He would play baseball out in the yard
3  with them.  He helped coach their baseball teams.  And
4  when I would be at work, because he was coaching
5  Jonathan's team, but Lauren would go with him because
6  I was at work, and she would actually practice right
7  along with the boys with him.
8  Q.     How was John around the house?  Was he
9  helpful with helping you with chores and cooking and
10  things like that?
11  A.     Very, yes.
12  Q.     He was?
13  A.     Yes.
14  Q.     What types of things would he do?
15  A.     He would help run the vacuum cleaner.
16  Didn't really like to dust.  He would fold laundry,
17  put it away.  We have animals, and he would take care
18  of feeding the animals.
19         We shared the yard work, because I enjoy
20  doing yard work.  We would both cut grass together,
21  because we have five acres, so we would both cut
22  grass.  He would do the weed-eating.
23         And he loved to cook.  His wild fowl that he
24  killed and his deer he loved to cook.  And actually,

6 (Pages 18 to 21)

d0285672-15be-4495-b93f-26036f9d2e3c

A1002

Balas v. Taylor, et al.
Cindy L. Adkins

Page 22

1 when we would have people -- well, most nights if he
2 was home, he would do the dishes so that I could bathe
3 the kids or get them ready for bed or help them with
4 their homework or whatever. He would actually do the
5 dishes.
6 Q.     And he had, in addition to his work at the
7 Department of Correction, he also had a lawn care
8 business; correct?
9 A.     Correct.
10 Q.     When did he start that?
11 A.     He actually was doing that when he was 16,
12 before I met him, and had stopped doing it and had
13 restarted doing it around -- probably around the time
14 he started at the jail we started doing it together.
15 Q.     Was that something that you both did
16 seasonally or throughout the whole year? How often
17 did you work the business?
18 A.     Usually it ran from like March till
19 November, depending on the weather, because we also
20 did leaf and, you know, did leafing, remove leaves out
21 of people's yards for them, and we also did
22 landscaping.
23 Q.     Was this a formal incorporated business or
24 just something you did on the side?

Page 23

1 A.     Something we did on the side.
2 Q.     How would you describe John? Describe for
3 me his personality, some of his traits and
4 characteristics.
5 A.     Very outgoing, always loved to make somebody
6 laugh, was always very jolly, smiling. You knew when
7 he was around. He just was always trying to make
8 someone laugh. He was just a pleasure to be around.
9 Q.     Any other traits you would use to describe
10 him?
11 A.     Very loving. Gosh, there are so many. I
12 don't know. He just was very huggy. You know, I
13 could be cooking dinner and he would come up and give
14 me a hug and a kiss and just very --
15 Q.     Very affectionate?
16 A.     Very affectionate.
17 Q.     Did John have a lot of friends?
18 A.     Yes.
19 Q.     And how would you define "a lot"?
20 A.     Well, he hunted with my brother, Dennis
21 Murray, and Lee Mears. Lee Mears was his best friend.
22 Also Mike Santini. Him and Mike would do a lot
23 together. He would go over and help Mike -- he helped
24 Mike reseed his yard because Mike had built a new

Page 24

1 house. He helped him reseed a yard and level his
2 driveway and stuff, because John's dad had a tractor,
3 so he went over and helped Mike with his yard.
4 Q.     And all of these, they all work at
5 Department of Correction?
6 A.     Yes.
7 Q.     Did he have friends outside the department?
8 A.     I am trying to think. Richard Scott from J.
9 Conn Scott, his ex-boss, he enjoyed his company, and
10 also Alan from -- I can't even think of his last name.
11 Alan and Sharon. Alan was an attorney. I can't even
12 think of his name. I am drawing a blank. He was good
13 friends with them.
14         And they were actually lawn customers of
15 John's. And he went over and helped Alan put up a
16 fence, a fence in his yard, because Alan didn't know
17 what he was doing. So John is, like, "I am staying to
18 help him."
19 Q.     Now, during the course of your marriage and
20 John working at the Department of Correction, did he
21 talk about work a lot?
22 A.     Yes.
23 Q.     How often would you say he would talk about
24 work with you?

Page 25

1 A.     I would say practically every day. If I was
2 home when he came home, he would tell me how his day
3 went.
4 Q.     What types of things did that usually
5 include?
6 A.     Sometimes actually he would wake me up in
7 the middle of the night. Like, when he worked 4:00 to
8 12:00, like, if they had an inmate come in that they
9 had to cap-stun and get under control, he was so wound
10 up, he would just say, "It was a terrible night."
11         And he talked a lot about, you know, the
12 understaffing and having to be frozen, which was a
13 pain in the -- you know, if we had plans and he would
14 call and say, "Cindy, I am froze." We got tired of
15 that.
16 Q.     Did he seem stressed a lot because of work
17 from '94 to when he passed?
18 A.     Actually, no. When he first started working
19 there, he didn't like it at Smyrna very much, and he
20 didn't tell me this till the counselor got raped and
21 almost murdered, that he said, "Cindy, I never told
22 you this," he said, "but I was scared every day I went
23 to work." And John was six-two and 200 pounds. He
24 said, "I never told you that."

Wilcox and Fetzer, Ltd.   Registered Professional Reporters            302-655-0477

d0285672-15be-4495-b93f-26036f9d2e3c

A1003

Balas v. Taylor, et al.
Cindy L. Adkins

Page 26

1  Q.    What time period was he talking about?
2  A.    He was up in Smyrna the first three years he
3  was up there, so it was '94 to '97.
4  Q.    So I guess he was working at Delaware
5  Correctional Center then --
6  A.    DCC.
7  Q.    -- does that sound right?
8  A.    Yes, yes.
9  Q.    And he said he was scared going to Delaware
10 Correctional Center?
11 A.    Yes. He said he was scared every day that
12 he went there.
13 Q.    Did he indicate why?
14 A.    He said it wasn't safe. And actually, the
15 Christmas of 2003 we were Christmas shopping, and we
16 ran into a gentleman who to me seemed like he was
17 mentally challenged. And I just stood there while
18 John was talking to him, and when we walked away, John
19 goes, "That was an officer who was beat up on the
20 compound while working at Smyrna," he said, "who has
21 lost his job as a result of it, and he has got
22 permanent brain damage."
23 Q.    Understanding that this, I think, '94 to '97
24 would have been early on in your marriage -- is that

Page 27

1  correct?
2  A.    Yes.
3  Q.    -- did John seem to you when he was home,
4  did he seem stressed because of work?
5  A.    He never let on. I think he didn't tell me
6  because he didn't want me to worry every single day
7  that he went to work. So he kept that a secret, that
8  he was scared to death to go to work.
9  Q.    And did he just talk generally about life as
10 a correctional officer being stressful at all? Did he
11 ever state that to you?
12 A.    Yes.
13 Q.    And was this all throughout his career or --
14 A.    Yes.
15 Q.    Any other times that you can recall
16 throughout his career that seemed specifically more
17 stressful for him than others?
18 A.    I would say from July, July '04 until his
19 death, yes.
20 Q.    You would say specifically from July
21 forward?
22 A.    Yes, because I remember July the Fourth
23 him -- we were at a party at my aunt's, and he was on
24 the phone all day -- like, he did not enjoy the party

Page 28

1  at all. I don't know why he didn't stay home --
2  discussing, you know, the understaffing and the
3  problems that the jail was going through.
4  Q.    Did you feel that work was causing him any
5  stress in 2003?
6  A.    Yes. When he was teaching QRT with Truman
7  and Mears and my brother, it frustrated him that
8  Truman was coming in late, leaving early, not showing
9  up at all, writing in incorrect times on his time
10 card. And John and Jeff were doing all the work, and
11 Truman was getting credit for being there and he
12 wasn't.
13 Q.    Who is this? Jeff who?
14 A.    Jeff Foskey, my brother.
15 Q.    Foskey. How about in 2002?
16 A.    No. He -- when Drummond, Rudy Drummond was
17 his supervisor, I remember one day telling him -- he
18 would always go to work early. And I remember telling
19 him -- he always seemed real jolly. And I am, like,
20 you know, "You make me sick because I wish I loved my
21 job as much as you do." He really enjoyed Rudy as his
22 supervisor.
23 Q.    I want to talk a little bit about the
24 complaint in the case. Did you read the complaint?

Page 29

1  A.    Yes.
2  Q.    A lot of the complaint seems to deal with
3  issues and circumstances that you would not have been
4  directly involved in. Does that sound accurate?
5  A.    Yes.
6  Q.    So I would like to know where the
7  information that is contained in the complaint came
8  from.
9  A.    From interviewing union officials and from
10 their sworn affidavits.
11 Q.    Do you mean your attorneys interviewing?
12 A.    Yes.
13 Q.    Do you have any personal knowledge of the
14 allegations in the complaint?
15 A.    Such as?
16 Q.    Any of them.
17 A.    That was discussed with the union. I don't
18 know exactly what you are trying to say.
19 Q.    Well, the complaint walks through various
20 time periods but specifically goes through 2004
21 forward. Does that sound accurate?
22 A.    Yes.
23 Q.    Did you have any direct involvement in any
24 of the allegations contained in the complaint from

8 (Pages 26 to 29)

d0285672-15be-4495-b93f-26036f9d2e3c

Balas v. Taylor, et al.
Cindy L. Adkins

Page 30

1  2004 forward?
2  A.    You mean like John being harassed for
3  speaking out against the job action?
4  Q.    Any of the allegations, but that would be
5  one, yes.
6  A.    Yes.
7  Q.    What was your involvement?
8  A.    Just, you know, that John would come home
9  and tell me that, you know, Truman had a personal
10  vendetta against him, and that for speaking out
11  against, you know -- resigning from CERT and speaking
12  out for the job action, he felt like he was being
13  retaliated against.
14  Q.    So is any of the information that you know
15  or that you gave for drafting the complaint, does that
16  come through John?
17  A.    He had discussed it with me, yes.
18  Q.    Other than information you got from John,
19  did you personally get information from anywhere else?
20  A.    No.
21  Q.    How do you know if the information that you
22  got from John is complete and/or accurate?
23  A.    I don't know that.  Just from the -- I found
24  when I was cleaning out his closet the bag that he had

Page 31

1  all of this stuff.  And actually, he was thinking
2  about filing a lawsuit himself, and I think that's why
3  he had it all together in a bag.
4  Q.    Was it common for John during his employment
5  with DOC to keep his copies of his personnel records
6  at home?
7  A.    Yes.
8  Q.    He always had some sort of work file at
9  home?
10  A.    Yes.
11  Q.    Do you know if he had any system for keeping
12  or maintaining those records?
13  A.    They were all in pretty much order.  He kept
14  them in a file, and as he got new ones, he kept
15  putting them behind for his commendations and letters
16  job well done.  He kept all that.
17       And he was in the service for 14 years, and
18  so he was used to having to keep his papers in order.
19  Q.    Did he have a habit of also keeping his
20  evaluations?
21  A.    Yes.
22  Q.    And did he regularly keep handwritten notes?
23  A.    He started keeping handwritten notes when he
24  felt like he was being retaliated against after he

Page 32

1  resigned from CERT.
2  Q.    What time period do you think he started
3  keeping handwritten notes?
4  A.    I would say September of '04.
5  Q.    Did you know at the time that he was writing
6  the notes?
7  A.    I saw some of them when he was writing them.
8  Q.    Do you know how many times John received an
9  evaluation with the rating of meets expectations while
10  he was employed at the Department of Correction?
11  A.    I don't believe ever until the last one.
12  Q.    What basis do you form that belief on?
13  A.    From the ones I found, he always got meets,
14  because he always strived to do a hundred-plus effort,
15  because that meant -- an exceeds expectations was very
16  important to John, and he felt like if he put out good
17  work, that he deserved an A-plus evaluation.  And a
18  meets expectations to him was a failing grade.
19  Q.    So I just want to go back, because I think
20  you might have misspoke before.  You said he always
21  got meets.  Did you mean he always got exceeds?
22  A.    I mean he always got exceeds, yes.
23  Q.    When John got evaluated at work, did he
24  speak with you about it?

Page 33

1  A.    Yes.  We always did.  I get evaluated every
2  year.  And we always discussed our evaluation when we
3  got it.
4  Q.    Do you recall him ever telling you before
5  that he had gotten a meets expectations?
6  A.    No, never.  I remember one particular day he
7  went to work with a fever of 102, and I said, "You've
8  really got no business going to work."  And he said,
9  "No, I want my perfect attendance."
10  Q.    Have you reviewed the documents that we
11  provided to your counsel in this case?
12  A.    Yes.
13  Q.    Are you now aware that John had in the past
14  received meets expectations before the one that he
15  received from Lieutenant Mears?
16  A.    No.
17  Q.    Did you see that in the documents?
18  A.    No, I didn't see that.
19  Q.    I have a copy I can show you, or do you have
20  reason to disbelieve me?  Would you like to me to show
21  you a copy or --
22  A.    Sure, because I don't remember seeing that
23  when I was reviewing the documents.  And what year was
24  that?

9 (Pages 30 to 33)

Balas v. Taylor, et al.
Cindy L. Adkins

Page 34

1        MS. XARHOULAKOS: I believe these have
2   previously been admitted, so we will mark them as
3   Exhibits 1 and 2. We will do the earlier one as 1 and
4   the second one as 2.
5        (Adkins Deposition Exhibit Nos. 1 and
6   2 were marked for identification.)
7        MR. NEUBERGER: Stacey, which is
8   which?
9        MS. XARHOULAKOS: The one with the
10  stamp in '97 is 1, and the one with the stamp in '99
11  is 2.
12  BY MS. XARHOULAKOS:
13   Q.    Do you want some more time to review the
14  documents or --
15   A.    '99, I know he probably didn't have perfect
16  attendance that year because he had knee surgery, so
17  he probably didn't have perfect attendance.
18   Q.    The documents we are looking at, Exhibit 1
19  is stamped on the bottom D00104; correct?
20   A.    Yes.
21   Q.    And that continues to D00106, the stamps?
22   A.    Yes.
23   Q.    I am just doing this to clarify the record.
24  And the second one is marked D00102 and D00103;

Page 35

1   correct?
2    A.    Yes.
3    Q.    Do you see that both of these have a meets
4   expectations ranking on them?
5    A.    Yes.
6    Q.    Do you know why John wouldn't have told you
7   about these?
8    A.    No.
9    Q.    Do you remember speaking with him at all
10  about his evaluations in either '96 to '97 or 1999? I
11  know it is a long time ago.
12   A.    No, I can't remember.
13   Q.    Okay. Do you think a meets expectations is
14  a bad evaluation?
15   A.    I think if you are going over and beyond
16  your work duty, yes, I do think it is a bad one.
17   Q.    Why? Why do you think it is bad?
18   A.    I think if someone is putting -- going above
19  and beyond their job duty, like he was on CERT,
20  teaching QRT, going out and capturing escapees, that
21  that deserves an exceeds expectations.
22   Q.    Do you agree that you could be doing all of
23  those things but still be underperforming in other
24  areas, just generally?

Page 36

1    A.    Generally, you could. But I don't think
2   that John was -- that would have been John, because he
3   was a hard worker, and he always strived to do his
4   best.
5    Q.    But you didn't work with John; correct?
6    A.    Well, I worked with him with his lawn
7   business. We did it together.
8    Q.    But not at the Department of Correction?
9    A.    No.
10   Q.    Did John think that a meets expectations was
11  a bad evaluation?
12   A.    Yes, he did.
13   Q.    Why?
14   A.    Because he always felt like he gave a
15  hundred percent-plus, and he felt like he deserved an
16  exceeds, and that's why he was so upset when he got
17  the meets before his death.
18   Q.    Was John ever promoted after 1996?
19   A.    I can't remember when he was promoted to
20  corporal.
21   Q.    Do you remember approximately when it was?
22   A.    No.
23   Q.    Do you recall how long he was a corporal
24  for?

Page 37

1    A.    No.
2    Q.    Did he ever -- well, strike that.
3    A.    I know he took a couple -- prior to his
4   death, probably in the last year and a half before his
5   death, I know he took the test to be promoted to
6   sergeant two different times.
7        The first test he went and took with my
8   brother at Del Tech, and he did the best he could, you
9   know, answered the questions to the best of his
10  knowledge, and received -- it was -- I can't remember.
11  I think it was like a 75. It was -- I think you had
12  to receive at least an 80 to get an interview, and so
13  he wasn't able to interview.
14       So the next time he went and took the test
15  and he put all C's. All the answers were C's. He
16  went straight down, and got the same exact grade.
17   Q.    When was this?
18   A.    I am thinking it was like six months prior
19  to his death.
20       (Discussion off the record.)
21  BY MS. XARHOULAKOS:
22   Q.    Looking at the evaluations that we just
23  submitted as Exhibits 1 and 2, the first one, which is
24  date-stamped on top January 1997, it looks like the

10 (Pages 34 to 37)

d0285672-15be-4495-b93f-26036f9d2e3c

A1006

Balas v. Taylor, et al.
Cindy L. Adkins

Page 38

1    evaluator is Billy Smith.  Does that name sound
2    familiar to you?
3    A.    No.
4    Q.    Did John generally talk to you about who his
5    supervisors were?
6    A.    Yes.  I knew Rudy Drummond and I knew Truman
7    Mears and Johnson.  I forgot what his first name was.
8    John -- he had one by the name of Johnson.
9    Q.    And this supervisor --
10   A.    Billy Smith does not ring a bell to me.
11   Q.    It looks like this was while he was at
12   Sussex Work Release Center, '96 to December --
13   beginning of January '96 to the end of '96.  Do you
14   recall John's work during that time period at all?
15   A.    I remember him being at work release, but I
16   don't remember the name, that name.
17   Q.    And during that time he was a correctional
18   officer.  That's his rank on top --
19   A.    Yes.
20   Q.    -- do you see that?
21         So he must have been promoted since that
22   time; is that correct?
23   A.    Correct.
24   Q.    And that would have been after he received a

Page 39

1    meets expectations; correct?
2    A.    Yes.
3    Q.    And then on the second evaluation, which is
4    stamped on top April of 1999, this is -- the
5    supervisor here was Johnson.  You mentioned him;
6    right?
7    A.    Yes.
8    Q.    So you do recall him working under a
9    Johnson?
10   A.    Yes.
11   Q.    Do you recall anything specifically about
12   that time period?
13   A.    No.
14   Q.    And on this evaluation Johnson did give him
15   a meets expectations; correct?
16   A.    Yes.
17   Q.    The complaint also alleges -- various parts
18   of the complaint allege that John at some point asked
19   either Mike Deloy or Dave Wilkinson or both for a
20   transfer.
21   A.    Yes.  Not -- he didn't want a transfer from
22   the property receiving room, but he just wanted a new
23   supervisor.
24   Q.    Okay.  So you are not stating that he ever

Page 40

1    asked to be transferred out of his current assignment.
2    A.    Right.
3    Q.    You are stating he requested a new
4    supervisor?
5    A.    Supervisor.
6    Q.    And what is your basis for saying that?
7    A.    John said that of the ten CERT members who
8    resigned, he was the only one who still had a
9    supervisor that was on CERT, and he thought that that
10   may lead to problems later, so he went and asked if he
11   could have a different supervisor.
12   Q.    Do you remember when John told you this?
13   A.    It was right after he resigned from the CERT
14   team and spoke out for the job action.
15   Q.    So do you think it was sometime in the fall
16   or the summer of --
17   A.    Fall.
18   Q.    2004 we are speaking of; correct?
19   A.    Yes.
20   Q.    Have you ever met Lieutenant Mears?
21   A.    Yes.
22   Q.    When did you first meet him?
23   A.    He came over to our house and went duck
24   hunting with John one day.  I met him.  And we also

Page 41

1    went to a Ducks Unlimited dinner, and him and his wife
2    were there.
3    Q.    Do you remember when he came over to the
4    house?
5    A.    I can't remember when they hunted.
6    Q.    Was this -- at this point was Lieutenant
7    Mears already John's supervisor?
8    A.    I think he was.  I think it was like two --
9    two years prior to John's death is when they hunted, I
10   believe.
11   Q.    Do you like Lieutenant Mears?
12   A.    I had no problem disliking -- I didn't
13   really know him.
14   Q.    How long did you speak with him for?
15   A.    Not very long.  When they came back, they
16   just were discussing how many ducks they got, and then
17   he went on about his merry way.
18   Q.    Other than those two encounters, did you
19   ever have another opportunity to meet with him or
20   speak with him?
21   A.    I saw him at Major Townsend's funeral, but I
22   did not speak with him.
23   Q.    What did John tell you about Lieutenant
24   Mears?

11 (Pages 38 to 41)

d0285672-15be-4495-b93f-26036f9d2e3c

Balas v. Taylor, et al.
Cindy L. Adkins

Page 42

1   A.      From what timeframe?
2   Q.      Do you recall when Lieutenant Mears first
3   began supervising John?
4   A.      No, not really.
5   Q.      Do you think it was around 2003?
6   A.      I am thinking that's when it might have
7   been.
8   Q.      Do you agree that it was definitely before
9   the year 2004?
10  A.      Yes.
11  Q.      What were John's initial impressions?  I
12  guess we can start from the beginning, when he started
13  first working for Lieutenant Mears.
14  A.      I can't remember specific details, but I
15  know he didn't like him as well as Rudy Drummond.
16  Q.      But he really liked Rudy Drummond; is that
17  right?
18  A.      Yes.
19  Q.      Are there any other supervisors that John
20  had that you recall him not liking?
21  A.      No.
22  Q.      Did John tell you specifically what he
23  didn't like about Lieutenant Mears?
24  A.      I just think he didn't like change, like any

Page 43

1   of us.  And he came in and wanted to make changes, and
2   some of the changes John didn't agree with.  But I
3   can't remember the exact -- the exact, you know,
4   changes that he was talking about.
5   Q.      So Lieutenant Mears -- I mean John was
6   already working in the property room, and Lieutenant
7   Mears came in, and so his supervisor changed but his
8   job didn't change; is that right?
9   A.      Correct.
10  Q.      So prior to Lieutenant Mears, Rudy Drummond
11  was his supervisor in the property room --
12  A.      Yes.
13  Q.      -- at SCI?
14  A.      Yes.
15  Q.      Did John give you the impression that he had
16  a friendly relationship with Lieutenant Mears?
17  A.      Yes.
18  Q.      And like you said, they went hunting
19  together --
20  A.      Yes.
21  Q.      -- once?
22          Did anyone else go hunting with them?
23  A.      Yes.  I think it might have been Lee Mears.
24  I know there was somebody else.  It was either Lee

Page 44

1   Mears or Dennis Murray went with them.
2   Q.      And at some point did John begin to complain
3   about Lieutenant Mears?
4   A.      He complained about during the QRT training.
5   Q.      Do you recall when that was?
6   A.      I believe the first time they taught it was
7   like January, February of 2003, and then they also did
8   it in January, February of 2004.  They did it two
9   years together.
10  Q.      Do you recall him complaining about
11  Lieutenant Mears in 2003 and '4 or just one of the
12  years?
13  A.      Yes, he complained both years.
14  Q.      Both years?
15  A.      And worse in 2004, because Lieutenant Mears
16  was doing less on -- less of his part on training all
17  of the correctional officers.
18  Q.      Were the complaints specifically about QRT
19  or were they just about Lieutenant Mears as a
20  supervisor as a whole?
21  A.      It was about the QRT.
22  Q.      Did Lieutenant Mears -- I mean did John
23  complain about Lieutenant Mears as his supervisor
24  during that time?

Page 45

1   A.      I don't remember him --
2   Q.      Did you ever speak with any other
3   correctional officers about Lieutenant Mears?
4   A.      Do you mean after John's death?
5   Q.      Before or after.
6   A.      No.
7   Q.      Did John seem stressed at work in 2003?
8   A.      Just mainly during the QRT training.
9   Q.      You gave your attorneys documents that were
10  given to us; correct?
11  A.      Yes.
12  Q.      I would like to know where most of them came
13  from.  You already talked about some files that John
14  kept; is that right?
15  A.      Yes.
16  Q.      Did you -- when we made the requests for the
17  documents, did you just go into his files and pull
18  everything?
19  A.      Yes.
20  Q.      Where did you look?
21  A.      We have a filing cabinet.  I looked there.
22  And he also had a bag in his closet that I found like
23  the copies of his time cards that had been altered.
24  And he also had the notes that he had written talking

12 (Pages 42 to 45)

d0285672-15be-4495-b93f-26036f9d2e3c

A1008

Balas v. Taylor, et al.
Cindy L. Adkins

Page 46

1  about the personal vendetta that Truman had against
2  him for speaking out for the job action and resigning
3  from CERT, and that he was angry about the meets
4  expectations on his evaluation, and that he had met
5  with Captain Wilkinson and Deloy and -- or no.  It was
6  Captain Wilkinson, and wanted him to be in on the
7  meeting with a union rep when they reviewed John's
8  evaluation.
9      Q.    Did you at some point, I guess, when you
10 found these documents, had you ever -- had you moved
11 anything since John's death?
12     A.    No.
13     Q.    And did you at some point find additional
14 documents?
15     A.    I think I turned in the commendations later,
16 because they were in a different file than -- he had a
17 couple different files, and I didn't -- I didn't find
18 them.  He had them in with his Navy -- he had gotten
19 some different letters of job well done in the Navy,
20 and he had all of them together.
21         MS. XARHOULAKOS:  I just want to pull
22 something out here.  We will mark this as Exhibit 3.
23         (Adkins Deposition Exhibit No. 3
24 document was marked for identification.)

Page 47

1         (Recess taken.)
2  BY MS. XARHOULAKOS:
3      Q.    The document marked as Exhibit 3 is two
4  pages, and it is marked on the bottom P498 and P833;
5  correct?
6      A.    Yes.
7      Q.    And I just introduced this because I am
8  mostly curious, but this top document, 498, was
9  produced to us with the original production, and we
10 recently got the bottom page.  Do you know why?  Is
11 this something you found later on?
12     A.    Well, when I found John's papers in his bag
13 in his closet, he had tons of copies of things.  So
14 when I was sorting a notebook for my attorneys and one
15 for myself as the originals, I didn't realize that one
16 copy didn't have this on it.  I just -- and I
17 didn't -- if I did notice it, I was like, oh, what do
18 they need that for?  So I just made sure that they had
19 what was typed on it, and I gave one to them and kept
20 one for myself.
21         Well, when Cheryl was on maternity leave,
22 Steve --
23         MR. NEUBERGER:  Just for the record,
24 if you are going to say something -- if you are going

Page 48

1  to say something about what you said to us as your
2  attorneys, I will ask -- I would interpose an
3  objection on attorney-client privilege and say don't
4  say that stuff.
5         THE WITNESS:  Okay.  Well, what
6  happened was, when Cheryl looked at both things, she
7  realized that one didn't have this, and when she saw
8  that, she made a copy and sent it over to you.
9  BY MS. XARHOULAKOS:
10     Q.    Okay.  So they came from two separate
11 sources because he kept multiple copies; is that --
12     A.    Well, in that bag he had several copies, for
13 some reason, of the same stuff.  And I tried to make
14 sure I had the same in both books, and there was a
15 couple that I missed.
16     Q.    Okay.  And do you know what this says?  C/L,
17 is that what that says, or C/C?
18     A.    It says, "Note: C/C for mother passing
19 away.  (Only one day) (not fair)."  Oh, compassionate
20 leave.  It is C/L.
21     Q.    Compassionate leave?
22     A.    "For grandmother passing away.  (Only one
23 day) (not fair)."
24     Q.    Okay.  You can put that aside.

Page 49

1         Also in the documents that we got there were
2  multiple leave slips that John had filled out.  Do you
3  know what I am referring to?
4      A.    Yes.
5      Q.    And they were filled out and dated in
6  January of 2005 --
7      A.    Yes.
8      Q.    -- do you recall that?
9      A.    Yes.
10     Q.    Did you fill these out with John or were you
11 there when you both filled them out?
12     A.    I wasn't there when he filled them out.
13     Q.    Did you know he was filling them out?
14     A.    He told me that he was going to put in for
15 leave.  He felt so stressed that he felt like he
16 needed some time off.
17     Q.    And was it common for him to do all of his
18 leave at one time for the whole year?
19     A.    They -- I think it was the department's
20 policy that when you were putting in for vacations,
21 you had to submit them all at one time, and you had
22 to -- like Week 1 was your first choice.  Week 2 was
23 your second choice.  And you wouldn't necessarily --
24 it didn't mean that you would necessarily get them,

13 (Pages 46 to 49)

Balas v. Taylor, et al.
Cindy L. Adkins

Page 50

1  but you had to give them several weeks, and they would
2  give you whatever they could.
3     Q.    I see.  So the slips that he filled out
4  didn't mean he actually wanted all that time.  Some of
5  them might have been backup choices?
6     A.    Well, this was a vacation request.  The
7  leave -- I don't know.  The leave request I think was
8  on top of his vacation.  He was going to take extra
9  time.  I think he was going to use his sick time --
10    Q.    Okay.  I will --
11    A.    -- just because he felt so stressed that he
12  needed -- he needed to get away.
13          MS. XARHOULAKOS:  Okay.  I will
14  introduce them because I think it will help.  I didn't
15  know if we needed to.  But this is Exhibit 4.
16          (Adkins Deposition Exhibit No. 4 was
17  marked for identification.)
18  BY MS. XARHOULAKOS:
19    Q.    These were the documents that we were just
20  discussing and I was referring to.  They are Bates-
21  stamped on the bottom P508 through P517; correct?
22    A.    Yes.
23    Q.    And on each of them vacation leave has been
24  checked --

Page 51

1     A.    Oh, I see that.
2     Q.    -- and dates have been given on top.  Do you
3  see what I am referring to?
4     A.    I do know that he had already received,
5  because he had it marked on our calendar at home, what
6  weeks he was going to be on vacation.  So I guess he
7  was going to use his holidays and his comp time to
8  take this additional leave.
9     Q.    And going through each page, the first one
10  asked for the 17th of January through the 23rd of
11  January.  The second one asked for the 24th of January
12  through the 30th of January.  And I think this is a
13  typo.  It is probably the third one is March --
14    A.    7.
15    Q.    7 through March 13, although he wrote 7
16  there.  I am thinking that's probably a typo.  Do you
17  agree?  Or an error?
18    A.    I do know that he was getting frustrated
19  because the meeting with the union rep and Wilkinson
20  and Truman was not taking place over his evaluation.
21  And I know -- I believe he said something to Wilkinson
22  about, "Well, I will just take three months off then."
23  So, you know, maybe -- that's four months.  That's
24  over four months.  So I don't -- I couldn't tell you.

Page 52

1     It could be a --
2     Q.    Well, it does say on top "total hours
3  requested:  40"; correct?
4     A.    Yes.  So then it must have been a typo.  I
5  mean, a --
6     Q.    Or a handwritten mistake?
7     A.    Yes.
8     Q.    And then the fourth one requests April 4
9  through April 10; correct?
10    A.    Yes.
11    Q.    And then the fifth one is May 9 through
12  May 15.  And the next one requests June 20 through I
13  think -- it looks like the 26th on there.  Is that
14  correct?
15    A.    Yes.
16    Q.    Okay.  And then the next one asks for
17  October 3 through October 9.
18    A.    Yes.
19    Q.    And the next one is November 28 through
20  December 4.
21    A.    Yes.
22    Q.    And then December 5 through December 11;
23  correct?
24    A.    Yes.

