# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

CINDY L. BALAS a/k/a CINDY L. ADKINS,    :
Executrix of the Estate of CORPORAL JOHN J.   :
BALAS,    :
    :
      Plaintiff,    :
    :     **C.A.No. 06-592-JJF**
    v.    :
    :
STANLEY W. TAYLOR, JR., individually and   :
in his official capacity as the Commissioner of   :
Correction; ALAN MACHTINGER,    :
individually and in his official capacity as the   :
Director of Human Resources of the Department   :
of Correction; MICHAEL DELOY, individually   :
and in his official capacity as Deputy Warden of   :
Sussex Correctional Institution; CAPTAIN   :
DAVID WILKINSON, individually;    :
LIEUTENANT TRUMAN MEARS,    :
individually; and DEPARTMENT OF    :
CORRECTION OF THE STATE OF    :
DELAWARE,    :
    :
      Defendants.    :
    :

## PLAINTIFF'S ANSWERING BRIEF IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

THE NEUBERGER FIRM, P.A.
THOMAS S. NEUBERGER, ESQ. (#243)
STEPHEN J. NEUBERGER, ESQ. (#4440)
CHERYL A. HERTZOG, ESQ. (*Pro Hac Vice*)
Two East Seventh Street, Suite 302
Wilmington, DE 19801
(302) 655-0582
TSN@NeubergerLaw.com
SJN@NeubergerLaw.com
CherylH@NeubergerLaw.com

Dated: February 19, 2008        Attorneys for Plaintiff

# TABLE OF CONTENTS

NATURE AND STAGE OF THE PROCEEDING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

SUMMARY OF THE ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    I.      STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    II.     PLAINTIFF DOES NOT OPPOSE THE DISMISSAL OF DEFENDANTS DELOY, WILKINSON, MACHTINGER OR TAYLOR . . . . . . . . . . . . . . . . . . 4

    III.    PLAINTIFF'S RETALIATION CLAIMS FOR ENGAGING IN FIRST AMENDMENT PROTECTED ACTIVITY ARE TIMELY . . . . . . . . . . . . . . . . 4

    IV.    PLAINTIFF IS ENTITLED TO DAMAGES INCLUDING COMPENSATORY AND PUNITIVE DAMAGES NOT LIMITED IN TIME FROM THE DATE OF INJURY TO THE DATE OF DEATH . . . . . . . . . . . . . . . . . . . . . . . 6

        A.    This Retaliation Action is Proper . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

        B.    Damages Available in § 1983 Retaliation Action Where the Plaintiff's Death is Caused by the Constitutional Violation . . . . . . . . . . 6

            1.    Defendant Mears' Retaliation Caused Plaintiff's Suicide . . . . . . . 9

                a.    The Temporal Evidence - Plaintiff's Personality Changed Following the Retaliation . . . . . . . . . . . . . . . . . . 9

                b.    The Direct Evidence - Plaintiff Tells Several Persons That He Plans to Kill Himself Because of the Situation at Work . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    V.    PLAINTIFF ENGAGED IN FIRST AMENDMENT PROTECTED ACTIVITY BY WAY OF HIS UNION MEMBERSHIP, UNION SOLIDARITY DEBATE WITH DEFENDANT MEARS, SYMBOLIC SPEECH REFUSING TO CROSS A PICKET LINE, RESIGNATION FROM CERT AND FILING A UNION GRIEVANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

        A.    Plaintiff Engaged in Protected Union Association . . . . . . . . . . . . . . . . . 11

        B.    Plaintiff Also Engaged in Protected Free Speech . . . . . . . . . . . . . . . . . 11

            1.    Speech About Union Solidarity . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*i*

        2.      Symbolic Speech and Resignation - Refusal to Cross the
                Union Picket Line . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        3.      Plaintiff Spoke as a Citizen . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

                a.      The Clear Record on Plaintiff's Job Duties . . . . . . . . . . 13

                b.      Defense Reliance on Garcetti Is Without Merit . . . . . . . . 14

                c.      The Garcetti Court Explained that Speech Related to
                        the Workplace is Still Protected . . . . . . . . . . . . . . . . . . . . 14

                d.      Garcetti Does Not Apply to Union Activity . . . . . . . . . . 16

        4.      Plaintiff's Speech was on Matters of Public Concern . . . . . . . . 17

        5.      Defendants Have Waived The Pickering Balancing Defense . . . 17

    C.      Plaintiff Engaged in Protected Petitioning . . . . . . . . . . . . . . . . . . . . . . . . 17

VI.     DEFENDANT MEARS' RETALIATION AGAINST PLAINTIFF WOULD
        CHILL A PERSON OF ORDINARY FIRMNESS FROM EXERCISING
        THEIR FIRST AMENDMENT RIGHTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

    A.      Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

    B.      The Person of Ordinary Firmness Standard . . . . . . . . . . . . . . . . . . . . . . 20

    C.      Defendant Mears' Adverse Action Against Plaintiff . . . . . . . . . . . . . . . . 22

        1.      A Mediocre Performance Evaluation . . . . . . . . . . . . . . . . . . . . . . 22

                a.      The Case Law Dictates That This is Adverse Action . . . 25

        2.      Continuous Denial of a Meeting with his Supervisors . . . . . . . . 26

        3.      Plaintiff is Denied a Transfer to Another Supervisor . . . . . . . . . 26

        4.      Mears Alters Plaintiff's Time Cards . . . . . . . . . . . . . . . . . . . . . . . 27

        5.      Plaintiff is Denied a Copy of His Timecard . . . . . . . . . . . . . . . . . 27

        6.      Plaintiff is Constantly Monitored and Nit Picked by Mears . . . . 28

7.    The Totality of All of this Retaliation Meets this "Extremely Low Hurdle" and Qualifies As Adverse Action . . . . . . . . . . . . 28

VII.    THE CAUSAL EVIDENCE IN THE RECORD DEMONSTRATES THAT PLAINTIFF'S PROTECTED FIRST AMENDMENT ACTIVITY WAS A SUBSTANTIAL OR MOTIVATING FACTOR IN THE RETALIATION TAKEN AGAINST HIM BY DEFENDANT MEARS . . . . . . . . . . . . . . . . . . . 28

A.    Substantial or Motivating Factor . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

1.    Direct Evidence Admission . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

2.    Demonstrated Anger, Hostility and Antagonism . . . . . . . . . . . . 29

3.    Unduly Suggestive Temporal Proximity . . . . . . . . . . . . . . . . . . 29

4.    Knowledge of the Protected Activity . . . . . . . . . . . . . . . . . . . . . 30

5.    Motive to Retaliate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

6.    Disparate Treatment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

7.    Violations of Procedures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

8.    Falsehoods . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

9.    Pretext and Cover-Up . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

10.    The Big Picture . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

11.    Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

B.    Defendants Waived Their Same Decision Anyway Affirmative Defense . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

VIII.    DEFENDANT DEPARTMENT OF CORRECTION IS PROPERLY JOINED IN THIS ACTION FOR THE PURPOSES OF COLLECTING ATTORNEYS' FEES AND COSTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

IX.    DEFENDANT TRUMAN MEARS IS NOT ENTITLED TO QUALIFIED IMMUNITY IN HIS INDIVIDUAL CAPACITY . . . . . . . . . . . . . . . . . . . . . . . 32

A.    Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

B.    The Facts Show the Defendant Mears Violated Plaintiff's First Amendment Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

C.    Plaintiff's First Amendment Rights were Clearly Established . . . . . . . . 33

    1.    Union Association . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

    2.    Free Speech Retaliation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

    3.    Petition Clause Retaliation . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>                                                                                                                            <u>Page</u>

<u>A.D. Bedell Wholesale Co. v. Philip Morris, Inc.</u>, 263 F.3d 239 (3d Cir. 2001) . . . . . . . . . . . 39

<u>Acierno v. Cloutier</u>, 40 F.3d 597 (3d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

<u>Agosto-de-Feliciano v. Aponte-Rogue</u>, 889 F.2d 1209 (1st Cir. 1989) (en banc) . . . . . . . . 20-21

<u>Allah v. Seiverling</u>, 229 F.3d 220 (3d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

<u>Anderson v. Davila</u>, 125 F.3d 148 (3d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

<u>Anderson v. Creighton</u>, 483 U.S. 635 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

<u>Andrews v. City of Phila.</u>, 895 F.2d 1469 (3d Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . 22,30

<u>Assaf v. Fields</u>, 178 F.3d 170 (3d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

<u>Atkinson v. Taylor</u>, 316 F.3d 257 (3d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

<u>Azzaro v. County of Allegheny</u>, 110 F.3d 968 (3d Cir. 1997) (en banc) . . . . . . . . . . . . . . . . . 15

<u>Baca v. Sklar</u>, 398 F.3d 1210 (10th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

<u>Baldassare v. State of N.J.</u>, 250 F.3d 188 (3d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . 29,38

<u>Banks v. East Baton Rouge Parish Sch. Bd.</u>, 320 F.3d 570 (5th Cir. 2003) . . . . . . . . . . . . . . 21

<u>Bart v. Telford</u>, 677 F.2d 622 (7th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20-21

<u>Bennett v. Hendrix</u>, 423 F.3d 1247 (11th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

<u>Bennett v. Murphy</u>, 274 F.3d 133 (3d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

<u>Bennett v. Murphy</u>, 120 Fed.Appx. 914 (3d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

<u>Bennis v. Gable</u>, 823 F.2d 723 (3d Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20,35,38

<u>Berry v. City of Muskogee, Oklahoma</u>, 900 F.2d 1489 (10th Cir. 1990) . . . . . . . . . . . . . . . . 7-9

<u>Bieregu v. Reno</u>, 59 F.3d 1445 (3d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36,39

<u>Biggs v. Village of Dupo</u>, 892 F.2d 1298 (7th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Bloch v. Ribar, 156 F.3d 673 (6th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Boyle v. County of Allegheny, Pa., 139 F.3d 386 (3d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . 1-2

Brammer-Hoelter v. Twin Peaks Charter Academy, 492 F.3d 1192 (10th Cir. 2007) . . . . . . . 25

Brazier v. Cherry, 293 F.2d 401 (5th Cir. 1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Brennan v. Norton, 350 F.3d 399 (3d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . 18,22,28,39

Brotherhood of R. R. Trainmen v. Virginia ex rel. Va. State Bar, 377 U.S. 1 (1964) . . . . . . 37,39

Brownsville Golden Age Nursing Home, Inc. v. Wells, 839 F.2d 155 (3d Cir. 1988) . . . . . . . . 39

Cal. Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508 (1972) . . . . . . . . . . . . . . . . . . 39

Carroll v. Pfeffer, 262 F.3d 847 (8th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20-21

Charpentier v. Godsil, 937 F.2d 859 (3d Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

City of San Diego v. Roe, 543 U.S. 77 (2004) (per curiam) . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Clue v. Johnson, 179 F.3d 57 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Collins v. State of Ill., 830 F.2d 692 (7th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Connick v. Myers, 461 U.S. 138 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11,17

Constantine v. Rectors and Visitors of George Mason Univ.,
    411 F.3d 474 (4th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Crawford-El v. Britton, 523 U.S. 574 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Doe v. Delie, 257 F.3d 309 (3d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Farrell v. Planters Lifesavers Co., 206 F.3d 271 (3d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . 29

Foraker v. Chaffinch, C.A.No. 02-302-JJF (D.Del. June 17, 2003) . . . . . . . . . . . . . . . . . . . . 32

Foraker v. Chaffinch, 501 F.3d 231 (3d Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12-13,39

Fuerst v. Clarke, 454 F.3d 770 (7th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16-17

Garcetti v. Ceballos, 547 U.S. 410 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12,15

Garcia v. City of Trenton, 348 F.3d 726 (8th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Garrity v. New Jersey, 385 U.S. 493 (1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Givhan v. Western Line Consol. Sch. Dist., 439 U.S. 410 (1979) . . . . . . . . . . . . . . . . . . . . . . 15

Glass v. Snellbaker, 2007 WL 1723472 (D.N.J. June 14, 2007) . . . . . . . . . . . . . . . . . . . . . . . . 16

Good v. Dauphin County, 891 F.2d 1087 (3d Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Grennan v. Nassau County, 2007 WL 952067 (E.D.N.Y. March 29, 2007) . . . . . . . . . . . . . . . 25

Harlow v. Fitzgerald, 457 U.S. 800 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Healy v. James, 408 U.S. 169 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Herr v. Pequea Township, 274 F.3d 109 (3d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Hicks v. Finney, 770 F.2d 375 (3d Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Hill v. City of Scranton, 411 F.3d 118 (3d Cir. 2005) . . . . . . . . . . . . . . . . . . 3,18-19,24,29,31,39

Hill v. Borough of Kutztown, 455 F.3d 225 (3d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . 18,39

Hoffman v. Dougher, 2008 WL 148877 (M.D.Pa. Jan. 14, 2008) . . . . . . . . . . . . . . . . . . . . . . . 16

Hope v. Pelzer, 536 U.S. 730 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34,36

Hutto v. Finney, 437 U.S. 678 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Johnson v. DiMario, 14 F.Supp.2d 107 (D.D.C. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Keenan v. Tejeda, 290 F.3d 252 (5th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Labov v. Lalley, 809 F.2d 220 (3d Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11,37

Lapinski v. Bd. of Educ. of the Brandywine Sch. Dist.,
        2006 WL 167443 (3d Cir. Jan. 24, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Leveto v. Lapina, 258 F.3d 156 (3d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Lewis v. Casey, 518 U.S. 343 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Losch v. Borough of Parkesburg, Pa., 736 F.2d 903 (3d Cir. 1984) . . . . . . . . . . . . . . . . . . . . . 39

Magee v. Rose, 405 A.2d 143 (Del.Super. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Mariana v. Fisher, 338 F.3d 189 (3d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

McDonald v. Smith, 472 U.S. 479 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

McKee v. Hart, 436 F.3d 165 (3d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38-39

