## IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CINDY L. ADKINS,<br>**Executrix of the Estate**<br>**of JOHN J. BALAS,** | ) ) ) ) | |
| **Plaintiff,** | ) ) | |
| **v.** | ) ) | **C. A. No. 06-592-JJF** |
| **STANLEY W. TAYLOR, JR.,**<br>**ALAN MACHTINGER,**<br>**MICHAEL DELOY,**<br>**DAVID WILKINSON,**<br>**TRUMAN MEARS, and the**<br>**DEPARTMENT OF CORRECTION**<br>**of the STATE OF DELAWARE,** | ) ) ) ) ) ) ) | |
| **Defendants.** | ) | |

### ANSWERING BRIEF IN OPPOSITION TO
### PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

**DEPARTMENT OF JUSTICE**
**STATE OF DELAWARE**

*/s/ Ralph K. Durstein, III*
Ralph K. Durstein, III, ID #912
Stacey Xarhoulakos, ID #4667
Deputy Attorneys General
Carvel State Office Building
820 North French Street
Wilmington, DE 19801
(302) 577-8400
Attorneys for Defendants

DATED:  FEBRUARY 19, 2008

# **TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ...................................................................................... ii

NATURE AND STAGE OF THE PROCEEDINGS ..................................................1

SUMMARY OF THE ARGUMENT .........................................................................2

STATEMENT OF FACTS .........................................................................................3

ARGUMENT ............................................................................................................14

    I.     The Plaintiff Cannot Rely On Citations To Inadmissible Evidence To Establish Liability As A Matter Of Law Against Lt. Mears .................................................14

    II.    The Plaintiff Cannot Be Awarded Summary Judgment As The Record Clearly Establishes That The Plaintiff Does Not Have An Actionable Constitutional Claim And Lt. Mears Is Entitled To Judgment As A Matter of Law ..................16

        A.     Balas' speech is not protected under the First Amendment......................17

        B.     The plaintiff has produced no evidence to establish that the decedent suffered an adverse employment action....................................................19

        C.     The record establishes that there is no causal connection between any action of Lt. Mears and decedent's alleged protected activity...................23

        D.     Lt. Mears would have taken the same actions absent the alleged protected activity of decedent.....................................................................................27

            1.     The defendants have not waived their right to assert the *Mount Healthy* defense..........................................................................27

            2.     Lt. Mears would have taken the same actions absent the alleged protected conduct.........................................................................29

    III.    The Decedent Did Not Petition the Government...................................................30

CONCLUSION.........................................................................................................33

i

## TABLE OF AUTHORITIES

**Case Name**                                                                                                                                  **Page**

*Baldassare v. New Jersey,* 250 F.3d 188 (3d Cir. 2001) ...............................................................17

*Batiste v. Burke,* 746 F.2d 257 (5th Cir. 1984) ............................................................................28

*Blackburn v. United Parcel Serv., Inc.,* 179 F.3d 81 (3d Cir. 1999) ...........................................14

*Bouriez v. Carnegie Mellon Univ.,* 2005 WL 2106582 (W.D. Pa. Aug. 26, 2005)......................14

*Bradshaw v. Twp. of Middletown,* 296 F.Supp.2d 526 (D.N.J. 2003),
    *aff'd* 1556 Fed. Appx. 763 (3d Cir. 2005) ...........................................................................19

*Brennan v. Norton,* 350 F.3d 399 (3d Cir. 2003).........................................................................17

*Brinkley v. Harbour Recreation Club,* 180 F.3d 598 (4th Cir. 1999)........................................28

*Celotex Corp. v. Carter,* 477 U.S. 317 (1986) .............................................................................14

*Charpentier v. Godsil,* 937 F.2d 859 (3d Cir. 1991).....................................................................27

*Coszalter v. City of Salem,* 320 F.3d 968 (9th Cir. 2003)..........................................................23

*Farrell v. Planters Lifesavers Co.,* 206 F.3d 271 (3d Cir. 2007)..................................................24

*Foraker v. Chaffinch,* 501 F.3d 231 (3d Cir. 2007)......................................................................18

*Garcetti v. Ceballos,* 547 U.S. 410, 126 S.Ct. 1951 (2006) ............................................17, 18, 19

*Glass v. Snellbaker,* 2007 WL 1723472 (D.N.J. June 14, 2007)..................................................19

*Green v. Philadelphia Housing Authority,* 105 F.3d 882 (3d Cir. 1997) .....................................16

*Haynes v. City of Circleville,* 474 F.3d 357 (6th Cir. 2007) ......................................................18

*Hill v. City of Scranton,* 411 F.3d 118 (3d Cir. 2005) .................................................................16

*Hoffman v. Dougher,* 2008 WL 148877 (M.D. Pa. Jan. 14, 2008)...............................................24

*Johnson v. Zerbst,* 304 U.S. 458 (1938) ......................................................................................29

*Killen v. N.W. Human Servs., Inc.,* 2007 WL 2684541 (E.D. Pa. Sept. 7, 2007) .........................24

*Kleinknecht v. Gettysburg College,* 989 F.2d 1360 (3d Cir. 1993) ..............................................27

*Mills v. City of Evansville, Ind.,* 452 F.3d 646 (7th Cir. 2006)........................................................18

*Mount Healthy Cty. Sch. Dist. Bd. Of Educ. v. Doyle,* 429 U.S. 274 (1977).........16, 17, 23, 27, 29

*Philbin v. Trans Union Corp.,* 101 F.3d 957 (3d Cir. 1996) ...........................................................14

*Price v. Chaffinch,* 2006 WL 1313178 (D.Del. May 12, 2006) ....................................................28

*Pro v. Danatucci,* 81 F.3d 1283 (3d Cir. 1996) ............................................................................27

*Proctor v. ARMDS,* 2006 WL 3392932 (D.N.J. Nov. 21, 2006) ...................................................14

*SanFilippo v. Bongiovanni,* 30 F.3d 424 (3d Cir. 1994)................................................................30

*Shankle v. Bell,* 2006 WL 2794559 (W.D. Pa. Sept. 27, 2006) ....................................................26

*Shellenberger v. Summit Bancorp., Inc.,* 318 F.3d 183 (3d Cir. 2003) .........................................24

*Smith v. Central Dauphin Sch. Dist.,* 511 F.Supp.2d 460 (M.D. Pa. 2007) .................................27

*Sporn v. Ocean Colony Condo. Ass'n,* 173 F.Supp.2d 244 (D.N.J. 2001) ....................................26

*Turiano v. Schnarrs,* 904 F.Supp. 400 (M.D.Pa. 1995)................................................................27

*Williams v. West Chester,* 891 F.2d 458 (3d Cir. 1989) ...............................................................14

## **OTHER AUTHORITIES**

First Amendment of the United States Constitution............................................................. *passim*

F.R.C.P. Rule 8(c)...............................................................................................................27, 28

F.R.C.P. Rule 56(e)..................................................................................................................14

F.R.E. Rules 801 - 807.............................................................................................................14

## <u>NATURE AND STAGE OF THE PROCEEDINGS</u>

This is a civil survival action brought by the widow of a correctional officer who committed suicide on February 19, 2005 after the plaintiff confronted him about an extramarital affair. The plaintiff's lawsuit, filed on September 25, 2006, is based on allegations of so-called "retaliation" said to have been directed to the decedent from September 26, 2004 until his death. She attempts to link this conduct to the resignations of the decedent and nine other correctional officers from a voluntary unit within the Department of Correction on August 6, 2004. Her claim is that the decedent was bothered by supposed problems at work, rather than the ongoing affair and other personal problems he experienced in the Winter of 2004-2005. The Complaint attempts to link routine employment issues with the resignation. She seeks to recover damages for the alleged actions of the defendants up to the time of death. No wrongful death action has been filed, and any such claims are now barred.

