# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

CINDY L. ADKINS,                )
Executrix of the Estate         )
of JOHN J. BALAS,               )
                                )
    Plaintiff,               )
                                )
    v.                       )    C. A. No. 06-592-JJF
                                )
STANLEY W. TAYLOR, JR.,         )
ALAN MACHTINGER,                )
MICHAEL DELOY,                  )
DAVID WILKINSON,                )
TRUMAN MEARS, and the           )
DEPARTMENT OF CORRECTION        )
of the STATE OF DELAWARE,       )
                                )
    Defendants.              )

## APPENDIX TO ANSWERING BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

DEPARTMENT OF JUSTICE
STATE OF DELAWARE


/s/ Ralph K. Durstein, III
Ralph K. Durstein, III, ID #912
Stacey Xarhoulakos, ID #4667
Deputy Attorneys General
Carvel State Office Building
820 North French Street
Wilmington, DE 19801
(302) 577-8400
Attorneys for Defendants

DATED:  FEBRUARY 19, 2008

# TABLE OF CONTENTS

Page

Portions of Deposition of Allen Adams...................................................................B000001

Portions of Deposition of Cindy (Balas) Adkins ..............................................B000005

Portions of Deposition of Scott E. Bradley, Sr. ...............................................B000010

Portions of Deposition of Harry Hastings..........................................................B000012

Portions of Deposition of Truman Mears ..........................................................B000014

Answer of Defendants filed February 6, 2007 ..................................................B000018

Letter to Ralph K. Durstein, III from Neil S. Kaye, M.D. dated December 20, 2007........B000035

Letter to The Neuberger Firm regarding COAD files ......................................B000048



**WILCOX & FETZER LTD.**

In the Matter Of:

# Balas

## v.

# Taylor, et al.

C.A. # 06-592-JJF

---

Transcript of:

Allen Adams

November 7, 2007

---

Wilcox and Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: depos@wilfet.com
Internet: www.wilfet.com

Balas v. Taylor, et al.
Allen Adams

**10**

1  bit. Were you one of the ones who was activated?
2  A. Yes.
3  Q. Do you recall who else was?
4  A. There's ten of us.
5  Q. Okay.
6  A. I can't -- Dennis Murray; John Mumford; Lee
7  Mears; David West.
8  Q. Was John Balas one of them?
9  A. John Balas, yeah, he was one. I mean,
10  there's ...
11  Q. Okay.
12  A. Who have resigned that day was activated.
13  Q. Got ya. So let's still focus on the day before
14  then. How were you activated?
15  A. By pager.
16  Q. By pager. Okay. And did you have a meeting
17  with the other CERT members?
18  A. Yes.
19  Q. Where was the meeting?
20  A. At Lee Mears' house.
21  Q. Lee Mears' house. Okay. Was Lee Mears one of
22  the team leaders?
23  A. Yes.
24  Q. Did all of these CERT members, all ten -- did

**11**

1  all ten of the CERT members that you just mentioned,
2  did they all attend the meeting?
3  A. I don't know if all of them did.
4  Q. Did most of them attend?
5  A. I would say eight or nine, maybe. I don't know
6  if every one of them.
7  Q. Was John Balas there?
8  A. Yes.
9  Q. Do you recall what was discussed at that
10  meeting?
11  A. Just union -- I mean, like the displeasure of
12  having to do what we had to do. That's pretty much
13  what was discussed.
14  Q. The displeasure of doing what we had to do,
15  that would mean staffing the C & T unit?
16  A. Yes.
17  Q. Okay, okay. Do you recall the CERT members who
18  attended the meeting on August 5th of 2004, were they
19  generally in favor of --
20  A. No.
21  Q. So, in general, the CERT members who attended
22  that meeting, they were against staffing the C & T
23  unit the next day?
24  A. For the most -- yeah, I would say so, yeah.

**12**

1  Q. Okay, okay. Do you recall if John Balas spoke
2  up at that meeting at all?
3  A. Yeah.
4  Q. Do you recall what he said?
5  A. Just that he didn't believe that we were doing
6  right, that we were doing blue shirts wrong by going
7  in and working.
8  Q. Was it your understanding that John was
9  expressing sentiment that you guys should support the
10  union's actions or the actions of the blue shirts?
11  A. Pretty much, yeah.
12  Q. Do you recall anyone at the meeting who
13  expressed a different view?
14  A. Truman was there. He was there.
15  Q. Now, that's Truman Mears?
16  A. Yeah.
17  Q. He's different than Lee Mears; right?
18  A. Yes.
19  Q. Do you recall what Truman said?
20  A. Truman said, "Wait, and let's not be angry.
21  Let's not make a decision in anger and have a clear
22  head when we make these decisions."
23  Q. Okay. Now, what was the reaction to his view
24  at the meeting?

**13**

1  A. There was, like, three people that said, Oh,
2  that's crazy, you know, BS, you know. But there was
3  people like me like, hold, you know, and a couple
4  others, you know, you needed to wait and just see.
5  And then it was just kind of an awkward situation. I
6  was weighing both options.
7  Q. Was John one of the people who spoke up against
8  what Truman said?
9  A. He disagreed with him, yeah.
10  Q. Did Truman seem annoyed?
11  A. No. There was no hostility between anybody
12  like that.
13  Q. So it was just a discussion?
14  A. It was just a disagreement.
15  Q. Okay.
16  A. But it weren't like he did or nothing like
17  that. I mean nobody stood up. It weren't like that.
18  Q. It didn't come to blows or anything?
19  A. Not even an angry word spoken. It was just a
20  disagreement, pretty much. I mean, no, you are wrong
21  no, you are wrong. It was counterpoint, all that kind
22  of stuff. People were just sitting there listening.
23  Lee, Balas, Truman, they did most of the talking.
24  Q. Who organized this meeting?

4 (Pages 10 to 13)

Balas v. Taylor, et al.
Allen Adams

14

1    A.  I think Lee did.
2    Q.  And was it your understanding that it was
3    supposed to be a somewhat secret meeting?
4    A.  I thought it was just whatever CERT members
5    wanted to go.  Truman was on CERT.  But I don't think
6    it was a secret meeting.
7    Q.  Was it your understanding that management was
8    supposed to know about the meeting?
9    A.  I can't -- I don't remember that part.  I mean,
10   they can't stop you from going to somebody's house.
11   Q.  Sure.
12   A.  You know what I mean?
13   Q.  Okay.  Let's move forward to the very next day.
14   A.  Right.
15   Q.  Which I think the record will show was
16   August 6th of 2004.
17   A.  Mm-hmm.
18   Q.  This will be the day where you guys were
19   activated --
20   A.  Right.
21   Q.  -- for your CERT assignment on the C & T unit.
22   Okay?
23   A.  Right.
24   Q.  Do you recall roughly or approximately what

16

1    Q.  This would be the --
2    A.  Going in and running the C & T because no one
3    was there to run it.
4    Q.  And no one was there to run it because of the
5    job action; right?
6    A.  Because nobody was doing the overtime.
7    Q.  So was it your understanding that these other
8    officers appeared to be unhappy with you and your
9    fellow CERT officers for showing up and and filling those
10   vacancies which were being caused by the general
11   refusal --
12   A.  Yes.
13   Q.  -- of the COs to work overtime?
14   A.  That's probably right, yeah.
15   Q.  So you showed up that day and you did your job;
16   right?
17   A.  Yeah.
18   Q.  Do you recall if -- was the C & T unit busy
19   that day?
20   A.  I don't know.  I never worked C & T before, so
21   I couldn't gauge that.
22   Q.  Do you recall how many prisoners were
23   transported that day?
24   A.  I didn't transport none.  I went directly to

15

1    time you reported to the unit?
2    A.  It was maybe between 6:00 and 7:00.  I can't
3    give a direct time.
4    Q.  Then so you showed up at the -- and the unit is
5    at SCI; right?
6    A.  That's correct.
7    Q.  So you show up at SCI?
8    A.  Mm-hmm.
9    Q.  Did you run into any other COs while you were
10   there?
11   A.  Yeah.
12   Q.  And I think you mentioned this before, but I
13   want to focus on it a little bit now.  What was the
14   general reaction of the other COs that you ran into?
15   A.  Negative.
16   Q.  Negative.  Do you recall the kinds of things or
17   the types of things that they said?
18   A.  Just like: "You are not doing right, you are
19   doing wrong."  That type of thing.  "Make sure you do
20   your duty, good Lord."  You know, that kind of -- you
21   know, just little wise cracks.
22   Q.  What was your understanding of what they were
23   referring to?
24   A.  Just us going and doing our job, I mean.

17

1    the courthouse.  They made the C & T people -- the
2    people that worked the unit, they took them to
3    wherever they needed to go.  We just went to Sussex
4    County Courthouse, worked cell block, took guys up to
5    see the judge.
6    Q.  Did you actually transport anybody between
7    courthouse and the prisons?
8    A.  And the prisons?  No.  I didn't.  I don't know
9    anybody did.  Might have.  I didn't.
10   Q.  Got ya.  Did you ever talk to a major,
11   Major David Hall about why CERT had been activated?
12   A.  Yeah.
13   Q.  Could you recall that conversation for me?
14   A.  He was telling us that there was a couple plans
15   to be used -- we were kind of angry that we had to be
16   used.  He said people above him made a call that we
17   were to be used, and we were to do our job.
18   Q.  Okay.
19   A.  And he was sorry we had to be put into this
20   position, but, you know, we had to do the things that
21   were asked of us.  So we told him, okay, but we're
22   going to resign at the end of the day.
23   Q.  What was his reaction to that?
24   A.  He didn't -- he weren't -- didn't get really

5 (Pages 14 to 17)

Balas v. Taylor, et al.
Allen Adams

22

1    A. You know. And Rick said, "I understand your
2   guys' decision. I don't agree with it, but I can
3   understand your decision."
4    Q. Was John one of the --
5    A. He talked. John did most of the talking.
6    Q. John did most of the talking?
7    A. John and Lee Mears, them two. They were --
8   well, I don't know if Balas -- he wasn't a team
9   leader, but Lee was. Lee was very looked upon -- I
10  mean, he was a leader, you know.
11   Q. It was John and Lee Mears who did most of the
12  talking during this meeting?
13   A. Yes.
14   Q. Ultimately, the meeting ended with all of you
15  resigning?
16   A. Yes.
17   Q. You mentioned you all signed some kind of a
18  pad?
19   A. Something like that, a yellow note pad?
20   Q. Like a yellow legal pad, a yellow note pad of
21  some kind?
22   A. Yes.
23   Q. What did the pad say, do you recall?
24   A. We're just resigning. I can't recall exact

23

1   word for word, verbatim. But we are resigning our
2   position as CERT members effective this date and we
3   signed at the bottom of it. We had ten signatures at
4   the bottom of it. That was it.
5        MR. NEUBERGER: Counsel, was that document
6   in the document production?
7        MR. DURSTEIN: I don't think I've ever seen
8   it.
9        MS. XARHOULAKOS: I have never seen or
10  heard of it, no.
11       MR. NEUBERGER: I guess I would like to
12  renew a request that you guys can see if it is still
13  around in the warden's office or whatever his position
14  is now, whether he still has it. Okay?
15       MS. XARHOULAKOS: Sure.
16  BY MR. NEUBERGER:
17   Q. Now, after you resigned, did you get any -- you
18  resigned on August 6th of 2004.
19   A. Mm-hmm.
20   Q. From that point thereafter, for the next couple
21  months, did you get any grief from management about
22  your resignation?
23   A. No.
24   Q. Okay. Did you ever hear that anyone else did?

