IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CINDY L. BALAS a/k/a CINDY L.          :
ADKINS, Executrix of the Estate of     :
CORPORAL JOHN J. BALAS,                :
                                       :
         Plaintiff,                    :
                                       :
    v.                                 :        C.A.No. 06-592-JJF
                                       :
STANLEY W. TAYLOR, JR., individually   :
and in his official capacity as the    :
Commissioner of Correction; ALAN       :
MACHTINGER, individually and in his    :
official capacity as the Director of Human :
Resources of the Department of         :
Correction; MICHAEL DELOY,             :
individually and in his official capacity as :
Deputy Warden of Sussex Correctional   :
Institution; CAPTAIN DAVID             :
WILKINSON, individually;               :
LIEUTENANT TRUMAN MEARS,               :
individually; and DEPARTMENT OF        :
CORRECTION OF THE STATE OF             :
DELAWARE,                              :
                                       :
         Defendants.                   :

## JOINT PRE-TRIAL STIPULATION AND ORDER

(1)     A statement of the nature of the action, the pleadings in which the issues are
        raised (e.g., third amended complaint and answer) and whether
        counterclaims, crossclaims, etc., are involved;

**Plaintiff's Statement**:

        This is a First Amendment retaliation action for compensatory and punitive damages and

for injunctive relief brought by the Estate of a deceased Correctional Officer whose death was

proximately caused by a Department wide policy of retaliation against Correctional Officers who

refused to engage in anti-Union activity or become strike breakers, in violation of the decedent's

rights to free speech, association, assembly and petition under the First and Fourteenth

Amendments of the U.S. Constitution. As a citizen the decedent engaged in protected conduct under the First Amendment, by speaking out on matters of public concern regarding union solidarity issues, actively associating with his Union and refusing to become a strike breaker in a job action by Union members who also were petitioning government for the redress of grievances and engaging in collective bargaining. Defendant Truman Mears then retaliated against him in such a severe fashion that as a direct and proximate result the decedent committed suicide on February 19, 2005 as a result of the retaliation.

The issues are raised in the Complaint and the Answers thereto. No counterclaims, cross-claims, etc. remain in the case.

**Defendants' Statement:**

This is a survival action filed on behalf of the Estate of a Department of Correction ("DOC") employee who committed suicide on February 19, 2005. The suit was filed against State of Delaware Defendants: (1) Stanley Taylor, Commissioner of the DOC (retired); (2) Alan Machtinger, DOC Human Resources Director; (3) Deputy Warden (now Warden) Michael Deloy; (4) Captain (now Major) David Wilkinson; (5) Lieutenant Truman Mears and (6) the DOC. The lawsuit was filed on September 25, 2006. The plaintiff claims damages under 42 U.S.C. § 1983 for alleged "retaliation" against the decedent, John Balas. Plaintiff has recently abandoned most of her original claims against all defendants, other than Lt. Mears and the DOC, admitting that she has no basis for her allegations against them and thus no basis for her allegations of a department- wide policy of retaliation.

The defendants have at all times denied the allegations of "retaliation." Defendants have asserted defenses based on the applicable statute of limitations, sovereign and qualified immunity from liability, the limited claims and damages recoverable in a survival action under Delaware

law, the failure of the plaintiff to state any viable claim arising from the suicide of the decedent, and the plaintiff's failure to establish a first amendment retaliation claim.  On January 31, 2008, defendants moved for summary judgment as to all claims asserted against them by the plaintiff. Briefing is complete and the motion is pending before the Court.

**(2)     The constitutional or statutory basis of Federal jurisdiction, together with a brief statement of the facts supporting such jurisdiction.**

**Plaintiff's Statement:**

The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) and (4), 28 U.S.C. §§ 2201 and 2202, and the First and Fourteenth Amendments to the U.S. Constitution. The cause of action arises under 42 U.S.C. § 1983. The claim arose in this judicial district.

**Defendants' Statement:**

The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3). The cause of action is brought under 42 U.S.C. § 1983. The claim arose in this judicial district, and claim violations of the First and Fourteenth Amendments of the United States Constitution. Defendants do not dispute the jurisdiction of this Court to hear the plaintiff's First Amendment retaliation claims brought in the form of a survival action filed on behalf of the Estate of the decedent. Defendants submit, as argued in detail in their Brief in Support of Motion for Summary Judgment, that the District Court lacks jurisdiction to hear any claim for damages arising from the suicide death of the decedent as the plaintiff has not asserted a state law wrongful death claim.

Balas, Cindy \ Pre-Trial \ (02) Jurisdiction.draft.02.wpd

**(3)    A statement of the facts which are admitted and require no proof.**[1]

1.    John Balas ("decedent") committed suicide on February 19, 2005. (Compl. & Ans. ¶1).[2]

2.    Plaintiff is the widow of Corporal John J. Balas, a citizen of the United States and a resident of Sussex County, Delaware. She is the executrix of the Estate of John J. Balas, appointed under his Last Will and Testament dated June 15, 1994, and brings this survival action on behalf of the Estate. (Compl. & Ans. ¶3).

3.    At the time of his death, decedent was employed by the Department of Correction ("DOC") for eleven years and held the rank of Corporal. (Compl. & Ans. ¶4).

4.    Decedent was a member in the Correctional Officers' Association of Delaware ("COAD"), which was the bargaining agent for DOC employees. (Compl. & Ans. ¶4,131).

5.    Prior to being hired by the Department of Correction, decedent served in the United States Navy from 1986 to 1989 and subsequently he was a member of the Naval Reserves until 1999. Decedent also served for three years in the Army National Guard of Delaware. (Compl. & Ans. ¶5).

6.    Stanley W. Taylor, Jr., at all times relevant hereto, was the Commissioner of Correction of the State of Delaware. Taylor was in a position of administrative authority to review the operations of the DOC. (Compl. & Ans. ¶6).

7.    Alan Machtinger, at all times relevant hereto, was the Director of Human Resources and Development of the Department. Machtinger was in a position of administrative authority to review the Human Resources operations of the DOC. (Compl. & Ans. ¶7).

8.    Michael Deloy, at all times relevant hereto, was the Deputy Warden of the Sussex Correctional Institution ("SCI"). Deloy was in a position of administrative authority at SCI. (Compl. & Ans. ¶8).

9.    Captain David Wilkinson, at all times relevant hereto, was the superior officer in the chain of command over the decedent. Wilkinson was in a position of command authority within SCI. (Compl. & Ans. ¶9).

---

[1] There is a dispute as to some of these Admitted facts as noted at # 29-48 below.

[2] *See* Complaint (D.I.1) and Answer (D.I.9).

10.      Lieutenant Truman Mears, at all times relevant hereto, was the superior officer for the decedent. Mears was in a position of command authority within SCI. He is sued in his individual capacity. (Compl. & Ans. ¶10).

11.      DOC is a State agency, named as a defendant in the lawsuit filed by plaintiff. (Compl. & Ans. ¶11).

12.      On August 6, 2004, the DOC Certified Emergency Response Team ("CERT") was activated to assist the Court and Transportation Unit in transporting officers to and from court. (Compl. & Ans. ¶31,33).

13.      Ten CERT members were asked to fill in for the court and transportation officers who usually would be forced to work overtime to accommodate the prisoners' court schedules. These court and transportation officers were responsible for the transportation of DOC offenders to their court appearances and for the transfer of offenders from one facility to another. (Compl. & Ans. ¶44).

14.      Decedent was a CERT Team member on August 6, 2004. (Compl. & Ans. ¶32).

15.      At the end of their shift, decedent and other CERT members tendered their resignation directly to the Warden and handed in their equipment and declined to participate in the assignment any further. (Compl. & Ans. ¶36-37,47).

16.      Decedent served as a Corporal in the Property/Receiving Room. His essential job duties included processing prisoners and transfers, logging each prisoner's personal belongings upon arrival to the prison, issuing prison attire and collecting the prisoners' paperwork. (Compl. & Ans. ¶42).

17.      The Human Resources Division controls, among other things, the terms, conditions and privileges of employment, promotions, assignments, transfers, shifts and days off. (Compl. & Ans. ¶50).

18.      At all times, defendant Mears was aware of the reasons the ten CERT team members resigned. He had even participated in a CERT team meeting to discuss their possible resignation. (Compl. & Ans. ¶56).

19.      In fact, Mears was one of the CERT Team members. (Compl. & Ans. ¶57).

20.      On September 26, 2004, Mears approached decedent with his 2004 annual performance evaluation and asked him to review and sign it. At that time, decedent learned that he received a rating of "Meets Expectations." (Compl. & Ans. ¶60).

21.      Decedent refused to sign the evaluation. (Compl. & Ans. ¶70).

22.    On February 19, 2005, Corporal John J. Balas committed suicide in his backyard while his wife and children were in their home. He administered a self-inflicted gunshot wound to his head. His widow has subsequently remarried. (Compl. & Ans. ¶90).

23.    Participation in CERT is voluntary.

24.    Decedent was promoted to Corporal on February 1, 1998.

25.    Correctional officers in Delaware receive periodic pay raises, and are eligible during their career with the Department of Correction for promotions, transfers, and extra duty assignments that yield additional compensation.

26.    The decedent did not suffer any loss of salary, vacation time, promotion, or any other economic loss during his lifetime as a result of any of the allegations in the Complaint.

27.    On February 18, 2005, John Balas had a rollover accident in his truck with his son in the vehicle.

28.    Decedent received evaluations of "meets expectations" in 1996 for the time period between January 1, 1996 and December 15, 1996 and in 1999 for the time period between February 1, 1998 and January 31, 1999.

**Issue for the Court to Address**

Defendants admitted all of the following facts in their Answer and now, after the close of discovery, have raised objections as noted below. Plaintiff believes that numbers 29-48 below should be Admitted as Facts that require no proof under the doctrine of binding judicial admissions.

29.    On June 1, 2002, COAD was certified as the exclusive bargaining representative for all correctional officers up to and including Sergeants and also for other positions which require basic correctional officer training plus a primary skill. (Compl. & Ans. ¶12).

30.    Throughout 2003 and 2004, COAD members engaged in negotiations with DOC. (Compl. & Ans. ¶14-16).

31.    DOC employees raised various issues, such as security, minimum staffing, overtime, salary and turnover, in the course of collective bargaining and negotiations conducted by COAD. (Compl. & Ans. ¶17-21).

32.    The State of New Jersey pays a higher starting salary to correctional officers than

Delaware pays to its correctional officers. (Compl. & Ans. ¶19).

33.   On July 12, 2004, a female counselor at Delaware Correctional Center was assaulted by an inmate and held hostage, before being rescued. COAD raised the issue of employee security in the context of labor negotiations. (Compl. & Ans. ¶22).

34.   COAD sought to promote the interests of DOC employees in the context of contract negotiations. (Compl. & Ans. ¶23).

35.   At this time, the news media reported on issues involving the DOC. (Compl. & Ans. ¶23).

36.   The contract negotiations between management and COAD were ongoing, constructive, and at times contentious. (Compl. & Ans. ¶24).

37.   Governor Minner and Commissioner Stan Taylor monitored the effects on the court system caused by the job action. (Compl. & Ans. ¶29).

38.   On August 5, 2004, the Governor filed a lawsuit in Chancery Court and sought a Temporary Restraining Order to end the job action ("TRO") naming COAD leaders as defendants. The TRO was denied. (Compl. & Ans. ¶30).

39.   The action of Decedent and the other CERT members in resigning their positions on the CERT Team was taken to pursue employee grievances in the context of collective bargaining and contract negotiations. (Compl. & Ans. ¶35).

**Defendants' objections to #29-39 above:**

Defendants object to the plaintiff's inclusion of facts that are not relevant to the allegations of retaliation in the Complaint. The alleged First Amendment conduct occurred in August of 2004 and the alleged retaliation in months thereafter. Any acts alleged to have occurred before September 25, 2004 are time-barred. Plaintiff attempts to include facts dating back to 2002 that have no relevance to the alleged retaliatory conduct. Accordingly, defendants object to # 1-11 above pursuant to:

FRE 401, 402 –    Evidence not relevant to this litigation
FRE 403 –    Confusion of Issues/Unfair prejudice

**Plaintiff's Response to These Objections:**

The defense contention that admissions contained in their Answer are not evidence and may not be used as admitted facts at trial is clear error.

**A. Judicial Admissions.** As our District has explained, an "admission in a pleading is a judicial admission, which is binding on the litigant." Donald M. Durkin Contracting, Inc. v. City of Newark, 2006 WL 2724882, *6 (D.Del. Sept. 22, 2006). In the Third Circuit's words, "judicial admissions are binding for the purpose of the case in which the admissions are made." Glick v. White Motor Co., 458 F.2d 1287, 1291 (3d Cir. 1972). "If factual matters in issue have been judicially admitted, *they are binding on the tendering party*." Donald M. Durkin Contracting, 2006 WL 2724882, *6 (emphasis added).

"It is axiomatic that a party's assertion of fact in a pleading is a judicial admission by which it normally is bound throughout the course of the proceeding. Courts have specifically found that admissions in a party's answer constitute judicial admissions to which the party is subsequently bound." Marathon Enter., Inc. v. Schroter GMBH & CO. KG, 2003 WL 355238, *4 (S.D.N.Y. 2003) (internal punctuation and citations omitted). "[M]atters admitted in a defendant's answer require neither proof nor finding." Martinez v. Cornell Corrections of Texas, Inc., 229 F.R.D. 236 (D.N.M. 2005) (internal punctuation omitted). Indeed, numerous courts have held that matters admitted by a defendant in their Answer are deemed conclusively admitted for the purposes of the litigation.[3]

**B. Evidence Discussion.** Admitted Facts #29-38 are relevant to the overall content, form and context in which plaintiff's protected speech and associations were occurring. Additionally, one of the motives for retaliating against plaintiff arose from the fact that his protected activity occurred in the midst of a long public battle between the union and the DOC that was widely reported in the Delaware media, which itself was reporting almost daily on the widespread problems plaguing the troubled DOC. In our present case, defendants wanted to punish plaintiff for his public stand in support of union solidarity which publically embarrassed and angered the DOC.

Admitted Fact #39 is relevant to establishing why plaintiff and his fellow CERT members resigned. As defendants admitted in their Answer, this action was taken "to pursue employee grievances in the context of collective bargaining and contact negotiations." (Compl. & Ans. ¶ 35).

None of the above uses can be fairly said to confuse the issues or unfairly prejudice

---

[3]     See National Assoc. of Life Underwriters, Inc. v. Commissioner of Internal Revenue, 30 F.3d 1526, 1530 (D.C.Cir. 1994); Missouri Hous. Develop. Comm. v. Brice, 919 F.2d 1306, 1314 (8th Cir. 1990); Schott Motorcycle Supply, Inc. v. Amer. Honda Motor Co., Inc., 976 F.2d 58, 61 (1st Cir. 1992); Bright v. QSP, Inc., 20 F.3d 1300, 1305 (4th Cir. 1994); Knudsen v. U.S., 254 F.3d 747, 752 (8th Cir. 2001); Dunham v. City of O'Fallon, 945 F.Supp. 1256, 1261 (E.D.Mo. 1996); Elec. Mobility Corp. v. Bourns Sensors/Controls, Inc., 87 F.Supp.2d 394, 405 (D.N.J. 2000); In re Cendant Corp., 109 F.Supp.2d 225, 230 (D.N.J. 2000); Dortz v. City of N.Y., 904 F.Supp. 127, 146 n.6 (S.D.N.Y. 1995); Mitchell v. Allen, 1994 WL 66099 (N.D.Ill. 1994).

defendants. As the District of New Jersey has explained, it is certainly not unfair to hold a party "to its unambiguous and plainly worded statements, deliberately drafted by counsel for the express purpose of limiting and defining the facts at issue." In re Cendant Corp., 109 F.Supp.2d at 230 (internal punctuation omitted).

40.   DOC employees participated in a job action by refusing to work their scheduled job assignments in the Court and Transportation Unit. This failure to report for work caused concerns and problems for judges and prosecutors. (Compl. & Ans. ¶25-26).

41.   Months after resigning from CERT, in the context of a dispute over a performance evaluation, the decedent asked for a transfer from defendant Truman Mears to another supervisor. (Compl. & Ans. ¶55,80).

42.   In previous evaluations, Mears recognized the decedent's perfect attendance records and mentioned his CERT membership as areas where his performance was distinguished or exceeded expectations and ranked him as "Exceeds Expectations." (Compl. & Ans. ¶62).

43.   Decedent contacted Capt. Wilkinson regarding his refusal to sign his performance evaluation. (Compl. & Ans. ¶71).

44.   In February, decedent asked that his performance evaluation be returned to him. (Compl. & Ans. ¶74).

45.   As part of his home record keeping, the decedent periodically made copies of his time cards. (Compl. & Ans. ¶77).

46.   The decedent mentioned changes on his timecards regarding the use of emergency vacation days to Captain Wilkinson, who discussed it with Lt. Mears, who agreed to remove the "emergency" notations. (Compl. & Ans. ¶78).

**Defendants' objections to #40-46 above**:

Defendants do not stipulate to the allegations set forth at paragraphs 40-46 above in that the plaintiff bears the burden of proving such facts through competent evidence at trial, and such testimony is barred by the hearsay rule, Rule 802, and no exception applies.

**Plaintiff's Response to These Objections:**

**A. Judicial Admissions.** As discussed above, the doctrine of judicial admissions conclusively establishes these facts in this litigation. Defendants may not now contest them.

**B. Evidence Discussion.** The hearsay rule does not bar these admissions because they are judicial admissions by a party opponent. By definition, they are not hearsay. <u>See</u> Fed.R.Evid. 801(d)(2) (Admissions by a Party Opponent).

47.    Further, under the State Merit Law, 29 Del.C. §5927, performance records are considered in determining salary increases, promotions, transfers, and other employment actions. (Compl. & Ans. ¶68).

48.    At all times material hereto the individual defendants and their agents were acting under color of law. (Compl. & Ans. ¶103).

**<u>Defendants' objections to #47-48 above</u>:**

Defendants object because they call for legal conclusions, and are thus not the proper subject of factual statements. They are not admitted.

**<u>Plaintiff's Response to These Objections:</u>**

**A. Judicial Admissions.** As discussed above, the doctrine of judicial admissions conclusively establishes these facts and legal issues in this litigation. Defendants may not now contest them.

**B. Evidence Discussion.** Even to the extent these are considered a mix of factual matters and legal conclusions, by admitting these in their Answer, defendants removed them from the case as contested issues.

(4)     **A statement of the issues of fact which any party contends remain to be litigated.**

**Plaintiff's Statement:**

1.      Did decedent engage in protected petition of government?

2.      Did decedent engage in protected union association?

3.      Did decedent engage in protected speech through his union solidarity debate with defendant Mears, symbolic speech of refusing to cross a picket line, and resignation from CERT?

