IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CINDY L. BALAS a/k/a CINDY L. :
ADKINS, Executrix of the      :
Estate of CORPORAL JOHN J.    :
BALAS,                        :
          Plaintiff,          :
                              :
     v.                       :    Civil Action No. 06-592 JJF
                              :
STANLEY W. TAYLOR, JR.,       :    JURY TRIAL DEMANDED
individually and in his       :
official capacity as the      :
Commissioner of Correction,   :
et al.,                       :
                              :
          Defendants.         :

---

Thomas S. Neuberger, Esquire; Stephen J. Neuberger, Esquire; and
Cheryl A. Hertzog, Esquire of THE NEUBERGER FIRM, Wilmington,
Delaware.

Attorneys for Plaintiff.

Ralph K. Durstein, III, Deputy Attorney General & Stacey
Xarhoulakos, Deputy Attorney General of the DEPARTMENT OF JUSTICE
FOR THE STATE OF DELAWARE, Wilmington, Delaware.

Attorneys for Defendants.

---

**MEMORANDUM OPINION**

July 29, 2008

Farnan, District Judge

Pending before the Court are the cross motions for summary judgment filed by Plaintiff Cindy L. Balas and Defendants Taylor, Machtinger, Deloy, Wilkinson, Mears, and Department of Correction of the State of Delaware.  (D.I. 57, D.I. 54.)  For the reasons discussed below, Plaintiff's Motion will be granted in part and denied in part, and Defendants' Motion will be granted in part and denied in part.

BACKGROUND

On September 25, 2006, Plaintiff Cindy L. Balas (also referred to as Cindy L. Adkins), as executrix of the estate of Corporal John J. Balas ("Corporal Balas"), filed this action against  Defendants Taylor, Machtinger, Deloy, Wilkinson, Mears, and Department of Correction of the State of Delaware ("DOC") pursuant to 42 U.S.C. § 1983, alleging that Cpl. Balas's suicide was proximately caused by Defendants' retaliation in violation of the First and Fourteenth Amendments.  (D.I. 1.)  Specifically, Plaintiff alleges that, following Cpl. Balas's union solidarity debate, resignation from the Correction Emergency Response Team in support of a union job action, and refusal to cross a picket line, Lieutenant Truman Mears ("Lt. Mears") retaliated against Cpl. Balas by giving him a mediocre performance evaluation that contained falsified information, refusing to discuss the evaluation with Cpl. Balas and Lt. Mears's supervisor, altering

2

Cpl. Balas's timecard, and constantly monitoring and nitpicking Cpl. Balas.  (See D.I. 58.)

## I.   Cpl. Balas's Union Affiliation and CERT resignation[1]

At the time of his suicide, Cpl. Balas was an eleven year veteran of the DOC.  (D.I. 63 at A655.)  Cpl. Balas worked in the Property and Receiving Room at Sussex Correctional Institute ("SCI") in Georgetown, Delaware, and also served as a  Correction Emergency Response Team ("CERT") member from 1995 through 2004. (Id. at 656.)  CERT is a tactical unit composed of an elite group of correctional officers who, in addition to their normal duties, respond to a variety of public safety situations, including escapes.  (D.I. 63, T. Mears deposition at A721.)[2]  In August of 2004, Cpl. Balas was a member of the Correctional Officers Association of Delaware ("COAD"), a union for prison guards of the rank of sergeant and below.  (T. Mears dep. at A756.)

At all times relevant to this lawsuit, Defendant Truman Mears was a Lieutenant, a member of CERT, and Cpl. Balas's immediate supervisor in Property and Receiving.  (Id. at A707-08.)

---

[1]Because only the qualified immunity inquiry and the first prong of Plaintiff's retaliation claim (whether Cpl. Balas has engaged in conduct protected by the First Amendment) warrant summary judgment, see infra, the Court will limit its recitation of facts to those relevant to these issues.

[2]Hereinafter, Witness testimony contained in Document Items 58-64 will be cited as "[Deponent Name] dep. at A[###]."

3

During the summer of 2004, COAD was involved in contentious contract negotiations with the DOC. (Id. At 716-17.) As part of its campaign to pressure the DOC and state elected officials, COAD publicized security lapses in the Delaware prisons and its understaffing concerns, among other issues, through newspaper articles and large billboards. (Id.; Wilkinson dep. at A922; Mumford dep. at A973; Knight decl at A550.) On July 30, 2004, as a way to publicize the "critically low staffing levels," COAD publicly announced that its membership would refuse voluntary overtime (the "job action"). (Knight decl at A560.)