Page 53

1     Q.    And the last one is the 12th through the
2  18th; correct?
3     A.    Yes.
4     Q.    Now, hopefully you trust my addition, but I
5  added these up and I got 400 hours, which seems like a
6  lot of time to me.  And so my question to you is
7  whether you think he was asking for all of this time
8  or if some of this was a backup for weeks he might not
9  have gotten.
10    A.    I would say it was probably backup, because
11  I don't think that he thought he had enough vacation,
12  holiday and comp time to be 400 hours.  That's a lot.
13    Q.    Okay.  Okay.  So he probably asked for
14  multiple weeks just hoping he would get a couple of
15  them?
16    A.    Yes.
17    Q.    Okay.  How many weeks did he typically take?
18    A.    I think around six weeks a year, I believe.
19    Q.    Is that how much he earned or how much he
20  actually took usually?
21    A.    I think that's normally -- it was four or
22  six weeks he took every year.
23    Q.    Okay.
24    A.    I can't remember exactly.

14 (Pages 50 to 53)

d0285672-15be-4495-b93f-26036f9d2e3c

A1010

Balas v. Taylor, et al.
Cindy L. Adkins

Page 54

1   Q.    So he did regularly use his vacation?
2   A.    Yes.
3   Q.    Did you discuss with him any of these weeks
4   and have any specific plans for any of these time
5   periods?
6   A.    No, because we didn't make plans until we
7   knew for sure that he had that week off, that time
8   period off.
9   Q.    Were you able to schedule your vacation a
10  little more flexibly than him?
11  A.    Yes. I didn't have to submit -- my boss
12  isn't as organized, unfortunately. We don't put in in
13  January for our whole year's vacation, because we have
14  to be staffed 24/7 with therapists, and if for some
15  reason somebody was out sick or something, she
16  couldn't guarantee us that we could have that week.
17  She had to wait till, you know, the month before when
18  she put the new month's schedule out is when she would
19  tell you that you could have that week.
20  Q.    So was it common in years past for John to
21  put in for some vacation, then it would get scheduled,
22  and then the two of you would schedule time together?
23  A.    Yes. Then I would look at his weeks and put
24  in for the same weeks to try to get the same week.

Page 55

1   Q.    I see. Okay. Well, thank you. It helps me
2   understand that.
3         Okay. At some point did John, to your
4   knowledge, fill out a union grievance?
5   A.    Yes.
6   Q.    Okay. When were you aware of this
7   grievance?
8   A.    He told me when he was going to do it. I
9   believe it was in the fall of 2004, September and
10  October, somewhere around there.
11  Q.    Did he -- well, what did he tell you?
12  A.    He told me he was going to file a grievance
13  because he felt like he was being retaliated against
14  because he resigned from CERT.
15  Q.    Did he tell you that the grievance was going
16  to be about retaliation?
17  A.    Yes.
18  Q.    Anything else?
19  A.    It was retaliation on his evaluation.
20  Q.    Did he think that the evaluation was the
21  retaliation?
22  A.    Yes.
23  Q.    Anything else?
24  A.    No, not that I can think of right now.

Page 56

1   Q.    Did he specifically name anyone to you that
2   he thought was retaliating against him?
3   A.    Yes. Truman Mears.
4   Q.    Anyone else?
5   A.    No.
6   Q.    Did he tell you that he was thinking about
7   filing it first and then tell you he filed it or how
8   did it happen?
9   A.    He just said, "I am going to file a
10  grievance."
11  Q.    And did you -- did he ever tell you that he
12  actually filed it?
13  A.    Yes, I believe he did.
14  Q.    Do you remember when that was?
15  A.    I would say late September, early October.
16  Q.    Did he explain to you at all or tell you how
17  he would go about filing it?
18  A.    I just knew he had to fill out the
19  paperwork.
20  Q.    Did he tell you if he filled it out with
21  anyone?
22  A.    Filled it out with anyone?
23  Q.    Yes.
24  A.    No.

Page 57

1   Q.    Did he ever mention his shop steward to you?
2   A.    No. But he did say that he got it -- that
3   when he turns it in, he has to get it signed.
4   Q.    So he told you that when he turns the
5   grievance in, he has to get it signed by the shop
6   steward?
7   A.    Yes.
8   Q.    After he told you that he filed it, did he
9   ever tell you anything else about the grievance?
10  A.    Just he was awaiting to have this meeting
11  with the union rep and Wilkinson and Deloy, which it
12  seemed like the meeting was scheduled every week
13  for -- till the time of his death, and it never did
14  occur.
15  Q.    Did he tell you that the meeting was a
16  result of the grievance?
17  A.    No, because he had gone to Wilkinson and had
18  asked that they have this meeting with all of them to
19  discuss this evaluation. He wanted -- he wanted
20  representation when he went in to review his
21  evaluation with Truman.
22  Q.    Other than that, did he ever again reference
23  the grievance or anything that was happening with it
24  or where it was in the process?

15 (Pages 54 to 57)

Wilcox and Fetzer, Ltd. Registered Professional Reporters          302-655-0477

d0285672-15be-4495-b93f-26036f9d2e3c

Balas v. Taylor, et al.
Cindy L. Adkins

Page 58

1   A.    No.
2   Q.    The grievance that was submitted with the
3   original documents is two pages, and one of the pages
4   had a fax number and one didn't.  Have you seen those
5   pages?
6   A.    Yes.
7   Q.    Okay.  Do you know why or where the number
8   is?
9   A.    One was -- again, I had prepared my lawyers
10  a book and my book, and one had it and one didn't, and
11  it was because John had several copies and I thought
12  it was the same.  I don't look at the little numbers
13  at the top or the bottom of the page, and I didn't
14  realize that they were different.
15  Q.    And I think since, an original copy of the
16  grievance has been turned in.  But what I am wondering
17  is have you ever found the second page of the
18  grievance with the fax number on it.
19  A.    The one copy of mine did have it.  I think
20  it was 854-69 something was the number.
21  Q.    Right.  The number was on the first page;
22  correct?
23  A.    Right.
24  Q.    Did you ever find the second page with the

Page 59

1   number on it?
2   A.    No, I don't think so.
3   Q.    And do you know where that number is, what
4   it is for --
5   A.    No.
6   Q.    -- or whose number it is?
7   A.    No.
8   Q.    Did John ever tell you that he faxed the
9   grievance somewhere?
10  A.    No.  I am assuming it was faxed from work,
11  but I don't know that for sure.  I know it is not our
12  phone number, and the number I didn't recognize, so it
13  is not -- to my knowledge, we are the only one who has
14  a fax machine in our family, so I don't -- it would
15  either have to be our house or somewhere from the jail
16  is my assumption.
17          MS. XARHOULAKOS:  I want to mark this
18  document as Exhibit 5.
19          (Adkins Deposition Exhibit No. 5 was
20  marked for identification.)
21  BY MS. XARHOULAKOS:
22  Q.    Okay.  The document that I provided to you
23  is marked P523 on the bottom; correct?
24  A.    Yes.

Page 60

1   Q.    Do you recognize this?
2   A.    Yes.
3   Q.    Can you tell me what it is?
4   A.    These are journal entries of John's after we
5   went to see Dr. Jani on February 15, and he started
6   him on medication for anxiety.  Dr. Jani asked him if
7   he would keep journal entries on how he felt during
8   the day.
9   Q.    Okay.  As far as you know, are these the
10  only entries that he made?
11  A.    Yes.
12  Q.    Had John ever done this in the past?
13  A.    No.
14  Q.    Did John talk to you about these entries
15  when he made them or after?
16  A.    After he wrote them, he let me read them,
17  when we went away to Cabela's.
18  Q.    And after you read them, did you two talk
19  about it at all?
20  A.    No.  I just read them and kind of wanted to
21  know what he was feeling.  I was hoping that the
22  medication was going to work.
23  Q.    And at this time he was on medication?
24  A.    Yes.  He started on the Klonopin that

Page 61

1   Dr. Jani ordered for his anxiety.
2   Q.    And he saw -- do you recall the date again
3   that he saw Dr. Jani?  Did you say the 15th?
4   A.    Yes, the 15th.
5   Q.    And was it at that time that you two decided
6   to take a trip together?
7   A.    Yes.
8   Q.    Was that -- whose suggestion was that?
9   A.    John.
10  Q.    Were you both already off of work?
11  A.    Yes.
12  Q.    And where did you decide to go?
13  A.    We decided to go to Cabela's in Pennsylvania
14  for a couple days.
15  Q.    Did you have somewhere to stay overnight?
16  A.    We got a hotel room.
17  Q.    And Cabela's, what's that?
18  A.    It is a big hunting store, huge, and it was
19  fairly new, and guys from work had been there and he
20  said, "They said we got to see it."  He said, "Let's
21  go away for a couple days, just the two of us."
22  Q.    Why did you feel that it was good for you
23  two to get away at the time?
24  A.    Just the stress that he had been going

16 (Pages 58 to 61)

d0285672-15be-4495-b93f-26036f9d2e3c

Balas v. Taylor, et al.
Cindy L. Adkins

Page 62

1  through with the jail, and that stress also came home
2  to the house, his frustration, his agitation,
3  screaming and hollering, and it was awful.
4      Q.    And how was the trip?
5      A.    We had a wonderful time. We walked through
6  the store holding hands, very loving. We had a lot of
7  nice talks at dinner; very intimate that night in the
8  hotel room. I was hoping that the medication would
9  work and that we would start rebonding.
10     Q.    Was John different at all because of the
11 medication?
12     A.    Yes. In Cabela's I noticed -- he started
13 taking it on the 15th in the evening, because we went
14 and got the prescription filled right away. And he
15 took two pills, I believe, before we got up to
16 Cabela's, and I noticed that he seemed to be stumbling
17 a little bit. And I am, like, is this me, because the
18 tile in the floor was a little bit rough. I was,
19 like, is this me or is this him? I am, like, "Do you
20 feel okay?" I said, "You feel like you are
21 stumbling." And he said, "No. I am fine."
22        So we continued shopping. And he drove all
23 the way up to Pennsylvania.
24        MS. XARHOULAKOS: Okay. You can put

Page 63

1  that one down. I am going to have this next couple of
2  pages marked as Exhibit 6
3        (Adkins Deposition Exhibit No. 6 was
4  marked for identification.)
5  BY MS. XARHOULAKOS:
6      Q.    Do you recognize these pages?
7      A.    Yes.
8      Q.    And they are marked on the bottom P560
9  through P562; correct?
10     A.    Yes.
11     Q.    Okay. Can you tell me what they are?
12     A.    They are the calendar that hangs on our
13 refrigerator that kind of kept all of our
14 appointments.
15     Q.    And I notice that we have January, February,
16 and then June. Why did you specifically give these
17 months?
18     A.    January and February was the last -- the
19 most stressful months with John, and June was showing
20 that he had an appointment with Dr. Pitts. It took
21 four months to get an appointment with the
22 psychiatrist.
23     Q.    I mean, did you typically keep notes similar
24 to this on the calendar --

Page 64

1      A.    Yes.
2      Q.    -- on the fridge?
3      A.    Yes.
4      Q.    These months are most representative of most
5  months; is that fair to say?
6      A.    Yes. We always wrote all of our hair
7  appointments, vacations, doctor's appointments,
8  haircuts, everything on there.
9      Q.    Were any of the notes on any of these --
10 were all these notes on the pages -- I mean, how did
11 you go about writing them? Did you write them when an
12 appointment was made or --
13     A.    Yes, except for the week that John -- the
14 week before John died, I wrote that in afterwards,
15 after he passed away.
16     Q.    How long afterwards?
17     A.    I would say within the first month after his
18 death.
19     Q.    Why did you decide to do that?
20     A.    I don't know. I was just trying to rethink,
21 could I have done something different to get, you
22 know, to try to save his life; could I have gotten a
23 doctor's appointment somewhere else.
24        And I found out afterwards from Dr. Jani

Page 65

1  that if I had called Dr. Jani, he could have possibly
2  gotten him in sooner with a psychiatrist, but I can't
3  beat myself up because it wasn't my fault.
4      Q.    So these are kind of your notes in
5  hindsight, trying to capture what happened that week?
6      A.    Yes.
7      Q.    And the best of your recollection, they were
8  written within a month of John's death?
9      A.    Yes.
10     Q.    All right. You can put that aside for now.
11        John left some notes the day that he killed
12 himself; correct?
13     A.    Yes.
14     Q.    Okay. And those notes were left for you and
15 your children, I believe his parents, and Lee Mears.
16 Does that sound accurate?
17     A.    Yes.
18        MS. XARHOULAKOS: Okay. I am going to
19 go ahead and admit the notes as an exhibit.
20        (Adkins Deposition Exhibit No. 7 was
21 marked for identification.)
22 BY MS. XARHOULAKOS:
23     Q.    When did you first read the notes?
24     A.    I didn't find them till Thursday after he

17 (Pages 62 to 65)

d0285672-15be-4495-b93f-26036f9d2e3c

Balas v. Taylor, et al.
Cindy L. Adkins

Page 66

1  died.
2  Q.    Okay. I am sorry. I am just going to go
3  back. They are marked P524 through P528; correct?
4  A.    Yes.
5  Q.    Okay. You said you didn't find them until
6  Thursday after. Were they hidden somewhere?
7  A.    Actually, they were right by the laundry
8  room door where he kept his wallet.
9  Q.    Okay. Were they all together?
10 A.    Yes.
11 Q.    In the note to you he says, "Sorry I wasn't
12 what you wanted." What was your impression of what
13 you thought he meant when you read that?
14 A.    Actually, I don't know what he meant by
15 that, because I never led him to believe that he
16 wasn't what I wanted.
17 Q.    Did he ever tell you that he thought he
18 wasn't what you wanted?
19 A.    No.
20 Q.    That is the first you ever heard that?
21 A.    Yes.
22 Q.    He then says, "You deserve a lot of credit
23 for putting up with me." What was your impression of,
24 you know -- what did you think he was trying to convey

Page 67

1  by saying that?
2  A.    I think all the screaming and hollering and
3  the stress that he brought home from work, because he
4  knew it reflected on me and the kids also. It wasn't
5  just his stress. It was our stress.
6  Q.    So you think he was referring to stress and
7  screaming and hollering at home?
8  A.    Yes.
9  Q.    He says, "Sorry for all the misery I brought
10 you and your family." What do you think he meant by
11 that?
12 A.    The same, the same, because one time I
13 remember being on the phone with my aunt, and I don't
14 know what happened exactly, but he started screaming
15 at me while I was on the phone with her, and she
16 called my mom and she is, like, "I just don't know how
17 Cindy is dealing with all this."
18 Q.    When was that?
19 A.    It was probably January of '05. And I -- my
20 mom told me, and then I told him. I am, like, you
21 know, can you -- you know, "If you are going to scream
22 and holler, you know, can you at least keep it here?
23 You don't have to do it when somebody is on the phone
24 or," you know.

Page 68

1          And he got so he would say mean things to
2  anybody. It could be my mom who called. I mean, he
3  was just very angry.
4  Q.    Was there any other members of your family
5  who you think he brought stress to?
6  A.    I would say my mom and my aunt, because, you
7  know, they love me, and they hated to see me and the
8  kids have to go through being screamed at for no
9  reason.
10 Q.    And you think that the misery and the stress
11 that he is referring to and his attitude at home, you
12 think that was the result of what he believes to be
13 retaliation at Department of Correction?
14 A.    Yes.
15 Q.    Do you think there were any other reasons?
16 A.    No.
17 Q.    But Balas -- John in these notes, he doesn't
18 mention the department; correct?
19 A.    No.
20 Q.    Okay. And he doesn't mention Lieutenant
21 Mears; correct?
22 A.    No.
23 Q.    Okay. You can put those aside.
24         At some point after John passed away, did

Page 69

1  someone bring you the items from his locker?
2  A.    Yes.
3  Q.    Who brought them to you?
4  A.    I believe it was my brother.
5  Q.    Anyone else?
6  A.    I can't remember if Lee was with him when
7  they came over or not, because Lee and my brother were
8  there a lot after John died.
9  Q.    Did you ask for the items or did they just
10 voluntarily give them to you?
11 A.    I asked for them.
12 Q.    And do you think -- do you know if they gave
13 you everything that was in the locker?
14 A.    Well, I asked them to give me everything.
15 No, I don't know positively, but I asked them to give
16 me everything.
17 Q.    Can you tell me what the items were, if you
18 remember?
19 A.    There was some handcuffs. I can't recall
20 what else. I think there was an email that Jennifer
21 Cox had sent to him, that there was a copy of that.
22 Q.    Do you remember what the email said?
23 A.    It was from her, and she said something
24 about she couldn't believe that he was going home and

18 (Pages 66 to 69)

d0285672-15be-4495-b93f-26036f9d2e3c

Balas v. Taylor, et al.
Cindy L. Adkins

Page 70

1 sleeping with me, sleeping with -- "I can't believe
2 you are going home sleeping with her."
3    Q.    And you understood that to be referring to
4 you?
5    A.    Yes.
6    Q.    Were there any other items that you can
7 remember?
8    A.    No.
9    Q.    Were there any photographs?
10    A.    Oh, there was a photograph of Jennifer Cox.
11 It was her -- I think it was her license.
12    Q.    Her actual license or the photograph of --
13    A.    A photograph of her license. I don't know
14 where he got it from or why it was in there.
15    Q.    Were there any other photographs?
16    A.    No.
17    Q.    Did you recognize Jennifer at the time?
18    A.    Yes.
19    Q.    Had you seen her before?
20    A.    Yes.
21    Q.    Where?
22    A.    The kids and I went to the softball games
23 that John was playing on, and she was one of the
24 players on the team.

Page 71

1    Q.    Had you spoken with her before?
2    A.    No.
3    Q.    Tell me about John's friendship with Lee
4 Mears.
5    A.    They were best friends. They hunted
6 together. They actually had one big lawn -- they cut
7 the school together, and they both cut at the same
8 time at the school.
9    Q.    Do you know how long they were best friends
10 for?
11    A.    I would say probably the whole time John was
12 on CERT, which was about ten years, I believe.
13    Q.    Have you spoken with Lee since John's death?
14    A.    Oh, yes. We are best friends.
15    Q.    You still are with Lee?
16    A.    Yes.
17    Q.    How often do you speak with him?
18    A.    At least once a month.
19    Q.    And is that once a month since John passed?
20    A.    Yes.
21    Q.    And Lee, he has moved; correct?
22    A.    Yes.
23    Q.    Where is he?
24    A.    Montana.

Page 72

1    Q.    And when did he move there?
2    A.    I believe it was September -- it was this
3 fall, this past fall. It was September or October
4 that he moved there, because prior to that he was in
5 Arizona.
6    Q.    Okay. So when did he leave Delaware?
7    A.    John died in February, and I believe he left
8 in April.
9    Q.    When John died, was Lee already planning to
10 leave at that point?
11    A.    Yes. Actually, John had been reference for
12 Lee.
13    Q.    How did John feel about Lee leaving?
14    A.    Sad to see him go but happy that he was
15 trying to achieve something that, you know, he was
16 interested in.
17    Q.    You said they had been best friends for ten
18 years.
19    A.    Yes.
20    Q.    They spent a lot of time together --
21    A.    Yes.
22    Q.    -- outside of work?
23    A.    Yes.
24    Q.    Would you say that Lee was John's closest

Page 73

1 confidant?
2    A.    Yes.
3    Q.    And Lee leaving and John losing his closest
4 confidant, how do you think that affected John?
5    A.    I think he was sad to see him go, but we had
6 talked about that we would go visit, so it wasn't like
7 he was going to disappear off the face of the earth.
8 We were going to stay in contact and go visit.
9    Q.    Is Lee married?
10    A.    Yes.
11    Q.    Does he have children?
12    A.    Three.
13    Q.    Are you close with the rest of his family as
14 well?
15    A.    Yes. We had actually taken a trip to Busch
16 Gardens together.
17    Q.    When is the last time you spoke with Lee?
18    A.    I believe he called me last week.
19    Q.    And do you talk with him about the case?
20    A.    Yes.
21    Q.    And how does Lee feel about the case?
22    A.    He feels that John was retaliated against.
23    Q.    Did Lee work directly with John?
24    A.    I think he would pass through, but they

19 (Pages 70 to 73)

d0285672-15be-4495-b93f-26036f9d2e3c

A1015

Balas v. Taylor, et al.
Cindy L. Adkins

| Page 74 |
|---|
| 1  didn't actually work in the receiving room together. |
| 2  Q.    Did -- Lee served on CERT with John; |
| 3  correct? |
| 4  A.    Yes. |
| 5  Q.    Do you think that a lot of the information |
| 6  Lee has about what John was going through would have |
| 7  come from John? |
| 8  A.    Yes. |
| 9  Q.    Do you think it came from anywhere else? |
| 10  A.    No. |
| 11  Q.    Do you think Lee Mears will testify as a |
| 12  witness at trial? |
| 13  A.    More than likely. |
| 14  Q.    Do you expect that he will provide |
| 15  information that will support your testimony? |
| 16  A.    Yes. |
| 17  Q.    When was the last time you spoke to your |
| 18  brother, Jeff? |
| 19  A.    Probably about six months ago. |
| 20  Q.    And what was that conversation?  Was it |
| 21  telephone or did you see him? |
| 22  A.    It was telephone. |
| 23  Q.    And what was it about? |
| 24  A.    About I needed to know some information |

| Page 75 |
|---|
| 1  about the case, and he said -- he was very rude to me |
| 2  on the phone and said that he couldn't say anything |
| 3  because he did not want to be retaliated against -- |
| 4  Q.    So -- |
| 5  A.    -- because he still works for the |
| 6  department. |
| 7  Q.    So Jeff didn't provide any information to |
| 8  you? |
| 9  A.    No. |
| 10  Q.    Was he willing to discuss it with you at |
| 11  all? |
| 12  A.    He said if he was subpoenaed, that he would |
| 13  come forward and talk. |
| 14  Q.    Did he indicate to you what he would say? |
| 15  A.    My mom raised us in the church, and we are |
| 16  strong in our faith, and I am sure that Jeff would |
| 17  tell the truth. |
| 18  Q.    Did John tell you how he felt about the |
| 19  lawsuit -- I mean Jeff tell you how he felt about the |
| 20  lawsuit? |
| 21  A.    He is actually the one right after John |
| 22  died, he volunteered to go up to Dover to help me take |
| 23  care of the paperwork with the pension and everything. |
| 24  And on the way up it was my brother who said, "You are |

| Page 76 |
|---|
| 1  going to sue, aren't you?" |
| 2  Q.    And when was this? |
| 3  A.    This was, I believe, March of 2005. |
| 4  Q.    Has he ever since that time expressed to you |
| 5  that he is not happy with the lawsuit? |
| 6  A.    No.  But he just doesn't want to be put in a |
| 7  situation where -- at the time of John's death |
| 8  apparently he was in a position where he was on |
| 9  straight -- a straight 8:00 to 4:00, but since he is |
| 10  on -- taken a new position with vacation/holiday |
| 11  relief.  And he said, "If I talk, they are going to |
| 12  mess with my time.  They are going to put me on, you |
| 13  know -- they could put me on straight nights.  They |
| 14  could put me on every weekend."  He said, "So I am not |
| 15  going to talk unless I am subpoenaed." |
| 16  Q.    Have you talked to Jeff since then? |
| 17  A.    Since March of '05? |
| 18  Q.    No.  Since you said you spoke with him last |
| 19  six months ago. |
| 20  A.    Six months ago?  No. |
| 21  Q.    Have you tried to? |
| 22  A.    No. |
| 23  Q.    Has he tried to talk to you? |
| 24  A.    He has said some things through Mom, you |

| Page 77 |
|---|
| 1  know, that Mom said he is upset and, you know, that it |
| 2  is really bothering him that him and I aren't getting |
| 3  along. |
| 4  Q.    And why is it that you think you are not |
| 5  getting along? |
| 6  A.    It is other -- one thing is his wife.  She |
| 7  has done nothing but try to keep him away from my kids |
| 8  and myself and John since she has been in the picture. |
| 9  And they have been married probably about 11 years. |
| 10        And I for the last four or five years have |
| 11  had Easter dinner and Thanksgiving dinner, and since |
| 12  she has been married to him, he has not had one |
| 13  Thanksgiving dinner with us.  And Jeff and I lost our |
| 14  dad when he was 53 from a malignant brain tumor, and |
| 15  family is very important to me.  And it just upset me |
| 16  that Jeff couldn't, you know, at least every other |
| 17  year come have Thanksgiving dinner with us. |
| 18  Q.    Did Jeff ever tell you that he is not |
| 19  speaking with you because of the lawsuit? |
| 20  A.    No. |
| 21  Q.    Does Jeff talk with your kids still? |
| 22  A.    Some. |
| 23  Q.    Sometimes? |
| 24  A.    Yes. |

20 (Pages 74 to 77)

d0285672-15be-4495-b93f-26036f9d2e3c

A1016

Balas v. Taylor, et al.
Cindy L. Adkins

Page 78

1    Q.    When was the last time they saw Jeff?
2    A.    Last week at my mom's.
3    Q.    So anytime they see him -- well, is it
4    typically at your mom's that he would see them?
5    A.    Yes.
6    Q.    After John's death did you speak with anyone
7    else who we haven't already discussed about his
8    suicide?
9    A.    No.
10    Q.    You didn't speak with any of your family
11    members about it, other family members?
12    A.    That came to the house that day.  I mean,
13    they knew -- they knew he was depressed.  They could
14    tell the personality change, change in him.  I mean,
15    if they asked me what happened, yes, I told them that.
16    Q.    Have you talked with his parents?
17    A.    Yes.
18    Q.    And what did you talk about with his
19    parents?
20    A.    Actually, I had the state -- they were
21    somewhere where I didn't know -- I knew where they
22    were but I didn't have a telephone to be able to get
23    in contact with them the day that John died.  And so I
24    had the troopers get in touch with them, and then they

Page 79

1    came directly to my house.
2    Q.    That was the day that John died --
3    A.    Yes.
4    Q.    -- you are speaking of?  Okay.
5    A.    Apparently the night before his mom had come
6    over after I had come home from the hospital when John
7    had totaled my Tahoe, and he told her that he couldn't
8    wait for it to be over.  And I didn't find out that
9    until after he died.
10    Q.    So this would have been you are referring to
11    the day before --
12    A.    Yes.
13    Q.    -- he passed away, on the 18th of February?
14    A.    Yes.
15    Q.    And when is the last time you spoke with
16    John's parents?
17    A.    Just about three weeks ago, in the Wal-Mart
18    parking lot in Georgetown.
19    Q.    You just -- did you happen to just run into
20    them?
21    A.    Yes.
22    Q.    Before that when was the last time you spoke
23    with them?
24    A.    It had been months.  I am not sure exactly

Page 80

1    when.
2    Q.    Do your kids see them regularly?
3    A.    No.
4    Q.    Why not?
5    A.    Because I allowed them to spend the night
6    one night after John passed away, and they gave my
7    son, who at the time was ten, gave him a shot of
8    tequila.
9        And then we were -- the kids and I were in
10    counseling, and when we would come home from
11    counseling, a lot of times we would go over there to
12    eat dinner, and she would say, you know, "What was
13    discussed in counseling today?"  And I said, "The
14    counselors have suggested that I don't let Jonathan
15    play with any type of weapon, no BB gun, no slingshot,
16    nothing that he could harm himself with, because he
17    said that he wanted to kill himself so that he could
18    go be with his dad."
19    Q.    And were they letting him play with --
20    A.    Well, they behind -- went behind my back,
21    because Jonathan had wanted a paintball gun before
22    John had died, and we had decided against it because
23    on the Internet -- and my brother printed the sheet
24    off -- it recommends that they be 18 years old and

Page 81

1    wear protective gear.  And so we decided that Jonathan
2    wasn't old enough.
3        And they went behind my back and bought
4    paintball guns for both kids.  And the kids would go
5    over there on Friday nights a lot because they had
6    pizza on Friday nights, and they would say, "Can we go
7    to Grandma's to eat pizza?"  And come to find out
8    Grandma had bought these guns and had told them not to
9    tell me.
10        And about a month later I had taken Jonathan
11    to an orthodontist appointment, and we were walking
12    into Wal-Mart to get something, and he goes, "Mom, I
13    have got to tell you something."  And I said, "What?"
14    And he said, "Well, it is about Grandma and Grandpa."
15    I said, "What?"  He said, "They bought paintball guns
16    for Lauren and I, and that's why we have been wanting
17    to go over there on Friday nights, because Ms. Patty
18    is coming, and we have a competition out in the yard."
19        And about -- I would say about a week before
20    that I had thought I heard a $CO_2$ cartridge discharge,
21    because I grew up with guns.  My dad and my brother
22    both hunted.  And when Jonathan had come home, I had
23    questioned him: "Are you over at Grandma and
24    Grandpa's shooting a BB gun, because I heard -- I

21 (Pages 78 to 81)

Balas v. Taylor, et al.
Cindy L. Adkins

Page 82

1  thought I heard a CO2 cartridge discharging." And
2  Jonathan, being sworn to secrecy from Grandma and
3  Grandpa, said no, because actually he wasn't shooting
4  a BB gun. He was shooting a paintball gun.
5      And so when I found this out, I am, like,
6  "You know what? You are done. You are not going to
7  Grandma and Grandpa's." So they kept calling and
8  saying, "Can you come over? Can you come over?" And
9  the kids are, like, no, no, no.
10     And then one day she said, "Why aren't you
11 coming over?" And the kids said, "Because Mommy won't
12 let us." So she said, "Can I speak to your mom?" And
13 so when I got on the phone, she said, "Why are you not
14 letting the kids come over here to see us?" And I
15 said, "I am glad you asked." So that's when I told
16 her about the alcohol.
17     I said, you know, "John had become an
18 alcoholic. He shot and killed himself with a gun, so
19 you are going to give our kids alcohol and you are
20 going to buy them a paintball gun against the
21 counselor's advice?" I said, "I don't understand."
22 She said, "Well, we didn't know." And I said, "What
23 do you mean you didn't know? I told you the
24 counselors" -- I said, "So if you didn't know, why did

Page 83

1  you tell the kids not to tell me?" And I said, "If
2  you want to see them, you will have to come over here
3  with me present. You will no longer see them by
4  yourself."
5      So then they went and got a lawyer to take
6  me to court for visitation. And they eventually gave
7  up.
8  Q.    And when was the last time? When did this
9  all happen, the last time that they saw them and then
10 they confronted you?
11 A.    The last time the kids saw the Balases was
12 in a counseling session with Helen McCool.
13 Q.    Do you remember when that was?
14 A.    Gee, I would say beginning of like March of
15 2006, somewhere around there. And actually the last
16 session they had, Jonathan argued with them the whole
17 entire time, and after the session we went home and he
18 said, "Can I speak to Ace," which is now my husband,
19 "in private." And he took Ace upstairs and said,
20 "Ace, I don't want to see Grandma or Grandpa anymore
21 and," he said, "I don't want to go back to Helen
22 McCool as my counselor." He said, "I am done."
23 Q.    So you said they took you to court. You
24 said they filed a petition for visitation?