Memphis Community Sch. Dist. v. Stachura, 477 U.S. 299 (1986) . . . . . . . . . . . . . . . . . . . . . . 8

Miller v. Cigna, Corp., 47 F.3d 586 (3d Cir. 1995) (en banc) . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Missouri v. Jenkins, 491 U.S. 274 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Monell v. Department of Social Services of City of New York, 436 U.S. 658 (1978) . . . . . . . . 8

Monroe v. Pape, 365 U.S. 167 (1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Mt. Healthy City Bd. of Educ. v. Doyle, 429 U.S. 274 (1977) . . . . . . . . . . . . . . . . . . . . . . 15,29

NAACP v. Button, 371 U.S. 415 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Nagle v. Village of Calumet Park, 2006 WL 3797726 (N.D.Ill. Dec. 18, 2006) . . . . . . . . . . . . 16

National Railroad Passenger Corp. v. Morgan, 536 U.S. 101 (2002) . . . . . . . . . . . . . . . . . . . . 5

Nicholas v. Pa. State Univ., 227 F.3d 133 (3d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

O'Connor v. City of Newark, 440 F.3d 125 (3d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . 4-5,20-22

O'Hare Truck Service, Inc. v. City of Northlake, 518 U.S. 712 (1996) . . . . . . . . . . . . . . . . . . . 38

Oliphant v. Connecticut Dept. of Transp., 2006 WL 3020890 (D.Conn. Oct. 23, 2006) . . . . . . 25

Paff v. Kaltenback, 204 F.3d 425 (3d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Pickering v. Bd. of Educ., 391 U.S. 563 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15,17,37

Power v. Summers, 226 F.3d 815 (7th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Price v. Chaffinch, 2006 WL 131378 (D.Del. May 12, 2006) . . . . . . . . . . . . . . . . . . 21-22,28,36

Pro v. Donatucci, 81 F.3d 1283 (3d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133 (2000) . . . . . . . . . . . . . . . . . 3,19,24

Rhodes v. Robinson, 408 F.3d 559 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Rivera-Jimenez v. Pierluisi, 362 F.3d 87 (1st Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Rode v. Dellarciprete, 845 F.2d 1195 (3d Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Rogers v. Powell, 120 F.3d 446 (3d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Rutan v. Republican Party, 497 U.S. 62 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20,22

San Filippo v. Bongiovanni, 30 F.3d 424 (3d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . 17-18,39

Saucier v. Katz, 533 U.S. 194 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32-34

Shefcik v. Village of Calumet Park, 2007 WL 3334329 (N.D.Ill. Nov. 7, 2007) . . . . . . . . . . . 16

Shehee v. City of Wilm., 67 Fed.Appx. 692 (3d Cir. May 13, 2003) . . . . . . . . . . . . . . . . . . . . 20

Shirden v. Cordero, 509 F.Supp.2d 461 (D.N.J.2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Shotzberger v. State of Delaware Department of Correction,
        2004 WL 758354 (D.Del. Jan. 30, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3,32

Smith v. Arkansas State Highway Emp., Local 1315, 441 U.S. 463 (1979) . . . . . . . . . . . . . . . 37

Smith v. Plati, 258 F.3d 1167 (10th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Spence v. Washington, 418 U.S. 405 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Springer v. Henry, 2004 WL 2127172 (D.Del. Sept. 16, 2004) . . . . . . . . . . . . . . . . . . . . . . . . 10

Stellmaker v. DePetrillo, 710 F.Supp. 891 (D.Conn.1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Sterner v. Wesley College, Inc., 747 F.Supp. 263 (D.Del. 1990) . . . . . . . . . . . . . . . . . . . . . . 7-9

Stoneking v. Bradford Area Sch. Dist., 882 F.2d 720 (3d Cir. 1989) . . . . . . . . . . . . . . . . . . . . 35

Sudac v. Hoang, 2004 WL 1125153 (D.Kan. May 13, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Suppan v. Dadonna, 203 F.3d 228 (3d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . 20,22,28-30

Tenafly Eruv Ass'n v. Borough of Tenafly, 309 F.3d 144 (3d Cir. 2002) . . . . . . . . . . . . . . . . . 12

Troster v. Pennsylvania State Department of Corrections, 65 F.3d 1086 (3d Cir. 1995) . . . . . . 12

U.S. v. Lanier, 520 U.S. 259 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

United Artists Theatre Circuit, Inc. v. Twp. of Warrington, 316 F.3d 392 (3d Cir. 2003) . . . . . 39

United Mine Workers of America v. Ill. State Bar Ass'n, 389 U.S. 217 (1967) . . . . . . . . . . . . 39

United Transp. Union v. State Bar of Mich., 401 U.S. 576 (1971) . . . . . . . . . . . . . . . . . . . . . . 37

Walker v. City of Orem, 2007 WL 3026399 (D.Utah Oct. 9, 2007) . . . . . . . . . . . . . . . . . . . . . . 8

Washington v. County of Rockland, 373 F.3d 310 (2d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . 20

We, Inc., v. City of Phila., 174 F.3d 322 (3d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Wilson v. Layne, 526 U.S. 603 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32,35

Wright v. City of Phila., 409 F.3d 595 (3d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Wyatt v. City of Boston, 35 F.3d 13 (1st Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Zamboni v. Stamler, 847 F.2d 73 (3d Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Zelnik v. Fashion Institute of Technology, 464 F.3d 217 (2d Cir. 2006) . . . . . . . . . . . . . . . . . 25

**Constitutions, Statutes, and Rules**

U.S. Const., Amend. I . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

U.S. Const., Amend. XIV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

42 U.S.C. § 1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

10 Del.C. § 8119 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

29 Del.C. § 5927 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Federal Rule of Civil Procedure 8(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Federal Rule of Civil Procedure 56(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

## NATURE AND STAGE OF THE PROCEEDING

Plaintiff[1] relies upon the Nature and Stage of the Proceedings set forth in his Opening Brief in Support of his Motion for Summary Judgment Against Defendant Truman Mears. (D.I. 58). This is plaintiff's Answering Brief in opposition to defendants' motion for summary judgment.[2]

## SUMMARY OF THE ARGUMENT

1.      Plaintiff does not oppose the dismissal of defendants Deloy, Wilkinson, Machtinger or Taylor because the record clearly demonstrates that defendant Truman Mears personally and maliciously made all of the retaliatory decisions, harassed plaintiff and drove him to kill himself.

2.      Plaintiff filed this claim pursuant to 42 U.S.C. § 1983, which has a two year statute of limitation. Plaintiff's retaliation claims for engaging in First Amendment protected activity are timely since plaintiff filed this complaint on September 25, 2006 and all adverse action occurred after September 25, 2004.

3.      Consistent with the deterrent function of 42 U.S.C. § 1983, since plaintiff died as a result of Mears' deprivation of his treasured constitutional rights, plaintiff is entitled to damages including compensatory and punitive damages not limited in time from the date of injury to the date of death.

4.      Plaintiff engaged in First Amendment protected activity by way of his union membership, union solidarity debate with defendant Mears, symbolic speech refusing to cross a

---

[1] To reduce confusion, the decedent John J. Balas will be referenced as "plaintiff."

[2] Defendants' summary judgment opening brief will be cited as "DOB" and plaintiff's own summary judgment opening brief will be cited as "POB."

1

picket line, resignation from CERT and filing a union grievance.

5.     Defendant Mears' retaliation against plaintiff would chill a person of ordinary firmness from exercising their First Amendment rights.

6.     The causal evidence in the record demonstrates that plaintiff's protected First Amendment activity was a substantial or motivating factor in the retaliation taken against him by defendant Mears.

7.     Consistent with Supreme Court case law, defendant Department of Correction is properly joined in this action for the purposes of collecting attorneys' fees and costs.

8.     Defendant Truman Mears is not entitled to qualified immunity in his individual capacity since he violated plaintiff's rights to freedom of speech, union association and to petition the government for redress of grievances, all of which have long been clearly established.

## STATEMENT OF FACTS

Plaintiff relies upon the exhaustive Statement of Facts contained in the summary judgment opening brief. (POB at 1-19).

## ARGUMENT

## I.     STANDARD OF REVIEW.

A motion for summary judgment shall be granted if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Boyle v. County of Allegheny, Pa., 139 F.3d 386, 393 (3d Cir. 1998); Fed.R.Civ.P. 56(c).  "All facts and inferences are construed in the light most favorable to the non-moving party." Boyle, 139 F.3d at 393.  At summary judgment, "a court may not weigh the evidence or make credibility determinations; these tasks are left to the fact-finder." Id.  To raise a genuine issue of material fact, "the

2

[summary judgment] opponent need not match, item for item, each piece of evidence proffered by the movant, but simply must exceed the 'mere scintilla' standard.'" Id. (internal punctuation omitted).

As both the Supreme Court and Third Circuit have unequivocally stated, when an employer moves for summary judgment, even the <u>uncontradicted</u> testimony of interested witnesses supporting the employer, such as supervisors and other workers, should not be considered or otherwise weighed in the summary judgment balancing. "[W]hen evaluating a summary judgment motion a court should not consider even uncontradicted testimony of an interested witness where that testimony supports the movant." <u>Hill v. City of Scranton</u>, 411 F.3d 118, 131 n.22 (3d Cir. 2005) (citing <u>Reeves v. Sanderson Plumbing Products, Inc.</u>, 530 U.S. 133, 149-151 (2000)); <u>see also</u> <u>Hill v. City of Scranton</u>, 411 F.3d at 129 n.16. Likewise, this court has previously held that at the summary judgment stage, the court should consider only evidence which supports the moving party "to the extent that that evidence comes from *disinterested witnesses*.'" <u>Shotzberger v. State of Delaware Department of Correction</u>, 2004 WL 758354, *2 (D.Del. Jan. 30, 2004) (quoting <u>Reeves</u>, 530 U.S. at 150) (internal punctuation omitted) (emphasis added).

Thus, long standing Supreme Court, Third Circuit and District of Delaware precedent dictates that defense reliance upon testimony and affidavits from its own employees is misplaced at the summary judgment stage due to their obvious bias, fear of losing their jobs or other retaliation. Thus, their testimony should be excluded from the Court's analysis of summary judgment issues. Additionally, defendants' own testimony should be disregarded because, as defendants, they certainly are "interested witness[es]" under <u>Hill v. City of Scranton</u>, 411 F.3d at 131 n.22.

II.    **PLAINTIFF DOES NOT OPPOSE THE DISMISSAL OF DEFENDANTS DELOY, WILKINSON, MACHTINGER OR TAYLOR.**

Plaintiff does not oppose the dismissal of defendants Deloy, Wilkinson, Machtinger or Taylor because the record clearly demonstrates that defendant Truman Mears personally and maliciously made all of the retaliatory decisions, harassed plaintiff and drove him to kill himself.

III.    **PLAINTIFF'S RETALIATION CLAIMS FOR ENGAGING IN FIRST AMENDMENT PROTECTED ACTIVITY ARE TIMELY.**

Plaintiff filed this action on September 25, 2006 to remedy the violation of his rights to free speech, association, assembly and petition under the First and Fourteenth Amendments of the U.S. Constitution resulting from the retaliation by his direct supervisor, Truman Mears, when plaintiff debated and opposed Mears who openly supported management's position and then symbolically resigned from CERT and refused to cross a picket line to show solidarity with his union brethren and the job action. Plaintiff filed this case pursuant to 42 U.S.C. § 1983, which has a two year statute of limitations. See 10 Del.C. § 8119; O'Connor v. City of Newark, 440 F.3d 125, 126 (3d Cir. 2006). Defendants claim that two of plaintiff's claims are barred by the statute of limitations which would prevent claims that occurred prior to September 25, 2004. (DOB at p.15). However, despite defendants' assertions to the contrary, both of these claims are timely and defendants are not entitled to partial summary judgment.

First, defendants argue that plaintiff's request for a transfer is time-barred, yet their own admissions prove otherwise. Defendants readily admit that plaintiff requested a transfer to a different supervisor with the hope that a transfer would alleviate the stress resulting from working for a supervisor who was trying to "screw him." (DOB at p.7,9; see also Deloy 54-55; Wilkinson 57,106; T.Mears 198; A907,927,940,755). Now in an attempt to run from this admission, defendants claim that this request occurred before September 25, 2004 and is barred

4

by the statute of limitations. (DOB at p.15).  However, this claim is disingenuous given that on

more than one occasion in their Answer, defendants explicitly admitted that for "months after

resigning from CERT, in the context of a dispute over a performance evaluation, the decedent

asked for a transfer to another supervisor." (Ans. ¶¶ 55,80; A47).  The undisputed record proves

plaintiff did not receive his performance evaluation until September 26, 2004. (P831; A587).

Therefore, based on defendants' own admissions plaintiff could not have requested a transfer

until after September 26, 2004.  Accordingly, as defendants concede, plaintiff's claim is timely.

(See DOB at p.15).

Second, defendants argue that plaintiff's claim that he feared "immediate retaliation"

following his resignation from the CERT team is untimely. (Id.).  Defendants legal argument,

however, is flawed.  The Supreme Court in National Railroad Passenger Corp. v. Morgan, 536

U.S. 101, 113 (2002), "established a bright-line distinction between discrete acts, which are

individually actionable, and acts which are not individually actionable but may be aggregated."

O'Connor, 440 F.3d at 127.  These discrete acts include: "termination, failure to promote, denial

of transfer, refusal to hire, wrongful suspension, wrongful discipline, denial of training, wrongful

accusation." Id.  Under the reasoning of Morgan, plaintiff's fear of immediate retaliation is not a

discrete act and plaintiff does not claim that is individually actionable.  Plaintiff's fear, rather,

only helps in understanding the overall context of the adverse action taken against him.  As the

record reveals, the retaliation against plaintiff did not begin until the month after his resignation.

(P832; T.Mears Ex.11; A15,588,838-42,).