Discovery has yielded facts from depositions of the plaintiff and the defendants, and various other employees (and a former employee) of the Department of Correction. The defendants have produced the affidavit of Warden Deloy as to the Department of Correction's annual performance evaluation process and criteria. The plaintiff has produced suicide notes and other material attributed to the decedent, but has failed to produce evidence in support of her claims that would be admissible at trial.

The defendants have filed a motion for summary judgment as to all claims asserted by the plaintiff. The plaintiff has filed a motion for partial summary judgment. This is the defendants' answering brief in opposition to the plaintiff's motion.

## SUMMARY OF THE ARGUMENT

The emotional and psychological problems experienced by the decedent in the Winter of 2004-2005 were attributable to his personal life, and not his job, his supervisor, or his resignation from the CERT unit in August of 2004.  The decedent committed suicide immediately after his wife, the plaintiff here, learned of his extramarital affair and confronted him about it.  The affair began in the Summer of 2004, and continued until the woman involved broke it off in early 2005.  In the weeks before his suicide, the decedent had become increasingly traumatized over his personal life, and had taken emergency leave from work to spend time with his wife.  His sole focus was his marriage, his family, and the extramarital relationship.

By all accounts of those involved, the CERT resignations in August did not result in any adverse consequences for the ten officers who resigned.  Decedent's problems at work in the summer and Fall of 2004 were nothing more than routine employment issues.  The decedent disputed a rating of "meets expectations" on his annual evaluation (without reading it or the attached documentation), even though he had received that rating at least twice previously.  The plaintiff's other complaints: as to timecards, a supposed transfer request, a purported grievance, and vacation records, are not supported by competent evidence in the record.  An employee who complains of monitoring by a supervisor does not state a constitutional claim.

For the reasons set forth in the Defendants' Motion for Summary Judgment and the Brief in support thereof, the defendants are entitled to summary judgment as to all claims asserted by the plaintiff in her survival action.

## STATEMENT OF FACTS

### A.    Balas' Suicide

John Balas committed suicide by shooting himself at home on the morning of Saturday, February 19, 2005.  The plaintiff, Cindy (Balas) Adkins, made entries on a calendar after her husband's death, reflecting the tragic chain of events leading up to his suicide.  Her entry for February 19 reads as follows:  "Found out John cheated from Tina.  Confronted him.  He killed himself."[1]  On the morning of February 19, 2005, Cindy had learned from Tina Foskey that John had been involved in an affair with Jennifer (Cox) Weldon.  Up until that moment, Cindy had been unaware of the relationship.[2]  Cindy immediately confronted her husband, and he admitted that he had been cheating on her.  He then said "I have got one job to finish".  He went to the barn, obtained a hidden gun, and shot himself.[3]

### B.    Events Leading Up to the Suicide

On the afternoon before his suicide, Balas had a rollover accident in his truck, with his son Jonathon along.  He was injured and received medical treatment.  Balas had been taking medication since February 15, but was told at the emergency room to quit taking it until he saw his family doctor.[4]  The truck looked demolished, but was drivable.[5]  Cindy told Jeff Foskey and Lee Mears, two of John's closest friends, about it.[6]

That night (Friday), Balas left several voice messages with Jennifer, who was still trying to remove herself from the relationship.  She spoke to him after he wrecked his truck and his

---

[1]  A66; A57 (Adkins Exhibit 6 at 2; Adkins at 133).
[2]  A147-149; 54-56 (L. Mears at 47-49; Adkins at 130-132).
[3]  A57-60 (Adkins at 133-136).
[4]  A53 (Adkins at 124).
[5]  A48 (Adkins at 116).
[6]  A144-145 (L. Mears at 44-45).

speech was very slurred.  She asked him if he had been drinking.  She spoke to him again the next morning, but the conversation ended when he was interrupted and hung up.[7]

On Thursday, February 17, 2005, two days before Balas' suicide, Jennifer had spoken to Deputy Warden Michael Deloy at the Sussex Correctional Center about John Balas.  She divulged that she had been romantically involved with Balas, had just broken up with him, and was afraid he might hurt himself.  Deloy then told Warden Kearney, and they determined that Balas had been given vacation and would be off work until the following week.  They decided that they would handle the matter when Balas returned to work.[8]

## C.    The Extramarital Affair

Balas had originally approached Jennifer, who worked at SCI for a medical contractor, in late August of 2004, as a "secret admirer".  They met and began an affair in September.[9] Jennifer first tried to end the affair in December of 2004, due to Balas' personal problems.[10] However, Balas and Jennifer kept in contact by telephone after that.  He used a cell phone that she had provided for him.[11]  These conversations were of a personal nature, and not about work.

While hunting in November of 2004, Balas had told his close friend Lee Mears that he had a "girlfriend", Jennifer, who worked at the jail.  Balas later told Lee that he loved Jennifer and that things had gone back and forth until late January of 2005, when she broke off the relationship because Balas would not leave his wife.[12]  However, Lee was aware that, after that, Balas continued to have contact with Jennifer.

---

[7]  A211 (Weldon at 16).
[8]  A77-85 (Deloy at 60-63, 65-68, 70).
[9]  A202 (Weldon at 6).
[10]  A203 (Weldon at 7).
[11]  A49-51 (Adkins at 118-120).
[12]  A133-136 (L. Mears at 33-36).

### D.    <u>Intervention and Bay Health Visit</u>

On January 29, 2005, Lee Mears found Balas drunk, with a gun in his lap, and very depressed after calling Jennifer from a pay phone.  He told Lee that he (Balas) "would not be around in the morning".[13]  After staying up with John all night, Lee, Jeff  Foskey, and Cindy took Balas to Dover for a psychiatric evaluation.[14]  He was seen by a counselor and released.  When they returned, Foskey and Lee Mears removed all of Balas' guns from the house.[15]  Later that day, Balas and Lee Mears discussed the affair, whether his wife was aware of it, and the need to end it.  Balas called SCI and arranged to take time off from work.[16]

### E.    <u>Attempted Reconciliation with Cindy</u>

Balas' last day at work at SCI was February 13, 2005.  During the week before his death, he was spending time with his wife, including a visit to Cabela's in Pennsylvania.  This was an effort to repair the damage done to Balas' marriage.  However, during this time he continued to be in contact with Jennifer.  His behavior was erratic.  It is apparent that Balas' focus at this critical time was not on work issues, or the union action half a year before, but on the personal crisis brought on by the deterioration of his marriage and the end of his affair.  As set forth in the analysis of Balas' state of mind prepared by Neil S. Kaye, M.D. on behalf of the defendants:

> "This unfortunate decision to end his life was unrelated to any work issues….
> Neither the suicide itself, nor any depression leading up to his choice to kill
> himself was a product of his September 2004 work performance evaluation or
> disputed time cards, nor were any mental health issues he might have evidenced
> in 2004 or 2005 related to his job as a Correctional Officer (CO) for DOC….
> There is no evidence of workplace retaliation in terms of assignments, shifts,
> salary, requests for time off, demotions, transfers, etc.  Rather, other non-work
> related stressors including his marital problems, extramarital affair, concerns over
> inter-familial relationships, his own alcoholism, probable concussion, underlying

---

[13]   A136-138 (L. Mears at 36-38).
[14]   A108-113; A36 (Foskey at 41-46; Adkins at 96-104).
[15]   A113; A45 (Foskey at 46; Adkins at 109).
[16]   A138-143; A47 (L. Mears at 38-43; Adkins at 114).

personality, feelings of rejection and abandonment and shame all contributed to his decision to take his life."[17]