24

1    A. No.
2    Q. Did you ever talk to Truman about it?
3    A. Not really. Not -- I didn't talk to Truman
4   till -- he was on swing shift. I was on midnight to
5   8:00. I probably didn't talk to Truman till
6   Major Townsend died.
7    Q. When did Major Townsend die?
8    A. He died in August of '05.
9    Q. Okay.
10   A. And they had a thing. He talked about me going
11  back on CERT. I told him I wasn't mad with him and
12  drank a couple beers. It's ....
13   Q. Okay. All right. Did you ever hear about
14  management being angry with John?
15   A. No, no.
16   Q. Did you ever receive any negative comments or
17  disapproving looks from members of management which
18  you understood to be in reference to your resignation
19  from CERT?
20   A. Right. No.
21   Q. Did you ever talk to John about the CERT
22  resignation after August 6th of 2004?
23   A. Not really, no. Because pretty much, I never
24  seen him after that because the only connection we had

25

1   was the CERT Team.
2    Q. Got ya.
3    A. I might see him coming through, and he saw I
4   got promoted to corporal. He said, "Oh, you lost
5   5 percent; you got it right back." I mean, that's
6   with John.
7    Q. Okay.
8    A. I didn't drink -- other than that, I wasn't
9   real close with John like that.
10   Q. Did John have a good way about him?
11   A. Yeah. I liked John. I did.
12   Q. Just from your experiences working with him,
13  was he a hard worker?
14   A. I never worked with him like -- he worked in
15  the receiving room, and I never worked with him like
16  that. But from CERT Team, he was very supportive of
17  all us. That's my relationship with John, was: We
18  were all on CERT together; he was together with all
19  us.
20   Q. From what you were able to observe, was he well
21  liked?
22   A. By some and disliked by others.
23   Q. Did he have that kind of personality where
24  either you love him or you hate him?

7 (Pages 22 to 25)

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

CINDY L. BALAS a/k/a CINDY L.    :
ADKINS, Execiutrix of the Estate
of CORPORAL JOHN J. BALAS,       :

                Plaintiff,       :

       vs.                       :        Civil Action
                                          No. 06-592-JJF
STANLEY W. TAYLOR, JR.,          :
individually and in his
official capacit as the          :
Commissioner of Correction,
et al.,                          :

                Defendants.   :

                       -  -  -


        Deposition of CINDY L. ADKINS, taken
pursuant to notice in the offices of Delaware
Department of Justice, Sixth Floor, Carvel State
Office Building, 820 North French Street, Wilmington,
Delaware, on Thursday, December 20, 2007, at 9:41
a.m., before Lorraine B. Marino, Registered Diplomate
Reporter and Notary Public.

                       -  -  -


                 WILCOX & FETZER
    1330 King Street - Wilmington, Delaware 19801
                  (302) 655-0477
                  www.wilfet.com



WILCOX & FETZER LTD.
Registered Professional Reporters



Cindy L. Adkins

31

```
 1   all of this stuff.  And actually, he was thinking

 2   about filing a lawsuit himself, and I think that's why

 3   he had it all together in a bag.

 4   Q.        Was it common for John during his employment

 5   with DOC to keep his copies of his personnel records

 6   at home?

 7   A.        Yes.

 8   Q.        He always had some sort of work file at

 9   home?

10   A.        Yes.

11   Q.        Do you know if he had any system for keeping

12   or maintaining those records?

13   A.        They were all in pretty much order.  He kept

14   them in a file, and as he got new ones, he kept

15   putting them behind for his commendations and letters

16   job well done.  He kept all that.

17             And he was in the service for 14 years, and

18   so he was used to having to keep his papers in order.

19   Q.        Did he have a habit of also keeping his

20   evaluations?

21   A.        Yes.

22   Q.        And did he regularly keep handwritten notes?

23   A.        He started keeping handwritten notes when he

24   felt like he was being retaliated against after he
```

Cindy L. Adkins

45

| | | |
|---|---|---|
| 1 | A. | I don't remember him -- |
| 2 | Q. | Did you ever speak with any other |

correctional officers about Lieutenant Mears?

4    A.       Do you mean after John's death?

5    Q.       Before or after.

6    A.       No.

7    Q.       Did John seem stressed at work in 2003?

8    A.       Just mainly during the QRT training.

9    Q.       You gave your attorneys documents that were

10 given to us; correct?

11   A.       Yes.

12   Q.       I would like to know where most of them came

13 from.  You already talked about some files that John

14 kept; is that right?

15   A.       Yes.

16   Q.       Did you -- when we made the requests for the

17 documents, did you just go into his files and pull

18 everything?

19   A.       Yes.

20   Q.       Where did you look?

21   A.       We have a filing cabinet.  I looked there.

22 And he also had a bag in his closet that I found like

23 the copies of his time cards that had been altered.

24 And he also had the notes that he had written talking

Cindy L. Adkins

46

1   about the personal vendetta that Truman had against

2   him for speaking out for the job action and resigning

3   from CERT, and that he was angry about the meets

4   expectations on his evaluation, and that he had met

5   with Captain Wilkinson and Deloy and -- or no.  It was

6   Captain Wilkinson, and wanted him to be in on the

7   meeting with a union rep when they reviewed John's

8   evaluation.

9   Q.        Did you at some point, I guess, when you

10  found these documents, had you ever -- had you moved

11  anything since John's death?

12  A.        No.

13  Q.        And did you at some point find additional

14  documents?

15  A.        I think I turned in the commendations later,

16  because they were in a different file than -- he had a

17  couple different files, and I didn't -- I didn't find

18  them.  He had them in with his Navy -- he had gotten

19  some different letters of job well done in the Navy,

20  and he had all of them together.

21              MS. XARHOULAKOS:  I just want to pull

22  something out here.  We will mark this as Exhibit 3.

23              (Adkins Deposition Exhibit No. 3

24  document was marked for identification.)

Cindy L. Adkins

47

```
 1              (Recess taken.)

 2   BY MS. XARHOULAKOS:

 3    Q.         The document marked as Exhibit 3 is two

 4   pages, and it is marked on the bottom P498 and P833;

 5   correct?

 6    A.         Yes.

 7    Q.         And I just introduced this because I am

 8   mostly curious, but this top document, 498, was

 9   produced to us with the original production, and we

10   recently got the bottom page.  Do you know why?  Is

11   this something you found later on?

12    A.         Well, when I found John's papers in his bag

13   in his closet, he had tons of copies of things.  So

14   when I was sorting a notebook for my attorneys and one

15   for myself as the originals, I didn't realize that one

16   copy didn't have this on it.  I just -- and I

17   didn't -- if I did notice it, I was like, oh, what do

18   they need that for?  So I just made sure that they had

19   what was typed on it, and I gave one to them and kept

20   one for myself.

21              Well, when Cheryl was on maternity leave,

22   Steve --

23              MR. NEUBERGER:  Just for the record,

24   if you are going to say something -- if you are going
```



**WILCOX & FETZER LTD.**



## In the Matter Of:

# Balas

## v.

# Taylor, et al.

### C.A. # 06-592-JJF

Transcript of:

Scott E. Bradley, Sr.

November 13, 2007

Wilcox and Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: depos@wilfet.com
Internet: www.wilfet.com

B000010

Balas v. Taylor, et al.
Scott E. Bradley, Sr.

26

1    A. I am not sure.
2    Q. So after you resigned, were you aware of
3  management's attitude towards your resignation?
4    A. As far as?
5    Q. I'll rephrase. Are you -- was management happy
6  that you had resigned?
7    A. I don't know if they were happy or upset or
8  whatever. They never treated me any different than
9  prior.
10    Q. So you never heard any comments from management
11  that they were displeased with your decision to
12  resign?
13    A. No, I mean, they -- you had the same thing
14  as -- inside the jail is about, like, I guess you
15  could say, in the girl's room, the rumors go wild. I
16  mean, it's just the way it is. You know, you believe
17  half of the stuff you hear because you can guarantee
18  the rest of it is just nonsense. There was comments
19  going around that the management wasn't going to let
20  us back on CERT for quitting, but. You know, I am not
21  sure those were true or if that was just some, you
22  know, people trying stir stuff up again.
23    Q. Right. Are you aware of if management was
24  unhappy with the job action going on at that time?

27

1    A. I am not sure.
2    Q. Did anyone from management say anything to you
3  about the job action either way?
4    A. No.
5    Q. Did anyone from management say anything to you
6  about the CERT resignation?
7    A. They questioned me on why -- what was my
8  decision on it. Because everybody at first, I think,
9  thought it was, say, follow-the-leader-type thing. I
10  told them it didn't make a difference who quit because
11  I was done anyway because my reason was for the
12  comment that Dave Hall made and his attitude towards
13  us, I guess you could say that day, just struck me the
14  wrong way.
15    Q. What kind of attitude?
16    A. It was just, you know, he wasn't -- people that
17  do not work at SCI don't understand the way we look
18  after one another. I mean, we have your back no
19  matter what happens. And there was people looking
20  around trying to I, guess, see who we were, this and
21  that. Like I told him, I told Dave Hall that morning,
22  I said you wanted me, more or less, to walk away. I
23  said, and that's just -- you know, you have people
24  looking at us. I said, I depend on these guys to back

28

1  me up every day.
2    Q. When Dave Hall came out to meet with the five
3  of you that were activated, did anyone say anything to
4  Dave Hall?
5    A. Just about all of us were voicing opinions
6  towards him about not liking the way he handled --
7  they could have brought weapons down to us. We didn't
8  have to go into the institution. But for some reason,
9  they chose not to.
10    Q. Do you remember any specific comments made?
11    A. No, ma'am.
12    Q. It's been awhile?
13    A. It's been a long while since then. Other
14  people have, I guess, been ate up with it, but it
15  didn't bother me.
16    Q. Okay. Did you get any feelings after, I guess
17  we'll say, towards the end of August through the end
18  of the year from management at all like they were
19  irritated at what was going on with the job action?
20    MS. XARHOULAKOS: Objection. Asked.
21    Q. You can answer.
22    MS. XARHOULAKOS: You can answer.
23    A. No, ma'am. Me and the warden, we golf together
24  every day, and deputy warden. We don't have any