4.      Did decedent engage in protected speech as a citizen rather than pursuant to his job duties as a correctional officer or CERT member?

5.      Was decedent's protected speech on matters of public concern?

6.      Was decedent subject to adverse action which would chill a person of ordinary firmness in the exercise of his first amendment freedoms?

7.      Did defendant Mears admit that decedent's protected activity was a factor in his decision in evaluating decedent?

8.      Did defendant Mears know of the protected activity?

9.      Did defendant Mears demonstrate anger, hostility and antagonism towards decedent?

10.     Did defendant Mears have a motive to retaliate against decedent?

11.     Is there a suggestive temporal proximity of the events?

12.     Was decedent singled out for disparate treatment when prior to his resignation from CERT, decedent received good evaluations from defendant Mears who recognized his meritorious job performance, but after his resignation decedent received a lowered negative evaluation?

13.     Does evidence of pretext and a coverup demonstrate causation?

14.     Do defendant Mears' intentional falsehoods demonstrate causation?

15.     Do defendant Mears' violations of DOC procedures demonstrate causation?

16.    Would defendant Mears have made the same decisions if decedent had not engaged in protected speech or petition (only if the Court rules this is still in the case)?

17.    Were the actions of the defendant the proximate cause of any damage to decedent?

18.    What is the total amount of non-economic damages decedent suffered for emotional distress, injury to his reputation, and/or humiliation?

19.    What economic damages has decedent suffered up to the date of his death?

20.    What economic damages will decedent's estate suffer into the future including the loss of earnings, pension and other benefits losses based upon the probable duration of the decedent's life had not the injury occurred?

21.    What economic damages did decedent's estate suffer for funeral expenses?

22.    Did defendant Mears act recklessly, intentionally or maliciously with regard to decedent?

23.    What amount of punitive damages is an appropriate award, if any?


**Defense Objections to Plaintiff's Contested Statement of Facts:**

Defendants object to #'s 1-6, 11 and 13-15 as they call for a legal conclusion.

Defendants object to #'s 3, 5-8, 12-15, and 16 as they are predicated on disputed factual or legal conclusions.

Defendant's object to #20 and 21 as the plaintiff has only filed a survival action and is thus barred from pursing any claims arising from the death of the decedent.

**Defendants' Statement**:

1.    Whether Defendant Stanley Taylor had any personal involvement in the events alleged.

2.    Whether Defendant Alan Machtinger had any personal involvement in the events alleged.

3.    Whether Defendant Mike Deloy had any personal involvement in the events alleged.

4.    Whether Defendant David Wilkinson had any personal involvement in the events alleged.

The plaintiff has presented no opposition to the Defendants' motion for summary judgment on the issues asserted in (1) though (4).

5.    Whether the decedent engaged in constitutionally protected speech?

6.    Whether the decedent ever spoke out in support of the union?

7.    Whether the decedent ever filed a grievance with his union?

8.    If yes, whether defendants had knowledge of the filed grievance prior to any of the alleged retaliatory conduct?

9.    Whether the decedent's performance evaluation with a rating of "meets expectations" was based on reasons unrelated to his resignation from CERT.

10.    Whether a rating of meets expectations has any negative effect on an officer's employment with the DOC

11.    Whether the rating of meets expectations had any negative effect on Balas' employment with the DOC.

12.    Whether the decedent suffered any adverse employment action as a result of engaging in protected conduct (if it is found that he engaged in such activity).

13.    If so, was that "adverse employment action" taken because of any protected activity by decedent (if it is found that he engaged in such activity)?

14.    If the decedent did suffer an "adverse employment action", was the adverse action trivial or de minimis?

15.    Would defendants have made the same decisions anyway, regardless of whether

the decedent engaging in constitutionally protected activity (if it is found that he did engage in such activity)?

16.    The decedent never looked at his performance evaluated dated September 26, 2004.

17.    Decedent was engaged in an extramarital affair with Jennifer Weldon in the fall of 2004.

18.    Cindy Adkins learned of John Balas' affair on the morning of his death and confronted him about it.

## DEFENSE STATEMENT TO DAMAGES

1.    Is plaintiff entitled to any damages?

2.    If yes, in what amount?

3.    Did any defendant act with malice or reckless indifference to the decedent's constitutionally protected rights?

4.    If yes, what amount of punitive damages is appropriate?

    **(5)**    **A statement of the issues of law which any party contends remain to be litigated, and a citation of authorities relied upon by each party.**

**Plaintiff's Statement:**

**I.**    **AS A MATTER OF LAW, PLAINTIFF[1] ENGAGED IN THE FIRST AMENDMENT PROTECTED ACTIVITY OF HIS UNION MEMBERSHIP, A UNION SOLIDARITY DEBATE WITH MEARS, SYMBOLIC SPEECH REFUSING TO CROSS A PICKET LINE, RESIGNATION FROM CERT AND FILING A UNION GRIEVANCE, ALL OF WHICH PROTECTED ACTIVITY WAS A SUBSTANTIAL OR MOTIVATING FACTOR IN CAUSING RETALIATION AGAINST HIM.**

Public employee claims of retaliation for engaging in protected First Amendment activity are analyzed using a three-step process. Hill v. City of Scranton, 411 F.3d 118, 125 (3d Cir. 2005); Springer v. Henry, 435 F.3d 268, 275 (3d Cir. 2006). First, the employee must show that the activity is protected. Second, the employee must show that the protected activity was a substantial or motivating factor in causing a retaliatory action. Lastly, the employer has the affirmative defense of demonstrating that it would have taken the same adverse action even in the absence of protected conduct. Springer, 435 F.3d at 275; Hill v. City of Scranton, 411 F.3d at 125.

In our present case, plaintiff will prove that he was a longstanding member of an aggressive union which in 2004 was at war with management, the DOC and the Governor. In the midst of a work stoppage plaintiff openly debated defendant Mears, his antagonist, about joining the union action. Then the next day, after initially crossing the picket line, with many others he symbolically resigned his CERT position to convey a message of union solidarity and he refused to cross the picket line ever again. During the immediate course of subsequent harassment and

---

    [1] To reduce confusion, the decedent John J. Balas will be referenced as "plaintiff."

1

retaliation by his direct supervisor, defendant Mears, he also grieved his mistreatment. Significantly, Mears under questioning admitted that this protected activity "was a factor" in his downgrading plaintiff's previous stellar performance record.

**A. Plaintiff Engaged in Protected Union Association.** The protected status of First Amendment activity is a question of law. Hill v. City of Scranton, 411 F.3d at 127.

"While the freedom of association is not explicitly set out in the [First] Amendment, it has long been held to be implicit in the freedoms of speech, assembly and petition." Healy v. James, 408 U.S. 169, 181 (1972). Here, plaintiff will prove that he engaged in protected First Amendment activity by joining and associating with COAD, the correctional officer's union which was actively sounding the alarm about the prison public safety crisis. "[T]he First Amendment protects the right of public employees to join together in a union, to seek redress for grievances through that collective entity, and to be free from retaliation for engaging in such activities." Petrario v. Cutler, 187 F.Supp.2d 26, 31-32 (D.Conn. 2002). As the Third Circuit has explained, "efforts of public employees to associate together for the purpose of collective bargaining involve associational interests which the first amendment protects from hostile state action." Labov v. Lalley, 809 F.2d 220, 222-223 (3d Cir. 1987).

**1. Public Concern Requirement.** The Circuits are split on whether the public concern requirement of Connick v. Myers, 461 U.S. 138, 147-48 (1983), applies to public employee association claims. Compare Hatcher v. Bd. of Pub. Educ., 809 F.2d 1546, 1558 (11th Cir.1987) with Boals v. Gray, 775 F.2d 686, 691-693 (6th Cir.1985). The Third Circuit has declined to address whether Connick generally applies to association claims. Sanguigni v. Pittsburgh Bd. of Public Educ., 968 F.2d 393, 400 (3d Cir. 1992). In so declining, the Third Circuit also held that Connick applies when a claim of association is based on expression that

2

does not independently implicate associational rights to any significantly greater degree than does the speech at issue. Id.

Here, even though the nature of plaintiff's association with COAD implicates rights above and beyond traditional free speech interests, as explained in Argument **I.C.3** below, plaintiff's union association clearly implicates matters of public concern. Accordingly, this Court need not resolve the issue of whether Connick applies to association claims since COAD was clearly addressing matters of public concern, such as security lapses and understaffing which endangered public safety.

Thus, plaintiff will prove that his union membership was protected activity under the First Amendment which could not serve as a basis for adverse action.

**B. As a Private Citizen Plaintiff Also Engaged in Protected Free Speech.** Speech is protected when a public employee speaks on a matter of public concern and the employee's interests as a citizen outweigh the government's interest as employer. See Pickering v. Bd. of Educ., 391 U.S. 563, 568 (1968); Garcetti v. Ceballos, 547 U.S. 410, 126 S.Ct. 1951, 1958 (2006); Springer, 435 F.3d at 275. Here, plaintiff will prove that he first debated defendant Mears on the question of solidarity with his union brothers on August 5th, 2004. Mears wanted to back management, and plaintiff strongly disagreed. The next day, after being cursed for crossing a picket line, plaintiff and others spoke out and resigned their CERT membership and engaged in the symbolic act of further refusal to be a scab and cross the picket line. Mears immediately learned of this speech and symbolic act and set out on his course of retaliation of plaintiff who was under his direct command.

**1. Symbolic Speech Was Protected.** Plaintiff engaged in symbolic speech when he resigned his position on CERT to support the union job action and, to show solidarity with his

union brethren, he also refused to cross the picket line again. As the Third Circuit has explained, "'[s]peech' is not construed literally, or even limited to the use of words." Tenafly v. The Borough of Tenafly, 309 F.3d 144, 158 (3d Cir. 2002). "Constitutional protection is afforded not only to speaking and writing, but also to some nonverbal acts of communication, *viz.,* 'expressive conduct' (or 'symbolic speech')." Id.; Virginia v. Black, 538 U.S. 343, 358 (2003).

Expressive conduct is protected by the First Amendment when "the nature of the activity, combined with the factual context and environment in which it was undertaken, shows that the activity was sufficiently imbued with elements of communication to fall within the First Amendment's scope." Tenafly, 309 F.3d at 158 (internal punctuation omitted); Troster v. Pennsylvania State Department of Corrections, 65 F.3d 1086, 1090 (3d Cir. 1995); Spence v. Washington, 418 U.S. 405, 409-10 (1974). This is a "fact-sensitive, context-dependent inquiry" and "the speaker bears the burden of proving that his or her conduct is expressive." Tenafly, 309 F.3d at 161. Certainly that burden has been carried here. As a matter of law, in the midst of a job action and a year of heated anti-management activity by his union, plaintiff's resignation from CERT and his refusal to ever again cross the picket line said to management and the Governor loud and clear - "I Corporal John Balas stand in solidarity with the men and women of COAD in their job action which is designed to draw attention to our legitimate grievances about mismanagement which endangers the public safety and welfare!"

In Troster, the Third Circuit explained that this inquiry is twofold. 65 F.3d at 1090. First, the court must examine "whether the officer intended subjectively (*i.e.,* actually intended) for his conduct to communicate to persons whom he expected to observe it (*i.e.,* his intended audience)." Tenafly, 309 F.3d at 161. Here, the record is undisputed that plaintiff (and the other resigning CERT members) subjectively intended their resignation to communicate their support

4

of the job action to DOC management. (Wilkinson 37-39,49-50;Deloy 41; T.Mears 115,118; L.Mears 52-53; L.Mears Ex.2 #22-23 p.4; Adams 18-22; Bradley 25,27; West 16,20-21; Shockley 15,19; Hastings 17-18; Mumford 24,28-31; Foskey 21,24,29-31; A922-23,925-26,903, 734-35,1062,1071,869-70,880-81,889-90,957,966-67,976-78,987-90). Their message was clear that they were resigning as a way of showing support for the job action. (West 20-21; A890). "We felt like we had a moral obligation to back up our fellow officers that we work with above anything else."(Hastings 18; A967). They resigned from CERT "[t]o support COAD."(Wilkinson 50; A926).

Second, the court must consider "whether observers understood the message the officer intended his conduct to convey." Tenafly, 309 F.3d at 161. As several former CERT members stated, the Warden understood why the CERT members were resigning even though he did not agree with it or the method the members employed. (Adams 19,22; Shockley 15; Hastings 18; Mumford 31; Foskey 31; A869-70,957,967,978,990). Defendant Mears was well aware of the message intended by their conduct. (T.Mears 112,115,118-19; A733-35). Additionally, plaintiff directly informed defendant Wilkinson that they resigned to back the union members and "[t]o support COAD." (Wilkinson 49-50; A925-26).

Furthermore, "[c]ontext is crucial" in evaluating expressive conduct. Tenafly, 309 F.3d at 158. Plaintiff's symbolic resignation came in the midst of a long running public battle and media firestorm about the hazardous conditions in DOC prisons. COAD was speaking out to the media, petitioning elected officials and conducting a symbolic job action to force the public, the Legislature and the Governor to take notice of the many problems plaguing the prison system. Thus, as a matter of law, plaintiff will prove that his symbolic speech taken in its proper context

5

is clearly expressive conduct protected by the First Amendment.[2]

        **2. Speech as a Citizen Also Was Protected.** In <u>Garcetti</u>, the Supreme Court

held that speech by public employees made "pursuant to their official duties" is not protected.

<u>Garcetti</u>, 126 S.Ct. at 1960. Here, neither plaintiff's job duties as a correctional officer in the

receiving room (Inter. #3 p-; West 11-12; Hastings 10; Bradley 13; Mears 56-57; A656,888,87,

719), nor as a member of CERT (Inter #3 p.; T.Mears 61-62; Shockley 9-10; Hastings 12;

Mumford 18-20; A656,720-21,955-56,965,975), required him to debate Mears the night before

and take an anti-management position opposed to the pro-management Mears. Nor did his job

duties require him to symbolically resign from CERT or refuse to cross a picket line to show

solidarity with his union brethren and the job action. (Id.). Indeed, if anything, plaintiff refused

to perform his CERT duties when he resigned from CERT. As a matter of logic, refusing to

perform one's job duties cannot be a part of one's job duties. Such an action was not part of his

official duties as a CERT member or correctional officer. Similarly, plaintiff's association and

support for COAD also does not fall within the scope of his job duties. See <u>Fuerst v. Clarke</u>, 454

F.3d 770, 774 (7th Cir. 2006) (holding that a union representative's criticism of his public

_____

    [2] The Supreme Court has long recognized that a multitude of expressive conduct can
implicate First Amendment protections. <u>See, e.g.</u> <u>City of Erie v. Pap's A.M.</u>, 529 U.S. 277, 289
(2000) (nude erotic dancing); . <u>Hurley v. Irish-American</u>, 515 U.S. 557, 568 (1995) (marching in
a parade); <u>Texas v. Johnson</u>, 491 U.S. 397, 406 (1989) (burning an American flag); <u>Clark v.
Community for Creative Non-Violence</u>, 468 U.S. 288, 293 (1984) (sleeping in a public park to
protest homelessness); <u>Tinker v. Des Moines Indep. Community Sch. Dist.</u>, 393 U.S. 503, 505-
06 (1969) (wearing black armbands to protest the Vietnam War).

6

employer falls outside the scope of Garcetti); Shefcik v. Village of Calumet Park, 2007 WL
3334329, *4-5 (N.D.Ill. Nov. 7, 2007) (union official's union speech not required by his job
duties)

   **3. The Message Also Was on Matters of Public Concern.**  "An employee's
speech addresses a matter of public concern when it can be 'fairly considered as relating to any
matter of political, social, or other concern to the community.'" Pro v. Donatucci, 81 F.3d 1283,
1288 (3d Cir. 1996).  This is determined by reference to the "content, form, and context of a
given statement, as revealed by the whole record." Connick, 461 U.S. at 147-48.

   **a. Content.**

   **(1). Union Activity.**  Speech involving union activity and other
related union efforts is inherently a matter of public concern. See, e.g. Crane v. Yurick, 287
F.Supp.2d 553, 560 (D.N.J. 2003); Herrera v. Med. Center Hosp., 241 F.Supp.2d 601, 610-11
(E.D.La. 2002); see also Thomas v. Collins, 323 U.S. 516, 531-32 (1945); Thornhill v. Alabama,
310 U.S. 88,102-03 (1940); Hotel & Restaurant Employees, 832 F.2d 263, 265 (3d Cir. 1987);
McGill v. Bd. of Educ., 602 F.2d 774, 778 (7th Cir. 1979); Cafeteria Employees Union v.
Angelos, 320 U.S. 293 (1943); Senn v. Tile Layers Protective Union, 301 U.S. 468 (1937).  Here,
the union was locked in public battle intended to resolve the crisis conditions in Delaware
prisons.  Plaintiff's anti-management solidarity speech and his symbolic resignation was part of
that battle and it was intended to show his support for the union's efforts.

   **(2). Public Safety Crisis in Prisons.**  Correctional officers hold a
unique status among public employees given that their job is to guard and maintain those deemed
to be too dangerous to function in society.  Cf. Wilcher v. City of Wilmington, 60 F.Supp.2d 298,
304 (D.Del.1999).  Similarly, speech related to systemwide crisis levels of understaffing in all of

7

the DOC prisons as well as dire health and safety issues, security lapses, and the inability to

retain qualified correctional officers inherently relates to matters of public concern. See Morris

v. Lindau, 196 F.3d 102, 111 (2d Cir. 1999); Springer v. Henry, 2002 WL 389136, *4 (D.Del

March 11, 2002) (speech involving suicides and escapes are "concerns of a grave nature that

would be relevant to the...taxpayers who financed the operation."). "Without doubt, issues of

prison security, public safety, and official corruption are matters of concern to the community,

particularly to one hosting a correctional facility." Spiegla v. Hull, 371 F.3d 928, 936 (7th Cir.