On August 5, 2004, Commissioner Taylor activated five members of the CERT team, including Cpl. Balas, to assist the DOC's Court and Transportation Unit ("transportation unit"). (Id. at A561; Wilkinson dep. at A922.) CERT members, including Cpl. Balas, met that night at the home of Lee Mears (no relation to Lt. Mears) to discuss the activation. (L. Mears dep. at A1054; T. Mears dep. at A733.) Both Cpl. Balas and Defendant Lt. Mears were vocal at this meeting, with Cpl. Balas opposing the activation and Lt. Mears expressing a different view. (Adams dep. at A867.) The five CERT members activated reported for their assignment the next day. (T. Mears dep. at A735.)

On August 6, 2004, the CERT members who had been activated to help the transportation unit were ridiculed, cursed, and called "strike-breakers" by their co-workers. (L. Mears dep. at

4

A1054.)  After reporting for duty, the CERT members discovered
that only two prisoners would have been released if not
transported to court that day, and that the five full-time unit
officers could have handled this task.  (Id.)  Because of this,
Cpl. Balas asked Major Hall, the head of CERT, why they had been
activated.  (Id.)  Major Hall's response led Cpl. Balas and other
CERT members to believe that their activation was politically
motivated. (Id. at A1054-55, A1071.)

At the conclusion of their shift on August 6, 2004, the five
assigned CERT members and five additional members met with
Warden Kearney and resigned their positions on CERT.  (Wilkinson
dep. at A923, A925; Foskey dep. at A987-90.)  The CERT members
told the Warden that they had a "moral obligation to back up our
fellow officers that we work with above anything else."
(Hastings dep. at A967.)  Lt. Mears did not resign.  (T. Mears
dep. at A738.)

## II.  Defendant Mears's Allegedly Retaliatory Acts

On September 26, 2004, Cpl. Balas received a performance
evaluation of "Meets Expectations" from Defendant Mears.  (T.
Mears Ex. 11 at A838.)  Lt. Mears included in the evaluation an
attached letter that purported to explain why Cpl. Balas was
receiving a "Meets Expectations," rather than "Exceeds
Expectations," as he had in the past.  (Id. at A840.)  In this
attachment, Lt. Mears wrote that he had meetings "with the Sgt.

5

in charge of the area Cpl. Balas works [in] about Cpl. Balas

[sic] poor work performance, poor attitude, and his unwillingness

to get along with other staff." (Id.)  Further, Lt. Mears wrote

that "Cpl. Balas is no longer a member of C.E.R.T," and that

Mears does "not feel that perfect attendance alone (although

commendable) is enough to justify exceeds." (Id.)  Lt. Mears

also discussed problems he had with Cpl. Balas teaching other

correctional officers in QRT training. (Id.)  Cpl. Balas

received a commendation from Major Townsend for a "job well done"

with respect to the QRT training, (T. Mears Ex. 8 at P827.),

which the performance evaluation did not mention. Lt. Mears

testified that he "didn't document" any of the criticisms

mentioned in the attachment prior to writing the evaluation. (T.

Mears dep. at A747, A475.)

     The policy and procedure of the DOC is to document

performance deficiencies (Wilkinson dep. at A935).  Defendant

Mears's supervisor, Captain Wilkinson, testified that an officer

with the attributes described in the attachment to Cpl. Balas's

performance evaluation would not meet the expectations set by the

DOC. (Id. at A937.)

     After learning that Defendant Mears was giving him an

evaluation of "Meeting Expectations," Cpl. Balas requested a

meeting with Capt. Wilkinson and a union representative to review

his evaluation, and refused to sign off on the evaluation until

this meeting.  (Id. at A927.)  Capt. Wilkinson agreed to review
the evaluation with Cpl. Balas, but Defendant Mears submitted it
up the chain of command before that meeting took place and
without Cpl. Balas's signature on it.  (Id. at A929, A930-31.)