Page 84

1  A.    They filed, but we never actually got to
2  court.
3  Q.    Okay.
4  A.    They gave up before it went to court.
5  Q.    Okay. Did you move away from the house that
6  is two doors down from them?
7  A.    No.
8  Q.    So you still live there?
9  A.    Yes. Actually, John and I and his father
10 built the house. We had somebody -- we had Amish who
11 built the frame and we had a mason, and other than
12 that, we did all the work. John learned how to be an
13 electrician in the Navy, and his dad and I helped him
14 pull wire to do the electrical. So it is very
15 sentimental, and I will have a hard time selling it.
16 Q.    So do you run into the Balases?
17 A.    Occasionally.
18 Q.    Do you speak with them?
19 A.    Yes.
20 Q.    Are you friendly with them?
21 A.    I am friendly, but I don't trust them.
22 Q.    Okay. Other than the people we have
23 discussed, have you spoken to anyone else about John's
24 employment with Department of Correction?

Page 85

1  A.    I think everybody knew that he worked there.
2  Q.    No. I mean have you talked to anybody about
3  his work at the department?
4  A.    About the retaliation that he felt like he
5  was receiving?
6  Q.    Just about his work, either that or
7  anything.
8  A.    If they asked, I would tell them, yes.
9  Q.    Okay. Who are some of the people you have
10 spoken to?
11 A.    It might be some of my co-workers.
12 Q.    Anyone other than your co-workers?
13 A.    Just family already knew. Not that I can
14 think of.
15 Q.    Do you speak to any other correctional
16 officers?
17 A.    Yes, I speak with Nadine Townsend
18 occasionally.
19 Q.    And how do you speak with her? Do you know
20 her through somewhere else?
21 A.    Her and John were friends.
22 Q.    And Nadine Townsend worked with John?
23 A.    Yes. Not directly in the receiving property
24 room, but they were friends, and actually John called

22 (Pages 82 to 85)

d0285672-15be-4495-b93f-26036f9d2e3c

Balas v. Taylor, et al.
Cindy L. Adkins

Page 86

1  her his stuff muffin.  They had this -- he said, "She
2  is my girlfriend."
3          And one day she was a correctional officer
4  at the hospital, because we had an inmate who was a
5  patient, and he said, "I want you to go down to such
6  and such a room."  He said, "I want you to meet her."
7  So that's the first time I met her.  And I couldn't
8  believe she was bigger than John.
9  Q.    And do you remember when that was that you
10 met her, what year?
11 A.    Oh, gosh.  No.  Because I knew her.
12 Q.    It is a long time ago?
13 A.    Yes.
14 Q.    Okay.  And she never worked directly with
15 John?
16 A.    Not that I am aware of.  She said that he
17 would always, you know, when they'd see each other in
18 passing in the parking lot, you know, he always would
19 yell and scream and, you know, talk to her and wave to
20 her.
21 Q.    When was the last time you talked to Nadine?
22 A.    I would say sometime over the summer I saw
23 her at the credit union.
24 Q.    Past summer, this past summer?

Page 87

1  A.    Yes.
2  Q.    So you ran into her in the summer of '07 at
3  the credit union, you said?
4  A.    Yes.
5  Q.    What did you talk about?
6  A.    She told me that Truman was going around the
7  jail trying to get a list of names, people that would
8  support him, and she told him don't bother to look her
9  way because she wasn't helping.  She wanted to stay
10 out of it.
11 Q.    And you are referring to Truman Mears?
12 A.    Yes.
13 Q.    Did she work under Lieutenant Mears?
14 A.    I don't believe so.
15 Q.    Did she tell you anything else?
16 A.    No.
17 Q.    So do you only talk to her if you kind of
18 run into her or do you run into her?
19 A.    We send Christmas cards, and she came over
20 to the house a couple times after the kids -- or after
21 John passed away and played with the kids, and we went
22 bowling one night.
23 Q.    Did you ever talk with her about John's
24 employment with Department of Correction?

Page 88

1  A.    Yes.
2  Q.    What did you talk about?
3  A.    Just that he felt like he was being
4  retaliated against for speaking out and quitting the
5  CERT team.
6  Q.    Did you tell her that?
7  A.    Yes.
8  Q.    How did she respond?
9  A.    She said that she doesn't like Truman Mears
10 either.
11 Q.    Did she say why?
12 A.    She -- I won't say what she said, but she
13 didn't have very nice words to say about him.
14 Q.    Can you paraphrase what she said?
15 A.    She said she thought he was an asshole.
16 Q.    Did she give a reason why she thought he was
17 an asshole?
18 A.    I guess just working with him.  She also
19 said that her father didn't like him very much either.
20 Q.    And who is her father?
21 A.    He was Phil Townsend.
22 Q.    Do you know when and how Nadine worked with
23 Lieutenant Mears?
24 A.    No.

Page 89

1  Q.    Do you know if she was on the CERT team?
2  A.    No, she wasn't.
3  Q.    Other than stating that she didn't like him,
4  she thought he was an asshole, did she say anything
5  else about him?
6  A.    Not that I can remember.
7  Q.    Okay.  I am going to change gears a little
8  bit and speak to you about the events leading up to
9  February 2005.  You mentioned before that you thought
10 John had become an alcoholic.  At what point do you
11 think that that happened?
12 A.    I would say in July of '04 his drinking
13 picked -- he had actually quit in May.  He started
14 drinking from stress from work, and he would come home
15 and drink a couple beers so that he could -- on Sunday
16 nights he would get off at midnight and have to be
17 back at 8:00 in the morning.  And the stress from
18 work, he said, "I just have to drink a couple beers so
19 I can get to sleep."  He said, "I can't stay up all
20 night because I got to get up and be back."
21         And then it just progressively got worse and
22 worse and worse.  And we had some arguments about
23 that.  And I actually was adding up -- we kept all the
24 receipts, and I was adding up, and for one month we

23 (Pages 86 to 89)

d0285672-15be-4495-b93f-26036f9d2e3c

A1019

Balas v. Taylor, et al.
Cindy L. Adkins

Page 90

1 had spent $300 on beer. And I said, "This is
2 ridiculous." And this is -- "150 of that is my money,
3 and I don't want my money to be used like that." And
4 I said, "If this continues, we are going to separate
5 our accounts and you can pay half the bills and I will
6 pay half the bills, because I am not spending $150 a
7 month on booze."
8 Q.    And you said he quit in May?
9 A.    May of '04.
10 Q.    But that impliedly means he was drinking
11 heavily before that; correct?
12 A.    Yes. His drinking started out to just be
13 casual one or two beers a night and then got worse.
14 And I wouldn't say that he was drunk or, you know,
15 drinking every single day, but when he drank, he
16 drank -- he would get drunk. And I said, you know,
17 "You can't be doing this."
18      And actually, one time I caught him drinking
19 and driving with the children in the car, and I said,
20 "If I ever find out this again, I will call you in DUI
21 myself, because I don't want something to happen to
22 our children."
23 Q.    When --
24 A.    So he quit. He said, "Fine. I will quit."

Page 91

1 So in May of '04 he quit. And he didn't go through
2 any, you know, DT's or anything. He just quit. And
3 then in July of '04, when he was on the phone at my
4 aunt's stressing about, you know, the understaffing,
5 being froze at work, talk about going to 12-hour
6 shifts, he was: "I can't do that with a lawn
7 business." It was just totally stressing him out. He
8 started drinking again.
9 Q.    Just going backwards, before he quit in May,
10 how long had he been drinking at that point? When did
11 he start?
12 A.    I would say teaching the QRT the first time
13 with Truman.
14 Q.    And when was that?
15 A.    I think it was like January, February, of
16 '03.
17 Q.    But it wasn't -- you know, he wasn't
18 spending $300 a month on booze. That spring of '04 it
19 really got out of control.
20 Q.    And then is it the spring of '04 it got out
21 of control? He quit in May?
22 A.    But he quit in May, yes.
23 Q.    You said that his shift from Sunday to
24 Monday had an effect on his drinking because he had to

Page 92

1 finish at midnight and start at 8:00; is that correct?
2 A.    Yes.
3 Q.    Was that something new or is that something
4 he had always done?
5 A.    That was something new.
6 Q.    When did that begin?
7 A.    I would say in the spring of '04, like
8 January, February, '04. The second time that they
9 were teaching QRT is when it started progressively
10 getting worse.
11 Q.    No. I guess I am asking when the change in
12 his shifts started, when he --
13 A.    Oh, the shifts. He -- they were -- his days
14 off were Friday, Saturday, and Sunday he would have to
15 work -- every other Sunday he would have to work 4:00
16 to 12:00 and then reported back to work on Monday at
17 8:00 to 4:00. It was just the way his shift was every
18 other week.
19 Q.    Right. And you said that that was stressful
20 and had an effect on his drinking; correct?
21 A.    Yes.
22 Q.    And I was just wondering when he began doing
23 those Sunday to Monday shifts where he only had eight
24 hours.

Page 93

1 A.    Well, he had been doing it for a while.
2 Q.    That's what I was getting at.
3 A.    Yes, yes.
4 Q.    That wasn't a change. He had been doing
5 that?
6 A.    He had been doing that.
7 Q.    Okay. And you also said that you caught him
8 drinking and driving one time with the children --
9 A.    Yes.
10 Q.    -- in the car. Both children?
11 A.    Yes.
12 Q.    When was that?
13 A.    It was in the spring of '04.
14 Q.    Do you recall the month?
15 A.    No.
16 Q.    How did you catch him?
17 A.    I came home from work and smelled liquor on
18 his breath, and they had already told me they had been
19 somewhere. And I am, like, "And the kids were with
20 you?" and yeah.
21 Q.    What did you say to him?
22 A.    I was furious. And I said, you know, "You
23 can't afford to lose your license. You know, how are
24 you going to get back and forth to work? Besides

24 (Pages 90 to 93)

d0285672-15be-4495-b93f-26036f9d2e3c

A1020

Balas v. Taylor, et al.
Cindy L. Adkins

Page 94

1  that, you know, I can't be taking you everywhere,
2  because, you know, if you lose that for six months or
3  whatever, I can't be at my job and taking you to your
4  job. How do you plan on getting there?" I said,
5  "You've got to think about consequences," you know. I
6  said, "You might kill somebody." I said, you know, "I
7  have worked hard for this house and," I said, "both of
8  our names are on it." I said, "If you want to
9  continue to drink and drive, then let me take your
10 name off the house, because I don't want to lose my
11 home."
12 Q.    Did that incident result in a prolonged
13 fight between the two of you?
14 A.    No. He thought about it and decided to quit
15 in May.
16 Q.    And so do you think that the time that you
17 caught him drinking and driving with the children, was
18 that closer to May or you just can't recall?
19 A.    Yes, I would say probably.
20 Q.    Had you had other fights during that time
21 period about his drinking?
22 A.    Just, you know, about the amount of money
23 that he was spending.
24 Q.    On liquor?

Page 95

1  A.    Yes.
2  Q.    Do you recall how often you were fighting
3  about the money and the liquor?
4  A.    No.
5  Q.    Do you think it was more than once a week?
6  A.    No.
7  Q.    Do you think it was once a week?
8  A.    No, because he had -- when our fights first
9  started, he was trying to decrease the amount he was
10 drinking. So he didn't know it, but when he would put
11 beer in the refrigerator, I had a little piece of
12 paper on the side of the refrigerator, and I would
13 count beers, how many were missing, because I wanted
14 to know if he was -- if it was, you know, decreasing.
15         MR. NEUBERGER: Stacey, I am sorry.
16 Are we still in the spring of '04 timeframe?
17         MS. XARHOULAKOS: Yes, spring of '04.
18 BY MS. XARHOULAKOS:
19 Q.    Did he ever discover that you had been doing
20 that?
21 A.    I think the kids pointed it out to him.
22 Q.    Did you fight about that?
23 A.    I just, you know -- I think one time I
24 caught him being dishonest, and I am, like, "Why lie

Page 96

1  about it?" you know.
2         But his brother would also come over
3  sometimes and want to drink, and I said, you know, "It
4  is expensive enough supporting your habit. I am not
5  supporting your brother's habit also."
6  Q.    Okay.
7  A.    So he put a sign on the door that if you
8  take a beer, leave a dollar.
9  Q.    Tell me about the trip. As I understand it,
10 there was a trip that you took with Lee Mears and Jeff
11 Foskey to the psychiatric center with John --
12 A.    Yes.
13 Q.    -- is that correct?
14 A.    Yes.
15 Q.    And when was that?
16 A.    That was January 30th. It was on a Sunday.
17 Q.    And tell me what happened to lead up to that
18 and how the decision came about.
19 A.    On Saturday prior to that, I had been
20 shopping with my mom and the kids, and apparently Lee
21 had gotten a phone call from John, and he was drunk.
22 And so Lee goes, "Where are you?" So Lee went and
23 found him, and he was at Kemp's Liquor Store, which
24 is -- it is on Route 16. I don't know if it is in

Page 97

1  Ellendale or a Milton address. And when Lee found
2  him, he had a loaded pistol in the truck and was very
3  drunk.
4         And they decided that they would go out to
5  dinner that night, the two of them, and celebrate
6  their birthdays. John told me that Lee wanted to go
7  out, but according to Lee, John wanted to go out. So
8  they went to Smitty McGee's and had dinner and drank.
9  But prior to that, when Lee came to pick John up, they
10 were out in our back field. We had dirt piles at the
11 time, and they were target-shooting with a nine-
12 millimeter into the dirt pile, my son and John and
13 Lee. And --
14 Q.    Are you still talking about Saturday, the
15 29th of January?
16 A.    Yes, yes.
17 Q.    Okay.
18 A.    And so they were target-shooting, and when
19 they finished target-shooting, Lee noticed that John
20 reloaded the nine-millimeter and he left it on top of
21 the gun safe in our garage.
22         And so Lee and John took off and had dinner,
23 and John got really drunk. And apparently on the way
24 home John told Lee, "I am not going to be living in

25 (Pages 94 to 97)

d0285672-15be-4495-b93f-26036f9d2e3c

A1021

Balas v. Taylor, et al.
Cindy L. Adkins

Page 98

1  the morning." And Lee thought, "Oh, my gosh. He has
2  left that loaded nine-millimeter there at home. I
3  can't take him home. Where am I going to take him?"
4  So he thought, "Well, I could take him to Troop 4 or I
5  could take him to his parents' house, but I can't take
6  him home." So he thought, "Well, I will take him to
7  Troop 4." And then he thought, well, that might
8  jeopardize his job. So he decided to take him to his
9  parents' house.
10        And when they got to his parents' house,
11  John's mom called me and said, "Lee has brought John
12  here, and he is going to spend the night here." I
13  said okay. And she said, "He is really drunk."
14        And so after that I was looking out or
15  bedroom window. It was dark or whatever, but I saw a
16  truck go by and I thought, well, that was Lee going
17  home. And at 5:30 in the morning I received a phone
18  call from Lee Mears's wife, Erika, and she said that
19  Lee was still over next door or two doors down with
20  John and that he had spent the whole night with him
21  and that John was suicidal.
22  Q.     Just backing up, when John's mom told you
23  John was staying there, did you ask her why John was
24  staying there and not at your house?

Page 99

1  A.     She said she had to go because she didn't
2  want John to know that she was calling me.
3  Q.     So did you ask her and she rushed off the
4  phone --
5  A.     Yes.
6  Q.     -- or you didn't get around to it?
7  A.     Yes, she rushed off the phone.
8  Q.     And you said earlier in the day Lee found
9  John at the liquor store sitting in his truck with a
10  weapon; correct?
11  A.     Yes.
12  Q.     And after that Lee took John out drinking?
13  A.     John drove on home, because when they came
14  home, when John came home, he was by himself, and he
15  went upstairs and got a shower. And I didn't even
16  know that he had went and met Lee. I didn't even know
17  he had seen Lee at the time.
18  Q.     Do you have a good recollection of that day?
19  A.     I just remember him getting a shower. And
20  Jonathan and I weren't feeling well, so we were laying
21  on the sofa watching TV, and he came down and asked,
22  "Can I get you anything to eat before I go, go with
23  Lee?" And I said, "No. We will be fine."
24  Q.     Do you recall if he appeared intoxicated to

Page 100

1  you?
2  A.     No, he didn't appear.
3  Q.     Could you usually tell when he was?
4  A.     Usually.
5  Q.     And then when did you later find -- did Lee,
6  I guess, later tell you that he had found John in his
7  truck?
8  A.     Yes.
9  Q.     Okay. And at what point were they in the
10  backyard shooting the weapons?
11  A.     When Lee came to pick him up, John wanted --
12  I think it was John who wanted to go out and target-
13  shoot before -- I don't know what -- I wasn't outside
14  when -- the gun safe is in the garage, so he got the
15  pistol out of the gun safe in the garage. And I don't
16  know what led to it, but I just heard the shooting.
17  Q.     So it was when Lee came over to get John to
18  go out?
19  A.     Yes.
20  Q.     First they stayed at the house and shot in
21  the backyard?
22  A.     Yes.
23  Q.     Okay. And then I think you left off where
24  you received a telephone call from Lee's wife --

Page 101

1  A.     Erika.
2  Q.     -- correct?
3  A.     Yes.
4  Q.     And that she said that Lee told her that
5  John was suicidal?
6  A.     Yes.
7  Q.     Had you ever heard before that John was
8  suicidal?
9  A.     No.
10  Q.     Had you ever suspected it?
11  A.     No. I knew he was depressed, but I didn't
12  know it was to that point.
13  Q.     Did you ever ask John if he was before this
14  time?
15  A.     No. I never had a reason to ask him.
16  Q.     Is there anything now in hindsight that you
17  can think of that might have at the time led you to
18  suspect that he was suicidal?
19  A.     No.
20  Q.     Okay. So then when was the decision made to
21  take John to the psychiatric center and who made it?
22  A.     I immediately called my mom and said, you
23  know, is there -- from working at Beebe, I knew we
24  didn't have a psych ward, and I didn't want to take

26 (Pages 98 to 101)

d0285672-15be-4495-b93f-26036f9d2e3c

Balas v. Taylor, et al.
Cindy L. Adkins

Page 102

1   John into the emergency room because I know they
2   handcuff them like they are inmates to haul them up
3   north, you know, for help. And I am, like, John is
4   not going to do that. I know I won't even get him
5   there.
6        So I called my mom and said -- because she
7   was a State of Delaware employee, and I am, like, "Do
8   you know if there is somewhere I can call to get him
9   help? He is suicidal." And she said, "Yes, there
10  is." And so then I got thinking, got -- I thought
11  John, John won't want to do this through the State of
12  Delaware because he will be afraid this is going to
13  jeopardize his job. So I thought I am going to wait
14  till 8:00, and I am going to page our primary care
15  physician and see what he recommends.
16       So when I got -- I paged him, and he didn't
17  call me back right away, but he called me back within
18  an hour, an hour and a half, and I said, "He is
19  suicidal. You know, what do I do?" I said,
20  "Dr. Jani, you know that he is not going to go to the
21  emergency room and be handcuffed and hauled away
22  somewhere. He just won't do that. We will never get
23  him there." And he said, "You need to take him to
24  St. Joan's." So he said, "Call St. Joan's."

Page 103

1        So when I got off the phone with him, I
2   called St. Joan's and I spoke with a counselor, and I
3   can't remember his name, and I told him, you know,
4   that John had been riding around the day before drunk
5   with a loaded weapon, had said that he wasn't going to
6   be living this morning, and that he had been
7   depressed; you know, what could I do? And he said,
8   "You bring him, bring him right up." And I said, "Do
9   you think you will be keeping him?" And he said,
10  "More than likely." And I said, "What does he need as
11  far as supplies?" And he said, "Bedroom slippers, but
12  they can't have strings. Sweatpants; they can't have
13  strings." He said, "It can't have anything in it that
14  he could possibly harm himself with."
15       So I packed his bags, and the kids even put
16  some mints in there and because I told them -- I said,
17  "We are going to try to take Daddy somewhere that can
18  help him," because from fall of '04 till the time of
19  his death the kids just kept saying, "What's wrong
20  with Daddy? What's wrong with Daddy?" And he would
21  say mean things to them, and I am, like, "Please don't
22  take anything personal that Daddy is saying to you,
23  because he is saying it at all of us."
24       And then Lauren said, "Make sure you tell

Page 104

1   him that he can only eat one mint a day, because
2   that's all I am putting in here is enough for one mint
3   a day." So I think she put like seven mints in there.
4        So I called Lee and I said, "Lee, can you go
5   up here with me to take him?" And he said yes. He
6   said, "I am going to call your brother." So Jeff and
7   Lee came over, and then the three of us went over and
8   convinced John to go. And all the way up John never
9   said a word.
10       MS. XARHOULAKOS: You want to take a
11  break?
12       THE WITNESS: Sure.
13       (Recess taken.)
14  BY MS. XARHOULAKOS:
15  Q.     Back on the record, I think where we left
16  off is you were talking about when you and Lee and
17  Jeff and John were traveling to St. Joan; correct?
18  A.     Yes.
19  Q.     What was John's feeling generally about
20  going there, even before you got into the car?
21  A.     When I went over, he was laying down on the
22  bed at his mom and dad's house, and I said, "John, you
23  need help. And we need to take you somewhere to get
24  you some help." I said, you know, "My dad is not

Page 105

1   here, and he would love to be here." I said, you
2   know, "We need to get you some help. I don't want you
3   to die."
4        And so then I left. I walked out. And then
5   Lee went in, and Lee finally convinced him to go.
6   Q.     Do you know what Lee said to him?
7   A.     No.
8   Q.     And John was silent the entire trip?
9   A.     Yes. As a matter of fact, he didn't say
10  anything all the way home either.
11  Q.     And what happened when you got to the
12  psychiatric center?
13  A.     There was no one at the front desk, so I
14  believe we pushed a buzzer, and the counselor came
15  out, and the counselor took John back. And I would
16  say they were back there probably a half an hour, and
17  Lee and Jeff and I sat out in the waiting room.
18  Q.     And what happened when John came back out?
19  A.     He sat down in a chair and the counselor
20  handed him two sheets of paper. One was a list of
21  counselors and one was a list of psychiatrists for the
22  State of Delaware, and he said, "You need to make an
23  appointment."
24       Well, the three of us looked at one another

27 (Pages 102 to 105)

d0285672-15be-4495-b93f-26036f9d2e3c

Balas v. Taylor, et al.
Cindy L. Adkins

Page 106

1   like, "They are discharging him?" And Lee goes, "Can
2   I talk to you for a minute?" So Lee took the
3   counselor -- or the counselor took Lee in the back,
4   and they were probably back there 20 minutes. And
5   according to Lee, he said, "He told you everything?
6   He told you he was, you know, drunk, riding around
7   with a loaded pistol; he wasn't going to be living
8   this morning?" And yes. And apparently John signed
9   some contract saying that he would not harm himself.
10       When the counselor came back out, he told us
11  that we were to remove all guns from the house.
12  Q.     Knowing John and looking back, do you think
13  John just might have told the counselor that so that
14  he wouldn't have to stay there?
15  A.     Yes, because later on that evening, when
16  John came home, he told me -- he goes, "You thought
17  that they were going to keep me there, didn't you?"
18  And I said, "I was hoping." And he said, "You tried
19  to trick me." I said, "We didn't try to trick you,
20  John." I said, "The counselor said he thought he
21  would probably keep you. We weren't trying to fool
22  you. You know, I think you need help."
23  Q.     Did John know that you had packed a bag for
24  him?

Page 107

1   A.     No.
2   Q.     He didn't know that?
3   A.     Jeff, when he came to pick me up, when --
4   Lee and Jeff, they were together. When they came to
5   pick me up, we put it behind -- I can't remember if we
6   put it in Jeff -- Jeff has one of those toolboxes in
7   back of his pick-up. I can't remember if we put it
8   there or behind the seat so John did not know that we
9   had his bag.
10  Q.     I know this is a difficult question, but
11  looking back, do you think there is a chance this
12  tragedy could have been prevented if he had been
13  admitted at that time?
14  A.     Possibly.
15  Q.     Have you thought about suing St. Joan?
16       MR. NEUBERGER: To the extent that the
17  answer calls for conversations with her attorneys, I
18  would instruct her not to answer to that extent --
19  BY MS. XARHOULAKOS:
20  Q.     Does it --
21       MR. NEUBERGER: -- based on the
22  attorney-client privilege. I am sorry.
23       MS. XARHOULAKOS: That's fine.
24       THE WITNESS: So I can answer or I

Page 108

1   can't answer?
2       MR. NEUBERGER: As long as it doesn't
3   involve conversations you have had with your
4   attorneys, you can answer. If it involves
5   conversations or thoughts with regard to anybody else;
6   right.
7   BY MS. XARHOULAKOS:
8   Q.     I can ask an easier question for you. Have
9   you thought -- independently of any conversation with
10  your attorney, have you ever thought about suing
11  St. Joan?
12  A.     I have thought about it, especially since
13  the records have disappeared.
14  Q.     Right.
15  A.     Mysteriously disappeared. And from working
16  at a hospital, everything needs to be documented and
17  it has to be signed.
18  Q.     So when you returned home that Sunday with
19  John, did everyone leave or did someone stay at the
20  house?
21  A.     We actually took John back to his parents'
22  house so that we could go to our house to remove the
23  weapons.
24  Q.     How many weapons did you have in the house?

Page 109

1   A.     Oh, my gosh. Too many. The gun safe is
2   packed.
3   Q.     And who proceeded to remove the weapons with
4   you?
5   A.     Jeff and Lee. I handed some of them, but
6   mainly those two loaded them in Jeff's car. I got
7   them some blankets so that -- to make sure in the ride
8   that the guns didn't get chipped or torn up. And Jeff
9   took them to his house.
10  Q.     And at some point did John come back to the
11  house?
12  A.     That evening -- well, when we got home, one
13  of the kids wanted to go over, and I think it was
14  Jonathan wanted to go over and be with his dad. So he
15  went over and watched TV with his dad over at Grandma
16  and Grandpa's, and then he decided to come home after
17  a couple hours.
18       And, I don't know, around dinnertime, they
19  said, "Let's watch some home movies." We had
20  videotaped a lot of the kids when they were -- you
21  know, their birthdays and smooshing cake in their face
22  and everything. And they had been wanting to watch
23  them for a while. And they said, "Can we watch them?"
24  And I said sure.

28 (Pages 106 to 109)

Balas v. Taylor, et al.
Cindy L. Adkins

---

Page 110

1        And I believe it was Lauren said, "Well, can
2   we call Daddy to come home and watch them with us?"
3   And I said, "Sure, you can call and see if he wants to
4   come home."  And he did want to come home.  So his mom
5   brought him home.
6   Q.      Did anyone else stay at the house, Jeff or
7   Lee, that night?
8   A.      No.  They went home.
9   Q.      And was John working that week or was he
10  off, the week following that Sunday?
11  A.      I think he went to work, because I tried to
12  get him -- I am, like, "Call out sick.  You need some
13  time off."  And he said, "No.  I am going to go in,
14  going into work."
15  Q.      And you said earlier that he wasn't the type
16  of person who would have sought help from the state --
17  A.      No.
18  Q.      -- is that correct?
19  A.      He went back to college and he wouldn't
20  even -- I think they have some type of tuition
21  reimbursement-type thing, and he wouldn't even do
22  that.
23  Q.      Do you think that one of the reasons is he
24  wouldn't want to air his personal problems with his

---

Page 111

1   co-workers?
2   A.       Well, I am not sure that that place was
3   actually his co-workers.  It was just a state suicide
4   prevention.  I don't -- from the number I called, it
5   wasn't through the jail.  It was some type of --
6   through the state, some type of suicide prevention
7   program.
8   Q.      You are talking about an assistance program
9   provided through the state?
10  A.      Yes.
11  Q.      You said you called them at one point?
12  A.      I just got the number.  I never did call
13  them because I got thinking, "I don't think he will
14  want to do this."
15  Q.      Where did you get the number from?
16  A.      The phone book.
17  Q.      Did you ever urge John to speak with any of
18  his supervisors about going to the state program?
19  A.      No.
20  Q.      Do you know if he ever did?
21  A.      No.
22  Q.      Then that week you said you think he
23  worked --
24  A.      Yes.

---

Page 112

1   Q.      -- to the best of your recollection?
2   A.      Yes.
3   Q.      Do you recall what his personality was like
4   that week, what his behaviors were like?
5   A.      Very withdrawn, moved very slowly, talked
6   slowly, didn't hardly ever smile, and when he did, it
7   wasn't his smile.  It was, "Okay, I will look like I
8   am happy."  But he always had this real big smile and
9   a very jolly, loud, laughing.  He was not himself at
10  all.
11  Q.      And at this point he wasn't on any
12  medication yet; correct?
13  A.      No.  And I couldn't get him -- I said,
14  "Please call and make an appointment."  And he goes,
15  "No, I don't want to."
16  Q.      Were you -- what were your -- do you
17  remember what your shift was that week?  Did you see a
18  lot of John?
19  A.      I worked three 12-hour shifts a week, so I
20  don't know exactly what my days were that week.
21  Q.      You regularly work three 12-hour shifts?
22  A.      Not anymore.
23  Q.      At that time?
24  A.      Yes.

---

Page 113

1   Q.      And then I guess that takes us to about the
2   7th or 8th, and then the next week is the week before
3   John's death; correct?
4   A.      Yes.
5   Q.      How were his behaviors in that week?
6   A.      Just very withdrawn, didn't want to do -- we
7   tried to get him to go to the movies with us, and we
8   had to beg him to go to the movies with us to Dagsboro
9   Clayton Theatre.  He just wanted to be left alone.
10  Q.      And that so his behaviors were similar to
11  the week before?
12  A.      Yes.  He kept wanting to watch MTV, the
13  music videos.  He would sit on the sofa and just watch
14  TV.  He was very easily agitated, and you never knew
15  what would set him off.  You had to walk on eggshells.
16  And I kept telling the kids, "Please don't argue.  You
17  know, just go play video games or whatever.  Just
18  don't upset your dad.  We don't want him to go off."
19          It was just very uncomfortable living
20  conditions.
21  Q.      And the week before his death he was off
22  from work; correct?
23  A.      Yes.  He took off.
24  Q.      Do you know when he put that request in to

---

29 (Pages 110 to 113)

d0285672-15be-4495-b93f-26036f9d2e3c

A1025

Balas v. Taylor, et al.
Cindy L. Adkins

Page 114

1  take off?
2  A.    No.  I don't know if that was a regularly
3  scheduled vacation or not --
4  Q.    You don't know?
5  A.    -- that year.  No.  I can't remember.
6  Q.    And then we already talked about this, but
7  midweek you convinced him to see Dr. Jani; correct?
8  A.    Yes.
9  Q.    And then you took your trip together;
10  correct?
11  A.    Yes.
12  Q.    And when did you return?
13  A.    Late Thursday night.  And it was on the way
14  home, he said, "I have got something that I want you
15  to listen to."  And he put in a tape by Tim McGraw
16  that said, "Kill Myself."  And so I was listening to
17  that and I am like, oh, my gosh, no wonder he feels
18  like -- if you don't know the background of the song,
19  apparently Tim McGraw in the song wants to kill the
20  old self and become a new self, and if you were in
21  John's state of mind, you would have thought that, you
22  know, the best thing for him to do was to kill
23  himself.
24  Q.    And this was on your way home from your

Page 115

1  trip?
2  A.    Yes.  And as a matter of fact, on 95 he
3  pulled over under an overpass and said, "You need
4  to drive."  It was like -- I described it to my
5  family, it was like a total going in a shell.  I was
6  just total withdrawal.  And he actually fell asleep on
7  the way home.  And I think we got home around 11:00.
8  Q.    And then the next day would have been
9  Friday, the 18th; is that correct?
10  A.    Yes.
11  Q.    And did he work that day?
12  A.    No.
13  Q.    And do you recall if you worked that day?
14  A.    No, I didn't work that day.
15  Q.    You didn't?  At some point did he leave the
16  house with your son?
17  A.    Yes.  They went to get their hair cut.
18  Q.    When was that?
19  A.    Well, I went to pick the kids up from school
20  at 3:00.  I think their appointment was like somewhere
21  between 3:30, 20 of 4:00, and their appointments were
22  like 20 minutes apart.
23  Q.    And then when did the accident occur?  Was
24  that on the way home from the haircut?