While it is true that the Third Circuit has recognized that "causes of action that can be

brought individually expire with the applicable limitations period," that holding is inapplicable to

the case at hand. O'Connor, 440 F.3d at 128 (citing to Morgan, 536 U.S. at 117-18).  Defendants'

refusal to transfer plaintiff is timely because it occurred after September 26, 2004 and is within the two year statute of limitations. Likewise, plaintiff's claim that he feared immediate retaliation is not an individually actionable discrete act thus the statute of limitations does not apply. Accordingly, defendants are not entitled to partial summary judgment.

**IV.    PLAINTIFF IS ENTITLED TO DAMAGES INCLUDING COMPENSATORY AND PUNITIVE DAMAGES NOT LIMITED IN TIME FROM THE DATE OF INJURY TO THE DATE OF DEATH.**

**A.  This Retaliation Action is Proper.**  Importantly, defendants do not contest that this is a properly filed First Amendment retaliation action which reads in underlying state law principles to the extent that state law is consistent with the purposes underlying the civil rights acts.

**B.  Damages Available in § 1983 Retaliation Action Where the Plaintiff's Death is Caused by the Constitutional Violation.**  Rather, defendants contest the type of damages plaintiff's estate is permitted to recover in this First Amendment retaliation action.  Defendants correctly state that damages recoverable in a pure state law survival action ordinarily include (a) pain and suffering from the time of injury to the time of death, (b) expenses incurred in endeavoring to be cured of such injuries and (c) loss of earnings resulting from such injuries from time of injury to the time of death. <u>Magee v. Rose</u>, 405 A.2d 143, 147 (Del.Super. 1979). However, defendants fail to address that this is not a pure state law survival action but is instead a First Amendment retaliation action brought pursuant to § 1983.  As the Courts have held, in such an action, the underlying principals regarding the deprivation of treasured constitutional rights must be considered in determining available remedies and should not be limited to those commonly recovered in pure state law survival actions.

Although the Third Circuit has not addressed the remedies available in a § 1983 action

6

where the plaintiff has died as a result of the constitutional tort, the District of Delaware has.  In

Sterner v. Wesley College, Inc., 747 F.Supp. 263 (D.Del. 1990), Judge Roth addressed the

distinction between damages available in pure state law survival actions and those available in §

1983 actions where the constitutional tort causes death.  As Judge Roth explained -

> When the act which caused a death is itself charged as a "constitutional tort" under
> section 1983, applicable survival and wrongful death statutes under state law will be
> applied only to the extent they are consistent with the policies and legislative intent
> underlying section 1983.  If those state statutes preclude recovery of [an element of
> damages] as a distinct basis for recovery, they will be ignored as inconsistent with the
> policies of section 1983.

Id. at 273.  Continuing -

> Where the constitutional deprivation sought to be remedied has caused death, state law
> that precludes recovery on behalf of the victim's estate for the loss of life is inconsistent
> with the deterrent policy of section 1983.  Such restrictive state laws must give way to
> federal common law rules that permit recovery.

Id.  (internal punctuation omitted).

The Tenth Circuit also has addressed this same issue in Berry v. City of Muskogee,

Oklahoma, 900 F.2d 1489 (10th Cir. 1990).  There, the Tenth Circuit specifically addressed the

question of whether damages in a § 1983 action in which death occurs are limited to those

recoverable under the state survival action alone, or by a survival action and wrongful death suit,

or by "some federal standard either as a survival or wrongful death-type action not defined or

limited by state law." Id. at 1501.  The Court was concerned with fashioning a remedy that was

"in accord with § 1983's express statement that the liability is 'to the party injured.'" Id. at 1507.

After discussing at length each option, the Court held that "federal courts must fashion a federal

remedy to be applied to § 1983 death cases." Id. at 1506.  Accordingly, the Court held that the

damages available must "serve the deterrent function central to the purpose of § 1983" including

both compensatory and punitive damages. Id. at 1506-07.  In addition to the full panoply of

traditional § 1983 constitutional tort damages available under <u>Memphis Community Sch. Dist. v. Stachura</u>, 477 U.S. 299, 305-06 (1986), in cases where the constitutional tort causes death -

> appropriate compensatory damages would include medical and burial expenses, pain and suffering before death, *loss of earnings based upon the probable duration of the victim's life had not the injury occurred*, the victim's loss of consortium, and other damages recognized in common law tort actions.

<u>Berry</u>, 900 F.2d at 1507 (emphasis added); <u>accord</u> <u>Walker v. City of Orem</u>, 2007 WL 3026399, *1 (D.Utah Oct. 9, 2007); <u>Sudac v. Hoang</u>, 2004 WL 1125153, *2 (D.Kan. May 13, 2004).

As explained in detail in <u>Berry</u>, supporters of § 1 of the Civil Rights Act (which became § 1983) "intended to give a broad remedy for violations of federally protected civil rights." <u>Berry</u>, 900 F.2d at 1501 (citing to <u>Monell v. Department of Social Services of City of New York</u>, 436 U.S. 658, 685 (1978)).  Further, in creating § 1983, derived from § 1 of the Civil Rights Act, "Congress intended significant recompense when a constitutional violation caused the death of a victim." <u>Id.</u> at 1501.  In holding that the Oklahoma state survival action was clearly deficient in its remedy and deterrent effect, the Court in <u>Berry</u> preserved the very essence of § 1983. Comparable to the facts in <u>Berry</u>, if plaintiff's recovery was limited to those available under Delaware's survival statute, which is identical to the Oklahoma survival statute, it would provide an extraordinarily limited recovery. <u>See Id.</u> at 1504.  Thus, in light of the deterrent function of § 1983, the remedies available under the Delaware survival action are "clearly deficient." <u>Id.</u> Likewise, as Judge Roth has explained for our District, when state laws provide deficient remedies in a § 1983 action, "they will be ignored as inconsistent with the policies of section 1983." <u>Sterner</u>, 747 F.Supp. at 273.  Accordingly, plaintiff's § 1983 damages should encompass those more closely akin to the federal remedy fashioned in <u>Sterner</u> and <u>Berry</u> including punitive damages, compensatory damages and "loss of earnings based upon the probable duration of the

8

victim's life had the injury not occurred," Berry, 900 F.2d at 1507, rather than those ordinarily allowed in pure state law survival actions.  Defendants motion for partial summary judgment on this claim should be denied.

**1. Defendant Mears' Retaliation Caused Plaintiff's Suicide.**  As stated in Berry, in creating § 1983, "Congress intended significant recompense when *a constitutional violation caused the death of a victim*." Id. at 1501 (emphasis added).  The legislative history of the Civil Rights Act "makes clear that *death was among the civil rights violations that Congress intended to remedy*." Id. (emphasis added) (citing Monroe v. Pape, 365 U.S. 167, 174-76 (1961)); see also Sterner, 747 F.Supp. at 273.

> [I]t defies history to conclude that Congress purposely meant to assure to the living freedom from such unconstitutional deprivations, but that, with like precision, it meant to withdraw the protection of civil rights statutes against the peril of death.

Brazier v. Cherry, 293 F.2d 401, 404 (5th Cir. 1961).  In our present case, there is a clear causal and temporal correlation between plaintiff's stress at work due to the retaliation and his mental and psychological "deterioration," which culminated in his suicide. (Tavani report p.11,13; A580,582).

**a. The Temporal Evidence - Plaintiff's Personality Changed Following the Retaliation.**  In the Fall of 2004, after the retaliation for his CERT resignation began, plaintiff's personality changed. (Adkins 141,145; Foskey 40-41; A1032-33,992).  During this time plaintiff became depressed and extremely stressed due to the deteriorating situation at work. (Tavani report p.3-6,10; Inter. #20 p.46-48; A572-75,696-98).  While before he was "outgoing" and "lovable," now he was easily agitated, withdrawn and had little patience with his children. (Adkins 20,89,112-14,128-9; Inter. #20 p.46-47; A1002,1019, 1025-26,1029,696-97).  Prior to the Fall of 2004, plaintiff loved spending time with his wife and children. (Adkins 128;

A1029).  As plaintiff's widow described, "We were each other's best friend. We did everything

together." (Id.).  However, in the last months he was alive, "He was not himself at all." (Adkins

112; A1025).  During this time plaintiff became withdrawn, depressed, and stopped spending

time with his children or participating in hobbies. (Adkins 112,128; A1025,1029).

**b.  The Direct Evidence - Plaintiff Tells Several Persons That He**

**Plans to Kill Himself Because of the Situation at Work.**  More importantly and key in this

death case, in January of 2005, plaintiff regularly began telling family and friends, including his

wife, mother and best friend that he would take his own life. (L.Mears 37-38; Adkins 97-98;

A1058-59,1021-22).  This prompted his family and friends to seek professional psychological

help at St. Jones to prevent plaintiff from harming himself. (Adkins 101-04; L.Mears 39-41;

Foskey 41-48; A1022-23,1059,922-94).  During the consultation as St. Jones, plaintiff informed

the counselor of the stress he was under due to the retaliation by defendant Mears which was

causing his suicidal behavior. (L.Mears 40; A1059).[3]  Accordingly, there is a "compelling and

clear cause and effect association between the retaliation and Cpl. Balas' demise." (Tavani report

p.13; A582).[4]

Therefore, under the deterrent principles of § 1983, plaintiff is entitled to punitive and

compensatory damages including those caused by his untimely death.[5]

---

[3]  During the course of one workday, several of the individual defendants were actually
told that plaintiff was going to kill himself.  They did nothing (Deloy 64-68; A909-10), which
itself also violates DOC policies. (See T.Mears Ex.2; A767-70).

[4]  To the extent defendants claim that their expert believes differently, the court is faced
with "a battle of the experts" and it "is within the province of the jury to determine which expert
is more credible."  Springer v. Henry, 2004 WL 2127172, *7 (D.Del. Sept. 16, 2004)

[5]  Plaintiff expressed a clear desire to commit suicide well before his wife discovered he
had an affair.  In late January plaintiff informed his good friend Lee Mears that he would not be
alive in the morning. (L.Mears 37-38; A1058-59).  Likewise, in the following weeks he discussed

V.    **PLAINTIFF ENGAGED IN FIRST AMENDMENT PROTECTED ACTIVITY BY WAY OF HIS UNION MEMBERSHIP, UNION SOLIDARITY DEBATE WITH DEFENDANT MEARS, SYMBOLIC SPEECH REFUSING TO CROSS A PICKET LINE, RESIGNATION FROM CERT AND FILING A UNION GRIEVANCE.**

As set forth in greater detail in the opening brief, plaintiff clearly engaged in First Amendment protected activity.  (POB at 20-32).

**A.  Plaintiff Engaged in Protected Union Association.**  The defense claim that associating with a union does not receive First Amendment protection  is clearly mistaken.   As the Supreme Court has explained, "[w]hile the freedom of association is not explicitly set out in the [First] Amendment, it has long been held to be implicit in the freedoms of speech, assembly and petition." Healy v. James, 408 U.S. 169, 181 (1972).  Plaintiff engaged in protected First Amendment activity by joining and associating with COAD, the correctional officer's union which was actively sounding the alarm about the prison public safety crisis.   This effort "to associate together for the purpose of collective bargaining involve associational interests which the first amendment protects from hostile state action." Labov v. Lalley, 809 F.2d 220, 222-223 (3d Cir. 1987).  Additionally, as discussed in plaintiff's opening brief, (POB at 22), the Court need not decide whether the public concern requirement of Connick v. Myers, 461 U.S. 138, 147-48 (1983) applies in this action since COAD was clearly addressing matters of public concern.

**B.  Plaintiff Also Engaged in Protected Free Speech.**  Twice plaintiff spoke out on matters of public concern under the First Amendment.

**1.  Speech About Union Solidarity.**  First, plaintiff debated defendant Mears on the question of solidarity with his union brothers on August 5th, 2004, the night before the CERT

---

his suicidal ideation with his wife and mother. (Adkins 114-15,123; Inter. #20 p.49-50; A1026,1028, 699-700).

activation.  Mears wanted to back management, and plaintiff strongly disagreed.  Plaintiff spoke

out against the activation in front of Mears saying, "he didn't believe that we were doing right,

that we were doing blue shirts wrong by going in and working." (Adams 12; see T.Mears 119;

A867,735).  Directly thereafter, Mears stated, "quitting is not the answer. Never be a quitter."

(T.Mears 119; A735).  Quite tellingly, Mears then stated, "if  you do decide to quit, it's got to be

your decision, and you better be willing to live with it *the rest of your career.*" (Id.) (emphasis

added).

### 2.  Symbolic Speech and Resignation - Refusal to Cross the Union Picket

**Line.**    Second, on the following day, after reporting for the CERT activation and being cursed

by fellow co-workers for crossing a picket line, plaintiff and others spoke out and resigned their

CERT membership.  These CERT members engaged in the symbolic act of further refusal to be a

scab and cross the picket line.  Upon learning of the resignation, Mears set out on his course of

retaliation of plaintiff who was under his direct command.  As thoroughly discussed in plaintiff's

opening brief, such expressive conduct is clearly protected by the First Amendment.  Tenafly

Eruv Ass'n v. Borough of Tenafly, 309 F.3d 144, 158 (3d Cir. 2002); Troster v. Pennsylvania

State Department of Corrections, 65 F.3d 1086, 1090 (3d Cir. 1995); Spence v. Washington, 418

U.S. 405, 409-10 (1974).

### 3.  Plaintiff Spoke as a Citizen.    The defense claim that under Garcetti v.

Ceballos, 547 U.S. 410 (2006), plaintiff's job duties as a prison guard and CERT member

required him to debate union issues and refuse to cross a picket line is simply without merit.  As

the Third Circuit recently explained, the Garcetti analysis regarding the scope of an employee's

job duties is a "fact- intensive ... inquiry."  Foraker v. Chaffinch, 501 F.3d 231, 240 (3d Cir.