F.   **Balas' Evaluation**

Balas worked in the receiving or property room at SCI, processing inmates newly committed to the institution, handling inmates to be transferred or released.[18]  His job performance was very good for a number of years.  Beginning early in 2004, there was a change and his performance dropped, not drastically, but the problems were documented in the evaluation.[19]

In early 2004, Balas and Jeff Foskey had helped Lt. Truman Mears with QRT (Quick Response Team) training.  During the training, Balas would constantly come in late, want to leave early, or need the night off.  This created a burden for Lt. Mears and Foskey to train some three hundred officers.  Major Townsend and Deputy Warden Deloy determined that Balas would not be involved in the training in the future.[20]

Lt. Mears, Balas' supervisor, felt that it was important first to communicate with employees whose work performance was affected by problems in their lives.  "You would ask them - - you would bring to their attention the deficiencies in their work and ask them if there is something causing this that I don't know about, and is there anything we can do to help."[21]  Such informal counseling is not reflected in the employee disciplinary file, unless it becomes a continuing issue that needs to be addressed.[22]  Problems with purely voluntary activities such as QRT training and CERT (Corrections Emergency Response Team) deployments would not

---

[17]  B46-47 (Neil S. Kaye, M.D. letter to counsel dated 12/20/07)
[18]  A152-153 (T. Mears at 55-58).
[19]  A153 (T. Mears at 59-61).
[20]  A161-162 (T. Mears at 99-105).
[21]  B16 (T. Mears at 20).
[22]  A160 (T. Mears at 94).

normally be noted in the personnel file.[23]  When Sgt. Cassase, the officer in charge of the property area, approached Lt. Mears concerning problems with Balas' performance in the property room, these conversations were not documented in Balas' personnel file, because Lt. Mears felt that Balas could "pull out of it" and bounce back.  Mears did not want "negative stuff" in Balas' file, hoping the problem had been solved, informally.[24]

On September 26, 2004, the decedent received his annual performance evaluation from Lt. Mears, his supervisor.  The evaluation included a rating of "Meets Expectations" and reads: "In light of the rest of Corporal Balas' performance I do not feel that perfect attendance alone, although commendable, is enough to justify exceeds."[25]  In an attachment, Lt. Mears listed the reasons for the rating of "Meets Expectations": the problems with QRT training, the lack of CERT membership, and complaints from Sgt. Cassase concerning Balas' poor work performance, poor attitude, and unwillingness to get along with staff.[26]  The evaluation, including the rating, had no effect on Balas' rank, compensation, or job assignment.[27]

The plaintiff characterizes this rating as a "poor performance evaluation",[28] but has presented no facts to support that theory.  According to the affidavit of Warden Deloy, attached hereto,[29] such a rating does not reflect poorly on the employee.  A negative rating would be "Needs Improvement" or "Unsatisfactory".  A majority of the evaluations done by supervisors at SCI contain the "Meets Expectations" rating.  A rating of 'Meets Expectations' does not

---

[23]  A162, B17 (T. Mears at 102, 162-164).
[24]  A175-176 (T. Mears at 168-171).
[25]  A229; A171 (Wilkinson at 93; T. Mears at 146-148).
[26]  A186; A175-176 (T. Mears Exhibit #11 at 3; T. Mears at 167-170).
[27]  A132 (L. Mears at 30).
[28]  P. Op. Br. at 11.
[29]  A1-2 (Deloy Affidavit)

adversely impact an employee's assignments, shifts, salary, requests for time off, transfers, opportunity for advancement, or any other benefit.

The plaintiff alleges,[30] without support, that the decedent had, prior to his resignation from CERT, "consistently received" ratings of "Exceeds Expectations", and claims that this was "his first ever" reduced rating.[31]  Those statements are false.  In fact, Balas had received prior ratings of "Meets Expectations" in 1996 and in 1998.  It is noteworthy that those ratings were given by supervisors other than Lt. Mears.  The plaintiff has made no showing that such acceptable ratings adversely affected the decedent in any way.[32]  She admits that her husband at no time lost salary, vacation time, promotion, or other economic loss.[33]

Balas refused to even look at the evaluation, and would not sign to acknowledge that he had received it.  "It's not an exceeds, I don't want it".[34]  He refused to meet with his supervisor, Lt. Mears, to review it.  Lt. Mears told Balas that he could have a copy of the evaluation, after he sat down and discussed it.[35]  Balas refused to cooperate.  Lt. Mears eventually turned in the evaluation, with an attachment explaining Balas' refusal to meet and discuss (or sign) it.[36]

Major Wilkinson recalled that, after he had signed off on the evaluation, Balas spoke to him about his disappointment or dissatisfaction that he did not receive a rating above "meets expectations".[37]  Balas thought that Lt. Mears was going to 'screw him' on the evaluation because he quit CERT.  He asked Wilkinson to be present for discussion of the evaluation with

---

[30]  A261 (Complaint ¶¶60, 62).
[31]  P. Op. Br. at 11.
[32]  The plaintiff admitted at her deposition that she was unaware of the prior ratings of "Meets Expectations".  A17-21 (Adkins at 32-35).
[33]  A63-64 (Adkins at 143-144).
[34]  A172-173 (T. Mears at 151-154).
[35]  A178 (T. Mears at 182).
[36]  A174, A179 (T. Mears at 158-159, 187).
[37]  A217-218, A220, A245 (Wilkinson at 53-54, 62, 115).

Lt. Mears and Wilkinson readily agreed to be there and to arrange a conference.[38]   Several attempts, initiated by Lt. Mears, were made to set up a meeting, but it had not happened yet due to vacations and conflicting schedules.[39]   After Balas learned that the evaluation had been submitted, he called Wilkinson at home, upset that Lt. Mears had forwarded the evaluation up the chain of command, and Wilkinson promised to "take care of it".  At his request, the Warden retrieved the evaluation a day or two later, and Wilkinson attempted to again set up the meeting with Lt. Mears and Balas.[40]   Balas committed suicide several days later.[41]

### G.    Grievance Form

Lee Mears recalled that Balas talked about filing a grievance over sick leave or his attendance record, but he never saw any such document.[42]   Balas mentioned to Jeff Foskey that he was filing a grievance over his time cards, but Foskey never heard anything more about it. Balas did not mention filing a grievance over his performance evaluation.[43]   Jennifer Weldon recalled Balas mentioning a grievance over dissatisfaction with his performance evaluation, but he never mentioned how it was ultimately resolved.[44]   Major Wilkinson was not familiar with the grievance form supposedly filed by Balas.[45]   Lt. Mears was not aware of any grievance filed by Balas as a result of his evaluation.[46]   The plaintiff claims that in the fall of 2004 Balas mentioned

---

[38]  Lt. Mears had "no problem" with that.  A219, A221 (Wilkinson at 57, 65).  A227-228, A246 (Wilkinson at 78-79, 116).
[39]  A219, 224, 246 (Wilkinson at 57, 69, 116).
[40]  A222-223 (Wilkinson at 67-68).
[41]  A222-224 (Wilkinson at 67-69).
[42]  A122-124 (L. Mears at 13-15).
[43]  A105-106 (Foskey at 38-39).
[44]  A206-207 (Weldon at 10-11).
[45]  A230-234 (Wilkinson at 98-102).
[46]  A173-174 (T. Mears at 157-158).

filing a grievance about "retaliation" for resigning from CERT. But she found the grievance forms among her husband's papers after his death.[47]

Officer Michael R. Ackenbrack, the COAD union shop steward, could not recall talking to Balas about his grievance directed at the performance evaluation.[48] He testified that he would have given Balas a form to complete. He could not remember signing the form, although he recognized his signature.[49] He kept the first page, after Balas completed the top area with basic information, and gave Balas the second page to complete. It was up to Balas to complete the second page and submit it. Ackenbrack did not follow up with Balas, and Balas never gave him any documents back to file. Ackenbrack did not tell anyone else about the grievance, due to confidentiality. He has no idea whether Balas actually filed the grievance.[50] The union, COAD, has no record of this grievance,[51] and there is no evidence that this grievance, or any other grievance, was ever filed by John Balas.