29

1  problems. I don't -- there's never been a problem
2  between, per se, me and the management. We all golf
3  together. We don't have -- we played softball
4  together. I have never had a problem with them.
5    Q. Okay. You have to fill out a time card,
6  correct, for your job?
7    A. No, ma'am. We have -- we use a thing we punch
8  or that they scan us in and out of the institution,
9  and then people keep our time cards.
10    Q. Okay.
11    A. We have the ability to keep our own time card,
12  but it's not our official time card.
13    Q. Let me ask it a different way. In 2004, was
14  there a paper that maybe your supervisor kept of your
15  vacation days, time off, things like that?
16    A. Yes, ma'am.
17    Q. Was that considered the official time card?
18    A. That's -- yes, ma'am.
19    Q. Have things changed?
20    A. Well, now, the lieutenants don't keep them. A
21  lady at the business office does.
22    Q. Would you review your time cards at all?
23    A. Yes. We -- as a matter of fact, I just got a
24  copy of 2007's and -- I keep my own just to have

8 (Pages 26 to 29)

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

CINDY L. BALAS a/k/a CINDY L.          )
ADKINS, Executrix of the Estate of )
CORPORAL JOHN J. BALAS,               )
                                       )
          Plaintiff,                   )
                                       )      Civil Action
v.                                     )      No. 06-592-JJF
                                       )
STANLEY W. TAYLOR, JR., individu-      )
ally and in his official capacity      )
as the Comissioner of Correction;     )
ALAN MACHTINGER, individually and     )
in his official capacity as the       )
Director of Human Resources of the )
Department of Correction; MICHAEL     )
DELOY, individually and in his        )
official capacity as Deputy Warden )
of Sussex Correctional Institution;)
CAPTAIN DAVID WILKINSON, individu-    )
ally; LIEUTENANT TRUMAN MEARS,        )
individually; and DEPARTMENT OF       )
CORRECTION OF THE STATE OF            )
DELAWARE,                             )
                                       )
          Defendants.                  )

          Deposition of HARRY P. HASTINGS, III,
taken pursuant to notice at the law offices of The
Neuberger Firm, P.A., Two East Seventh Street - Suite
302, Wilmington, Delaware, beginning at 12:43 p.m. on
Tuesday, December 4, 2007, before Christina M. Vitale,
Certified Shorthand Reporter and Notary Public.


Continued. . . . . . . . . .

            WILCOX & FETZER
   1330 King Street - Wilmington, Delaware 19801
               (302) 655-0477

            www.wilfet.com



WILCOX & FETZER LTD.
Registered Professional Reporters



Harry P. Hastings,

19

1    A.    There was other stuff said.  I don't recall

2    much of it now three years later.

3    Q.    A lot has happened since then?

4    A.    Yeah.

5    Q.    After your meeting you left the warden's office

6    and did anything else happen that day?

7    A.    No.  I mean, we all just pretty much went home

8    at that point, I believe.

9    Q.    Following the resignation did you experience --

10   did anyone from management ever say anything to you

11   about the resignation?

12   A.    No, not that I recall.

13   Q.    What was your take on the demeanor of

14   management towards the resignation?

15   A.    I don't recall them really -- I don't recall

16   any difference, I mean, towards their attitudes

17   towards any of us.

18   Q.    What about towards the job action, what was

19   their demeanor towards that?

20   A.    I couldn't really tell you because my contact

21   was mostly with -- with the rank only up to sergeant

22   and occasionally seeing the lieutenant and, of course,

23   most of our staff up to the rank sergeant were

24   supportive of it.  Actually, most of the lieutenants

W&F

**WILCOX & FETZER LTD.**
Registered Professional Reporters

**B000013**



**WILCOX & FETZER LTD.**

## In the Matter Of:

# Balas

## v.

# Taylor, et al.

### C.A. # 06-592-JJF



### Transcript of:

### Truman J. Mears

### November 6, 2007

Wilcox and Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: depos@wilfet.com
Internet: www.wilfet.com

Balas v. Taylor, et al.

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CINDY L. BALAS, a/k/a          )
CINDY L. ADKINS, Executrix     )
of the Estate of CORPORAL      )
JOHN J. BALAS,                 )
                               )
          Plaintiff,           )
                               )   Civil Action
v.                             )   No. 06-592-JJF
                               )
STANLEY W. TAYLOR, JR.,        )
individually and in his        )
capacity as the Commissioner   )
of Correction, et al.,         )
                               )
          Defendants.          )

     Deposition of TRUMAN J. MEARS taken pursuant to
notice at the law offices of The Neuberger Firm, P.A.,
Two East Seventh Street, Wilmington, Delaware,
beginning at 10:06 a.m. on Tuesday, November 6, 2007,
before Lucinda M. Reeder, Registered Diplomate
Reporter and Notary Public.

APPEARANCES:

          STEPHEN J. NEUBERGER, ESQ.
          The Neuberger Firm, P.A.
             Two East Seventh Street
             Wilmington, Delaware 19801
             for the Plaintiff,

          RALPH DURSTEIN, ESQ.
          STACEY XARHOULAKOS, ESQ.
          Department of Justice
             Carvel State Office Building
             820 N. French Street
             Wilmington, Delaware 19801
             for the Defendants.

ALSO PRESENT:    CINDY L. ADKINS
                 WILCOX & FETZER, LTD.
       1330 King Street - Wilmington, Delaware  19801
                  (302) 655-0477
                  www.wilfet.com

Balas v. Taylor, et al.
Truman J. Mears

**18**

1    A.  No.

2    Q.  Now, the physical well-being of your employees

3  is something that's important to you as a good

4  supervisor; right?

5    A.  Yes.

6    Q.  And their psychological well-being is something

7  that's important as well; right?

8    A.  Yes.

9    Q.  And the same thing with their emotional

10  well-being?

11    A.  Yes.

12    Q.  One of the reasons for that is because all

13  those things can affect an employee's work

14  performance; right?

15    A.  Yes.

16    Q.  And if an employee is distracted or under

17  stress or has something on their minds that has the

18  potential to cause -- or that has the potential to

19  have repercussions as they do their job day in and day

20  out; right?

21    A.  Yes.

22    Q.  Okay.  So as a result of that, do you try to be

23  proactive on those kinds of things?

24    A.  Yes.

**19**

1    Q.  Do you try to keep an eye out on those

2  employees who are having some kind of trouble in their

3  lives to see if they need any help or if they're doing

4  okay?

5    A.  Yes, communicate with them.

6    Q.  Communicate with them?

7    A.  Yes.

8    Q.  And is that partially to better enable you to

9  know how they're doing?

10    A.  Yes.  I can't -- I'm not going to ask them

11  intimate details.  That's not my business, but I will

12  ask them if there's problems.

13    Q.  Right.  Because to the extent it affects their

14  work performance --

15    A.  Yes, if it affects the work performance, I will

16  talk to them then.

17    Q.  Right.  Now, if it is affecting their work

18  performance and you see that the employee is under

19  that kind of stress, do you tell them tough luck, suck

20  it up, be a man, something like that, or do you take a

21  different approach?

22    A.  A different approach.

23    Q.  What kind of an approach do you take?

24    A.  This is something I haven't experienced a lot

**20**

1  of, but I --

2    Q.  Based on your experiences, for what you have

3  experienced.

4    A.  Yeah.  You would ask them -- you would bring to

5  their attention the deficiencies in their work and ask

6  them if there is something causing this that I don't

7  know about, and is there anything we can do to help.

8    Q.  Got ya.

9    A.  That sort of approach.

10    Q.  If there is, do you try and get them help?

11    A.  Yes.

12    Q.  What kind of help would you try to get them?

13    A.  There is -- we have programs within the

14  Department.  I can't think of the name of them right

15  now, but it's through human resources where they can

16  get help.

17        Now, this, all you can do is suggest as a

18  supervisor.  I cannot force anyone to go anywhere or

19  get any kind of help as a lieutenant.  All I can do is

20  suggest.

21    Q.  And, now, you said there are these programs

22  available through human resources?

23    A.  Yes.  I don't know the name of them or the

24  details of them without the paperwork in front of me.

**21**

1    Q.  Do you know how you go about invoking them, for

2  lack of a better term?  Do you contact the HR

3  director?  Do you talk to the employee?

4    A.  I talk to the employee first because that's

5  where my responsibilities are.

6    Q.  What happens if the employee does not want

7  help?

8    A.  The only thing I can do is document through, as

9  a supervisor, their -- it's according to the severity

10  of it, but I can only document according to their work

11  performance.

12    Q.  Do you report things to HR?

13    A.  I have not.  I can only deal with my officers.

14  You know, I can only suggest and offer.  It's up to

15  them to take it further.  I can't force them to do

16  anything.

17    Q.  Okay.  So --

18    A.  That's invasion of their privacy, you know,

19  unless it's -- unless their performance -- again, it

20  gets to the point where the performance becomes

21  dangerous on the job for someone or themselves,

22  sometime you go to -- I would go to my supervisor

23  then.

24    Q.  So what happens when their performance does

6  (Pages 18 to 21)

B000016

Balas v. Taylor, et al.
Truman J. Mears

162

1  on the electronic data for discovery, but as you all
2  know, we have been unable to search it yet. We're
3  trying to hire someone to do that. It may be it comes
4  out when we do the search of records. It's not in the
5  documents we produced yet.
6         MR. NEUBERGER: So it wasn't in the Friday
7  documents?
8         MS. XARHOULAKOS: Right, right.
9         MR. NEUBERGER: We're not going to be able
10  to end the deposition today, then. I thought all the
11  stuff was in the Friday, so which means we may have to
12  come back again.
13        MS. XARHOULAKOS: So long as we don't go
14  over our time here. We're already getting pretty late
15  in the day. I don't know how much time we have set
16  for the depo.
17        MR. NEUBERGER: That's fine.
18        MS. XARHOULAKOS: We do have some
19  electronic documents, I believe, that we'll produce,
20  still. Assuming that we recover any documents after
21  we do a search.
22  BY MR. NEUBERGER:
23        Q.  Now, would you have put a copy of that e-mail
24  in your supervisory file?