2004).[3]

        **(3). Wrongdoing and Breach of the Public Trust.** "The content

of the speech may help to characterize it as relating to a matter of social or political concern of

the community if . . . the speaker seeks to 'bring to light actual or potential wrongdoing or breach

of public trust' on the part of government officials." Holder v. City of Allentown, 987 F.2d 188,

195 (3d Cir. 1993) (quoting Connick, 461 U.S. at 148). Here, the union's long public campaign

sought to expose "specific wrongs and abuses" in the prison system relating to its

mismanagement. Baldassare v. State of N.J., 250 F.3d 188, 196 (3d Cir. 2001). These included

the Governor's removal of vacant job positions to skew the actual staffing numbers, (Knight

Decl. #18-19 p.4; A551), and management's decision to lower employment requirements just to

maintain minimum staffing levels. (Id. #83 p. 14; A561). More importantly, however, the union

sought to expose the Governor and management's outright refusal to take drastic measures to fix

---

    [3] Accord Campbell v. Arkansas Dept. of Correction, 155 F.3d 950, 958 (8th Cir. 1998); Kiddy-Brown v. Blagojevich, 408 F.3d 346, 358 n.9 (7th Cir. 2005); Cygan v. Wisconsin Dept. of Corrections, 388 F.3d 1092, 1100 (7th Cir. 2004); Jennings v. Warren County Com'rs, 2006 WL 694742, *5-6 (N.D.Ind. 2006); Hughes v. Bedsole, 913 F.Supp. 420, 428 (E.D.N.C. 1994); Mascetta v. Miranda, 957 F.Supp. 1346, 1356 (S.D.N.Y 1997).

the problems affecting the DOC.

(4). **Best Position to Know.**  By virtue of their jobs, certain

persons are in better positions to speak out on certain issues than the public at large and "it is

essential that they be able to [do so] without fear of retaliatory dismissal." Pickering, 391 U.S. at

572 . The Third Circuit has adopted this same principle.

> Silencing a public employee seeking to speak on a matter of public concern deprives a
> self-governing society of information that may be vital to informed decision-making . . .
> [t]his can be a particularly serious loss because public employees, by virtue of their
> constant interactions with a public office, are often in the best position to know what ails
> that office.

Azzaro v. County of Allegheny, 110 F.3d 968, 977 (3d Cir. 1997) (en banc); accord Pickering,

391 U.S. at 571-72.  In the case at bar, this speech is protected because correctional officers are

in the best position to know what is ailing the prison system so it is essential that the public be

able to hear their informed voice on such important public issues.

(5).  **Informed Electorate and the Conduct of Government.**

Relatedly, public employees also have an "interest in ... enabling the electorate to make informed

decisions." Curinga v. City of Clairton, 357 F.3d 305, 310 (3d Cir.2004).  Speech on matters

about government during the time of elections falls at the heart of First Amendment protection.

See, e.g. **Buckley v. Valeo, 424 U.S. 1, 49 n.55 (1976); Republican Party of Minnesota v.**

**White, 536 U.S. 765, 781 (2002).**

During the Summer of 2004, COAD was speaking out and informing the public about the

dramatic shortcomings of the prison system under the stewardship of our Governor,

shortcomings that were endangering public safety in the midst of a hotly contested gubernatorial

campaign.  In doing so, the union was speaking out about public officials "discharging [their]

governmental responsibilities" and "[brought] to light actual or potential wrongdoing or breach

9

of the public trust" on the part of these officials. <u>Czurlanis v. Albanese</u>, 721 F.2d 98, 104 (3d Cir.

1983). In the same way, the union was publicly opposing the Governor's reelection because of

the disastrous conditions in the prisons.

       **(6). Advocacy in a Democracy.** Likewise, "[a]dvocacy for a

change in public perception and law, a fundamental component of democracy, is certainly a

matter of public concern, regardless of the underlying subject matter." <u>Melzer v. Bd. of Educ. of

City Sch. Dist. of City of N.Y.</u>, 336 F.3d 185, 196 (2d Cir. 2003). Here, the union was

advocating for change in the entire Delaware prison system.

       **b. Form and Context.**

       **(1). Media Coverage.** Whether a particular issue receives news

coverage also is relevant in determining the public import of speech.[4] In the Supreme Court's

words, "public concern is something that is a subject of legitimate news interest; that is, a subject

of general interest and of value and concern to the public at the time of publication." <u>City of San

Diego v. Roe</u>, 543 U.S. 77, 83-84 (2004) (per curiam). The widespread media coverage

regarding the issues at the DOC during the summer of 2004 speaks for itself in support of the

proposition that plaintiff's activity was on matters of public concern. (P1-441; A49-489).

       **(2). Legislative Concern.** Moreover, legislative interest also may

be used to demonstrate the public value of speech. <u>See</u> <u>Rode</u>, 845 F.2d at 1201-02. Here, the

legislature and members of the Joint Finance Committee were involved and concerned about the

issues union officials were speaking about, including the understaffing problem addressed by the

---

[4] <u>See, e.g.</u> <u>Pickering</u>, 391 U.S. 563 (newspaper); <u>Holder</u>, 987 F.2d 188 (newspaper); <u>Rode v.
Dellarciprete</u>, 845 F.2d 1195 (3d Cir. 1988) (newspaper); <u>Watters v. City of Phila.</u>, 55 F.3d 886 (3d
Cir. 1995) (newspaper); <u>Springer v. Henry</u>, 2002 WL 389136 (D.Del. March 11, 2002) (newspaper).

job action. (Knight Decl. #14-15 p.3-4;A550-51).

          **(3). Public Safety Setting.** It also is well established that speech occurring in the public safety setting raises the public's level of concern. See Caver v. City of Trenton, 420 F.3d 243, 256 n.11 (3d Cir. 2005). Similarly, the speech at issue addressed staffing levels which directly related to the protection of inmates, officers and the public.

          **(4). Motivation.** Finally, the union's motive to keep the public informed and plaintiff' personal motive to stand up for the rights of his fellow union members in calling public attention to the crisis in the Delaware prisons serve the public interest and are not purely personal. See Versarge v. Township of Clinton, N.J., 984 F.2d 1359, 1364 (3d Cir. 1993) ("[M]otiv[e] is relevant to the extent that it indicates whether the speaker is speaking as a citizen upon matters of public concern or . . . upon matters only of personal interest.").

    **4. Disruption and Balancing of Interests Is Not a Defense in This Case.** Next, the trial court ordinarily must balance the interests of the government as an employer in promoting the effective and efficient fulfillment of its public responsibilities against the public employee's interest as a citizen in speaking out on matters of public concern and the value to the community at large of being free to hear such speech. Azzaro, 110 F.3d at 980. The burden is on the employer here to make a "substantial showing." Waters v. Churchill, 511 U.S. 611, 674 (1994) (plurality opinion); Watters v. City of Phila., 55 F.3d at 896.

    "The more tightly the First Amendment embraces the speech the more vigorous a showing of disruption must be made." McGreevy v. Stroup, 413 F.3d 359, 365 (3d Cir. 2005) (internal punctuation omitted). As the Supreme Court has warned, "[v]igilance is necessary to ensure that public employers do not use authority over employees to silence discourse, not because it hampers public functions but simply because superiors disagree with the content of

employees' speech." <u>Rankin v. McPherson</u>, 483 U.S. 378, 384 (1987).

Importantly however, "[t]his balancing test comes into play *only* if the public employer concedes that it dismissed an employee because of the employee's protected speech but contends that it was justified in doing so." <u>San Filippo v. Bongiovanni</u>, 30 F.3d 424, 434 n.11 (3d Cir. 1994)(emphasis added).[5] If the employer denies that is dismissed the employee for his protected speech, the balancing test "has no application." <u>Id.</u>; <u>accord</u> <u>Howard v. Bd. of Educ.</u>, 90 Fed.Appx. 571, 575 n.6 (3d Cir. 2003). Accordingly, in our present case because defendants flatly deny any retaliation whatsoever against plaintiff because of his protected conduct the balancing test "has no application." <u>Id.</u>; (See Compl & Ans. ¶59-81; A15-19,39-42). Consequently, plaintiff's speech is protected by the First Amendment since it was on matters of public concern and no disruption defense has been raised.

**C. Protected Petitioning.** The First Amendment also protects the "right to petition the Government for a redress of grievances." U.S. Const., Amend. I. "The right to petition the government for grievances is a fundamental component of a just and orderly society." <u>Anderson v. Davila</u>, 125 F.3d 148, 164 (3d Cir. 1997). "[W]hen one files a 'petition' one is addressing [the] government and asking government to fix what ... government has broken or has failed in its duty to repair." <u>San Filippo</u>, 30 F.3d at 442.

Here, plaintiff invoked the formal mechanism of his union grievance procedure to petition the government for redress concerning his downgraded evaluation. <u>San Filippo</u>, 30 F.3d at 439 n.18; <u>Foraker v. Chaffinch</u>, 501 F.3d 231, 236 (3d Cir. 2007). Because plaintiff invoked a

---

[5] <u>Accord</u> <u>Dennison v. Pa. Dept. of Corr.</u>, 268 F.Supp.2d 387, 399 (M.D.Pa. 2003); <u>Mitchell v. Street</u>, 415 F.Supp.2d 490, 494 n.5 (E.D.Pa. 2005); <u>Bedford v. SEPTA</u>, 867 F.Supp. 288, 295 n.8 (E.D.Pa. 1994).

formal mechanism, no public concern analysis comes into play. <u>San Filippo</u>, 30 F.3d at 442;

<u>Foraker</u>, 501 F.3d at 236. Instead, matters of purely private concern are protected, as long as the

petition is not a sham. <u>Hill v. City of Scranton</u>, 411 F.3d at 126. Review of plaintiff's union

grievance reveals that it is not a sham. (Ackenbrack Ex.1;T.Mears Ex.12;P831-32; A1046-

47,848-49,587-88). Accordingly, it was protected conduct and cannot be the basis for retaliation.

**D. As a Matter of Law Plaintiff Has Proven That Protected Conduct Was A**

**Substantial or Motivating Factor in a Course of Adverse Action.** Following the

determination that his conduct was constitutionally protected, plaintiff also must demonstrate that

this conduct was a "substantial" or "motivating factor" in the relevant decision. <u>Suppan v.</u>

<u>Dadonna</u>, 203 F.3d 228, 235 (3d Cir. 2000); <u>Mount Healthy City Bd. of Educ. v. Doyle</u>, 429 U.S.

274, 287 (1977). "But for" causation is not needed. <u>Suppan</u>, 203 F.3d at 236. "'Substantial

factor' does not mean 'dominant' or 'primary' factor." <u>Hill v. City of Scranton</u>, 411 F.3d at 126

n.11. Instead, a plaintiff need only show that his protected First Amendment rights "played any

substantial role" in the relevant decision. <u>Suppan</u>, 203 F.3d at 236; <u>see</u> <u>Miller v. Cigna Corp.</u>, 47

F.3d 586, 597 n.9 (3d Cir. 1995) (en banc) ("played a role" in the adverse decision). This is a

question of fact. <u>Hill v. City of Scranton</u>, 411 F.3d at 127. The evidence follows.

**1. Direct Evidence Admission.** Mears actually admitted at his deposition that

plaintiff's resignation from CERT "was a factor" in his decision to not give him a ranking of

"Exceeds Expectations." (T.Mears 174-75; A749).

**2. Demonstrated Anger, Hostility and Antagonism.** At his deposition

defendant Mears was forced to admit his upset and antagonism towards plaintiff. Mears was

disappointed in the CERT members' decision to resign. (T.Mears 133; A738). Mears'

antagonism for plaintiff is best illustrated by his comment that plaintiff was a man of integrity up

13

until the time he quit CERT. (T.Mears 54-55; A719). "[A] plaintiff [also] can establish a link

between his or her protected behavior and subsequent discharge if the employer engaged in a

pattern of antagonism in the intervening period." Woodson v. Scott Paper Co., 109 F.3d 913,

920-21 (3d Cir. 1997); accord Adkins v. Rumsfeld, 389 F.Supp.2d 579, 586 (D.Del. 2005). For

example, evidence that a defendant is "irritated" or otherwise angered by a plaintiff can be

compelling evidence of causation. See Fasold v. Justice, 409 F.3d 178, 190 (3d Cir. 2005)

(defendant "irritated" by protected conduct). Here, defendant Mears had a "personal vendetta"

against plaintiff. (P832;T.Mears Ex.13; A588,850). Mears was out to "screw" him. (Wilkinson

57; A927).

     **3. Unduly Suggestive Temporal Proximity.** Temporal proximity "is an obvious

method by which a plaintiff can proffer circumstantial evidence sufficient to raise the inference

that [his] protected activity was the likely reason for the adverse action." Kachmar v. Sungard

Data Sys., Inc., 109 F.3d 173, 177 (3d Cir. 1997) (internal punctuation omitted). When a

plaintiff engages in a pattern of protected activity and is

> dismissed shortly after the final episode of such protected activity, a fact-finder may
> reasonably infer that it was the aggregate of the protected activities that led to retaliatory
> dismissal. This inference would be particularly strong if the plaintiff can show that the
> decisionmaker lacked a pretext on which to dismiss the plaintiff until shortly before the
> time of dismissal.

San Filippo, 30 F.3d at 444. Here, Balas was retaliated against and given the mediocre

evaluation just one month after his resignation from CERT.

     **4. Knowledge of the Protected Activity.** Sufficient evidence must be produced

to demonstrate that the defendants knew of the protected activity. Keenan v. City of Phila., 983

F.2d 459, 466 (3d Cir. 1992). Here, Mears was present when plaintiff debated him on union

solidarity and the next day he immediately learned of plaintiff's symbolic speech and resignation.

14

Moreover, all the defendants were aware of the fact that plaintiff and the union were speaking out.

      **5. Motive to Retaliate.** Mears and all the defendants had a distinct motive to retaliate against plaintiff. Here, the job action and union speech gave the appearance that DOC management was losing control of its officers. Additionally, the CERT activation was politically motivated and ordered by the Governor. The CERT resignation went completely against management's desires to squelch the successful job action. Mears carried forth this antagonism by retaliating against plaintiff.

      **6. Disparate Treatment.** Similarly, evidence of disparate treatment also can demonstrate causation. San Filippo, 30 F.3d at 444; Brennan v. Norton, 350 F.3d 399, 421 (3d Cir. 2003); Adkins, 389 F.Supp.2d at 586. Prior to the resignation, plaintiff received good evaluations from Mears who recognized his meritorious job performance. After speaking out in support of the union and job action, Mears refused to recognize his outstanding accomplishments and instead fabricated performance deficiencies.

      **7. Violations of Procedures.** Violations of laws, rules, policies and procedures also are proof of wrongdoing. See Village of Arlington Heights v. Metropolitan Hous. Develop. Corp., 429 U.S. 252, 267 (1977); Stewart v. Rutgers, The State Univ., 120 F.3d 426, 434 (3d Cir. 1997); Bray v. Marriott Hotels, 110 F.3d 986, 992, 994 (3d Cir. 1997). Here, defendant Mears has no documentary record of plaintiff's alleged performance deficiencies in violation of DOC policy. Mears also disobeyed his direct supervisor's instruction when he submitted plaintiff's evaluation without a meeting taking place.

      **8. Falsehoods.** As the Supreme Court has held, it is a "general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact

15

as affirmative evidence of guilt." Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133,

147 (2000). "We routinely expect that a party give honest testimony in a court of law; there is no

reason to expect less of an employer charged with unlawful [retaliation]." Sheridan, 100 F.3d at

1069. Here, it is clear that defendant Mears fabricated numerous claimed performance

deficiencies to somehow try to justify his retaliatory actions.

     **9. Pretext and Cover-Up.** Pretextual explanations by a defendant also are proof

of causation. Feldman v. Phila. Hous. Auth., 43 F.3d 823, 831 (3d Cir. 1994); Adkins, 389

F.Supp.2d at 586. This is because "[r]esort to a pretextual explanation is, like flight from the

scene of a crime, evidence indicating consciousness of guilt, which is, of course, evidence of

illegal conduct." Sheridan, 100 F.3d at 1069. Record evidence is sound in this regard.

     **10. The Big Picture.** "A play cannot be understood on the basis of some of its

scenes but only on its entire performance, and similarly, a [retaliation] analysis must concentrate

not only on individual incidents, but on the overall scenario." Andrews v. City of Phila., 895

F.2d 1469, 1484 (3d Cir. 1990). The big picture in our case makes it clear that defendants

illicitly retaliated against plaintiff because he engaged in protected speech when he resigned from

CERT to support the job action and by virtue of being a COAD member.

     **11. Conclusion.** Thus, in light of the overwhelming record evidence outlined

above, it is clear that plaintiff has met his burden and demonstrated that his First Amendment

protected activity consisting of his union association, solidarity debate with Mears, resignation,

symbolic speech and refusal to cross the picket line, together with his union grievance, as a

matter of law played a "substantial role in the relevant decision." Suppan, 203 F.3d at 236.

Importantly, "but for" causation is not needed. Id. "'[S]ubstantial factor' does not mean

'dominant' or 'primary' factor." Hill v. City of Scranton, 411 F.3d at 126 n.11. As a matter of

law, due to the overwhelming evidence outlined above - including defendant Mears' own admission of the same - no reasonable jury could conclude otherwise.

    **E. Same Decision Anyway Affirmative Defense.** The burden of proof then "shifts to the defendant to show 'by a preponderance of the evidence that it would have reached the same decision even in the absence of the protected conduct.'" Nicholas v. Pa. State Univ., 227 F.3d 133, 144 (3d Cir. 2000). This last step is an "affirmative defense" to be met by the defendants, id., and also is a question of fact. Hill v. City of Scranton, 411 F.3d at 127.

    But defendants failed to plead this affirmative defense in their Answer to the Complaint as required under the Federal Rules, see Fed.R.Civ.P. 8(c) (a party must plead any "matter constituting an avoidance or affirmative defense"), so no discovery was needed on this issue. (See D.I. 9 p.16). Accordingly, it has been waived and plaintiff seeks such a ruling from the Court at this time. See Charpentier v. Godsil, 937 F.2d 859, 863 (3d Cir. 1991) (noting the general rule that "[f]ailure to raise an affirmative defense by response pleading or by appropriate motion generally results in the waiver of that defense.") (internal footnotes omitted).

    As a matter of law, plaintiff will prove he engaged in protected conduct and that his speech certainly played a motivating or substantial role in the unprecedented retaliation that occurred. Lastly, because defendants chose not to assert their affirmative defense, plaintiff will prove that liability can be established and damages can be assessed.

**II.    AS A MATTER OF LAW, DEFENDANT MEARS' RETALIATION AGAINST PLAINTIFF WOULD CHILL A PERSON OF ORDINARY FIRMNESS FROM EXERCISING THEIR FIRST AMENDMENT RIGHTS**

    **A. The Basics.** In the First Amendment context, "the constitutional violation is not in the harshness of the sanction applied, but in the imposition of *any* disciplinary action for the exercise of permissible free speech." Bennis v. Gable, 823 F.2d 723, 731 (3d Cir. 1987)

(emphasis added). The First Amendment "is implicated whenever a government employee is disciplined for his speech." Id. The breadth of its protection is demonstrated by the Supreme Court and the Third Circuit's repeated recognition that the First Amendment "protects state employees not only from patronage dismissals but also from even an act of retaliation as trivial as failing to hold a birthday party for a public employee . . . when intended to punish her for exercising her free speech rights." Suppan, 203 F.3d at 234 (quoting Rutan v. Republican Party, 497 U.S. 62, 76 n.8) (internal punctuation omitted); accord O'Connor v. City of Newark, 440 F.3d 125, 128 (3d Cir. 2006). "The effect on freedom of speech may be small, but since there is no justification for harassing people for exercising their constitutional rights it need not be great in order to be actionable." Suppan, 203 F.3d at 235 (quoting Bart v. Telford, 677 F.2d 622, 625 (7th Cir. 1982)).