In September of 2004, Cpl. Balas discovered that Defendant
Mears had altered his time card to show that Cpl. Balas had taken
an emergency vacation day rather than a holiday or scheduled
vacation.  Lt. Mears testified that he changed Cpl. Balas's time
card because of a complaint from staff that they were unable to
get emergency vacation time because of their race, "something
that had nothing to do with [Cpl. Balas]."  (T. Mears dep. at
A753-54.)  Lt. Mears returned Cpl. Balas's timecard to its
original form at Capt. Wilkinson's request.  (Wilkinson dep. at
A939.)

In October of 2004, Cpl. Balas told his wife that he was
going to file a grievance disputing his performance evaluation,
because he believed it was retaliatory.  (Adkins dep. at A1011.)
Plaintiff has produced a copy of a completed COAD grievance form,
dated October 4, 2004, that was found in Cpl. Balas's home.
(A587-588.)  The COAD shop steward testified to giving Cpl. Balas
the grievance form, to recognizing his own signature on it, and
to having "no idea" whether Cpl. Balas actually filed the
grievance.  (Ackenbrack dep. at A1045.)  Defendants were not
aware of Cpl. Balas filing any grievance.  (D.I. 56, Wilkinson

7

dep. at A230-34; D.I. 56, T. Mears dep. at A173-174.)

On February 19, 2005, Cpl. Balas committed suicide.

## STANDARD OF LAW

In pertinent part, Federal Rule of Civil Procedure 56(c) provides that a party is entitled to summary judgment if a court determines from its examination of "the pleadings, dep.sitions, answers to interrogatories, and admissions on file, together with the affidavits, if any," that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

A court should not make credibility determinations or weigh the evidence. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000). To properly consider all of the evidence without making credibility determinations or weighing the evidence, a "court should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." Id. at 151 (internal citations omitted).

To defeat a motion for summary judgment, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts. . . .  In the language of the Rule, the non-moving party must come forward with specific facts showing that there is a genuine issue for trial."

8

<u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586-87 (1986)(internal citations omitted).  The mere existence of some evidence in support of the non-movant will not be sufficient to support a denial of a motion for summary judgment; there must be enough evidence to enable a jury to reasonably find for the non-movant on that issue.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986).  Thus, if the evidence is "merely colorable, or is not significantly probative," summary judgment may be granted.  <u>Id</u>.

### DISCUSSION

The Court will discuss the contentions raised in the parties' cross motions for summary judgment as follows: (1) whether Plaintiff's damage claims arising from the Cpl. Balas's suicide are procedurally barred; (2) whether summary judgment is appropriate with respect to Plaintiff's claims against Defendants Taylor, Machtinger, Wilkinson, and Deloy; (3) whether summary judgment is appropriate with respect to Plaintiff's claim against Defendant Mears; (4) whether Defendant Mears is entitled to qualified immunity; and (5) whether the DOC, as an agency of the state of Delaware, is protected by Eleventh Amendment immunity.

I.    **Whether Plaintiff's Damage Claims are Limited to those Arising During the Lifetime of Cpl. Balas**

Defendants contend that Plaintiff's claims for damages arising from the suicide of Cpl. Balas are barred by her failure to plead a wrongful death action under Delaware law.  Defendants contend that Plaintiff brought a § 1983 claim based on Delaware survival action principles, and that, in the absence of a wrongful death action, Plaintiff cannot attribute Cpl. Balas's suicide to the alleged retaliation by Defendants.  In response, Plaintiff contends that available remedies in § 1983 actions are not limited to those commonly recovered in pure state law survival actions.

Plaintiff brought this First Amendment retaliation action under 42 U.S.C. § 1983.  Section 1983, however, provides no guidance for how to evaluate damages.  Frontier Ins. Co. v. Blaty, 454 F.3d 590, 598 (6th Cir. 2006).  Federal law incorporates the law of the forum state where section 1983 is "deficient in the provisions necessary to furnish suitable remedies," provided the state law is not inconsistent with the federal law or Constitution.  42 U.S.C. § 1988; see also Robertson v. Wegmann, 436 U.S. 584, 589-90 (1978); Frontier Ins., 454 F.3d at 598.  Various courts of appeal have examined state survival and wrongful death laws to determine whether they fulfill the compensation and deterrent purposes of section 1983, and if not, what federal common law remedies are available.  See,

10

e.g., <u>Frontier Ins.</u>, 454 F.3d at 599-604; <u>Berry v. City of</u>

<u>Muckogee</u>, 900 F.2d 1489 (10th Cir. 1990).