Page 116

1  A.    Yes.
2  Q.    Do you recall how and when you found out
3  about that?
4  A.    Yes.  I knew that they were like 15 minutes
5  overdue for being home, like, "Where are they?"  And
6  Jonathan came -- I was at the kitchen sink, and
7  Jonathan came running up on the deck to the sliding
8  glass door, and he opened it up, and he was panicking,
9  and he goes, "Mom, look what Daddy has done to the
10  Tahoe."
11  And so I walked out, and this demolished
12  Tahoe -- I couldn't believe it was driveable -- was
13  pulled up in our backyard.  And John was standing
14  there and kind of looked like -- I describe it as a
15  cartoon character with stars going.  You know, he just
16  looked like he had his bell rung (indicating).
17  And I am, like, "Are you all right?"  And he
18  said yes.  And I said, "What happened?"  And he said,
19  "I don't know."  He said, "I lost control and I rolled
20  it."  And I said, "Well, how did you get it home like
21  this?"  And he said apparently somebody by the name of
22  Bear from work -- I don't know who.  Everybody has
23  nicknames -- was behind him, and a dump truck came up,
24  and they got it pulled back up on its tires, and then

Page 117

1  John drove it home and left the scene of the accident.
2  And apparently this Bear brought Jonathan home.  He
3  did not ride home with John.
4  The windshield was all shattered, and there
5  wasn't a place on the car that wasn't dent.
6  Q.    Did this Bear just happen to be driving
7  behind John?
8  A.    Yes.
9  Q.    Had you seen John drink at all that day?
10  A.    No.  He had not been drinking that day.  And
11  as a matter of fact, I took him to the hospital after
12  that, and they ran blood tests, and it showed no blood
13  alcohol in his system.
14  Q.    Was he on the medication at that time?
15  A.    Yes, he had taken two of the pills that
16  morning.  He had to take them, I think, three times a
17  day, and he had taken two.
18  Q.    And so was this the first you heard about
19  the accident when your son came running towards you?
20  A.    Yes.  And when Dr. Jani put him on that
21  medication, he didn't say, you know, "You can't drive
22  a car," you know.  He didn't say that.
23  Q.    Right.  Right.  You did say earlier that you
24  thought John look dazed from the medication the first

30 (Pages 114 to 117)

d0285672-15be-4495-b93f-26036f9d2e3c

Balas v. Taylor, et al.
Cindy L. Adkins

| Page 118 | Page 120 |
|---|---|
| 1  day he was on it -- correct? -- or stumbling, I think | 1  questioned John about it, he said it was a jail |
| 2  you said? | 2  cellphone so that they could get in touch with him |
| 3  A.    He didn't look dazed.  He just was | 3  when they needed him. |
| 4  stumbling. | 4  Q.    Did you believe that? |
| 5  Q.    Stumbling.  Okay.  Did John ever tell you | 5  A.    Yes. |
| 6  that he had contacted anyone else after he got in the | 6  Q.    Did you question him any further about it? |
| 7  accident? | 7  A.    No. |
| 8  A.    No. | 8  Q.    And do you recall approximately when that |
| 9  Q.    Did he ever tell you that he called a police | 9  was? |
| 10  officer who was a friend of his? | 10  A.    No. |
| 11  A.    When he got home, I said, "John, we have got | 11  Q.    And you know now that John had been lying to |
| 12  to call and report this accident," and because he said | 12  you about that? |
| 13  he took somebody's mailbox out.  And I said, "We need | 13  A.    Yes. |
| 14  to call."  And he goes, "Well, call John Mitchell." | 14  Q.    What happened with the telephone call to |
| 15  So I can't remember if I looked the number up or he | 15  John Mitchell?  Were you present when he made that |
| 16  did, but he is the one who called John Mitchell. | 16  phone call? |
| 17  Q.    So he did that after he got home? | 17  A.    I think I was, and John said, "You need to |
| 18  A.    Yes. | 18  call and report it." |
| 19  Q.    Did John ever tell you that he called | 19  Q.    Okay.  So John did call and reported it? |
| 20  Jennifer after he got in the accident? | 20  A.    I can't remember if he did or I did. |
| 21  A.    No, but my son did. | 21  Q.    Okay. |
| 22  Q.    Your son overheard it? | 22  A.    One of us did.  I think it was me that did, |
| 23  A.    Apparently John called from the accident.  I | 23  as a matter of fact, because they said that they knew |
| 24  found out later from Jonathan that his dad had called | 24  that a Tahoe had been in an accident and they were |

| Page 119 | Page 121 |
|---|---|
| 1  and used a cellphone that wasn't ours and called and | 1  looking for it.  But our house is surrounded by leland |
| 2  spoke to Jennifer or Drugash, somebody.  He was on the | 2  cyprus, and we had our go-cart trailer pulled out in |
| 3  phone.  And Jonathan goes, "Can I have that phone so I | 3  front of our garage, and John had pulled on the other |
| 4  can call Mommy?" and he goes, "No, you can't call | 4  side of it so they couldn't see it.  The only way they |
| 5  Mommy from this phone."  So I never knew about the | 5  would have been able to see it was from the air. |
| 6  accident until they drove up in the backyard. | 6  Q.    So someone called and said they were looking |
| 7  Q.    Had you ever seen this other phone before? | 7  for a Tahoe.  So do you think someone saw the |
| 8  A.    No. | 8  accident? |
| 9  Q.    Do you know if Jonathan had? | 9  A.    No.  When I called to report it, SUSCOM told |
| 10  A.    I heard that he did. | 10  me that the accident had been reported and that they |
| 11  Q.    From Jonathan? | 11  knew it was a Tahoe. |
| 12  A.    Yes. | 12  Q.    Okay.  I see.  And I guess at some point |
| 13  Q.    Did he tell you when he had seen the phone | 13  then they came and towed the Tahoe?  Was that taken |
| 14  before? | 14  away from the property? |
| 15  A.    He said one day that John was down in Lewes | 15  A.    Well, John and I pulled it in the garage |
| 16  picking up a bike chain and that it rang in the | 16  because we didn't know if it was going to be totaled |
| 17  console, and he said, "Dad, this phone was ringing," | 17  or not, because there was so much broken glass, and we |
| 18  and that John got furious with him and said that, you | 18  didn't want it to rain inside.  So he got me to back |
| 19  know, he is being nosy and he shouldn't having been | 19  it into the barn. |
| 20  digging in it and da, da, da.  And Jonathan is, like, | 20  Q.    Okay.  Did -- |
| 21  "But it was ringing." | 21  A.    But after John died is when they came and |
| 22        And Jonathan did come home and tell me that, | 22  got the Tahoe -- |
| 23  and I can't remember the date that he said, "Mom, Dad | 23  Q.    Okay. |
| 24  has a cellphone that is not ours."  And when I | 24  A.    -- and towed it away. |

31 (Pages 118 to 121)

d0285672-15be-4495-b93f-26036f9d2e3c

A1027

Balas v. Taylor, et al.
Cindy L. Adkins

Page 122

1    Q.      Okay.  So that didn't happen until after
2  John passed away?
3    A.      Yes.
4    Q.      That night -- and now we are talking about
5  Friday, February 18 -- did at some point anyone come
6  to the house?
7    A.      My brother and his wife came and took the
8  kids out for pizza.
9    Q.      Was that preplanned or is there a reason --
10   A.      No.  They came because I was going to take
11  Jonathan -- or John to the hospital.
12   Q.      Okay.  So they took the kids while you took
13  John to the hospital?
14   A.      Yes.
15   Q.      And at what point did you return from the
16  hospital?  Do you remember what time it was?
17   A.      We were only there for about two hours.  I
18  would say around 9:00-something that evening.
19   Q.      Were the kids already back home when you --
20   A.      Yes.
21   Q.      And then did Jeff and his wife leave?
22   A.      Yes.
23   Q.      Did Lee ever come to the house that night?
24   A.      No.  John's mom did.  When -- I think when

Page 123

1  we got back there, I think John's mom was there with
2  my brother and his wife.
3    Q.      Did she also leave when they left or did she
4  stay?
5    A.      She went upstairs, because John came in, put
6  his coat in the closet and went straight up to bed,
7  and she went up there to talk to him.
8    Q.      Did she tell you what they talked about?
9    A.      No.  But when I entered the room, they
10  stopped their conversation.  And I found out through a
11  neighbor later that John had told her he would be glad
12  when this was all over and that my mother-in-law had
13  said, "But who is going to be cleaning their gun in
14  their underwear when Lauren brings over her first
15  boyfriend?"  And he said, "Cindy will."
16   Q.      And then his mom at some point left the
17  house?
18   A.      Yes.
19   Q.      And John went to sleep at that point?
20   A.      Yes.
21   Q.      And did he stay asleep for the rest of the
22  night?
23   A.      I don't know how much he slept.  He had been
24  having trouble sleeping.  But, yes, he stayed in bed.

Page 124

1    Q.      I just want to step back a minute.  Was
2  there some point -- maybe I missed something, but
3  another day when -- maybe this was the week before,
4  but when Jeff and Lee convinced John to stop taking
5  the medication he was on?  Did that ever happen?
6    A.      No.
7    Q.      No.  Okay.  And so John was prescribed the
8  medication the 15th; is that correct?
9    A.      And he took it until that Friday --
10   Q.      Until --
11   A.      -- when at the emergency room they told him
12  to quit taking it until he saw Dr. Jani, and they also
13  told him not to drive.
14   Q.      Okay.  I guess the day of was a Saturday.
15  The day that John --
16   A.      Yes.
17   Q.      -- killed himself was a Saturday.  Did you
18  have anything planned for that day?
19   A.      Yes.
20   Q.      What was the plan?
21   A.      Actually, I was supposed to work that day,
22  and I had gotten somebody to take my place, because we
23  had dogs, and we were going to take them to the SPCA
24  to get their rabies vaccination, and I knew John

Page 125

1  couldn't do it by himself with all those dogs.  We at
2  the time had eight dogs.
3    Q.      Oh, wow.  Were you --
4    A.      We had a litter, and we still had some of
5  the puppies we hadn't gotten rid of.
6    Q.      Okay.  So this was a preplanned SPCA trip?
7    A.      Yes.
8    Q.      And were you and John together for most of
9  the day?
10   A.      Yes.
11   Q.      Were there times when you were not together?
12   A.      Yes.  When we woke up that morning, he sat
13  in the recliner and just was very quiet, and I said,
14  "Are you upset because you totaled the car?" I said,
15  "I think you have totaled the Tahoe."  I said, "Are
16  you upset that you wrecked the Tahoe?"  He nodded his
17  head yes.  And I said, "Well, don't worry about it."
18  I said, "That's material.  It can be replaced."  I
19  said, "I am just glad that you and Jonathan are okay."
20   Q.      And then what time did you go to the SPCA?
21  Did you ever --
22   A.      We never got there.
23   Q.      You never made it?  Okay.
24   A.      I forget what time we were supposed to go.

32 (Pages 122 to 125)

Balas v. Taylor, et al.
Cindy L. Adkins

---

Page 126

1  I think we were supposed to go at like noon, and I
2  think it was around noon we were supposed to go.
3          He went on out in the backyard and was doing
4  some stuff, and I had the keys to his truck, because I
5  had driven to the emergency room, and he came in and
6  said, "Can I have the keys to my truck? I need to put
7  something in it."  And I said okay.  So I gave him the
8  keys to his truck.
9          And then I later went out to the barn, and
10 when you walk in the front part, there is another set
11 of double doors that are solid that you walk to the
12 back part.  And when I went in there, I didn't see
13 him.  And I opened up the double door, and it was
14 dark, and I saw him walk by, and it was like he didn't
15 even see me.  And he was headed to the lawn mower that
16 had the pistol.  And I didn't know at the time that
17 that's where he was headed, but that's where he was
18 headed.  He had the lights out.  And I said, "John,"
19 and he didn't -- he still was walking.  And I turned
20 the light on and I was, like, "John."  And "yeah?"
21 like I startled him.
22         And I said, "What would you like for
23 breakfast?"  I said, "I have got sausage.  You want
24 some sausage and eggs for breakfast?"  "Whatever."

---

Page 127

1          And I said, "So do you think this is
2  totaled?"  And by then the tire had gone flat on the
3  one side of the Tahoe, and there was something leaking
4  out from underneath of it.  And I said, "Do you think
5  it is totaled?"  And he said, "I don't know."  I said,
6  "Jeff said there is something leaking from underneath
7  of it."  So he got on his hands and knees and he
8  looked under and he said, "Yes, there is."  I said,
9  "Well, we need to get all the stuff out of it."  And
10 he said, "Well, I will do that."  He said, "There is
11 broken glass."  He said, "I got some gloves here.  I
12 will clean that out."
13         I said, "All right.  I am going back in and
14 fix breakfast."  So I went in to fix breakfast.
15 Q.     Did you ever see John on the phone that
16 morning?
17 A.     No.
18 Q.     Generally -- I am going to switch gears here
19 a little bit -- in the year before John's death how
20 would you describe his mood and personality compared
21 to previous years?
22 A.     A year before his death?
23 Q.     For the year preceding his death.
24 A.     For the year preceding?

---

Page 128

1  Q.     Yes.  That would be most of 2004.
2  A.     He was always very joking, lively, always
3  had a joke.  You know, he would come in from work and
4  say, "Listen to this joke," or he would have some
5  printed out where they had -- somebody had given him a
6  joke.  And I have a folder that I have the jokes, some
7  of the jokes in.  The good ones I kept.  But some of
8  them were stupid, so I threw them away.
9          But he just was very outgoing, very lovable.
10 Like I said, he played ball with the kids out in the
11 yard.  He actually bought them a sprinkler where they
12 could play around.  It was a great big elephant that
13 shot water out of everywhere and they could play in
14 the yard.  We would play with the dogs.  We were each
15 other's best friends.  We did everything together.
16 Q.     Did his regular activities or the things
17 that he did in the household, did anything change in
18 the year before?
19 A.     The last winter before he died, he didn't do
20 much hunting.  And I am, like, "Why aren't you" --
21 because before he would go every day that he was able
22 to.  And honestly, I got sick of it, because when he
23 would get up at 3:00 to go duck hunting, I was usually
24 up.  I couldn't get back to sleep, and then I had to

---

Page 129

1  go to work at 7:00 and work a 12-hour shift, so I was
2  exhausted.  And if he did it too many days in a row, I
3  am, like, "Oh, I can't take it."
4          But that winter he didn't go very much,
5  and -- but I knew that the duck population had
6  decreased because of the weather.  And so he said, "I
7  am not -- I am not going."  He said, "I just don't
8  feel like it."  He said, "There is not many ducks out
9  there.  It is not worth it."
10         But since I have read a lot of literature
11 about depression.  They often stop doing hobbies that
12 they did before.
13         And I do remember him saying, "I just don't
14 feel like I have any energy."  He said, "I talked to
15 your brother and he feels the same way."  So I really
16 didn't -- I was like, well, maybe it is just the
17 weather.
18 Q.     Did anything else change other than that?
19 A.     He didn't seem to want to do much with the
20 kids.  Go-cart racing; didn't seem to have very many
21 patience for Jonathan.  He was always screaming at him
22 on the way home, telling him what he had done -- his
23 mistakes.
24         And before he said, "You did a good job

---

33 (Pages 126 to 129)

Balas v. Taylor, et al.
Cindy L. Adkins

| Page 130 | Page 132 |
|---|---|
| 1 there," whatever. And I videotaped all the races, and | 1 pursue her in January? |
| 2 usually John and him would come home, and I don't care | 2 A.    No. |
| 3 what time it was; we'd get home and they would go over | 3 Q.    Did you confront John about the relationship |
| 4 the video, and John is, like, "Do you see what you | 4 when you found out? |
| 5 could have done different there?" And we had done | 5 A.    Yes. |
| 6 that for five years, and our son had won a | 6 Q.    Did John tell you that he called Jennifer |
| 7 championship in 2002, and I credit those videos, | 7 multiple times that morning of his death? |
| 8 because he could see, you know, what he had done and | 8 A.    No. |
| 9 what he needed to do different. | 9 Q.    Did he tell you he called her the night |
| 10    And after John got sick, he had no patience. | 10 before? |
| 11 As a matter of fact, one race he said, "Just get your | 11 A.    No. |
| 12 mom to put your cart out there on the track." And so | 12 Q.    Did he tell you he called her at all? |
| 13 I went and got a friend of mine that I had gone to | 13 A.    No. I didn't know until that morning that |
| 14 school with and I said, "Keith, can you help me get | 14 he had been having an affair. |
| 15 this cart out on the track?" And Jonathan won that | 15 Q.    What was his reaction when you confronted |
| 16 race, so I was happy. | 16 him? |
| 17 Q.    Do you remember when that was? | 17 A.    I went out there and I said, "You and I need |
| 18 A.    That was the fall of 2004. | 18 to talk." And he said, "What?" And I said, "You've |
| 19 Q.    At what point did you find out that John had | 19 been cheating on me, haven't you?" And he nodded his |
| 20 been having an affair with another woman? | 20 head yeah. And I said, "Are you still seeing her?" |
| 21 A.    The day that he died. | 21 And he shook his head no. |
| 22 Q.    And how did you find out? | 22 Q.    And anything else? |
| 23 A.    My sister-in-law called me, Tina, Jeff's | 23 A.    He said -- I said, "Do you love her?" He |
| 24 wife. | 24 said, "I don't know what I think anymore." And he |

| Page 131 | Page 133 |
|---|---|
| 1 Q.    Do you know why she decided to call you at | 1 said -- what was I getting ready to say? He said, "I |
| 2 that time? Had she just found out? | 2 don't know what I think anymore." Oh, I said, "You |
| 3 A.    Yes. | 3 and I promised one another we would never do this." I |
| 4 Q.    What did she tell you? | 4 said, "How could you?" And that's what I just kept |
| 5 A.    She told me that she had just found out. | 5 saying, "How could you?" And he just looked at me, |
| 6 Q.    How did she find out? | 6 and I turned around and walked out of the barn. |
| 7 A.    My brother. | 7 Q.    Did you ever ask him when was the last time |
| 8 Q.    Do you know if your brother had known before | 8 he spoke to her? |
| 9 that day? | 9 A.    No, because he told me the affair was over. |
| 10 A.    She said that he had known for a couple | 10 Q.    Would you agree now that John was not |
| 11 weeks. | 11 truthful with you in the months before his death? |
| 12 Q.    Had John ever had an affair that you know of | 12 A.    Yes. |
| 13 before? | 13 Q.    Would you also agree that he was not loyal |
| 14 A.    Never. | 14 to you in the months before his death? |
| 15 Q.    In the fall of 2004 did he tell you that he | 15 A.    Yes. |
| 16 bought another woman flowers? | 16 Q.    Can you turn back to the calendar for me, |
| 17 A.    No. | 17 which I believe was Exhibit 6, and February 19, you |
| 18 Q.    Did he tell you that he was regularly | 18 wrote on there, "Found out John cheated from Tina. |
| 19 confiding in another woman? | 19 Confronted him. He killed himself." That's what it |
| 20 A.    No. | 20 says; correct? |
| 21 Q.    Did he tell you that Jennifer tried to break | 21 A.    Yes. |
| 22 off the relationship with him in December? | 22 Q.    Is that what happened? |
| 23 A.    No. | 23 A.    I found out later, when I found the suicide |
| 24 Q.    Did John tell you that he continued to | 24 notes, that they were already in place prior to me |

34 (Pages 130 to 133)

d0285672-15be-4495-b93f-26036f9d2e3c

A1030

Balas v. Taylor, et al.
Cindy L. Adkins

Page 134

1  going out and confronting him. So I believe he was
2  going to do it regardless of whether I found out or
3  not.
4      Q.     But you don't have any idea when he might
5  have left those notes there?
6      A.     I think that the notes were in his truck and
7  that's why he asked for the keys to his truck when he
8  said he had to put something in it, because the pad
9  that they were written on came from his truck.
10     Q.     And you don't know when he might have
11 written them in his truck; correct?
12     A.     No.
13     Q.     And you did go out and confront him about
14 the other woman; correct?
15     A.     Yes.
16     Q.     And at that point is when John killed
17 himself; correct?
18     A.     He came back in the house and wanted to know
19 who told me. And I told him -- I asked Tina, because
20 I had her on the phone, because she said, "Call me
21 when you get back in. I want to make sure that he
22 doesn't hurt you." And I said, "Would you care if I
23 tell John who?" And she said, "No, not if it is
24 true."

Page 135

1          So I told him, and he said, "I have got one
2  job to finish."
3      Q.     And he left the house?
4      A.     He went out to the barn, and I said, "I have
5  got to go," because our barn is really tall, and I
6  said, "I don't know if he is going" -- because I
7  thought he didn't have any more weapons. I said, "He
8  may try to hang himself. I got to go."
9      Q.     Okay.
10     A.     And when I got to the front door, I heard
11 the side door slam, and I peeked back, and I saw his
12 dog looking over there, and I am like, "Oh, he is
13 going out the side door." So I quick ran around and I
14 was chasing after him, and he turned around and
15 pointed the gun at me and told me to get away.
16     Q.     And did you?
17     A.     I just put my hands up and just froze. And
18 he told me I could pack his bags, because before I
19 left the barn I forgot; I told him, "I think you need
20 to pack your bags and go stay at your mom's." And he
21 was backing up and actually tripped and fell, and he
22 said, "Now you can pack my bags."
23          And then he turned around, and as he was
24 walking away from me, I said, "Please, can't we go to

Page 136

1  counseling and try to work this out? Please, please."
2  And he wouldn't turn around.
3      Q.     Okay. Have you -- since that day, have you
4  learned of any other affairs John had?
5      A.     No. As a matter of fact, his mom even said,
6  "I would have never thought that he would have an
7  affair," she said, "because he thought too much of you
8  and the kids."
9      Q.     Have you learned any more about the affair
10 since that day from anyone else?
11     A.     Lee told -- Lee told me he found out that
12 apparently John had sent her flowers end of August.
13     Q.     Did Lee tell you when he found out about it,
14 when Lee found out about it?
15     A.     After John's death.
16     Q.     So Lee didn't know?
17     A.     Apparently Lee knew about the affair, but he
18 didn't know the details of when it exactly started.
19 Apparently on a duck hunting -- they went duck hunting
20 one day and John told him he was having an affair, and
21 Lee said, "I didn't believe him."
22     Q.     You said earlier that John -- this was in
23 the beginning of the deposition, but you said he had
24 been thinking about filing a lawsuit.

Page 137

1      A.     Yes.
2      Q.     Why do you say that?
3      A.     Because he felt he was being retaliated
4  against for resigning from CERT and speaking out and
5  for the job action --
6      Q.     Did John --
7      A.     -- to co-workers.
8      Q.     -- tell you he was going to file a lawsuit?
9      A.     Yes.
10     Q.     When did he tell you that?
11     A.     I would say two weeks before his death.
12     Q.     Did John tell you how he thought he was
13 being harmed because of the retaliation?
14     A.     He felt harassed and intimidated. He felt
15 like he had given his all and was given a failing
16 grade and he felt like this was going to be the
17 beginning of no end, that they were just going to
18 continue until they had -- apparently a co-worker
19 showed him a note where Truman had him write down
20 where he was every minute. The note said something
21 about he was in the bathroom from such a time to such
22 a time and that he was in Captain Wilkinson's office
23 from such a time to such a time. He felt like he was
24 being watched every minute. He thought they were

35 (Pages 134 to 137)

d0285672-15be-4495-b93f-26036f9d2e3c

A1031

Balas v. Taylor, et al.
Cindy L. Adkins

|  | Page 138 |
|---|---|

Page 138

1  looking for something to try to demote him or fire
2  him, and he thought a lot of the jail.
3      Q.      You said earlier he received a poor
4  evaluation.  I think that's what you just said.
5      A.      In his eyes it was a poor evaluation.
6      Q.      He believed that a meets expectations was a
7  poor evaluation?
8      A.      Yes.
9      Q.      Why did you file this lawsuit?
10     A.      Because I think that he was treated unfairly
11  for speaking out for what he thought was right.  And I
12  don't want another family to have to go through what
13  me and my family have gone through.
14     Q.      You really think that John killed himself
15  because he had a bad evaluation?
16     A.      I think of the retaliation he received, yes.
17     Q.      And earlier you said that retaliation was
18  the bad evaluation; correct?
19     A.      Yes.
20     Q.      And you think if John were around today, he
21  would have filed the lawsuit?
22     A.      Yes, I do.
23     Q.      Do you know if John ever filed any lawsuits
24  before?

Page 140

1  the lawsuit Stan Taylor, Alan Machtinger, Mike Deloy
2  and Dave Wilkinson have been named.
3      A.      Yes.
4      Q.      Do you have any personal knowledge or any
5  direct evidence to support any of the allegations
6  against them?
7              MR. NEUBERGER:  Objection; form.  Go
8  ahead.  You can answer.
9              MS. XARHOULAKOS:  You can answer.
10             THE WITNESS:  No.  I think -- I am
11  assuming that my attorneys had to do it because they
12  didn't know the full story of my -- and we were
13  limited on our time, so they listed everybody to make
14  sure that everybody was covered if we needed them.
15  BY MS. XARHOULAKOS:
16     Q.      Okay.  And can you tell me what you are
17  seeking, what relief you want from this lawsuit, what
18  damages you want?
19             MR. NEUBERGER:  Objection; form.  You
20  can answer.
21             THE WITNESS:  Economic, for one.  I
22  have two kids that I have to put through college.  I
23  know it won't bring their father back, but I wish we
24  could.  The stress that we went through prior to

Page 139

1      A.      No.
2      Q.      You have remarried since John's death;
3  correct?
4      A.      Yes.
5      Q.      When did you remarry?
6      A.      June of 2006.
7      Q.      And what is your husband's name?
8      A.      Ace.
9      Q.      And when did you meet Ace?
10     A.      We were actually friends with John -- Ace,
11  John and I were friends.  He was our engine-builder
12  for our go-carts, and we had known him for six years.
13     Q.      And I guess Ace, was he single at the time
14  when John killed himself?
15     A.      He was -- had been separated for over a
16  year.
17     Q.      And then when did you start dating Ace?
18     A.      I would say April of '05.
19     Q.      Did Ace at some point move into your home?
20     A.      Yes.
21     Q.      When did that happen?
22     A.      I would say sometime in the fall of 2005.
23     Q.      Do you have -- I guess I want to talk just
24  real quick specifically about the claims against -- in

Page 141

1  John's death and all the stress that we have had
2  since; the counseling.  My son still is struggling
3  more than my daughter, and he has seen three
4  counselors so far.
5  BY MS. XARHOULAKOS:
6      Q.      What loss do you think John suffered during
7  his lifetime because of the allegations in the
8  complaint?
9      A.      What loss?  I think he would have been at
10  the jail until he retired.  He hoped one day that he
11  could be warden.
12     Q.      I want to just have you direct your
13  attention to specifically the time period from June of
14  '04 to February of '05.  Do you think John suffered
15  any loss at that time?
16     A.      Yes, I do.  I think the depression totally
17  changed his total personality.  He was so stressed, I
18  think it ruined his relationship with his kids,
19  because they felt like they didn't even know who their
20  dad was anymore.  They kept saying, "What's wrong with
21  Daddy?  What's wrong with Daddy?"
22     Q.      Have you received any insurance proceeds
23  since John's death?
24     A.      Yes.

36 (Pages 138 to 141)

Balas v. Taylor, et al.
Cindy L. Adkins

Page 142

1    Q.    From his death?
2    A.    Yes.
3    Q.    How much did you receive?
4    A.    I don't know the exact amount.
5    Q.    Can you approximate how much?
6    A.    280,000.
7    Q.    Earlier you said that to draft the complaint
8    you had spoken to some union officials and gotten some
9    affidavits; is that correct?
10   A.    My attorneys did.
11   Q.    Do you know who those union officials were?
12   A.    No.
13   Q.    Did you provide the names to them?
14   A.    No.
15         MS. XARHOULAKOS:  Okay.  Do you want
16   to take a quick break?  I think I might be close to
17   done.
18         (Recess taken.)
19         MS. XARHOULAKOS:  I have three quick
20   questions and then we will be done.  At least I will
21   be done.  Okay?
22   BY MS. XARHOULAKOS:
23   Q.    Going back to the damages, I just need to be
24   more specific.  Are you claiming that there is any

Page 143

1    salary that John lost during his lifetime as a result
2    of the allegations in the complaint?
3    A.    Definitely.
4    Q.    During his lifetime?
5    A.    During his lifetime.
6    Q.    Yes.
7    A.    Salary he lost?
8    Q.    From Department of Correction.
9    A.    No, because he had vacation time.  He got
10   paid when he took off prior.
11         I don't know if I understand exactly what
12   you are trying to say.
13   Q.    I will rephrase.  Was John ever denied
14   overtime?
15   A.    Denied overtime, no.
16   Q.    Was John ever denied a promotion because of
17   the allegations in the complaint?
18   A.    No.
19   Q.    Did John suffer any other economic loss from
20   the Department of Correction because of the
21   allegations in the complaint?
22   A.    Not that I am aware of.
23         MR. NEUBERGER:  What time?  What
24   timeframe are we talking about?

Page 144

1          MS. XARHOULAKOS:  June 2004 to
2    February 2005.
3          MR. NEUBERGER:  Okay.
4    BY MS. XARHOULAKOS:
5    Q.    Okay.  The answer is the same for that time
6    period?
7    A.    Yes.
8          MS. XARHOULAKOS:  Okay.  That's all I
9    have.
10         MR. NEUBERGER:  Then I have a few
11   questions.
12   BY MR. NEUBERGER:
13   Q.    Cindy, do you believe that John or John's
14   estate suffered economic loss from the time of his
15   death forward?
16   A.    Yes, I do.
17   Q.    Okay.  Let me see.  A couple more questions.
18         I believe in the very beginning you were
19   asked some questions about whether the workplace was
20   stressful, whether John's workplace was stressful from
21   July of 2004 through his death, and I think the
22   question asked you to compare that to prior periods of
23   time in the workplace.  Do you recall that line of
24   questioning?

Page 145

1    A.    Yes.
2    Q.    Okay.  And what was your answer?  Was the
3    July 2004 through February of '05 timeframe more
4    stressful --
5    A.    Yes.
6    Q.    -- or less stressful?
7    A.    More.
8    Q.    More stressful.  Okay.
9          And do you recall approximately when that
10   stress began?
11   A.    I would say the time -- from the time he
12   quit CERT on.
13   Q.    Okay.  And so that would have been August 2
14   of -- the beginning of August of 2004?  Or maybe the
15   better question is do you recall when -- do you recall
16   when he quit CERT?
17   A.    August 6.
18   Q.    August 6 of 2004?
19   A.    Correct.
20   Q.    Okay.  And from that timeframe forward the
21   stress that John was experiencing in the workplace
22   that he was speaking to you about, was that more
23   stressful or less stressful than before?
24   A.    More, very much more.