2007).  In determining whether a plaintiff's claims are barred under Garcetti, the controlling

factor is whether the employee was required by his job duties to engage in such speech. <u>Foraker</u>, 501 F.3d at 241. Accordingly, in the case at hand, the analysis must turn on whether plaintiff was "required to" speak up pursuant to his job duties when he opposed the CERT activation directly to defendant Mears or through his symbolic speech by resigning from CERT. <u>See</u> <u>Foraker</u>, 501 F.3d at 241. Review of the record shows that none of plaintiff's duties encompassed union activity, debating union activities with a superior officer, symbolic resignation in support of a job action, or petitioning pursuant to a collective bargaining agreement.

**a. The Clear Record on Plaintiff's Job Duties.** There is a comprehensive record on the scope of plaintiff's job duties, both as a correctional officer assigned to the receiving room and as a CERT member. As a correctional officer in the receiving room, plaintiff's job duties required that he process all new commitments which required him to: meet the police officer bringing the inmate in; take all paperwork from the officer; do a pat search of the inmate; take custody of the inmate; bring them into the areal to fingerprint them; take pictures of them; get their vital statistical data; take them to the property room where they are strip-searched and processed; give them their new property; and notify housing of a new commitment. (T.Mears 56-57; A719; <u>see also</u> Corporal Job Description; B1-3). Plaintiff was also responsible for handling the release of inmates and transferring of inmates which included: bringing the inmate into the receiving room; confirming the inmate's identity; gathering their personal property; holding the inmates in cells until transportation officers arrive; rechecking the inmate's identify and handing them off to the transportation officers. (T.Mears 57-58; A719-20; <u>see also</u> Corporal Job Description; B1-3). Plaintiff was also responsible for responding to emergency codes which included assisting other officers if there was a fight or medical code.

13

(Id.).

As a CERT member, his job duties required that he respond when CERT was activated to handle "whatever situation may arise," (T.Mears 61-62; A720-21; see also CERT Job Description; B4-5), including: uproars in the prisons or major disturbances meaning that the normal prison staff could not handle the situation; recovery of escaped inmates; riot control. (Shockley 9-10; Hastings 12; A955-56,965; see also CERT Job Description; B4-5). Plaintiff, as a CERT member, was also required to perform shakedowns which including searching an inmate's cell for shanks, drugs, cigarettes, and contraband, defined as anything not given to the inmate by the prison staff or bought in the commissary. (Mumford 19-20; Shockley 9-10; Hastings 12; A975,955-56,965).

**b. Defense Reliance on Garcetti Is Without Merit.** Accordingly, it is clear that plaintiff's job duties in either role simply did not include or require him to speak out on union solidarity matters. For example, nothing in his job duties in the receiving room processing a new inmate, or handling the release or transfer of an inmate required him to engage in union activity, debate union activities with a superior officer, or file an official grievance opposing his supervisor's unwarranted retaliation. Nor did his job duties as a CERT member require him to symbolically resign from CERT or refuse to cross a picket line to show solidarity with his union brethren and the job action. Indeed, if anything, plaintiff refused to perform his CERT duties when he resigned from CERT. As a matter of logic, refusing to perform one's job duties cannot be a part of one's job duties.

**c. The Garcetti Court Explained that Speech Related to the Workplace is Still Protected.** The defense claim that speech related to things plaintiff observed during the course of his job is equally unavailing. First, this was not Garcetti's holding. Instead,

14

the Garcetti Court took pains to make clear that it was not overruling another long line of

precedent holding that speech about the workplace or the speaker's job also is protected.

> The memo [at issue] concerned the subject matter of Ceballos' employment, but this, too, is nondispositive.  The First Amendment protects some expressions related to the speaker's job.  See, e.g. [Pickering v. Bd. of Educ., 391 U.S. 563, 573 (1968)]; [Givhan v. Western Line Consol. Sch. Dist., 439 U.S. 410, 414 (1979)].  As the Court noted in Pickering: "Teachers are, as a class, the members of the community most likely to have informed and definite opinions as to how funds allotted to the operation of the schools should be spent.  Accordingly, it is essential that they be able to speak out freely on such questions without fear of retaliatory dismissal." 391 U.S. at 572.  The same is true of many other categories of public employees.

Garcetti, 126 S.Ct. at 1959 (emphasis added).  Thus, the fact that Ceballos' speech also addressed

aspects of his employment was not dispositive.  Similarly, the fact that plaintiff's speech

addressed union activity in opposition to problems in the prisons, also is not dispositive.[6]

In City of San Diego v. Roe, 543 U.S. 77 (2004) (per curiam), the Supreme Court again

addressed why it is imperative that public employees like plaintiff be able to speak out about

workplace matters without fear of retaliation.  The Court explained that -

> Underlying the decision in Pickering is the recognition that public employees are often the members of the community who are likely to have informed opinions as to the operations of their public employers, operations which are of substantial concern to the public.  Were they not able to speak on these matters, the community would be deprived of informed opinions on important public issues.  The interest at stake is as much the public's interest in receiving informed opinion as it is the employee's own right to disseminate it.

Roe, 543 U.S. at 82.  In our present case, as a union member and correctional officer, plaintiff

was in an ideal position to shine the bright light of public scrutiny upon the problems in DOC

---

[6] Cf. Givhan, 439 U.S. at 412-13 (speech by a teacher addressing racially discriminatory policies and practices in her school); Mt. Healthy City Bd. of Educ. v. Doyle, 429 U.S. 274, 282 (1977) (speech by a teacher addressing new teacher dress code in his school); Pickering, 391 U.S. at 571-72 (speech by teacher about school funding issues); Rode v. Dellarciprete, 845 F.2d 1195, 1202 (3d Cir. 1988) (speech by police department employee addressing race discrimination in the workplace); Azzaro v. County of Allegheny, 110 F.3d 968, 981 (3d Cir. 1997) (en banc) (speech about sexual harassment and gender discrimination in the workplace).

prisons by resigning from CERT in solidarity with his union brethren.  Who knows better what

ails a prison than a prison guard?

      **d.  <u>Garcetti</u> Does Not Apply to Union Activity.**  As the District of New

Jersey has explained -

> nothing in the <u>Garcetti</u> case casts doubt upon the First Amendment associational
> protections of public employees expressing themselves through lawful union activities,
> such as meetings and grievances.

<u>Glass v. Snellbaker</u>, 2007 WL 1723472 (D.N.J. June 14, 2007).  Courts throughout the country

also have unfailingly held that union activities are not part of a public employee's job duties for

<u>Garcetti</u> purposes.  <u>See</u> <u>Fuerst v. Clarke</u>, 454 F.3d 770, 774 (7th Cir. 2006) (deputy sheriff's

speech in his capacity as a union official which criticized the management decisions of the sheriff

not part of his job duties); <u>Hoffman v. Dougher</u>, 2008 WL 148877, *7 (M.D.Pa. Jan. 14, 2008)

(rejecting the defense claim that speech made by a union representative as part of a union

investigation was required by the employee's job duties as a public employee); <u>Shefcik v. Village</u>

<u>of Calumet Park</u>, 2007 WL 3334329, *4-5 (N.D.Ill. Nov. 7, 2007) (rejecting the defense claim

that the actions of a union official who filed 50 grievances on behalf of union members were part

of his job duties as a police officer and holding that "a public employee who makes a statement

in his capacity as a union representative is speaking as a citizen, not as an employee"); <u>Shirden v.</u>

<u>Cordero</u>, 509 F.Supp.2d 461, 466-67 (D.N.J.2007) (speech made by a union president to the

press are not made in his capacity as a public employee); <u>Nagle v. Village of Calumet Park</u>, 2006

WL 3797726, *5 n.2 (N.D.Ill. Dec. 18, 2006) (rejecting the claim that a union official who filed

over 100 union grievances for union members was required to do so by his job duties as a police

officer).  Similar to the plaintiff in <u>Fuerst</u> and in the other cases listed above, plaintiff's protected

activity which "precipitated the adverse action," were made as a union member and private

16

citizen and not in this course of his employment as a correctional officer or a CERT member.

Fuerst, 454 F.3d at 774.

    **4. Plaintiff's Speech was on Matters of Public Concern.** As discussed in plaintiff's opening brief, taking into consideration the content, form and context, plaintiff's speech was clearly on matters of public concern. "An employee's speech addresses a matter of public concern when it can be 'fairly considered as relating to any matter of political, social, or other concern to the community.'" Pro v. Donatucci, 81 F.3d 1283, 1288 (3d Cir. 1996). This is determined by reference to the "content, form, and context of a given statement, as revealed by the whole record." Connick, 461 U.S. at 147-48. (See POB at 26-30). Importantly, in their brief, defendants do not contest that plaintiff's speech was on matters of public concern. Rather, defendants quickly conclude that plaintiff did not engage in protected activity without further discussion. However, as plaintiff's opening brief sets forth in detail, his speech meets the test for the public concern on numerous levels.

    **5. Defendants Have Waived The <u>Pickering</u> Balancing Defense.** As discussed more fully in plaintiff's opening brief (POB at 30-31), the Pickering v. Bd. of Educ., 391 U.S. 563 (1968) "balancing test comes into play only if the public employer concedes that it dismissed an employee because of the employee's protected speech but contends that it was justified in doing so." San Filippo v. Bongiovanni, 30 F.3d 424, 434 n.11 (3d Cir. 1994) (emphasis added). If the employer denies that it dismissed the employee because of his protected speech, the balancing test "has no application." Id. Accordingly, because defendants flatly deny that they retaliated against plaintiff because of his protected activity, the balancing test does not apply. Therefore, plaintiff's speech is protected by the First Amendment.

    **C. Plaintiff Engaged in Protected Petitioning.** Defendants summarily state that

plaintiff failed to petition the government for redress, either formally or informally therefore his

petition claim must fail. (DOB at 36). In making this argument, defendants discount the record

which clearly proves that on October 4, 2004, plaintiff filed an official grievance disputing the

performance evaluation and asked that his rating be increased from "Meets Expectations" to

"Exceeds Expectations." (P831-32; T.Mears Ex.12; Adkins 55-56; Ackenbrack 30-31; A587-

88,849,1011,1045). Plaintiff filed this grievance because he felt he was being retaliated against

by Truman Mears for resigning from CERT and that Mears had a "personal vendetta" against

him and was evaluating him "personally not professionally." (P832; Adkins 55-56; Deloy 52;

L.Mears 28; A588,1011,906,1056). Thus, plaintiff invoked the formal mechanism of his union

grievance procedure to petition the government for redress concerning his downgraded

evaluation. San Filippo, 30 F.3d at 439 n.18; Foraker, 501 F.3d at 236. Because plaintiff invoked

a formal mechanism, no public concern analysis is required and review of his petition show that

it is not a sham. San Filippo, 30 F.3d at 442; Foraker, 501 F.3d at 236; Hill v. City of Scranton,

411 F.3d at 126.[7] Accordingly, it is protected.

 To the extent defendants imply that this grievance was never filed, the record does not

support such a claim. First, Michael Ackenbrack was the shop steward who initially signed and

gave plaintiff the grievance form. He testified that plaintiff had a "right" to file the grievance and

could have done so without his further involvement. (Ackenbrack 30-31; A1045). Secondly, as

defendants concede, plaintiff discussed the filing of his grievance with numerous persons. (DOB

at 9-10). The fact that none of these individuals saw the actual grievance is irrelevant. Plaintiff

---

 [7] In San Filippo, the Third Circuit specifically held that filing grievances pursuant to a
collective bargaining agreement was protected petitioning. 30 F.3d at 434-35; see also Hill v.
Borough of Kutztown, 455 F.3d 225, 242 n.24 (3d Cir. 2006); Brennan v. Norton, 350 F.3d 399,
417 (3d Cir. 2003).

also informed his wife that he actually filed the grievance. (Adkins 56; A1011).  Third, as

plaintiff's widow explained, she found the original carbon copy of the grievance which was a

yellow, carbon copy that had at least one page removed from the top among plaintiff's papers.

(Adkins 55-58; Ackenbrack 19-20; A1042).  Plaintiff found other copies of this grievance, but

the only paper in original form was the yellow, carbon copy.  Further, as Ackenbrack stated, it

was up to the employee to fill out the grievance form. (Ackenbrack 9,17; A1039,1041).  The

employee could then either give the top page back to the shop steward to file or simply file the

grievance with management directly. (Id. at 30-31; A1045).  Thus, these facts prove that plaintiff

filed the grievance because if he had simply filled out the form and not submitted it, the top page

would still be attached.  Lastly, defendants' testimony that they were not aware plaintiff filed a

grievance cannot be properly considered as they are biased witnesses who are simply attempting

to protect their own interests. See Reeves, 530 U.S. at 151 ("the court should give credence to []

evidence...supporting the moving party that is uncontradicted and unimpeached, at least to the

extent that that evidence comes from disinterested witnesses."); see also Hill v. City of Scranton,

411 F.3d at 131 n.22 ("when evaluating a summary judgment motion a court should not consider

even uncontradicted testimony of an interested witness where that testimony supports the

movant.").

Accordingly, contrary to defendants' argument, plaintiff engaged in protected petitioning

and defendants are not entitled to summary judgment on this claim.

**VI.    DEFENDANT MEARS' RETALIATION AGAINST PLAINTIFF WOULD CHILL
A PERSON OF ORDINARY FIRMNESS FROM EXERCISING THEIR FIRST
AMENDMENT RIGHTS.**

**A.  Introduction.**  The defense claim that no adverse action was taken against plaintiff is

actionable also is mistaken. (DOB at 20).  In the First Amendment context, "the constitutional

violation is not in the harshness of the sanction applied, but in the imposition of *any* disciplinary

action for the exercise of permissible free speech." Bennis v. Gable, 823 F.2d 723, 731 (3d Cir.

1987) (emphasis added).  It "is implicated whenever a government employee is disciplined for

his speech." Id.  The breadth of its protection is demonstrated by the Supreme Court and the

Third Circuit's repeated recognition that it "protects state employees not only from patronage

dismissals but also from even an act of retaliation as trivial as failing to hold a birthday party for

a public employee . . . when intended to punish her for exercising her free speech rights."