### H.    Routine Employment Issues

The DOC allows employees to take planned or scheduled vacation days, and also to request emergency vacation days when necessary. The only difference between the two is that a regular vacation day is pre-scheduled and an emergency vacation day is a last minute request of the employee. Emergency vacation days are not frowned upon and they do not adversely impact an employee or their employment status.[52] Lt. Mears routinely recorded emergency vacation days for all employees he supervised.[53]

---

[47]  A24-28 (Adkins at 55-59).
[48]   A4 (Ackenbrack at 15)
[49]  A5 (Ackenbrack at 22).
[50]  A6-12 (Ackenbrack at 24-30).
[51]  B48 (P834)
[52]  A2, A180-181 (Affidavit of Warden Mike Deloy at ¶4; T. Mears at 192-194).
[53]  A181 (T. Mears at 195).

At the end of the year, supervisors total each employee's time cards, they are audited, and then copies are given to the officers. Early in 2005, Balas requested his 2004 time card, and Lt. Mears immediately gave it to him.[54]

After Balas spoke to Major Wilkinson about his issues with the notations on the time cards, Major Wilkinson ordered Lt. Mears to change them, in order to "shut John up". [55] Lt. Mears had explained that time cards for all the employees were marked in the same way, based on the rosters, indicating "emergency vacation".

Balas never asked Major Wilkinson for a transfer.[56] He never asked Lt. Mears for a change in supervisor or a transfer to a different assignment within the institution.[57] Deputy Warden Deloy felt that Balas wanted him to remove Lt. Mears as his supervisor. This was based on the "Meets Expectations" rating that Balas received in his evaluation. There were no complaints from Balas to Deloy of "harassment". [58]

### H.    The CERT Resignations

John Balas had volunteered to serve on the Correctional Emergency Response Team ("CERT") team at the Sussex Correctional Institution (SCI). The CERT team is a tactical unit called upon to handle everything from shakedowns to escapes.[59] Participation in CERT is purely voluntary on the part of the individual officer, and cannot be compelled by supervisors. Members who respond to CERT activations may find this reflected in a favorable way on an evaluation, but leaving CERT would not be a negative, unless discipline was involved.[60] Balas'

---

[54]  A179 (T. Mears at 186).
[55]  A235-236; A181 (Wilkinson at 103-104; T. Mears at 195-196).
[56]  A238 (Wilkinson at 106).
[57]  A182 (T. Mears at 198-199).
[58]  A74-76 (Deloy at 53-55).
[59]  A153-154 (T. Mears at 61-62).
[60]  A156 (T. Mears at 74-76).

record while on CERT was "shaky".  He was twice removed for failure to respond to activations, in 2001 and 2003.[61]  Lt. Truman Mears, also a CERT member, was not involved in either incident, both of which were handled by CERT headquarters.

Several SCI CERT members were activated on August 5, 2004.  CERT members, including Balas, met at the home of Lee Mears to discuss the activation.[62]  They had been tasked to transport inmates to and from court, to replace other DOC officers who had refused to work overtime.  The activation was unpopular.  No one wanted to break the "job action" of the Court & Transportation Unit.  Following much discussion, the CERT members agreed to report the following day.  After leaving the meeting, Lt. Mears, as team leader, called CERT command, either Major Hall or Major Radcliffe.  He reassured them that the team would respond, even though no one wanted to do the mission, under the circumstances.

On the next day, August 6, 2004, the CERT officers who were activated, reported for duty at SCI.  They were criticized by fellow officers as "strike-breakers".[63]  Scott Bradley, one of the team members, contacted Major Hall to complain about the assignment.  After the CERT shift was over, ten CERT members collectively went to Warden Kearney's office and resigned from CERT.[64]  The resignations took place in private, within the confines of the Warden's Office.  There is no record of public statements by any of those who resigned.  The resignations did not constitute a "strike" or a "job action", as participation in CERT was voluntary.  None of the officers who resigned was ever disciplined in any way.  Each returned to his job assignment at SCI without interruption.

---

[61]  A153-155 (T. Mears at 61-67).
[62]  A125-126; A89-94 (L. Mears at 18-19; Foskey at 20-25).
[63]  A126-128; A95-96 (L. Mears at 19-20, 22; Foskey at 26-27).
[64]  A167-169; A96-101 (T. Mears at 124-130; Foskey at 27-32).

After the resignations, Balas refused to speak to Lt. Mears, his supervisor, with whom he had gone duck-hunting in the past.[65]  Curiously, he never complained to Foskey, his brother-in-law, co-worker, and another CERT team member who resigned, about Lt. Mears.[66]  Lee Mears felt that he got a "cold shoulder" from the administration after resigning, but he suffered no adverse consequences at work.  He is not aware of any CERT officers who resigned, other than Balas, who experienced that; nor were any, including Balas, denied a raise, transfer, or promotion.[67]  Foskey was never treated any differently.[68]  After co-workers learned of the resignations, their attitude was completely different.  They appreciated what the CERT members had done, and were sorry they had to do it.[69]

---

[65]  A152 (T. Mears at 54).
[66]  A102 (Foskey at 33).
[67]  A117-120, A129 (L. Mears at 8-11, 23).
[68]  A103 (Foskey at 34).
[69]  A129-130 (L. Mears at 23-24).

## ARGUMENT

### I. The Plaintiff Cannot Rely On Citations To Inadmissible Evidence To Establish Liability As A Matter Of Law Against Lt. Mears

The plaintiff, in her Opening Brief in Support of her Partial Motion for Summary Judgment ("Plaintiff's Opening Brief"), routinely relies on evidence that is not competent and admissible for purposes of summary judgment or trial. This evidence should not be considered by the Court, and the plaintiff is not entitled to judgment as a matter of law against Lt. Mears based on inadmissible evidence.

"Argument supported by hearsay, not admissible at trial, cannot be considered on a motion for summary judgment." *Philbin v. Trans Union Corp.*, 101 F.3d 957, 961 (3d Cir. 1996). At the summary judgment stage, hearsay evidence should not be considered unless the party offering the evidence can establish either that it can be reduced to a form that is admissible at trial or that it is not inadmissible hearsay under the Federal Rules. *Celotex Corp. v. Carter,* 477 U.S. 317, 327 (1986); *Williams v. West Chester*, 891 F.2d 458, 466 n. 12 (3d Cir. 1989); *Blackburn v. United Parcel Serv. Inc.,* 179 F.3d 81, 95 (3d Cir. 1999); Fed. R. Civ. P. 56(e); Fed. R. Evid. 801 – 807. The "mere possibility that a hearsay statement will be admissible at trial, does not permit its consideration at the summary judgment stage." *Bouriez v. Carnegie Mellon Univ.,* 2005 WL 2106582, *9 (W.D. Pa. Aug. 26, 2005); *Proctor v. ARMDS,* 2006 WL 3392932, *4 (D.N.J. Nov. 21, 2006).

Throughout the plaintiff's Opening Brief, the plaintiff repeatedly cites to her Interrogatory Response #3, hearsay portions of her deposition testimony, portions of other hearsay testimony, and handwritten notes attributed to the decedent, as evidence in support of her claims. The Interrogatory Response, hearsay writings, and hearsay portions of the depositions are not admissible evidence that can be used by the plaintiff to prove her case. It would be

14

patently unfair and prejudicial to the defendants to allow this "evidence" to be used for purposes of summary judgment or trial.