164

1  an evaluation for his daily duties.
2         Q.  Okay.
3         A.  In a negative way.
4         Q.  Okay. This is the same QRT stuff which we
5  talked about earlier in Mears Exhibit 8, where John
6  received a memo of appreciation from Major Townsend?
7         A.  Yes, it is.
8         Q.  Right.
9         A.  Yes.
10        Q.  You don't mention that memo of appreciation in
11  this evaluation, do you? Either on the first, second
12  or third pages of this exhibit?
13        A.  No, it's not.
14        Q.  Why?
15        A.  I don't have an answer right now.
16        Q.  I'm sorry?
17        A.  I don't have an answer for that. I don't know
18  why it's not in there other than the fact that due to
19  his poor performance, he was taken out of it.
20        Q.  I'm sorry. I am not following you. The memo
21  was dated July 8th of 2004; right?
22        A.  Yes, it was.
23        Q.  And you are saying that somehow due to his poor
24  performance the memo would be taken out of the

163

1         A.  No.
2         Q.  Why?
3         A.  Again, this was something that was extra that
4  he did above his duties in the receiving room, which
5  he was being evaluated on.
6         Q.  Okay.
7         A.  And it just meant that he didn't have that
8  extra now. So I didn't want to put negative stuff in
9  there.
10        Q.  Okay.
11        A.  Because it was extras that he was doing.
12        Q.  So you are saying because his job performance
13  was lacking in the extras?
14        A.  Yes, and in that instance. And, you know, if
15  somebody is doing the extra thing that they don't
16  really have to do, they're volunteering to do, and
17  then they just choose to quit it or not doing so good
18  at it and they're removed from it, well, that was
19  extras to make things go up.
20        Q.  Are you saying that's not enough to make things
21  to go down?
22        A.  No, that's not what I'm saying. The extras put
23  him over the top of going higher, but in the same
24  term, since it was voluntary, I can't see it affecting

165

1  evaluation?
2         A.  No, no.
3         Q.  Okay. Could you explain that to me, then? I
4  am not following what your explanation is.
5         A.  I thought you were referring to why the QRT
6  wasn't referred to in there. You are saying the --
7  rephrase or ask the question again, please.
8         Q.  Okay, sure. In the evaluation that we're
9  looking at, the QRT is not referenced as a positive;
10  correct?
11        A.  Exactly.
12        Q.  It's referenced in this attachment here as a
13  negative?
14        A.  Exactly.
15        Q.  You are saying that John's performance during
16  the QRT was lacking?
17        A.  Yes.
18        Q.  This is the same performance for which he
19  received a memo of appreciation from major --
20        A.  From the major.
21        Q.  Right?
22        A.  Yes.
23        Q.  The memo of appreciation is not mentioned in
24  the evaluation; right?

42 (Pages 162 to 165)

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

CINDY L. ADKINS,                          )
Executrix of the Estate                   )
of JOHN J. BALAS,                         )
                                          )
                                          )
            Plaintiff,                    )
                                          )
            v.                            )        C. A. No. 06-0592-JJF
STANLEY W. TAYLOR, JR.,                   )
ALAN MACHTINGER,                          )
MICHAEL DELOY,                            )
DAVID WILKINSON,                          )
TRUMAN MEARS, and the                     )
DEPARTMENT OF CORRECTION                  )
of the STATE OF DELAWARE,                 )
                                          )
            Defendants.                   )

### ANSWER OF DEFENDANTS

1.      Admitted only that the decedent committed suicide on February 19, 2005 for reasons unrelated to his job, and that the plaintiff has filed this survival action. Denied that the relief sought is available to the plaintiff. Further denied that plaintiff is entitled to the relief sought. All allegations of "retaliation" are denied. It is further denied that the decedent was prevented from exercising his constitutional rights. It is further denied that any act or omission on the part of any defendant contributed in any way to decedent's suicide.

### I.      JURISDICTION

2.      Admitted only that the Court has jurisdiction to hear this claim. Denied that the plaintiff can pursue a survival action based on the suicide of the decedent.

1

**B000018**

## II.    PARTIES

3.    Admitted, by information and belief.

4.    Denied as alleged. Admitted only that the decedent held the rank of Corporal at the time of his death, and had been employed by the Department of Correction for eleven years. His job performance during his career is reflected in periodic performance evaluations and other information found in his personnel file. Admitted by information and belief that he participated in COAD. Admitted that COAD is the bargaining agent for Department of Correction employees.

5.    Admitted by information and belief.

6.    The first and second sentences are admitted. The third sentence is denied as alleged. Admitted only that Commissioner Taylor was in a position of administrative authority to review the operations of the Department of Correction. The final sentence is denied.

7.    The first and second sentences are admitted. The third sentence is denied as alleged. Admitted only that Mr. Machtinger was in a position of administrative authority to review the Human Resources operations of the Department of Correction. The final sentence is denied.

8.    The first and second sentences are admitted. The third sentence is denied as alleged. Admitted only that Deputy Warden Deloy was in a position of administrative authority at the Sussex Correctional Institution. The final sentence is denied.

9.    The first and second sentences are admitted. The third sentence is denied as alleged. Admitted only that Captain Wilkinson was in a position of command authority within the Institution. The final sentence is denied.

2

10.    The first and second sentences are admitted.  The third sentence is denied as alleged.    Admitted only that Lieutenant Mears was in a position of command authority within the Institution.  The final sentence is denied.

11.    Admitted only that the Department of Correction is a State agency, named as a defendant in the lawsuit filed by the plaintiff.  Denied that the plaintiff has any right or basis to recover fees or costs in this case.

### III.    ALLEGATIONS
#### A.    THE LACK OF PROTECTED SPEECH

12.    Denied as alleged.  Admitted only that COAD was certified as noted.  The allegation as to "ineffective union representation" is denied.

13.    The answering defendants are without sufficient information, knowledge, or belief to respond, and the averment is therefore denied.

14.    Denied as alleged.  Admitted only that COAD engaged in contract negotiations with the Department of Correction during the time frame set forth.

15.    Denied as alleged.  Admitted only that COAD members engaged in negotiations related to their employment with the Department of Correction.

16.    Denied as alleged.  Admitted only that COAD members engaged in negotiations related to their employment with the Department of Correction.

17.    Denied as alleged.  Admitted only that Department of Correction employees raised various job-related issues, such as security, overtime, and turnover, in the course of collective bargaining and negotiations conducted by COAD.

3

18.     Denied as alleged.  Admitted only that Department of Correction employees raised various job-related issues, such as security, overtime, and turnover, in the course of collective bargaining and negotiations conducted by COAD.

19.     Denied as alleged.  Admitted only that employees raised salary as an issue in contract negotiations.  Admitted that New Jersey pays a higher starting salary to correctional officers than Delaware pays.  Denied that Maryland pays a higher salary than Delaware for equivalent correctional officer positions.  Correctional officers in Delaware have received periodic pay raises, and are eligible during their career with the Department of Correction for promotions, transfers, and extra duty assignments that yield additional compensation.

20.     Denied as alleged.  Admitted only that COAD raised job-related issues such as security and minimum staffing at the Delaware Correctional Center in the course of contract negotiations.

21.     Denied as alleged.  Admitted only that COAD raised job-related issues such as security and minimum staffing at the Delaware Correctional Center in the course of contract negotiations.  Denied that attacks on correctional officers are increasing.  They are not.

22.     Denied as alleged.  Admitted only that, on the date alleged, a female counselor was assaulted by an inmate and held hostage, before being rescued.  The incident occurred at the Delaware Correctional Center in Smyrna, not at the Sussex Correctional Center as alleged.  Further admitted that COAD raised the issue of employee security in the context of labor negotiations.

23.     Denied as alleged.  COAD sought to promote the interests of Department of Correction employees in the context of contract negotiations.  The news media independently reported on issues involving the Department of Correction.

4

24.     Denied as alleged.  The defendants are without knowledge or belief as to the attitude of COAD officers with respect to contract negotiations.  The negotiations were ongoing, constructive, and at times contentious.  Some progress was made.  The Department of Correction administration took steps to address issues such as staffing, compensation, and security and other employee grievances.

25.     Denied as alleged.  Admitted only that some employees in the Court Transportation Unit refused to work their scheduled job assignments.

26.     Denied as alleged.  Admitted only that some employees in the Court Transportation Unit refused to work their scheduled job assignments.  Further admitted that the failure of some CTU employees to report for work caused concerns and problems for judges and prosecutors.

27.     Denied as alleged.  Negotiations between the Department of Correction and COAD had been underway prior to the refusal of some CTU employees to work.  These negotiations continued.  The balance of the averment is denied.

28.     Denied.

29.     Denied as alleged.  The Governor monitored the situation in conjunction with the Commissioner, in order to insure that the courts could continue to function normally with adequate staffing for prisoner transportation.  The balance of the averment is denied.

30.     Denied as alleged.  The Court filing and disposition speak for themselves.  Denied that the failure of some employees to report for work influenced the ongoing contract negotiations, or the Court of Chancery.  The balance of the averment is denied.

31.     Denied as alleged.  Admitted only that, on the date alleged, The Department of Correction CERT team was activated to assist the CTU officers in the transportation of

5

inmates to and from the courts. Commissioner Taylor was aware that some CERT members failed to report for work. Steps were taken to insure adequate staffing.

32.    Denied as alleged. Admitted only that the decedent was a CERT Team member on August 6, 2004. The balance of the averment is denied.

### B.    THE FORM AND CONTENT OF JOB-RELATED ACTIVITY

33.    Denied as alleged. Admitted only that the CERT members were asked to assist CTU in the transportation of inmates to and from the courts. The balance of the averment is denied.

34.    Denied.

35.    Denied as alleged. The defendants are without knowledge or belief as to actions discussed by the decedent or other employees. Admitted only that the decedent and some other employees failed to report for CERT duty. Admitted by information and belief that this action was taken to pursue employee grievances in the context of collective bargaining and contract negotiations. The balance of the averment is denied.

36.    The first sentence is admitted. The second sentence is denied.

37.    Denied as alleged. Admitted only that the decedent and several others declined to participate in a CERT assignment.

38.    Denied.

39.    Denied as alleged. The defendants have no specific recollection of any such newspaper article. The balance of the averment is denied.

6

### C. DECEDENT ACTED IN THE CONTEXT OF HIS EMPLOYMENT

40.     Denied.

41.     Denied.

42.     Admitted.

43.     Denied as alleged.  Admitted only that the decedent served on the CERT Team,
except that the decedent's service on the CERT Team was interrupted twice by dismissals
for cause occurring prior to his resignation.

44.     Admitted.

45.     The averment is denied as incomprehensible.

46.     Denied.

47.     The first sentence is denied.  The defendants are without knowledge or belief as to
the second sentence.  The third sentence is denied as alleged.  Admitted only that the
decedent failed to report for his CERT assignment.

48.     Denied.

49.     Denied.

50.     Denied as alleged.  No such policy existed.  The allegations as to the functions of
the Human Resources Division are admitted.  The balance of the averment is denied.