**B. The Person of Ordinary Firmness Standard.** Accordingly, adverse action is found if "retaliatory conduct [is] *sufficient to deter a person of ordinary firmness* from exercising his First Amendment rights." Suppan, 203 F.3d at 235 (citing Bart, 677 F.2d at 625) (internal punctuation omitted) (emphasis added); accord O'Connor, 440 F.3d at 128; Allah v. Seiverling, 229 F.3d 220, 225 (3d Cir. 2000); Shehee v. City of Wilm., 67 Fed.Appx. 692, 694 (3d Cir. May 13, 2003) (public employee context); see Lapinski v. Bd. of Educ. of the Brandywine Sch. Dist., 2006 WL 167443, *2 (3d Cir. Jan. 24, 2006) (public employee context) (reversing the district court for failing to apply the person of ordinary firmness standard in a First Amendment retaliation case).[6] Put another way, the retaliatory actions must be sufficient to "cause reasonably

---

[6] Numerous other courts have adopted this standard. See e.g. Bennett v. Hendrix, 423 F.3d 1247, 1254-55 (11th Cir. 2005); Washington v. County of Rockland, 373 F.3d 310, 320 (2d Cir. 2004); Keenan v. Tejeda, 290 F.3d 252, 258 (5th Cir. 2002); Carroll v. Pfeffer, 262 F.3d 847, 850 (8th Cir. 2001); Smith v. Plati, 258 F.3d 1167, 1176 (10th Cir. 2001); Bloch v. Ribar,

hardy individuals" to refrain from protected activity. Agosto-de-Feliciano, 889 F.2d at 1217.[7]

This is an objective test, not a subjective one. Garcia v. City of Trenton, 348 F.3d 726, 729 (8th

Cir. 2003).[8]

    As the Third Circuit has explained, a "First Amendment retaliation claim will lie for any

individual act which meets this 'deterrence threshold,' *and that threshold is very low.*"

O'Connor, 440 F.3d at 127-28 (emphasis added); accord Price v. Chaffinch, 2006 WL 1313178,

*3 (D.Del. May 12, 2006). "First Amendment retaliation claims are always individually

actionable, even when relatively minor." O'Connor, 440 F.3d at 127-28. As the Supreme Court,

Third Circuit and District of Delaware have repeatedly noted, the person of ordinary firmness

standard may be satisfied even for acts of "retaliation as trivial as failing to hold a birthday party

for a public employee if intended to punish her for exercising her free speech rights." Id.

(internal punctuation omitted); accord Rutan, 497 U.S. at 76 n.8; Suppan, 203 F.3d at 234-35;

Price, 2006 WL 1313178, *3. This is not surprising in the employment context given that, as one

---

156 F.3d 673, 678 (6th Cir. 1998); Agosto-de-Feliciano v. Aponte-Rogue, 889 F.2d 1209, 1217
(1st Cir. 1989) (en banc); Bart, 677 F.2d at 625;

    [7] The person of ordinary firmness standard is an easier standard to meet than in the
statutory Title VII discrimination context. See, e.g. Rivera-Jimenez v. Pierluisi, 362 F.3d 87, 94
(1st Cir. 2004) ("the standard for showing an adverse employment action is lower in the First
Amendment retaliation context than it is in other contexts (such as Title VII)."); Baca v. Sklar,
398 F.3d 1210, 1220 (10th Cir. 2005) ("we have repeatedly concluded that a public employer can
violate an employee's First Amendment rights by subjecting an employee to repercussions that
would not be actionable under Title VII."); Rodriguez v. Torres, 60 F.Supp.2d 334, 345 n.10
(D.N.J. 1999) (recognizing the distinction between the adverse action standards in the First
Amendment and Title VII contexts).

    [8] Because this is an objective standard, a plaintiff need not demonstrate that he actually
was deprived of his First Amendment rights. See Constantine v. Rectors and Visitors of George
Mason Univ., 411 F.3d 474, 500 (4th Cir. 2005). Indeed, "[s]peech can be chilled even when not
completely silenced." Rhodes v. Robinson, 408 F.3d 559, 568 (9th Cir. 2005); see Constantine,
411 F.3d at 500 ("The cause of action targets conduct that tends to *chill* such activity, not just
conduct that *freezes* it completely").

Court has observed,"[o]ne does not have to be an employment expert to know that an employer can make an employee's job undesirable or even unbearable without money or benefits ever entering into the picture." Collins v. State of Ill., 830 F.2d 692, 703 (7th Cir. 1987).

"Determining whether a plaintiff's First Amendment rights were adversely affected by retaliatory conduct is a fact intensive inquiry focusing on the status of the speaker, the status of the retaliator, the relationship between the speaker and the retaliator, and the nature of the retaliatory acts." Brennan, 350 F.3d at 419; see Andrews v. City of Phila., 895 F.2d at 1484 ( "A play cannot be understood on the basis of some of its scenes but only on its entire performance, and similarly, a [retaliation] analysis must concentrate not on individual incidents, but on the overall scenario").   Importantly liability may be established "based upon a continuing course of conduct even though some or all of the conduct complained of would be *de minimis* by itself or if viewed in isolation." Id. at 419 n.16; see Suppan, 203 F.3d at 235 (noting that what is "trivial in detail may have been substantial in gross"); O'Connor,440 F.3d at 128.

**C. Discussion.** Defendant Mears' course of retaliatory harassment and acts of adverse action against plaintiff include the following:

- Giving plaintiff a mediocre evaluation of his job performance, job performance which, as Captain Wilkinson explained, does not meet the expectations set for correctional officers in the DOC.

- Falsifying plaintiff's evaluation and fabricating allegations of misconduct to justify Mears' actions.

- Violating Captain Wilkinson's order to meet with he and plaintiff before Mears turned in the evaluation to HR.

- Denying plaintiff a meeting with Mears himself and his union representative.

- Altering plaintiff's time card.

- Denying plaintiff a copy of his time card.

20

    ·      Repeatedly denying plaintiff transfer to a new supervisor.

    ·      Nitpicking plaintiff's work performance.

This long course of retaliatory conduct is certainly "sufficient to deter a person of ordinary firmness from exercising his First Amendment rights." Suppan, 203 F.3d at 235; O'Connor, 440 F.3d at 128. Indeed, in light of this retaliation, as a matter of law a "reasonably hardy individual[]" would to refrain from exercising his First Amendment rights. Agosto-de-Feliciano, 889 F.2d at 1217.

## III.    SHOULD THE COURT GRANT PLAINTIFF THE FOLLOWING RELIEF:

(a)    Enter judgment against the defendants, jointly and severally.

(b)    Enter a declaratory judgment declaring the acts of the defendant to be a violation of John Balas' constitutional rights.

(c)    Enter a judgment against the individual defendant for funeral expenses and other compensatory damages, including lost wages, back pay, pension and other benefits, for future or front pay, loss of earning capacity, emotional distress, humiliation, and injury to reputation.

(e)    Enter a judgment against the individual defendant for punitive damages.

(f)    Issue a reparative injunction directing that the individual defendant place a signed document in John Balas' personnel file apologizing for violating his constitutional rights.

(h)    Award Plaintiff attorney's fees, costs and pre and post judgment interest for this action.

(i)    Require such other and further relief as the Court deems just and proper under the circumstances.


### Defense Objection to Plaintiff's Statement:

21

Defendants' object to the plaintiff's "statement of the issues of law" in its entirety. The pretrial procedure was designed to provide a "clear statement of the issues to be tried." *Johnson v. Geffen*, 294 F.2d 197, 199 (C.A.D.C. 1960)(citing *Meadow Gold Prods. Co. v. Wright*, 278 F.2d 867 (D.C. Cir. 1960)(cited in the advisory notes of Fed. R. Civ. P. 16). Thus, Local Rule 16.3(4) requires a "statement of the issues of law which any party contends remains to be litigated, and a citation of authorities relied upon by each party." Rather than provide a clear statement of the issues, the plaintiff has provided legal argument that appears to have been largely cut and pasted from her summary judgment briefs. Rule 16 does not request or call for legal argument under the statement of issues. By improperly substituting legal argument in place of a concise statement of the issues to be litigated, the plaintiff's statement contravenes the purpose of a pretrial order to streamline the issues for the Court and for trial.

### Plaintiff's Response

By incorporating by reference the entirety of the defense summary judgment briefing (see below), defendants have done what they have accused plaintiff of doing.

**Defendants Statement:**

1.    Whether the plaintiff is barred by the applicable statute of limitations from

arguing any retaliatory conduct prior to September 25, 2004, the date the

Complaint was filed.

2.    Whether the plaintiff's claims in this survival action are limited to those arising
during the decedent's lifetime.

3.    Whether the plaintiff can recover for damages sustained by the decedent after his
death when a wrongful death action has not been filed.

4.    Whether the decedent's alleged protected conduct was pursuant to his official
duties and thus barred by *Garcetti*?

5.    Whether the plaintiff can establish a *prima facie* case of retaliation against the
defendants by a preponderance of the evidence.


a..  If yes, whether the defendants can establish that they would have taken the
same actions absent the protected activity of decedent.

6.    Whether defendants are entitled to qualified immunity on the claim of a
"campaign of retaliatory harassment" that was not clearly established at the time
of the filing of the Complaint.

7.    When it is undisputed that the DOC is protected from liability by the Eleventh
Amendment, is it necessary or appropriate to retain the DOC as a nominal
defendant for the sole purpose that the plaintiff *might* at some point recover costs
in this case.

8.    Whether Defendants Taylor, Machtinger, Deloy, and Wilkinson can be held liable
absent any personal involvement in the events alleged.


Defendants have moved for summary judgment on all of the above legal issues and the citations
of authorities relied upon for purposes of summary judgment will also be relied upon for
purposes of trial.

**Defendant's Statement to Damages:**

1.  Did the acts of the defendants proximately cause any harm to the decedent?

2.  If yes, what damages are appropriate?

3.  Are punitive damages appropriate?

4.  Can plaintiff's harm, if any, be fully rectified by the award of damages, and may the Court order the injunctive and equitable relief sought by the plaintiff?

5.  Whether, and in what amount, attorneys' fees are appropriate?

Balas, Cindy 5335-06\Pre-Trial\(5) Legal Issues.draft.03.wpd

24

(6)     A list of pre-marked exhibits, including designations of interrogatories and answers thereto, requests for admissions and responses, which each party intends to offer at the trial with a specification of those which will be admitted in evidence without objection, those that will be objected to and the Federal Rule of Evidence in support of said objection and the Federal Rule of Evidence relied upon by the proponent of the exhibit.

**Schedule (6)(1)**
**Plaintiff's "No Objection" Exhibits**

1. The following exhibits were offered by Plaintiff, received in evidence and marked as indicated.

| Plaintiff's Ex. No. | Description |
|---|---|
| P__ | |
| P__ | |
| P__ | |
| P__ | |
| P__ | |
| P__ | |
| P__ | |
| P__ | |
| P__ | |

2

Schedule (6)(1)
Plaintiff's "Objection"Exhibits

1. The following exhibits were offered by Plaintiff, received in evidence and marked as indicated.

\* = exhibit is marked as CONFIDENTIAL

| Plaintiff's Ex. No. | Description | Defendant's Basis for Objection | Plaintiff's Response to Objection |
|---|---|---|---|
| PX1 | Various 2004 Media Articles (P1-441); A49-489 | Objection. Hearsay, no foundation, not best evidence, not relevant, prejudicial, confuses the issues, misleads the jury, and waste of time. F.R.E. 401, 402, 403, 802, 805. | **FRE 401-402 (Relevance):**<br>- This exhibit is relevant to defendants' motivation to retaliate against plaintiff. The multitude of problems at the DOC were receiving statewide and widespread media attention for the entire year up to and including August 2004 when plaintiff symbolically resigned. The DOC was being cast in a very negative light and this exhibit helps demonstrate defendants' state of mind and motive for wanting to punish plaintiff who caused defendants to receive even more adverse publicity as a result of his symbolic resignation from CERT.<br>- It also tends to demonstrate the public concern value and nature of plaintiff's speech and union association. The plethora of problems at the DOC were constantly in the media.<br><br>**FRE 403:**<br>- this rule only forbids "unfair" prejudice, which defendants do not allege.<br>- plaintiff does not intend to go through every article with the jury. Instead, when several of the witnesses testify about the widespread negative media attention that was focused upon DOC in 2004, they will be able to point to this exhibit as representative of that media attention. To the extent defendants deny that the DOC was in the news media on nearly a daily basis, these articles will be used to |

3

| | | | |
|---|---|---|---|
| | | | impeach their incredible denials.<br><br>**FRE 801-802, 805 (Non-Hearsay Purpose):**<br>- This is not being offered for the truth of the matter asserted. Instead, this is being offered to help demonstrate defendants' motive to retaliate against plaintiff.<br><br>**Foundation:**<br>- the foundation can be laid through the testimony of defendants and their employees, as was done extensively at their depositions. |
| PX2 | Pictures of John J. Balas (P521-22); A537-38 | Objection. Not relevant, prejudicial, and confuses the issues. F.R.E. 401, 402, 403 | **FRE 401-403:**<br>- This entire case is about plaintiff, who is dead. The jury will hear a week's worth of testimony and evidence about him. In light of that, it is not unreasonable to allow the jury to see pictures of the man who is not here testifying today because defendant Mears drove him to kill himself.<br><br>- these pictures also tend to demonstrate that plaintiff was not always a person struggling with depression and other problems. Instead, these pictures reveal that plaintiff was a happy family man up until the retaliation against him began. This also bolsters the testimony of plaintiff's wife, as well as the testimony of several of plaintiff's co-workers who testified to the same. |
| PX3 | Journal Entries of John J. Balas (P523); A539 | Objection. No foundation, hearsay, and unfair prejudice. F.R.E. 401, 403, 802, 901. | **FRE 401-402 (Relevance):**<br>- These are relevant to plaintiff's state of mind in the days leading up to his death. They are his private thoughts about how he is feeling and what he is thinking about. These journal entries tend to prove that the reason he killed himself had nothing to do with his relationship with his wife Cindy (as the defense contends). Thus, this tends to prove that the reason for plaintiff's death was not a personal problem, but was instead the retaliation he was experiencing at work.<br><br>**FRE 403:**<br>- defendants claim that plaintiff killed himself because he was distraught |

4

about his personal life. This exhibit tends to prove that his personal life was getting better and that his relationship with his wife was strong. This is hardly unfair.

**FRE 803(1) (Present Sense Impression):**
- these journal entries contain hourly and daily notations in which plaintiff describes his personal feelings and state of mind - a key issue in this case.

**FRE 803(3) (Then Existing Mental or Emotional Condition):**
- these entries plainly describe plaintiff's state of mind during the most relevant time frame - the days prior to his death. They are relevant to determining causation - why plaintiff killed himself - because of personal problems or because of workplace retaliation.

**FRE 803(4) (Statements Made for Purpose of Medical Diagnosis)**
- plaintiff's wife testified that after plaintiff was placed on anti-anxiety medications, his doctor asked him to keep a journal of how he was feeling. This is that journal.

**FRE 803(5) (Recorded Recollection):**
- these are clearly plaintiff's recorded recollections of his state of mind

**FRE 901(b)(1-2) (Testimony by a Witness With Knowledge):**
- plaintiff's wife has already sworn that these journal entries are in plaintiff's handwriting which she became familiar with during their years of marriage.