Plaintiff contends that the federal remedies fashioned in

<u>Berry</u> are appropriate here in light of the deficiencies of

Delaware's survival action, but this contention ignores the

broader remedies afforded by Delaware's wrongful death action.[3]

Indeed, Defendants' contention is that Plaintiff is estopped from

asserting damage claims stemming from Cpl. Balas's suicide

because she failed to file a wrongful death action, not because

Delaware law provides no such remedies.  Thus, the question

_____

[3]For damages under a wrongful death action, Delaware law
provides:

(d) In fixing the amount of damages to be awarded under this
subchapter, the court or jury shall consider all the facts and
circumstances and from them fix the award at such sum as will
fairly compensate for the injury resulting from the death. In
determining the amount of the award the court or jury may
consider the following:

(1) Deprivation of the expectation of pecuniary benefits to the
beneficiary or beneficiaries that would have resulted from the
continued life of the deceased;

(2) Loss of contributions for support;

(3) Loss of parental, marital and household services, including
the reasonable cost of providing for the care of minor children;

(4) Reasonable funeral expenses not to exceed $7,000, or the
amount designated in § 5546(a) of Title 29, whichever is greater;

(5) Mental anguish resulting from such death to the surviving
spouse and next-of-kin of such deceased person. . . .

Del. Code Ann. tit. 10, § 3724(d)(2008).

before the Court is whether Plaintiff's pleading properly encompasses damage claims arising from Cpl. Balas's death.

Paragraph one of Plaintiff's Complaint states "[t]his is a civil survival action for compensatory and punitive damages and for injunctive relief brought by the Estate of a deceased Correctional Officer whose death was proximately caused by a Department wide policy of retaliation ... in violation of the decedent's rights ... under the First and Fourteenth Amendments of the U.S. Constitution." (D.I. 1, ¶1.) Paragraph two states "[t]he cause of action arises under 42 U.S.C. § 1983." (Id., ¶2.) Paragraph three labels the complaint "this survival action." (Id., ¶3.) Paragraph one hundred thirty nine requests, *inter alia*, damages stemming from Cpl. Balas's death,[4] including "future or front pay" and "loss of earning capacity." (Id., ¶139(C).)

The Court concludes that Plaintiff has properly pled a section 1983 retaliation claim that incorporates Delaware tort law principles, including those encompassed in a wrongful death action. Section 1983 does not require a plaintiff bringing a section 1983 claim to specify whether it is incorporating state

---

[4]      "Enter a judgment against the individual defendants, jointly and severally, for funeral expenses and other compensatory damages, including lost wages, back pay, pension and other benefits, for future or front pay, loss of earning capacity, emotional distress, humiliation, embarrassment, and injury to reputation."  (D.I. 1, ¶139(C).)

tort law principles, or if it is, which principles it relies on. See 42 U.S.C. §§ 1983, 1988; Robertson, 436 U.S. at 589-90. Defendants contend that Plaintiff has filed a survival action and would need to have instead filed a wrongful death action to avail herself of the remedies provided in § 3724. Plaintiff, however, has not asserted a state law survival action only, but rather a First Amendment retaliation action pursuant to section 1983, which incorporates state law principles as necessary. See 42 U.S.C. § 1988. The Court concludes that Plaintiff's Complaint, as styled, gives Defendants adequate notice of damage claims arising from Cpl. Balas's death. In other words, despite labeling the Complaint a "survival action," Plaintiff filed this action pursuant to section 1983 and pled broad damage claims, such that Defendants will not be prejudiced if Delaware wrongful death damages principles are incorporated into this action. Accordingly, the Court will deny Defendants' Motion for partial Summary Judgment on these damage claims.

## II.  Claims Against Defendants Taylor, Machtinger, Wilkinson, and Deloy

By her Answering Brief, Plaintiff states that she "does not oppose the dismissal of defendants Deloy, Wilkinson, Machtinger or Taylor," leaving only Lt. Mears and the DOC as named defendants. (D.I. 65 at 4.) Accordingly, the Court will grant Defendant's Motion for Summary Judgment with respect to Defendants Taylor, Machtinger, Wilkinson, and Deloy.