37 (Pages 142 to 145)

d0285672-15be-4495-b93f-26036f9d2e3c

A1033

Balas v. Taylor, et al.
Cindy L. Adkins

Page 146

1  Q.    Okay.  Did you talk about the change in
2  John's personality in your answers to the
3  interrogatories?
4  A.    Yes.
5  Q.    Okay.  And John's mood, his personality from
6  August of 2004 through February of 2005, think of that
7  timeframe and then think of times prior to that
8  timeframe.  Did his mood or personality change in that
9  time?
10  A.    Definitely.
11  Q.    Okay.  For better or for worse?
12  A.    For worse.
13       MR. NEUBERGER:  Okay.  All right.  I
14  have no further questions.
15  BY MS. XARHOULAKOS:
16  Q.    Okay.  Just a little bit of follow-up on
17  that.  Did you read Dr. Tavani's report?
18  A.    Yes.
19  Q.    Do you recall telling Dr. Tavani that John
20  began changing in 2003?
21  A.    Yes, with his drinking.
22  Q.    Okay.  Do you recall telling her that he was
23  experiencing stress as early as 2003?
24  A.    Yes.

Page 147

1  Q.    So that would be a change from -- is that a
2  change from the testimony you just gave --
3       MR. NEUBERGER:  Objection.
4  BY MS. XARHOULAKOS:
5  Q.    -- to your attorney?
6  A.    I would say that, yes, he was experiencing
7  stress then, but it got much worse in the fall of
8  2004.
9  Q.    But the stress from 2003 to '04 was more
10  than in previous years; is that correct?
11  A.    Yes.
12       MS. XARHOULAKOS:  Okay.  Anything
13  else?
14  BY MR. NEUBERGER:
15  Q.    All right.  The stress from August of 2004
16  through February of 2005, was that more or less than
17  the stress that John was experiencing in 2003 through
18  the beginning of 2004?
19  A.    Yes, it was more.
20  Q.    It was more in the timeframe from August of
21  '05 -- I am sorry -- August of 2004 through February
22  of '05?
23  A.    Yes.
24       MR. NEUBERGER:  Okay.  No further

Page 148

1  questions.  We will read and sign.
2       - - -
3       (Deposition concluded at 12:50 p.m.)
4       - - -
5       INDEX
6  WITNESS                    Page
7  CINDY L. ADKINS
8    By Ms. Xarhoulakos--------------------  3
9    By Mr. Neuberger-------------------- 144
     By Ms. Xarhoulakos-------------------- 146
10   By Mr. Neuberger-------------------- 147

ADKINS DEPOSITION EXHIBITS           Marked
11
  1 Performance evaluation date-stamped 1/8/97  34
12
  2 Performance evaluation date-stamped 4/19/99  34
13
  3 Series of vacation requests, dated 11/29/04  46
14
  4 Series of leave applications, dated 1/5/05  50
15
  5 Series of handwritten journal notes
16   dated 2/05-------------------------------  59
  6 Marked-up calendar pages for January,
17   February and June 2005----------------  63
18
  7 Five handwritten notes found post-death----  65
19
     - - -
20
21
22
23
24

Page 149

1       CERTIFICATE
2       I, LORRAINE B. MARINO, Registered
3  Diplomate Reporter and Notary Public, do hereby
4  certify that the witness, CINDY L. ADKINS, after being
5  duly sworn by me, was examined by counsel for the
6  respective parties and the questions of said witness
7  and her answers were taken down by me in stenotype
8  notes and thereafter transcribed into typewriting at
9  my direction.
10       I certify that the foregoing is a true
11  and correct transcript of the testimony given at said
12  examination of said witness.
13       I further certify that the deposition
14  was made available to the witness for reading and
15  signing.
16       I further certify that I am not
17  counsel, attorney, or relative of either party, or
18  otherwise interested in the event of this suit.
19
20
21
       Registered Diplomate Reporter and Notary Public
22       Certificate No. 181PS/Exp.: Permanent
23
     Date: 12/27/07
24

38 (Pages 146 to 149)

d0285672-15be-4495-b93f-26036f9d2e3c

A1034

ATTACH TO DEPOSITION OF: Cindy L. Adkins

DATE TAKEN: 12-20-07

IN THE MATTER OF: Balas v Taylor

## ERRATA SHEET

**INSTRUCTIONS:** After reading the transcript of your deposition, please note any change or correction and the reason therefor on this sheet. **Do not make any marks or notations on the transcript itself.** Rule 30(e) governing this procedure is enclosed. Please sign and date this errata sheet and return it to our office at the address indicated below. Thank you.

| PAGE | LINE | CHANGE OR CORRECTION AND REASON |
|------|------|----------------------------------|
| 36 | 1 | But I don't think that was John — that would not have been John, because he was a hard worker, and he always strived to do his best. (Reason - typographical error - did not express what was stated.) |
| 82 | 23 | I told you what the counselors said about guns. (Reason - typographical error - did not express what was stated) |

I have read the foregoing transcript of my deposition and, except for any corrections or changes noted above, I hereby subscribe to the transcript as an accurate record of the statements made by me.

DATED: 1-23-08     _Cindy L Adkins_
(Signature of Deponent)

RETURN TO: WILCOX & FETZER, LTD.
1330 King Street
Wilmington, DE 19801



WILCOX & FETZER LTD.

In the Matter Of:

# Balas

v.

# Taylor, et al.

C.A. # 06-592-JJF

———————————

Transcript of:

Michael R. Ackenbrack

January 8, 2008

———————————

Wilcox and Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: depos@wilfet.com
Internet: www.wilfet.com

Balas v. Taylor, et al.

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

CINDY L. BALAS a/k/a CINDY L.      )
ADKINS, Executrix of the Estate of )
CORPORAL JOHN J. BALAS,            )
                                   )
          Plaintiff,         )
                             ) Civil Action
v.                           ) No. 06-592-JJF
                             )
STANLEY W. TAYLOR, JR., individu-  )
ally and in his official capacity  )
as the Comissioner of Correction;  )
ALAN MACHTINGER, individually and  )
in his official capacity as the    )
Director of Human Resources of the )
Department of Correction; MICHAEL  )
DELOY, individually and in his     )
official capacity as Deputy Warden )
of Sussex Correctional Institution;)
CAPTAIN DAVID WILKINSON, individu- )
ally; LIEUTENANT TRUMAN MEARS,     )
individually; and DEPARTMENT OF    )
CORRECTION OF THE STATE OF         )
DELAWARE,                          )
                                   )
          Defendants.        )

          Deposition of MICHAEL R. ACKENBRACK taken
pursuant to notice at the law offices of The Neuberger
Firm, P.A., Two East Seventh Street - Suite 302,
Wilmington, Delaware, beginning at 10:03 a.m. on
Tuesday, January 8, 2008 before Christina M. Vitale,
Certified Shorthand Reporter and Notary Public.

Continued. . . . . . . . . .

          WILCOX & FETZER
   1330 King Street -  Wilmington, Delaware 19801
          (302) 655-0477

          www.wilfet.com

d1e363f6-7f63-483e-9701-c7649478682f

Balas v. Taylor, et al.
Michael R. Ackenbrack

Page 2

1  APPEARANCES:
2
3      CHERYL A. HERTZOG, ESQUIRE
       THE NEUBERGER FIRM, P.A.
         Two East 7th Street, Suite 302
4        Wilmington, Delaware  19801
         For the Plaintiff
5
6      STACEY XARHOULAKOS, ESQUIRE
       DEPARTMENT OF JUSTICE
7        Carvel State Office Building
         820 N. French Street
8        Wilmington, Delaware  19801
         For the Defendants
9
10        - - - - - - - - - - - - - -
11        MICHAEL R. ACKENBRACK, the deponent herein,
12  having first been duly sworn on oath, was examined and
13  testified as follows:
14  BY MS. HERTZOG:
15    Q.  Good morning, my name is Cheryl Hertzog, I'm a
16  lawyer for the plaintiff, Cindy Adkins, formerly Cindy
17  Balas, the widow of Corporal John Balas.  Have you
18  ever testified in court before?
19    A.  Yes.
20    Q.  And when was that?
21    A.  November 2006.
22    Q.  Was that a lawsuit that you were testifying in
23  court for?
24    A.  Yes.

Page 3

1    Q.  And have you ever had your deposition taken
2  before?
3    A.  Yes.
4    Q.  When was that?
5    A.  For that same case, earlier that year.  I don't
6  remember what month it was.
7    Q.  So, you are familiar a little bit with the
8  procedures of having your deposition taken?
9    A.  Yes.
10    Q.  And so, for example, you will have to verbalize
11  your answers, you can't nod your head because the
12  court reporter here is going to take down our words.
13  We also can't talk at the same time, correct?
14    A.  Correct.
15    Q.  After you are done you will have an opportunity
16  to review the transcript to make sure there are no
17  errors or anything on it.  Okay?
18    A.  Okay.
19    Q.  If I ask you a question that you don't
20  understand, just ask me to rephrase and I'll be happy
21  to do that.  Okay?
22    A.  Sure.
23    Q.  If you don't know the answer to a question,
24  just say so, I don't want you to guess.

Page 4

1    A.  Okay.
2    Q.  Are you taking any medications today?  Is there
3  anything else that would prevent you from remembering
4  accurately or testifying truthfully today?
5    A.  No.
6    Q.  If you need a break, let me know.  You have
7  taken an oath to tell the truth today.  Do you
8  understand the significance of that oath?
9    A.  Yes.
10    Q.  Do you understand that I'm going to be asking
11  some questions about a lawsuit that was filed by Cindy
12  on behalf of her late husband, John Balas, in
13  September of 2006?
14    A.  Yes.
15    Q.  Have you met with anyone prior to your
16  deposition today?
17    A.  Only Stacey.
18    Q.  And have you talked with anybody in your office
19  about the deposition at all?
20    A.  No.
21        MS. HERTZOG:  Are you representing him
22  today?
23        MS. XARHOULAKOS:  Given that we represent
24  the Department of Correction, so, yes, I would have to

Page 5

1  say we are.
2        MS. HERTZOG:  Okay.
3  BY MS. HERTZOG:
4    Q.  And your full name?
5    A.  Michael Robert Ackenbrack.
6    Q.  Where were you born?
7    A.  West Chester, Pennsylvania.
8    Q.  And where were you raised?
9    A.  Pennsylvania.
10    Q.  Where did you go to high school?
11    A.  East High School.
12    Q.  Is that in West Chester?
13    A.  Yes.
14    Q.  What did you do after high school?
15    A.  Worked for Hilton Hotel Corporation, went to
16  Penn State and left there and moved to Delaware and
17  worked for Bridgeville Police Department.
18    Q.  And then when did you start with the Department
19  of Correction?
20    A.  October 1997.
21    Q.  And what institution were you at?
22    A.  After graduation from the Academy I worked at
23  the women's prison, transferred to SCI in 1998 and now
24  I transferred to Sussex Community Corrections in July

Wilcox and Fetzer, Ltd.  Registered Professional Reporters          302-655-0477

d1e363f6-7f63-483e-9701-c7649478682f

**A1038**

Balas v. Taylor, et al.
Michael R. Ackenbrack

Page 6

1  of 2006.
2    Q.  And what rank are you currently?
3    A.  Sergeant.
4    Q.  When you came out of the Academy, you were a
5  correction officer?
6    A.  Correct.
7    Q.  When did you become a corporal?
8    A.  In 2004.
9    Q.  Next rank is?
10    A.  Sergeant.
11    Q.  When did you become a sergeant?
12    A.  July 2006.
13    Q.  Do you remember the month you became a
14  corporal?
15    A.  March 2004.
16    Q.  Did you know John Balas?
17    A.  No.
18    Q.  Not even in working at SCI you did not know of
19  him?
20    A.  I knew of him.  Did not work with him.
21    Q.  You didn't know him personally?
22    A.  Correct.
23    Q.  What did you know of him?
24    A.  That he was a corporal and he worked in the

Page 7

1  receiving room.
2    Q.  Are you currently a union shop steward for
3  COAD?
4    A.  No, I'm not.
5    Q.  When did you become a shop steward for COAD?
6    A.  It was at the inception of the COAD union,
7  sometime in 2003.
8    Q.  How long did you serve as a shop steward?
9    A.  Eighteen months.
10    Q.  Why did you stop being a shop steward?
11    A.  For personal reasons.
12    Q.  Were you a shop steward in October of 2004?
13    A.  Yes.
14    Q.  Were you the union shop steward for SCI in
15  October of 2004?
16    A.  I was one of the shop stewards.
17    Q.  How many were there?
18    A.  I do not recall.
19    Q.  More than ten?
20    A.  No, probably less than five.
21    Q.  Were you John Balas' shop steward in October of
22  2004?
23    A.  Yes.
24    Q.  Can you explain how the shop steward worked.

Page 8

1  Is one shop steward assigned to so many people or
2  there is just five and you can go to any of them?
3    A.  No.  Whatever how many there are it's whatever,
4  you are not assigned to anybody specifically.  It's
5  just a union member seeking you out.
6    Q.  So, any of the correction officers could have
7  sought any of the shop stewards out --
8    A.  Correct.
9    Q.  -- as long as it was at the same institution?
10    A.  Correct.
11    Q.  Can you explain the duties of a shop steward?
12    A.  They are to handle any type of conflicts
13  between management and employees.  Basically act as a
14  voice for -- as for the -- any type of grievance
15  process, handle any type of disciplinary matters.
16    Q.  And by handle you mean -- what does that
17  entail?
18    A.  Could you rephrase?
19    Q.  Sure.  You said you handled such things as
20  grievances and disciplinary things.
21    A.  Oh, that would be providing the grievant with a
22  grievance form, you know, talking to them about their
23  rights under the Garrity rules and stuff like that.
24    Q.  Would you also go to hearings with them?

Page 9

1    A.  Yes.
2    Q.  Such as grievance hearings and there are
3  certain levels for those?
4    A.  Right.
5    Q.  Can you walk me through a little bit the
6  process of when a correction officer wants to file a
7  union grievance?
8    A.  Well, the grievant would seek out a shop
9  steward, discuss the matter at hand.  If the shop
10  steward would think there would be any type of
11  validity, a grievance form would be handed to the
12  grievant and it's up to the grievant to fill
13  everything out.
14    Q.  What happens to that form after the grievant
15  fills that out?
16    A.  That could be handed in to the management from
17  the grievant or could be passed back to the shop
18  steward to be turned into management.
19    Q.  And what was the process that you followed?
20    A.  I don't know.  I mean, I never really handled
21  any grievances up until John seeking me out for the
22  one.
23    Q.  So, aside from John Balas you never had to file
24  a grievance --

3 (Pages 6 to 9)

d1e363f6-7f63-483e-9701-c7649478682f

A1039

Balas v. Taylor, et al.
Michael R. Ackenbrack

Page 10

1  A. No.
2  Q. -- for a correction officer?
3  A. No.
4  Q. Can you explain what the grievance form looks
5  like?
6  A. It has been a while since I've seen them.
7  There is probably a body about explaining the
8  grievance, an area for a resolution, informal
9  resolution or anything.
10  Q. Was there one page to it? Were there multiple
11  pages?
12  A. There could be multiple pages, yes.
13  Q. Could be, were there different types of
14  grievance forms?
15  A. No, you would have your face sheet and any type
16  of attachments for any additional page.
17  Q. Was it a carbon copy with three separate layers
18  of pages?
19  A. I don't remember.
20  Q. You don't remember if there was a white sheet,
21  a pink sheet and a yellow sheet?
22  A. No.
23  Q. Did you ever handle a grievance, like actually
24  hold it?

Page 11

1  A. Yes, I guess, yes.
2  Q. But you don't remember how many pages were on
3  it?
4  A. No.
5      MS. HERTZOG: I'm going to mark an exhibit
6  that would be Exhibit 1.
7      (Ackenbrack Deposition Exhibit No. 1 was
8  marked for identification.)
9  BY MS. HERTZOG:
10  Q. I've placed a document before you which has
11  been marked Ackenbrack Exhibit 1. Do you see the
12  Bates stamp at the bottom, very, very bottom of the
13  page, P831?
14  A. Oh, yes.
15  Q. And does the next page say P832?
16  A. Yes.
17  Q. Do you recognize this document?
18  A. It is a COAD grievance form.
19  Q. And does this appear to be a copy of a
20  grievance filed by John Balas on October 4th, 2004?
21  A. Yes.
22  Q. At the top do you see where it says "Number"?
23  A. Yes.
24  Q. I think the copying got caught, but it says,

Page 12

1  "File Number." If you look at the second page it
2  says, "File Number 04-04-A," correct?
3  A. Um-hum.
4  Q. Is that the file number given to the grievance?
5  A. I do believe when we were setting up through
6  COAD how -- it was up to each -- every individual shop
7  steward to keep track of your grievances. There was
8  no file number given from what I remember. So, it's
9  basically a created file number by myself.
10  Q. So, you gave this grievance that file number?
11  A. Correct.
12  Q. And it would have been maybe according to your
13  own system?
14  A. That's correct.
15  Q. Do you remember what your system was?
16  A. The month and the year -- I'm sorry, not the
17  month, excuse me, the day and year.
18  Q. Do you remember what the A stood for?
19  A. Maybe being my last name? No, I don't
20  remember. I don't know.
21  Q. And on the second page at the top do you see
22  where it says 0404A?
23  A. That's correct.
24  Q. Is that the same file number that is on the

Page 13

1  first page?
2  A. Yes.
3  Q. Would you have filled out both file numbers?
4  A. I don't know.
5  Q. And you said that you hadn't ever actually
6  filed -- had to deal with one of these before, so this
7  would have been the first time you would have given a
8  grievance a file number?
9  A. That's correct.
10  Q. Did you do any after John Balas?
11  A. No.
12  Q. Do you remember when you stopped being a shop
13  steward?
14  A. March of 2005.
15  Q. So, from 2003 to 2005 this was the only
16  grievance that you handled?
17  A. Um-hum, yes.
18  Q. Do you see about middle of the page where it
19  says, "Signature of Grievant"?
20  A. Yes.
21  Q. Do you recognize that signature?
22  A. It's kind of illegible in my opinion.
23  Q. So, you can't read the signature?
24  A. I guess it says John Balas.

4 (Pages 10 to 13)

d1e363f6-7f63-483e-9701-c7649478682f

A1040

Balas v. Taylor, et al.
Michael R. Ackenbrack

Page 14

1   Q.  What is the date next to that signature?
2   A.  10/04/04.
3   Q.  Do you see where it says, "Signature of
4   Representative"?
5   A.  That's correct.
6   Q.  Whose signature is that?
7   A.  That is my signature.
8   Q.  What does it say next to title?
9   A.  "COAD S/S."
10  Q.  What does S, slash, S stand for?
11  A.  Shop steward.
12  Q.  Back to the top of this page do you see written
13  says, "Page," at the top right?
14  A.  Yes.
15  Q.  And it says, "Page 1 of 2"?
16  A.  Yes.
17  Q.  Would you have filled that in?
18  A.  I don't know.
19  Q.  And on the second page where it says, "Page 2
20  of 2," do you remember if you filled that in?
21  A.  I don't remember.
22  Q.  Setting this document aside for a minute, do
23  you remember what John's grievance was about?
24  A.  No.

Page 15

1   Q.  Did he speak to you about what his grievance
2   was about?
3   A.  At the time he must have, yes.
4   Q.  And do you remember how he went about doing it?
5   A.  No.
6   Q.  I want to let you take a look at this document
7   and read through the first and second page to see if
8   it refreshes your memory at all.
9   A.  (Witness complies.)
10  Q.  Do you remember speaking to John at all about
11  what this grievance was about?
12  A.  Just after reading it, yes.
13  Q.  But it doesn't refresh your memory as to what
14  you talked about?
15  A.  No.
16  Q.  You don't remember if he contacted you in-
17  person or by phone?
18  A.  No.
19  Q.  But you worked at the same institution?
20  A.  Correct.
21  Q.  Excuse me, you worked at the same institution
22  in October of 2004?
23  A.  Correct.
24  Q.  Is it possible he came and talked to you in-

Page 16

1   person?
2   A.  I don't remember.
3   Q.  Did you ever have a grievant contact you even
4   if they didn't file a grievance while you were a shop
5   steward?
6   A.  Could you rephrase that?
7   Q.  Did a correctional officer ever come to you and
8   say, I'm thinking about filing a grievance, even
9   though he didn't end up following through with it?
10  A.  Oh, sure.
11  Q.  How did they normally contact you?
12  A.  It all depended on what part of the compound
13  they worked.  SCI is a big place.  So, if you are
14  within the same building I was inside of, it would be
15  in-person.  If they were on the other side of the
16  compound, telephone, but.
17  Q.  So, you were accessible by telephone?
18  A.  Yes.
19  Q.  And also in-person if they wanted to?
20  A.  Yes.
21  Q.  And when an officer approached you about a
22  problem they were having, did you meet with them?
23  A.  Yes.
24  Q.  Was that your normal practice to meet with the

Page 17

1   person?
2   A.  Sure.
3   Q.  And to discuss what was going on?
4   A.  Sure, yes.
5   Q.  What was your next step then?
6   A.  If, you know, if they were going -- if they
7   wanted to go forward with a grievance, they would have
8   been handed a form such as this one placed in front of
9   me and it would be up to them to fill it out.
10  Q.  But you never had to give anybody else a form?
11  A.  No.
12  Q.  So, you never handed another officer a
13  grievance form aside from John Balas?
14  A.  Not that I remember, no.  Most of the areas I
15  handled was disciplinary.
16  Q.  And so no one would file a grievance after
17  being disciplined?
18  A.  No.
19  Q.  I'm going to place a document in front of you
20  and I'm not going to mark it as an exhibit only
21  because it's the original photocopy.  What has been
22  marked Ackenbrack-1 is a direct copy of this document.
23       MS. HERTZOG:  Stacey, you are more than
24  welcome to take a look at it.

5 (Pages 14 to 17)

d1e363f6-7f63-483e-9701-c7649478682f

A1041

Balas v. Taylor, et al.
Michael R. Ackenbrack

Page 18

1  BY MS. HERTZOG:
2    Q.  Can you describe the document I have placed
3  before you because it is not going to be attached to
4  the actual deposition?
5    A.  It's an original grievance COAD form.
6    Q.  Is it yellow?
7    A.  Yes.
8    Q.  Does it appear to be a carbon copy?
9    A.  Yes, it does.
10   Q.  Does it have the same file number of 04-04-A
11  attached?
12   A.  That's correct.
13   Q.  Not attached, but up at the top left corner?
14   A.  Yes.
15   Q.  And the first page has 1 of 2 at the top right-
16  hand corner?
17   A.  Right.
18   Q.  And second page has 2 of 2?
19   A.  Right.
20   Q.  And same file number appears on the second
21  page?
22   A.  Yes.
23   Q.  On the first page there is a signature line for
24  signature of grievant, first page?

Page 19

1    A.  Yes.
2    Q.  And a signature line for signature of
3  representative?
4    A.  Yes.
5    Q.  Is that your signature?
6    A.  Yes.
7    Q.  And the second page has the filled out form?
8    A.  Correct.
9    Q.  Is that your handwriting?
10   A.  No.
11   Q.  Would you say that this was an original -- a
12  copy of what has been marked as Ackenbrack Exhibit 1?
13   A.  It is a photocopy, it is an original of the
14  photocopy, yes.
15   Q.  We have talked a little bit earlier about
16  whether there were multiple pages to a grievance and
17  you didn't remember?
18   A.  Right.
19   Q.  Does this refresh your memory at all?
20   A.  Yes, I guess, yes.
21   Q.  So, a grievance form could it have had three
22  different pages to it?
23   A.  I don't know.
24   Q.  When you became a shop steward, did you ever

Page 20

1  have to go through any type of I don't know if
2  training is the right word, but as far as how to go
3  about filing grievances?
4    A.  We never really had any type of formal training
5  on how to file grievances, no.
6    Q.  Did you have any informal training?
7    A.  We had a member -- excuse me -- somebody that
8  the union hired to I don't want to say teach, but to
9  show union instructions on how to do this stuff, but as far
10  as there was nothing written in stone from what I
11  remember, no.
12   Q.  Do you remember what the process was?
13   A.  No, I don't.
14   Q.  Do you remember -- I think this shows that this
15  is a carbon copy, correct, this doesn't look like it's
16  the top page of something?
17   A.  Correct.
18   Q.  So, if there was a top page to it and if I were
19  to represent to you that there were two top pages,
20  being a white and pink page and the third page was
21  yellow, do you remember what should have happened to
22  the white and pink copies?
23   A.  No.
24   Q.  If there was a white copy, could it be possible

Page 21

1  that that was supposed to be kept by the shop steward?
2    A.  I don't remember.
3    Q.  Is it possible that a copy was supposed to be
4  given to the warden of the institution?
5    A.  Well, the warden, if it was being filed the
6  warden would have received a copy of it.
7    Q.  From who?
8    A.  From either the shop steward or the grievant,
9  either one of the two.
10   Q.  Was the pink copy --
11   A.  I don't remember which color it was.
12   Q.  Let me finish my question.  Could it be that
13  the pink copy was supposed to be filed with the COAD
14  office?
15   A.  Again, I don't remember which color went to
16  where.
17   Q.  So, you never received the white copy of this
18  grievance from John Balas?
19   A.  Not that I remember, no.
20   Q.  So, you didn't give the warden a copy of this
21  grievance?
22   A.  I never filed any grievances for him.
23   Q.  And you never filed anything with the COAD
24  office?

6 (Pages 18 to 21)

d1e363f6-7f63-483e-9701-c7649478682f

**A1042**

Balas v. Taylor, et al.
Michael R. Ackenbrack

Page 22

1  A.  No.
2  Q.  After you spoke with John -- and it could have
3  been either by phone or in person, correct, could have
4  been?
5  A.  Sure.
6  Q.  -- did you hand him a grievance form?
7  A.  I might have.  He might have just requested it.
8  If he requested it, I gave it to him.
9  Q.  Isn't that your signature on the grievance?
10  A.  Yes.  I don't remember.
11  Q.  Do you remember signing that form?
12  A.  I don't remember signing it, no.
13  Q.  But you don't contest that that's your
14  signature?
15  A.  No, I'm not contesting that it's my signature.
16  It is my signature.
17  Q.  Would you have reviewed the grievance before
18  signing it?
19  A.  I guess I would have, yes.
20  Q.  And as part of being a shop steward would you
21  think that that was your job to review the
22  grievance --
23  A.  Sure.
24  Q.  -- before signing it?

Page 23

1  A.  Sure.
2  Q.  But you wanted to do a good job for being a
3  shop steward?
4  A.  I guess, yeah.
5  Q.  Why did you become a shop steward?
6  A.  At the time for personal reasons.
7  Q.  And what were those personal reasons?
8  A.  Because we were creating a new union for
9  correctional officers and I wanted to be involved in
10  it.
11  Q.  Did you want to help correctional officers that
12  might have had problems with the management?
13  A.  I don't think that was the reason why, no.
14  Q.  So, you didn't want to represent the interests
15  of the officers?
16  A.  That's not what I'm saying.  I, you know,
17  wanted to be involved, I guess, in one way or another
18  and this is what was offered, a shop steward was
19  offered to me.
20  Q.  Once you became a shop steward was it important
21  to you to protect the interests of the officers?
22  A.  The ones who were being disciplined, yes.
23  Q.  So, for instance, John Balas in his mind was
24  being disciplined so you would want to have protected

Page 24

1  his interest?
2        MS. XARHOULAKOS:  Object to form.
3  BY MS. HERTZOG:
4  Q.  You can answer.
5  A.  I guess if he felt he was being disciplined,
6  yes.  May I give you some clarity to one of these
7  forms?
8  Q.  Sure.
9  A.  John would have been handed that probably for
10  him to fill out.
11  Q.  "That" meaning the second page of the
12  grievance?
13  A.  That's correct, second page of the grievance.
14  First page would have stayed with me.  He would have
15  filled out the top form, the top area where it says
16  the date filed and the name of grievant because the
17  name of grievant that is not my handwriting.  He would
18  have filled out the institution area, SCI, the
19  classification of grievant, which is CPL, short for
20  corporal, he would have filled that all out.  The
21  remaining areas, the file number, the page, the list
22  of violations or nature of grievance, the EPPA or
23  employee performance evaluation -- whatever it breaks
24  down to -- for the year 2004 is my handwriting.  The

Page 25

1  adjustment required is my handwriting and I probably
2  would have had him just sign it the day I gave it to
3  him and I might have just signed it as waiting to
4  receive the second page back.  That might have been,
5  you know, how I went down.
6  Q.  Are you saying that might have been or that's
7  how you remember?
8  A.  Well, that's how I remember pretty much how
9  what happens.
10  Q.  And did you ever follow-up with John to get the
11  second page?
12  A.  No.
13  Q.  You knew he wanted to file a grievance, but did
14  you ever call him and ask him where he was at?
15  A.  No, no.
16  Q.  Do you remember why you wouldn't have done
17  that?
18  A.  Why I wouldn't have done what?
19  Q.  You are saying that you might have kept that
20  first page in your possession.
21  A.  Sure.
22  Q.  If he had the second page, would you have
23  followed up with him to ask if he was going to
24  complete it?

7 (Pages 22 to 25)

d1e363f6-7f63-483e-9701-c7649478682f

A1043

Balas v. Taylor, et al.
Michael R. Ackenbrack

Page 26

1    A.  That was up to him.
2    Q.  What did you ever do with the first page?
3    A.  I have no idea.
4    Q.  Did you keep files?
5    A.  I did probably then in a binder, yeah.
6  Whatever happened to it I couldn't tell you.
7    Q.  When you were no longer a shop steward, did you
8  turn those files back into COAD?  Did you turn them --
9  who did you turn those into?
10   A.  I don't believe I had any files to turn back
11 into COAD other than the shop steward binder that we
12 were given.
13   Q.  What was that binder?
14   A.  It just had the copies of our -- at that time
15 or currently -- our interim agreement and I don't
16 remember anything else that was in there.
17   Q.  So you don't know what would have happened to
18 the original?
19   A.  I have no idea.
20   Q.  Would you have taken the first two pages of
21 that?
22   A.  If there were three pages, I don't remember, I
23 don't remember how many pages there were to the
24 grievance form.

Page 27

1    Q.  But you are saying you might have kept the
2  original of this page?
3    A.  No.
4    Q.  Then maybe I don't understand what you were
5  saying before is that you would have kept the top page
6  and waited for the second page to come back to you?
7    A.  I don't know.  Like I said, I don't remember if
8  there was the other two pages to this.  I have no idea
9  what happened to them.
10   Q.  I'm just expanding a little bit when you asked
11 to clarify and you said that you probably would have
12 kept this top page?
13   A.  Right, yeah, if there was two or three pages to
14 it, I might have kept a copy of it, yes.
15   Q.  But you don't know what happened to those
16 copies?
17   A.  I have no idea.
18   Q.  And you never gave copies of that to anybody at
19 the Department of Correction?
20   A.  No.
21   Q.  You never gave copies of that to anybody at
22 COAD?
23   A.  No.
24   Q.  I'm going to place another document in front of

Page 28

1  you that has been marked Mears Exhibit 12.  I don't
2  think I'll mark this as an exhibit to this since it
3  was marked previously.
4        MS. XARHOULAKOS:  That's fine.
5  BY MS. HERTZOG:
6    Q.  Does this appear to be another copy of the
7  grievance we have been discussing?
8    A.  Yes, it does.
9    Q.  And at the bottom you see where it says
10 Deposition Exhibit Mears 12?
11   A.  That's correct.
12   Q.  At the top do you see -- I'm sorry, let me back
13 up a minute.  Do you see the same file number, 0404A?
14   A.  That's correct.
15   Q.  And it's the same file number, correct?
16   A.  That's correct.
17   Q.  And the same date, 10/4/04?
18   A.  That's correct.
19   Q.  At the very top do you see where there is a fax
20 number and I'll represent that I think when it got
21 scanned by the court reporter for Mears Exhibit 12 it
22 got cut off, but I'll represent that it's 854-6985, do
23 you see that?
24   A.  Yes.