Suppan v. Dadonna, 203 F.3d 228, 234 (3d Cir. 2000) (quoting Rutan v. Republican Party, 497

U.S. 62, 76 n.8 (1990)) (internal punctuation omitted); accord O'Connor, 440 F.3d at 128.  "The

effect on freedom of speech may be small, but since there is no justification for harassing people

for exercising their constitutional rights it need not be great in order to be actionable." Suppan,

203 F.3d at 235 (quoting Bart v. Telford, 677 F.2d 622, 625 (7th Cir. 1982)).

    **B. The Person of Ordinary Firmness Standard.**  Accordingly, adverse action is found

if  "retaliatory conduct [is] *sufficient to deter a person of ordinary firmness* from exercising his

First Amendment rights." Suppan, 203 F.3d at 235 (citing Bart, 677 F.2d at 625) (internal

punctuation omitted) (emphasis added); accord O'Connor, 440 F.3d at 128; Allah v. Seiverling,

229 F.3d 220, 225 (3d Cir. 2000); Shehee v. City of Wilm., 67 Fed.Appx. 692, 694 (3d Cir. May

13, 2003) (public employee context); see Lapinski v. Bd. of Educ. of the Brandywine Sch. Dist.,

2006 WL 167443, *2 (3d Cir. Jan. 24, 2006) (public employee context) (reversing the district

court for failing to apply the person of ordinary firmness standard in a First Amendment

retaliation case).[8]  Put another way, the retaliatory actions must be sufficient to "cause reasonably

---

    [8]  Numerous other courts have adopted this standard.  See e.g. Bennett v. Hendrix, 423
F.3d 1247, 1254-55 (11th Cir. 2005); Washington v. County of Rockland, 373 F.3d 310, 320 (2d
Cir. 2004); Keenan v. Tejeda, 290 F.3d 252, 258 (5th Cir. 2002); Carroll v. Pfeffer, 262 F.3d

hardy individuals" to refrain from protected activity.  <u>Agosto-de-Feliciano</u>, 889 F.2d at 1217.[9]

This is an objective test, not a subject one.  <u>Garcia v. City of Trenton</u>, 348 F.3d 726, 729 (8th Cir.

2003).[10]

 As the Third Circuit recently explained, a "First Amendment retaliation claim will lie for

any individual act which meets this 'deterrence threshold,' *and that threshold is very low*."

<u>O'Connor</u>, 440 F.3d at 127-28 (emphasis added); <u>accord</u> <u>Price v. Chaffinch</u>, 2006 WL 131378,

*3 (D.Del. May 12, 2006).  "First Amendment retaliation claims are always individually

actionable, *even when relatively minor*."  <u>O'Connor</u>, 440 F.3d at 127-28 (emphasis added).  As

the Supreme Court, Third Circuit and District of Delaware have repeatedly noted, the person of

ordinary firmness standard may be satisfied even for acts of "retaliation as trivial as failing to

hold a birthday party for a public employee if intended to punish her for exercising her free

---

847, 850 (8th Cir. 2001); <u>Smith v. Plati</u>, 258 F.3d 1167, 1176 (10th Cir. 2001); <u>Bloch v. Ribar</u>, 156 F.3d 673, 678 (6th Cir. 1998); <u>Agosto-de-Feliciano v. Aponte-Rogue</u>, 889 F.2d 1209, 1217 (1st Cir. 1989) (en banc); <u>Bart</u>, 677 F.2d at 625.

 [9] The person of ordinary firmness standard is an easier standard to meet than the statutorily based adverse employment action Title VII test.  <u>See</u> <u>Rivera-Jimenez v. Pierluisi</u>, 362 F.3d 87, 94 (1st Cir. 2004) ("the standard for showing an adverse employment action is lower in the First Amendment retaliation context than it is in other contexts (such as Title VII)."); <u>Baca v. Sklar</u>, 398 F.3d 1210, 1220 (10th Cir. 2005) ("we have repeatedly concluded that a public employer can violate an employee's First Amendment rights by subjecting an employee to repercussions that would not be actionable under Title VII."); <u>Power v. Summers</u>, 226 F.3d 815, 820-21 (7th Cir. 2000) (noting that the explicit Title VII statutory language upon which Title VII adverse action law is based is not present in 42 U.S.C. § 1983); <u>Banks v. East Baton Rouge Parish Sch. Bd.</u>, 320 F.3d 570, 580 (5th Cir. 2003) (recognizing that "§ 1983's definition of adverse employment action may be broader than Title VII's definition").

 [10] Because this is an objective standard, a plaintiff need not demonstrate that he actually was deprived of his First Amendment rights.  <u>See</u> <u>Constantine v. Rectors and Visitors of George Mason Univ.</u>, 411 F.3d 474, 500 (4th Cir. 2005).  Indeed, "[s]peech can be chilled, even when not completely silenced."  <u>Rhodes v. Robinson</u>, 408 F.3d 559, 568 (9th Cir. 2005); <u>see</u> <u>Constantine</u>, 411 F.3d at 500 ("The cause of action targets conduct that tends to *chill* such activity, not just conduct that *freezes* it completely").

speech rights." Id. (internal punctuation omitted); accord Rutan, 497 U.S. at 76 n.8; Suppan, 203 F.3d at 234-35; Price, 2006 WL 131378, *3. This is not surprising in the employment context given that, as one Court has observed, "[o]ne does not have to be an employment expert to know that an employer can make an employee's job undesirable or even unbearable without money or benefits ever entering into the picture." Collins v. State of Ill., 830 F.2d 692, 703 (7th Cir. 1987). As our District has explained, this is "an extremely low hurdle to overcome." Price, 2006 WL 131378, *2.

"Determining whether a plaintiff's First Amendment rights were adversely affected by retaliatory conduct is a fact intensive inquiry focusing on the status of the speaker, the status of the retaliator, the relationship between the speaker and the retaliator, and the nature of the retaliatory acts." Brennan, 350 F.3d at 419; see Andrews v. City of Phila., 895 F.2d 1469, 1484 (3d Cir. 1990) ( "A play cannot be understood on the basis of some of its scenes but only on its entire performance, and similarly, a [retaliation] analysis must concentrate not only on individual incidents, but on the overall scenario"). The retaliatory acts must "be more than de minimis or trivial." Brennan, 350 F.3d at 419. Importantly however, liability also may be established "based upon a continuing course of conduct even though some or all of the conduct complained of would be de minimis by itself or if viewed in isolation." Id. at 419 n.16; see Suppan, 203 F.3d at 235 (noting that what is "trivial in detail may have been substantial in gross"); O'Connor, 440 F.3d at 128.

**C. Defendant Mears' Adverse Action Against Plaintiff.** As discussed in detail in plaintiff's opening brief (POB at 39-40, 11-14, 18-19), after he resigned from CERT defendant Mears began a course of retaliatory harassment against him, including the following.

**1. A Mediocre Performance Evaluation.** Only one month after the CERT

22

resignation, defendant Mears gave plaintiff a mediocre performance evaluation in which he
attacked plaintiff's performance in such a way that Mears' own supervisor explained that if
plaintiff had actually been as poor an employee as Mears described in his evaluation, that
plaintiff would not meet the expectations of the job. (T.Mears Ex.11; Wilkinson 94,96; A838-
40,937).

Defendants claim that plaintiff's evaluation and ranking of "Meets Expectations" is a
"good evaluation" that could not negatively effect plaintiff. (DOB at 22). Defendants assertions
are incorrect for several reasons. Initially, defendants fail to take into account that, as explained
in plaintiff's opening brief (POB at 11-12), plaintiff's evaluation was accompanied by a multi-
page attachment in which defendant Mears attacked plaintiff's job performance. (T.Mears Ex.11
at 2-3; A839-40) As defendant Mears' own supervisor explained, if plaintiff's performance had
actually been as poor as Mears claimed in this attachment, plaintiff deserved to have flunked the
evaluation entirely. (Wilkinson 94, 96; A937) As Captain Wilkinson explained, an employee
with the performance problems that defendant Mears claimed plaintiff had does not meet the
performance standards set by the DOC which are expected of every correctional officer. (Id.).
Thus, this evaluation was extremely negative.[11]

Yet to support of their assertion, defendants submit the affidavit of Mike Deloy which

---

[11] Additionally, defendants can point to no documentation to support defendant Mears'
false allegations of numerous performance problems in plaintiff's evaluations, despite a DOC
policy requiring all supervisors to document any and all performance deficiencies. (T.Mears Ex.9
at 4; Wilkinson 87-91; T.Mears 89-94; A821,935-36,727-29). As Capt. Wilkinson stated, in a
situation such as this where the employee was alleged to have multiple instances of poor work
performance, at the very least "some type of corrective action should have taken place."
(Wilkinson 96; A937). In fact, however, there is no written record whatsoever to support any of
plaintiff's alleged deficiencies. (T.Mears 160-61,167-68,171-73; see Wilkinson 87; A745,747-
48,935). Conversely, the record reflects quite the opposite. Defendants Mears' negative
assertions are false, unsupported and intended only to retaliate against plaintiff for his protected
activity.

states, *inter alia*, that a "rating of 'meets expectations' is not a negative or bad evaluation." (DA at A1).  Assuming *arguendo* that Deloy's affidavit could be properly considered, plaintiff's 2004 evaluation was not a typical "Meets Expectations" since a multi-page attachment was submitted with it attacking plaintiff's performance in several areas at the DOC.  As Captain Wilkinson testified, if plaintiff was as poor an employee as described at length in the attachment, he did not meet the DOC's performance standards. (See Wilkinson 94, 96; A937).[12]

Second, defendants claim that because earlier in his career plaintiff had received a ranking of "Meets Expectations," the fact that he received the same ranking much later in his career, after many intervening years of consistently receiving a ranking of "Exceeds Expectations," that somehow this evaluation is not adverse action.  Yet again, defendants ignore the fact that plaintiff's two evaluations from the prior decade did not contain any attachments or full pages of text berating plaintiff and making unsubstantiated and false allegations about his work performance, which, as Captain Wilkinson explained, means that he did not meet the standards expected of every DOC employee - thus that he did not meet expectations.  (Wilkinson 94-97; A937).  Thus, in comparing the "Meets Expectations" evaluations in 1996 and 1998 with the evaluation in 2004, it is easy to see that the 2004 evaluation was extremely negative and intended to punish plaintiff.

Lastly, defendants claim that performance evaluation ratings have "no effect on assignments, shifts, salary, requests for time off, transfers, opportunity for advancement, or any

_____

[12]  The Deloy affidavit also may be rejected under the standard of review because he is an interested witness of the defendant employer.  See Reeves, 530 U.S. at 150; Hill v. City of Scranton, 411 F.3d at 131 n.22; see also id. at 129 n.16.  Deloy is currently the Warden at Sussex Correctional Institution and during the times relevant to plaintiff's lawsuit he served as the Deputy Warden. (Deloy 7-8; A895).  Thus, as a high level management official, Deloy clearly has an interest in protecting his subordinates, as well as the DOC, from any liability.

other benefit." (DOB at 22). To support this proposition defendants again cite to Deloy's affidavit, which is not properly considered at summary judgment. However, again assuming *arguendo* that Deloy's affidavit could be properly considered, it is refuted by defendants' own admission in their Answer where defendants admitted that under State Merit Law, 29 Del.C. § 5927, performance records are considered in determining salary increases, promotions, transfers and other employment actions. (Compl. & Ans. ¶ 68; A16,40). Therefore, a negative evaluation, such as the one received by plaintiff, could easily effect salary progression, ability for promotions and transfer, and other terms and conditions of his employment.

       **a.  The Case Law Dictates That This is Adverse Action.** Fortunately, the Tenth Circuit has squarely addressed the factual scenario where a plaintiff asserts that he was given "poor performance evaluations (that differed materially from [the plaintiff's] prior evaluations)" in retaliation for the exercise of his First Amendment rights. Brammer-Hoelter v. Twin Peaks Charter Academy, 492 F.3d 1192, 1208 (10th Cir. 2007). There, the Tenth Circuit explained that "it is clear that poor performance ratings certainly" could "deter a reasonable person from exercising his or her First Amendment rights." Id. Other courts also have held that negative evaluation letters and accusations of lying satisfy the First Amendment adverse action standard. See, e.g. Zelnik v. Fashion Institute of Technology, 464 F.3d 217, 226 (2d Cir. 2006); Oliphant v. Connecticut Dept. of Transp., 2006 WL 3020890, *9 (D.Conn. Oct. 23, 2006); Grennan v. Nassau County, 2007 WL 952067, *9 (E.D.N.Y. March 29, 2007). Other courts have found that even under Title VII's higher adverse action standard, retaliation such as "unwarranted negative job evaluations" qualifies as adverse action. See Wyatt v. City of Boston, 35 F.3d 13 (1st Cir. 1994); Johnson v. DiMario, 14 F.Supp.2d 107, 111 (D.D.C. 1998). Accordingly, it is clear that the lowered evaluation given to plaintiff by Mears, in which Mears attacked plaintiff's

job performance in such a way that Mears' own supervisor explained that based upon Mears' description, plaintiff was not meeting the expectations of the job, qualifies as First Amendment adverse action.

**2. Continuous Denial of a Meeting with his Supervisors.** After learning that Mears gave him a mediocre rating, plaintiff requested a meeting with Captain Wilkinson and a union representative to review his evaluation. (Wilkinson 57; T.Mears 155; T.Mears Ex.13; A927,744,850). However, despite his requests, this meeting never took place. (Wilkinson 68-69; T.Mears 188; A930,752). Instead, Mears decided on his own accord to submit the evaluation without plaintiff's signature despite knowing his Captain had requested that a meeting be held. (Wilkinson 67,70,80; T.Mears 155-57; A930-31,933,744). Defendants fail to address this adverse action in their brief. Clearly, however, the continuous denial of a meeting which was required by his superiors and then disregarded by Mears, constitutes adverse action.