Interrogatory Response #3 is an approximately thirty page essay, presumably written by the plaintiff's counsel, that is essentially a summary of the Complaint. No sources are indicated. It is rhetoric and argument and it is not supported by factual evidence. Moreover, it is verified by the plaintiff who clearly testified in her deposition that she has no personal knowledge of any of the allegations in the Complaint.[70]

The decedent's notes, the plaintiff's testimony of what her husband told her, and hearsay portions of any other testimony used in support of the plaintiff's motion for summary judgment are not competent admissible evidence. The defendants cannot depose John Balas and cannot cross-examine him at trial. As the plaintiff testified, she has no way of knowing whether what her husband told her was factually correct or complete:

> Q:    So is any of the information that you know or that you gave for drafting the complaint, does that come through John?
>
> A:    He had discussed it with me, yes.
>
> Q:    Other than the information that you got from John, did you personally get information from anywhere else?
>
> A:    No.
>
> Q:    How do you know if the information that you got from John is complete and/or accurate?

---

[70]  A16 (Adkins at 30).

A:     I don't know that.  Just from the – I found when I was cleaning out his closet the

bag that he had all of this stuff.  And actually, he was thinking about filing a

lawsuit himself, and I think that's why he had it all together in a bag.[71]

Moreover, as the plaintiff admitted, her husband was not honest with her in the months

before his death.  Indeed, he was routinely lying to her.[72]  It would be unfair and prejudicial to

the defendants to allow this unreliable hearsay evidence to be used against them for purposes of

summary judgment or for purposes of trial.

Lt. Mears, or any of the defendants, cannot be held constitutionally liable based on this

unsupported hearsay evidence.  The interrogatory response, the hearsay writings attributed to

Balas, the testimony of the plaintiff as to what her husband told her, and any other hearsay

testimony cannot be used by the plaintiff for the purposes of proving her case.  Any citation to

them by the plaintiff should not be considered by the Court.

## II.     The Plaintiff Cannot Be Awarded Summary Judgment As The Record Clearly Establishes That The Plaintiff Does Not Have An Actionable Constitutional Claim And Lt. Mears Is Entitled To Judgment As A Matter of Law

A "well-established" three-step approach is used by the courts when analyzing a First

Amendment retaliation claim.  *Hill v. City of Scranton*, 411 F.3d 118, 125 (3d Cir. 2005); *Mount*

*Healthy Cty. Sch. Dist. Bd. Of Educ. v. Doyle*, 429 U.S. 274, 287 (1977).  The plaintiff must

establish: 1) that the activity in question is protected by the First Amendment; 2) the "protected

activity was a substantial factor in the alleged retaliatory action"; and 3) the defendants can rebut

a prima facie case of retaliation by "demonstrating that the same adverse action would have

taken place in the absence of the protected conduct."  *Hill*, 411 F.3d at 125 (citations omitted);

*See also Green v. Philadelphia Housing Authority*, 105 F.3d 882, 885 (3d Cir. 1997).

---

[71]  A16 (Adkins at 30).
[72]  A57 (Adkins at 133).

The plaintiff asks this Court to find as a matter of law that Lt. Mears retaliated against the decedent because the decedent engaged in protected activity.  As thoroughly documented and argued in the Defendants' Opening Brief in Support of their Motion for Summary Judgment ("Defendants' Opening Brief"), the decedent did not engage in any protected conduct and he did not suffer any adverse employment action.  The employment action that is alleged to be adverse is either wholly unsupported by any evidence or was not an adverse action at all.  Further, these alleged adverse employment actions have no causal connection to any of the alleged protected activity.  Finally, the defendants in their responsive pleading have denied that the evaluation was an "adverse action" and have preserved the *Mt. Healthy* defense and the argument that any action taken by Lt. Mears would have been taken regardless of the alleged protected activity.

Perhaps in an effort to bolster a weak retaliation case or to sensationalize an ordinary employment dispute, the plaintiff has completely inundated the Court with inflammatory and inadmissible information that is not relevant to the allegations in the Complaint.  Despite the plaintiff's efforts to distract the Court, this case is about a dispute between Lt. Mears and Cpl. Balas about Balas' annual performance evaluation, nothing more and nothing less, and certainly not an actionable Constitutional claim.

**A.**    **Balas' speech is not protected under the First Amendment.**

The First Amendment protects a public employee's right, under certain circumstances, to speak as a citizen on matters of public concern.  *Brennan v. Norton*, 350 F.3d 399, 412 (3d Cir. 2003)(citing *Baldassare v. New Jersey*, 250 F.3d 188, 194 (3d Cir. 2001).  This protection does not extend to public employees when the speech is made pursuant to their official duties. *Garcetti v. Ceballos*, 547 U.S. 410, 126 S.Ct. 1951. 1957 (2006).

After *Garcetti*, the First Amendment legal landscape has significantly changed, and an initial inquiry of whether the speech was made pursuant to work duties must be made by the Court.  This is a practical inquiry and it is not dependent on or limited by the duties outlined in an employee's formal job description.  *Id* at 1962.  Further, the fact that an employee speaks privately, while not conclusive as to whether the speech is within the scope of his or her job duties, is indicative.  *Foraker v. Chaffinch,* 501 F.3d 231, 241 (3d Cir. 2007)(citing *Haynes v. City of Circleville*, 474 F.3d 357 (6th Cir. 2007)(employee's communication solely to his supervisor indicated that he was speaking as a public employee); *Mills v. City of Evansville*, *Ind.*, 452 F.3d 646, 648 (7th Cir. 2006)(the fact that the employee was on duty, in uniform, and spoke with superiors all indicated she spoke in capacity as public employee).

Any speech or conduct, including the resignation, by the decedent was connected to his employment duties with CERT and the decision of some of the CERT members to resign.  The CERT members spoke in a private meeting the night before the resignation[73] and in an internal meeting with the Warden on August 5, 2004.  This speech and conduct was directed solely to other CERT members and to the Warden at SCI.  The activation was unpopular and the CERT members expressed their disdain for management's decision to activate CERT and go against the C & T officers' decision not to work overtime.[74]  However, unlike the C & T officers, the CERT members did not go out on "strike" or engage in any job action.  They merely resigned, with due notice, from further participation in a purely voluntary work-related activity.  The speech was

---

[73]  While the plaintiff asserts that the decedent "debated" Lt. Mears, there is absolutely no evidence to support this claim.  The testimony of correctional officers who were at the meeting is that there was an open discussion about the activation and many officers expressed their opinions.  Lt. Mears did not feel that the officers should quit and the decedent thought that they should.  There is no evidence that they "debated" as asserted by the plaintiff.  *See* B2, A125, A166 (Adams at 13; L. Mears at 18; T. Mears at 119).

[74]  B2, 3; A165 (Adams at 11, 17; T. Mears at 115).

related to whether or not the CERT members agreed with their supervisor's decision to activate them, whether or not they would work the activation, and whether they would resign, all work-related decisions. This is precisely the type of work related speech that is not protected under the First Amendment after *Garcetti*.

While the decedent's right to associate with his union is protected under the First Amendment, to state a claim under § 1983, the plaintiff "must allege instances of union activity for which they were retaliated against by persons acting under color of state law." *Glass v. Snellbaker*, 2007 WL 1723472, at *5 (D.N.J. June 14, 2007)(citing *Bradshaw v. Twp. of Middletown*, 296 F.Supp.2d 526, 544 (D.N.J. 2003), *aff'd* 1556 Fed. Appx. 763 (3d Cir. 2005). There is no evidence that the decedent was actively engaged in any union activity, advocated on behalf of the union, or that he ever spoke to the media or any other public outlet as a union member. Further, there must be some causal connection between his union membership and retaliatory conduct and, as discussed below, there is not.