51.     Denied.

7

52.    Denied.

53.    Denied.

54.    Denied.

### E.    DECEDENT EXPERIENCED NO ADVERSE ACTION

55.    Denied as alleged.  The defendants are without knowledge or belief as to the decedent's attitude toward his supervisor.  At one point, months after resigning from CERT, in the context of a dispute over a performance evaluation, the decedent asked for a transfer to another supervisor.  After further discussion of the evaluation, decedent did not pursue the request.  The balance of the averment is denied.

56.    Admitted.

57.    Admitted.

58.    Denied.

59.    Denied.

60.    Denied as alleged.  "Meets expectations" is not a mediocre evaluation.  The decedent had previously received evaluations of "meets expectations" in 1996 and 1999. The balance of the averment is admitted.

61.    Denied.

62.    Denied as alleged.  The decedent had previously received evaluations of "meets expectations" in 1996 and 1999.  The balance of the averment is admitted.

8

63.    Denied.

64.    Denied.

65.    The defendants are without knowledge or belief as to what the decedent believed.
The balance of the averment is denied.

66.    Denied.

67.    Denied as alleged.  The defendants are without knowledge as to the decedent's
career aspirations.  Denied that "meets expectations" reflects a mediocre evaluation.
Denied that a single evaluation of "meets expectations" would hinder an employee's
advancement.  Decedent had several evaluations of 'meets expectations", and remained
eligible for promotion.  The balance of the averment is denied.

68.    The first sentence is admitted.  The second sentence is denied.

69.    Denied.

70.    Denied as alleged.  Lt. Mears asked the decedent to sign where indicated to
acknowledge having received and read the evaluation.  The decedent refused to sign.  An
evaluation of "meets expectations" is not a mediocre evaluation.  The balance of the
averment is denied.

71.    Denied as alleged.  Admitted only that the decedent contacted Captain Wilkinson
regarding decedent's refusal to sign the performance evaluation.  There was no request
for a union representative.

72.    Denied as alleged.  The decedent refused to accept a copy of his performance
evaluation.  The balance of the averment is denied.

9

73.    Denied.

74.    Denied as alleged.  At some point later in February, the decedent asked that his
performance evaluation be returned to him.  The balance of the averment is denied.

75.    Denied.

76.    Denied as alleged.  Decedent's performance was routinely monitored by his
supervisor.  The balance of the averment is denied.

77.    The first sentence is admitted, by information and belief.  The balance of the
averment is denied as alleged.  Notations as to emergency vacation days were routinely
made for all employees who used such days.  There is no distinction made between
vacation days.  The balance of the averment is denied.

78.    Denied as alleged.  The decedent mentioned the vacation timekeeping to Captain
Wilkinson, who discussed it with Lt. Mears, who agreed to remove the "emergency"
notations as to all employees.  Lt. Mears was not disciplined or reprimanded.  There was
no retaliatory behavior on the part of any defendant.  The balance of the averment is
denied.

79.    Denied as alleged.  In January of 2005, Lt. Mears prepared timecard totals for the
year 2004 for fifteen subordinate employees.  The decedent requested a copy of his
timecard on the very day this work was completed, and Lt. Mears immediately gave the
decedent a copy of his timecard.  Decedent was the first employee to receive his
timecard.  There was no delay whatsoever.  The balance of the averment is denied.

80.    Denied as alleged.  At one point, months after resigning from CERT, in the
context of a dispute over a performance evaluation, the decedent asked for a transfer to
another supervisor.  After further discussion of the evaluation, decedent did not pursue
the request.  At no time did the decedent mention "retaliation".  To the extent, if any, that

10

the decedent had a mental or emotional condition, it was not job-related. The balance of the averment is denied.

81.    Denied.

82.    Denied as alleged. The defendants are without knowledge as to any physical complaints, medical tests, or medication. To the extent, if any, that the decedent suffered from physical ailments or sought medical diagnosis or treatment, such matters were not job-related. The balance of the averment is denied.

83.    The allegation of "harassment" is denied. The defendants are without knowledge as to the decedent's expectations as to career advancement. The balance of the averment is denied.

84.    Denied as alleged. The defendants are without sufficient knowledge as to what the decedent told his close friends. The balance of the averment is denied.

85.    Denied as alleged. Admitted by information and belief that the decedent was experiencing personal problems, unrelated to his work, which caused concern to his family and friends. The balance of the averment is denied.

86.    Denied.

87.    Denied.

88.    Denied as alleged. The defendants are without knowledge as to any efforts on the part of decedents' family or friends to help him. Admitted by information and belief that medication was prescribed. Denied that any anxiety experienced by the decedent was work-related. The balance of the averment is denied.

89.    The defendants are without sufficient knowledge or information to respond.

11

B000028

90.    Denied as alleged.  Admitted only that the decedent took his own life as alleged, and that his widow subsequently remarried.  Denied that the defendants were responsible for the suicide of the decedent.  The balance of the averment is denied.

### F.    NO DAMAGES ARE RECOVERABLE FROM DEFENDANTS

91.    Denied as alleged.  Denied that the defendants caused the decedent's death.  The allegation of "harassment" is denied.  Admitted by information and belief that the decedent suffered from stress related to personal problems and unrelated to his job.  The balance of the averment is denied.

92.    Denied.

93.    Denied.

### G.    LACK OF A CAUSAL LINK

94.    Denied, as to each and every particular and subpart.

95.    Denied.

96.    Denied.

97.    Denied as alleged.  The allegations made against the defendants are denied.  The defendants are without sufficient information to respond to the hypothetical question.  The balance of the averment is denied.

98.    Denied.

12

99.    Denied as alleged. The allegations made against the defendants are denied. The defendants are without sufficient information to respond to the hypothetical question. The balance of the averment is denied.

100.    Denied as alleged. The allegations of adverse action and unfair treatment are denied. The defendants did not violate the Constitution. Plaintiff's legal analysis if flawed. The balance of the averment is denied.

## IV.    DENIAL OF ALLEGATIONS REGARDING DEFENDANTS' CONDUCT

101.    Denied.

102.    Denied.

103.    The first sentence is admitted. The allegation of "federal constitutional deprivations" is denied as to the individual defendants and the Department of Correction of the State of Delaware. The balance of the averment is denied.

104.    Denied.

105.    Denied.

106.    Denied.

107.    Denied.

108.    Denied.

109.    Denied.

110.    Denied.

13

111.    Denied.

112.    Denied.

113.    Denied.

114.    Denied.

115.    The defendants restate and incorporate herein by reference the responses set forth
in paragraphs 1 through 114 above.

116.    Denied.

117.    Denied.

118.    Denied.

119.    Denied.

120.    Denied.

121.    Denied.

122.    Denied.

123.    The defendants restate and incorporate herein by reference the responses set forth
in paragraphs 1 through 122 above.

124.    Denied.

14

**B000031**

125.    Denied.

126.    Denied.

127.    Denied.

128.    Denied.

129.    Denied.

130.    The defendants restate and incorporate herein by reference the responses set forth in paragraphs 1 through 129 above.

131.    The defendants are without knowledge as to the decedent's relationship with COAD, except to admit by information and belief that decedent was a union member. The balance of the averment is denied.

132.    Denied.

133.    Denied.

134.    Denied.

135.    Denied.

136.    Denied as alleged.  The allegations of adverse action and unfair treatment are denied.  The defendants did not violate the Constitution.  Plaintiff's legal analysis is flawed.  The balance of the averment is denied.

137.    Denied.

15

138.    Denied.

139.    Denied.  The defendants further deny that the plaintiff is entitled to any of the relief sought.

## V.    AFFIRMATIVE DEFENSES

140.    Plaintiff's cause of action arises under 42 U.S.C. §1983, and all claims asserted are barred by the applicable two-year statute of limitations, 10 *Del.C.* §8119, in that they arose in July and August of 2004, as alleged in the Complaint, and the lawsuit was belatedly filed on September 25, 2006.

141.    All claims asserted are barred by the qualified immunity of the defendants.

142.    All claims asserted against the State of Delaware are barred by the doctrine of sovereign immunity and by the Eleventh Amendment to the United States Constitution.

143.    Under Delaware law, 10 *Del.C.* §§3701, 3704, the plaintiff's claims arising from the suicide of the decedent cannot be pursued in a survival action.

144.    Plaintiff has failed to state a claim upon which relief can be granted.

WHEREFORE, the defendants demand that plaintiff's lawsuit be dismissed, with prejudice, with all costs payable by the plaintiff.

/s/ Ralph K. Durstein, III
Ralph K. Durstein, III (ID# 912)
Stacey Xarhoulakos (ID#4667)
Deputy Attorneys General
Department of Justice
State of Delaware
820 N. French Street, 6th Floor
Wilmington, DE 19801
(302)577-8510

DATED: February 6, 2007

16

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CINDY L.ADKINS,<br>Executrix of the Estate<br>of JOHN J. BALAS, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) | C. A. No. 06-0592-JJF |
| STANLEY W. TAYLOR, JR.,<br>ALAN MACHTINGER,<br>MICHAEL DELOY,<br>DAVID WILKINSON,<br>TRUMAN MEARS, and the<br>DEPARTMENT OF CORRECTION<br>of the STATE OF DELAWARE, | ) ) ) ) ) ) ) | |
| Defendants. | ) | |

**CERTIFICATE OF MAILING AND/OR DELIVERY**

The undersigned certifies that on February 6, 2007, he caused the attached

Answer of Defendants to be electronically filed with the Clerk of Court using CM/ECF

which will send notification of such filing to the following:

Thomas S. Neuberger, Esq.
Stephen J. Neuberger, Esq.
Two East Seventh Street, Suite 302
Wilmington, DE 19801

/s/ Ralph K. Durstein III
Ralph K. Durstein III, I.D. #912
Deputy Attorney General
Carvel State Office Building
820 N. French Street, 6th Floor
Wilmington, DE 19801
(302)577-8510
Attorney for Defendants

## Neil S. Kaye, M.D., P.A.

Stoney Batter Office Building
5301 Limestone Road
Suite 103
Wilmington, Delaware 19808
302-234-8950 office • 302-234-8984 fax • nskaye@aol.com • www.courtpsychiatrist.com

• Distinguished Fellow of the American Psychiatric Association
• Diplomate of the American Board of Psychiatry and Neurology with Added Qualifications in
Forensic Psychiatry and Geriatric Psychiatry

Ralph Durstein, Esq.
Stacey Xarhoulakos, Esq.
Department of Justice
820 North French Street
Wilmington, DE 19801

12/20/07

Re:  Adkins v Taylor, et al.