| | | | |
|---|---|---|---|
| PX4 | Suicide Notes left by John J. Balas (P524-28); A540-44 | Objection. No foundation, hearsay, and unfair prejudice. F.R.E. 401, 403, 802, 901. | - This exhibit is identical to DX13 which defendants themselves offer. There is a certain inconsistency in the defense position that plaintiff may not admit his own suicide note as an exhibit but the defense may.<br><br>- see Response to PX3 above. |
| PX5 | Plaque in Remembrance of John J. Balas (P534); A0547 | Objection. No foundation, not relevant, confusion of the issues, and | (Note - plaintiff has removed the original first two pages of this exhibit - P532-533. All that now remains is the third page - P534).<br><br>**FRE 401-403 (Relevance, Confusion, Prejudice):** |

| | | | |
|---|---|---|---|
| | | prejudicial. F.R.E. 401, 402, 403. | - this is a plaque presented in plaintiff's memory on behalf of the DOC prison in which he worked - Sussex Correctional Institution. It tends to show that plaintiff was a dedicated Correctional Officer who did his job well. This exhibit speaks to plaintiff's "dedicated service," commends him for "a job well done" and notes that he will "surely be missed." Thus it is relevant to rebut the defense claims that plaintiff was a poor performing officer during the relevant time frame covered by the challenged evaluation.<br><br>**Foundation**<br>- the foundation for this exhibit will be laid through the testimony of defendants as well as several of plaintiff's fellow co-workers who also will testify.<br><br>**FRE 801(d)(2) (Admission):**<br>- To the extent any hearsay objections are raised, this exhibit is an admission by a party opponent. |
| PX6 | Official COAD Grievance, dated Oct. 4, 2004 (P831-32); A1046-47 (Ackenbrack Depo. Ex. 1); same document as (P519-20); A848-49 (T. Mears Depo. Ex. 12) | Objection. Hearsay, no foundation, and original writing required, F.R.E. 802, 1001, 1002. **F.R. Civ. Pr. 32(a)(3).** | **FRE 401-402 (Relevance):**<br>- explains and describes in plaintiff's own words and handwriting why plaintiff believed that the negative evaluation he received was unwarranted. This document also has independent legal significance - it is plaintiff's First Amendment protected petition of the government - his union grievance.<br><br>**FRE 803(6) (Business Record):**<br>- this is an official COAD grievance form which was filled out by plaintiff. The union shop steward who signed the form explained the process at his deposition and laid the foundation. Several witnesses testified that it was eventually filed.<br>**FRE 803(5) (Recorded Recollection):**<br>- this is plaintiff's written recorded recollection of the retaliatory events he suffered, including the negative performance evaluation, at the hands of Lt. Mears. He once had knowledge of these events but no longer does due to his untimely death. It was created 8 days after receipt of the evaluation, so the events were clearly fresh in his mind.<br>**FRE 807 (Residual Exception):**<br>- as explained in detail at pages 10-15 of plaintiff's Summary Judgment |

| | | |
|---|---|---|
| | | Reply Brief, plaintiff had an impeccable reputation for honesty and integrity in everything dealing with the workplace - which this grievance addresses. The facts it contains are corroborated in the deposition and document record and its probative value is unmatched given that it is plaintiff's own recorded recollection of the retaliation against him, the same retaliation which ultimately drove him to kill himself. Lastly, both fairness and justice require that plaintiff, while deceased, have a voice in this lawsuit addressing the cause of his death. <br><br> **FRE 1002-1004 (This is an Original):** <br> - the union shop steward testified that this is the original yellow carbon copy of the three page union grievance form. This was the copy that plaintiff kept for his records. The other identical carbon copy pages are pink & white and have not been found in discovery of DOC and the union. <br><br> **Fed.R.Civ.P. 32(a)(3)** <br> - unknown why the defense has cited this procedural rule. |
| PX7 | [Lt. Truman Mears' Supervisor's File on John Balas (D750-90); A0596-636 | Objection. No foundation. Hearsay. F.R.E. 802. | **FRE 401-402 (Relevance):** <br> - the negative performance evaluation challenged in this case lists a host of performance problems plaintiff is alleged to have had. Explicit DOC policy (see PX17) requires that all such performance problems be documented in the Supervisor's File of each employee. This is that Supervisor's File of John Balas, and it contains no references to any performance deficiencies whatsoever. In other words, it is compelling evidence that the barrage of performance criticism leveled by Lt. Mears in plaintiff's performance evaluation is baseless because none of the written documentation of that criticism, which is mandated by DOC policy, exists. <br><br> **Foundation:** <br> - PX17 (to which the defense does not object) combined with Lt. Mears' testimony and that of the other defendants, will lay the foundation for this exhibit <br><br> **FRE 803(6) (Business Records)** <br> - Supervisor files are held in the normal course of business and are |

| | | | |
|---|---|---|---|
| PX8 | Performance Evaluation of John Balas - 10/94-10/95 (D107-14); A775-82 (T. Mears Depo. Ex. 4) | No objection | So it is Admitted |
| PX9 | Performance Evaluation of John Balas - 2/99-1/00 (D98,101); A783-84 (T. Mears Depo. Ex. 5) | No objection to the actual performance evaluation for the asserted time period found at D98. | So it is Admitted |
| PX10 | Performance Evaluation of John Balas - 1/01-7/02 (D95,97); A785-86 (T. Mears Depo. Ex. 6) | No objection to the actual performance evaluation for the asserted time period found at D95. | So it is Admitted |
| PX11 | Performance Evaluation of John Balas - 1/02-5/03 (D93-94); A787-88 (T. Mears Depo. Ex. 7) | No objection to the actual performance evaluation for the asserted time period found at D93. | So it is Admitted |
| PX12 | John Balas' Various Awards and Commendations; A789-817 (T. | No objection | So it is Admitted |
| PX13 | DOC Policy - | | business records. (See PX13 - requiring the keeping of these records). Defendants also testified about this requirement. |

8

| | | No objection. | So it is Admitted |
|---|---|---|---|
| PX14 | Supervisor's File on Employee (D667-84); A818-836 (T. Mears Depo. Ex. 9) | No objection. | |
| | 8/12/04 E-mail From Timothy Radcliffe, dated August 12, 2004 (P518); A837 (T. Mears Depo. Ex. 10) | Objection. Relevance, hearsay. F.R.E. 401, 802. | **FRE 401-402 (Relevance):**<br>- this exhibit tends to prove that plaintiff's speech and symbolic resignation was viewed negatively by the DOC administration because it occurred at such a "critical time." Accordingly, it is relevant to the motive to retaliate against plaintiff.<br><br>- it also tends to prove that plaintiff was an excellent employee and was viewed as such by the DOC administration and was not the problem employee that defendant Mears describes.<br><br>- it also tends to prove that plaintiff was and had always been a person with "a high level of personal integrity," which tends to rebut the defense characterization of him as a philander and man of low personal integrity.<br><br>**FRE 801(d)(2) (Admission):**<br>- this is an admission by the agent of a party opponent about matters within the scope of his employment responsibilities. Major Radcliffe was the CERT Commander of DOC at the time and admits that the CERT resignation was viewed negatively by DOC command.<br><br>**FRE 803(6) (Business Record):**<br>- this also clearly is a DOC business record. |
| PX15 | Performance Evaluation of John Balas - 9/03-9/04 (D84-92, 378); A838-47 (T. Mears Depo. Ex. 11) | Objection to D378. Hearsay. F.R.E. 802. | D378 has been removed. Accordingly, the remainder of this exhibit is Admitted |

9

| PX16 | John's Recorded Recollection (P529-31); A850-52 (T. Mears Depo. Ex. 13) | Objection. Hearsay, no foundation, unfair prejudice. F.R.E. 403, 802, 901. | **FRE 401-402 (Relevance):**<br>- in plaintiff's own words, this exhibit describes several conversations and interactions plaintiff had with defendant Mears about his negative performance evaluation, Mears' hostility toward him and Mears' refusal to follow Capt. Wilkinson's orders regarding it.<br>**FRE 403:**<br>- Mears has flatly denied any retaliatory intent. This document, several others and the testimony of several witnesses demonstrate otherwise. It is not unfair to let the jury decide.<br>**FRE 803(1) (Present Sense Impression):**<br>- these separately dated and marked contemporaneous created handwritten notes describe plaintiff's interactions with Mears. Given that each interaction is described down to the day, hour and minute, it is clear that it was contemporaneously created or immediately thereafter.<br>**FRE 803(5) (Recorded Recollection):**<br>- this is plaintiff's written recorded recollection of the some of the retaliatory events he suffered, including the negative performance evaluation and other interactions with Lt. Mears. He once had knowledge of these events but no longer does due to his untimely death. Review makes clear that it was contemporaneously created and it is dated down to the day, hour and minute<br>**FRE 803(3) (Then Existing State of Mind):**<br>- these entries plainly describe plaintiff's state of mind during the most relevant time frame - the days and weeks leading up to his death. They tend to show that plaintiff killed himself because he felt "pressured, intimidated and stressed with ... Lt. Mears" and not because of personal problems. Plaintiff's state of mind is key.<br>**FRE 807 (Residual Exception):**<br>- see Response to PX6 above under FRE 807 section. Plaintiff was well known for his integrity and truthfulness in workplace matters and the events described in this recorded statements are corroborated in other parts of the record. Lastly, both fairness and justice require that plaintiff, while deceased, have a voice in his lawsuit addressing the cause of his death.<br>**FRE 901(b)(1-2) (Testimony by a Witness With Knowledge):**<br>- plaintiff's wife has already sworn that these recorded recollections are in plaintiff's handwriting which she became familiar with during their years of marriage. |

10

| | | | |
|---|---|---|---|
| PX17 | John Balas' Time Card Records (P494-503); A853-62 (T. Mears Depo. Ex. 14) | Objection. No foundation, hearsay. F.R.E. 802. | **FRE 401-402 (Relevance):**<br>- These are plaintiff's own time cards, which were altered by defendant Mears. This exhibit also has independent legal significance given that it is part of the adverse action against plaintiff.<br><br>**Foundation:**<br>- Defendant Mears will provide the foundation for them, as he did at his deposition.<br><br>**FRE 803(6) (Business Records):**<br>- these are plaintiff's copies of defendants' business records - the time cards that all DOC employees were required to keep. |
| PX18 | Memo from Phil Townsend to John Balas, dated July 8, 2004 (D281); A944 (Wilkinson Depo. Ex. 1) | No Objection. | So it is admitted |
| PX19 | Memo from Phil Townsend to John Balas Given to Truman Mears (P827-28); A0585-86 | Objection. No foundation, hearsay, and unfair prejudice. F.R.E. 403, 802, 901. | - Page 1 of this document is identical to PX23, to which defendants do not object. So it appears their objection is solely to the second page of this exhibit. However, the second page is merely the back side of the first page. The back side of this document contains handwriting indicating that it was given to defendant Truman Mears. Under FRE 106, the Rule of Completeness requires that the entire document be offered, not just a portion of it.<br><br>**FRE 401-402 (Relevance):**<br>- Defendant Mears claims that plaintiff was a problem employee and did an extremely poor job during QRT training. This is a Memo of Appreciation to plaintiff from the Major in charge of QRT training commending plaintiff for a "JOB WELL DONE!" during QRT training (emphasis in original). This tends to prove that defendant Mears is prevaricating in attacking plaintiff's job performance and |

11

| | | Objection | Response |
|---|---|---|---|
| | | | that his real motivation for giving plaintiff a poor evaluation was illicit intent to retaliate against plaintiff.<br><br>**FRE 801(d)(2) (Admission By a Party Opponent):**<br>- this is an admission by the agent of a party opponent about matters within the scope of his employment responsibilities. Major Townsend was the Commander in Charge of QRT training and he admitted that plaintiff did an excellent job during the training.<br><br>**FRE 803(6) (Business Record):**<br>- this is a DOC business record, on DOC letterhead, from plaintiff's DOC commander, commending plaintiff on his outstanding performance during QRT training, a specific type of DOC training.<br><br>**FRE 901 (Authentication):**<br>- this is defendants' own business record. |
| PX20 | Professional Qualifications of Thomas Borzilleri, Ph.D. (P584-85) | Objection. Not relevant, confuses the issues, unfair prejudice, cannot testify as to a fact in issue. F.R.E. 401, 402, 403, 702. | - Defendants also have offered as an exhibit the curriculum vitae and professional qualifications of their expert. (See DX8). There is a certain logical inconsistency between the defense position in objecting to the inclusion of plaintiff's expert's qualifications and seeking to admit as an exhibit that of their own expert.<br><br>**FRE 401-403:**<br>- This resume is being offered by the author, a person with personal knowledge who can be cross examined. It will expedite the lengthy trial to simply admit the resume rather than to waste trial time reciting it. |
| PX21 | Curriculum Vitae of Carol A. Tavani, M.D. (P623-53) | Objection. Hearsay. F.R.E. 801. **Lack of foundation. F.R.E. 702.** | See Response to PX21 above. |

12

| PX22* | Medical records of John J. Balas (P703-822) | Objection. No foundation, not relevant, confuses the issues, hearsay F.R.E. 401, 402, 403, 705, 801. | **FRE 401-402 (Relevance):**<br>- this exhibit is relevant to damages and causation.<br>- these medical records discuss the onset of plaintiff's headaches in October 2004 and follow his treatment efforts and continues until the time of his death. The records repeatedly mention that plaintiff is complaining about stress at work arising from a "labor dispute" and "job strike." Similarly, the headaches temporally follow the onset of the retaliation at work and so are compelling evidence of a causal link between the two.<br>- these medical records also tend to prove that the reason plaintiff killed himself is because of the stress at work and not problems in his personal life.<br><br>**FRE 403**<br>- as noted above, such a use is hardly unfair.<br><br>**FRE 705**<br>- plaintiff is offering this as substantive evidence, not merely as documents which Dr. Tavani reviewed in preparation of her expert report determining that plaintiff killed himself because of the workplace stress.<br><br>**FRE 803(4) (Statements For Purposes of Medical Diagnosis or Treatment**<br>- these exhibit clearly contains numerous statements from plaintiff that he made for purposes of obtaining medical help in dealing with the headaches he was experiencing.<br><br>**FRE 803(6)**<br>- these also are contemporaneously created business records obtained from plaintiff's medical providers about plaintiff's medical treatment. |

## Schedule (6)(1)
### Defendants' "No Objection" Exhibits

1. The following exhibits were offered by Defendants, received in evidence and marked as indicated.

| Defendants' Ex. No. | Description |
|---|---|
| D___ | |
| D___ | |
| D___ | |
| D___ | |
| D___ | |
| D___ | |
| D___ | |
| D___ | |
| D___ | |

14

Schedule (6)(1)
Defendants' "Objection"Exhibits

| Defendants' Ex. No. | Description | Plaintiff's Basis for Objection | Defendants' Response to Objection |
|---|---|---|---|
| DX1 | Employment evaluation for John Balas for 01/01/96-12/15/96 (D00106). | No objection. | |
| DX2 | Employment evaluation for John Balas for 02/01/98 – 01/31/99 (D102). | No objection. | |
| DX3 | Letter to John Balas from Captain Gerard Flaherty dated 01/26/98 re: promotion to corporal. (P446) | No objection. | |
| DX4 | DOC Job Description for Correctional Lieutenant. (D387-388). | FRE 401-402 (Relevance) - plaintiff was not a Lieutenant. | Relevant to supervisory duties of Lt. Mears, which included the monitoring of correctional officers, and to rebut the unsupported allegation of that Lt. Mears excessively monitored Balas. |
| DX5 | Letters to John Balas regarding perfect attendance in 1996 and 1998. (D128, 134). | No objection. | |
| DX6 | Calendar of Cindy Balas for the months of January, February, and June of 2005. (P560-562). | No objection. | |
| DX7 | State of Delaware Uniform Traffic Collision Report 02/15/05 (D379-380). | No objection. | |
| DX8 | Curriculum Vitae of Neil S. Kaye, M.D. (D791-867). | Provided defendants withdraw their objections to PX20 and PX21 (the | Defendants will withdraw their objection to the curriculum vitae of Plaintiff's expert. |

15

| | | |
|---|---|---|
| | curriculum vitae of plaintiff's experts), plaintiff has no objection as inclusion of this exhibit will save time and expedite the trial. If defendants decline to withdraw their objection, plaintiff objects on the same grounds as have defendants to PX20 & PX21. Defendants cannot have it both ways. | |
| DX9 | DELJIS report from the investigation of John Balas' death on February 19, 2005 (D743-749). | FRE 401-402 (relevance) - that plaintiff killed himself is not at issue. The DSP investigation into his death and the notes of the officers investigating his death are irrelevant to any facts of consequence in this public employee First Amendment retaliation action.<br><br>FRE 403 | Plaintiff repeatedly asserts that Balas' death was proximately caused by the actions of Lt. Mears. Defendants' have objected to this and any claim related to the death of Balas. If, however, this type of claim is permitted by the Court, then any documents related to the death of the decedent are relevant and admissible. |
| DX10 | Police report from the investigation of John Balas' death. (D868-890). | Same objections as DX9 above. | Same response to DX9. |
| DX11 | Commendations and Awards from the employment file of Lt. Mears (D491, 501, 504, 510-11, 516, 556-571, 577, 581-82, 584, 586-87). | FRE 401-402 (Relevance) - Lt. Mears' job performance since 1991 is not at issue in this case as he is not claiming | Lt. Mears' job performance includes supervising correctional officers and Plaintiff is asserting retaliation claims directly related to his supervisory role. Thus, evidence related to his |

16

| | | | |
|---|---|---|---|
| | performance as a supervisor is relevant. Evidence is further offered to rebut Plaintiff's allegations that Lt. Mears engaged in unconstitutional conduct or conduct that did not comport with the rules, policies, and procedures of the DOC. It is further offered to show Lt. Mears' loyalty and dedication to the mission and purpose of the DOC and its' policies and provisions, including anti-retaliation policies. | retaliation or discrimination.<br><br>FRE 404(a) - improper character evidence and attempt to prove action in conformity therewith. | |
| DX12 | Evaluations from the employment file of Lt. Mears (D500, 503, 507-08, 512, 515, 517-553). | Same objections as DX 11 above. | Same response as DX11 |
| DX13 | Suicide notes of John Balas (P524-528). | No objection. Plaintiff notes that defendants have objected to this same exhibit as offered by plaintiff. See PX 4. | |

17

**Schedule (6)(2)**
**Plaintiff's Demonstrative Evidence**

| Plaintiff's Ex. No. | Description | Defendants' Basis for Objection | Plaintiff's Response to Objection |
|---|---|---|---|
| A | Courtboard enlargements of any numbered exhibits. | Defendants reserve the right to object upon review of the evidence. | |
| B | Courtboard identifying damages sustained by plaintiff. | Defendants reserve the right to object upon review of the evidence. | |
| C | | | |
| D | | | |

18

**Schedule (6)(2)**
**Defendants' Demonstrative Evidence**

| Defendants' Ex. No. | Description | Plaintiff's Basis for Objection | Defendants' Response to Objection |
|---|---|---|---|
| A | | | |
| B | | | |
| C | | | |
| D | | | |

19

Balas, Cindy 5335-06\Pre-Trial\(6) Exhibits.draft.08.wpd

    (7)    **The names of all witnesses a party intends to call to testify, whether the witness will testify in person or by deposition and, if by designation, a list of deposition designations;**

**Plaintiff's Statement:**

The following witnesses will be called to testify in person:

1. Defendant Lt. Truman Mears, DOC - (*as on cross*)

2. Capt. David Wilkinson, DOC - (*as on cross*)

3. Warden Michael Deloy, DOC - (*as on cross*)

4. Cpl. Jeff Foskey - (*as on cross*)

5. Sgt. Allen Adams - (*as on cross*)

6. Cpl. Heath Shockley - (*as on cross*)

7. Officer David West - (*as on cross*)

8. Cpl. Dennis Murray - (*as on cross*)

9. Officer Harry Hastings - (*as on cross*)

10. Officer Jon Mumford - (*as on cross*)

11. Cpl. Scott Bradley - (*as on cross*)

12. Cindy Adkins, plaintiff

13. Thomas C. Borzilleri, Ph.D.
    Forensic Economic Consultant
    3 Democracy Center
    6905 Rockledge Drive, Suite 600
    Bethesda, MD 20817

14. Carol A. Tavani, M.D.
    Christiana Psychiatric Services, P.A.
    4745 Ogletown-Stanton Road
    Suite 124, Medical Arts Pavilion I
    Newark, DE 19713

The following witnesses may be called to testify in person:

15.    Henry Purnell, ret. DOC

16.    David Knight, DOC

17.    Wilbur Justice, ret. DOC

18.    Uday Jani, M.D.

19.    Paul Peet, M.D.

20.    Alan Machtinger, DOC - (*as on cross*)

21.    Stan Taylor, DOC - (*as on cross*)

The following witnesses may be called to testify by deposition:

1.    Arthur Lee Mears, ret. DOC

### Defense Objections to Plaintiff's Witnesses #1-11, 20-21:

Defendants specifically reserve the right to object to the form of any question. Defendants object to #'s 1-11, 20, and 21 as examination of witnesses is subject to the discretion of the Court pursuant to F.R.E. 611(a). The rule provides the Court with control over the mode and order of interrogating witnesses so as to "(1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment." Plaintiff's request to cross-examine witnesses on direct examination in Plaintiff's opening case is premature at this stage of the litigation and is subject to the discretion of the Court. The use of leading questions should be precluded or limited by the Court to avoid needless consumption of time and harassment or undue embarrassment of the witnesses. To the extent that such questioning is permitted by the Court in Plaintiff's opening case on direct examination, defendants reserve the right to lead those witnesses on cross-examination.