13

### III. Whether Summary Judgment is Appropriate on Plaintiff's Public Employee Retaliation Claim Against Lt. Mears

Public employee claims of retaliation for engaging in protected First Amendment conduct are analyzed using a three-step approach.  Hill v. City of Scranton, 411 F.3d 118, 125 (3d Cir. 2005).  First, the employee must show that the activity is protected.  Second, the employee must show that the protected activity was a substantial or motivating factor in the alleged retaliatory action.  Lastly, the employer may defeat the employee's claim by demonstrating that the same adverse action would have taken place in the absence of the protected conduct. Id.

### A.  Whether Cpl. Balas Engaged in Protected Activity

The first prong of the retaliation test, which concerns the protected status of the employee's activity, is a question of law.  Hill, 411 F.3d at 127.

By her Motion, Plaintiff contends that Cpl. Balas engaged in conduct protected by the First Amendment through his: (1) union membership; (2) union solidarity debate with Defendant Mears; (3) symbolic speech of resigning from CERT and refusing to cross a picket line; and (4) filing a union grievance.  In response, Defendants contend Cpl. Balas's alleged protected conduct was pursuant to his official duties and thus not protected by the First Amendment.

Speech by private citizens on matters of public importance

14

lies at the heart of the First Amendment.  See, e.g., Schenck v. Pro-Choice Network Of Western New York, 519 U.S. 357, 377 (1997). An employee's speech addresses a matter of public concern when it can be "fairly considered as relating to any matter of political, social, or other concern to the community." Connick v. Myers, 461 U.S. 138, 146 (1983); Pro v. Donatucci, 81 F.3d 1283, 1288 (3d Cir. 1996).  Non-verbal conduct is "protected by the First Amendment when the nature of [the] activity, combined with the factual context and environment in which it was undertaken, shows that the activity was sufficiently imbued with elements of communication to fall within the [First Amendment's] scope." Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly, 309 F.3d 144, 158 (3d Cir. 2002)(internal punctuation omitted)(quoting Spence v. Washington, 418 U.S. 405, 409-10 (1974)); Troster v. Pa. State Dep't of Corrections, 65 F.3d 1086, 1090 (3d Cir. 1995)).  In this "fact-sensitive, context-dependent inquiry," a court analyzes both the intent of the expressive "speaker" and the success that person had in communicating their message.  Troster, 65 F.3d at 1090.  "First, we examined whether the officer intended subjectively (i.e., actually intended) for his conduct to communicate to persons whom he expected to observe it ( i.e., his intended audience).... Second, we considered whether observers understood the message the officer intended his conduct to convey." Tenafly, 309 F.3d at 161.

15

The Court concludes that Cpl. Balas's resignation from CERT constitutes symbolic speech protected by the First Amendment.[5] To begin, the resignation of Cpt. Balas and nine other CERT members can only be understood in light of the public dispute over contract negotiations between the COAD union and DOC management.  The extent to which Delaware's prisons were understaffed, and the subsequent imposition of voluntary and mandatory overtime on officers, was a major issue in COAD's labor dispute and a point of emphasis in its media campaign.  The COAD job action of refusing all voluntary overtime spoke directly to this issue, as did the Commissioner's decision to activate the CERT team to supplement the Court and Transportation unit.  In this context, the resignation of ten CERT team members, including Cpl. Balas, was significant.  The record evidence demonstrates that the resigning CERT members intended their resignation to communicate support of the job action to prison management (Adam dep. at A869-70; West dep. at A889, A890), and that prison management understood that this was the message the CERT members intended to convey (Hasting dep. at 967; Shockley dep. at A957). Further Cpl. Balas even told Captain Wilkinson that they had

---

[5]Given the sufficiency of the CERT resignation in conferring protected status under the First Amendment, the Court will focus its analysis on the resignation without addressing whether the other conduct Plaintiff raises confers protected status.  Cpl. Balas's union membership, pre-resignation speech with Defendant Mears, and alleged union grievance all directly relate to the CERT members' decision to resign.

resigned "to support COAD." (Wilkinson dep. at A926.)
Accordingly, the Court concludes that Cpl. Balas's resignation
from the CERT team constituted symbolic speech on matters of
public concern,[6] and as such was conduct protected by the First
Amendment.