Page 29

1    Q.  Do you know what fax number that is?
2    A.  I have no clue.
3    Q.  Do you know why this would have had a fax
4  number on it?
5    A.  I have no clue.
6    Q.  I think you are saying that you filled in --
7  back to Ackenbrack Exhibit 1 I think you said you
8  filled in where it says list of violations and then
9  adjustment required?
10   A.  That's correct.
11   Q.  You didn't sign a blank grievance form,
12 correct?
13   A.  No.
14   Q.  You wouldn't have signed a blank grievance
15 form?
16   A.  No.
17   Q.  I think you stated that you did not follow-up
18 with John after you signed this grievance form?
19   A.  Not that I remember.
20   Q.  And John never gave any documents back to you
21 to file?
22   A.  Not that I remember, no.
23   Q.  Did you ever tell anybody that John was going
24 to file a grievance?

8 (Pages 26 to 29)

d1e363f6-7f63-483e-9701-c7649478682f

A1044

Balas v. Taylor, et al.
Michael R. Ackenbrack

Page 30

1    A.  Not that I remember, no.
2    Q.  So, you didn't alert his lieutenant at that
3  time that John Balas was going to file a grievance?
4    A.  No, because any type of -- basically that was
5  confidentiality.
6    Q.  So, you wouldn't have gone to them and told
7  them?
8    A.  No, I would not breach confidentiality, no.
9    Q.  Did you tell anybody else, other shop stewards,
10  anything?
11    A.  I don't remember who was a shop steward with me
12  then.  I have no clue.
13    Q.  It has been a long time?
14    A.  Yes, it has.
15    Q.  And you represented that you don't remember if
16  there were white and pink copies to the grievance so
17  you don't remember whatever happened to them?
18    A.  No.
19    Q.  To the best of your recollection you never
20  actually filed this grievance?
21    A.  That's correct.
22    Q.  Do you know if John filed the grievance?
23    A.  I have no idea.
24    Q.  So, he could have gone and filed the grievance

Page 31

1  without you?
2    A.  Sure, that was his right.  I mean, I had
3  already signed it so he could have filed it, yes.
4    Q.  He didn't have to come back to you to have it
5  be filed?
6    A.  Correct.
7    MS. HERTZOG:  Stacey, I want to take a
8  quick break.
9    (Brief recess.)
10    MS. HERTZOG:  I think that's all I have.
11  Read and sign?
12    MS. XARHOULAKOS:  Do you think you want to
13  review the transcript?  Let's do it just in case.
14    (The deposition was concluded at 12:03
15  p.m.)
16          I N D E X
17  DEPONENT: Michael R. Ackenbrack      PAGE
18    Examination by Ms. Hertzog        2
19        E X H I B I T S
20  ACKENBRACK DEPOSITION EXHIBITS      MARKED
21  1  Document Bates stamped P831
       through P832            11
22
23  ERRATA SHEET/DEPONENT'S SIGNATURE    PAGE 32
24  CERTIFICATE OF REPORTER        PAGE 33

Page 32

1
2
3        REPLACE THIS PAGE
4        WITH THE ERRATA SHEET
5        AFTER IT HAS BEEN
6        COMPLETED AND SIGNED
7        BY THE DEPONENT.
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 33

1  State of Delaware  )
              )
2  New Castle County  )
3
4        CERTIFICATE OF REPORTER
5
     I, Christina M. Vitale, Certified Shorthand
6  Reporter and Notary Public, do hereby certify that
   there came before me on Tuesday, January 8, 2008, the
7  deponent herein, MICHAEL R. ACKENBRACK, who was duly
   sworn by me and thereafter examined by counsel for the
8  respective parties; that the questions asked of said
   deponent and the answers given were taken down by me
9  in Stenotype notes and thereafter transcribed by use
   of computer-aided transcription and computer printer
10  under my direction.
11     I further certify that the foregoing is a true
   and correct transcript of the testimony given at said
12  examination of said witness.
13     I further certify that I am not counsel,
   attorney, or relative of either party, or otherwise
14  interested in the event of this suit.
15
16
17    Christina M. Vitale, CSR
      Certification No. 261-RPR
18    (Expires January 31, 2008)
19
   DATED:
20
21
22
23
24

9  (Pages 30 to 33)

d1e363f6-7f63-483e-9701-c7649478682f

A1045

Number _04-04-A_                                     Page __1__ of _2_

# Correctional Officers Association of Delaware

# C.O.A.D.

Office (302) 734-8061
Fax (302) 734-8062

DEPOSITION
EXHIBIT
ACKENBRACK-1
1/8/08-CMV
PENGAD 800-631-6989

## Official Grievance Form

Date Filed _____10-04-04_____                    Step _____1_____

Name of Grievant ___JOHN J. BALAS___            Institution __S.C.I.__

Address _____          Grievant Phone # _____

_____                   Classification of Grievant ___CPL.___

List violation(s) and nature of grievance(s) ___C.P.P.A. FOR THE YEAR 2004___

_____

_____

Adjustment Required: _FOR THE PERFORMANCE EVALUATION TO BE INCREASED_
_FROM "MEETS" EXPECTATIONS, TO "EXCEEDS" DUE TO PERFECT_
_ATTENDENCE._

_____

(Use Continuation Sheet for Additional Space)

I authorize the Correctional Officers Association of Delaware as my representative to act for me in
the disposition of this grievance.

Signature of Grievant ___John Balas___          Date ___10-04-04___

Signature of Representative ___W R Aull___       Title _COAD S/S_

Date Presented to Management _____

Disposition of Grievance: _____

_____

_____

_____

_____

COAD Official Grievance Form #12200201

File Number  04-04-A          Continuation Form          Page 2 of 2

# Correctional Officers Association of Delaware
# C.O.A.D.

Office (302) 734-8061
Fax (302) 734-8062

### Official Grievance Form

ON SUNDAY SEPTEMBER THE 26TH, AT APPROXIMATELY 1900hrs, LT. MEARS
CAME IN THE RECEIVING ROOM WITH AN EVALUATION FOR MYSELF. LT. MEARS
SAID "I NEED YOU LOOK OVER THIS AND SIGN IT." I READ OVER THE EVALUATION AND
DID NOT AGREE WITH MY PERFORMANCE THAT I WAS GIVEN. THE EVALUATION
I RECEIVED WAS "MEETS EXPECTATIONS." THERE WASN'T ANYTHING ON THE
EVALUATION ABOUT A LETTER FROM THE COMMISSIONER ABOUT MY PERFECT
ATTENDANCE, A LETTER FROM MAJOR TOWNSEND OF APPRECIATION FOR
TEACHING CAPSTUN AND O.R.T. REFRESHER, AND MY C.E.R.T. MEMBERSHIP.
I ASKED LT. MEARS IF HE WORKS MONDAY SEPTEMBER 27TH, HE HESITATED
FOR A MOMENT AND SAID "NO" I TOLD LT. MEARS THAT I WOULD SIGN IT AT A
LATER DATE. I DID NOT REFUSE TO SIGN IT. LT. MEARS SNATCHED THE EVALUATION
OFF THE COUNTER AND WENT TO HIS OFFICE. APPROXIMATELY FIVE MINUTES LATER
I WENT TO FIND LT. MEARS AND RESPECTFULLY REQUESTED A COPY OF THE EVALUATION,
HE SAID, "YOU DIDN'T SIGN IT, SO YOU ARE NOT GETTING A COPY OF IT." I ASKED
WHY WASN'T ANYTHING OF THE LETTERS PUT ON THE EVALUATION. LT. MEARS SAID,
"IT DOES NOT WARRANT ENOUGH TO GET "EXCEED EXPECTATIONS" AND DID NOT
NEED TO BE PUT ON THE EVALUATION." I FEEL THAT LT. MEARS HAS A PERSONAL
VENDETTA AGAINST ME SINCE I HAVE RESIGNED FROM C.E.R.T. AND HE IS
SHOWING DISCRIMINATION TOWARDS MYSELF. I FEEL THAT IT IS A CONFLICT
OF INTEREST, HAVING LT. MEARS AS MY SUPERVISOR.

    THE LAST FOUR YEARS, I HAVE RECEIVED "EXCEED EXPECTATIONS" ON
MY EVALUATIONS BECAUSE OF MY PERFECT ATTENDANCE, WHY NOT THIS
EVALUATION. I BELIEVE THAT LT. MEARS IS EVALUATING ME PERSONALLY NOT
PROFESSIONALLY.

COAD Official Grievance Continuation Form #12200201



**WILCOX & FETZER LTD.**

In the Matter Of:

# Balas

v.

# Taylor, et al.

C.A. # 06-592-JJF

———————————————————

Transcript of:

Arthur Lee Mears

January 22, 2008

———————————————————

Wilcox and Fetzer, Ltd.
Phone:  302-655-0477
Fax:  302-655-0497
Email:  depos@wilfet.com
Internet:  www.wilfet.com

Balas v. Taylor, et al.

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CINDY L. BALAS, a/k/a          )
CINDY L. ADKINS, Executrix  )
of the Estate of CORPORAL    )
JOHN J. BALAS,               )
                             )
        Plaintiff,           )
                             ) Civil Action
v.                           ) No. 06-592-JJF
                             )
STANLEY W. TAYLOR, JR.,      )
individually and in his      )
capacity as the Commissioner )
of Correction, et al.,       )
                             )
        Defendants.          )

    Telephone deposition of ARTHUR LEE MEARS taken
pursuant to notice at the law offices of the
Department of Justice, 5th Floor Conference Room,
Carvel State Office Building, 820 N. French Street,
Wilmington, Delaware, beginning at 8:06 a.m. on
Tuesday, January 22, 2008, before Lucinda M. Reeder,
Registered Diplomate Reporter and Notary Public.

APPEARANCES:

        STEPHEN J. NEUBERGER, ESQ.
        CHERYL A. HERTZOG, ESQ.
        The Neuberger Firm, P.A.
          Two East Seventh Street, Suite 302
          Wilmington, Delaware 19801
          for the Plaintiff,

        RALPH DURSTEIN, ESQ.
        STACEY XARHOULAKOS, ESQ.
        Department of Justice
          Carvel State Office Building
          820 N. French Street
          Wilmington, Delaware 19801
          for the Defendants.
            WILCOX & FETZER, LTD.
      1330 King Street - Wilmington, Delaware  19801
               (302) 655-0477
               www.wilfet.com

64e25f15-ea15-4a96-91ce-e5a98ed105ab

## Balas v. Taylor, et al.

Page 2

1          ARTHUR LEE MEARS,
2    the witness herein, having first been
3    duly sworn on oath, was examined and
4    testified as follows:
5    BY MR. DURSTEIN:
6      Q.  Good morning, Mr. Mears.  It's Ralph Durstein.
7    We spoke last week.
8      A.  Yes, sir.
9      Q.  I am going to lead off asking you questions.
10     A.  Okay.
11     Q.  For the record, can you tell us where you are
12   located at presently?
13     A.  Presently, I am in Scobey, Montana,
14   S-C-O-B-E-Y.
15     Q.  And is that -- you are at your home?
16     A.  I am at my home, yes.
17     Q.  It's my understanding you are employed out
18   there right now.  Is that correct?
19     A.  Yes, sir.
20     Q.  For whom do you work?
21     A.  I work for the United States Border Patrol.  I
22   am a border patrol agent.
23     Q.  How long have you held that position?
24     A.  A little over two and a half years.

Page 3

1      Q.  Do you have anything with you this morning as
2    far as documents or notes or anything to refresh your
3    memory?
4      A.  Yeah.  The only thing I have is -- let me find
5    it here -- is the affidavits that I have already sent
6    in.
7      Q.  Okay.  Is there one or two of those documents?
8      A.  Two of those.
9      Q.  Do you have both of them in front of you?
10     A.  Yes.
11     Q.  Is there anybody there with you?
12     A.  Well, my family is here, but they're not -- at
13   the present time, they're not in the room with me.
14     Q.  Okay.
15     A.  They probably will be in about a half an hour.
16     Q.  All right.  What we're going to do, just so you
17   know, is attach your first unsworn declaration as what
18   we call an exhibit to the deposition and also your
19   second declaration.  That's just so when the
20   transcript of the deposition is prepared, these things
21   will be attached.  So if we refer to them or you refer
22   to them during the deposition, somebody reading the
23   deposition can see them.  Okay?
24     A.  Okay.

Page 4

1          MR. DURSTEIN:  We can mark them later.
2    BY MR. DURSTEIN:
3      Q.  I mentioned that Stacey and I spoke to you by
4    telephone last week.  Is that correct?
5      A.  Yes, sir.
6      Q.  I understand from what you said that you have
7    also had contacts with the plaintiff, Cindy Balas, now
8    known as Cindy Adkins.  Is that correct?
9      A.  Yes.
10     Q.  How often have you spoken to her?
11     A.  Sometimes I'll call her once a week.
12   Sometimes, it will be once a month.  No real pattern
13   to it.
14     Q.  Have you discussed the lawsuit with her?
15     A.  Somewhat, I would say.  Just in reference to,
16   you know, the fact that you would be calling and that
17   the other people, you know, her attorneys would be
18   calling.  And we've discussed situations from the past
19   when John was alive.
20     Q.  Including some of the situations that she's
21   mentioned in the lawsuit?
22     A.  Yeah, I believe so.
23     Q.  Have you also spoken with her attorneys?
24     A.  Yes.

Page 5

1      Q.  On how many occasions, if you know?
2      A.  I am guessing.  I would say four or five times.
3      Q.  In the course of those conversations, did you
4    provide information that ended up in these unsworn
5    declarations?
6      A.  Yes.
7      Q.  Did you have a chance to review these documents
8    after they were prepared?
9      A.  Yes.
10     Q.  Did you sign the documents?
11     A.  Yes.
12     Q.  For some reason the heading says, "Unsworn
13   Declaration" as opposed to an affidavit.  Can you
14   explain to me why they're unsworn?
15     A.  I'm assuming because of the distance, where I
16   am here, and nobody to swear me in.
17     Q.  So it wasn't any reluctance on your part to
18   appear before a notary public or someone like that?
19     A.  No, no.  I'm assuming just geography.
20     Q.  Okay.  In general, tell me what your feeling is
21   about the lawsuit.
22     A.  Well, basically, I am just here to provide what
23   information I know.  And I feel that John was
24   mistreated, I do feel that, by the Department of

2 (Pages 2 to 5)

64e25f15-ea15-4a96-91ce-e5a98ed105ab

**A1050**

## Balas v. Taylor, et al.

Page 6

1  Corrections. I witnessed it several times throughout
2  my career. And I think the lawsuit is warranted.
3    Q. Did John ever talk about filing a lawsuit while
4  he was alive?
5    A. I don't recall him actually saying he was going
6  to file a lawsuit. He did talk to me about filing the
7  grievances. I do know that he kept a lot of his
8  information up to date regarding the grievances. And
9  I do believe -- from what he told me, I got the
10  feeling that he didn't have a lot of faith in the
11  Department of Corrections and the grievance process.
12  So I think he was keeping that stuff for the future,
13  whatever the outcome may be. But I don't recall him
14  actually saying he was going to file a lawsuit.
15    Q. Do you know if during his life he ever
16  contacted a lawyer?
17    A. Yeah, I do, actually. I don't remember the
18  lawyer's name. And I do not recall -- I know he
19  called a lawyer for advice, and I don't remember the
20  lawyer's name. I believe he was out of Seaford,
21  Delaware. It was a guy that we met through duck
22  hunting. I never actually met him. John had met him
23  through the hunting club or something he was in, or
24  some organization, and they became friends. I know he

Page 7

1  talked to him for advice on this matter.
2    Q. Do you remember when that was?
3    A. No, I don't, really. I don't remember the
4  exact, exact time.
5    Q. Let me ask for a moment about you and the
6  Department of Corrections.
7    A. Okay.
8    Q. Did you have any experience that in your mind
9  you were mistreated or treated unfairly while you were
10  employed by the Department of Corrections?
11    A. Yes.
12    Q. What was that in relation to?
13    A. The main thing that I recall would be the day
14  that we were on CERT, I thought that was very
15  unprofessional and I thought we were used as a team.
16    Q. And that's why you resigned?
17    A. Part of the reason I resigned was the fact
18  that -- I really enjoyed being on the CERT Team. We
19  did a lot for the Department of Corrections. To be
20  honest, we did a lot for the state. We apprehended a
21  lot of people and stopped a lot of hostage situations,
22  and different incidents in the institutions. Yeah,
23  the last day, that we resigned, we all felt betrayed,
24  we did, and we felt like they were putting us in a

Page 8

1  spot where we didn't want to be.
2      That wasn't very professional. It wasn't
3  what the CERT Team was designed for. If it can't be
4  what it's designed for, then I didn't want to be on
5  it. And I didn't want to go against the other
6  officers that were fighting for change.
7    Q. Now, after you resigned from the CERT Team, did
8  you see any impact on you and your job, your
9  assignment or your daily work with the DOC?
10    A. Somewhat, but not to the extent that John did.
11  I really -- it was more of a cold shoulder to me from
12  some of the administration, whereas I think John got,
13  you know, more of the brunt of it. But I have to
14  mention that they knew at the time that I was leaving
15  the Department, so.
16    Q. Had you ever given notice?
17    A. I hadn't given notice, but it was pretty much
18  known because of, I had told them that I had been
19  hired, but I hadn't had a start date yet. And the
20  background investigators had been to the institution
21  and talked to everybody involved. So, yeah, I hadn't
22  given notice, but I had been hired by the border
23  patrol.
24    Q. What you are saying is that your decision to go

Page 9

1  with the border patrol is something that had started,
2  the processes had started for hiring before the CERT
3  resignations. Is that correct?
4    A. Yes, yes.
5    Q. Did John Balas ever talk about leaving the
6  Department of Corrections?
7    A. Yeah. But I don't really think he was ever
8  really decided on what he was going to do or what he
9  wanted to do. I think he liked working there. I
10  don't think it was necessarily him wanting to leave
11  the Department.
12      I know after we resigned CERT and after I
13  had said that I was leaving and after his affair, we
14  had talked a couple times, and he had mentioned he may
15  be interested in finding other employment or getting
16  another job. I know that he was not happy with the
17  way he was being treated. I know he had mentioned it,
18  but just never really anything about what he was going
19  to do. Just mentioned it in the fact that he may be
20  interested in finding another job.
21    Q. To your knowledge, have any of the other CERT
22  Team members who resigned left the DOC?
23    A. To the best of my knowledge, I don't believe
24  so.

3 (Pages 6 to 9)

64e25f15-ea15-4a96-91ce-e5a98ed105ab

A1051

Balas v. Taylor, et al.

Page 10

1    Q.   Are you still in communication with any of
2  those persons?
3    A.   A few, a few.  I speak with Scott Bradley on
4  occasion, Harry Hastings on occasion.  I speak with
5  quite a few of the other CERT members that had
6  resigned prior to this.  On occasion, I'll speak to
7  some of them.  I don't really -- it's not -- I don't
8  call them all the time.  Scott Bradley, Harry
9  Hastings, Allen Adams are probably the three that I
10  talk to the most.
11    Q.   Of those that you have contact with, have any
12  of those individuals complained of any kind of
13  mistreatment or this cold shoulder you mentioned from
14  the DOC as a result of those resignations?
15    A.   No, I don't believe so.
16    Q.   Let me ask you about Truman Mears.  First, I
17  guess for the record, you and he are no relation; is
18  that correct?
19    A.   We are distantly related.  It's pretty distant,
20  though.
21    Q.   Did you ever work with him or for him at the
22  DOC?
23    A.   Yeah.  I can't recall if he was ever my
24  supervisor.  I do believe he was.  But if it was, it

Page 11

1  was for a short time.  But we did work together daily,
2  and we were both on the CERT Team and we were both
3  CERT Team leaders.
4    Q.   Did you have any issues or problems with him,
5  either working with him or, perhaps, for him or
6  working CERT with him?
7    A.   Yeah.  I did have problems with Truman when we
8  were working CERT.  The whole thing with CERT was, it
9  was a team concept.  And from the time I got on -- I
10  was on it, I think about seven years -- from the time
11  I got on CERT until the time I got off, it was just --
12  it was a team.  Everything was done as a team.
13  Decisions were made as a team.  When you go on CERT,
14  rank goes out on the window.  There is no rank.
15  Everybody is equal.
16        The day when we resigned -- the night
17  before we resigned, we had a meeting because some of
18  the guys were wanting to quit right away.  I told
19  them, no.  I said, I didn't think it was a good idea,
20  and I suggested we have a meeting.  Truman Mears came
21  to that meeting and left early.  And within five
22  minutes of him leaving the meeting, I got a phone call
23  from CERT Command.  And they were irate and accusing
24  me of being an instigator and all kinds of things, as

Page 12

1  well as -- me and John.  They automatically brought
2  John into it, saying it was John and I that were
3  trying to get everybody to quit.
4        There was only one person that knew about
5  the meeting and that was Truman.  And I had some
6  problems with that.
7    Q.   Who was it you spoke to on the phone?
8    A.   That would be Tim Radcliffe.
9    Q.   What was his position at that time?
10    A.   He changed positions so many times with CERT
11  Command.  He was always second in command, but they
12  changed the rank structure.  So at that time, he was
13  either a major or staff lieutenant --
14    Q.   Before that night --
15    A.   -- or captain.  I can't remember.  I think he
16  changed, like, three times in the course of like three
17  years.
18    Q.   But that night, was he speaking to you as a
19  CERT Team member?
20    A.   He was -- CERT Command would be one step higher
21  than a team member.  So he was speaking to me as a
22  supervisor.
23    Q.   As a CERT supervisor?
24    A.   Yes.

Page 13

1    Q.   Before the night of the resignations, had you
2  encountered any problems with Truman Mears?
3    A.   I am going to have to think about that one,
4  but.  Me personally, probably not.  Nothing, nothing
5  serious.  We had disagreements, but that's to be
6  expected in that line of work.  But nothing, nothing,
7  really, I don't believe.
8    Q.   You mentioned that John Balas at some point
9  talked about filing a grievance against the Department
10  of Correction; correct?
11    A.   Yes.
12    Q.   Did you ever actually see the grievance
13  document, the paper he filled out?
14    A.   No, I don't believe I did.
15    Q.   What did he say about it?  What was your
16  understanding of what he was attempting to accomplish
17  with the grievance?
18    A.   I just know that it -- the grievance.  I
19  believe the grievance was about the time or it was a
20  conflict over annual leave that he had used or sick
21  leave that he had used and that it shouldn't have been
22  reported, but he was saying that Truman had changed
23  his attendance record.  Forgive me if I am mistaken on
24  the terminology.  It's been almost three years.

4 (Pages 10 to 13)

64e25f15-ea15-4a96-91ce-e5a98ed105ab

A1052

## Balas v. Taylor, et al.

Page 14

1    Q.  Right.
2    A.  So.  Whatever his attendance record was, he
3  felt that Truman had changed it or had manipulated it
4  in some way.  And I don't recall all the details of
5  that.
6    Q.  Are you familiar with a term called "emergency
7  leave" or "emergency vacation"?
8    A.  Yes.  I believe they used emergency leave
9  before.
10    Q.  Do you know if that terminology was involved in
11  John Balas wanting to file a grievance?
12    A.  It may have been.  I know that officers there
13  would get emergency leave on occasion.  But there was
14  several ways to get time off.  You know, emergency
15  leave, or the schedule was just low, it would just be
16  leave -- or I mean, the schedule was full and they had
17  enough people, they would just give you leave.
18    Q.  Was there any difference, to your knowledge,
19  between emergency leave and regular leave in terms of
20  how much time you lost or how you were paid or
21  anything of that nature?
22    A.  The only difference that I know in emergency
23  leave and leave is the terminology.  One, leave is
24  scheduled in advance.  I believe you do it, like, in

Page 15

1  November, and it is for the following year.
2          Emergency leave, I believe it's just
3  anything that's short notice, where you want to call
4  up and say, hey, I want to take this.  And to the best
5  of my knowledge, it could be a week out or it could be
6  call up the captain that morning and say, hey, I need
7  emergency leave today if you can give it to me, and
8  they'll give it to you or they won't.
9    Q.  Did John ever tell you what happened to that
10  grievance?
11    A.  No, I don't really recall what happened to the
12  grievance.  I think it was still in motion at the
13  time.
14    Q.  Do you know if he actually filed it?
15    A.  I believe he met with Deputy Warden Deloy on
16  that.  I believe he met with him.  John only told me
17  about these facts.  I never actually saw him go into
18  the deputy warden's office, but I do believe that's
19  who he met with.
20    Q.  What kind of -- let me back up.  Strike that
21  question.  You were a member of the union COAD when
22  you worked at DOC?
23    A.  Yes, yes.
24    Q.  John was also a member?

Page 16

1    A.  Yes.
2    Q.  Did you or he hold any positions within the
3  union?
4    A.  I didn't, and I don't believe he did.
5    Q.  Do you know if John ever acted as a
6  spokesperson for the union?
7    A.  No, I don't believe so.
8    Q.  Let me get back to the CERT resignations since
9  you mentioned that.  I think you've already described
10  in part why that happened, but just so this record is
11  clear, can you tell us why it was that you and the
12  others resigned from CERT?
13    A.  All right.
14    Q.  I know it's a hard question.
15    A.  No, it's not.  It's a long answer.  It's kind
16  of a complicated answer.
17    Q.  I understand.
18    A.  Nobody really wanted to resign CERT.  Nobody
19  wanted to resign CERT.  The thing was a lot of these
20  guys were -- had come from -- they didn't have a whole
21  lot of seniority.  They had come down from Smyrna
22  where they had been forced into overtime.  It's called
23  freezing.  They came to SCI where it didn't happen a
24  whole lot, but then it start happening.  And a lot of

Page 17

1  the union -- not the union, but just officers in
2  general, I believe, started refusing to work overtime
3  at Court & Transportation.  And it was, finally,
4  making the Department look at the officers and see
5  that something -- that we weren't happy.
6          At the same time, the CERT members were all
7  pretty happy with CERT.  I believe most of them liked
8  their job.  And when -- they started -- there was
9  rumors about a week before they ordered us out there
10  to work the Court & Transportation unit.  And I was
11  leaving the prison one night or the correctional
12  institution, and I believe that was, it was the day
13  before we resigned CERT.
14    Q.  Okay.
15    A.  And I was leaving there, and Warden Kearney
16  stopped me.  And I believe John was walking out with
17  me.  And he stopped me and John, I am pretty sure it
18  was.  Either that or we met in the parking lot
19  afterwards.  But he told me that I had been activated
20  for CERT till further notice and that I was to report
21  to Court & Transportation the following morning.  He
22  told me there would be five of us.
23          So no big deal.  I went out in the parking
24  lot.  And as soon as I got out in the parking lot, I

5 (Pages 14 to 17)

64e25f15-ea15-4a96-91ce-e5a98ed105ab

**A1053**

Balas v. Taylor, et al.

Page 18

1 ran into a couple of the other CERT members who had
2 also been told that they were to report. And also, I
3 started getting -- I guess some of the other CERT
4 members had heard about it. So within a matter of
5 probably a half an hour, I started getting phone
6 calls. We were all standing in the parking lot. I
7 started getting phone calls. And people wanted to
8 resign right there from CERT because they felt that it
9 was a political move and everything. I told them, no.
10 I was like, look, we've always gone when we have been
11 gone. CERT, the entire time I was on, we never
12 refused to do anything. So I said, "We can't just
13 resign. Let's have a meeting, let's talk about this."
14 Normally, we would have just gone somewhere, you know,
15 a local restaurant or whatever, but we had to do it at
16 my house because my wife had to work and I had to
17 watch my kids that night.
18 Q. Okay.
19 A. So everybody met at my house, and we discussed
20 it. And we decided that we were not going to resign
21 because we felt like that we had never refused to
22 report before, and we weren't going to start then.
23 But we also decided that if we got there the next
24 morning and found that it was a low court schedule, if

Page 19

1 we felt we were used, yeah, we would quit, but we
2 would make the decision as a team.
3        We got to the Court & Transportation
4 building the next morning. When we arrived, I met
5 with Rudy Drummond. He came out into the parking lot,
6 and he told -- he asked me why we were there. I told
7 Rudy, I said, "Rudy, we're just here. We're not
8 taking everybody to court." I said, "I have been
9 assured by the warden as well as CERT Command that we
10 are only taking the people to court that would
11 otherwise be released if they did not get to court.
12 And we felt obligated to make sure those people got to
13 court." And he said, "Well, I don't know why they
14 sent you." He said, "My guys can handle that." And I
15 asked him what he meant. He said, "Well, there is
16 only two today." And I believe it was two. It may
17 have been three. But I believe it was two. And so we
18 felt, well, we're here, we're going to do it.
19        So we went and got our weapons from the
20 armory at the control center inside the institution.
21 When we pulled into the main parking lot to go into
22 the main building to get our weapons, we were
23 ridiculed. We had agents stand -- or officers
24 standing in front of the institution that were just

Page 20

1 irate, yelling at us, couldn't believe we were
2 crossing, you know, and turning our backs on them.
3 And people that I have worked with for 12 years would
4 turn around and walk away from me and wouldn't say a
5 word to me.
6        We got inside, got our weapons, walked out,
7 and it was pretty quiet. We didn't say a word to each
8 other until we got back over -- and we drove in
9 separate vehicles, but. Walked out to our vehicles,
10 got in our vehicles, drove back to the Court &
11 Transportation building in the parking lot right
12 there.
13        We were all pretty upset about that. We
14 called CERT Command. No, actually we didn't call CERT
15 Command. Scott Taylor from CERT Command arrived in
16 the parking lot. He had been, I guess sent down
17 either to check on us or watch over us, or whatever.
18 I don't know what the reason was. He got there. We
19 told him how we felt, that we were a little concerned
20 about things, being there was only two on the court
21 list, and that it was pretty rough, didn't really feel
22 like it was fair, and that it wasn't very professional
23 of the Border Patrol -- I mean, the Department of
24 Corrections to do that.

Page 21

1        At that point, he called CERT Command, and
2 I would say, within an hour or so, Major Hall arrived
3 at the institution. Now, in the process, in the time
4 between when we talked to Scott and when Major Hall
5 arrived, we had discussed quitting at that point
6 because -- at that point, we already felt like we were
7 just being used. We hadn't told them we were going to
8 quit. We talked about it. We were all pretty upset
9 over it, but didn't feel like -- some of us felt like
10 we should quit, some of us weren't sure. But we
11 waited just to see what Dave Hall would say.
12        Dave Hall showed up. He made several
13 comments. And one of the comments he made led us to
14 decide to quit. When he mentioned -- we asked him
15 how -- I think it was John asked him why he --
16        Well, how did that go?
17        He, Major Hall -- or I guess he's Deputy
18 Warden Hall; I don't know what he was at the time --
19 asked us to -- asked us why were and asked -- or why
20 we were upset over it. We asked him a few questions.
21 And he said that he had turned in four, I believe four
22 operations orders to Stan Taylor, the commissioner. I
23 thinking John is the one that asked him why he chose
24 this one, the one that they were using us in that

6 (Pages 18 to 21)

64e25f15-ea15-4a96-91ce-e5a98ed105ab

**A1054**

Balas v. Taylor, et al.