**3. Plaintiff is Denied a Transfer to Another Supervisor.** Plaintiff repeatedly requested a transfer to another supervisor so he would no longer have to work for or report to defendant Mears. (Deloy 53-55; Wilkinson 106; T.Mears 198; Adkins 39-40; A906-7,940,755, 1007). Plaintiff hoped that a transfer would alleviate the stress resulting from working for a supervisor who was trying to "screw him." (Wilkinson 57,93,101). Admittedly, however, plaintiff's superiors never transferred plaintiff or gave him a new supervisor. (DOB at 26). Instead, Deputy Warden Deloy decided to employ a "wait and see" approach, allowing defendant Mears the opportunity to continue his retaliatory behavior. (DOB at 26). As defendant Mears testified that he was aware plaintiff requested a transfer to another supervisor, but was told no decision had been made. (T.Mears 198-99; A755). Prior to plaintiff's death, defendant Mears

26

knew plaintiff was trying to escape his unbearable retaliation but did nothing to try and rectify or alleviate the situation. (Id.).  Instead, he continued retaliating against plaintiff until his death.

**4. Mears Alters Plaintiff's Time Cards.**  In both deposition testimony as well as in their brief, defendants admit that Mears altered plaintiff's timecards. (T.Mears 189-198; A752-55; DOB at 24).  In September of 2004, plaintiff discovered that Mears had tampered with his timecard and altered it so that he had taken emergency vacation days rather than holidays or regular vacation days. (T.Mears Ex.14; A853-62).  Contrary to defendants assertions that emergency vacation days are not frowned upon, as deposition testimony revealed, emergency vacation days are reserved for last minute call outs versus vacation days which are planned months ahead. (Adams 28; Bradley 31; A871,882).  If an officer uses an emergency vacation day that means he has called out at the last minute and has left his shift in a flux and someone will have to fill that position. (Adams 28; A871).  If staffing levels were low, which they often were, this could leave the shift commander in a bind. (Adams 29; Bradley 31-32; Mumford 36; A871,882,979).  As an employee who prided himself on perfect attendance, such unwarranted tampering of his timecards was of the upmost concern. (see Adkins 33; L.Mears 27; T.Mears Ex.8; A1005,1056,794,800,808,812,814-15,817).  Despite defendants assertions to the contrary, this alteration was intended to punish plaintiff for his conduct and constitutes adverse action.

**5. Plaintiff is Denied a Copy of His Timecard.**  In January 2005, plaintiff also was denied a copy of his timecard, which is another violation of DOC rules and regulations. (T.Mears 186; T.Mears Ex.13; Inter. #3 p.28; A752,850,678).  Plaintiff was forced to formally request a copy of his timecard since defendant Mears refused to give him a copy at the end of the year. (T.Mears Ex.13; A850).  Despite defendants' claims, this denial when viewed in the context of surrounding events and defendant Mears' long course of continued retaliatory behavior was

27

intended to harass plaintiff.

      **6. Plaintiff is Constantly Monitored and Nit Picked by Mears.** Lastly, plaintiff also was constantly watched and monitored by Mears who was searching for a performance misstep to use as a basis for discipline. (Adkins 137-38; A1031-32). For example, plaintiff was shown a note pad where someone was keeping chronological notes for Mears of plaintiff's performance and whereabouts. (Adkins 137; A1031). Mears also admits he is a "hands-on" supervisor if he does not have confidence in his employee. (T.Mears 14; A709). Such nit-picking was improper, (Wilkinson 108; A940), and clearly constitutes adverse action.

      **7. The Totality of All of this Retaliation Meets this "Extremely Low Hurdle" and Qualifies As Adverse Action.** As the Third Circuit has explained, liability also may be established "based upon a continuing course of conduct even though some or all of the conduct complained of would be *de minimis* by itself or if viewed in isolation." Brennan, 350 F.3d at 419 n.16; see Suppan, 203 F.3d at 235 (noting that what is "trivial in detail may have been substantial in gross"). Thus, to the extent the court believes that one or two of the above sections do not independently satisfy the "extremely low hurdle," Price, 2006 WL 131378, *2, that is the First Amendment adverse action standard, it is clear that when viewed together as part of a continuing course of retaliation, the standard is satisfied.

**VII.    THE CAUSAL EVIDENCE IN THE RECORD DEMONSTRATES THAT PLAINTIFF'S PROTECTED FIRST AMENDMENT ACTIVITY WAS A SUBSTANTIAL OR MOTIVATING FACTOR IN THE RETALIATION TAKEN AGAINST HIM BY DEFENDANT MEARS.**

      The defense claim that there is no record evidence on causation is also without merit.

      **A. Substantial or Motivating Factor.** Following the determination that plaintiff's conduct was constitutionally protected, plaintiff must demonstrate that this conduct was a

"substantial" or "motivating factor" in the relevant decision.  Suppan, 203 F.3d at 235; Mt.

Healthy, 429 U.S. at 287.  "But for" causation is not needed.  Suppan, 203 F.3d at 236.

"'Substantial factor' does not mean 'dominant' or 'primary' factor."  Hill v. City of Scranton, 411

F.3d at 126 n.11.  Instead, a plaintiff need only show that his protected First Amendment rights

"played any substantial role in the relevant decision."  Suppan, 203 F.3d at 236; see Miller v.

Cigna, Corp., 47 F.3d 586, 597 n.9 (3d Cir. 1995) (en banc) ("played a role" in the adverse

decision).  This is a question of fact, not one of law.  Baldassare v. State of N.J., 250 F.3d 188,

195 (3d Cir. 2001).  Likewise, the Third Circuit "has set forth no limits on what we have been

willing to consider" in establishing a causal connection.  Farrell v. Planters Lifesavers Co., 206

F.3d 271, 281 (3d Cir. 2000).  Plaintiff notes that the overwhelming causal evidence in this

regard was discussed in great detail in his opening brief.  However, plaintiff will briefly discuss

that evidence below.

       **1.  Direct Evidence Admission.**  In the interest of brevity, plaintiff relies upon the

evidence contained in his opening brief on this point.  (POB at 32, 14).

       **2.  Demonstrated Anger, Hostility and Antagonism.**  Plaintiff relies on the

evidence contained in his opening brief on this point.  (POB at 32-33, 14-15).  Additionally, as

one Corporal explained, his resignation from CERT in August of 2004 is still an ongoing thorn in

management's side.  Corporal Shockley explained the resignation is still being explicitly raised

by management during personnel interviews as a reason to deny positions. (Shockley 19-21;

A958).  This flies directly in the face of defendants' contentions that no one at the DOC harbors

any animosity against the CERT members for their resignation. (DOB at 30).

       **3.  Unduly Suggestive Temporal Proximity.**  Plaintiff relies on the evidence

contained in his opening brief on this point.  (POB at 33, 15-16).

      **4.  Knowledge of the Protected Activity.**  Plaintiff relies on the evidence contained in his opening brief on this point.  (POB at 33, 16).

      **5.  Motive to Retaliate.**  Plaintiff relies on the evidence contained in his opening brief on this point.  (POB at 33-34, 16-17).

      **6.  Disparate Treatment.**  Plaintiff relies on the evidence contained in his opening brief on this point.  (POB at 34, 17).

      **7.  Violations of Procedures.**  Plaintiff relies on the evidence contained in his opening brief on this point.  (POB at 34, 18).

      **8.  Falsehoods.**  Plaintiff relies on the evidence contained in his opening brief on this point.  (POB at 34, 18-19).

      **9.  Pretext and Cover-Up.**  Plaintiff relies on the evidence contained in his opening brief on this point.  (POB at 35, 19).

      **10.  The Big Picture.**  "A play cannot be understood on the basis of some of its scenes but only on its entire performance, and similarly, a [retaliation] analysis must concentrate not on individual incidents, but on the overall scenario."  <u>Andrews</u>, 895 F.2d at 1484. The big picture in our case makes it clear that defendants illicitly retaliated against plaintiff because he supported union solidarity and resigned from CERT in support of the job action.

      **11.  Conclusion.**  Thus, in light of the overwhelming record evidence outlined above, as well as in plaintiff's opening brief, it is clear that plaintiff has met his burden and demonstrated that his First Amendment protected activity certainly played a "substantial role in the relevant decision."  <u>Suppan</u>, 203 F.3d at 236.  Accordingly, defendants are not entitled to summary judgment.

      **B.  Defendants Waived Their Same Decision Anyway Affirmative Defense.**  In their

brief, defendants assert for the first time the affirmative defense that they would have taken the same actions absent the protected activity. (DOB at 34). This defense requires the defense to prove 'by a preponderance of the evidence that it would have reached the same decision even in the absence of the protected conduct.'" Nicholas v. Pa. State Univ., 227 F.3d 133, 144 (3d Cir. 2000). This last step is an "affirmative defense" to be met by the defendants, id., and also is a question of fact. Hill v. City of Scranton, 411 F.3d at 127. Defendants, however, failed to plead this affirmative defense in their Answer to the Complaint as required under the Federal Rules, see Fed.R.Civ.P. 8(c) (a party must plead any "matter constituting an avoidance or affirmative defense"), so no discovery was needed on this issue. (See Ans. at p.16; A47). Accordingly it has been waived. See Charpentier v. Godsil, 937 F.2d 859, 863 (3d Cir. 1991).

Thus, summary judgment for defendants is inappropriate. Plaintiff has clearly engaged in protected conduct and there is overwhelming causal evidence to meet his substantial or motivating factor burden. And lastly, because defendants chose not to assert their affirmative defense, liability has been established and all that is needed is a trial on damages.

## VIII. DEFENDANT DEPARTMENT OF CORRECTION IS PROPERLY JOINED IN THIS ACTION FOR THE PURPOSES OF COLLECTING ATTORNEYS' FEES AND COSTS.

Defendant Department of Correction asserts that the Eleventh Amendment bars this suit against it. (DOB at 37-38). Plaintiff is well aware of the law in this regard and as ¶ 11 of the Complaint makes perfectly clear, the Department of Correction "is only joined in this action for purposes of collecting attorneys' fees and costs." The Supreme Court has explained that, "an award of attorney's fees ancillary to prospective relief is not subject to the strictures of the Eleventh Amendment." Missouri v. Jenkins, 491 U.S. 274, 279 (1989). "[S]ubstantive protections of the Eleventh Amendment" does not prevent an award of attorney's fees against

31

official capacity defendants. <u>Hutto v. Finney</u>, 437 U.S. 678, 692 (1978). Likewise, in accord

with Supreme Court precedent, this Court has previously and repeatedly rejected this same

argument. See <u>Shotzberger</u>, 2007 WL 758354, *4; <u>Foraker v. Chaffinch</u>, C.A.No. 02-302-JJF

(D.Del. June 17, 2003) (slip op. at 2 n.1) (attached hereto as Tab A). In <u>Shotzberger</u>, this court

specifically held that a § 1983 plaintiff properly joined the State of Delaware, Department of

Correction and its employees as official capacity defendants for the limited purpose of collecting

attorney's fees. <u>Shotzberger</u>, 2007 WL 758354, *4. Accordingly, as in <u>Shotzberger</u>, plaintiff

properly joined the Department of Correction and summary judgment is inappropriate.

**IX.    DEFENDANT TRUMAN MEARS IS NOT ENTITLED TO QUALIFIED
        IMMUNITY IN HIS INDIVIDUAL CAPACITY.**

Defendant Mears claims he is entitled to qualified immunity, purportedly because it was

not clearly established that he could not engage in a long course of harassment against plaintiff in

retaliation for his speech, union association and other protected activity. (DOB at 38-39). As

discussed below, he is mistaken.

**A. Introduction.** Qualified immunity is a two part inquiry. <u>Atkinson v. Taylor</u>, 316

F.3d 257, 261 (3d Cir. 2003) (noting that the Supreme Court reaffirmed the "two-part inquiry" in

<u>Saucier v. Katz</u>, 533 U.S. 194 (2001)). First, "[t]aken in the light most favorable to the party

asserting the injury, do the facts alleged show the [defendants'] conduct violated a constitutional

right?" <u>Atkinson</u>, 316 F.3d at 261. Next, the court must next decide whether the right allegedly

violated was a clearly established one. <u>Wilson v. Layne</u>, 526 U.S. 603, 609 (1999). "Whether a

government official is entitled to protection under the doctrine of qualified immunity is a 'purely

legal question.'" <u>Rogers v. Powell</u>, 120 F.3d 446, 454 (3d Cir. 1997) (citing to <u>Acierno v.

Cloutier</u>, 40 F.3d 597, 609 (3d Cir.1994)).

At issue here, are plaintiff's First Amendment right to be free of retaliation for exercising his rights to freedom of speech, union association and to petition the government for redress of grievances. The test for qualified immunity here is whether it was clearly established for a public official in September of 2004 to believe that retaliating against plaintiff for his First Amendment protected conduct. Notably, defendant Mears testified that he knows it is illegal to retaliate against an employee who engages in First Amendment protected conduct. (T.Mears 41-42; A715-16). Thus it is apparent that defendant himself is admittedly already well aware of this clearly established law.

**B.  The Facts Show the Defendant Mears Violated Plaintiff's First Amendment Rights.**  As explained both above and in plaintiff's opening brief (POB at 20-36), plaintiff has established that defendant Mears violated his First Amendment protected rights of union association, free speech and petition. Accordingly, plaintiff has met prong one of the qualified immunity burden by establishing a constitutional violation.

**C.  Plaintiff's First Amendment Rights were Clearly Established.**  "Once it is determined that evidence of a constitutional violation has been adduced, courts evaluating a qualified immunity claim move to the second step of the analysis to determine whether the constitutional right was clearly established." Bennett v. Murphy, 274 F.3d 133, 136 (3d Cir. 2002) ("Bennett I").

> That is, *in the factual scenario established by the plaintiff*, would a reasonable officer have understood that his actions were prohibited. *The focus in this step is solely upon the law*. If it would not have been clear to a reasonable officer what the law required *under the facts alleged*, he is entitled to qualified immunity. If the requirements of the law would have been clear, the officer must stand trial.