Decedent's work-related speech in connection with the activation decision is not protected speech under the First Amendment. Decedent's membership in the union alone is insufficient protected conduct to establish a First Amendment retaliation claim absent any evidence that he advocated for the union, or any evidence of adverse action or causation. The plaintiff is not entitled to judgment as a matter of law.

**B.     The plaintiff has produced no evidence to establish that the decedent suffered an adverse employment action.**

The plaintiff cannot be awarded summary judgment because she has not provided any evidence that the decedent sustained an adverse employment action. The conduct is not constitutionally actionable, either individually or collectively, and is not sufficient to deter a person of ordinary firmness from exercising their rights.

The plaintiff's repeated assertion that Lt Mears gave "plaintiff his first ever poor performance evaluation" and that it was "just a passing grade" is completely unsupported by the record.[75]  As thoroughly argued and documented in Defendants' Opening Brief, this was a good evaluation and a rating that the plaintiff had received twice in the past.  This was the rating received by the majority of officers within the institution.[76]  The plaintiff argues that to an officer like plaintiff "who took great pride in his work performance," this evaluation was the equivalent of a failing grade.  However, a First Amendment claim is actionable only if it deters a "person of ordinary firmness" from exercising their rights, and liability cannot be based on the decedent's inadmissible subjective belief that he felt it was a "failing grade."[77]

There was also no harm in Lt. Mears' decision to consider, as a factor in the evaluation, that the plaintiff was no longer a member of CERT.  Participation in CERT can be reflected in a favorable way on an evaluation, but leaving CERT would not be a negative, unless discipline was involved.[78]  As Lt. Mears testified, CERT was an "above and beyond" voluntary duty taken on by officers and, as such, can be used to positively impact an evaluation and bring an officer to the infrequently-given rating of "exceeds expectations."  The evidence is that Balas' participation in CERT had been "shaky" at times in the past, although he was nevertheless commended for his service.  As a result of his resignation, he would simply lack such a basis for "extra credit" for voluntary contributions beyond his job.

---

[75]  P. Op. Br. at 11.
[76]  A1-2 (Deloy Affidavit).
[77]  P. Op. Br. at 11.
[78]  A156 (T. Mears at 74-76).

The decedent refused to ever even look at the evaluation,[79] After several attempts to get the decedent to review the evaluation and several refusals by the decedent to do so, Lt. Mears submitted his evaluation, indicating (accurately) that he refused to sign it.[80]

The decedent was also never denied a meeting.  All parties, including Lt. Mears,[81] had always agreed to have the meeting and Lt. Mears made several efforts to schedule the meeting, it just had yet to be arranged due to scheduling conflicts and vacations.[82]  The officers were still working on scheduling the meeting when the decedent committed suicide.[83]

The plaintiff asserts that the decedent constantly demanded a transfer from under Lt. Mears, and was denied a transfer.  The plaintiff provides no evidentiary support to suggest that the decedent ever made this request to Lt. Mears.  There is no documentation whatsoever.  The evidence clearly establishes that the only person that the decedent spoke to about a transfer was Mike Deloy.[84]  The decedent never asked Lt. Mears for a transfer to a different supervisor.[85] Any other evidence (including the testimony the plaintiff cites to)[86] about the request for a new supervisor is based entirely on what other officers heard.[87]  Lt. Mears could not have taken any action to transfer the decedent because he was never asked to and he did not even know of the request.  Clearly, the plaintiff is not entitled to judgment as a matter of law against Lt. Mears in the absence of any admissible evidence whatsoever that the decedent requested a new supervisor from Lt. Mears.

---

[79]  A172-173, 178 (T. Mears at 151-154, 182)
[80]  A179, 174 (T. Mears at 187-188, 158-59).
[81]  A223 (Wilkinson at 68).
[82]  A219, 224, 246; A179 (Wilkinson at 57, 69, 116, T. Mears Dep. at 188)
[83]  A223 (Wilkinson at 68).
[84]  A1-2 (Deloy Affidavit).
[85]  A182 (T. Mears at 198).
[86]  P. Op. Br. at 13.
[87]  A182; A238 (T. Mears at 198; Wilkinson at 106).

Lt. Mears does not dispute that he made emergency vacation notations on the decedent's time cards, but there is no evidentiary support for the allegation that this was an adverse action by Lt. Mears against the decedent. The evidence shows that this had no effect on the decedent. The notations were made on Lt. Mears' time cards for each of the employees he supervised, and the time cards were kept for Lt. Mears' benefit only.[88] Further, the plaintiff provides no support for the allegation that Lt. Mears denied the plaintiff a copy of his time card in violation of a DOC policy. As Lt. Mears testified, the officers have no set time for totaling and distributing the timecards. When Lt. Mears completed them, he gave them to the decedent, right off of the copier.[89]

There is also no evidence to support the allegation that Lt. Mears was "excessively monitoring" the decedent, whatever this curious charge may imply. The plaintiff made these bald assertions in her Complaint and continues to make them in her summary judgment motion, but has adduced no evidence in support of her claim. Again, the plaintiff can not be granted judgment as a matter of law on a claim that is unsupported by any evidence in the record. Indeed, the lack of evidence entitles Lt. Mears to summary judgment.

Routine supervisory tasks such as monitoring employee performance, the recording of leave taken, and the preparation of annual performance evaluations cannot form the basis for an actionably adverse employment action. An employee's mere disappointment with a standard performance rating is not deserving of Constitutional protection, particularly where the employee arbitrarily bypasses the review process and refuses even to read the evaluation. This is particularly true where there is no evidence to support a purported connection between such

---

[88] The plaintiff argues that Lt. Mears noted emergency vacation days for days where the decedent did not use an emergency vacation day, but once again, the plaintiff provides no evidentiary support for this claim.

[89] A179 (T. Mears at 186).

supervisory functions and the employee's resignation from a voluntary work-related unit. The plaintiff has not provided evidence sufficient for this Court to determine that as a matter of law the decedent suffered an adverse action. The allegations are unsupported by the record and the lack of evidence precludes judgment in favor of the plaintiff.

### C.    The record establishes that there is no causal connection between any action of Lt. Mears and decedent's alleged protected activity.

The second prong of the *Mount Healthy* First Amendment analysis requires that the plaintiff establish that the alleged protected activity of the decedent was a substantial factor in the alleged retaliatory action. *Mount Healthy*, 429 U.S. at 287. Evidencing temporal proximity between the protected conduct and alleged retaliatory action, that the employer expressed opposition to the speech, or that the employer proffered explanations for the decisions that were false or pretext are various ways to demonstrate causation. *Coszalter v. City of Salem,* 320 F.3d 968, 977 (9th Cir. 2003). The arguments by the plaintiff which purportedly establish causation lack factual support in the record and legally fail.

There is an absence of temporal proximity in the record. The alleged protected conduct occurred on or before **August 6, 2004** and the first alleged retaliatory act did not occur until **September 26, 2004**, some fifty-one days later. For the reasons set forth in Argument I of the Defendants' Opening Brief, any claims of "retaliation" occurring before September 26, 2004 would be barred by the applicable limitation act. The plaintiff asserts that the evaluation was one month after the conduct.[90] This is a distortion of the record, as the evaluation was not prepared until September 26, 2004,[91] or more than seven weeks later. During those seven weeks, in the immediate aftermath of the CERT resignations, the decedent was supervised by Lt. Mears, yet

---

[90]  P. Op. Br. at 33.
[91]  A184-193 (T. Mears Ex.11)

there is no claim made of any retaliatory conduct, against Balas or any of the other ten officers who resigned, in that time period.