Dear Mr. Durstein and Ms. Xarhoulakos:

Mr. John Balas committed suicide by gunshot, on 2/19/05.  Mr. Neuberger, on
behalf of the deceased's wife (Cindy Balas Adkins) has filed an action against the
State of Delaware Department of Correction (DOC), former Commissioner
Stanley Taylor, Alan Machtinger, Michael DeLoy, Capt. David Wilkinson, and Lt.
Truman Mears alleging that Mr. Balas' death by suicide was proximately caused
by a "Department wide policy of retaliation against Correctional Officers who
refused to engage in anti-Union activity or become strike breakers..."

Pursuant to your request, I have had the opportunity to review the following
records in the above referenced matter:

1.  Records of Paul Peet, MD
2.  Records of John Stump, MD
3.  Records of Papastavros' Associates
4.  Records of Sussex Eye Center
5.  Records of Beebe Medical Center
6.  Records of Uday Jani, MD
7.  Imaging Reports
8.  Lab Reports
9.  Report and CV of Carol Tavani, MD
10. Records Coastal Therapeutic Services
11. Complaint
12. Answers of Defendants

General Psychiatry • Psychopharmacology • Forensic Psychiatry • Neuropsychiatry • Geriatric Psychiatry

13. DOC Memos
14. Certificates earned by John Balas
15. Resume of John Balas
16. COAD Grievance form
17. Handwritten notes of John Balas
18. Obituary of John Balas
19. Unsworn Declaration of Cindy Balas
20. Unsworn Declaration of Arthur Lee Mears
21. Defendant's Supplemental Disclosures as to Expert Testimony
22. Deposition transcript of Allen Adams
23. Deposition transcript of Scott Bradley
24. Deposition transcript of Harry Hastings
25. Deposition transcript of Jon Mumford
26. Deposition transcript of William Shockley
27. Deposition transcript of Jennifer Weldon
28. Deposition transcript of David West
29. Deposition transcript of Michael DeLoy
30. Deposition transcript of Truman Mears
31. Deposition transcript of David Wilkinson
32. Deposition transcript of Cindy Balas Adkins

Summary:

01/22/68  Born

1991  Married Cindy, sister of Jeff Foskey, with whom John Balas had gone to school.

1994  Stared work at SCI as a Correctional Officer.

08/00/04  Entire CERT teamed resigned after working coverage for one shift for court and transfers.

09/00/04  Liver function tests were elevated.

09/00/04  Began extramarital affair with Jennifer Weldon.

10/04/04  Mr. Balas fills out COAD Grievance Form, contesting his meets expectations evaluation and claiming that Lt. Mears has a "vendetta against me since I have resigned from CERT…"

12/10/04 Brian MRI normal.

12/20/04 Peet. Headaches since early October.  No relief with OTC medications. CT of brain, wnl.  Stressful situation with job as a correctional officer.  There has

been some labor dispute. He and 10 colleagues had some type of job strike. Reports he is being watched closely at work. This does add to his perceived stress. Dx.: Mixed headache syndrome, migraine, tension muscular headaches, cervicalgia. Get MRI. Start Inderal and Imitrex prn.

01/05/05 Stump. New onset headaches for 4-5 months. No ophthalmic cause for headaches.

01/09/05 Balas. Written statement about his performance evaluation where he was rated as meet expectations and not exceeds expectations as well as claim that Lt. Mears is being vindictive due to his resignation from CERT. "I feel pressured, intimidated, and stressed with (Mears)." Notified Capt. Wilkinson of conversation with Lt. Mears and he advised that he wanted to be there for the review. Requested and received a copy of his 2004 time card.

01/21/05 Jani. Migraine headaches, cervicalgia. He still has some stress at work. Increase Inderal to 120 mg at bedtime. Imitrex prn.

01/29/05 Tavani. "Confided to a close friend, Lee Mears, that he was going to commit suicide." His wife, her brother and his friend Lee Mears took him for psychiatric evaluation to St. Jones Behavioral Health Center, under the impression that he would be kept there. "He was discharged with referral to outpatient counseling." After he came home, he promised not to harm himself.

02/02/05 Returned to work.

02/07/05 Balas. Learned that evaluation was turned in with notation that he refused to sign the evaluation. He contacted Captain Wilkinson and was told this would be taken care of.

02/14/05 Balas. Left a note that said goodbye. Did not return wife's calls to his cell phone. Cindy called his best friend and brother, to no avail (Tavani). Returned home, after driving as far as Virginia. Evidently, he wrote suicide notes during this time on a pad in his truck.

02/15/05 Jani. Depression. Decreased sleep. Seen at psychiatric hospital but not admitted. Advised to go to outpatient counseling. Has not started counseling as had bad experience in past. No thought of suicide or has any plans of suicide. Had been screened in psych hospital. "I have started workout and am feeling good." "I am talking more openly with my wife. I have good friends." Family has removed all guns from the house. Insomnia, fatigue, anxiety. Counseling suggested. Wife and patient given number of psych and therapist. Some problem with wife 1 year ago. "Big blowout-now trying to resolve it." Prescribed Klonopin, an anti-anxiety medication.

Balas. Tired but feel good and feel loved by all.

02/16/05 & 02/17/05  John and Cindy Balas go away to a hunting lodge.  Per Tavani's records, they had a nice dinner and some long talks.  He bought some hunting things, a hobby he had not engaged in for some time, since his depression.

02/16/05  Balas.  Feel tired, feel down a little.  For most part good feelings. Talked to Lee.  Feel better.  Getting ready to leave for Cabela's.  A little nervous. Feeling fair.  Ate lunch, still nervous about trip.  Stopped to get gas.  Cindy acts like she enjoys me and my company.  Feel good.  I got pizza in Dover Mall.  Feel a little down but tings are good for me with Cindy by my side.  Left Cabela's. Found good deal on waders.  Eating dinner at a place called Cousins.  Nice. Happy with Cindy.  Talking.  Enjoying her company.  Feel no stress so far.  No worries.  Feels secure.  Good dinner.  Back to hotel and feel calm.  No pressures.  Nice to be with Cindy.

02/17/05  Balas.  Woke up.  Took a shower.  Well rested.  Looking forward to the day with Cindy.  Cindy-feel good with her.  No pressure/no stress.  Doing what we both want to do.  Friends checking on me.  Feeling down/tired.  Don't know why, sad.  Thinking about everything.  Going to try to clear mind and enjoy time with Cindy.

02/18/05 Friday.  Balas.  Feeling down.  So much to do.  Going to work on one thing at a time.  Feel a little insecure/lonely.  Don't know why.  Thinking off into space.  I feel fair.

Rollover MVA with son as passenger.  Fled the scene and strong suspicion that he was intoxicated at the time of the MVA.  Not immediately reported to police.

Beebe.  MVA.  Hit head.  Wife states not acting normal.  States has not been acting right for several months.  History of depression.  Clonazepam 1 mg tid; Imitrex 50 mg prn; Inderal 120 mg qd.  Wife says he has been depressed over a period of a couple of months.  Son states patient was talking to him and lost control of vehicle and it rolled onto its roof.  Patient does not recall event.  Struck his head but denies loss of consciousness.  Non-restrained driver.  Normal affect. LFT's wnl.  He was advised to stop the Klonopin and sent home.  "It is unclear whether this was a covert attempt at self harm."

Coastal Therapeutic Services.  Initial client contact.  No suicidal thoughts. Referred by Jani.  Depression.  Appointment made for 6/8/05.

02/19/05 Saturday.  John Balas commits suicide by gunshot.  Per Tavani: "He walked out of the with the pistol.  His wife ran after him, but he stopped and pointed the gun at her-then turned and walked into the field.  She called 911. They arrived, and she heard a shot, and then another.  His wife, son and

daughter saw him on the ground. He died from a gunshot wound into the mouth, the exit wound out the cranium."

Suicide note: Cindy-sorry I wasn't what you wanted. You deserve a lot of credit for putting up with me. Sorry for all the misery I brought you and your family. Remember, I did this because I love you. You don't need me to weigh you down. Live life to the fullest, I just didn't want to live anymore.

Jonathan-you bring me so much joy watching you grow up. Your smart as a whip. You have a good head on your shoulders-stay string and take care of the homestead. You are everything I wanted in a son.

Lauren-you bring me so much love. I cry when I say your name or think of you. I felt your live so much. It's like God tells me you loved me no matter what. Don't ever stop being you. You are so wonderful.

Mom/Dad-I tried to make it, but I couldn't. I am sorry for being so weak. Don't dwell on this. I am sorry for being so weak. Love Lauren and Jonathan like no other. Sorry I didn't turn out like you wanted. The kids needs you so focus on them. This is no one's fault. Don't blame Cindy or anybody. This was my choice.

10/08/07  Cindy Adkins. On 1/30/05 she called St. Jones and asked if there was a counselor who could meet with John. The previous day he was drinking and driving around with a loaded pistol. He was evaluated by a counselor there, and released. In the weeks following his visit to St. Jones, he was quiet, introverted and refused to contact any of the psychiatrists the counselor had suggested.

10/11/07  Lee Mears. On 10/29/05, found John parked in his car with a gun on his lap and he had been drinking. At one point he said he was going to kill himself. It was obvious he was agitated, upset and angry. On 1/30/05, Cindy, her brother Jeff Foskey and Lee Mears took John to St. Jones for evaluation. The week prior to his death, John took vacation.

10/23/07  Tavani. About 2 years prior to his death, wife reports that Mr. Balas increased his alcohol use. Wife told Dr. Tavani that his increased drinking was due to work related stress. Increased alcohol began in Fall 2003. He stopped drinking 5/04 but resumed alcohol in 7/04. Liver function tests were elevated in 9/04 but were normal again on 2/18/05. Dr. Tavani relates that: "he developed an entire depressive complex of neurovegetive stigmata, described to me by his wife as having begun in July 2004 and progressed forward until in the Fall and Winter of 2004 included the following:"

Wife was unable to persuade him to make an appointment with a psychiatrist or counselor, and when they tried, there was nothing available prior to June, so she took him to Dr. Jani, their PCP. His parents lived two doors away, which neither

wished to happen, but Cindy was close to his father, nonetheless. His mother is described as tending to be intrusive.

Mr. Balas is diagnosed by Dr., Tavani with a major depressive episode and a history of two prior episodes of alcohol abuse, which she opines was self medication for stress and may have fueled his depression. She maintains he Was not drinking at the time of the accident, the day before his death.

Dr. Tavani opines that stress at work, his resignation from CERT, and retaliation, which she describes as being scrutinized and monitored at work, failure to be transferred to a different supervisor (from Lt. Mears), an incident with timecards, and his evaluation being submitted with the notation that he refused to sign it constitute incidents of retaliation and mistreatment, and resulted in his feeling hopeless and helpless, causing a profound depressive state. She discounts his extramarital affair as his symptoms of depression as reported by Cindy preceded the onset of the affair and concludes that the affair was the product of the depression. Further, she gives weight to his journal entries after the intimate getaway with Cindy that indicate her presence and support were comforting and not the ideation of a man who is grieving the loss of a paramour. Dr. Tavani also notes that alcohol can be a depressogenic substance. Alcohol would have exacerbated the depth of his depression, but did not initiate the depression. IN summary, there is a clear temporal correlation between the retaliatory events and his deterioration. This presents a compelling and clear cause and effect association between the retaliation and Cpl. Balas' demise.