### Plaintiff's Response:

#### A. The Witnessese at Issue.

Witness #1 - This is defendant Lt. Truman Mears. He is the individual defendant in this action. Fed.R.Evid. 611(c) provides that "[w]hen a party calls ... an adverse party ... interrogation may be by leading questions." Thus, the use of leading questions with this defendant in proper.

Witnesses # 2, 3, 20 and 21 - all of these witnesses (Capt. (now Major) Wilkinson, Warden Deloy, H.R. Director Machtinger, and DOC Commissioner Taylor) are presently individual defendants in this case who were sued by plaintiff in this action. They are high ranking officers, managers and decisionmakers for the defendant Department of Correction. As explained below, they are clearly witnesses identified with an adverse party and also are currently adverse parties.

Witnesses # 4-11 - these are current employees of defendant DOC, co-workers and subordinate officers of defendant Lt. Mears and also are subordinate officers in the chain of command to the other individual defendants. All served on the CERT team with plaintiff and defendant Lt. Mears.

**B. Witnesses Identified with an Adverse Party.** To protect a witness and to elicit truthful testimony, the Federal Rules of Evidence permit the use of leading questions on direct for "witnesses automatically regarded as adverse, and therefore subject to interrogation by leading questions without further showing of actual hostility." Ellis v. City of Chicago, 667 F.2d 606, 612-13 (7th Cir. 1981); see FRE 611(c) Advisory Committee Notes. Rule 611(c) states in relevant part:

> When a party calls a hostile witness, an adverse party, or *a witness identified with an adverse party*, interrogation may be by leading questions.

Fed.R.Evid. 611(c) (emphasis added).

The phrase "witness identified with an adverse party" has been developed to assist trial courts in ruling on FRE 611(c) issues by including those "identified with an adverse party" such as "*employees*, agents, friends, or relatives of an adverse party." Vanemmerik v. The Ground Round, 1998 WL 474106, *1 (E.D. Pa. July 16, 1998) (emphasis added). The phrase "is intended to apply broadly to an *identification based upon employment* by the party or by virtue of a *demonstrated connection* to an opposing party." U.S. v. McLaughlin, 1998 WL 966014, *1 (E.D.Pa. Nov. 18, 1998) (emphasis added). Employees called by the party opposing their employer, are identified with the adverse party under Rule 611(c).

**1. Law Enforcement Officers Are Identified With Their Employer.** In the closely analogous police department context, in Ellis v. City of Chicago, the Seventh Circuit held the district court erred by not allowing plaintiff to examine two police officers as on cross. Ellis, 667 F.2d at 613. The two officers were employed by the defendant, the City of Chicago, throughout the entire life of the litigation and were present during portions of the incident in question. Id. Further, the two officers "worked closely with the specific defendant during their periods of employment. Id. Notably, the court never addressed the content of the police officer's testimony as a deciding factor for permitting leading questions. Instead, the appeals court held the two officers "*clearly qualified* as 'witness(es) identified with an adverse party' for purposes of Rule 611(c)." Id. (emphasis added). Likewise, these witnesses all are current employees of the DOC, they work with defendants, who are their commanding officers and remain subject to retaliation and workplace harassment by defendants for their testimony.

By analogy, in the criminal context, a police officer is almost automatically deemed identified with the government and against the defendant by virtue of his or her employment as a police officer. U.S. v. Duncan, 712 F.Supp. 124, 126 (S.D.Ohio 1988). "[A] government agent's 'interests ... could safely be assumed to be adverse to those of the defendant.'" Id. (citing U.S. v. Bryant, 461 F.2d 912, 917 (6th Cir. 1972)); see also Commonwealth v. Lambert, 1998 WL 558749, *22 (Pa.Com.Pl. Aug. 24, 1998) (recognizing "the use of leading questions in direct examination of law enforcement officials...because they are 'identified' with an adverse party, i.e. the prosecution."). The underlying reason for this assumption is that a police officer "called by the defense as a witness, 'will not be predisposed to accept suggestions offered by defense counsel's [leading] questions.'" Duncan, 712 F.Supp. at 126. Likewise, the Utah Supreme Court held a Highway Patrol Lieutenant was identified with the adverse party, the prosecution, for purposes of testifying to inconsistencies in a State Trooper's prior testimony. State v. Johnson, 784 P.2d 1135, 1143 (Utah 1989). Thus, in the criminal context, the courts have also repeatedly found a police officer identified with the adverse party, the government, absent any showing of hostility or bias and based on the virtue of their employment.

In the case at hand, some of these witnesses are defendants and high level managers for the DOC while others are current DOC employees and subordinate officers in the chain of command to other defendants. For the aforementioned reasons, these witnesses are all identified with the adverse party in this litigation by virtue of their employment relationship.

## 2. Employees Identified With Their Employer in Other Settings.
Additionally, other employee/agent relationships have been sufficient to identify a witness with the adverse party, their employer. A nurse called to testify by the plaintiff was sufficiently identified with the defendant, her employer, since she was present when the legal wrong occurred. Haney, 744 F.2d at 1478. A Volkwagen employee was also identified with his employer, the defendant, for purposes of FRE 611(c). Perkins v. Volkswagen of America, Inc., 596 F.2d 681, 682 (5th Cir. 1979). Similarly, a witness that may not be in "cahoots" but is at least in "cohorts" with an adverse party is enough. McLaughlin, 1998 WL 966014 at *1. In McLaughlin, the witness and the defendant clearly worked together and did continual business for at least ten years. Id. Accordingly, the witness was deemed identified with the adverse party.

Even former employees have been identified with their employer for purposes of FRE 611(c). A former president and personnel director of a defendant school have been found to be identified with the adverse party. See Chonich v. Wayne County Comm. College, 874 F.2d 359, 368 (6th Cir. 1989). Likewise, a former administrative secretary was deemed identified with her former employer because of her previous employment and her ongoing relationship with defendant. See Stahl v. Sun Microsystems, Inc., 775 F.Supp. 1397, 1398 (D.Colo. 1991). Also, a former supervisor of a plaintiff employee was identified with the defendant employer purely by virtue of his employment. See Garden v. General Elec. Co., 1992 WL 184345, *1 (D.N.J. July 6, 1992). Accordingly, by virtue their current employment with defendants, these witnesses are plainly identified with adverse parties.[1]

---

[1] Plaintiff notes that he is not seeking to lead former DOC employees Mr. Henry Purnell, Mr. Wilbur Justice or Mr. Arthur Lee Mears (no relation to defendant Truman Mears). Nor is he

**C. Hostile Witnesses.** In addition to the traditional manner of witness demeanor, a witness also may be found to be a hostile witness "by pretrial actions." Vanemmerik v. The Ground Round, 1998 WL 474106, *2 (E.D. Pa. July 16, 1998). "The witness' refusal to meet with the direct examiner before trial to prepare for his testimony may be particularly important since the refusal suggests hostility and the failure to prepare reduces the likely impact of suggestion." Id. (quoting 28 Wright & Miller, Federal Practice and Procedure § 6168, *7 (1993)).

Here, defense counsel took the position that they were the attorneys for all of the CERT member and DOC employee witnesses (in addition to the defendants themselves).[2] Accordingly, Rule 4.2 of the Model Rules of Professional Conduct forbids plaintiff from meeting with any of these witnesses prior to trial. Thus, the opportunity for suggestion is greatly diminished and these witnesses may be led in their examination.

**Defense Objections to Plaintiff's Witness #13:**

Defendants object to #13 as the plaintiff has only filed a survival action and is thus barred from pursing any economic damages arising from the death of the decedent. The preferred

---

seeking to lead current union official and DOC employee Mr. David Knight.

[2]

MS. XARHOULAKOS: Objection. I think that as to attorney/client we do represent the Department of Correction and Mr. Foskey is an employee of the Department of Correction just as the rest of the CERT team members were. Be careful about treading on the substance of our conversations.

MR. NEUBERGER: If you are representing him, then I have no problem --

MS. XARHOULAKOS: Yes.

MR. NEUBERGER: So, you would assert that you guys represent him?

MS. XARHOULAKOS: Right.

MR. NEUBERGER: All right, then we'll move on from that.

BY MR. NEUBERGER:  Q. Other than your attorneys here have you talked to anybody about your testimony here today?

A. No.

(Foskey depo at 6).

testimony would therefore be irrelevant to any issues in the case, and unfairly prejudicial to the defendants.

**Plaintiff's Response:**

Because this is a First Amendment retaliation action pursuant to 42 U.S.C. § 1983, and not a state law survival actions, as our District has held that such damages are recoverable. Sterner v. Wesley College, Inc., 747 F.Supp. 263, 273 (D.Del. 1990). As Judge Roth explained -

When the act which caused a death is itself charged as a "constitutional tort" under section 1983, applicable survival and wrongful death statutes under state law will be applied only to the extent they are consistent with the policies and legislative intent underlying section 1983. If those state statutes preclude recovery of [an element of damages] as a distinct basis for recovery, they will be ignored as inconsistent with the policies of section 1983.

Id. at 273. Continuing -

Where the constitutional deprivation sought to be remedied has caused death, state law that precludes recovery on behalf of the victim's estate for the loss of life is inconsistent with the deterrent policy of section 1983. Such restrictive state laws must give way to federal common law rules that permit recovery.

Id. (internal punctuation omitted). In addition to our own District, other federal courts, including the Tenth Circuit, have held the same. See Berry v. City of Muskogee, Oklahoma, 900 F.2d 1489, 1506-07 (10th Cir. 1990); Walker v. City of Orem, 2007 WL 3026399, *1 (D.Utah Oct. 9, 2007); Sudac v. Hoang, 2004 WL 1125153, *2 (D.Kan. May 13, 2004). Accordingly, and for the reasons set forth in plaintiff's Answering Brief in Opposition to Defendants' Motion for Summary Judgment at pages 6-10, plaintiff is entitled to recovery of such economic damages.

**Defense Objection to Plaintiff's Witness #14:**

Defendants object to #14 pursuant to F.R.E. 703.

**Plaintiff's Response:**

The facts and data relied upon by Carol A. Tavani, M.D. are of the type reasonably relied upon by experts in her field. Some of the most compelling evidence of this fact is that the same type of information was relied upon by the opposing defense expert.[3] Accordingly, Dr. Tavani's

---

[3] Plaintiff's response assumes that defendants have indeed given such materials to their expert to review. Plaintiff does not know to a certainty which materials they have in fact given to their expert because defendants have yet to produce their long overdue expert report to plaintiff,

basis of knowledge under Fed.R.Evid. 703 is proper.

### Defense Objection to Plaintiff's Witness - Arthur Lee Mears:

Defendants object to the inclusion of Arthur Lee Mears by deposition. Local Rule 16.3(7) requires a list of deposition designations should a party offer a witness to testify by deposition at trial. Plaintiff has not included any such designations.

### Plaintiff's Response:

These designations will be provided.

which was due in November 2007.

**Defendants Statement:**

Will be called to testify:

1.    Lieutenant Truman Mears

2.    Warden Michael Deloy

3.    Captain David Wilkinson

4.    Jennifer Weldon

5.    Cpl. Jeff Foskey

6.    Cpl. Scott Bradley

7.    Corporal John B. Mitchell

8.    Neil S. Kaye, M.D

May be called to testify:

1.    Sergeant Robert Hudson

2.    Richard Kearney, Bureau Chief of Prisons

3.    Stanley Taylor, former DOC Commissioner

4.    Alan Machtinger, DOC Director of Human Resources

5.    Sgt. Allen Adams

6.    Officer Heath Shockley

7.    Officer David West

8.    Cpl. Dennis Murray

9.    Officer Harry Hastings

10.   Cpl. Jon Mumford

Defendants reserve the right to call rebuttal witnesses.

Balas, Cindy 5335-06 \ Pre-Trial \ (07)Witnesses.draft.05.wpd

(8)    **A brief statement of what plaintiff intends to prove in support of plaintiff's claims including the details of the damages claimed, or of other relief sought, as of the date of preparation of the draft order.**

**A. Plaintiff.**[1]  Plaintiff was a loving, caring husband and father of two young children. (Plaintiff's Interrogatory Responses (hereinafter "Inter.") #3 p.5;P521-22; A655,537-38). On the job he was professional, dependable and helpful. (Inter. #3 p.5;Shockley 17;West 8;Mumford 15-17;L.Mears Ex.2 #29 p.5; A655,957,887,974,1072).

**1. DOC Employment History.**  Plaintiff was a Corporal and an eleven year employee of the DOC. (Inter. #3 p.5; A655).  During his career, he received numerous accolades and commendations. (Id. p.5-6;P442-68; Mears Ex.8; A655-56,490-516,789-817)

**a. Correction Emergency Response Team ("CERT").**  He also served as a CERT member from 1995 through 2005. (Inter. #3 p.6; Bradley 13; West 7; Shockley 10; Hastings 10; Mumford 18; Foskey 14; A656,877,887,956,975,986).  CERT is an elite group of correctional officers who serve on that unit in addition to their normal duties.  They compete for promotion to CERT by passing rigorous physical and mental tests. (Inter. #3 p.6; DOC webpage p.3; T.Mears 61-62; A656-1076,721). The CERT unit ensures public safety, as well as the safety of department staff and offenders. (Inter. #3 p.6; T.Mears 61-62; Shockley 9-10; Hastings 12; Mumford 18-20; A656,721,955-56,965,975).

**B. Plaintiff's Protected Union Association.**  In August 2004, plaintiff was an active member of the Correctional Officers Association of Delaware ("COAD") - a union for prison guards of the rank of sergeant and below. (Inter. #3 p.6-7; T.Mears 204-05; West 6; Shockley 6;

---

[1]  To reduce confusion, the decedent John J. Balas will be referenced as "plaintiff."

1

Hastings 7; Mumford 6; L.Mears 15-16; A656-57,756,887,955,964,972,1053).

**C. Union Activity.**

**1. Negotiating a New Contract With DOC.** During the Summer of 2004, COAD was involved in protracted, divisive and confrontational contract negotiations with DOC. (Knight Decl. #4-7 p.2; L.Mears Ex.2 #5 p. 2; T.Mears 45-46; A549,1069,716-17).

**2. Union Speech to the Media and the Public.** In the Spring and Summer of 2004, in an effort to publicly pressure DOC management and State elected officials to enact workplace reform, union officials began successfully speaking to the media about dire health and safety issues, severe understaffing, low wages, the lack of longevity pay or a career ladder, the inability of DOC to retain correctional officers after ten years of service, and lapses in security, among other issues. (Knight Decl. #9,11 at p.2-3; T.Mears 42-46; Wilkinson 34-36; Deloy 40; L.Mears Ex.2 #6 p.2; Shockley 7-8; West 9-10; Hastings 7-9; Bradley 10-12; Mumford 7-13; A549-50,716-17,922,903,1069,955,887,964,877,972-73). This resulted in a flood of newspaper articles and media attention adverse to DOC about these issues. (Knight Decl. #10 p.2; P1-441; A549,49-489). COAD also was responsible for several large billboards which were posted across the State in an effort to increase public awareness. (Knight Decl. #12-13 p.3; A550).[2]

_____

[2] These billboards included three lined statements such as: "Delaware - The First State - Unable To Staff Its Own Prisons;" "Delaware Corrections - Doing More With Less - More Inmates Less Staff;" "Delaware Corrections - Where Minimum Staffing... - Would be an Increase;" "Welcome to Sussex County - For Your Safety Obey the Law - We Cannot Staff Our Prisons;" and "Delaware - It's Good to be the First - To Build Prisons Without Staff." (Knight Decl. #12 p.3; A550).

2

**3. Union Speech and Petitions to Elected Officials.** Union officials also spoke directly with elected officials during the summer of 2004 and even made pointed speeches before the Joint Finance Committee. (Id. #14-15 p.4; A550-51).

**D. The Content of the Union Activity.** As discussed above, union officials were pushing for reform in several areas. (See section **C.1-3** supra; Knight Decl. #16 p.4; A551). As the voice of the rank and file, Sergeants and below, COAD lobbied hard for these issues at every opportunity. (Knight Decl. #17 p.4; A551).

**1. Severe Understaffing that Endangered Public Safety.** Correctional officers have one of the most dangerous jobs in the State of Delaware. (Id. #23 p.5; A552). Yet jobs cuts had made this already dangerous job even worse.

Such cuts had resulted in one officer doing the job of three throughout the entire prison system. (Knight Decl. #18 p.4; A551). As a consequence, at the beginning of a shift if there were not enough officers to work, other officers were asked to work voluntary overtime or in some cases were forced to work mandatory overtime, a process called "freezing." (Id. #24 p.5; A552). In May of 2004, the DOC was over an entire shift short, which resulted in a mass amount of involuntary overtime or freezing of officers. (Id. #25 p.5; A552). As union officials disclosed to the media, understaffing was the number one problem facing officers. (Id. #26 p.5; A552).

A severe understaffing problem was caused and also compounded by a large number of officers leaving DOC versus a small number of new hires. (Knight Decl. #27 p.5; A552). The reasons for this massive exodus from DOC jobs was a direct result of practices such as freezing, the stress of working in hazardous conditions due to the shortage of officers or exhaustion from working 16 hour shifts with low wages. (Id.). In June of 2004, COAD vice-president David Knight publically disclosed that staffing had reached crisis proportions with two officers leaving

3

for every new recruit hired. (Id. #28 p.5; A552).

Security and understaffing went hand-in-hand. (Id. #29 p.6; A552). The more understaffed a facility was, the higher the risk of harm to the public, the inmates, and the correctional officers. (Id.) As Knight stated to The News Journal, it was normal for one officer to be responsible for 60 or more inmates in direct supervision environments and the ratio could even be 1 to 100 or more in some housing and facility areas. (Id.)

**2. Wage Increases to Attract and Retain Skilled Correctional Officers.** Union officials advocated for wage changes such as a career ladder and longevity pay which would result in better working conditions for correctional officers which in turn would help to keep officers on the job. (Id. #53 p.10; A557).

**3. Frequent Security Lapses.** Approximately nine months prior to the violent rape of a DOC counselor, union official David Knight prophetically addressed the Joint Finance Committee and stated that the severe levels of understaffing would inevitably lead to murder, injury or even rape within DOC. (Id. #54 p.11; A558). There were other lapses of which the public was not even aware. (Id. #56 p.11; A558). Having one officer multi-task and perform a job designed for several officers inevitably led to security breakdowns. (Id. #56-57 p.11; A558).