Speech made by public employees "pursuant to their official
duties" is not protected under the First Amendment. <u>Garcetti v.
Ceballos</u>, 547 U.S. 410, 421 (2006). Defendants' contention that
resigning from CERT is pursuant to a CERT member's official
duties is difficult to understand, given that a resignation in
the circumstances present here is in effect a refusal to perform
one's job duties. The Court thus concludes that Cpl. Balas's
resignation from CERT was not pursuant to his official duties,
but rather was symbolic speech made in his capacity as a citizen
for First Amendment purposes. <u>Cf. Foraker v. Chaffinch</u>, 501 F.3d
231 (3d. Cir 2007)(finding prior statements made in the chain of
command, and a later statement to the State Auditor ordered by
superiors, pursuant to official duties). Accordingly, insofar as
the Court decides as a matter of law that Cpl. Balas's conduct
conferred protected status under the First Amendment, it will
grant Plaintiff's Motion and deny Defendant's Motion.

--------

[6]Defendant do not contend that the COAD job action and
larger labor dispute were not matters of public concern.

    B.   *Whether Summary Judgment is Warranted on Prongs
         Two and Three*

Under the second prong in a public employee retaliation
claim, the employee must show that the protected activity was a
substantial or motivating factor in the alleged retaliatory
action.  <u>Hill</u>, 411 F.3d at 125.  Under the third prong, the
employer may defeat the employee's claim by demonstrating that
the same adverse action would have taken place in the absence of
the protected conduct.  <u>Id.</u>

The Court finds that genuine issues of material fact exist
for prongs two and three of Plaintiff's retaliation claim, such
that summary judgment for either party under Rule 56(c) is
inappropriate.

**IV.   Whether Defendent Mears is Entitled To Qualified
        Immunity**

A public official is entitled to qualified immunity if the
official's conduct does not violate clearly established statutory
or constitutional rights that a reasonable person would have
known.  <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982).  Whether
an official is entitled to qualified immunity is a purely legal
question, <u>Acierno v. Cloutier</u>, 40 F.3d 597, 609 (3d Cir. 1994),
in which a court first asks the threshold question: "Taken in the
light most favorable to the party asserting the injury, do the
facts alleged show the officer's conduct violated a
constitutional right," <u>Saucier v. Katz</u>, 533 U.S. 194, 201 (2001).

If such a violation can be made out, the court next asks "whether the right was clearly established" Id. This second inquiry does not require exact factual correspondence between the right asserted and prior case law, as "officials can still be on notice that their conduct violates established law even in novel factual circumstances." Hope v. Pelzer, 536 U.S. 730, 741 (2002). Rather, application of qualified immunity turns on the "objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken;" the salient question is whether "reasonable officials in Defendants' positions could have believed that their conduct was lawful." Doe v. Delie, 257 F.3d 309, 318 (3d Cir. 2001) (internal quotes and citations omitted).

By his reply brief, Lt. Mears contends that he is entitled to qualified immunity because the conduct Plaintiff alleges to be retaliatory was not clearly established as actionable during the relevant time period. With respect to part one of the qualified immunity inquiry, Lt. Mears does not contest the proposition that the facts alleged by Plaintiff reveal a constitutional violation. In response, Plaintiff contends that an individual's right to be free from retaliation for union association, free speech, and petitioning the government is clearly established law.

With respect to part one of the qualified immunity inquiry, the Court concludes that the facts alleged by Plaintiff could

19

support a contention of a constitutional violation.  Viewed in
the light most favorable to Plaintiff, Saucier, 533 U.S. at 201,
Cpl. Balas was given a mediocre performance evaluation that
contained falsified criticism, denied an opportunity to discuss
that evaluation with Lt. Mears' supervisor, had his time card
altered, and was constantly monitored and nitpicked in
retaliation for his union membership, symbolic speech (resigning
from CERT) in support of the union job action, and refusal to
cross the picket line.  To be actionable, retaliatory conduct
need only be "sufficient to deter a person of ordinary firmness"
from exercising her free speech rights.  Suppan v. Dadonna, 203
F.3d 228, 235 (3d Cir. 2000).  The Court finds that the facts
alleged by Plaintiff satisfies this low deterrence threshold.
See O'Connor v City of Newark, 440 F.3d 125, 127-28 (3d Cir.
2006).