Page 22

1  order.  And he said it wasn't Stan.  And we all were
2  confused and asked:  "Well, what do you mean it wasn't
3  Stan?"  He said, "It came from higher than Stan."
4          At that point, we all felt that it was a
5  political issue, and that we were just being used.
6  so at that point, we told him we were resigning at
7  3:00 o'clock that afternoon, that we would finish out
8  the day because we had been called, but we were going
9  to resign that afternoon.
10         And at 3:00 o'clock that afternoon, we
11 walked into the warden's office and resigned from
12 CERT.  We also advised Warden Kearney that even though
13 we resigned from CERT, that just meant we would not
14 respond on a CERT level to anything that CERT wanted.
15 But off the record, if a situation arose to him in the
16 institution, feel free to call us, we would do
17 anything for the institution.  As employees of the
18 institution, we would come in and do what we could do,
19 so.  And that's pretty much it, unless you have any
20 other questions.
21 Q.  Let me just go back and clarify a couple
22 things.  Rudy Drummond, what was his capacity?
23 A.  He was a sergeant in charge of Court &
24 Transportation for Sussex County.

Page 23

1  Q.  All right.  Now, as a result of this, and while
2  you are still at the DOC, are you aware of any of the
3  CERT Team members who resigned who suffered a
4  consequence, such as being denied a raise because of
5  that?
6  A.  Denied a raise?
7  Q.  Yeah.
8  A.  No.
9  Q.  Were any of the CERT Team members who resigned,
10 including yourself, denied a transfer they requested?
11 A.  I don't recall.  And I didn't apply for any
12 transfers at that time.
13 Q.  And, again, I am asking not just yourself, but
14 others that you might be aware of.  Did you ever hear
15 of any of the CERT Team members who resigned being
16 denied a promotion they were entitled to or thought
17 they were entitled to?
18 A.  No.
19 Q.  I think you may have mentioned this before,
20 but.  Your co-workers who you mentioned have been
21 criticizing the CERT team members when you were going
22 to get your weapons, what was the attitude of
23 co-workers after the resignations?
24 A.  It was completely different.  They were

Page 24

1  appreciative.  They thanked us.  They felt sorry for
2  us.  They knew we all liked CERT.  That was it.  They
3  were happy, but at the same time, they were -- several
4  of them told us -- told me that they were sorry that
5  we had to resign, that they appreciated us doing it,
6  but they knew how much we liked CERT.
7  Q.  What was the warden's reaction when the members
8  told him that they were resigning?
9  A.  Shocked, I believe.  He couldn't understand why
10 we were resigning.  I explained it to him the best I
11 could.  And I told him it was nothing personal against
12 him or the institution, that it was -- we felt we were
13 being used by the upper management, Court &
14 Transportation unit, CERT unit.  Which CERT and Court
15 & Transportation are all one unit.
16 Q.  Right.
17 A.  They're just separate entities of those units.
18 But Major Dave Hall is in charge of both of them.  He
19 was surprised, so.
20 Q.  You mentioned when you spoke to him.  Were you
21 speaking as the leader of the group?
22 A.  I was the team leader, so I felt that it was my
23 responsibility to tell him.  And all of us actually
24 spoke in there that day.  It wasn't just me.  I think

Page 25

1  I started it, but I think several of the other people
2  mentioned different things that day in his office.
3  Q.  In your mind, do you feel there was any
4  retaliation against the group on the part of the
5  warden?
6  A.  On the part of the warden, no, I don't believe
7  so.  I do believe there was some on the part of the
8  deputy warden.
9  Q.  Who was that at the time?
10 A.  Mike Deloy.
11 Q.  Now, let's go forward from the date of these
12 resignations.  First, just for the record, what was
13 your assignment with the DOC at the time of the
14 resignations?  What was your job?
15 A.  Oh, I have changed jobs so many times out there
16 I don't really know.  I believe I -- actually, I do
17 know, too.  At that time, I was a shakedown sergeant.
18 I reported to the institutional investigator, and I
19 was in charge of shakedowns.
20 Q.  Who was your supervisor at the time, if you
21 remember?
22 A.  Yeah.  Oh, man.  Earl Messick.
23 Q.  How much contact did you have with John Balas
24 at work during that time frame?

7 (Pages 22 to 25)

Balas v. Taylor, et al.

Page 26

1    A.  I don't remember because before this I changed
2  shifts.  Not a lot, but after 12 years, it all kind of
3  runs together.
4    Q.  Sure.  Let me ask it this way.  What I am
5  trying to get at is:  To the extent you had contact
6  with John, and I know you were good friends, was it
7  more likely you would see him out of work than in
8  work?
9    A.  It depends.  It would depend.  Sometimes I
10  would, you know, I would see him after shift change or
11  before shift change if we were on different shifts.  I
12  would go back to the receiving room and talk to him.
13  If I was working overtime, I would -- you know.
14  Because at the time I don't believe we were on the
15  same shift.  And I believe -- I know for a fact that
16  if I was on overtime, I would go back there and
17  work -- I would talk to him, or a lot of times, I
18  would end up working with him because I was also
19  receiving room officer at the same time.  And so I
20  worked -- because I had worked the receiving room with
21  John for years, so.  But at the time, I was a
22  shakedown sergeant.  I believe I was on a different
23  shift.  But I would see him at work -- I would see him
24  probably daily, but sometimes, it wouldn't be for more

Page 27

1  than five or ten minutes, and sometimes, we'd work
2  together a whole shift.  But I saw him, I saw him
3  daily at work and probably once or twice a week
4  outside of work.
5    Q.  That's what I was really getting at.
6    A.  Yeah.
7    Q.  At some point after the resignations, did John
8  complain to you about an evaluation he had received
9  from Truman Mears?
10    A.  Yeah, he did.
11    Q.  Was it your understanding that evaluation, that
12  part of it was the meets expectations is what he was
13  classified or rated at?
14    A.  I don't recall the exact rating.  I know he
15  wasn't happy with the overall outcome of the
16  evaluation.  He felt that it was lower than what it
17  had been before, and he felt that it was unjustified.
18  I do believe it was mainly over attendance.
19    Q.  Now, John, for a long time, had had a perfect
20  attendance record; correct?
21    A.  As far as I know, yes.  I know he had gotten
22  several -- I don't know if it was awards or letters or
23  what from the commissioner every year about perfect
24  attendance.

Page 28

1    Q.  And it's your understanding that John, from
2  what he said, that his evaluation, part of it dealt
3  with the attendance issue?
4    A.  I believe so.
5    Q.  Do you remember anything else he said about
6  that evaluation?
7    A.  Yeah.  I do recall him and Jeff Foskey -- and
8  he told me -- Jeff Foskey and John had both told me
9  about this letter.  They were together, I believe, at
10  the time.  Apparently Truman had turned in the
11  evaluation and along with it had attached a letter of
12  some sort to the evaluation.  And apparently before he
13  turned it in, he showed it to Dave Wilkinson, and I
14  guess Dave Wilkinson had made a copy of it and had in
15  there John -- something in the letter.  I didn't never
16  read the letter, so I don't know.  But John had told
17  me there was something in the letter that he said made
18  him feel that it was just one more thing that, to him,
19  he felt that Truman was against him for whatever
20  reason, was trying to -- you know.  He felt -- I guess
21  what I'm trying to say he felt it was personal.  There
22  was something in the letter that made him feel that
23  Truman was out to get him on some kind of level.
24    Q.  I gather you never saw this letter?

Page 29

1    A.  I never saw it.  It's just what John told me.
2  I really don't know.
3    Q.  But John did see it?
4    A.  John apparently saw it because he mentioned it
5  to -- I don't know if he saw or maybe Dave Wilkinson
6  told him about it.  I am not sure.  But I believe he
7  saw it because I now that -- I believe he told me Dave
8  Wilkinson had a copy of it.
9    Q.  Did John have any issues that you know of or
10  problems with Dave Wilkinson?
11    A.  I don't believe so.  I don't believe so.
12    Q.  How about Mike Deloy?
13    A.  I don't recall.  I don't think there was any --
14  I don't think there were any problems.  I would say
15  not that I recall.
16    Q.  Is it your understanding that John's issue was
17  primarily centered on Truman Mears?
18    A.  To the best of my knowledge, that's what it
19  was.
20    Q.  Okay.
21    A.  And, well, and CERT Command.
22    Q.  Yeah.  Before the resignations that we've
23  spoken about in the summer of 2004, before that time,
24  are you aware of any problems that John Balas had with

8 (Pages 26 to 29)

64e25f15-ea15-4a96-91ce-e5a98ed105ab

A1056

Balas v. Taylor, et al.

Page 30

1  Truman Mears?
2    A.  Yeah.  I mean, I don't recall exactly what it
3  was, but there was tension between them.  Prior to
4  this, we had all hunted together, Truman, John and I.
5  But I don't know what happened.  Something happened,
6  and there was a rift between John and Truman.
7    Q.  To your knowledge, did the rating that John
8  received in this evaluation have any affect on his
9  compensation?
10   A.  No, I don't believe so.
11   Q.  Did it have any affect on his job assignment?
12  Did that change in any way?
13   A.  John's assignment was bidded.  It wouldn't have
14  changed.  Well, I -- his primary job assignment would
15  not have changed.  John had additional assignments
16  outside of the property room, where he worked.  He was
17  also an instructor for, I believe pepper spray and QRT.
18  And I know that Truman had tried several times to get
19  him and -- at least John, but I believe it was John
20  and Jeff Foskey thrown off of the QRT training.  John
21  had told me that Truman had gone to Major Phil
22  Townsend to try to get John and Jeff thrown off.  I
23  believe it was Jeff, but I know at least John thrown
24  off the QRT training.  It was -- I am not exactly sure

Page 31

1  what all transpired there.
2    Q.  Was the QRT and the pepper spray training, did
3  that result in additional compensation?
4    A.  Not monetary.  What it was, I believe they
5  trained for -- instead of working five eight-hour
6  shifts, they would work ten -- or four ten-hour
7  shifts.  So they got one additional day off a week, I
8  believe.
9    Q.  Do you know if John and Jeff were taken off of
10  that training by Truman Mears?
11   A.  I don't know that they were because it's only
12  done once a year, and I believe it's usually in
13  February, late February or March.  But I don't recall.
14  It's been awhile since I thought about that.
15   Q.  Okay.
16   A.  But I just recall him telling me that he had
17  gone to Phil Townsend, you know, or Phil Townsend had
18  mentioned it to him, so.
19   Q.  Let me move on.  One question I wanted to ask
20  you is:  Did you see any change in John's drinking
21  habits, consumption of alcohol?
22   A.  At the end, before he died, yeah.
23   Q.  How long before his death, would you say?
24   A.  Probably a month.

Page 32

1    Q.  That would be he was drinking more?
2    A.  Drinking more.  John always drank quite a bit.
3  I don't know what a lot is, but, I mean, he always
4  drank.  But he drank more at the end, the last
5  month, maybe month and a half.  I really don't know.
6  But I do know the last month he was drinking a lot.
7  Actually, I take that back.  He drank a lot up until
8  about two weeks or three weeks before he committed
9  suicide.  And then I believe he quit drinking.
10   Q.  What would he drink?  Was he a beer-drinker or
11  drinking liquor, or?
12   A.  I believe beer, for the most part.
13   Q.  And before and after the increase, he just
14  drank more beer that last month?
15   A.  Yeah, yeah.
16   Q.  As opposed to, you know, bourbon or whiskey or
17  something else?
18   A.  I don't ever recall him drinking any hard
19  liquor at all, except for on occasion, maybe.  There
20  were a few exceptions, but for the most part, it was
21  beer.
22   Q.  Let me ask you if you know Jennifer Weldin?
23   A.  I believe I know you who you are talking about.
24  I don't know her by that last name.  It was Cox, I

Page 33

1  believe.
2    Q.  Jennifer Cox.  Yeah.  Who is that?
3    A.  She was -- she worked at the jail there.  She
4  was -- when I first met her, she was a -- I don't
5  know.  I don't know what her position was, but it was
6  records clerk or secretary or something like that at
7  the medical department.  At one point, I guess she
8  became involved with John.  I believe they had an
9  affair.
10   Q.  When did you learn about that?
11   A.  November, I believe.
12   Q.  Of 2004?
13   A.  Yeah, yeah, I believe it had to be November
14  2004, yeah.
15   Q.  How did you learn about it?
16   A.  John told me.
17   Q.  What did he say?
18   A.  It was kind of a strange conversation.  He just
19  told me that -- he said that he had been out or that
20  he was seeing somebody new.  I don't recall exactly
21  how he put it.  He just said that -- he was laughing
22  and joking.  And he said something about having a
23  girlfriend.  I laughed.  I didn't believe him.  And I
24  thought, yeah, right, you know.  And I told him I

9 (Pages 30 to 33)

64e25f15-ea15-4a96-91ce-e5a98ed105ab

A1057

Balas v. Taylor, et al.

Page 34

1  didn't believe him. We were hunting. So I just kept
2  on doing what I was doing. And he told me, no, I am
3  serious, and he had to convince me that he was. And
4  then he actually told me some details that day. So I
5  ended up believing him.
6    Q. Did he tell you how long it had been going on?
7    A. Yeah, I believe so. But I don't recall exactly
8  what it was. I believe the end of September, maybe,
9  early October.
10    Q. Did he give you by any indication by what he
11  said or the conversation as to why the affair
12  happened?
13    A. Not really, I don't believe. I am sure, I am
14  sure we talked about it. I am positive we talked
15  about it, but I don't recall exactly why. At that
16  point anyway. Later on we talked about it more, and
17  he told me that -- he told me that he felt that -- to
18  tell you the truth, I really don't recall what he
19  exactly said. In my words, I guess he felt -- you
20  know, I really don't recall exactly why, why it
21  started.
22    Q. Mm-hmm.
23    A. I know he stayed in it, you know. He said he
24  felt that -- at times, he told me he loved that

Page 35

1  girl, Jennifer, but at other times, he said he wanted
2  to break it off with her. And it just -- it kind of
3  went back and forth until late January. And then he
4  finally told me that he wanted to break it off with
5  her, so.
6    Q. Did he ever tell you that she broke it off with
7  him?
8    A. To tell you the truth, it went back and forth.
9  I believe at one time it did. She had -- he told me
10  that she had broken off with him because he wouldn't
11  leave his wife.
12    Q. And when was that, if you know, that she --
13    A. I believe that was December, I believe.
14    Q. And --
15    A. Like late December, early January. I think it
16  was December because I think it was right around
17  Christmas.
18    Q. Did he -- did John say whether he was
19  considering what Jennifer was requesting, that is,
20  breaking up his marriage?
21    A. He never said -- I don't recall him ever saying
22  that he was going to do it. But I think -- he told me
23  that he had thought about it, but that he -- for
24  whatever reason, I don't know what it was, but he just

Page 36

1  wasn't going to do it. And I don't know that it was
2  going to be a long-term thing or a short-term thing
3  that he wasn't going to do it. I don't know. Until
4  later on, like I said, in January, he told me that he
5  wanted to end it. I believe it was January.
6    Q. From that point up until his death, do you have
7  any idea what kind of contact John was having with
8  Jennifer?
9    A. Not really. I know they talked at work some
10  when he was on day shift. I know they had -- she had
11  given him a cell phone, and that was according to
12  John. She showed me a cell phone that he claimed that
13  she had given him. Then, yeah, outside of that, I
14  really don't know other than I know he apparently made
15  time to go see her outside of work, but I don't know
16  exactly when or have any details of that.
17    Q. I am going to ask you in a moment about when
18  you took John to seek some psychological help or some
19  counseling.
20    A. Yes.
21    Q. Do you know if at that time period, and we're
22  in, I guess, late January, early February, John was
23  still having contact with Jennifer?
24    A. Yeah. Um, yeah, he did, as a matter of fact.

Page 37

1  He did still have contact with her. I believe that --
2  John had told me that he hadn't had contact with her,
3  but then after a week or so he had told me that he had
4  had contact with her. I forget the exact date. It
5  was -- I took John to -- John called me. He was kind
6  of upset. I went and found him. This was the night
7  before we took him to St. Jones. He had told me that
8  he had had contact with her. As a matter of fact, he
9  called her while I was with him that night. I don't
10  know what he told her because he got -- we were in my
11  pickup, and he got out of the truck and went to, I
12  believe, a pay phone and he called her. I didn't hear
13  the conversation. But I do know he called her that
14  night.
15    Q. By "her," you mean called Jennifer?
16    A. Jennifer, yes.
17    Q. What was his state of mind that night?
18    A. He was irate, upset. This was prior to me --
19  this is prior to him talking to her -- at least that I
20  saw him talk to her. And then he was pretty upset,
21  pretty irate. That's the night he told me that he was
22  going to -- he wouldn't be around in the morning and
23  made some other comments that made me feel that he was
24  possibly suicidal. That's when everything went in

10 (Pages 34 to 37)

64e25f15-ea15-4a96-91ce-e5a98ed105ab

A1058

Balas v. Taylor, et al.

Page 38

1  motion for the next day getting him to St. Jones.
2  Q.  Why don't you go ahead and talk about that.
3  What action did you take when you realized that John
4  might be suicidal?
5  A.  Well, I didn't really know what to do, so. I
6  knew I wasn't going to let him go back to his house.
7  So I took him to his parents' house and thought that
8  I -- I knew that I was going to need more than just me
9  to control him if he got real bad.  And so I took him
10  there, and his mom and I talked to him.  He wouldn't
11  let anybody else around him but me.  So I ended up
12  staying up with him all night long in his garage, his
13  mom and dad's garage.  They have a room, it's like an
14  apartment, on the end of the garage.  We sat up all
15  night long in there.  He made several threats to me
16  about, you know, he's going to not be around in the
17  morning.  He told me that if I fell asleep that he
18  would be gone, you know.  So I, basically, stayed away
19  all night long.  He eventually fell asleep.  And I was
20  able to go out.  I called my wife.  I had her call
21  Cindy.  And Cindy called, I guess John's dad, and his
22  dad came over.  And his dad and mom stayed with him.
23  I was mentally and physically exhausted, so I knew I
24  couldn't stay any longer.  I had been with him for

Page 39

1  probably eight or ten hours like that.  So I went
2  home.  I had to get some -- get away, get a break.
3  Q.  Sure.
4  A.  Cindy, I guess had -- I believe she spoke with
5  Dr. Angel.  And then I guess he had recommended
6  St. Jones, so.  And he recommended that, I believe it
7  was him that recommended that I go with John as well
8  up there.  So Jeff came and picked me up, and it was
9  me and Jeff and Cindy and John all went to St. Jones.
10  Q.  What happened at Jones?
11  A.  St. Jones, we walked in.  A male counselor came
12  out or a psychologist.  I am not sure what his title
13  was.  Came out.  We walked in.  He took John into a
14  back room.  We brought, you know, bags with us.  We
15  thought John would be staying.  John was pretty open
16  to it, and -- which surprised me.  I thought he would
17  fight it, but he didn't.  And anyway, we went in, and
18  within about 15 minutes, 20 minutes, maybe, John and
19  the counselor both came back out.  And the counselor
20  was, like, he's free to go; he's not going to do
21  anything; he's -- you know.  We were all shocked.
22  And then the counselor asked to speak with
23  me there in the -- in front of everybody, he asked to
24  speak with me off on the side.  I told him I wanted to

Page 40

1  talk to him in his office.  So I went into the office
2  with the counselor, and with John, and I asked the
3  counselor if John had told him about everything,
4  including the affair, including the stuff that was
5  going on at work, and, you know, and the stress, you
6  know, resigning from CERT, with -- the thing with
7  Truman, with everything.  I don't think I mentioned
8  Truman's name, but just the grievances and things at
9  work.  And the counselor said, yeah, he was told about
10  everything, and that John -- I believe that he said
11  John signed a contract saying he wouldn't hurt
12  himself.
13  And he told us to remove all the guns from
14  the house and for him to see a psychologist, counselor
15  or something like that.  And anyway, I do remember him
16  giving him a list of some psychiatrists or
17  psychologists or counselors to speak with.  He told us
18  that John was free to go.
19  So we took him back home, kind of in shock
20  the whole way home, but.  We took him back to his mom
21  and dad's house.  Then Jeff and Cindy and I went and
22  got all the guns out, the guns we knew of, out of the
23  house.  Apparently, he had one we didn't know about,
24  so.  We went and got all of those out of the house,

Page 41

1  so.
2  Q.  What was John's state of mind as you came back
3  from St. Jones?
4  A.  He was actually -- he actually looked a lot
5  better.  He seemed a lot better, seemed better than I
6  had seen him in weeks, so.  And he and I had several
7  discussions that day because at that point, he was
8  scared to death -- well, he told me, he said -- he
9  asked me if Cindy knew about the affair, and I told
10  him, no.  And he said, "That's it."  He said, "What do
11  I do?  How do I fix this?"  I said, "You are going to
12  have to end it with Jennifer."  He said, "That's
13  done."  I said, "Okay," you know.  And I told him this
14  counselor agreed he should take time off from work.  I
15  told him he needed to take time off from work.  I
16  think he -- I don't know how he did it.  I know he
17  didn't want to use any sick time.  I think he may have
18  called George Truitt, who was a captain at SCI.  I
19  believe he got some time off that way.  I believe
20  George may have given him some emergency leave or done
21  something.  I don't know what the situation was.
22  Q.  Was it your understanding that part of the
23  reason for the leave was so John could spend some time
24  with Cindy, his wife?

11 (Pages 38 to 41)

64e25f15-ea15-4a96-91ce-e5a98ed105ab

A1059

Balas v. Taylor, et al.

Page 42

1   A.  That was part of it, yes.  They went away.  He
2  wanted to go away.  That was a suggestion that I made.
3  I believe Dr. Angel even mentioned that would probably
4  be a good thing just to get away, just the two of
5  them.
6   Q.  Was one reason for getting away -- this is your
7  understanding -- that John was going to tell Cindy
8  about the affair with Jennifer?
9   A.  No, I don't believe so.
10   Q.  Let me ask you about another thing.  Were you
11  aware at the time that DOC provided an employee
12  assistance program?
13   A.  Yeah, yeah, I was.
14   Q.  Do you know if John was aware of that?
15   A.  Possibly.  I don't know.  They mention it when
16  you go through your basic academy.  And then in the
17  time that I was there, I saw it mentioned one or two
18  other times.  Once -- one time I believe it was
19  brought up in a pamphlet or something they handed out
20  and one time I think it may have come out in like a
21  newsletter or something with our paycheck.
22   Q.  During this time that it became apparent that
23  John might be a suicide risk, I am talking late John,
24  do you remember if you or Jeff mentioned this to John

Page 43

1  or he mentioned to you the possibility of pursuing the
2  employee assistance program?
3   A.  No, I don't believe so.  I think he wanted to
4  handle it through outside care.
5   Q.  Let me just ask you a couple questions about
6  Jeff.  Jeff Foskey was John's brother-in-law, Cindy's
7  brother; is that correct?
8   A.  Yes.
9   Q.  Also a friend of yours?
10   A.  Yes, yes.  I do speak with Jeff on occasion.
11   Q.  Was Jeff also close with John?
12   A.  Pretty close.  We all hunted together.  They
13  cut grass together.  We all three of us had our own
14  side lawn care business, as do a lot of the officers
15  at SCI.
16   Q.  Have you spoken to Jeff about the lawsuit that
17  Cindy filed?
18   A.  Not really.  We've talked about it when she --
19  right after John died, you know, when she first -- I'm
20  saying right after.  Within probably a year when she
21  decided that she was probably going to pursue it.  But
22  I don't recall what was said.  Just the fact that she
23  was going to file a lawsuit.
24   Q.  Have you spoken to Jeff since you have been out

Page 44

1  in Montana?
2   A.  I believe so.  I am not sure.  We don't talk
3  all the time.  I'll call him, you know, every couple
4  months or maybe once every six months.  If I am coming
5  home, I usually call him because I usually -- we'll
6  either go out or I'll stop in and see him.
7   Q.  Have you talked with Jeff about John, John's
8  death and these issues we have been talking about
9  today, the affair, and work situation?
10   A.  Not since, not since the time that John died,
11  around that time.
12   Q.  Just a few more questions from me.  The other
13  attorneys may have some questions for you.
14   A.  Okay.
15   Q.  If you need to take a break at any time, I
16  should have said that at the beginning, feel free to
17  tell us.
18   A.  No, that's all right.
19   Q.  Did you become aware that John had had a
20  rollover accident in his truck, I think that was
21  February 17th or 18th of 2005?
22   A.  Yeah, I was aware of that.
23   Q.  How did you find out about it?
24   A.  I believe Jeff told me.

Page 45

1   Q.  Was that before John's death or not?
2   A.  That Jeff told me?  Yeah.  I believe it was the
3  night that -- it was either the night that it
4  happened -- I mean, Cindy and I talked about it, too.
5  I believe it was Jeff that told me.  But I also talked
6  to Cindy about it.
7   Q.  What did she say?
8   A.  I don't recall.  It was just that John had had
9  a rollover.  Him and Jonathan were in the vehicle, and
10  they had a rollover on kind of a back, winded country
11  road.  That was, basically, it.  I don't think she
12  knew what to say.  I knew she said they took him to
13  the hospital, I believe.  I don't really recall.
14   Q.  In your mind when you heard about that, did you
15  have any concern that the accident was somehow related
16  to John's state of mind?
17   A.  Not really.  Only because -- at first when I
18  heard, okay, he had a rollover, yeah, I did.  But then
19  when they said Jonathan was in the car with him, then,
20  no, because he wouldn't do anything to hurt his son --
21  at all, I know that.
22   Q.  From the time of the St. Jones incident until
23  his death, do you know if John continued to have any
24  contact with Jennifer?

12 (Pages 42 to 45)

64e25f15-ea15-4a96-91ce-e5a98ed105ab

**A1060**

Balas v. Taylor, et al.

Page 46

1    A.  I was under the impression -- I believe, I
2  believe that he was going to have one contact with her
3  to just break it off, completely finish it, and that
4  was going to be it.  Now, whether he made that contact
5  or not I don't -- I don't know.  I don't really -- he
6  never really said if he had any more contact with her.
7    Q.  When was the last time that you saw John alive?
8    A.  Probably, I don't know, maybe the day before he
9  died.  I was over -- at that point, I was over there
10 just about every day or at least every other day.
11 Usually, I think it was every day at that time, just
12 stopping in, visiting, checking on him.
13   Q.  How did he seem when you saw him?
14   A.  He seemed fine.  He seemed a lot better.
15   Q.  Now, did you learn from Cindy that at some
16 point she did find out about the affair with Jennifer?
17   A.  I first found out from Jeff that Cindy found
18 out.
19   Q.  What did Jeff tell you?
20   A.  Well, it was the morning that John died.  It
21 was early -- I think it was early.  I can't remember.
22 I called Jeff to find out how -- if he had heard from
23 Cindy or John to see how he was doing that day.  And I
24 was at work.  I called Jeff.  Jeff said that he didn't

Page 47

1  know.  Jeff's wife's name is Tina.  He said that Tina
2  was on the phone, the other phone with Cindy at the
3  same time.  And he said, "Things aren't good," or
4  something like that.  I was like, "What do you mean?"
5  He said, "Cindy found out about the affair" and said
6  that -- you know, he's -- that she had talked to him
7  about it and said that he had just gone out of the
8  house.  And, anyway, she -- at that point, that's when
9  John told her -- Jeff told me -- I heard Cindy -- not
10 Cindy.  I heard Tina yell at Jeff that John had a gun.
11 I guess Cindy had told Tina.  It was kind of confusing
12 because it was like four people on the phone at one
13 time.
14   Q.  Right, right.
15   A.  I guess Cindy had told Tina; Tina yelled at
16 Jeff; and Jeff told me that John had a gun and that he
17 was walking towards the back of their property.  Then
18 she said that, I guess, Jonathan was running after
19 him.  And then Cindy went after him.  Then Cindy
20 yelled for Jonathan to come back.  I guess they talked
21 in the yard there.  Apparently, John told Cindy to go
22 back in the house and get away from him or whatever.
23        Anyway, at that point, I hung up the phone
24 and left work and went over to John's house as fast as

Page 48

1  I could.  When I got there, there were already -- Jeff
2  had told me that the state police had already been
3  called.
4    Q.  Mm-hmm.
5    A.  When I got there, there were two state
6  troopers' vehicles in the yard, one out by the yard
7  and one up in the driveway.  And it was just quiet
8  when I walked up there.  I walked up to the front door
9  and Cindy came to the door and just crying and said
10 that John had killed hisself.
11   Q.  Did Jeff tell you how Cindy found out about the
12 affair?
13   A.  Yeah.  Cindy -- well, somebody, I believe,
14 called Tina and told Tina that they knew about it or
15 something.  And I believe they were going to tell
16 Cindy.  And Tina decided that if they were going to
17 tell Cindy that it would be better if it came from
18 Tina because -- I guess they felt that, you know,
19 let's work on getting John better before, you know, he
20 finds out that Cindy knows about the affair.  So Tina
21 is the one I believe that told Cindy.
22   Q.  But it's your understanding at that point
23 that -- see if I get this right -- that John knew that
24 Cindy knew?

Page 49

1    A.  I guess when -- from what I understand, when
2  John -- when Tina told Cindy, Cindy said something to
3  John about it.  I don't know the exact timing of how
4  it was put.  I don't know -- I guess Cindy had
5  mentioned to John, hey, I know about this.  I don't
6  know what was said.  I just know that Cindy did tell
7  John that she knew about it, about the affair.  And
8  then when I got there that day, after John had killed
9  himself, Cindy said that she had told John, you know,
10 I know about it, we can work this out.  And I don't
11 recall whatever else.  I do recall that.
12   Q.  And that was right before he took the gun and
13 killed himself?
14   A.  Apparently, yes.
15        MR. DURSTEIN:  All right.  I appreciate you
16 having the patience to answer these questions
17 particularly when we just talked about this a week
18 ago, but it's now on the record.
19        THE WITNESS:  Okay.
20        MR. DURSTEIN:  That's all the questions I
21 have, but stand by because the other attorneys may
22 have some for you.  Let us know if you have trouble
23 hearing.
24 BY MR. NEUBERGER:

13 (Pages 46 to 49)

64e25f15-ea15-4a96-91ce-e5a98ed105ab

**A1061**

Balas v. Taylor, et al.

Page 50

1    Q.   Mr. Mears, my name is Steve Neuberger.  I am
2  one of Cindy's attorneys.  Do you understand that?
3    A.   Yes, sir.
4    Q.   I have a few questions for you.  Then we can
5  wrap this up.
6    A.   All right.
7    Q.   Mr. Durstein asked you some questions in the
8  very beginning about those two declarations that you
9  signed.  Do you recall those questions?
10    A.   Yes, sir.
11    Q.   Do you recall that on the last page of those
12  declarations it says, right after you signed it, it
13  say that "I declare under penalty of perjury that the
14  foregoing is true and correct"?
15    A.   Yes, sir.
16    Q.   Did you understand you were taking an oath
17  then?
18    A.   Yes, sir.
19    Q.   And that you were swearing there?
20    A.   Yes, sir.
21    Q.   Okay.  Now, you mentioned the gentleman by the
22  name of Tim Radcliffe, whatever his rank was.  Do you
23  recall testifying about him?
24    A.   Earlier today?  Yes, sir.