Id. at 136-37 (emphasis added); accord Bennett v. Murphy, 120 Fed.Appx. 914, 916-17 (3d Cir. 2005) (Bennett II); Wright v. City of Phila., 409 F.3d 595, 600 (3d Cir. 2005); Saucier, 533 U.S.

at 201. Defendant Mears simply ignores this aspect of the law which analyzes the factual

scenario alleged by plaintiff, not one wished for by defendant.

The prong two question becomes would a reasonable public official be put on notice that

the constitutional violation already established under prong one runs afoul of clearly established

law.[13]

If there was any doubt on what is needed to put a reasonable public official on notice of

clearly established law, the short answer is found in the U.S. Supreme Court case of Hope v.

Pelzer, 536 U.S. 730 (2002). Hope held that "officials can still be on notice that their conduct

violates established law even in *novel factual circumstances*." Id. at 741 (emphasis added). The

Supreme Court unanimously agreed on this issue. Id. at 753-54 (Thomas, J. dissenting with

whom Rehnquist, C.J. and Scalia, J. join) (agreeing that "officials can still be put on notice that

their conduct violates established law even in novel factual circumstances"). This holding is in

accord with a plethora of preexisting Third Circuit and Supreme Court law, discussed in much

greater length below, and puts to rest in our present case any conceivable uncertainty regarding

the level of factual correspondence needed between the right asserted and prior cases.

Even prior to the Hope decision, the law was the same as is demonstrated by many other

Third Circuit and Supreme Court opinions. "[Q]ualified immunity applies if 'reasonable

---

[13] The reasonableness of an official's conduct is not a separate question from whether the
law was clearly established. Instead, these are two sides of the same coin. The "relevant,
dispositive inquiry in determining whether a right is clearly established is whether it would be
clear to a reasonable officer that his conduct was unlawful in the situation he confronted."
Saucier, 533 U.S. at 202. This is because "[i]f the law was clearly established, the immunity
defense ordinarily should fail, since a reasonably competent public official should know the law
governing his conduct." Crawford-El v. Britton, 523 U.S. 574, 591 (1998) (quoting Harlow v.
Fitzgerald, 457 U.S. 800, 818-19 (1982)). In other words, the law presumes that reasonably
competent public officials are aware of clearly established law. Thus if the law is clearly
established, a reasonably competent public official would have known of it. Id.

officials in the defendants' position at the relevant time could have believed, *in light of what was in the decided case law*, that their conduct would be lawful.'" Doe v. Delie, 257 F.3d 309, 318 (3d Cir. 2001) (emphasis added) (quoting Good v. Dauphin County, 891 F.2d 1087, 1092 (3d Cir. 1989)).  Continuing -

> Thus, having determined that Doe has alleged a violation of a constitutional right, we must determine whether Doe's right [ ] was "clearly established" in a "particularized" sense. Anderson v. Creighton, 483 U.S. 635, 640 (1987). "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Id. *We do not require precise factual correspondence between the right asserted and prior case law.* Good, 891 F.2d at 1092. Whether an official may be protected by qualified immunity turns on the "objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken." Wilson, 526 U.S. at 614 (internal quotes omitted). The issue is whether, given the established law and the information available to Defendants, reasonable [] officials in Defendants' positions could have believed that their conduct was lawful.  See Paff v. Kaltenback, 204 F.3d 425, 431 (3d Cir. 2000).

Doe, 257 F.3d at 318 (emphasis added).  The Third Circuit also has explained that the "clearly established" language test requires "some but not precise factual correspondence and [demands] that officials apply general, well-developed legal principles." Bennis, 823 F.2d at 733; see also Stoneking v. Bradford Area Sch. Dist., 882 F.2d 720, 726 (3d Cir. 1989) ("the general legal principles governing analogous factual situations, if any, and a subsequent determination whether the official should have related this established law to instant situations" are the basis for the court's inquiry); accord Hicks v. Finney, 770 F.2d 375, 380 (3d Cir. 1985).[14]  The Supreme Court

---

[14]  Additionally as indicated by the Supreme Court, all that is required to defeat a qualified immunity claim is a "consensus of cases of persuasive authority."  Wilson, 526 U.S. at 604.  Note that this says nothing of a consensus of binding authority.  This is the point made as far back as 1989 by the Third Circuit in Good, 891 F.2d at 1092, that precise factual correspondence is not needed between the right asserted and prior cases.  "A right may be clearly established even if there is no 'previous precedent directly in point.'" Leveto v. Lapina, 258 F.3d 156, 162 (3d Cir. 2001) (quoting Good, 891 F.2d at 1092); see also Assaf v. Fields, 178 F.3d 170, 177 (3d Cir. 1999).  This point was reiterated again by the Third Circuit in 1999, that a court need not have ruled on a case bearing a "precise factual correspondence" with the one under consideration. Assaf, 178 F.3d at 177.

in <u>U.S. v. Lanier</u>, 520 U.S. 259, 271 (1997), also stated that a "general constitutional rule already identified in the decisional law" may give fair warning to a public official if the rule applies "[w]ith obvious clarity to the specific conduct in question" even though the specific issue has not been previously addressed.  Finally, in the Third Circuit, a law may be clearly established even if the Court has not ruled on an issue and even if there is some disagreement among other Circuits, as long as "[n]o gaping divide has emerged in the jurisprudence" which would lead a party to "reasonably expect" the Courts in this Circuit to rule other than one way.  <u>Bieregu v. Reno</u>, 59 F.3d 1445, 1459 (3d Cir. 1995) (overruled on other grounds by <u>Lewis v. Casey</u>, 518 U.S. 343 (1996)).  Thus, "the salient question ... is whether the state of the law at the time of the acts in question gave the [defendant] fair warning that [his] alleged treatment of the [plaintiff] was unconstitutional." <u>Price</u>, 2006 WL 1313178, *4 (citing to <u>Hope</u>, 536 U.S. at 741) (internal punctuation omitted).

Therefore, government officials will not be granted immunity if they fail to make obvious inferences from a generally established right and apply the right in particular situations. So it was unreasonable in our case for defendant Mears to believe that he could, for example, maliciously retaliate against plaintiff because he had dared to oppose him by speaking up in support of union rights and then further refusing to be a strike breaker and cross the picket line. "There has never been a section 1983 case accusing welfare officials of selling foster children into slavery; it does not follow that if such a case arose, the officials would be immune from damages [ ] liability." <u>U.S. v. Lanier</u>, 520 U.S. at 271 (internal punctuation omitted).

**1.  Union Association.**  Plaintiff's right to be free of retaliation for associating with a union advocating for changes within the Department of Correction has been clearly established for decades.  The Supreme Court itself has repeatedly addressed the rights of

36

workers, their unions and their officers to speak, associate and petition to the fullest extent of the First Amendment.  For example, in Brotherhood of R. R. Trainmen v. Virginia ex rel. Va. State Bar, 377 U.S. 1, 5 (1964), the Supreme Court struck down state efforts to bar that union from advising its members of their legal rights as violative of the First Amendment.  Then, in United Transp. Union v. State Bar of Mich., 401 U.S. 576, 578 (1971), the Supreme Court again explained that "the First Amendment guarantees of free speech, petition, and assembly give [union members] the right to cooperate in helping and advising one another in asserting their rights."  Eight years later, in Smith v. Arkansas State Highway Emp., Local 1315, 441 U.S. 463, 464-65 (1979), again in the union context, the Supreme Court explained that "public employees surely can associate and speak freely and petition openly, and he is protected by the First Amendment from retaliation for doing so."

The lower courts have followed the Supreme Court's lead in this regard.  See, e.g. Labov, 809 F.2d at 222-223 ("efforts of public employees to associate together for the purpose of collective bargaining involve associational interests which the first amendment protects from hostile state action."); Clue v. Johnson, 179 F.3d 57, 60 (2d Cir. 1999) ("[t]here is no doubt that retaliation against public employees solely for their union activities violates the First Amendment."); Stellmaker v. DePetrillo, 710 F.Supp. 891, 892 (D.Conn.1989) ( "[T]he state may not abridge the right of public employees to associate in a labor union and to seek redress of grievances through collective action, nor may it retaliate against an employee for doing so.").  Accordingly, defendant Mears cannot now claim to have been unaware of plaintiff's clearly established rights to be free of retaliation for associating with fellow union members.

2. **Free Speech Retaliation.**  Since Pickering v. Bd. of Educ., 391 U.S. 563 (1968), the Supreme Court, Third Circuit and District of Delaware have all made clear that

public employees do not surrender their free speech rights by virtue of their public employment.[15] In 1988, the Third Circuit held that it has been clearly established **since 1982** that a public employee cannot be retaliated against for exercising his First Amendment rights. <u>Zamboni v. Stamler</u>, 847 F.2d 73, 80 n.7 (3d Cir. 1988) (quoting <u>Bennis</u>, 823 F.2d at 733); <u>accord Baldassare</u>, 250 F.3d at 201 (noting the same in the law enforcement context). Thus, for more than 26 years, it has been clearly established that a public employee may not be retaliated against for exercising his free speech rights.

Given that plaintiff's protected speech encompassed the same union expression which were discussed at length in Argument **IX.C.1.** above, plaintiff also relies upon the clearly established First Amendment law cited therein and incorporates it by reference here.[16] This right was clearly established as well.[17]

---

[15] <u>See</u> <u>O'Hare Truck Service, Inc. v. City of Northlake</u>, 518 U.S. 712, 716 (1996) (noting that the Supreme Court has for decades rejected Justice Holmes' then famous aphorism that a policeman "may have a constitutional right to talk politics, but he has no constitutional right to be a policeman."). As the Seventh Circuit has explained, "freedom of speech is not traded for an officer's badge." <u>Biggs v. Village of Dupo</u>, 892 F.2d 1298, 1303 (7th Cir. 1990). The Supreme Court has noted the same - "policemen, like teachers and lawyers, are not relegated to a watered-down version of constitutional rights." <u>Garrity v. New Jersey</u>, 385 U.S. 493, 500 (1967). The same logic applies for correctional officers.

[16] <u>See, e.g.</u> <u>Bennis</u>, 823 F.2d at 733 ("we cannot in good conscience, conclude that in 1982 a reasonably active politician would not have believed that it would be impermissible to demote an employee in retaliation for his political speech and/or associations.")

[17] Defense reliance on <u>McKee v. Hart</u>, 436 F.3d 165 (3d Cir. 2006) to claim lack of notice that a defendant could not engage in a campaign of retaliatory harassment also does not survive scrutiny. In <u>McKee</u>, the plaintiff was only able to point to three comments that the defendants made to him as being retaliatory adverse action, but he could not point to anything else or to any concrete acts. Notably, these comments by his employer were comments urging him not to lose his focus as he was neglecting to do the job that had been assigned to him. <u>Id.</u> at 171-72. Consequently, the Third Circuit simply held that, as a matter of law, these three comments by themselves were an insufficient basis to establish adverse action. <u>Id.</u> at 170-71. The Circuit distinguished <u>Suppan</u> where the plaintiffs were subjected to a course of retaliatory harassment for more than a year and contrasted this with the constructive criticism the <u>McKee</u>

3. **Petition Clause Retaliation.**  In the same way, the right to petition has been clearly established for even longer than its better known cousin, the free speech clause.  A citizen's right to petition the government was part of the Magna Carta and also was such a well-recognized part of the law that it was included in Blackstone's famous works.  San Filippo, 30 F.3d at 443 and n.22-23.  In the U.S., the right to petition the government has been clearly established under decades of Supreme Court precedent.[18]  Similarly, the Third Circuit has repeatedly and exhaustively discussed the right of a public employee to petition the government for redress of grievances, including by invoking formal grievance mechanisms as part of collective bargaining agreements.[19]

This right was clearly established as well.  Therefore, defendant Mears is not entitled to qualified immunity.

---

plaintiff received and found them to be of a qualitatively different nature.  Id. at 171.  As discussed above, like the plaintiff in Suppan, plaintiff also suffered a long campaign of retaliatory harassment - including a lowered performance evaluation which independently qualifies as adverse action - all of which is more than sufficient to meet and far surpass the adverse action threshold.

[18]  See e.g., NAACP v. Button, 371 U.S. 415, 429-30 (1963); Brotherhood of R.R. Trainmen, 377 U.S. at 5; United Mine Workers of America v. Ill. State Bar Ass'n, 389 U.S. 217, 221-225 (1967); Cal. Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508, 510-16 (1972); McDonald v. Smith, 472 U.S. 479, 482-85 (1985).

[19]  See San Filippo, 30 F.3d at 434-43 (formal union grievance); Anderson v. Davila, 125 F.3d 148, 161-63 (3d Cir. 1997) (lawsuit and EEOC charge); Hill v. City of Scranton, 411 F.3d at 126-27 (lawsuit); see also Losch v. Borough of Parkesburg, Pa., 736 F.2d 903, 909-10 (3d Cir. 1984); Brownsville Golden Age Nursing Home, Inc. v. Wells, 839 F.2d 155, 160 (3d Cir. 1988); Bieregu, 59 F.3d at 1453; We, Inc., v. City of Phila., 174 F.3d 322, 326-30 (3d Cir. 1999); A.D. Bedell Wholesale Co. v. Philip Morris, Inc., 263 F.3d 239, 250-54 (3d Cir. 2001); Herr v. Pequea Township, 274 F.3d 109, 115-17 (3d Cir.2001) (abrogated on other grounds by United Artists Theatre Circuit, Inc. v. Twp. of Warrington, 316 F.3d 392, 400 (3d Cir.2003)); Mariana v. Fisher, 338 F.3d 189, 197-200 (3d Cir. 2003); Brennan, 350 F.3d at 417-18; Hill v. Borough of Kutztown, 455 F.3d at 242 n.24; Foraker, 501 F.3d at 235-38.