Further, the overwhelming testimony in the record by the CERT officers and the defendants is that, after the resignation, things quickly returned to normal within the institution and the officers who resigned were not treated any differently after the resignation.[92]  Third Circuit precedent establishes that the Court considers an employment action temporally proximate to protected conduct when it occurs within days of the conduct, not seven weeks later, with no intervening conduct. *Hoffman v. Dougher*, 2008 WL 148877 at *12 (M.D.Pa. Jan.14, 2008)(citing *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280 (3d Cir. 2007)(two days can establish causation on its own);  *Shellenberger v. Summit Bancorp., Inc.*, 318 F.3d 183, 189 (3d Cir. 2003)(ten days insufficient to establish temporal proximity unless accompanied by other evidence of wrongdoing); *Killen v. N.W. Human Servs., Inc.,* 2007 WL 2684541, at *8 (E.D. Pa. Sept. 7, 2007)(seventeen days is insufficient to establish causation).  Thus there is no temporal proximity.  Contrary to the plaintiff's litany of unrelated actions by union members and officials not affiliated with CERT, the action of the "CERT ten" was a brief storm that quickly passed.

There are no statements or admission in the record by Lt. Mears that provide support for a retaliation claim.  On the contrary, the CERT officers thought that Lt. Mears did not have a "mean bone in his body"[93] and did not feel that he harbored any bad feelings because of their resignation. [94]  He even discussed the possibility of getting back on CERT with at least one

---

[92]  A195-196; A101-103; B11; B13; A244 (Mumford at 31-32; Foskey at 32-34; Bradley at 26; Hastings at 19; Wilkinson at 114).

[93]  A195-196 (Mumford at 31-32)

[94]  A101, A199-200, A244, A195-196 (Foskey at 32, Shockley at 19-20, Wilkinson at 114, Mumford at 31-32)

officer who had resigned.[95]  To the extent that any of the Sussex County CERT team members had issues with CERT management; these gripes were directed at Major Radcliffe or Major Hall.[96]

The argument asserted by the plaintiff that Lt. Mears was "hostile and angry" is completely unsupported by any evidence.  While Lt. Mears did not agree with the decision of the CERT members and thus did not resign with them, there is no actionable constitutional harm in disagreeing with the decision of the other CERT members.  Lt. Mears, too, has the right to express his opinion and to be free from retaliation from colleagues for doing so.  The plaintiff's attempt to construe Lt. Mears' personal views as to the resignation decision as support for the retaliation argument further fails, because there is no causal connection between the two.  The plaintiff states that "Lt. Mears was forced to admit his upset and antagonism towards plaintiff"[97] and then in support of this assertion cites to a portion of Lt. Mears testimony where he stated he was disappointed with the CERT members' decision to resign:

Q:    What was your reaction to their quitting?

A:    Disappointment.

Q:    Why?

A:    Because I didn't have the knowledge of it ahead of time, you know.

The cited testimony directly contradicts the plaintiff's argument.  The plaintiff cannot rely on her own interpretation of the testimony, but must use the record created in the case.

The record in this case establishes that Lt. Mears was not angry with any of the CERT members for their resignation, including the decedent, and he had no "vendetta" against the

---

[95]  B4 (Adams at 23).
[96]  B4 (Adams at 23).
[97]  P. Op. Br. at 32.

decedent.[98]  There is no objective or admissible evidence in the record indicating that Lt. Mears harbored any anger or animosity toward any of the CERT members who resigned.  The plaintiff can only point to the decedent's subjective beliefs,[99] unsupported by any competent or admissible evidence, and this is insufficient to establish constitutional liability,  *See Shankle v. Bell*, 2006 WL 2794559 (W.D. Pa. Sept. 27, 2006)(citing *Sporn v. Ocean Colony Condo. Ass'n.*, 173 F.Supp.2d 244, 251 (D.N.J. 2001)(testimony of subjective belief rejected for the purposes of showing retaliatory motive)), particularly where contradicted by competent evidence in the record.

Further, Lt. Mears had no motive to retaliate against the decedent by giving him an unfavorable evaluation, by making notations on his time cards, or any of the other alleged actions, because none of these acts would have affected the plaintiff's status or employment with the DOC.  The plaintiff's insinuation that Lt. Mears was motivated to retaliate because he was following marching orders of management – up to the Governor – to retaliate against the decedent[100] is the kind of petty partisan political attack, wholly unsupported by any evidence in the record, that has no place in litigation, and only detracts from the plaintiff's argument.

The record establishes that the decedent was not working in the week before he killed himself because he had taken extra time off to try to rekindle his relationship with his wife, that he wrecked his truck with his son in his vehicle the night before he killed himself, that he was confronted by his wife about his extramarital affair moments before he killed himself, and that he wrote suicide notes to his wife, friend, and children which made no mention of the Department

---

[98]  A101; A199-200; A244; A195-196; A178 (Foskey at 32, Shockley at 19-20, Wilkinson at 114, Mumford at 31-32, T. Mears at 182)
[99]  A219 (Wilkinson at 57), P. Op. Br. at 33.
[100] P. Op. Br. at 16-17.

of Correction or Lt. Mears.  There is absolutely no competent evidence of a causal connection between Balas' death and any conduct of Lt. Mears.

    **D.**    **Lt. Mears would have taken the same actions absent the alleged protected activity of decedent.**

The third prong of a First Amendment retaliation claim or the 'same decision anyway' defense is only applicable if the plaintiff has demonstrated the first two prongs.  *Smith v. Central Dauphin Sch. Dist.,* 511 F.Supp.2d 460, 480 (M.D. Pa. 2007).

        **1.**    **The defendants have not waived their right to assert the *Mount Healthy* defense.**

The plaintiff cites to Fed. R. Civ. Proc. 8(c) and asks the Court to grant summary judgment in her favor because the defendants did not plead the "same decision anyway" or *Mt. Healthy* defense as an affirmative defense in their Answer to the Complaint, and thus have waived the right to make a legal argument in reliance on this case in this Brief.  The plaintiff's argument fails.  The plaintiff completely ignores the record in the case and the purpose of Rule 8(c).  Moreover, the defendants gave fair notice of their dispute of the allegations as to the motivation for the performance rating, and should not be barred from pursuing a legal argument supported by the facts.

Rule 8(c) states that affirmative defenses are to be asserted in the pleadings, but the defense is not waived if it is "raised at a pragmatically sufficient time and the plaintiff was not prejudiced in [her] ability to respond.  *Charpentier v. Godsil*, 937 F.2d 859, 863-864 (3d Cir. 1991); *Kleinknecht v. Gettysburg College*, 989 F.2d 1360, 1373 (3d Cir. 1993)("failure to raise an affirmative defense in a responsive pleading . . . does not always result in a waiver."); *See also Pro v. Danatucci,* 81 F.3d 1283, 1286 (3d Cir. 1996).  Further, "the defense may be raised in an appropriate motion, such as a summary judgment motion."  *Turiano v. Schnarrs*, 904

F.Supp. 400, 405 (M.D.Pa. 1995)(citing *Batiste v. Burke*, 746 F.2d 257, 258-259 (5th Cir. 1984). "[A]bsent unfair surprise or prejudice to the plaintiff, a defendant's affirmative defense is not waived when it is first raised in a pre-trial dispositive motion." *Brinkley v. Harbour Recreation Club*, 180 F.3d 598, 612 (4th Cir. 1999). Thus, to succeed on this argument the plaintiff must assert that the defendants failed to assert this defense and that such failure was prejudicial to the plaintiff or resulted in unfair surprise. She has failed to do so in her Opening Brief.