12/03/07 Weldon. Met John in 9/04 and they began a romantic relationship. He pursued her, initially anonymously. She ended the relationship in 12/04 and began dating another Correctional Officer. "He had a lot of personal problems that were interfering with our relationship." In part, his being married was a factor. She did not feel he was stressed about his work. He never mentioned that he felt his supervisor was angry with him for resigning from CERT. Recalls all of their conversations. Was seeing him weekly. He mentioned the grievance he had filed. He was displeased but not "upset" about the evaluation. During 12/04-2/05 time-period their conversations were about personal matters, not work. In 2/05, she went to Dep. Warden DeLoy regarding her concern that John was suicidal. This was he week before he killed himself. "I felt that John was going to hurt himself because I had tried to break things off and he expressed this to me and I did not know where else to go." She last spoke with John the morning of his suicide. He told her he rolled his truck the night before. He insisted he had not been drinking but his speech was very slurred. He had left her several messages on her voice mail that week. "I was trying to remove myself from the relationship and from communication from him." Friday night, he left her several messages. She spoke with him Saturday morning, but their conversation was interrupted, as he had to get off the phone. She then turned off her phone. He did not tell her he was trying to patch things up with Cindy, his wife.

12/20/07  Cindy Balas-Adkins.  Deposition.  We met at a bar in Lewes, Delaware. I was out with the girls from Beebe.  Thursday night was called ladies night, and I met him there.  And after that he called me and asked me out for a date.  It was the summer of 1990.  Began dating the next week.  We dated for eight months, and then we got engaged, and then we were married a year later.  We actually lived with my parents while we were looking for land, because we wanted to build a home.  I was still living at home, and John moved in.  Lived there for about three years.  It was difficult at times.  It is hard, two families living in one home.  We moved into our new home in August of '94.  How did John get along with your parents?  Good.  Were there any problems?  My mom would get upset when he on the way home from work, because he worked in Selbyville at J. Conn Scott Furniture, and he stopped at his parents' house after work and did not come straight home for dinner.  And so we ended up going to counseling to try to work through that, and we only -- he went once with me, and I went twice, and after that things got better.  After we went to counseling, he didn't speak to me for three days because just her questioning had made him feel, you know, that everything that had happened was his fault.  So I don't think he wanted to go back, no.  But he did improve after, after he had time to think about it.  They moved into their new home in 1994 and his parents moved into the same neighborhood, two doors away, in 2000.  And what was your relationship like with John's parents?  Good.  Did you ever have any problems with them?  When John and I first started dating, his mom, I believe, was jealous that he wanted to spend -- he was spending every single minute with me, and I think she didn't like that.  She wanted him to spend more time with her, with the family.  How did you feel when you found out that John's parents were moving into the neighborhood?  Both John and I were upset.  And actually, when we were shopping for our land, his parents wanted to go with us, and we picked up on when we were looking one time that they were also looking for land.  And I am, like, "John, I think they are wanting to buy with us," you know.  And I am, like, you know, "I love your parents, but I don't want to live next -- I don't want our marriage to be destroyed like my Aunt Martha's."  During the course of your relationship with John, did you have typical marital problems?  On and off, just like everybody else.  What types?  Well, when I was pregnant with Jonathan, a couple of guys would go to Pickles in Georgetown to have a drink after work, and I was towards the end of my pregnancy, and, you know, I said, you know, "I am expecting anytime, and I don't think you need to be at the bar drinking while I am" -- and actually, he didn't drink a lot, but he was just going to be sociable with his co-workers.  At that time he didn't drink a lot.  And so he quit going.  Did you ever argue over money?  When he first started working for the Department of Corrections, it upset him that I was making more than he was.  And I said it doesn't matter because it is all going in one pot, and it doesn't matter who is making it.  Any problem raising the kids?  No, not until the stress from the jail started in the fall of 2004.  He became very easily agitated and aggravated and would come home screaming and hollering at the kids.  And, you know, I would pull him to the side and say, you know, "That's not fair to the kids."  So, yes, it did bother me.  Did he seem stressed a lot

because of work from '94 to when he passed? Actually, no. And did he just talk generally about life as a correctional officer being stressful at all? Did he ever state that to you? Yes. And was this all throughout his career or -- Yes. John would come home and tell me that, you know, Truman had a personal vendetta against him, and that for speaking out against, you know -- resigning from CERT and speaking out for the job action, he felt like he was being retaliated against. In 1997 and 1999 received meets expectations evaluations of which she was not aware, believing he always received exceeds. Received a promotion after a meets expectations evaluation. John and Lt. Mears went duck hunting together. Did John seem stressed at work in 2003? Just mainly during the QRT training. And how was the trip (to Cabela's)? We had a wonderful time. We walked through the store holding hands, very loving. We had a lot of nice talks at dinner; very intimate that night in the hotel room. Was John different at all because of the medication? Yes. In Cabela's I noticed -- he started taking it on the 15th in the evening, because we went and got the prescription filled right away. And he took two pills, I believe, before we got up to Cabela's, and I noticed that he seemed to be stumbling a little bit. And I am like is this me, because the tile in the floor was a little bit rough. I was like is this me or is this him? I am, like, "Do you feel okay?" I said, "You feel like you are stumbling." And he said, "No. I am fine."

Notes on calendar were written by her about a month after John's death. After his death, she was delivered items from his locker, which she thinks included an email that Jennifer Cox had sent to him, that there was a copy of that. Do you remember what the email said? It was from her, and she said something about she couldn't believe that he was going home and sleeping with me, sleeping with -- "I can't believe you are going home sleeping with her." Oh, there was a photograph of Jennifer Cox. It was her -- I think it was her license. Apparently the night before his mom had come over after I had come home from the hospital when John had totaled my Tahoe and he told her that he couldn't wait for it to be over. And I didn't find out that until after he died. She is unhappy that John's parents bought paint ball guns for the children to use at their house and also because she believes they served the children tequila. I said (to John's mother), you know, "John had become an alcoholic. He shot and killed himself with a gun, so if you are going to give our kids alcohol and you are going to buy them a paintball gun against the counselor's advice?" I said, "I don't understand." She said, "Well, we didn't know." And I said, "What do you mean you didn't know? I told you the counselors" -- I said, "So if you didn't know, why did you tell the kids not to tell me?" And I said, "If you want to see them, you will have to come over here with me present. You will no longer see them by yourself." So then they went and got a lawyer to take me to court for visitation. And they eventually gave up. You mentioned before that you thought John had become an alcoholic. At what point do you think that that happened? I would say in July of '04 his drinking picked -- he had actually quit in May. He started drinking from stress from work, and he would come home and drink a couple beers so that he could -- on Sunday nights he would get off at midnight and have to be back at 8:00 in the morning. And the stress from work, he said, "I just have to drink a couple beers

so I can get to sleep." And then it just progressively got worse and worse and worse. And we had some arguments about that. And I actually was adding up -- we kept all the receipts, and I was adding up, and for one month he had spent $300 on beer. And I said, "This is ridiculous." And this is -- 150 of that is my money, and I don't want my money to be used like that." And I said, "If this continues, we are going to separate our accounts and you can pay half the bills and I will pay half the bills, because I am not spending $150 a month on booze." And you said he quit in May? May of '04. But that impliedly means he was drinking heavily before that; correct? Yes. His drinking started out to just be casual one or two beers a night and then got worse. And I wouldn't say that he was drunk or, you know, drinking every single day, but when he drank, he drank - - he would get drunk. And actually, one time I caught him drinking and driving with the children in the car, and I said, "If I ever find out this again, I will call you in DUI myself, because I don't want something to happen to our children." In July 2004. He started drinking again. Estimates he stared drinking in January of February of 2003.

Hospital evaluation. That was January 30th. It was on a Sunday. On Saturday prior to that, I had been shopping with my mom and the kids, and apparently Lee had gotten a phone call from John, and he was drunk. And so Lee goes, "Where are you?" So Lee went and found him, and he was at Kemp's Liquor Store. And when Lee found him, he had a loaded pistol in the truck and was very drunk. Later, Lee and John were target-shooting, and when they finished target-shooting, Lee noticed that John reloaded the nine-millimeter and he left it on top of the gun safe in our garage. And so Lee and John took off and had dinner, and John got really drunk. And apparently on the way home John told Lee, "I am not going to be living in the morning." And Lee thought, "Oh, my gosh. He has left that loaded nine-millimeter there at home. I can't take him home. Where am I going to take him?" So he thought, "Well, I could take him to Troop 4 or I could take him to his parents' house, but I can't take him home." So he thought, "Well, I will take him to Troop 4." And then he thought, well, that might jeopardize his job. So he decided to take him to his parents' house. And at 5:30 in the morning I received a phone call from Lee Mears's wife, Erika, and she said that Lee was still over next door or two doors down with John and that he had spent the whole night with him and that John was suicidal. Admits she has considered suing St. Joan's, especially since their records have disappeared. Do you recall what his personality was like that week, what his behaviors were like? Very withdrawn, moved very slowly, talked slowly, didn't hardly ever smile, and when he did, it wasn't his smile. It was, "Okay, I will look like I am happy." But he always had this real big smile and a very jolly, loud, laughing. He was not himself at all. He would sit on the sofa and just watch TV. He was very easily agitated, and you never knew what would set him off. You had to walk on eggshells.

And when did you return (from PA trip to Cabela's)? Late Thursday night. And it was on the way home, he said, "I have got something that I want you to listen to." And he put in a tape by Tim McGraw that said, "Kill Myself." And so I was

listening to that and I am like, oh, my gosh, no wonder he feels like -- if you don't know the background of the song, apparently Tim McGraw in the song wants to kill the old self and become a new self, and if you were in John's state of mind, you would have thought that, you know, the best thing for him to do was to kill himself.