**4. The Job Action and Strike.** As the staffing crisis worsened and tension and stress levels escalated among correctional officers, on July 22, 2004, ten days after the rape of a staffer by an inmate (See Section **E(1)** infra), 25 COAD members held a special meeting to discuss the problems at DOC. (Knight Decl. #60 p.12; A559; see A141). Many claimed to be burnt-out due to forced overtime and long hours spent at work rather than at home with their families, others feared the increasingly dangerous conditions they were working under with staffing being at an all time low. (Knight Decl #61 p.12; A559). As WBOC quoted David Knight, "It's getting

4

dangerous. It's coming to a head." (Id. #62 p.12; A559; see WBOC article at A141).

Two days after this meeting the media reported that correctional officers were planning a seven-day work action to protest low pay and other issues. (Knight Decl. #63 p.12; A559). The job action was intended to demonstrate to the Governor and Legislature over "20 years worth of problems." (Knight Decl. #66 p.12; A559; see A142). Officers, desperate for change, felt this was the only way to make their voices heard by the Governor and the Legislature. (Knight Decl. #67 p. 12; L.Mears Ex.2 #7 p. 2; A559,1069). This job action would have a severe impact on the court and transportation unit because officers would refuse to work any of the voluntary overtime shifts which the unit depended upon due to the critically low staffing levels. (Knight Decl. #69-72 p.12-13; Adams 7; Deloy 39; Wilkinson 36-37; T.Mears 113-14; L.Mears Ex.2 #7 p. 2; A559-60,866,903,922,733-34,1069 ).[3]

In a desperate attempt to get officers to staff the unit, management issued a memo to members urging them to resume voluntary overtime. (Id. #73 p.13; A560). However, on July 30, 2004, COAD issued a public press release stating that all three prison unions - COAD, AFSCME and FOP Lodge 10 - supported their membership's desire not to accept voluntary overtime. (Id. #74 p.13; A560). The job action grew in strength. (Id. #75 p.13; A560). As a result, in late July, management agreed to meet with COAD on August 3rd to discuss the issues plaguing the DOC (Id. #76 p.13; A560) but its proposal was vehemently rejected. (Id. #77 p.13-14; A560). As a result, officers refused to end the job action and continued to decline voluntary overtime. (Id. #78 p.14; A561). Angry and frustrated, DOC filed a lawsuit against the union on August 5, 2004. (Id. #108 p.17-18; A564-65; see A222-231).

---

[3] By law officers could not strike or refuse mandatory overtime, but no one could force them to work voluntary overtime shifts. (Id. #65 p.12; A559).

**5. Suggested Solutions to These Problems.** During legislative meetings and negotiating sessions, solutions to these many problems were presented by union officials. (Knight Decl. #80 p.14; A561).

**E. The Overall Context.** During the Summer of 2004, all this union activity occurred in a setting of: (1) the rape of a female DOC employee;[4] (2) escapes;[5] (3) security breakdowns;[6] (4) a highly critical public report by a security expert;[7] and (5) a race for the reelection of the Governor.[8] Many times during this time period, The News Journal and Delaware State News would run several stories in one day. (See e.g. A203,208; A220,226,230; A235-239). Additionally, the union was responsible for several billboards posed throughout the State.

---

[4] On July 12, 2004, as COAD had prophetically warned, an inmate took a female counselor hostage and brutally raped her before being killed by a CERT officer. (Knight Decl. #89-92 p.15-16; A562-63). The subsequent investigation revealed that this convicted felon was able to pass through secure prison doors which had been propped open due to understaffing. (See various media articles at A93-121).

[5] In December of 2003, another inmate escaped from two correctional officers while traveling to the Kent County Courthouse. (Knight Decl. #93 p.16; A563-). This inmate then robbed two motels and led police on a high-speed chase in a stolen car, prompting a three week manhunt which eventually ended with his capture in Arkansas. (See A53-55).

[6] On April 26, 2004, another inmate slit his own throat in open court while on trial for rape. This occurred on the heels of another inmate being injured by a tiny piece of disposable razor blade. Then two days later another convict swallowed a handcuff key as part of an escape plan while in transport to court. The very next day another inmate escaped from Sussex Community Correction Center in Georgetown, leading to a police shooting incident. (Knight Decl. #94-96 p.16; A563).

[7] Then in June of 2004, a private security expert reviewed DOC's court transportation policies and procedures and released his report to the media. It stated that if changes were not made, someone would be seriously injured or killed. The report also harshly criticized the administration for severe security lapses and the lack of training for transportation officers. (See A64-76).

[8] COAD publically opposed the re-election of the incumbent Governor and actively worked to defeat her. (Knight Decl. #97-98 p.16; Mumford 13; Wilkinson 60-61; A563,973, 928).

(Knight Decl. #12-13 p. 3; A550).

**F. The Content, Form and Context of Plaintiff's Speech.**

**1. The Activation of the CERT Team.** On August 5, 2004, Commissioner Taylor activated five members of the CERT Team, including plaintiff, to step in the next day and staff the DOC's Court and Transportation unit. (Id. #79 p. 14; L.Mears Ex.2 #8 p. 2; Wilkinson 37; Deloy 41; Adams 10; A561,1069,922,903,867).

**2. Plaintiff's Public Speech During a Meeting with Defendant Mears.** Because plaintiff and his team members were concerned about crossing a picket line and not supporting their fellow co-workers and union members in their job action, a meeting was held that same night to discuss the activation. (L.Mears 11,18; L.Mears 2nd Decl #10-12 p.3; T.Mears 111; Adams 10; A1052,1054,1070,733,867).

At the meeting the CERT members discussed whether to resign from CERT to show solidarity with the union and job action. (Adams 11-12; see T.Mears 112,115; A867,733-34). Plaintiff was vocal stating in the presence of defendant Truman Mears, "he didn't believe that we were doing right, that we were doing blue shirts wrong by going in and working." (Adams 12; see T.Mears 119; A867,735). Conversely, defendant Truman Mears wanted to back management. (T.Mears 119; see Adams 12; A735,867). Plaintiff spoke up against what defendant Mears said and verbally disagreed with him on the need to resign. (Adams 12; A867).[9]

---

[9] Defendant Lt. Truman Mears was the highest ranking officer at this CERT meeting. (Wilkinson 52; A926). He also was plaintiff's supervisor for plaintiff's regular job in the prison receiving room. (Compl & Ans. ¶10; A4,34). Plaintiff was the only CERT member to be supervised during his regular job by another CERT member. (Adkins 40; A1007).

7

Defendant Mears then admittedly left the meeting and reported to CERT command and upper management that the members were having a meeting and actively discussing resignation. (T. Mears 116-18; L.Mears 11-12; A734-35,1052). CERT command then contacted Lee Mears by telephone and accused he and plaintiff of "instigating" the entire problem. (L.Mears 11-12,51; A1052,1062). CERT Command then explained to them that public safety would be endangered if they did not staff the unit because otherwise, prisoners would be released if they were not transported to their preliminary hearings. (L.Mears Ex.2 #14 p.3; A1070). Therefore, to ensure the public's safety, the five CERT members decided to report for their assignment the next day. (L.Mears 18-19; T.Mears 119; A1054,735).

**3. CERT Reports for Duty.** When they arrived for their assignment, the CERT members were ridiculed, cursed and given the cold shoulder by their fellow co-workers as they crossed the picket line. (L.Mears 19-20; L.Mears Ex.2 #16 p.3; Adams 15-16; A1054,1070,868).

When CERT reported for duty they learned there were only two prisoners who would have been released if they were not taken to court; a job the five full time Court and Transportation officers could have handled. (L.Mears 19; L.Mears Ex.2 #17 p.3; A1054,1070). Contrary to CERT Command's assertion, there was no dire necessity for CERT's activation. (See L.Mears Ex.2 #14 and 17 p.3; A1070). In fact, the head of the unit told them they did not even need CERT's help that day. (L.Mears 19; A1054). This prompted plaintiff to ask Major Dave Hall, the head of CERT, why they had even been activated. (L.Mears 21; L.Mears Ex.2 #19 p.4; A1054,1071). Hall replied that he had given four operations orders to Commissioner Taylor. (L.Mears 21-22; L.Mears Ex.2 #19 p.4; Adams 17; A1054-55,1071). Plaintiff then asked Major Hall why defendant Taylor had picked this one to which Hall replied, "He didn't." (L.Mears Ex.2 #19 p.4; A1071). Lee Mears then asked Hall who gave the order and he replied, "It came from

higher than Stan." (Id.; L.Mears 22; Adams 17; T.Mears 128; A1071,1055,737)  The only person

higher than Taylor was Governor Minner. (L.Mears 53; T.Mears 128; A1062,737).  It was

unheard of and unprecedented that command decisions were being made by someone higher than

the Commissioner. (L.Mears Ex.2 #19 p.4; A1071).

At this point the CERT members concluded that their activation was politically motivated

by the Governor and that they had been lied to and used as pawns in managements's battle with

the union. (L.Mears 18,22; L.Mears Ex.2 #20 p.4; A1054-55,1071). CERT members told Hall

that they would be resigning at the end of their shift. (L.Mears 22; Adams 17; A1055,868). Hall

did not have a "positive reaction" and tried to talk them out of it. (Adams 18; A869).

**4.  Plaintiff's Resignation Speech and Symbolic Speech - Refusal to Cross the Picket
Line Again.**  At the conclusion of their shift, the five assigned CERT members and five

additional members met with the Warden and resigned their positions on CERT in an effort to

support the union job action and they refused to cross the picket line. (Wilkinson 37-39,49-

50;Deloy 41; L.Mears 22; L.Mears Ex.2 #22-23 p.4; Adams 18-22; Bradley 25,27; West 16,20-

21; Shockley 15,19; Hastings 17-18; Mumford 24,28-31; Foskey 21,24,29-31;

A923,925,1055,1062, 1071,869-70,880-81,889-90,957,966-67,976-78,987-90). The Warden

understood that the CERT members were resigning to show support for the job action. (West 20-

21; A890). They told the Warden they had "a moral obligation to back up [their] fellow

officers...above anything else." (Hastings 18; A966).

During this meeting, plaintiff and Lee Mears did most of the talking and plaintiff "spoke

his mind." (Adams 22; West 16; A870,889).  Later, plaintiff stated to defendant Wilkinson that

they had resigned "[t]o support COAD." (Wilkinson 50; A926).  Notably, plaintiff's supervisor,

defendant Truman Mears, did not resign, (T.Mears 144; A741); and he immediately learned of

plaintiff's pro union speech. (T.Mears 130-33; A738).

**5. Management's Reaction to the Resignation.** Management was "disappointed,"

"annoyed" and "frustrated" by their resignation in support of the job action. (T.Mears 132;

L.Mears Ex.2 #25 p.5; A738,1072). CERT Command was "mad." (West 18; A890). It was made

clear to plaintiff and the others that they would never again be welcome on CERT because of

their decision. (West 18; Bradley 26; Shockley 22-23; A890,881,959). CERT command stated it

did not sanction the process utilized and that it was unfortunate that during a critical time in DOC

history they decided to resign. (T.Mears Ex.10; A837).

At the time of their resignation on August 6, 2004, defendant Mears was the only CERT

member not on vacation or active miliary duty who refused to resign in support of the job action.

(Inter. #3 p.25; A675). Defendant Mears was admittedly disappointed by their decision to resign

and he did not agree with it. (T.Mears 133,144; A738,741). He also was disappointed that the

CERT members did not first discuss with him their decision to resign. (Id. at 133; A738) Jon

Mumford informed defendant Mears that plaintiff had said not to bother calling Mears because

he would "talk you out of it." (T.Mears 134; A739). "It stung," stated defendant Mears about

this statement by plaintiff. (T.Mears 140; A740).

**G. Mears' Retaliation Against Plaintiff.**

**1. The Mediocre Performance Evaluation.** Just one month later, defendant Mears

gave plaintiff his first ever poor performance evaluation. Unlike prior years, he now refused to

recognize plaintiff's perfect attendance record for the past four years, his CERT membership, or

even his numerous commendations as reasons to give plaintiff a ranking of "Exceeds

Expectations" which he had consistently received previously. (T.Mears Ex.5-7,13; A783-

88,850). Instead, Mears dropped plaintiff's ranking to just a passing grade of "Meets

Expectations." (T.Mears Ex.11; A838).[10]

To try to justify this lowered evaluation, defendant Mears attached a multi-page supplement to the evaluation in which he heavily criticized plaintiff's job performance. (T.Mears Ex.11 at 2-3; A839-40). Importantly however, in the words of the supervising Captain above Mears in the chain of command, if plaintiff's performance had actually been as poor as Mears claimed in this attachment, plaintiff should have flunked the evaluation entirely. (Wilkinson 94, 96; A937). As Captain Wilkinson explained, an employee with the performance problems that defendant Mears claimed plaintiff had does not meet the performance standards set by the DOC which are expected of every correctional officer. (Id.).

As discussed in section **H.7** below, despite DOC policies and practices which explicitly require any and all performance deficiencies to be documented (T.Mears Ex.9 at 4; Wilkinson 87-91; T.Mears 89-94; A821,935-36,727-29), there is no written record whatsoever to support any of these claimed deficiencies (T.Mears 160-61,167-68,171-73; see Wilkinson 87; A745,747-48,935). Indeed, the written record that does exist actually contradicts Mears' claims and demonstrates that plaintiff was actually commended by Major Townsend for a "job well done" for his performance in one of the areas in which Mears contradictorily had criticized him. (T.Mears Ex.8; P827-28; A816,585-86).

---

[10]  To an employee like plaintiff who took great pride in his job performance, a "meets expectations" was the equivalent of a failing grade. (Adkins 32,36; see Deloy 50; A1005-6,906). Because performance evaluations are considered in determining salary increases, promotions and transfers, plaintiff believed this mediocre evaluation would have negative consequences and effect on his salary progression and his ability to rise in the DOC. (Compl&Ans. ¶68; A16,40).

**a. Protected Petition - Plaintiff Files a Union Grievance.** As a result, on October 4, 2004, plaintiff filed an official grievance disputing the performance evaluation and asked that his rating be increased from "Meets Expectations" to "Exceeds Expectations." (P831-32; T.Mears Ex.12; Adkins 55-56; Ackenbrack 30-31; A587-88,849,1011,1045). Plaintiff filed this grievance because he felt he was being retaliated against by Truman Mears for resigning from CERT. (P832; Adkins 55-56; Deloy 52; A588,1011,906). He thought Mears was going to "screw him" on his evaluation. (Wilkinson 57; A927). Plaintiff felt Mears had "a personal vendetta" against him and was evaluating him "personally not professionally."(P832; L.Mears 28; A588,1056).

**2. Plaintiff is Continuously Denied a Meeting with his Supervisors.** After learning that Mears gave him a mediocre rating, plaintiff requested a meeting with Captain Wilkinson and a union representative to review his evaluation. (Wilkinson 57; T.Mears 155; Adkins 57; T.Mears Ex.13;T.Mears Ex.11; A927,850,842,844,847,1011). However, despite his requests, this meeting never took place. (Wilkinson 68-69; T.Mears 188; Adkins 51,57; A 930,752,1010-11). Instead, Mears decided to submit the evaluation without plaintiff's signature, despite his Captain's request that a meeting be held. (T.Mears Ex.11;Wilkinson 67,70,80; T.Mears 155-57; A839,930-31,933,744).

**3. Mears Alters Plaintiff's Time Cards.** Plaintiff always kept copies of his time cards because he prided himself on his work attendance. (Adkins 31,33; see T.Mears 98,166-67; A1005,730,747). Then in September of 2004, he discovered that Mears had tampered with his timecard and altered it so that he had taken frowned upon emergency vacation days rather than

12

holidays or vacation days.[11] (T.Mears Ex.14; A853-62). Mears admits this falsehood. (T.Mears 189-198; A752-55). Contrary to Mears' claims that plaintiff had used emergency vacation days, on each of those days plaintiff had legitimately used holidays or vacation days. (Inter. #3 p.28; A678). Upon notification, Captain Wilkinson ordered Mears to correct them. (Wilkinson 102-05; T.Mears 195-96; A939,754).

   **4. Plaintiff is Denied a Copy of His Timecard.** In January 2005, plaintiff also was denied a copy of his timecard, which is another violation of DOC rules and regulations. (T.Mears 186; T.Mears Ex.13; Inter. #3 p.28; A752,850,678).

   **5. Plaintiff is Denied Transfer to Another Supervisor.** Plaintiff repeatedly requested a transfer to another supervisor so he would no longer have to work for or report to defendant Mears. (Deloy 53-55; Wilkinson 106; T.Mears 198; Adkins 39-40; A906-7,940,755,1007). But defendants Deloy and Wilkinson never responded to or granted this transfer request. (Inter. #3 p.28; A678). Plaintiff hoped that a transfer would alleviate the stress resulting from working for a supervisor who was trying to "screw him," (Wilkinson 57,93,101), but his requests were denied. (Inter. #3 p.28; A678).

   **6. Plaintiff is Constantly Monitored and Nit Picked by Mears.** Plaintiff also was

---

   [11] Emergency vacation days are reserved for last minute call outs versus vacation days which are planned months ahead. (Adams 28; Bradley 31; A871,882). If an officer uses an emergency vacation day that means he has called out at the last minute and has left his shift in a flux and someone will have to fill that position. (Adams 28; A871). If staffing levels were low, which they often were, this could leave the shift commander in a bind. (Adams 29; Bradley 31-32; Mumford 36; A871,882,979).

constantly watched and monitored by Mears who was searching for a performance misstep to use as a basis for discipline. (Adkins 137-38; A1031-32). For example, plaintiff was shown a note pad where someone was keeping chronological notes for Mears of plaintiff's performance and whereabouts. (Adkins 137; A1031). Mears also admits he is a "hands-on" supervisor if he does not have confidence in his employee. (T.Mears 14; A709). Such nit-picking was improper. (Wilkinson 108; A940).

### H. Evidence of Causation.

**1. Direct Admissions.** Defendant Mears admitted at his deposition that plaintiff's resignation from CERT "was a factor" in his decision not to give him a ranking of "Exceeds Expectations." (T.Mears 174-75; A749).

**2. Anger, Hostility and Antagonism.** When plaintiff resigned from CERT, Mears began "a personal vendetta" against him. (P832; A588). This personal vendetta manifested itself when Mears completed a performance evaluation of plaintiff a mere month after the two had heated disagreements about the CERT resignation. (Adams 12;T.Mears 119; A867,735). Mears was so angry with plaintiff he decided to lower his performance rating and falsely accuse plaintiff of being derelict in his duties. (T.Mears Ex.11; A838-40). Because of his anger, resentment and overall vendetta against plaintiff, Mears evaluated him "personally, not professionally." (P832; A588). Mears was out to "screw" him. (Wilkinson 57; A927).