Turning to part two of this inquiry, the Court concludes
that a reasonable officer in Defendant Mears' position could not
have believed that his actions were constitutionally permissible.
Notably, Defendant Mears testified that he knows it is illegal to
retaliate against an employee who belongs to a union or files a
grievance.  (T. Mears dep. at A715-16.)  Supreme Court case law
clearly established decades ago that the First Amendment
encompasses union membership and activity, and prohibits
retaliation for such activity.  See, e.g., United Transp. Union

20

v. State Bar of Mich., 401 U.S. 576, 578 (1971); Smith v.

Arkansas State Highway Emp., Local 1315, 441 U.S. 463, 464-65

(1979). Similarly, the Third Circuit held that, as of 1982, the

law has been clearly established that a public employee cannot be

retaliated against for exercising First Amendment rights. Bennis

v. Gable, 823 F.2d 723, 733 (3d Cir. 1987). As already

discussed, the retaliatory conduct need only be "sufficient to

deter a person of ordinary firmness" from exercising their free

speech rights. Suppan, 203 F.3d at 235. The Suppan court found

a "campaign of harassment which though trivial in detail may have

been substantial in gross," and which culminated in a lowered

ranking on a promotion list, to be actionable under section 1983.

Id. Under the factual scenario alleged by Plaintiff, and in

light of the clearly established law discussed above, the Court

concludes that a reasonable officer in Defendant Mears's position

could not have believed his actions to be constitutionally

permissible. Accordingly, Defendant Mears is not entitled to

qualified immunity and the Court will deny Defendants' Motion for

Summary Judgment in this respect.

> V. **Whether the Department of Correction is Protected by
> Eleventh Amendment Immunity**

By their Motion, Defendants contend that Plaintiff's claims

against the DOC, an agency of the state of Delaware, are barred

because the Eleventh Amendment provides immunity from such

actions. In response, Plaintiff contends that the DOC is a

21

properly joined defendant for the sole purpose of collecting attorneys' fees and costs.

After reviewing Plaintiff's Complaint and the applicable law, the Court concludes that Plaintiff's joinder of the DOC is impermissible.  "[T]he substantive protections of the Eleventh Amendment do not prevent an award of attorney's fees against the Department's officers in their official capacities." <u>Hutto v. Finney</u>, 437 U.S. 678, 692 (1978).  The Supreme Court has elaborated: "[t]he holding of Hutto, therefore, was ... that the Eleventh Amendment did not apply to an award of attorney's fees ancillary to a grant of prospective relief." <u>Missouri v. Jenkins</u>, 491 U.S. 274, 280 (1989)(citation omitted).  Here, unlike in <u>Hutto</u>, Plaintiff is seeking attorneys' fees directly from a state agency, rather than from state officers in their official capacity.  The sole remaining individual Defendant in this action, Lieutenant Truman Mears, (see *supra*, Discussion § I) is named only in his individual capacity (D.I. 1, ¶10). Moreover, the prospective (or injunctive) relief sought by Plaintiff in her Complaint is no longer applicable, given that Defendant Mears is the only remaining defendant and that the prospective relief sought pertained only to Defendants Taylor, Machtinger, and Deloy.  The Court therefore concludes that Plaintiff's claim against the DOC for attorneys' fees is impermissible, as no claims for prospective relief remain and

22

attorneys' fees against a state are only permitted under the Eleventh Amendment when ancillary to a grant of prospective relief.  <u>See</u> 491 U.S. at 280.  Accordingly, the Court will grant Defendants' Motion for Summary Judgment with respect to Defendant DOC.

## CONCLUSION

For the reasons discussed, the Court concludes as a matter of law that (1) Cpl. Balas's conduct conferred protected status under the First Amendment, (2) Defendant Mears is not entitled to qualified immunity, and (3) the DOC is improperly joined as a defendant and is entitled to summary judgment.  Further, the Court concludes that Defendants' Motion for Summary Judgment should be granted with respect to Taylor, Machtinger, Wilkinson, and Deloy.  For the remaining elements of Plaintiff's public employee retaliation claim, the Court finds that genuine issues of material fact exist, such that summary judgment for either party under Rule 56(c) is inappropriate.  Accordingly, Plaintiff's Motion will be granted in part and denied in part, and Defendants' Motion will be granted in part and denied in part.

An appropriate order will be entered.