Page 51

1    Q.   I think you said that he called you the night
2  of the -- the night before the CERT activation, and he
3  spoke to you on the phone after Truman Mears left the
4  meeting.
5    A.   Yes, sir.
6    Q.   And so he was the CERT Command supervisor?
7    A.   He would have been second in charge of CERT
8  Command.
9    Q.   Who was first in charge?
10    A.   Dave Hall.
11    Q.   Dave Hall okay.  Tim Radcliffe was second in
12  charge of CERT Command?
13    A.   Yes.
14    Q.   He accused you and John of instigating the
15  entire meeting with the CERT members the night before?
16    A.   Yes, sir.
17    Q.   Do you recall anything else he said during that
18  conversation?
19    A.   No, not really.  He just -- he said -- well,
20  first off, when I answered the phone, he said -- he
21  asked me, you know, "What are you doing?"  I said,
22  "What do you mean?"  He said, "Why are you having a
23  meeting?"  And it was kind of, I don't know, kind of
24  rude the way he was asking me.  I told him, I said,

Page 52

1  "Some of the guys are concerned.  They don't feel this
2  is right.  And a lot of the guys, really, you know,
3  are not happy, and we're having a meeting to discuss
4  how the team feels and what the team is going to do
5  about it."  He said, It's not up to the team.  It's up
6  to CERT Command, or something along those lines.  I am
7  not exactly sure what was said.  But that was the
8  general thing I got from it.  But after that, I don't
9  recall what he said.
10    Q.   Then let's fast forward to the next day when
11  you guys are activated and you're actually in the
12  prison.  Okay?
13    A.   Yeah.
14    Q.   Now, when you went into the warden's office and
15  actually resigned --
16    A.   Mm-hmm.
17    Q.   -- did you or anyone else explain that one of
18  the reasons that you were doing that, that you were
19  resigning, was because you didn't want to go against
20  the union job action?
21    A.   That was part of the reason.
22    Q.   And did someone articulate that to the warden?
23    A.   I believe so.  Several of us talked.  From my
24  perspective, I believe that I probably mentioned that

Page 53

1  when I said that we felt we were being used by the
2  Department to go against the officers and everything
3  they had done and that we also felt that we were being
4  used in a political manner, not an emergency manner,
5  what the team was designed for.
6    Q.   And then let's -- I guess maybe we're going to
7  rewind a little bit to the conversation you had with
8  Major David Hall before your resignation.
9    A.   Okay.
10    Q.   I think you mentioned he said something to the
11  effect that it wasn't Stan, it came from higher than
12  Stan when referencing the four operation orders?
13    A.   Yes.
14    Q.   Who is higher than Stan Taylor?
15    A.   As far as I know, the only one that Stan Taylor
16  answers to would be the governor.
17    Q.   At the time, it would have been our
18  Governor Ruth Ann Minner?
19    A.   Yes, sir.
20    Q.   One last question.  Regarding that evaluation
21  that you were questioned about a little earlier, the
22  one that John received.
23    A.   Yes.
24    Q.   Did John ever say to you that he felt Truman

14  (Pages 50 to 53)

64e25f15-ea15-4a96-91ce-e5a98ed105ab

**A1062**

## Balas v. Taylor, et al.

Page 54

1   had lowered his evaluation because Truman was angry at
2   him for resigning from CERT?
3     A.   I don't -- well, I don't recall him saying that
4   it was because of him resigning from CERT.
5     Q.   Okay.
6     A.   But I do recall him saying that Truman had
7   lowered his evaluation and that he felt that Truman
8   had something against him.
9     Q.   Okay. I'm sorry. Go ahead.
10    A.   Well, I am just trying to put this into
11  perspective for you. From what I saw and from what
12  John had told me, I took it as he felt that Truman was
13  messing with him because of -- for whatever reason, I
14  am not sure. It seemed like it wasn't one particular
15  reason, it was -- it may have had something to do with
16  resigning from CERT. It probably went back to some
17  other issues that -- from other situations that
18  happened on CERT.
19        When we went on CERT, CERT -- nobody really
20  ever -- not that we did anything to have anybody mess
21  with us, but nobody messed with CERT because CERT
22  stuck together, and we didn't allow anybody to harass
23  any of us. I recall several situations, one real
24  vivid, where they did try to mess with John at a CERT

Page 55

1   activation -- actually two, where they did try to mess
2   with John at a CERT activation, where the team stood
3   up and said, no, you are not doing that.
4         I don't know if it was because we were no
5   longer on CERT that they felt, you know, we
6   couldn't -- we didn't have as much power, which we
7   probably didn't as a team. We weren't there as a
8   team. After we resigned CERT, we were all individual
9   officers again.
10        So I don't know if that's where some of
11  that hostility came from or not. But I did see
12  hostility from CERT Command as well as Truman towards,
13  towards John.
14    Q.   And then based on all the things that you saw,
15  based on all the things that you heard, and based on
16  all the things that were said to you by John or said
17  to you by others, do you think that one of the reasons
18  for Truman's hostility was the CERT resignation?
19    A.   That may have had a part of it. I don't know
20  what his reasons were. Truman never mentioned it to
21  me. But that may have been a part of it.
22        MR. NEUBERGER:  Got ya. Then just let me,
23  just on the record, ask defense counsel, Mr. Durstein,
24  so we're attaching these two declarations as exhibits?

Page 56

1         MR. DURSTEIN:  Yeah. What we're going to
2   do, why don't we have the first one we'll make exhibit
3   1, Lee Mears 1, and then the second declaration will
4   be Lee Mears 2.
5         MR. NEUBERGER:  With that said, I have no
6   further questions, Mr. Mears. Thank you very much for
7   your time.
8         MR. DURSTEIN:  Mr. Mears, we're almost
9   done. I know you need to get to work. Would you like
10  to review a copy of the transcript of this deposition
11  when it's prepared? You have the right to do that and
12  make any corrections or you can waive that right if
13  you don't feel it's necessary. It's entirely up to
14  you.
15        THE WITNESS:  Yeah, I would like a copy.
16        MR. DURSTEIN:  Okay. We'll send one out to
17  you. It will have an errata sheet. So if you think
18  there is anything taken down wrong, you can make the
19  corrections and then just send it back to us or send
20  it back to the court reporter. Okay?
21        THE WITNESS:  Thank you.
22        MR. DURSTEIN:  Thank you again for your
23  time.
24        (L. Mears Exhibit Nos. 1 and 2 were marked

Page 57

1   for identification.)
2         (Deposition concluded at 9:27 a.m.)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

15 (Pages 54 to 57)

64e25f15-ea15-4a96-91ce-e5a98ed105ab

**A1063**

# Balas v. Taylor, et al.

Page 58

I N D E X

WITNESS: ARTHUR LEE MEARS                 PAGE

EXAMINATION BY MR. DURSTEIN          2
EXAMINATION BY MR. NEUBERGER        49

DEPOSITION EXHIBITS

NO.                          MARKED

1   First declaration of A. Lee Mears      56

2   Second declaration of A. Lee Mears    56

Page 60

State of Delaware    )
                     )
New Castle County    )

CERTIFICATE OF REPORTER

I, Lucinda M. Reeder, Registered Diplomate Reporter, Certified Real-time Reporter and Notary Public, do hereby certify that there came before me on January 23, 2008, the witness herein, ARTHUR LEE MEARS, who was first duly sworn by me and thereafter examined by counsel for the respective parties; that the questions asked of said witness and the answers given were taken down by me in Stenotype notes and thereafter transcribed by use of computer-aided transcription and computer printer under my direction.

I further certify that the foregoing is a true and correct transcript of the testimony given at said examination of said witness.

I further certify that I am not counsel, attorney, or relative of either party, or otherwise interested in the event of this suit.

Lucinda M. Reeder

Lucinda M. Reeder, RDR, CRR
Certification No. 132-RPR
(Expires January 31, 2008)

DATED:    1-28-08

Page 59

REPLACE THIS PAGE

WITH THE ERRATA SHEET

AFTER IT HAS BEEN

COMPLETED AND SIGNED

BY THE DEPONENT.

16 (Pages 58 to 60)

64e25f15-ea15-4a96-91ce-e5a98ed105ab

A1064

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CINDY L. BALAS a/k/a CINDY L. ADKINS,          :
Executrix of the Estate of CORPORAL JOHN J.    :
BALAS,                                          :
                                                :
       Plaintiff,                       :
                                                :
      v.                                :     C.A.No. 06-592-JJF
                                                :
STANLEY W. TAYLOR, JR., individually and       :
in his official capacity as the Commissioner of :
Correction; ALAN MACHTINGER,                    :
individually and in his official capacity as the :
Director of Human Resources of the Department   :
of Correction; MICHAEL DELOY, individually     :
and in his official capacity as Deputy Warden of :
Sussex Correctional Institution; CAPTAIN        :
DAVID WILKINSON, individually;                  :
LIEUTENANT TRUMAN MEARS,                        :
individually; and DEPARTMENT OF                 :
CORRECTION OF THE STATE OF                      :
DELAWARE,                                        :
                                                :
       Defendants.                      :

UNSWORN DECLARATION OF ARTHUR LEE MEARS
UNDER 28 U.S.C. § 1746

    I, Arthur Lee Mears, hereby depose and state as follows:

    1.    I have personal knowledge of the facts contained in this declaration and, if called

as a witness, I am competent to testify as to those facts.

    2.    I was a friend of John J. Balas, deceased. We were friends from approximately

1993 until his untimely death on February 19, 2005.

    3.    On January 29, 2005, I received a phone message from John which I found to be

extremely odd. I went looking for John and found him parked in his car with a gun on his lap



and discovered he had been drinking.

4.     I felt that John was extremely depressed I suggested that we go somewhere to sit and talk. We went to a local establishment and made small talk. It was obvious that John was agitated, upset and angry all night.

5.     On the way back to his house he told me that he would not be around in the morning and that he would not be any trouble to anyone else. At one point he got mad and said that he was going to kill himself.

6.     Unsure of what to do next, I took John to his parent's house so he would not be alone. John refused to talk to his parents and would only allow me to be around him. I stayed up with John all night.

7.     Early the next morning I called my wife and told her where I was and what had happened the previous night. I also had my wife call Cindy and explain what happened and that I needed someone to come stay with John because I was exhausted.

8.     Later that day I received a call from Cindy who stated that John's behavior was still very concerning and she had called St. Jones Behavioral Health Center because she felt he needed to talk to someone. She asked that I accompany her in taking John to St. Jones.

9.     In the early afternoon of January 30, 2005, Cindy, her brother Jeff Foskey, and I took John to St. Jones for psychiatric evaluation.

10.     Upon arriving at St. Jones, John met with a male counselor for about 20 to 30 minutes. After meeting with John, the counselor released him.

11.     The counselor instructed us to remove all guns from the house.

12.     The counselor also recommended that John contact a counselor or psychologist. He gave John a list of doctors in the area and recommended that he call to set up an appointment.

2

P558

**A1066**

13.    Since we were confused as to why John was not being admitted for observation, I asked to speak with the male counselor directly. I met with the counselor for about 10 to 15 minutes. I asked several questions to make sure that John was honest about things going on in his life such as the fact that he was feeling depressed and that he was stressed at work. The counselor stated to me that John had signed a contract that he would not hurt himself and to bring him back if things got worse. I was shocked that the counselor was not going to keep John for observation.

14.    After leaving St. Jones, we decided to take John to his parents house while Cindy, Jeff, and I removed all of the guns from his house.

15.    In the following weeks, I maintained regular contact with John and Cindy to make sure he was doing okay. I often called the house to talk to John, or if John was at work I would speak with Cindy. The week prior to his death, John took a week of vacation from work.

16.    On February 19, 2005 I learned from Jeff that John had walked into the backyard with a gun. I immediately left work and proceeded to John's house. Jeff informed me that the police had already been called. When I arrived at Johns' house, two Delaware State Police cars were on John's property. I walked to the door where I was told by Cindy that John had killed himself.

*Arthur L Mears*

**Arthur Lee Mears**

I declare under penalty of perjury that the foregoing is true and correct. Executed on October _11_, 2007.

Balas / Pleadings / Declaration / Lee Mears Declaration

3

P559

**A1067**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CINDY L. BALAS a/k/a CINDY L. ADKINS, :
Executrix of the Estate of CORPORAL JOHN J. :
BALAS, :
           :
    Plaintiff, :
           :
    v.          :    C.A.No. 06-592-JJF
           :
STANLEY W. TAYLOR, JR., individually and :
in his official capacity as the Commissioner of :
Correction; ALAN MACHTINGER, :
individually and in his official capacity as the :
Director of Human Resources of the Department :
of Correction; MICHAEL DELOY, individually :
and in his official capacity as Deputy Warden of :
Sussex Correctional Institution; CAPTAIN :
DAVID WILKINSON, individually; :
LIEUTENANT TRUMAN MEARS, :
individually; and DEPARTMENT OF :
CORRECTION OF THE STATE OF :
DELAWARE, :
           :
    Defendants.      :

SECOND UNSWORN DECLARATION OF ARTHUR LEE MEARS
UNDER 28 U.S.C. § 1746

   I, Arthur Lee Mears, hereby depose and state as follows:

   1. I have personal knowledge of the facts contained in this declaration and, if called

as a witness, I am competent to testify as to those facts.

   2. During all times relevant to this case, I was a correctional officer with the Department

of Correction ("DOC") as well as a member of the Correctional Emergency Response Team

("CERT") until August 6, 2004. I was also an active member of the Correctional Officer's

Association of Delaware ("COAD"), the correctional officer's union.



3. I have since resigned from the DOC and currently reside in Montana where I work as a Border Patrol agent for the United States Border Patrol.

**Summer of 2004**

4. CERT acts as technical advisors to Wardens and provides tactical responses during emergency situations. CERT also assists with escapee and erroneous release operations. Members of CERT are trained to perform advanced, high-risk, or community operations.

5. During the Summer of 2004, COAD was in contract negotiations with DOC regarding issues such as correctional officer's pay and working conditions, among others.

6. Also, during this time the DOC was under public scrutiny regarding the severe levels of understaffing which often caused officers to work mandatory overtime, or two eight hour shifts.

7. In an effort to make our voices heard on the severe levels of understaffing and the stresses it caused, correctional officers organized a job action where we refused to accept any voluntary overtime. The job action primarily effected the Court and Transportation Unit where previously officers volunteered to work overtime in order to transport prisoners to court. When officers refused to work voluntary overtime, the risk of prisoners not being transported to court increased.

8. On August 5, 2004, we learned from then Warden Rick Kearney that Commissioner Stan Taylor activated five members of CERT to step in and staff the DOC's Court and Transportation unit. I was one of the five CERT members to be activated.

9. Upon hearing this, we CERT members became concerned that if we reported to our assignment we would be going against the job action instituted by our fellow correctional officers.

2

10. Due to the unrest among the CERT members regarding the activation, as a team leader I suggested we have a meeting is discuss the matter before making the decision to quit. The night we learned of CERT's activation, a meeting was held at my house.

11. In attendance at the meeting, in addition to myself, was John Balas, Jeff Foskey, Allen Adams, Scott Bradley, John Mumford, Heath Shockley, Truman Mears, Dennis Murray, Harry Hastings.

12. At the meeting, several members discussed their unrest at reporting to Court and Transportation because it would be viewed as going against the job action.

13. At some point prior to the conclusion of the meeting, Truman Mears left. Shortly thereafter I received a call from CERT Command who had just learned of the meeting from Truman Mears.

14. CERT Command assured us that our activation was to transport prisoners who would be released if they were not transported to court for their mandatory preliminary hearing.

15. Thus after the long meeting and CERT Command's assurances, we decided that if our presence was needed to protect the public from the possible release of prisoners we would report to Court and Transportation.

16. So on August 6, 2004, we showed up for our assignment and crossed the picket line. When we showed up for our assignment, we were ridiculed and cursed at by our fellow co-workers and given the cold shoulder.

17. However, shortly after reporting to duty, we learned that there was an extremely light court load that day with only a handful of prisoners on the court list. Further, only two prisoners would have been released if they did not get to court that day. In addition to the five assigned CERT members, there were also approximately five full time Court and Transportation officers

3

assigned on that day as well.

18. Generally, when CERT is activated, DOC Commissioner Stan Taylor allowed CERT command to draw up the operation orders and then he would pick the best one.

19. When we asked Major Dave Hall, the head of CERT, why we had been activated given the small amount of prisoners that needed to be transported he replied that he had given four operations orders to Stan Taylor. Cpl. John Balas asked Major Hall why Taylor had picked this one. Dave replied, "He didn't." I then asked Taylor who gave the order and he replied, "It came from higher than Stan." This was the first time in the seven years I was on CERT that I ever witnessed initial command decisions being made by someone higher than the Commissioner.

20. At this point we realized CERT's activation was politically motivated and had not occurred for critical reasons of public safety.

21. Therefore, at the end of our shift that day, the five assigned CERT members, including myself, and five other CERT members met with the Warden and resigned our positions on CERT in an effort to show support for the job action.

22. We explained that we did this because we did not feel CERT's activation was proper and that we were lied to and used for political reasons. We expressed to the Warden that we would not go against our fellow co-workers if the public's safety was not in jeopardy.

23. When the Warden asked that we reconsider our resignations, we stated that we felt betrayed by the department despite our loyal service and that management could no longer be trusted. Accordingly, we refused to reconsider.

24. After the resignation, I learned that the Bureau Chief Paul Howard made comments that the members who resigned would never be allowed on CERT again.

4

25. I believe that CERT Command was irritated with our decision to resign because it shed a negative light on their unit. I also believe that DOC management was frustrated by our resignation.

**John Balas**

26. I incorporate, by reference, my first unsworn declaration produced in this case previously marked as P557-559.

27. I was a friend of John J. Balas, deceased. We were friends from approximately 1993 until his untimely death on February 19, 2005.

28. John was the type of person who was always laughing. He loved his family and enjoyed spending time with them.

29. John was a trustworthy, honest and dependable friend. He was fun to be around.

30. In the Fall of 2004, I noticed that John began acting different. John was depressed. He stopped laughing and became quiet and withdrawn. I knew John was experiencing a lot of stress at work mostly because he believed that his supervisor Truman Mears was retaliating against him for resigning from CERT.

31. During this same time, John told me he received a performance evaluation from Truman Mears which was bad compared to other evaluations he had received in the past.

32. Also during this time, John informed me that he was having an affair with a co-worker. This behavior was completely uncharacteristic of John since he loved his wife and children.

33. On January 29, 2005, John made comments to me that he was suicidal. As set forth more fully in my first unsworn declaration, on January 30, 3005 his wife Cindy, brother-in-law Jeff Foskey and I took John to St. Jones Behavioral Health Center for observation. However,

5

John was not kept at St. Jones.

34.  In the following weeks, I maintained regular contact with John and Cindy to make sure he was doing okay.  I often called the house to talk to John, or if John was at work I would speak with Cindy.  The week prior to his death, John took a week of vacation from work.

35.  On February 18, 2005, I learned that John's mistress spoke with then Deputy Warden Deloy and informed him that John was suicidal.  I believe I learned this information from John.

36.  On February 19, 2005 I learned that John had killed himself.


**Arthur Lee Mears**


I declare under penalty of perjury that the foregoing is true and correct.   Executed on December 28, 2007.

Bales / Pleadings / Declaration / Lee Mears 2nd Declaration

6




# State of Delaware
### The Official Website for the First State

Visit the Governor | General Assembly | Courts | Other Elected Officials | Federal, State & Local Sites

State Directory | Help | Search This Site | Your Search...     Citizen Services | Business Services | Visitor Info.

**Department of Correction (DOC)**

**HOME**
About DOC
Newsroom
Divisions / Programs
  Commissioner
  Management Svcs.
  BOCC
  Bureau of Prisons
FAQs
Employment
Related Links
Contact Information
Calendar of Events
DOC Locations
DOC Site Map

**SERVICES**

**INFORMATION**

# BUREAU OF PRISONS

**Rick Kearney, Bureau Chief**
**MISSION**

The mission of the Bureau of Prisons is to provide overall administrative support for Delaware's five state prisons. These correctional facilities provide sanctions for sentenced offenders and pre-trial detention services for offenders awaiting disposition of criminal charges. The five facilities housing inmates sentenced to Level V sanctions provide:

+ Protection for the public through incarceration of the offender.

+ Protection for the public through rehabilitation of the offender to prevent future crime.

+ A safe and humane living environment for the incarcerated offender.

+ A safe and appropriate working environment for staff.

+ A range of correctional programs necessary to meet the needs of both society and the individual while implementing court-ordered sanctions in the least restrictive environment consistent with public safety.

Delaware's Five correctional institutions are:

Delores J. Baylor Women's Correctional Institution (BWCI)
Delaware Correctional Center (DCC)
Howard R.Young Correctional Institution (HRYCI)
Sussex Correctional Institution (SCI)*
John L. Webb Correctional Facility (WCF)

* The Sussex Boot Camp is located on the grounds of the Sussex Correctional Institution

**BACKGROUND**

Delaware has five adult correctional facilities. The Baylor Women's Correctional Institution is Delaware's only female correctional facility. The Delaware Correctional Center, the Howard R. Young Correctional Institution and the Sussex Correctional Institution provide incarceration at all security levels to male populations (HRYCI accommodates a small juvenile population in the Young Criminal Offenders Program-YCOP). The John L. Webb Correctional Facility is a minimum-security male facility.

Delaware Department of Correction facilities have a design capacity of 6,469 and a temporary maximum capacity of 7,005. The average daily population is approximately 6,500 (as of Dec. 1, 2001). Currently, the Department of Correction experiences approximately 20,000 admissions and 20,000 releases a year.

The following figures offer a snapshot of the lengths of stay for the categories of offenders in detention (pre-trial) status, jail sentences (less than a year), prison sentences (more than one year), Life & Death sentences: (these statistics reflect the categories as analyzed on a single

day.)

### LENGTH OF STAY

| | |
|---|---|
| Detention | 113.8 days |
| Jail | 63.1 days |
| Prison | 20.8 months |
| Life | 9.0 years |
| Death | 5.2 years |

The above information illustrates the significant movement within Delaware's prison population. Statistics also reveal that approximately 97% of all inmates in Delaware will be released, mirroring national statistics. As significant numbers of offenders will be released back to society, it is important to rehabilitate, as well as, incarcerate. Historically the BOP has focused much attention on tight security of prisons i.e. preventing escapes, serious incidents, reducing assaults, etc. These functions fall under the broad umbrella of incarcerating offenders--and are still a top priority of the Bureau of Prisons. To truly protect the public, the BOP must also address the offenders--individual needs during incarceration to increase the chance they will succeed once released to the community. Programming (including substance abuse treatment, education, vocational training, religious practice, and work opportunities) increases the likelihood that offenders will become successful and contributing members of society once released from incarceration.

**Facts & Figures:** In Fiscal Year 2002 (July 1, 2001-June 30, 2002), the Bureau of Prisons received and released over 33,592 detentioners. There were 10,166 sentenced admissions, 9778 transfers within the system and 12,013 sentenced releases. There were no prison escapes. (There has not been a prison escape since 1995.)

**Prison Construction:** In calendar year 2001, the Bureau of Prisons completed the largest prison construction project in Delaware';s history. It was a 4-year, $180 million expansion. Project highlights: opened State';s first Boot Camp (100 beds) in April 1997; between April 1997 and April 2000, 760 beds were added to the Sussex Correctional Institution (including the 100 Boot Camp beds); in December 2000, a 900-bed maximum-security addition at the Delaware Correctional Center was completed; two Violation of Probation Centers, each with 250 beds, opened; and approximately 300 beds were added to Howard R. Young Correctional Institution prison. In all, 2,500 beds were added to the system.

**Security Enhancements:** The Bureau of Prisons continues to upgrade security and Correctional Emergency Response Team (CERT) operations. There are twenty-eight K-9 teams assigned to various correctional facilities. Work continues with the National Guard to maximize the use of their IonScan equipment. The IonScan detects the presence of illegal substances at the molecular level. Additionally, the Bureau of Prisons randomly tests employees and offenders for drugs. The result has been a reduction in all forms of illegal contraband, including drugs.

**Correctional Officers** are the first line of defense in the Department's mission to ensure public safety. No longer can Correctional Officers be called prison guards. The term prison guard does not adequately reflect the duties and responsibilities of today's Correctional Officer. Before becoming Officers, individuals attend eight weeks of training at the DOC Staff Training Academy. They receive hands-on, physical and classroom training in several areas including weapons, defensive tactics, report writing, substance abuse training and inter-personal communication. On the job, Correctional Officers do much more than "guard" offenders. Officers must notice changes in offender behavior (behavior changes can indicate contemplating suicide or an escape attempt). They must be able to administer basic first aid, make suggestions on programming needs, and help to identify offender emotional problems. New employees enter the security force as Correctional Officers. Ranks above include Corporal, Sergeant, Lieutenant, Staff Lieutenant, Captain, Major, Deputy Warden and Warden. Correctional Officers put their lives on the line 24 hours a day, seven days a week for public safety. Delaware Correctional Officers have full police powers as defined by the Delaware Code whether supervising offenders at any place within the State, while going to or returning from such duty, and while searching for escaped offenders. Officers are equipped with handcuffs, pepper spray, a flashlight and CPR

mask. Standard issue personal security equipment for correctional staff now includes bullet and stab-proof vests.

**Correctional Emergency Response Team (CERT):** These operations fall under the auspices of the Bureau of Prisons. The mission of the CERT Unit is to ensure public safety, as well as, the safety of department staff and offenders through a joint partnership with and cooperation from all BOP institutions. CERT develops and implements security programs for institutions based on the individual needs. CERT trains and develops selected groups of staff to perform advanced, high-risk, or community operations. CERT acts as technical advisors to Wardens and provides tactical responses during emergency situations. CERT also assists with escapee/erroneous release operations.

**Quick Response Teams (QRT)** provide institutions with a first response capability that can quickly quell a disturbance. Early responses can reduce the possibility of staff/offender injuries. CERT can be called to support operations initiated by the QRT.

**Escapee Recovery Teams (ERTs)** provide the Bureau of Prisons with personnel trained to manage and complete escapee - erroneous release recovery operations within the community.

**K-9 Unit:** These 28 units provide the Bureau of Prisons with enhanced institutional security and a drug interdiction capability. Units provide a selection and training component, on-going proficiency training, narcotic drug detection, offender disturbance control, perimeter security, evidence collection, escapee apprehension and crowd control. K-9 teams must complete 14 weeks (560 hours) of basic training. Training includes canine obedience, criminal apprehension, tracking, area search, article search, building search, agility, K9 health care and first aid. At the completion of training, teams are certified at the Police Dog I standard under guidelines established by the United States Police Canine Association (USPCA). To maintain certification, K9 teams must complete eight hours of proficiency training every month (96 hours annually).

**Mobile Command Post:** The Mobile Command Post supports management of escape, hostage and riot situations in both prison and community operations, maintains multiple communication capabilities, provides officers on-board computers with access to law enforcement networks, and mapping. Trained staff supports all CERT operations from the Mobile Command Post.

**Video/teleconferencing** equipment usage continues to expand. Video-conferencing allows an offender to take part in a court proceeding without having to leave the secured confines of a correctional facility.  The offender's attorney can either be present at the correctional facility or in the courtroom. The offender can see and hear the proceedings through a television monitor. Likewise, the court can see and hear communications from the facility. The use of video-conferencing reduces court and transportation costs while increasing public safety. Increasing the use of video-conferencing means fewer offenders are leaving the correctional facility. In Fiscal Year 2002 (July 1, 2001-June 30, 2002) 21,934 video-conferencing sessions were conducted versus 21,468 sessions for the previous fiscal year. This increase of 466 sessions represents a 2% increase in activity. 24% were conducted with the Delaware Public Defender's Office and other non-court entities. 76% (16,579 sessions) were conducted with the Delaware courts. This level of court activity represents an increase of 4% (658 sessions) when compared to Fiscal Year 2001. The Delaware Department of Correction has worked to establish teleconferencing capabilities with other jurisdictions. In August 2000, the Commissioner of Correction signed a Memorandum of Understanding with the United States District Court to establish video conferencing capabilities in compliance with amendment to Title 42, USC, Section 1997(e). Additionally, video conferencing was also utilized between the Delaware DOC and a Pennsylvania court in a felony case.

**The Court and Transportation Unit:** The Delaware Department of Correction manages an offender transportation unit. This Unit is responsible for the transportation of all DOC offenders to court appearances and for the transfer of offenders from one facility to another. C&T transported 37,823 offenders in Fiscal Year 2002 (July 1, 2001-June 30, 2002). This is a 7% increase (2,438 offenders) over transports made in Fiscal year 2001.

**Young Criminal Offenders Program-(YCOP):** This housing unit/program accommodates a juvenile male population between ages 15-18. It is located at the Howard R. Young Correctional Institution. YCOP was opened to manage the state';s most difficult juvenile offenders. These youths are either found non-amenable in Delaware Family Court or are sentenced by Delaware Superior Court to the adult system for serious offenses. YCOP has capacity for 40. The YCOP housing unit is segregated from the adult male population at MPCJF. YCOP is a therapeutic

community--that is--it seeks to change behaviors through structured programming. Programs including substance abuse treatment, anger management, alternatives to violence, youth leadership, public speaking and parenting. Education is mandatory for juveniles without a high school diploma. Offenders attend classes five days a week. Young offenders with a GED are encouraged to earn their high school diploma. Other activities include Prison Arts, religious worship, and outdoor recreation. YCOP offenders are permitted weekly visits, daily phone calls, and visits to the commissary.

**Programming:** It is the belief of the Delaware Department of Correction that rehabilitation must occur during an inmate's period of incarceration. As 97% of all Delaware inmates will eventually be released from incarceration, it is vital we do something with each offender while entrusted to our care. The likelihood that an offender will succeed upon release increases with each program participation. Programming includes substance abuse treatment, education, vocational training and work opportunities. Every Delaware correctional facility offers an extensive array of programming. Education programs include adult basic education, the James H. Groves High School, GED and Life Skills. Vocational programs include training in the following areas: clinical nursing assistant, computer training, custodial maintenance, carpentry, masonry, plumbing, residential electric, blueprint reading, drafting, vocational rehabilitation, farming and the arts. Treatment programs include KEY/Crest/Aftercare, 12 Steps, Alcoholics Anonymous, Narcotics Anonymous, and Gamblers Anonymous. Dozens of self-improvement programs are offered including victim sensitivity, public speaking, leadership, goal setting, mentoring, parenting, and self-esteem.

**Contact Information**

Bureau of Prisons
Department of Correction
Administration Building
245 McKee Road
Dover,   DE   19904
(302) 857-5221

Last Updated: Thursday, 15-Nov-2007 11:43:14 EST

## CERTIFICATE OF SERVICE

I, Thomas S. Neuberger, being a member of the bar of this Court do hereby certify that on

January 31, 2008, I filed this **Appendix** with the Clerk of the Court using CM/ECF which will

send notification of such filing to the following:

> Ralph Durstein, Esquire
> Stacey Xarhoulakos, Esquire
> Department of Justice
> Carvel State Office Building
> 820 North French Street
> Wilmington, DE 19801


                              /s/ Thomas S. Neuberger
                              **THOMAS S. NEUBERGER, ESQ.**

Balas \ Appendix \ SJOB App. COS