## CONCLUSION

Plaintiff does not oppose the dismissal of defendants Deloy, Wilkinson, Machtinger or Taylor. However, for the reasons discussed above, as well as in plaintiff's opening brief, the defense motion for summary judgment should be denied in all other respects.

Respectfully Submitted,

**THE NEUBERGER FIRM, P.A.**

/s/   Stephen J. Neuberger
**THOMAS S. NEUBERGER, ESQ. (#243)**
**STEPHEN J. NEUBERGER, ESQ. (#4440)**
**CHERYL A. HERTZOG, ESQ. (*Pro Hac Vice*)**
Two East Seventh Street, Suite 302
Wilmington, Delaware 19801
(302) 655-0582
TSN@NeubergerLaw.com
SJN@NeubergerLaw.com
CherylH@NeubergerLaw.com

Dated: February 19, 2008          Attorneys for Plaintiff

40

## <u>CERTIFICATE OF SERVICE</u>

I, Thomas S. Neuberger, being a member of the bar of this Court do hereby certify that on

February 19, 2008, I filed this **Brief** with the Clerk of the Court using CM/ECF which will send

notification of such filing to the following:

>Ralph Durstein, Esquire
>Stacey Xarhoulakos, Esquire
>Department of Justice
>Carvel State Office Building
>820 North French Street
>Wilmington, DE 19801

>/s/ Thomas S. Neuberger
>**THOMAS S. NEUBERGER, ESQ.**

Balas \ Briefs \ SJAB.final

Tab

A

*Pleadings*

*CLERK U.S. FILED*
*DISTRICT OF DELAWARE*
*DISTRICT COUR*
*2003 JUN 17 PM 1:46*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

SERGEANT CHRISTOPHER D. FORAKER,      :
                                      :
          Plaintiff,                  :
                                      :
     v.                               :     C.A. No. 02-302-JJF
                                      :
COLONEL L. AARON CHAFFINCH,           :
individually and in his official      :
capacity as Superintendent of the     :
Delaware State Police, DIVISION       :
OF STATE POLICE, DEPARTMENT OF         :
PUBLIC SAFETY, STATE OF DELAWARE,     :
                                      :
          Defendants.                 :

### MEMORANDUM AND ORDER

Pending before the Court is Defendants' Motion for Summary Judgment (D.I. 19). For the reasons discussed below, the Court will deny the Motion.

This is a public employee free speech retaliation case filed under 42 U.S.C. § 1983. Plaintiff Christopher D. Foraker, a Sergeant ("Sgt.") in the Delaware State Police ("DSP"), was transferred in alleged retaliation for reporting various inappropriate acts of Corporal ("Cpl.") Eddie Cathell, who was Sgt. Foraker's subordinate and an alleged personal friend of the Superintendent of the DSP, Defendant Colonel ("Col.") L. Aaron Chaffinch. Defendants have filed for summary judgment contending that Sgt. Foraker's transfer did not amount to adverse employment action and that Sgt. Foraker's speech was not protected

1

activity.[1]

## I.   Was Sgt. Foraker's Transfer An Adverse Employment Action?

On February 22, 2002, Sgt. Foraker was transferred from his
position as the non-commissioned officer in charge ("NCOIC") of
the Firearms Training Unit ("FTU") after having held the position
for seven months, which, historically, is a very short tenure in
the position.   The FTU is responsible for the firearms training
of all police academy recruits and the annual retraining of all
620 DSP troopers.   In addition to his duties in the FTU, Sgt.
Foraker also served as a member of the Special Operations
Response Team ("SORT").   Sgt. Foraker's service in the SORT
accounted for 53 to 71% of his overtime income.   Sgt. Foraker
took a leave of absence from the SORT in March 2002 and resigned
from the SORT in December 2002.

Sgt. Foraker contends he was permanently transferred to the
Police Academy on February 22, 2002, to a dead-end job with no

---

[1]Defendants also contend that Sgt. Foraker's Section 1983
claims for monetary damages against the Division of State Police,
Department of Public Safety, State of Delaware, and Col.
Chaffinch in his official capacity (the "State Defendants") must
be dismissed for lack of subject matter jurisdiction.   In
response, Sgt. Foraker contends that he joined the State
Defendants solely for the purpose of collecting attorneys' fees
and costs associated with obtaining prospective relief.   (D.I. 1
at ¶ 6).   Because "an award of attorney's fees ancillary to
prospective relief is not subject to the strictures of the
Eleventh Amendment," the Court concludes that it has subject
matter jurisdiction over Sgt. Foraker's claim for attorneys' fees
and costs against the State Defendants.   Missouri v. Jenkins, 491
U.S. 274, 279 (1989).

2

job description or responsibilities. Defendants contend the transfer, which involved no change in rank, base pay, or benefits, was a temporary one intended to allow Sgt. Foraker to wrap up two projects related to his work in the FTU. After three weeks at the Police Academy, Sgt. Foraker was transferred to Troop 6 as a patrol sergeant with no change in rank, base pay, or benefits. Sgt. Foraker contends that Defendants transferred him to Troop 6 after they heard about his impending retaliation lawsuit.

Defendants contend that Sgt. Foraker's temporary transfer to the Police Academy does not rise to the level of an adverse employment action because it was short term. Sgt. Foraker contends that there is a genuine issue of material fact as to whether the transfer was temporary. Viewing the facts in the light most favorable to Sgt. Foraker, the Court agrees with Sgt. Foraker. (D.I. 22 at 17 n.10). If the transfer was not temporary, it would satisfy the adverse action requirement. Torre v. Casio, Inc., 42 F.3d 825, 831 n. 7 (3d Cir. 1994)(finding transfer without loss of pay or benefits to a dead end job was an adverse action). Because there is a genuine issue of material fact regarding whether the initial transfer was an adverse action, the Court concludes that summary judgment on the issue is inappropriate.

Defendants also contend that Sgt. Foraker's subsequent

3

transfer to Troop 6 as a patrol sergeant was not an adverse action because it was a mere lateral transfer involving no change in benefits, base pay, or rank.  Defendants characterize the harm to Sgt. Foraker caused by the transfer as nothing more than a bruised ego and contend that Sgt. Foraker's preference to do another job does not make the transfer an adverse action. Defendants provide a detailed comparison of the two positions and argue that Sgt. Foraker's responsibilities and chances for overtime and promotion are actually higher in the new position.

In response, Sgt. Foraker contends that the transfer to Troop 6 was an adverse employment action because he suffered monetary loss as a result of it.  Sgt. Foraker contends that the emotional distress and depression caused by Defendants' retaliation made him unable to safely discharge his duties in the SORT and led to his resignation.  Sgt. Foraker contends that he lost the source of 53-71% of his overtime pay due to Defendants actions.  The Court concludes that, viewed in the light most favorable to Sgt. Foraker, these facts raise a genuine issue of fact for trial that precludes summary judgment.

Sgt. Foraker also contends that the transfer to Troop 6 was not a mere lateral transfer.  In essence, Sgt. Foraker contends that the position of NCOIC of the FTU is significantly different from and objectively more desirable than the patrol sergeant position at Troop 6.  The Third Circuit has held that a transfer

4

to a less desirable position can constitute an adverse employment
action.  Jones v. School Dist. of Philadelphia, 198 F.3d 403,
411-12 (3d Cir. 1999)(finding adverse action when teacher
transferred to a less desirable school and lost the opportunity
to teach physics); Hampton v. Borough of Tinton Falls Police
Dept., 98 F.3d 107, 115-16 (3d Cir. 1996)(reversing grant of
summary judgment on the issue of adverse action where police
officer was transferred to less desirable assignment and
Department asserted transfer was merely lateral reassignment).
Based on these cases, the Court concludes that the decision
regarding whether Sgt. Foraker's transfer to Troop 6 was an
adverse employment action is a fact bound inquiry that must be
resolved by the jury.

    For all of these reasons, the Court concludes that summary
judgment is not appropriate as to the issue of whether Sgt.
Foraker suffered an adverse employment action.

II.  Was Sgt. Foraker's Speech Protected Activity?

    A public employee's claim of retaliation for engaging in
protected activity is analyzed under a three-step process:

> First, plaintiff must show that the activity in
> question was protected.  To be protected the speech
> must be on a matter of public concern, and the
> employee's interest in expression on this matter must
> not be outweighed by any injury the speech could cause
> to the interest of the state as an employer in
> promoting the efficiency of the public services it
> performs through its employees.  Second, plaintiff must
> show that the protected activity was a substantial or
> motivating factor in the alleged retaliatory action.

> Finally, defendant may defeat plaintiff's claim by
> demonstrating by a preponderance of the evidence that
> the same action would have been taken even in the
> absence of the protected conduct.

<u>Watters v. City of Philadelphia</u>, 55 F.3d 886, 892 (3d Cir.

1995)(internal citations omitted).  Whether the speech is

protected activity is a legal question for the court, whereas

whether the protected activity was a substantial or motivating

factor and whether the same actions would have been taken absent

the protected activity are questions of fact for the jury.  <u>Id.</u>

at 892 n.3; <u>see also</u> <u>Baldassare v. State of N.J.</u>, 250 F.3d 188,

195 (3d Cir. 2001).

"An employee's speech addresses a matter of public concern

when it can be fairly considered as relating to any matter of

political, social, or other concern to the community ... The

public concern inquiry is a legal one, to be determined by the

content, form, and context of a given statement, as revealed by

the whole record."  <u>Watters</u>, 55 F.3d at 892.  "The content of the

speech may involve a matter of public concern if it attempts 'to

bring to light actual or potential wrongdoing or breach of public

trust on the part of government officials.'"  <u>Baldassare</u>, 250

F.3d at 195.

Sgt. Foraker contends that his speech, which consisted of

several reports and email messages delivered to his superiors in

the DSP, concerned a subordinate who lied on the job, failed to

perform his job duties, had dangerously high levels of lead in

6

his blood, and sexually harassed a female civilian.  Sgt. Foraker
contends that these issues are a matter of public concern because
they relate to wrongdoing by a public official.

Defendants contend that Sgt. Foraker's speech was not
protected activity because it was communicated internally as part
of his normal job duties.  However, in <u>Givhan v. Western Line
Consolidated School District</u>, 439 U.S. 410, 415-16 (1979), the
United States Supreme Court stated: "[t]he First Amendment
forbids abridgment of the 'freedom of speech.' Neither the
Amendment itself nor our decisions indicate that this freedom is
lost to the public employee who arranges to communicate privately
with his employer rather than to spread his views before the
public."  Moreover, the Third Circuit has noted that:

> the community's interest in the free exchange of
> information and ideas relating to matters of public
> concern is not limited to public declarations. That
> interest is implicated in internal exchanges as well as
> in exchanges between an individual and members of the
> public.  Internal dissemination of information and
> ideas can be as important to effective self-governance
> as public speeches. Thus, if the content and
> circumstances of an internal communication are such
> that the message conveyed would be relevant to the
> process of self-governance if disseminated to the
> community, that communication is public concern speech,
> even though it occurred in a private context.

<u>Baldassare</u>, 250 F.3d at 198 (internal punctuation omitted).

Because Sgt. Foraker's communications attempted to bring to

7

light wrongdoing on the part of a government official,[2] the Court

concludes that the communications, when viewed in the light most

favorable to the nonmovant, involved a matter of public concern.

The Court further concludes, based on Baldassare, that the

internal nature of Sgt. Foraker's communications does not deprive

---

[2]The DSP originally used lead based ammunition for firearms training; however, there came a time when the DSP realized that it needed to stop using lead based ammunition because of its hazardous side-effects, such as long-term, permanent damage to the nervous system. Thus, after building a multi-million dollar indoor range and spending $500,000 to upgrade its air handling system to eliminate lead particles discharged in the air, the DSP began using lead free handgun ammunition. Nonetheless, because there is not an adequate substitute, all shotgun ammunition remains lead based.

Because of the health hazards posed by lead based ammunition, Troopers working in the FTU are required to have their blood tested every 90 days to evaluate the lead levels in their blood. There are wide ranges of medical opinion as to what constitutes acceptable levels of lead in the bloodstream, but Sgt. Foraker was told by his superiors that a level of 20 was dangerous.

Cpl. Cathell's lead levels were consistently two to three times higher than any other Trooper at the FTU, even after the change to non-lead based handgun ammunition. Sgt. Foraker took steps to reduce Cpl. Cathell's exposure to lead and repeatedly asked Cpl. Cathell if he was doing anything off duty that could be adversely affecting his blood lead levels. Over the course of several years, Cpl. Cathell denied that he was doing anything which could be contributing to his abnormally high lead levels.

In October 2001, after Cpl. Cathell's lead levels came in more than twice as high as the next FTU Trooper, Cpl. Cathell admitted to Sgt. Foraker that he had been loading and reloading lead based ammunition for off duty shooting competitions. Sgt. Foraker subsequently reported to his superiors that Cpl. Cathell's lead levels were in the high teens and that Cpl. Cathell had been lying to his superiors about the cause of his high lead levels. Sgt. Foraker also reported that Cpl. Cathell was suffering from lesions, headaches, blurred vision, and tingling fingers. Finally, in January 2002, Sgt. Foraker reported that Cpl. Cathell's lead level had hit 20, which was the danger level set by Sgt. Foraker's superiors.

8

them of First Amendment protection.   Once a court determines that

the speech regards a matter of concern, it must evaluate whether

the employee's interest in the expression is outweighed by any

injury the speech could cause to the state's interest in

providing efficient public services.   <u>Watters</u>, 55 F.3d at 892.

Here, Sgt. Foraker's interest in reporting unacceptable behavior

by a subordinate is very high and actually serves to increase the

efficiency of the State Police.   Thus, the Court concludes that

the balance tilts in favor of treating Sgt. Foraker's speech as

protected activity.

    NOW THEREFORE, IT IS HEREBY ORDERED that Defendants' Motion

for Summary Judgment (D.I. 19) is **DENIED**.

_June 17 2003_
DATE

_Joseph J. Farnan_
UNITED STATES DISTRICT JUDGE

9