The plaintiff is wrong in characterizing the argument as an affirmative defense subject to Rule 8. She confuses factual disputes raised in the pleadings with the narrow class of defenses that are subject to the special pleading provisions of Rule 8. Rule 8 is not intended as a trap for the unwary, or a gimmick to be used by a clever litigant to avoid an inconvenient truth. Rather, the Rule is intended to provide sufficient notice so that an adverse party can anticipate and respond to defenses. Regardless, given the very specific responses of the defendants' Answer denying in no uncertain terms the plaintiff's contentions,[101] the defendants have preserved the argument that Lt. Mears conduct was unaffected by the decedent's resignation from CERT. Thus the plaintiff was entirely aware that this defense would potentially be an issue at trial when she received the Answer to the Complaint.

The Court addressed this identical issue in *Price v. Chaffinch*, 2006 WL 1313178, at *3 n.2 (D.Del. May 12, 2006) and held that the defendant's denial of the allegation in the Complaint that "the defendants cannot prove by a preponderance of the evidence that absent a constitutional violation they would have had grounds to adversely treat the plaintiffs" was "sufficient to put the

---

[101] The plaintiff's Complaint included several averments stating that the defendants could not prove that they would have taken the same actions anyway. *See* A269, 272, 273, 275; B30-33 (*Complaint and Answer* at 100, 121, 128, 138).

plaintiffs on notice that the *Mount Healthy* defense would be at issue." The same exact allegation was asserted by the plaintiff in this case and denied by the defendants.[102]

Moreover, waiver is "the intentional relinquishment or abandonment of a known right." *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938). The defendants did not relinquish or abandon their right to use this defense. Not only was it raised in the Answer to their Complaint, but it is now raised in the summary judgment pleadings with more than ample opportunity for the plaintiff to respond and defend the claim. It also cannot be said that plaintiff was denied discovery on the issue.[103] The parties engaged in extensive discovery involving all possible aspects of this case as evidenced by the plaintiff's enormous (and superfluous) summary judgment appendix. The parties have not completed summary judgment briefing, have not completed a pre-trial order, have not attended a pre-trial conference, and do not even have a trial date. There is no prejudice to the plaintiff by the defendants' use of the *Mt. Healthy* defense.

The plaintiff does not even argue that she was unaware that this defense could be litigated or that that she is now prejudiced by use of the defense. That is because the plaintiff was at all times fully aware of the defendant's intent to assert this defense. Indeed, Lt. Mears so testified in the course of his deposition, and thus the plaintiff had full notice of the potential use of the defense.

### 2. Lt. Mears would have taken the same actions absent the alleged protected conduct.

The plaintiff has not established the first two prongs of the applicable test, and thus Lt. Mears – and not the plaintiff – is entitled to judgment as a matter of law. Regardless, even if the

---

[102] A269, 272, 273, 275; B30-33 (*Complaint and Answer* at 100, 121, 128, 138).
[103] P. Op. Br. at 36.

plaintiff could establish the first two elements of the claim, the record establishes that Lt. Mears would have taken the same actions absent any of the alleged protected conduct.

The decedent's work performance began to falter as early as a year before the decedent's death or around February of 2004,[104] months before the CERT resignation in the summer of 2004.  Lt. Mears heard complaints from the decedent's Sergeant about his work performance.[105] The September 26, 2004 evaluation was an annual performance evaluation, covering the previous year, and not simply the seven weeks since the CERT resignations.  There are numerous references to significant performance issues occurring prior to August 6, 2004.  Many of these issues are documented in an addendum, which also contains an explanation of the rating of "Meets Expectations".  Thus the evaluation as a whole, and the performance rating, has an objective basis independent of Balas' decision to resign from CERT.

## III.    The Decedent Did Not Petition the Government.

The decedent did not engage in petitioning conduct protected by the First Amendment. In support of her petitioning conduct argument, the plaintiff cites to a union grievance form and asserts that it was filed by the decedent with COAD.  The defendants do not dispute that the filing of a union grievance is protected petitioning conduct under the First Amendment *San Filippo v. Bongiovanni*, 30 F.3d 424 (3d Cir. 1994), but where there is no competent evidence that a grievance was ever filed, there is no petition, and no conduct to protect.  The decedent did not petition the government because he never filed a grievance.

Despite the plaintiff's extensive attempts in discovery to show that this grievance was filed, no such evidence was found.  On the contrary, the record clearly establishes that the decedent did not file this grievance. The plaintiff includes in her Appendix to her Opening Brief,

---

[104]  A153 (T. Mears at 60).
[105]  A175 (T. Mears at 168).

a copy of the grievance form alleged to have been filed by the decedent.[106]   The plaintiff, however, fails to include the subpoena response from COAD indicating that it has no record of the grievance.[107] This evidence, along with the testimony of several witnesses, establishes that the decedent received the grievance form from his shop steward and filled out at least the first page of the form with his shop steward.[108]   The shop steward testified that it then would have been up to Balas to file the grievance or give it back to the shop steward to file.  The decedent never gave it back to the shop steward and there is no evidence that the decedent ever filed the grievance.  He apparently took it home and put it with his employment paperwork that he kept at his house[109] because it was later found by the plaintiff when she went through decedent's work papers.[110]   Neither the Department of Correction nor COAD has any record of the grievance, because it was never filed by the decedent.

To the extent that the plaintiff claims that the grievance was filed to dispute the decedent's satisfactory performance rating, that claim is contradicted by the evidence of the decedent's efforts – without any reference to the grievance process – to set up a meeting with Major Wilkinson to discuss the evaluation.  The only possible conclusion is that the decedent, having bypassed the normal review of the evaluation with his supervisor, Lt. Mears, subsequently sought – informally – to set up a meeting with the Major in attendance.

Moreover, Lt. Mears had no knowledge of the grievance or any other complaint by the

---

[106]  P. App. 587-88.
[107]  B48 (P834).
[108]  A6-7 (Ackenbrack at 24-25).
[109]  B6 (Adkins at 31).
[110]  B7-9 (Adkins at 45-47).

decedent.[111]  Lt. Mears could not have retaliated against the decedent for filing a grievance when he was not even aware that the grievance existed.

The plaintiff is not entitled to summary judgment on the petitioning argument because the plaintiff has produced no evidence that the decedent ever engaged in protected petitioning conduct. There is also no evidence that Lt. Mears had any knowledge of this alleged grievance. As asserted in the Defendants' Opening Brief, the defendants are entitled to summary judgment because the decedent did not petition the government.

---

[111]  A173 (T. Mears at 157).

**<u>CONCLUSION</u>**

The plaintiff has failed to show that the decedent sustained any adverse employment action before his death.  To the extent that the decedent was experiencing problems at work, these were the result of an extramarital affair and other personal problems.  The evidence attributed by the plaintiff to so-called "retaliation" consists of routine employment practices such as an annual personnel evaluation, recording of vacation time, and monitoring by supervisors. The plaintiff fails to show any change in the decedent's circumstances.

The plaintiff has failed to produce any credible evidence of the decedent's involvement in union activities or public statements of any kind.  The record reflects nothing more than the plaintiff's resignation from a voluntary unit, along with nine other corrections officers, none of whom suffered any adverse consequences from the resignations.  It is unrebutted that the decedent continued in his same job, with the same rank, same rate of pay and benefits.  There is no competent evidence that the decedent ever requested a transfer or filed a grievance, or was denied a hearing.

The plaintiff's motion is wholly without merit and should be denied.  The defendants are entitled to summary judgment as set forth in the brief in support of their motion.

> /s/ *Ralph K. Durstein, III*
> Ralph K. Durstein, III (ID# 912)
> Stacey Xarhoulakos (ID#4667)
> Deputy Attorneys General
> Department of Justice
> State of Delaware
> 820 N. French Street, 6th Floor
> Wilmington, DE 19801
> (302)577-8400