The next day, John and Jonathan went for haircuts. They were later getting back home due to John having an accident. I was at the kitchen sink, and Jonathan came running up on the deck to the sliding glass door, and he opened it up, and he was panicking, and he goes, "Mom, look what Daddy has done to the Tahoe." And so I walked out, and this demolished Tahoe -- I couldn't believe it was driveable -- was pulled up in our backyard. And John was standing there and kind of looked like -- I describe it as a cartoon character with stars going. You know, he just looked like he had his bell rung (indicating). And I am, like, "Are you all right?" And he said yes. And I said, "What happened?" And he said, "I don't know." He said, "I lost control and I rolled it." And I said, "Well, how did you get it home like this?" John drove it home and left the scene of the accident. Did John ever tell you that he called Jennifer after he got in the accident? No, but my son did. Your son overheard it? Apparently John called from the accident. I found out later from Jonathan that his dad had called and used a cell phone that wasn't ours and called and spoke to Jennifer or Drugash, somebody. He was on the phone. And Jonathan goes, "Can I have that phone so I can call Mommy," and he goes, "No, you can't call Mommy from this phone." So I never knew about the accident until they drove up in the backyard. Had you ever seen this other phone before? No. Do you know if Jonathan had? I heard that he did. From Jonathan? Yes.

The night before he killed himself, his mother came over. She went upstairs, because John came in, put his coat in the closet and went straight up to bed, and she went up there to talk to him. Did she tell you what they talked about? No. But when I entered the room, they stopped their conversation. And I found out through a neighbor later that John had told her he would be glad when this was all over and that my mother-in-law had said, "But who is going to be cleaning their gun in their underwear when Lauren brings over her first boyfriend?" And he said, "Cindy will." Yes.

When we woke up that morning, he sat in the recliner and just was very quiet, and I said, "Are you upset because you totaled the car?" I said, "I think you have totaled the Tahoe." I said, "Are you upset that you wrecked I said, "That's material. It can be replaced." I said, "I am just glad that you and Jonathan are okay." They were supposed to take the digs to the SPCA to get Rabies shots. He went on out in the backyard and was doing some stuff, and I had the keys to his truck, because I had driven to the emergency room, and he came in and said, "Can I have the keys to my truck? I need to put something in it." And I said okay. So I gave him the keys to his truck. And then I later went out to the barn, and when you walk in the front part, there is another set of double doors that are

solid that you walk to the back part. And when I went in there, I didn't see him. And I opened up the double door, and it was dark, and I saw him walk by, and it was like he didn't even see me. And he was headed to the lawn mower that had the pistol. And I didn't know at the time that that's where he was headed, but that's where he was headed. He had the lights out. And I said, "John," and he didn't -- he still was walking. And I turned the light on and I was, like, "John." And "yeah?" like I startled him. And I said, "What would you like for breakfast?" I said, "I have got sausage. You want some sausage and eggs for breakfast?" "Whatever."

The year before his death, he didn't want to go hunting as much or do as much with Jonathan car racing. And after John got sick, he had no patience. As a matter of fact, one race he said, "Just get your mom to put your cart out there on the track." And so I went and got a friend of mine that I had gone to school with and I said, "Keith, can you help me get this cart out on the track?" And Jonathan won that race, so I was happy (fall 2004).

At what point did you find out that John had been having an affair with another woman? The day that he died. And how did you find out? My sister-in-law called me, Tina, Jeff's wife. Do you know why she decided to call you at that time? Had she just found out? Yes. What did she tell you? She told me that she had just found out. How did she find out? My brother. Do you know if your brother had known before that day? She said that he had known for a couple weeks. Had John ever had an affair that you know of before? Never. In the fall of 2004 did he tell you that he bought another woman flowers? No. Did he tell you that he was regularly confiding in another woman? No. Did he tell you that Jennifer tried to break off the relationship with him in December? No. Did John tell you that he continued to pursue her in January? No. Did you confront John about the relationship when you found out? Yes. Did John tell you that he called Jennifer multiple times that morning of his death? No. Did he tell you he called her the night before? No. Did he tell you he called her at all? No. I didn't know until that morning that he had been having an affair. What was his reaction when you confronted him? I went out there and I said, "You and I need to talk." And he said, "What?" And I said, "You've been cheating on me, haven't you?" And he nodded his head yeah. And I said, "Are you still seeing her?" And he shook his head no. And anything else? He said -- I said, "Do you love her?" He said, "I don't know what I think anymore." And he said -- what was I getting ready to say? He said, "I don't know what I think anymore." Oh, I said, "You and I promised one another we would never do this." I said, "How could you?" And that's what I just kept saying, "How could you?" And he just looked at me, and I turned around and walked out of the barn. Did you ever ask him when was the last time he spoke to her? No, because he told me the affair was over. Would you agree now that John was not truthful with you in the months before his death? Yes. Would you also agree that he was not loyal to you in the months before his death? Yes. Can you turn back to the calendar for me, which I believe was Exhibit 6, and February 19, you wrote on there, "Found out John cheated

from Tina. Confronted him. He killed himself." That's what it says; correct? Yes. Is that what happened? I found out later, when I found the suicide notes, that they were already in place prior to me going out and confronting him. So I believe he was going to do it regardless of whether I found out or not. But you don't have any idea when he might have left those notes there? I think that the notes were in his truck and that's why he asked for the keys to his truck when he said he had to put something in it, because the pad that they were written on came from his truck. And you don't know when he might have written them in his truck; correct? No. And you did go out and confront him about the other woman; correct? Yes. And at that point is when John killed himself; correct? He came back in the house and wanted to know who told me. And I told him -- I asked Tina, because I had her on the phone, because she said, "Call me when you get back in. I want to make sure that he doesn't hurt you." And I said, "Would you care if I tell John who?" And she said, "No, not if it is true." So I told him, and he said, "I have got one job to finish." He went out to the barn, and I said, "I have got to go," because our barn is really tall, and I said, "I don't know if he is going" -- because I thought he didn't have any more weapons. I said, "He may try to hang himself. I got to go." And when I got to the front door, I heard the side door slam, and I peeked back, and I saw his dog looking over there, and I am like, "Oh, he is going out the side door." So I quick ran around and I was chasing after him, and he turned around and pointed the gun at me and told me to get away. And did you? I just put my hands up and just froze. And he told me I could pack his bags, because before I left the barn I forgot; I told him, "I think you need to pack your bags and go state at your mom's." And he was backing up and actually tripped and fell, and he said: "Now you can pack my bags." And then he turned around, and as he was walking away from me, I said, "Please, can't we go to counseling and try to work this out? Please, please." And he wouldn't turn around.

Have you learned any more about the affair since that day from anyone else? Lee told -- Lee told me he found out that apparently John had sent her flowers end of August. Did Lee tell you when he found out about it, when Lee found out about it? After John's death. So Lee didn't know? Apparently Lee knew about the affair, but he didn't know the details of when it exactly started. Apparently on a duck hunting -- they went duck hunting one day and John told him he was having an affair, and Lee said, "I didn't believe him."

Started dating Ace and he moved in Fall 2005. She remarried June 2006.

Conclusion:

Mr. John Balas voluntarily and without coercion of any type chose to commit suicide on 2/19/05. This unfortunate decision to end his life was unrelated to any work issues. Rather, it reflects primarily the narcissistic injury suffered to his ego when he was shunned by Jennifer Weldon, with whom he was having an

extramarital affair, after she broke off the relationship in favor of another co-worker as well as the deterioration of his marriage to Cindy Balas (Adkins). These and other stressors caused him to seek professional mental health treatment.  Shortly before taking his own life, Mr. Balas was involved in a single vehicle accident (MVA), rolling his truck, with his son as a passenger. He fled the scene of this accident and there is a significant suspicion that alcohol was involved. He was drinking heavily at times and driving while intoxicated. There is ample reason to suspect a concussion, which would also have contributed to disinhibited and impulsive behavior and poor judgment.

It was in the aftermath of the MVA that his wife Cindy learned of his extramarital affair, confronted Mr. Balas, and he then shot himself, leaving suicide notes. Neither the suicide itself, nor any depression leading up to his choice to kill himself was a product of his September 2004 work performance evaluation or disputed time cards, nor were any mental health issues he might have evidenced in 2004 or 2005 related to his job as a Correctional Officer (CO) for DOC.  Mr. Balas had received evaluations of meets expectations at least on two prior occasions and then subsequent promotions.  The idea that this was the first time he ever was evaluated as other than exceeds expectations is not factually correct.  There is also no evidence of workplace retaliation in terms of assignments, shifts, salary, requests for time off, demotions, transfers, etc.

Rather, other non-work related stressors including his marital problems, extramarital affair, concerns over inter-familial relationships, his own alcoholism, probable concussion, underlying personality, feelings of rejection and abandonment and shame all contributed to his decision to take his life, rather than to appropriately confront his problems and straighten things out.

All of the opinions stated in this report are to a reasonable degree of medical and psychiatric certainty.

Sincerely:

Neil S. Kaye, MD, DFAPA

Diplomate of the American Board of Psychiatry and Neurology
with Added Qualifications in Forensic Psychiatry and
with Added Qualifications in Geriatric Psychiatry

**B000047**

# Correctional Officer's Association of Delaware



Blue Hen Corporate Center
655 S. Bay Road
Suite 4KK
Dover, DE 19901

Phone: 302-734-8061
Fax: 302-734-8062

www.truetoblue.org



November 13, 2007


The Neuberger firm, P.A.
Stephen J. Neuberger, Esq.
Two East Seventh Street, Suite 302
Wilmington, DE  19801


Dear Mr. Neuberger,

     I have researched all of COAD's files & records, there is no information Pertaining to Mr. John Balas in our office.

Sorry we could'nt have been of better assistance to your firm.


If you have any further questions feel free to contact this office.



Sincerely,

Patricia Jordan
Officer Manager


cc:    Stephen Martelli
      C.O.A.D  President



RECEIVED

DEC 0 7 2007

By_____

P834

B000048

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

CINDY L. ADKINS,                       )
Executrix of the Estate                )
of JOHN J. BALAS,                      )
                                       )
         Plaintiff,                    )
                                       )
         v.                            )    C. A. No. 06-592-JJF
                                       )
STANLEY W. TAYLOR, JR.,                )
ALAN MACHTINGER,                       )
MICHAEL DELOY,                         )
DAVID WILKINSON,                       )
TRUMAN MEARS, and the                  )
DEPARTMENT OF CORRECTION               )
of the STATE OF DELAWARE,              )
                                       )
         Defendants.                   )

## CERTIFICATE OF SERVICE

The undersigned certifies that on February 19, 2008, he caused the Appendix to Opening Brief in

Support of Defendants' Motion for Summary Judgment to be sent via CM/ECF to the following:

> Thomas S. Neuberger, Esq.
> Stephen J. Neuberger, Esq.
> Cheryl Hertzog, Esq.
> Two East Seventh Street, Suite 302
> Wilmington, DE 19801

                          DEPARTMENT OF JUSTICE
                          STATE OF DELAWARE

                          /s/ Ralph K. Durstein, III
                          Ralph K. Durstein, III, ID #912
                          Stacey Xarhoulakos, ID #4667
                          Deputy Attorneys General
                          Carvel State Office Building
                          820 North French Street
                          Wilmington, DE 19801
                          (302) 577-8400
                          Attorneys for Defendants