At his deposition Mears readily admitted his antagonism towards plaintiff. Mears stated that plaintiff was a man of integrity up until the time he quit CERT. (T.Mears 54-55; A719). Further, at the meeting the night before the activation, Mears directly opposed plaintiff's views on a mass resignation and stated that quitting was not the answer. (T.Mears 119; A735). Mears was disappointed with plaintiff's decision. (T.Mears 54-55,133; A719,738).

14

As former CERT team member Lee Mears described, after their resignation Lee Mears received a "cold shoulder" from people in management, while plaintiff got "more of the brunt of it." (L.Mears 8; A1051). As plaintiff discussed, Mears was "out to get him."(L.Mears 28;A1056).

The day before plaintiff's resignation, on August 5, 2004, the State of Delaware and DOC filed a lawsuit against COAD in Chancery Court to try to force an end to the job action. (Wilkinson 35; A922). This lawsuit was the result of a last ditch effort by the Governor to put a stop to the correctional officers' defiance of upper management and to end their very successful job action. (Knight Decl. #108 p.18; A565). Additionally, in the past, correctional officers were warned to avoid union activity if they wanted to progress in the DOC. (Inter. #3 p.29; A679).

Moreover, another former CERT member who resigned with plaintiff testified that more than three years later, the resignation is still being explicitly raised by management during personnel interviews as a reason to deny positions. (Shockley 19-21; A958).

**3. Temporal Proximity.** The temporal proximity here is unduly suggestive also.

| | |
|---|---|
| Aug. 5, 2004 | Plaintiff debates Mears on union solidarity. |
| | Gov. Minner files a lawsuit against COAD and the union officials to stop the job action. (See section **H.2** above.) |
| Aug. 6, 2004 | Plaintiff resigns and refuses to cross picket line. |
| Sept. 26, 2004 | Mears falsifies a mediocre performance evaluation of plaintiff. |
| Sept. 2004 | Plaintiff learns he is being constantly monitored by Mears. Also, Mears alters Plaintiff's time card. (See section **G.4** and **G.6** above.) |
| Sept. 2004 | Plaintiff is denied a transfer. After September he continuously requested a transfer and it was always denied. (See section **G.5** above.) |
| Oct. 4, 2004 | Plaintiff files an Official COAD Grievance. (See section **G.1.a** above) |
| Jan. 2005 | Plaintiff constantly tries to meet with his supervisors and union representative regarding his evaluation, but is pushed aside. Also, plaintiff is denied a copy of his 2004 timecard. (See section **G.2-3** above). |
| | Plaintiff learns Mears has sent his performance evaluation to the Warden |

15

Feb. 7, 2005    without his signature. (T.Mears Ex.13; A852).

Feb. 19, 2005    Plaintiff kills himself. (Inter. #20 p.49-51;D868-74; A699-701,637-43).

**4. Knowledge of the Protected Activity.** Plaintiff's status as a member of the ever vocal union was well known. (T.Mears 204-5; West 6; Shockley 6; Hastings 7; Mumford 6; A756,887,955,964,972 ). As indicated, defendant Mears knew every word plaintiff spoke disagreeing with him about the picket line. (See section **F** above). Plaintiff even was accused of "instigating" the resignation by management. (L.Mears 11-12,51; A1052,1062).

**5. Motive to Retaliate.** First, as a result of the job action and the union's highly publicized campaign, the public perception was that DOC was losing control over its correctional officers. (See Knight Decl. #100 p.17; A564). Accordingly, the Governor and Commissioner began monitoring the effects the job action had on the Court and Transportation Unit. (Compl. &Ans. ¶29; A8,36). The job action made "everything a little tight for administrators." (Adams 7; A866). Additionally, the Governor was criticized in the news media and took political heat in the midst of a hotly contested reelection campaign. (Knight Decl. #107 p.17; A564).

Second, as the head of CERT disclosed, the CERT activation order came from the Governor herself. (L.Mears 21-22,53; Adams 17; T.Mears 128; L.Mears Ex.2 #19 p.4; A1054-55,1062,868,737,1070). Never before had DOC command decisions been made by someone other than the Commissioner. (L.Mears Ex.2 #19 p.4; A1071). The Governor directly interfered with the department and her decision was politically motivated. (L.Mears Ex.2 #20 p.4; A1071). Thus, when the CERT members resigned in support of the job action, they were working against the Governor. As defendant Wilkinson described, lower ranking officers must follow orders given by higher ranking officers - the Commissioner takes marching orders from the Governor, the Warden from the Commissioner, and so forth. (Wilkinson 76; A932). Accordingly, as a

16

current CERT team leader and Lieutenant, the burden fell on defendant Mears to take out

management's disdain for the resignation on plaintiff. (See T.Mears 132,144; A738,741).

Lastly, Mears himself had a motive to retaliate because he was the only active CERT

member in August 2004 who refused to join his fellow co-workers in supporting the job action.

(T.Mears 144; A741). Mears was supportive of DOC management and did not like that plaintiff,

his subordinate employee, spoke against management. (Inter. #3 p.30; A680).

**6. Disparate Treatment.** Plaintiff also was singled out for disparate treatment. In prior

years his meritorious job performance was regularly recognized in his performance evaluation.

(T.Mears Ex.5-7; A783-88). Yet after refusing to cross the picket line and resigning, plaintiff

was singled out in his evaluation and his supervisor refused to recognize his outstanding work

accomplishments as they had previously been. (T.Mears Ex.11; A838-40). Instead, unlike in all

previous years, his supervisor fabricated purported performance deficiencies, ones which

contradict the actual written record. (See section **H.7-8** below).

**7. Violation of Rules, Policies and Procedures.** First, DOC rules, policies and

procedures explicitly require that any and all performance deficiencies - from warnings to verbal

counseling to written reports - be documented in writing and placed in the Supervisor's

Employee File so they may be used to prepare the employee's performance evaluation. (T.Mears

Ex.9 at 4; Wilkinson 87-91; T.Mears 90-94; A821,935-56,728-29). Contradictorily however,

despite the fact that Mears keeps such a file per policy (T.Mears 87-90; A727-28), there simply is

nothing in it whatsoever to support the performance deficiencies that Mears identified in

plaintiff's evaluation. (D750-90; A596-636). There is nothing there at all about any performance

deficiencies whatsoever. (Id.). In fact, the record flatly contradicts these false claims and instead

shows that plaintiff received a written commendation from Major Townsend commending him

17

for a "job well done" during the QRT training - the very area for which Mears criticized him. (T.Mears Ex.8;P827-28; A816,585-86).

Second, Mears claimed that he submitted plaintiff's evaluation to DOC headquarters without plaintiff's signature because plaintiff purportedly refused to sign it. (T.Mears 155-57; T.Mears Ex.11; A744,844). However, as Captain Wilkinson testified and plaintiff's writings reveal, Captain Wilkinson had instructed that he wanted to be present at a meeting between plaintiff and Mears to review the evaluation to address its problem before its submission. (Wilkinson 57,67,70,80; T.Mears 155,188; Adkins 51,57; T.Mears Ex.11,13; A 927,930-31,933,744,752,1010-11,839,847,50-51). But Mears disobeyed Captain Wilkinson's instruction on this, despite his duty to follow it. (T.Mears Ex.11;Wilkinson 67,70,80;T.Mears 155-57; A850-51,930-31,933744).

**8. Falsehoods.** Defendant Mears' justification for plaintiff's poor performance evaluation is flatly contradicted by the record, which demonstrates that Mears' claims are simple falsehoods.

First, the claims of plaintiff's poor performance in QRT training and claim that Corporal Foskey complained about him are contradicted by his QRT commendation and Foskey's own testimony. (Foskey 17-18; T.Mears Ex.8;P827-28; A986-87,816,585-86). Second, the claims of poor performance in the receiving room are contradicted by the utter lack of any written record documenting those problems, in violation of DOC policies which require all such problems to be documented. (T.Mears 89-94;160-61;167-68;171-73; Wilkinson 87-91; T.Mears Ex.9; A727-29,745,747-48,935-36,821). Third, the claim that plaintiff's evaluation was justified because he was no longer on CERT are contradicted by the fact that plaintiff was on CERT for 10 ½ - 11 months of the 12 month evaluation time frame. (T.Mears 173-74; A748-49).

18

**9. Pretextual Reasons and Cover-Up.** Defendant Mears claims that plaintiff had a multiplicity of performance problems. (T.Mears 60,100-04,161-78; T.Mears Ex.11; A720,730-31,745-50,838-40). But review of plaintiff's performance record reveals that he had no performance deficiencies whatsoever and was instead repeatedly commended for his exceptional job performance and attendance. (P442-68; D750-90; T.Mears Ex.4-8; Wilkinson Ex.1; A490-516,596-636,775-817).

**I. Proximate Cause**

Beginning in the Summer of 2004, plaintiff became depressed and extremely stressed due to the deteriorating situation at work. (Tavani report p.3-6,10;Inter. #20 p.46-48; A572-75,696-98). As the stress at work increased, plaintiff's depressive symptoms grew worse. (Tavani report p.11,13; A580,582). There is a clear temporal correlation between plaintiff's stress at work due to the retaliation and his "deterioration," culminating in his suicide. (Id.) There is a "compelling and clear cause and effect association between the retaliation and Cpl. Balas' demise." (Tavani report p.13; A582). In the Fall of 2004, after the CERT resignation, plaintiff's personality changed. (Adkins 141,145; A1032-33). While before he was "outgoing" and "lovable," now he was easily agitated, withdrawn and had little patience with his children. (Adkins 20,89,112-14,128-9;Inter. #20 p.46-47; A1002,1019, 1025-26,1029,696-97). "He was not himself at all." (Adkins 112; A1025).

**J. Economic Damages.** Dr. Borzilleri, the forensic economist, who was not deposed by the defense, will project earnings, pension and benefits losses of $1,287,690 with a retirement age of 66 and $1,199,910 with a retirement age of 62.

**K. Non-Economic Damages.** In the Fall of 2004, plaintiff's personality changed and

19

that, among other things discussed below, he became depressed and extremely stressed due to the deteriorating situation at work. Plaintiff also began drinking as a method of coping and participated in non-characteristic behavior such as having an affair, both of which were preceded by the onset of depression. Then, in January of 2005, plaintiff expressed suicidal ideation and disclosed his suicidal thoughts to friends and family. On February 19, 2005, plaintiff committed suicide.

Dr. Tavani, the forensic psychiatrist, who also was not deposed by the defense, will testify as to injuries which include major depression, single episode. Further, Dr. Tavani will testify that there is a clear causal and temporal correlation between plaintiff's stress at work due to the retaliation by defendant Truman Mears and plaintiff's mental and psychological deterioration, which culminated in plaintiff's suicide.

Plaintiff's widow, Cindy Adkins, will also testify about his emotional distress which includes symptoms such as depressed mood, diminution of energy and interest, decreased libido, psychomotor slowing, agitation, insomnia, irritability, lowered self-esteem, difficulties with concentration, attention and memory, and social withdrawal from coworkers, friends and children. The widow also will explain decedent's humiliation and injury to reputation.

**Defense Objections to Plaintiff's Statement:**

Defendants object to Plaintiff's statement of what she intends to prove in its entirety. Local Rule 16.3(8) calls for a "brief statement of what plaintiff intends to prove". Plaintiff's statement is 20 pages long and anything but brief. The statement includes numerous allegations

that are not relevant to the claims of retaliation in this litigation.   It also includes numerous

references to inadmissible evidence that Defendants have specifically objected to in the

Plaintiff's exhibit list and Defendants' Answering Brief in Response to Plaintiff's Motion for

Partial Summary Judgment.

Balas, Cindy 5335-06 \ Pre-Trial \ (8) What Plaintiff Intends to Prove.draft.05.wpd

**(9)    A brief statement of what the defendant intends to prove as defenses.**

Defendants intend to prove that the emotional and psychological problems experienced by the decedent in the winter of 2004-2005 were attributable to his personal life, and not his job, his supervisor, or his resignation from CERT in August of 2004. The decedent's personal problems began as early as the beginning of 2004 when he was drinking excessively, drinking and driving with his children in the vehicle, and arguing with his wife. The decedent's work performance began to slip during the same time period.

The decedent committed suicide immediately after his wife, the plaintiff here, learned of his extramarital affair and confronted him about it. The decedent had been engaged in an extramarital affair during the fall of 2004. He had initiated the affair by anonymously sending flowers to Jennifer (Cox) Weldon in late August 2004. They met and began the affair in September. Jennifer ended the affair in either late 2004 or early 2005. However, the decedent and Jennifer continued to keep in regular contact by telephone after Jennifer ended the affair. In the weeks before his suicide, the decedent was increasingly traumatized over his personal life, and he took emergency leave from work to spend time with his wife. His sole focus was his marriage, his family, and the extramarital relationship.

On the afternoon before his suicide, the decedent had a rollover accident in his truck, with his son in the vehicle. That night (Friday), the decedent left several voice messages with Jennifer, who was still trying to remove herself from the relationship. She spoke to him after he wrecked his truck and his speech was very slurred. She asked him if he had been drinking. She spoke to him again the next morning, but the conversation ended when he was interrupted and hung up.

Defendants further intend to prove that the decedent's problems at work in the summer and fall of 2004 were nothing more than routine employment issues. The allegations of retaliatory conduct are completely unsupported by any evidence. The CERT resignations in August did not result in any adverse consequences for the ten officers who resigned, including decedent, in terms of salary, benefits, assignment, or eligibility for promotion. After the resignation, things quickly returned to normal within the institution, and the officers who resigned were not treated any differently after the resignation. Specifically, Lt. Mears did not retaliate against the decedent for resigning from CERT, being a member of the union, or otherwise.

The defendants intend to prove that Balas refused to cooperate or to participate in the evaluation process. When Lt. Mears approached the decedent with his evaluation in September 2004, Balas refused to even look at the evaluation unless the rating was an "exceeds expectations". When Lt. Mears told him it was a "meets expectations", he refused to sign it or look at it. This rating of "meets expectations" had no effect on Balas' assignments, shifts, salary, requests for time off, transfers, opportunity for advancement, or any other benefit. Indeed, Balas had twice received this rating in previous evaluations and was promoted to corporal after receiving a rating of "meets expectations".

The defendants will prove that the decedent did not sustain any adverse employment action before his death. The plaintiff's complaints as to timecards, a supposed transfer request, a purported grievance, alleged excessive monitoring, vacation records, and an alleged denial of a meeting are not supported by competent evidence. The decedent never requested a transfer or new supervisor from Lt. Mears. The decedent never filed a grievance. Lt. Mears never denied the decedent a copy of his timecard, and the emergency vacation notations were made on all of Lt. Mears' time cards for reasons completely unrelated to the decedent. Lt. Mears always agreed to a meeting with Balas and a

union representative to discuss the evaluation. Lt. Mears, as a supervisor, was required to monitor his employees, but he did not "excessively" monitor Balas or keep any handwritten notes on him.

Defendants will prove that the decedent did not engage in any protected conduct. The decedent was not actively involved in any union activity and he did not make a public statement, symbolic or otherwise, of any kind. Defendants will further prove that there is no causal connection between any of these routine employment issues and any alleged protected activity months earlier in August 2004. Nor can the plaintiff rely on any alleged retaliatory acts before September 25, 2004, as any such evidence would be time-barred. To the extent that the decedent was experiencing problems at work, these were the result of an extramarital affair and other personal problems.


** Defendants have also proved in their summary judgment motion that there is no evidence to support the claims against Defendants Taylor, Machtinger, Wilkinson, or Deloy. The plaintiff has not opposed the summary judgment motion as to these defendants and thus it is not necessary to prove their lack of personal involvement at trial and summary judgment should be granted in their favor as a matter of law.

Balas, Cindy 5335-06 \ Pre-Trial \ (09) What Defendant Intends to Prove.draft.02.wpd

    **(10)    Statements by counter claimants or cross-claimants comparable to that required of plaintiff.**

Not applicable since there are no counter claimants or cross-claimants.

    **(11)    Any amendments to the pleadings desired by any party with a statement whether it is unopposed or objected to, and if objected to, the grounds therefore.**

**<u>Plaintiff's Statement:</u>**

None.

**<u>Defendants' Statement:</u>**

None.

Balas, Cindy 5335-06\ Pre-Trial \ (10-11)Draft - Counter, Cross, Amendments.draft.02.wpd

   **(12)**    **The parties certify that two-way communication has occurred between persons having authority in a good faith effort to explore the resolution of the controversy by settlement but those efforts were unsuccessful.**

The parties have attempted unsuccessfully to engage in good faith settlement negotiations.

   **(13)**    **Any other matters which the parties deem appropriate.**

**<u>Plaintiffs Statement</u>:**

None.

**<u>Defendants Statement</u>:**

Defendants anticipate filing several Motions in Limine in this matter.  Per the Court's instruction, such motions are not included as a part of the pretrial order and the filing of Motions in Limine will be discusses at the pretrial conference.

Balas, Cindy 5335-06 \ Pre-Trial \ (12-13) Settlement, Other Matters.draft.04.wpd

(14)    This Order shall control the subsequent course of the action unless modified by the court to prevent manifest injustice.

## TRIAL TIME ESTIMATES

Trial is scheduled to begin _____.

Estimated Number of Hours: The parties estimate the trial will take 5 days.

**THIS ORDER SHALL CONTROL THE SUBSEQUENT COURSE OF THE ACTION UNLESS MODIFIED BY THE COURT TO PREVENT MANIFEST INJUSTICE.**

**IT IS SO ORDERED**, this _____ day of May, 2008.

_____
**JOSEPH J. FARNAN**
**UNITED STATES DISTRICT JUDGE**

**THE NEUBERGER FIRM, P.A.**

/s/ Stephen J. Neuberger
**THOMAS S. NEUBERGER, ESQ. (#243) STEPHEN  J. NEUBERGER, ESQ. (#4440)**
Two East Seventh Street, Suite 302
Wilmington, DE 19801
(302) 655-0582
TSN@NeubergerLaw.com
SJN@NeubergerLaw.com

Attorneys for Plaintiff

**DEPARTMENT OF JUSTICE, STATE OF DELAWARE**

 /s/ Ralph Durstein, Esq
**RALPH DURSTEIN, ESQ. (#912)**
**STACEY XARHOULAKOS, ESQ. (#4667)**
Carvel State Office Building
820 North French Street
Wilmington, DE 19801
(302) 577-8400
Ralph.Durstein@state.de.us
Stacey.Xarhoulakos@state.de.us

Attorneys for Defendants